1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    )
    )
         Plaintiff    )
      vs    )  18-CR-97
    )
ROSS ROGGIO,    )
    )
         Defendant    )
_____)

TRANSCRIPT EXCERPT OF PROCEEDINGS
*Forfeiture Proceedings (Day 10)*
BEFORE THE HONORABLE ROBERT D. MARIANI
FRIDAY, MAY 19, 2023; 8:45 P.M.
SCRANTON, PENNSYLVANIA

FOR THE GOVERNMENT:
    TODD K. HINKLEY, ESQ.
    Assistant United States Attorney
    Suite 311
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503

    SCOTT A. CLAFFEE, ESQ.
    DOJ-Nsd
    Counterintelligence & Export Control Section
    950 Pennsylvania Avenue NW
    Washington, DC  20530

    PATRICK JASPERSE, ESQ.
    DOJ-Crm
    1301 New York Avenue, NW
    Washington, DC  20530

FOR THE DEFENDANT:
    GINO A. BARTOLAI, JR., ESQ.
    238 William Street
    Pittston, Pennsylvania  18640

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

2

# I N D E X

Witness:

| For the Government: | Direct | Cross |
|---|---|---|
| Thomas O'Donnell (Forfeiture) | 5 | 12 |

# E X H I B I T    I N D E X

| For the Government: | Identified | Admitted |
|---|---|---|
| Exhibit No. F-1 | 10 | 12 |

(The following is an excerpt of the proceedings.)

THE COURT: All right, ladies and gentlemen, in my instructions that I gave you in connection with your deliberations and the verdict that you reached, which I have just published, I also told you there might be one additional issue for your deliberation, and it's now necessary to present you with that additional issue.

After hearing evidence on the additional issue, I will ask you to retire to deliberate as you did before. This second portion of the trial will likely take significantly less time than the proceedings that took place before you entered your first verdict, which I just published.

I should tell you, as we move into the second phase of the trial, you are bound by all of the same instructions that I laid out to you during the first phase and which are, also, written in the final instructions that I have he previously given to each of you. I have discussed all of these instructions in detail already.

Accordingly, I do not believe it is necessary to repeat them now. However, if any of you are, at all, and, in any way, unclear on any of the instructions and how they apply to your conduct, as we move forward, please tell me now.

(No affirmative response.)

Having no response, I'll now turn to the additional matter that you must consider.

You have found Ross Roggio guilty of conspiracy to commit an offense against the United States, violations of the Arms Export Control Act, violation of the International Emergency Economic Powers Act, wire fraud offenses, money laundering offenses, as charged in Counts 3 through 6, 9, 10, 12 through 15, 17 through 19, 21 through 24, 27 through 34 and 36 through 39 of the superseding indictment.

You will now need to consider a further question regarding property that the superseding indictment alleges was subject to forfeiture by Mr. Roggio to the Government.

Forfeiture means that Mr. Roggio would lose any ownership or interest he has or claims to have in the specified property, as a part of the penalty for engaging in criminal activity. After the parties have presented any additional evidence in this case, I will instruct you further on the law, with respect to forfeiture.

In considering whether the property is subject to forfeiture, you should consider the evidence you have already heard and any additional evidence presented by the parties. You should evaluate that evidence and its credibility, as I explained to you earlier in my instructions.

The Government may now present evidence to you on this matter.

MR. HINKLEY: We would call Thomas O'Donnell, Your Honor.

T H O M A S   O' D O N N E L L   IS CALLED, AND HAVING BEEN

5

DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state and spell your name for the record.

THE WITNESS: Thomas O'Donnell. T-H-O-M-A-S, O'-D-O-N-N-E-L-L.

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.    How are you employed, sir?

A.    I'm a Special Agent with the Federal Bureau of Investigation.

Q.    Were you involved in the investigation for which a trial occurred these last two weeks --

A.    Yes.

Q.    -- with Mr. Roggio?

A.    Yes.

Q.    You were here and heard testimony of witnesses during the trial?

A.    I did.

Q.    I've called you as a witness for the forfeiture proceeding. As part of your investigation, did you do the investigation, in regards to potential proceeds of illegal activity alleged to have occurred in this case?

A.    Yes, I have.

Q.    And did you review financial documents related to this investigation?

A.    Yes, I have.

6

Q.   And did you, specifically, review documents from PNC Bank and Wells Fargo Bank?

A.   I have.

Q.   And were you part of a search warrant that was executed at the residence of 143 Indian Spring Drive, Stroudsburg?

A.   Yes.

Q.   As well as another residence that was the corporate headquarters of Roggio Consulting Company and, also, the residence of Mr. Roggio's parents, were you part of that, also?

A.   Yes, I was.

Q.   Were there items seized from those two residences?

A.   We seized numerous items from both residences.

Q.   Were those items listed on the return which was made part of the record in this case?

A.   Yes, they were.

Q.   As part of your investigation, did you or could you determine whether or not the real property located at 143 Indian Spring Drive, Stroudsburg was purchased with proceeds from the illegal activity for which the Defendant had gone to Kurdistan, Iraq?

A.   Yes, we did.

Q.   What was that?

A.   396,000-dollar wire transfer from his PNC account on or about December 17, 2015 to the settlement company, and then Kristy Roggio, his wife, received that property on or about

7

12/20/2015. That money was deposited into his PNC account overseas from a bank in Iraq.

Q.    As part of the investigation, were seizure warrants issued and bank accounts frozen or seized from Wells Fargo, in regards to Roggio Consulting Company LLC?

A.    Yes, there were.

Q.    Would that be Wells Fargo Account No. 2089401166?

A.    1166?

Q.    Yes.

A.    Yes, that was one.

Q.    As well as 2089401158?

A.    That was the other, yes.

Q.    Were there vehicles that were seized, as part of the investigation in this case?

A.    Yes, there were two vehicles seized.

Q.    And do you recall the vehicles, where they were at, when they were seized?

A.    I believe both vehicles were at his parents' house at 116 Turkey Hill Court, which was the corporate headquarters for Roggio Consulting Company.

Q.    And as part of the investigation, were photographs taken of those vehicles?

A.    Yes, we did take photographs of those vehicles.

Q.    And do you recall that one of them was a 2015 BMW model i8?

8

A.    Yes, it was.

Q.    A 2016 McLaren. Is that correct?

A.    I don't believe we seized the McLaren, we returned that. So there were three vehicles that were initially taken, one was returned to the company that owned it, which was the McLaren.

Q.    Do you recall the make and model of the last vehicle?

A.    Mercedes GLK 350, I believe.

Q.    Were those vehicles, from your research of the finances, purchased with proceeds from the project going on in Kurdistan?

A.    Yes, they were.

Q.    Did the investigation discover and seize any Rolex watches?

A.    We seized four Rolex watches.

Q.    Where did you seize those from?

A.    I believe, they were in the bedroom of his parents' house where the Defendant was sleeping or where he slept at night.

Q.    Going through those watches, did they have serial numbers for the watches?

A.    They had both serial numbers and descriptions.

Q.    Was one of those watches a Rolex Oyster Perpetual Cosmograph Daytona?

A.    Yes, it was.

Q.    Serial No. 4H2E2303?

A.    That sounds correct.

Q.    Was another a Rolex Geneve Cellini 18k rose gold?

A.    Yes, it was.

Q.    Serial No. 50525512F28Q1?

A.    Yes.

Q.    A Rolex Oyster Perpetual with Serial No. H42V39543. Is that correct?

A.    Yes, sir.

Q.    Finally, a Daytona mother of pearl and diamond dial with Serial No. 8Q0291C3.

A.    Yes, sir.

Q.    Does that sound familiar?

A.    They do.

Q.    Okay. Were there a number of firearms, also, seized during the investigation?

A.    There were numerous firearms and suppressors or silencers.

Q.    And as part of your investigation, did you undertake to try to discover when, where and how these were purchased?

A.    Yes, we did.

Q.    And as in preparation for today's testimony, did you prepare, yourself, or someone in your office prepare a document which shows the type of firearm, the firearm, serial number and other associated information?

A.    Yes, we created a spread sheet.

Q.    Does the spread sheet, also, include a number of firearms which, through your investigation, determined should not be seized but should be returned to the Defendant or his

10

representative?

A.    Yes, there were a few that should be returned.

        MR. BARTOLAI: Your Honor, may I have a moment?

        THE COURT: Yes.

        MR. HINKLEY: May I approach the witness, Your Honor?

        THE COURT: Yes.

BY MR. HINKLEY:

Q.    I'm showing you what's marked as Government's Exhibit F-1. Is this a document that you had just described?

A.    This is the document we created, yes.

Q.    And the highlighted firearms, are they the firearms which you determined ought to be returned to the Defendant or his representative because these were not purchased with proceeds of the illegal activity?

A.    There are two items that are highlighted that we would intend to seize, and there are comments over to the right that describe when they were purchased and the date range which was consistent with the investigation. That would be Item 21B167.

Q.    Would you describe what that is?

A.    Yes, Item 21B167 is a Tikka T3 .308 Winchester caliber with a Serial No. 059939. And the second item, Item 141B173 is a Ruger .22 caliber long caliber rifle 824-01532, we believe were purchased, transferred or registered in the period of the criminal activity.

Q.    Are there any other items which you would describe as

11

items that should not be forfeited here?

A.    It's highlighted in yellow, but 1B110 is not actually a firearm, I'm not sure it's something similar to that, so that should be returned as noted that way.

Q.    Were there other scopes, sites, bipods, magnifiers and other firearm accessories that were seized during the investigation?

A.    There were.

Q.    And those were listed, were they not, on the search warrant return?

A.    Generally, a lot of the bipods, tripods or the scopes were attached to the weapons, so we tried to identify them with an Alpha designator or another property number. They are on this list, as well.

Q.    Would those other items be items that were purchased with proceeds from the illegal activity?

A.    From reviewing the records, we were able to find some of those items on that list. Generally, you buy a firearm first before you purchase a scope for it.

Q.    Unless it's already scoped?

A.    Unless it's already scoped. So it is our belief that they were purchased at or after that time.

    MR. HINKLEY: No further questions, Your Honor. We do move for admission of Government's Exhibit F-1.

    THE COURT: Any objection?

12

MR. BARTOLAI: No objection.

(At this time Government's Exhibit No.F-1 was admitted into evidence.)

THE COURT: You may cross-examine.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    Good evening.

A.    Good evening.

Q.    Agent O'Donnell, the optics, the scopes, some of the scopes that you indicated were on these rifles, a lot of these scopes are detached bolt-type scopes; right?

A.    They are; many were attached to the weapons.

Q.    They weren't mounted on the weapons, they were attached; is that a fair statement?

A.    I'm not quite sure of the difference, counselor.

Q.    Were they drilled and tapped or were they the type of scopes that you can, you know, quickly mount?

A.    I haven't tried to disassemble them from the rifles, so I wouldn't be confident in answering that.

Q.    With respect to these firearms that you identified as coming from proceeds, you looked at the 4473's relative to those; is that it?

A.    We did ATF 4473's, which is what you use when you purchase or transfer a weapon. For the Federal Government, we looked at receipts from the armory where he purchased numerous weapons,

13

we looked at receipts from Dunkelberger's, we looked at ATF -- when we seize a weapon, we could send off the serial number and description, and ATF, sometimes, returns more information on that. We also gathered information from that, as well.

So there was -- between credit card receipts, transfers, store receipts, we looked at numerous items to determine that list to try and identify when it was purchased, transferred or registered.

Q.   Did you do a similar-type check on the optics?

A.   I don't believe there's a way to do that.

Q.   Well, some of these are -- some of these optics are high-end optics, are they not?

A.   Yes, some of them are.

Q.   And these -- some of these EOTech sites, they have serial numbers on those, as well; right?

A.   Some of those sites have serial numbers.

Q.   Like, for instance, like, for example, on my list 62, I don't know if you have that list available, Item 38B optic EOTech magnifier with long gun, Ruger. I believe it's Ruger SR .556 caliber, Serial No. 59400633.

That serial number that I just read, is that for the rifle or is that for the optic?

A.   On the list I have, the printout is cut out, so I don't have 62. Find another one. Generally, we put the serial number

14

to the left, sir, was the primary weapon or the item listed, and then the serial number to the right would have been the scope.

If you see the item listed as, for example, Item No. 529 scope, that would be the serial number for the scope if it were just to the right of it. I'll find one that identifies it that way, if that's what you would like me to do.

Q.    No, but I notice on my list -- I'm sorry, I might not have it -- our list may not be the same, but the point I'm asking is, a lot of these optics are expensive optics.

A.    They are.

Q.    Like, Trijicon Reflex RX34 and these optic EOTechs holographic, you know, optics -- some of these optics are thousands of dollars; right?

A.    I know some of them are expensive, I don't know if they're a thousand or 500, but some of them are expensive.

Q.    Were you able to identify them as coming from proceeds relative to the proceeds received from the Middle East?

A.    I have looked at some receipts from Dunkelberger's, for example, that showed scopes, but I have not determined where every scope has come from.

MR. BARTOLAI: Nothing further.

MR. HINKLEY: No redirect, Your Honor. Thank you.

THE COURT: With respect to the exhibit you introduced and that was admitted, Government's F-1, is there a copy of that

15

for the Court?

MR. HINKLEY: We will make that for you if you want me to, Your Honor. Unfortunately, I just got that document a moment ago.

THE COURT: I would request that you do so.

MR. HINKLEY: Okay.

THE COURT: Do you have additional witnesses?

MR. HINKLEY: I do not, Your Honor.

THE COURT: Thank you, sir. You can step down.

THE WITNESS: Yes, sir.

MR. BARTOLAI: May I have a moment? We have no evidence, Your Honor.

THE COURT: Very well. In light of that, I'll hear any closing argument counsel wishes to make on the forfeiture issue.

MR. HINKLEY: May it please the Court, Mr. Bartolai, ladies and gentlemen.

It's a fairly simple matter at this point. The standard of proof is not beyond a reasonable doubt, it's just more likely than not that these items were purchased with proceeds from the illegal activity.

We will be sending back that Government's exhibit, which shows the items which they determined were purchased prior to the Defendant's illegal activity, in regards to the firearms type of items.

16

The testimony, through Mr. O'Donnell, as well as, I recall, the testimony during the trial was that Mr. Roggio's only source of income during the time frame was his activity in Kurdistan, and so anything that was bought with money that was gathered as a result of that would be forfeitable, including the marital home, the vehicles that he had in the garage that were seized by the FBI, and those Rolex watches.

So we would ask that the jury return a forfeiture of those items. Thank you.

THE COURT: Mr. Bartolai?

MR. BARTOLAI: Good evening, ladies and gentlemen. So the point is, we know the firearms and all the other items are specifically identified through transfer records, 4473, which are required when you transfer a firearm.

With respect to the scopes, though, there's lot of scopes, there's a lot of optics there that do have serial numbers and are capable of being identified. It's important to know when they were purchased. A lot of those scopes are the type that could be mounted on one rifle then taken off and put on another without drilling into the rifle, without tapping it, they're modern, very expensive scopes.

So we're asking -- we have heard how -- to the extent that they proved the transfer of the firearms and the extensive research they did there, the opposite wasn't done, with respect to these optics and scopes, and we ask you to consider that

17

when you're making your determination. Thank you.

THE COURT: Ladies and gentlemen, I'm going to ask you to, just briefly, return to the jury room for the simple reason that we could not copy and finalize my final instructions to you, of course, until we knew what your verdict was. So we're now in the process of doing that, if you would just indulge us and be somewhat, once more, be patient with us, we should be able to complete this shortly.

So if you would take the jury out, we will get these copies to them very quickly.

(At this time there was a pause in the proceedings.)

(The following discussion took place outside the presence of the jury.)

MR. HINKLEY: Your Honor, just before you came in -- we may be able to have a stipulation and resolve the forfeiture rather than go through the process.

THE COURT: Do you want me to exit the courtroom?

MR. HINKLEY: Could we have about 10 minutes? I think we might be able to do this.

THE COURT: Absolutely.

(At this time a brief recess was taken.)

THE COURT: Counsel, before we go any further, it's my understanding the parties have reached an agreement with respect to items of forfeiture?

MR. HINKLEY: Yes, Your Honor, we have.

18

THE COURT: Are you prepared to state what the agreement is?

MR. HINKLEY: I am, Your Honor.

THE COURT: Please do so.

MR. HINKLEY: Your Honor, the parties agree that the properties listed in the superseding indictment in the forfeiture allegation are forfeitable and the Defendant is agreeing to forfeit those items listed, including;

Real property at 143 Indian Spring Drive, Stroudsburg.

Wells Fargo Account 2089401166.

Wells Fargo Account 2089401158.

A 2015 BMW Model i8, with a VIN as listed.

A 2015 Mercedes GL 350 Bluetec with the VIN as shown in the superseding indictment.

And for what it's worth, the McLaren, which, as I believe what was testified, was turned back in to the finance company.

However, he is agreeing, for whatever interest he has in that, he is forfeiting the 2016 McLaren automobile, as well as the four Rolex watches listed in the superseding indictment.

In regards to Government's Exhibit F-1, he is forfeiting all the property listed in the Government's exhibit, with the following exceptions:

No. 14, which is a long gun Ruger 1022 .22 long rifle caliber.

No. 23, which is a Savage 3401 .222 Remington caliber.

19

No. 24, which is a long gun Remington 870 .12 gauge caliber.

In regards to No. 14, there's, also, Item 76-A, which is a scope, which would go with the gun.

As well as No. 110 listed as a pistol revolver, model unknown, .44 caliber.

I would note that, in regards to all of those firearms, if there are any scopes or accessories with the firearm, they will be returned.

The parties will reduce this stipulation to writing and we will file it with the Court within a week or two.

THE COURT: Mr. Bartolai, on behalf of your client, do you agree to the forfeiture of all of the items that Mr. Hinkley has just identified, with the exceptions of those that he expressly excluded from forfeiture?

MR. BARTOLAI: I do, Your Honor.

THE COURT: Is that correct, Mr. Roggio?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do counsel agree that obviates the necessity of a jury finding, with respect to forfeiture, on any of the items?

MR. HINKLEY: We do, Your Honor.

MR. BARTOLAI: We do, yes.

THE COURT: Very well. Ladies and gentlemen, based on that, you will not need to make a further deliberation, with respect

20

to the forfeiture of the items about which you've just heard.

Because of that, your jury duties are now over. Before you go, I want to, first of all, thank you for your service. It has been a long two weeks. Thank you for your very rapid attention and careful listening. And as you leave, I want you to understand that you do not have to speak to anyone about this case or anything having to do with it, unless I order you to do so, and I'm telling you right now, I am not ordering you to do so.

So with that, you're excused. Thank you very much.

(At this time the jury was excused.)

THE COURT: One final item, if you would please be seated. Very briefly. With respect to the Pre-Sentence Report, I will set the disclosure date for the report to counsel, Mr. Roggio, and counsel for the Government as July 14, 2023. And I am setting the date for sentencing as August 23, 2023 at 2 p.m.

Is there anything else before we adjourn?

MR. BARTOLAI: No, Your Honor.

MR. HINKLEY: What time was that, Your Honor, for the sentencing?

THE COURT: I beg your pardon?

MR. HINKLEY: You said, August 23rd?

THE COURT: 2 p.m.

MR. HINKLEY: Thank you . Nothing further from the Government.

21

THE COURT: Thank you very much.

(At this time the excerpt was concluded.)

22

C E R T I F I C A T E

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.


                              S/Kristin L. Yeager
                              KRISTIN L. YEAGER, RMR,CRR
                              Official Court Reporter


REPORTED BY:

    KRISTIN L. YEAGER, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    P.O. Box 5
    Scranton, Pennsylvania  18501




        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)