THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:18-CR-97 |
| | : | (JUDGE MARIANI) |
| ROSS ROGGIO, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

### I. INTRODUCTION

At Defendant Ross Roggio's April 15, 2024, sentencing, the Court conducted a

hearing concerning his objections to the Presentence Investigation Report ("PSR") (Doc.

350). After considering Defendant's written objections, all relevant documents, and

arguments presented at the hearing, the Court concluded that Defendant's objections were

properly overruled. Because of the extensive oral explication of the Court's consideration of

the objections and reasons for overruling them, here the Court places of record the rationale

provided at sentencing.

Defendant objected to the following paragraphs of the PSR: 5 through 37, 43 and

related paragraphs, 44, 46, 48, 49, 50, 51, 56, 58, 59, 61, 64, 113, 114, 121, 131, and 132.

Under the heading "Factual Objections," Defendant identified paragraphs 5 through 37, the

paragraphs found in the "Offense Conduct" section in the PSR, but he did not provide a

specific objection as to any identified paragraph. (*See* Objections to Presentence Report,

Doc. 351 at 8.[1]) Under the heading "General Objections," Defendant identified paragraphs

50, 51, 56, 58, 59, 61, 64, 113, 114, 121, 131, and 132, but he did not provide a specific

objection as to any identified paragraph. (*See id.*) Thus, paragraphs 43, 44, 46, 48, and 49

were the only paragraphs for which Defendant provided a specific rationale for his objection.

## II. ANALYSIS

### A. Paragraph 43

Paragraph 43 of the PSR provides as follows: "**Base Offense Level**: The guideline

for a violation of 18 U.S.C. § 2340A(a) is USSG §2A4.1. **The base offense level is 32**.

USSG §2A4.1(a)." The Addendum to the PSR explains that pursuant to USSG Appendix A,

a violation of 18 U.S.C. § 2340A could result in the use of several Chapter Two guidelines,

including

- USSG §2A1.1, the guideline for Murder;

- USSG §2A1.2, the guideline for Second Degree Murder;

-  USSG §2A2.1, the guideline for Attempted Murder;

- USSG §2A2.2, the guideline for Aggravated Assault; and

- USSG §2A4.1, the guideline for Kidnapping, Abduction, Unlawful Restraint.

---

[1] Defendant's initial objections are found in the document included in the "Addendum to the Presentence Report" at pages five through nine titled "Objections to Presentence Report." (*See* Doc. 351.) "Defendant's Sentencing Memorandum" (Doc. 359) contains further argument in support of the initial objections. Defendant's Sentencing Memorandum also includes a request for a downward departure pursuant to USSG §2M5.2 (Doc. 359 at 13) which the Court denied at the April 15, 2015, sentencing hearing.

Pursuant to USSG §1B1.2 Application Note 1, "In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute, and the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted. (*See* Addendum to the Presentence Report, Doc. 351 at 1.)

The Probation Office determined that USSG §2A4.1, the guideline for "Kidnapping, Abduction, Unlawful Restraint," is the most appropriate guideline considering the conduct alleged against Mr. Roggio. (Doc. 351 at 2.) The conclusion is based on the assessment that "[a] jury found Ross Roggio guilty of Counts 1 and 2 of the Superseding Indictment which, in part, state 'Roggio directed Kurdish soldiers to abduct the victim, detain the victim at a Kurdish military compound for approximately 39 days, and torture the victim during multiple interrogation sessions led by Roggio.'" (*Id.*)

Defendant objected to the use of the kidnapping guideline, asserting that USSG §2A2.2, the guideline for Aggravated Assault with a base offense level of 14, is most analogous to the crime of Torture that was charged by the Government. (Defendant's Sentencing Memorandum, Doc. 359 at 2-3.)

The Government maintained that the PSR correctly determined that USSG §2A4.1, the kidnapping guideline, is the correct guideline for calculating the offense level related to counts 1 and 2. (Government's Sentencing Memorandum, Doc. 358 at 6.)

The Court agreed with the PSR assessment that USSG §2A4.1 is the appropriate guideline to use based on the offense conduct charged in Counts One and Two. As charged in the Superseding Indictment (Doc. 122), when the victim, Ross Roggio's employee Siim Saar, raised concerns about Mr. Roggio's weapons project, Mr. Roggio directed Kurdish soldiers to abduct Mr. Saar, detain him against his will at a Kurdish military compound for approximately 39 days, and torture him during multiple interrogation sessions led by Mr. Roggio. (Doc. 122 ¶¶ 5, 12-15.)

Defendant primarily relied on two cases to support his contention that the guideline for aggravated assault applies here: *United States v. Mills*, 1 F.3d 414 (6th Cir. 1993), and *Government of the Virgin Islands v. Berry*, 604 F.2d 221 (3d Cir. 1979). The Court reviewed these cases and found they do not provide the suggested support.

Defendant cited *Mills* for the proposition that the Court should base its guideline determination on what the gravamen of the offense is, and Defendant contended that, in this case, the gravamen of the offense for the crime of Torture is assault. (Doc. 359 at 5.) In *Mills*, the question was whether the base offense level of the aggravated assault guideline or the base offense level of the "burglary of other structures" guideline applied in a case where the defendants were convicted of "pharmacy burglary" in violation of 18 U.S.C. § 2118 which has a provision that the sentence can be enhanced if an assault occurred in committing the offense. *Mills*, 1 F.3d at 419. The conduct giving rise to the assault sentencing enhancement in *Mills* occurred **after** the pharmacy burglary when the

4

defendants were attempting to avoid apprehension during a police chase following the burglary and the defendants' vehicle hit the pursuing police officer's vehicle causing the officer serious injuries. 1 F.3d at 417.

The Sixth Circuit decided, in these circumstances, that the "burglary of other structures" guideline was appropriate, commenting that, "[i]f an assault takes place in a drugstore, the use of the aggravated assault guideline would be more appropriate. The government could then rely upon the jurisdictional provision in § 2118(b)(3) [addressing when "another person was killed or suffered significant bodily injury as a result of such taking or attempt."], as well as charging the sentence enhancement in § 2118(c)(1)." 1 F.3d at 421-422. The circuit court held that the district court committed error in opting for the aggravated assault guideline, USSG §2A2.2, because the government could not charge the conduct which caused the injury under 2118(b)(3) or charge the sentence enhancement under 2118(c)(1). *Mills*, 1 F.3d at 422.

The Court concluded that *Mills* is not applicable here. *Mills* is readily distinguishable in that here Siim Saar was abducted **before** the torture, he was tortured numerous times **during** his unlawful detention, and he was detained for an extended period of time. In these circumstances, the abduction and unlawful restraint are interwoven with the repeated torture to which Siim Saar was subjected and the decision in *Mills* is of no persuasive value.

Based on his assertion that "statutory interpretation requires an examination of the crime of Kidnapping as it relates to the facts and circumstances of the instant case,"

Defendant cited *Government of the Virgin Islands v. Berry* to support his conclusion that the elements of the crime of Kidnapping are missing and, therefore, the kidnapping guideline range is not applicable. (Doc. 359 at 8.) The Court concluded that *Berry* does not support the application of the aggravated assault guideline for several reasons.

In *Berry*, the Third Circuit Court considered the proper interpretation of the Virgin Islands kidnapping statute at issue, contrasting the traditional rule

> that any asportation i. e., carrying away of the victim, no matter how short in distance or duration, was sufficient to establish the crime of kidnapping . . . with the modern approach [which] is to construe the kidnapping statutes so as to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal.

604 F.2d at 225, 226-227. In following the modern approach, the Circuit Court recognized that "[t]he principal danger of overzealous enforcement of kidnapping statutes is that persons who have committed such substantive crimes as robbery or assault which inherently involve the temporary detention or seizure of the victim will suffer the far greater penalties prescribed by the kidnapping statutes." 604 F.2d at 226.

*Berry* identified four factors to be considered by the court when determining whether a defendant was properly charged with kidnapping.

> (1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Berry*, 604 F.2d at 226-27.

Defendant contended that the *Berry* factors weighed in favor of applying the aggravated assault guideline because the elements of the crime of Kidnapping are missing and, therefore, the kidnapping guideline range is not applicable. (Doc. 359 at 8.) Considering the factors themselves and the cases from which the Circuit Court derived the factors, 604 F.2d at 227, the Court disagreed.

Applying the first factor, "the duration of the detention or asportation," courts consider whether "the victim is isolated for a substantial period, or is carried away a substantial distance." 604 F.2d at 227 (citing Model Penal Code § 212.1; *People v. Caudillo*, 21 Cal. 3d 562, 146 Cal. Rptr. 859, 580 P.2d 274 (1978); *Wright v. State*, 94 Nev. 415, 581 P.2d 442 (1978)). Defendant did not specifically address this factor. (*See* Doc. 359 at 8.) However, considered under Defendant's general assertion that all *Berry* factors weigh in his favor (*see id.*), the Court concluded that the first factor did not because the conduct charged in Count One for Conspiracy to Commit Torture and Count Two for Torture of which Defendant was convicted includes that, at Ross Roggio's direction, Siim Saar was abducted from his apartment, taken to a Kurdish military compound, and detained at the compound for thirty-nine days during which time he was subjected to torture numerous times. (Doc. 122 ¶¶ 5-19.)

Considering the second factor, the question of "whether the detention or asportation occurred during the commission of a separate offense," the Court rejected Defendant's conclusion that this factor weighed in favor of applying the aggravated assault guideline

(Doc. 359 at 8). Although Defendant contended that Siim Saar's detention occurred during the offense of Torture (*id.*), the conduct charged in Counts One and Two of the Superseding Indictment and Defendant's conviction on these counts shows otherwise. While Siim Saar was unlawfully detained during the torture sessions, Defendant's assessment was not consistent with the facts of the case, which show that the abduction occurred two days before the first interrogation/torture session and Mr. Roggio continuously unlawfully detained Mr. Saar from his abduction on October 14, 2015, until his release approximately thirty-nine days later, Mr. Roggio having directed and/or directly participated in approximately ten torture sessions in that period of time. On these facts, the unlawful detention did not only occur **during** the commission of the separate offense of Torture and the Court found that this factor did not weigh in favor of applying the aggravated assault guideline.

Applying the third factor, the question of "whether the detention or asportation which occurred is inherent in the separate offense," the Court again rejected Defendant's conclusion that this factor weighed in favor of applying the aggravated assault guideline (Doc. 359 at 8). The Court found that Defendant's assertion that "an element of Torture requires the victim to be in the control or custody of the defendant and it is therefore 'inherent' in the separate offense of Torture" (*id.*) ignored crucial facts in this case and told only part of the story. While Torture, as defined in 18 U.S.C. § 2340(1), requires as an element that the defendant have custody or physical control over the victim, Mr. Roggio's

unlawful detention of Siim Saar for 39 days went far beyond what was inherent in the ten

torture sessions during that period. For the reasons found in applying the second factor, the

Court concluded that Mr. Roggio's sustained unlawful detention of Mr. Saar could not

merely be seen as inherent in or subsumed in his torture of Mr. Saar and, therefore, this

factor did not weigh in favor of applying the aggravated assault guideline.

Applying the fourth factor, the question of "whether the asportation or detention

created a significant danger to the victim independent of that posed by the separate

offense," the Court disagreed with Defendant's conclusion that this factor weighed in favor

of applying the aggravated assault guideline (Doc. 359 at 8). Defendant contended that the

detention "did not create a significant danger to the victim independent of that posed by the

separate offense . . . [because] he was not detained in inhumane conditions and the

detention itself did not form the basis for the government's allegations of severe physical or

mental pain." (*Id*.) Contrary to this conclusion, the Court found that Mr. Saar's detention

created a significant danger independent of that posed by the torture sessions: anything

could have happened to him at any moment when he was detained on a military base in

Kurdistan with Mr. Roggio controlling his detention and torture; there could be serious

mental and physical effects related to the fact of detention and the conditions of

confinement; and harm inflicted during a torture session could be exacerbated by a lack of

treatment during his detention.

Because all *Berry* factors weighed against Defendant's position, the Court concluded that *Berry* did not support Defendant's conclusion that the kidnapping guideline range is inapplicable in this case.

Further, the Court found that the case of *United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010), was of special significance in that it addresses the issue of whether the defendant, Roy M. Belfast, Jr., who had been convicted of committing numerous acts of torture pursuant the Torture Act, 18 U.S.C. § 2340-2340A, had been properly sentenced by the district court which used the kidnapping guideline to calculate his sentence, 611 F.3d at 824-26. Mr. Belfast was the first individual to be prosecuted under the Torture Act and the only person to be convicted under the Torture act before Mr. Roggio's conviction. *See* 611 F.3d at 793. Mr. Belfast had tortured his victims over extended periods of time after first having them seized and imprisoned and argued on appeal that the district court should have used the aggravated assault guideline, § 2A2.2, to calculate his sentence. 611 F.3d at 801, 825. The Eleventh Circuit found that the district court had not erred in determining that USSG §2A4.1, the kidnapping guideline, was the most appropriate guideline for the offense conduct, providing the following explanation for its decision:

> Torture requires, as an element, that the defendant have custody or physical control over the victim. 18 U.S.C. § 2340(1). Kidnapping is one method of obtaining and maintaining custody or physical control over another.… This charged seizure and detention of his victims enabled and facilitated [defendant]'s acts of torture, thus the application of the kidnapping guideline, which itself recognizes that kidnapping can occur "during the commission of, or in connection with, another offense," was entirely proper. U.S.S.G. § 2A4.1(b)(7). Indeed, the kidnapping guideline is particularly appropriate in

cases of torture, such as this case, where there are repeated, severe physical assaults, and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse.

The kidnapping guideline takes into account the gravity of the victim's injuries, whether a dangerous weapon was used, the length of the unlawful detention, and whether the victim was sexually exploited or killed – all of which are circumstances relevant to determining the proper degree of punishment for [defendant]'s crimes, and none of which are considered under the other applicable guidelines for Torture Act convictions.

*Belfast*, 611 F.3d at 825.

Because Defendant provided no sound basis to apply the aggravated assault guideline rather than the kidnapping guideline and because the facts of this case and the reasoning of *Belfast* indicated the kidnapping guideline is appropriately applied here, the Court overruled Defendant's objection to the application of the kidnapping guideline, USSG §2A4.1, and base offense level of 32.

In making this determination, the Court recognized that Defendant had argued that the proper application of guidelines at sentencing is generally determined under the preponderance of the evidence standard but, in a case where there is a significant increase in the base offense level, as is the case here between the aggravated assault guideline and the kidnapping guideline, the burden of proof should be clear and convincing evidence. (*See* Defendant's Sentencing Memorandum, Doc. 359 at 3-4.) Without deciding the merits of the argument, the Court found that the conclusion that USSG §2A4.1 was the appropriate guideline for determining the base offense level in this case would be supported by the higher standard of clear and convincing evidence were it to be applied.

B. **Paragraph 44**

Paragraph 44 of the PSR provides as follows: "**Specific Offense Characteristics**:

Two levels are added because the victim sustained serious bodily injury. USSG

§2A4.1(b)(2)(B)." "Serious Bodily Injury" is defined in the Commentary to USSG §1B1.1 as

"injury involving extreme physical pain or the protracted impairment of a function of a bodily

member, organ, or mental faculty; or requiring medical intervention such as surgery,

hospitalization, or physical rehabilitation."

The two-level enhancement was applied based on the assessment that

each act of torture imposed upon Siim Saar constituted "serious bodily injury"

because, at bare minimum, they caused "extreme physical pain." (Doc. 351 at 2.)

After summarizing the acts of torture supported by the record, the PSR concludes

that "[i]n all likelihood, Siim Saar's injuries would have required hospitalization if

available to him." (*Id.*)

Defendant objected to this enhancement on the basis that "the evidence elicited at

trial did not prove 'extreme' physical pain." (Doc. 359 at 9.) He also asserted that USSG §

1B1.1 requires that an injury must be present that causes the extreme pain and the

Government did not prove an injury. (*Id.* at 9-10.)

The Government maintained that the two-level enhancement was justified by the

evidence. (Doc. 358 at 11.) The Government identifies the following acts of torture:

> The victim testified that he was struck and tased repeatedly in particularly
> sensitive areas of his body, such as his nose, throat and groin; the soldiers

acting under Roggio's direction hit him so hard that he was knocked down repeatedly; the beatings with plastic pipes caused intense pain; and he was unable to breathe, thought he was going to die, and passed out while being suffocated with a plastic bag (multiple times) and, when Roggio wrapped his belt around the victim's neck and lifted the victim off the ground (once).

(Doc. 358 at 10-11 (citing PSR ¶ 22).)

Notably, Defendant did not attempt to support his conclusions that actions taken against Siim Saar during torture sessions did not cause Mr. Saar "extreme pain" or bodily injury. The Court concluded that any attempt to do so would have failed. The torture identified by the Government is supported by the record. Further, evidence at trial showed that others employed by Mr. Roggio were brought to the military base and, when outside the room where Mr. Saar was being tortured, they could hear him screaming. (PSR ¶ 24.) Mr. Roggio could not credibly argue that being struck and tased repeatedly in particularly sensitive areas of the body, such as the nose, throat and groin, would not cause extreme pain.[2]  Mr. Roggio could not credibly argue that being hit hard enough to be knocked down repeatedly and being beaten with plastic pipes would not cause injury and extreme pain. Mr. Roggio could not credibly argue that Siim Saar's twitching and lack of feeling in his hands as well as coughing up blood (see PSR ¶ 25) are not specific signs of injury.

---

[2] In the context of the 18 U.S.C. § 3553(a) sentencing factors, Defendant asserts in his Supplemental Sentencing Memorandum that "Mr. Roggio denies the severity of the assaults that occurred against Mr. Saar. The 'taser' that was used was not the type of taser we are familiar with and it contained very little force." (Doc. 360 at 6-7.) Mr. Roggio's assertion that the taser "contained very little force" is not a fact of record and there is no basis to infer that the pain resulting from being tased in sensitive areas would not have been extreme.

Based on the credible evidence presented at trial, the Court concluded that Defendant's assertion that "the evidence elicited at trial did not prove 'extreme' physical pain" (Doc. 359 at 9) was without merit in that it ignored the severity of the torture tactics directed and employed by Mr. Roggio. The Court also concluded that Defendant's assertion that the injury requirement of USSG § 1B1.1 had not been satisfied (*id.* at 9-10) was without merit in that it ignores the facts of the case which can support no conclusion other than that bodily injury occurred in the course of torture sessions which lasted up to six hours and where soldiers employed the torture tactics directed by Mr. Roggio. For these reasons, Defendant's objection to the two-level enhancement for serious bodily injury in paragraph 44 was overruled.

## C. Paragraph 46

Paragraph 46 of the PSR provides as follows: "**Specific Offense Characteristics**: Two levels are added because the victim was not released before thirty days had elapsed. USSG §2A4.1(b)(4)(A)." The two-level enhancement was applied based on the following assessment: USSG §2A4.1(b)(4)(A) states "If the victim was not released before thirty days had elapsed, increase by two levels." Ross Roggio does not appear to dispute that Siim Saar was detained for more than 30 days." (Doc. 351 at 2.)

Defendant maintained that the USSG §2A4.1(b)(4)(A) enhancement is inapplicable because use of the kidnapping guideline, USSG §2A4.1(a) in paragraph 43 is not warranted. (Doc. 351 at 6; Doc. 359 at 10.) Defendant alternatively asserted that evidence

14

at trial showed that Siim Saar was detained lawfully by a foreign government and/or military and Defendant did not have the ability or authority to detain Mr. Saar. (Doc. 359 at 10.)

Contrary to Defendant's assertion that Siim Saar was lawfully detained by a foreign government or military, the Government stated that "[w]ith the exception of Roggio's testimony, all of the evidence at trial indicated that the victim was abducted and detained at Roggio's behest." (Doc. 358 at 11.)

Based on the Court's conclusion previous conclusion that the kidnapping guideline was properly applied to determine the base offense level in paragraph 43, Defendant's argument regarding the impropriety of the kidnapping guideline enhancement in paragraph 46 was found to be without merit. Further, no evidence at trial suggested that Siim Saar was lawfully detained. Rather, credible evidence presented at trial indicated otherwise. As noted by the Government "[a]n Iraqi judge provided expert testimony that what happened to the victim was not permitted by the laws of Iraq." (Doc. 358 at 11.) Because Defendant had presented no sound basis to find the §2A4.1(b)(4)(A) enhancement inapplicable, the Court overruled Defendant's objection to paragraph 46.

**D**. *Paragraph* **48**

Paragraph 48 of the PSR provides as follows: "**Adjustment for Role in the Offense**: The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added. USSG §3B1.1(a)." The four-level enhancement was applied because, even if the Court were to find that the

criminal activity did not involve five or more participants, the activity was "otherwise extensive" based on *U.S. v. Helbling*, 209 F.3d 226 (3rd Cir. 2000), where the Third Circuit Court of Appeals adopted a three-step test to determine whether a criminal activity was "otherwise extensive." The PSR states that the application of three-step process in *U.S. v. Helbling* and the defendant's use of Kurdish soldiers clearly demonstrates that the Torture convictions were "otherwise extensive." (Doc. 351 at 3.)

Defendant objected to the four-level enhancement on two grounds. First, Mr. Roggio contended that he was not the leader or organizer of criminal activity, that Siim Saar was lawfully detained, and that he had no authority to issue the order of detention. (Doc. 351 at 7.) Second, Mr. Roggio contended that the criminal activity did not involve five or more participants as required by USSG §3B1.1(a) in that the Kurdish soldiers do not meet the definition of "participant" which, in this case, requires that the individual satisfy the torture statute's requirement of being a national of the United States or being present in the United States. (Doc. 359 at 12-13.) In support of his second assertion, Defendant specifically asserted that

> the elements of the statutory crime of Torture require that the individual be a United States national or present in the United States at the time of the offense. 18 U.S.C. §2340A(b)(1-2). The individuals identified as "participants" for this enhancement are soldiers of a foreign military. They are not United States nationals and the offense did not take place in the United States. As such, none of the "participants" have met all of the elements of the statutory crime with the requisite mens rea.

(Doc. 359 at 11.)

The Government responded that Defendant's assertions that he was not the leader or organizer of criminal activity and Siim Saar was lawfully detained ignore the trial evidence and verdict that he was responsible for ordering and leading Siim Saar's torture. (Doc. 358 at 12.) As to Defendant's argument regarding the elements of torture, the Government stated that the requirements in 18 U.S.C. § 2340A(b)(1-2) that the alleged offender be a national of the United States or present in the United States is jurisdictional and not an element of torture. (Doc. 358 at 12.)

The Court rejected Defendant's argument (1) that he was not the leader or organizer of criminal activity, (2) that Siim Saar was lawfully detained and (3) that Defendant had no authority to issue the order of detention for reasons discussed previously. The Court found that the evidence and verdict clearly demonstrated that Ross Roggio had the authority to direct and did direct Kurdish soldiers to abduct and detain Mr. Saar and directed Kurdish soldiers, acting under color of law, to torture Mr. Saar on numerous occasions.

The Court construed the second aspect of Defendant's objection asserting that the Kurdish soldiers do not satisfy the elements of the Torture statute to be an argument that the criminal activity did not involve five or more participants **and** the criminal activity was not otherwise extensive as required under USSG §3B1.1(a). To decide whether the four-level adjustment applies in the circumstances of this case, the Court considered the meaning of "participant" and the meaning of "otherwise extensive" criminal activity as used in §3B1.1(a).

According to USSG §3B1.1, Application Note 1, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." The Third Circuit Court of Appeals has provided further guidance on the issue of who is a participant. As stated in In *United States v. Helbling*, 209 F.3d at 248, "[t]he defendant may be considered as one of the participants." As stated in *United States v. Tai*, 750 F.3d 309, 318 (3d Cir. 2014), and *United States v. Badaracco*, 954 F.2d 928, 934-35 (3d Cir. 1992), to be criminally responsible for the commission of the offense, the individual "must have committed all the elements of a statutory crime with the requisite *mens rea*."

The Court found that Defendant's conclusion that Kurdish soldiers could not be "participants" was flawed because Defendant misread the Torture statute at issue. The Torture statute, 18 U.S.C. § 2340A has two components: "Offense" is addressed under § 2340A(a) and "Jurisdiction" is addressed under § 2340A(b). The "offense" addressed in § 2340A(a) applies to "[w]hoever **outside** the United States commits or attempts to commit torture . . . ." 18 U.S.C.A. § 2340A(a) (emphasis added). The jurisdictional component Section 2340A(b) provides as follows:

There is jurisdiction over the activity prohibited in subsection (a) if—

**(1)** the alleged offender is a national of the United States; or

**(2)** the alleged offender is present in the United States, irrespective of the nationality of the   victim or alleged offender.

18 U.S.C. § 2340A(b).

The Court specifically found that Defendant's position that an element of the crime of torture requires that the alleged offender be either a national of the United States or that the offense take place **in** the United States was an incorrect interpretation of the statute. 18 U.S.C. § 2340A(a) expressly applies **only** to torture **outside** the United States. Further, because subsection (b) of § 2340A defines jurisdiction over "the activity prohibited in subsection(a)," 18 U.S.C. § 2340A(a) is the source for discerning whether the individual is "criminally responsible, i.e, that [he] must have committed all of the elements of the statutory crime [of torture] with the requisite *mens rea*," *see Tai*, 750 F.3d at 318. Because the location of the alleged offender in the Torture statute is jurisdictional and the statute requires that the offense be committed "outside the United States," Defendant's argument that Kurdish soldiers could not be participants in Ross Roggio's criminal activity was found to be entirely without merit.

On the contrary, the Court concluded that the soldiers who participated in the torture of Siim Saar meet the definition of "participant" for purposes of applying the four-level enhancement. As defined in 18 U.S.C. § 2340(1) "'torture' means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." Evidence shows that the soldiers who tortured Siim Saar were acting under color of law, they intended to inflict severe physical or mental pain, the infliction of pain was not incidental to lawful sanctions, Mr. Saar was in the

custody and physical control of Mr. Roggio and the soldiers, and the torture took place outside the United States.

The Court then explained that, while it was clear that more than one soldier participated in the torture of Siim Saar and those who did so were "participants" in the criminal activity led by Ross Roggio because they meet all the elements of the statutory offense of Torture, the precise number of soldiers who tortured Siim Saar was uncertain. Other than the soldier referred to as "Goran," soldiers who were directed by Ross Roggio to torture Siim Saar are not identified by name. Because the record shows that more than four soldiers were present at the compound during the period of Saar's abduction, the Court that the five-participant aspect of USSG §3B1.1(a) was satisfied. However, in an abundance of caution, the Court proceeded with the analysis of whether the four-level enhancement applied under the "otherwise extensive" prong of USSG §3B1.1(a).

To determine whether the four-level enhancement was applicable under the "otherwise extensive" prong, the Court first assessed the individuals involved under the three-step inquiry adopted in *United States v. Helbling*:

> a sentencing court must first separate out the "participants" as defined by Application Note 1 from other individuals, non-participants, who were involved in the criminal activity. . . . The court must next determine whether the defendant used each non-participants' services with specific criminal intent. . . . Third, the court must determine the extent to which the services of each individual non-participant were peculiar and necessary to the criminal scheme.

*Helbling*, 209  F.3d at 247-48 (citing *United States v. Carrozzella*, 105 F.3d 796, 804 (2d Cir. 1997); *United States v. Colletti*, 984 F.2d 1339, 1346 (3d Cir. 1992)). *Helbling* added that, in

determining what non-participants should be counted, individuals used by the defendant to

legitimize, facilitate or hide the criminal activity should be included. *Helbling*, 209 F.3d at

248 (citing *United States v. Napoli,* 179 F.3d 1, 15 (2d Cir.1999), and *United States v.*

*Nolan*, 136 F.3d 265, 273 (2d Cir.1998)). *Helbling* further requires that, after the court

decides which individuals may be counted,

> the court must then consider whether the sum of the participants and countable
> non-participants is the "functional equivalent" of five participants. . . . [A]t a
> minimum, a criminal scheme must involve more than one participant in order
> to be found otherwise extensive; there can be no less than the defendant and
> one participant the defendant led or organized.

209 F.3d at 248.

Applying the required inquiry to the facts of this case, the Court found that all factors

weighed in favor of finding the four-level enhancement applicable.

First, separating out the "participants" as defined by Application Note 1 from other

individuals, non-participants, who were involved in the criminal activity, the Court concluded

that there were at least three participants. Record evidence consistently refers to "soldiers"

in the plural when describing the torture inflicted on Mr. Saar. (*See, e.g.*, PSR ¶ 22.) This

means there was a minimum of two soldiers and Ross Roggio who were participants in the

torture of Mr. Saar for a total of three "participants" in the criminal activity.

In addition to general references to soldiers at the military compound, the record

specifically indicates that four armed Kurdish soldiers forced their way into Mr. Saar's

apartment, assaulted him, abducted him, and took him to the military base where the torture

took place. (*See* PSR ¶ 21.)  Assuming for the purpose of this analysis that none of the soldiers who abducted Mr. Saar also tortured him, the four soldiers who abducted Mr. Saar were involved in the criminal activity. Therefore, the Court found there was a minimum of four non-participants.

Second, considering whether Ross Roggio used each of the non-participants' services with specific criminal intent, the Court concluded that he did so. Mr. Roggio did not have the lawful authority to order Siim Saar's abduction and detention.

Third, considering whether the services of the non-participants were necessary to the criminal scheme, the Court concluded that the soldiers' abduction and detention of Mr. Saar satisfied this factor. For Mr. Roggio to conduct the criminal activity of Torture, he first had to gain custody and control of Mr. Saar and this was accomplished through the four soldiers' abduction and detention of Mr. Saar.

Because the four non-participants who abducted Mr. Saar facilitated the criminal activity of Torture, the Court concluded that they must be counted. Therefore, the Court further concluded that the sum of the participants (a minimum of three) and countable non-participants (a minimum of four) is the "functional equivalent" of at least five participants and Ross Roggio's role in the criminal activity satisfied the requirements of the four-level enhancement applied in paragraph 48 under the "otherwise extension" prong.[3]

---

[3] Because the four soldiers who abducted Siim Saar are at least non-participants, should any of them have taken part in the torture of Mr. Saar the individual's status would change from non-participant to participant but the total number of participants and non-participants would necessarily reach five when counted with Defendant.

Based on the Court's conclusion that Ross Roggio was "the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," USSG §3B1.1(a), the Court concluded that the four-level enhancement was applicable and overrruled Defendant's objection to paragraph 48.

## E. Paragraph 49

Paragraph 49 of the PSR provides as follows:

**Adjustment for Obstruction of Justice**: By lying to authorities during the investigation, and under oath at trial, the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels are added. USSG §3C1.1.

(PSR ¶ 49.) The two-level enhancement was applied based on conduct alleged in paragraphs 34 and 36 of the PSR. (Doc. 351 at 3.) Paragraph 34 states that Ross Roggio lied to investigators during the investigation on at least three occasions as follows:

• On or about April 29, 2016, Ross Roggio told FBI agents that he had not shipped any gun parts or tools for guns to Iraq during a telephonic interview while Ross Roggio was in Kurdistan and agents were at Ross Roggio's home in Stroudsburg, Pennsylvania;

• On or about February 26, 2017, during a secondary inspection at John F. Kennedy Airport, New York, New York, Ross Roggio gave U.S. Customs and Border Protection Officers a false cover story about having been in Iraq to oversee the construction of residential buildings; and

• On or about May 10, 2017, during execution of a search warrant at his residence, Ross Roggio told Homeland Security agents that he had been working for the CIA in Kurdistan from 2014 to 2016.

(PSR ¶ 34.) Paragraph 36 of the PSR states that "Ross Roggio's false statements to agents and his extensive, elaborate trial testimony reflected a willful attempt to obstruct or impede, the administration of justice. USSG §3C1.1 Application Notes 4(B) and (G)."

The PSR explained that Application Notes 4(B) and (G) state that committing perjury and providing a materially false statement to law enforcement that significantly obstructed or impeded the official investigation are factors to consider when applying the enhancement. Further, the defendant continued to lie to the probation officer and the Court by claiming that Siim Saar was lawfully detained. (Doc. 351 at 3 (listing Third Circuit cases involving the enhancement for Obstruction of Justice and Lying under oath).)

In support of his objection to paragraph 49, Mr. Roggio contended that lying to authorities during an investigation does not meet the elements necessary for this enhancement. Mr. Roggio further contended that he was not under oath during the investigation and was not sworn to tell the truth, he did not make untruthful statements during the investigation, he did not lie at trial, and he should not be punished for asserting his constitutional right to defend himself and offer evidence at trial. (Doc. 351 at 8; Doc. 359 at 12-13.)

The Government maintained that the obstruction enhancement does not apply only when a defendant obstructs justice under oath and it applies when materially false

statements are made to law enforcement. (Doc. 358 at 13 (citing *United States v. LaCroix*, 69 F. App'x 566, 569 (3d Cir. 2003); *United States v. Kim*, 27 F.3d 947, 958-61 (3d Cir. 1994)).) Regarding Defendant's argument about his trial testimony, the Government asserted that "the Supreme Court has held "on a number of occasions that a defendant's right to testify does not include a right to commit perjury." (Doc. 358 at 13 (citing *United States v. Dunnigan*, 507 U.S. 87, 96 (1993)).) The Government refuted Defendant's assertion that the "verdict does not lead to a conclusion that the Defendant lied under oath," pointing to the fact that Mr. Roggio testified that he acted under duress, the jury received an instruction that it must find Mr. Roggio not guilty if it found that he was acting under duress, and the jury found Mr. Roggio guilty. (Doc. 358 at 14 (quoting Doc. 351 at 8; citing Doc. 267 at 18.)

First, the Court found Defendant's statement that he was not under oath during the investigation irrelevant pursuant to *United States v. LaCroix*, 69 F. App'x at 569, and *United States v. Kim*, 27 F.3d at 958-61, both of which found the obstruction enhancement applicable where the defendant was not under oath.

Second, the Court found that Defendant's assertion that he did not make untruthful statements during the investigation specifically as to the shipping of gun parts is contradicted by evidence presented at trial and the jury's verdict, both of which demonstrate that Mr. Roggio shipped gun parts to Iraq. Defendant was found guilty of Count Four of the Superseding Indictment which charged him with unlawfully exporting M4 Bolt Gas Rings

and Firing Pin Retainers and Count Five of the Superseding Indictment which charged him

with unlawfully exporting rifling combo buttons. (*See* Doc. 317 at 37, 40; Doc. 319 at 2.)

Because "a guilty verdict binds the sentencing court to accept the facts necessarily implicit

in the verdict," Mr. Roggio's statement that he did not ship gun parts cannot be accepted as

truthful. *See United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996).

Third, the Court found that, although Defendant denies lying under oath at trial, he

testified that he acted under duress, the jury received an instruction that it must find him not

guilty if it found that he was acting under duress, and the jury found him guilty. The Court

then determined that because, as stated in *Boggi,* the Court is bound to accept the facts

necessarily implicit in the verdict, Mr. Roggio perjured himself when he said that he acted

under duress.

For the foregoing reasons, the Court concluded that Defendant had presented no

valid basis to find the USSG §3C1.1 Obstruction of Justice two-level enhancement

inapplicable and overruled Defendant's objection to paragraph 49.

## F. General Objections

Under the heading "General Objections," Defendant identified paragraphs 50, 51, 56,

58, 59, 61, 64, 113, 114, 121, 131, and 132, but he did not provide a specific objection as to

any identified paragraph. (*See* Doc. 351 at 8.) Rather, Defendant stated that his objection to

these paragraphs was "[c]onsistent with" with his objections to paragraphs 43, 44, 46, 48,

and 49.  Because the Court concluded that Defendant's objections to paragraphs 43, 44, 46, 48, and 49 were properly overruled, his "General Objections" were also overruled.

## G. Factual Objections

Under the heading "Factual Objections," Defendant identified paragraphs 5 through 37, the paragraphs found under the "Offense Conduct" heading in the PSR. (*See* Doc. 351 at 8.) Mr. Roggio stated that because he "maintains his innocence . . . , [he] disagrees with the facts provided." (*Id.*) The Court concluded that Defendant's objections had no impact on how the Guidelines sentence is calculated and, therefore, overruled the objections.

### III. CONCLUSION

For the foregoing reasons, Defendant's objections to the PSR were overruled. A separate Order will be entered.

Robert D. Mariani
United States District Judge