**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
UNITED STATES OF AMERICA,     )
                              )
             Plaintiff        )
        vs                    )    18-CR-97
                              )
ROSS ROGGIO,                  )
                              )
             Defendant        )
_____)
```

TRANSCRIPT OF PROCEEDINGS
Jury Selection/Trial - Day One
BEFORE THE HONORABLE ROBERT D. MARIANI
MONDAY, MAY 8, 2023; 9:30 A.M.
SCRANTON, PENNSYLVANIA

FOR THE GOVERNMENT:
    TODD K. HINKLEY, ESQ.
    Assistant United States Attorney
    Suite 311
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503

    SCOTT A. CLAFFEE, ESQ.
    DOJ-Nsd
    Counterintelligence & Export Control Section
    950 Pennsylvania Avenue NW
    Washington, DC  20530

    PATRICK JASPERSE, ESQ.
    DOJ-Crm
    1301 New York Avenue, NW
    Washington, DC  20530

FOR THE DEFENDANT:
    GINO A. BARTOLAI, JR., ESQ.
    238 William Street
    Pittston, Pennsylvania  18640

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

2

THE COURT: Good morning, everyone. I'm Judge Robert Mariani, I'm the Trial Judge assigned in this case. You've been called to this courtroom as a panel of prospective jurors for the case of United States v. Ross Roggio.

Now, this is a criminal case in which the Defendant Mr. Roggio is charged with the following offenses in violation of Federal criminal law:

1. Criminal conspiracy to commit torture.

2. Torture.

3. Conspiracy to commit an offense against the United States.

4. Violations of the Arms Export Control Act.

5. Violation of the International Emergency Economic Powers Act.

6. Smuggling goods from the United States.

7. Wire fraud.

8. Money laundering.

From this panel, we will select the jurors who will sit on this jury that will decide this case. We will also select alternate jurors who will be part of the trial and available in the event that one or more of the regular jurors becomes ill or is otherwise unable to continue on the jury.

As I think you all know, we rely on juries in this country to decide cases that are tried in our courts, so service on a jury is truly an important duty of citizenship, and jurors must

accordingly conduct themselves with honesty, integrity and fairness.

Under our system of justice, the role of the jury is to find the facts of the case based on the evidence presented in trial. That is, from the evidence that is seen and heard in court, the jury decides what the facts are and then applies the law that I will give in my instructions to the jury to those facts.

My role as Trial Judge is to make whatever legal decisions must be made during the trial and to explain to the jury the key principles that will guide their decisions.

In a few minutes, you'll be sworn to answer truthfully questions about your qualifications to act as jurors in this case. The questioning process is called voir dire. I will conduct the questioning. It is, as I'm sure you understand, essential that you answer these questions truthfully. A deliberately untruthful answer could result in severe penalties.

The voir dire examination will begin with a brief statement about the particulars of the case. The purpose of this statement is to tell you what the case is about and to identify the parties and their lawyers. Questions will then be asked to find out whether any of you have any personal interest in this case or know of any reason why you cannot render a fair and impartial verdict.

We want to know whether you are related to or personally acquainted with any of the parties, lawyers or any of the witnesses who may appear during the trial and whether you already know anything about this case. Other questions will be asked to determine whether any of you have any beliefs, feelings, life experiences or any other reasons that might influence you in rendering a verdict.

Now, there may be periods of silence during the voir dire process. During these times, you may talk among yourselves but you must not talk about the case or talk about the voir dire questions or the answers that are given.

When this questioning is completed, some of you will be chosen to sit on the jury for this case. In choosing a jury, the parties on either side may ask that a member of the panel be excused or exempted from service on the jury. When this happens, these are called challenges.

First, a prospective juror may be challenged for cause if the voir dire examination shows that he or she might be prejudiced or otherwise unable to render a fair and impartial verdict in this case. I will excuse a prospective juror if I decide that there is sufficient cause for the challenge. You should understand there is no limit to the number of challenges for cause.

Second, the parties also have a right to a certain limited number of challenges for which no cause is necessary. These are

called peremptory challenges. Each party has a pre-determined number of peremptory challenges. The concept of the peremptory challenge is a right long-recognized by the law as a means of giving the parties some choice in the make-up of the jury. You should understand that if you are eliminated from the jury panel by a peremptory challenge, this is not, in any way, a reflection on your ability or your integrity.

So I ask that you accept the questioning in the spirit of its objective, which is to select a fair and impartial jury.

With this, my courtroom deputy will swear the panel.

(At this time the prospective jury panel was sworn.)

THE COURT: Now, before I ask the questions that I'm going to pose to you, let me explain how I would like you to respond.

If your answer is to a question is, Yes, please stand, particularly, because of the number of persons in the courtroom, I may not be able to identify someone who is in the back who doesn't stand.

Please stand, state your juror number, because that's how the parties and I will be able to identify you. So stand, raise your hand, state your juror number and give your answer. That's the approach I would please ask you to use here.

If, in fact, you provide an affirmative response to a question, there may be a need for me or, later on, the lawyers to ask additional questions that call for more than a yes or no answer. But that's how we will initially begin.

Now, if your answer is, No, you need not say or do anything. You need not stand, you need not raise your hand, we will assume by your silence and your failure to stand and your failure to raise your hand that your answer is, No.

You should also understand that my questions and any questions by counsel are not intended, in any way, to embarrass you. If you have a response that you are uncomfortable sharing publicly, please say so, and I will see to it that you are questioned in private. And, on occasion, I may decide on my own that certain questions should be asked in private.

Now, the case for which jurors are now being selected is expected to take, approximately, three weeks to try. It will begin later today and is expected to finish by May 28. We all recognize that you are here at some sacrifice. However, we cannot excuse anyone, merely, because of personal inconvenience, unless serving on the jury would be a compelling hardship.

I can excuse for hardship based on the answers to the following questions:

First. Would sitting on a case of this duration, as I've explained it, pose a hardship or special problem to any member of this panel?

PROSPECTIVE JUROR: No. 55. Yes.

THE COURT: Juror 55, can you explain what the hardship is?

PROSPECTIVE JUROR: I'm having a back problem, I'm seeing a

doctor three days a week for it, physical therapist. Sitting for long periods of time aggravates it.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror No. 82. I have a scheduled vacation June 3, I know that's very close to May 28, but it has been scheduled.

THE COURT: For June 3?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. You're Juror 82?

PROSPECTIVE JUROR: Yes.

THE COURT:  Thank you.

PROSPECTIVE JUROR: No. 32. I'm flying into Atlanta tomorrow for work. I'll be there until, at least, Thursday.

THE COURT: Atlanta?

PROSPECTIVE JUROR: Yes.

THE COURT: You'll be there for 30 days?

PROSPECTIVE JUROR: No, I'll be there, at least, until Thursday. I'm leaving tomorrow.

THE COURT: I see.

PROSPECTIVE JUROR: No. 115. As a Golf Course Superintendent, I oversee 200 acres of turf, and that period of time would be detrimental to that.

THE COURT: What golf course is that?

PROSPECTIVE JUROR: Elmhurst Country Club.

THE COURT: Thank you.

8

PROSPECTIVE JUROR: 116. I only have enough PTO at work to cover today, and it's peak season where I work, so it's really essential I be there.

THE COURT: You only have enough paid time off to cover today?

PROSPECTIVE JUROR: Yes, I was sick a couple weeks ago, and I had to use it for that.

THE COURT: Where do you work?

PROSPECTIVE JUROR: Western Power Sports over on Jessup Mountain.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 111. I am a Nursing Home Administrator and an RN, and with the staffing shortage and with running a facility of 120 beds, being off for that length of time would be very difficult for them.

THE COURT: What nursing home?

PROSPECTIVE JUROR: The Gardens at East Mountain.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 89. I am a night manager at Market 32 Grocery Store, we are severely short-staffed, it's only me and my assistant night manager at the moment. If I was to be out for three weeks, he would be by himself throughout the night.

THE COURT: I understand. Thank you.

PROSPECTIVE JUROR: Juror 91. We're a construction company,

paving season is just kicking off, and we have a lot of work scheduled.

THE COURT: Is this your company, sir?

PROSPECTIVE JUROR: Yes, sir, I'm the owner of the company, yes.

THE COURT: You're on-site?

PROSPECTIVE JUROR: Yes, I physically work with the company.

THE COURT: Thank you.

PROSPECTIVE JUROR: I'm Juror 107. I don't know if I would financially be able to pay my bills three weeks on the trial.

THE COURT: 107?

PROSPECTIVE JUROR: Yes.

THE COURT: I understand.

PROSPECTIVE JUROR: No. 106. I deal with leg problems, I have really bad leg edema, and I've been in and out of hospitals, seeing doctors about it.

THE COURT: Does that prevent you from sitting for long periods of time?

PROSPECTIVE JUROR: It's very uncomfortable. I have to get up and move around or it starts to bother me.

THE COURT: You're being treated for that now?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 79. I'm a restaurant manager and coordinator for a non-profit. I would not be able to change my

schedule for that length of time.

THE COURT: The name of the restaurant is?

PROSPECTIVE JUROR: Ollie's Restaurant.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 28. It's two-fold. I was not going to -- like someone else, I have plane tickets scheduled for June 3. Again, it's post the 28th, when the trial is supposed to end, but if it runs over, I do already have a vacation booked.

Two-fold. I work at an oncology clinic, we are short-staffed to begin with, the person who is covering for me is taking vacation time, as well as will have to cover for, because vacation time has already started. We're even more short-staffed than we were before I got called in for jury duty. If I were to be away for three weeks, I don't think it would go well.

THE COURT: Are you a nurse or?

PROSPECTIVE JUROR: I'm a Pharmacy Technician, I run our in-office dispensary.

THE COURT: What facility is that?

PROSPECTIVE JUROR: Hematology and Oncology Associates in Dunmore.

THE COURT: Thank you very much.

PROSPECTIVE JUROR: Your Honor, I'm Juror 60. I'm a Registered Nurse and Manager of an Emergency Room in

11

Wilkes-Barre. Three weeks would be a significant stretch for me and my staff.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 113. My daughter has an ultrasound scheduled for Thursday this week, and I'm, also, IT Director for a hospital, Geisinger, and if it was a day or so, it wouldn't be a problem, because we're short-staffed, so it's going to be a burden.

THE COURT: I understand. Thank you.

PROSPECTIVE JUROR: No. 20. I'm scheduled to go down to my daughter's house to dog sit next week.

THE COURT: I guess that means your daughter is not available?

PROSPECTIVE JUROR: Right, she and her husband are going on vacation.

PROSPECTIVE JUROR: Juror 18. I have stitches in my arm that I have to have removed next week.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR: No. 3. I'm going to start a new job on May 15th, it was supposed to be my dream job, and, also, the vast majority of my job is derived from commissions.

THE COURT: This is a new job you're starting?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 4. I work for a school district, we

12

are being Federally-monitored for Title 1, 2-A & 4 on May 18th. I have to be present at that.

THE COURT: You're simply unavailable on the 18th, is that what I understand?

PROSPECTIVE JUROR: There's two monitors coming in to review our books, and I have to, kind of, be there for that. It's a process.

THE COURT: I understand. Thank you.

PROSPECTIVE JUROR: No. 2. Being out of work for three weeks, I will not be able to pay my bills, financially, and I have a grandmother I have to take care of.

MR. HINKLEY: I'm having a hard time hearing these folks. If they could raise their voice a little bit.

THE COURT: Sure. Anyone that you would like to hear again?

MR. HINKLEY: Yes, No. 3 and No. 2, I was unable to hear them.

THE COURT: No. 3, please repeat what you told me.

PROSPECTIVE JUROR: I start a new job on May 15th, and I'm, also, in a health recruiting business, the vast majority of our income is derived from commissions. So if the trial goes on for a long time, that job may be gone. I already have an offer. I can show you proof of that.

THE COURT: Mr. Hinkley, someone else, as well?

MR. HINKLEY: No. 2.

THE COURT: Would you mind repeating yourself?

13

PROSPECTIVE JUROR: Financially being out of work three weeks, I would not be able to pay my bills, and I have a grandmother I have to take care of.

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR: Good morning, Your Honor. Juror No. 11. I just started a new position last Monday, and we're set to open a new store in June, so three weeks might prohibit me from getting the essential training that is needed for that.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 14. I'm a Department of Defense employee. I'm responsible for about 25 employees in the capacity planning of the entire maintenance facility. Three weeks on trial would be a strain on resources.

THE COURT: What is the Department of Defense facility where you're employed?

PROSPECTIVE JUROR: Tobyhanna Army Depot.

THE COURT: Thank you very much, sir. You were No. 14?

PROSPECTIVE JUROR: Yes.

PROSPECTIVE JUROR: Juror No. 49. I have a scheduled vacation for the 23rd to the 30th.

THE COURT: Is this something that you scheduled with your employer?

PROSPECTIVE JUROR: With my family.

THE COURT: But I mean you've cleared this with your employer, am I understanding you correctly?

14

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you, No. 49.

PROSPECTIVE JUROR: No. 48. I work on my own as an Electrical Mechanical Technician on night shift, and there's nobody to replace me.

THE COURT: Where do you work?

PROSPECTIVE JUROR: Hood Packaging Corporation, it's in Hazleton.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 46. I have bronchitis, I have a doctor's note with me. Also, I own and operate a fully-functioning farm in Jackson, PA, and I don't have coverage for the livestock for three weeks.

THE COURT: You have no coverage for the livestock on your farm?

PROSPECTIVE JUROR: Today I do, but I don't have anybody that would know how to cover all that for three weeks.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 83. I have a funeral to attend this coming Friday, and the Friday before Memorial Day Weekend, I'm scheduled for vacation.

THE COURT: How long is the vacation?

PROSPECTIVE JUROR: Just the long weekend, Friday through Monday.

THE COURT: And a funeral this Friday?

15

PROSPECTIVE JUROR: Yes, this coming Friday.

THE COURT: I understand. Thank you. Yes, sir.

PROSPECTIVE JUROR: No. 37. Being out for three weeks will affect me, financially, and, also, I'm the reliable transportation for my nephew to school and emergency contact.

THE COURT: Thank you, No. 37. Yes, sir.

PROSPECTIVE JUROR: Juror 92. I work at a manufacturing facility in East Stroudsburg. Tomorrow and Wednesday, we have scheduled company audits that I need to be there for. I also dropped off a letter from the company, I gave it to the lady where I registered when I came today.

THE COURT: Just so I'm clear. Are you available except for those two days?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you for that. You are 92, correct?

PROSPECTIVE JUROR: Correct.

THE COURT: Yes.

PROSPECTIVE JUROR: Juror 117. I work security at a high school, I'm the only coverage, so today they don't have anybody providing security for the school. Coming up on the end of the year, I need to be there, because the SRO is injured, and I have to cover two buildings. The high school and middle school.

THE COURT: What school district is this?

PROSPECTIVE JUROR: Dallas High School.

THE COURT: Thank you, 117. Yes.

16

PROSPECTIVE JUROR: Juror No. 42. I have an injury, and I'm probably going to have knee surgery in a couple weeks.

THE COURT: Are you pretty sure you're having that surgery?

PROSPECTIVE JUROR: Yes.

PROSPECTIVE JUROR: Hi, I'm 44. I'm an elementary school teacher, and to be out the end of the year for three weeks, we are very short-staffed on subs, and nobody wants to sub at the end of the year.

THE COURT: What school district are you in?

PROSPECTIVE JUROR: Pine Bush in New York.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 97. I'm Chief Administrative Superintendent for State University of New York. I maintain facilities operation, building and ground, 12 buildings in the school system. We're short-staffed, it would be very difficult for three weeks.

THE COURT: Thank you. Am I missing someone?

PROSPECTIVE JUROR: I have a mission trip scheduled. I know it's after the time period of the trial, in the end of June, to Kenya, but I discovered my passport is lost or missing, and I understand, because of the time period, I need to travel to Philadelphia to make an appointment with him in the next three weeks to have that expedited.

THE COURT: Juror number?

PROSPECTIVE JUROR: 65.

THE COURT: So is it the passport problem or?

PROSPECTIVE JUROR: Passport problem, yes.

THE COURT: Yes.

PROSPECTIVE JUROR: No. 90. I manage a concrete company. Three weeks would be exceedingly difficult to continue the management of that company for three weeks.

THE COURT: Can you tell me the name of the company?

PROSPECTIVE JUROR: Scranton Wilbert Vault.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 58. We're scheduled to go out of town on the 19th for a graduation in New York.

THE COURT: Thank you, 58.

PROSPECTIVE JUROR: Juror 78. I'm a single mom on a single income. This would pose a huge financial burden on myself and my son.

THE COURT: How old is your son?

PROSPECTIVE JUROR: He's 13.

THE COURT: Thank you, 78.

PROSPECTIVE JUROR: No. 17, sir. I work in Health Service Management in the Air Force, and they're expecting me back by the beginning of June, so just in case the trial gets pushed back, I want to put it out there.

THE COURT: You would have to be back by?

PROSPECTIVE JUROR: June 4th or 5th.

THE COURT: I understand, thank you. Counsel, would you

18

approach?

(At this time a discussion was held on the record at sidebar.)

THE COURT: I count 36 individuals who have indicated some form of hardship. If this is something we can dispose of in a brief conversation, we will do it right here. If it's going to require a 10 or 15 or 20-minute discussion, I would suggest that we leave the bench and proceed to the jury room where we can discuss it further.

My inclination, so you know, is generally to grant anything that is a reasonable request, given the length of this trial, for a lot of reasons. One, of course, is the hardship that the juror, the prospective juror is facing, and a second reason is that, as a general proposition, I think, everyone would agree we want jurors who want to be here and don't not want to be here.

That's a juror who starts off with, perhaps, the wrong attitude about the trial, and we don't want that for either side. So I'll ask you, Todd, first, how do you want to proceed? Do we have enough information to decide these right now? Do you want to talk about these outside this courtroom?

MR. HINKLEY: So I think a number of them are just generic, we're short-staffed at work, and, usually, we don't excuse for that type of thing. So, maybe, we should talk about each one of these more in depth. There's some of them I have check-marked

19

that I have no problem with.

MR. BARTOLAI: Obviously, some are, you could tell from the situation --

MR. HINKLEY: Surgeries and stuff like that.

THE COURT: Why don't we run through these right now, and then we will decide whether further discussion is needed. The only reason I haven't taken them out to another room already is just the sheer difficulty of moving everybody out of the courtroom.

First one I have is No. 55, who has back pain, and sitting for a long period of time is difficult for him.

MR. HINKLEY: I have no problem with that one.

THE COURT: So he would be excused.

MR. HINKLEY: Yes.

THE COURT: Next one is someone who is -- the first person was 55. Next one is 82. They have a scheduled vacation on June 3.

MR. HINKLEY: I suspect we will be done long before that.

THE COURT: I was inclined to think that, too. What do you think, Gino?

MR. BARTOLAI: Here's my thoughts. Everybody knows, when they have a vacation, they need to guard it like the goalie of the hockey puck. So if we're not, there's going to be high anxiety -- there are several that had scheduled vacations. I wouldn't want to get to the point where they're wondering if

20

this is going to be done. If we're done in time, and I think we will be, that's not a problem. But --

MR. HINKLEY: Realistically, I don't see it happening.

MR. BARTOLAI: All right, then, that will be fine. I understand.

THE COURT: So what's --

MR. BARTOLAI: No, we will be okay with that one.

THE COURT: Next one was Juror No. 32. Flying to Atlanta for work, he'll be gone until Thursday. I would question him further about the nature of work, but it seems to me it's a commitment he has made.

MR. BARTOLAI: I'm good with that if you are.

MR. HINKLEY: So you want to excuse him?

THE COURT: Yes.

MR. HINKLEY: No problem.

THE COURT: The next fellow is No. 115. He is a Golf Course Superintendent.

MR. HINKLEY: At Elmhurst. I'm highly sympathetic to that.

MR. BARTOLAI: Me, too. It has to be right.

THE COURT: All right, we will excuse him. The next was No. 70.

MR. HINKLEY: I have 118.

THE COURT: I'm sorry, I have 116. He doesn't have any paid time off.

MR. BARTOLAI: The nursing home guy?

21

THE COURT: He works for Western Power Source. He has no more paid time off, which means he takes a hit.

MR. HINKLEY: Is that how this works?

THE COURT: All he will get is what the Government pays for him.

MR. HINKLEY: That's fine, we don't want to put anybody in that predicament.

MR. BARTOLAI: Is 115 is the golf course guy?

THE COURT: Yes. So we will, also, excuse 116. No. 111 is a Nursing Home Administrator, short-staffed, has to be there.

MR. HINKLEY: So, again, I'll leave that to the Court's discretion.

THE COURT: Gino?

MR. BARTOLAI: Again, Judge, a lot of people are short-staffed. Again, I don't know what to tell you. There are some short-staffed people like the oncology --

THE COURT: We will put that person aside for now. Next one is the same thing. No. 89 is, also, manager of a market and they're short-staffed. So we will pass on the two short-staffed people for now.

Next one is Juror 91, owner of the construction company, needs to be on the job site.

MR. HINKLEY: I have no problem with him.

MR. BARTOLAI: No problem.

THE COURT: So he'll be stricken. I believe Juror 107?

22

MR. HINKLEY: 107.

THE COURT: Can't pay his bills being out for three weeks.

MR. HINKLEY: Yeah, Amazon, I have no problem with him.

THE COURT: All right. Juror No. 106.

MR. HINKLEY: Health issues with his legs.

THE COURT: I have leg edema.

THE CLERK: He has to get up and move around.

MR. BARTOLAI: I'm okay with him.

MR. HINKLEY: I'm okay with him being excused.

THE COURT: Being stricken?

MR. HINKLEY: Yes.

THE COURT: Juror 79. Restaurant manager, as I recall, and, also, short-staffed. So that's three short-staffed people we haven't ruled on.

MR. BARTOLAI: There are a lot.

MR. HINKLEY: Yes, I mean, everybody could say that. Shall we reserve those?

THE COURT: Then, Juror 28, they're scheduled -- they're, also, someone who is scheduled for --

MR. HINKLEY: I have June 3 vacation.

THE COURT: Yes, that's the one.

MR. HINKLEY: As well as short-staffed at the oncology clinic.

MR. BARTOLAI: I'm okay with that one.

THE COURT: The Oncology Department, Cancer Treatment

23

Center.

MR. HINKLEY: Yes, let's excuse her.

THE COURT: I'll excuse her. Juror No. 60 is an RN, short-staffed.

MR. BARTOLAI: I'm all right if you are.

MR. HINKLEY: Yes, we are, too.

THE COURT: Strike that one?

MR. HINKLEY: Yes.

THE COURT: 113?

THE CLERK: No. 114, 1-1-4.

THE COURT: What do you have for 114?

THE CLERK: Daughter has an ultrasound and he's IT Director.

MR. HINKLEY: Yes, 114. What was about the daughter?

THE CLERK: Daughter has ultrasound scheduled for Thursday, he has to take her.

MR. HINKLEY: If it weren't for the daughter situation, I might be otherwise inclined, but if the Court wants to dismiss.

MR. BARTOLAI: 114 is off?

THE COURT: Yes. No. 20 is an interesting one. She's dog-sitting for a week for her daughter and husband who are going on vacation.

MR. HINKLEY: I'm not inclined.

MR. BARTOLAI: That's something we can come back to. I don't know what to tell you about that.

MR. HINKLEY: I'm just worried we don't have enough, at the

24

end of the day.

THE COURT: No. 18. Stitches that are being removed this week. I don't know what kind of stitches they have. Usually, removal of stitches is not a particularly lengthy, time-consuming procedure. But we can hardly have that person not here for an hour or two, during the course of the day. That's a tough one.

Unless, if the person were to get picked, I suppose, we could structure lunch around the time of that person's appointment.

MR. HINKLEY: Yes. This might be a good point, too, Judge. As you know, we have witnesses coming from Estonia, and we have them scheduled to fly in next week. We think we have sufficient witnesses to fill this week, but we might be -- so if you have someone like that, it probably wouldn't affect us that much.

MR. BARTOLAI: You mean, being a break in the schedule? I certainly have no objection to that.

MR. HINKLEY: I don't anticipate we're going to miss a full day, but it might be we have a day that we're --

THE COURT: Let's keep that person on then. No. 3, starting a new job, and they get paid commissions only.

MR. HINKLEY: I don't have any problem with that, I don't want to put anybody in a financial burden based on this.

THE COURT: So No. 3 would be excused. Juror 4 works for the school district, nobody to replace her, May 18th. What's your

pleasure on that?

MR. HINKLEY: Did he indicate what his position was at the school?

MR. JASPERSE: School Administrator, Federal auditors coming on May 18th, he needs to be there.

MR. HINKLEY: Whatever the Court wants to do.

THE COURT: All right, I'm going to excuse that person. Juror No. 2, financially, can't be out of work for three weeks.

MR. HINKLEY: Also said he took care of his grandmother.

THE COURT: Let's excuse him. Juror No. 11 started a new position.

MR. BARTOLAI: I think he said the next couple weeks are important for the training. Opening a new store.

THE COURT: Department of Defense, Tobyhanna.

THE CLERK: No, that's the next one.

THE COURT: This guy just said he's starting a new position.

THE CLERK: And I think they're opening a new store.

THE COURT: Yes. I'm inclined to excuse him.

MR. HINKLEY: No objection.

MR. BARTOLAI: No objection.

THE COURT: Juror 14 is the Tobyhanna Army Depot fellow. He says three weeks put a strain on the facility. Is that enough?

MR. HINKLEY: I'm not inclined.

MR. BARTOLAI: I know he says he's a supervisor, and I think he said it would be a draw on resources. I would be inclined,

26

but, again, I think that's a hardship. But everybody is a hardship.

MR. HINKLEY: Are you worried about The Department of Defense?

MR. BARTOLAI: No, I mean, if anyone has resources to cover, it would be them, rather than these small guys. I agree.

THE COURT: He stays. Juror 49, a scheduled vacation from 23rd to 30th.

MR. HINKLEY: Again, this is one that I think it's a possibility that it may be within the trial, so I don't want someone on the jury that feels they missed their vacation because of this.

THE COURT: We'll excuse that person. Okay, 48, this guy works at a packaging operation in Hazleton.

THE CLERK: He's Electrical Mechanical Maintenance, works night shift alone, there's no one to replace him.

THE COURT: Okay.

MR. BARTOLAI: He's gone?

THE COURT: Yes.

MR. HINKLEY: 48, okay.

THE COURT: 46, she's got a farm.

MR. BARTOLAI: No problem.

MR. HINKLEY: We have to let her go.

THE COURT: Juror No. 83. Funeral on Friday and then vacation.

27

MR. HINKLEY: Funeral.

THE COURT: I suppose we can ask about the funeral, whether it's someone close to them, but I think that's a bit intrusive.

THE CLERK: And he has a vacation, too.

THE COURT: Right, 83 is out.

MR. HINKLEY: 83 is out.

THE COURT: No. 37, three weeks out, financially, is too much for him.

MR. HINKLEY: Again, I'm fine with having him off.

MR. BARTOLAI: Yes, also, reliable transport person for his nephew.

THE COURT: Juror No. 92. Works at East Stroudsburg, there's two days of auditing. This is the fellow who had to be there for two days for auditing.

MR. BARTOLAI: He has a letter, too, he said.

THE COURT: I'd be inclined to let him go.

MR. HINKLEY: That's fine with us.

THE COURT: Juror No. 117. Works security at the high school, covers two buildings, Dallas School District. I don't know, to me, that wasn't a particularly strong reason.

THE CLERK: He says he's the only one covering.

MR. BARTOLAI: He said, it's the end of the year --

THE COURT: I don't want to put people on the jury who will resent the fact they're going to be on the jury. That's a bad way to start. So we'll excuse that person.

And Juror 14 has an ACL knee surgery scheduled.

MR. HINKLEY: 43.

MR. BARTOLAI: He's got the brace on.

MR. HINKLEY: No objection to excusing him.

THE COURT: Juror No. 44.

MR. HINKLEY: Elementary teacher.

THE COURT: Yes, elementary school teacher, end of the year issues, hard to get substitutes.

MR. HINKLEY: I think she should stay on the pool.

THE COURT: I have her here as 44; am I right?

THE CLERK: 44.

MR. HINKLEY: That is correct.

THE COURT: Juror 97, Chief Administrator of City of New York, short-staffed.

MR. HINKLEY: I think he said SUNY, State University of New York. He's like a maintenance guy or -- see, these guys may have a different opinion, I think the golf course is different from a college. I think that's a little weak, but it's up to the Court. I would go with whatever you want to do.

THE COURT: I beg your pardon?

MR. HINKLEY: In my mind, it's a little weak, because it's a -- University of New York has a lot of employees.

MR. BARTOLAI: I agree.

THE COURT: So not stricken.

THE COURT: Juror --

29

MR. HINKLEY: 65.

MR. BARTOLAI: Passport issue.

THE COURT: Yes, passport problem. She's the one going on a mission trip to Kenya. Is she 65?

THE CLERK: Yes.

MR. HINKLEY: I have her as 65.

THE COURT: So we will excuse her. Juror No. 90, this is another financial hardship one.

MR. HINKLEY: He was manager of a concrete --

MR. BARTOLAI: Vault, I think he said, cemetery vault.

MR. HINKLEY: I'm agnostic on that, I don't know how many people work for that company. Mostly, these folks are fairly small businesses. I don't think it's so much he doesn't want to be here, but he's saying it's going to be a burden on my employees.

MR. BARTOLAI: It's up to you guys.

THE COURT: Let's excuse him.

MR. HINKLEY: Okay.

THE COURT: Juror No. 58, out of town the 19th.

MR. HINKLEY: It's for a graduation, I didn't catch who it was for.

THE COURT: I didn't either. Graduation in New York.

MR. HINKLEY: Can we inquire about that? Because if she's going leave on Friday for a Saturday graduation, we probably could accommodate that.

THE COURT: The 19th of May. Is that a Friday?

MR. HINKLEY: Yes. Or if the Court is inclined --

THE COURT: We will come back to her, as well. Juror No. 78, single mother, 13-year-old child.

MR. HINKLEY: No, God bless her.

MR. BARTOLAI: No problem. She might have a tough time.

THE COURT: We will excuse her. Juror No. 17.

MR. HINKLEY: Again --

MR. BARTOLAI: He's worried about June 4, he's got to report somewhere. We should be fine with him.

THE COURT: All right. So what do we need? Obviously, we need 12 and 4 alternates.

THE COURT: Is that a total of 36 with the alternates and the strikes?

MR. BARTOLAI: How many strikes, 7 or 6?

MR. HINKLEY: I get 7.

MR. BARTOLAI: Judge, how do you do the alternates? Do we do them separate or whoever is left?

THE COURT: Separate. Judy will tell you.

MR. HINKLEY: Do we have enough, if we just dismiss the other ones left on the pool?

MR. HINKLEY: Other concern, Judge, is we still haven't done any of the other for cause questions, so we should try to keep as many of these on the pool as we can, I think.

THE CLERK: 82, scheduled vacation June 3.

MR. HINKLEY: No, that's outside the time frame. We'll be fine.

THE CLERK: 11 of the 36.

THE COURT: This is what I've got, fellas, who we're excusing. And correct me if I'm wrong here.

55, 32, 115, 116, 91, 107, 106, 28, 60, 114, 3, 4, 2, 11, 49, 48, 46, 83, 37, 92, 117, 44.

MR. HINKLEY: I have 43.

THE COURT: 43. That's the guy with the knee?

THE CLERK: Yes, ACL.

THE COURT: 65, 90, 78, and that's it.

MR. HINKLEY: That's what I have.

THE CLERK: 25.

THE COURT: 25? Is that what everybody has?

THE CLERK: We started with 113.

THE COURT: Several people, apparently, didn't show. So 113, minus 25, 88, then we're going to take from that -- we need 36, right? So we have an additional 52 jurors. Are we good?

MR. HINKLEY: I guess we'll see.

THE COURT: That's a lot.

MR. BARTOLAI: That's pretty good. We might get those residual hardships, but we will deal with them.

THE COURT: Yes. So let's excuse them.

(At this time the discussion on the record at sidebar was concluded.)

THE CLERK: If I call your number, please stand. Juror No. 55. Juror No. 32. Juror No. 115. Juror No. 116. Juror No. 91. Juror No. 107. Juror No. 106. Juror No. 28. Juror No. 60. Juror No. 114. Juror No. 3. Juror No. 4. Juror No. 2. Juror No. 11. Juror No. 49. Juror No. 48. Juror No. 46. Juror No. 83. Juror No. 37. Juror No. 92. Juror No. 117. Juror No. 43. Juror No. 65. Juror No. 90. Juror No. 78. Juror No. 55.

Okay, you have been excused. Your jury service for today is complete, and you may leave the courtroom. Thank you.

(At this time the above-mentioned jurors were excused.)

THE COURT: I have some additional questions that will also relate to your ability to serve as jurors in this case.

Does any member of the panel have any special disability or problem, such as a vision or hearing problem, that would make it difficult to sit as a juror?

PROSPECTIVE JUROR: Yes, Your Honor, No. 93. I have a hearing problem that I've not seen anybody for that, right now, that's from the military, but I also have blood clots in both my legs and rod in my back and several disks injured in my neck, and I'm under medical treatment for all of them.

THE COURT: Thank you, 93. Anyone else? Yes, sir.

PROSPECTIVE JUROR: No. 9. I have a hearing problem, I have very little to no hearing in my right ear, it's from an accident. I was going to lose my hearing, as I aged. I have maybe 20 percent left. A hearing aid or anything else won't

correct it, I've already seen a Dr. Michael Olenginski.

THE COURT: Do you think that --

PROSPECTIVE JUROR: If everyone talked loud, I would be all right.

THE COURT: Do you think that loss of hearing might be a problem for you?

PROSPECTIVE JUROR: I think so, yeah. It's a problem for my wife sitting next to me.

THE COURT: That's a problem.

PROSPECTIVE JUROR: No. 12. I have a hearing problem, I'm having a hard time hearing in here right now with a lot of people talking.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 23. I do have a low range hearing loss that I've gone to doctors about, so a lot of lower tones, sometimes, I have trouble hearing.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror 62. 70 percent, disabled veteran, hearing loss.

THE COURT: Thank you, 62. Yes, in the back.

PROSPECTIVE JUROR: 111 juror. I do have vision problems with seeing distance and sometimes I get a cloudy. I just had eye surgery done, and I also have back problems, I had back surgery, so when I sit long periods of time, I have to get up and move a little.

34

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 94. I wear contacts right now, but I don't know if I get put on trial, I don't know if I can go home and change them out.

THE COURT: So correct me, you wear contacts and you need to change them?

PROSPECTIVE JUROR: I can't sleep with these overnight, I don't know if I get picked, if tonight, I'll be going home or whatnot.

THE COURT: Thank you, sir. Yes.

PROSPECTIVE JUROR: No. 96. I'm hard of hearing.

THE COURT: Severe?

PROSPECTIVE JUROR: I have to go see the doctor -- I don't get to see him until July so.

THE COURT: All right. Thank you all.

Is any juror taking any medication which would prevent him or her from giving full attention to all of the evidence that's presented at this trial? Yes, sir.

PROSPECTIVE JUROR: Currently, I just started a new regimen of medications. I don't want to disclose it in open public, but it would prevent me.

THE COURT: Juror number?

PROSPECTIVE JUROR: 7.

THE COURT: No. 7, would you approach, please?

(At this time a discussion was held on the record at

35

sidebar.)

THE COURT: Sir, can you tell us a little more?

PROSPECTIVE JUROR: I suffer from severe anxiety, two weeks ago, I was put on Lexapro and Lorazepam, because I have difficulty with anxiety.

THE COURT: Lexapro and Lorazepam?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you think that would make it difficult to sit?

PROSPECTIVE JUROR: I'm experiencing a lot of anxiety from just sitting around today.

THE COURT: Any questions?

MR. HINKLEY: No, not on behalf of the Government.

THE COURT: Thank you.

(Prospective Juror excused from sidebar.)

MR. BARTOLAI: Judge, I would move for cause.

MR. HINKLEY: Yes, for cause. There's two more what I call hardship questions after this. The next one is there any problem reading or understanding the English language. We should be okay there, I think. We'll find out. The other is just a question about the length of the day.

So they would have to have something really compelling on that. These people with the hearing, if they say they can't hear, they're under oath, I have to say that they don't belong on this jury.

MR. HINKLEY: Don't we have the hearing aids that we use during the trial that the Court can provide them?

THE CLERK: We have half dozen of them, I think.

MR. BARTOLAI: Sometimes, even with those, they can't hear. It's not always -- so it's a very special type of hearing loss, I think, that can't be cured by those.

MR. HINKLEY: So, maybe, like a follow-up question, if provided by the Court with hearing aids or head sets, assuming that the Court can give that aid to them, whether or not they still believe that they would be unable to hear.

Because they heard good enough to raise their hands and get up and say, I have a hearing issue, so it's not anybody stone deaf like me.

THE COURT: Well, what I will do is, I will now ask those people who have indicated they have a hearing problem, would you be able to sit and hear all the evidence if you were provided with hearing aids?

THE CLERK: Hearing head sets, which give a boost.

MR. HINKLEY: We have up to six?

THE CLERK: They're in that cabinet that's locked, there were six last time I checked about a year ago so. Because we have six with a hearing issue.

THE CLERK: We can get one out of another courtroom.

MR. HINKLEY: 93 said he also had some blood clots and other issues. So that would leave six folks with hearing loss.

MR. BARTOLAI: He's got the problem in the back with the discs.

MR. HINKLEY: Whatever the Court wants to do.

THE COURT: The vision problem.

MR. HINKLEY: That should not be an issue.

THE CLERK: Also has a problem sitting, though.

THE COURT: Yeah, he has a back problem. The guy didn't -- I didn't quite understand the fellow who said that he needs to change his contact lenses.

MR. BARTOLAI: He thinks they'll be in a hotel room overnight.

THE COURT: Let me ask the final questions, then, we will reconvene.

(At this time the discussion at sidebar was concluded.)

PROSPECTIVE JUROR: I have cervical radiculopathy, herniated discs from lower back and in my neck. I just started medical marijuana about two months ago, so I'm currently doing that every night for severe pain. That's the only thing that relieves it, right now, so if I'm here for three weeks, I would have to take some at night, every night, so I don't know how that would work out. I, currently, just started it two months ago, so I'm working through it.

THE COURT: In the morning?

PROSPECTIVE JUROR: At night, after work.

THE COURT: When you arise in the morning, are you clear?

PROSPECTIVE JUROR: Yes.

THE COURT: You're Juror 21?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 93. Again, Your Honor, I'm on Oxycodone, some other muscle relaxers, I'm on an opioid and other medicine.

THE COURT: You also have a hearing problem and rods in your back and blood clots?

PROSPECTIVE JUROR: Yes, sir. Blood clots in my leg, prolonged sitting, standing, that's all really hard for me.

THE COURT: I'm going to excuse you for hardship.

PROSPECTIVE JUROR: I'm sorry, sir?

THE COURT: I'm going to excuse you for hardship, based on all of those physical issues that you have. You can leave the courtroom.

For the record, that was Juror No. 93. Juror No. 7, you're also excused. Is there anyone else who needs to answer a question?

No hands.

Does any juror have difficulty reading or understanding English?

No hands.

Does anyone have a problem with the length of the trial day? 9:30 a.m. until 5:30 p.m., appropriate breaks throughout

the day, as well as a break for lunch? Anyone have a problem with that? Yes.

PROSPECTIVE JUROR: Juror 79. Because I am the restaurant manager, I have to be at work at 10 or 11:00 every morning until 10:00 at night.

THE COURT: So you wouldn't be able to get here at 9:30 in the morning?

PROSPECTIVE JUROR: I would have to leave my house to go to work by 9:30.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 77. That's a two-hour commute for me, one each way, it's a long day. I was thinking I could do my work at nighttime, because I'm the only one who covers my job, for three weeks. I prepare training stuff. And I'm sorry to say I have dog issues, I work remotely and I'm usually home for my dog.

THE COURT: It's a two-hour commute to the courthouse?

PROSPECTIVE JUROR: One hour each way, two hours of commuting.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR: I have no one to take care of my daughter after school and take her to her after school activities.

THE COURT: May I ask you how old your daughter is?

PROSPECTIVE JUROR: 13. But she has to be driven to some of

40

these activities.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 31. I also drive an hour each way, but that commute back and forth, then sitting the whole day on top of that, I have six herniated discs in my back, I'm doing quite well, but with my traveling and sitting the whole day, it's a lot.

THE COURT: You have six herniated discs?

PROSPECTIVE JUROR: Yes, three cervical, three lumbar.

PROSPECTIVE JUROR: Juror 89. As I stated prior, I'm night manager, my hours are 11 p.m. to 7 a.m., sometimes after 7 a.m., so to get here at 9 -- I would be going on no sleep. And as I said, I'm the only -- it's me and one other guy that's running the night crew right now.

THE COURT: Thank you.

(At this time a discussion was held on the record at sidebar.)

THE COURT: As you know, I've already excused 93 for a variety of medical issues that he had. And I've excused No. 7 because of his Lexapro and Lorazepam medications for severe anxiety. That, essentially, leaves us with the other hearing issues and the hardship issues for people who work at night.

At least, one of the two people who works at night, someone whom we did not excuse at first pass, but it seems to me, if I don't excuse this person, I don't know how they're going to

41

work 11 to 7:00 in the morning and come here for the trial. I think that's --

MR. HINKLEY: For the prosecution team, we would be used to that, Your Honor.

THE COURT: So we will excuse 89. The other person, this gentleman has no one to take care of his 13-year-old daughter, she has to be driven, I'm not sure why, but it sounds like there's a reason for it, so I'm inclined to excuse 13.

The woman, No. 31, with six herniated discs, can't sit, I think that's a basis. So I would excuse her.

MR. BARTOLAI: Yeah.

THE COURT: I wasn't sure about 77 who said she has a two-hour commute, but it's actually a one-hour commute.

MR. BARTOLAI: We're almost home, so it's still all right.

THE COURT: No. 79 is the restaurant manager who has the hours that are --

MR. HINKLEY: 78 or 79?

THE CLERK: 79.

MR. BARTOLAI: I think she doesn't want to be on the jury.

MR. HINKLEY: I would move for cause for 79.

MR. BARTOLAI: I'm inclined to agree, Judge.

THE COURT: And 77, what are your notes on 77?

THE CLERK: It's an hour each way, she was planning to work at night, sounds like she's going to continue to do whatever work she does, that she's the only one who does it, she has to

42

prepare training materials, so she's going to be going home trying to get her work done at night, and that would be a hardship. She's the only one who can do it, she said.

THE COURT: All right. And that leaves us with people with, either, vision problems or hearing problems.

MR. HINKLEY: Did we address Juror 21 who has the herniated discs and uses the marijuana at night?

THE COURT: We did not. Although, he's the one who says he has cervical radiculopathy.

MR. HINKLEY: He seemed like he's going to be in a lot of pain, the way he was describing his condition to the Court.

THE COURT: If he's -- I don't know enough about medical marijuana to say too much about it, but if he's using it at night, I don't know whether that's something that's going to have him coming in here less than clear.

MR. BARTOLAI: I don't think it's a good idea.

MR. HINKLEY: We move for cause.

THE COURT: We all agree, so 21 is out. So the person with eye surgery?

THE CLERK: 111, vision problems.

THE COURT: She has vision problems.

MR. BARTOLAI: Also back problems, I thought.

THE COURT: She's got that, too.

THE COURT: I'll excuse her.

MR. BARTOLAI: I'd move.

43

THE COURT: Unless there's some objection.

MR. HINKLEY: No objection.

MR. BARTOLAI: No objection.

THE CLERK: That just leaves the straight on hearing problem.

THE COURT: No. 62 says he has 70 percent military disability for hearing loss.

MR. HINKLEY: Well, I think the proper question is, he has heard what was going on so far, and would the use of the head phones, maybe, be enough to do that? Because 70 percent could be one ear --

MR. BARTOLAI: Maybe that's only part of his disability. He's 70 percent disabled, maybe, there's other issues. Can you be 70 percent disabled on hearing? I don't know if you can be.

THE COURT: Here's the concern I'm having. We're drawing distinctions among those persons who say they have hearing disabilities. That's going to require to us dig even further deeper into this and question whether it's a valuable use of -- proper valuable use of our time to do that, if we have enough people to pick a jury, if the rest were to remain.

Because it seems to me if we question one as to the extent of the hearing loss, we have to question them all. And I will do that, if you want to, we will bring them in.

MR. HINKLEY: I think we could ask just a simple question, assuming that the Court would be able to provide you with the

44

ear phones to aid you in hearing, is there anybody, knowing that, still believes their hearing loss is such that they wouldn't be able to serve. I think, probably, that would answer the question.

THE COURT: Now, if we're going to do that, I'm going to suggest that we do that by bringing that person up here and asking that so that it's just all of us who hear it.

MR. HINKLEY: Okay.

THE COURT: Doing it in a group is not a good idea.

MR. HINKLEY: There was only five people that we have left.

THE COURT: We're going to excuse thus far 93 -- in fact, I've already excused 93. We're going to excuse 111, No. 7 has been excused, and I believe No. 21 will be excused. Who else?

THE CLERK: 79.

THE COURT: 79, 77, 13, 31, 89.

MR. HINKLEY: Yes.

THE COURT: All right. Judy, could you get this, please. I've already excused 93, so he's gone. So No. 11, No. 7 is already excused. 21 you're going to excuse. You're also going to excuse, now, 79, 77, 13, 31, 89.

MR. JASPERSE: First one is 111.

THE COURT: It is 111. Did I say 11?

THE CLERK: Yes.

THE COURT: I'm sorry, I beg your pardon. And once they're excused, you might as well stay right here because we'll be

bringing up these other people and questioning them.

(At this time the discussion at sidebar was concluded.)

THE CLERK: If I call your number, please stand.

Juror No. 111. Juror No. 21. Juror No. 79. Juror No. 77. Juror No. 13. Juror No. 31. Juror No. 89. Okay, you've been excused, your jury service is complete and you may leave the courtroom.

(At this time the above-mentioned prospective jurors were excused.)

THE CLERK: You would want the other five individually now?

THE COURT: Yes. Nos. 9, 12, 23, 62 --

MR. HINKLEY: 96 would be the last one.

THE COURT: 96. That's it, those five.

THE CLERK: Juror No. 9, would you please come forward.

(At this time Prospective Juror No. 9 was called to sidebar.)

PROSPECTIVE JUROR: If you want to see what caused the problem?

THE COURT: We asked you up here because we would like to know if you think if you were provided with head phones, you would still be able to hear the trial?

PROSPECTIVE JUROR: Even my television, I have to have the letters, the English underneath.

THE COURT: Closed captioning?

PROSPECTIVE JUROR: Yes.

46

THE COURT: Questions, counsel?

MR. HINKLEY: None.

MR. BARTOLAI: No.

THE COURT: Thank you. Have a seat.

(Prospective juror excused from sidebar.)

MR. HINKLEY: Government moves for cause, Your Honor.

MR. BARTOLAI: I agree.

THE CLERK: Juror No. 12, please approach.

(At this time Prospective Juror No. 12 was called to sidebar.)

THE COURT: We're interested in knowing whether, if you were given head phones to aid your hearing, whether you think you'd be able to hear the testimony that's presented throughout the trial?

PROSPECTIVE JUROR: It's possible. I'm having a hard time hearing in here right now. I'm having a hard time hearing.

THE COURT: Questions?

MR. BARTOLAI: Is that the type of hearing, when a lot of people start talking --

PROSPECTIVE JUROR: It is, but, usually, one on one, I'm pretty good, but I'm having a hard time hearing. I worked in heavy fab, I mean, I do have hearing issues. I was a heavy fabricator, welder, a lot of noise. I have to go for a hearing aid, I just never did yet.

THE COURT: Okay. Thank you.

(Prospective juror excused from sidebar.)

MR. BARTOLAI: I would move for cause.

MR. HINKLEY: No objection for cause, Your Honor.

(At this time Prospective Juror No. 23 was called to sidebar.)

THE COURT: We're trying to understand whether you would still be able to sit as a juror, if you were provided with head phones?

PROSPECTIVE JUROR: I don't have a problem all the time, it's, like, lower range voices, a lot of times, is the problem, it's all on the low level. So male voices a lot of times are harder to hear, if there's background noise with it, it's hard to hear. I mean, I hear, but they don't have me wearing hearing aids yet, so it's kind of -- in groups or stuff, sometimes, it's difficult.

THE COURT: Do you think you would find it unpleasant to have to sit through days of testimony, struggling to hear, is that what you're looking at here?

PROSPECTIVE JUROR: I'm just afraid I might not hear everything is what I would be more concerned with. Because, in conversations, sometimes, I just don't hear things, even though, you kind of pretend like you do, sometimes you don't, so that's the only thing I would be concerned with.

THE COURT: Have you ever had any experience with head phones?

PROSPECTIVE JUROR: Like, what would it be, like, everything everybody is saying would be through the head phones?

THE COURT: Do you have a simple description of how the head phones work, Judy? Does it amplify?

THE CLERK: It just boosts the sound.

PROSPECTIVE JUROR: It probably would be fine, I would probably feel like more I wouldn't miss anything.

THE COURT: Would you be willing to wear them?

PROSPECTIVE JUROR: Sure.

THE COURT: I mean, if you won't, tell us now.

PROSPECTIVE JUROR: I still would be a little concerned I wouldn't hear things correctly. I've been tested several times, it's not getting better, it's getting a little worse.

THE COURT: I appreciate your honesty.

(Prospective juror excused from sidebar.)

MR. BARTOLAI: She's No. 22. I think the Court hit it on the head, a lot of these people have problems, where do you draw the line? If you can't hear lower tones and you amplify it, does that make them hearable? I don't know.

THE CLERK: That was 23.

MR. HINKLEY: 23. So our position is, in regards to 23, it seems that she would be able to serve, because when you have the ear phones, it will be isolated and whatnot. So we are objecting for cause, that's all I really have to say on that.

MR. BARTOLAI: All right, I'll ask for cause, Judge, only

49

because I think -- she seemed very conscientious that she wants to hear, and she's concerned, maybe, she can't do her job because of it. And, again, the low tones and men, of course, she did make that distinction, so I would move for cause.

THE COURT: I'm going to grant that.

MR. HINKLEY: Okay.

THE COURT: Judy, next.

(At this time Prospective Juror No. 62 was called to sidebar.)

THE COURT: We were interested in knowing a couple things. One, you said, you were 70 percent --

PROSPECTIVE JUROR: I am a 70 percent disabled veteran, yes, 21 years.

THE COURT: All the result of your ears?

PROSPECTIVE JUROR: No, 10 percent hearing loss, 30 percent PTSD, couple tours, yeah, so.

THE COURT: Couple tours?

PROSPECTIVE JUROR: Yes, I did a couple tours. I've been to Afghanistan, Kurdistan, all of those places.

THE COURT: How do you feel about serving? Do you think you can do this?

PROSPECTIVE JUROR: If it was anything other than the torture, I'd say, yes. There's certainly personal things with that that I'd rather not deal with. So the last ten years of my -- after I retired, the last 10 years of my life, I've tried to

50

put it back together from a lot of PTSD issues that I've seen. I would really rather not have to relive some of that sort of stuff with certain sensitive information in this courthouse.

THE COURT: Counsel?

MR. BARTOLAI: Move for cause, Your Honor.

MR. HINKLEY: Sir, we're done asking you questions, so we will talk to the Judge now. You can step down.

PROSPECTIVE JUROR: Thank you, sir.

(Prospective juror excused from sidebar.)

MR. HINKLEY: That's fine, Your Honor, for cause is fine.

(At this time Prospective Juror No. 96 was called to sidebar.)

THE COURT: We're just interested in trying to see how much your hearing loss would affect you here and specifically whether, if you were given head phones that amplify the sound, whether that would make a difference in your ability to hear.

PROSPECTIVE JUROR: That would help. I have tinnitus, and I can't get into -- the V.A. lost a couple audiologists, I can't get in until July, that's why there's a delay.

THE COURT: Would you wear the head phones?

PROSPECTIVE JUROR: Yes, sir, I would wear them. Thank you.

(Prospective juror excused from sidebar.)

THE COURT: I think he's okay, Todd.

MR. HINKLEY: Yes.

(At this time Prospective Juror No. 94 was called to

51

sidebar.)

THE COURT: Hi, Juror No. 94. We need some clarification. You talked about the need to change your contact lenses. Is that once a day?

PROSPECTIVE JUROR: Yeah.

THE COURT: Were you thinking that you would be sequestered? You would have to stay here?

PROSPECTIVE JUROR: Yeah, I've got to change them out, I have to put them in a kit, I have to keep them overnight. I could use the same ones --

THE COURT: You understand you'll be going home every day?

PROSPECTIVE JUROR: See, I wasn't sure about that. I also adopted a puppy about a month ago, this is the longest I've been away from him, so I have no idea what he's doing at home. I can show you a picture of him.

THE COURT: Who is taking care of him?

PROSPECTIVE JUROR: I am. He's 7 years, 70 pounds, he's a Golden Lab, I got him from OSCAR about a month and a half ago. I have no idea what he's doing at home right now.

THE COURT: Questions, gentlemen?

MR. HINKLEY: No questions.

MR. BARTOLAI: Thank you.

THE COURT: All right.

(Prospective juror excused from sidebar.)

MR. BARTOLAI: I would move for cause.

52

MR. HINKLEY: Because of the dog?

MR. BARTOLAI: I think he's concerned about the dog -- it seems like the dog is -- he doesn't know what the dog is doing. I don't know, maybe.

MR. HINKLEY: I think he could serve, but, obviously, it's up to the Court.

THE COURT:  Are you moving on him?

MR. BARTOLAI: I'll move, Your Honor.

THE COURT: Let's just say this, I considered all of his answers, I'm going to excuse him for cause.

There was this other gentleman who has a sugar problem.

(At this time Prospective Juror No. 120 was called to sidebar.)

PROSPECTIVE JUROR: Yes, Your Honor, I had high blood pressure of 450 this morning, and it affects my eyes, my vision.

THE COURT: You have diabetes?

PROSPECTIVE JUROR: Yes.

THE COURT: Type 2?

PROSPECTIVE JUROR: Yes.

THE COURT: You have blood sugar fluctuation?

PROSPECTIVE JUROR: Extremely high, yes.

THE COURT: Do you think this trial would be hard for you?

PROSPECTIVE JUROR: Sir, it's 1:00, I haven't eaten nothing since. Look at how many hours I've been here? It's not normal.

53

THE COURT: That's not the way it is for you.

PROSPECTIVE JUROR: Yeah, it's not normal.

THE COURT: Questions, counsel?

MR. HINKLEY: No, thank you.

(Prospective juror excused from sidebar.)

THE COURT: He was No. 120.

MR. BARTOLAI: I would move for cause.

MR. HINKLEY: No objection.

THE COURT: So this would be No. 9, No. 12, No. 23, No. 62, No. 94, and No. 20. What do we do with No. 11?

MR. BARTOLAI: I have 11 as knocked off.

THE COURT: 111 was previously excused. 11 was in the first round for hardship. 120 is the last guy.

THE COURT: Yes, he's out. Then 96 we found okay. That's it.

(At this time the discussion at sidebar was concluded.)

THE CLERK: If I call your number, please stand. Juror No. 9. Juror No. 12. Juror No. 23. Juror No. 62. Juror No. 94. Juror No. 120. You've been excused and you may leave the courtroom. Thank you.

THE COURT: Members of the panel, I now have additional questions for you. These relate to the nature of this case and anything that you may tell us, with respect to your ability to be fair and impartial, based on the questions that I ask. So let's go forward here.

As I told you earlier, the name of the case for which we're

selecting jurors is United States v. Ross Roggio. The superseding indictment in which Mr. Roggio is charged alleges that, in 2015, Mr. Roggio and officials in the Kurdistan region of Iraq began a business relationship in which Mr. Roggio agreed to manage a project to construct a weapons factory and produce weapons for Kurdish soldiers.

Count 1 of the superseding indictment alleges that Ross Roggio Conspired to Commit Torture against an employee of the project beginning on or about October 14, 2015 and continuing through on or about November 21, 2015.

Count 2 charges that during the same time period, Mr. Roggio Committed and Attempted to Commit Torture.

Count 3 alleges that Mr. Roggio Conspired to Commit an Offense Against The United States by conspiring to export defense articles and services from The United States to Iraq, without having first obtained the necessary license or written approval and fraudulently exported merchandise, articles and objects.

Count 4 alleges that Mr. Roggio violated The Arms Export Control Act by exporting and attempting to export defense articles, being M4 bolt gas rings and firing pin retainers, without first having obtained the necessary license or other written approval from The United States Department of State.

Count 5 alleges Mr. Roggio violated The International Emergency Economic Powers Act by exporting, attempting to

export and causing to be exported rifling combo buttons, without first having obtained the required license from The United States Department of Commerce.

Count 6 alleges that Mr. Roggio violated The Arms Export Control Act by exporting, attempting to export, furnishing and causing to export and furnish defense services to Iraq without a license or other approval from The United States Department of State.

Count 7 and 8 charge Mr. Roggio with smuggling goods from The United States, based on activities related to the rifling firing combo buttons, the M4 bolt gas rings and firing pin retainers.

Counts 9 and 10 charge Mr. Roggio with Wire Fraud.

The 23 remaining counts charge Mr. Roggio with Money Laundering.

Have any of you heard, seen or read anything about this case from any source whatsoever?

No hands.

Based on my brief description of this case and the allegations against Mr. Roggio, would any member of the panel be unable to decide this case fairly and impartially? Yes, sir.

PROSPECTIVE JUROR: Juror No. 61, Your Honor and counsel, the count of Attempted Torture and Torture, my wife's good friend and a co-worker of mine was tortured and murdered, so I'm just bringing that up. I'm already emotional.

56

THE COURT: That knowledge, would that affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR: I'm sorry, Your Honor, it would. I'm already getting emotional, because bringing that up, that just came to mind. I can disclose discreetly, if you'd like.

THE COURT: Please.

(At this time a discussion was held on the record at sidebar.)

PROSPECTIVE JUROR: Maria Nydock was a juvenile that was tortured and set on fire by Steven Duffey, who was the same man who murdered my co-worker and classmate Kathy Kurimchak. I believe he's still incarcerated.

THE COURT: Steven Duffey. That happened at a catering center?

PROSPECTIVE JUROR: Yes.

THE COURT: This gentleman did what, also?

PROSPECTIVE JUROR: As a juvenile, he tortured and murdered -- tortured and set Maria Nydock on fire, he had two more charges for that. He was released, and then, later on, he attacked Kathy Kurimchak at Genetti's Manor, stabbed her multiple times and murdered her. And, like I said, that just immediately came back to mind when you brought up just the word, torturing people.

THE COURT: So you think that what you know about what happened and what was done by Steven Duffey --

57

PROSPECTIVE JUROR: I wouldn't be able to stop about --

THE COURT: You would tend -- it would be hard for you to be impartial, with respect to the Defendant?

PROSPECTIVE JUROR: Mr. Roggio.

THE COURT: Questions, counsel?

MR. HINKLEY: This is just for my edification, so I understand. Are the victims in that crime, are they related to you or friends of them?

PROSPECTIVE JUROR: Maria Nydock was a childhood friend of my wife and Kathy Kurimchak was a classmate and co-worker of mine.

MR. HINKLEY: Were you close with those folks?

PROSPECTIVE JUROR: I was involved in the murder questioning or investigation of Kathy Kurimchak by Steven Duffey.

MR. HINKLEY: Law enforcement questioned you?

PROSPECTIVE JUROR: Yes, actually, as a suspect, it was a big thing.

MR. HINKLEY: Thank you.

THE COURT: Thank you, sir.

(Prospective juror excused from sidebar.)

MR. BARTOLAI: I would move for cause on that. I think it's close.

MR. HINKLEY: I have no objection for cause.

MR. BARTOLAI: Judge, if I may, and the only thing I want to ask the Court is, when the juror gets up and says I'm 61 and

58

they've answered affirmatively to the question, perhaps, we could have that discussion here rather than them talking openly in court about it. I think it might be --

THE COURT: I'll be happy to do that.

MR. BARTOLAI: I think he just volunteered that.

THE COURT: He did. Okay, thanks.

(At this time the discussion at sidebar was concluded.)

THE COURT: Yes, sir.

PROSPECTIVE JUROR: Your Honor, Juror No. 14. Again, as an Air Force Vet, a family of a long line of Vets, Department of Defense employee, I think it would be unfair for me, given the nature of the charges, to sit on this jury and be able to make a fair decision, based on why we're here.

THE COURT: Counsel, I'll allow you to question this prospective juror, now from, your seats.

MR. HINKLEY: Thank you, Your Honor. Sir, you understand that, as the Defendant stands here right now, he's considered to be innocent of these charges, unless the Government can prove the case.

PROSPECTIVE JUROR: I do.

MR. HINKLEY: Do you understand that the Judge will instruct you, in regards to what the law is, what the evidence is, and then you would have to make a decision based only on the evidence here in this case? Do you understand that?

PROSPECTIVE JUROR: I do.

MR. HINKLEY: So given that, is it your position that you would not be able to follow the instructions of the Court and base your decision on the evidence alone?

PROSPECTIVE JUROR: No, I just think my opinions would be impartial. I would have a hard time making -- having this in the back of my head and what the current charges are would make it very difficult for me to concentrate and sit here and judge what they have to say and make a decision on that.

Anything that comes to military-related, government-related, anything like that, I take very personally. I've got a long line of vets in my family, I have a lot of family that spent a significant amount of time in Iraq and Afghanistan, so I just think it would be better if I wasn't sitting here.

MR. HINKLEY: No further questions, Your Honor. Thank you.

THE COURT: Mr. Bartolai?

MR. BARTOLAI: Yes, thank you. So, sir, what we're looking for is people that could be fair and impartial, that could put those thoughts aside and decide the case based on the evidence they see and the law that the Judge gives them. You volunteered that you don't feel that you can do that, in good conscience, is that basically what your answer was?

PROSPECTIVE JUROR: Basically.

MR. BARTOLAI: Thank you.

THE COURT: Thank you, sir. So the panel understands, I'll

60

make the decision on excusals at the end of this questioning, so you don't expect it to be on a person by person basis. Yes, is there someone else?

PROSPECTIVE JUROR: No. 98. I'm actually an Iraqi Veteran, I've seen lot of things over there, I would have a biased opinion.

THE COURT: Can you just tell us -- this one, you better approach.

(At this time a discussion was held on the record at sidebar.)

PROSPECTIVE JUROR: I joined The United States Marine Corps back in the year 2000, I got out in 2005. I was in Kabul, Afghanistan before Iraq, I think I got those backwards. I would not be able to hear this fairly, especially, with the torture charges and the M4 firing pins. Was he making them for what got our brothers killed? I would not be able to, no.

THE COURT: Questions?

MR. HINKLEY: No questions, Your Honor.

MR. BARTOLAI: No, thank you.

THE COURT: Thank you.

(Prospective juror excused from sidebar.)

THE COURT: Was there anyone else?

PROSPECTIVE JUROR: Your Honor, 51. What was said in the beginning, I want to disclose to you privately, but I would have -- I don't know that I could come out with a verdict that

61

is impartial.

THE COURT: Does counsel wish to question this witness?

MR. HINKLEY: Perhaps, at sidebar, Your Honor.

THE COURT: Sure. No. 98, would you approach?

(At this time a discussion was held on the record at sidebar.)

THE COURT: Juror No. 51, I beg your pardon.

PROSPECTIVE JUROR: Your Honor, during my childhood and my marriage, there was violence or whatever. I wouldn't be able to be impartial to him for his physical mistreatment.

THE COURT: So you feel you've already formed an opinion in your mind?

PROSPECTIVE JUROR: As I said, I don't know that it's something I could surpass and be fair in my heart, and I am very conscious.

THE COURT: You were in Iraq?

PROSPECTIVE JUROR: No, no, no, sir. My childhood -- anything like that, really, emotionally, this gets me distraught. I've been up since 4:00 this morning because of the anxiety of even coming in.

THE COURT: I see. Questions?

MR. BARTOLAI: No.

THE COURT: Questions?

MR. HINKLEY: No, Your Honor. Thank you.

THE COURT: All right, thank you.

(At this time the discussion at sidebar was concluded.)

THE COURT: Was there anyone else who raised a hand? Okay, let's continue.

Mr. Roggio is at counsel table. Sir, would you stand, please. Does anyone know Ross Roggio?

No hands. Thank you, sir. You can be seated.

I'm going to ask counsel for the Government to stand and introduce themselves.

MR. HINKLEY: Ladies and gentlemen, my name is Todd Hinkley, I'm an Assistant United States Attorney. I work in the Scranton office of the U.S. Attorney, and I've been tasked with this case.

With me today is Patrick Jasperse standing next to me. He's with the Human Rights Special Prosecutions Unit of the Department of Justice. He will be trying the case with me.

Next to him is Scott Claffee with The National Security Division Counter Espionage and Export Enforcement Section of The Department of Justice. They are both trial attorneys who will be assisting me in this case.

THE COURT: Does anyone know Mr. Hinkley?

No hands.

Does anyone know Mr. Jasperse? Does anyone know Mr. Claffee? No hands. Thank you, gentlemen.

MR. HINKLEY: Your Honor, some additional individuals I would introduce, including the case agents in this case.

THE COURT: Would you identify those persons?

MR. HINKLEY: Certainly. In the corner over there, there are two gentleman, Thomas O'Donnell, who just stood up, he's with the FBI, he works out of the Scranton office. Next to him is Jeffrey Burke who is with Homeland Security Investigations, and he works out of Philadelphia. And Bradley Binkley with The Department of Commerce is the last gentleman.

THE COURT: Does anyone know Mr. O'Donnell? No hands. Mr. Burke? Mr. Binkley? Does anyone know any of these gentlemen?

No hands. Thank you, gentlemen.

MR. HINKLEY: Finally, we do have a courtroom -- a person that assists us in the courtroom, there will be two of those, they will help both parties with presenting any electronic evidence that comes in. Sierra Murano, who is with the U.S. Attorney's Office here in Scranton, and Anna Rogers, who is a paralegal that works with Mr. Jasperse.

THE COURT: Do you know either of these individuals?

No hands. Thank you.

Mr. Hinkley, if you would, also, take a moment to identify the persons whom you believe may testify in this case.

MR. HINKLEY: Certainly, Your Honor. The Government anticipates that there are a number of witnesses we may or may not call, I'll go through those quickly.

Ronald Bly, who is a resident of North Carolina.

THE COURT: Does anyone know this individual? No hands.

64

MR. HINKLEY: Triin Kiviking, who is a witness from Estonia.

THE COURT: Does anyone know this individual? No hands.

MR. HINKLEY: Shawn Stevens, who works for ATF and works for them out of the D.C. area in Washington.

THE COURT: Does anyone know Mr. Stevens? No hands.

MR. HINKLEY: Kristi Merring, who is a person that lives down in the Stroudsburg area.

THE COURT: No hands.

MR. HINKLEY: Thomas Hall, who lives in Connecticut.

THE COURT: Anyone know this person? No hands.

MR. HINKLEY: Frank Monteforte, who lives down in the Stroudsburg area?

THE COURT: Does anyone know Frank Monteforte?

PROSPECTIVE JUROR: The name sounds familiar.

MR. HINKLEY: He's a business owner of a packaging place. It's called "The Packaging Place".

PROSPECTIVE JUROR: I do know him, I don't know him, personally.

MR. HINKLEY: May I follow up with him?

THE COURT: Of course.

MR. HINKLEY: The fact that you may or may not know this gentleman, would it have any effect whatsoever --

PROSPECTIVE JUROR: No, I can't even picture his face, I don't know him well.

MR. HINKLEY: If I may continue, Your Honor?

THE COURT: Yes.

MR. HINKLEY: William Mathes, a person who lives in North Carolina.

THE COURT: Anyone know William Mathes? No hands.

MR. HINKLEY: Roger Krahl, a person who lives in Illinois.

THE COURT: Anyone know Mr. Krahl? No hands.

MR. HINKLEY: Suzy Abayeva, who is, originally, from the Pocono area but now lives down in New Jersey.

THE COURT: No hands.

MR. HINKLEY: Dr. Denise Natali, who works with us in the Washington D.C. area.

THE COURT: Does anyone know Dr. Natali? No hands.

MR. HINKLEY: Aurelia Morales, who is a Customs and Border Patrol Officer, currently stationed in Montreal, Canada?

THE COURT: Does anyone know Aurelia Morales? No hands.

MR. HINKLEY: James Mundy, who is a Special Agent with Homeland Security Investigations, currently, assigned to the New York region.

THE COURT: Does anyone know James Mundy? No hands.

MR. HINKLEY: Douglas Green, a Computer Forensic gentleman from Homeland Security Investigations, currently, in the Philadelphia area.

THE COURT: Douglas Green? No hands.

MR. HINKLEY: Thomas Smith, who works for The Department of Commerce as a Forensics person, and he lives in the Pittsburgh

66

area.

THE COURT: Thomas Smith? No hands.

MR. HINKLEY: Steven Clagett, a Commerce employee who works in the Washington, D.C. area.

THE COURT: Anyone know Steven Clagett? No hands.

MR. HINKLEY: Alex Douville, a State Department employee who works in the Washington, D.C. area?

THE COURT: Anyone know Alex Douville? No hands.

MR. HINKLEY: Rauno Viltrop, who is a witness who lives in and is a citizen of Estonia.

THE COURT: Does anyone know this individual? No hands.

MR. HINKLEY: Heret Enden Viltrop, also, an Estonian citizen.

THE COURT: Anyone know this individual? No hands.

MR. HINKLEY: Patricia Foster, who works for PNC Bank, locally.

THE COURT: Anyone know Patricia Foster? No hands.

MR. HINKLEY: Kate Salazar, an employee with Wells Fargo. I think she lives down in the Allentown, Pennsylvania area.

THE COURT: Anyone know Kate Salazar? No hands.

MR. HINKLEY: Zuhair Al-Maliki, who is a citizen of Iraq, as well as The United States. He resides in Baghdad.

THE COURT: Anyone know this gentleman? No hands.

MR. HINKLEY: Marrtin Vilist, an Estonian citizen.

THE COURT: Anyone know Mr. Vilist? No hands.

67

MR. HINKLEY: Cody McBride, who resides in Texas.

THE COURT: Cody McBride? No hands.

MR. HINKLEY: Finally, Siim Saar, who is a citizen and resides in Estonia.

THE COURT: Anyone know Mr. Saar? No hands.

MR. HINKLEY: That's all we have, Your Honor.

THE COURT: Thank you. Now, I'll ask counsel for Mr. Roggio to stand and introduce himself.

MR. BARTOLAI: Good afternoon, ladies and gentlemen. My name is Gino Bartolai, I'm a lawyer and I represent Mr. Roggio. I live in Pittston and my office is in Pittston, Pennsylvania.

THE COURT: Does anyone know Mr. Bartolai?

PROSPECTIVE JUROR: I do. Juror 47. Mr. Bartolai used to be a client of mine in my old office, an insurance office.

THE COURT: Now, Mr. Bartolai, while you, of course, are under no obligation to call any witnesses, I'd ask you, if you would, please, to identify any witness who may possibly be a witness in this case?

MR. BARTOLAI: Your Honor, I'm unable, at this point, to identify any witnesses. There may be an Amanda Mecomber, she's from Michigan.

THE COURT: Anyone know Ms. Amanda Mecomber?

MR. BARTOLAI: Also, a Ken Gross, he's from Washington, D.C.

THE COURT: Anyone know Ken Gross? No hands as to either one of those individuals.

68

Let me continue. Does anyone here in this panel recognize another member of the panel as a relative a friend or an associate? Yes, sir.

PROSPECTIVE JUROR: You said relative, friend or associate?

THE COURT: Yes.

PROSPECTIVE JUROR: Yes, I'm Juror 42, I recognize 51, I believe.

THE COURT: 51. How do you know each other?

PROSPECTIVE JUROR: I was best friends with her son growing up.

THE COURT: Thank you very much.

PROSPECTIVE JUROR: I'm No. 24. No. 72, we used to work together.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: Five years -- 2018 I retired. PECO in Philadelphia and at PPL up in Scranton and Allentown.

THE COURT: Thank you very much.

PROSPECTIVE JUROR: Juror 73. It just happens that myself and Juror 74 are close friends.

THE COURT: Okay.

PROSPECTIVE JUROR: No. 98. We're neighbors(indicating).

PROSPECTIVE JUROR: We live right next door to each other.

THE COURT: Okay, thank you.

PROSPECTIVE JUROR: No. 14. I'm not quite sure what his juror number is, but the gentleman in the orange shirt over

69

there, we used to work together at Tobyhanna Army Depot.

PROSPECTIVE JUROR: That's me. I don't remember. I've been out of that place for ten years so. I don't remember. I'm 96.

THE COURT: Thank you both. Yes.

PROSPECTIVE JUROR: I'm Juror No. 86, I'm not sure what your number is, but she is my friend's mom.

THE COURT: It's 118. Thank you.

PROSPECTIVE JUROR: Juror No. 90. I'm familiar with Juror No. 26, he was a City Council Member of Wilkes-Barre when I frequented the City Council meetings.

THE COURT: Thank you. Have any of you ever served, previously, as a juror in a criminal case or a civil case or on a Grand Jury, either, in Federal or State Court? Yes.

PROSPECTIVE JUROR: Juror 82. It was over 20 years ago, I served on a civil case for a week in Federal Court.

THE COURT: Do you recall what it was about?

PROSPECTIVE JUROR: Civil. It was a Wal-Mart case.

THE COURT: Did the case go to verdict?

PROSPECTIVE JUROR: Yes, it did.

THE COURT: Do you recall what happened?

PROSPECTIVE JUROR: It was for Wal-Mart.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 51. I believe it was a civil over next door. It was a fall. Would that be civil?

THE COURT: That would be civil, yes.

70

PROSPECTIVE JUROR: After two days or three days, then, they came to an agreement.

THE COURT: So they settled?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

PROSPECTIVE JUROR: I was on the Investigative Grand Jury over in Lackawanna County in 2010, and I was in a civil case over in Lackawanna for a malpractice.

THE COURT: Juror number, sir?

PROSPECTIVE JUROR: 24.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: I'm No. 6. In October, I was a juror, he made a plea deal right before it went to trial, he pled guilty.

THE COURT: So you were selected, but you didn't hear testimony?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror 5. Malpractice case in Stroudsburg.

THE COURT: Did that case go to verdict?

PROSPECTIVE JUROR: Yes, it did.

THE COURT: What was the verdict?

PROSPECTIVE JUROR: Not guilty.

THE COURT: Medical malpractice, you said?

PROSPECTIVE JUROR: Yes.

71

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 22. I served on a jury in Schuylkill County. It was, I'm assuming, civil, it was an accident between a motor vehicle and an ATV, and trying to decide the percentage of who was at fault and what money would be given.

THE COURT: Did the jury do that?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Yes, ma'am.

PROSPECTIVE JUROR: No. 19. About 20 years ago, I served on a criminal case in Luzerne County. It was a drug-related case for possession and distribution.

THE COURT: Did the case go to verdict?

PROSPECTIVE JUROR: Yes, it did, guilty on some, not guilty on others.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR: No. 18. Susquehanna County. Criminal. Burglary, and he was found guilty.

THE COURT: Thank you. Thank you, Juror 18. Yes.

PROSPECTIVE JUROR: No. 10. I was on a case in Stroudsburg, but it settled out of court before we had to hear testimony.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 112. Pike County. And I think it was a burglary, it was a young man who was moving out of his apartment, and he had his friends help him, and they packed everything up and they took some of the landlord's stuff and

72

the landlord brought charges. And I can't remember if we found him guilty or it just got thrown out of court, but we did have a trial where we heard all the information.

THE COURT: That was some time ago?

PROSPECTIVE JUROR: Yes, it has been a long time ago.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 108. I served in Luzerne County on a murder trial and, also, a medical malpractice one.

THE COURT: Tell me about the murder trial.

PROSPECTIVE JUROR: It was a marine and another gentleman, I don't remember if he was a marine, and he got shot in the back, and he said he didn't do it, but we found him guilty, and he got life in prison. He was 21 years old.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror No. 102. I served on a trial for Pike County, a criminal trial, it involved pedophilia.

THE COURT: Was there a verdict?

PROSPECTIVE JUROR: It was a verdict, it was innocent.

THE COURT: Thank you, sir. Yes, sir.

PROSPECTIVE JUROR: Juror 38. Approximately, four years ago, I served on a burglary case in Schuylkill County, and the trial went to verdict, and it was a guilty verdict.

THE COURT: Thank you, Juror 38.

PROSPECTIVE JUROR: Juror No. 39. I served as a petit juror in Grand Jury, this was in New Jersey many years ago.

THE COURT: You served on both a Grand Jury and --

PROSPECTIVE JUROR: First petit juror and then --

THE COURT: They were both a long time ago, both of those services took place a long time ago?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you remember anything about the service?

PROSPECTIVE JUROR: The Grand Jury, you know how that goes, I couldn't. And the other one, it was about this person who lived in the building, and you know how they throw the fliers on the steps in Jersey, and he went out one morning and the fliers were there, he slipped and fell, and he was trying to sue the landlord.

THE COURT: I understand. Thank you. Thank you very much. Moving right to left. Yes, sir.

PROSPECTIVE JUROR: Juror No. 66. About 20 years ago in Manhattan, a criminal case, some guy wanted to take off -- rip off a drug dealer.

THE COURT: Did it go to verdict?

PROSPECTIVE JUROR: Guilty.

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR: 95. Civil suit in Luzerne County for a building company, and the house wasn't built properly, there was mold and stuff, it went to verdict and it was guilty.

THE COURT: Thank you. 96.

PROSPECTIVE JUROR: 2013, it was auto accident, civil court

in Lackawanna County. I was an alternate juror, I was released before the verdict was handed out.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR: No. 70. About three, four years ago in Luzerne County, I was on a case for a weapons charge, it did go to verdict and came back as not guilty.

THE COURT: Thank you very much. Yes.

PROSPECTIVE JUROR: 44. In Morristown, New Jersey, it was a civil case, it was some sort of an accident, and we had to decide who was at fault and who got money, and that kind of stuff.

THE COURT: I understand. Have any of you served as a witness in a criminal case or a civil case at a trial or a hearing or at a deposition? Served as a witness? Yes.

PROSPECTIVE JUROR: 45. In my line of work, I work Loss Prevention, I've been witness to a few court cases with theft.

THE COURT: Did you testify?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror No. 97. I was witness for a trip and fall in New York City, and that was probably about ten years ago. Recently, actually, yesterday, I gave testimony in a case in Stroudsburg.

THE COURT: What type of case was that?

PROSPECTIVE JUROR: I don't know how they classified it, but

it was a weapon, guy pulled a gun, threatened someone. Actually, me.

THE COURT: Threatened you?

PROSPECTIVE JUROR: Yes.

THE COURT: What happened with that case?

PROSPECTIVE JUROR: It didn't go very well. He did some rehab, and they said time-served, so the D.A. is bringing it back again.

THE COURT: Thank you.

MR. BARTOLAI: Number, sir?

PROSPECTIVE JUROR: 97.

THE COURT: Thank you.

PROSPECTIVE JUROR: 95. In my line of work, I do testify for Luzerne County Children and Youth on behalf of whether or not people should attend appointments.

THE COURT: Are you a case worker?

PROSPECTIVE JUROR: Social worker, yes.

PROSPECTIVE JUROR: 118. Similar to this, I've testified for cases as a school counselor for child abuse and custody and things like that.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror 109. About 20 years ago, I witnessed a drunk driving accident and was subpoenaed to testify, although, it was settled out of court before I could.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 108. I'm a receptionist at a law firm, and we were being harassed, and I had to testify to the person that was calling. We had a hearing in Lackawanna.

THE COURT: You were a witness?

PROSPECTIVE JUROR: I'm a receptionist at a law firm here in Scranton, we were getting harassed by a gentleman, and it actually went to a hearing.

THE COURT: You were the victim, as well?

PROSPECTIVE JUROR: I didn't know him, I recognized his voice and he showed up one time.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror 74. I was a witness at a Federal Grand Jury.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: I don't feel comfortable talking about it. I'll approach and talk to you.

THE COURT: Hold on to that. Thank you. Yes, sir.

PROSPECTIVE JUROR: Sir, 14. I was called as a witness for an injury case about ten years ago, depositions were taken, never went to trial, settled out of court.

THE COURT: Thank you, Juror 14. Yes, ma'am.

PROSPECTIVE JUROR: Juror 20. Our restaurant had somebody that was robbed in our parking lot, so I was a witness for that. And I, also, testified at my PFA hearing against my husband.

77

THE COURT: Thank you, Juror 20. Yes, sir.

PROSPECTIVE JUROR: Juror 1. Gave deposition for automobile accident about, probably, ten years ago in New Jersey. It settled out of court.

THE COURT: Do you or a family member have any conviction in State or Federal Court of a crime, the punishment for which could have been for more than a year, regardless of what sentence was actually imposed? You or any family member?

PROSPECTIVE JUROR: Family members, like, your brother, sisters or?

THE COURT: Brother, sister, father, mother, son, daughter.

PROSPECTIVE JUROR: How about nephew? Too far?

THE COURT: You can tell us about that, yes.

PROSPECTIVE JUROR: My nephew had spent, I think, four years in prison for armed robbery.

THE COURT: Understood. Thank you. What was your number, sir?

PROSPECTIVE JUROR: No. 24.

THE COURT: Yes.

PROSPECTIVE JUROR: No. 112. It's my daughter, she was arrested and charged with road rage and went to court. I do not know the outcome, because she has never spoken to me about it.

THE COURT: Fair enough, thank you. Yes, sir.

PROSPECTIVE JUROR: Juror No. 59. Brother, multiple armed robbery charges.

78

THE COURT: Convicted?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Yes, ma'am.

PROSPECTIVE JUROR: Your Honor, Juror 80. My son was convicted of drug offenses and served in county for -- there was several, actually -- for, approximately, two years all together.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR: No. 73. My son spent time in jail, several jails, county jails, for theft and forgery.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 5. I got charged with two aggravated assaults, simple assault and reckless endangerment, but I took a plea for just the reckless endangerment.

THE COURT: Understood. Yes.

PROSPECTIVE JUROR: No. 57. I think this was about 15 years ago my brother served, I don't know, Camp Hill, I don't know what that is, for robbery. Then he went to rehab. I don't know much about it.

THE COURT: I appreciate that. Thank you.

PROSPECTIVE JUROR: 56. I have a brother who I know is charged on drug-related charges. I know he did serve jail time, I don't know how long. I have a cousin, same thing.

THE COURT: Thank you, 56.

PROSPECTIVE JUROR: Juror 82. My brother, 20 years ago,

served a year in Lehigh County Prison for multiple D.U.I.-related charges.

THE COURT: Thank you, Juror 82.

PROSPECTIVE JUROR: No. 41. I'd like to keep it private, if I can, please, sir.

MR. HINKLEY: I'm sorry, I couldn't hear you.

PROSPECTIVE JUROR: I'd like to keep it private.

THE COURT: We will do that, thank you. Yes, sir.

PROSPECTIVE JUROR: Juror No. 66. I had a brother went to prison for robbery. West Chester County, New York.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: Was the question just charged or?

THE COURT: Convicted.

PROSPECTIVE JUROR: Convicted or just charged? You want to hear about charges, as well?

THE COURT: I'm sorry, if I misspoke. I'm interested in convictions.

PROSPECTIVE JUROR: Sorry.

THE COURT: Yes, please.

PROSPECTIVE JUROR: Juror 51. My son was charged and served a month. I can't tell you, specifically, what the charge was.

THE COURT: You're not sure what it is? That's okay, but I need to know.

PROSPECTIVE JUROR: I'm sorry?

THE COURT: You're not sure what the charge was?

PROSPECTIVE JUROR: I don't know what it was, specifically, no.

THE COURT: All right. Now, you anticipated my next question. As of now, does anyone have a charge pending against them for the commission of a crime or a charge against a member of their family, pending now?

PROSPECTIVE JUROR: No. 19. I have a nephew awaiting, I guess, a determination on child pornography.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 20. I have a nephew that is going back to jail. He had parole, but he broke his -- he violated, so he will be going back. In Baltimore.

THE COURT: I understand, thank you. For those of you who have pointed out that some member of your family was convicted of a crime, do any of you believe that that particular family member was treated unfairly?

No hands.

Have you or any member of your family ever been employed by a law enforcement agency, whether Federal or State?

PROSPECTIVE JUROR: No. 33. My son-in-law is a Corporal in the State Police.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 51. My brother was in the State Police and my aunt was in the U.S. Marshals.

THE COURT: Thank you.

81

PROSPECTIVE JUROR: Juror 57. My son-in-law is in the State Police.

THE COURT: Yes.

PROSPECTIVE JUROR: 58. I have a cousin in the State and a cousin in the Borough Police.

THE COURT: So one in the State Police and one in the Borough; right?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: Juror 128. My son is a Sergeant in Allentown Police and, also, the ERT team in Allentown.

THE COURT: Thank you.

PROSPECTIVE JUROR: 82 my husband, my son and my son-in-law are in the State Police.

THE COURT: Your son, son-in law and --

PROSPECTIVE JUROR: And my husband.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 75. My brother-in-law is in the State Police.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: Juror 47. I have a cousin who is in the State Police and a cousin who is retired from the FBI and a cousin who is Secret Service.

THE COURT: Thank you, 47. Thank you very much. Yes.

PROSPECTIVE JUROR: It's a nephew-in-law, he's in Colorado

Police.

PROSPECTIVE JUROR: Juror 41. I don't know if this counts, but my father is a correctional officer.

THE COURT: Is he employed locally?

PROSPECTIVE JUROR: No, State.

THE COURT: What institution is he at?

PROSPECTIVE JUROR: McKeesport County Prison.

THE COURT: Thank you.

PROSPECTIVE JUROR: I have a cousin who works for Luzerne County Sheriff's Department and another who works for the City of Wilkes-Barre Police Department.

THE COURT: Juror number?

PROSPECTIVE JUROR: 70.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR: No. 97. My niece and her husband are both Sergeants in the New York City Police Department.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR: No. 40. My brother works as a bank financial auditor, I believe, it's for the State of Pennsylvania, but I'm not sure.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror No. 51. I have a family member, but I was wondering if I could tell you privately.

THE COURT: Sure. Is there anyone else? Juror number?

PROSPECTIVE JUROR: 110.

83

THE COURT: Counsel, approach.

(At this time a discussion was held on the record at sidebar.)

THE COURT: What is it?

PROSPECTIVE JUROR: My uncle, actually, is -- he works here in the building as security, I just didn't know if that was like --

MR. HINKLEY: He's a Court Security Officer here at the Federal Courthouse?

PROSPECTIVE JUROR: Yes, Mark Rogan. I didn't know if that would be --

THE COURT: That's absolutely something you should tell us.

PROSPECTIVE JUROR: Thank you.

THE COURT: Questions?

MR. BARTOLAI: Yes. Your uncle works here as a Court Security Officer?

PROSPECTIVE JUROR: He's a Marshal I think. Mark Rogan.

MR. BARTOLAI: You think he's a U.S. Marshal?

PROSPECTIVE JUROR: Yes.

(Prospective Juror excused from sidebar.)

THE COURT: While you're here, there were two other people who wanted to speak.

(At this time Prospective Juror No. 41 was called to sidebar.)

THE COURT: Juror No. 41, you wanted to answer a question

84

privately. What would you like to tell us?

PROSPECTIVE JUROR: It was about me. The charges I had, I settled with a misdemeanor, but that's not what the original charges were.

THE COURT: What was the misdemeanor that you, apparently, pled guilty to?

PROSPECTIVE JUROR: Um-hum.

THE COURT: What was that?

PROSPECTIVE JUROR: Just trespassing.

THE COURT: There were other more serious charges?

PROSPECTIVE JUROR: There were, but they were dropped.

THE COURT: Questions, counsel?

MR. BARTOLAI: So my understanding is, you were charged with an offense, and you pled down to a misdemeanor?

PROSPECTIVE JUROR: Yes, sir.

MR. BARTOLAI: Were the original charges felony charges?

PROSPECTIVE JUROR: Yes.

MR. HINKLEY: Thank you. Of course, we're on the Government side, so there's two sides, there's the Defense and the Government. Part of the whole process here is just to make sure no one has a bias, either, against a Defendant or the Government.

So this experience that you had, being charged with these charges, did you feel that you were being -- that you were treated fairly through the process?

PROSPECTIVE JUROR: Yes.

THE COURT: So is there anything about that experience, which would make you hesitate, that you would give the Government a fair shake in this?

PROSPECTIVE JUROR: There's nothing that would influence my decision, at all.

MR. HINKLEY: Okay, very good.

THE COURT: Okay. Thank you.

(Prospective Juror excused from sidebar.)

(At this time Prospective Juror No. 74 was called to sidebar.)

THE COURT: No. 74.

PROSPECTIVE JUROR: All these young guys probably don't remember this, but I worked for Air America, Luytjes, and I was a witness there, and I was very involved with that.

THE COURT: You were a witness before the Grand Jury in Rik Luytjes' case?

PROSPECTIVE JUROR: Yes, I worked for him for six years, you guys probably don't remember. I'm not proud of what I did, but I caught up in the situation.

THE COURT: Rik Luytjes was a pilot?

PROSPECTIVE JUROR: Yes, and I worked for him since the beginning. And Zubrod was the one, I signed a Letter of Immunity with them back then.

THE COURT: Gordon Zubrod?

PROSPECTIVE JUROR: Yes. And Rik, he got me off too -- I don't think I was really guilty -- I don't want to get into it, it's a long story.

THE COURT: Well, what we really need to know is, that experience, as a witness before the Grand Jury and your participation, to the extent you had any other participation in the Luytjes matter, will that affect you here in your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR: I was very involved with the money laundering. Never convicted, but money laundering and conspiracy.

THE COURT: Counsel?

MR. HINKLEY: No questions, thank you.

PROSPECTIVE JUROR: Back then.

MR. BARTOLAI: Just if I'm correct, did you receive a target letter from the Government Attorney, does that ring a bell, Gordon Zubrod?

PROSPECTIVE JUROR: No, I was subpoenaed down to Harrisburg, and then went on from there, went to the Grand Jury.

MR. BARTOLAI: You were never charged with anything?

PROSPECTIVE JUROR: No.

MR. BARTOLAI: Do you feel that you got -- would you be able to be fair and impartial to both sides?

PROSPECTIVE JUROR: I don't know. To be honest with you, I don't know.

87

MR. BARTOLAI: Because that's what we're looking for.

PROSPECTIVE JUROR: I'm not real proud of it, it took me a while to get this off my back, and I don't want anybody to really know, because where I work now, some people know, but it's not fun. I have an interesting life. I can write a book.

MR. HINKLEY: Okay, thank you.

THE COURT: All right, thank you.

(Prospective Juror excused from sidebar.)

MR. BARTOLAI: Should I move now or should we wait?

THE COURT: We have a bunch of these we have to deal with. I don't know if you want to wait until the end.

MR. HINKLEY: What number was he, by the way?

THE COURT: 74. You want to deal with him right now? I'm happy to do it.

MR. BARTOLAI: Yes, Judge, I would move for cause. It seems to me like he may have been -- well, he's certainly a co-conspirator, according to what he said, he was a participant, let me say that. Maybe he got a break from the Government, not being charged. He certainly did appear as a witness in that, which, at the time, was a high profile case, I think Mr. Luytjes was one of the largest cocaine smuggling cases in the country, at the time.

So due to the closeness of him with the Government in that case, being a witness for the Government, the fact that he was a participant in that offense, and his candor, here, where he

88

said he's not sure if he could be fair and impartial, I would move.

MR. HINKLEY: No objection.

THE COURT: Juror No. 74 is stricken for cause. Since we're all here, anyone else you want to move for?

MR. HINKLEY: For cause?

THE COURT: Yes.

MR. BARTOLAI: So I have -- again, I had No. 14. These were the allegations, Judge, this went back to the allegations of torture. And I think, right off the bat, you excused 61.

THE COURT: I did.

MR. BARTOLAI: Then, there was No. 14, he was an Air Force Veteran, he came up and testified -- I don't recall specifically what he said -- but I do recall he said he couldn't be fair and impartial.

No. 98 was the same, Veteran of Iraq, he was in the Marines and --

THE COURT: There was no question that he made it clear he could not be fair and impartial.

MR. HINKLEY: No. 98, I have no objection to 98. 14 --

MR. CLAFFEE: I think I recall --

MR. HINKLEY: He wasn't as firm when I said the Judge is going to instruct you, and you would have to make your decision based only on the evidence. But anyway --

MR. BARTOLAI: So you're holding off on 14?

MR. HINKLEY: Yes.

MR. BARTOLAI: 98, you'll agree?

MR. HINKLEY: Fine.

MR. BARTOLAI: 51 was the one.

MR. HINKLEY: I would join in a for cause.

MR. BARTOLAI: She was visibly shaken.

THE COURT: I grant your joint request for strike for cause of No. 98. I will tell you -- I'll give you an opportunity, if you wish, to further question No. 14, but I thought he made it clear he couldn't be fair and impartial.

MR. BARTOLAI: I thought he made it clear.

THE COURT: But I'll give you the opportunity --

MR. HINKLEY: Okay, we will agree. 14 is out.

MR. BARTOLAI: And the one girl knew me but -- she was my insurance -- she probably worked for a firm that I had a business relationship with. She may have known my wife, who knows.

What do you have on 34? I thought 34 knew one of your witnesses. I have a note.

MR. HINKLEY: Before we get on to that, the insurance lady, what number was she?

MR. BARTOLAI: 47.

MR. HINKLEY: I mean, we can ask her, because, I guess, it's her --

MR. BARTOLAI: We should ask her. I think the reason being

is, my ex-wife had a problem and a lot of claims that she filed, I don't want that to come out.

THE COURT: Bring her up, No. 47.

(At this time Prospective Juror No. 47 was called to sidebar.)

THE COURT: Juror No. 47, you testified that you knew Mr. Bartolai or?

PROSPECTIVE JUROR: Yes, I worked at State Farm for 27 years, he was a client of mine for a long time.

MR. BARTOLAI: When did you work there? I don't remember.

PROSPECTIVE JUROR: 1994 to 2021.

MR. BARTOLAI: Would that affect -- so were you privy, at all, to any of the matters that -- I guess, I had insurance there.

PROSPECTIVE JUROR: Yes.

MR. BARTOLAI: Was that John Ryan's office?

PROSPECTIVE JUROR: You and your ex-wife.

MR. BARTOLAI: My ex-wife, do you know anything --

PROSPECTIVE JUROR: Yes, I do. I was the one who she usually spoke to through all of that. I've, actually, never met him before, but I knew who you were.

MR. BARTOLAI: Will you hold that against me?

THE COURT: Are you comfortable going forward, knowing what you know?

PROSPECTIVE JUROR: Yes, it wouldn't affect me.

THE COURT: Wouldn't affect you?

PROSPECTIVE JUROR: No.

MR. BARTOLAI: Fine, thank you.

MR. HINKLEY: No questions.

(Prospective juror excused from sidebar.)

THE COURT: Is there anybody else?

MR. BARTOLAI: Judge, if I can just say something. I appreciate her answering that it wouldn't affect her, but my wife was really -- like, she had a bad time, she was smashing cars, three and four a year, and there was issues with, you know, narcotics, drugs and things. I don't know what to tell you, I'm uncomfortable with her, that's the problem.

MR. HINKLEY: If you're uncomfortable, that's fine.

THE COURT: You're divorced, aren't you?

MR. BARTOLAI: I'm divorced and she's deceased.

THE COURT: I'm sorry. I would grant that.

MR. BARTOLAI: Yes, I think Todd agrees, right?

MR. HINKLEY: I'm not going to -- I'm saying, if you don't feel comfortable for that reason, I'm not going to insist that she be sitting on the jury.

MR. BARTOLAI: It's funny, because I had thought that, and she more or less volunteered that when she came up. She never met me, but she does know my ex-wife, and it was a storied past.

MR. HINKLEY: What I'm saying, Judge, is, if counsel feels

92

uncomfortable, I'm not going to insist that she be put on the jury.

THE COURT: So 47 is stricken for cause. Is there anyone else that anybody wants to bring up at this point?

THE CLERK: Did you cover 61, Judge?

THE COURT: I thought we did cover 61. I excused her for cause.

THE CLERK: Okay.

MR. HINKLEY: Judge, there was one of the jurors, potential jurors, I think it was No. 70, who indicated that there were firearms charges in their past, either, with him or a relation. Because this is a firearms type case, I think we should probably bring him up just to clear that up a bit. No. 70.

(At this time Prospective Juror No. 70 was called to sidebar.)

THE COURT: When you answered several questions, was there a reference to firearms charges?

PROSPECTIVE JUROR: One of the criminal cases I sat on in Luzerne County was a weapons charge.

THE COURT: Was that one of the cases that went to verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you remember what the nature of the charge was?

PROSPECTIVE JUROR: There was a gentleman who was pulled over by the casino in Plains Township, he was said to have a

gun on him as he was driving the vehicle, and he was on Probation, he wasn't supposed to have a gun on him.

THE COURT: All right. Counsel, questions?

MR. HINKLEY: No further questions. That clarifies in my mind what we were talking about.

MR. BARTOLAI: I have no questions, thank you.

(Prospective Juror excused from sidebar.)

THE COURT: Do you want to question Juror No. 97 further, with respect to his experience having a gun pulled on him? That's entirely up to you. I have no interest in doing so.

MR. BARTOLAI: I guess we should talk to him.

THE COURT: Bring him up, Judy.

(At this time Prospective Juror No. 97 was called to sidebar.)

THE COURT: You explained, in the course of telling us about being a witness to a crime, you had a gun pointed at you?

PROSPECTIVE JUROR: Yeah, it was, actually, last Thursday not yesterday, it's kind of blending together. I gave testimony again. He was convicted, I had to go back for sentencing, that was last Thursday, but, yeah, I was the victim.

THE COURT: Was it an attempted robbery?

PROSPECTIVE JUROR: No, I went into my friend's auto shop, he starting screaming and cursing out the girl working there. So I asked him to calm down. He started flipping out on me asking me who I was, I said I didn't work here, but there's no

94

reason to yell at the girl, the owner is coming. Then, he took a swing, I ducked out of it. I told him if he did it again, I was going to take him outside. He pulled a gun and put it to my head and told me he was going to kill me.

So I told him to do it, stepped forward and knocked his gun out of his hand, and the State Police took him away. Fun times.

MR. HINKLEY: Couple quick questions. You're making light of a situation that was fairly serious.

PROSPECTIVE JUROR: Yes, it also happened a couple months ago, so -- but it was bad, yeah.

MR. HINKLEY: Obviously, we don't want anybody on the jury whose life experiences are going to make it impossible for you to act as a fair and impartial juror.

Is there anything about that experience that you think is going to affect your ability to sit on this jury and listen to this evidence and be fair and impartial?

PROSPECTIVE JUROR: The torture, maybe, if it comes down to a situation like that, that might throw me off a bit, but other than that, it seems pretty legit, other than that.

THE COURT: Mr. Bartolai?

MR. BARTOLAI: So, sir, I know you're 71, right?

PROSPECTIVE JUROR: No, I'm 97.

MR. BARTOLAI: So this charge against this individual is pending, I guess?

PROSPECTIVE JUROR: No, convicted, terroristic threat with a

95

loaded weapon. We're still going back with sentencing.

MR. BARTOLAI: Did they ask you, as the victim, for your input on that?

PROSPECTIVE JUROR: Yes, but he pleaded guilty to those charges, so the D.A. told me it would be between 3 and 8 months.

MR. BARTOLAI: There is a sentencing that's going to come up?

PROSPECTIVE JUROR: He was, but that's why we went back again, because the Judge kind of cut 31 days off his sentence, because he went to rehab, so the D.A. is after him, that's why we keep going back.

MR. BARTOLAI: So you're a victim, and this is relatively recent, and to a certain extent it's pending?

PROSPECTIVE JUROR: Yes.

MR. BARTOLAI: Would that make you feel, at all, uncomfortable in this case?

PROSPECTIVE JUROR: The only thing may be the torture part. Other than that, it's legal issues.

MR. BARTOLAI: But the fact that you're kind of involved in a case, right now, as a victim and as a witness, you don't think that that would come into your fairness?

PROSPECTIVE JUROR: Depending on how the torture was.

MR. BARTOLAI: You're having a problem with the torture?

PROSPECTIVE JUROR: Yes, with the weapon involved, yes.

96

MR. BARTOLAI: Thank you.

THE COURT: Appreciate it. Thank you very much.

(Prospective juror excused from sidebar.)

MR. BARTOLAI: I would move on 97, Your Honor. I think he was pretty candid when he said he has problems with the torture. And given the fact -- and he was cavalier about it -- but he did have a gun pointed at him recently, and he's -- this is a pending case, hasn't gone fully through sentencing at this point.

And it may be that he may connect that to the torture, if it's just a slap. He said there's more than that in this case, there's going to be more than, of course, just a slap. So I think that, based on those circumstances, there's cause there to doubt his ability to be fair and impartial.

MR. HINKLEY: I'm trying to be fair and accurate, and it seems to me that he did say he was going to have an issue with the torture charge. I think that the evidence will show that the Defendant did point his firearm at various victims, during the course of this, so I think that's hitting pretty close to the mark as to what he went through, so I don't have any problem with the Court doing a for cause with him.

THE COURT: All right, Juror 97 is stricken for cause. Okay, gentlemen, let's continue.

(At this time the discussion at sidebar was concluded.)

THE CLERK: If I call your number, please stand. Juror No.

61. Juror No. 98. Juror No. 14. Juror No. 51. Juror No. 74. Juror No. 47. Juror No. 97.

Okay, you have been excused, your jury service is complete. You may leave the courtroom.

(At this time the above-mentioned Prospective Jurors were excused.)

THE COURT: I'll continue now. Have you or any immediate family ever been employed by a law enforcement agency, whether Federal, State or local? I think you've answered that, with respect to Pennsylvania State Police or law enforcement officers. Is there anyone who didn't answer that question?

PROSPECTIVE JUROR: I'm sorry, you said if anyone is a Federal employee?

THE COURT: I'm sorry, are you or a member of your family employed or have you ever been employed by a law enforcement agency?

PROSPECTIVE JUROR: Okay, no, I'm sorry. Thank you.

THE COURT: You're welcome. Have you or a member of your family attended law school or engaged in the practice of law?

PROSPECTIVE JUROR: Juror 34. My aunt was a paralegal.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 41. My cousin is an attorney in New York.

THE COURT: Thank you.

PROSPECTIVE JUROR: My cousin -- Juror 59. My cousin is a

98

lawyer.

THE COURT: Thank you.

PROSPECTIVE JUROR: No. 53. My cousin is a lawyer in Massachusetts.

THE COURT: Thank you.

PROSPECTIVE JUROR: Juror 6. My brother-in-law is an attorney in New Jersey.

THE COURT: Yes, sir.

PROSPECTIVE JUROR: Juror 1. My father-in-law is an attorney, one of my brother-in-law's is a local judge, I have a sister-in-law that's a local judge in Upstate New York, and I've got two other brother-in-laws who are attorneys.

THE COURT: Thank you, Juror No. 1. Yes.

PROSPECTIVE JUROR: My wife is a paralegal.

THE COURT: Number, please?

PROSPECTIVE JUROR: 5.

PROSPECTIVE JUROR: No. 15. Cousin is a lawyer.

PROSPECTIVE JUROR: No. 40. My sister-in-law is an attorney.

PROSPECTIVE JUROR: Sir, Juror 17. My brother works in a law firm in Florida.

THE COURT: Have you or any member of your immediate family ever been employed in a prosecutor's office, such as, in an Office of The United States Attorney or a District Attorney?

No hands.

Are you or anyone you know related to or know anyone in The

United States Attorney's Office for the Middle District of Pennsylvania, including the United States Attorney, himself, Gerard Karam?

No hands.

The Defendant Ross Roggio has been charged by indictment. And he has pleaded not guilty. An indictment is just the formal way of specifying the exact crime a Defendant is accused of committing and is simply a description of the charges against a Defendant. It is only an accusation. An indictment is not evidence of anything, and you should not give any weight to the fact that the Defendant has been indicted in making a decision in this case.

Is there any reason you would be unable to follow my instruction that the indictment is not evidence of guilt?

No hands.

Mr. Roggio has been charged with the crimes that I have already described. In our system of justice, a Defendant is presumed innocent unless and until the Government has proven guilt beyond a reasonable doubt. In a criminal trial, the burden of proving guilt beyond a reasonable doubt rests with the Government.

The burden of proof remains on the Government, it never shifts to the Defendant in a criminal trial. In a criminal trial, a Defendant has no burden to testify or offer any evidence, and you, the jury, may not consider a Defendant's

100

failure to testify or offer evidence, in any way.

Having said this, is there anyone who believes that because the United States has brought these charges against Mr. Roggio, that he must be guilty?

No hands.

Knowing, now, that this case involves the charges that I've described, is there anyone who, because of the nature of this case, would not be able to apply the presumption of innocence to the Defendant and hold the Government to its burden of proof of guilt beyond a reasonable doubt?

No hands.

Knowing, now, that the burden of proving evidence and proving guilt is always on the Government and that it never shifts to Mr. Roggio, is there anyone here who feels they would not be able to apply that standard in this case?

No hands.

Knowing, now, that a Defendant has no burden to testify or to offer any evidence, and that you, as a juror, may not attach any significance to the fact that Mr. Roggio may decide not to testify or draw any adverse inference against him if he does not take the witness stand, is there anyone here who feels they would not be able to disregard Mr. Roggio's decision not to testify or to offer evidence, if he chooses not to do so?

No hands.

Would anyone here have any difficulty finding the Defendant

Ross Roggio not guilty, if you believe that the Government had not met its burden of proving the Defendant's guilt of the offense beyond a reasonable doubt?

No hands.

As I will instruct you, proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty. A reasonable doubt is a fair doubt based on reason, logic, common sense or experience. A reasonable doubt means a doubt that would cause an ordinary, reasonable person to hesitate to act in matters of importance of his or her own life.

Is there any member of the panel who will hold the Government to a higher standard of proof than the law requires?

No hands.

I will instruct you on how to evaluate and weigh witness credibility. Do any of you not believe that it is possible for a witness to be mistaken or to fabricate testimony under oath?

No hands.

In any criminal case, it is for the jury to decide the facts and to resolve issues of credibility. Having said this, I will tell you that this case may involve the testimony of one or more witnesses who have scientific, technical or other specialized knowledge.

Is there anyone here who has any feelings for or against the use of expert testimony that would affect your ability to

102

render a fair and impartial verdict?

No hands.

This case may, also, involve the testimony of law enforcement officers. Is there anyone here who feels that because a witness is a law enforcement officer, that he or she should be given more or less credibility than a lay witness?

No hands.

Is there anyone here who has strong feelings for or against law enforcement, in general, such that you would be unable to render a fair and impartial verdict based, solely, on the evidence presented at trial?

No hands.

Have you, a family member or close friend had a dispute or bad experience with the United States Government, an employee, official or agency of the Federal Government, including an agency that issues export licenses?

No hands.

Have you, a family member or close friend lived in or served in or otherwise visited the country of Iraq? And let me follow this question up. Please remaining standing.

If so, is there anything about your experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR: No.

MR. BARTOLAI: What was your number, ma'am?

PROSPECTIVE JUROR: 44.

THE COURT: Can each of you tell me how you came to be in Iraq?

PROSPECTIVE JUROR: Juror No. 40. I was in the United States Marine Corps, deployed.

THE COURT: Thank you.

PROSPECTIVE JUROR: You said family member, as well? Yes, my nephew was in Iraq.

THE COURT: Was he there in the service, ma'am?

PROSPECTIVE JUROR: Yes.

THE COURT: Who else?

PROSPECTIVE JUROR: No. 108. My son was in Operation Iraqi Freedom.

THE COURT: Would that affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR: Absolutely not.

THE COURT: Yes.

PROSPECTIVE JUROR: Juror No. 99. My brother-in-law served in Iraq, but it would not affect me.

PROSPECTIVE JUROR: No. 96. My niece and her husband both served in Iraq, three tours.

THE COURT: Would that affect your ability to be fair and impartial?

PROSPECTIVE JUROR: No, sir.

THE COURT: Thank you. Knowing that this case involves allegations of torture and conspiracy to commit torture, is

104

there anyone here who would not be able to fairly and impartially consider the evidence in this case and follow the Court's instructions?

PROSPECTIVE JUROR: I would not be able to. The torture thing just gets me. I was abused very badly by my husband, and I just can't.

THE COURT: Understood. Anybody else? Just so I'm absolutely clear, I have another question on that issue.

Is there anyone here who has strong feelings about a criminal prosecution for the crime of torture, as that crime will be defined by the Court, such that you would be unable to render a fair and impartial verdict based solely on the evidence? I understand you've already answered, ma'am.

No other hands.

Knowing that this case involves allegations of illegally exporting firearm parts to the country of Iraq, is there anyone who would not be able to fairly and impartially consider the evidence in this case and follow the Court's instructions on the law?

No hands.

Is there anyone here who has any bias or prejudice for or against The United States Department of State, The United States Department of Commerce or the regulation of exports and export licensing requirements, such that you would be unable to render a fair and impartial verdict based solely on the

evidence?

No hands.

Do you or a family member or close friend have any training, expertise or experience in the import or export business, the business of freight forwarding or the business of overseas shipping and transport?

PROSPECTIVE JUROR: My wife is a customs broker. I'm No. 53, sorry.

THE COURT: A customs broker?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you. Yes.

PROSPECTIVE JUROR: No. 25. I work for the FDA administration, I inspect facilities that import into the United States. That's part of my job.

THE COURT: I'm sorry, I missed the first part of that.

PROSPECTIVE JUROR: I work for the FDA?

THE COURT: Food and Drug?

PROSPECTIVE JUROR: Yes, I'm in the Food Division, so I inspect food manufacturing facilities that import into the United States.

THE COURT: Thank you.

PROSPECTIVE JUROR: I work for a number of warehouses that import hard Italian cheeses and also automobile parts.

THE COURT: Your juror number?

PROSPECTIVE JUROR: Juror 1.

106

THE COURT: Yes.

PROSPECTIVE JUROR: No. 104. I sell military electronics that get ITAR regulations, so I'm familiar and been trained on that aspect of what's allowed and what's not allowed to ship.

THE COURT: How long have you been doing that?

PROSPECTIVE JUROR: 26 years.

THE COURT: Counsel may have additional questions for you on that.

Do you or a family member or close friend have any training, expertise or experience with manufacturing, selling, purchasing or transporting firearms or firearm parts for any purpose, other than your or their personal use?

No hands.

Your duty, if you are selected as a juror, are to judge guilt or innocence based on the evidence. It's my duty, as the Judge, to determine punishment. If you vote guilty, and I am required to impose punishment, you should understand that the law does not permit you to consider the issue of punishment because there are factors having nothing to do with the trial that will determine the lenience or the severity of the sentence.

Is there anyone here who would vote not guilty, no matter what the evidence indicated, just because this crime may result in punishment?

No hands.

Would the fact that the possibility that Mr. Roggio would spend time in prison affect your ability to render a fair and impartial verdict in this case?

No hands.

Do any of you hold any moral, ethical or philosophical beliefs that would prevent you from sitting in judgment of another person in a criminal case?

No hands.

If you are selected as a juror, you will have a sworn duty to follow the legal principles as given to you by me, even if you do not personally agree with them. Would any of you be unable to follow my instructions, if you personally disagree with them?

No hands.

Would anyone be unable to reach a verdict based solely on the evidence admitted at trial and on the law as explained to you by me?

No hands.

Whatever the verdict is in this case, it must be unanimous. In other words, all of the jurors will have to agree on the verdict or there will be no verdict. It is important for the jury to reach unanimous agreement, but only if each juror can do so honestly and in good conscience.

Is there anyone here who would have difficulty expressing their own opinions and thoughts about this case to their fellow

108

jurors during deliberations?

No hands.

Last question, before I turn to the lawyers for any further questions. Do you know of any other reason, beyond those we have discussed here today, do you know of any other reason why you should not be seated on this jury or why, if you are seated, you would not be able to render a fair and impartial decision based only upon the evidence submitted in this case?

No hands.

Mr. Hinkley, do you have any further questions?

MR. HINKLEY: Just a few, if I may, Your Honor. Juror No. 18. Earlier you had indicated you had to get stitches out.

PROSPECTIVE JUROR: Yes.

MR. HINKLEY: Are you scheduled to have that done?

PROSPECTIVE JUROR: It happened Saturday night, so it has to come out in 10 days, so it has to be scheduled -- well, this next week.

MR. HINKLEY: Next Wednesday, you said?

PROSPECTIVE JUROR: Next week, yes, I didn't say Wednesday, but, yes, Wednesday is the 10 days.

MR. HINKLEY: Would you be able to do that, do you think, on a lunch break or in the morning or afternoon after --

PROSPECTIVE JUROR: I live forty-five minutes to an hour out of here, so that wouldn't be very practical, though.

MR. HINKLEY: Juror No. 58. I think you indicated you had

109

something going on May 19th?

PROSPECTIVE JUROR: We have a scheduled vacation out of town.

MR. HINKLEY: Prepaid vacation. I don't have the juror number, but somebody indicated they had to go to a graduation ceremony.

PROSPECTIVE JUROR: That's me. We're leaving Friday morning, vacation for the day, Saturday for graduation.

MR. HINKLEY: So it's a weekend vacation?

PROSPECTIVE JUROR: Graduation vacation, we're getting out of town.

MR. HINKLEY: How many days will you be out of town?

PROSPECTIVE JUROR: We leave Friday morning, Saturday and we'll be home Sunday night.

MR. HINKLEY: Okay. One general question. There were a number of folks who indicated they had relatives who had, either, been charged or convicted of crimes. I just want to make sure that there's no one who has had that experience in the family who, because of that experience, would be unable to give a fair shake to the Government, as well as to the Defendant.

Is there anyone here who answered positively to that question who has any doubt that they would be able to be fair and impartial as a juror?

No hands, Your Honor. Thank you.

110

THE COURT: Mr. Bartolai?

MR. BARTOLAI: Well, my question is, you know, we have talked a lot about some things, torture and firearm parts and things and shipping and exporting them.

But, ultimately, this is a firearms case, there is a firearms aspect to this case, and we know so much about firearms, we hear about them every day.

Does anyone have any thoughts about firearms, to such an extent that they may have an opinion in their mind, to such an extent, that they wouldn't be able to leave that opinion, say, at the door, and judge the case based upon the law and the evidence that you see and the Judge gives you?

No hands, very good.

THE COURT: Would counsel approach?

(At this time a discussion was held on the record at sidebar.)

MR. HINKLEY: If I may go first, Your Honor. No. 20 indicated she just can't sit on a torture case, I'm going to move for a for cause.

MR. BARTOLAI: I agree, Judge.

THE COURT: Anybody else?

MR. HINKLEY: Maybe the two with the scheduling issues.

MR. BARTOLAI: What are the numbers?

MR. HINKLEY: And, yeah, maybe the two with scheduling issues. And the stitches, 58. And then we have the one going

111

away Friday for the weekend.

MR. BARTOLAI: I'm okay. Do we have enough jurors?

THE CLERK: Yes.

MR. BARTOLAI: I'm okay with that.

THE COURT: All right, so, Judy, 20, 18 and 58.

MR. HINKLEY: 58, yes.

MR. BARTOLAI: If you're finished, I just want to catch up here. I guess I'm fine. I have no one else, Your Honor. I'd like a chance to compare lists and make sure I'm not missing something, but aside from that, I think I'm fine.

THE COURT: Do you want to do that now?

MR. BARTOLAI: We might as well do that.

MR. HINKLEY: Patrick has that. There's one issue.

MR. BARTOLAI: Judge, I should have said -- there was a young man here who came up, he said that his -- I think he was 110 -- he said his uncle works here in the building, he's a CSO. I don't think he was struck, but I would move for cause.

MR. HINKLEY: We would object to that, Your Honor. He did not say he could not be impartial.

THE COURT: You would have to get him back up here.

MR. BARTOLAI: Yeah, if we can.

MR. HINKLEY: We won't get to 110.

THE COURT: You actually won't.

MR. BARTOLAI: Well, then, what's the point? He was here and I had the chance. He seemed to be okay, I was just moving for

112

cause.

THE COURT: Do you want to do this?

MR. BARTOLAI: No, we're good.

THE COURT: Thank you. We're good. All right, now, as soon as we get this done, we will excuse these people and we will go right into peremptory challenges.

MR. HINKLEY: That is the issue I need to raise. The Government wants to make sure that the Court doesn't sit and swear the jury in until there's been a decision rendered on the suppression. Because, theoretically, if the Court rules against the Government, we would have a right to appeal that decision, but if the jury is sat and sworn in, then, jeopardy attaches.

THE COURT: That's true.

MR. HINKLEY: So if we're going to have a suppression hearing, I think, what we should do is put the jury there, but then not swear them in and dismiss them until we get done with that and swear them in once they get back.

MR. BARTOLAI: Well, I agree, I agree.

THE COURT: All right. I would like to be able to instruct them, however, not to discuss the case with anybody or among themselves.

MR. HINKLEY: I don't think that's a problem.

THE COURT: All right.

MR. BARTOLAI: Then -- so we'll compare notes, at some point, to see who has been stricken? I just want to make sure

113

I'm not missing somebody.

MR. HINKLEY: Yes. It has been quite a while, I don't know about the jury pool, but I don't know how much longer I'm going to last without using the rest room.

THE COURT: Once we do this --

MR. HINKLEY: We would also like to confer --

THE COURT: Can you see your way clear for peremptories before you do that?

MR. HINKLEY: We would like to do that first.

THE COURT: Okay. We'll take a break, once this is done.

(At this time the discussion at sidebar was concluded.)

THE CLERK: If I call your number, please stand.

Juror No. 20, Juror No. 18, Juror No. 58. Okay, you've been excused and you may leave the courtroom. Your jury service is complete.

(At this time the above-mentioned Prospective Jurors were excused.)

THE COURT: Members of the panel, the next step in this process is the exercise by the lawyers for the parties to use their peremptory challenges, which I told you about at the beginning of this process.

Before we do that, however -- and that shouldn't take a very long time and then we will have a jury and those who are selected will remain, those who are not will be excused. But we're going to take, basically, a rest room break here for

114

twenty minutes, and then we'll return.

(At this time a recess was taken.)

THE COURT: Counsel, are you ready to use your peremptory challenges?

MR. BARTOLAI: Yes, we are.

MR. HINKLEY: Yes.

THE COURT: Let's proceed.

(At this time peremptory challenges were exercised.)

THE CLERK: Okay, a jury has been selected. If I call your number, would you please stand. That means you've been selected as a juror.

Juror No. 30. Juror No. 34. Juror No. 36. Juror No. 38. Juror No. 40. Juror No. 15. Juror No. 16. Juror No. 17. Juror No. 45. Juror No. 22. Juror No. 50. Juror No. 52. Juror No. 53. Juror No. 56. Juror No. 59 and Juror No. 66.

You've been selected to serve as jurors. If you're not standing, your jury service is complete and you may leave the courtroom.

(At this time the remaining Prospective Jurors were excused.)

THE COURT: Ladies and gentlemen, we're going to excuse you for the rest of the day. There's a matter that I'm required to address that does not involve your presence, and we're going to do that right now.

So I'll excuse you for the day. Please return tomorrow by

9:30. In the meantime, don't discuss the case among yourselves and don't discuss it with anyone else, including, of course, your family or friends.

With that, thank you for your attendance. See you all tomorrow.

(At this time the jury panel was excused for the evening.)

THE COURT: Counsel, my understanding is there's some technological setup that needs to be undertaken before we can begin this hearing on the Motion to Suppress. Are you aware of that?

MR. HINKLEY: Yes. There may be some audio that would be played during the hearing, if we are having a hearing. I don't know if it has been declared that we are at this point.

THE COURT: Well, someone will have to educate me and enlighten me here. As far as I know, we're going to have a hearing on a Motion to Suppress.

MR. BARTOLAI: Yes, Your Honor. This is the time and place set for the hearing on the Motion to Suppress, and this matter has been raised by prior counsel, fully briefed, and the Court has set this time for that hearing.

My understanding, from the Court's ruling, is that the Defendant has the burden in this case to show that the exception would apply, the blackmail exception.

So that being the case, Your Honor, it's our burden to go forward. And I don't have a witness, Your Honor. The witness,

**116**

when I had this Pre-trial Conference last Wednesday or, I think, it was Thursday, maybe, we had discussed the possibility that there might be a witness. And that witness would have been Mr. Roggio.

Since then, we have met at the jail, as early as yesterday, and we have discussed it, and he won't testify, he will not be called as a witness at this hearing.

So having said that, Your Honor, we are in a position that we have no witnesses to go forward. And I think, at that point, it would probably be incumbent on the Court, us having the burden, to find against us. So that's kind of where I am, Your Honor.

THE COURT: Mr. Hinkley, were you previously aware of the Defendant's position?

MR. HINKLEY: We had some discussions, it was never really declared whether or not the Defendant would be putting on a witness or not. So we anticipated it as a possibility, but we did not know for sure.

MR. BARTOLAI: That's a decision, Your Honor, that we couldn't really make until right now, actually, you know, whether or not to do that. And just moments ago, I finalized that decision with Mr. Roggio, and that's where we are, Your Honor.

THE COURT: Well, as I think about the matter as it's now presently been put before me, there's a question, in my mind,

as to how to proceed.

On one hand, I can easily understand your position as conceding that there is no defense to the admission of the recording, if you will.

On the other hand, to the extent that you would have a right to cross-examine any witness that the Government should present, I would, obviously, allow you to do so. But I need to know how you wish to proceed.

MR. BARTOLAI: Your Honor, if I may. So the thought had come to my mind Friday to subpoena or to ask that Triin Kiviking, the person who has made this recording, come and testify as for the Defense. And I've spoke to Mr. Hinkley about that, and I've been given, since then, the Jencks material where she said she didn't do this for the purposes of blackmail.

I don't know, you know, I can't, in good faith, think that she's going to change -- that she would come and testify that she, in fact, attempted to blackmail Mr. Roggio. So that's the big -- that's the clear answer, whether or not she intended to make this tape to use against Mr. Roggio.

And I think everyone agrees, if we take the Government's word for it, you know, that she did this because she was afraid of Mr. Roggio and, at some point in time, she would have this as some sort of security for that purpose, maybe, that's not classical blackmail, but, perhaps, it was made for a purpose that would preclude its admission.

118

I have no case on that, I don't have anything that would indicate that that would be the case, Your Honor. But that seems to be an argument that can be made. And I don't know if the Court is interested in that. I brought this to the Court's attention Thursday that the Government would attempt to authenticate or, you know, at least, put on a preliminary showing of this tape and the circumstances they got it under, etc.

But, again, and I think I brought that up with the Court, and if a witness were called, I would question that witness. But aside from that, knowing that if, as stated in the Court's ruling and opinion on this matter that we have the burden on this issue, clearly, we're not prepared to meet that burden for lack of a witness.

THE COURT: Counsel?

MR. JASPERSE: Your Honor, the recording is admissible unless the primary motivation or a determinative factor in the witness' motivation for making the recording was to commit a criminal, tortious or other injurious act. The Court already has ruled that the Defendant has the burden of proving an unlawful purpose by a preponderance of the evidence.

The Defendant needs to go first, the Defendant needs to put on some kind of showing, before the Government should be required to call witnesses it, also, plans to call at trial and expose them to cross examination at this hearing. They have

conceded they have not met the burden, therefore, I don't see how the Court can rule otherwise than to deny the Motion to Suppress.

THE COURT: Do you have any response to that argument?

MR. BARTOLAI: I don't.

THE COURT: Very well. In that case, I will deny the Motion to Suppress. As a consequence, no hearing will be held, as it is, obviously, unnecessary, in light of the fact that the Defendant has conceded that it has no basis to challenge the audio recording on the grounds that were originally set forth in his Motion to Dismiss, albeit, by other counsel.

With that, I guess I've sent the jury home slightly early. There doesn't appear to be anything else we need to do, without going further by swearing this jury in and having give them their preliminary instructions, which are somewhat lengthy. Does someone else have a contrary view here?

MR. HINKLEY: No, Your Honor.

MR. BARTOLAI: No, Your Honor.

THE COURT: All right. Well, in that case, we will adjourn, unless I have to hear a reason not to. We will adjourn for today, we will pick up tomorrow. I will give the jury my preliminary instructions, and you should be prepared to give opening statements. Anything further?

MR. BARTOLAI: No, thank you, Your Honor.

THE COURT: Mr. Hinkley?

120

MR. HINKLEY: We do have a few matters. So as the Court is aware, there are numerous pre-trial In Limine Motions that were filed for various issues we thought might come up during trial.

One of the things that we have been struggling with on this side is that we're going to be calling certain witnesses who have indicated that, as part of the recollection of what happened, that they were sexually assaulted by the Defendant. The way that the witnesses termed it is that these assaults were a way to control the witnesses, part of loyalty tests that the Defendant did for these witnesses.

And we're trying to be very careful about how we present evidence, and we -- of course, the evidence, which is admissible, we would like to admit, but we understand that there's some sensitivity with presenting that type of evidence. While we don't view it as 404(b), other bad acts, because it is, in our mind, arguably, integral to the Defendant's crimes, we believe there's, probably, a weight test that the Court would have to do and, maybe, even give some cautionary instructions that won't come up with our first couple witnesses, but probably, this week, it will come up with one of the witnesses.

So I'm just -- I'm laying that out so that when we get to that point, we probably will want to talk to the Court, because you have heard some of the evidence, at that point, maybe, you would be in a position to make a decision, one way or the

121

other, whether the Government would be allowed, but our concern is we have prepped the witness, and, thus far, what we have said to the witnesses, we're not sure that the Court will allow the witness to talk about that part of her testimony.

So we would need time to speak to her, if it's otherwise, if the Court decides that it's evidence that is admissible, so that she would be prepared to testify. And what it does is kind of completes a picture that would otherwise not be as complete.

And I can proffer what the witness told us is that she was hired by the Defendant, and then was -- a plane ticket was purchased for her to travel to Iraq, but she met the Defendant in Istanbul, and that the Defendant sexually assaulted her there, and as part of her meeting with the Defendant there, he was stressing loyalty to him, stressing that, basically, that she had passed the test, because, when confronted with what happened and another person indicating, We should call the Defendant's wife, when she said, Maybe we shouldn't do that, it was declared, You passed the test, you're loyal to the Defendant, regardless of what happened.

So, again, it's very sensitive, I think, and we want to be very careful in how we put the evidence in. But that's not the only witness who has experience nor provided the Government, through their statements, of being sexually assaulted and for the sexual assault to be part of the controlling that the Defendant did to try to prevent these employees/victim

122

witnesses to report the criminal behavior.

So it's just one aspect of what we have heard over and over in the case.

THE COURT: It sounds like you're telling me this is intrinsic to the crimes at issue?

MR. HINKLEY: Yes.

THE COURT: Well, before I say anything else, Mr. Bartolai, do you want to respond?

MR. BARTOLAI: Yes, Your Honor. Well, it certainly is not intrinsic to the torture charges. This witness he's discussing now wasn't even present or in Iraq, during the time of the alleged torture. I submit, Your Honor, it's not intrinsic or relevant to these import or to these export violations.

As everyone knows, it doesn't go towards items being exported, it doesn't go towards the approval of whether or not the individual had approval, it doesn't go towards his defense services, any of the charges that are contained in the indictment. It doesn't go to money laundering, it doesn't go to wire fraud, simply, doesn't go to anything.

And to the extent it does go to anything, to the extent it, somehow, completes a picture that would not otherwise not be completed, well, there's other ways the Government can complete the picture without coming out and saying that Mr. Roggio raped me, and that's what the reports say. And that's what these witnesses will most likely blurt out, that they were raped by

Mr. Roggio.

And I think that that's just devastating, I think, what we're looking at is something that would just cause the jury to make a decision in this case not based upon the evidence but out of pure emotion, Your Honor. It's going to be an emotional case, Your Honor, anyway, at this point, with this torture charge.

We know it's not 404(b), the Government has said that, they're arguing intrinsic. I say it's not, Judge, I don't see how it's intrinsic to any of the charges contained in the superseding indictment.

And, I think, to the extent that, somehow, it's probative of any of those charges, there's 403 to be considered, which is, you know, unfair prejudice, if it's something that has substantial unfair prejudice against Mr. Roggio, it should be excluded, and I would submit if there ever would be a circumstance where that rule would apply, it would be relative to these allegations that Mr. Roggio had raped them -- had raped this woman.

Now, going about this loyalty test, I'd like to point this out, as well. We're dealing with a case where these are foreign witnesses, and they're coming from -- you know, who is to say who is going to show up and who is not going to show up. I know that Mr. Hinkley alluded to an instance where someone told this Government witness, We should call his wife, and the Government

124

witness said, No, let's not. And then that other person said, Well, you passed the loyalty test. I can tell you this, that witness was a person by the name of Elina Kadaja, and she's not going to be at this trial. So this conversation that the Government is alluding to is only half of a conversation. The Government would need to use hearsay to put that whole picture together, and, certainly, we would object to that.

So for all these reasons, Your Honor, and I appreciate the fact -- Mr. Hinkley and I have been discussing this, and it's a delicate issue, and we filed these motions, and it's going to come up, Your Honor. We, of course, our position is that there's no place for that in this trial.

And it's not just this witness, I think, there are a few other witnesses. I believe, that there's a witness relative to this reporting who made this reporting against Mr. Roggio, and I think she has said in the 302's that I've seen that there was inappropriate sexual contact there.

In fact, I think she said he raped her, as well. So, I mean, it has the potential here, Your Honor, to really, you know, take this out of the fair trial into something that's, you know, almost circus-like. And I certainly am not suggesting that anyone would permit a circus to go on in this courtroom, but it has that potential, Your Honor, so I would object.

THE COURT: Let me make these observations. First, I'm keenly aware of the possibility that evidence of sexual assault

125

or outright rape would be -- has the potential to be highly prejudicial, that it has the potential to be -- to have an application of a 403, where I determine that the probative value is outweighed by the danger of unfair prejudice.

However, on the other hand, it may very well be that if the Government can establish the sufficient nexus between the testimony regarding sexual assault and the testimony this witness offers as to -- that incriminates Mr. Roggio, with respect to one or more of the counts of the indictment, in particular, obviously, the torture counts, that it probably would be intrinsic in that situation.

If the evidence is that any delay in reporting or any other conduct that would tend to cast doubt on the testimony is explainable by the sexual assaults, that presents a different set of circumstances. But, by itself, isolated from any other evidence, there's a serious problem with the admissibility of the sexual assaults.

I don't mean to be flippant here, but if this witness is on the witness stand and she testifies about a variety of matters relating to one of the torture counts of the indictment, and, then, it's, By the way, didn't he also sexually assault you? That isn't going to fly. There's going to have to be some nexus between her testimony that is incriminating, with respect to the charges against him, and the sexual assault, so that, if I do a 403 analysis, I can then determine whether or not the

**126**

probative value of what she's saying is not outweighed by the danger of unfair prejudice.

Obviously, among us here, without testimony, without us having heard a word of testimony, I can't decide anything.

MR. HINKLEY: If I can reply very briefly. I'm sure we could come up with a more elegant way of saying this, but basically our investigation, what we believe, is that the Defendant had hired these various folks to work on this project that the jury will hear about with the weapons project, that the folks that he hired -- he had hired professionals, accountants, engineers and Estonian and some Americans, that were not part of the criminal scheme. So the Defendant had, basically, a problem with that.

That is, how do you conduct a criminal scheme with folks that are cooperating and being part of your project, if you will, yet, protect yourself from being disclosed to law enforcement? So he did a variety of things. Loyalty was very important. He went through these witnesses, as well as doing things like the sexual assaults, which made the folks afraid to go against the Defendant, report him to authorities, things like that.

And because it is part of the scheme, our argument is that we have to prove willfulness in this case. And the Defendant has placed willfulness in question by indicating that it's both a duress defense and a public authority defense. So his state

127

of mind is at issue. So I think that when the Court weighs what we are allowed to put in, we're not putting in the sexual assault, just in isolation, it's part of the whole scheme he had to control these folks, which, then, shows the willfulness of the crimes that he is charged with.

THE COURT: So as part of the scheme or as part of the conspiracy to carry out the conspiracy to commit torture, you're suggesting there would be evidence that there were various ways to keep those not in the conspiracy in line, if you will, and one of them was sexual assault?

MR. HINKLEY: Yes, and we believe the evidence will show that he brought other employees to view the torture and then made threats about those folks could end up at the compound. Another example of his way he needed to control these folks.

THE COURT: Well, let me just say, I understand the theory of the Government's case, obviously, I'm not approving it or passing on it, I understand the theory of the case. I think it's a theory that may very well allow evidence of control by sexual conduct in, I'll have to hear the testimony.

MR. HINKLEY: Okay.

MR. BARTOLAI: Very good.

THE COURT: Anything else, before we adjourn?

MR. HINKLEY: No, thank you. And thank you for taking, at least, the time to think about that.

THE COURT: You're very welcome. All right, we will see you

128

tomorrow morning.

(At this time the proceedings were adjourned.)

129

CERTIFICATE

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

S/Kristin L. Yeager
KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter

REPORTED BY:

KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter
United States District Court
Middle District of Pennsylvania
P.O. Box 5
Scranton, Pennsylvania  18501

(The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)