1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff          )
           vs                      )      18-CR-97
                                   )
ROSS ROGGIO,                       )
                                   )
                Defendant          )
_____    )

TRANSCRIPT OF PROCEEDINGS
*Jury Trial - Day Ten*
BEFORE THE HONORABLE ROBERT D. MARIANI
FRIDAY, MAY 19, 2023; 9:30 A.M.
SCRANTON, PENNSYLVANIA

FOR THE GOVERNMENT:
    TODD K. HINKLEY, ESQ.
    Assistant United States Attorney
    Suite 311
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503

    SCOTT A. CLAFFEE, ESQ.
    DOJ-Nsd
    Counterintelligence & Export Control Section
    950 Pennsylvania Avenue NW
    Washington, DC  20530

    PATRICK JASPERSE, ESQ.
    DOJ-Crm
    1301 New York Avenue, NW
    Washington, DC  20530

FOR THE DEFENDANT:
    GINO A. BARTOLAI, JR., ESQ.
    238 William Street
    Pittston, Pennsylvania  18640

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

2

# I N D E X

| Witness For the Government: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Thomas O'Donnell (Forfeiture) | 129 | 136 | -- | -- |

# E X H I B I T    I N D E X

| For the Government: | Identified | Admitted |
|---|---|---|
| Exhibit No. F-1 | 134 | 135 |

THE COURT: Counsel, are you ready to present closing arguments?

MR. HINKLEY: We are, Your Honor.

MR. BARTOLAI: Yes.

THE COURT: Please proceed. Ladies and gentlemen, the Government goes first because they have the burden of proof, and for that reason, as well, it has the right of rebuttal, after the Defendant's closing. With that.

MR. HINKLEY: Thank you, Your Honor. May it please the Court, Mr. Bartolai. It has been a long two weeks. For me, it has been a long couple of months. Yesterday was a long day. I was exhausted by the time I got home last night, which was around 9:00.

I got changed, I went to bed, and I don't remember my head hitting the pillow, in fact, if you were to ask me when I went to bed, the only way I could tell you I did is because I woke up there.

All the way home on my drive something was bothering me. I couldn't figure out what it was. Something wasn't right. When I hit the pillow with my head, I was out. But not too long after that, I started flipping and flopping like a fish on dry water. I swear to God, at one point, my dog Willow raised her head, looked at me and sighed. I couldn't figure out what it was.

I'll never forget, at 4:34 this morning, my eyes popped open. Too clever by half. Those are words my mom used to say,

and they echoed in my brain. Mr. Roggio was too clever by half. And I knew then what was bothering me.

Ross Roggio thought he was above the law. During this trial, you have seen that he put himself, his own interests, his greed, his ego, his need to dominate other people ahead of everyone and everything. The evidence, during this trial, proved that Ross Roggio exported weapons, tools, weapons parts, tools and services from the United States to Iraq, and he did so without acquiring the required permissions or licenses from the Government.

The evidence has proved that, as he feared his scheme was falling apart, Roggio brutally tortured one of his employees. You have heard two weeks of testimony, seen photographs, videos, you've heard from 25 witnesses, many of those witnesses personally witnessed Roggio's crimes.

Other witnesses were experts. Experts in the field of computer forensics, experts in the law of export, experts in The Kurdish Region of Iraq. You even heard from an Iraqi Judge, in regards to the law in Iraq.

You heard from a law enforcement agent who uncovered these crimes. You heard from witnesses from as far away as Tallinn, Estonia and Baghdad, Iraq.

You heard from witnesses who sold controlled items to Mr. Roggio, which he then illegally exported from The United States to Iraq.

You heard from retired soldiers who had been in Sulaymaniyah and had firsthand knowledge of the CTG and Polad and Lahur Talabani.

You heard from witnesses at the compound where Siim was taken is a Kurdish CTG base, full of CTG soldiers who go on CTG missions.

There was a lot to cover today. We spent a lot of time putting into the record all the evidence the Government had to prove beyond a reasonable doubt of each and every crime. And I created this power point, in anticipation of using it with you today. Let's go through it quickly, because I spent a lot of time on this.

The controlled items. Department of State, Department of Commerce experts both came in to tell you that the items that Ross Roggio purchased were controlled for export. Each of them testified to you and showed you documents where they searched the records to determine whether or not this Defendant had licenses or permission to export any of the things that he bought that were controlled.

We had the receipts that showed he bought these items, how much he paid for them. We had the financial records showing he purchased the items, some of which he purchased with his father-in-law's credit card and paid through his bank accounts.

We had the invoices where he purchased the firing rings and the -- excuse me -- the gas rings and the firing pin retainers.

6

There's the invoice. There's the payment from his account. We had evidence to show that these items ended up in Iraq. Remember the balance sheet, the gas rings, how many he bought, the firing pin retainers, how many he bought, which was the same amount as shown on the receipt.

Remember the videos showing that there was, actually, a factory in Kurdistan, Iraq. There's the machines, there's the factory floor, there's another angle.

We had the evidence of Mr. Roggio test-firing one of the firearms he produced in Kurdistan. Remember this?

(At this time a portion of a videotape was played.)

I'll spare you that part.

We had the email where he sent this test video, the email, where he says he made the barrel, himself, in Iraq. How did he do that? With the rifling buttons. He says he did not build the receiver in Iraq, which means, he would have had to import gas rings. He would have had to import the firing pin retainers. He admits so in that email he sent to his clients.

We have the feasibility report where he described exactly how he was going to set up this illegal arms manufacturing plant.

We had the financial records that showed that the Kurds transferred funds from Iraq through international wire to his accounts in Pennsylvania with PNC Bank and Wells Fargo. On that occasion, $1,329,608.65. From where? Kurdistan International

Bank from Zarya Construction to Roggio Consulting Company.

We have documents, emails, videos, Weapons Feasibility Reports, financial records, payments. Yeah, there was a lot covered.

These folks over here, remember Anna and Sierra, I drove them crazy. I was practicing my closing, I was taking that power point and I was tweaking it, I was changing it, they were here after hours at night to fix that thing, because I wanted to make sure it was perfect.

Then yesterday happened. Mr. Roggio took the stand and admitted to almost everything. This is the closing I had prepared for you. Not to be melodramatic, but I no longer need it.

He admitted he was well aware of Export Law and the Regulations, that the weapons project would require a license. He assumed parts he purchased were controlled and would be illegal to export to Iraq. He admitted that he used an American made Colt M4 as a model to figure out how to make the manufacturing work.

He admits that he went to Kurdistan to set up an arms factory for M4 rifles and for Glock 9mm pistols. He admits that the goal was to get the Kurds to the point where they could run the factory by themselves. He admits that he smuggled combo buttons in a ski bag, that the gas rings and the firing pin retainers, which he purchased with money from the Kurds in this

8

project, came to him in Iraq.

He admitted to purchasing the combo buttons from Eldorado Tool. The gas rings, firing pin retainers from OML and illegally exporting them to Iraq. He admitted that he set up accounts with PNC Bank and with Wells Fargo for having the Kurds transfer funds from Iraq into those accounts.

He admitted that he purchased controlled items with a credit card. He admitted that he used the Kurds' money -- well, I'm sorry, his money that was given to him by the Kurds -- to purchase this beautiful home and to build that unbelievable garage, to purchase his gun collection, his exotic sports cars. Remember those? One stacked on another? This collection of Rolex watches.

He admitted that he emailed the Firearms Feasibility Report to the Kurds. He admitted the International Transfer of Funds from Iraq to his accounts at PNC and Wells Fargo. He admitted that he paid for the controlled items via credit card, paid for by money from his account funded by the Kurds. That, by the way, is one number drawn on his account.

He also admits he sent the E-file that contained the feasibility report, which is the other wire charge. He admitted violating The Arms Export Control Act. He admitted that he violated The International Traffic and Arms Regulations, he admitted he violated The International Emergency Economic Powers Act.

He admitted he laundered money in support of his illegal activities. He admitted that he committed wire fraud, when he sent the Feasibility Report via email and paid his stepfather's credit card off of money in his bank account.

So I had prepared that long and detailed closing argument, in which I point out several documents, videos, receipts, bank records, other evidence to convince you that he violated these laws. Mr. Roggio beat me to the punch. He admitted he was guilty of each and every one of those crimes.

The question is why? Why testify and admit to these crimes? As my mom would have said, Roggio's too clever by half. Clever enough to come up with a scheme but not clever enough to pull it off. And if we're being honest, isn't it the story of Mr. Roggio's life so far? Clever enough to come up with schemes but not clever enough to pull them off?

Why make these admissions? Why confess to you that he is guilty of these crimes? Could it be that he admits these crimes hoping to gain credibility with you, a gamut to gain your trust, hoping against all hope that, if he confesses to these crimes, perhaps, perhaps, when he spins his yarn about saving Siim, you might believe that, too?

Knowing that he is going to be found guilty of something, he hopes that, at least, don't let it be torture and don't let it be conspiracy to torture.

So thinking that he has built a little bit of trust with

you, what is his story? I needed to torture Siim to save him. Really? That's the best you can come up with? Well, to be fair, I've got to say it was a good plan. When Roggio came up with that whopper, I happened to be looking at your direction from my chair at counsel table, I'm not going to point out who, but one among the member of the jurors was taking notes, and when he heard what Mr. Roggio had to say, this was the reaction (indicating). Really?

You know, the truth, that's easy to remember, to tell it straight. The problem is, when you're lying, the details get murky. You make mistakes as you're telling it. You change the story as you go along. Roggio said -- and your recollection is what matters, your recollection controls -- but I believe he said there's no doubt that Siim was physically abused and I had some role in it.

He also said he told the soldiers, when Siim didn't answer his questions and then they beat him, he said that he lost his temper and kicked Siim out of his chair. Well, as far as it goes, he admits to that he was there when the torture took place. Well, he could hardly deny that part, could he? But he wasn't quite so up front with you when it came down to the details, was he? What tangled webs we weave when first we practice to deceive. It's always the best course of action to tell the truth, that way you don't have to remember the details about the lie.

I have here a list of examples from Roggio's testimony where he changes his story or gets the details screwed up. Of course, it doesn't matter that I remember. I know that you paid close attention during this testimony, so you probably caught all of those and, I'm guessing, some more.

How about an example or two? If you recall his testimony, Roggio, at first, indicated he was out of Iraq and had no idea why Siim was taken to the compound. Later, he indicated that he called Lahur to say there was a problem with Siim and Lahur sent him on to Polad to fix the problem. Well, which is it, sir? No idea or did you report the problem?

Speaking of Polad and Lahur, apparently, they are to blame for this, somehow, in Roggio's account, Siim embarrassed Polad Lahur and he brought this down on himself only, only to be saved by the hero of the hour, Ross Roggio. Yeah, when asked to explain how the leader of the Kurdistan Counterterrorism Group and the head of The Kurdistan Intelligence Agency came to be embarrassed by an Estonian engineer and mid-level employee in the Roggio Consulting Company, a person they had next to no contact with nor interaction with.

Well, Mr. Roggio's details get a bit murky at that point, don't they? Best he can come up with is smoking marijuana. Really?

Let's talk about torture. You heard from Triin Kiviking. Who, among you, will ever forget her testimony on the first day

of this trial? Triin told you what Roggio had the Kurdish soldiers do to Siim Saar. Ms. Kiviking made the recording of Roggio on her iPhone, where he admits to torturing Siim Saar.

You heard the testimony of Marrtin Vilist. Marrtin was an engineer working with Siim. He is a witness who said he was tased on the shoulder at that military compound, at Roggio's direction.

You heard from Heret Viltrop. According to her, Roggio took Heret and the other Estonian victims to the military compound, in order to intimidate them and to demonstrate his power over their lives.

And, finally, you heard from Siim Saar. He testified about what Roggio and the soldiers did to him. Every single one of these witnesses testified that Roggio was in charge.

At the beginning of the trial, Mr. Roggio's attorney said it was the Faruk goons who did all this to Siim, and that Siim is alive today because the Defendant intervened. There has been zero evidence of that, none. Well, unless you count the self-serving and contradictory lies of Mr. Roggio's testimony.

The evidence has proved beyond a reasonable doubt that Roggio, working together with Kurdish soldiers to inflict the violence on Siim, it was Roggio who was running the show. It was Roggio that had Goran grab Siim from the apartment he shared with Triin and Marrtin and take him to the compound.

By the way, isn't that an important detail? How would the

Kurds have known to grab Siim at the apartment, unless Roggio told him not to come to work that day? It was Roggio who asked the questions. It was Roggio who ordered the soldiers to hurt Siim. It was Roggio who told the soldiers when to start and when to stop.

All of these witnesses laid out for you an absolutely terrible ordeal. It was hard for them to come here and relive that terrible experience. It was probably hard for you to listen to what was done to Siim.

Do any of you have any question, whatsoever, whether those Estonians were telling the truth? Do any of you think they were making this up? Siim was tortured. It was Roggio, working hand in hand with the Kurdish soldiers, working in the Kurdish CTG compound, the authority who tortured Siim, it was Roggio who was responsible. Roggio is guilty of Torture, of Conspiracy To Commit Torture, and there is a mountain of evidence that proves that.

Siim Saar was screaming as he was being beaten, while the Estonians stood outside that room where he was being tortured. They were forced, one by one, to come into that room and observe what the soldiers were doing to Siim at this man's direction.

They each testified that they, too, were under suspicion by who? By Lahur and Polad? No, they testified they were under suspicion by him. He needed to know whether they were loyal to

14

him or not. What more is there to say? What more is there to say? What more is there to say that hasn't been said by these victims over the last few days?

Judge Mariani will instruct you, with respect to Torture and Conspiracy To Torture.

In order to find the Defendant guilty of Torture, the Government must prove, first, that Roggio was acting under color of law. Second, that Roggio acted with specific intent to inflict severe physical or mental pain and suffering. Third, the pain or suffering Roggio inflicted was not incidental to lawful sanctions. Four, that the victims were within Roggio's custody and physical control. And, finally, fifth, that the actions occurred outside The United States.

Let's talk about color of law. Judge Mariani will instruct you that to act under color of law means to act beyond the bounds of lawful authority but in such a manner that the unlawful acts were done while the official was purporting or pretending to act in performance of his official duties.

In other words, the unlawful acts must consist of abuse or misuse of power, which is possessed by the official, only because that person is an official.

Here, you heard testimony from Triin Kiviking, from Marrtin Vilist, Heret Viltrop and Siim Saar. Each told you that Siim was taken to a CTG military compound where Roggio directed Kurdish military soldiers to torture Siim while Roggio

interrogated Siim.

Heret Viltrop told you that Roggio directed Goran to kidnap Siim and to take him to the compound. All the Estonian witnesses discussed Goran. Even Cody McBride, if you recall him, the soldier that was in the area, at that time, he remembers someone named Goran who was at the CTG compound.

This was not a brief or isolated event, either. Siim was taken to the CTG compound for 39 days. He went through multiple sessions at the hands of his tormenters, all at the direction of Roggio and the cooperation of his military conspirators at the compound. Roggio, himself, engaged in the torture. But for the most part, he didn't want to get his hands dirty rather he used the Kurdish military to torture Siim.

You heard from Dr. Natali, an expert in The Kurdish Region of Iraq. She confirmed that the CTG is an official military unit in Iraq. She, also, opined that it was unthinkable that a civilian could be held at a military base for more than 30 days without the CTG, the compound military leadership's knowledge and consent.

You heard from Ron Bly. He, likewise, confirmed that Polad Talabani was the head of the CTG, an official military unit in the Kurdistan Iraq Region. You heard from Cody McBride who worked with the CTG and confirmed that the military compound, where Roggio had Siim taken to be tortured, was an official CTG military and Peshmerga location, official military units of

16

Iraq.

Each of the Estonians described the place where Siim was taken as a military compound with military check points and armed soldiers.

Judge Mariani will tell you that, even though, this Defendant was not an official, an employee or member of the Kurdish military, if you find that Ross Roggio was a willful participant together with the Kurdish military, you may find him guilty of Torture.

Let's talk about specific intent to inflict severe physical or mental pain and suffering. You heard the testimony of Siim Saar and the other Estonians who witnessed some of the torture. You know what was done to Siim by Ross Roggio and the members of the CTG who were involved in this. You heard him testify Siim was repeatedly beaten. He was electrocuted with a taser over and over, until his hands were numb and shaking. He was tased on the nose, he was tased on the throat, they even tased his genitals.

Siim was beaten and struck in the face, his ears, chest and throat. He had a plastic bag put over his head until he thought he was going to die, until he was unconscious from a lack of air to breathe. When he woke up, he was beaten with a stick in the groin. Goran placed a cutting tool to Siim's finger and squeezed. Roggio, himself, wrapped a belt around Siim's neck and used it to pick him up off the ground. Siim was coughing

blood.

I just let 39 seconds go by, 39 seconds. The testimony is that the first time Siim endured hours, under the hands of his tormenters. You experienced 39 seconds of silence. Siim was in that compound for 39 days. There was no doubt that Roggio intended to inflict severe physical and mental pain and suffering.

We have to prove that the pain and suffering of the victim was not incidental to lawful sanctions. You heard from Zuhair Al-Maliki, an Iraqi Judge and expert in Iraqi law. He told you the torture was not legal under the Iraqi Constitution of 2005 nor should Siim ever have been detained or jailed at the CTG military compound in the first place.

Siim was held at that compound at the direction of Roggio. Siim was taken there, he was held there, and he could not leave until Roggio was satisfied and said he could. Siim was within Roggio's custody and physical control the whole time he was held at that military compound.

Finally, Roggio's torture occurred outside the United States. Is there any question of that? Siim was held and tortured in Kurdistan, Iraq at a military base controlled by the CTG with the Kurdish PUK and CTG flags flying overhead. Everyone that testified, including, I may add, Mr. Roggio, agrees that this was a Kurdish military compound occupied by Kurdish soldiers in Kurdistan, Iraq.

18

(At this time an audio recording was played.)

MR. HINKLEY: Enough to beat Siim, enough to torture Siim. Let's not be confused about anything here. Roggio repeatedly says, I. I still can't look Siim in the eyes, not like I can look you in the eye, because of what I did to him. You know, I couldn't take, that, you know, crushing him. Siim experienced the overwhelming ability of mine to crush somebody. This is why Siim is like a beacon to me, because, now, I get to rebuild what I broke. Were you there when I told Siim about his girlfriend and his mom? That is brutal crushing.

And you heard what Goran said. I've never seen anyone do it like that, you know, I'm learning from you, Ross. That's what I used to do to every -- to all those people. I used to get so deep in their heads. It was, either, to torture Siim or was he there to save him? When asked by Triin, Why? Roggio says, He wanted to blackmail me. Not that Siim embarrassed Polad, not that Siim embarrassed Lahur, it was about Ross Roggio. It's always about Ross Roggio.

Are you sure? Enough to beat him, enough to torture him. I don't make mistakes, says Ross Roggio.

(At this time an audio recording was played.)

MR. HINKLEY: After the Siim incident, when does Triin get petrified? When Roggio gets upset, not when Polad gets upset, not when Lahur gets upset, when this guy gets upset. If he is a hero, the saviour of Siim and Triin, why not say to her, Why

19

would you be afraid when I get upset? It's Polad and Lahur that you need to be worried about.

This case is about a man who thinks he's above the law, a man who put himself, his own interests, his greed, his ego, his need to dominate other people ahead of everyone and everything. This is a man who was willing to lie, whenever it suited him. This is a man who was willing to terrify the people who worked for him.

You heard Triin Kiviking's anguish on those recordings. You heard how scared she was of him. This is a man who was willing to torture. And his attitude towards the employees, he owned them. They were there for his use. He discarded or tortured them at his pleasure. Remember the recording where Roggio told Triin that he owned her?

The evidence proved that Roggio brutally tortured Siim, he tortured Siim at a Kurdish military compound with the cooperation of the Kurdish soldiers. This wasn't done by those goons. Ross Roggio is not a hero, Ross Roggio wasn't helping Siim out of the compound, when he had the soldiers beat him and tase him and choke him and put a plastic bag over his head and put shears to his finger.

Now is the time for you to decide. There can be only one answer, based on the evidence in this trial. Ross Roggio is guilty of Torture and Conspiracy to Torture.

(At this time an audio recording was played.)

20

MR. HINKLEY: In this courtroom, you were privileged to witness firsthand courage. Our culture throws around the term, hero. What is a hero? Certainly, Ron Bly is a hero. He received multiple purple hearts. He was awarded the Bronze Star for Valor on more than one occasion such that he deserved our admiration and deserves our respect. However, not every act of bravery is rewarded with ribbons and stars, sometimes, bravery is never even noticed.

In this courtroom, over the last two weeks, you have witnessed courage and bravery. You witnessed it in Siim Saar. His quiet and dignified bravery, facing the man who tortured him. His courage in telling you what was done to him at that compound.

And you witnessed the courage of the Estonians who testified. You witnessed the courage of Triin Kiviking. There was terror in her voice in those recordings, but there was bravery, too. Like every one of these Estonian witnesses, Triin undertook an arduous journey from Estonia to Scranton. She was a stranger in a strange place surrounded by people she did not know, and she did so willingly and to face a man of whom she was terrified, a man who told her that if she ever betrayed him, he would find her, he would come for her, and he would kill her.

You met true heroes in this courtroom. The man sitting there, he's not one of those heroes. Find him guilty, not only

for the crimes he admits, but, also, for torturing and conspiring to torture Siim Sebastian Saar. Thank you.

THE COURT: Mr. Bartolai.

MR. BARTOLAI: Thank you. If it pleases the Court, counsel, members of the jury. Mr. Roggio is no hero, he's no saviour, and he's never pretended to be one, and we're never going to make that argument, we're not going to tell you that he saved Siim, we're not going to say that he's some sort of hero.

Sure, that he was in the service, he was in Iraq, we don't brag about it, he didn't brag about it, he learned from it, and he met some people there that got him over to Iraq, again, in this misadventure.

And, ladies and gentlemen, what you've seen over the last couple weeks, and, thankfully, it wasn't the three or four weeks that, originally, were predicted. It was short and it was to the point and everything went off as planned. You've heard a lot of people, including the Defendant. Now, he had no right, he had no obligation to testify, but he chose to testify, and he testified and he faced the music. He faced the hard questions by the prosecutor, and he faced your eyes and your ears, as well. So there was nothing to hide there. So that's the story.

So I say a misadventure. You know, the Government says greed. What is the difference between greed and ambition, you know? We have an individual, Mr. Roggio, you know, he's a

22

businessman, and there was an opportunity there. He has been in the firearms business, he has known people like Ron Bly, and he sees an opportunity or an opportunity presents itself to go and to build a weapons factory in The Kurdistan Region of Iraq. And I have to submit to you that it's a gutsy undertaking on his behalf to go over there and to try to, you know, accept that risk and to put this thing together. And I submit it's no easy task, you know, it's a pretty complicated project.

You see the factory, you see what has to be done, the challenges that have to be met here. And he's dealing with these people that aren't necessarily familiar. We're in Iraq, we're in The Kurdistan Region of Iraq, there's a family, the Faruks, and he has to deal with these people. They're powerful people, they're sheikhs, they're Klan members, they're part of this tribe.

But he does it, he goes there and he tries to put this thing together. And this is his plan, this is his ambition, and he's looking to do that. He's not there to torture anybody, that's not what he wants to do, to go there and to get in trouble and to find himself sitting in a container having to watch and participate in the physical abuse of a person. That's not his intention.

We look at these Estonians, we look at the other people in the plant. There's Greek people, there was Filipino workers there. None of them testified, that's not important. We did

hear from these people from Estonia, these Tier One people, they were part of the project, really, from day one. They came in and they testified.

And, you know, these are people, these are people that are also ambitious, you know, they're educated people, some are accountants, some are engineers, and they see an opportunity, as well. They say, Hey -- they don't know who Ross Roggio is, they don't know about firearms, they see that, you know, in Iraq, there's a project and, maybe, they could be a part of it. It's good money, it's a lot more money they're going to make, and they're young people, and sure enough, they come over.

Everyone is there, they're living together, they're very tight, it's a tight unit, and they're living amongst each other, and they're all in it together, you know, these are people -- they're all over there in this foreign land together, eating, sleeping, sharing apartments, sharing work space, sharing a common purpose to do this project. And they're all in this together. So there is ambition here, you know, what we see. Everyone has good hopes and bright prospects, and they want it to be that way.

But there's a dark force here, you see, there's a dark force. They're working for these people, this Government, the Faruks. We don't know the whole -- I'm going to talk a little bit about this later in my presentation -- but these people are present and they're overseeing this. And it's 20 miles from

24

Iran, and there's a terrorist organization named ISIS operating in the east, in Syria, and there's factions among these families, these Klans, these tribes, the Talabani, and so we don't know about that, no one knows about that, at that point, but they're there, they're all around this factory, they're participating in this project.

You have to ask yourself, you know, we know that the -- we know the Peshmerga, apparently, is the Army in Iraq, in Kurdistan, we know that from the expert testimony. We know that the Army has budgeted firearms, it's a line item budget in their financial budget, you know. They're going to have weapons. The Peshmerga doesn't need Ross Roggio's weapons, you see.

So whose weapons are these? What's the whole point of this clandestine weapons factory? And that's what it is, a secret factory, a clandestine factory. It's a relatively small factory, it's not Colt, it's not Smith and Wesson, it's not any major type of company. If the Kurdish company wanted to buy weapons, they certainly wouldn't buy them from Ross Roggio.

Let's think about that. So let's try to put things in perspective, let's try to use our common sense. Sure, it's emotional, we knew that from the beginning, torture, torture is violence and violence is ugly, and no one -- it's hard to listen to that, and it's hard to be rational when those are the charges.

But we picked this jury, we questioned you people about that, and everyone said, Hey, do you know what? We'll do our best. And that's all I'm asking. Do your best. You've heard the evidence, you've heard the evidence, and you're going to decide what the facts are.

The Judge is going to tell you what the law is in this case, and he's going to define, Torture, for you, and you're going to apply that and come up with a verdict. And no matter what that verdict is, you'll hear a not guilty, you'll have done your job, and that's all we ask, and that's all anybody can ask, because this is The United States. This isn't Iraq, this isn't Kurdistan, you know, we're here to do justice, right.

Now, I said that Ross Roggio is no hero, he's no saviour. He testified yesterday he was cruel, he was an ass. That's his testimony. He told you. But I offer, I ask you, jurors, what control, actually, did Ross Roggio have over these Kurdish soldiers? If these were Kurdish soldiers, CTG soldiers, what control did he have over them? How could he have had control over those soldiers? And, I mean, control, how could he boss those soldiers around? How could he direct those soldiers around, at all?

He's a foreigner, he's in this country for a year and a half. We have heard from Dr. Natali, she's an expert on that area and on that culture, you have to have -- she said the word

was, wasta. You have to have some sort of power, you just don't get it, it comes from being in the tribe, it comes from your political connections. And keep in mind, this is a society that's very rigid. As a foreigner, you're not going to come in and direct the Kurdish soldiers to do this, you see. And I don't know what kind of Kurdish soldiers would do something like that.

Is that an official Army act or is that what we say, as I mentioned earlier, are they goons, you know, are they some sort of Faruk goons, some sort of private people that work for the Faruks that, you know, act like CTG soldiers, and, you know, they guard his palace, and they pull people out of this factory and put a bag over their head and take them to this compound? This is something that you'll have to decide. It's plainly before you in this case, ladies and gentlemen.

So I want to talk about when the wheels began to come off and how I submit this thing began to turn. We know that this is a clandestine project, these people are working here, and they're struggling to reverse-engineer this firearm, they're taking measurements. They have a 3D model, and they bring it to these Faruks, and there's armed guards there, as well, and go forward with it, they continue to go forward with it.

We know that Siim Saar who came in here and testified, who was an engineer on the project, he and Mr. Roggio had some conflicts over machines, over various things. And there came a

27

point in time when he was alone and he started to go into places where he shouldn't have been, the financial documents and other things, and started copying some of these company secrets and other things. And he has them on his hard drive, maybe, in his diary, but he does this. He said, for insurance purposes, and I'll talk to you a little more about that later.

But what he does is he starts to take these documents. What he's doing is he's taking the company's secrets, and he's taking them for, say, insurance purposes, that's what he said, to use, again, if he needed them, but the fact of the matter is that he's taking them.

And when he does that, he creates a very dangerous situation, not just for himself, but for the other people that are there, you see. This is a clandestine operation, they're not going to let these secrets get out to the Iranians, ISIS, even members of the Klan. If this is a Klan, the Talabani Klan and there's Faruks and other people, and we have heard there's inter-Klan rivalries, there's civil wars, each one of these Klans has their own private Army, Peshmerga Army Unit, you know. They're not going to let that get out. So it's a serious situation, it's a situation that put everyone at risk.

Now, you've heard Siim talk about some of the fears that he was feeling, at that point in time. One of the reasons he said he took these documents was because he was fearful that if this company didn't produce those numbers, something might happen,

he might get killed, he might get killed because of that. He's an engineer. I submit that the fear that he had, that fear, that was a fear shared by everyone in that factory, all of the Tier One people knew that they were behind on this project, that they couldn't put those numbers up, they all had those fears, it was an intense situation there.

If anyone would have been killed by these fellows, it would have been Roggio, because he was the one, he was the one taking their money, he was the one, ultimately, responsible for this project.

So we know the company is behind, and we know that there is tensions, and we know that Siim had these fears, and we know that he took those trade secrets for insurance purposes. And at some point in time, he starts to act -- he said, like, maybe, a prima dona or maybe Roggio said that -- but we know Siim wanted to get out of there, so he started to act up a little bit, he started to be a little, I don't know what the exact words he used were, but he was trying to get fired, so he was being a little bit outrageous with his demands, demanding and such, so he wants to get fired.

And Mr. Roggio is in Greece, and he's trying to resolve the differences with Siim. Now, that wasn't just Mr. Roggio, Ross Roggio that said that in his testimony, that was other of the witnesses said the same thing, that Roggio was in Greece. He's trying to resolve the differences, he even invites Saar to come

to Greece to resolve the differences. But what happens? Elina, Elina tells Siim not to come to work the next day.

Now, ladies and gentlemen, among yourselves, you'll be able to put this together. I submit that Elina said that, Elina told him not to come to work, and the next day, we know what happened, these guys come knocking at the door. They don't say, Peshmerga. Open up, Peshmerga. They're just guys dressed in some sort of a uniform, camouflage pants, maybe, a black top. You'll recall. Anyway, he's taken to this compound.

Now, at the time, Mr. Roggio is in Greece. We heard, we heard the Government say that it was -- that Heret said, Heret Enden, said that it was Roggio that told them to get Saar, but Heret Enden is a friend of Elina, if you recall, that's why she says she went back to the region, because that's her friend. And it was Elina that did that. Roggio was in Greece. That's a fact, you'll find, I hope, from the evidence.

So Roggio does return from Greece, and there's a major situation going on. Siim is at the compound. You've heard Mr. Roggio testify yesterday that Siim's life was in jeopardy. You've heard this tape, the Government's tape that they played, where he -- now, he doesn't know he's being recorded, and he's having this conversation with Triin. He says, on this tape, They had already decided what was going to happen to Siim. He was, at least, going to go to a Baghdad jail for years or he was going to disappear, he was going to be killed.

Now, that's not Roggio testifying, trying to trick you, you know, trying to half-whit you or things like that, that's him talking to Siim -- or to Triin. And he does say that. So, you see, it's corroborated. And it only makes sense. Who is, as the Government points out, who is Siim to these fellas? What difference does it make what happens to him? Would anyone care if one guy from Estonia, some white guy, some infidel disappears in Iraq, in The Kurdistan Region of Iraq? Like that never happened before? It wouldn't make a difference.

So it's a terrible time, Triin is in the compound, and it's a big situation. It's desperate, there's desperation. As they say, desperate times call for desperate measures. This is what Roggio is thinking, when he's coming back from Greece, you know. What could he do? What control does he have? Can he get him out of there? He can't. He can't get him out of the compound.

He couldn't -- do you remember the time when the Government -- or when Siim testified and some of the other Estonians testified that the day they went to go pick up Siim, they had to wait, they were in the car, they were going to get ready in the car and go away, he was going to take him out of there, right then, but they said, No, stop, you can't do that, it has to be authorized by someone else. This was Goran telling Roggio and the gang, the rest of them, they had to wait, it had to come from above.

Just like it had to come from above to get him out of there, it would have had to have come from above to put him in there, you see, that's what, I submit, was the situation. Roggio had little control over that. What control did he have, when Siim was in there? What control did he have? He could ask a question, that would stop this, if he asked a question, and that's what he did, he would ask the questions.

And I'm not trying to, you know, it's not -- how do I say what Ross Roggio did was okay? How do I come up here and look at you and say that it was excusable? It's not, it's not, it's not. But I submit, ladies and gentlemen, there was a reason for it, there was a reason for it, and the reason was, he's trying to help, he's trying to get out of this situation, by any means that they can, you see, and this is the only thing he could do, at the time.

He could have Siim write letters, see. Have Siim write letters to his mother, because the mother will know where he is, you know. Make up a story, possession of marijuana. Who cares if they smoked the weed? That wasn't the reason that he was there, that wasn't the reason, but put that in the letter so the mother knows. My son is in Estonia, here's the letter I got, and they hand-deliver it. That's what Ross Roggio had done. He could bring people there, he could bring witnesses there, you see.

When you're in a container, all alone, and you're wondering

32

what's going on, and your fellow people come, now, you have five or six witnesses that see you there, That's where I saw him last. Now, you don't have one person to disappear, now you have five people, you see, five countrymen, five Estonians there, and this is what Ross Roggio did.

Now, everything Ross Roggio ever did was painted black by the Government. They're prosecuting Ross Roggio. Whose fault was it? Ross Roggio. Who were you afraid of? Ross Roggio. Who directed it? Ross Roggio. Ross Roggio, Ross Roggio, Ross Roggio.

You didn't go overseas. How dare you compare yourself to Ron Bly? Show us in your records where you served this country overseas, you see? They plop a binder in your lap. You're a Veteran, you're not a Purple Heart medalist, you're not a Bronze Star medalist, but you were in the Army, you served your country, you have a General Discharge under honorable conditions.

So you had a misconduct, you know, you went overseas. Prove it, prove it, see. And, then, well, right here, you know, it's right here, I'll read you the letter. And you read the letter, you see.

So it's not all Ross Roggio, it's not all Ross Roggio. Ross Roggio was in a bad situation with a bunch of people, and he tried to do the best that he could. And he made mistakes. You know, when Siim testified he said about how he thought he was

going to die, he thought, maybe, I'm going to die, you know. And he realized, at one point, when he had written the letter to his mother that, maybe, he wasn't going to die, maybe, there was some sort of hope, maybe, Mr. Roggio made a mistake by letting him write that letter. Well, that wasn't a mistake. That was part of what Ross Roggio wanted to do, you see.

So, you see, just like the witnesses that were brought here, you know, they would like to say that it was too intimidating, but, again, he tried to bring these people here to act as witnesses, you know, to see, preserve the situation, make it harder for them to disappear, things like that. You know, and, ultimately, Mr. Saar is released, and he's taken to the local hospital there and treated and he returns home, not much later, a few weeks after that, and he doesn't come back.

We know that there's time that goes by, all the other Estonians wind up leaving, as well, they all go back home. Again, Ross Roggio doesn't try to prevent them from going home. He would like them to stay, he told them that. We heard testimony about that one night before they left, how things got a little out of hand, Roggio was -- got in a physical thing with Elina, slapped her, things like that, and they were arguing, and they were afraid. He had a gun, he had a gun.

And he brought them in the next day and he apologized to them and he tried to make them -- convince them to stay, but they didn't, they went home. So that was it. You know, they

were gone. But he stays there. You can only imagine -- and he testified it just got tighter, the situation, these people that, the overseers kept squeezing, Where is the production? Only a few weapons are ever made, a few working weapons. You've seen those weapons. Nothing ever came of that. And, ultimately, Roggio, himself, is taken captive. And you've seen -- he has testified about it, and you've seen some videos that he sent to his ex-wife from Iraq, and we have them, and I won't play them, but you could play them if you're interested.

Again, he's saying I'm -- he's not pretending that what he went through was the same level as Mr. Saar, but he says, I'm afraid, they're trying to extort me, they say I owe them all this money, I don't. I was involved in this project, he won't disclose what it is, but he's trying to, you know, make a record, make a record if something does happen, this is what it's about. That seems to be a common thing in this case, you know, people want to preserve something, you know.

Siim Saar was scared, trying to make some copies of things. When Roggio was afraid, Siim Saar tried to send some records home to his mother, have witnesses there. When Roggio, himself, was in that situation, he tried to make a recording and send it to his ex-wife.

So I submit, ladies and gentlemen, there's a lot of -- what was -- it was a misadventure, it was a horrible thing, and it was tragic, it really was truly tragic.

I want to talk a little bit about the law, and then I'll make my final remarks, and the Government will have a chance to rebut what I have to say.

So this case is about Torture. And the word, torture, we heard it all the time, people use it left and right, Roggio used it in this case. Torture, I tortured him, you see. I mean, that's what he said. That's on the tape.

Now, torture is defined by law, and you're going to hear that soon, all in what the Judge tells you, we have had the benefit of discussing some of the law with you. I'll tell you, right off the bat, when you're instructed, the term torture is a significant term, it's usually reserved for extreme, deliberate and unusually cruel practices rather than lesser forms of cruel, inhumane or degrading treatment or punishment.

So this is something that they're pointing out, right off the bat. Torture is serious, very serious, extreme, deliberate and unusually cruel practices rather than lesser forms of cruel, inhumane or degrading punishment. So it's interesting to note that some lesser forms of cruel and inhumane or degrading treatment or punishment cannot be torture, see. But you're going to decide that, that's going to be for you to decide.

In order to find Mr. Roggio guilty, the Government must prove, and, again, it's the Government that has the burden of proof, you know, in our society, we're presumed to be innocent until the Government proves you guilty, so they have that

burden. And that applies to all of us. And some of the elements that you'll hear about torture is that Mr. Roggio -- in order for the Government to prove his guilt, they must prove to you each of the following elements beyond a reasonable doubt.

First, that Roggio committed an act with the specific intent to inflict severe physical pain or suffering. And you'll hear that specific intent to inflict severe physical pain or suffering means to act with the intent to commit the act, as well as the intent to achieve the consequences of the act, which is the infliction. So you'll have to decide.

Did Mr. Roggio do this with the specific intent of torturing him? Of inflicting severe physical pain or suffering? Or did he did it with the intent of trying to help him out, when he did these acts, when he was there in that room, participating in this thing? What was his purpose? What was his state of mind? And that's going to be for you to decide. And you'll have to do that.

We submit, ladies and gentlemen, you know what we submit, that he did this to try to minimize what was going to happen to Mr. Saar.

Second element is that Mr. Roggio was acting under color of law. Color of law, the Judge will tell you, is to act beyond the bounds of lawful authority in such a manner that the unlawful acts were done while the official was purporting or pretending to act in the performance of official duties.

I submit, you know, officials, we need officials here. Is it clear that, at least, Kurdish soldiers or people that were actually involved in the interrogation and physical abuse of Saar, were they Kurdish officials? Were they Kurdish soldiers? Were they officials? Or were they some sort of a private security force, you know? Were they body guards of Faruk or were they involved in this Faruk organization? Were they the Faruk goons that I said in my opening statement, and I'll say again here today.

So that's important, the color of law. When we say, color of law, I'm not trying -- if I say to you -- and I submit, ladies and gentlemen, that they won't be able to prove it, that they haven't proved that this was done under color of law.

And I'm basically saying, You should find Mr. Roggio not guilty because the acts that he had done weren't under color of law. And you may think to yourself, Bullshit, I'm going to find him guilty, regardless of whether or not they were under color of law, because I don't like him and I don't like what he did. Don't talk to me about color of law. But that's the law you'll have to apply, the law that the Court gives to you, and that is, it has to be under color of law.

And I want to discuss things such as, you know, when we talk about color of law, we need to think of, you know, like, what is the color of law in Iraq? What is the color of law in The Kurdistan Region? What does it mean? Who are the officials

there? We heard about Dr. Natali and this concept of wasta. Basically, if you're a regular guy, you're not going to go anywhere in this place in Kurdistan, unless you're in the right tribe, you know, the sheikh or part of that gang, you're just going to be a regular -- nothing is ever going to happen.

We hear about these -- we know the Peshmerga is the official military, they are the official, the Peshmerga, but we also hear about these political armies, how there are local Peshmerga. Can you imagine, when we try to think about American justice in this country, and then apply it to The Kurdistan Region of Iraq? Can you imagine if the Republicans had their own Army and the Democrats and the local politicians had theirs? What color of law is that? What kind of law would that be?

Can you imagine Klan rivalries and party rivalries we see in local politics and in national politics and Civil War breaking out on the street? It's bad enough to look at politics on CNN, MSN and Fox News and the different divergents. Can you imagine if they were armed? Can you imagine Ivanka Trump or Hunter Biden having their own little Army and what day chaos this country would be in? This is what is in Iraq.

And, again, what did they want Ross Roggio's guns for? Why would these official Kurdish soldiers want his guns, when they could have all the guns they want? They have a budget, as I've already pointed out. We have heard from this Iraqi lawyer who

came in and testified. And, you know, he talked about the Iraqi Constitution of 2005, and he talked about, you know, Torture is illegal in Iraq. It's illegal everywhere, see, but it's, also, illegal in Iraq. But he, also, talked about some of the differences in the law there in Iraq, he talked about how religion has a large part in the law that we have heard about Islam having somewhat of their major religion there, and it's part of their laws and their Constitution.

We have heard about Investigatory Judges, you know, where the judges there -- they're not fair and impartial like the judges we have in our court system, they're investigatory. They play the role of the prosecutor in those countries, in Iraq, in Kurdistan. And we have heard how you have to be -- you can't just be detained, you have to have some sort of Judicial involvement. In this case and the case that the Judge referenced, when the fellow is coming out of the bank with the loot, they could put him in custody, but they would have to make a phone call to the Judge soon afterwards. And that's the judicial thing, the phone call.

Which leads me to suggest, How do you know that wasn't done here? I'm not saying it was and I'm not suggesting that it was, but I'm saying, How do you know that it wasn't? You know. Really? How do you know -- how can you know, in a society like that? How can you know? When you think of color of law -- I'm simplifying this and making an argument -- but you think of

40

color of law, what is the color of law in Iraq, in The Kurdistan Region, you think of a pallet there and some of your kids paints, you put a little orange there, put a little yellow there, and you start to mix them together, it becomes what? What color does it become? Some brown color. The lines get blurred. What is the color of law? Who is an official? Where does it stop? Where does it start? So when I say, Faruk goons versus Kurdish soldiers, where does that line begin and where does it end, you know?

In this case, there's a charge of Conspiracy, not only Torture but Conspiracy and Conspiracy to Torture. And Conspiracy is an agreement to break the law, in simplified terms, the Judge will instruct you further as to what that is. But one of the requirements is that there be an agreement to commit torture and a unity of purpose and intent to achieve a common goal or objective.

So if all these individuals had come to an agreement, an understanding to torture Siim, for the purposes of, you know, causing excessive pain and suffering, that would be torture. If Mr. Roggio was there for another purpose to try to minimize the damage to Siim, it wouldn't be, it wouldn't be Conspiracy To Commit Torture on his part, and I ask you to pay careful attention when the Judge instructs on that charge of Conspiracy. He has to knowingly and intentionally join in the conspiracy, and we submit, ladies and gentlemen, that that

41

wasn't it, that that wasn't his goal or objective to torture Siim.

It's not enough that he would have known about it, it's not enough that he was there, it wasn't enough that he was present or associated with those people or that he approved of what happened or he didn't object to it. He has to agree to it. And it has to be for that specific purpose to achieve the torture.

He's, also, charged with aiding and abetting. And this is similar, some of the principles are similar to the conspiracy laws. And in this particular case, Mr. Roggio would have to have done, knowingly, done some act, for the purpose of aiding and with the intent that his co-conspirators committed the specific offense.

So in this case, it all comes down to, What was his intent? Was he there to torture Siim? Was he there to inflict that pain and that suffering, that level of torture on him, or was his purpose, as we suggested to you, that he was there is to try to minimize what would happen to Siim and to give him some sort of help? And, again, you'll have to decide that. So pay careful attention, when the Judge instructs you, as to those elements.

Now, there's a defense that's raised in this case, it's called the defense of Duress, and it's a little different than the elements of the charges, Torture and Conspiracy to Torture and Aiding and Abetting. Duress is a defense, it's what they call an affirmative defense, and the Defendant has the burden

42

of putting forth evidence on that point. So unlike charges against Mr. Roggio, where the Government has the burden of proving beyond a reasonable doubt, this is an instance when the Defendant does have a burden, and it has to do with this Duress defense.

And the Defendant has the burden by a preponderance of the evidence. And this is the scales, when they balance the scales. So this will be what the Judge instructs. And it is a defense, a defense of Torture, Conspiracy To Commit Torture, and Aiding and Abetting Torture, if Mr. Roggio acted under duress.

And the elements are, first, that Mr. Roggio was under an immediate, unlawful threat of death or serious bodily injury to himself or to others. This is Siim. Not Mr. Roggio, he's in Greece, but Siim, who was in the compound in Iraq.

Second, that Mr. Roggio had a well-rounded belief that the threat would be carried out, if he didn't commit the offense. In other words, if he didn't go there and participate.

Third, that Mr. Roggio's criminal action was directly caused by the need to avoid the threat and harm, and that Roggio had no reasonable, lawful opportunity to avoid the threat and harm without committing the offense. That is, that Mr. Roggio had no reasonable, lawful opportunity both to refuse to do the criminal act and to avoid the threat and harm. This is what we submit, as I indicated earlier.

What choice did he have? What could he have done? Not go

back? When he was there, what choice did he have? Get him out of there? He couldn't get him out of there. The only thing he could do is ask a question.

Finally, fourth, that Mr. Roggio had not recklessly placed himself in a situation in which he would be forced to engage in criminal conduct. And I submit, ladies and gentlemen, really, what choice did he have? To run away? To leave Siim there? So this is the defense, and the Court will instruct you more on that.

So I'm going to wrap it up. Some final remarks. Sometimes you think about certain things, and like Todd had said, Mr. Hinkley, they cause you some concern or, at least, you have to work on them, and I offer you these things. And this has to do with, you know, what actually really happened? A lot of times, you hear things like, This, and then it's that. Where is the truth, you know, where is it on the line in between, you know?

And we heard a lot of things about acts that were done. But we have to ask, you know, to what extent, really, was it that bad or what was the full severity of it? Things like that. And some things I noted.

So Siim, there was a time when he was in the compound, where he not only was writing his letters, but he had -- they had brought him the laptop, and he had wired some funds to his mother, his mother was doing a renovation project, and he was able to send her some money for that project, you know. And

44

there was a time when he, himself, I guess, was going to rent a car, but because of the situation, couldn't live up to that contract, so when he had gotten out, he sent an email to them and said, Hey, do you know what? I'll pay you. I was detained by the local authorities for a violation of the local law. So, you know, again, everything goes back to Roggio, right? The Government;s answer is Roggio made them do that, Roggio made them pay his mother the money, Roggio this. But you'll decide, you know, you'll decide what that was all about. Did Roggio do that?

You know, he never reported it to the hospital and the authorities, and, really, I see the point about the hospital in Iraq, he went to the hospital, he didn't say, I was tortured, and he didn't -- who do you call, right? The Peshmerga? The local police? We never heard about the local police there. But he did go to Estonia, and he never said nothing there, he never reported when he went to the hospital that there he had some problems that he had to take care of. Never reported that.

I submit it would have been relevant, if you're trying to diagnose your medical condition, that would have been something you might want to let them know about, I was beaten and tortured, so on and so forth. Never to the authorities there, as well.

And the maintaining contact, you know, we had not just one person, we had several, Heret and husband Rauno and Siim, they

had maintained contact with Mr. Roggio over the years, after this occurred. Now, they're back in Estonia. And, you know, we see birthday greetings back and forth, Christmas greetings, condolences, when people are passing on in the family, you know, I'm sorry, etc., asking for recommendations, How about a job recommendation? How about a reference? How about Rauno teasing Roggio, You're a sissy, you know, calling him a sissy. I guess, you're scared, huh? Then, of course, sending some rabbit pictures. It's funny, I guess. Would you send rabbit pictures? I don't know. You decide.

Then, ultimately, going to dinner with this guy. He shows up in Estonia, he wants to go to dinner. The four of them meet and have dinner, you know. And, then, there's that funny thing about Heret, you know, who got apologized to. Well, he apologized to all of us, Heret said. But then Siim said, He didn't apologize to me. So that was a discrepancy in the testimony. There was a lot of that, I submit, for you to decide.

But I thought that the Heret and the Rauno story was kind of telling there. If anything came out of this, maybe, it was Heret and Rauno, you know. They got married, they seemed to be -- they appeared to be happy in the photos that they sent Roggio. Maybe, that was the happy ending, if there was one.

But here's Heret, she's over there, she's working there a long time and friends with Elina, really good friends. And her

46

boyfriend that she met, Rauno, they're not married yet, he comes over to visit her in Iraq. He's a tourist. And he talked about this Lake Dukan day trip that he went on. He came the day Siim went to the compound, he went to Lake Dukan with the Estonians, they're out in Lake Dukan. I can't imagine what it's like but, probably, like, a regular Harvey's Lake or one of these lakes, nature area, and you're with your country men.

Hey, how about Siim? They discuss it, they said they discussed it. So we're taking things to Siim, some water, food, clothing, but anyhow, this is a discussion amongst them, you know.

So Rauno, actually -- after all this, knowing what happened, said that Roggio seemed like a nice guy. He goes back to Estonia, and he, ultimately, comes to work for Roggio. Now, I don't know, you decide. Common sense is not -- you know, don't leave that at the door, when you come in here, you know. I don't know.

You know what really is, I thought, is telling, and this is Heret who loves this man, right, she's -- turns out that they're very happy, in love, and she knows what's going on there, and she knows he left. Why would she have him come back, you know? Why would he come back, but why would she let him come back? Is that something you would do? What does it mean? I submit, it means something, ladies and gentlemen.

So that's all I have. I want to say something. These people

were very helpful to me, they're on the other side, and they helped out a lot in presenting my evidence, and I want to give them credit for that. We're adversaries, but they were very sportsman-like.

So Roggio is no hero, he's no hero, you know. He never said he was, I'm not suggesting that he is, he's certainly no saviour, but he's no Faruk goon. He made some mistakes over there, he came here and owned up to them. And you're going to decide that, you're going to decide his fate. I'd ask you to consider all the evidence that you heard, deliberate, listen to the Judge, as he instructs you as to the law, and return a verdict of not guilty on the Torture, on the Conspiracy To Commit Torture and on Aiding and Abetting the torture. Thank you.

THE COURT: Rebuttal?

MR. CLAFFEE: Thank you, Your Honor. So you've heard from Mr. Hinkley, you've heard from Mr. Bartolai, I don't think anyone, yet, has thanked you all for your service, for your time, for coming here and listening patiently, considering all the evidence over the last two weeks, so we thank you for that.

I, also, want to acknowledge the courtroom staff and the Marshals for their assistance over the last two weeks. And like Mr. Bartolai, I want to recognize the contributions of all the Government's assistants who kept us organized and kept all of the exhibits running smoothly.

That said, I'm the last lawyer you have to listen to today, so the best way for me to show my gratitude is to keep this short and get out of the way so that you all can, finally, start talking about this case amongst yourselves.

Where to start? Mr. Bartolai said it a couple times. Was it that bad? I think he called it a misadventure, at one point? No, it was very bad, and it was not a misadventure. Everything that you heard over the last two weeks, everything that Mr. Roggio did, over a period of years, was very bad. About the only thing I agree with Mr. Bartolai on is that his client is no hero.

No hero was the theme of Mr. Hinkley's opening. That, remarkably, other than the hero quote, I don't think Mr. Bartolai addressed any of it in his closing statement, probably, because Mr. Hinkley was right, that his client, yesterday, Mr. Bartolai's client admitted to, basically, all of the conduct, which is why you didn't hear anything in the Defense closing about any of the export shipments, any of the defense services provided.

You know, I had all of these notes written down, these cards made up of things that we heard about over the last two weeks from Mr. Bartolai and his client about combo buttons and where did they go and the gas rings and we never produced a weapon. But that all, sort of, fell away this morning. Why? Because the Defendant admitted to all of the export charges, so

there was a lot of focus on, and rightfully so, the torture.

But like any good Defense attorney, I compare Defense attorneys, sometimes, to magicians, they're trying to rely on slight of hand and misdirection, Look over here, to distract you from what's really going on. So what we heard was a lot of distractions. You know, we heard Mr. Bartolai call this a dark force looming across the border, 20 miles from Iran, ISIS.

What does this have to do with anything? Is ISIS the reason why Mr. Roggio didn't get a license? That he hid items in a ski bag? That he tortured Siim for five weeks? Was it a fear of ISIS, finding out the trade secrets, the plans for the machines? Do you think ISIS wanted to set up a manufacturing plant with Chinese CNC drills? I don't think so. Just distractions.

Let's start with the first distraction here. Mr. Roggio didn't have any wasta. How could he have, possibly, had control over the CTG?

You heard testimony that Roggio was vouched for by Polad Talabani from the most powerful family in the region, the Commander of their counterterrorist group. The reason Polad vouched for Roggio is because Ron Bly, a highly-decorated, high-ranking U.S. soldier recommended him to Lahur Talabani, Polad's brother and head of th PUK Intelligence. Why didn't Roggio testify about any of that yesterday?

We heard about these Faruk goons being used as a private

Army. But Roggio testified yesterday that they were one in the same. The CTG and private security for Faruk, same guys, but the CTG personnel who was involved in the torture of Siim Saar, they were asking questions about terrorism, they were asking questions about ISIS, they were not being asked any questions about Faruk's project. When asked whether that's what they were asking questions about, Roggio testified yesterday, not so much. After all, this was a Polad Talabani project.

Whose logo did Marrtin Vilist say Roggio wanted to put on the guns that he was manufacturing? Was it the Zarya Construction logo from the blue vests in the photos? No. It was the CTG logo with the sun and the eagle wings. Roggio admitted his initial contact for the whole project was with Polad and Lahur. He called Polad and Lahur, The driving force behind this project. It's all a distraction. These Faruk goons, Zarya Construction.

So the next distraction, the next misdirection, I guess, was that we're going to blame it on Elina, it was all Elina's fault. Roggio testified that Elina was his right-hand person. Do you think that she did all of this, without Ross Roggio knowing? You heard testimony that no one did anything without Roggio's approval. He was like a babysitter. He approved every single invoice. You had to get permission from Roggio to go anywhere. Roggio testified, himself, that he told Lahur he had a problem and Lahur said Polad would take care of it. It wasn't

Elina. Elina is a distraction, a misdirection.

Desperate times call for desperate measures? That's what the Defense wants you to believe this is all about? What control did Ross Roggio have? What could he have done? Roggio did not try to help Siim Saar. Every Estonian witness said that that was not the case. What did Heret Viltrop say? Roggio told her that Siim had breached his loyalty and that he needed to be punished for it, and, also, that it was an example for the rest of us that we shouldn't go against him.

You heard, again, on the recording this morning Roggio's own words, Siim wanted to blackmail me. Triin: Are you sure? Roggio: Enough to beat him, enough to torture him.

How about Roggio's testimony -- now, again, your recollection of Roggio's testimony is going to control, you can evaluate his own credibility. He admitted that Siim got beaten when he didn't answer Roggio's questions, he also said, at one point, that he lost his temper and kicked him off his chair. That doesn't sound like he was helping Siim.

Roggio testified there was no doubt Siim was physically abused and I had some role in it. Again, he said, I told Lahur we had a problem, Polad said, We will take care of that. Is that helping Siim?

The Estonians weren't there to witness what was happening to protect Siim, they were there because Roggio wanted them to see that it could happen to them. Roggio threatened them, he

threatened their family, he even told Triin, I'll come get you, myself. This witness thing, a distraction. Same thing with Siim's letter to his mom. These are just mind games that Roggio was playing. After all, he's the one who told Siim that his mother didn't want to hear from him. That caused Siim to break down. That was the crushing that inspired Goran so much that Roggio was so good at it. That itself is torture, mental suffering.

The next distraction was Roggio's whole abduction at the end. We will get back to that.

But the main thing, here, is, as counsel pointed out, Torture and the definition of Torture. The Judge is going to instruct you on the law of Torture. Your job is to apply the facts, what you remember of the testimony, and for you to decide whether what happened to Siim Saar rose to severe physical and mental pain and suffering.

You heard testimony that Siim was punched and beaten in the stomach, in the ears, in his nose, in his throat, soldiers jumped on his chest, he was suffocated with a plastic bag, he was tased in his arm, in his throat, in his genitals, he was beaten with rubber hoses, he was made to run barefoot on sharp rocks, they threatened to cut off his fingers with pliers, he was hoisted up from behind with a belt and beaten with a stick. Does that sound like lesser forms of physical harm to you?

Roggio says, It wasn't pleasant. He, also, said Siim was

being a bit melodramatic. Even after his attempts to minimize it, Roggio, also, said that he didn't condone any of it, and that it was assault. You can use your common sense and experience to decide what Siim endured rose to the level of severe physical and mental pain and suffering. Roggio saying that there had to be 24 hours between interrogation sessions, that doesn't make it any lesser, though.

Was this done under color of law? Another distraction. These were CTG soldiers not some sort of off-duty cop. What is the color of law in Iraq? Distraction. Political armies? Distraction. Look over here. Focus on the testimony of Dr. Natali, Ron Bly, Cody McBride, everyone who testified that the CTG was the official -- was an official form of Kurdish Government. This was a CTG base in constant control by the CTG. There was uniformed CTG soldiers wearing a patch on their arm who was there committing this torture.

Defense counsel's attempt to muddy this up with, Who is an official? Just more distractions. Do you know who was an official? Polad Talabani. He was Commander of the CTG. Lahur was an official, he was head of the PUK factions. Who did Roggio call to say that he had a problem with Siim? Lahur Talabani. Who did Lahur say would take care of it? Polad Talabani.

Then, we have, you know, the exchange of Christmas greetings and rabbit photos and dinners in Estonia. Why did the

54

Estonians keep in touch with Roggio after all of this happened? Easy. They were scared of him. They were worried about what would happen, if they were perceived as disloyal. Heret Viltrop talked about Stockholm Syndrome. They were all afraid that he would find them, and they had good reason to be afraid that he would find them.

Again, Triin, on the recording: You told me you had Kurds in Finland and Sweden that would kill me.

Roggio: No, I would come get you, myself.

Heret testified that he had a reach, and that he would follow you wherever you are. Siim even testified that Roggio threatened his family in Estonia.

That brings us to, perhaps, the biggest distraction of all. This idea that Roggio committed these crimes because of duress. We agree with all of the elements that were laid out, and the Judge is going to instruct you on the elements of the Duress defense, but the Defense didn't meet any of these elements.

What choice did he have? How about choosing not to beat him, himself? How about choosing not to tell the soldiers when to beat him, when Siim didn't answer his questions?

Now, the most important, arguably, the most important element of a Duress defense is the last one. It said, Roggio had not recklessly placed himself in a situation in which he would be forced to engage in the torture. In other words, if he got himself into this mess, he can't claim duress to get

himself out.

So did he commit torture, because he was under stress from Faruk's accountant? Did it sound like he feared for his life, when all of the Estonians said that he was the one running the show? If he was so scared, why did he brag to Triin that he did it, and that Goran, actually, got tips from him on how to do it? If Roggio was under an immediate threat of his own physical harm, why was he allowed to freely fly in and out of Iraq for, at least, a year after Siim was tortured?

He testified that he was abducted, himself, over a year later. How does that prove duress? While he was going out for pizza and playing Xbox? Was he thinking about Siim choking and begging for tea? All distractions.

Look, at the beginning of this trial last Tuesday, although, that seems like a month ago, my colleague Mr. Jasperse told you this was a complex case. And 25 witnesses and scores of exhibits later, you may be inclined to believe him. I'll get grief for this later, but I'm actually inclined to disagree with him, it's actually rather simple.

This man, Ross Roggio, set up a business with a Kurdish tribe and military commander to build a weapons factory without any of the required approvals. He immediately sent weapons parts to Iraq from the U.S.A. without any required licenses, he defrauded people along the way, and he laundered the proceeds.

And, then, when he got wind that Siim Saar found out about

56

the fraud and copied documents, he made a call. I told Lahur we had a problem. And he had Siim brutally tortured for five weeks, until he coughed up blood. Roggio didn't try to help him. He said, For the torture to stop, all Siim needed to do was comply. Roggio didn't stop there. He threatened the rest of his employees, telling them, I'll come get you, myself.

These are the actions of a man who knew exactly what he was doing, who confessed to everything on a recording and who admitted all of his crimes, while trying to talk his way out of them on the stand.

Take your time, review all of the evidence. Please review your notes of all of the testimony, including the Defendant's own testimony yesterday, and listen to the seven audio excerpts. They're only about 15 minutes total. Then, you will apply your common sense to see past all of the distractions and all the other hocus pocus. That will lead you to the only logical conclusion, which is, Ross Roggio is guilty of each and every count.

THE COURT: We will take a short break before instructions are given. We will take twenty minutes.

(At this time a recess was taken.)

THE COURT: Members of the jury, we are at the stage of the proceedings, now, where I will give you my instructions, both orally and in writing. For that purpose, my courtroom deputy will hand out copies of the jury charge, as well as the verdict

57

form. Everyone has a copy, okay.

Members of the jury, you have seen and heard all the evidence and the arguments of the lawyers. Now, I will instruct you on the law. You have two duties as a jury. Your first duty is to decide the facts from the evidence that you have heard and seen in court during this trial. This is your job and yours alone. I play no part in finding the facts. You should not take anything I may have said or done during the trial as indicating what I think of the evidence or what I think about what your verdict should be.

Your second duty is to apply the law that I give you to the facts. My role, now, is to explain to you the legal principles that must guide you in your decisions. You must apply my instructions carefully. Each of the instructions is important, and you must apply all of them. You must not substitute or follow your own notion or opinion about what the law is or ought to be. You must apply the law that I give you, whether you agree with it or not.

Whatever your verdict, it will have to be unanimous. All of you will have to agree on it or there will be no verdict. In the jury room, you will discuss the case among yourselves, but, ultimately, each of you will have to make up your own mind. This is a responsibility that each of you has and that you cannot avoid.

During your deliberations, you must not communicate with or

provide any information to anyone, by any means, about this case. You may not use any electronic device or media, such as, the telephone or cell phone or the computer, the internet or any text or instant messaging service to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. You may not use these electronic means to investigate or communicate about the case, because it is important that you decide this case based, solely, on the evidence presented in this courtroom.

You are only permitted to discuss the case with your fellow jurors during deliberations, because they have seen and heard the same evidence you have. In our Judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear or public opinion to influence you. You should, also, not be influenced by any person's race, color, religion, national ancestry, gender, profession, occupation, economic circumstances or position in life or in the community.

59

2. Evidence. You must make your decision in this case based only on the evidence that you saw and heard in the courtroom. Do not let rumors, suspicions or anything else that you may have seen or heard outside of court influence your decision, in any way.

The evidence from which you are to find the facts consists of the following:

1. The testimony of the witnesses.

2. Documents and other things received as exhibits.

3. Any fact or testimony that was stipulated, that is, formally agreed to by the parties.

The following are not evidence:

1. The indictment.

2. Statements and arguments of the lawyers for the parties in this case.

3. Questions by the lawyers and questions that I might have asked.

4. Objections by lawyers, including objections in which the lawyers stated facts.

5. Any testimony I struck or told you to disregard.

6. Anything you might have seen or heard about this case outside the courtroom.

You should use your common sense in weighing the evidence. Consider it in light of your every day experience with people and events and give it whatever weight you believe it deserves.

60

If your experience and common sense tells you that certain evidence reasonably leads to a conclusion, you may reach that conclusion. As I told you in my preliminary instructions, the Rules of Evidence control what can be received into evidence. During the trial, the parties objected when they thought that evidence was offered that was not permitted by The Rules of Evidence.

These objections simply meant that the parties were asking me to decide whether the evidence should be allowed under the rules. You should not be influenced by the fact that an objection was made. You should, also, not be influenced by my rulings on objections.

When I overruled an objection, the question was answered or the exhibit was received as evidence and you should treat that testimony or exhibit like any other. When I allowed evidence, testimony or exhibits, for a limited purpose only, I instructed you to consider that evidence only for that limited purpose and you must do that.

When I sustained an objection, the question was not answered or the exhibit was not received as evidence. You must disregard the question or the exhibit entirely. Do not think about or guess what the witness might have said, in answer to the question. Do not think about or guess what the exhibit might have shown.

Sometimes a witness may have already answered before a

61

party objected or before I ruled on the objection. If that happened, and if I sustained the objection, you must disregard the answer that was given.

Also, if I ordered some testimony or evidence be stricken or removed from the record, you must disregard that evidence. When you are deciding this case, you must not consider or be influenced, in any way, by the testimony or other evidence that I told you to disregard.

The lawyers may have called your attention to certain facts or factual conclusions that they think are important. However, those arguments are not evidence and are not binding on you. It is your own recollection and interpretation of the evidence that controls your decision in this case.

Also, do not assume from anything I may have done or said during the trial that I have any opinion about any of the issues in this case or about what your verdict should be.

3. Direct and Circumstantial Evidence. Two types of evidence may be used in this trial, direct evidence and circumstantial or indirect. You may use both types of evidence in reaching your verdict.

Direct evidence is evidence, which, if believed, directly proves a fact. An example of direct evidence occurs when a witness testifies about something the witness knows, from his or her own senses, something the witness has seen, touched, heard or smelled.

Circumstantial evidence is evidence, which, if believed, indirectly proves a fact. It is evidence that proves one or more facts from which you could reasonably find or infer the existence of some other fact or facts. A reasonable inference is simply a deduction or conclusion that reason, experience and common sense lead you to make from the evidence.

Reasonable evidence is not a suspicion or a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact. Sometimes, different inferences may be drawn from the same set of facts. The Government may ask you to draw one inference, and the Defense may ask you to draw another.

You and you alone must decide what reasonable inferences you will draw, based on all the evidence, and your reason, experience and common sense. You should consider all the evidence that is presented in this trial, direct and circumstantial. The law makes no distinction between the weight that you should give to, either, direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

4. Credibility of Witnesses. As I stated in my preliminary instructions at the beginning of the trial, in deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe.

You are the sole judges of the credibility of the

63

witnesses. Credibility refers to whether a witness is worthy of belief. Was the witness truthful? Was the witness' testimony accurate? You may believe everything a witness says or only part of it or none of it.

You may decide whether to believe a witness, based on his or her behavior and manner of testifying, the explanations the witness gave, and all the other evidence in the case, just as you would in any important matter where you are trying to decide if a witness is truthful, straightforward and accurate in his or her recollection.

In deciding the question of credibility, remember to use your common sense, your good judgment and your experience. In deciding what to believe, you may consider a number of factors:

1. The opportunity and ability of the witness to see or hear or know the things about which the witness testifies.

2. The quality of the witness' knowledge, understanding and memory.

3. The witness' appearance, behavior and manner while testifying.

4. Whether the witness has an interest in the outcome of the case or any motive, bias or prejudice.

5. Any relation the witness may have with the party in the case and any effect the verdict may have on the witness.

6. Whether the witness said or wrote anything before trial that was different from the witness' testimony in court.

7. Whether the witness' testimony was consistent or inconsistent with other evidence that you believe. And;

8. Any other factors that bear on whether the witness should be believed.

Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness' testimony. Two or more persons witnessing an event may simply see or hear it differently. Mistaken recollection, like failure to recall, is a common human experience.

In weighing the effect of an inconsistency, you should also consider whether it was about a matter of importance or an insignificant detail. You should, also, consider whether the inconsistency was innocent or intentional.

You are not required to accept testimony, even if the testimony was not contradicted and the witness was not impeached. You may decide that the witness is not worthy of belief because of the witness' bearing and demeanor or because of the inherent improbability of the testimony or for other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can, then, attach to that witness' testimony the importance or weight that you think it deserves.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testified or

the quantity of evidence that was presented. What is more important than numbers or quantity is how believable the witnesses were and how much weight you think their testimony deserves.

5. Not All Evidence. Not All Witnesses Needed. Although, the Government is required to prove Ross Roggio guilty beyond a reasonable doubt, The Government is not required to present all possible evidence related to the case or to produce all possible witnesses who might have some knowledge about the facts of the case.

In addition, Mr. Roggio is not required to present any evidence or produce any witnesses.

6. Presumption of Innocence. Burden of Proof. Reasonable Doubt. Defendant Ross Roggio pleaded not guilty to the offenses charged. Mr. Roggio is presumed to be innocent. He started the trial with a clean slate with no evidence against him.

The presumption of innocence stays with Mr. Roggio, unless and until The Government has presented evidence that overcomes that presumption by convincing you that he is guilty of the offenses charged beyond a reasonable doubt.

Presumption of innocence requires that you find Mr. Roggio not guilty, unless you are satisfied that The Government has proved guilt beyond a reasonable doubt. The presumption of innocence means Mr. Roggio had no burden or obligation to present any evidence, at all, or to prove that he is not

guilty.

The burden or obligation of proof is on the Government to prove that he is guilty, and this burden stays with The Government throughout the time of trial.

In order for you to find Mr. Roggio guilty of an offense charged, The Government must convince you that he is guilty beyond a reasonable doubt. That means that the Government must prove each and every element of each offense charged beyond a reasonable doubt. A Defendant may not be convicted, based on suspicion or conjecture, but only on evidence proving guilt beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty. Possible doubts or doubts based on conjecture, speculation or hunch are not reasonable doubts. A reasonable doubt is a fair doubt, based on reason, logic, common sense or experience. It is a doubt that an ordinary, reasonable person has, after carefully weighing all of the evidence, and is a doubt of the sort that would cause him or her to hesitate to act in matters of importance in his or her own life. It may arise from the evidence or from the lack of evidence or from the nature of the evidence.

If, having now heard all the evidence, you are convinced that The Government proved each and every element of the offense charged beyond a reasonable doubt, you should return a

verdict of guilty for that offense. However, if you have a reasonable doubt about one or more of the elements of an offense charged, then, you must return a verdict of not guilty for that offense.

7. Nature of the Indictment. As you know, the Defendant Ross Roggio is charged in the superseding indictment with violating Federal law, Conspiracy To Commit Torture, Torture, Conspiracy To Commit An Offense Against The United States, Arms Export Control Act Violations, International Emergency Economic Powers Act Violations, Smuggling Goods From The United States, Wire Fraud and Money Laundering.

As I explained at the beginning of trial, an indictment is just a formal way of specifying the exact crimes the Defendant is accused of committing. An indictment is simply a description of the charges against a Defendant. It is an accusation only. An indictment is not evidence of anything, and you should not give any weight to the fact that Mr. Roggio has been indicted in making your decision in this case.

8. On Or About. The indictment charges that the offenses were committed, quote, on or about, end quote, certain dates. The Government does not have to prove with certainty the exact date of the alleged offense. It is sufficient, if The Government proves beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

9. Separate Consideration. Single Defendant Charged With

68

Multiple Offenses. The Defendant Ross Roggio is charged with more than one offense. The number of offenses charged is not evidence of guilt. This should not influence your decision, in any way. You must separately consider the evidence that relates to each offense, and you must return a separate verdict for each offense.

For each offense charged, you must decide whether The Government has proved beyond a reasonable doubt that Mr. Roggio is guilty of that particular offense. Your decision on one offense, whether guilty or not guilty, should not influence your decision on any of the other offenses charged. Each offense should be considered separately.

10. Expert Witnesses. Opinion Evidence. The Rules of Evidence do not ordinarily permit witnesses to state their own opinions about important questions in a trial, but there are exceptions to these rules.

In this case, you heard testimony from witnesses who were admitted as experts. Alex Douville was admitted as an expert on defense articles, The United States Munitions List and The State Department process. Steven Clagett was admitted as an expert on The Commerce Department Licensing process and how The Commerce Department controls items for export to certain countries.

Douglas Green was admitted as an expert in the field of Investigation of Crime involving Computers, generally, and

Computer and Digital Forensics, specifically.

Thomas Smith was admitted as an expert in the field of Investigation of Crimes involving Computers, generally, and Computer and Digital Forensics, specifically.

Denise Natali was admitted as an expert on The Kurdistan Region of Iraq, particularly, on Kurdistan's relationship with Iraq and how certain families control power in Kurdistan, including power over The Government, political parties, the military, security services and private companies. Zuhair Al-Maliki was admitted as an expert on Iraqi law.

Because of their knowledge, skill, experience, training or education in their fields, these individuals were permitted to offer an opinion in his field and the reasons for the opinion.

The opinions stated by the experts admitted should receive whatever weight you think appropriate, given all the other evidence in the case. In weighing the opinion testimony, you may consider the witness' qualifications, the reasons for the witness' opinion and the reliability of the information supporting the witness' opinion, as well as the other factors discussed in these instructions for weighing the testimony of witnesses.

You may disregard the opinion entirely, if you decide that it is not based on sufficient knowledge, skill, experience, training or education. You may, also, disregard the opinion, if you conclude that the reasons given in support of the opinion

70

are not sound or if you conclude that the opinion is not supported by the facts shown by the evidence or if you think that the opinion is outweighed by other evidence.

11. Opinion Evidence. Lay Witness. Witnesses are not generally permitted to state their personal opinions about important questions in a trial. However, a witness may be allowed to testify to his or her opinion, if it is rationally based on the witness' perception and is helpful to a clear understanding of the witness' testimony or to the determination of a fact in issue.

In this case, I permitted Patricia Foster, Katherine Salazar and William Mathes to offer opinions based on their perceptions. The opinions of these witnesses should receive whatever weight you think appropriate, given all the other evidence in the case and the other factors discussed in these descriptions for weighing and considering whether to believe the testimony of witnesses.

12. Credibility of Witnesses. Law Enforcement Officer. You have heard the testimony of law enforcement officers. The fact that a witness is employed as a law enforcement officer does not mean that his or her testimony necessarily deserves more or less consideration or greater or lesser weight than that of any other witness. At the same time, it is quite legitimate for the Defense to try to attack the believability of a law enforcement officer witness on the ground that his or

her testimony may be colored by a personal or professional interest in the outcome of the case.

You must decide, after reviewing all the evidence, whether you believe the testimony of the law enforcement witness and how much weight, if any, it deserves.

13. Impeachment of Witness. Prior Inconsistent Statement For Credibility Only. You have heard the testimony of certain witnesses, you've also heard that, before this trial, they made statements that may be different from their testimony in this trial. It is up to you to determine whether the statements were made and whether they were different from the witness' testimony in this trial.

These earlier statements were brought to your attention only to help you decide whether to believe the witnesses' testimony here at trial. You cannot use it as proof of what the witnesses said in the earlier statements, you could only use it as one way of evaluating the witness' testimony in this trial.

14. False In One. False In All. If you believe that a witness knowingly testified falsely concerning any important matter, you may distrust the witness' testimony concerning other matters. You may reject all of the testimony or you may accept such parts of the testimony that you believe are true and give it such weight as you think it deserves.

15. Defendant's Choice To Testify. In a criminal case, the Defendant has a Constitutional Right not to testify. However,

if he chooses to testify, he is, of course, permitted to take the witness stand on his own behalf. In this case, Ross Roggio testified. You should examine and evaluate his testimony just as you would the testimony of any other witness.

16. Consciousness Of Guilt. False Exculpatory Statements. You have heard testimony that Ross Roggio made certain statements outside the courtroom to law enforcement authorities in which he claimed that his conduct was consistent with innocence and not with guilt. The Government claims these statements are false.

If you find that Mr. Roggio made a false statement, in order to direct the attention of law enforcement officers away from himself, you may, but are not required to conclude that Mr. Roggio believed that he was guilty.

It is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence. You may not, however, conclude, on the basis of this alone, that Mr. Roggio is, in fact, guilty of the crime for which he is charged.

You must decide whether or not the evidence as to Mr. Roggio shows that he believed that he was guilty and the significance, if any, to be attached to this evidence. In your evaluation, you may consider that there may be reasons fully consistent with innocence that could cause a person to give a false statement that he did not commit a crime.

Fear of law enforcement's reluctance to become involved or simple mistake may cause an innocent person to give such a statement or explanation.

17. Prior Statement Of The Defendant. The Government included evidence that Ross Roggio made statements to his former employees and to Special Agents with the FBI and Homeland Security. You must decide whether Mr. Roggio did, in fact, make the statements. If you find that Mr. Roggio did make those statements, then, you must decide what weight, if any, you feel the statements deserve.

In making this decision, you should consider all matters in evidence having to do with the statements, including those concerning Mr. Roggio, himself, and the circumstances under which the statements we were made.

18. Audio Recordings. Consensual. During the trial, you heard audio recordings of conversations with Mr. Roggio made without his knowledge. These audio recordings were made with the consent and agreement of Triin Kiviking, the other party to the conversations. The use of this procedure to gather evidence is lawful and the recordings may be used by either party.

19. Audio Recordings. Transcripts. You have heard audio recordings that were received into evidence, and you were shown transcripts of the recordings. Keep in mind that the transcript is not evidence.

As I instructed you before you saw the transcripts, it was

74

shown to you only as a guide to help you follow what was being said. The recordings, themselves, are the evidence. If you noticed any differences between what you heard on the recording and what you read in the transcript, you must rely on what you heard not what you read.

If you could not hear or understand certain parts of the recordings, you must ignore the transcript, as far as those parts are concerned.

20. Elements Of The Offenses Charged. Count 1 of the superseding indictment charges Ross Roggio with Conspiracy to Commit Torture, which is a violation of Federal Law.

Count 1, specifically, charges that;

On or about October 14th, 2015, through on or about November 21, 2015, while outside The United States and in The Kurdistan Region of Iraq, Ross Roggio, whose last known address was Stroudsburg, Pennsylvania, in the Middle District of Pennsylvania, knowingly conspired with others to commit torture, in that, Mr. Roggio and others conspired to commit acts under color of law, specifically, intended to inflict severe physical and mental pain and suffering, (other than the pain and suffering incidental to lawful sanctions), upon another person within the conspirator's custody and control.

It is a Federal crime for two or more persons to agree or conspire to commit the offense of Torture, even if they never actually achieve their objective. A conspiracy is a kind of

criminal partnership. In order to find Ross Roggio guilty of Conspiracy To Commit Torture, you must find that the Government proved each of the following three elements beyond a reasonable doubt:

First, that two or more persons agreed to commit torture, as charged in the superseding indictment.

I will explain the elements of the offense of Torture to you shortly.

Second, that Ross Roggio was a party to or member of that agreement.

And third, that Mr. Roggio joined the agreement or conspiracy knowing of its objective to commit torture and intending to join together with, at least, one other alleged conspirator to achieve that objective; that is, that Mr. Roggio and, at least, one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to commit torture.

The first element of the crime of conspiracy is the existence of an agreement. The Government must prove beyond a reasonable doubt that two or more persons knowingly and intentionally arrived at a mutual understanding or agreement, either, spoken or unspoken, to work together to achieve the overall objective of the conspiracy to commit torture.

The Government does not have to prove the existence of a formal or written agreement or an express oral agreement

spelling out the details of the understanding. The Government, also, does not have to prove all the members of the conspiracy directly met or discussed between themselves their unlawful objectives or agreed to all the details or agreed to what the means were by which the objectives would be accomplished.

The Government is not even required to prove that any other members of the alleged conspiracy were named or that all members of the conspiracy are even known. What The Government must prove beyond a reasonable doubt is that two or more persons, in some way or manner, arrived at some type of agreement, mutual understanding or meeting of the mind to try to accomplish a common and unlawful objective.

You may consider both direct and circumstantial evidence in deciding what the Government has proved beyond a reasonable doubt that an agreement or mutual understanding existed. You may find the existence of a conspiracy, based on reasonable inferences drawn from the actions and statements of the alleged members of the conspiracy, from the circumstances surrounding the scheme and from evidence of related facts and circumstances which prove that the activities of the participants in a criminal venture could not have been carried out, except as the result of a preconceived agreement, scheme or understanding.

If you find a criminal agreement or conspiracy existed, then, in order to find Ross Roggio guilty of Conspiracy, you must, also, find that the Government proved beyond a reasonable

doubt that Mr. Roggio knowingly and intentionally joined that agreement or conspiracy during its existence.

The Government must prove that Mr. Roggio knew the goal or objectives of the agreement or conspiracy and voluntarily joined it during its existence, intending to achieve the common goal or objective, and to work together with the other alleged conspirators toward the goal or objective.

The Government need not prove that Mr. Roggio knew everything about the conspiracy or that he knew everyone involved in it or that he was a member from the beginning. The Government, also, does not have to prove that Mr. Roggio played a major or substantial role in the conspiracy.

You may consider both direct and circumstantial evidence in deciding whether Mr. Roggio joined the conspiracy, knew of the criminal -- knew of its criminal objective and intended to further the objective. Evidence which shows that Mr. Roggio only knew about the conspiracy or only kept bad company by associating with members of the conspiracy or was only present when it was discussed or when a crime was committed is not sufficient to prove that Mr. Roggio was a member of the conspiracy, even if Mr. Roggio approved of what was happening or did not object to it.

Likewise, evidence showing Mr. Roggio may have done something that happened to help the conspiracy does not necessarily prove that he joined the conspiracy. You may,

however, consider this evidence with all the other evidence in deciding whether The Government proved beyond a reasonable doubt that Mr. Roggio joined the conspiracy. In order to find Ross Roggio guilty of Conspiracy, you must find that the Government proved beyond a reasonable doubt that Mr. Roggio joined the conspiracy, knowing of its objective and intending to help further or achieve that objective.

That is, The Government must prove;

1. That Mr. Roggio knew of the objective and goal of the conspiracy;

2. That Mr. Roggio joined the conspiracy, intending to help further or achieve that goal or objective;

3. That Mr. Roggio and, at least, one other alleged conspirator shared a unity or purpose for that objective or goal.

You may consider both direct and circumstantial evidence, including Mr. Roggio's words or conducted and other facts and circumstances in deciding whether Mr. Roggio had the required knowledge and intent.

For example, evidence that showed Mr. Roggio derived some benefit from the conspiracy or had some stake in the achievement of the conspiracy's objective might tend to show that Mr. Roggio had the required intent or purpose that the conspiracy's objective be achieved.

The Government is not required to prove that any of the

members of the conspiracy were successful in achieving any or all of the objectives of the conspiracy. You may find Mr. Roggio guilty of Conspiracy if you find that The Government proved beyond a reasonable doubt the elements I have explained, even if you find that the Government did not prove that any of the conspirators, actually, committed torture.

Conspiracy is a criminal offense, separate from the offenses that were the objective of the conspiracy. Conspiracy is complete without the commission of those offenses.

A conspiracy ends when the objectives of the conspiracy have been achieved or when all of the members of the conspiracy have withdrawn from it. However, a conspiracy may be a continuing conspiracy, and if it is, it lasts until there is some affirmative showing that it has ended or that its members have withdrawn.

A conspiracy may be a continuing one, if the agreement includes an understanding that the conspiracy will continue over time. Also, a conspiracy may have a continuing purpose or objective and, therefore, may be a continuing conspiracy.

Evidence has been admitted in this case that certain persons who are alleged to be co-conspirators of Mr. Roggio did or said certain things. The acts or statements of any member of the conspiracy are treated as the acts or statements of all the members of the conspiracy, if these acts or statements were performed or spoken during the existence of the conspiracy and

to further the objectives of the conspiracy. Therefore, you may consider as evidence against Mr. Roggio any acts done or statements made by any members of the conspiracy, during the existence of and to further the objectives of the conspiracy.

You may consider these acts and statements, even if they were done and made in Mr. Roggio's absence and without his knowledge. As with all the evidence presented in this case, it is for you to decide whether you believe the evidence and how much weight to give it.

Count 2 of the superseding indictment charges Ross Roggio with Torture, which is a violation of Federal Law. It is a Federal Crime for a national of The United States or anyone now present in the United States, irrespective of nationality, to commit torture while outside the United States.

Count 2, specifically, charges;

On or about October 15, 2014 and continuing through on or about November 21, 2015, while outside of The United States and in The Kurdistan Region of Iraq, Ross Roggio, together with others, did, while, specifically, intending to inflict severe physical and mental pain and suffering, other than pain and suffering incidental to lawful sanctions upon another person, within his custody or physical control.

My instructions on the offense of Torture, also, apply to Count 1, Conspiracy To Commit Torture. Torture means an act committed by a person acting under the color of law,

specifically, intended to inflict severe physical pain or suffering, other than pain or suffering incidental to lawful sanctions, upon another person within his custody or physical control.

Lawful sanctions include Judicially-imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and the purpose of the law prohibiting torture.

In order to find Mr. Roggio guilty of Torture, you must find that the Government proved each of the following four elements beyond a reasonable doubt.

First, that Mr. Roggio committed an act with the specific intent to inflict severe physical pain or suffering.

Second, that Mr. Roggio was acting under the color of law.

Third, that the act of torture was within Mr. Roggio's custody or physical control.

And fourth, that the act of torture occurred outside the United States.

Specific intent to inflict severe physical pain or suffering means to act with the intent to commit the act, as well as the intent to achieve the consequences of the act; namely, the infliction of the severe physical pain or suffering. An act that results in the unanticipated or unintended severity of pain and suffering is not torture.

Severe physical pain means bodily pain that is extreme in

intensity and difficult to endure.

Severe physical suffering means physical distress that is extreme, considering its intensity and duration or persistence and that is difficult to endure.

The term, torture, is usually reserved for extreme, deliberate and unusually cruel practices rather than lesser forms of cruel, inhumane or degrading treatment or punishment. The severity of the intended pain and suffering is the distinguishing characteristic of torture, under the applicable statute.

To act, quote, under color of law, end quote, means to act beyond the bounds of lawful authority, but in such a manner that the unlawful acts were done while the official was purporting or pretending to act in the performance of official duties. In other words, the unlawful acts must consist of an abuse or misuse of power, which is possessed by the official, only because that person is an official.

Private persons jointly engaged with Government officials, with military or agents thereof, are acting under color of law. To act under color of law does not require that the accused individual, himself, be a Government official, member of the military or agent. It is enough that he is a willful participant in joint activity with the Government officials, military or agents thereof.

Therefore, Mr. Roggio may be found guilty of the torture

charges contained in the superseding indictment, even though, he was not an official, an employee or a member of a Government unit or the military, if you find beyond a reasonable doubt that the essential facts constituting the offense charged have been established, as defined in these instructions, and that Mr. Roggio was a willful participant together with the governmental unit, the military or its agents in the doing of such acts.

Outside the United States means outside a state in the United States, the District of Columbia and the Commonwealth territories and possessions of the United States. A U.S. military base located overseas is not a territory or possession of the United States.

Count 2, also, charges that Mr. Roggio aided and abetted others in committing torture. A person may be guilty of an offense because he personally committed the offense, himself, or because he aided and abetted another person to commit the offense charged.

A person who has aided and abetted another person in committing an offense is often called an accomplice. The person whom the accomplice aids and abets is known as the principal. In this case, the Government alleges that Mr. Roggio aided and abetted co-conspirators in committing torture, as charged in the superseding indictment.

In order to find Mr. Roggio guilty of this offense, because

he aided and abetted co-conspirators in committing this offense, you must find that the Government proved each of the following four requirements beyond a reasonable doubt:

First, that Ross Roggio's co-conspirators committed the offenses charged by committing each of the elements of the offenses charged, as I have explained those elements to you in these instructions.

Mr. Roggio's co-conspirators need not have been charged with or found guilty of the offenses, however, as long as you find that the Government proved beyond a reasonable doubt that Mr. Roggio committed the offense.

Second, that Mr. Roggio knew that the offense charged was going to be committed or was being committed by Mr. Roggio's co-conspirators.

Third, that Mr. Roggio knowingly did some act, for the purpose of aiding, assisting, soliciting, facilitating or encouraging his co-conspirators in committing the specific offense charged and with the intent that his co-conspirators commit the specific offense.

And fourth, that Mr. Roggio performed an act in furtherance of the offense charged.

In deciding whether Mr. Roggio had the required knowledge and intent to satisfy the third requirement for aiding and abetting, you may consider both direct and circumstantial evidence, including Mr. Roggio's words and actions and the

other facts and circumstances.

However, evidence that Mr. Roggio merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator, during the commission of the offense, is not enough for you to find Mr. Roggio guilty as an aider and abetter.

If the evidence shows that Mr. Roggio knew that the offense was being committed or was about to be committed but does not also prove beyond a reasonable doubt that it was Mr. Roggio's intent and purpose to aid, assist, encourage, facilitate or otherwise associate himself with the offense, you may not find Mr. Roggio guilty of the offense as an aider and abetter.

The Government must prove beyond a reasonable doubt that Mr. Roggio, in some way, participated in the offense committed by his co-conspirators as something Mr. Roggio wished to bring about and to make succeed.

To show that Mr. Roggio performed an act in furtherance of the offense charged, to satisfy the fourth requirement, The Government needs to show some affirmative participation by Mr. Roggio, which, at least, encouraged his co-conspirators to commit the offense. That is, you must find Mr. Roggio's act did, in some way, aid, assist, facilitate or encourage his co-conspirators to commit the offense.

Mr. Roggio's co-conspirators' acts need not further aid, assist, facilitate or encourage every part or phase or element

of the offense charged, it is enough if Mr. Roggio's acts further aid, assist, facilitate or encourage only one or some part or phase or element of the offense.

Also, Mr. Roggio's acts need not, themselves, be against the law.

Count 3 of the superseding indictment charges Ross Roggio with Conspiracy To Commit An Offense Against The United States. Count 3, specifically, charges that;

On or before January 13, 2013 and continuing through and on February 2017 in the Middle District of Pennsylvania and elsewhere, Mr. Roggio, together with Unindicted Co-conspirator No. 1, Unindicted Co-conspirator No. 2 did knowingly and willfully conspire with other individuals to willfully export defense services and defense articles from The United States to Iraq without having first obtained a license or written approval from The United States Department of State's Director of Trade Controls, in violation of The Arms Export Control Act and related regulations and to fraudulently and knowingly export merchandise, articles and objects contrary to a law of The United States prohibiting smuggling goods from The United States.

For Mr. Roggio to be found guilty of Conspiracy To Commit An Offense Against The United States, The Government must prove each following elements beyond a reasonable doubt:

First, that two or more persons agreed to commit an offense

against The United States; namely, to willfully export defense services and defense articles from The United States to Iraq, without having first obtained the necessary license or written approval, and to fraudulently and knowingly export merchandise, articles and objects contrary to a law of The United States.

Second, that Ross Roggio was a party to or member of that agreement.

Third, that Mr. Roggio joined the agreement or conspiracy, knowing of its objectives to commit offenses against The United States, and intending to join together with, at least, one other alleged conspirator to achieve those objectives.

That is, that Mr. Roggio and, at least, one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to control and to commit an offense against The United States.

Fourth, that, at some time, during the existence of the agreement or conspiracy, at least, one of its members performed an overt act, in order to further the objectives of the agreement.

The instructions I gave you, in the context of Count 1, Conspiracy To Commit Torture, related to the existence of an agreement, membership in the agreement, Mr. Roggio's mental state, success of the conspiracy and acts or statements of co-conspirators, also, apply to Count 3.

In considering Count 3, the focus is Conspiracy To

Illegally Export Defense Services, Defense Articles, And/Or Other Controlled Items rather than Conspiracy To Commit Torture.

When you are considering the existence of an agreement alleged in Count 3, I remind you that Count 3 of the superseding indictment charges a conspiracy to commit several Federal crimes, including violating The Arms Export Control Act and prohibitions against smuggling goods from The United States.

The Government does not have to prove that the alleged conspirators agreed to commit all of these crimes. The Government, however, must prove that they agreed to commit, at least, one of the object crimes, and you must, unanimously, agree on which crime. You cannot find Ross Roggio guilty of conspiracy, unless you, unanimously, agree that the same Federal crime was the objective of the conspiracy.

It is not enough if some of you agree that one of the charged was crimes was the objective of the conspiracy and others agree that a different crime was the object of the conspiracy.

I will later provide you with specific instructions, regarding The Arms Export Control Act and Smuggling Goods From The United States, as well as definitions that will help guide you in your consideration of Count 3.

Count 4 of the superseding indictment charges Ross Roggio

with violating The Arms Export Control Act.

Count 4, specifically, charges Mr. Roggio with violating The Arms Export Control Act, also known as AECA, by willfully exporting and attempting to export M4 bolt gas rings and firing pin retainers from The United States to Iraq, without first having obtained a license from The United States Department of State.

Count 4 alleges that the violation occurred between on or about March 28, 2016 and on or about September 26, 2016, in or near Monroe County, Pennsylvania, within the Middle District of Pennsylvania and elsewhere.

The Arms Export Control Act and International Traffic in Arms Regulations, also known as ITAR, spelled I-T-A-R, makes it a crime for anyone to willfully export or attempt to export retransfer, furnish or cause to be exported from The United States any defense article that is covered by The United States Munitions List, also called the USML, unless a license has first been obtained from The State Department's Directorate of Defense Trade Controls, also called the DDTC.

For Mr. Roggio to be found guilty of the crime charged in Count 4, the Government must prove beyond a reasonable doubt:

First, that Mr. Roggio exported, attempted to export, retransferred, furnished or caused to be exported the items from The United States to Iraq.

Second, that the items Mr. Roggio exported, attempted to

export, retransferred, furnished or caused to be exported was a defense article controlled for export on The United States Munitions List.

Third, that Mr. Roggio did not obtain from the DDTC the necessary license before exporting, attempting to export, retransferring, furnishing or causing to be exported the item.

Fourth, that Mr. Roggio acted willfully.

The first element the Government must prove is that Mr. Roggio exported, attempted to export, retransferred, furnished or caused to be exported the product at issue to Iraq. Export means the shipment or transmission of items out of The United States.

The second element the Government must prove is that the item Mr. Roggio exported, attempted to export, retransferred, furnished or caused to be exported was a defense article controlled for export by USML, at the time of the export. The term, defense article, means any item that is listed on the USML.

The third element the Government must prove is that Mr. Roggio did not obtain a license from the DDTC before exporting, attempting to export, retransferring, furnish ing or causing to be exported the item.

Unless specifically exempted, persons engaged in the export of defense articles covered by the USML must be registered with the DDTC and must apply for and receive a valid license or

91

other approval to export a defense article from The United States.

The fourth element the Government must prove is that Mr. Roggio acted willfully. In a few moments, I will instruct you on the meaning and definition of the term, willfully.

As relevant to Count 4, the Government is not required to prove that Mr. Roggio knew the existence or details of The Arms Export Control Act or The International Traffic in Arms Regulations.

Count 5 of the superseding indictment charges Ross Roggio with violating The International Emergency Economic Powers Act.

Count 5, specifically, charges that on or about March 29, 2016, in or near Monroe County, within the Middle District of Pennsylvania, Mr. Roggio, aided and abetted by others, knowingly and willfully exported, attempted to export and caused to be exported from The United States to Iraq rifling combo buttons, without having first obtained a license from The United States Department of Commerce.

Committing a violation of The International Emergency Economic Powers Act involves knowingly and willfully exporting or causing the export of from The United States an export-controlled item, without first having obtained a license from The Department of Commerce Bureau of Industry and Security, in violation of the Act and the related export administration regulations.

For Mr. Roggio to be found guilty of the crime charged in Count 5, the Government must prove each of the following four elements beyond a reasonable doubt:

First, that Mr. Roggio exported, caused the export of or aided and abetted the export of an item from The United States to Iraq.

Second, that the item Mr. Roggio exported caused the export of or aided and abetted the export of was controlled for export on The Commerce Control List.

Third, that Mr. Roggio did not obtain the necessary license from The Department of Commerce before exporting the item.

Fourth, that Mr. Roggio did so knowingly and willfully.

The first element The Government must prove is Mr. Roggio exported or caused the export of the product at issue to Iraq. As I've explained, export means the shipment or transmission of items out of The United States.

The second element The Government must prove is that the item Mr. Roggio is charged with exporting was an export-controlled item, which means, an item for which The Department of Commerce requires that a license be obtained before the item can lawfully be exported from The United States to certain countries.

The item at issue must have been an export-controlled item, at the time of the alleged export.

The third element the Government must prove is that Mr.

Roggio did not obtain a license from The Department of Commerce before exporting the items charged.

The fourth item the Government must prove is Mr. Roggio acted knowingly and willfully.

In a few minutes, I will instruct you on the meaning and definition of the terms, knowingly and willfully.

As to Count 5, The Government is not required to prove that Mr. Roggio knew the existence or details of The International Emergency Economic Powers Act or The Export Administration Regulations.

Count 6 charges Ross Roggio with violating The Arms Export Control Act.

Count 6, specifically, charges that;

Between on or about October 2010 and on or about April 2017, Ross Roggio willfully violated and attempted to violate the AECA by exporting, attempting to export, furnishing and causing to export and furnish defense services to Iraq, without a license or other approval obtained -- without a license or other special approval obtained from The United States Department of State.

I have already instructed you, with respect to the elements of a violation of The Arms Export Control Act, regarding defense services. The elements regarding defense services are similar.

First, Mr. Roggio, to be found guilty of the crime charged

in Count 6, the Government must prove beyond a reasonable doubt each of the following four elements:

First, that Mr. Roggio exported, furnished or caused to be exported or furnished a defense service to a foreign country or foreign national.

Second, that Mr. Roggio did not obtain from the DDTC the necessary license or other written approval before exporting, furnishing or causing to be exported or furnished the defense service.

Third, that Mr. Roggio acted willfully.

The International Traffic in Arms Regulations define defense services as, quote, the furnishing of assistance (including training) to foreign persons, whether in The United States or abroad, in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles.

Approval of DDTC must be obtained before defense services may be furnished. To obtain such approval, The United States person must submit a proposed agreement to the DDTC. Such agreements are generally characterized as manufacturing license agreements, technical assistance agreements, distribution agreements or off-shore procurement agreements, and may not enter into force without the prior written approval of The DDTC.

Once approved, the defense services described in the agreements may, generally, be provided without further licensing. This requirement, also, applies to the training of any foreign military forces, regular and irregular, in the use of defense articles.

The terms, export and defense article, have the meanings on which I have already instructed you. In addition, an export may include performing a defense service, on behalf of or for the benefit of a foreign person, whether in The United States or abroad.

As I said earlier, I will instruct you on the meaning and definition of the term, willfully.

As relevant to Count 6, The Government is not required to prove that Mr. Roggio knew the existence or details of The Arms Export Control Act or The International Traffic in Arms Regulations.

Count 7 of the superseding indictment charges Ross Roggio with smuggling goods from the United States, which is a violation of Federal law.

It is a Federal crime to fraudulently or knowingly export, send or attempt to export or send from The United States, any merchandise, article or object contrary to any law or regulation of The United States.

Count 7 charges Mr. Roggio with Exporting and Attempting to Export and Send Rifling Combo Buttons, knowing that the export

96

was contrary to The International Emergency Economic Powers Act. Count 7, also, charges that the activities took place within the Middle District of Pennsylvania and elsewhere.

In order for Mr. Roggio to be found guilty of Count 7, The Government must prove each of the following elements beyond a reasonable doubt:

First, that Mr. Roggio knowingly or fraudulently exported or sent or attempted to export or send the merchandise, article or object specified in Count 7 of the superseding indictment; rifling combo buttons.

Second, that the exportation or sending or attempted exportation or sending of the merchandise or article or object was contrary to The International Emergency Economic Powers Act.

Third, that Mr. Roggio knew that the exportation or sending or attempted exportation or sending of the merchandise, articles or object was contrary to law or regulation.

I've already instructed you as to the meaning of export. Merchandise means objects, items, goods and wares of every description.

To do something fraudulently means to do so with an intent to deceive. Shortly, I will instruct you on the meaning of knowingly.

The Government does not need to prove the elements of a violation of The International Emergency Economic Powers Act to

97

be found guilty of smuggling.

Count 8 of the superseding indictment charges Ross Roggio with Smuggling Goods From The United States, which is a violation of Federal law.

It is a Federal crime to fraudulently or knowingly export, send or attempt to export from The United States any merchandise, article or object contrary to any law or regulation of The United States.

Count 8 charges Mr. Roggio with Exporting and Attempting to Export and Send M4 bolt gas rings and firing pin retainers, knowing that the export was contrary to The Arms Export Control Act and The International Traffic in Arms Regulations.

Count 8, also, charges that the activities took place within the Middle District of Pennsylvania and elsewhere.

In order for Mr. Roggio to be found guilty of Count 8, The Government must prove each of the following elements beyond a reasonable doubt:

First, that Mr. Roggio knowingly or fraudulently exported or sent or attempted to export or send the merchandise, article or object specified in Count 8 of the superseding indictment; M4 bolt gas rings and firing pin retainers.

Second, that the exportation or sending or attempted exportation and sending of the merchandise, article or object was contrary to The Arms Export Control Act and the related arms regulations.

Third, that Mr. Roggio knew that the exportation or sending or attempted exportation or sending of the merchandise, article or object was contrary to law or regulation.

I have already instructed you as to the meaning of export merchandise and fraudulently. I will shortly instruct you on the meaning of, knowingly.

The Government does not need to prove the elements of a violation of The Arms Export Control Act and related International Traffic in Arms Regulations to be found guilty of smuggling.

Count 9 of the superseding indictment charges Ross Roggio with Wire Fraud, which is a violation of Federal law.

Count 9 charges that;

From in or about 2015 to on or about the date of the superseding indictment, February 15, 2022, Mr. Roggio devised and intended to devise a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises by purchasing items from a company located in The United States and provided The United States company with false information about the end user of the items, thereby, obtaining money and property through false pretenses.

Count 9 further charges that;

For purposes of executing the scheme, within the Middle District of Pennsylvania and elsewhere, Mr. Roggio emailed a

Weapons and Ammunition Feasibility Report on November 14, 2015.

In order to find Mr. Roggio guilty of Count 9, you must find that The Government proved each of the following elements beyond a reasonable doubt.

First, Mr. Roggio knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises or willfully participated in such a scheme, with knowledge of its fraudulent nature.

Second, Mr. Roggio acted with the intent to defraud.

Third, in advancing, furthering or carrying out the scheme, Mr. Roggio transmitted any writing, signal or sound, by means of a wire, radio or television communication in interstate or foreign commerce or caused a transmission of any writing signal or sound of some kind by means of a wire, radio or television communication in interstate or foreign commerce.

The first element that The Government must prove beyond a reasonable doubt is Mr. Roggio knowingly devised and willfully participated in a scheme to defraud the victims of money or property by materially false or fraudulent pretenses, representations or promises.

A scheme is, merely, a plan for accomplishing an object. Fraud is a general term, which embraces all the various means by which one person can gain an advantage over another by false representations, suppression of the truth or deliberate

100

disregard for the truth.

Thus, a scheme to defraud is any plan, device or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence.

In this case, the superseding indictment alleges that the scheme to defraud was carried out by making false or fraudulent statements, representations, claims or documents.

The representations, which the Government charges were made as part of the scheme to defraud, are set forth in the superseding indictment, which I told you about a minute ago.

The Government is not required to prove every misrepresentation charged in the superseding indictment. It is sufficient if the Government proves beyond a reasonable doubt that one or more of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud. However, you cannot convict Mr. Roggio unless all of you agree as to, at least, one of the material misrepresentations.

A statement, representation, claim or document is false if it is untrue when made and if the person making the statement, representation claim or document or causing it to be made knew it was untrue, at the time it was made .

A representation or statement is fraudulent if it was falsely made with the intention to deceive. In addition, deceitful statements of half-truths or the concealment of

101

material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements. The arrangement of the words or the circumstances in which they are used may convey the false and deceptive appearance. The deception need not be premised upon spoken or written words alone. If there is deception, the manner in which it is accomplished is immaterial.

The failure to disclose information may constitute a fraudulent representation, if The Government -- excuse me -- if the Defendant was under a legal, professional or contractual duty to make such a disclosure, the Defendant actually knew such disclosure ought to be made and the Defendant failed to make such a disclosure with the intent to defraud.

The false or fraudulent representation or failure to disclose must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision.

This means that if you find that a particular statement of fact was false, you must decide whether that statement was one that a reasonable person might have considered important in making his or her decision. The same principle applies to fraudulent half-truths or omissions of material facts.

In order to establish a scheme to defraud, The Government must also prove that the alleged scheme contemplated depriving

another of money or property. However, the Government is not required to prove that Mr. Roggio, himself, originated the scheme to defraud.

Furthermore, it is not necessary that The Government prove that Mr. Roggio actually realized any gain from the scheme or that any intended victim, actually, suffered any loss. In this case, it so happens that The Government does contend that the proof establishes the persons were defrauded and that Mr. Roggio profited.

Although, whether or not the scheme actually succeeded is really not the question, you may consider whether it succeeded in determining whether the scheme existed.

If you find that The Government has proved beyond a reasonable doubt that the overall scheme to defraud charged in the superseding indictment did exist and that Mr. Roggio knowingly devised or participated in the overall scheme charged in the superseding indictment, you should, then, consider the second element.

The second element is that The Government must prove beyond a reasonable doubt that Mr. Roggio acted with the specific intent to defraud. To act with intent to defraud means to act knowingly and with the intention or the purpose to deceive or cheat.

In considering whether Roggio acted with an intent to defraud, you may consider, among other things, whether Ross

Roggio acted with a desire or purpose to bring about some gain or benefit to himself or to someone else or with a desire or purpose to cause some loss to someone.

For wire fraud, the third element that The Government must prove beyond a reasonable doubt is that, in advancing, furthering or carrying out the scheme, Mr. Roggio transmitted a writing, signal or sound by means of a wire, radio or television communication in interstate or foreign commerce or caused the transmission of a writing, signal or sound of some kind by means of a wire, radio or television communication in interstate or foreign commerce.

The phrase, transmits by means of wire, radio or television communication, in interstate or foreign commerce, means to send from one state to another or from one country to another, by means of telephone or telegraph lines or by means of radio or television.

The phrase includes a telephone conversation by a person in one state with a person in another state or electronic signals sent from one country to another, such as, by FAX or financial wire.

The Government is not required to prove that Mr. Roggio, actually, used a wire communication in interstate commerce or foreign commerce or that Mr. Roggio even intended that anything be transmitted in interstate or foreign commerce by means of a wire, radio or television communication to further or to

advance or to carry out the scheme or plan to defraud or the scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

However, The Government must prove beyond a reasonable doubt that a transmission by a wire, radio or television communication facility in interstate or foreign commerce was, in fact, used to further or to advance or to carry out the scheme to defraud.

The Government must, also, prove, either, that Mr. Roggio used wire, radio or television communication in interstate or foreign commerce or that Mr. Roggio knew the use of the wire, radio or television communication in interstate or foreign commerce would follow in the ordinary course of business or events or that Mr. Roggio should reasonably have anticipated the wire, radio or television communication in interstate commerce or foreign commerce would be used.

It is not necessary that the information transmitted by means of wire, radio or television communication in interstate or foreign commerce itself was false or fraudulent or contained any false or fraudulent pretense, representation or promise or contained any request for money or anything of value.

However, The Government must prove beyond a reasonable doubt that the use of the wire, radio or television communication in interstate or foreign commerce furthered or advanced or carried out, in some way, the scheme.

Count 10 of the superseding indictment charges Ross Roggio with wire fraud, which is a violation of Federal law.

Count 10 charges;

From on or about 2015 to on or about the date of the superseding indictment, February 15, 2022, Mr. Roggio devised and intended to devise a scheme to defraud and to obtain money and property by means of materially false and fraudulent promises, representations and promises by purchasing items from a company located in The United States and providing The United States company false information about the end user of the items, thereby, obtaining money and property through false pretenses.

Count 10 further charges that, for purposes of executing the scheme, within the Middle District of Pennsylvania and elsewhere, Mr. Roggio ordered 15 rifling buttons from a United States supplier, paying for them via credit card on December 3, 2015.

In order to find Mr. Roggio guilty of Count 10, you must find that The Government proved each of the following three elements beyond a reasonable doubt:

First, that Mr. Roggio knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises or willfully participated in such a scheme with knowledge of its fraudulent nature.

106

Second, that Mr. Roggio acted with the intent to defraud.

Third, that in advancing, furthering or carrying out the scheme, Mr. Roggio transmitted any writing, signal or sound by means of a wire, radio or television communication in interstate or foreign commerce or caused the transmission of any writing, signal or sound of some kind by means of a wire, radio or television communication in interstate or foreign commerce.

The instructions I gave you have, in the context of Count 9, regarding consideration of the elements of the charge of Wire Fraud, also, apply to Count 10.

Counts 12 through 15, 17 through 19, 21 through 24, 27 through 34, and 36 through 39 of the superseding indictment charge Mr. Roggio with Money Laundering, which is a Federal crime.

In order to find Mr. Roggio guilty of the offense of Money Laundering, you must find that The Government proved each of the following elements beyond a reasonable doubt:

First, that on or about the dates alleged in the indictment, Mr. Roggio transported money to a place in The United States, from or through a place outside the United States.

Second, Mr. Roggio conducted the financial transaction with the proceeds of a specified unlawful activity, that is, smuggling goods from the United States and violations of The

Arms Export Control Act and related regulations.

Third, that Mr. Roggio knew the transaction involved the proceeds of some form of unlawful activity.

Fourth, that Mr. Roggio intended to promote the carrying on of the specified unlawful activity, that is, smuggling goods from The United States, and violations of The Arms Export Control Act and related regulations.

I will, now, talk to you about the state of mind element of the charges in the superseding indictment.

In the charges in the superseding indictment, which I've explained to you, Mr. Roggio's state of mind is at issue. Often, the state of mind with which a person acts at any given time cannot be proved directly, because one cannot read another person's mind and tell what he or she is thinking. However, Ross Roggio's state of mind can be proved indirectly from the surrounding circumstances.

Thus, to determine Mr. Roggio's state of mind, what Mr. Roggio knew at a particular time, you may consider evidence about what Mr. Roggio said, what he did and failed to do, how he acted, and all the other facts and circumstances shown by the evidence that may prove what was in Mr. Roggio's mind at the time.

It is entirely up to you to decide what the evidence presented during this trial proves or fails to prove about Mr. Roggio's state of mind. You may, also, consider the natural and

108

probable results or consequences of any acts Mr. Roggio knowingly did and whether it is reasonable to conclude that Mr. Roggio intended those results or consequences.

You may find, but you are not required to find, that Mr. Roggio knew and intended the natural and probable consequences or results of acts he knowingly did. This means that if you find that an ordinary person in Mr. Roggio's situation would have naturally realized that certain consequences would result from his actions, then, you may find, but you are not required to find, that Mr. Roggio did know and did intend that those consequences would result from his actions. This is entirely up to you to decide, as the finder of facts in this case.

In some instances, I have instructed you about the state of mind for this specific charge. I will now instruct you about states of mind applicable to several charges.

The offenses of violating The International Emergency Economic Powers Act, which is Count 5, Smuggling Goods, Counts 7 and 8, and Wire Fraud, Counts 9 and 10, charged in the superseding indictment, require that The Government prove that Mr. Roggio acted knowingly, with respect to certain elements of the offenses.

This means that The Government must prove beyond a reasonable doubt that Ross Roggio was conscious and aware of the nature of his actions and of the surrounding facts and circumstances, as specified in the definition of the offenses

109

charged.

In deciding whether Mr. Roggio acted knowingly, you may consider evidence about what Mr. Roggio said, what he did and failed to do, and how Mr. Roggio acted, and all of the other facts and circumstances shown by the evidence that may prove what was in Mr. Roggio's mind, at the time.

Counts 4 and 6, violating The International Emergency Economic Powers Act, Count 5, and Wire Fraud, Counts 9 and 10, charged in the superseding indictment, require that The Government prove Mr. Roggio acted willfully. This means that The Government must prove beyond a reasonable doubt that Mr. Roggio knew his conduct was unlawful and intended to do something that the law forbids.

That is, to find that Mr. Roggio acted willfully, you must find that the evidence proved beyond a reasonable doubt Mr. Roggio acted with a purpose to disobey or disregard the law. Willfully does not, however, require proof that Mr. Roggio had any evil motive or bad purpose, other than the purpose to disobey or disregard the law.

Willfully does not require proof that the actor knew of the existence and meaning of the Statute making his conduct criminal.

Motive is not an element of the offenses with which Mr. Roggio is charged. Proof of bad motive is not required to convict. Further, proof of bad motive alone does not establish

that Mr. Roggio is guilty, and proof of good motive alone does not establish Mr. Roggio is not guilty. Evidence of Mr. Roggio's motive may, however, help you find Mr. Roggio's intent.

Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done. Personal advancement and financial gain, for example, are motives for much of human conduct. However, these motives may prompt one person to intentionally do something perfectly acceptable, while prompting another person to intentionally do an act that is a crime.

21. Defenses. I will now talk with you about a defense to certain charges that Mr. Roggio has raised.

Mr. Roggio has raised as a defense that he committed the offenses charged in Counts 1 and 2 of the superseding indictment because he was acting under duress.

If you find that The Government proved beyond a reasonable doubt that Mr. Roggio committed the offenses charged, then, you must consider whether Mr. Roggio committed the offenses under duress.

If you find that The Government proved that Mr. Roggio committed the offenses charged, and you, also, find that Mr. Roggio proved he was acting under duress, then, you must find Mr. Roggio not guilty of the charges.

To find Mr. Roggio is not guilty of the offenses charged in Counts 1 and 2 because of duress, you must find that Mr. Roggio proved by a preponderance of the evidence each of the following elements:

First, that Mr. Roggio was under an immediate, unlawful threat of death or serious bodily injury to himself or to others.

Second, Mr. Roggio had a well-grounded belief that the threat would be carried out if he did not commit the offenses.

Third, Mr. Roggio's criminal action was directly caused by the need to avoid the threatened harm, and that Roggio had no reasonable, lawful opportunity to avoid the threatened harm without committing the offenses. That is, that Mr. Roggio had no reasonable, lawful opportunity both to refuse to do the criminal act and, also, to avoid the threatened harm.

Fourth, that Mr. Roggio had not recklessly placed himself in a situation in which he would be forced to engage in criminal conduct.

Mr. Roggio has the burden of proving the defense of Duress by a preponderance of the evidence. Preponderance of the evidence is a lower standard than proof beyond a reasonable doubt. To prove something by a preponderance of the evidence means to prove that it is more likely true than not true.

If you put the credible evidence that is favorable on opposite sides of a scale, the scale would have to tip somewhat

on Mr. Roggio's side, in order for you to find that Mr. Roggio is not guilty because of duress.

However, if the scale tips in favor of The Government or if the credible evidence appears to be equally balanced or if you cannot say on which side the credible evidence is heavier, then, you must decide that Mr. Roggio has not proved the defense of Duress by a preponderance of the evidence.

In making this determination, you should consider all of the evidence presented during the trial, regardless of who offered it. You should evaluate the evidence and its credibility according to the instructions I gave you earlier. You should, also, remember that the fact that Mr. Roggio raised this defense does not relieve The Government of the burden of proving all the elements of the offense charged beyond a reasonable doubt.

22. Election of Foreperson. Unanimous Verdict. Do Not Consider Punishment. Duty to Deliberate. Communication With The Court. That concludes my instructions explaining the law, regarding the testimony and other evidence and the offenses charged.

Now, let me explain some things about your deliberations in the jury room and your possible verdicts.

First. The first thing you should do in the jury room is choose someone to be your foreperson. This person will speak for the jury here in court, he or she will preside over your

discussions. However, the views and vote of the foreperson are entitled to no greater weight than those of any other juror.

Second. I want to remind you that your verdict, whether it is guilty or not guilty, must be unanimous. To find Mr. Roggio guilty of an offense, every one of you must agree that The Government has overcome the presumption of innocence with evidence that proves each element of that offense beyond a reasonable doubt.

If you find him not guilty, every one of you must agree that The Government has failed to convince you beyond a reasonable doubt.

Third. If you decide The Government has proved Mr. Roggio guilty, then, it will be my responsibility to decide what the appropriate punishment should be. You should never consider the possible punishment in reaching your verdict.

Fourth. As I have said before, your verdict must be based only on the evidence received in this case and the law I have given you. You should not take anything I may have said or done during trial as indicating what I think of the evidence or what I think your verdict should be. What the verdict should be is the exclusive responsibility of the jury.

Fifth. Now that all the evidence is in, the arguments are completed and once I have finished these instructions, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence to make

114

every reasonable effort you can to reach unanimous agreement.

Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind, as you listen to what your fellow jurors have to say. Do not hesitate to change your mind, if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently or just to get the case over with. In the end, your vote must be exactly that, your own vote.

It is important for you to reach unanimous agreement but only if you can do so honestly and in good conscience. Listen carefully to what the other jurors have to say and then decide for yourself if the Government has proved Mr. Roggio guilty beyond a reasonable doubt.

No one will be allowed to hear your discussions in the jury room and no record will be made of what you say. You should all feel free to speak your mind.

Remember, if you elected to take notes during the trial, your notes should be used only as memory aids. You should not give your notes greater weight than your independent recollection of the evidence. You should rely on your own independent recollection of the evidence or lack of evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impression of each juror.

Six. Once you start deliberating, do not talk, communicate with or provide any information about this case, by any means, to the court officials or to me or anyone else, except each other. During your deliberations, you may not use any electronic device or media, such as, a telephone, cell phone or computer, the internet or any text or instant messaging service to communicate with anyone any information about this case or to conduct any research about this case.

Seven. If you have questions or messages, your foreperson should write them down on a piece of paper, sign them, then give them to my courtroom deputy who will give them to me. I will first talk with the lawyers about what you have asked, and I will respond as soon as I can. In the meantime, if possible, continue with your deliberations on some other subject.

One more thing about messages. Do not ever write down or tell anyone how you or anyone else voted. That should stay secret until you've finished your deliberations. If you have occasion to communicate with the Court, do not disclose the number of jurors who have noted to convict or acquit on any offense.

23. Verdict Form. A verdict form has been prepared that you should use to record your verdict. Take this form with you to the jury room. When you have reached your unanimous verdicts, the foreperson should write the verdicts on the form, date and sign it, return it to the courtroom and give the form to my

**116**

courtroom deputy to give to me.

If you decide that The Government has proved Ross Roggio guilty of one or more of the offenses charged beyond a reasonable doubt, say so, by having your foreperson mark the appropriate place on the form.

If you decide The Government has not proved Ross Roggio guilty of one or more of the offenses charged beyond a reasonable doubt, say so, by having your foreperson mark the appropriate place on the form.

Lastly, please be aware that, after you complete your deliberations, there may be some additional evidence presented and additional matters about which you'll have to engage in deliberations.

With that, ladies and gentlemen, those are my instructions to you. My courtroom deputy will now take you to the jury room so you can begin your deliberations.

Juror Nos. 13, 14, 15 and 16, you will be accompanied downstairs to the jury room. The rest of you will begin your deliberations in the jury room right here on the fourth floor.

(At this time the jury was excused to begin deliberations.)

THE COURT: They may have questions, everyone, so try to stay close.

MR. HINKLEY: Judge, we need to talk about the exhibits that will go back.

THE COURT: I beg your pardon?

117

MR. HINKLEY: Did we need to speak, in regards to the exhibits that were entered into evidence and which ones go back?

THE COURT: If there's some issue, otherwise, I'm sure that Judy Malave and Corey, yesterday, and Sylvia have them recorded.

MR. HINKLEY: Just for the record, then, we want to make sure, there was some physical exhibits we entered into evidence, including Government's Exhibits 1.1, Government's 2.2, 2.1, 20.9 and 4.15, we are not requesting they go back. As the Court recalls, those are the hard drives and the disks that were presented, and per the agreement of the parties, the jury will not see the full contents of that, but only those documents which were, otherwise, made exhibits and entered into evidence.

So we just want to make it clear for the record that we are not sending these exhibits back.

THE CLERK: Could you give us the numbers again?

MR. HINKLEY: Sure. It's 1.1, 2.1, 2.2, 20.9 and 4.15.

THE CLERK: I don't have 4.15 going into the record.

MR. HINKLEY: So we would not, obviously, send it back.

THE CLERK: Okay. And 20.9?

MR. HINKLEY: Yes.

MR. JASPERSE: I think 20.9 was a paper document where just part of it was admitted.

118

THE CLERK: I don't have that one even going in.

MR. JASPERSE: So on 20.9, it's just -- there's an email from the Defendant to Ravi(phonetic). I think that goes in but not the rest of it.

THE CLERK: I have an email marked 20.17. Is that different?

MR. JASPERSE: 20.17 is different. That should be -- we have that down as being admitted. And then 24.2, just the last page of that exhibit was admitted and not the preceding pages.

THE CLERK: Only Page 8, correct?

MR. JASPERSE: Correct.

THE CLERK: I have that one. The only one not marked down here is 20.9.

MR. HINKLEY: 20.9 would be the Forensics Examination Report, I think that you had an objection to that, so I don't think we actually entered that into the record. This is the one where Agent Burke was restricted to only reading that part -- this is the official list, right?

THE CLERK: Yes.

MR. BARTOLAI: We should probably compare our notes.

(At this time a recess was taken.)

(At this time there was a question from the jury.)

THE COURT: The jury has a question. It is a single sentence.

"Can we have clarity on who is being defrauded in Count 9?"

Sylvia, would you show this to counsel? Before I offer any

119

thoughts of my own, counsel, Government counsel, anything?

MR. HINKLEY: So I'm looking through the superseding indictment, and there is language in there in regards to manner and means.

THE COURT: Yes, there is.

MR. HINKLEY: If anything, I think that would be the appropriate language. And if the Court is so inclined to do that, fine. If not, then, I think the answer would be, Read the instructions, or something to that effect.

THE COURT: Mr. Bartolai?

MR. BARTOLAI: I see manner and means, as well, Paragraph 55. So it would seem that would be appropriate, based upon the charge.

THE COURT: So the response that each of you is suggesting is that I, simply, refer the jury to Paragraph 55 of the indictment?

MR. BARTOLAI: I'm sorry, Judge. So Count 9 is the Ross Roggio email, Weapons and Ammunition Feasibility Report.

THE COURT: Correct.

MR. BARTOLAI: This is when he gave this to Bayan to submit to Polad Talabani. That wouldn't involve an end user, I don't think. I think 55 is relating to --

MR. HINKLEY: It's both of them. So the underlying fraud would be the fraud as against the manufacturers and/or suppliers of the controlled items and the steps he took in the

120

fraud, in order to consummate the fraud with those folks, because, as I think I explained to the jury, the theory is is that the Defendant would not have been able to acquire those controlled items, which he used in his arms manufacturing, from those suppliers and/or manufacturers if he had advised them that he was going to illegally export the goods.

And so the fraud is giving him false information as to the end user, as to where those parts were going.

THE COURT: Here's the difficulty I'm having. If we're not careful, we're going to invade the province of the jury by finding a fact for them.

MR. HINKLEY: Yes.

THE COURT: And, obviously, we can't do that. So while they may or may not understand that, the question where they ask, Who is being defrauded, is really a question that the jury, I think, is to determine.

And for us to tell them who it is seems as though we're -- for the Court to tell them who it is is exceeding my authority, whereas, I've told them I play no role in finding the facts.

Now, I have no difficulty, if there's an agreement, on telling them to please refer to paragraph such and such or page such and such of the instructions, but I don't think it's possible to go beyond that kind of a reference without telling them the answer, and the answer is really for them to decide,

121

is it not?

MR. BARTOLAI: I agree, Judge.

MR. HINKLEY: Your Honor, Page 38 of the instructions. The language from the superseding indictment is repeated.

THE COURT: Page 38? I'll take a quick look. Are you sure it's 38?

MR. BARTOLAI: Seems to be 38, Your Honor, Count 9 of the superseding indictment.

THE COURT: You are both correct, it is 38.

MR. HINKLEY: I think the safest course is to, maybe, just refer them to that language.

MR. BARTOLAI: Yes.

THE COURT: Shall I stop at Page 38 or refer them to Page 38 and continue on to 39? I don't have any particular preference, it's just that there is continuity, because Page 39 then says, In order to find Mr. Roggio guilty of Count 9, you must find each of the following three elements beyond a reasonable doubt.

Maybe, it's the last paragraph of 38 and the first full paragraph of -- first and second paragraph of 39.

MR. HINKLEY: I think, really, the heart of the question goes to the language on 38. I would recommend to the Court that you tell them that they should review the language on Page 38 from Count 9 of the superseding indictment charges.

THE COURT: Gino?

MR. BARTOLAI: Well, one alternative would be to

give -- just them having the benefit of this document, the charge, they could just go from Count 9 -- it would be 38 to, I think, it's 44, if the Court felt that they should excise that and point them, more specifically, yeah, I would imagine it would be 38 and Page 39 to where it says, The first element. But, The first element, mid-page, right above the scheme.

THE COURT: I'm inclined to go that far, unless you have an objection to that.

MR. HINKLEY: No objection.

THE COURT: All right. So this will say -- and unless you want me to bring the jury back in for this, I'll simply answer it on their same page.

MR. HINKLEY: I have no objection to that.

MR. BARTOLAI: No objection.

MR. HINKLEY: As long as it's noted on the record what's on the note. Thank you, Your Honor.

MR. BARTOLAI: Thank you.

THE COURT: Sylvia, you'll deliver that?

THE CLERK: I'll make a copy first and then give it to them.

THE COURT: All right, thank you, fellas.

(At this time jury deliberations continued.)

(At this time there was a question from the jury.)

THE COURT: We have two separate questions. The first says, "Count 33 and 34 share the same date and there's only one transaction. Is the date on Count 34 correct?" For ease of

123

reference, I refer you to Page 7 of the verdict form.

MR. CLAFFEE: The date is wrong.

THE COURT: Yes, frankly, it's a typographical error that I should have picked up.

MR. HINKLEY: We should have caught that for you.

THE COURT: The second one is, I might characterize it as more of the same. This one says, "Can you confirm the date of transaction for Count 39 is 12/16/2016?"

MR. HINKLEY: No, it's 12/16/2015. From the Government's perspective, we have no problem with correcting the date in the note, if that's what you want to do.

MR. BARTOLAI: Right, Judge.

THE COURT: All right, well, with respect to the first one, about 33 and 34, it would seem that the simplest thing to write is the correct date for Count 34 is 10/27/2015. Does everyone agree with that?

MR. BARTOLAI: Yes.

MR. HINKLEY: Yes, Your Honor.

THE COURT: With respect to the second one, similarly, I would suggest that I write the correct date for Count 39 is 12/16/2015.

MR. HINKLEY: I agree.

MR. BARTOLAI: Yes.

THE COURT: So we're all in agreement that those answers are appropriate?

124

MR. HINKLEY: Yes.

MR. BARTOLAI: Yes.

THE COURT: Stay tuned.

(At this time jury deliberations continued.)

(At this time the jury was returned to the courtroom.)

THE COURT: Who speaks as the foreperson?

JURY FOREPERSON: I do.

THE COURT: Has the jury reached a verdict?

JURY FOREPERSON: Yes, we have reached a verdict.

THE COURT: Is it the unanimous verdict of each and every juror?

JURY FOREPERSON: Yes, it is.

THE COURT: Would you hand the verdict slip to my courtroom deputy?

I will now publish the verdict.

Count 1. On the charge of Conspiracy To Commit Torture. The jury unanimously finds Defendant Ross Roggio, Guilty.

Count 2. On the charge of Torture. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 3. On the charge of Conspiracy To Commit An Offense Against The United States. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 4. On the charge of Violating The Arms Export Control Act By Exporting Defense Articles On The United States Munitions List; To Wit, M4 Bolt Gas Rings and Firing Pin

Retainers, Without Having First Obtained From The United States Department of State A License Or Written Approval. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 5. On the charge of Violating The International Emergency Economic Powers Act By Exporting Rifling Combo Buttons, Without Having First Obtained From The United States Department of Commerce A License Or Written Approval. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 6. On the charge of Violating The Arms Export Control Act By Exporting And Furnishing Defense Services To Iraq, Without Having First Obtained From The United States Department of State A License Or Written Approval. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 7. On the charge of Smuggling Goods From The United States By Smuggling Rifling Combo Buttons. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 8. On the charge of Smuggling Goods From The United States By Smuggling M4 Bolt Gas Rings or Firing Pin Retainers. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 9. On the charge of Wire Fraud Relating To The Emailing of a Weapons and Ammunition Feasibility Report on November 14, 2015. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 10. On the charge of Wire Fraud Related To The Order of Rifling Buttons and Paying For Them With A Credit Card Via

126

Wire Transfer. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Counts 12 through 15, 17 through 19, 21 through 24, 27 through 34 and 36 through 39.

On the charge of Money Laundering, Based on the Transporting, Transmitting And Transferring Funds To The United States From And Through A Place Outside The United States To Promote The Carrying On Of A Specified Unlawful Activity. The jury unanimously finds the Defendant Ross Roggio, Guilty. As to Count 12, Guilty. As to Count 13, Guilty. As to Count 14, Guilty. As to Count 15, Guilty. As to Count 17, Guilty. As to Count 18, Guilty. As to Count 19, Guilty. As to Count 21, Guilty. As to Count 22, Guilty. As to Count 23, Guilty. As to Count 24, Guilty. As to Count 27, Guilty. As to Count 28, Guilty. As to Count 29, Guilty. As to Count 30, Guilty. As to Count 31, Guilty. As to Count 32, Guilty. As to Count 33, Guilty. As to Count 34, Guilty. As to Count 36, Guilty. As to Count 37, Guilty. As to Count 38, Guilty . And as to Count 39, Guilty.

The foreperson has signed and dated the verdict form, in accordance with the Court's instructions.

Is there any request from counsel?

MR. BARTOLAI: No, Your Honor.

MR. HINKLEY: No, Your Honor.

THE COURT: All right, ladies and gentlemen, in my

instructions that I gave you in connection with your deliberations and the verdict that you reached, which I have just published, I also told you there might be one additional issue for your deliberation, and it's now necessary to present you with that additional issue.

After hearing evidence on the additional issue, I will ask you to retire to deliberate as you did before. This second portion of the trial will likely take significantly less time than the proceedings that took place before you entered your first verdict, which I just published.

I should tell you, as we move into the second phase of the trial, you are bound by all of the same instructions that I laid out to you during the first phase and which are, also, written in the final instructions that I have he previously given to each of you. I have discussed all of these instructions in detail already.

Accordingly, I do not believe it is necessary to repeat them now. However, if any of you are, at all, and, in any way, unclear on any of the instructions and how they apply to your conduct, as we move forward, please tell me now.

(No affirmative response.)

Having no response, I'll now turn to the additional matter that you must consider.

You have found Ross Roggio guilty of conspiracy to commit an offense against the United States, violations of the Arms

128

Export Control Act, violation of the International Emergency Economic Powers Act, wire fraud offenses, money laundering offenses, as charged in Counts 3 through 6, 9, 10, 12 through 15, 17 through 19, 21 through 24, 27 through 34 and 36 through 39 of the superseding indictment.

You will now need to consider a further question regarding property that the superseding indictment alleges was subject to forfeiture by Mr. Roggio to the Government.

Forfeiture means that Mr. Roggio would lose any ownership or interest he has or claims to have in the specified property, as a part of the penalty for engaging in criminal activity. After the parties have presented any additional evidence in this case, I will instruct you further on the law, with respect to forfeiture.

In considering whether the property is subject to forfeiture, you should consider the evidence you have already heard and any additional evidence presented by the parties. You should evaluate that evidence and its credibility, as I explained to you earlier in my instructions.

The Government may now present evidence to you on this matter.

MR. HINKLEY: We would call Thomas O'Donnell, Your Honor.

T H O M A S   O' D O N N E L L   IS CALLED, AND HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state and spell your name for the record.

129

THE WITNESS: Thomas O'Donnell. T-H-O-M-A-S, O'-D-O-N-N-E-L-L.

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.   How are you employed, sir?

A.   I'm a Special Agent with the Federal Bureau of Investigation.

Q.   Were you involved in the investigation for which a trial occurred these last two weeks --

A.   Yes.

Q.   -- with Mr. Roggio?

A.   Yes.

Q.   You were here and heard testimony of witnesses during the trial?

A.   I did.

Q.   I've called you as a witness for the forfeiture proceeding. As part of your investigation, did you do the investigation, in regards to potential proceeds of illegal activity alleged to have occurred in this case?

A.   Yes, I have.

Q.   And did you review financial documents related to this investigation?

A.   Yes, I have.

Q.   And did you, specifically, review documents from PNC Bank and Wells Fargo Bank?

A.    I have.

Q.    And were you part of a search warrant that was executed at the residence of 143 Indian Spring Drive, Stroudsburg?

A.    Yes.

Q.    As well as another residence that was the corporate headquarters of Roggio Consulting Company and, also, the residence of Mr. Roggio's parents, were you part of that, also?

A.    Yes, I was.

Q.    Were there items seized from those two residences?

A.    We seized numerous items from both residences.

Q.    Were those items listed on the return which was made part of the record in this case?

A.    Yes, they were.

Q.    As part of your investigation, did you or could you determine whether or not the real property located at 143 Indian Spring Drive, Stroudsburg was purchased with proceeds from the illegal activity for which the Defendant had gone to Kurdistan, Iraq?

A.    Yes, we did.

Q.    What was that?

A.    396,000-dollar wire transfer from his PNC account on or about December 17, 2015 to the settlement company, and then Kristy Roggio, his wife, received that property on or about 12/20/2015. That money was deposited into his PNC account overseas from a bank in Iraq.

Q.   As part of the investigation, were seizure warrants issued and bank accounts frozen or seized from Wells Fargo, in regards to Roggio Consulting Company LLC?

A.   Yes, there were.

Q.   Would that be Wells Fargo Account No. 2089401166?

A.   1166?

Q.   Yes.

A.   Yes, that was one.

Q.   As well as 2089401158?

A.   That was the other, yes.

Q.   Were there vehicles that were seized, as part of the investigation in this case?

A.   Yes, there were two vehicles seized.

Q.   And do you recall the vehicles, where they were at, when they were seized?

A.   I believe both vehicles were at his parents' house at 116 Turkey Hill Court, which was the corporate headquarters for Roggio Consulting Company.

Q.   And as part of the investigation, were photographs taken of those vehicles?

A.   Yes, we did take photographs of those vehicles.

Q.   And do you recall that one of them was a 2015 BMW model i8?

A.   Yes, it was.

Q.   A 2016 McLaren. Is that correct?

A.    I don't believe we seized the McLaren, we returned that. So there were three vehicles that were initially taken, one was returned to the company that owned it, which was the McLaren.

Q.    Do you recall the make and model of the last vehicle?

A.    Mercedes GLK 350, I believe.

Q.    Were those vehicles, from your research of the finances, purchased with proceeds from the project going on in Kurdistan?

A.    Yes, they were.

Q.    Did the investigation discover and seize any Rolex watches?

A.    We seized four Rolex watches.

Q.    Where did you seize those from?

A.    I believe, they were in the bedroom of his parents' house where the Defendant was sleeping or where he slept at night.

Q.    Going through those watches, did they have serial numbers for the watches?

A.    They had both serial numbers and descriptions.

Q.    Was one of those watches a Rolex Oyster Perpetual Cosmograph Daytona?

A.    Yes, it was.

Q.    Serial No. 4H2E2303?

A.    That sounds correct.

Q.    Was another a Rolex Geneve Cellini 18k rose gold?

A.    Yes, it was.

Q.    Serial No. 50525512F28Q1?

A.    Yes.

Q.    A Rolex Oyster Perpetual with Serial No. H42V39543. Is that correct?

A.    Yes, sir.

Q.    Finally, a Daytona mother of pearl and diamond dial with Serial No. 8Q0291C3.

A.    Yes, sir.

Q.    Does that sound familiar?

A.    They do.

Q.    Okay. Were there a number of firearms, also, seized during the investigation?

A.    There were numerous firearms and suppressors or silencers.

Q.    And as part of your investigation, did you undertake to try to discover when, where and how these were purchased?

A.    Yes, we did.

Q.    And as in preparation for today's testimony, did you prepare, yourself, or someone in your office prepare a document which shows the type of firearm, the firearm, serial number and other associated information?

A.    Yes, we created a spread sheet.

Q.    Does the spread sheet, also, include a number of firearms which, through your investigation, determined should not be seized but should be returned to the Defendant or his representative?

A.    Yes, there were a few that should be returned.

134

MR. BARTOLAI: Your Honor, may I have a moment?

THE COURT: Yes.

MR. HINKLEY: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MR. HINKLEY:

Q.   I'm showing you what's marked as Government's Exhibit F-1. Is this a document that you had just described?

A.   This is the document we created, yes.

Q.   And the highlighted firearms, are they the firearms which you determined ought to be returned to the Defendant or his representative because these were not purchased with proceeds of the illegal activity?

A.   There are two items that are highlighted that we would intend to seize, and there are comments over to the right that describe when they were purchased and the date range which was consistent with the investigation. That would be Item 21B167.

Q.   Would you describe what that is?

A.   Yes, Item 21B167 is a Tikka T3 .308 Winchester caliber with a Serial No. 059939. And the second item, Item 141B173 is a Ruger .22 caliber long caliber rifle 824-01532, we believe were purchased, transferred or registered in the period of the criminal activity.

Q.   Are there any other items which you would describe as items that should not be forfeited here?

A.   It's highlighted in yellow, but 1B110 is not actually a

135

firearm, I'm not sure it's something similar to that, so that should be returned as noted that way.

Q.    Were there other scopes, sites, bipods, magnifiers and other firearm accessories that were seized during the investigation?

A.    There were.

Q.    And those were listed, were they not, on the search warrant return?

A.    Generally, a lot of the bipods, tripods or the scopes were attached to the weapons, so we tried to identify them with an Alpha designator or another property number. They are on this list, as well.

Q.    Would those other items be items that were purchased with proceeds from the illegal activity?

A.    From reviewing the records, we were able to find some of those items on that list. Generally, you buy a firearm first before you purchase a scope for it.

Q.    Unless it's already scoped?

A.    Unless it's already scoped. So it is our belief that they were purchased at or after that time.

MR. HINKLEY: No further questions, Your Honor. We do move for admission of Government's Exhibit F-1.

THE COURT: Any objection?

MR. BARTOLAI: No objection.

(At this time Government's Exhibit No.F-1 was admitted

136

into evidence.)

THE COURT: You may cross-examine.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.   Good evening.

A.   Good evening.

Q.   Agent O'Donnell, the optics, the scopes, some of the scopes that you indicated were on these rifles, a lot of these scopes are detached bolt-type scopes; right?

A.   They are; many were attached to the weapons.

Q.   They weren't mounted on the weapons, they were attached; is that a fair statement?

A.   I'm not quite sure of the difference, counselor.

Q.   Were they drilled and tapped or were they the type of scopes that you can, you know, quickly mount?

A.   I haven't tried to disassemble them from the rifles, so I wouldn't be confident in answering that.

Q.   With respect to these firearms that you identified as coming from proceeds, you looked at the 4473's relative to those; is that it?

A.   We did ATF 4473's, which is what you use when you purchase or transfer a weapon. For the Federal Government, we looked at receipts from the armory where he purchased numerous weapons, we looked at receipts from Dunkelberger's, we looked at ATF -- when we seize a weapon, we could send off the serial

137

number and description, and ATF, sometimes, returns more information on that. We also gathered information from that, as well.

So there was -- between credit card receipts, transfers, store receipts, we looked at numerous items to determine that list to try and identify when it was purchased, transferred or registered.

Q.    Did you do a similar-type check on the optics?

A.    I don't believe there's a way to do that.

Q.    Well, some of these are -- some of these optics are high-end optics, are they not?

A.    Yes, some of them are.

Q.    And these -- some of these EOTech sites, they have serial numbers on those, as well; right?

A.    Some of those sites have serial numbers.

Q.    Like, for instance, like, for example, on my list 62, I don't know if you have that list available, Item 38B optic EOTech magnifier with long gun, Ruger. I believe it's Ruger SR .556 caliber, Serial No. 59400633.

That serial number that I just read, is that for the rifle or is that for the optic?

A.    On the list I have, the printout is cut out, so I don't have 62. Find another one. Generally, we put the serial number to the left, sir, was the primary weapon or the item listed, and then the serial number to the right would have been the

138

scope.

If you see the item listed as, for example, Item No. 529 scope, that would be the serial number for the scope if it were just to the right of it. I'll find one that identifies it that way, if that's what you would like me to do.

Q.   No, but I notice on my list -- I'm sorry, I might not have it -- our list may not be the same, but the point I'm asking is, a lot of these optics are expensive optics.

A.   They are.

Q.   Like, Trijicon Reflex RX34 and these optic EOTechs holographic, you know, optics -- some of these optics are thousands of dollars; right?

A.   I know some of them are expensive, I don't know if they're a thousand or 500, but some of them are expensive.

Q.   Were you able to identify them as coming from proceeds relative to the proceeds received from the Middle East?

A.   I have looked at some receipts from Dunkelberger's, for example, that showed scopes, but I have not determined where every scope has come from.

MR. BARTOLAI: Nothing further.

MR. HINKLEY: No redirect, Your Honor. Thank you.

THE COURT: With respect to the exhibit you introduced and that was admitted, Government's F-1, is there a copy of that for the Court?

MR. HINKLEY: We will make that for you if you want me to,

Your Honor. Unfortunately, I just got that document a moment ago.

THE COURT: I would request that you do so.

MR. HINKLEY: Okay.

THE COURT: Do you have additional witnesses?

MR. HINKLEY: I do not, Your Honor.

THE COURT: Thank you, sir. You can step down.

THE WITNESS: Yes, sir.

MR. BARTOLAI: May I have a moment? We have no evidence, Your Honor.

THE COURT: Very well. In light of that, I'll hear any closing argument counsel wishes to make on the forfeiture issue.

MR. HINKLEY: May it please the Court, Mr. Bartolai, ladies and gentlemen.

It's a fairly simple matter at this point. The standard of proof is not beyond a reasonable doubt, it's just more likely than not that these items were purchased with proceeds from the illegal activity.

We will be sending back that Government's exhibit, which shows the items which they determined were purchased prior to the Defendant's illegal activity, in regards to the firearms type of items.

The testimony, through Mr. O'Donnell, as well as, I recall, the testimony during the trial was that Mr. Roggio's

only source of income during the time frame was his activity in Kurdistan, and so anything that was bought with money that was gathered as a result of that would be forfeitable, including the marital home, the vehicles that he had in the garage that were seized by the FBI, and those Rolex watches.

So we would ask that the jury return a forfeiture of those items. Thank you.

THE COURT: Mr. Bartolai?

MR. BARTOLAI: Good evening, ladies and gentlemen. So the point is, we know the firearms and all the other items are specifically identified through transfer records, 4473, which are required when you transfer a firearm.

With respect to the scopes, though, there's lot of scopes, there's a lot of optics there that do have serial numbers and are capable of being identified. It's important to know when they were purchased. A lot of those scopes are the type that could be mounted on one rifle then taken off and put on another without drilling into the rifle, without tapping it, they're modern, very expensive scopes.

So we're asking -- we have heard how -- to the extent that they proved the transfer of the firearms and the extensive research they did there, the opposite wasn't done, with respect to these optics and scopes, and we ask you to consider that when you're making your determination. Thank you.

THE COURT: Ladies and gentlemen, I'm going to ask you to,

just briefly, return to the jury room for the simple reason that we could not copy and finalize my final instructions to you, of course, until we knew what your verdict was. So we're now in the process of doing that, if you would just indulge us and be somewhat, once more, be patient with us, we should be able to complete this shortly.

So if you would take the jury out, we will get these copies to them very quickly.

(At this time there was a pause in the proceedings.)

(The following discussion took place outside the presence of the jury.)

MR. HINKLEY: Your Honor, just before you came in -- we may be able to have a stipulation and resolve the forfeiture rather than go through the process.

THE COURT: Do you want me to exit the courtroom?

MR. HINKLEY: Could we have about 10 minutes? I think we might be able to do this.

THE COURT: Absolutely.

(At this time a brief recess was taken.)

THE COURT: Counsel, before we go any further, it's my understanding the parties have reached an agreement with respect to items of forfeiture?

MR. HINKLEY: Yes, Your Honor, we have.

THE COURT: Are you prepared to state what the agreement is?

MR. HINKLEY: I am, Your Honor.

THE COURT: Please do so.

MR. HINKLEY: Your Honor, the parties agree that the properties listed in the superseding indictment in the forfeiture allegation are forfeitable and the Defendant is agreeing to forfeit those items listed, including;

Real property at 143 Indian Spring Drive, Stroudsburg.

Wells Fargo Account 2089401166.

Wells Fargo Account 2089401158.

A 2015 BMW Model i8, with a VIN as listed.

A 2015 Mercedes GL 350 Bluetec with the VIN as shown in the superseding indictment.

And for what it's worth, the McLaren, which, as I believe what was testified, was turned back in to the finance company.

However, he is agreeing, for whatever interest he has in that, he is forfeiting the 2016 McLaren automobile, as well as the four Rolex watches listed in the superseding indictment.

In regards to Government's Exhibit F-1, he is forfeiting all the property listed in the Government's exhibit, with the following exceptions:

No. 14, which is a long gun Ruger 1022 .22 long rifle caliber.

No. 23, which is a Savage 3401 .222 Remington caliber.

No. 24, which is a long gun Remington 870 .12 gauge caliber.

In regards to No. 14, there's, also, Item 76-A, which is a scope, which would go with the gun.

As well as No. 110 listed as a pistol revolver, model unknown, .44 caliber.

I would note that, in regards to all of those firearms, if there are any scopes or accessories with the firearm, they will be returned.

The parties will reduce this stipulation to writing and we will file it with the Court within a week or two.

THE COURT: Mr. Bartolai, on behalf of your client, do you agree to the forfeiture of all of the items that Mr. Hinkley has just identified, with the exceptions of those that he expressly excluded from forfeiture?

MR. BARTOLAI: I do, Your Honor.

THE COURT: Is that correct, Mr. Roggio?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do counsel agree that obviates the necessity of a jury finding, with respect to forfeiture, on any of the items?

MR. HINKLEY: We do, Your Honor.

MR. BARTOLAI: We do, yes.

THE COURT: Very well. Ladies and gentlemen, based on that, you will not need to make a further deliberation, with respect to the forfeiture of the items about which you've just heard.

Because of that, your jury duties are now over. Before you

144

go, I want to, first of all, thank you for your service. It has been a long two weeks. Thank you for your very rapid attention and careful listening. And as you leave, I want you to understand that you do not have to speak to anyone about this case or anything having to do with it, unless I order you to do so, and I'm telling you right now, I am not ordering you to do so.

So with that, you're excused. Thank you very much.

(At this time the jury was excused.)

THE COURT: One final item, if you would please be seated. Very briefly. With respect to the Pre-Sentence Report, I will set the disclosure date for the report to counsel, Mr. Roggio, and counsel for the Government as July 14, 2023. And I am setting the date for sentencing as August 23, 2023 at 2 p.m.

Is there anything else before we adjourn?

MR. BARTOLAI: No, Your Honor.

MR. HINKLEY: What time was that, Your Honor, for the sentencing?

THE COURT: I beg your pardon?

MR. HINKLEY: You said, August 23rd?

THE COURT: 2 p.m.

MR. HINKLEY: Thank you. Nothing further from the Government.

THE COURT: Thank you very much.

(At this time the proceedings were adjourned.)

145

C E R T I F I C A T E

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.


                              S/Kristin L. Yeager
                              KRISTIN L. YEAGER, RMR,CRR
                              Official Court Reporter


REPORTED BY:

    KRISTIN L. YEAGER, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    P.O. Box 5
    Scranton, Pennsylvania  18501




        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

**$**

**$1,329,608.65** [1] - 6:25

**0**

**059939** [1] - 134:19

**1**

**1** [12] - 59:8, 59:13, 63:14, 74:9, 74:12, 78:9, 80:24, 86:12, 87:20, 110:16, 111:2, 124:16
**1.1** [2] - 117:9, 117:19
**10** [11] - 68:13, 105:1, 105:3, 105:13, 105:18, 106:11, 108:18, 109:8, 125:24, 128:3, 141:16
**10/27/2015** [1] - 123:15
**1022** [1] - 142:21
**11** [1] - 70:4
**110** [1] - 143:3
**116** [1] - 131:16
**1166** [1] - 131:6
**12** [6] - 70:18, 106:12, 126:3, 126:10, 128:3, 142:24
**12/16/2015** [2] - 123:9, 123:21
**12/16/2016** [1] - 123:8
**12/20/2015** [1] - 130:24
**129** [1] - 2:4
**13** [4] - 71:6, 86:9, 116:17, 126:10
**1301** [1] - 1:18
**134** [1] - 2:9
**135** [1] - 2:9
**136** [1] - 2:4
**14** [8] - 71:18, 99:1, 116:17, 125:22, 126:10, 142:21, 143:1, 144:13
**141B173** [1] - 134:19
**143** [3] - 130:3, 130:15, 142:7
**14th** [1] - 74:13
**15** [11] - 56:14, 71:24, 80:16, 98:15, 105:5, 105:15, 106:12, 116:17, 126:3, 126:11, 128:4
**16** [2] - 72:5, 116:17
**17** [6] - 73:4, 106:12,

126:3, 126:11, 128:4, 130:22
**18** [2] - 73:15, 126:12
**18-CR-97** [1] - 1:4
**18501** [1] - 145:19
**18503** [2] - 1:13, 1:25
**18640** [1] - 1:21
**18k** [1] - 132:23
**19** [6] - 1:9, 73:21, 106:12, 126:3, 126:12, 128:4
**1B110** [1] - 134:25

**2**

**2** [14] - 59:1, 59:9, 59:14, 63:16, 78:11, 80:10, 80:15, 83:14, 86:12, 110:16, 111:2, 124:18, 144:14, 144:21
**2.1** [2] - 117:10, 117:19
**2.2** [2] - 117:10, 117:19
**20** [3] - 23:25, 49:7, 74:9
**20.17** [2] - 118:5, 118:6
**20.9** [7] - 117:10, 117:19, 117:22, 117:24, 118:2, 118:12, 118:13
**2005** [2] - 17:11, 39:2
**2010** [1] - 93:14
**2013** [1] - 86:9
**2014** [1] - 80:16
**2015** [12] - 74:13, 74:14, 80:17, 98:14, 99:1, 105:4, 105:17, 125:22, 130:22, 131:22, 142:10, 142:11
**2016** [5] - 89:9, 91:13, 131:25, 142:16
**2017** [2] - 86:10, 93:15
**2022** [2] - 98:15, 105:5
**2023** [3] - 1:9, 144:13, 144:14
**20530** [2] - 1:16, 1:18
**2089401158** [2] - 131:9, 142:9
**2089401166** [2] - 131:5, 142:8
**21** [7] - 74:14, 80:17, 106:12, 110:13, 126:3, 126:12, 128:4
**21B167** [2] - 134:16, 134:18
**22** [4] - 112:16,

126:13, 134:20, 142:21
**222** [1] - 142:23
**23** [4] - 115:21, 126:13, 142:23, 144:14
**235** [2] - 1:12, 1:25
**238** [1] - 1:20
**23rd** [1] - 144:20
**24** [6] - 53:6, 106:12, 126:3, 126:14, 128:4, 142:24
**24.2** [1] - 118:7
**25** [2] - 4:14, 55:16
**26** [1] - 89:9
**27** [4] - 106:12, 126:3, 126:14, 128:4
**28** [3] - 89:9, 126:14, 145:6
**29** [2] - 91:12, 126:15

**3**

**3** [15] - 59:10, 59:16, 61:17, 63:18, 78:13, 86:6, 86:8, 87:24, 87:25, 88:5, 88:24, 105:16, 124:20, 128:3
**30** [2] - 15:17, 126:15
**308** [1] - 134:18
**31** [1] - 126:16
**311** [1] - 1:12
**32** [1] - 126:16
**33** [3] - 122:24, 123:14, 126:16
**34** [8] - 106:13, 122:24, 122:25, 123:14, 123:15, 126:4, 126:17, 128:4
**3401** [1] - 142:23
**350** [2] - 132:5, 142:11
**36** [4] - 106:13, 126:4, 126:17, 128:4
**37** [1] - 126:18
**38** [13] - 121:3, 121:5, 121:6, 121:7, 121:9, 121:13, 121:18, 121:21, 121:22, 122:2, 122:5, 126:18
**38B** [1] - 137:17
**39** [15] - 15:8, 17:2, 17:4, 17:5, 106:13, 121:14, 121:15, 121:19, 122:5, 123:8, 123:20, 126:4, 126:18, 128:5
**396,000-dollar** [1] - 130:21
**3D** [1] - 26:20

**4**

**4** [10] - 59:18, 62:21, 63:20, 88:25, 89:2, 89:8, 89:21, 91:6, 109:7, 124:23
**4.15** [3] - 117:10, 117:19, 117:20
**44** [2] - 122:3, 143:4
**4473** [1] - 140:11
**4473's** [2] - 136:19, 136:21
**4:34** [1] - 3:24
**4H2E2303** [1] - 132:21

**5**

**5** [11] - 59:20, 63:22, 65:5, 91:10, 91:12, 92:2, 93:7, 108:17, 109:8, 125:4, 145:18
**500** [1] - 138:14
**50525512F28Q1** [1] - 132:25
**529** [1] - 138:2
**55** [3] - 119:12, 119:15, 119:22
**556** [1] - 137:19
**59400633** [1] - 137:19

**6**

**6** [10] - 59:21, 63:24, 65:13, 93:11, 93:13, 94:1, 95:13, 109:7, 125:9, 128:3
**62** [2] - 137:16, 137:23

**7**

**7** [10] - 64:1, 67:5, 95:17, 95:24, 96:2, 96:4, 96:9, 108:18, 123:1, 125:14
**753** [1] - 145:6
**76-A** [1] - 143:1

**8**

**8** [10] - 64:3, 67:19, 97:2, 97:9, 97:13, 97:15, 97:20, 108:18, 118:9, 125:17
**824-01532** [1] - 134:20
**870** [1] - 142:24
**8Q0291C3** [1] - 133:6

**9**

**9** [16] - 67:25, 98:11, 98:13, 98:23, 99:2, 106:10, 108:18, 109:8, 118:24, 119:17, 121:7, 121:16, 121:23, 122:2, 125:20, 128:3
**950** [1] - 1:15
**9:00** [1] - 3:13
**9:30** [1] - 1:9
**9mm** [1] - 7:21

**A**

**A.M** [1] - 1:9
**abducted** [1] - 55:10
**abduction** [1] - 52:9
**abets** [1] - 83:21
**abetted** [8] - 83:14, 83:17, 83:19, 83:23, 84:1, 91:14, 92:5, 92:8
**abetter** [2] - 85:6, 85:12
**abetting** [2] - 41:8, 84:24
**Abetting** [3] - 41:24, 42:10, 47:13
**ability** [2] - 18:7, 63:14
**able** [9] - 29:3, 37:12, 43:25, 120:3, 135:15, 138:15, 141:6, 141:13, 141:17
**above-mentioned** [1] - 145:8
**abroad** [2] - 94:14, 95:10
**absence** [1] - 80:6
**absolutely** [2] - 13:6, 141:18
**abuse** [4] - 14:19, 22:21, 37:3, 82:16
**abused** [2] - 10:14, 51:20
**accept** [4] - 22:6, 58:6, 64:15, 71:22
**acceptable** [1] - 110:10
**accessories** [2] - 135:4, 143:6
**accompanied** [1] - 116:17
**accomplice** [2] - 83:20, 83:21
**accomplish** [1] - 76:12
**accomplished** [2] -

2

76:5, 101:7
**accomplishing** [1] - 99:22
**accordance** [1] - 126:21
**according** [2] - 12:8, 112:11
**accordingly** [1] - 127:17
**Account** [3] - 131:5, 142:8, 142:9
**account** [7] - 6:1, 8:18, 8:19, 9:4, 11:13, 130:21, 130:24
**accountant** [1] - 55:3
**accountants** [1] - 23:6
**accounts** [6] - 5:23, 6:24, 8:5, 8:6, 8:16, 131:2
**accurate** [2] - 63:3, 63:9
**accusation** [1] - 67:15
**accused** [2] - 67:14, 82:20
**achieve** [13] - 36:9, 40:15, 41:7, 74:25, 75:14, 75:16, 75:22, 77:5, 78:7, 78:12, 81:21, 87:11, 87:13
**achieved** [2] - 78:24, 79:11
**achievement** [1] - 78:22
**achieving** [1] - 79:1
**acknowledge** [1] - 47:21
**acquire** [1] - 120:3
**acquiring** [1] - 4:9
**acquit** [1] - 115:19
**Act** [33] - 8:22, 8:25, 67:9, 67:10, 86:17, 88:7, 88:22, 89:1, 89:3, 89:12, 91:8, 91:11, 91:20, 91:24, 93:9, 93:12, 93:22, 95:15, 96:2, 96:14, 96:25, 97:12, 97:24, 98:8, 107:1, 107:7, 108:17, 109:8, 124:24, 125:5, 125:10, 128:1, 128:2
**act** [41] - 14:15, 14:18, 20:6, 26:8, 26:11, 28:14, 28:16, 33:10, 36:5, 36:8, 36:9, 36:22, 36:25, 41:11, 42:23, 66:19, 80:24, 81:12, 81:15, 81:17, 81:20, 81:21, 81:23,

82:11, 82:14, 82:20, 84:15, 84:20, 85:17, 85:21, 87:18, 102:21, 110:6, 110:7, 110:11, 111:15
**acted** [18] - 14:8, 42:10, 90:7, 91:4, 93:4, 94:10, 99:10, 102:20, 102:24, 103:1, 106:1, 107:20, 108:20, 109:2, 109:4, 109:10, 109:14, 109:16
**acting** [7] - 14:7, 36:21, 80:25, 81:14, 82:19, 110:17, 110:24
**action** [4] - 10:23, 42:18, 100:3, 111:10
**actions** [8] - 14:13, 56:7, 76:17, 81:6, 84:25, 108:9, 108:11, 108:24
**activities** [4] - 9:2, 76:20, 96:2, 97:13
**Activity** [1] - 126:8
**activity** [13] - 82:23, 106:24, 107:3, 107:5, 128:11, 129:19, 130:17, 134:12, 134:22, 135:14, 139:19, 139:22, 140:1
**actor** [1] - 109:20
**acts** [22] - 14:17, 14:19, 36:14, 36:24, 37:15, 43:17, 74:19, 79:22, 79:23, 79:24, 80:2, 80:5, 82:13, 82:15, 83:8, 85:24, 86:1, 86:4, 87:23, 107:12, 108:1, 108:6
**add** [1] - 17:23
**addition** [3] - 65:11, 95:7, 100:24
**additional** [9] - 116:11, 116:12, 127:3, 127:5, 127:6, 127:22, 128:12, 128:17, 139:5
**address** [1] - 74:15
**addressed** [1] - 48:14
**adjourn** [1] - 144:15
**adjourned** [1] - 144:25
**administration** [1] - 91:25
**Administration** [1] - 93:9

**admiration** [1] - 20:6
**admission** [1] - 135:22
**admissions** [1] - 9:16
**admit** [1] - 9:10
**admits** [9] - 6:18, 7:20, 7:21, 7:23, 8:20, 9:17, 10:19, 12:3, 21:1
**admitted** [35] - 7:11, 7:14, 7:17, 8:2, 8:4, 8:7, 8:8, 8:14, 8:15, 8:16, 8:21, 8:22, 8:24, 9:1, 9:2, 9:8, 48:16, 48:25, 50:12, 51:15, 56:9, 68:18, 68:20, 68:24, 69:2, 69:5, 69:10, 69:14, 79:20, 117:25, 118:7, 118:8, 135:25, 138:23
**Admitted** [1] - 2:8
**advance** [2] - 104:1, 104:7
**advanced** [1] - 104:25
**advancement** [1] - 110:8
**advancing** [3] - 99:11, 103:5, 106:2
**advantage** [1] - 99:24
**adversaries** [1] - 47:3
**advised** [1] - 120:5
**AECA** [2] - 89:3, 93:16
**afraid** [7] - 19:1, 32:8, 33:22, 34:12, 34:19, 54:4, 54:5
**afterwards** [1] - 39:18
**Agency** [1] - 11:17
**agent** [3] - 4:20, 82:22, 136:7
**Agent** [2] - 118:16, 129:6
**agents** [3] - 82:19, 82:24, 83:7
**Agents** [1] - 73:6
**ago** [3] - 55:15, 100:11, 139:2
**agree** [19] - 41:6, 48:10, 54:15, 57:18, 57:20, 74:23, 88:14, 88:15, 88:17, 88:19, 100:17, 113:5, 113:9, 121:2, 123:16, 123:22, 142:3, 143:11, 143:17
**agreed** [7] - 59:11, 75:5, 76:4, 86:25, 88:11, 88:12
**agreeing** [2] - 142:6,

142:15
**agreement** [32] - 40:12, 40:14, 40:17, 73:18, 75:10, 75:11, 75:19, 75:21, 75:25, 76:11, 76:15, 76:22, 76:23, 77:2, 77:4, 79:16, 87:7, 87:8, 87:17, 87:19, 87:22, 88:4, 94:20, 114:1, 114:10, 117:12, 120:21, 123:24, 141:21, 141:24
**agreements** [6] - 94:21, 94:22, 94:23, 95:2
**agrees** [1] - 17:24
**ahead** [2] - 4:5, 19:5
**aid** [4] - 85:10, 85:22, 85:24, 86:2
**aided** [9] - 1:22, 83:14, 83:17, 83:19, 83:22, 84:1, 91:14, 92:5, 92:8
**aider** [2] - 85:6, 85:12
**aiding** [4] - 41:8, 41:11, 84:16, 84:23
**Aiding** [3] - 41:24, 42:9, 47:13
**aids** [2] - 83:21, 114:19
**air** [1] - 16:22
**Al** [2] - 17:10, 69:10
**Al-Maliki** [2] - 17:10, 69:10
**Alex** [1] - 68:18
**alive** [1] - 12:17
**allegation** [1] - 142:5
**alleged** [19] - 67:22, 67:24, 75:13, 75:15, 76:7, 76:17, 77:6, 78:13, 79:21, 87:11, 87:12, 88:5, 88:10, 92:24, 100:15, 100:16, 101:25, 106:19, 129:19
**alleges** [4] - 83:22, 89:8, 100:6, 128:7
**allow** [1] - 58:20
**allowed** [5] - 55:8, 60:9, 60:15, 70:7, 114:15
**almost** [1] - 7:11
**alone** [8] - 27:1, 31:25, 57:7, 62:13, 72:18, 101:6, 109:25, 110:1
**Alpha** [1] - 135:11
**alternative** [1] - 121:25
**ambition** [3] - 21:24,

22:17, 23:18
**ambitious** [1] - 23:5
**AMERICA** [1] - 1:2
**American** [2] - 7:17, 38:9
**Ammunition** [3] - 99:1, 119:18, 125:21
**amount** [1] - 6:5
**ancestry** [1] - 58:23
**AND** [1] - 128:23
**angle** [1] - 6:8
**anguish** [1] - 19:9
**Anna** [1] - 7:5
**answer** [11] - 10:16, 19:23, 44:7, 51:16, 54:20, 60:22, 61:3, 119:8, 120:25, 122:11
**answered** [3] - 60:13, 60:20, 60:25
**answering** [1] - 136:17
**answers** [1] - 123:24
**anticipated** [1] - 104:14
**anticipation** [1] - 5:10
**anyhow** [1] - 46:10
**anyway** [1] - 29:9
**apart** [1] - 4:12
**apartment** [2] - 12:23, 13:1
**apartments** [1] - 23:16
**apologize** [1] - 45:16
**apologized** [3] - 33:23, 45:14, 45:15
**appearance** [2] - 63:18, 101:4
**appeared** [1] - 45:22
**applicable** [2] - 82:9, 108:15
**applies** [3] - 36:1, 95:3, 101:22
**apply** [15] - 25:8, 37:20, 38:10, 52:13, 56:15, 57:11, 57:13, 57:15, 57:17, 80:23, 87:24, 90:25, 106:11, 127:19, 145:22
**appointed** [1] - 145:5
**approach** [1] - 134:3
**appropriate** [8] - 69:15, 70:14, 113:14, 116:5, 116:9, 119:7, 119:12, 123:25
**Approval** [3] - 125:2, 125:7, 125:12
**approval** [10] - 50:22, 86:16, 87:4, 91:1,

3

93:18, 93:19, 94:7, 94:18, 94:19, 94:24
**approvals** [1] - 55:22
**approved** [4] - 41:5, 50:22, 77:21, 95:1
**April** [1] - 93:14
**arduous** [1] - 20:18
**area** [3] - 15:5, 25:25, 46:7
**arguably** [1] - 54:21
**arguing** [1] - 33:22
**argument** [4] - 9:5, 21:7, 39:25, 139:12
**arguments** [5] - 3:2, 57:3, 59:14, 61:11, 113:22
**arise** [1] - 66:20
**arm** [2] - 52:20, 53:15
**armed** [3] - 16:4, 26:21, 38:19
**armies** [2] - 38:8, 53:10
**armory** [1] - 136:23
**arms** [4] - 6:20, 7:20, 97:25, 120:4
**Arms** [27] - 8:22, 8:23, 67:8, 86:17, 88:7, 88:22, 89:1, 89:3, 89:12, 89:13, 91:7, 91:8, 93:11, 93:22, 94:11, 95:14, 95:15, 97:11, 97:12, 97:24, 98:8, 98:9, 107:1, 107:6, 124:23, 125:9, 127:25
**Army** [9] - 24:8, 24:10, 26:8, 27:19, 32:15, 38:12, 38:20, 50:1
**arrangement** [1] - 101:3
**arrived** [2] - 75:21, 76:10
**article** [13] - 89:16, 90:2, 90:15, 90:17, 91:1, 95:6, 95:22, 96:8, 96:12, 97:7, 97:19, 97:23, 98:2
**Articles** [2] - 88:1, 124:24
**articles** [9] - 68:19, 86:14, 86:19, 87:2, 87:5, 90:24, 94:17, 95:5, 96:17
**AS** [1] - 128:24
**ass** [1] - 25:15
**assault** [1] - 53:3
**assembly** [1] - 94:15
**assist** [4] - 85:10, 85:22, 85:25, 86:2
**assistance** [3] - 47:22,

94:12, 94:22
**Assistant** [1] - 1:11
**assistants** [1] - 47:24
**assisting** [1] - 84:16
**associate** [1] - 85:11
**associated** [3] - 41:5, 85:2, 133:19
**associating** [1] - 77:18
**assume** [1] - 61:14
**assumed** [1] - 7:16
**ATF** [3] - 136:21, 136:25, 137:1
**attach** [1] - 64:22
**attached** [4] - 72:22, 135:10, 136:10, 136:11
**attack** [1] - 70:24
**attempt** [4] - 53:17, 89:14, 95:21, 97:6
**attempted** [12] - 89:22, 89:25, 90:9, 90:14, 91:15, 93:15, 96:8, 96:11, 96:16, 97:19, 97:22, 98:2
**Attempting** [2] - 95:24, 97:9
**attempting** [4] - 89:4, 90:5, 90:21, 93:16
**attempts** [1] - 53:1
**attention** [7] - 11:4, 40:23, 41:20, 61:9, 71:13, 72:12, 144:2
**attitude** [1] - 19:11
**attorney** [2] - 12:15, 49:2
**Attorney** [1] - 1:11
**attorneys** [1] - 49:3
**audio** [9] - 18:1, 18:21, 19:25, 56:13, 73:15, 73:16, 73:17, 73:21
**August** [2] - 144:14, 144:20
**authorities** [4] - 44:5, 44:12, 44:22, 72:7
**authority** [5] - 13:14, 14:16, 36:23, 82:12, 120:19
**authorized** [2] - 30:23, 81:6
**automobile** [1] - 142:16
**available** [1] - 137:17
**AVENUE** [1] - 1:25
**Avenue** [3] - 1:12, 1:15, 1:18
**average** [1] - 100:5
**avoid** [7] - 42:19, 42:20, 42:23, 57:24,

111:11, 111:12, 111:15
**awarded** [1] - 20:4
**aware** [3] - 7:14, 108:23, 116:10

## B

**babysitter** [1] - 50:22
**bad** [10] - 32:23, 38:17, 43:19, 48:6, 48:7, 48:9, 77:17, 109:18, 109:24, 109:25
**bag** [6] - 7:24, 16:20, 19:20, 26:13, 49:10, 52:19
**Baghdad** [2] - 4:22, 29:24
**balance** [2] - 6:3, 42:7
**balanced** [1] - 112:4
**Bank** [5] - 6:24, 7:1, 8:5, 129:24, 129:25
**bank** [6] - 5:23, 9:4, 9:6, 39:16, 130:25, 131:2
**barefoot** [1] - 52:21
**barrel** [1] - 6:14
**Bartolai** [13] - 3:10, 21:3, 47:17, 47:23, 48:5, 48:10, 48:14, 48:22, 49:6, 119:10, 139:14, 140:8, 143:10
**BARTOLAI** [27] - 1:20, 3:4, 21:4, 118:19, 119:11, 119:17, 119:20, 121:2, 121:7, 121:12, 121:25, 122:14, 122:17, 123:12, 123:17, 123:23, 124:2, 126:23, 134:1, 135:24, 136:4, 138:20, 139:9, 140:9, 143:14, 143:21, 144:16
**Bartolai's** [1] - 48:16
**base** [5] - 5:5, 15:17, 17:21, 53:14, 83:12
**based** [15] - 19:23, 58:13, 59:1, 62:14, 63:5, 66:9, 66:14, 66:16, 69:23, 70:8, 70:12, 76:16, 113:16, 119:12, 143:22
**Based** [1] - 126:5
**basis** [2] - 62:9, 72:18

**bat** [2] - 35:11, 35:16
**Bayan** [1] - 119:20
**beacon** [1] - 18:8
**bear** [1] - 64:3
**bearing** [1] - 64:18
**beat** [8] - 9:8, 10:17, 18:2, 18:19, 19:19, 51:12, 54:18, 54:20
**beaten** [9] - 13:18, 16:15, 16:19, 16:22, 44:21, 51:15, 52:17, 52:21, 52:23
**beautiful** [1] - 8:10
**become** [2] - 40:5, 73:1
**becomes** [1] - 40:4
**bed** [2] - 3:14, 3:16
**bedroom** [1] - 132:13
**BEEN** [1] - 128:23
**BEFORE** [1] - 1:8
**beg** [2] - 116:25, 144:19
**began** [2] - 26:16, 26:17
**begging** [1] - 55:13
**begin** [4] - 40:8, 116:16, 116:18, 116:20
**beginning** [6] - 12:15, 24:22, 55:14, 62:22, 67:12, 77:10
**behalf** [4] - 22:6, 72:2, 95:8, 143:10
**behavior** [2] - 63:6, 63:18
**behind** [4] - 28:4, 28:11, 50:14, 52:23
**belief** [5] - 42:15, 63:2, 64:18, 111:8, 135:19
**believability** [2] - 64:21, 70:24
**believable** [1] - 65:2
**belt** [2] - 16:24, 52:23
**benefit** [5] - 35:10, 78:21, 95:9, 103:2, 122:1
**best** [7] - 10:2, 10:23, 11:22, 25:3, 32:24, 48:2
**betrayed** [1] - 20:21
**between** [10] - 21:24, 43:16, 53:6, 62:17, 64:6, 74:3, 76:3, 89:8, 93:14, 137:4
**beyond** [62] - 5:9, 12:20, 14:15, 36:4, 36:22, 42:3, 65:6, 65:20, 65:23, 66:7, 66:8, 66:11, 66:12, 66:25, 67:23, 68:8,

75:3, 75:19, 76:9, 76:14, 76:25, 78:2, 78:5, 79:4, 81:11, 82:12, 83:3, 84:3, 84:10, 85:9, 85:13, 86:24, 89:21, 92:3, 94:1, 96:5, 97:16, 99:4, 99:17, 100:14, 102:13, 102:19, 103:5, 104:4, 104:22, 105:20, 106:18, 108:22, 109:11, 109:15, 110:18, 111:21, 112:14, 113:7, 113:10, 114:14, 116:3, 116:7, 120:24, 121:17, 139:17
**bias** [1] - 63:21
**Biden** [1] - 38:20
**big** [1] - 30:11
**biggest** [1] - 54:13
**binder** [1] - 32:13
**binding** [1] - 61:11
**bipods** [2] - 135:3, 135:9
**birthday** [1] - 45:3
**bit** [7] - 9:25, 11:21, 23:24, 28:16, 28:19, 35:1, 53:1
**black** [2] - 29:8, 32:6
**blackmail** [2] - 18:16, 51:11
**blame** [2] - 11:12, 50:18
**blood** [2] - 17:1, 56:3
**blue** [1] - 50:11
**Bluetec** [1] - 142:11
**blurred** [1] - 40:6
**Bly** [6] - 15:20, 20:3, 22:2, 32:12, 49:21, 53:12
**BMW** [2] - 131:22, 142:10
**bodily** [3] - 42:12, 81:25, 111:6
**body** [1] - 37:6
**Bolt** [2] - 124:25, 125:18
**bolt** [4] - 89:4, 97:10, 97:21, 136:9
**bolt-type** [1] - 136:9
**border** [1] - 49:7
**boss** [1] - 25:20
**bothering** [2] - 3:18, 4:2
**bought** [5] - 5:19, 5:20, 6:3, 6:4, 140:2
**bound** [1] - 127:12

4

**bounds** [3] - 14:16, 36:23, 82:12
**Box** [1] - 145:18
**boyfriend** [1] - 46:1
**brag** [3] - 21:10, 55:5
**brain** [1] - 4:1
**bravery** [5] - 20:7, 20:10, 20:11, 20:17
**breached** [1] - 51:7
**break** [3] - 40:12, 52:5, 56:19
**breaking** [1] - 38:17
**breathe** [1] - 16:22
**brief** [2] - 15:7, 141:19
**briefly** [2] - 141:1, 144:11
**bright** [1] - 23:19
**bring** [7] - 26:20, 31:23, 33:9, 85:15, 103:1, 122:11
**brings** [1] - 54:13
**broke** [1] - 18:9
**Bronze** [2] - 20:4, 32:15
**brother** [1] - 49:23
**brought** [5] - 11:14, 33:7, 33:23, 43:23, 71:13
**brown** [1] - 40:5
**brutal** [1] - 18:10
**brutally** [3] - 4:12, 19:15, 56:2
**budget** [3] - 24:10, 24:11, 38:24
**budgeted** [1] - 24:10
**build** [4] - 6:15, 8:10, 22:4, 55:21
**built** [1] - 9:25
**Bullshit** [1] - 37:16
**bunch** [1] - 32:23
**burden** [13] - 3:6, 35:23, 36:1, 41:25, 42:2, 42:4, 42:6, 65:13, 65:24, 66:2, 66:3, 111:19, 112:13
**Bureau** [2] - 91:23, 129:6
**Burke** [1] - 118:16
**business** [3] - 22:2, 55:20, 104:13
**businessman** [1] - 22:1
**Buttons** [4] - 95:25, 125:6, 125:15, 125:25
**buttons** [7] - 6:15, 7:24, 8:2, 48:22, 91:17, 96:10, 105:15
**buy** [3] - 24:18, 24:19, 135:16

**BY** [4] - 129:4, 134:5, 136:4, 145:15

## C

**calculated** [1] - 100:5
**caliber** [8] - 134:18, 134:20, 137:19, 142:22, 142:23, 142:25, 143:4
**CALLED** [1] - 128:23
**camouflage** [1] - 29:8
**cannot** [9] - 35:20, 57:24, 58:7, 71:15, 88:14, 100:17, 107:13, 112:5
**capable** [1] - 140:15
**captive** [1] - 34:6
**car** [3] - 30:20, 30:21, 44:2
**Card** [1] - 125:25
**card** [6] - 5:23, 8:8, 8:17, 9:4, 105:16, 137:4
**cards** [1] - 48:21
**care** [5] - 30:6, 44:18, 50:25, 51:21, 53:22
**careful** [4] - 40:22, 41:19, 120:10, 144:3
**carefully** [4] - 57:14, 66:17, 114:2, 114:12
**cares** [1] - 31:19
**carried** [5] - 42:16, 76:21, 100:7, 104:25, 111:9
**carry** [2] - 104:1, 104:7
**carrying** [4] - 99:11, 103:6, 106:2, 107:4
**Carrying** [1] - 126:8
**cars** [1] - 8:11
**case** [60] - 19:3, 25:7, 26:15, 34:16, 35:4, 35:6, 39:15, 40:10, 41:10, 41:14, 41:21, 48:4, 51:6, 55:16, 57:21, 58:2, 58:5, 58:6, 58:9, 58:12, 58:13, 58:15, 59:1, 59:15, 59:21, 61:6, 61:13, 61:16, 63:7, 63:21, 63:23, 65:8, 65:10, 67:18, 68:17, 69:16, 70:11, 70:15, 71:2, 71:24, 72:2, 79:20, 80:7, 83:22, 100:6, 102:7, 108:12, 113:17, 113:24, 114:8, 115:2, 115:7, 115:8,

128:13, 129:19, 130:12, 131:12, 144:5
**caught** [2] - 11:4, 123:5
**caused** [15] - 42:19, 52:5, 89:23, 90:1, 90:10, 90:15, 91:16, 92:4, 92:7, 92:14, 94:3, 99:14, 103:9, 106:5, 111:10
**causing** [7] - 40:19, 90:6, 90:21, 91:21, 93:17, 94:8, 100:21
**cell** [2] - 58:3, 115:5
**Cellini** [1] - 132:23
**certain** [15] - 43:11, 60:1, 61:9, 67:20, 68:22, 69:7, 71:7, 72:6, 74:6, 79:20, 79:22, 92:22, 108:8, 108:20, 110:14
**certainly** [3] - 20:3, 24:19, 47:6
**certainty** [2] - 66:13, 67:21
**certificate** [1] - 145:22
**CERTIFIED** [1] - 1:24
**certify** [2] - 145:6, 145:10
**certifying** [1] - 145:23
**chair** [3] - 10:5, 10:18, 51:17
**challenges** [1] - 22:10
**chance** [1] - 35:2
**change** [3] - 10:11, 114:4, 114:6
**changed** [1] - 3:14
**changes** [1] - 11:2
**changing** [1] - 7:7
**chaos** [1] - 38:20
**characteristic** [1] - 82:9
**characterize** [1] - 123:6
**characterized** [1] - 94:21
**charge** [21] - 8:21, 12:14, 40:10, 40:23, 56:25, 106:10, 106:14, 108:14, 119:13, 122:2, 124:16, 124:18, 124:20, 124:23, 125:4, 125:9, 125:14, 125:17, 125:20, 125:24, 126:5
**charged** [47] - 41:8, 65:15, 65:20, 66:6,

66:8, 66:25, 67:3, 67:6, 68:1, 68:2, 68:7, 68:11, 72:19, 75:6, 83:4, 83:18, 83:23, 84:5, 84:6, 84:8, 84:12, 84:18, 84:21, 85:18, 86:1, 88:18, 89:20, 92:1, 92:18, 93:2, 93:25, 100:13, 102:14, 102:16, 108:18, 109:1, 109:9, 109:24, 110:16, 110:19, 110:23, 111:1, 112:14, 112:20, 116:3, 116:7, 128:3
**Charged** [2] - 67:25, 74:9
**charges** [40] - 24:25, 41:23, 42:1, 48:25, 67:15, 67:19, 74:10, 74:12, 80:10, 80:15, 83:1, 83:14, 86:6, 86:8, 88:6, 88:25, 89:2, 91:10, 91:12, 93:11, 93:13, 95:17, 95:24, 96:2, 97:2, 97:9, 97:13, 98:11, 98:13, 98:23, 100:9, 105:1, 105:3, 105:13, 107:9, 107:10, 108:15, 110:14, 110:25, 121:23
**cheat** [1] - 102:23
**check** [2] - 16:3, 137:8
**chest** [2] - 16:19, 52:19
**Chinese** [1] - 49:13
**Choice** [1] - 71:24
**choice** [4] - 42:25, 43:1, 43:7, 54:18
**choke** [1] - 19:20
**choking** [1] - 55:12
**choose** [1] - 112:24
**chooses** [1] - 72:1
**choosing** [2] - 54:18, 54:19
**chose** [1] - 21:18
**Christmas** [2] - 45:3, 53:24
**circumstances** [11] - 58:24, 73:13, 76:18, 76:19, 78:18, 85:1, 101:3, 107:16, 107:20, 108:25, 109:5
**Circumstantial** [1] - 61:17

**circumstantial** [8] - 61:19, 62:1, 62:17, 62:18, 76:13, 77:13, 78:16, 84:24
**Civil** [1] - 38:16
**civil** [1] - 27:18
**civilian** [1] - 15:17
**CLAFFEE** [3] - 1:14, 47:16, 123:2
**Clagett** [1] - 68:20
**claim** [3] - 54:25, 100:19, 100:21
**claimed** [1] - 72:8
**claims** [3] - 72:9, 100:8, 128:10
**clandestine** [4] - 24:15, 24:16, 26:18, 27:14
**clarity** [1] - 118:24
**clean** [1] - 65:16
**clear** [3] - 37:2, 70:8, 117:16
**CLERK** [10] - 117:18, 117:20, 117:22, 118:1, 118:5, 118:9, 118:11, 118:18, 122:19, 128:25
**clever** [7] - 3:25, 4:1, 9:11, 9:12, 9:14, 9:15
**client** [5] - 48:10, 48:15, 48:16, 48:22, 143:10
**clients** [1] - 6:18
**close** [2] - 11:4, 116:22
**closing** [8] - 3:1, 3:8, 7:6, 7:11, 9:5, 48:14, 48:18, 139:12
**clothing** [1] - 46:10
**CNC** [1] - 49:13
**CNN** [1] - 38:18
**Co** [2] - 86:11, 86:12
**co** [14] - 41:12, 79:21, 83:23, 84:1, 84:4, 84:8, 84:14, 84:17, 84:18, 85:15, 85:20, 85:23, 85:24, 87:24
**Co-conspirator** [2] - 86:11, 86:12
**co-conspirators** [13] - 41:12, 79:21, 83:23, 84:1, 84:4, 84:8, 84:14, 84:17, 84:18, 85:15, 85:20, 85:23, 87:24
**co-conspirators'** [1] - 85:24
**Code** [1] - 145:6
**Cody** [3] - 15:4, 15:22,

**5**

53:12

**colleague** [1] - 55:15
**collection** [2] - 8:11, 8:12
**color** [31] - 14:8, 14:14, 14:15, 36:21, 36:22, 37:10, 37:13, 37:15, 37:17, 37:19, 37:21, 37:23, 37:24, 38:13, 39:24, 40:1, 40:5, 40:6, 53:8, 53:10, 58:23, 74:19, 80:25, 81:14, 82:11, 82:19, 82:20
**colored** [1] - 71:1
**Colt** [2] - 7:18, 24:17
**Columbia** [1] - 83:10
**combo** [5] - 7:23, 8:2, 48:22, 91:17, 96:10
**Combo** [3] - 95:25, 125:5, 125:15
**coming** [5] - 30:13, 39:16, 47:19, 136:19, 138:15
**commander** [1] - 55:21
**Commander** [2] - 49:20, 53:19
**comments** [1] - 134:14
**Commerce** [10] - 5:14, 68:21, 68:22, 91:18, 91:23, 92:9, 92:11, 92:20, 93:1, 125:7
**commerce** [17] - 99:14, 99:16, 103:8, 103:11, 103:13, 103:22, 103:23, 103:24, 104:6, 104:11, 104:13, 104:16, 104:19, 104:24, 106:5, 106:8
**commission** [2] - 79:9, 85:4
**commit** [26] - 36:8, 40:15, 42:16, 55:2, 72:25, 74:17, 74:18, 74:24, 75:5, 75:12, 75:17, 75:23, 80:14, 81:20, 83:17, 84:19, 85:21, 85:23, 86:25, 87:9, 87:14, 88:6, 88:11, 88:12, 111:9, 127:24
**Commit** [15] - 13:16, 40:22, 42:9, 47:13, 67:7, 67:8, 74:11, 75:2, 80:24, 86:7, 86:22, 87:21, 88:2, 124:16, 124:20

**committed** [22] - 9:2, 36:5, 41:12, 54:14, 67:20, 67:24, 77:19, 79:6, 80:25, 81:12, 83:16, 84:4, 84:11, 84:13, 85:8, 85:14, 110:15, 110:19, 110:20, 110:23
**committing** [11] - 42:21, 53:16, 67:14, 83:15, 83:20, 83:23, 84:1, 84:5, 84:17, 91:19, 111:13
**common** [18] - 23:17, 24:21, 34:16, 40:16, 46:15, 53:3, 56:15, 59:23, 60:1, 62:6, 62:15, 63:12, 64:10, 66:16, 75:16, 76:12, 77:5, 87:14
**Commonwealth** [1] - 83:10
**communicate** [7] - 57:25, 58:4, 58:8, 58:11, 115:1, 115:7, 115:18
**communication** [16] - 99:13, 99:16, 103:8, 103:10, 103:13, 103:22, 103:25, 104:6, 104:10, 104:12, 104:15, 104:18, 104:24, 106:4, 106:7, 112:17
**community** [1] - 58:25
**companies** [1] - 69:9
**company** [13] - 24:18, 27:3, 27:25, 28:11, 77:17, 98:19, 98:20, 105:9, 105:10, 130:22, 132:3, 142:14
**Company** [5] - 7:1, 11:19, 130:6, 131:3, 131:18
**company's** [1] - 27:8
**compare** [3] - 32:11, 49:2, 118:19
**complete** [3] - 79:9, 116:10, 141:6
**completed** [1] - 113:23
**complex** [1] - 55:16
**complicated** [1] - 22:8
**comply** [1] - 56:5
**compound** [30] - 5:4, 11:8, 12:6, 12:9, 12:24, 13:14, 14:24, 15:3, 15:6, 15:8, 15:11, 15:18, 15:23,

16:3, 17:5, 17:13, 17:14, 17:18, 17:24, 19:16, 19:19, 20:13, 26:13, 29:9, 29:18, 30:10, 30:16, 42:14, 43:21, 46:4
**computer** [4] - 1:22, 4:17, 58:3, 115:6
**Computer** [2] - 69:1, 69:4
**computer-aided** [1] - 1:22
**Computers** [2] - 68:25, 69:3
**concealment** [1] - 100:25
**concept** [1] - 38:1
**concepts** [1] - 110:5
**concern** [2] - 43:12, 101:16
**concerned** [1] - 74:8
**concerning** [3] - 71:19, 71:20, 73:13
**conclude** [5] - 69:25, 70:1, 72:13, 72:18, 108:2
**concludes** [1] - 112:18
**conclusion** [4] - 56:17, 60:2, 60:3, 62:5
**conclusions** [1] - 61:10
**condition** [1] - 44:20
**conditions** [1] - 32:17
**condolences** [1] - 45:4
**condone** [1] - 53:2
**conduct** [10] - 43:6, 48:17, 58:5, 72:8, 109:12, 109:21, 110:9, 111:18, 115:8, 127:20
**conducted** [2] - 78:17, 106:23
**confess** [1] - 9:16
**confessed** [1] - 56:8
**confesses** [1] - 9:19
**confident** [1] - 136:17
**confirm** [1] - 123:7
**confirmed** [3] - 15:15, 15:20, 15:23
**conflicts** [1] - 26:25
**confused** [1] - 18:3
**conjecture** [2] - 66:10, 66:14
**connection** [1] - 127:1
**connections** [1] - 26:3
**conscience** [1] - 114:11

**conscious** [1] - 108:23
**consciousness** [1] - 72:5
**consensual** [1] - 73:15
**consent** [2] - 15:19, 73:18
**consequences** [7] - 36:9, 81:21, 108:1, 108:3, 108:5, 108:8, 108:11
**Consider** [1] - 112:17
**consider** [32] - 47:10, 59:24, 60:17, 61:6, 62:15, 63:13, 64:12, 64:13, 68:4, 69:17, 72:23, 73:11, 76:13, 77:13, 78:1, 78:16, 80:2, 80:5, 84:24, 102:11, 102:17, 102:25, 107:18, 107:25, 109:3, 110:20, 112:8, 113:14, 127:23, 128:6, 128:16, 140:23
**Consideration** [1] - 67:25
**consideration** [3] - 70:22, 88:24, 106:10
**considered** [2] - 68:12, 101:21
**considering** [7] - 47:19, 70:16, 82:3, 87:25, 88:4, 102:24, 128:15
**consist** [2] - 14:19, 82:15
**consistent** [4] - 64:1, 72:8, 72:24, 134:16
**consists** [1] - 59:6
**Conspiracy** [27] - 13:15, 14:5, 19:24, 40:10, 40:11, 40:12, 40:21, 40:24, 41:23, 42:9, 47:12, 67:7, 67:8, 74:10, 75:2, 76:24, 78:4, 79:3, 80:24, 86:7, 86:22, 87:21, 87:25, 88:2, 124:16, 124:20
**conspiracy** [57] - 9:24, 40:25, 41:9, 74:25, 75:12, 75:18, 75:23, 76:2, 76:7, 76:8, 76:16, 76:18, 76:23, 77:2, 77:4, 77:9, 77:12, 77:14, 77:17, 77:18, 77:21, 77:24,

77:25, 78:3, 78:6, 78:10, 78:11, 78:21, 79:1, 79:2, 79:7, 79:8, 79:10, 79:11, 79:12, 79:13, 79:16, 79:17, 79:18, 79:19, 79:23, 79:24, 79:25, 80:1, 80:3, 80:4, 87:8, 87:17, 87:23, 88:6, 88:15, 88:16, 88:18, 88:20, 127:24
**conspiracy's** [2] - 78:22, 78:24
**conspirator** [7] - 75:14, 75:15, 78:14, 86:11, 86:12, 87:11, 87:13
**conspirator's** [1] - 74:22
**conspirators** [17] - 15:10, 41:12, 77:7, 79:6, 79:21, 83:23, 84:1, 84:4, 84:8, 84:14, 84:17, 84:18, 85:15, 85:20, 85:23, 87:24, 88:11
**conspirators'** [1] - 85:24
**conspire** [2] - 74:24, 86:13
**conspired** [2] - 74:17, 74:18
**conspiring** [1] - 21:2
**constant** [1] - 53:14
**constitute** [2] - 101:2, 101:8
**constituting** [1] - 83:4
**Constitution** [3] - 17:11, 39:2, 39:8
**Constitutional** [1] - 71:25
**Construction** [3] - 7:1, 50:11, 50:16
**Consulting** [5] - 7:1, 11:19, 130:6, 131:3, 131:18
**consummate** [1] - 120:1
**contact** [4] - 11:20, 44:24, 45:1, 50:13
**contained** [4] - 8:20, 83:1, 104:19, 104:21
**container** [2] - 22:20, 31:25
**contemplated** [1] - 101:25
**contend** [1] - 102:7
**contents** [1] - 117:13
**context** [2] - 87:20, 106:9

**6**

continue [4] - 26:22, 79:17, 115:14, 121:14
continued [2] - 122:21, 124:4
continuing [6] - 79:13, 79:16, 79:18, 79:19, 80:16, 86:9
continuity [1] - 121:15
contract [1] - 44:3
contractual [1] - 101:10
contradicted [1] - 64:16
contradictory [1] - 12:19
contrary [10] - 86:19, 87:5, 95:22, 96:1, 96:13, 96:17, 97:7, 97:11, 97:24, 98:3
contributions [1] - 47:23
control [22] - 14:12, 17:17, 25:17, 25:19, 25:20, 30:14, 31:4, 31:5, 49:16, 51:4, 51:14, 53:14, 60:4, 69:7, 74:22, 80:22, 81:4, 81:16, 87:14, 145:23
Control [22] - 1:15, 8:22, 67:9, 86:17, 88:7, 88:22, 89:1, 89:3, 89:12, 91:8, 92:9, 93:12, 93:22, 95:15, 97:11, 97:24, 98:8, 107:1, 107:7, 124:23, 125:9, 128:1
Controlled [1] - 88:2
controlled [16] - 4:23, 5:13, 5:15, 5:19, 7:16, 8:7, 8:17, 17:21, 90:2, 90:16, 91:22, 92:8, 92:19, 92:23, 119:25, 120:4
controls [3] - 10:13, 61:13, 68:22
Controls [2] - 86:17, 89:19
conversation [2] - 29:22, 103:17
conversations [2] - 73:16, 73:19
convey [1] - 101:4
convict [3] - 100:17, 109:25, 115:19
convicted [1] - 66:9
convince [4] - 9:7, 33:24, 66:6, 113:10
convinced [2] - 66:23,

114:5
convincing [1] - 65:19
cooperation [2] - 15:10, 19:17
cop [1] - 53:9
copied [1] - 56:1
copies [3] - 34:18, 56:25, 141:8
copy [4] - 57:1, 122:19, 138:23, 141:2
copying [1] - 27:3
Corey [1] - 117:5
corporate [2] - 130:5, 131:17
correct [12] - 118:9, 118:10, 119:19, 121:9, 122:25, 123:15, 123:20, 131:25, 132:22, 133:3, 143:15, 145:7
correcting [1] - 123:10
correspond [1] - 58:8
corroborated [1] - 30:4
Cosmograph [1] - 132:19
coughed [1] - 56:3
coughing [1] - 16:25
counsel [13] - 3:1, 10:5, 21:4, 52:11, 118:25, 119:1, 126:22, 139:12, 141:20, 143:17, 144:12, 144:13
counsel's [1] - 53:17
counselor [1] - 136:13
Count [65] - 74:9, 74:12, 80:24, 87:20, 87:24, 87:25, 88:5, 88:24, 89:21, 91:6, 91:12, 92:2, 93:7, 93:13, 94:1, 95:13, 96:2, 96:4, 96:9, 97:15, 97:20, 98:13, 99:2, 105:13, 105:18, 106:9, 106:11, 108:17, 109:8, 118:24, 119:17, 121:7, 121:16, 121:23, 122:2, 122:24, 122:25, 123:8, 123:15, 123:20, 124:16, 126:10, 126:11, 126:12, 126:13, 126:14, 126:15, 126:16, 126:17, 126:18
count [30] - 12:18,

56:18, 80:10, 80:15, 83:14, 86:6, 86:8, 88:25, 89:2, 89:8, 91:10, 93:11, 95:17, 95:24, 97:2, 97:9, 97:13, 98:11, 98:23, 105:1, 105:3, 124:18, 124:20, 124:23, 125:4, 125:9, 125:14, 125:17, 125:20, 125:24
Counterintelligence [1] - 1:15
Counterterrorism [1] - 11:16
counterterrorist [1] - 49:20
countries [3] - 39:12, 68:23, 92:22
country [9] - 25:23, 32:12, 32:16, 38:10, 38:21, 46:7, 94:4, 103:14, 103:19
countrymen [1] - 32:4
counts [2] - 109:7, 126:3
Counts [7] - 106:12, 108:17, 108:18, 109:8, 110:16, 111:2, 128:3
County [2] - 89:10, 91:13
couple [3] - 3:11, 21:14, 48:5
courage [5] - 20:2, 20:10, 20:12, 20:14, 20:15
course [8] - 10:23, 11:3, 45:8, 72:1, 100:2, 104:13, 121:10, 141:3
court [6] - 39:11, 57:6, 59:4, 63:25, 112:25, 115:3
Court [20] - 3:10, 21:4, 37:20, 43:8, 112:18, 115:18, 117:11, 119:7, 120:18, 121:21, 122:3, 131:17, 138:24, 139:14, 143:9, 145:3, 145:4, 145:14, 145:17, 145:17
COURT [61] - 1:1, 3:1, 3:5, 21:3, 47:15, 56:19, 56:22, 116:21, 116:25, 117:4, 118:22,

119:5, 119:10, 119:14, 119:19, 120:9, 120:13, 121:5, 121:9, 121:13, 121:24, 122:7, 122:10, 122:18, 122:20, 122:23, 123:3, 123:6, 123:13, 123:19, 123:24, 124:3, 124:6, 124:8, 124:10, 124:13, 126:25, 134:2, 134:4, 135:23, 136:2, 138:22, 139:3, 139:5, 139:7, 139:11, 140:8, 140:25, 141:15, 141:18, 141:20, 141:24, 142:2, 143:10, 143:15, 143:17, 143:22, 144:10, 144:19, 144:21, 144:24
Court's [1] - 126:21
courtroom [17] - 20:1, 20:9, 20:24, 47:21, 56:24, 58:14, 58:19, 59:2, 59:22, 72:7, 115:11, 115:25, 116:1, 116:15, 124:5, 124:13, 141:15
cover [1] - 5:7
covered [3] - 7:4, 89:16, 90:24
crazy [1] - 7:6
created [3] - 5:10, 133:20, 134:8
creates [1] - 27:12
Credibility [1] - 71:7
credibility [9] - 9:18, 51:15, 62:21, 62:25, 63:1, 63:11, 70:18, 112:11, 128:18
credible [3] - 111:24, 112:4, 112:5
credit [7] - 5:23, 8:8, 8:17, 9:4, 47:3, 105:16, 137:4
Credit [1] - 125:25
Crime [2] - 68:25, 80:12
crime [17] - 5:9, 72:19, 72:25, 74:23, 75:18, 77:19, 88:14, 88:16, 88:19, 89:14, 89:20, 92:1, 93:25, 95:20, 97:5, 106:15, 110:12
crimes [15] - 4:15,

4:21, 9:9, 9:10, 9:17, 9:20, 21:1, 54:14, 56:9, 67:13, 88:7, 88:11, 88:13, 88:18
Crimes [1] - 69:3
criminal [17] - 42:18, 42:23, 43:6, 71:24, 75:1, 76:21, 76:23, 77:15, 79:7, 85:3, 109:22, 111:10, 111:15, 111:18, 128:11, 134:22
Crm [1] - 1:17
cross [1] - 136:2
Cross [1] - 2:3
CROSS [1] - 136:3
cross-examine [1] - 136:2
CRR [1] - 1:24
cruel [8] - 25:15, 35:13, 35:14, 35:17, 35:18, 35:19, 82:6, 82:7
crush [1] - 18:7
crushing [3] - 18:6, 18:10, 52:6
CTG [29] - 5:2, 5:5, 13:13, 14:24, 15:6, 15:8, 15:15, 15:18, 15:21, 15:23, 15:24, 16:14, 17:12, 17:22, 25:18, 26:11, 49:17, 50:2, 50:3, 50:12, 53:9, 53:13, 53:14, 53:15, 53:19
culture [2] - 20:2, 25:25
custody [7] - 14:12, 17:17, 39:17, 74:22, 80:22, 81:3, 81:16
cut [2] - 52:22, 137:22
cutting [1] - 16:23

**D**

damage [1] - 40:21
dangerous [1] - 27:12
dare [1] - 32:11
dark [3] - 23:21, 49:6
date [17] - 67:22, 67:24, 98:14, 105:4, 115:24, 122:24, 122:25, 123:2, 123:7, 123:10, 123:15, 123:20, 134:15, 144:12, 144:14, 145:9
dated [1] - 126:20
dates [3] - 67:20, 106:19, 145:9

7

**days** [4] - 14:3, 15:8, 15:17, 17:5
**Daytona** [2] - 132:19, 133:5
**DC** [2] - 1:16, 1:18
**DDTC** [8] - 89:19, 90:4, 90:20, 90:25, 94:6, 94:18, 94:20, 94:25
**deal** [1] - 22:13
**dealing** [1] - 22:10
**death** [3] - 42:12, 81:7, 111:6
**deceitful** [1] - 100:25
**deceive** [5] - 10:23, 96:22, 100:5, 100:24, 102:22
**December** [2] - 105:16, 130:22
**deception** [2] - 101:5, 101:6
**deceptive** [1] - 101:4
**decide** [44] - 19:22, 25:4, 26:14, 35:21, 36:10, 36:16, 41:19, 44:8, 44:9, 45:10, 45:18, 46:15, 47:9, 52:15, 53:4, 57:5, 58:12, 60:9, 62:13, 62:19, 62:23, 63:5, 63:9, 64:17, 68:7, 69:22, 71:3, 71:14, 72:20, 73:7, 73:9, 80:8, 101:20, 107:23, 108:12, 112:6, 113:12, 113:13, 114:12, 116:2, 116:6, 120:25
**decided** [1] - 29:23
**deciding** [10] - 61:6, 62:22, 63:11, 63:13, 76:14, 77:14, 78:2, 78:18, 84:22, 109:2
**decision** [11] - 59:1, 59:4, 61:13, 62:8, 67:18, 68:3, 68:9, 68:11, 73:11, 101:18, 101:22
**decisions** [1] - 57:13
**decorated** [1] - 49:21
**deduction** [1] - 62:5
**deep** [1] - 18:14
**defeat** [1] - 81:7
**DEFENDANT** [2] - 1:19, 143:16
**Defendant** [40] - 1:6, 5:17, 12:17, 14:6, 16:6, 21:17, 41:25, 42:4, 42:6, 48:25, 65:14, 66:9, 67:5,

67:13, 67:15, 67:25, 68:1, 71:25, 73:4, 101:10, 101:11, 101:12, 118:3, 120:3, 124:17, 124:19, 124:22, 125:3, 125:8, 125:13, 125:16, 125:19, 125:22, 126:1, 126:9, 130:17, 132:14, 133:23, 134:10, 142:5
**Defendant's** [4] - 3:8, 56:12, 71:24, 139:22
**defense** [40] - 41:21, 41:22, 41:24, 41:25, 42:5, 42:8, 42:9, 43:8, 48:19, 53:17, 54:17, 54:22, 68:19, 86:14, 87:1, 87:2, 89:16, 90:2, 90:15, 90:17, 90:24, 91:1, 93:17, 93:23, 94:4, 94:8, 94:12, 94:17, 94:18, 95:1, 95:5, 95:6, 95:8, 110:13, 110:15, 111:19, 112:7, 112:13
**Defense** [12] - 48:18, 49:2, 51:3, 54:17, 62:11, 70:24, 88:1, 89:19, 124:24, 125:10
**defenses** [1] - 110:13
**define** [2] - 25:7, 94:11
**defined** [2] - 35:8, 83:5
**definition** [5] - 52:12, 91:5, 93:6, 95:12, 108:25
**definitions** [1] - 88:23
**defraud** [20] - 98:16, 99:5, 99:10, 99:19, 100:2, 100:7, 100:10, 100:16, 101:13, 101:24, 102:3, 102:14, 102:21, 102:25, 104:1, 104:8, 105:6, 105:22, 106:1
**defrauded** [4] - 55:24, 102:8, 118:24, 120:15
**degrading** [4] - 35:14, 35:18, 35:19, 82:7
**Deliberate** [1] - 112:17
**deliberate** [6] - 35:13, 35:16, 47:10, 82:6,

99:25, 127:7
**deliberating** [1] - 115:1
**deliberation** [2] - 127:4, 143:23
**deliberations** [15] - 57:25, 58:10, 58:16, 112:21, 115:4, 115:14, 115:17, 116:11, 116:13, 116:16, 116:19, 116:20, 122:21, 124:4, 127:2
**deliver** [2] - 31:22, 122:18
**demanding** [1] - 28:19
**demands** [1] - 28:19
**demeanor** [1] - 64:18
**demilitarization** [1] - 94:16
**Democrats** [1] - 38:12
**demonstrate** [1] - 12:10
**Denise** [1] - 69:5
**deny** [1] - 10:20
**Department** [16] - 5:13, 68:20, 68:21, 68:22, 86:16, 89:6, 91:18, 91:23, 92:11, 92:20, 93:1, 93:20, 125:2, 125:7, 125:11
**Department's** [1] - 89:18
**deposited** [1] - 130:24
**deprive** [1] - 100:3
**depriving** [1] - 101:25
**deputy** [5] - 56:24, 115:11, 116:1, 116:15, 124:14
**derived** [1] - 78:20
**describe** [3] - 134:15, 134:17, 134:23
**described** [4] - 6:19, 16:2, 95:1, 134:7
**description** [3] - 67:14, 96:20, 137:1
**descriptions** [2] - 70:16, 132:17
**deserve** [1] - 73:10
**deserved** [1] - 20:5
**deserves** [7] - 20:6, 59:25, 64:23, 65:4, 70:21, 71:5, 71:23
**design** [1] - 94:14
**designator** [1] - 135:11
**desire** [2] - 103:1, 103:2
**desperate** [5] - 30:11, 30:12, 51:2

**desperation** [1] - 30:11
**destruction** [1] - 94:17
**detached** [1] - 136:9
**detail** [3] - 12:25, 64:13, 127:16
**detailed** [1] - 9:5
**details** [10] - 10:10, 10:22, 10:24, 11:2, 11:21, 76:1, 76:4, 91:7, 93:8, 95:14
**detained** [3] - 17:12, 39:14, 44:4
**determination** [3] - 70:9, 112:8, 140:24
**determine** [6] - 5:17, 71:10, 107:17, 120:16, 130:15, 137:5
**determined** [4] - 133:22, 134:10, 138:18, 139:21
**determining** [1] - 102:12
**development** [1] - 94:14
**device** [3] - 58:2, 100:2, 115:5
**devise** [2] - 98:16, 105:6
**devised** [6] - 98:15, 99:5, 99:18, 102:16, 105:5, 105:21
**diagnose** [1] - 44:20
**dial** [1] - 133:5
**diamond** [1] - 133:5
**diary** [1] - 27:5
**die** [4] - 16:21, 33:1, 33:3
**difference** [4] - 21:24, 30:6, 30:9, 136:13
**differences** [5] - 28:22, 28:25, 29:1, 39:5, 74:3
**different** [11] - 38:18, 41:22, 62:9, 63:25, 64:6, 71:9, 71:11, 88:19, 110:5, 118:5, 118:6
**differently** [2] - 64:9, 114:7
**difficult** [2] - 82:1, 82:4
**difficulty** [2] - 120:9, 120:21
**Digital** [2] - 69:1, 69:4
**dignified** [1] - 20:11
**dinner** [3] - 45:11, 45:12, 45:13

**dinners** [1] - 53:25
**direct** [14] - 25:21, 26:5, 61:17, 61:18, 61:21, 61:22, 62:16, 62:18, 72:12, 76:13, 77:13, 78:16, 84:24, 145:23
**Direct** [1] - 2:3
**DIRECT** [1] - 129:3
**directed** [3] - 14:24, 15:2, 32:9
**direction** [5] - 10:4, 12:7, 13:22, 15:9, 17:14
**directly** [5] - 42:18, 61:21, 76:3, 107:13, 111:10
**Director** [1] - 86:16
**Directorate** [1] - 89:18
**dirty** [1] - 15:12
**disagree** [1] - 55:19
**disappear** [3] - 29:25, 32:3, 33:11
**disappears** [1] - 30:8
**disassemble** [1] - 136:16
**disbelieve** [1] - 64:7
**discarded** [1] - 19:12
**Discharge** [1] - 32:16
**disclose** [4] - 34:14, 101:8, 101:15, 115:18
**disclosure** [4] - 101:11, 101:12, 101:13, 144:12
**discover** [2] - 132:9, 133:14
**discrepancies** [1] - 64:5
**discrepancy** [1] - 45:16
**discuss** [5] - 37:22, 46:8, 57:21, 58:9, 58:15
**discussed** [7] - 15:4, 46:9, 69:20, 70:15, 76:3, 77:19, 127:15
**discussing** [1] - 35:10
**discussion** [2] - 46:10, 141:10
**discussions** [2] - 113:1, 114:15
**disks** [1] - 117:11
**disloyal** [1] - 54:3
**disobey** [2] - 109:16, 109:19
**disputed** [1] - 62:8
**disregard** [10] - 59:20, 60:21, 61:2, 61:5, 61:8, 69:22, 69:24,

**8**

100:1, 109:16, 109:19
**distinction** [1] - 62:17
**distinguishing** [1] - 82:9
**distract** [1] - 49:4
**distraction** [10] - 49:15, 50:15, 50:17, 51:1, 52:2, 52:9, 53:8, 53:10, 53:11, 54:13
**distractions** [5] - 49:6, 49:14, 53:18, 55:13, 56:15
**distress** [1] - 82:2
**distribution** [1] - 94:22
**District** [13] - 74:16, 83:10, 86:10, 89:10, 91:13, 96:3, 97:14, 98:25, 105:14, 145:4, 145:17, 145:18
**DISTRICT** [2] - 1:1, 1:1
**distrust** [1] - 71:20
**divergents** [1] - 38:18
**document** [8] - 100:19, 100:21, 117:24, 122:1, 133:17, 134:7, 134:8, 139:1
**documents** [12] - 5:16, 7:2, 9:6, 27:2, 27:7, 27:24, 56:1, 59:9, 100:8, 117:14, 129:21, 129:24
**dog** [1] - 3:22
**DOJ** [2] - 1:14, 1:17
**DOJ-Crm** [1] - 1:17
**DOJ-Nsd** [1] - 1:14
**dollars** [1] - 138:12
**dominate** [2] - 4:5, 19:5
**dona** [1] - 28:15
**done** [27] - 13:9, 14:17, 16:13, 19:17, 20:12, 22:9, 25:10, 31:23, 36:24, 37:13, 37:15, 39:20, 41:11, 42:25, 43:17, 51:4, 53:8, 57:8, 61:14, 77:23, 80:2, 80:6, 82:13, 110:7, 113:18, 140:22
**door** [2] - 29:6, 46:16
**Doubt** [1] - 65:14
**doubt** [66] - 5:9, 10:14, 12:20, 17:5, 36:4, 42:3, 51:19, 65:7, 65:20, 65:23,

66:7, 66:9, 66:11, 66:12, 66:13, 66:15, 66:17, 66:18, 66:25, 67:2, 67:23, 68:8, 75:4, 75:20, 76:9, 76:15, 77:1, 78:3, 78:5, 79:4, 81:11, 83:3, 84:3, 84:10, 85:9, 85:13, 86:24, 89:21, 92:3, 94:1, 96:6, 97:17, 99:4, 99:18, 100:14, 102:14, 102:20, 103:5, 104:5, 104:23, 105:20, 106:18, 108:23, 109:11, 109:15, 110:19, 111:22, 112:15, 113:8, 113:11, 114:14, 116:4, 116:8, 121:17, 139:17
**doubts** [3] - 66:14, 66:15
**Douglas** [1] - 68:24
**Douville** [1] - 68:18
**down** [10] - 10:21, 11:14, 41:14, 48:20, 52:6, 115:10, 115:15, 118:7, 118:11, 139:7
**downstairs** [1] - 116:18
**Dr** [4] - 15:14, 25:24, 38:1, 53:12
**draw** [3] - 62:11, 62:14
**drawn** [3] - 8:19, 62:10, 76:17
**dressed** [1] - 29:7
**drilled** [1] - 136:14
**drilling** [1] - 140:18
**drills** [1] - 49:13
**Drive** [3] - 130:3, 130:16, 142:7
**drive** [2] - 3:18, 27:4
**drives** [1] - 117:11
**driving** [1] - 50:14
**drove** [1] - 7:5
**dry** [1] - 3:21
**Dukan** [3] - 46:3, 46:4, 46:5
**DULY** [1] - 128:24
**Dunkelberger's** [2] - 136:24, 138:17
**duration** [1] - 82:3
**Duress** [6] - 41:22, 42:4, 54:16, 54:22, 111:19, 112:7
**duress** [10] - 41:24, 42:10, 54:14, 54:25,

55:11, 110:17, 110:21, 110:24, 111:2, 112:2
**during** [28] - 4:3, 4:6, 11:4, 57:6, 57:8, 57:25, 58:10, 58:16, 60:5, 61:15, 73:15, 77:2, 77:5, 79:25, 80:3, 85:4, 87:16, 107:24, 112:9, 113:19, 114:18, 115:4, 127:13, 129:13, 133:10, 135:4, 139:25, 140:1
**duties** [6] - 14:18, 36:25, 57:4, 58:20, 82:15, 143:25
**duty** [6] - 53:9, 57:4, 57:11, 101:11, 112:17, 113:25

## E

**E-file** [1] - 8:20
**eagle** [1] - 50:12
**ears** [3] - 16:19, 21:21, 52:18
**ease** [1] - 122:25
**East** [1] - 138:16
**east** [1] - 24:2
**easy** [3] - 10:9, 22:7, 54:2
**eating** [1] - 23:16
**echoed** [1] - 4:1
**economic** [1] - 58:24
**Economic** [12] - 8:24, 67:9, 91:11, 91:20, 93:9, 96:1, 96:13, 96:25, 108:17, 109:8, 125:5, 128:2
**educated** [1] - 23:5
**education** [2] - 69:12, 69:24
**effect** [3] - 63:23, 64:11, 119:9
**effort** [1] - 114:1
**ego** [2] - 4:5, 19:4
**either** [6] - 15:7, 18:14, 62:18, 73:20, 75:22, 104:9
**Eldorado** [1] - 8:2
**elected** [1] - 114:18
**election** [1] - 112:16
**electrocuted** [1] - 16:15
**electronic** [4] - 58:2, 58:11, 103:18, 115:5
**electronically** [1] - 58:8
**element** [23] - 36:21,

54:22, 66:8, 66:24, 75:18, 85:25, 86:3, 90:8, 90:13, 90:19, 91:3, 92:13, 92:17, 92:25, 99:17, 102:18, 102:19, 103:4, 107:8, 109:23, 113:7, 122:5, 122:6
**elements** [33] - 36:1, 36:4, 41:20, 41:23, 42:11, 54:15, 54:16, 54:17, 67:2, 74:9, 75:3, 75:7, 79:4, 81:11, 84:5, 84:6, 86:24, 92:3, 93:21, 93:23, 94:2, 96:5, 96:24, 97:16, 98:7, 99:3, 105:20, 106:10, 106:18, 108:20, 111:4, 112:14, 121:17
**Elina** [12] - 29:1, 29:2, 29:4, 29:13, 29:15, 33:21, 45:25, 50:18, 50:19, 51:1
**Elina's** [1] - 50:18
**elsewhere** [6] - 86:11, 89:11, 96:3, 97:14, 98:25, 105:15
**email** [8] - 6:13, 6:18, 9:3, 44:3, 118:2, 118:5, 119:18
**emailed** [2] - 8:14, 98:25
**Emailing** [1] - 125:21
**emails** [1] - 7:2
**embarrassed** [4] - 11:13, 11:18, 18:16, 18:17
**embraces** [1] - 99:23
**Emergency** [12] - 8:24, 67:9, 91:11, 91:19, 93:9, 96:1, 96:13, 96:25, 108:16, 109:7, 125:5, 128:1
**emotional** [1] - 24:22
**employed** [2] - 70:20, 129:5
**employee** [3] - 11:18, 16:6, 83:2
**employees** [4] - 4:12, 19:11, 56:6, 73:6
**encourage** [4] - 85:10, 85:22, 85:25, 86:2
**encouraged** [1] - 85:20
**encouraging** [1] - 84:17

**end** [10] - 40:9, 52:10, 67:20, 82:11, 98:20, 105:10, 114:8, 119:21, 120:8, 137:11
**ended** [2] - 6:2, 79:14
**Enden** [2] - 29:12, 29:13
**ending** [1] - 45:23
**ends** [1] - 79:10
**endure** [2] - 82:1, 82:4
**endured** [2] - 17:3, 53:4
**enforcement** [8] - 4:20, 70:19, 70:20, 70:25, 71:4, 72:7, 72:12, 81:6
**Enforcement** [1] - 70:18
**enforcement's** [1] - 73:1
**engage** [4] - 43:5, 54:24, 111:17, 116:12
**engaged** [3] - 15:11, 82:18, 90:23
**engaging** [1] - 128:11
**engineer** [5] - 11:18, 12:5, 26:19, 26:24, 28:2
**engineering** [1] - 94:14
**engineers** [1] - 23:6
**enter** [1] - 94:24
**entered** [5] - 117:2, 117:8, 117:14, 118:15, 127:9
**entertained** [1] - 101:2
**entirely** [4] - 60:21, 69:22, 107:23, 108:11
**entitled** [2] - 113:2, 114:24
**EOTech** [2] - 137:13, 137:18
**EOTechs** [1] - 138:10
**equally** [1] - 112:4
**error** [1] - 123:3
**ESQ** [4] - 1:11, 1:14, 1:17, 1:20
**essential** [1] - 83:4
**establish** [4] - 72:17, 101:24, 109:25, 110:2
**established** [1] - 83:5
**establishes** [1] - 102:8
**Estonia** [11] - 4:22, 20:18, 23:1, 30:7, 31:21, 44:16, 45:2,

**9**

45:12, 46:14, 53:25, 54:12

**Estonian** [5] - 11:18, 12:9, 15:3, 20:17, 51:5

**Estonians** [13] - 13:11, 13:19, 16:2, 16:12, 20:14, 22:23, 30:19, 32:4, 33:16, 46:5, 51:23, 54:1, 55:4

**etc** [1] - 45:5

**evaluate** [4] - 51:15, 72:3, 112:10, 128:18

**evaluating** [1] - 71:17

**evaluation** [1] - 72:23

**evening** [3] - 136:5, 136:6, 140:9

**event** [2] - 15:7, 64:8

**events** [2] - 59:25, 104:14

**everywhere** [1] - 39:3

**evidence** [142] - 4:6, 4:11, 5:8, 6:2, 6:9, 9:7, 12:18, 12:20, 13:16, 19:15, 19:23, 25:4, 29:16, 42:1, 42:7, 47:2, 47:10, 47:20, 56:11, 57:3, 57:5, 57:9, 58:13, 58:17, 59:1, 59:2, 59:6, 59:12, 59:23, 60:2, 60:4, 60:6, 60:9, 60:14, 60:15, 60:17, 60:20, 61:4, 61:5, 61:7, 61:11, 61:12, 61:18, 61:19, 61:21, 61:22, 62:1, 62:2, 62:6, 62:7, 62:14, 62:16, 62:19, 62:20, 63:7, 64:2, 64:24, 65:1, 65:8, 65:12, 65:16, 65:18, 65:25, 66:10, 66:18, 66:21, 66:22, 66:23, 67:16, 68:3, 68:4, 69:16, 70:2, 70:3, 70:15, 71:3, 72:20, 72:22, 73:5, 73:12, 73:19, 73:22, 73:24, 74:2, 76:13, 76:19, 77:13, 77:16, 77:23, 78:1, 78:16, 78:20, 79:20, 80:2, 80:7, 80:8, 84:25, 85:2, 85:7, 107:18, 107:21, 107:23, 109:3, 109:5, 109:15, 111:3, 111:20, 111:21,

111:22, 111:24, 112:4, 112:5, 112:7, 112:9, 112:10, 112:19, 113:7, 113:17, 113:19, 113:22, 113:25, 114:21, 114:22, 116:11, 117:2, 117:9, 117:15, 127:6, 128:12, 128:16, 128:17, 128:18, 128:20, 136:1, 139:9

**Evidence** [8] - 60:4, 60:7, 61:17, 65:5, 68:13, 68:14, 70:4, 110:2

**evil** [1] - 109:18

**ex** [2] - 34:8, 34:22

**ex-wife** [2] - 34:8, 34:22

**exact** [3] - 28:17, 67:13, 67:21

**exactly** [3] - 6:19, 56:7, 114:9

**Examination** [1] - 118:13

**EXAMINATION** [2] - 129:3, 136:3

**examine** [2] - 72:3, 136:2

**example** [8] - 11:6, 51:8, 61:22, 78:20, 110:8, 137:16, 138:2, 138:18

**examples** [1] - 11:1

**exceeding** [1] - 120:18

**except** [2] - 76:21, 115:3

**exceptions** [3] - 68:16, 142:20, 143:12

**excerpts** [1] - 56:14

**excessive** [1] - 40:19

**exchange** [1] - 53:24

**excise** [1] - 122:3

**excluded** [1] - 143:13

**exclusive** [1] - 113:21

**Exculpatory** [1] - 72:5

**excusable** [1] - 31:10

**excuse** [2] - 5:25, 101:9

**excused** [3] - 116:20, 144:8, 144:9

**executed** [1] - 130:2

**executing** [2] - 98:24, 105:13

**exempted** [1] - 90:23

**exhausted** [1] - 3:12

**exhibit** [9] - 60:14, 60:15, 60:20, 60:21, 60:23, 118:8, 138:22, 139:20, 142:19

**Exhibit** [5] - 2:9, 134:6, 135:22, 135:25, 142:18

**exhibits** [9] - 47:25, 55:17, 59:9, 60:16, 116:23, 117:2, 117:8, 117:14, 117:17

**Exhibits** [1] - 117:9

**exist** [1] - 102:15

**existed** [3] - 76:15, 76:23, 102:12

**existence** [15] - 62:4, 75:19, 75:24, 76:16, 77:2, 77:5, 79:25, 80:4, 87:16, 87:21, 88:4, 91:7, 93:8, 95:14, 109:21

**exists** [1] - 62:8

**exit** [1] - 141:15

**exotic** [1] - 8:11

**expected** [1] - 101:16

**expensive** [4] - 138:8, 138:13, 138:14, 140:19

**experience** [11] - 13:8, 53:4, 59:24, 60:1, 62:5, 62:15, 63:12, 64:10, 66:16, 69:11, 69:23

**experienced** [2] - 17:4, 18:6

**expert** [11] - 15:14, 17:10, 24:9, 25:24, 68:13, 68:18, 68:21, 68:24, 69:2, 69:5, 69:10

**experts** [7] - 4:16, 4:17, 5:14, 68:18, 69:14

**explain** [4] - 11:16, 57:12, 75:7, 112:21

**explained** [7] - 67:12, 79:4, 84:6, 92:15, 107:11, 120:2, 128:19

**explaining** [1] - 112:18

**explanation** [2] - 72:16, 73:3

**explanations** [1] - 63:6

**Export** [26] - 1:15, 7:14, 8:22, 67:9, 86:17, 88:1, 88:7,

88:22, 89:1, 89:3, 89:12, 91:8, 93:9, 93:11, 93:22, 95:15, 95:25, 97:10, 97:11, 97:24, 98:8, 107:1, 107:6, 124:23, 125:9, 128:1

**export** [55] - 4:17, 5:15, 5:18, 7:17, 48:18, 48:25, 68:22, 86:13, 86:19, 87:1, 87:4, 89:4, 89:14, 89:22, 90:1, 90:2, 90:5, 90:9, 90:10, 90:14, 90:16, 90:21, 90:23, 91:1, 91:15, 91:21, 91:22, 91:24, 92:4, 92:5, 92:7, 92:8, 92:14, 92:15, 92:19, 92:23, 92:24, 93:16, 93:17, 95:6, 95:7, 95:20, 95:21, 95:25, 96:8, 96:18, 97:5, 97:6, 97:11, 97:19, 98:4, 120:6

**export-controlled** [3] - 91:22, 92:19, 92:23

**exportation** [8] - 96:11, 96:12, 96:15, 96:16, 97:22, 97:23, 98:1, 98:2

**exported** [24] - 4:7, 4:24, 89:15, 89:22, 89:23, 89:25, 90:1, 90:6, 90:9, 90:10, 90:14, 90:15, 90:22, 91:15, 91:16, 92:4, 92:7, 92:14, 92:21, 94:3, 94:4, 94:8, 96:7, 97:18

**exporting** [10] - 8:4, 89:4, 90:5, 90:20, 91:20, 92:11, 92:18, 93:2, 93:16, 94:7

**Exporting** [5] - 95:24, 97:9, 124:24, 125:5, 125:10

**express** [1] - 75:25

**expression** [1] - 101:1

**expressly** [1] - 143:13

**extensive** [1] - 140:21

**extent** [2] - 43:18, 140:20

**extort** [1] - 34:12

**extreme** [5] - 35:12, 35:16, 81:25, 82:3, 82:5

**eye** [1] - 18:5

**eyes** [3] - 3:24, 18:4, 21:20

**F**

**F-1** [5] - 2:9, 134:6, 135:22, 138:23, 142:18

**fabricate** [1] - 72:16

**face** [2] - 16:19, 20:20

**faced** [3] - 21:19, 21:20

**facilitate** [4] - 85:10, 85:22, 85:25, 86:2

**facilitating** [1] - 84:16

**facility** [1] - 104:6

**facing** [1] - 20:11

**fact** [23] - 3:15, 27:10, 29:16, 59:10, 60:10, 61:22, 62:2, 62:4, 62:8, 62:9, 64:24, 67:17, 70:10, 70:20, 72:19, 73:8, 101:15, 101:16, 101:20, 104:7, 112:12, 113:24, 120:11

**factions** [2] - 24:2, 53:20

**factors** [4] - 63:13, 64:3, 69:19, 70:15

**factory** [14] - 6:7, 6:8, 7:21, 7:23, 22:4, 22:9, 24:5, 24:15, 24:16, 24:17, 26:12, 28:3, 55:21

**facts** [25] - 25:5, 52:14, 57:5, 57:7, 57:12, 59:6, 59:19, 61:9, 62:3, 62:4, 62:10, 62:23, 65:10, 70:2, 76:19, 78:17, 83:4, 85:1, 101:1, 101:23, 107:20, 108:12, 108:24, 109:5, 120:20

**factual** [1] - 61:10

**failed** [4] - 101:12, 107:19, 109:4, 113:10

**fails** [1] - 107:24

**failure** [3] - 64:9, 101:8, 101:14

**fair** [4] - 10:2, 39:10, 66:15, 136:12

**fairly** [2] - 58:20, 139:16

**falling** [1] - 4:12

**false** [27] - 71:18, 72:5, 72:10, 72:11, 72:25, 98:17, 98:20, 98:22, 99:6, 99:20, 99:24, 100:4, 100:7, 100:19, 101:2,

101:4, 101:14, 101:20, 104:3, 104:19, 104:20, 105:7, 105:10, 105:11, 105:22, 120:7
**falsely** [2] - 71:19, 100:24
**familiar** [2] - 22:11, 133:8
**families** [2] - 24:3, 69:7
**family** [5] - 22:12, 45:4, 49:19, 52:1, 54:12
**far** [5] - 4:21, 9:14, 10:18, 74:7, 122:7
**Fargo** [8] - 6:24, 8:5, 8:16, 129:25, 131:2, 131:5, 142:8, 142:9
**Faruk** [10] - 12:16, 26:10, 37:6, 37:7, 37:8, 40:7, 47:7, 49:25, 50:2, 50:15
**Faruk's** [2] - 50:6, 55:3
**Faruks** [5] - 22:13, 23:23, 26:11, 26:21, 27:17
**fate** [1] - 47:9
**father** [1] - 5:23
**father-in-law's** [1] - 5:23
**fault** [2] - 32:7, 50:19
**favor** [1] - 112:3
**favorable** [1] - 111:24
**FAX** [1] - 103:19
**FBI** [2] - 73:6, 140:5
**fear** [6] - 28:2, 28:3, 49:10, 58:21, 73:1
**feared** [2] - 4:11, 55:3
**fearful** [1] - 27:24
**fears** [3] - 27:22, 28:6, 28:12
**feasibility** [2] - 6:19, 8:21
**Feasibility** [6] - 7:2, 8:14, 9:3, 99:1, 119:18, 125:21
**February** [3] - 86:10, 98:15, 105:5
**Federal** [16] - 67:7, 74:11, 74:23, 80:11, 80:12, 88:7, 88:16, 95:19, 95:20, 97:4, 97:5, 98:12, 105:2, 106:14, 129:6, 136:22
**fell** [1] - 48:24
**fellas** [2] - 30:5,

122:20
**fellow** [5] - 32:1, 39:16, 58:10, 58:15, 114:4
**fellows** [1] - 28:7
**felt** [1] - 122:3
**few** [7] - 14:3, 33:14, 34:4, 91:4, 93:5, 133:25
**field** [4] - 4:16, 68:24, 69:2, 69:13
**fields** [1] - 69:12
**Fifth** [1] - 113:22
**fifth** [1] - 14:12
**figure** [3] - 3:19, 3:23, 7:18
**file** [2] - 8:20, 143:9
**Filipino** [1] - 22:24
**final** [5] - 35:2, 43:10, 127:14, 141:2, 144:10
**finalize** [1] - 141:2
**Finally** [1] - 43:4
**finally** [5] - 12:12, 14:12, 17:19, 48:3, 133:5
**finance** [1] - 142:14
**finances** [1] - 132:6
**financial** [9] - 5:21, 6:22, 7:3, 24:11, 27:2, 103:19, 106:23, 110:8, 129:21
**finder** [1] - 108:12
**fine** [1] - 119:8
**finger** [2] - 16:23, 19:21
**fingers** [1] - 52:22
**finished** [2] - 113:23, 115:17
**Finland** [1] - 54:8
**firearm** [8] - 26:19, 133:18, 135:1, 135:4, 135:16, 140:12, 143:6
**Firearms** [1] - 8:14
**firearms** [14] - 6:10, 22:2, 23:8, 24:10, 133:10, 133:12, 133:21, 134:9, 136:18, 139:22, 140:10, 140:21, 143:5
**fired** [2] - 28:18, 28:20
**Firing** [2] - 124:25, 125:18
**firing** [10] - 5:24, 5:25, 6:4, 6:9, 6:17, 7:24, 8:3, 89:4, 97:10, 97:21

**first** [49] - 3:6, 10:22, 11:7, 11:25, 14:7, 17:3, 17:13, 36:5, 42:11, 49:15, 57:4, 75:5, 75:18, 81:12, 84:4, 86:15, 86:25, 87:3, 89:5, 89:18, 89:22, 90:8, 91:17, 91:22, 92:4, 92:13, 93:25, 94:3, 96:7, 97:18, 99:5, 99:17, 105:21, 106:19, 111:5, 112:23, 115:12, 121:18, 121:19, 122:5, 122:6, 122:19, 122:23, 123:13, 127:10, 127:13, 135:16, 144:1
**First** [3] - 125:1, 125:6, 125:11
**firsthand** [2] - 5:2, 20:2
**fish** [1] - 3:21
**five** [6] - 32:2, 32:4, 49:10, 56:2
**fix** [2] - 7:8, 11:10
**flags** [1] - 17:22
**flipping** [1] - 3:21
**floor** [2] - 6:8, 116:19
**flopping** [1] - 3:21
**fly** [1] - 55:8
**flying** [1] - 17:22
**focus** [3] - 49:1, 53:11, 87:25
**folks** [2] - 7:5, 120:1
**follow** [4] - 54:11, 57:16, 74:1, 104:13
**following** [18] - 36:4, 59:7, 59:12, 75:3, 81:10, 84:3, 86:24, 92:2, 94:2, 96:5, 97:16, 99:3, 105:19, 106:18, 111:3, 121:17, 141:10, 142:20
**FOLLOWS** [1] - 128:24
**food** [1] - 46:9
**FOR** [3] - 1:1, 1:10, 1:19
**forbids** [1] - 109:13
**force** [6] - 23:21, 23:22, 37:6, 49:7, 50:14, 94:24
**forced** [4] - 13:20, 43:5, 54:24, 111:17
**forces** [1] - 95:4
**foregoing** [3] - 145:7, 145:10, 145:22

**foreign** [21] - 23:15, 94:4, 94:5, 94:13, 95:4, 95:9, 99:14, 99:16, 103:8, 103:11, 103:13, 103:23, 103:24, 104:6, 104:11, 104:12, 104:16, 104:19, 104:24, 106:5, 106:7
**foreigner** [2] - 25:23, 26:4
**Forensics** [3] - 69:1, 69:4, 118:13
**forensics** [1] - 4:17
**Foreperson** [1] - 112:16
**FOREPERSON** [3] - 124:7, 124:9, 124:12
**foreperson** [8] - 112:24, 113:1, 115:9, 115:24, 116:4, 116:8, 124:6, 126:20
**forfeit** [1] - 142:6
**forfeitable** [2] - 140:3, 142:5
**forfeited** [1] - 134:24
**forfeiting** [2] - 142:16, 142:18
**Forfeiture** [1] - 2:5
**forfeiture** [14] - 128:8, 128:9, 128:14, 128:16, 129:16, 139:12, 140:6, 141:13, 141:22, 142:5, 143:11, 143:13, 143:18, 143:24
**forget** [2] - 3:24, 11:25
**form** [11] - 53:13, 57:1, 107:3, 115:21, 115:22, 115:24, 115:25, 116:5, 116:9, 123:1, 126:20
**Form** [1] - 115:21
**formal** [2] - 67:13, 75:25
**formally** [1] - 59:11
**former** [1] - 73:6
**forms** [5] - 35:14, 35:17, 35:19, 52:24, 82:7
**forth** [5] - 42:1, 44:22, 45:3, 100:10, 145:9
**forward** [3] - 26:22, 127:20
**Foster** [1] - 70:11
**four** [9] - 14:11, 21:14, 45:12, 81:10, 84:3,

92:2, 94:2, 132:11, 142:17
**fourth** [12] - 43:4, 81:17, 84:20, 85:18, 87:16, 91:3, 92:12, 93:3, 107:4, 111:16, 113:16, 116:19
**Fourth** [1] - 90:7
**Fox** [1] - 38:18
**frame** [1] - 140:1
**frankly** [1] - 123:3
**fraud** [11] - 9:2, 56:1, 99:23, 103:4, 105:2, 119:23, 119:24, 120:1, 120:7, 128:2
**Fraud** [7] - 67:11, 98:12, 106:11, 108:18, 109:8, 125:20, 125:24
**fraudulent** [17] - 98:17, 99:6, 99:8, 99:20, 100:4, 100:7, 100:23, 101:2, 101:9, 101:14, 101:23, 104:3, 104:19, 104:20, 105:7, 105:23, 105:24
**fraudulently** [8] - 86:18, 87:4, 95:20, 96:7, 96:21, 97:5, 97:18, 98:5
**free** [2] - 113:24, 114:17
**freely** [1] - 55:8
**FRIDAY** [1] - 1:9
**friend** [2] - 29:13, 29:14
**friends** [2] - 45:25
**front** [1] - 10:21
**frozen** [1] - 131:2
**full** [4] - 5:5, 43:19, 117:13, 121:18
**fully** [1] - 72:23
**funded** [1] - 8:18
**funds** [3] - 6:23, 8:6, 43:23
**Funds** [2] - 8:15, 126:6
**funny** [2] - 45:9, 45:13
**furnish** [3] - 89:15, 90:21, 93:17
**furnished** [8] - 89:23, 90:1, 90:9, 90:15, 94:3, 94:4, 94:8, 94:19
**Furnishing** [1] - 125:10
**furnishing** [4] - 90:6, 93:16, 94:8, 94:12

**11**

**furtherance** [3] - 84:20, 85:17, 100:16
**furthered** [1] - 104:24
**furthering** [3] - 99:11, 103:6, 106:2
**furthermore** [1] - 102:4

**G**

**gain** [6] - 9:18, 99:24, 102:5, 103:1, 110:8
**games** [1] - 52:3
**gamut** [1] - 9:18
**gang** [2] - 30:24, 38:4
**garage** [2] - 8:11, 140:4
**Gas** [2] - 124:25, 125:18
**gas** [9] - 5:25, 6:3, 6:16, 7:24, 8:3, 48:23, 89:4, 97:10, 97:21
**gather** [1] - 73:19
**gathered** [2] - 137:2, 140:3
**gauge** [1] - 142:24
**gender** [1] - 58:23
**general** [1] - 99:23
**General** [1] - 32:16
**generally** [8] - 68:25, 69:3, 70:5, 94:21, 95:2, 135:9, 135:16, 137:23
**Geneve** [1] - 132:23
**genitals** [2] - 16:18, 52:20
**gentlemen** [17] - 3:5, 21:13, 26:15, 29:3, 31:11, 34:23, 36:18, 37:12, 40:25, 43:6, 46:24, 116:14, 126:25, 139:15, 140:9, 140:25, 143:22
**Gino** [1] - 121:24
**GINO** [1] - 1:20
**girlfriend** [1] - 18:10
**given** [9] - 8:9, 56:20, 61:3, 69:15, 69:25, 70:14, 107:12, 113:18, 127:15
**GL** [1] - 142:11
**GLK** [1] - 132:5
**Glock** [1] - 7:21
**goal** [11] - 7:22, 40:16, 41:1, 75:16, 77:3, 77:6, 77:7, 78:9, 78:12, 78:15, 87:14
**God** [1] - 3:22

**gold** [1] - 132:23
**goods** [7] - 86:20, 88:8, 95:18, 96:19, 106:25, 107:5, 120:6
**Goods** [6] - 67:10, 88:22, 97:3, 108:17, 125:14, 125:17
**goon** [1] - 47:7
**goons** [8] - 12:16, 19:18, 26:9, 26:10, 37:8, 40:7, 49:25, 50:15
**Goran** [9] - 12:23, 15:2, 15:4, 15:6, 16:23, 18:11, 30:23, 52:6, 55:6
**GOVERNMENT** [1] - 1:10
**Government** [122] - 2:3, 2:8, 3:6, 4:10, 5:8, 14:7, 21:23, 23:22, 29:11, 30:5, 30:18, 32:7, 35:2, 35:22, 35:23, 35:25, 36:3, 42:2, 53:14, 62:10, 65:6, 65:7, 65:18, 65:22, 66:2, 66:4, 66:6, 66:7, 66:24, 67:21, 67:23, 68:8, 69:8, 72:9, 73:4, 75:2, 75:19, 75:24, 76:1, 76:6, 76:8, 76:14, 76:25, 77:3, 77:8, 77:11, 78:2, 78:5, 78:8, 78:25, 79:3, 79:5, 81:10, 82:18, 82:21, 82:23, 83:2, 83:22, 84:2, 84:10, 85:13, 85:19, 86:23, 88:10, 88:12, 89:21, 90:8, 90:13, 90:19, 91:3, 91:6, 92:2, 92:13, 92:17, 92:25, 93:3, 93:7, 94:1, 95:13, 96:5, 96:24, 97:16, 98:7, 99:3, 99:17, 100:9, 100:12, 100:14, 101:9, 101:24, 102:1, 102:4, 102:7, 102:13, 102:19, 103:4, 103:21, 104:4, 104:9, 104:22, 105:19, 106:17, 108:19, 108:22, 109:10, 109:11, 110:18, 110:22, 112:3, 112:13, 113:6,

113:10, 113:12, 114:13, 116:2, 116:6, 119:1, 128:8, 128:20, 136:22, 144:13, 144:23
**Government's** [12] - 29:20, 47:24, 117:9, 123:9, 134:6, 135:22, 135:25, 138:23, 139:20, 142:18, 142:19
**Government;s** [1] - 44:7
**governmental** [1] - 83:7
**grab** [2] - 12:23, 13:1
**gratitude** [1] - 48:2
**greater** [3] - 70:22, 113:2, 114:20
**Greece** [8] - 28:21, 28:24, 29:1, 29:10, 29:15, 29:17, 30:13, 42:14
**greed** [4] - 4:5, 19:4, 21:24
**Greek** [1] - 22:24
**Green** [1] - 68:24
**greetings** [3] - 45:3, 53:25
**grief** [1] - 55:18
**groin** [1] - 16:23
**ground** [2] - 16:25, 70:25
**grounded** [1] - 111:8
**Group** [1] - 11:16
**group** [1] - 49:20
**guard** [1] - 26:12
**guards** [2] - 26:21, 37:6
**guess** [7] - 44:1, 45:8, 45:9, 50:17, 60:22, 60:23, 62:7
**guessing** [1] - 11:5
**guide** [3] - 57:13, 74:1, 88:23
**guilt** [5] - 36:3, 65:23, 66:10, 68:3, 72:9
**Guilt** [1] - 72:5
**guilty** [69] - 9:9, 9:17, 9:22, 13:15, 14:6, 16:9, 19:24, 20:25, 25:9, 35:22, 35:25, 37:15, 37:17, 47:12, 56:17, 65:6, 65:14, 65:19, 65:22, 66:1, 66:3, 66:5, 66:6, 67:1, 67:3, 68:9, 68:10, 72:14, 72:19, 72:21, 75:1, 76:24, 78:4, 79:3, 81:9,

82:25, 83:15, 83:25, 84:9, 85:5, 85:12, 86:22, 88:14, 89:20, 92:1, 93:25, 96:4, 97:1, 97:15, 98:9, 99:2, 105:18, 106:16, 110:1, 110:2, 110:25, 111:1, 112:2, 113:4, 113:5, 113:9, 113:13, 114:13, 116:3, 116:7, 121:16, 127:24
**Guilty** [34] - 124:17, 124:19, 124:22, 125:3, 125:8, 125:13, 125:16, 125:19, 125:23, 126:2, 126:9, 126:10, 126:11, 126:12, 126:13, 126:14, 126:15, 126:16, 126:17, 126:18, 126:19
**gun** [7] - 8:11, 33:22, 137:18, 142:21, 142:24, 143:2
**guns** [4] - 38:22, 38:23, 38:24, 50:10
**gutsy** [1] - 22:5
**guy** [6] - 18:24, 30:7, 38:2, 45:11, 46:13
**guys** [3] - 29:6, 29:7, 50:2

**H**

**H42V39543** [1] - 133:2
**half** [7] - 3:25, 4:1, 9:11, 25:24, 30:2, 100:25, 101:23
**half-truths** [2] - 100:25, 101:23
**half-whit** [1] - 30:2
**hand** [8] - 13:12, 13:13, 31:22, 33:20, 49:4, 50:19, 56:25, 124:13
**hand-deliver** [1] - 31:22
**hands** [4] - 15:9, 15:12, 16:16, 17:3
**happy** [3] - 45:22, 45:23, 46:20
**hard** [7] - 13:7, 13:8, 21:19, 24:23, 24:24, 27:4, 117:11
**harder** [1] - 33:11
**hardly** [1] - 10:20
**harm** [8] - 42:19,

42:21, 42:23, 52:24, 55:8, 111:11, 111:12, 111:15
**Harvey's** [1] - 46:6
**HAVING** [1] - 128:23
**head** [10] - 3:14, 3:20, 3:22, 11:17, 15:21, 16:20, 19:20, 26:13, 49:23, 53:20
**headquarters** [2] - 130:6, 131:17
**heads** [1] - 18:14
**hear** [15] - 23:1, 25:9, 35:8, 36:2, 36:7, 38:6, 38:8, 43:15, 48:17, 52:5, 63:15, 64:8, 74:6, 114:15, 139:11
**heard** [75] - 4:13, 4:14, 4:18, 4:20, 4:21, 4:23, 5:1, 5:4, 10:7, 11:24, 12:4, 12:8, 12:12, 14:22, 15:14, 15:20, 15:22, 16:11, 16:14, 17:9, 18:11, 19:9, 19:10, 21:16, 25:3, 25:4, 25:24, 27:17, 27:22, 29:10, 29:11, 29:18, 29:20, 33:18, 35:5, 38:1, 38:25, 39:6, 39:9, 39:13, 43:17, 44:15, 47:10, 47:16, 47:17, 48:8, 48:21, 49:5, 49:6, 49:18, 49:25, 50:21, 51:10, 52:17, 57:2, 57:5, 58:16, 59:2, 59:4, 59:21, 61:25, 66:23, 68:17, 70:19, 71:7, 71:8, 72:6, 73:16, 73:21, 74:3, 74:5, 128:17, 129:13, 140:20, 143:24
**hearing** [1] - 127:6
**heart** [1] - 121:20
**Heart** [1] - 32:14
**hearts** [1] - 20:4
**heavier** [1] - 112:5
**held** [5] - 15:17, 17:14, 17:15, 17:18, 17:20
**help** [12] - 31:13, 36:13, 41:19, 51:5, 56:3, 71:14, 74:1, 77:24, 78:7, 78:11, 88:23, 110:3
**helped** [1] - 47:2
**helpful** [2] - 47:1, 70:8
**helping** [3] - 19:18, 51:18, 51:22

**12**

**hereby** [1] - 145:6
**hereinbefore** [1] - 145:9
**Heret** [17] - 12:8, 12:9, 14:23, 15:2, 29:11, 29:13, 44:25, 45:14, 45:15, 45:19, 45:21, 45:24, 46:19, 51:6, 54:3, 54:10
**hero** [14] - 11:15, 18:25, 19:18, 20:3, 21:5, 21:8, 25:14, 47:5, 48:11, 48:12, 48:13
**heroes** [2] - 20:24, 20:25
**hesitate** [2] - 66:19, 114:4
**hid** [1] - 49:9
**hide** [1] - 21:21
**high** [2] - 49:22, 137:11
**high-end** [1] - 137:11
**high-ranking** [1] - 49:22
**highlighted** [3] - 134:9, 134:13, 134:25
**highly** [1] - 49:21
**highly-decorated** [1] - 49:21
**Hill** [1] - 131:17
**himself** [28] - 4:4, 6:14, 11:14, 15:11, 16:24, 19:4, 22:20, 27:13, 34:6, 34:20, 42:13, 43:5, 44:1, 50:24, 54:19, 54:23, 54:25, 55:1, 55:10, 72:13, 73:13, 82:21, 83:16, 85:11, 102:2, 103:2, 111:6, 111:16
**Hinkley** [4] - 43:12, 47:17, 48:15, 143:11
**HINKLEY** [48] - 1:11, 3:3, 3:9, 18:2, 18:22, 20:1, 116:23, 117:1, 117:7, 117:19, 117:21, 117:23, 118:13, 119:2, 119:6, 119:23, 120:12, 121:3, 121:10, 121:20, 122:9, 122:13, 122:15, 123:5, 123:9, 123:18, 123:22, 124:1, 126:24, 128:22, 129:4, 134:3, 134:5, 135:21, 138:21,

138:25, 139:4, 139:6, 139:14, 141:12, 141:16, 141:23, 142:1, 142:3, 143:20, 144:17, 144:20, 144:22
**Hinkley's** [1] - 48:12
**hit** [1] - 3:20
**hitting** [1] - 3:15
**hocus** [1] - 56:16
**hoisted** [1] - 52:23
**holographic** [1] - 138:11
**home** [9] - 3:12, 3:18, 8:10, 33:13, 33:16, 33:17, 33:25, 34:20, 140:4
**Homeland** [1] - 73:7
**honest** [1] - 9:13
**honestly** [2] - 101:1, 114:11
**Honor** [26] - 3:3, 3:9, 47:16, 121:3, 121:7, 122:16, 123:18, 126:23, 126:24, 128:22, 134:1, 134:3, 135:21, 138:21, 139:1, 139:6, 139:10, 141:12, 141:23, 142:1, 142:3, 143:14, 143:16, 143:20, 144:16, 144:17
**HONORABLE** [1] - 1:8
**honorable** [1] - 32:16
**hope** [3] - 9:19, 29:16, 33:4
**hopes** [2] - 9:23, 23:19
**hoping** [2] - 9:18, 9:19
**horrible** [1] - 34:24
**hoses** [1] - 52:21
**hospital** [5] - 33:13, 44:11, 44:12, 44:13, 44:17
**hour** [1] - 11:15
**hours** [3] - 7:8, 17:3, 53:6
**house** [2] - 131:16, 132:13
**human** [2] - 64:10, 110:9
**hunch** [1] - 66:14
**Hunter** [1] - 38:20
**hurt** [1] - 13:3
**husband** [1] - 44:25

**I**

**i8** [2] - 131:23, 142:10
**idea** [3] - 11:7, 11:11, 54:14
**identified** [4] - 136:18, 140:11, 140:15, 143:12
**Identified** [1] - 2:8
**identifies** [1] - 138:4
**identify** [3] - 135:10, 137:6, 138:15
**ignore** [1] - 74:7
**illegal** [12] - 6:20, 7:17, 9:1, 39:3, 39:4, 129:18, 130:17, 134:12, 135:14, 139:19, 139:22
**Illegally** [1] - 88:1
**illegally** [3] - 4:24, 8:4, 120:6
**imagine** [8] - 34:1, 38:9, 38:11, 38:15, 38:19, 46:5, 122:4
**immaterial** [1] - 101:7
**immediate** [3] - 42:12, 55:7, 111:5
**immediately** [1] - 55:22
**impartial** [1] - 39:10
**impartially** [1] - 58:20
**impeached** [1] - 64:17
**impeachment** [1] - 71:6
**import** [2] - 6:16, 6:17
**importance** [3] - 64:12, 64:23, 66:20
**important** [17] - 12:25, 22:25, 37:10, 54:21, 57:14, 58:12, 58:18, 61:10, 63:8, 65:2, 68:15, 70:6, 71:19, 101:21, 114:10, 140:15
**imposed** [1] - 81:5
**impression** [1] - 114:25
**improbability** [1] - 64:19
**IN** [1] - 1:1
**incident** [1] - 18:22
**incidental** [5] - 14:10, 17:9, 74:21, 80:21, 81:2
**inclined** [4] - 55:17, 55:18, 119:7, 122:7
**include** [4] - 81:5, 81:7, 95:8, 133:21
**included** [1] - 73:5
**includes** [2] - 79:17,

103:17
**including** [14] - 17:23, 21:17, 56:12, 59:18, 69:8, 73:12, 78:17, 81:6, 84:25, 88:7, 94:13, 117:9, 140:3, 142:6
**income** [1] - 140:1
**inconsistencies** [1] - 64:5
**inconsistency** [2] - 64:11, 64:14
**Inconsistent** [1] - 71:6
**inconsistent** [1] - 64:2
**independent** [2] - 114:20, 114:22
**Indian** [3] - 130:3, 130:16, 142:7
**indicated** [4] - 11:7, 11:8, 42:24, 136:8
**indicating** [2] - 57:8, 113:19
**indicating)** [1] - 10:8
**indicted** [1] - 67:17
**Indictment** [1] - 67:5
**indictment** [45] - 59:13, 67:6, 67:12, 67:14, 67:16, 67:19, 74:10, 75:6, 80:10, 83:1, 83:24, 86:6, 88:6, 88:25, 91:10, 95:17, 96:9, 97:2, 97:20, 98:11, 98:15, 100:6, 100:11, 100:13, 102:15, 102:17, 105:1, 105:5, 106:13, 106:20, 107:9, 107:10, 108:19, 109:9, 110:17, 119:3, 119:16, 121:4, 121:8, 121:23, 128:5, 128:7, 142:4, 142:12, 142:17
**indirect** [1] - 61:19
**indirectly** [2] - 62:2, 107:15
**individual** [2] - 21:25, 82:21
**individuals** [3] - 40:17, 69:12, 86:13
**indulge** [1] - 141:4
**Industry** [1] - 91:23
**infer** [2] - 62:3, 72:15
**inference** [2] - 62:4, 62:11
**inferences** [3] - 62:9, 62:13, 76:17
**infidel** [1] - 30:7

**inflict** [12] - 12:21, 14:9, 16:10, 17:6, 36:6, 36:7, 41:15, 74:19, 80:19, 81:1, 81:13, 81:19
**inflicted** [1] - 14:10
**inflicting** [1] - 36:12
**infliction** [2] - 36:10, 81:22
**influence** [4] - 58:21, 59:4, 68:3, 68:10
**influenced** [6] - 58:18, 58:22, 60:10, 60:11, 61:7, 114:23
**information** [13] - 58:1, 58:5, 69:18, 98:20, 101:8, 104:17, 105:10, 115:2, 115:7, 120:7, 133:19, 137:2
**ing** [1] - 90:21
**inherent** [1] - 64:19
**inhumane** [4] - 35:14, 35:18, 35:19, 82:7
**initial** [1] - 50:13
**injury** [2] - 42:12, 111:6
**Innocence** [1] - 65:13
**innocence** [7] - 65:17, 65:21, 65:24, 72:9, 72:17, 72:24, 113:6
**innocent** [5] - 35:24, 64:14, 65:15, 72:15, 73:2
**insignificant** [1] - 64:13
**inspired** [1] - 52:6
**instance** [2] - 42:3, 137:16
**instances** [1] - 108:13
**instant** [2] - 58:4, 115:6
**instruct** [14] - 14:4, 14:14, 40:13, 43:8, 52:13, 54:16, 57:3, 91:4, 93:5, 95:11, 96:22, 98:5, 108:14, 128:13
**instructed** [8] - 35:11, 60:16, 73:25, 93:21, 95:7, 96:18, 98:4, 108:13
**instructions** [28] - 56:19, 56:23, 57:14, 60:3, 62:22, 69:20, 80:23, 83:5, 84:7, 87:20, 88:21, 106:9, 112:11, 112:18, 113:23, 116:14, 119:9, 120:23,

**13**

121:3, 126:21, 127:1, 127:12, 127:14, 127:16, 127:19, 128:19, 141:2
**instructs** [4] - 40:23, 41:20, 42:8, 47:11
**insurance** [3] - 27:5, 27:9, 28:13
**Intelligence** [2] - 11:17, 49:23
**intend** [2] - 108:10, 134:14
**intended** [13] - 17:6, 74:19, 77:15, 81:1, 82:8, 98:16, 102:6, 103:23, 105:6, 107:4, 108:3, 108:5, 109:12
**intending** [6] - 75:13, 77:5, 78:6, 78:11, 80:19, 87:10
**intense** [1] - 28:6
**intensity** [2] - 82:1, 82:3
**Intent** [1] - 110:5
**intent** [31] - 14:8, 16:10, 36:6, 36:7, 36:8, 36:9, 36:11, 36:13, 40:15, 41:12, 41:14, 75:16, 78:19, 78:23, 81:13, 81:19, 81:20, 81:21, 84:18, 84:23, 85:10, 87:13, 96:21, 99:10, 101:13, 102:21, 102:24, 106:1, 110:4, 110:6
**intention** [3] - 22:22, 100:24, 102:22
**intentional** [1] - 64:14
**intentionally** [5] - 40:24, 75:21, 77:1, 110:10, 110:11
**inter** [1] - 27:18
**inter-Klan** [1] - 27:18
**interaction** [1] - 11:20
**interest** [4] - 63:20, 71:2, 128:10, 142:15
**interested** [1] - 34:9
**interesting** [1] - 35:18
**interests** [2] - 4:4, 19:4
**international** [1] - 6:23
**International** [21] - 6:25, 8:15, 8:23, 8:24, 67:9, 89:12, 91:8, 91:11, 91:19, 93:8, 94:11, 95:15,

96:1, 96:13, 96:25, 97:12, 98:9, 108:16, 109:7, 125:4, 128:1
**internet** [2] - 58:3, 115:6
**interpretation** [1] - 61:12
**interrogated** [1] - 15:1
**interrogation** [2] - 37:3, 53:6
**interstate** [15] - 99:13, 99:16, 103:8, 103:11, 103:13, 103:22, 103:24, 104:6, 104:10, 104:12, 104:15, 104:18, 104:24, 106:5, 106:7
**intervened** [1] - 12:17
**intimidate** [1] - 12:10
**intimidating** [1] - 33:9
**introduced** [1] - 138:22
**invade** [1] - 120:10
**invent** [1] - 72:16
**investigate** [1] - 58:11
**investigation** [14] - 129:8, 129:17, 129:18, 129:22, 130:14, 131:1, 131:12, 131:19, 132:9, 133:11, 133:13, 133:22, 134:16, 135:5
**Investigation** [3] - 68:25, 69:3, 129:7
**investigatory** [1] - 39:11
**Investigatory** [1] - 39:9
**invites** [1] - 28:25
**invoice** [2] - 6:1, 50:23
**invoices** [1] - 5:24
**involve** [1] - 119:21
**involved** [10] - 16:14, 34:13, 37:3, 37:7, 50:3, 73:1, 77:10, 85:3, 107:2, 129:8
**involvement** [1] - 39:15
**involves** [1] - 91:20
**involving** [2] - 68:25, 69:3
**iPhone** [1] - 12:3
**Iran** [2] - 24:1, 49:7
**Iranians** [1] - 27:15
**Iraq** [63] - 4:8, 4:18, 4:19, 4:22, 4:25, 6:2, 6:7, 6:14, 6:16, 6:23, 7:17, 8:1, 8:4, 8:6,

8:16, 11:7, 15:15, 15:16, 15:22, 16:1, 17:21, 17:25, 21:9, 21:11, 22:4, 22:11, 22:12, 23:9, 24:8, 25:11, 30:8, 34:8, 37:24, 38:11, 38:21, 39:3, 39:4, 39:5, 39:12, 40:1, 42:14, 44:13, 46:2, 53:10, 55:8, 55:23, 69:6, 69:7, 74:15, 80:18, 86:15, 87:2, 89:5, 89:24, 90:10, 91:16, 92:6, 92:14, 93:17, 125:10, 130:18, 130:25
**Iraqi** [7] - 4:18, 17:10, 17:11, 38:25, 39:1, 69:10
**irregular** [1] - 95:4
**irrespective** [1] - 80:13
**IS** [1] - 128:23
**ISIS** [7] - 24:1, 27:15, 49:7, 49:8, 49:11, 49:12, 50:5
**Islam** [1] - 39:7
**isolated** [1] - 15:7
**issue** [10] - 70:10, 90:10, 92:14, 92:23, 107:11, 117:4, 127:4, 127:5, 127:6, 139:13
**issued** [1] - 131:1
**issues** [1] - 61:16
**ITAR** [2] - 89:13
**Item** [6] - 134:16, 134:18, 134:19, 137:17, 138:2, 143:1
**item** [20] - 24:10, 90:6, 90:14, 90:17, 90:22, 91:22, 92:5, 92:7, 92:11, 92:18, 92:19, 92:21, 92:23, 93:3, 134:19, 137:24, 138:2, 144:10
**Items** [1] - 88:2
**items** [42] - 4:23, 5:13, 5:14, 5:20, 5:22, 6:2, 8:7, 8:17, 49:9, 68:22, 89:23, 89:25, 90:11, 92:16, 93:2, 96:19, 98:18, 98:21, 105:8, 105:11, 119:25, 120:4, 130:9, 130:10, 130:11, 134:13, 134:23, 134:24, 135:13, 135:16,

137:5, 139:18, 139:21, 139:23, 140:7, 140:10, 141:22, 142:6, 143:11, 143:19, 143:24
**itself** [3] - 22:3, 52:7, 104:19
**Ivanka** [1] - 38:19

## J

**jail** [1] - 29:24
**jailed** [1] - 17:12
**January** [1] - 86:9
**Jasperse** [1] - 55:16
**JASPERSE** [5] - 1:17, 117:24, 118:2, 118:6, 118:10
**jeopardy** [1] - 29:19
**job** [4] - 25:10, 45:6, 52:13, 57:6
**join** [3] - 40:24, 75:13, 87:10
**joined** [9] - 75:11, 77:1, 77:5, 77:14, 77:25, 78:3, 78:6, 78:11, 87:8
**joint** [1] - 82:23
**jointly** [1] - 82:18
**journey** [1] - 20:18
**JR** [1] - 1:20
**Judge** [20] - 4:18, 14:4, 14:14, 16:5, 17:10, 25:6, 35:9, 36:22, 39:15, 39:18, 40:13, 40:23, 41:20, 42:8, 47:11, 52:12, 54:16, 119:17, 121:2, 123:12
**judge** [1] - 116:23
**Judges** [1] - 39:9
**judges** [3] - 39:10, 39:11, 62:25
**judgment** [2] - 63:12, 64:21
**Judicial** [2] - 39:14, 58:17
**judicial** [1] - 39:19
**Judicially** [1] - 81:5
**Judicially-imposed** [1] - 81:5
**Judy** [1] - 117:5
**July** [1] - 144:13
**jumped** [1] - 52:19
**juror** [4] - 113:2, 114:25, 116:17, 124:11
**jurors** [10] - 10:6, 25:16, 58:10, 58:16,

114:4, 114:5, 114:7, 114:12, 114:24, 115:19
**JURY** [3] - 124:7, 124:9, 124:12
**jury** [50] - 21:5, 25:1, 56:22, 56:25, 57:2, 57:4, 57:21, 58:10, 112:22, 112:23, 112:25, 113:21, 113:24, 114:15, 115:23, 116:15, 116:18, 116:19, 116:20, 117:13, 118:21, 118:22, 119:15, 120:2, 120:10, 120:15, 122:11, 122:21, 122:22, 124:4, 124:5, 124:8, 124:17, 124:18, 124:21, 125:2, 125:7, 125:12, 125:15, 125:19, 125:22, 126:1, 126:9, 140:6, 141:1, 141:7, 141:11, 143:18, 143:25, 144:9
**Jury** [1] - 1:8
**justice** [2] - 25:12, 38:10

## K

**Katherine** [1] - 70:11
**keep** [5] - 26:3, 48:2, 54:1, 73:23, 114:3
**kept** [4] - 34:3, 47:24, 77:17
**kicked** [2] - 10:18, 51:17
**kidnap** [1] - 15:2
**kids** [1] - 40:3
**kill** [2] - 20:23, 54:8
**killed** [4] - 28:1, 28:7, 29:25
**kind** [8] - 26:6, 38:13, 45:19, 74:25, 99:15, 103:10, 106:6, 120:24
**Kiviking** [5] - 11:24, 12:2, 14:22, 20:15, 73:18
**Kiviking's** [1] - 19:9
**Klan** [6] - 22:14, 27:16, 27:18, 38:15
**Klans** [2] - 24:3, 27:19
**knocking** [1] - 29:6
**knowing** [9] - 9:22,

**14**

46:12, 50:21, 75:12, 78:6, 85:4, 87:9, 95:25, 97:11

**knowingly** [30] - 40:24, 41:11, 71:19, 74:17, 75:20, 77:1, 84:15, 86:12, 86:18, 87:4, 91:15, 91:20, 92:12, 93:4, 93:6, 95:20, 96:7, 96:23, 97:5, 97:18, 98:6, 99:5, 99:18, 102:16, 102:22, 105:21, 108:2, 108:6, 108:20, 109:2

**knowledge** [12] - 5:2, 15:18, 63:16, 65:9, 69:11, 69:23, 73:17, 78:19, 80:7, 84:22, 99:8, 105:24

**known** [8] - 13:1, 22:2, 41:3, 74:15, 76:8, 83:21, 89:3, 89:13

**knows** [5] - 24:4, 31:21, 46:20, 46:21, 61:23

**KRISTIN** [4] - 1:24, 145:3, 145:13, 145:16

**Kristy** [1] - 130:23

**Kurdish** [28] - 4:18, 5:5, 12:1, 12:21, 13:13, 14:25, 15:13, 15:14, 16:7, 16:8, 17:22, 17:24, 17:25, 19:16, 19:17, 24:18, 25:17, 25:18, 26:5, 26:6, 37:2, 37:4, 38:23, 40:8, 53:13, 55:20

**Kurdistan** [26] - 6:7, 6:10, 6:25, 7:20, 11:16, 11:17, 15:22, 17:21, 17:25, 22:4, 22:12, 24:9, 25:12, 30:8, 37:25, 38:3, 38:10, 39:13, 40:2, 69:5, 69:7, 74:15, 80:18, 130:18, 132:7, 140:2

**Kurdistan's** [1] - 69:6

**Kurds** [9] - 6:22, 7:22, 7:25, 8:6, 8:9, 8:15, 8:18, 13:1, 54:7

**Kurds'** [1] - 8:8

**L**

**lack** [3] - 16:21, 66:21, 114:22

**ladies** [17] - 3:5, 21:13, 26:15, 29:3, 31:11, 34:23, 36:18, 37:12, 40:25, 43:6, 46:24, 116:14, 126:25, 139:14, 140:9, 140:25, 143:22

**Lahur** [19] - 5:3, 11:9, 11:12, 11:14, 13:24, 18:17, 18:24, 19:1, 49:22, 50:14, 50:24, 50:25, 51:20, 53:19, 53:21, 53:22, 56:1

**laid** [3] - 13:6, 54:15, 127:13

**Lake** [4] - 46:3, 46:4, 46:5, 46:6

**lakes** [1] - 46:7

**land** [1] - 23:15

**language** [6] - 119:3, 119:7, 121:4, 121:11, 121:21, 121:22

**lap** [1] - 32:13

**laptop** [1] - 43:23

**large** [1] - 39:6

**last** [17] - 3:12, 14:3, 20:9, 21:13, 32:3, 47:20, 47:22, 48:1, 48:8, 48:21, 54:22, 55:14, 74:15, 118:7, 121:18, 129:9, 132:4

**lastly** [1] - 116:10

**lasts** [1] - 79:13

**laundered** [2] - 9:1, 55:24

**Laundering** [4] - 67:11, 106:14, 106:17, 126:5

**laundering** [1] - 128:2

**Law** [3] - 7:14, 74:11, 80:11

**law** [81] - 4:3, 4:17, 4:19, 4:20, 14:8, 14:14, 14:15, 17:10, 19:3, 25:6, 35:1, 35:8, 35:10, 36:22, 37:10, 37:11, 37:13, 37:16, 37:18, 37:19, 37:20, 37:21, 37:23, 37:24, 38:13, 39:5, 39:6, 39:24, 40:1, 40:6, 40:12, 44:5, 47:11, 52:13, 53:8, 53:10, 57:4, 57:11, 57:16, 57:17, 62:17, 67:7, 69:10, 70:18, 70:19, 70:20, 70:25, 71:4, 72:7, 72:12,

73:1, 74:19, 80:25, 81:6, 81:8, 81:14, 82:11, 82:19, 82:20, 86:5, 86:19, 87:5, 95:19, 95:22, 96:17, 97:4, 97:7, 98:3, 98:12, 105:2, 109:13, 109:16, 109:19, 112:18, 113:17, 128:13

**law's** [1] - 5:23

**lawful** [14] - 14:11, 14:16, 17:9, 36:23, 42:20, 42:22, 73:20, 74:21, 80:21, 81:2, 81:5, 82:12, 111:12, 111:14

**lawfully** [1] - 92:21

**laws** [3] - 9:8, 39:8, 41:10

**lawyer** [2] - 38:25, 48:1

**lawyers** [7] - 57:3, 59:14, 59:16, 59:18, 59:19, 61:9, 115:12

**lay** [1] - 70:4

**lead** [2] - 56:16, 62:6

**leader** [1] - 11:16

**leadership's** [1] - 15:18

**leads** [2] - 39:20, 60:2

**learned** [1] - 21:10

**learning** [1] - 18:12

**least** [14] - 9:23, 29:24, 37:2, 43:12, 55:9, 75:13, 75:15, 78:13, 85:20, 87:10, 87:12, 87:17, 88:13, 100:18

**leave** [4] - 17:15, 43:7, 46:16, 144:3

**leaving** [1] - 33:16

**left** [4] - 33:19, 35:5, 46:21, 137:24

**legal** [3] - 17:11, 57:12, 101:10

**legitimate** [1] - 70:24

**less** [2] - 70:22, 127:8

**lesser** [7] - 35:13, 35:17, 35:19, 52:24, 53:7, 70:22, 82:6

**letter** [7] - 31:20, 31:21, 32:20, 33:2, 33:5, 52:3

**letters** [3] - 31:16, 31:17, 43:22

**letting** [1] - 33:5

**level** [4] - 11:18, 34:11, 41:16, 53:4

**License** [3] - 125:2,

125:7, 125:12

**license** [18] - 7:15, 49:9, 86:15, 87:3, 89:6, 89:17, 90:5, 90:20, 90:25, 91:17, 91:22, 92:10, 92:20, 93:1, 93:18, 94:7, 94:21

**licenses** [3] - 4:9, 5:18, 55:23

**licensing** [1] - 95:3

**Licensing** [1] - 68:21

**lie** [2] - 10:25, 19:6

**lies** [1] - 12:19

**life** [5] - 9:14, 29:19, 55:3, 58:24, 66:20

**light** [2] - 59:24, 139:11

**likely** [3] - 111:23, 127:8, 139:17

**likewise** [2] - 15:20, 77:23

**limited** [2] - 60:16, 60:17

**line** [3] - 24:10, 40:8, 43:16

**lines** [2] - 40:5, 103:15

**list** [10] - 11:1, 118:17, 135:12, 135:16, 137:6, 137:16, 137:17, 137:22, 138:6, 138:7

**List** [5] - 68:19, 89:17, 90:3, 92:9, 124:25

**listed** [11] - 90:17, 130:11, 135:7, 137:24, 138:2, 142:4, 142:6, 142:10, 142:17, 142:19, 143:3

**listen** [8] - 13:9, 24:24, 47:10, 48:1, 56:13, 114:2, 114:3, 114:11

**listening** [2] - 47:19, 144:3

**live** [1] - 44:2

**lives** [1] - 12:11

**living** [2] - 23:12, 23:13

**LLC** [1] - 131:3

**local** [8] - 33:13, 38:8, 38:12, 38:16, 44:5, 44:15

**located** [4] - 83:12, 98:19, 105:9, 130:15

**location** [1] - 15:25

**logic** [1] - 66:16

**logical** [2] - 56:17, 62:8

**logo** [3] - 50:9, 50:11,

50:12

**look** [9] - 18:4, 18:5, 22:23, 31:9, 38:17, 53:11, 55:14, 121:5

**Look** [1] - 49:4

**looked** [7] - 3:23, 136:19, 136:22, 136:24, 137:5, 138:17

**looking** [3] - 10:4, 22:18, 119:2

**looming** [1] - 49:7

**loot** [1] - 39:17

**lose** [1] - 128:9

**loss** [2] - 102:6, 103:3

**lost** [2] - 10:17, 51:17

**love** [1] - 46:20

**loves** [1] - 46:19

**lower** [1] - 111:21

**loyal** [1] - 13:25

**loyalty** [1] - 51:7

**lying** [1] - 10:10

**M**

**M4** [7] - 7:18, 7:21, 89:4, 97:10, 97:21, 124:25, 125:18

**machine** [1] - 1:22

**machines** [3] - 6:7, 26:25, 49:12

**magicians** [1] - 49:3

**magnifier** [1] - 137:18

**magnifiers** [1] - 135:3

**main** [1] - 52:11

**maintained** [1] - 45:1

**maintaining** [1] - 44:24

**maintenance** [1] - 94:16

**major** [4] - 24:18, 29:17, 39:7, 77:12

**Malave** [1] - 117:5

**Maliki** [2] - 17:10, 69:10

**man** [12] - 19:3, 19:4, 19:6, 19:7, 19:10, 20:11, 20:20, 20:21, 20:24, 46:19, 55:20, 56:7

**man's** [1] - 13:21

**manner** [9] - 14:16, 36:23, 63:6, 63:18, 76:10, 82:12, 101:6, 119:3, 119:11

**manufacture** [1] - 94:15

**manufacturers** [2] - 119:24, 120:5

**manufacturing** [6] -

6:20, 7:19, 49:12, 50:10, 94:21, 120:4
**March** [2] - 89:9, 91:12
**Mariani** [3] - 14:4, 14:14, 16:5
**MARIANI** [1] - 1:8
**marijuana** [2] - 11:22, 31:18
**marital** [1] - 140:4
**mark** [2] - 116:4, 116:8
**marked** [3] - 118:5, 118:11, 134:6
**married** [2] - 45:21, 46:1
**Marrtin** [5] - 12:4, 12:24, 14:22, 50:9
**Marshals** [1] - 47:22
**material** [6] - 100:15, 100:18, 101:1, 101:15, 101:23
**materially** [5] - 98:17, 99:6, 99:20, 105:7, 105:22
**mathematical** [1] - 66:13
**Mathes** [1] - 70:12
**matter** [10] - 11:3, 25:8, 27:10, 63:8, 64:12, 71:20, 101:15, 127:22, 128:21, 139:16
**matters** [5] - 10:13, 66:19, 71:21, 73:11, 116:12
**MAY** [1] - 1:9
**McBride** [3] - 15:4, 15:22, 53:12
**McLaren** [5] - 131:25, 132:1, 132:3, 142:13, 142:16
**mean** [6] - 25:20, 35:6, 37:25, 46:23, 66:12, 70:21
**meaning** [8] - 91:5, 93:5, 95:11, 96:18, 96:22, 98:4, 98:6, 109:21
**meanings** [1] - 95:6
**means** [50] - 6:16, 14:15, 31:13, 36:8, 46:24, 58:1, 58:11, 65:24, 66:7, 76:5, 80:24, 81:20, 81:25, 82:2, 82:11, 83:9, 90:11, 90:17, 92:15, 92:19, 96:19, 96:21, 98:17, 99:12, 99:15, 99:23, 100:3, 101:19, 102:21, 103:7, 103:10,

103:12, 103:13, 103:15, 103:24, 104:2, 104:18, 105:7, 106:4, 106:6, 108:6, 108:22, 109:10, 111:23, 115:2, 119:4, 119:11, 128:9, 145:22
**meant** [1] - 60:8
**meantime** [1] - 115:13
**measurements** [1] - 26:20
**measures** [2] - 30:12, 51:2
**medalist** [2] - 32:14, 32:15
**media** [2] - 58:2, 115:5
**medical** [1] - 44:20
**meet** [2] - 45:12, 54:17
**meeting** [1] - 76:11
**melodramatic** [2] - 7:12, 53:1
**member** [9] - 10:6, 16:6, 75:9, 77:10, 77:20, 79:22, 82:21, 83:2, 87:6
**members** [17] - 16:13, 21:5, 22:14, 27:16, 56:22, 57:2, 76:2, 76:7, 76:8, 76:18, 77:18, 79:1, 79:11, 79:14, 79:24, 80:3, 87:17
**membership** [1] - 87:22
**memory** [3] - 63:17, 114:19, 114:25
**men** [1] - 46:7
**mental** [9] - 14:9, 16:11, 17:6, 52:7, 52:16, 53:5, 74:20, 80:20, 87:22
**mentioned** [3] - 26:9, 145:8
**Mercedes** [2] - 132:5, 142:11
**merchandise** [12] - 86:19, 87:4, 95:22, 96:8, 96:12, 96:16, 96:19, 97:7, 97:19, 97:23, 98:2, 98:5
**merely** [4] - 85:2, 85:3, 85:4, 99:22
**mess** [1] - 54:25
**messages** [2] - 115:9, 115:15
**messaging** [2] - 58:4, 115:6
**met** [5] - 20:24, 21:11,

22:10, 46:1, 76:3
**mid** [2] - 11:18, 122:6
**mid-level** [1] - 11:18
**mid-page** [1] - 122:6
**Middle** [11] - 74:16, 86:10, 89:10, 91:13, 96:3, 97:14, 98:24, 105:14, 138:16, 145:4, 145:18
**MIDDLE** [1] - 1:1
**might** [16] - 9:21, 27:25, 28:1, 44:21, 59:16, 59:21, 60:22, 60:24, 65:9, 78:22, 101:21, 123:6, 127:3, 138:6, 141:17
**miles** [2] - 23:25, 49:7
**military** [32] - 12:6, 12:9, 14:24, 14:25, 15:10, 15:13, 15:15, 15:17, 15:18, 15:21, 15:23, 15:25, 16:3, 16:7, 16:8, 17:13, 17:18, 17:21, 17:24, 19:16, 38:7, 55:21, 69:9, 82:19, 82:22, 82:24, 83:3, 83:7, 83:12, 95:4
**mind** [22] - 26:3, 36:16, 52:3, 57:22, 73:23, 76:11, 107:8, 107:11, 107:12, 107:14, 107:15, 107:17, 107:21, 107:25, 108:14, 108:15, 109:6, 110:7, 114:3, 114:5, 114:7, 114:17
**mine** [1] - 18:7
**minimize** [4] - 36:19, 40:20, 41:18, 53:1
**minute** [1] - 100:11
**minutes** [4] - 56:14, 56:20, 93:5, 141:16
**misadventure** [5] - 21:12, 21:23, 34:24, 48:6, 48:7
**misconduct** [1] - 32:18
**misdirection** [3] - 49:4, 50:17, 51:1
**misrepresentation** [1] - 100:13
**misrepresentations** [2] - 100:15, 100:18
**missions** [1] - 5:6
**mistake** [3] - 33:4, 33:5, 73:2
**mistaken** [1] - 64:9
**mistakes** [4] - 10:11,

18:20, 32:24, 47:7
**misuse** [2] - 14:20, 82:16
**mix** [1] - 40:4
**Model** [1] - 142:10
**model** [5] - 7:18, 26:20, 131:22, 132:4, 143:3
**modern** [1] - 140:19
**modification** [1] - 94:16
**mom** [4] - 3:25, 9:11, 18:10, 52:3
**moment** [3] - 134:1, 139:1, 139:9
**moments** [1] - 91:4
**Money** [4] - 67:11, 106:14, 106:16, 126:5
**money** [27] - 7:25, 8:8, 8:9, 8:18, 9:1, 9:4, 23:10, 28:9, 34:13, 43:25, 44:8, 98:16, 98:21, 99:6, 99:19, 100:3, 102:1, 104:2, 104:21, 105:6, 105:11, 105:22, 106:20, 128:2, 130:24, 140:2
**Monroe** [2] - 89:10, 91:13
**month** [1] - 55:15
**months** [1] - 3:11
**morning** [3] - 3:24, 48:24, 51:10
**most** [4] - 15:12, 49:19, 54:21
**mother** [10] - 31:17, 31:21, 33:3, 34:20, 43:24, 44:8, 52:5, 133:5
**motive** [9] - 63:21, 109:18, 109:23, 109:24, 109:25, 110:1, 110:3, 110:5
**motives** [2] - 110:8, 110:9
**mount** [1] - 136:15
**mountain** [1] - 13:16
**mounted** [2] - 136:11, 140:17
**move** [3] - 127:11, 127:20, 135:21
**MR** [78] - 3:3, 3:4, 3:9, 18:2, 18:22, 20:1, 21:4, 47:16, 116:23, 117:1, 117:7, 117:19, 117:21, 117:23, 117:24, 118:2, 118:6,

118:10, 118:13, 118:19, 119:2, 119:6, 119:11, 119:17, 119:20, 119:23, 120:12, 121:2, 121:3, 121:7, 121:10, 121:12, 121:20, 121:25, 122:9, 122:13, 122:14, 122:15, 122:17, 123:2, 123:5, 123:9, 123:12, 123:17, 123:18, 123:22, 123:23, 124:1, 124:2, 126:23, 126:24, 128:22, 129:4, 134:1, 134:3, 134:5, 135:21, 135:24, 136:4, 138:21, 138:25, 139:4, 139:6, 139:9, 139:14, 140:9, 141:12, 141:16, 141:23, 142:1, 142:3, 143:14, 143:20, 143:21, 144:16, 144:17, 144:20, 144:22
**MSN** [1] - 38:18
**muddy** [1] - 53:17
**Multiple** [1] - 68:1
**multiple** [2] - 15:8, 20:4
**Munitions** [4] - 68:19, 89:17, 90:3, 124:25
**murky** [2] - 10:11, 11:21
**music** [1] - 21:19
**must** [89] - 14:7, 14:19, 35:22, 36:3, 57:13, 57:15, 57:17, 57:25, 59:1, 60:18, 60:20, 61:2, 61:5, 61:6, 62:13, 62:23, 66:6, 66:7, 67:3, 68:4, 68:5, 68:7, 71:3, 72:20, 73:7, 73:9, 74:4, 74:7, 75:2, 75:19, 76:9, 76:25, 77:3, 78:4, 78:8, 81:9, 82:15, 84:2, 85:13, 85:21, 86:23, 88:12, 88:13, 89:21, 90:8, 90:13, 90:19, 90:24, 90:25, 91:3, 92:2, 92:13, 92:17, 92:23, 92:25, 93:3, 94:1, 94:18, 94:20, 96:5, 97:16,

99:2, 99:17, 101:15, 101:20, 101:25, 102:19, 103:4, 104:4, 104:9, 104:22, 105:18, 106:17, 108:22, 109:11, 109:14, 110:20, 110:24, 111:2, 112:6, 113:4, 113:5, 113:9, 113:16, 114:8, 121:16, 127:23
**mutual** [3] - 75:21, 76:11, 76:15

# N

**name** [1] - 128:25
**named** [3] - 15:6, 24:1, 76:7
**namely** [2] - 81:22, 87:1
**Natali** [5] - 15:14, 25:24, 38:1, 53:12, 69:5
**national** [4] - 38:16, 58:23, 80:12, 94:5
**nationality** [1] - 80:13
**natural** [2] - 107:25, 108:5
**naturally** [1] - 108:8
**nature** [6] - 46:7, 66:21, 67:5, 99:9, 105:25, 108:24
**near** [3] - 67:24, 89:10, 91:13
**necessarily** [4] - 22:11, 64:25, 70:21, 77:25
**necessary** [9] - 72:16, 87:3, 90:5, 92:10, 94:7, 102:4, 104:17, 127:4, 127:17
**necessity** [1] - 143:17
**neck** [1] - 16:24
**need** [20] - 4:5, 7:12, 19:2, 19:5, 24:12, 37:1, 37:23, 42:19, 77:8, 84:8, 85:24, 86:4, 96:24, 98:7, 101:5, 111:11, 116:23, 117:1, 128:6, 143:23
**needed** [5] - 10:1, 13:25, 27:10, 51:7, 56:4
**Needed** [1] - 65:5
**needs** [1] - 85:19
**never** [16] - 3:24, 18:11, 20:8, 21:6,

30:9, 44:11, 44:15, 44:16, 44:18, 44:22, 47:5, 48:23, 74:24, 113:14
**New** [1] - 1:18
**News** [1] - 38:18
**next** [7] - 11:19, 29:2, 29:5, 33:23, 50:17, 52:9
**nice** [1] - 46:13
**night** [4] - 3:12, 7:8, 33:19, 132:14
**No.F-1** [1] - 135:25
**none** [3] - 12:18, 22:25, 63:4
**Nos** [1] - 116:17
**nose** [2] - 16:17, 52:18
**note** [4] - 35:19, 122:16, 123:11, 143:5
**noted** [4] - 43:20, 115:19, 122:15, 135:2
**notes** [9] - 10:6, 48:20, 56:12, 114:18, 114:19, 114:20, 114:23, 114:24, 118:19
**nothing** [6] - 21:21, 34:5, 38:5, 44:16, 138:20, 144:22
**notice** [1] - 138:6
**noticed** [2] - 20:8, 74:3
**notion** [1] - 57:16
**November** [4] - 74:14, 80:17, 99:1, 125:22
**Nsd** [1] - 1:14
**numb** [1] - 16:16
**number** [14] - 8:19, 63:13, 64:25, 68:2, 115:19, 133:10, 133:18, 133:21, 135:11, 137:1, 137:20, 137:23, 137:25, 138:3
**numbered** [1] - 145:9
**numbers** [9] - 27:25, 28:5, 65:2, 117:18, 132:15, 132:17, 137:14, 137:15, 140:14
**numerous** [4] - 130:10, 133:12, 136:23, 137:5
**NW** [2] - 1:15, 1:18

# O

**O'** [1] - 128:23

**O'-D-O-N-N-E-L-L** [1] - 129:2
**O'Donnell** [5] - 2:4, 128:22, 129:1, 136:7, 139:24
**object** [14] - 41:6, 77:22, 81:8, 88:13, 88:19, 95:22, 96:9, 96:12, 96:17, 97:7, 97:20, 97:23, 98:3, 99:22
**objected** [2] - 60:5, 61:1
**objection** [12] - 60:11, 60:13, 60:19, 61:1, 61:2, 118:14, 122:8, 122:9, 122:13, 122:14, 135:23, 135:24
**objections** [4] - 59:18, 60:8, 60:12
**objective** [24] - 40:16, 41:1, 74:25, 75:12, 75:14, 75:16, 75:23, 76:12, 77:6, 77:7, 77:15, 77:16, 78:6, 78:7, 78:9, 78:12, 78:14, 78:22, 78:24, 79:8, 79:19, 87:14, 88:16, 88:18
**objectives** [10] - 76:4, 76:5, 77:4, 79:2, 79:10, 80:1, 80:4, 87:9, 87:11, 87:18
**objects** [3] - 86:19, 87:5, 96:19
**obligation** [3] - 21:18, 65:24, 66:2
**observe** [1] - 13:21
**obtain** [10] - 90:4, 90:20, 92:10, 93:1, 94:6, 94:19, 98:16, 99:6, 105:6, 105:22
**obtained** [10] - 86:15, 87:3, 89:6, 89:18, 91:17, 91:22, 92:20, 93:18, 93:19, 94:18
**Obtained** [3] - 125:1, 125:6, 125:11
**obtaining** [3] - 98:21, 104:2, 105:11
**obviates** [1] - 143:17
**obviously** [2] - 117:21, 120:13
**occasion** [3] - 6:25, 20:5, 115:18
**occupation** [1] - 58:24
**occupied** [1] - 17:24
**occurred** [7] - 14:13, 17:19, 45:2, 81:17,

89:8, 129:9, 129:19
**occurs** [1] - 61:22
**October** [3] - 74:13, 80:16, 93:14
**OF** [3] - 1:1, 1:2, 1:7
**off-duty** [1] - 53:9
**off-shore** [1] - 94:23
**offense** [52] - 41:13, 42:16, 42:21, 66:5, 66:8, 66:25, 67:1, 67:3, 67:4, 67:22, 67:23, 68:2, 68:5, 68:6, 68:7, 68:9, 68:10, 68:12, 74:24, 75:7, 79:7, 80:23, 83:4, 83:16, 83:18, 83:20, 83:25, 84:2, 84:11, 84:12, 84:18, 84:19, 84:21, 85:5, 85:7, 85:11, 85:12, 85:14, 85:18, 85:21, 85:23, 86:1, 86:3, 86:25, 87:14, 106:16, 112:14, 113:5, 113:7, 115:20, 127:25
**Offense** [4] - 67:8, 86:7, 86:23, 124:20
**Offenses** [2] - 68:1, 74:9
**offenses** [27] - 65:14, 65:20, 67:19, 68:2, 68:11, 79:8, 79:9, 84:5, 84:6, 84:9, 87:9, 108:16, 108:21, 108:25, 109:23, 110:16, 110:19, 110:20, 110:23, 111:1, 111:9, 111:13, 112:19, 116:3, 116:7, 128:2, 128:3
**offer** [5] - 25:16, 43:13, 69:13, 70:12, 118:25
**offered** [2] - 60:6, 112:10
**office** [1] - 133:17
**Officer** [1] - 70:18
**officer** [2] - 70:20, 70:25
**officers** [2] - 70:19, 72:12
**official** [28] - 14:17, 14:18, 14:20, 14:21, 15:15, 15:21, 15:24, 15:25, 16:6, 26:8, 36:24, 36:25, 38:7, 38:23, 40:6, 53:13, 53:18, 53:19, 53:20,

82:13, 82:14, 82:16, 82:17, 82:21, 83:2, 118:17
**Official** [3] - 145:3, 145:14, 145:17
**officials** [8] - 37:1, 37:4, 37:5, 37:25, 82:18, 82:23, 115:3
**often** [2] - 83:20, 107:12
**omissions** [1] - 101:23
**OML** [1] - 8:3
**once** [4] - 95:1, 113:23, 115:1, 141:5
**one** [90] - 3:22, 4:12, 6:9, 8:12, 8:19, 9:9, 10:6, 12:13, 13:20, 19:22, 20:5, 20:17, 20:25, 21:6, 23:2, 24:4, 24:23, 27:18, 27:23, 28:8, 28:9, 30:7, 32:3, 33:2, 33:19, 40:14, 44:24, 45:23, 46:6, 48:6, 50:1, 50:21, 51:16, 52:4, 54:22, 55:4, 62:2, 62:11, 67:2, 68:2, 68:9, 71:17, 75:13, 75:15, 78:13, 79:16, 86:2, 87:10, 87:12, 87:17, 88:13, 88:17, 99:24, 100:15, 100:18, 101:16, 101:20, 103:14, 103:18, 103:19, 107:13, 110:9, 113:5, 113:9, 114:15, 115:15, 116:3, 116:7, 118:1, 118:11, 118:15, 121:25, 122:24, 123:6, 123:7, 123:13, 123:19, 127:3, 131:8, 131:22, 132:2, 132:18, 137:23, 138:4, 140:17, 144:10
**One** [3] - 23:1, 28:4, 71:18
**ones** [1] - 117:2
**open** [3] - 3:25, 29:7, 114:3
**opening** [2] - 37:8, 48:12
**operating** [1] - 24:1
**operation** [2] - 27:14, 94:16
**opined** [1] - 15:16

**17**

opinion [16] - 57:16, 58:21, 61:15, 69:13, 69:16, 69:18, 69:19, 69:22, 69:24, 69:25, 70:1, 70:3, 70:4, 70:7, 101:1
**Opinion** [1] - 68:13
opinions [5] - 68:15, 69:14, 70:5, 70:12, 70:13
opportunity [9] - 22:1, 22:3, 23:6, 42:20, 42:22, 63:14, 111:12, 111:14
opposite [2] - 111:25, 140:22
optic [3] - 137:17, 137:21, 138:10
optics [10] - 136:7, 137:8, 137:10, 137:11, 138:8, 138:11, 140:14, 140:23
oral [1] - 75:25
orally [1] - 56:24
orange [1] - 40:3
ordeal [1] - 13:7
**Order** [1] - 125:24
order [22] - 12:10, 14:6, 35:22, 36:2, 66:5, 72:12, 75:1, 76:24, 78:3, 81:9, 83:25, 87:18, 96:4, 97:15, 99:2, 101:24, 105:18, 106:16, 112:1, 120:1, 121:16, 144:5
ordered [3] - 13:3, 61:4, 105:15
ordering [1] - 144:6
ordinarily [1] - 68:14
ordinary [3] - 66:17, 104:13, 108:7
organization [2] - 24:1, 37:7
organized [1] - 47:24
original [1] - 114:6
originally [1] - 21:15
originated [1] - 102:2
otherwise [3] - 85:11, 117:4, 117:14
ought [3] - 57:17, 101:12, 134:10
outcome [2] - 63:20, 71:2
outrageous [1] - 28:19
outside [15] - 13:19, 14:13, 17:19, 58:19, 59:4, 59:22, 72:7,

74:14, 80:14, 80:17, 81:17, 83:9, 106:21, 141:10
**Outside** [1] - 126:7
outweighed [1] - 70:3
overall [3] - 75:23, 102:14, 102:16
overcome [1] - 113:6
overcomes [1] - 65:18
overhead [1] - 17:22
overruled [1] - 60:13
overseas [5] - 32:11, 32:13, 32:18, 83:12, 130:25
overseeing [1] - 23:25
overseers [1] - 34:3
overt [1] - 87:18
overwhelming [1] - 18:7
owe [1] - 34:12
own [20] - 4:4, 19:4, 27:19, 38:12, 38:20, 51:11, 51:15, 55:7, 56:13, 57:16, 57:22, 61:12, 61:24, 64:21, 66:20, 68:14, 72:2, 114:9, 114:21, 119:1
owned [4] - 19:11, 19:14, 47:8, 132:3
ownership [1] - 128:9
**Oyster** [2] - 132:18, 133:2

### P

**p.m** [2] - 144:14, 144:21
**P.O** [1] - 145:18
page [5] - 118:7, 120:22, 121:5, 122:6, 122:12
**Page** [8] - 118:9, 121:3, 121:13, 121:15, 121:22, 122:5, 123:1
pages [1] - 118:8
paid [6] - 5:21, 5:23, 8:17, 9:3, 11:3
pain [25] - 14:9, 14:10, 16:11, 17:6, 17:8, 36:6, 36:7, 36:12, 40:19, 41:15, 52:16, 53:5, 74:20, 74:21, 80:20, 81:1, 81:2, 81:13, 81:19, 81:22, 81:24, 81:25, 82:8
painted [1] - 32:6
paints [1] - 40:3
palace [1] - 26:12
pallet [1] - 40:2

pants [1] - 29:8
paper [2] - 115:10, 117:24
**Paragraph** [2] - 119:11, 119:15
paragraph [4] - 120:22, 121:18, 121:19
pardon [2] - 116:25, 144:19
parents [1] - 130:7
parents' [2] - 131:16, 132:13
part [28] - 6:12, 10:20, 15:12, 22:14, 23:2, 23:9, 33:6, 38:4, 39:6, 39:8, 40:22, 57:7, 63:4, 85:25, 86:3, 100:10, 117:25, 118:17, 128:11, 129:17, 130:2, 130:7, 130:11, 130:14, 131:1, 131:11, 131:19, 133:13
participant [3] - 16:8, 82:23, 83:6
participants [1] - 76:20
participate [2] - 22:21, 42:17
participated [5] - 85:14, 99:8, 99:19, 102:16, 105:24
participating [2] - 24:6, 36:15
participation [1] - 85:19
particular [6] - 41:10, 68:9, 101:19, 107:18, 110:7, 121:14
particularly [1] - 69:6
parties [11] - 59:11, 59:14, 60:5, 60:8, 69:8, 117:12, 128:12, 128:17, 141:21, 142:3, 143:8
partnership [1] - 75:1
parts [7] - 4:7, 7:16, 55:23, 71:22, 74:6, 74:8, 120:8
party [7] - 38:15, 61:1, 63:22, 73:18, 73:20, 75:9, 87:6
passing [1] - 45:4
past [1] - 56:15
patch [1] - 53:15
patient [1] - 141:5
patiently [1] - 47:19

**Patricia** [1] - 70:11
**PATRICK** [1] - 1:17
pause [1] - 141:9
pay [4] - 40:22, 41:19, 44:4, 44:8
**Paying** [1] - 125:25
paying [1] - 105:16
payment [1] - 6:1
payments [1] - 7:3
pearl [1] - 133:5
penalty [2] - 81:7, 128:11
**PENNSYLVANIA** [3] - 1:1, 1:9, 1:25
**Pennsylvania** [17] - 1:13, 1:15, 1:21, 6:24, 74:16, 74:17, 86:10, 89:10, 89:11, 91:14, 96:3, 97:14, 98:25, 105:14, 145:5, 145:18, 145:19
people [43] - 4:5, 18:13, 19:5, 19:7, 20:19, 21:11, 21:17, 22:2, 22:11, 22:13, 22:14, 22:23, 22:24, 23:1, 23:4, 23:5, 23:11, 23:15, 23:22, 23:24, 25:1, 26:10, 26:12, 26:18, 27:13, 27:17, 28:4, 31:23, 32:1, 32:4, 32:23, 33:9, 34:2, 34:17, 35:5, 37:2, 41:5, 45:4, 46:25, 55:24, 59:24
per [1] - 117:12
perceived [1] - 54:3
perception [1] - 70:8
perceptions [1] - 70:13
perfect [1] - 7:9
perfectly [1] - 110:10
perform [1] - 58:20
performance [3] - 14:18, 36:25, 82:14
performed [4] - 79:25, 84:20, 85:17, 87:17
performing [1] - 95:8
perhaps [3] - 9:20, 54:13
period [2] - 48:9, 134:21
permission [2] - 5:18, 50:23
permissions [1] - 4:9
permit [1] - 68:14
permitted [6] - 58:15, 60:6, 69:12, 70:5,

70:11, 72:1
**Perpetual** [2] - 132:18, 133:2
persistence [1] - 82:3
person [34] - 11:19, 14:21, 22:21, 32:3, 44:25, 50:19, 66:17, 72:15, 72:24, 73:2, 74:22, 80:21, 80:25, 81:3, 82:17, 83:15, 83:17, 83:19, 83:20, 94:20, 95:9, 99:24, 100:20, 101:17, 101:21, 103:17, 103:18, 107:12, 108:7, 110:6, 110:10, 110:11, 112:24
person's [2] - 58:22, 107:14
**Personal** [1] - 110:7
personal [2] - 70:5, 71:1
personally [2] - 4:15, 83:16
personnel [1] - 50:3
persons [13] - 64:8, 74:23, 75:5, 75:20, 76:10, 79:21, 82:18, 85:3, 86:25, 90:23, 94:13, 100:5, 102:8
perspective [2] - 24:21, 123:10
**Peshmerga** [10] - 15:25, 24:8, 24:12, 27:19, 29:7, 38:6, 38:7, 38:9, 44:14
petrified [1] - 18:23
phase [4] - 85:25, 86:3, 127:11, 127:13
phone [5] - 39:18, 39:19, 58:3, 58:7, 115:5
photographs [3] - 4:13, 131:19, 131:21
photos [3] - 45:22, 50:11, 53:25
phrase [2] - 103:12, 103:17
physical [28] - 14:9, 14:12, 16:10, 17:6, 17:17, 22:21, 33:20, 36:6, 36:7, 36:12, 37:3, 52:16, 52:24, 53:5, 55:7, 74:20, 80:20, 80:22, 81:1, 81:3, 81:13, 81:16, 81:19, 81:22, 81:25, 82:2, 117:8
physically [2] - 10:14,

**18**

51:19
**pick** [2] - 16:25, 30:19
**picked** [2] - 25:1, 123:4
**pictures** [2] - 45:9, 45:10
**piece** [1] - 115:10
**pillow** [2] - 3:15, 3:20
**pin** [8] - 5:25, 6:4, 6:17, 7:24, 8:3, 89:5, 97:10, 97:21
**Pin** [2] - 124:25, 125:18
**pistol** [1] - 143:3
**pistols** [1] - 7:21
**Pittston** [1] - 1:21
**pizza** [1] - 55:12
**Place** [1] - 126:7
**place** [13] - 10:20, 16:2, 17:13, 20:19, 38:3, 96:2, 97:13, 106:20, 106:21, 116:5, 116:9, 127:9, 141:10
**placed** [4] - 16:23, 43:4, 54:23, 111:16
**places** [1] - 27:2
**plainly** [1] - 26:14
**plaintiff** [1] - 1:3
**plan** [6] - 10:3, 22:17, 99:22, 100:2, 104:1, 104:2
**planned** [1] - 21:16
**plans** [1] - 49:11
**plant** [3] - 6:21, 22:24, 49:13
**plastic** [3] - 16:20, 19:20, 52:19
**play** [5] - 34:8, 34:9, 39:12, 57:7, 120:19
**played** [6] - 6:11, 18:1, 18:21, 19:25, 29:20, 77:11
**playing** [2] - 52:4, 55:12
**pleaded** [1] - 65:14
**pleasant** [1] - 52:25
**pleases** [1] - 21:4
**pleasure** [1] - 19:13
**pliers** [1] - 52:22
**plop** [1] - 32:13
**PNC** [6] - 6:24, 8:5, 8:16, 129:24, 130:21, 130:24
**pocus** [1] - 56:16
**point** [22] - 3:22, 5:10, 7:7, 7:22, 9:6, 10:5, 11:21, 21:16, 24:4, 24:14, 27:1, 27:23, 28:14, 33:2, 42:1,

44:12, 48:6, 51:17, 122:4, 138:7, 139:16, 140:10
**pointed** [2] - 38:25, 52:11
**pointing** [1] - 35:15
**points** [2] - 16:3, 30:5
**Polad** [19] - 5:2, 11:10, 11:12, 11:13, 13:24, 15:20, 18:16, 18:23, 19:1, 49:18, 49:20, 50:8, 50:13, 50:14, 50:25, 51:21, 53:19, 53:22, 119:21
**Polad's** [1] - 49:23
**police** [2] - 44:15
**political** [4] - 26:3, 38:8, 53:10, 69:8
**politicians** [1] - 38:12
**politics** [3] - 38:16, 38:17
**popped** [1] - 3:24
**portion** [2] - 6:11, 127:8
**position** [2] - 58:24, 114:6
**possessed** [2] - 14:20, 82:16
**possession** [2] - 31:18, 83:12
**possessions** [1] - 83:11
**possible** [8] - 65:8, 65:9, 66:13, 112:22, 113:15, 115:13, 120:24
**possibly** [1] - 49:16
**potential** [1] - 129:18
**power** [8] - 5:10, 7:7, 12:10, 14:20, 26:1, 69:7, 69:8, 82:16
**powerful** [2] - 22:13, 49:19
**Powers** [12] - 8:25, 67:10, 91:11, 91:20, 93:9, 96:1, 96:13, 96:25, 108:17, 109:8, 125:5, 128:2
**practice** [1] - 10:23
**practices** [3] - 35:13, 35:17, 82:6
**practicing** [1] - 7:6
**Pre** [1] - 144:11
**Pre-Sentence** [1] - 144:11
**preceding** [1] - 118:8
**preconceived** [1] - 76:22
**predicted** [1] - 21:15
**preference** [1] -

121:14
**prejudice** [2] - 58:21, 63:21
**preliminary** [2] - 60:3, 62:21
**premised** [1] - 101:5
**preparation** [1] - 133:16
**prepare** [2] - 133:17
**prepared** [5] - 7:12, 9:5, 115:21, 141:24, 145:11
**preponderance** [6] - 42:6, 111:3, 111:20, 111:22, 112:7
**presence** [1] - 141:10
**present** [11] - 3:1, 23:25, 41:4, 65:7, 65:11, 65:25, 77:18, 80:13, 85:3, 127:4, 128:20
**presentation** [1] - 23:24
**presented** [11] - 58:13, 62:16, 65:1, 65:18, 80:7, 107:24, 112:9, 116:11, 117:12, 128:12, 128:17
**presenting** [1] - 47:2
**presents** [1] - 22:3
**preserve** [2] - 33:10, 34:17
**preside** [1] - 112:25
**presumed** [2] - 35:24, 65:15
**presumption** [6] - 65:13, 65:17, 65:19, 65:21, 65:23, 113:6
**pretended** [1] - 21:6
**pretending** [4] - 14:18, 34:10, 36:25, 82:14
**pretense** [1] - 104:20
**pretenses** [8] - 98:18, 98:22, 99:7, 99:20, 100:4, 104:3, 105:12, 105:23
**pretty** [1] - 22:8
**prevent** [1] - 33:17
**previously** [1] - 127:14
**prima** [1] - 28:15
**primary** [1] - 137:24
**principal** [1] - 83:21
**principle** [1] - 101:22
**principles** [2] - 41:9, 57:12
**printout** [1] - 137:22
**private** [7] - 26:10,

27:19, 37:5, 49:25, 50:2, 69:9, 82:18
**privileged** [1] - 20:1
**probable** [2] - 108:1, 108:5
**problem** [9] - 10:10, 11:9, 11:10, 11:11, 50:25, 51:21, 53:21, 56:2, 123:10
**problems** [1] - 44:18
**procedure** [1] - 73:19
**proceed** [1] - 3:5
**proceeding** [1] - 129:17
**proceedings** [5] - 56:23, 127:9, 141:9, 144:25, 145:8
**PROCEEDINGS** [1] - 1:7
**Proceedings** [1] - 1:22
**proceeds** [12] - 55:24, 106:24, 107:3, 129:18, 130:16, 132:7, 134:11, 135:14, 136:19, 138:15, 138:16, 139:18
**process** [4] - 68:20, 68:21, 141:4, 141:14
**processing** [1] - 94:17
**procurement** [1] - 94:23
**produce** [3] - 27:25, 65:8, 65:12
**produced** [3] - 1:22, 6:10, 48:23
**product** [2] - 90:10, 92:14
**production** [2] - 34:3, 94:15
**profession** [1] - 58:23
**professional** [2] - 71:1, 101:10
**profited** [1] - 102:9
**prohibiting** [2] - 81:8, 86:20
**prohibitions** [1] - 88:8
**project** [19] - 7:15, 8:1, 22:8, 23:2, 23:9, 23:17, 24:6, 26:18, 26:24, 28:4, 28:10, 34:13, 43:24, 43:25, 50:6, 50:8, 50:13, 50:15, 132:7
**promise** [1] - 104:20
**promises** [8] - 98:18, 99:7, 99:21, 100:4, 104:3, 105:8, 105:23
**promote** [1] - 107:4

**Promote** [1] - 126:8
**prompt** [1] - 110:9
**prompting** [1] - 110:11
**prompts** [1] - 110:6
**proof** [14] - 3:6, 35:24, 66:2, 66:12, 71:15, 102:8, 109:17, 109:20, 109:24, 109:25, 110:1, 111:21, 139:17
**Proof** [1] - 65:13
**properties** [1] - 142:4
**property** [18] - 98:17, 98:21, 99:6, 99:20, 100:3, 102:1, 104:2, 105:7, 105:11, 105:22, 128:7, 128:10, 128:15, 130:15, 130:23, 135:11, 142:7, 142:19
**proposed** [1] - 94:20
**prosecuting** [1] - 32:7
**prosecutor** [2] - 21:20, 39:12
**prospects** [1] - 23:19
**protect** [1] - 51:24
**prove** [73] - 5:9, 14:7, 17:8, 32:18, 32:19, 35:23, 36:3, 37:12, 55:11, 64:24, 65:6, 65:25, 66:3, 66:8, 67:21, 75:19, 75:24, 76:2, 76:6, 76:9, 76:20, 77:3, 77:8, 77:11, 77:20, 77:25, 78:8, 78:25, 79:5, 85:9, 85:13, 86:23, 88:10, 88:12, 89:21, 90:8, 90:13, 90:19, 91:3, 91:7, 92:2, 92:13, 92:17, 92:25, 93:3, 93:7, 94:1, 95:14, 96:5, 96:24, 97:16, 98:7, 99:17, 100:12, 101:25, 102:2, 102:4, 102:19, 103:5, 103:21, 104:4, 104:9, 104:22, 107:21, 107:24, 108:19, 108:22, 109:5, 109:10, 109:11, 111:22, 111:23
**proved** [34] - 4:7, 4:11, 12:20, 19:15, 37:13, 65:23, 66:24, 68:8, 75:3, 76:14, 76:25,

**19**

78:2, 78:5, 79:4, 81:10, 84:2, 84:10, 99:3, 102:13, 105:19, 106:17, 107:13, 107:15, 109:15, 110:18, 110:22, 110:24, 111:3, 112:6, 113:12, 114:13, 116:2, 116:6, 140:21
**proves** [9] - 13:16, 35:25, 61:22, 62:2, 67:23, 100:14, 107:24, 113:7
**provide** [3] - 58:1, 88:21, 115:2
**provided** [3] - 48:19, 95:2, 98:19
**providing** [1] - 105:9
**province** [1] - 120:10
**proving** [4] - 42:3, 66:10, 111:19, 112:14
**provisions** [1] - 145:5
**prudence** [1] - 100:5
**prudent** [1] - 101:17
**public** [1] - 58:21
**publish** [1] - 124:15
**published** [2] - 127:3, 127:10
**PUK** [3] - 17:22, 49:23, 53:20
**pull** [3] - 9:12, 9:15, 26:12
**punch** [1] - 9:8
**punched** [1] - 52:17
**punished** [1] - 51:8
**punishment** [6] - 35:14, 35:18, 35:20, 82:7, 113:14, 113:15
**Punishment** [1] - 112:17
**purchase** [4] - 8:10, 8:11, 135:17, 136:21
**purchased** [20] - 5:15, 5:22, 5:24, 7:16, 7:25, 8:7, 130:16, 132:7, 133:14, 134:11, 134:15, 134:21, 135:13, 135:20, 136:23, 137:6, 139:18, 139:21, 140:16
**purchasing** [3] - 8:2, 98:18, 105:8
**purple** [1] - 20:4
**Purple** [1] - 32:14
**purporting** [3] - 14:17, 36:24, 82:14
**purpose** [24] - 23:17,

36:15, 40:15, 40:20, 41:7, 41:11, 41:17, 56:24, 60:16, 60:17, 75:16, 78:14, 78:23, 79:18, 81:8, 84:16, 85:10, 87:13, 102:22, 103:1, 103:3, 109:16, 109:18
**purposes** [6] - 27:6, 27:9, 28:13, 40:18, 98:24, 105:13
**pursuant** [1] - 145:5
**put** [21] - 4:4, 16:20, 19:4, 19:20, 19:21, 22:7, 22:16, 24:20, 26:13, 27:21, 28:5, 29:4, 31:2, 31:20, 39:17, 40:3, 50:9, 111:24, 137:23, 140:17
**putting** [2] - 5:8, 42:1

## Q

**qualifications** [1] - 69:17
**quality** [1] - 63:16
**quantity** [2] - 65:1, 65:2
**questioned** [1] - 25:1
**questions** [18] - 10:17, 13:3, 21:20, 31:7, 50:4, 50:5, 50:7, 51:16, 54:20, 59:16, 68:15, 70:6, 115:9, 116:21, 122:23, 135:21
**quick** [1] - 121:5
**quickly** [3] - 5:11, 136:15, 141:8
**quiet** [1] - 20:11
**quite** [3] - 10:21, 70:23, 136:13
**quote** [6] - 48:13, 67:20, 82:11, 94:12

## R

**rabbit** [3] - 45:9, 53:25
**race** [1] - 58:22
**radio** [15] - 99:13, 99:15, 103:7, 103:10, 103:12, 103:15, 103:25, 104:5, 104:10, 104:12, 104:15, 104:18, 104:23, 106:4, 106:7
**raised** [5] - 3:22,

41:21, 110:14, 110:15, 112:12
**range** [1] - 134:15
**ranking** [1] - 49:22
**rapid** [1] - 144:2
**rather** [7] - 15:12, 35:13, 35:17, 55:19, 82:6, 88:2, 141:13
**rational** [1] - 24:24
**rationally** [1] - 70:7
**Rauno** [6] - 44:25, 45:6, 45:19, 45:21, 46:1, 46:12
**Ravi(phonetic)** [1] - 118:3
**reach** [4] - 54:10, 60:2, 114:1, 114:10
**reached** [5] - 115:23, 124:8, 124:9, 127:2, 141:21
**reaching** [2] - 61:20, 113:15
**reaction** [1] - 10:7
**Read** [1] - 119:8
**read** [6] - 32:20, 74:4, 74:5, 107:13, 137:20
**reading** [1] - 118:16
**ready** [2] - 3:1, 30:21
**real** [2] - 130:15, 142:7
**realized** [3] - 33:2, 102:5, 108:8
**really** [17] - 10:2, 10:8, 11:23, 23:2, 34:25, 39:23, 43:6, 43:14, 43:18, 44:12, 45:25, 46:18, 49:5, 102:11, 120:15, 120:25, 121:20
**REALTIME** [1] - 1:24
**reason** [13] - 3:7, 31:11, 31:12, 31:19, 31:20, 49:8, 49:20, 54:5, 62:5, 62:14, 66:16, 141:1
**reasonable** [75] - 5:9, 12:20, 36:4, 42:3, 42:20, 42:22, 62:4, 62:7, 62:13, 65:7, 65:13, 65:20, 65:23, 66:7, 66:9, 66:11, 66:12, 66:15, 66:17, 66:25, 67:2, 67:23, 68:8, 72:15, 75:3, 75:20, 76:9, 76:14, 76:16, 76:25, 78:2, 78:5, 79:4, 81:11, 83:3, 84:3, 84:10, 85:9, 85:13, 86:24, 89:21, 92:3, 94:1, 96:6, 97:17, 99:4,

99:18, 100:14, 101:17, 101:21, 102:14, 102:20, 103:5, 104:4, 104:22, 105:20, 106:18, 108:2, 108:23, 109:11, 109:15, 110:18, 111:12, 111:14, 111:21, 112:15, 113:8, 113:11, 114:1, 114:14, 116:4, 116:8, 121:17, 139:17
**reasonably** [6] - 60:2, 62:3, 67:24, 100:5, 101:16, 104:14
**reasoned** [1] - 62:8
**reasons** [6] - 27:23, 64:20, 69:13, 69:17, 69:25, 72:23
**rebuild** [1] - 18:8
**rebut** [1] - 35:3
**rebuttal** [2] - 3:7, 47:15
**receipt** [1] - 6:5
**receipts** [7] - 5:20, 9:6, 136:23, 136:24, 137:4, 137:5, 138:17
**receive** [3] - 69:14, 70:13, 90:25
**received** [9] - 20:3, 59:9, 60:4, 60:14, 60:20, 73:22, 113:17, 130:23, 138:16
**receiver** [1] - 6:16
**recess** [3] - 56:21, 118:20, 141:19
**recklessly** [3] - 43:4, 54:23, 111:16
**recognize** [1] - 47:23
**recollection** [8] - 10:12, 10:13, 51:14, 61:12, 63:10, 64:9, 114:21, 114:22
**recommend** [1] - 121:21
**recommendation** [1] - 45:6
**recommendations** [1] - 45:5
**recommended** [1] - 49:22
**record** [13] - 5:8, 34:15, 61:5, 114:16, 115:22, 117:7, 117:16, 117:20, 118:15, 122:15, 128:25, 130:12

**recorded** [3] - 1:22, 29:21, 117:6
**recording** [10] - 12:2, 18:1, 18:21, 19:13, 19:25, 34:21, 51:10, 54:7, 56:8, 74:3
**Recordings** [2] - 73:15, 73:21
**recordings** [9] - 19:9, 20:16, 73:16, 73:17, 73:20, 73:22, 73:23, 74:2, 74:7
**records** [9] - 5:17, 5:21, 6:22, 7:3, 9:7, 32:12, 34:19, 135:15, 140:11
**Recross** [1] - 2:3
**redirect** [1] - 138:21
**Redirect** [1] - 2:3
**reduce** [1] - 143:8
**refer** [5] - 119:15, 120:22, 121:11, 121:13, 123:1
**reference** [3] - 45:6, 120:24, 123:1
**referenced** [1] - 39:16
**refers** [2] - 63:1, 110:6
**Reflex** [1] - 138:10
**refuse** [2] - 42:22, 111:14
**regarding** [6] - 88:22, 93:22, 93:23, 106:10, 112:19, 128:6
**regardless** [2] - 37:17, 112:9
**regards** [9] - 4:19, 117:1, 119:3, 129:18, 131:2, 139:22, 142:18, 143:1, 143:5
**region** [2] - 29:14, 49:19
**Region** [12] - 4:18, 15:14, 15:22, 22:4, 22:12, 30:8, 37:25, 38:11, 40:2, 69:6, 74:15, 80:18
**registered** [3] - 90:24, 134:21, 137:7
**regular** [4] - 38:2, 38:5, 46:6, 95:4
**regulation** [4] - 95:23, 96:17, 97:8, 98:3
**Regulations** [9] - 7:15, 8:23, 89:13, 91:9, 93:10, 94:11, 95:16, 97:12, 98:9
**regulations** [5] - 86:18, 91:25, 97:25,

**20**

107:1, 107:7
**reject** [1] - 71:21
**relate** [1] - 101:15
**related** [10] - 65:8, 76:19, 86:18, 87:21, 91:24, 97:24, 98:8, 107:1, 107:7, 129:21
**Related** [1] - 125:24
**relates** [1] - 68:4
**Relating** [1] - 125:20
**relating** [1] - 119:22
**relation** [1] - 63:22
**relationship** [1] - 69:6
**relative** [2] - 136:19, 138:16
**relatively** [1] - 24:16
**released** [1] - 33:12
**relevant** [3] - 44:19, 91:6, 95:13
**reliability** [1] - 69:18
**relieve** [1] - 112:13
**religion** [3] - 39:6, 39:7, 58:23
**relive** [1] - 13:7
**reluctance** [1] - 73:1
**rely** [3] - 49:3, 74:4, 114:21
**relying** [1] - 101:17
**remarkably** [1] - 48:13
**remarks** [2] - 35:2, 43:10
**remember** [15] - 3:14, 6:3, 6:6, 6:10, 7:5, 8:12, 10:9, 10:24, 11:3, 19:13, 30:17, 52:14, 63:11, 112:12, 114:18
**remembers** [1] - 15:6
**remind** [2] - 88:5, 113:3
**Remington** [2] - 142:23, 142:24
**removed** [1] - 61:5
**renovation** [1] - 43:24
**rent** [1] - 44:1
**repair** [1] - 94:15
**repeat** [1] - 127:17
**repeated** [1] - 121:4
**repeatedly** [2] - 16:15, 18:3
**report** [4] - 6:19, 8:21, 11:11, 144:12
**Report** [7] - 8:14, 9:3, 99:1, 118:14, 119:18, 125:21, 144:11
**reported** [3] - 44:11, 44:17, 44:18
**REPORTED** [1] - 145:15

**Reporter** [3] - 145:3, 145:14, 145:17
**reporter** [1] - 145:23
**REPORTER** [1] - 1:24
**Reports** [1] - 7:3
**representation** [7] - 100:19, 100:21, 100:23, 101:9, 101:14, 101:18, 104:20
**representations** [10] - 98:18, 99:7, 99:21, 99:25, 100:4, 100:8, 100:9, 104:3, 105:8, 105:23
**representative** [2] - 133:24, 134:11
**reproduction** [1] - 145:22
**Republicans** [1] - 38:11
**request** [3] - 104:21, 126:22, 139:3
**requesting** [1] - 117:10
**require** [6] - 7:15, 82:20, 108:19, 109:9, 109:17, 109:20
**required** [23] - 4:9, 55:22, 55:23, 64:15, 65:6, 65:7, 65:11, 72:13, 76:6, 78:18, 78:23, 78:25, 84:22, 91:6, 93:7, 95:13, 100:12, 102:2, 103:21, 108:4, 108:9, 109:24, 140:12
**requirement** [3] - 84:23, 85:18, 95:3
**requirements** [2] - 40:14, 84:3
**requires** [2] - 65:21, 92:20
**research** [4] - 58:5, 115:8, 132:6, 140:22
**reserved** [2] - 35:12, 82:5
**residence** [3] - 130:3, 130:5, 130:7
**residences** [2] - 130:9, 130:10
**resolve** [4] - 28:21, 28:25, 29:1, 141:13
**respect** [15] - 14:4, 20:6, 93:21, 108:20, 123:13, 123:19, 128:13, 136:18, 138:22, 140:13,

140:22, 141:22, 143:18, 143:23, 144:11
**respectfully** [1] - 114:2
**respond** [1] - 115:13
**response** [3] - 119:14, 127:21, 127:22
**responsibility** [3] - 57:23, 113:13, 113:21
**responsible** [2] - 13:15, 28:9
**rest** [5] - 30:24, 51:8, 56:5, 116:18, 118:4
**restricted** [1] - 118:16
**result** [4] - 76:22, 108:8, 108:11, 140:3
**results** [4] - 81:23, 108:1, 108:3, 108:6
**Retainers** [2] - 125:1, 125:18
**retainers** [8] - 5:25, 6:4, 6:17, 7:25, 8:3, 89:5, 97:10, 97:21
**retire** [1] - 127:7
**retired** [1] - 5:1
**retransfer** [1] - 89:15
**retransferred** [4] - 89:23, 90:1, 90:9, 90:14
**retransferring** [2] - 90:6, 90:21
**return** [10] - 29:17, 47:11, 66:25, 67:3, 68:5, 115:25, 130:11, 135:8, 140:6, 141:1
**returned** [8] - 124:5, 132:1, 132:3, 133:23, 133:25, 134:10, 135:2, 143:7
**returns** [2] - 33:13, 137:1
**reverse** [1] - 26:19
**reverse-engineer** [1] - 26:19
**review** [5] - 56:11, 121:22, 129:21, 129:24
**reviewing** [2] - 71:3, 135:15
**revolver** [1] - 143:3
**rewarded** [1] - 20:7
**ribbons** [1] - 20:7
**rifle** [5] - 134:20, 137:20, 140:17, 140:18, 142:21
**rifles** [3] - 7:21, 136:8, 136:16

**rifling** [4] - 6:15, 91:16, 96:10, 105:15
**Rifling** [4] - 95:25, 125:5, 125:15, 125:25
**right-hand** [1] - 50:19
**rightfully** [1] - 49:1
**rigid** [1] - 26:4
**Rings** [2] - 124:25, 125:18
**rings** [10] - 5:24, 5:25, 6:3, 6:17, 7:24, 8:3, 48:23, 89:4, 97:10, 97:21
**risk** [2] - 22:7, 27:21
**rivalries** [3] - 27:18, 38:15
**RMR** [1] - 1:24
**RMR,CRR** [2] - 145:13, 145:16
**ROBERT** [1] - 1:8
**rocks** [1] - 52:22
**Roggio** [387] - 4:1, 4:3, 4:7, 4:12, 4:24, 5:15, 6:9, 7:1, 7:10, 9:8, 10:3, 10:7, 10:12, 11:7, 11:15, 11:19, 12:1, 12:3, 12:8, 12:13, 12:14, 12:21, 12:22, 12:23, 13:1, 13:2, 13:3, 13:4, 13:12, 13:14, 13:15, 14:7, 14:8, 14:10, 14:24, 14:25, 15:2, 15:10, 15:11, 15:24, 16:7, 16:13, 16:24, 17:5, 17:14, 17:16, 17:23, 18:3, 18:15, 18:17, 18:18, 18:20, 18:23, 19:13, 19:15, 19:18, 19:23, 21:5, 21:25, 23:7, 24:19, 25:14, 25:17, 26:24, 28:8, 28:15, 28:21, 28:22, 28:23, 28:24, 29:10, 29:12, 29:15, 29:17, 29:19, 30:1, 30:13, 30:24, 31:4, 31:9, 31:22, 32:5, 32:6, 32:7, 32:8, 32:9, 32:10, 32:22, 32:23, 33:4, 33:6, 33:17, 33:20, 34:6, 34:19, 34:20, 35:5, 35:22, 36:2, 36:5, 36:11, 36:21, 37:14, 40:20, 41:10, 42:2, 42:10, 42:11, 42:13, 42:15, 42:20, 42:22, 43:4, 44:6, 44:7,

44:8, 44:9, 45:1, 45:7, 45:23, 46:13, 46:14, 47:5, 48:9, 49:9, 49:15, 49:18, 49:21, 49:24, 50:1, 50:7, 50:9, 50:12, 50:19, 50:20, 50:23, 50:24, 51:4, 51:6, 51:12, 51:19, 51:24, 51:25, 52:3, 52:7, 52:25, 53:2, 53:5, 53:21, 54:1, 54:9, 54:11, 54:14, 54:22, 55:7, 55:20, 56:3, 56:5, 56:17, 65:6, 65:11, 65:14, 65:15, 65:17, 65:21, 65:24, 66:5, 67:6, 67:17, 68:1, 68:8, 72:2, 72:6, 72:11, 72:14, 72:18, 72:21, 73:5, 73:7, 73:8, 73:13, 73:16, 74:10, 74:15, 74:18, 75:1, 75:9, 75:11, 75:14, 76:24, 77:1, 77:3, 77:8, 77:11, 77:14, 77:16, 77:20, 77:21, 77:23, 78:3, 78:4, 78:5, 78:9, 78:11, 78:13, 78:18, 78:20, 78:23, 79:3, 79:21, 80:2, 80:10, 80:18, 81:9, 81:12, 81:14, 82:25, 83:6, 83:14, 83:22, 83:25, 84:11, 84:12, 84:15, 84:20, 84:22, 85:2, 85:5, 85:7, 85:12, 85:14, 85:15, 85:17, 85:20, 86:6, 86:11, 87:6, 87:8, 87:12, 88:14, 88:25, 89:2, 89:20, 89:22, 89:25, 90:4, 90:7, 90:9, 90:14, 90:20, 91:4, 91:7, 91:10, 91:14, 92:1, 92:4, 92:7, 92:10, 92:12, 92:13, 92:18, 93:1, 93:3, 93:8, 93:11, 93:15, 93:25, 94:3, 94:6, 94:10, 95:14, 95:17, 95:24, 96:4, 96:7, 96:15, 97:2, 97:9, 97:15, 97:18, 98:1, 98:11, 98:15, 98:25, 99:2, 99:5, 99:10, 99:12, 99:18, 100:17, 102:2, 102:5, 102:9, 102:15, 102:20,

**21**

102:24, 103:1, 103:6, 103:21, 103:23, 104:9, 104:11, 104:14, 105:1, 105:5, 105:15, 105:18, 105:21, 106:1, 106:3, 106:14, 106:16, 106:20, 106:23, 107:2, 107:4, 107:18, 107:19, 108:1, 108:3, 108:5, 108:10, 108:20, 108:23, 109:3, 109:4, 109:10, 109:12, 109:14, 109:16, 109:17, 109:24, 110:1, 110:2, 110:14, 110:15, 110:19, 110:20, 110:22, 110:24, 110:25, 111:1, 111:2, 111:5, 111:8, 111:11, 111:13, 111:16, 111:19, 112:1, 112:6, 112:12, 113:4, 113:12, 114:13, 116:2, 116:6, 119:18, 121:16, 124:17, 124:19, 124:22, 125:3, 125:8, 125:13, 125:16, 125:19, 125:23, 126:2, 126:9, 127:24, 128:8, 128:9, 129:11, 130:6, 130:23, 131:3, 131:18, 143:15, 144:12

**roggio** [2] - 86:22, 109:2

**ROGGIO** [1] - 1:5

**Roggio's** [47] - 4:15, 9:11, 9:14, 11:1, 11:13, 11:21, 12:6, 12:15, 12:19, 14:11, 17:17, 17:19, 24:12, 38:22, 42:18, 50:22, 51:10, 51:13, 51:14, 51:16, 52:9, 78:17, 80:6, 81:15, 84:4, 84:8, 84:13, 84:25, 85:9, 85:21, 85:24, 86:1, 86:4, 87:22, 107:11, 107:15, 107:17, 107:21, 107:25, 108:7, 109:6, 110:3,

111:10, 112:1, 130:7, 139:25

**role** [6] - 10:15, 39:12, 51:20, 57:12, 77:12, 120:19

**Rolex** [8] - 8:13, 132:9, 132:11, 132:18, 132:23, 133:2, 140:5, 142:17

**Ron** [6] - 15:20, 20:3, 22:2, 32:12, 49:21, 53:12

**room** [14] - 13:19, 13:20, 36:14, 57:21, 58:10, 112:22, 112:23, 113:24, 114:16, 115:23, 116:15, 116:18, 116:19, 141:1

**rose** [3] - 52:15, 53:4, 132:23

**Ross** [85] - 4:3, 4:7, 5:15, 11:15, 16:7, 16:13, 18:12, 18:17, 18:18, 18:20, 19:18, 19:23, 23:7, 24:12, 24:19, 25:14, 25:17, 28:22, 31:9, 31:22, 32:5, 32:6, 32:7, 32:8, 32:9, 32:22, 33:6, 33:17, 38:22, 50:20, 51:4, 55:20, 56:17, 65:6, 65:14, 67:6, 68:1, 72:2, 72:6, 73:5, 74:10, 74:15, 75:1, 75:9, 76:24, 78:4, 80:10, 80:18, 84:4, 86:6, 87:6, 88:14, 88:25, 91:10, 93:11, 93:15, 95:17, 97:2, 98:11, 102:25, 105:1, 107:15, 108:23, 116:2, 116:6, 119:17, 124:17, 124:19, 124:22, 125:3, 125:8, 125:13, 125:16, 125:19, 125:23, 126:1, 126:9, 127:24

**ROSS** [1] - 1:5

**rounded** [1] - 42:15

**rubber** [1] - 52:21

**Ruger** [4] - 134:20, 137:18, 142:21

**ruled** [1] - 61:1

**Rules** [3] - 60:4, 60:6, 68:13

**rules** [2] - 60:10, 68:16

**rulings** [1] - 60:12

**rumors** [1] - 59:3

**run** [3] - 7:22, 43:7, 52:21

**running** [3] - 12:22, 47:25, 55:4

**RX34** [1] - 138:10

## S

**s/Kristin** [1] - 145:13

**Saar** [21] - 12:2, 12:3, 12:12, 13:18, 14:23, 16:12, 20:10, 21:2, 26:23, 28:25, 29:12, 33:12, 34:11, 34:18, 34:19, 36:20, 37:4, 50:3, 51:5, 52:15, 55:25

**safest** [1] - 121:10

**Salazar** [1] - 70:12

**sanctions** [8] - 14:11, 17:9, 74:21, 80:21, 81:3, 81:5, 81:7

**satisfied** [2] - 17:16, 65:22

**satisfy** [2] - 84:23, 85:18

**Savage** [1] - 142:23

**save** [2] - 10:1, 18:15

**saved** [2] - 11:15, 21:7

**saving** [1] - 9:20

**saviour** [4] - 18:25, 21:5, 25:14, 47:7

**saw** [3] - 32:2, 59:2, 73:25

**scale** [3] - 111:25, 112:3

**scales** [2] - 42:7

**scared** [5] - 19:10, 34:18, 45:8, 54:2, 55:5

**scheme** [34] - 4:11, 9:12, 76:19, 76:22, 98:16, 98:24, 99:5, 99:8, 99:11, 99:19, 99:22, 100:2, 100:7, 100:10, 100:16, 101:24, 101:25, 102:3, 102:5, 102:10, 102:12, 102:14, 102:16, 103:6, 104:1, 104:2, 104:8, 104:25, 105:6, 105:14, 105:21, 105:24, 106:3, 122:6

**schemes** [1] - 9:14

**scope** [6] - 135:17, 138:1, 138:3,

138:19, 143:2

**scoped** [2] - 135:18, 135:19

**scopes** [14] - 135:3, 135:9, 136:7, 136:8, 136:9, 136:15, 138:18, 140:13, 140:16, 140:19, 140:23, 143:6

**scores** [1] - 55:17

**SCOTT** [1] - 1:14

**SCRANTON** [2] - 1:9, 1:25

**Scranton** [3] - 1:13, 20:18, 145:19

**screaming** [1] - 13:18

**screwed** [1] - 11:2

**search** [2] - 130:2, 135:7

**searched** [1] - 5:16

**seated** [1] - 144:10

**Sebastian** [1] - 21:2

**Second** [1] - 99:10

**second** [27] - 14:8, 36:21, 42:15, 57:11, 75:9, 81:14, 84:12, 87:6, 89:25, 90:13, 92:7, 92:17, 94:6, 96:11, 97:22, 102:18, 102:19, 106:1, 106:23, 111:8, 113:3, 121:19, 123:6, 123:19, 127:7, 127:11, 134:19

**seconds** [3] - 17:2, 17:4

**secret** [2] - 24:15, 115:17

**secrets** [5] - 27:4, 27:8, 27:15, 28:13, 49:11

**Section** [2] - 1:15, 145:6

**security** [3] - 37:6, 50:2, 69:9

**Security** [2] - 73:7, 91:24

**see** [36] - 22:9, 23:6, 23:8, 23:19, 23:21, 24:13, 26:5, 27:14, 30:4, 31:3, 31:14, 31:16, 31:24, 32:2, 32:4, 32:13, 32:19, 32:21, 33:6, 33:7, 33:10, 35:6, 35:20, 38:15, 39:3, 44:12, 45:3, 51:25, 56:15, 63:14, 64:8, 114:7, 117:13, 119:11,

138:2

**seem** [2] - 119:12, 123:14

**sees** [1] - 22:3

**seize** [4] - 132:9, 132:12, 134:14, 136:25

**seized** [12] - 130:9, 130:10, 131:2, 131:11, 131:13, 131:15, 132:1, 132:11, 133:10, 133:23, 135:4, 140:5

**seizure** [1] - 131:1

**self** [1] - 12:19

**self-serving** [1] - 12:19

**send** [12] - 34:19, 34:21, 43:25, 45:9, 95:21, 96:8, 97:6, 97:19, 103:13, 117:21, 136:25

**Send** [2] - 95:25, 97:10

**sending** [11] - 45:8, 96:11, 96:12, 96:15, 96:16, 97:22, 97:23, 98:1, 98:2, 117:17, 139:20

**sense** [11] - 24:21, 30:4, 46:15, 53:3, 56:15, 59:23, 60:1, 62:6, 62:15, 63:12, 66:16

**senses** [1] - 61:24

**sent** [12] - 6:13, 6:18, 8:20, 9:3, 11:10, 34:7, 44:3, 45:22, 55:22, 96:8, 97:19, 103:19

**sentence** [1] - 118:23

**Sentence** [1] - 144:11

**sentencing** [2] - 144:14, 144:18

**separate** [4] - 67:25, 68:5, 79:7, 122:23

**separately** [2] - 68:4, 68:12

**September** [1] - 89:9

**serial** [12] - 132:15, 132:17, 132:25, 133:18, 136:25, 137:13, 137:15, 137:20, 137:23, 137:25, 138:3, 140:14

**Serial** [5] - 132:21, 133:2, 133:6, 134:19, 137:19

**serious** [5] - 27:20,

**22**

35:16, 42:12, 111:6
**served** [2] - 32:12, 32:15
**service** [8] - 21:9, 47:18, 58:4, 94:4, 94:9, 95:8, 115:6, 144:1
**services** [11] - 4:8, 48:19, 69:9, 86:14, 87:2, 93:17, 93:23, 94:12, 94:18, 95:1
**Services** [2] - 88:1, 125:10
**serving** [1] - 12:19
**sessions** [2] - 15:9, 53:6
**set** [9] - 6:20, 7:20, 8:4, 49:12, 55:20, 62:10, 100:10, 144:12, 145:9
**setting** [1] - 144:14
**settlement** [1] - 130:22
**Seven** [1] - 115:9
**seven** [1] - 56:13
**several** [4] - 9:6, 44:25, 88:6, 108:15
**severe** [16] - 14:9, 16:10, 17:6, 36:6, 36:7, 36:12, 52:15, 53:5, 74:20, 80:19, 81:1, 81:13, 81:19, 81:22, 81:25, 82:2
**severity** [3] - 43:19, 81:24, 82:8
**shaking** [1] - 16:16
**shall** [1] - 121:13
**share** [1] - 122:24
**shared** [5] - 12:24, 28:3, 75:15, 78:14, 87:13
**sharing** [3] - 23:16, 23:17
**sharp** [1] - 52:21
**shears** [1] - 19:21
**sheet** [3] - 6:3, 133:20, 133:21
**sheikh** [1] - 38:4
**sheikhs** [1] - 22:14
**shipment** [2] - 90:11, 92:15
**shipments** [1] - 48:18
**shore** [1] - 94:23
**short** [3] - 21:15, 48:3, 56:19
**shorthand** [1] - 1:22
**shortly** [4] - 75:8, 96:22, 98:5, 141:6
**shoulder** [1] - 12:6
**show** [9] - 6:2, 12:22,

32:12, 48:2, 55:5, 78:22, 85:17, 85:19, 118:25
**showed** [5] - 5:16, 5:20, 6:22, 78:20, 138:18
**showing** [5] - 5:21, 6:6, 77:23, 79:14, 134:6
**shown** [8] - 6:5, 60:24, 70:2, 73:22, 74:1, 107:20, 109:5, 142:11
**shows** [6] - 45:11, 72:21, 77:16, 85:7, 133:18, 139:21
**side** [3] - 47:1, 112:1, 112:5
**sides** [1] - 111:25
**Sierra** [1] - 7:5
**sighed** [1] - 3:23
**sign** [2] - 115:10, 115:25
**signal** [6] - 99:12, 99:14, 103:7, 103:9, 106:3, 106:6
**signals** [1] - 103:18
**signed** [1] - 126:20
**significance** [1] - 72:22
**significant** [1] - 35:12
**significantly** [1] - 127:8
**Siim** [118] - 5:4, 9:21, 10:1, 10:14, 10:16, 10:18, 11:8, 11:9, 11:13, 12:2, 12:3, 12:5, 12:12, 12:16, 12:22, 12:23, 13:1, 13:4, 13:9, 13:12, 13:14, 13:18, 13:21, 14:23, 14:25, 15:1, 15:3, 15:7, 15:13, 15:24, 16:2, 16:11, 16:13, 16:15, 16:19, 16:25, 17:3, 17:4, 17:12, 17:14, 17:15, 17:16, 17:20, 18:2, 18:4, 18:6, 18:8, 18:9, 18:14, 18:16, 18:17, 18:22, 18:25, 19:15, 19:16, 19:19, 20:10, 21:2, 21:8, 26:23, 27:22, 28:12, 28:15, 28:22, 29:2, 29:18, 29:23, 30:3, 30:5, 30:18, 30:19, 31:5, 31:16, 32:25, 34:18, 34:19, 40:18, 40:21, 41:2, 41:15,

41:18, 42:13, 42:14, 43:7, 43:21, 44:25, 45:15, 46:4, 46:8, 46:9, 49:10, 50:3, 51:5, 51:7, 51:11, 51:15, 51:18, 51:19, 51:22, 51:24, 52:4, 52:5, 52:15, 52:17, 52:25, 53:4, 53:21, 54:11, 54:20, 55:9, 55:12, 55:25, 56:2, 56:4
**Siim's** [4] - 16:23, 16:24, 29:19, 52:3
**silence** [1] - 17:4
**silencers** [1] - 133:12
**similar** [5] - 41:9, 93:24, 135:1, 137:8
**similar-type** [1] - 137:8
**similarly** [1] - 123:19
**simple** [4] - 55:19, 73:2, 139:16, 141:1
**simplest** [1] - 123:14
**simplified** [1] - 40:12
**simplifying** [1] - 39:25
**simply** [6] - 60:8, 62:5, 64:8, 67:14, 119:15, 122:11
**single** [3] - 12:13, 50:23, 118:22
**Single** [1] - 67:25
**sissy** [2] - 45:7
**sites** [3] - 135:3, 137:13, 137:15
**sitting** [2] - 20:24, 22:20
**situation** [17] - 27:13, 27:21, 28:6, 29:18, 30:11, 31:3, 31:13, 32:23, 33:10, 34:2, 34:21, 43:5, 44:2, 54:23, 108:7, 111:17
**six** [2] - 32:2, 115:1
**ski** [2] - 7:24, 49:9
**skill** [2] - 69:11, 69:23
**slapped** [1] - 33:21
**slate** [1] - 65:16
**sleeping** [2] - 23:16, 132:14
**slept** [1] - 132:14
**slight** [1] - 49:4
**slip** [1] - 124:13
**small** [1] - 24:16
**smelled** [1] - 61:25
**Smith** [2] - 24:17, 69:2
**smoked** [1] - 31:19
**smoking** [1] - 11:22
**smoothly** [1] - 47:25
**smuggled** [1] - 7:23

**smuggling** [7] - 86:20, 88:8, 95:18, 97:1, 98:10, 106:25, 107:5
**Smuggling** [8] - 67:10, 88:22, 97:3, 108:17, 125:14, 125:15, 125:17, 125:18
**society** [3] - 26:3, 35:24, 39:23
**sold** [1] - 4:23
**soldier** [2] - 15:5, 49:22
**soldiers** [32] - 5:1, 5:5, 10:16, 12:2, 12:13, 12:21, 13:3, 13:4, 13:13, 13:21, 14:25, 16:4, 17:25, 19:17, 19:19, 25:18, 25:20, 25:21, 26:5, 26:6, 26:11, 37:2, 37:4, 38:23, 40:8, 52:18, 53:9, 53:15, 54:19
**sole** [1] - 62:25
**solely** [1] - 58:13
**soliciting** [1] - 84:16
**someone** [6] - 15:6, 30:23, 103:2, 103:3, 112:24, 133:17
**sometimes** [6] - 20:7, 43:10, 49:3, 60:25, 62:9, 137:1
**somewhat** [3] - 39:7, 111:25, 141:5
**son** [1] - 31:21
**soon** [3] - 35:9, 39:18, 115:13
**sorry** [4] - 8:9, 45:5, 119:17, 138:6
**sort** [12] - 21:8, 26:1, 26:9, 26:10, 29:8, 33:4, 37:5, 39:14, 41:18, 48:24, 53:9, 66:18
**sound** [11] - 51:18, 52:24, 55:3, 70:1, 99:12, 99:15, 103:7, 103:9, 106:3, 106:6, 133:8
**sounds** [1] - 132:22
**source** [1] - 140:1
**space** [1] - 23:16
**spare** [1] - 6:12
**speaking** [1] - 11:12
**speaks** [1] - 124:6
**special** [1] - 93:19
**Special** [2] - 73:6, 129:6
**specific** [14] - 14:8, 16:10, 36:5, 36:7,

36:11, 41:7, 41:13, 81:12, 81:19, 84:17, 84:19, 88:21, 102:20, 108:14
**specifically** [15] - 69:1, 69:4, 74:12, 74:19, 80:15, 80:19, 81:1, 86:8, 89:2, 90:23, 91:12, 93:13, 122:4, 129:24, 140:11
**specified** [6] - 96:9, 97:20, 106:24, 107:5, 108:25, 128:10
**Specified** [1] - 126:8
**specifying** [1] - 67:13
**spectator** [1] - 85:4
**speculation** [1] - 66:14
**spell** [1] - 128:25
**spelled** [1] - 89:13
**spelling** [1] - 76:1
**spent** [2] - 5:7, 5:11
**spins** [1] - 9:20
**spoken** [3] - 75:22, 79:25, 101:5
**sports** [1] - 8:11
**sportsman** [1] - 47:4
**sportsman-like** [1] - 47:4
**spread** [2] - 133:20, 133:21
**Spring** [3] - 130:3, 130:16, 142:7
**squeezed** [1] - 16:24
**squeezing** [1] - 34:3
**SR** [1] - 137:18
**stacked** [1] - 8:12
**staff** [1] - 47:21
**stage** [1] - 56:22
**stake** [1] - 78:21
**stand** [3] - 7:10, 56:10, 72:2
**standard** [2] - 111:21, 139:16
**Star** [2] - 20:4, 32:15
**stars** [1] - 20:7
**start** [7] - 13:4, 40:4, 40:7, 48:4, 48:5, 49:15, 115:1
**started** [6] - 3:21, 27:1, 27:3, 28:16, 28:17, 65:15
**starts** [2] - 27:7, 28:14
**state** [18] - 36:16, 68:14, 70:5, 83:9, 87:23, 103:14, 103:18, 107:8, 107:11, 107:12,

**23**

107:15, 107:17, 107:25, 108:13, 110:6, 128:25, 141:24

**State** [7] - 5:13, 68:20, 89:7, 89:18, 93:20, 125:2, 125:12

**State's** [1] - 86:16

**Statement** [2] - 71:6, 73:4

**statement** [13] - 37:8, 48:14, 72:11, 72:17, 72:25, 73:3, 100:19, 100:20, 100:23, 101:18, 101:19, 101:20, 136:12

**statements** [23] - 59:14, 71:9, 71:10, 71:13, 71:16, 72:7, 72:10, 73:5, 73:8, 73:9, 73:10, 73:12, 73:14, 76:17, 79:22, 79:23, 79:24, 80:3, 80:5, 87:23, 100:8, 100:25, 101:2

**Statements** [1] - 72:5

**STATES** [2] - 1:1, 1:2

**states** [1] - 108:15

**States** [78] - 1:11, 4:8, 4:24, 14:13, 17:20, 25:11, 67:8, 67:10, 68:19, 74:14, 80:12, 80:13, 80:14, 80:17, 81:18, 83:9, 83:10, 83:11, 83:13, 86:7, 86:14, 86:16, 86:20, 86:21, 86:23, 87:1, 87:2, 87:5, 87:10, 87:15, 88:9, 88:23, 89:5, 89:6, 89:16, 89:24, 90:2, 90:12, 91:2, 91:16, 91:18, 91:21, 92:5, 92:16, 92:21, 93:19, 94:14, 94:19, 95:9, 95:18, 95:21, 95:23, 97:3, 97:6, 97:8, 98:19, 98:20, 105:9, 105:10, 105:16, 106:21, 106:22, 106:25, 107:6, 124:21, 124:24, 125:1, 125:6, 125:11, 125:15, 125:18, 126:7, 127:25, 145:4, 145:6, 145:17

**statute** [1] - 82:10

**Statute** [1] - 109:21

**stay** [5] - 33:18, 33:24,

115:16, 116:22, 124:3

**stays** [3] - 34:1, 65:17, 66:3

**step** [1] - 139:7

**stepfather's** [1] - 9:3

**steps** [1] - 119:25

**Steven** [1] - 68:20

**stick** [2] - 16:22, 52:23

**still** [1] - 18:4

**stipulated** [1] - 59:10

**stipulation** [2] - 141:13, 143:8

**Stockholm** [1] - 54:4

**stomach** [1] - 52:18

**stood** [1] - 13:19

**stop** [7] - 13:5, 30:22, 31:6, 40:7, 56:4, 56:5, 121:13

**store** [1] - 137:5

**story** [7] - 9:13, 10:1, 10:12, 11:2, 21:22, 31:18, 45:19

**straight** [1] - 10:10

**straightforward** [1] - 63:9

**strange** [1] - 20:19

**stranger** [1] - 20:19

**Street** [1] - 1:20

**street** [1] - 38:17

**stress** [1] - 55:2

**stricken** [1] - 61:4

**Stroudsburg** [4] - 74:16, 130:3, 130:16, 142:7

**struck** [2] - 16:19, 59:20

**struggling** [1] - 26:19

**subject** [3] - 115:14, 128:7, 128:15

**submit** [20] - 22:5, 22:7, 26:17, 28:2, 29:4, 31:3, 31:11, 34:23, 36:18, 37:1, 37:11, 40:25, 42:24, 43:6, 44:19, 45:17, 46:24, 94:20, 119:20

**substantial** [1] - 77:12

**substitute** [1] - 57:15

**succeed** [1] - 85:16

**succeeded** [2] - 102:10, 102:11

**success** [1] - 87:23

**successful** [1] - 79:1

**suffered** [1] - 102:6

**suffering** [25] - 14:9, 14:10, 16:11, 17:7, 17:8, 36:6, 36:8, 36:12, 40:19, 41:16, 52:8, 52:16, 53:5,

74:20, 74:21, 80:20, 80:21, 81:2, 81:13, 81:20, 81:23, 81:24, 82:2, 82:8

**sufficient** [5] - 64:20, 67:22, 69:23, 77:20, 100:14

**suffocated** [1] - 52:19

**suggest** [2] - 39:20, 123:20

**suggested** [1] - 41:17

**suggesting** [3] - 39:21, 47:6, 119:14

**suite** [1] - 1:12

**suited** [1] - 19:6

**Sulaymaniyah** [1] - 5:2

**sun** [1] - 50:12

**superseding** [38] - 67:6, 74:10, 75:6, 80:10, 83:1, 83:24, 86:6, 88:6, 88:25, 91:10, 95:17, 96:9, 97:2, 97:20, 98:11, 98:15, 100:6, 100:11, 100:13, 102:15, 102:17, 105:1, 105:5, 106:13, 107:9, 107:10, 108:19, 109:9, 110:16, 119:2, 121:4, 121:8, 121:23, 128:5, 128:7, 142:4, 142:12, 142:17

**supervision** [2] - 145:11, 145:23

**supplier** [1] - 105:16

**suppliers** [2] - 119:25, 120:5

**support** [2] - 9:1, 69:25

**supported** [1] - 70:2

**supporting** [1] - 69:19

**suppression** [1] - 99:25

**suppressors** [1] - 133:12

**surrounded** [1] - 20:19

**surrounding** [3] - 76:18, 107:16, 108:24

**suspicion** [4] - 13:23, 13:25, 62:7, 66:10

**suspicions** [1] - 59:3

**sustained** [2] - 60:19, 61:2

**swear** [1] - 3:22

**Sweden** [1] - 54:8

**SWORN** [1] - 128:24

**Sylvia** [3] - 117:5, 118:25, 122:18

**sympathy** [1] - 58:21

**Syndrome** [1] - 54:4

**Syria** [1] - 24:2

**system** [2] - 39:11, 58:17

**T**

**T3** [1] - 134:18

**table** [1] - 10:5

**Talabani** [11] - 5:3, 15:21, 24:3, 27:16, 49:19, 49:22, 50:8, 53:19, 53:22, 53:23, 119:21

**Tallinn** [1] - 4:21

**tangled** [1] - 10:22

**tape** [4] - 29:20, 29:22, 35:7

**tapped** [1] - 136:14

**tapping** [1] - 140:18

**tase** [1] - 19:20

**tased** [5] - 12:6, 16:17, 52:20

**taser** [1] - 16:15

**task** [1] - 22:8

**tea** [1] - 55:13

**teasing** [1] - 45:7

**technical** [1] - 94:22

**telegraph** [1] - 103:15

**telephone** [4] - 58:3, 103:15, 103:17, 115:5

**television** [15] - 99:13, 99:15, 103:8, 103:10, 103:12, 103:16, 103:25, 104:5, 104:10, 104:12, 104:15, 104:18, 104:23, 106:4, 106:7

**temper** [2] - 10:18, 51:17

**Ten** [1] - 1:8

**tend** [1] - 78:22

**tending** [1] - 72:17

**tensions** [1] - 28:12

**term** [8] - 20:2, 35:11, 35:12, 82:5, 90:17, 91:5, 95:12, 99:23

**terms** [3] - 40:13, 93:6, 95:6

**terrible** [3] - 13:7, 13:8, 30:10

**terrified** [1] - 20:21

**terrify** [1] - 19:7

**territories** [1] - 83:11

**territory** [1] - 83:12

**terror** [1] - 20:16

**terrorism** [1] - 50:4

**terrorist** [1] - 24:1

**test** [2] - 6:9, 6:13

**test-firing** [1] - 6:9

**TESTIFIED** [1] - 128:24

**testified** [31] - 5:16, 12:12, 12:14, 13:23, 13:24, 17:23, 20:15, 21:19, 22:25, 23:3, 25:15, 26:23, 30:18, 30:19, 32:25, 34:2, 34:7, 39:1, 50:1, 50:7, 50:19, 50:24, 51:19, 53:12, 54:10, 54:11, 55:10, 64:25, 71:19, 72:3, 142:14

**testifies** [2] - 61:23, 63:15

**testify** [9] - 9:10, 16:14, 21:18, 29:19, 49:24, 70:7, 71:25, 72:1

**Testify** [1] - 71:24

**testifying** [3] - 30:1, 63:6, 63:19

**testimony** [69] - 4:13, 11:1, 11:4, 11:6, 11:25, 12:4, 12:19, 14:22, 16:11, 17:2, 24:9, 25:16, 28:23, 33:19, 45:17, 49:18, 50:21, 51:13, 51:14, 52:14, 52:17, 53:11, 56:12, 56:13, 59:8, 59:10, 59:20, 60:15, 60:16, 61:4, 61:7, 62:23, 62:24, 63:2, 63:25, 64:1, 64:5, 64:6, 64:7, 64:15, 64:16, 64:19, 64:22, 65:3, 68:17, 69:16, 69:20, 70:9, 70:17, 70:19, 70:21, 71:1, 71:4, 71:7, 71:9, 71:12, 71:15, 71:17, 71:20, 71:21, 71:22, 72:3, 72:4, 72:6, 112:19, 129:13, 133:16, 139:24, 139:25

**testing** [1] - 94:15

**text** [2] - 58:4, 115:6

**th** [1] - 49:23

**thanked** [1] - 47:18

**thankfully** [1] - 21:14

**THE** [78] - 1:1, 1:1, 1:8, 1:10, 1:19, 3:1,

**24**

3:5, 21:3, 47:15, 56:19, 56:22, 116:21, 116:25, 117:4, 117:18, 117:20, 117:22, 118:1, 118:5, 118:9, 118:11, 118:18, 118:22, 119:5, 119:10, 119:14, 119:19, 120:9, 120:13, 121:5, 121:9, 121:13, 121:24, 122:7, 122:10, 122:18, 122:19, 122:20, 122:23, 123:3, 123:6, 123:13, 123:19, 123:24, 124:3, 124:6, 124:8, 124:10, 124:13, 126:25, 128:25, 129:1, 134:2, 134:4, 135:23, 136:2, 138:22, 139:3, 139:5, 139:7, 139:8, 139:11, 140:8, 140:25, 141:15, 141:18, 141:20, 141:24, 142:2, 143:10, 143:15, 143:16, 143:17, 143:22, 144:10, 144:19, 144:21, 144:24
**theirs** [1] - 38:13
**theme** [1] - 48:12
**themselves** [4] - 7:23, 74:2, 76:3, 86:4
**theory** [1] - 120:2
**thereby** [2] - 98:21, 105:11
**therefore** [3] - 79:19, 80:1, 82:25
**thereof** [2] - 82:19, 82:24
**thinking** [4] - 9:25, 30:13, 55:12, 107:14
**thinks** [1] - 19:3
**third** [20] - 14:9, 42:18, 75:11, 81:15, 84:15, 84:23, 87:8, 90:4, 90:19, 92:10, 92:25, 94:10, 96:15, 98:1, 99:11, 103:4, 106:2, 107:2, 111:10, 113:12
**Thomas** [4] - 2:4, 69:2, 128:22, 129:1
**THOMAS** [1] - 129:1
**thoughts** [1] - 119:1

**thousand** [1] - 138:14
**thousands** [1] - 138:12
**threat** [8] - 42:12, 42:16, 42:19, 42:21, 42:23, 55:7, 111:6, 111:9
**threatened** [8] - 51:25, 52:1, 52:22, 54:12, 56:5, 111:11, 111:12, 111:15
**three** [5] - 21:14, 75:3, 105:19, 121:17, 132:2
**throat** [4] - 16:17, 16:20, 52:18, 52:20
**throughout** [1] - 66:4
**throws** [1] - 20:2
**Tier** [2] - 23:1, 28:4
**tight** [2] - 23:13
**tighter** [1] - 34:2
**Tikka** [1] - 134:18
**tip** [1] - 111:25
**tips** [2] - 55:6, 112:3
**Title** [1] - 145:6
**today** [5] - 5:7, 5:11, 12:17, 37:9, 48:1
**today's** [1] - 133:16
**TODD** [1] - 1:11
**Todd** [1] - 43:11
**together** [17] - 12:21, 16:8, 22:7, 22:17, 23:12, 23:14, 23:15, 23:18, 29:4, 40:4, 75:13, 75:22, 77:6, 80:18, 83:6, 86:11, 87:10
**took** [10] - 7:10, 10:19, 12:8, 27:24, 28:13, 96:2, 97:13, 119:25, 127:9, 141:10
**Tool** [1] - 8:3
**tool** [1] - 16:23
**tools** [2] - 4:7, 4:8
**top** [1] - 29:8
**tormenters** [2] - 15:9, 17:4
**Torture** [38] - 13:15, 13:16, 14:4, 14:5, 14:6, 16:9, 19:24, 25:7, 35:4, 39:2, 40:11, 40:22, 41:23, 42:9, 42:10, 47:12, 47:13, 52:12, 52:13, 67:7, 74:11, 74:24, 75:2, 75:7, 80:11, 80:23, 80:24, 81:9, 87:21, 88:3, 124:16, 124:18
**torture** [59] - 9:23,

9:24, 10:1, 10:19, 11:24, 14:25, 15:11, 15:13, 16:12, 17:11, 17:19, 18:2, 18:14, 18:19, 19:11, 21:2, 22:18, 24:22, 35:4, 35:6, 35:8, 35:11, 35:16, 35:20, 36:2, 40:15, 40:18, 40:19, 41:1, 41:7, 41:15, 41:16, 47:13, 49:1, 50:3, 51:12, 52:7, 53:16, 54:24, 55:2, 56:4, 74:18, 75:5, 75:12, 75:17, 75:23, 79:6, 80:14, 80:24, 81:8, 81:15, 81:17, 81:24, 82:5, 82:9, 82:25, 83:15, 83:23
**tortured** [16] - 4:12, 13:12, 13:14, 13:19, 15:24, 17:21, 19:12, 19:15, 19:16, 20:11, 35:6, 44:13, 44:22, 49:10, 55:9, 56:2
**torturing** [3] - 12:3, 21:1, 36:12
**total** [1] - 56:14
**touch** [1] - 54:1
**touched** [1] - 61:24
**tourist** [1] - 46:2
**toward** [1] - 77:7
**towards** [1] - 19:11
**trade** [2] - 28:13, 49:11
**Trade** [2] - 86:17, 89:19
**Traffic** [7] - 8:23, 89:12, 91:8, 94:11, 95:15, 97:12, 98:9
**tragic** [2] - 34:25
**training** [4] - 69:11, 69:24, 94:13, 95:3
**transaction** [4] - 106:23, 107:2, 122:25, 123:8
**transcript** [7] - 1:22, 73:23, 74:4, 74:7, 145:7, 145:10, 145:22
**TRANSCRIPT** [1] - 1:7
**transcription** [1] - 1:22
**transcripts** [3] - 73:21, 73:23, 73:25
**transfer** [6] - 8:6, 130:21, 136:22, 140:11, 140:12, 140:21
**Transfer** [2] - 8:15,

126:1
**transferred** [3] - 6:23, 134:21, 137:6
**Transferring** [1] - 126:6
**transfers** [1] - 137:4
**transmission** [6] - 90:11, 92:15, 99:14, 103:9, 104:5, 106:5
**transmits** [1] - 103:12
**transmitted** [5] - 99:12, 103:6, 103:24, 104:17, 106:3
**Transmitting** [1] - 126:6
**transported** [1] - 106:20
**Transporting** [1] - 126:6
**treat** [1] - 60:14
**treated** [2] - 33:13, 79:23
**treatment** [3] - 35:14, 35:20, 82:7
**trial** [34] - 4:4, 4:6, 12:1, 12:15, 19:23, 55:14, 57:6, 57:8, 60:5, 61:15, 61:18, 62:16, 62:22, 63:24, 65:16, 66:4, 67:12, 68:15, 70:6, 71:8, 71:10, 71:12, 71:15, 71:17, 73:15, 107:24, 112:9, 113:19, 114:18, 127:8, 127:12, 129:8, 129:14, 139:25
**Trial** [1] - 1:8
**tribe** [4] - 22:15, 26:2, 38:4, 55:21
**tribes** [1] - 24:3
**trick** [1] - 30:1
**tried** [7] - 32:24, 33:9, 33:24, 34:19, 34:21, 135:10, 136:16
**tries** [1] - 22:16
**Triin** [19] - 11:24, 12:1, 12:24, 14:22, 18:15, 18:22, 18:25, 19:9, 19:14, 20:15, 20:17, 29:22, 30:3, 30:10, 51:11, 52:1, 54:7, 55:5, 73:18
**Trijicon** [1] - 138:10
**trip** [1] - 46:3
**tripods** [1] - 135:9
**trouble** [1] - 22:20
**true** [5] - 20:24, 71:22,

111:23, 145:7
**truly** [1] - 34:25
**Trump** [1] - 38:19
**trust** [2] - 9:19, 9:25
**truth** [6] - 10:9, 10:24, 13:11, 43:16, 99:25, 100:1
**truthful** [2] - 63:2, 63:9
**truths** [2] - 100:25, 101:23
**try** [15] - 22:6, 24:20, 24:21, 33:17, 36:19, 38:9, 40:20, 41:17, 51:5, 56:3, 70:24, 76:11, 116:21, 133:14, 137:6
**trying** [17] - 28:18, 28:21, 28:25, 30:1, 30:2, 31:8, 31:12, 31:13, 34:12, 34:14, 34:18, 36:13, 37:11, 44:19, 49:3, 56:9, 63:8
**Tuesday** [1] - 55:14
**tuned** [1] - 124:3
**Turkey** [1] - 131:17
**turn** [2] - 26:17, 127:22
**turned** [1] - 142:14
**turns** [1] - 46:19
**tweaking** [1] - 7:7
**twenty** [1] - 56:20
**two** [23] - 3:10, 4:13, 11:6, 20:9, 47:20, 47:22, 48:8, 48:21, 57:4, 61:17, 64:7, 74:23, 75:5, 75:20, 76:9, 86:25, 122:23, 129:9, 130:9, 131:13, 134:13, 143:9, 144:2
**type** [8] - 24:18, 76:10, 133:18, 136:9, 136:14, 137:8, 139:23, 140:16
**types** [2] - 61:17, 61:19
**typographical** [1] - 123:3

## U

**U.S** [2] - 49:22, 83:11
**U.S.A** [1] - 55:23
**ugly** [1] - 24:23
**ultimately** [6] - 28:9, 33:12, 34:5, 45:11, 46:14, 57:22
**unanimous** [7] -

**25**

57:19, 112:16, 113:4, 114:1, 114:10, 115:23, 124:10

**unanimously** [13] - 88:13, 88:15, 124:17, 124:18, 124:21, 125:3, 125:8, 125:12, 125:15, 125:19, 125:22, 126:1, 126:9

**unanticipated** [1] - 81:23

**unbelievable** [1] - 8:10

**unclear** [1] - 127:19

**unconscious** [1] - 16:21

**uncovered** [1] - 4:20

**under** [33] - 13:23, 13:24, 14:7, 14:15, 17:3, 17:11, 32:16, 36:21, 37:13, 37:15, 37:17, 37:21, 42:10, 42:11, 53:8, 55:2, 55:7, 60:9, 73:13, 74:19, 80:25, 81:14, 82:9, 82:11, 82:19, 82:20, 101:10, 110:17, 110:20, 110:24, 111:5, 145:11, 145:23

**underlying** [1] - 119:23

**undertake** [1] - 133:13

**undertaking** [1] - 22:5

**undertook** [1] - 20:18

**unduly** [1] - 114:23

**unfortunately** [1] - 139:1

**uniform** [1] - 29:8

**uniformed** [1] - 53:15

**Unindicted** [2] - 86:11, 86:12

**unintended** [1] - 81:24

**unit** [5] - 15:16, 15:21, 23:13, 83:3, 83:7

**Unit** [1] - 27:19

**UNITED** [2] - 1:1, 1:2

**United** [78] - 1:11, 4:8, 4:24, 14:13, 17:19, 25:11, 67:8, 67:10, 68:19, 74:14, 80:12, 80:13, 80:14, 80:17, 81:18, 83:9, 83:10, 83:11, 83:13, 86:7, 86:14, 86:16, 86:20, 86:23, 87:1, 87:2, 87:5, 87:9, 87:15, 88:8, 88:23, 89:5,

89:6, 89:15, 89:16, 89:24, 90:2, 90:11, 91:1, 91:16, 91:18, 91:21, 92:5, 92:16, 92:21, 93:19, 94:13, 94:19, 95:9, 95:18, 95:21, 95:23, 97:3, 97:6, 97:8, 98:19, 98:20, 105:9, 105:15, 106:21, 106:25, 107:6, 124:21, 124:24, 125:1, 125:6, 125:11, 125:14, 125:17, 126:6, 126:7, 127:25, 145:4, 145:6, 145:17

**units** [1] - 15:25

**unity** [4] - 40:15, 75:15, 78:14, 87:13

**unknown** [1] - 143:4

**Unlawful** [1] - 126:8

**unlawful** [13] - 14:17, 14:19, 36:24, 42:12, 76:3, 76:12, 82:13, 82:15, 106:24, 107:3, 107:5, 109:12, 111:5

**unless** [15] - 12:18, 13:1, 38:3, 65:17, 65:22, 88:15, 89:17, 90:23, 100:17, 122:7, 122:10, 135:18, 135:19, 144:5, 145:23

**unlike** [1] - 42:1

**unspoken** [1] - 75:22

**unthinkable** [1] - 15:16

**untrue** [2] - 100:20, 100:22

**unusually** [3] - 35:13, 35:17, 82:6

**up** [38] - 3:17, 6:2, 6:20, 7:20, 8:4, 9:12, 9:14, 10:2, 10:3, 10:21, 11:2, 11:22, 13:12, 16:22, 16:25, 25:8, 28:5, 28:16, 29:7, 30:19, 31:9, 31:18, 33:16, 43:10, 44:2, 45:12, 47:8, 48:21, 49:12, 52:23, 53:17, 55:20, 56:3, 57:22, 71:10, 107:23, 108:11, 123:4

**upset** [5] - 18:23, 18:24, 19:1

**user** [4] - 98:20,

105:10, 119:21, 120:8

**USML** [4] - 89:17, 90:16, 90:18, 90:24

**V**

**valid** [1] - 90:25

**Valor** [1] - 20:5

**value** [1] - 104:21

**various** [2] - 26:25, 99:23

**vehicle** [1] - 132:4

**vehicles** [9] - 131:11, 131:13, 131:14, 131:16, 131:20, 131:21, 132:2, 132:6, 140:4

**venture** [2] - 76:21, 85:3

**verdict** [32] - 25:8, 25:9, 47:12, 56:25, 57:10, 57:19, 57:20, 58:6, 61:16, 61:20, 63:23, 67:1, 67:3, 68:5, 113:3, 113:15, 113:16, 113:20, 115:21, 115:22, 123:1, 124:8, 124:9, 124:10, 124:13, 124:15, 126:20, 127:2, 127:10, 141:3

**Verdict** [1] - 112:16

**verdicts** [3] - 112:22, 115:23, 115:24

**versus** [1] - 40:8

**vests** [1] - 50:11

**Veteran** [1] - 32:14

**Via** [1] - 125:25

**via** [3] - 8:17, 9:3, 105:16

**victim** [2] - 17:8, 102:6

**victims** [4] - 12:9, 14:3, 14:11, 99:19

**video** [1] - 6:13

**videos** [5] - 4:14, 6:6, 7:2, 9:6, 34:7

**videotape** [1] - 6:11

**views** [2] - 113:1, 114:3

**Vilist** [3] - 12:4, 14:23, 50:9

**Viltrop** [5] - 12:8, 14:23, 15:2, 51:6, 54:3

**VIN** [2] - 142:10, 142:11

**violate** [1] - 93:15

**violated** [4] - 8:23, 8:24, 9:7, 93:15

**violating** [9] - 8:22, 67:7, 88:7, 89:1, 89:2, 91:11, 93:11, 108:16, 109:7

**Violating** [3] - 124:23, 125:4, 125:9

**violation** [15] - 44:5, 74:11, 80:11, 86:17, 89:8, 91:19, 91:24, 93:22, 95:19, 96:25, 97:4, 98:8, 98:12, 105:2, 128:1

**violations** [3] - 106:25, 107:6, 127:25

**Violations** [2] - 67:9, 67:10

**violence** [3] - 12:22, 24:23

**visit** [1] - 46:2

**voice** [1] - 20:16

**voluntarily** [1] - 77:4

**vote** [3] - 113:1, 114:8, 114:9

**voted** [1] - 115:16

**vouched** [2] - 49:18, 49:21

**vs** [1] - 1:4

**W**

**wait** [2] - 30:20, 30:24

**wants** [4] - 22:19, 28:20, 45:12, 51:3

**War** [1] - 38:16

**wares** [1] - 96:19

**warrant** [2] - 130:2, 135:8

**warrants** [1] - 131:1

**wars** [1] - 27:18

**WASHINGTON** [1] - 1:25

**Washington** [2] - 1:12, 1:18

**washington** [1] - 1:16

**wasta** [3] - 26:1, 38:1, 49:16

**watch** [1] - 22:21

**watches** [8] - 8:13, 132:10, 132:11, 132:15, 132:16, 132:18, 140:5, 142:17

**water** [2] - 3:21, 46:9

**weapon** [4] - 48:24, 136:22, 136:25, 137:24

**Weapons** [4] - 7:2, 99:1, 119:18, 125:21

**weapons** [18] - 4:7,

7:15, 22:4, 24:12, 24:14, 24:15, 24:19, 34:4, 34:5, 55:21, 55:22, 135:10, 136:10, 136:11, 136:23

**wearing** [1] - 53:15

**weave** [1] - 10:22

**webs** [1] - 10:22

**weed** [1] - 31:19

**week** [1] - 143:9

**weeks** [14] - 3:10, 4:13, 20:9, 21:14, 21:15, 33:14, 47:20, 47:22, 48:8, 48:22, 49:10, 56:3, 129:9, 144:2

**weighing** [6] - 59:23, 64:11, 66:18, 69:16, 69:20, 70:16

**weight** [17] - 59:25, 62:17, 62:19, 64:23, 64:24, 65:3, 67:17, 69:15, 70:14, 70:22, 71:5, 71:23, 73:9, 80:9, 113:2, 114:20, 114:24

**well-grounded** [1] - 111:8

**well-rounded** [1] - 42:15

**Wells** [8] - 6:24, 8:5, 8:16, 129:25, 131:2, 131:5, 142:8, 142:9

**Wesson** [1] - 24:17

**whatsoever** [1] - 13:10

**wheels** [1] - 26:16

**whereas** [1] - 120:19

**whit** [1] - 30:2

**white** [1] - 30:7

**whole** [5] - 17:17, 23:23, 24:14, 50:13, 52:9

**whopper** [1] - 10:4

**wife** [3] - 34:8, 34:22, 130:23

**willful** [3] - 16:7, 82:22, 83:6

**willfully** [23] - 86:13, 87:1, 89:3, 89:14, 90:7, 91:4, 91:5, 91:15, 91:20, 92:12, 93:4, 93:6, 93:15, 94:10, 95:12, 99:7, 99:18, 105:23, 109:10, 109:14, 109:17, 109:20

**William** [2] - 1:20, 70:12

**26**

**willing** [3] - 19:6, 19:7, 19:10
**willingly** [1] - 20:20
**Willow** [1] - 3:22
**Winchester** [1] - 134:18
**wind** [2] - 33:16, 55:25
**wings** [1] - 50:12
**wire** [23] - 6:23, 8:21, 9:2, 99:13, 99:15, 103:4, 103:7, 103:10, 103:12, 103:20, 103:22, 103:25, 104:5, 104:10, 104:11, 104:15, 104:18, 104:23, 105:2, 106:4, 106:6, 128:2, 130:21
**Wire** [8] - 67:11, 98:12, 106:11, 108:18, 109:8, 125:20, 125:24, 126:1
**wired** [1] - 43:23
**wished** [1] - 85:15
**wishes** [1] - 139:12
**Wit** [1] - 124:25
**withdrawn** [2] - 79:12, 79:15
**within-mentioned** [1] - 145:8
**witness** [36] - 12:5, 20:2, 51:5, 51:23, 52:2, 60:22, 60:25, 61:23, 61:24, 63:1, 63:2, 63:3, 63:5, 63:7, 63:9, 63:14, 63:15, 63:20, 63:22, 63:23, 63:24, 64:3, 64:16, 64:17, 64:22, 70:6, 70:20, 70:23, 70:25, 71:4, 71:19, 72:2, 72:4, 129:16, 134:3
**Witness** [3] - 2:3, 70:4, 71:6
**WITNESS** [2] - 129:1, 139:8
**witness'** [17] - 63:2, 63:16, 63:18, 63:25, 64:1, 64:5, 64:7, 64:18, 64:22, 69:17, 69:18, 69:19, 70:8, 70:9, 71:11, 71:17, 71:20
**witnessed** [6] - 4:15, 16:12, 20:10, 20:14, 20:15
**Witnesses** [4] - 62:21,

65:5, 68:13, 70:18
**witnesses** [34] - 4:14, 4:16, 4:21, 4:23, 5:4, 12:14, 13:6, 15:4, 20:17, 28:24, 31:23, 32:2, 33:7, 33:10, 34:20, 55:16, 59:8, 63:1, 64:6, 64:25, 65:3, 65:9, 65:12, 68:14, 68:17, 69:21, 70:4, 70:13, 70:17, 71:8, 71:16, 129:13, 139:5
**witnesses'** [1] - 71:14
**witnessing** [1] - 64:8
**woke** [2] - 3:16, 16:22
**wondering** [1] - 31:25
**word** [2] - 25:25, 35:4
**words** [12] - 3:25, 14:19, 28:17, 42:17, 51:11, 54:24, 58:7, 78:17, 82:15, 84:25, 101:3, 101:5
**workers** [1] - 22:24
**worried** [2] - 19:2, 54:2
**worth** [1] - 142:13
**worthy** [2] - 63:1, 64:17
**wrap** [1] - 43:10
**wrapped** [1] - 16:24
**write** [8] - 31:16, 33:5, 115:10, 115:15, 115:24, 123:14, 123:20
**writing** [9] - 43:22, 56:24, 99:12, 99:14, 103:7, 103:9, 106:3, 106:6, 143:8
**Written** [3] - 125:2, 125:7, 125:12
**written** [9] - 33:2, 48:20, 75:25, 86:15, 87:3, 94:7, 94:24, 101:5, 127:14
**wrote** [1] - 63:24

## X

**Xbox** [1] - 55:12

## Y

**yarn** [1] - 9:20
**yeager** [1] - 145:13
**YEAGER** [4] - 1:24, 145:3, 145:13, 145:16
**year** [3] - 25:23, 55:9, 55:10

**years** [3] - 29:24, 45:1, 48:9
**yellow** [2] - 40:3, 134:25
**yesterday** [10] - 3:11, 7:10, 25:15, 29:19, 48:16, 49:24, 50:1, 50:7, 56:13, 117:5
**York** [1] - 1:18
**young** [1] - 23:11
**yourself** [5] - 24:7, 32:11, 37:16, 114:13, 133:17
**yourselves** [3] - 29:3, 48:4, 57:21

## Z

**Zarya** [3] - 7:1, 50:10, 50:15
**zero** [1] - 12:18
**Zuhair** [2] - 17:9, 69:9