1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff          )
       vs                      )    18-CR-97
                               )
ROSS ROGGIO,                   )
                               )
            Defendant          )
_____)

TRANSCRIPT OF PROCEEDINGS
*Sentencing*
BEFORE THE HONORABLE ROBERT D. MARIANI
MONDAY, APRIL 15, 2024; 10:00 A.M.
SCRANTON, PENNSYLVANIA

FOR THE GOVERNMENT:
    TODD K. HINKLEY, ESQ.
    Assistant United States Attorney
    Suite 311
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503

    SCOTT A. CLAFFEE, ESQ.
    DOJ-Nsd
    Counterintelligence & Export Control Section
    950 Pennsylvania Avenue NW
    Washington, DC  20530

    PATRICK JASPERSE, ESQ.
    DOJ-Crm
    1301 New York Avenue, NW
    Washington, DC  20530

FOR THE DEFENDANT:
    GINO A. BARTOLAI, JR., ESQ.
    238 William Street
    Pittston, Pennsylvania  18640

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

2

THE COURT: Good morning. We are here on the matter of United States v. Ross Roggio. Today is the date set for imposition of sentence in this matter.

By way of background, a jury trial commenced in this case before me on May 8 of 2023. Mr. Roggio was convicted on all undismissed counts of the superseding indictment on May 19, 2023.

Previously, the record should reflect that, on May 8 of 2023, Counts 11, 16, 20, 25, 26 and 35 of the superseding indictment were dismissed by the Court upon Motion of the Government.

The verdict form that was completed by the jury states as follows:

Count 1. On the charge of Conspiracy To Commit Torture. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 2. On the charge of Torture. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 3. On the charge of Conspiracy To Commit An Offense Against The United States. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 4. On the charge of Violating The Export Control Act By Exporting Defense Articles On The United States Munitions List; to wit, M4 Bolt Gas Rings and Firing Pin Retainers Without Having First Obtained From The United States Department of State A License Or Written Approval. The jury

unanimously finds the Defendant Ross Roggio, Guilty.

Count 5. On the charge of Violating The International Emergency Economic Powers Act By Exporting Rifling Combo Buttons Without Having First Obtained From The United States Department Of Commerce A License Or Written Approval. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 6. On the charge of Violating The Arms Export Control Act By Exporting And Furnishing Defense Services To Iraq Without Having First Obtained From The United States Department of State A License Or Written Approval. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 7. On the charge of Smuggling Goods From The United States By Smuggling Rifling Combo Buttons. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 8. On the charge of Smuggling Goods From The United States By Smuggling M4 Bolt Gas Rings Or Firing Pin Retainers. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 9. On the charge of Wire Fraud Relating To The Email Of A Weapons And Ammunition Feasibility Report on November 14, 2015. The jury unanimously finds the Defendant Ross Roggio, Guilty.

Count 10. On the charge of Wire Fraud Related To The Order Of Rifling Buttons And Paying For Them With A Credit Card Via Wire Transfer. The jury unanimously finds the Defendant Ross Roggio, Guilty.

4

Counts 12 through 15, 17 through 19, 21 through 24, 27 through 34 and 36 through 39. On the charge of Money Laundering Based On The Transporting, Transmitting and Transferring Of Funds To The United States From And Through A Place Outside The United States To Promote The Carrying On Of A Specific Unlawful Activity.

The jury unanimously finds the Defendant Ross Roggio, as to Count 12, Guilty; Count 13, Guilty; Count 14, Guilty; Count 15, Guilty; Count 17, Guilty; Count 18, Guilty; Count 19, Guilty; Count 21, Guilty; Count 22, Guilty; Count 23, Guilty; Count 24, Guilty; Count 27, Guilty; Count 28, Guilty; Count 29, Guilty; Count 30, Guilty; Count 31, Guilty; Count 32, Guilty; Count 33, Guilty; Count 34, Guilty; Count 36, Guilty; Count 37, Guilty; Count 38, Guilty; Count 39, Guilty.

The foregoing is the unanimous verdict of the jury in this case.

In accordance with The Federal Rules of Criminal Procedure, a Pre-Sentence Report in this matter was prepared on August 3 of 2023 and last revised on March 27 of 2024. There are objections to the report by the Defendant. My understanding is there are no objections from the Government.

MR. HINKLEY: That is correct, Your Honor.

THE COURT: I have received substantial written submissions from the parties, as to the objections in this case. The objections relate to specific paragraphs. I'll identify those

now.

With respect to Paragraphs 43 through 50. The Defendant objects to the use of United States Sentencing Guideline Section 2A4.1 Kidnapping, Abduction and Unlawful Restraint for the Sentencing Guideline calculations for Count 1.

The Defendant contends that the Chapter 2 Guideline for Aggravated Assault, which is Guideline Section 2A2.2 is more appropriate than the guideline used for Kidnapping.

Paragraph 44. The Defendant believes that the two-level enhancement at Sentencing Guideline 2A4.1(b)2(B) is not appropriate, because the evidence presented at trial did not prove serious bodily injury.

Paragraph 46. The Defendant believes that a two-level enhancement at Sentencing Guideline 2A4.1(b)4(A) is not appropriate because, in the Defendant's opinion, the evidence presented at trial proved that the victim was detained unlawfully by a foreign government or military.

I should note that Sentencing Guideline 2A4.1(b)4(A) states, quote;

If the victim was not released before 30 days had elapsed, increase by two levels. End Quote.

Paragraph 48. The Defendant believes that the four-level Aggravating Role Enhancement, pursuant to Sentencing Guideline 3B1.1(a) does not apply, because the criminal activity did not involve five or more participants.

6

Paragraph 49. The Defendant believes a two-level adjustment for Obstruction of Justice, pursuant to Sentencing Guideline 3C1.1 was inaccurately applied, because lying to authorities during the investigation does not meet the elements necessary for this enhancement. Mr. Roggio, also, denies lying under oath at trial.

In addition, because of these objections that I've just identified, the Defendant also objects to the conclusions made in the following paragraphs:

Paragraph 50, 51, 56, 58, 59, 61, 64, 113, 114, 121, 131 and 132.

And, lastly, the Defendant disagrees with the information contained in Paragraphs 5 through 37 of the Pre-Sentence Report, specifically, the offense conduct. He maintains his innocence, he maintains the position that the trial record speaks for itself, and that the Court is able to draw conclusions it deems necessary and appropriate.

Now, counsel, as I've indicated, you all have submitted -- or you each, I should say -- each have submitted extensive Sentencing Memoranda, with particular respect to the objections that have been raised that I've identified that relate to the Sentencing Guidelines.

In addition to that, there's obviously a need, thereafter, to address the factors of Section 3553(a) in determining the appropriate punishment in this case.

7

With respect to your objections, I am prepared to hear additional argument, if you believe that additional argument is necessary beyond that which you've given me in your very extensive written submissions on the objections. How do you wish to proceed?

MR. WATT: Your Honor, I would like a very brief opportunity. I promise I won't reiterate what I put in writing, I would just like an opportunity to, maybe, summarize it in a very short period of time.

THE COURT: Very well.

MR. HINKLEY: Your Honor, Mr. Jasperse will respond.

THE COURT: Very well. Mr. Watt, you can proceed. Again, perhaps, unnecessarily mentioning it again, I am very well aware of what your objections are, because they have been thoroughly explicated and I have studied them at length, so I'm ready to proceed, in light of your request I granted.

MR. WATT: Thank you, Your Honor. I will keep it brief and won't reiterate.

I would just like to -- it dawned on me this morning that the application -- and, again, the main objection here, I think, the main argument is with respect to the application of Kidnapping versus Aggravated Assault. And it dawned on me this morning that the way that this is structured and the way that the guidelines are applying the offense of Torture is a way for the Government -- maybe not in this case, but maybe in some

8

cases, and maybe this case, for all we know -- to circumvent whether or not they could have filed kidnapping charges.

Maybe they missed The Statute of Limitations, maybe they can't meet the elements, maybe there are other reasons why they couldn't bring the charge. And I respectfully submit that, if you look at torture and you look at what the gist of it is, it's an assault, there's no other elements that need to be proven by The Government, in order to get to the Aggravated Assault Guideline Range.

In order for the Kidnapping Guideline Range to apply, I respectfully submit to the Court that an additional finding of fact needs to be made, and that's that the detention of the victim was unlawful. The Torture charge itself only requires that the victim be in the custody or control, whether lawfully or unlawfully. The kidnapping requirement would require an unlawful gaining of custody or control, and that finding hasn't been made by the jury or the Court.

So when you look at what the gist of the underlying conduct is, we have aggravated assault, where all of the elements have been discussed and determined by a jury or we have kidnapping, where there is an element that was not found by the jury or by the Court. So just in its simplest form, when you look at which one applies, which one most --

THE COURT: Which guideline, do you mean?

MR. WATT: Yes, which guideline, Kidnapping versus

9

Aggravated Assault, which of those two applies, when you're trying to look at it from those basic sense? When you have all the elements that have been discussed and found by a jury and one that hasn't, I think, it's pretty simple, you know, there's no additional findings that are required by the Court, in order to take that leap.

With that, Your Honor, I think, you know, the rest of the arguments are contained in the written submissions. I think, using the Kidnapping Guideline, brings in a whole host of other issues that, you know, when you look at the Kidnapping Statute itself and the factors under Barry and Chapman, as I've explained, we don't need to get there, if we are under the Aggravated Assault Guideline, because all of it has already been addressed by the jury.

So in its simplest form, I think, it's the most -- it's the best guideline to use because nothing additional is needed. And in lieu of reiterating all the other arguments contained in the Sentencing Memo, I will leave it at that.

I think, the other objections speak for themselves in the written submissions. The only one I do want to touch on, Your Honor, is the four-level enhancement for the five participants, and I know there's been some back and forth, I know the Probation Office has cited a case.

THE COURT: Heavily.

MR. WATT: Yes. And I understand the difference between

participants and non-participants. I think, at the end of the day, you need, at least, two participants that all of the elements can be met for, and we don't have that in this case. So I think that argument is pretty simple. I do understand the use of non-participants, but I still think you need two.

Your Honor, with respect to the serious bodily injury again, I'll keep it brief. I think, we're now in a territory -- again, I'm talking about Paragraph 44 with the application of a two-level enhancement for serious bodily injury.

Again, the jury was tasked with determining -- or the Court -- or The Government has to prove severe physical or mental pain. We're, now, getting into extreme physical and mental pain, which is a higher burden, which is a higher standard that hasn't been met, as far as I'm concerned, yet. And when you look at the application of this enhancement for extreme pain or requiring medical attention, I don't think that a victim who may have needed medical treatment and didn't receive it, as the Probation Office suggests, I don't know that that meets the criteria.

So in addition to the arguments contained in the Sentencing Memorandum, I will just note that extreme pain versus severe pain, again, leads us back to a situation where we have a burden of proof today that, I think, needs to be addressed.

Everything else, Your Honor, in lieu of taking the Court's

time, speaks for itself, obviously, reserving the right to discuss the factors.

THE COURT: Thank you, Mr. Watt. Mr. Hinkley, Mr. Jasperse, will one of you respond?

MR. HINKLEY: Mr. Jasperse will.

MR. JASPERSE: Thank you, Your Honor. Because the Government filed its Sentencing Memoranda first and Defendant filed two Sentencing Memoranda second, I would like to, briefly, raise a few issues, I think, might be of interest to the Court.

Regarding whether the Kidnapping versus the Aggravated Assault Guideline should apply, in this case, where the Defendant had the victim held for an extended period of time, after arranging for him to be abducted, where the Defendant tortured the victim, on multiple occasions, where part of the torture was the severe mental pain of the victim, not knowing if he would ever get out, not knowing if he would survive, the Kidnapping Guideline, most comprehensively, takes into account the totality of the crime, as charged in the indictment.

As the Court is well aware, the facts, here, are quite similar to the only previous torture case that has gone to sentencing, the Belfast case, in which the Defendant, also, detained his victims for long periods of time and tortured them, repeatedly, while they were held.

And, in that case, the District Court found that the Kidnapping Guideline was the most appropriate, and the Eleventh

12

Circuit affirmed, stating that the Kidnapping Guideline is particularly appropriate in cases of torture, such as this case, where there are repeated, severe, physical assaults and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse.

The Defendant's position is, essentially, that because kidnapping is not an element of torture, the Kidnapping Guideline should not apply. First of all, as the Belfast case points out, an element of torture is that the Defendant have custody or physical control, and kidnapping is one method of obtaining custody and physical control of the victim.

Second, by the Defendant's logic, the Assault Guideline would be the only guideline that would ever be applied, but the statutory index lays out five options, one of them is kidnapping. So, obviously, the Sentencing Commission found that kidnapping, in some circumstances, is the appropriate guideline, and it is the appropriate guideline in this case, as The Probation Department has recommended.

Regarding serious bodily injury, the Defendant argues that repeatedly placing a bag over the victim's head suffocating him, placing a belt around his neck suffocating him, tasking him in the genitals and other sensitive areas, hitting him in the eyes, nose and ears, lashing his back with a rubber hose do not prove extreme physical pain.

In the verdict Your Honor just read, the jury found

otherwise. One of the elements of torture is that the Defendant inflicted severe physical pain or suffering, and the Court instructed the jury, quote, severe physical pain means bodily pain that is extreme in intensity and difficult to endure. So the facts already prove, not just by a preponderance of the evidence, not just by clear and convincing evidence, but beyond a reasonable doubt, that the Defendant caused extreme physical pain and, thus, the enhancement for causing serious bodily injury should apply.

Finally, regarding the Leadership Enhancement For Activity Involving Five Or More Participants. The Defendant argues -- the Defendant, here, is confusing the elements of Torture with the jurisdictional requirements for bringing a Torture charge.

Being a U.S. National or being present in The United States is not an element of Torture. To the contrary, one of the elements of Torture is that the torture occurred outside of The United States, rather the jurisdictional requirements of the Torture Statute are that the Defendant must be a U.S. National or present in The U.S., at the time of the charges.

If an individual tortures someone outside The United States and then emigrates to The United States, that person can be charged. There are several pending Torture cases in exactly that scenario. If Mr. Roggio's co-conspirators make the mistake of coming to The United States, they would be subject to

prosecution.

And, finally, Your Honor, I want to make one last point related to the arguments Mr. Roggio has made today, and, particularly, in the two Sentencing Memos, regarding the guidelines.

If the Court had any doubts about whether Mr. Roggio needs to spend the rest of his life in prison, any such doubts should be erased by the Sentencing Memos, which, among other things, argue that Siim Saar's injuries were not extreme, that the conditions of his detention were, quote, far from inhumane, and that Siim was playing games with military members when he was not being interrogated.

Your Honor, it's one thing, when a Defendant found guilty at trial preserves his appeal position by not admitting guilt at sentencing, but, wow, these statements go a lot farther than that, they are breath-taking in their audacity.

These claims are, obviously, not coming from counsel, who was not present during the trial and who does not have the benefit of a transcript that does not yet exist, these claims are coming from the Defendant. And these claims show that even at the end of this entire process, even after a two-week trial, even after seeing, in person, the lasting pain of the victim and the others who were forced to watch the victim being tortured, Mr. Roggio has learned nothing, and he still has zero remorse and zero recognition of wrongdoing.

The guidelines call for lifetime sentence, and as Mr. Hinkley will argue later, a guideline sentence is absolutely necessary.

THE COURT: Thank you. To repeat, I have carefully reviewed the parties' written submissions, and I have made my findings and reduced these to writing, and they are extensive, so I'd ask that you bear with me, as I address each and every one of the issues, as I see them.

Let me begin by observing that the Defendant's factual objections to Paragraphs 5 through 37 of the Pre-Sentence Report, which I'll refer to as the PSR, as we go forward, relate to facts of the Defendant's arrest, the counts of the superseding indictment dismissed on Motion of the Government, and offense conduct, which has no impact on how the guidelines are calculated. Therefore, these objections warrant no further discussion and are overruled.

Second, the Defendant's general objections to the conclusions stated in the PSR Paragraphs 50, 51, 56, 58, 59, 61, 64, 113, 114, 121, 131 and 132 are all derivative of his specific objections and, therefore, in the Court's view, warrant no separate consideration at this time.

Third, I have considered the Defendant's written arguments in the remaining objections to the PSR, as set out in his Sentencing Memoranda, which is document 359 of the record, and that is, as I have noted at the outset of this hearing,

16

objections to Paragraphs 43 and related Paragraphs 44, 46, 48 and 49.

In addition, I'd note that the Defendant, also, requests a Downward Departure, pursuant to United States Sentencing Guidelines 2M5.2, again, found at document 359 at Page 13, and I will discuss that objection or that motion at the conclusion of my having addressed the actual objections that are at issue here.

I begin with Paragraph 43. Paragraph 43 of the PSR provides as follows:

Base offense level. A guideline for violation of 18 U.S.C. Section 2340A(a) is Sentencing Guideline Section 2A4.1. The base offense level is 32. The addendum to the PSR explains that, pursuant to Appendix A of The Sentencing Guidelines, a violation of 18 U.S.C. 2340A could result in the use of several Chapter 2 guidelines.

They include;

2A1.1, the guideline for Murder;

2A1.2, the guideline for Second Degree Murder;

2A2.2, the guideline for Attempted Murder;

2A2.2, the guideline for Aggravated Assault, and that is the guideline advanced here by the Defendant.

And 2A4.1, the guideline for Kidnapping, Abduction and Unlawful Restraint.

The Application Note to Sentencing Guideline 1B1.2 states;

17

In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the statutory index may specify more than one offense guideline for that particular statute, and the Court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the Defendant was convicted.

Now, the Probation Office determined that Sentencing Guideline 2A4.1, the guideline for Kidnapping, Abduction and Unlawful Restraint is the most appropriate guideline considering the conduct alleged against Mr. Roggio.

This conclusion is based on the assessment that, quote;

A jury found Ross Roggio Guilty of Counts 1 and 2 of the superseding indictment, which, in part, state, quote;

Roggio directed Kurdish soldiers to abduct the victim and detain the victim at a Kurdish military compound for approximately 13 days and tortured the victim during multiple interrogation sessions led by Roggio.

Here, the Defendant objects to the use of the Kidnapping Guideline and asserts that Sentencing Guideline 2A2.2, which is the guideline for Aggravated Assault, with a base offense level of 14, is the most analogous to the crime of Torture that was charged by the Government.

You'll find that at the Defendant's Sentencing Memorandum, which is document 359 at Pages 2 and 3.

The Government, in response, maintains that the Pre-Sentence Report correctly determined that the guideline at 2A4.1, the Kidnapping Guideline, is the correct guideline for calculating the offense level related to the counts of Torture and Conspiracy To Commit Torture, which are Counts 1 and 2.

And that is the position taken by the Government in its Sentencing Memorandum, which is document 358 of the record, at Page 6.

I agree with the Pre-Sentence Report's assessment that Sentencing Guideline 2A4.1 is the appropriate guideline to use, based on the offense conduct charged in Counts 1 and 2. As charged in the superseding indictment, when the victim, who was Ross Roggio's employee, whose name is Siim, S-I-I-M, Saar, S-A-A-R, raised concerns about Mr. Roggio's weapons project, Mr. Roggio directed Kurdish soldiers to abduct Mr. Saar, detain him against his will at a Kurdish military compound for, approximately, 39 days and tortured him during 10 interrogation sessions led by Mr. Roggio.

The Defendant relies, primarily, on two cases to support his contention that the guideline for Aggravated Assault applies here.

The first case is United States v. Mills, 1 F3d. 414, a Sixth Circuit 1993 case, and a Third Circuit case entitled, Government of the Virgin Islands v. Berry, 604 F2d. 221, Third Circuit 1979 case.

19

I have reviewed these cases in detail, and I find that they do not provide the suggestive support for the argument raised by Mr. Roggio.

The Defendant cites the Mills case for the proposition that the Court should base its guideline determination on what the gravamen of the offense is, and here, Defendant argues that the gravamen of the offense for the crime of Torture is assault.

In Mills, the question was whether the base offense level of the Aggravated Assault Guideline or the base offense level of the Burglary of Other Structures Guideline applies in a case where the Defendants were convicted of pharmacy burglary, in violation of Title 18 of The United States Code Section 2118, which has a provision that the sentence can be enhanced if an assault occurred during the burglary.

The conduct giving rise to the assault, the sentencing enhancement in Mills, occurred after the pharmacy burglary, when the Defendants were attempting to avoid apprehension during a police chase following the burglary, and the Defendant's vehicle hit the pursuing police officer's vehicle causing the officer serious injury.

The Sixth Circuit decided, in these circumstances, that the Burglary of Other Structures Guideline was appropriate, commenting if the assault takes place in a drug store, the use of the Aggravated Assault Guideline would be more appropriate. The Government could, then, rely upon the jurisdictional

20

provision in Section 2118(b)3, which addresses when another person was killed or suffered significant bodily injury, as a result of such taking or attempt, as well as the charging of the sentence enhancement under 2118(c)1.

The Circuit Court held that the District Court committed error. The District Court committed error in opting for the Aggravated Assault Guideline, because the Government could not charge the conduct which caused the injury under 2118(b)3 or charge the sentence enhancement under 2118(c)1.

Now, I will state the case was cited to me, I have looked at it, I've explained it, as I understand it, and I will say to you, categorically, Mills is not applicable here. Mills is readily distinguishable, in that, Mr. Saar, in this case, was abducted before the torture, he was tortured numerous times during his unlawful detention, and he was detained for an extended period of time.

In these circumstances, the abduction and the unlawful restraint are interwoven with the repeated torture to which Mr. Saar was subjected, and the decision in Mills is of no persuasive value.

Next, based on his assessment that statutory interpretation requires an examination of the kidnapping, as it relates to the facts and circumstances of the case, the Defendant has cited Government of the Virgin Islands v. Berry to support his conclusion that the elements of the crime of Kidnapping are

missing and, therefore, the Kidnapping Guideline range is not applicable. Berry does not support the application of the Aggravated Assault Guideline for several reasons.

In Berry, the Third Circuit considered the proper interpretation of the Virgin Islands Kidnapping Statute at issue, contrasting the traditional rule that any asportation, that is carrying away of the victim, no matter how short in distance or duration, was sufficient to establish the crime of Kidnapping, in contrast, that it was a moderate approach, which is to construe the Kidnapping Statutes so as to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal.

You can find that quote at 604 F2d. at 226, 227.

Following the moderate approach, the Court in Berry recognized that the principal danger of overzealous enforcement of Kidnapping Statutes is the persons who have committed such substantive crimes as robbery or assault, which inherently involved a temporary detention or seizure of the victim, will suffer far greater penalties prescribed by the Kidnapping Statutes.

Accordingly, Berry identified four factors to be considered:

1. The duration of the detention or asportation.

2. Whether the detention or asportation occurred during the commission of a separate offense.

22

3. Whether the detention or asportation which occurred is inherent in the separate offense.

4. Whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

Now, the Defendant here contends that the Berry factors weighed in his favor, and because the elements of the crime of Kidnapping are missing, the Kidnapping Guideline range is not applicable. That is the Defendant's contention in document 359 at Page 8.

Considering the factors, themselves, and the cases from which the Circuit Court derived those factors, I disagree with the Defendant's position. Applying the first factor in Berry, the duration of the detention or asportation, Courts consider whether the victim is isolated for a substantial period or is carried away a substantial distance.

This factor indicates that kidnapping occurred, because Siim Saar was taken from his apartment to a military base and was unlawfully detained for 39 days, during which time he was isolated in a shipping container.

Considering the second factor, the question of whether the detention or asportation occurred during the commission of a second offense, I reject the Defendant's conclusion that this factor weighs in favor of applying the Aggravated Assault Guideline, on the theory that any detention of the victim

occurred during the commission of a separate offense.

While Siim Saar was unlawfully detained during the torture sessions, the Defendant's assessments are not consistent with the facts of the case, which show that the abduction occurred two days before the first interrogation or torture session, and Mr. Roggio continuously, unlawfully detained Mr. Saar from his abduction, until his release, approximately, 39 days later, during which period Mr. Roggio directed and/or directly participated in 10 torture sessions.

On these facts, the unlawful detention did not occur only during the commission of the separate offense of Torture.

Applying the third factor of Berry, the question of whether the detention or asportation which occurred is inherent in the separate offense, the Defendant's assertion that an element of torture requires the victim to be in the control or custody of the Defendant, and it is, therefore, inherent in the separate offense of Torture. That's the Defendant's assertion here.

This argument ignores crucial facts in this case and tells only part of the story. While Torture, as defined in Title 18 United States Code Section 2340 subsection 1, requires, as an element, that the Defendant have custody or physical control over the victim, Mr. Roggio's unlawful detention of Siim Saar for 39 days went far beyond what was inherent in the 10 torture sessions during that period.

For the reasons that I found in applying the second factor,

Mr. Roggio's sustained unlawful detention of Mr. Saar cannot, merely, be seen as inherent in or subsumed in his torture of Siim Saar.

Applying the fourth factor, the question of whether the asportation or detention created a significant danger to the victim, independent of that posed by the separate offense, I disagree with Defendant's conclusion that this factor weighs in favor of applying the Aggravated Assault Guideline. Defendant contends that the detention, quote, did not create a significant danger to the victim, independent of that posed by a separate offense, because he was not detained in inhumane conditions and the detention itself did not form the basis for The Government's allegations of severe physical or mental pain, end quote.

Contrary to the Defendant's arguments, I find that because Mr. Saar was detained on a military base in Iraq, with Mr. Roggio controlling his detention and torture, his detention created a significant risk, significant risk of danger, in that, anything could have happened to him, at any time, during that period.

Further, the potential of significant danger, related to the lack of treatment for any injury caused by Mr. Saar's torture sessions, created an additional significant danger that he would suffer ongoing or irreparable harm.

Because all Berry factors weigh against Defendant's

25

position, Berry does not support Defendant's conclusion that the Kidnapping Guideline is inapplicable. But further, and of special significance, here, application of the Kidnapping Guideline was found appropriate in United States v. Belfast 611 F3d. 783, Eleventh Circuit 2010, which considered the matter at issue, here, following the Defendant's conviction for Torture.

Belfast is the only previous conviction, under the Torture Statute, before Mr. Roggio's conviction in this case. In Belfast, the Defendant tortured his victims over extended periods of time, after first having them seized and imprisoned. He argued, on appeal, that the District Court should have used the Aggravated Assault Guideline, Section 2A2.2, to calculate the sentence.

The Eleventh Circuit found that the District Court had not erred in determining the Sentencing Guideline 2A4.1 was the most appropriate guideline for the offense, and the Court provided the following explanation for its decision, which I find to be applicable here:

"Torture requires, as an element, that the Defendant have custody or physical control over the victim. 18 U.S.C. Section 2040 subsection 1.

"Kidnapping is one method of obtaining and maintaining custody or physical control over another. This charged seizure and detention of his victims enabled and facilitated Defendant's acts of torture, thus, the application of the

Kidnapping Guideline, which itself recognizes that kidnapping can occur, quote, during the commission of or in connection with another offense, end quote, was entirely proper.

"Indeed, the Kidnapping Guideline is particularly appropriate in cases of torture, such as this case, where there are repeated severe physical assaults, and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse."

The Court continued;

"The Kidnapping Guideline, taking into account the gravity of the victim's injuries, whether a dangerous weapon was used, the length of the unlawful detention or whether the victim was sexually exploited or killed, all of which are circumstances relevant to determining the proper degree of punishment of the Defendant's crimes, none of which are considered under the other applicable guidelines for Torture Act convictions."

On this basis, I conclude that, because the Defendant has provided no sound basis to apply the Aggravated Assault Guideline rather than the Kidnapping Guideline and because the facts of this case and the reasoning of Belfast indicate that the Kidnapping Guideline is appropriately applied in this case, Defendant's objection to the application of the Kidnapping Guideline Sentencing Guideline 2A 4.1 and the base offense level of 32 is overruled.

Further, I should make the additional statement that I

recognize that the Defendant has argued that the proper application of the guidelines at sentencing is, generally, determined under the preponderance of the evidence standard, but in a case where there is a significant increase to the base offense level, as is the case here, between the Aggravated Assault Guideline and the Kidnapping Guideline, the burden of proof should be clear and convincing evidence.

That argument is set forth in the Defendant's Sentencing Memorandum at Pages 3 and 4 of document 359.

Without deciding the merits of that argument, I find that the foregoing conclusion that Sentencing Guideline 2A4.1, the Kidnapping Guideline, is the appropriate guideline for determining the base offense level in this case would be sustained under the higher standard of clear and convincing evidence, were that standard to be applied in this case.

I move to Paragraph 44 and Defendant's objections in connection with that paragraph.

Paragraph 44 of the Pre-Sentence Report provides as follows:

"Specific offense characteristics. Two levels are added because the victim sustained serious bodily injury, in accordance with Sentence Guideline 2A4.1(b)2(B).

"Serious bodily injury is defined in the commentary to Sentencing Guideline 1B1.1 as, quote, injury involving extreme pain or the protracted impairment of a function of a bodily

member, organ or mental faculty or requiring medical intervention, such as, surgery, hospitalization or physical rehabilitation.

"The two-level enhancement for serious bodily injury was applied, based on this assessment that each act of torture imposed upon Siim Saar constituted serious bodily injury, because, at bare minimum, they caused extreme physical pain. Of the many acts of torture that were imposed upon Siim Saar were having soldiers jump violently on his chest, being suffocated with a plastic bag until loss of consciousness, electrical shocks to his nose, throat and genitals, being struck, repeatedly, with a plastic hose and being yanked into the air by a belt wrapped around his neck, causing unconsciousness.

"In all likelihood, Mr. Saar's injuries would have required hospitalization had it been available to him."

The Defendant objects to this enhancement on the basis that the evidence elicited at trial did not prove extreme physical pain. The Government challenges this as unjustified and unsupported by the evidence.

With respect to this objection, I find that the Defendant puts forth only a conclusory allegation or assertion, in support of its objection. The conclusion that the enhancement for extreme pain does not apply is based only on Defendant's contention that to be convicted of Torture, The Government was required to prove severe physical or mental pain rather than

extreme physical pain, which is a higher threshold of pain that requires more significant pain than severe pain.

Also, in the context of 3553, the Defendant asserts in his Supplemental Sentencing Memorandum that Mr. Roggio denies the severity of the assaults that occurred against Mr. Saar, and that the taser that was used was not the type of taser we are familiar with, and it contains very little force.

You will find that argument at document 360 at Pages 6 and 7.

The Government, in response, identifies the following acts of torture, all of which are supported by the record:

"The victim testified he was struck and tased, repeatedly, in particularly sensitive areas of his body, such as, his nose, throat and groin. The soldiers, acting under Roggio's direction, hit him so hard that he was knocked down, repeatedly. The beating with plastic pipes caused intense pain and he was unable to breathe, and he thought he was going to die and passed out, while being suffocated with a plastic bag multiple times and when Roggio wrapped his belt around the victim's neck and lifted the victim off the ground."

You can find this at document 358, Pages 10 and 11.

The Government continues;

"Defendant does not attempt to address how actions taken against Siim Saar during torture sessions did not cause Mr. Saar extreme pain, and any attempt to do so would have failed.

"Evidence at trial showed that others employed by Mr. Roggio were brought to the military base, and when outside the room where Mr. Saar was being tortured, they could hear him screaming."

That's a reference to Paragraph 24 of the PSR.

"Mr. Roggio could not credibly argue that being struck and tased, repeatedly, in particularly sensitive areas of the body, such as, the nose, throat and groin, would not cause extreme pain. Mr. Roggio's assertion that the taser contained very little force is not a fact of record, and there's no basis to infer that the pain resulting from being tased in sensitive areas would not have been extreme.

"Likewise, Mr. Roggio could not credibly argue that being hit so hard to be knocked down, repeatedly, and being beaten with plastic pipes would not cause extreme pain."

For the foregoing reasons, Defendant's objection to two-level enhancement for serious bodily injury in Paragraph 44 is overruled.

Next, the Defendant objected to Paragraph 46. Paragraph 46 of the PSR provides as follows:

"Specific offense characteristics. Two levels are added because the victim was not released before 30 days had elapsed."

Citing Sentencing Guideline 2A4.1(b)4(A).

The Pre-Sentence Report states that the two-level

31

enhancement was applied, based on the following assessment:

"Sentencing Guideline 2A4.1(b)4(A) states, quote, If the victim was not released before 30 days had elapsed, increase by two levels."

Mr. Roggio does not appear to dispute that Mr. Saar was detained for more than 30 days nor could he, since there was unrefuted testimony that the term of his detention was 39 days.

The Defendant's objection, here, is that this particular guideline 2A4.1(b)4(A) is inapplicable, because of the claim that the evidence shows that Mr. Saar was detained lawfully by a foreign government or its military, and that the Defendant did not have the ability or authority to detain Mr. Saar.

That's the Defendant's objection.

The Government has countered that, contrary to the Defendant's assertion, Mr. Saar was lawfully detained by a foreign government or military, that, with the exception of Roggio's testimony, all of the evidence at trial indicated the victim was abducted and detained at Roggio's behest.

Based on my finding, regarding Paragraph 43, that the Kidnapping Guideline was properly applied to determine the base offense level, Defendant's argument, regarding the impropriety of the Kidnapping Guideline Enhancement in Paragraph 46 is without merit.

Further, no evidence at trial suggested that Siim Saar was lawfully detained. The credible evidence presented at trial

indicates otherwise. As noted by the Government, in addition, an Iraqi Judge provided expert testimony that what happened to the victim was not permitted by the laws of Iraq.

On this basis, I conclude that the Defendant has presented no sound basis to find that Guideline section 2A4.1(b)4(A) and the enhancement that it provides is inapplicable, and, accordingly, Defendant's objection to Paragraph 46 is overruled.

I move to Paragraph 48. Paragraph 48 of the Pre-Sentence Report provides as follows:

"Adjustment for role in the offense. The Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, therefore, four levels are added."

Citing Sentencing Guideline 3B1.1(a).

"The four-level enhancement was applied, because, even if the Court were to find that the criminal activity did not involve five or more participants, the activity was otherwise extensive, based on the decision in United States v. Helbling 209 F3d. 226, a Third Circuit 2000 case, where the Third Circuit adopted a three-step test to determine whether criminal activity was, quote, otherwise extensive, for purposes of this guideline."

The Pre-Sentence Report states that;

"The application of the three-step process in U.S. v.

Helbling and the Defendant's use of Kurdish soldiers, clearly, demonstrates that the Torture convictions were otherwise extensive."

The Defendant has objected to the four-level enhancement on two grounds:

First, Defendant contends that Mr. Roggio was not a leader or organizer of criminal activity, because Mr. Saar was lawfully detained, and the Defendant had no authority to issue the order of detention.

Second, Mr. Roggio contends that the criminal activity did not involve five or more participants, as required by Sentencing Guideline 3B1.1(a), in that, the Kurdish soldiers did not meet the definition of participant, which, in this case, requires that the individuals satisfy the Torture Statute's requirement of being a National of The United States or being present in The United States.

That is the Defendant's objection.

The Government has responded. The Government asserts that the Defendant's arguments, regarding not being the leader or organizer of criminal activity and Mr. Saar being lawfully detained, ignored the trial evidence and verdict that he was responsible for ordering and leading Siim Saar's torture.

As to the Defendant's argument, regarding the elements of Torture, The Government states, in response, that the requirements of Title 18 United States Code Section 2340A(b)

that the alleged offender be a National of The United States or present in The United States is jurisdictional and is not an element of Torture.

I reject the Defendant's argument that he was not a leader or organizer of criminal activity, I reject the argument that Mr. Saar was lawfully detained, and, likewise, I reject the argument that the Defendant had no authority to issue the order of detention. I do so for the reasons clearly discussed, previously.

Further, the evidence and verdict, clearly, demonstrate Mr. Roggio had the authority to direct and did direct Kurdish soldiers to abduct and detain Mr. Saar and directed Kurdish soldiers, acting under color of law, to torture Mr. Saar on numerous occasions.

I construed the second aspect of the Defendant's objection, asserting that the Kurdish soldiers do not satisfy the elements of the Torture Statute, to be an argument that the criminal activity did not involve five or more participants and the criminal activity was not otherwise extensive, as required by Sentencing Guideline 3B1.1(a).

To decide whether the four-level adjustment applies in the circumstances of this case, I have to consider the meaning of, participant, and, otherwise extensive criminal activity, as those terms are used in 3B1.1(a).

According to that guideline and its application note,

specifically, note 1;

"A participant is a person who is criminally responsible for the commission of the offense but need not have been convicted."

The Third Circuit has provided further guidance on the issue of who was a participant. As stated in United States v. Helbling 209 F3d. 248, quote, Defendant may be considered as one of the participants, end quote.

Likewise, as stated in United States v. Tai 750 F3d. 309 at 318, a Third Circuit 2014 case, and United States v. Badaracco 954 F2d. 928 at 934, 935, a Third Circuit 1992 case; "To be criminally responsible for commission of the offense, the individual, quote, must have committed all of the elements of a statutory crime with the requisite mens rea."

Defendant's argument that Kurdish soldiers could not be participants is flawed and erroneous, because Defendant misreads the Torture Statute at issue.

The Torture Statute has two separate components. Offense is addressed under Section 2340A(a) and jurisdiction is addressed under 2340B.

The offense addressed in 2340A(a) applies to, quote, whoever outside The United States commits or attempts to commit Torture.

The jurisdictional component of Section 2340B provides, as follows:

"There is jurisdiction over the activity prohibited in (a) if, One, the alleged offender is a National of The United States;

Or, Two, the alleged offender is present in The United States, irrespective of the nationality of the victim or alleged offender."

Defendant has argued that the elements of the Statutory Crime of Torture require that the individual be a United States National or present in The United States, at the time of the offense.

It further argues that the individuals that were as identified as participants for this enhancement are soldiers of a foreign military, they are not United States Nationals and the offense did not take place in The United States.

Accordingly, the Defendant argues that none of the participants have met all of the elements of the statutory crime with the requisite mens rea.

The Defendant's position that an element of the crime of Torture requires that the alleged offender be, either, a National of The United States or that the offense take place in The United States is an incorrect interpretation of the Statute.

Title 18 United States Code Section 2340A(a) expressly applies only to torture outside The United States. Further, because subsection (b) of Section 2340A defines jurisdiction

over the activity prohibited in (a), 2340A(a) is the source for discerning whether the individual is criminally responsible. That is, that he must have committed all of the elements of the Statutory Crime of Torture with the requisite mens rea.

I cite to United States v. Tai 750 F3d. at 318.

Because the location of the alleged offender and the Torture Statute is jurisdictional and the Statute requires that the offense be committed outside The United States, the Defendant's argument that Kurdish soldiers could not be participants in Ross Roggio's criminal activity is entirely without merit.

On the contrary, the soldiers who participated in the torture of Siim Saar meet the definition of participant, for purposes of applying the four-level enhancement.

As defined in Title 18 Section 2340.1, Torture means, An act committed by a person acting under color of law, specifically, intended to inflict serious, physical or mental pain or suffering, other than pain or suffering incidental to lawful sanctions, upon another person within his physical custody or physical control.

The evidence, here, shows that the soldiers who tortured Siim Saar were acting under color of law. They intended to inflict severe physical or mental pain. The infliction of that pain was not incidental to lawful sanctions, and that Mr. Saar was in the custody and physical control of Mr. Roggio and the

38

soldiers, and the torture took place outside The United States.

While it is clear that more than one soldier participated in the torture of Siim Saar, and those who did so meet all the elements of the Statutory Offense of Torture, and are, therefore, participants in the criminal activity led by Ross Roggio. The precise number of soldiers who did so is uncertain.

Because the Kurdish soldiers who were directed by Mr. Roggio to torture Siim Saar are not identified by name, other than the one referred to as Goran, G-O-R-A-N, and for the further reason that the record shows more than four soldiers were present at the compound, during the period of Saar's abduction, I find that the five-participant aspect of Sentencing Guideline 3B1.1(a) is satisfied.

However, in an abundance of caution, I will also proceed with the analysis under Helbling of whether the four-level enhancement applies by considering whether the criminal activity was, quote, otherwise extensive.

To find the four-level enhancement applicable under the otherwise extensive prong, I must assess the individuals involved under the three-step inquiry adopted in United States v. Helbling. There, the Court declared;

"A Sentencing Court must first separate out the participants, as defined by Application Note 1, from other individuals, non-participants who were involved in the criminal activity.

39

"The Court must next determine whether the Defendant used each non-participant services with specific criminal intent.

"Third, the Court must determine the extent to which the services of each individual non-participant were peculiar and necessary to the criminal scheme."

That's Helbling quoted at 209 F3d. 247, 248.

Citing other cases, specifically, United States v. Carrozzella 105 F3d. 796 at 804, Second Circuit 1997; United States v. Colletti, 984 F2d. 1339 at 1346, Third Circuit 1992.

Helbling added that;

"In determining what non-participants should be counted, individuals used by the Defendant to legitimize, facilitate or hide the criminal activity should be included."

That is Helbling at 248.

Helbling further requires that;

"After the Court decides which individuals may be counted, quote, the Court must then consider whether the sum of the participants and countable non-participants is the functional equivalent of five participants. At a minimum, a criminal scheme must involve more than one participant, in order to be found otherwise extensive. There can be no less than the Defendant and one participant the Defendant led or organized."

Again at 248 of Helbling.

Applying the required inquiry to the facts of the case, I find as follows:

40

First. Because the record evidence consistently refers to soldiers, in the plural, I conclude this means, at a minimum, there were three persons who tortured Mr. Saar, at least, two soldiers and Ross Roggio.

The record, also, indicates that four armed Kurdish soldiers forced their way into Mr. Saar's apartment, assaulted him, abducted him and took him to the military base where the torture took place.

Even assuming, for purposes of this analysis, that none of the soldiers who abducted Mr. Saar, also, tortured him, there is still a minimum of four non-participants.

Second. Ross Roggio used each of the non-participant services with specific criminal intent. He did not have the lawful authority to order Siim Saar's abduction and detention.

Third. Services of the non-participants were necessary to the criminal scheme, because they allowed Mr. Roggio to gain custody and control of Mr. Saar.

Because the four non-participants who abducted Mr. Saar facilitated the criminal activity, they must be counted, therefore, the sum of participants, which I find to be a minimum of three, and countable non-participants, which I find to be four, is the functional equivalent of, at least, five participants.

On this basis, these facts satisfy the requirements of a four-level enhancement for Mr. Roggio as the organizer and

41

leader of this criminal activity.

I find that criminal activity meets the, quote, otherwise extensive prong of Section 3B1.1(a), and Defendant's objection to Paragraph 48 is overruled.

Paragraph 39 has been objected to. Paragraph 39 of the PSR provides as follows:

"Adjustment for obstruction of justice. By lying to authorities during the investigation and under oath, at trial, the Defendant willfully obstructed or impeded or attempted to obstruct or impede the administration of justice, with respect to the investigation, prosecution or sentencing of the instant offense of conviction and the obstructive conduct related to Defendant's offense of conviction and any relevant conduct or a closely-related offense, therefore, two levels are added.

Citing Sentencing Guideline 3C1.1.

The two-level enhancement was applied, based on conduct alleged in Paragraphs 34 and 36 of the PSR. Paragraph 34 states that Ross Roggio lied to investigators during the investigation on, at least, three occasions as follows:

1. On or about April 29, 2016, Ross Roggio told FBI agents that he had not shipped any gun parts or tools or guns to Iraq, during a telephone interview, while Mr. Roggio was in Kurdistan and agents -- that is FBI agents -- were at Ross Roggio's home in Stroudsburg, Pennsylvania.

2. On or about February 26, 2017, during a secondary

42

inspection at John F. Kennedy Airport New York, New York, Ross Roggio gave U.S. Customs and Border Protection Officers a false cover story about having been in Iraq to oversee the construction of residential buildings.

3. On or about May 10, 2017, during execution of a search warrant at his residence, Ross Roggio told Homeland Security Agents that he had been working for the CIA in Kurdistan from 2014 to 2016.

Paragraph 36 of the PSR states that Ross Roggio's false statements to agents and his extensive elaborate trial testimony reflected a willful attempt to obstruct or impede justice and the administration of justice, again, citing Sentencing Guideline 3C1.1 and Application Notes 4 B and G.

The PSR further explains that Application Notes 4 B and G state that;

"Committing perjury and providing a materially false statement to law enforcement that significantly obstructed or impeded the official investigation are factors to consider when applying the enhancement.

"Further, the Defendant continues to lie to the Probation Officer and the Court by claiming that Siim Saar was lawfully detained."

In response, the Defendant has objected, and in support of the objection, the Defendant contains that;

"Lying to authorities during the investigation does not

43

meet the elements necessary for this enhancement."

Mr. Roggio further contends that he was not under oath during the investigation and was not sworn to tell the truth. He did not make untruthful statements during the investigation, he did not lie at trial, and he should not be punished for asserting his Constitutional Right to defend himself and offer evidence at trial.

This is set forth in the Defendant's Memorandum, document 351 at Page 8 and Pages 12 and 13.

The Government has asserted that the Obstruction Enhancement does not apply only when the Defendant obstructs justice under oath, it applies when materially false statements are made to law enforcement.

Citing United States v. LaCroix, 69 Federal Appendix 566 at 569, Third Circuit 2003 case, and United States v. Kim, 27 F3d. 947 at 958 through 961, Third Circuit 1994.

Further, the Government has asserted that;

"The United States Supreme Court has held, on a number of occasions, that a Defendant's right to testify does not include a right to commit perjury."

Citing United States v. Dunnigan 507 U.S. 87 at 96.

The Government further refutes the Defendant's assertion that the verdict does not lead to a conclusion that the Defendant lied under oath, and points to the fact that Mr. Roggio testified that he acted under duress, that the jury

received an instruction from this Court that it must find Mr. Roggio not guilty, if it found that he was acting under duress, and that the jury found Mr. Roggio guilty.

With respect to this objection, I find that the Defendant's statement that he was not under oath during the investigations irrelevant, pursuant to United States v. LaCroix and United States v. Kim, cited previously, both of which found that the Obstruction Enhancement was applicable, when the Defendant was not under oath.

The Defendant's assertion that he did not make unlawful statements during the investigation, specifically, as to the shipping of gun parts, is contradicted by evidence presented at trial and the jury's verdict, both of which demonstrate that Mr. Roggio shipped gun parts to Iraq.

The Defendant was found guilty of Count 4 of the superseding indictment, which charged him with Unlawfully Exporting M4 Bolt Gas Rings and Firing Pin Retainers, and Count 5 of the superseding indictment, which charged him with Unlawfully Exporting Rifle Combo Buttons.

Under United States v. Boggi 74 F3d. 470, 479, because a guilty verdict binds the Sentencing Court to accept the facts necessarily implicit in the verdict, Mr. Roggio's statements that he did not ship gun parts cannot be accepted as truthful. The Defendant denies lying under oath at trial, but as The Government has pointed out, he testified that he acted under

duress, that the jury received an instruction that it must find him not guilty, if it found that he was acting under duress, and the jury, instead, found him guilty.

Because, as stated in U.S. v. Boggi, I am bound to accept the facts necessarily implicit in the verdict, I conclude that Mr. Roggio perjured himself, when he said that he acted under duress.

On this basis, I find the Defendant has presented no valid basis to find that Sentencing Guideline 3C1.1's Obstruction of Justice Two-Level Enhancement is valid, and, accordingly, I find it inapplicable, and I overrule Defendant's objection to Paragraph 49.

Lastly, there is a Downward Departure request by the Defendant, under Sentencing Guideline 2M5.2. In support of that request, Mr. Roggio states as follows:

"The Application Notes to USSG Section 2M5.2 state that, quote;

The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of The United States. In the unusual case, where the offense conduct posed no such risk, a Downward Departure may be warranted, end quote.

"The Defendant was convicted of exporting parts of the M4 machine gun, a well-known weapon in the world that can be reverse-engineered by a simple Google search. It was alleged

that he was exporting the parts to the ethnic Kurds group in Iraq. The Kurds have been an ally of The United States since The Persian Gulf War in 1991, and The United States has been providing weapons for many years to the Kurds. Weaponry being supplied by The United States is much more sophisticated than the M4 rifle."

This argument continues;

"Testimony established that the Defendant did not produce a fully-assembled rifle, no harm was done to a security or foreign policy interest of The United States, due to the Defendant's actions, as such, a Downward Departure is appropriate."

That is the Defendant's argument.

I deny the Defendant's request for a Downward Departure. The verdict, in my view, indisputably shows Mr. Roggio acted illegally in derogation of the laws of The United States by his conduct of receiving funds from an ally of The United States and diverting those funds for his own personal use, he cast doubt on the reliability of The United States, in general.

Further, he used a foreign government's military to accomplish his unlawful personal agenda. He entered into an area where he had no right to interfere, including intruding on the foreign policy of The United States in a volatile area of the world, with specific respect to the Kurds and Kurdistan Government in its relation to other countries in that region,

47

including Iraq and NATO member Republic of Turkey.

For all of these reasons, the Motion for Downward Departure is denied.

Unless there's something else anyone wishes to offer, we would proceed to the application of the 3553(a) factors in this case.

MR. HINKLEY: There's nothing further, in regards to the objections, Your Honor. I take it, from your recitation on the record, that the Court has adopted the Pre-sentence Investigative Report, as submitted by the Probation Department, which finds an offense level of 43 and a criminal history category 1 for a total suggested guideline range of 7,500 months.

THE COURT: You are correct. In discussion of the 3553(a) factors, I intend to reaffirm that I have adopted the provisions in the Pre-Sentence Report.

But the question, here, Mr. Watt, is, simply, is there anything else, before we proceed to applying the factors of Section 3553(a) to determine what the sentence in this case should be?

MR. WATT: Other than what was already stated, Your Honor, the Court has made its determination, there will be nothing else on behalf of the Defendants, with respect to the departures.

THE COURT: Thank you. With respect to the guidelines and

48

the range of imprisonment that they provide, the guidelines provide for a period of life imprisonment, ineligibility for Probation, a period of one to three years supervised release, a fine of $50,000 to $3 million, and $9756.22 for restitution to Siim Saar, as well as a special assessment of $100 on each count, for a total of $3300.

However, since no count of conviction authorizes life imprisonment, the guideline term of imprisonment is the maximum term on each count, for an aggregate of 7,500 months or 625 years, in accordance with Sentencing Guideline 5G1.2(b).

With respect to the application of those 3553(a) factors, Mr. Watt, I'm ready to hear your statement, on behalf of Mr. Roggio.

MR. WATT: Thank you, Your Honor. Obviously, the Court is in receipt of the Supplemental Sentencing Memorandum dealing with the factors, I won't reiterate much of what's in there. The PSR, obviously, speaks for itself, and, obviously, the Court had the benefit of sitting through trial.

I will note a few things, and I think the most important thing that I will discuss is the disparity of sentences that the Court is obligated to avoid for similarly-situated individuals that are accused of similar conduct.

I think that's where I'm going to concentrate most of my argument here. I mean, the Court is well aware of Mr. Roggio, his background, and the facts that are in the PSR, so I'm not

49

going to reiterate those. I think, the most important part of this is, Where does this land? Obviously, a sentence of 7,500 months would be significantly more than Charles Taylor's son who murdered, at least, three individuals, during his acts of torture, who, I would submit, committed acts of torture that were significantly more extreme or severe than the acts that are found in this case.

So, I think, it's clear that the guidelines and the application of this Kidnapping Guideline range is leading to a guideline that just, frankly, doesn't comply with the limited cases that we have seen with this type of conduct that's alleged.

As I said, Charles Taylor's son, that's the Belfast case that the Court has repeatedly mentioned, there were multiple counts. His judgment of sentence, the Court had provided a sentence of ten years imprisonment for each count of Torture for each victim, for those victims that were not killed. So when you look at conduct that is similar amongst Defendants who have similar backgrounds, who have similar criminal history categories, it's hard to avoid examining that case and where that sentence fell.

I think, it's, also, hard to avoid similar cases, such as Pizarro, where there were allegations -- again, the Court has recognized that there have only been -- or there has only been one prior Torture conviction, so I understand that we're

50

limited in this application, but I think the Court can draw on similar conduct.

The Guidelines Sentencing Act, specifically, states that similar conduct not necessarily similar charges or exact charges, for that matter, so when you look at the Belfast case and you look at Pizarro, there were deaths that resulted in both of those cases, there were people that died, as a result of assaults, while they were in custody.

I understand that there was not torture charged for Pizarro, but it was an individual in custody who was assaulted, and, I think, the similarities of conduct should lead to an examination of that sentence and how that plays into the grand scheme of things, with respect to the guidelines in this case.

Again, I think, because there's an allegation of custody and control, it's appropriate for the Court to look at situations in which our U.S. military members were accused of assaulting detainees, while they were in their custody or control.

Again, not a Torture charge, per se, but the facts and circumstances of the conduct charged and the similarities of the Defendants, I think, is important. And I've alluded to two very well-known cases, Court Marshal cases, of course, that, understanding the difference and recognizing that it's a different sentencing scheme, I still think it's important to look at, Well, what was the punishment? What's a just

punishment? And to look at guidelines of 7,500 months, when Mr. Belfast committed acts that, I think, are -- no one would disagree are significantly more heinous than the acts that were alleged and determined in this case, I respectfully submit to the Court that the guidelines are not an appropriate sentence for Mr. Roggio.

Obviously, understanding his age and his lack of criminal history, I'm sure, the Court will take that into consideration. We would just, respectfully, ask that the Court consider the similarly-situated individuals that were accused of very similar conduct, when fashioning a sentence.

Otherwise, Your Honor, the sentencing documents that were supplied, the character letters that were supplied --

THE COURT: Which I have read.

MR. WATT: -- I'm sure the Court has read those, we will rest on that. If I could just have one moment to confer with my client?

THE COURT: Sure, of course.

MR. WATT: Your Honor, that's all I have, on behalf of Mr. Roggio. He would like to address the Court. He's aware of his right to do so, and he will elect to address the Court.

THE COURT: You have a right to do so. I'm ready to hear your statement.

THE DEFENDANT: Your Honor, I have nothing to say about the sentencing. I'm aware, and I respect this Court, and I

understand the authority under which this Court operates and the authority the prosecution has gives me the similar rights to defend myself.

As I sat here listening to you speak, I realized that you, obviously, spent a lot of time on your decision, it had to be typed up, it had to be researched. But I, also, noticed that, during this time, you constantly referred to everything being said as, Mr. Roggio alleges, Mr. Roggio says, and so does the prosecution.

My only objection I have is what I didn't do at trial, which I'm going to do now. I did not see the Sentencing Memorandum The Government submitted on the 4th or my attorney's responses until five minutes or, maybe, ten minutes before I walked in here. How can I be part of my defense, if I am delegated as a mere spectator?

There are arguments I would like to make, there are things I would like to say. How can I defend myself, both in my trial and here, if I remain silent and allow those people who I'm supposed to entrust in my defense to just make me a spectator? If I'm just to be a spectator in this, why bring me here? I think I have a right to be actively a participant in my own defense. This is my life.

You made your decision on whether to use -- on what part of the Statute you're going to use in your argument, and I respect that, but shouldn't I have had a larger say so than a couple of

hours? I look at the prosecution, there's three lawyers, a whole team, the probation officer, again, multiple people working, Your Honor and all his law clerks. And I'm not even afforded more than a couple hours with my attorney to make a defense? I don't feel that's fair.

Now, I understand that everything here is based upon the trial, and I'm not trying to rehash anything, I'm asking, when can I get a fair shot at this? When can I have more than a few minutes with an attorney, before they decide which course they're going to take?

Now, I have nothing against Mr. Watt or Mr. Bartolai who was my attorney before except that I just don't have the input. Things are being said in my name, which I may very well not agree to.

Before you render a decision, Your Honor, I would -- you know, at the base minimum -- I would like to have read the 34 pages The Government submitted and the 28 pages my attorney submitted before I walked in here. And I don't think that's asking too much. That's all I have to say, Your Honor.

THE COURT: Mr. Watt, is there anyone who wishes to speak on Mr. Roggio's behalf ?

MR. WATT: Other than the character letters that were submitted, no, Your Honor.

THE COURT: Mr. Hinkley? Mr. Jasperse?

MR. HINKLEY: Your Honor, we do have two victims who wish to

54

address the Court. Mr. Claffee will handle those. One live here today, another victim asked that his statement be read in open court. Once that's addressed, I will, then, address the Court with the Government's recommendation for sentence.

THE COURT: Proceed.

MR. CLAFFEE: Thank you, Your Honor. With respect to the victim who is here in person, that's Suzy Abayeva, and she would like to address the Court.

MS. SUZY ABAYEVA: Good morning. My name is Suzy Abayeva.

THE COURT: Spell that, please.

MS. ABAYEVA: That's A-B-A-Y-E-V-A. I spent some time with Ross in 2014 and '15, and I wrote a statement, which you guys will have a copy of, but, honestly, Ross, after hearing what you just said, it really is not surprising, to this moment, that you feel like you don't have to admit to the shit that you did to those people, and you're just going to sit there and say that you deserve and you have rights and you're a human?

You're mechanical, you have no soul, you have no empathy, you have no feeling for anybody. And for you to sit there and say that you have a right, when you did this stuff to all those people, and you could sit there with that face of yours and think that that's okay, you are, honestly -- I hope that you suffer in prison so bad, and that every day you think of all the shit that you did to everybody else, you fucking piece of shit. Excuse my language. Thank you.

55

MR. CLAFFEE: Your Honor, a number of other victims submitted statements that were included with the Pre-Sentence Report. One of those victims has asked that we read his statement for the record here today, and that victim is Siim Saar, with whom the Court is familiar.

With respect to how the crime affected Mr. Saar and his family, he says;

"The biggest effect has been me distancing myself from my family and friends."

He goes on to address the emotional impact of the crime on him and his family, saying;

"The emotional impact this crime had on me can probably be best described with one word. Loneliness. The mental and physical torture which was done to me did not stop the day I got back home. It kept going and still is going on, with the only difference being that now the person torturing me is inside my head.

"The first three years after the experience were, mentally, the most difficult. I tried to keep myself as busy as possible, in order to push away thoughts of suicide, which kept coming up in my head, because I was constantly anxious of being taken, killed or my family being hurt.

"Even though these following thoughts I describe are not as alarming anymore, as I've learned better to deal with them, there hasn't been a day they haven't crossed my mind. Every

time I step into my car, I think, there might be someone in the back seat. Every time I open my apartment door, I think, there's someone with weapons behind it. Every time I leave home, while my family stays behind, I'm afraid he will have them taken or killed.

"I am cautious of every person that I know or meet, and that includes my family, with the only exception being my small children. All of this makes the life of my family more difficult than it probably should be.

"But like with every difficulty in life, also, this one has a positive side. Due to the experience, I am more thankful of life and more understanding of others' struggles in their lives."

Mr. Saar says that therapy costs are the biggest financial impact on him and his family, and when asked if he has any recommendations to the Court about the sentencing of the case or anything else he would like to tell the Court, Mr. Saar says as follows:

"I don't have any suggestions to the Court for sentencing. I don't feel any hatred towards him", meaning Mr. Roggio, "or the need to punish him for his actions. I trust the people who will be making the decision about sentencing to make a fair decision.

"Mr. Roggio achieved more with his actions than he probably ever imagined he would. Although, writing this may not seem

57

like a lot, but it took me months. Every time I sat down to write, I was unable to do so. This is the best I managed at the moment. Thank you."

THE COURT: Very well. Is there anything else?

MR. HINKLEY: Not in regards to other than to mention there was an additional victim witness statement that was submitted to the Court and presented to Your Honor, as part of the PSR addendum.

THE COURT: I have it. Do you have argument?

MR. HINKLEY: Yes, Your Honor. Your Honor, this is an extraordinary case. I, in my career, with the exception of being part of investigations into genocide, never quite experienced a case quite like this.

We're all familiar with the 3553(a) factors that the Court will take into consideration today. The nature and circumstances of the offense, the history and characteristics of the Defendant, the need of the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the Defendant.

Your Honor, this Pre-sentence Investigative Report, by and far, has the longest suggested guideline range I have ever seen or ever heard of in my 25, 26 years of prosecuting. And there's a reason for that.

Mr. Roggio's attorney comes in and asks you to consider

58

sentences that he deems are appropriately considered and equivalent to what we have here today. He talks about crimes that occurred in the military. He talks about assaults that occurred. Those folks, according to his memorandum, received sentences of, approximately, ten years.

In this case, even the Export Violations, themselves, call for a sentence of 12 to 15 years, greater than what those Defendants received. At the end of the day, Your Honor, I wasn't part of those prosecutions, I was part of this prosecution.

What we have here is a person who, by strict calculation, determined he was going to torture someone. As I sat through the trial, it became clear to me that Mr. Roggio believed that his fraud that he was committing against the Kurds was going to come to light, and he needed a way to prevent that from happening.

By calculation, he determined the best way to assure the loyalty of his employees who might provide information to the Kurds that could result in negative consequences was the torture of one of their number and have the others watch parts of those torture so that he could control the situation. It was pure calculation.

I don't know what happened in those other cases, but I know what happened here.

In our sentencing recommendation that we prepared and filed

59

with the Court, we talked about taking each category of the crime and giving a maximum sentence for one of those to run concurrently with the other categorical crimes but consecutive to the other types of crimes for which he was convicted. If the Court does so, it comes up with 115 years, which, certainly, is a lifetime sentence for the Defendant. We do make that recommendation, but we make the recommendation noting that that should be the floor not the ceiling.

In preparing for today, what I wanted to do is provide to the Court the Defendant's characteristics, as well as the seriousness of these crimes and the nature of the offense. I think the best way to do that would be to play a short audio recording that was used during the trial of Triin Kiviking. The Court may recall that she used her iPhone to record her conversations with the Defendant.

THE COURT: I do.

MR. HINKLEY: This was used as an exhibit during the trial, but I think it really speaks to what was going on, what was in the Defendant's mind, while he was doing this, and the sheer calculation and control he was using.

(At this time a portion of an audio recording was played.)

MR. HINKLEY: I have nothing more to add, Your Honor.

THE COURT: Thank you. The lawyers are very familiar with the factors that are set forth in Section 3553(a) that guide me in determining what is a fair, just and appropriate sentence.

60

And they're very familiar with me. But for those who are in this courtroom who do not know what they are, I think, it's worthwhile for me to tell you what they are.

Those factors require that I consider the nature and circumstances of the offenses for which Mr. Roggio has been found guilty, as well as his history and characteristics, and then the sentence I impose must reflect the seriousness of the offense, in this case, the offenses, it must promote respect for the law, it must provide just punishment for the offenses, it must, also, afford adequate deterrence to criminal conduct, and it must protect the public from further crimes of the Defendant.

And among the other requirements that are particular to note, because this requirement is what The Supreme Court has called the overarching requirement, and that is that the sentence be reasonable and sufficient but not greater than necessary to satisfy the factors of Section 3553 that I have just identified.

And I will add that, in addition to the ones I've identified, there's, also, a need to consult the Sentencing Guidelines for the applicable category of offense and the guideline that is assigned to it.

There's, also, a need to avoid unwarranted sentencing disparities among Defendants with similar records who have been found guilty of similar conduct. Application of that particular

61

criteria in this case presents some difficulty, because Mr. Roggio's crimes are varied, and with respect to torture, somewhat unique in the prosecution of that type of offense under American law.

The application of the Sentencing Guidelines as a factor is usually very helpful, but, in this case, the guidelines are 7,500 months. That sounds almost cartoonish, but that is the guideline.

But I take all of these factors into consideration, and in applying those factors, first, I will, as I explained to Mr. Hinkley earlier, adopt the Pre-Sentence Report in its entirety. I will tell you that I have carefully reviewed the portion of the Pre-Sentence Report that's entitled, History and Characteristics, and while I will not make reference to each and every paragraph that is set forth in that section of the PSR, there are a few that I will make reference to.

Mr. Roggio, who was born with the name Ross Gothman Brogan, is 55 years old. He has an unusual history that appears to be free of any history of illicit drug abuse or alcohol abuse.

He is a high school graduate of East Stroudsburg High School, he has matriculated at a number of colleges but never earned a Bachelor of Arts or Science degree at any of these institutions, and they are listed in the Pre-Sentence Report.

With respect to his military service, he reported that he had joined The United States Army as a full-time, active-duty

62

enlistee at age 18. He, also, reported he was a member of the 82nd Airborne Division stationed at Fort Bragg, North Carolina. He reported that, after about two years, he received a General Discharge Other Than Honorable. He reported his highest rank was E-4.

Now, his actual United States Army Discharge document shows that he enlisted on December 9 of 1988 at age 20 for a four-year period. However, he was discharged on November 13, 1990 under a separation code that is entitled, Misconduct, Pattern of Misconduct. Although, I will note that he received an Army Service Ribbon and a Parachutist Badge.

His reasons, the specific factual reasons for his discharge were listed as receiving four Article 15 Non-judicial Punishment Assessments for fighting with soldiers, dereliction of duty by not maintaining his equipment for inspection, leaving his wall locker unsecured, failure to be at his appointed place of duty at the prescribed time and disobeying and being disrespectful to a non-commissioned officer. He, also, had numerous instances of providing what the PSR describes as dishonored checks.

Mr. Roggio has been incarcerated in this case since February 17 of 2022. By all accounts, he has a very unconventional employment history. Much of it is self-reported. But he was involved in a number of business activities, prior to February of 2017.

63

Between February of 2017 and March of 2018, he was supported by his parents. At one point, he worked for a company called Dyncorp, D-Y-N-C-O-R-P, International. He said his employment consisted of building homes for oil workers in North Dakota. That information could not be verified.

He, also, reported he was employed by a company called Future Services, where he worked in Kuwait to secure contracts for heavy equipment for U.S. Military Government Agencies. But this, again, could not be verified.

He reported that he was the CEO for Radon Tactics, Inc. in Bunnlevel, North Carolina. And according to his statement, he obtained contracts for security and logistical support for media companies and other entities, after the aftermath of the earthquake in Haiti in 2010. However, representatives from the Radon Tactics Company were interviewed, in connection with this investigation, and they reported Ross Roggio was not CEO of the business rather he was a contracted 1099 employee.

And after one month in Haiti, the ownership of this company learned Mr. Roggio was using their credit card for personal expenses, approximating $20,000, and that he produced multiple fraudulent contracts. Other employees observed him with prostitutes and cocaine.

37,000 pounds of clothing donations were collected through a church in North Carolina to be disbursed to the earthquake victims in Haiti, but Radon Tactics reports that they learned

64

that he sold that clothing for, approximately, 80 cents per pound.

These same representatives from Radon Tactics reported that Mr. Roggio lied about his military career to them. They asserted to the probation officer that they received telephone calls from people in Haiti who, quote, literally wanted to kill him, because of the harm he caused. He was dismissed after one month and left in Haiti to, as the Pre-Sentence Report says, do his own thing.

Then, from 2008 to 2010, he put all of his money, according to him, into Roggio Arsenal in Fayetteville, North Carolina. He wanted to be an arms manufacturer. He reportedly sold numerous units in 2008, because there was a high demand for assault rifle-style weapons, but when the sales dropped, he, as he put it, knew he wasn't going to survive and he shut down.

His partner in that business, a man named Jim Ripley, was interviewed about the business venture. Mr. Ripley explained that he believed that he was a partner in Roggio Arsenal, but later learned that Mr. Roggio didn't file the appropriate paperwork and, essentially, left everything in his own name.

Ripley, also, explained that the Defendant charged $10,000 to one of his credit cards without permission, and that Mr. Ripley was paying employees from his own savings.

Ripley further said that they were approached by the Sig Sauer Firearms Company to produce assault rifles, and they had

65

a handshake deal, but a few days later Ripley received a telephone call from Sig Sauer's president and told him they would not work with people who lied about their military service. And after questioning Mr. Roggio, the business, as Mr. Ripley put it, fell apart.

There are other businesses that he was engaged in. He reportedly opened and operated a Blunt Street Skate Park in Fayetteville. He, reportedly, sold it for what he called a long-term, convoluted-type thing.

He opened up a place called Smokey's in Fayetteville around the same time that he operated a business called Cape Fear Diving. He reportedly sold glass pipes, water pipes, t-shirts and Hookas in this business.

Prior to that, he was a tire builder for Good Year Tire and Rubber in Fayetteville. His employment there was terminated for excessive absences and attendance issues.

So he went through a lot of jobs, and even a job as an insurance agent for a particular insurance company and working as a commercial account executive for Orkin Pest Control. And he has no prior adult criminal convictions.

The nature and circumstances of the offense in this case are lengthy. It began, seemingly, in a genuine effort to conduct a legal business, which, unfortunately, didn't take place.

Command Sergeant Major Ronald Bly had been deployed to the

Kurdistan Region of Iraq in 2014 as a Liaison Officer to local military and civil leaders. Lahur Talabani, who was then the Director of the Zanyari Agency, the Intelligence Unit of the Patriotic Union of Kurdistan, and this man, Mr. Talabani, approached Mr. Bly about manufacturing firearms in Iraq. Specifically, Mr. Talabani wanted to know whether Ronald Bly knew anyone with expertise in the manufacturing of M4-type automatic weapons, which could be built via a manufacturing plant in the Kurdistan Region of Iraq.

Mr. Bly offered Mr. Roggio as a potential candidate. Mr. Roggio had previous experience in manufacturing M4 rifles and their civilian counterpart the AR15. Mr. Bly's wife had been employed there as an office manager. As we know, that business failed, but Mr. Bly offered Mr. Roggio as someone who could meet the requests of Mr. Talabani.

Now, when Mr. Bly approached Mr. Roggio with the opportunity in Kurdistan, he told Mr. Roggio that he would need approval for the project through The United States Department of State. Roggio agreed to pursue the project and met in North Carolina with Ronald Bly and Polad Talabani, Lahur's brother, and Commander of the Kurdistan Counterterrorism Group or CTG, and they figure into this case in a very significant way.

Mr. Roggio agreed to take this project on. He set up Roggio Consulting Company LLC with The Pennsylvania Department of State as a Single Member Limited Liability Corporation. He

named his parents' residence in Stroudsburg, Pennsylvania as the corporate headquarters, and he set up financial accounts for Roggio Consulting LLC with local branches of PNC Bank, and when PNC terminated its relationship with him, he went to Wells Fargo Bank.

Then, he traveled to Sulaymaniyah, Iraq in 2014 to undertake the arms manufacturing project for the Kurds. He, initially, hired two individuals, Suzy Abayeva and Elina Kadaja, to help him start the project. That involved searching for office space, setting up computer and email accounts, researching for various machines needed for the manufacturing process.

Mr. Roggio wrote a feasibility report. This is important. He wrote a feasibility report concerning the proposed manufacturing project, which he emailed to Elina Kadaja and requested she deliver it to his Kurdish sponsor. The feasibility report was a business plan that explained the various stages and requirements of the arms factory project, including the mechanics, personnel and legal hurdles of setting this factory up in Kurdistan.

The  report noted that the project required United States Department of State approval and said, Failure to do so would create what Mr. Roggio, himself, described as grave danger of incarceration and heavy fines. Right off the bat, Mr. Roggio knew to proceed without United States Government approval was

68

to place himself and anyone involved with him in severe legal jeopardy, criminal jeopardy.

The project was funded by a business associated with the Talabanis called Zarya, Z-A-R-Y-A Construction. This company transferred millions of dollars via International Wire Transfers from financial accounts in Kurdistan to banks in the Middle District of Pennsylvania, where accounts held by Ross Roggio were located. Those being PNC and Wells Fargo Banks.

Mr. Roggio planned to set up an arms factory that would be able to manufacture each part of an M4-type rifle and Glock-type semi-automatic pistol. He intended to do this by reverse-engineering these weapons, creating blue prints to manufacture them and to set up a factory to accomplish this.

He hired several Estonian employees, one of whom was Siim Saar, with various educational, technical expertise and including, specifically, engineering expertise. Mr. Roggio was careful not to provide too much detail to these people when hiring them, and he required each person to sign a non-disclosure agreement, as part of the hiring process.

As I said, he hired Estonian engineers who measured and researched schematics for the weapons he planned to produce, together with specialized equipment that would be used to manufacture the weapons, themselves, for the Kurds. These machines were purchased from suppliers in China and India and, eventually, installed in the factory located in Sulaymaniyah,

69

Iraq.

Some items that were acquired for the weapons project were purchased by Mr. Ross Roggio from United States manufacturers. This is where his criminal activity deepens.

He ordered rifling buttons from Drill Masters Eldorado Tools, Inc., a manufacturer of specialized tools located in Connecticut. These rifling buttons are a specialized-type of drill that's used in the manufacture of barrels, which requires a United States Commerce Department License to export from the United States anywhere and, certainly, to Iraq.

An individual from Drill Masters Eldorado Tools contacted the FBI to report that Mr. Roggio purchased items from the company and had them delivered to Mr. Roggio's address in Pennsylvania, before being transshipped to Iraq.

Mr. Roggio, also, purchased M4 gas rings and firing pin retainers from a company called OML Global, a supplier located in Fayetteville, North Carolina. These items required a United States Department of State License for export to Iraq.

United States Department of State, with respect to firearm parts, and United States Department of Commerce, with respect to firearm tools, were responsible for the controlled items during these offenses. Mr. Roggio, knowing what he knew, as I've already explained, violated the laws by failing to acquire a license from, either, The Department of State or The Department of Commerce, before exporting these items.

70

He had no permission nor any license to engage in the weapons manufacturing project that he, nonetheless, went ahead with.

He received International Transfers of Funds into his financial accounts. During the trial, The Government submitted exhibits from PNC Bank and Wells Fargo that showed $5,420,746.27 in International Wire Transfers from Zarya Construction to Ross Roggio's bank accounts. In addition, there was over $1 million in International Transfers from other entities, principally, from Turkey, related to this ongoing scheme.

During trial, witnesses testified that representatives of Zarya Construction, also, hand-delivered hundreds of thousands of dollars to Ross Roggio's arms factory, in support of the project in this particular case.

In addition to using the money toward illegal arms manufacturing, Mr. Roggio saw fit to divert funds to pay for unrelated personal debts, take expensive vacations, purchase and renovate a home in Stroudsburg, buy Rolex watches, expensive automobiles, even the unusual McLaren automobile, as well as purchasing for himself numerous firearms and accessories.

Siim Saar, then, becomes significant here. He discovered Ross Roggio was diverting and stealing funds from the Kurds. Siim Saar believed Mr. Roggio was spending large amounts of

money on vacations, and, as he put it, toys, such as buying expensive automobiles in The United States. Mr. Saar feared his life would be in danger, if the Kurds discovered that Ross was defrauding them. So to protect himself, in the summer of 2015, Mr. Siim Saar began to make copies of financial documents showing Mr. Roggio's purchases of various luxury items, together with blue prints created by employees for the arms manufacturing project. His plan was to give the documents to law enforcement, if the opportunity arose.

He made hard copies of these documents and electronically copied others. He kept the materials in his apartment, which he shared with two other Estonian employees, Triin Kiviking, whose voice you heard via recording, and Marrtin Vilist. He, also, kept in his apartment a journal, in which he had written that he had copied office materials, without specifying what he had copied.

Mr. Saar expressed his concerns about Roggio to a Kurdish individual named Akam, A-K-A-M, who worked for Zarya Construction and stopped by the weapons factory regularly to check on the progress of Mr. Roggio's operation.

In September of 2015, Mr. Roggio found out that someone had been talking to Akam and gave instructions that Elina was to be the only point of contact with Akam. In October of that year, while Ross Roggio was in Greece, Siim Saar told Ross Roggio via Facebook message that he wanted to leave Iraq. Saar told Roggio

72

he was upset that another employee earned more money than he did, although, Saar claimed it was a false reason, but may, also, have tipped off Ross Roggio that Siim Saar had looked at the weapons project financial records.

Around that time, Saar asked Elina Kadaja about how to give back his company telephone. Soon thereafter, Elina Kadaja told Mr. Saar he could not leave Iraq, but he should not come to work and he should stay in his apartment.

The following morning, Wednesday, October 14, 2015, Mr. Saar's roommates went to the weapons factory, while Saar stayed home. Saar answered a knock on the door and found four armed Kurdish soldiers in uniform. Soldiers forced their way into his apartment, struck him in the head, forced him into the back seat of an SUV, placed a cloth bag over his head, took him to a military base located near the Sulaymaniyah Airport.

Saar was housed in a Spartan shipping container. Not too much happened for the first few days. Soldiers stopped by, seemingly curious about who he was and why he was there. But two days later, when Roggio returned to Kurdistan, soldiers took Siim Saar to a different room where he was screamed at by Mr. Roggio, asked questions, and when it became apparent Mr. Roggio did not like the answers he was given, he directed the soldiers to beat Siim Saar.

The first night, Mr. Roggio and his Kurdish soldiers tortured Siim Saar for, approximately, six hours as follows:

Soldiers stood on Siim Saar, and then stood him up. Then hit him in the stomach and chest. When he was knocked down, the soldiers violently stomped on his chest, wearing their military boots. Soldiers hit Siim Saar in, particularly, painful places, such as, his ears, nose and throat. At Ross Roggio's orders, soldiers placed a plastic bag over Siim Saar's head to suffocate him. They did this multiple times. Saar, himself, said he thought he was going to die. He lost consciousness several times.

Soldiers, also, used a taser, on Ross Roggio's orders. They used to taser to inflict electronic shocks on Mr. Saar. They tased him repeatedly, again, targeting sensitive areas of Saar's body, including his nose, his throat and his genitals. At Ross Roggio's instructions, the soldiers inflicted more beatings, this time, using plastic hoses to lash Saar's legs, back, stomach and chest.

And, then, the soldiers had Mr. Saar taken outside, at Roggio's direction, where they made him run barefoot on sharp gravel on the military compound.

Two senior commanders from the CTG visited the room, during Saar's interrogation and torture. Saar said that he knew they were senior commanders, because of the way Ross Roggio interacted with them.

His view was commanders did not seem knowledgeable about the situation and asked Saar more basic questions than the

questions that Ross Roggio had been asking.

Roggio, then, compelled Saar's Estonian colleagues, Elina Kadaja, Heret Enden and Marrtin Vilist and Triin Kiviking to accompany him to the Kurdish military compound, during the first interrogation. These other Estonians spent much of the time outside the room, but they could hear Siim Saar being beaten and could hear him screaming.

At times, Mr. Roggio brought the other Estonians into the room, sometimes, individually, and, at least, once all together, to watch the physical abuse inflicted on Saar.

The purpose was, obviously, to intimidate the other Estonians and to show them what would happen to them if they were disloyal.

Roggio threatened the other Estonians, and all of them were traumatized by what they saw, and, in fact, Mr. Roggio had Kurdish soldiers tase Marrtin Vilist once.

Mr. Roggio directed these Kurdish soldiers, in English, what to do. Torture did not begin until Mr. Roggio arrived. He would ask questions and tell the soldiers when to start and when to stop torturing Siim Saar. By the end, Siim Saar could not feel his hands, which were involuntarily twitching. He experienced extreme pain, and as he was beaten, coughed up blood.

Siim Saar was detained for 39 days, as you heard. He estimated he was tortured 10 times. With Ross Roggio present,

eight times, and Mr. Roggio directing Elina Kadaja, by text, what to do on the other two occasions, when Saar was tortured. There was never an interrogation or beating at which only the soldiers were present. Never.

The sessions involved the same type of abuse that I've described here, including beatings with fists, beating with plastic hoses, tasing, suffocation with a plastic bag and other cruel forms of torture.

For example, on, at least, one occasion, Mr. Roggio instructed a Kurdish soldier named Goran to use a cutting tool to apply pressure to one of Siim Saar's fingers. Saar thought his finger was going to be cut off, as Goran increased the pressure, in response to Roggio's instructions.

On another occasion, after Saar asked Roggio for a cup of tea because his throat hurt from the abuse, Roggio took off his belt, wrapped it around Siim Saar's neck from behind, and yanked Siim Saar off the ground, until the belt around Saar's neck to suspend him caused him, as he hung in the air, to lose consciousness. When he came to, Goran was beating him with a stick.

Roggio admitted that he broke Siim Saar emotionally and testified, quote, Better broken than dead.

He, also, admitted to having threatened to send Siim Saar back to the Kurdish military compound, after Siim Saar's release, and threatened to call Goran and strap Triin Kiviking

naked to a table. Roggio testified that Saar needed to be taught a lesson.

The Estonian witnesses testified that Roggio was in charge of Siim Saar's torture, and that Ross Roggio was not trying to help Siim Saar, in any way. Saar, himself, testified he cannot talk about his experiences without trembling. Heret Enden, Marrtin Vilist and Triin Kiviking all testified they were frightened by what they saw at the compound. Triin Kiviking and Heret Enden, in particular, testified about the lasting impact the experience had on them, including Triin Kiviking having difficulty eating and sleeping afterward.

Saar was released from the military compound November 21, 2015. He remained in Kurdistan and was forced to work for Roggio for about one month after his release from the compound. Saar thought that if he tried to leave without Roggio's permission, he would be stopped at the airport by the authorities.

The PSR categorizes and catalogs additional suffering at the hands of Mr. Roggio, but I think I've described it sufficiently here.

With respect to one other aspect of the sentence, the adjustment for Obstruction of Justice. Mr. Roggio lied to investigators during the investigation on, at least, three occasions.

On or about April 29, 2016, Mr. Roggio told FBI agents he

had not shipped any gun parts or tools for guns to Iraq, during a telephonic interview, while Ross Roggio was in Kurdistan and FBI agents were at his home in Stroudsburg.

On February 26, 2017, during a secondary inspection at John F. Kennedy Airport in New York, Roggio gave U.S. Customs and Border Patrol Protection Officers a false cover story about having been in Iraq to oversee the construction of residential buildings.

And on or about May 10, 2017, during the execution of a search warrant at his residence, Ross Roggio told Homeland Security Agents that he had been working for the CIA in Kurdistan from 2014 to 2016.

In addition, Mr. Roggio gave false testimony at trial. Among the various instances of false testimony, Mr. Roggio stated that his involvement in the torture of Siim Saar was the result of coercion, because Siim Saar had embarrassed the Kurds who were, therefore, out to get Saar. According to Mr. Roggio, his actions were an attempt to save Siim Saar.

Government witnesses testified that Siim Saar's torture was conducted by Kurdish military soldiers, under the direction and control of Ross Roggio. They, also, testified that Roggio required each of the Estonian employees, who observed Siim Saar being tortured, were, themselves, thereafter, threatened with being taken to the compound, if they were not fully cooperative and loyal to Roggio. Saar testified that, after his release

78

from the compound, he was threatened by Roggio to be sent back, if necessary.

His false statements to agents and his extensive, elaborate trial testimony reflected a willful attempt to obstruct or impede the administration of justice.

Now, I've told you what the 3553(a) factors are, all of them are implicated here in this case. That's not always true, but it's true here.

First, with regard to the seriousness of the offense. You were found guilty on all 33 counts in which you were tried. The scope of your criminality, as counsel for The Government stated, is breathtaking.

Torture and Conspiracy To Torture, Counts 1 and 2. Smuggling of Firearms Components and Tools for Firearm Manufacture into Iraq, Kurdistan, Counts 7 and 8. Violations of The Arms Export Act, Counts 4 and 6. Violations of The International Emergency Economic Powers Act, Count 5. Wire Fraud, Counts 9 and 10. Money laundering of millions of dollars acquired through your fundamentally illegal activities, that being Counts, 12, 13, 14, 15, 17, 18, 19, 21, 22, 23, 24, 27, 28, 29, 30, 31, 32, 33, 34, 36, 37, 38 and 39. There is no question as to the seriousness of the offense.

With respect to the obligation that this sentence promote respect for the law. In your grasp for money and power, you trampled on human rights, you caused pain and suffering by

torture, you instilled fear and anxiety in those whom you employed, and you displayed an utter knowing disregard for the laws of The United States in every act that you took in your efforts to become a wealthy manufacturer of armaments. You proceeded without United States Government approval or license, when you knew such approval and license were both required.

Requirement of just punishment. As noted, the spectrum and audacity of your violations were perpetuated on a remarkably wide scale, which requires that each and every violation be factored into the sentence imposed. To do otherwise would run afoul of the requirement that the sentence imposed be reasonable, be sufficient but not greater than necessary to satisfy the sentencing objectives of 3553(a).

The sentence must afford adequate deterrence to criminal conduct. Your sentence must not only deter you from further criminal conduct of the kind you stand convicted, but, also, it must make clear to those who would engage in torture or trafficking and unlawful manufacturing of weaponery for political or monetary gain, that they face the severest of penalties.

So with regard to protecting the public from further crimes of the Defendant, given the nature of your crimes and your age and your, what I believe, truly, is your considerable willingness to violate the laws of The United States, there is a need for the sentence imposed to protect the public from

further crimes by you.

You have shown, throughout these proceedings, even today, you've shown neither regret nor remorse for anything you did, during the proceedings in this case. You've shown no remorse and no regret for your actions.

On that basis, having taken all of the factors of Section 3553 into consideration, I will enter the following disposition in this case:

Pursuant to the Sentencing Reform Act of 1984, it is the Judgment of the Court that the Defendant Ross Roggio is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 840 months or 70 years.

This term consists of Group 1, 240 months on each of Counts 1 and 2 to run concurrent; Group 2, 240 months on each of Counts 4, 5 and 6 to run concurrently with each other and consecutive to the terms imposed on Counts 1 and 2; Group 3, 60 months on Count 3 and 120 months on Counts 7 and 8 to run concurrently with each other and consecutive to the terms imposed on Counts 1, 2, 4, 5 and 6; and Group 4, 240 months on Counts 9, 10, 12, 13, 14, 15, 17, 18, 19, 21, 22, 23, 24, 27, 28, 29, 30, 31, 32, 33, 34 and 36, 37, 38, 39 to run concurrent with each other and consecutive to all other counts, for an aggregate term of 840 months.

It is Ordered that the Defendant shall pay to the Clerk of The United States District Court a special assessment of $100

on each count, for a total of $3300, due immediately.

The Court finds that the Defendant does not have the ability to pay a fine and no fine is imposed, but he shall make restitution of $9756.22 payable to The Clerk of The United States District Court for disbursement to Siim Saar. The payment of interest is waived.

During the term of imprisonment, restitution is payable every three months in an amount, after telephone allowance, equal to 50 percent of the funds deposited into the Defendant's Inmate Trust Fund Account.

In the event restitution is not paid in full, prior to the commencement of supervised release, the Defendant shall, as a condition of supervised release, satisfy the amount due in monthly installments of no less than $250 to commence 30 days after release from confinement.

Upon release from imprisonment, the Defendant is hereby placed on supervised release for a term of three years on each count to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, the Defendant shall report in person to the Probation Office in the district to which the Defendant is released.

While on supervised release, the Defendant must not commit another Federal, State or local crime and must not possess a dangerous weapon. The Defendant must comply with the standard

82

conditions adopted by this Court and the following additional conditions:

1. You must cooperate in the collection of a DNA sample.

2. You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

3. You must participate in a mental health testing program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program, which could include an evaluation and completion of any recommended treatment.

You must take all mental health medications that are prescribed by your treating conditions.

4. You must apply all monies received from income tax refunds, lottery winnings, judgments and/or other anticipated or unexpected financial gains to the outstanding Court-ordered financial obligation.

5. You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The Probation Office may share the financial information with The United States Attorney's Office.

6. You must not incur new credit charges or open additional lines of credit without approval of the probation officer.

7. You must pay the financial penalty, in accordance with

the Schedule of Payments Sheet of this Judgment, and must, also, notify the Court of any changes in economic circumstances that might affect the ability to pay this financial penalty.

8. You must not communicate or otherwise interact with any victim of the offenses, either, directly or through someone else, without first obtaining the permission of the Probation Office.

Further, the Defendant shall forfeit all assets, as listed in the Forfeiture Stipulation.

Lastly, I must advise you of your right to appeal your conviction and sentence to The United States Court of Appeals for The Third Circuit.

With few exceptions, any Notice of Appeal must be filed within 14 days after sentence is imposed on you. If you are unable to pay the costs of an appeal, you may apply for leave to appeal In Forma Pauperis, and if you so request, the Clerk of the Court will prepare and file a Notice of Appeal on your behalf.

Is there anything else, Mr. Hinkley?

MR. HINKLEY: No, Your Honor. Thank you.

THE COURT: Mr. Watt?

MR. WATT: No, Your Honor.

THE COURT: Thank you all very much.

(At this time the proceedings were adjourned.)

84

C E R T I F I C A T E

I, KRISTIN L. YEAGER, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

S/Kristin L. Yeager
KRISTIN L. YEAGER, RMR,CRR
Official Court Reporter

REPORTED BY:

    KRISTIN L. YEAGER, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    P.O. Box 5
    Scranton, Pennsylvania  18501

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

**$**

**$10,000** [1] - 64:21
**$100** [2] - 48:5, 80:25
**$20,000** [1] - 63:20
**$250** [1] - 81:14
**$3300** [2] - 48:6, 81:1
**$5,420,746.27** [1] - 70:7
**$50,000** [1] - 48:4
**$9756.22** [2] - 48:4, 81:4

**'**

**'15** [1] - 54:12

**1**

**1** [20] - 2:14, 5:5, 17:13, 18:5, 18:11, 18:22, 21:23, 23:20, 25:21, 35:1, 38:23, 41:20, 47:12, 70:9, 78:13, 80:13, 80:14, 80:16, 80:19, 82:3
**10** [10] - 3:22, 18:17, 23:9, 23:23, 29:21, 42:5, 74:25, 77:9, 78:18, 80:20
**105** [1] - 39:8
**1099** [1] - 63:17
**10:00** [1] - 1:9
**11** [2] - 2:9, 29:21
**113** [2] - 6:10, 15:19
**114** [2] - 6:10, 15:19
**115** [1] - 59:5
**12** [6] - 4:1, 4:8, 43:9, 58:7, 78:20, 80:20
**120** [1] - 80:17
**121** [2] - 6:10, 15:19
**13** [7] - 4:8, 16:5, 17:17, 43:9, 62:8, 78:20, 80:20
**1301** [1] - 1:18
**131** [2] - 6:10, 15:19
**132** [2] - 6:11, 15:19
**1339** [1] - 39:9
**1346** [1] - 39:9
**14** [7] - 3:19, 4:8, 17:22, 72:9, 78:20, 80:20, 83:14
**15** [7] - 1:9, 4:1, 4:8, 58:7, 62:13, 78:20, 80:20
**16** [1] - 2:9
**17** [5] - 4:1, 4:9, 62:22, 78:20, 80:20
**18** [12] - 4:9, 16:11, 16:15, 19:12, 23:19,

25:20, 33:25, 36:23, 37:15, 62:1, 78:20, 80:20
**18-CR-97** [1] - 1:4
**18501** [1] - 84:19
**18503** [2] - 1:13, 1:25
**18640** [1] - 1:21
**19** [5] - 2:6, 4:1, 4:9, 78:20, 80:20
**1979** [1] - 18:25
**1984** [1] - 80:9
**1988** [1] - 62:7
**1990** [1] - 62:9
**1991** [1] - 46:3
**1992** [2] - 35:11, 39:9
**1993** [1] - 18:23
**1994** [1] - 43:16
**1997** [1] - 39:8
**1B1.1** [1] - 27:24
**1B1.2** [1] - 16:25

**2**

**2** [15] - 2:16, 5:6, 16:16, 17:13, 17:25, 18:5, 18:11, 21:24, 41:25, 78:13, 80:14, 80:16, 80:19, 82:4
**20** [2] - 2:9, 62:7
**2000** [1] - 32:20
**2003** [1] - 43:15
**2008** [2] - 64:10, 64:13
**2010** [3] - 25:5, 63:14, 64:10
**2014** [6] - 35:10, 42:8, 54:12, 66:1, 67:6, 77:12
**2015** [5] - 3:20, 71:4, 71:21, 72:9, 76:13
**2016** [4] - 41:20, 42:8, 76:25, 77:12
**2017** [6] - 41:25, 42:5, 62:25, 63:1, 77:4, 77:9
**2018** [1] - 63:1
**2022** [1] - 62:22
**2023** [4] - 2:5, 2:7, 2:9, 4:19
**2024** [2] - 1:9, 4:19
**2040** [1] - 25:21
**20530** [2] - 1:16, 1:18
**209** [3] - 32:20, 35:7, 39:6
**21** [5] - 4:1, 4:10, 76:12, 78:20, 80:20
**2118** [1] - 19:12
**2118(b)3** [2] - 20:1, 20:8
**2118(c)1** [2] - 20:4, 20:9

**22** [3] - 4:10, 78:20, 80:20
**221** [1] - 18:24
**226** [2] - 21:13, 32:20
**227** [1] - 21:13
**23** [3] - 4:10, 78:20, 80:20
**2340** [1] - 23:20
**2340.1** [1] - 37:15
**2340A** [2] - 16:15, 36:25
**2340A(a** [5] - 16:12, 35:19, 35:21, 36:23, 37:1
**2340A(b** [1] - 33:25
**2340B** [2] - 35:20, 35:24
**235** [2] - 1:12, 1:25
**238** [1] - 1:20
**24** [5] - 4:1, 4:10, 30:5, 78:20, 80:20
**240** [3] - 80:13, 80:14, 80:19
**247** [1] - 39:6
**248** [4] - 35:7, 39:6, 39:14, 39:23
**25** [2] - 2:9, 57:23
**26** [4] - 2:9, 41:25, 57:23, 77:4
**27** [6] - 4:1, 4:11, 4:19, 43:15, 78:20, 80:20
**28** [5] - 4:11, 53:17, 78:21, 80:21, 84:6
**29** [5] - 4:11, 41:20, 76:25, 78:21, 80:21
**2A** [1] - 26:23
**2A1.1** [1] - 16:18
**2A1.2** [1] - 16:19
**2A2.2** [5] - 5:7, 16:20, 16:21, 17:20, 25:12
**2A4.1** [8] - 5:4, 16:12, 16:23, 17:9, 18:3, 18:10, 25:15, 27:11
**2A4.1(b)2(B** [1] - 5:10
**2A4.1(b)2(B)** [1] - 27:22
**2A4.1(b)4(A** [5] - 5:14, 5:18, 31:2, 31:9, 32:5
**2A4.1(b)4(A)** [1] - 30:24
**2M5.2** [3] - 16:5, 45:14, 45:16

**3**

**3** [10] - 2:18, 4:18, 17:25, 22:1, 27:9, 42:5, 48:4, 80:16, 80:17, 82:7

**30** [8] - 4:12, 5:20, 30:22, 31:3, 31:6, 78:21, 80:21, 81:14
**309** [1] - 35:9
**31** [3] - 4:12, 78:21, 80:21
**311** [1] - 1:12
**318** [2] - 35:10, 37:5
**32** [5] - 4:12, 16:13, 26:24, 78:21, 80:21
**33** [4] - 4:12, 78:10, 78:21, 80:21
**34** [7] - 4:2, 4:13, 41:17, 53:16, 78:21, 80:21
**35** [1] - 2:9
**351** [1] - 43:9
**3553** [3] - 29:3, 60:17, 80:7
**3553(a** [8] - 6:24, 47:5, 47:14, 47:19, 48:11, 57:14, 59:24, 78:6
**3553(a)** [1] - 79:13
**358** [2] - 18:7, 29:21
**359** [5] - 15:24, 16:5, 17:25, 22:9, 27:9
**36** [6] - 4:2, 4:13, 41:17, 42:9, 78:21, 80:21
**360** [1] - 29:8
**37** [5] - 4:13, 6:13, 15:10, 78:21, 80:21
**37,000** [1] - 63:23
**38** [3] - 4:14, 78:21, 80:21
**39** [12] - 4:2, 4:14, 18:17, 22:19, 23:7, 23:23, 31:7, 41:5, 74:24, 78:21, 80:21
**3B1.1(a** [4] - 5:24, 33:12, 38:13, 41:3
**3B1.1(a)** [3] - 32:15, 34:20, 34:24
**3C1.1** [3] - 6:3, 41:15, 42:13
**3C1.1's** [1] - 45:9

**4**

**4** [11] - 2:21, 22:3, 27:9, 42:13, 42:14, 44:15, 78:16, 80:15, 80:19, 82:15
**4.1** [1] - 26:23
**414** [1] - 18:22
**43** [6] - 5:2, 16:1, 16:9, 31:19, 47:11
**44** [6] - 5:9, 10:8, 16:1, 27:16, 27:18, 30:17
**46** [6] - 5:13, 16:1,

30:19, 31:22, 32:7
**470** [1] - 44:20
**479** [1] - 44:20
**48** [5] - 5:22, 16:1, 32:9, 41:4
**49** [3] - 6:1, 16:2, 45:12
**4th** [1] - 52:12

**5**

**5** [9] - 3:2, 6:13, 15:10, 44:18, 78:17, 80:15, 80:19, 82:19, 84:18
**50** [4] - 5:2, 6:10, 15:18, 81:9
**507** [1] - 43:21
**51** [2] - 6:10, 15:18
**55** [1] - 61:18
**56** [2] - 6:10, 15:18
**566** [1] - 43:14
**569** [1] - 43:15
**58** [2] - 6:10, 15:18
**59** [2] - 6:10, 15:18
**5G1.2(b)** [1] - 48:10

**6**

**6** [7] - 3:7, 18:8, 29:8, 78:16, 80:15, 80:19, 82:23
**60** [1] - 80:16
**604** [2] - 18:24, 21:13
**61** [2] - 6:10, 15:19
**611** [1] - 25:4
**625** [1] - 48:9
**64** [2] - 6:10, 15:19
**69** [1] - 43:14

**7**

**7** [5] - 3:12, 29:9, 78:15, 80:17, 82:25
**7,500** [5] - 47:12, 48:9, 49:2, 51:1, 61:7
**70** [1] - 80:12
**72** [1] - 81:19
**74** [1] - 44:20
**750** [2] - 35:9, 37:5
**753** [1] - 84:6
**783** [1] - 25:5
**796** [1] - 39:8

**8**

**8** [8] - 2:5, 2:8, 3:15, 22:10, 43:9, 78:15, 80:17, 83:4
**80** [1] - 64:1
**804** [1] - 39:8

**82nd** [1] - 62:2
**840** [2] - 80:12, 80:23
**87** [1] - 43:21

**9**

**9** [4] - 3:18, 62:7, 78:18, 80:20
**928** [1] - 35:11
**934** [1] - 35:11
**935** [1] - 35:11
**947** [1] - 43:16
**950** [1] - 1:15
**954** [1] - 35:11
**958** [1] - 43:16
**96** [1] - 43:21
**961** [1] - 43:16
**984** [1] - 39:9

**A**

**A-B-A-Y-E-V-A** [1] - 54:11
**A.M** [1] - 1:9
**Abayeva** [3] - 54:7, 54:9, 67:8
**ABAYEVA** [2] - 54:9, 54:11
**abduct** [3] - 17:15, 18:15, 34:12
**abducted** [6] - 11:13, 20:14, 31:18, 40:7, 40:10, 40:18
**Abduction** [3] - 5:4, 16:23, 17:9
**abduction** [5] - 20:17, 23:4, 23:7, 38:12, 40:14
**ability** [3] - 31:12, 81:3, 83:3
**able** [2] - 6:16, 68:10
**above-mentioned** [1] - 84:8
**absences** [1] - 65:16
**absolutely** [1] - 15:2
**abundance** [1] - 38:14
**abuse** [8] - 12:5, 26:8, 61:19, 74:10, 75:5, 75:15, 82:4
**accept** [2] - 44:21, 45:4
**accepted** [1] - 44:23
**access** [1] - 82:19
**accessories** [1] - 70:22
**accompany** [1] - 74:4
**accomplish** [2] - 46:21, 68:13
**accordance** [4] - 4:17, 27:22, 48:10, 82:25

**according** [5] - 34:25, 58:4, 63:11, 64:10, 77:17
**accordingly** [4] - 21:21, 32:7, 36:15, 45:10
**Account** [1] - 81:10
**account** [3] - 11:17, 26:10, 65:19
**accounts** [7] - 62:22, 67:2, 67:10, 68:6, 68:7, 70:5, 70:8
**accused** [3] - 48:22, 50:16, 51:10
**achieved** [1] - 56:24
**acquire** [1] - 69:23
**acquired** [2] - 69:2, 78:19
**Act** [8] - 2:21, 3:3, 3:8, 26:16, 50:3, 78:16, 78:17, 80:9
**act** [3] - 28:5, 37:16, 79:3
**acted** [4] - 43:25, 44:25, 45:6, 46:15
**acting** [6] - 29:14, 34:13, 37:16, 37:22, 44:2, 45:2
**actions** [6] - 29:23, 46:11, 56:21, 56:24, 77:18, 80:5
**active** [1] - 61:25
**active-duty** [1] - 61:25
**actively** [1] - 52:21
**activities** [2] - 62:24, 78:19
**activity** [23] - 5:24, 32:12, 32:17, 32:18, 32:22, 33:7, 33:10, 33:20, 34:5, 34:18, 34:19, 34:23, 36:1, 37:1, 37:10, 38:5, 38:17, 38:25, 39:13, 40:19, 41:1, 41:2, 69:4
**Activity** [2] - 4:6, 13:10
**acts** [8] - 25:25, 28:8, 29:10, 49:4, 49:5, 49:6, 51:2, 51:3
**actual** [2] - 16:7, 62:6
**add** [2] - 59:22, 60:19
**added** [5] - 27:20, 30:21, 32:14, 39:10, 41:14
**addendum** [2] - 16:13, 57:8
**addition** [9] - 6:7, 6:23, 10:21, 16:3, 32:1, 60:19, 70:8,

70:16, 77:13
**additional** [11] - 7:2, 8:11, 9:5, 9:16, 24:23, 26:25, 57:6, 76:18, 82:1, 82:23
**address** [10] - 6:24, 15:7, 29:23, 51:20, 51:21, 54:1, 54:3, 54:8, 55:10, 69:13
**addressed** [7] - 9:14, 10:24, 16:7, 35:19, 35:21, 54:3
**addresses** [1] - 20:1
**adequate** [3] - 57:19, 60:10, 79:14
**adjourned** [1] - 83:24
**adjustment** [5] - 6:1, 32:11, 34:21, 41:7, 76:22
**administration** [3] - 41:10, 42:12, 78:5
**admit** [1] - 54:15
**admitted** [2] - 75:21, 75:23
**admitting** [1] - 14:14
**adopt** [1] - 61:11
**adopted** [5] - 32:21, 38:20, 47:9, 47:15, 82:1
**adult** [1] - 65:20
**advanced** [1] - 16:22
**advise** [1] - 83:10
**affect** [1] - 83:3
**affected** [1] - 55:6
**affirmed** [1] - 12:1
**afford** [3] - 57:19, 60:10, 79:14
**afforded** [1] - 53:4
**afoul** [1] - 79:11
**afraid** [1] - 56:4
**aftermath** [1] - 63:13
**age** [4] - 51:7, 62:1, 62:7, 79:22
**Agencies** [1] - 63:8
**Agency** [1] - 66:3
**agenda** [1] - 46:21
**agent** [1] - 65:18
**agents** [7] - 41:20, 41:23, 42:10, 76:25, 77:3, 78:3
**Agents** [2] - 42:7, 77:11
**aggravated** [1] - 8:19
**Aggravated** [18] - 5:7, 7:22, 8:8, 9:1, 9:13, 11:10, 16:21, 17:21, 18:20, 19:9, 19:24, 20:7, 21:3, 22:24, 24:8, 25:12, 26:18, 27:5

**Aggravating** [1] - 5:23
**aggregate** [2] - 48:9, 80:23
**agree** [2] - 18:9, 53:14
**agreed** [2] - 66:19, 66:23
**agreement** [1] - 68:19
**ahead** [1] - 70:2
**aided** [1] - 1:22
**air** [2] - 28:12, 75:18
**Airborne** [1] - 62:2
**airport** [1] - 76:16
**Airport** [3] - 42:1, 72:15, 77:5
**Akam** [3] - 71:18, 71:22, 71:23
**AKAM** [1] - 71:18
**alarming** [1] - 55:24
**alcohol** [1] - 61:19
**allegation** [2] - 28:21, 50:14
**allegations** [2] - 24:13, 49:23
**alleged** [11] - 17:11, 34:1, 36:2, 36:4, 36:6, 36:19, 37:6, 41:17, 45:25, 49:12, 51:4
**alleges** [1] - 52:8
**allow** [1] - 52:18
**allowance** [1] - 81:8
**allowed** [1] - 40:16
**alluded** [1] - 50:21
**ally** [2] - 46:2, 46:17
**almost** [1] - 61:7
**AMERICA** [1] - 1:2
**American** [1] - 61:4
**Ammunition** [1] - 3:19
**amount** [2] - 81:8, 81:13
**amounts** [1] - 70:25
**analogous** [1] - 17:22
**analysis** [2] - 38:15, 40:9
**answered** [1] - 72:11
**answers** [1] - 72:22
**anticipated** [1] - 82:16
**anxiety** [1] - 79:1
**anxious** [1] - 55:21
**apart** [1] - 65:5
**apartment** [7] - 22:18, 40:6, 56:2, 71:11, 71:14, 72:8, 72:13
**apparent** [1] - 72:21
**appeal** [5] - 14:14, 25:11, 83:10, 83:15, 83:16
**Appeal** [2] - 83:13, 83:17

**Appeals** [1] - 83:11
**appear** [1] - 31:5
**Appendix** [2] - 16:14, 43:14
**applicable** [8] - 20:12, 21:2, 22:9, 25:18, 26:16, 38:18, 44:8, 60:21
**application** [17] - 7:20, 7:21, 10:9, 10:16, 21:2, 25:3, 25:25, 26:22, 27:2, 32:25, 34:25, 47:5, 48:11, 49:9, 50:1, 60:25, 61:5
**Application** [5] - 16:25, 38:23, 42:13, 42:14, 45:16
**applied** [9] - 6:3, 12:13, 26:21, 27:15, 28:5, 31:1, 31:20, 32:16, 41:16
**applies** [9] - 8:23, 9:1, 18:21, 19:10, 34:21, 35:21, 36:24, 38:16, 43:12
**apply** [12] - 5:24, 8:10, 11:11, 12:8, 13:9, 26:18, 28:23, 43:11, 75:11, 82:15, 83:15, 84:22
**applying** [12] - 7:24, 22:13, 22:24, 23:12, 23:25, 24:4, 24:8, 37:14, 39:24, 42:19, 47:18, 61:10
**appointed** [2] - 62:17, 84:5
**apprehension** [1] - 19:17
**approach** [2] - 21:9, 21:14
**approached** [3] - 64:24, 66:5, 66:16
**appropriate** [23] - 5:8, 5:11, 5:15, 6:17, 6:25, 11:25, 12:2, 12:16, 12:17, 17:6, 17:10, 18:10, 19:22, 19:24, 25:4, 25:16, 26:5, 27:12, 46:12, 50:15, 51:5, 59:25, 64:19
**appropriately** [2] - 26:21, 58:1
**approval** [6] - 66:18, 67:22, 67:25, 79:5, 79:6, 82:24
**Approval** [3] - 2:25, 3:5, 3:10

**3**

**approximating** [1] - 63:20
**APRIL** [1] - 1:9
**April** [2] - 41:20, 76:25
**AR15** [1] - 66:12
**area** [2] - 46:22, 46:23
**areas** [5] - 12:22, 29:13, 30:7, 30:12, 73:12
**argue** [4] - 14:9, 15:2, 30:6, 30:13
**argued** [3] - 25:11, 27:1, 36:7
**argues** [5] - 12:19, 13:12, 19:6, 36:11, 36:15
**argument** [22] - 7:2, 7:21, 10:4, 19:2, 23:18, 27:8, 27:10, 29:8, 31:21, 33:23, 34:4, 34:5, 34:7, 34:17, 35:15, 37:9, 46:7, 46:13, 48:24, 52:24, 57:9
**arguments** [8] - 9:8, 9:17, 10:21, 14:3, 15:22, 24:15, 33:19, 52:16
**armaments** [1] - 79:4
**armed** [2] - 40:5, 72:11
**arms** [7] - 64:12, 67:7, 67:18, 68:9, 70:14, 70:16, 71:7
**Arms** [2] - 3:7, 78:16
**Army** [3] - 61:25, 62:6, 62:11
**arose** [1] - 71:9
**arranging** [1] - 11:13
**arrest** [1] - 15:12
**arrived** [1] - 74:18
**Arsenal** [2] - 64:11, 64:18
**Article** [1] - 62:13
**Articles** [1] - 2:22
**Arts** [1] - 61:22
**aspect** [3] - 34:15, 38:12, 76:21
**asportation** [9] - 21:6, 21:23, 21:24, 22:1, 22:3, 22:14, 22:22, 23:13, 24:5
**Assault** [19] - 5:7, 7:22, 8:9, 9:1, 9:13, 11:11, 12:12, 16:21, 17:21, 18:20, 19:9, 19:24, 20:7, 21:3, 22:24, 24:8, 25:12, 26:18, 27:6
**assault** [9] - 8:7, 8:19,

19:7, 19:14, 19:15, 19:23, 21:17, 64:13, 64:25
**assaulted** [2] - 40:6, 50:10
**assaulting** [1] - 50:17
**assaults** [5] - 12:3, 26:6, 29:5, 50:8, 58:3
**assembled** [1] - 46:9
**asserted** [3] - 43:10, 43:17, 64:5
**asserting** [2] - 34:16, 43:6
**assertion** [7] - 23:14, 23:17, 28:21, 30:9, 31:15, 43:22, 44:10
**asserts** [3] - 17:20, 29:3, 33:18
**assess** [1] - 38:19
**assessment** [7] - 17:12, 18:9, 20:21, 28:5, 31:1, 48:5, 80:25
**Assessments** [1] - 62:14
**assessments** [1] - 23:3
**assets** [1] - 83:8
**assigned** [1] - 60:22
**Assistant** [1] - 1:11
**associated** [1] - 68:3
**assumes** [1] - 45:18
**assuming** [1] - 40:9
**assure** [1] - 58:17
**attempt** [7] - 20:3, 29:23, 29:25, 42:11, 77:18, 78:4, 82:5
**Attempted** [1] - 16:20
**attempted** [1] - 41:9
**attempting** [1] - 19:17
**attempts** [1] - 35:22
**attendance** [1] - 65:16
**attention** [1] - 10:17
**Attorney** [1] - 1:11
**attorney** [5] - 53:4, 53:9, 53:12, 53:17, 57:25
**Attorney's** [1] - 82:22
**attorney's** [1] - 52:12
**audacity** [2] - 14:16, 79:8
**audio** [2] - 59:12, 59:21
**August** [1] - 4:18
**authorities** [4] - 6:3, 41:8, 42:25, 76:17
**authority** [7] - 31:12, 33:8, 34:7, 34:11, 40:14, 52:1, 52:2

**authorize** [1] - 82:20
**authorizes** [1] - 48:7
**automatic** [2] - 66:8, 68:11
**automobile** [1] - 70:20
**automobiles** [2] - 70:20, 71:2
**available** [1] - 28:15
**AVENUE** [1] - 1:25
**Avenue** [3] - 1:12, 1:15, 1:18
**avoid** [5] - 19:17, 48:21, 49:20, 49:22, 60:23
**aware** [5] - 7:14, 11:19, 48:24, 51:20, 51:25

**B**

**Bachelor** [1] - 61:22
**background** [2] - 2:4, 48:25
**backgrounds** [1] - 49:19
**bad** [1] - 54:23
**Badaracco** [1] - 35:10
**Badge** [1] - 62:11
**bag** [6] - 12:20, 28:10, 29:18, 72:14, 73:6, 75:7
**bank** [1] - 70:8
**Bank** [3] - 67:3, 67:5, 70:6
**banks** [1] - 68:6
**Banks** [1] - 68:8
**bare** [1] - 28:7
**barefoot** [1] - 73:18
**barrels** [1] - 69:8
**Barry** [1] - 9:11
**BARTOLAI** [1] - 1:20
**Bartolai** [1] - 53:11
**base** [17] - 16:11, 16:13, 17:21, 19:5, 19:8, 19:9, 22:18, 24:16, 26:23, 27:4, 27:13, 30:2, 31:20, 40:7, 45:18, 53:16, 72:15
**based** [10] - 17:12, 18:11, 20:21, 28:5, 28:23, 31:1, 31:19, 32:19, 41:16, 53:6
**Based** [1] - 4:3
**basic** [2] - 9:2, 73:25
**basis** [11] - 24:12, 26:17, 26:18, 28:16, 30:10, 32:4, 32:5, 40:24, 45:8, 45:9, 80:6

**bat** [1] - 67:24
**bear** [1] - 15:7
**beat** [1] - 72:23
**beaten** [3] - 30:14, 74:7, 74:22
**beating** [4] - 29:16, 75:3, 75:6, 75:19
**beatings** [2] - 73:15, 75:6
**became** [2] - 58:13, 72:21
**become** [1] - 79:4
**becomes** [1] - 70:23
**BEFORE** [1] - 1:8
**began** [2] - 65:22, 71:5
**begin** [3] - 15:9, 16:9, 74:18
**behalf** [5] - 47:23, 48:12, 51:19, 53:21, 83:18
**behest** [1] - 31:18
**behind** [3] - 56:3, 56:4, 75:16
**Belfast** [9] - 11:21, 12:8, 25:4, 25:7, 25:9, 26:20, 49:13, 50:5, 51:2
**believes** [4] - 5:9, 5:13, 5:22, 6:1
**belt** [5] - 12:21, 28:13, 29:19, 75:16, 75:17
**benefit** [2] - 14:19, 48:18
**berry** [1] - 21:2
**Berry** [10] - 18:24, 20:24, 21:4, 21:14, 21:21, 22:6, 22:13, 23:12, 24:25, 25:1
**best** [5] - 9:16, 55:13, 57:2, 58:17, 59:12
**better** [1] - 55:24
**Better** [1] - 75:22
**between** [3] - 9:25, 27:5, 63:1
**beyond** [3] - 7:3, 13:6, 23:23
**biggest** [2] - 55:8, 56:14
**binds** [1] - 44:21
**blood** [1] - 74:23
**blue** [2] - 68:12, 71:7
**Blunt** [1] - 65:7
**Bly** [7] - 65:25, 66:5, 66:6, 66:10, 66:14, 66:16, 66:20
**Bly's** [1] - 66:12
**bodily** [13] - 5:12, 10:6, 10:9, 12:19, 13:3, 13:8, 20:2,

27:21, 27:23, 27:25, 28:4, 28:6, 30:17
**body** [3] - 29:13, 30:7, 73:13
**Boggi** [2] - 44:20, 45:4
**Bolt** [3] - 2:23, 3:16, 44:17
**boots** [1] - 73:4
**Border** [2] - 42:2, 77:6
**born** [1] - 61:17
**bound** [1] - 45:4
**Box** [1] - 84:18
**Bragg** [1] - 62:2
**branches** [1] - 67:3
**breath** [1] - 14:16
**breath-taking** [1] - 14:16
**breathe** [1] - 29:17
**breathtaking** [1] - 78:12
**brief** [3] - 7:6, 7:17, 10:7
**briefly** [1] - 11:8
**bring** [2] - 8:5, 52:20
**bringing** [1] - 13:13
**brings** [1] - 9:9
**Brogan** [1] - 61:17
**broke** [1] - 75:21
**broken** [1] - 75:22
**brother** [1] - 66:20
**brought** [2] - 30:2, 74:8
**builder** [1] - 65:14
**building** [1] - 63:4
**buildings** [2] - 42:4, 77:8
**built** [1] - 66:8
**Bunnlevel** [1] - 63:11
**burden** [3] - 10:14, 10:24, 27:6
**Bureau** [2] - 80:11, 81:19
**Burglary** [2] - 19:10, 19:22
**burglary** [4] - 19:11, 19:14, 19:16, 19:18
**business** [11] - 62:24, 63:17, 64:16, 64:17, 65:4, 65:11, 65:13, 65:23, 66:13, 67:17, 68:3
**businesses** [1] - 65:6
**busy** [1] - 55:19
**buttons** [2] - 69:5, 69:7
**Buttons** [4] - 3:4, 3:13, 3:23, 44:19
**buy** [1] - 70:19
**buying** [1] - 71:1

4

**BY** [1] - 84:15

**C**

**calculate** [1] - 25:12
**calculated** [1] - 15:15
**calculating** [1] - 18:4
**calculation** [4] - 58:11, 58:17, 58:22, 59:20
**calculations** [1] - 5:5
**candidate** [1] - 66:10
**cannot** [3] - 24:1, 44:23, 76:5
**Cape** [1] - 65:11
**car** [1] - 56:1
**card** [1] - 63:19
**Card** [1] - 3:23
**cards** [1] - 64:22
**career** [2] - 57:11, 64:4
**careful** [1] - 68:17
**carefully** [2] - 15:4, 61:12
**Carolina** [6] - 62:2, 63:11, 63:24, 64:11, 66:20, 69:17
**carried** [1] - 22:16
**carrozzella** [1] - 39:8
**Carrying** [1] - 4:5
**carrying** [1] - 21:7
**cartoonish** [1] - 61:7
**case** [65] - 2:4, 4:16, 4:24, 6:25, 7:25, 8:1, 9:23, 10:3, 11:11, 11:20, 11:21, 11:24, 12:3, 12:8, 12:17, 17:1, 18:22, 18:23, 18:25, 19:4, 19:10, 20:10, 20:13, 20:23, 23:4, 23:18, 25:8, 26:5, 26:20, 26:21, 27:4, 27:5, 27:13, 27:15, 32:20, 33:14, 34:22, 35:10, 35:11, 39:24, 43:15, 45:21, 47:6, 47:19, 49:7, 49:13, 49:20, 50:5, 50:13, 51:4, 56:16, 57:11, 57:13, 58:6, 60:8, 61:1, 61:6, 62:21, 65:21, 66:22, 70:15, 78:7, 80:4, 80:8
**cases** [14] - 8:1, 12:2, 13:23, 18:19, 19:1, 22:11, 26:5, 39:7, 49:11, 49:22, 50:7, 50:22, 58:23
**cast** [1] - 46:18

**catalogs** [1] - 76:18
**categorical** [1] - 59:3
**categorically** [1] - 20:12
**categories** [1] - 49:20
**categorizes** [1] - 76:18
**category** [3] - 47:12, 59:1, 60:21
**caused** [10] - 12:5, 13:7, 20:8, 24:22, 26:8, 28:7, 29:16, 64:7, 75:18, 78:25
**causing** [3] - 13:8, 19:20, 28:13
**caution** [1] - 38:14
**cautious** [1] - 56:6
**ceiling** [1] - 59:8
**cents** [1] - 64:1
**CEO** [2] - 63:10, 63:16
**certainly** [2] - 59:5, 69:10
**certificate** [1] - 84:22
**CERTIFIED** [1] - 1:24
**certify** [2] - 84:6, 84:10
**certifying** [1] - 84:23
**challenges** [1] - 28:18
**changes** [1] - 83:2
**Chapman** [1] - 9:11
**Chapter** [2] - 5:6, 16:16
**character** [2] - 51:13, 53:22
**Characteristics** [1] - 61:14
**characteristics** [5] - 27:20, 30:21, 57:16, 59:10, 60:6
**charge** [18] - 2:14, 2:16, 2:18, 2:21, 3:2, 3:7, 3:12, 3:15, 3:18, 3:22, 4:2, 8:5, 8:13, 13:14, 20:8, 20:9, 50:19, 76:3
**charged** [12] - 11:18, 13:23, 17:6, 17:23, 18:11, 18:12, 25:23, 44:16, 44:18, 50:9, 50:20, 64:21
**charges** [5] - 8:2, 13:20, 50:4, 50:5, 82:23
**charging** [1] - 20:3
**Charles** [2] - 49:3, 49:13
**chase** [1] - 19:18
**check** [1] - 71:20
**checks** [1] - 62:20
**chest** [4] - 28:9, 73:2,

73:3, 73:16
**children** [1] - 56:8
**China** [1] - 68:24
**church** [1] - 63:24
**CIA** [2] - 42:7, 77:11
**Circuit** [20] - 12:1, 18:23, 18:25, 19:21, 20:5, 21:4, 22:12, 25:5, 25:14, 32:20, 32:21, 35:5, 35:10, 35:11, 39:8, 39:9, 43:15, 43:16, 83:12
**circumstances** [11] - 12:16, 19:21, 20:17, 20:23, 26:13, 34:22, 50:20, 57:16, 60:5, 65:21, 83:2
**circumvent** [1] - 8:1
**cite** [1] - 37:5
**cited** [4] - 9:23, 20:10, 20:23, 44:7
**cites** [1] - 19:4
**citing** [6] - 30:24, 32:15, 39:7, 41:15, 42:12, 43:21
**Citing** [1] - 43:14
**civil** [1] - 66:2
**civilian** [1] - 66:12
**Claffee** [1] - 54:1
**CLAFFEE** [3] - 1:14, 54:6, 55:1
**claim** [1] - 31:9
**claimed** [1] - 72:2
**claiming** [1] - 42:21
**claims** [3] - 14:17, 14:19, 14:20
**clear** [7] - 13:6, 27:7, 27:14, 38:2, 49:8, 58:13, 79:17
**clearly** [3] - 33:1, 34:8, 34:10
**Clerk** [3] - 80:24, 81:4, 83:16
**clerks** [1] - 53:3
**client** [1] - 51:17
**closely** [1] - 41:14
**closely-related** [1] - 41:14
**cloth** [1] - 72:14
**clothing** [2] - 63:23, 64:1
**co** [1] - 13:24
**co-conspirators** [1] - 13:24
**cocaine** [1] - 63:22
**Code** [5] - 19:12, 23:20, 33:25, 36:23, 84:6
**code** [1] - 62:9
**coercion** [1] - 77:16

**colleagues** [1] - 74:2
**collected** [1] - 63:23
**collection** [1] - 82:3
**colleges** [1] - 61:21
**Colletti** [1] - 39:9
**color** [3] - 34:13, 37:16, 37:22
**Combo** [3] - 3:3, 3:13, 44:19
**coming** [4] - 13:25, 14:17, 14:20, 55:20
**command** [1] - 65:25
**Commander** [1] - 66:21
**commanders** [3] - 73:20, 73:22, 73:24
**commence** [1] - 81:14
**commenced** [1] - 2:4
**commencement** [1] - 81:12
**commentary** [1] - 27:23
**commenting** [1] - 19:23
**Commerce** [4] - 3:5, 69:9, 69:20, 69:25
**commercial** [1] - 65:19
**commission** [7] - 21:25, 22:22, 23:1, 23:11, 26:2, 35:3, 35:12
**Commission** [1] - 12:15
**commissioned** [1] - 62:18
**commit** [3] - 35:22, 43:20, 81:23
**Commit** [3] - 2:14, 2:18, 18:5
**commits** [1] - 35:22
**committed** [10] - 20:5, 20:6, 21:16, 35:13, 37:3, 37:8, 37:16, 49:5, 51:2, 80:11
**committing** [2] - 42:16, 58:14
**communicate** [1] - 83:4
**companies** [1] - 63:13
**company** [8] - 63:2, 63:6, 63:18, 65:18, 68:4, 69:13, 69:16, 72:6
**Company** [3] - 63:15, 64:25, 66:24
**compelled** [1] - 74:2
**completed** [1] - 2:12
**completion** [1] - 82:11
**comply** [2] - 49:10,

81:25
**component** [1] - 35:24
**Components** [1] - 78:14
**components** [1] - 35:18
**compound** [11] - 17:16, 18:16, 38:11, 73:19, 74:4, 75:24, 76:8, 76:12, 76:14, 77:24, 78:1
**comprehensively** [1] - 11:17
**computer** [2] - 1:22, 67:10
**computer-aided** [1] - 1:22
**concentrate** [1] - 48:23
**concerned** [1] - 10:15
**concerning** [1] - 67:14
**concerns** [2] - 18:14, 71:17
**conclude** [4] - 26:17, 32:4, 40:2, 45:5
**conclusion** [9] - 16:6, 17:12, 20:25, 22:23, 24:7, 25:1, 27:11, 28:22, 43:23
**conclusions** [3] - 6:8, 6:17, 15:18
**conclusory** [1] - 28:21
**concurrent** [2] - 80:14, 80:21
**concurrently** [4] - 59:3, 80:15, 80:18, 81:18
**condition** [1] - 81:13
**conditions** [7] - 12:4, 14:10, 24:12, 26:7, 82:1, 82:2, 82:14
**conduct** [28] - 6:14, 8:18, 15:14, 17:2, 17:6, 17:11, 18:11, 19:15, 20:8, 41:12, 41:13, 41:16, 45:18, 45:21, 46:17, 48:22, 49:11, 49:18, 50:2, 50:4, 50:11, 50:20, 51:11, 60:10, 60:25, 65:23, 79:15, 79:16
**conducted** [1] - 77:20
**confer** [1] - 51:16
**confinement** [1] - 81:15
**confusing** [1] - 13:12
**Connecticut** [1] - 69:7
**connection** [3] - 26:2, 27:17, 63:15
**consciousness** [3] -

**5**

28:10, 73:8, 75:19
**consecutive** [4] - 59:3, 80:16, 80:18, 80:22
**consequences** [1] - 58:19
**consider** [7] - 22:14, 34:22, 39:17, 42:18, 51:9, 57:25, 60:4
**considerable** [1] - 79:23
**consideration** [5] - 15:21, 51:8, 57:15, 61:9, 80:7
**considered** [7] - 15:22, 21:4, 21:22, 25:5, 26:15, 35:7, 58:1
**considering** [4] - 17:11, 22:11, 22:21, 38:16
**consisted** [1] - 63:4
**consistent** [1] - 23:3
**consistently** [1] - 40:1
**consists** [1] - 80:13
**Conspiracy** [4] - 2:14, 2:18, 18:5, 78:13
**conspirators** [1] - 13:24
**constantly** [2] - 52:7, 55:21
**constitute** [1] - 17:2
**constituted** [1] - 28:6
**Constitutional** [1] - 43:6
**Construction** [4] - 68:4, 70:8, 70:13, 71:19
**construction** [2] - 42:4, 77:7
**construe** [1] - 21:10
**construed** [1] - 34:15
**consult** [1] - 60:20
**consultation** [1] - 82:9
**Consulting** [2] - 66:24, 67:3
**contact** [1] - 71:23
**contacted** [1] - 69:11
**contained** [5] - 6:13, 9:8, 9:17, 10:21, 30:9
**container** [2] - 22:20, 72:16
**contains** [2] - 29:7, 42:24
**contends** [6] - 5:6, 22:6, 24:9, 33:6, 33:10, 43:2
**contention** [3] - 18:20, 22:9, 28:24

**context** [1] - 29:3
**continued** [1] - 26:9
**continues** [3] - 29:22, 42:20, 46:7
**continuously** [1] - 23:6
**contracted** [1] - 63:17
**contracts** [3] - 63:7, 63:12, 63:21
**contradicted** [1] - 44:12
**contrary** [4] - 13:16, 24:15, 31:14, 37:12
**contrast** [1] - 21:9
**contrasting** [1] - 21:6
**control** [17] - 8:14, 8:16, 12:10, 12:11, 23:15, 23:21, 25:20, 25:23, 37:20, 37:25, 40:17, 50:15, 50:18, 58:21, 59:20, 77:21, 84:23
**Control** [4] - 1:15, 2:21, 3:7, 65:19
**controlled** [1] - 69:21
**controlling** [1] - 24:17
**conversations** [1] - 59:15
**convicted** [8] - 2:5, 17:7, 19:11, 28:24, 35:4, 45:23, 59:4, 79:16
**conviction** [8] - 25:6, 25:7, 25:8, 41:12, 41:13, 48:7, 49:25, 83:11
**convictions** [3] - 26:16, 33:2, 65:20
**convincing** [3] - 13:6, 27:7, 27:14
**convoluted** [1] - 65:9
**convoluted-type** [1] - 65:9
**cooperate** [1] - 82:3
**cooperative** [1] - 77:24
**copied** [3] - 71:11, 71:15, 71:16
**copies** [2] - 71:5, 71:10
**copy** [1] - 54:13
**corporate** [1] - 67:2
**Corporation** [1] - 66:25
**correct** [4] - 4:22, 18:3, 47:14, 84:7
**correctly** [1] - 18:2
**costs** [2] - 56:14, 83:15
**coughed** [1] - 74:22

**counsel** [3] - 6:18, 14:17, 78:11
**Count** [29] - 2:14, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 5:5, 44:15, 44:17, 78:17, 80:17
**count** [16] - 2:16, 2:18, 2:21, 3:2, 3:7, 3:12, 3:15, 3:18, 3:22, 17:7, 48:6, 48:7, 48:9, 49:16, 81:1, 81:18
**countable** [2] - 39:18, 40:21
**counted** [3] - 39:11, 39:16, 40:19
**countered** [1] - 31:14
**Counterintelligence** [1] - 1:15
**counterpart** [1] - 66:12
**Counterterrorism** [1] - 66:21
**countries** [1] - 46:25
**counts** [7] - 2:6, 4:1, 15:12, 18:4, 49:15, 78:10, 80:22
**Counts** [15] - 2:9, 17:13, 18:5, 18:11, 78:13, 78:15, 78:16, 78:18, 78:20, 80:13, 80:15, 80:16, 80:17, 80:19, 80:20
**couple** [2] - 52:25, 53:4
**course** [3] - 50:22, 51:18, 53:9
**Court** [82] - 2:10, 6:16, 8:11, 8:17, 8:22, 9:5, 10:11, 11:9, 11:19, 11:24, 13:2, 14:6, 17:5, 19:5, 20:5, 20:6, 21:14, 22:12, 25:11, 25:14, 25:16, 26:9, 32:17, 38:21, 38:22, 39:1, 39:3, 39:16, 39:17, 42:21, 43:18, 44:1, 44:21, 47:9, 47:22, 48:14, 48:17, 48:21, 48:24, 49:14, 49:15, 49:23, 50:1, 50:15, 50:22, 51:5, 51:8, 51:9, 51:15, 51:20, 51:21, 51:25, 52:1, 54:1, 54:3, 54:8, 55:5, 56:16, 56:17, 56:19, 57:7, 57:14, 59:1, 59:5, 59:10, 59:14,

60:14, 80:10, 80:25, 81:2, 81:5, 82:1, 82:17, 83:2, 83:11, 83:17, 84:3, 84:4, 84:14, 84:17, 84:17
**COURT** [24] - 1:1, 2:1, 4:23, 7:10, 7:12, 8:24, 9:24, 11:3, 15:4, 47:14, 47:25, 51:14, 51:18, 51:22, 53:20, 53:24, 54:5, 54:10, 57:4, 57:9, 59:16, 59:23, 83:21, 83:23
**court** [1] - 54:3
**Court's** [2] - 10:25, 15:20
**Court-ordered** [1] - 82:17
**courtroom** [1] - 60:2
**Courts** [1] - 22:14
**cover** [2] - 42:3, 77:6
**create** [2] - 24:9, 67:23
**created** [5] - 22:3, 24:5, 24:18, 24:23, 71:7
**creating** [1] - 68:12
**credible** [1] - 31:25
**credibly** [2] - 30:6, 30:13
**credit** [4] - 63:19, 64:22, 82:23, 82:24
**Credit** [1] - 3:23
**crime** [15] - 11:18, 17:22, 19:7, 20:25, 21:8, 21:11, 22:7, 35:14, 36:17, 36:18, 55:6, 55:10, 55:12, 59:2, 81:24
**Crime** [2] - 36:8, 37:4
**crimes** [13] - 21:11, 21:17, 26:15, 57:20, 58:2, 59:3, 59:4, 59:11, 60:11, 61:2, 79:21, 79:22, 80:1
**criminal** [33] - 5:24, 32:12, 32:17, 32:21, 33:7, 33:10, 33:20, 34:5, 34:17, 34:19, 34:23, 37:10, 38:5, 38:16, 38:24, 39:2, 39:5, 39:13, 39:19, 40:13, 40:16, 40:19, 41:1, 41:2, 47:11, 49:19, 51:7, 60:10, 65:20, 68:2, 69:4, 79:14, 79:16
**Criminal** [1] - 4:17
**criminality** [1] - 78:11
**criminally** [3] - 35:2,

35:12, 37:2
**criteria** [2] - 10:20, 61:1
**Crm** [1] - 1:17
**crossed** [1] - 55:25
**CRR** [1] - 1:24
**crucial** [1] - 23:18
**cruel** [1] - 75:8
**CTG** [2] - 66:21, 73:20
**cup** [1] - 75:14
**curious** [1] - 72:18
**custody** [17] - 8:14, 8:16, 12:10, 12:11, 23:15, 23:21, 25:20, 25:23, 37:20, 37:25, 40:17, 50:8, 50:10, 50:14, 50:17, 80:11, 81:19
**Customs** [2] - 42:2, 77:5
**cut** [1] - 75:12
**cutting** [1] - 75:10

## D

**Dakota** [1] - 63:5
**danger** [9] - 21:15, 22:4, 24:5, 24:10, 24:18, 24:21, 24:23, 67:23, 71:3
**dangerous** [2] - 26:11, 81:25
**date** [2] - 2:2, 84:9
**dates** [1] - 84:9
**dawned** [2] - 7:19, 7:22
**days** [17] - 5:20, 17:17, 18:17, 22:19, 23:5, 23:7, 23:23, 30:22, 31:3, 31:6, 31:7, 65:1, 72:17, 72:19, 74:24, 81:14, 83:14
**DC** [2] - 1:16, 1:18
**dead** [1] - 75:22
**deal** [2] - 55:24, 65:1
**dealing** [1] - 48:15
**deaths** [1] - 50:6
**debts** [1] - 70:18
**December** [1] - 62:7
**decide** [2] - 34:21, 53:9
**decided** [1] - 19:21
**decides** [1] - 39:16
**deciding** [1] - 27:10
**decision** [8] - 20:19, 25:17, 32:19, 52:5, 52:23, 53:15, 56:22, 56:23
**declared** [1] - 38:21

**6**

**deems** [2] - 6:17, 58:1
**deepens** [1] - 69:4
**defend** [3] - 43:6, 52:3, 52:17
**Defendant** [100] - 1:6, 2:15, 2:17, 2:20, 3:1, 3:6, 3:11, 3:14, 3:17, 3:20, 3:24, 4:7, 4:20, 5:2, 5:6, 5:9, 5:13, 5:22, 6:1, 6:8, 6:12, 11:7, 11:12, 11:13, 11:21, 12:9, 12:19, 13:1, 13:7, 13:11, 13:12, 13:19, 14:13, 14:20, 16:3, 16:22, 17:7, 17:19, 18:19, 19:4, 19:6, 20:23, 22:6, 23:16, 23:21, 24:8, 25:9, 25:19, 26:17, 27:1, 28:16, 28:20, 29:3, 29:23, 30:19, 31:11, 32:4, 32:11, 33:4, 33:6, 33:8, 34:7, 35:7, 35:16, 36:7, 36:15, 39:1, 39:12, 39:22, 41:9, 42:20, 42:23, 42:24, 43:11, 43:24, 44:8, 44:15, 44:24, 45:8, 45:14, 45:23, 46:8, 57:17, 57:20, 59:6, 59:15, 60:12, 64:21, 79:22, 80:10, 80:24, 81:2, 81:12, 81:16, 81:20, 81:21, 81:23, 81:25, 83:8
**DEFENDANT** [2] - 1:19, 51:24
**Defendant's** [55] - 5:15, 12:6, 12:12, 15:9, 15:12, 15:17, 15:22, 17:24, 19:19, 22:9, 22:13, 22:23, 23:3, 23:14, 23:17, 24:7, 24:15, 24:25, 25:1, 25:6, 25:25, 26:15, 26:22, 27:8, 27:16, 28:23, 30:16, 31:8, 31:13, 31:15, 31:21, 32:7, 33:1, 33:17, 33:19, 33:23, 34:4, 34:15, 35:15, 36:18, 37:9, 41:3, 41:13, 43:8, 43:19, 43:22, 44:4, 44:10, 45:11, 46:11, 46:13, 46:14, 59:10, 59:19, 81:9
**Defendants** [7] - 19:11, 19:17, 47:23,

49:18, 50:21, 58:8, 60:24
**Defense** [2] - 2:22, 3:8
**defense** [4] - 52:14, 52:19, 52:22, 53:5
**defined** [4] - 23:19, 27:23, 37:15, 38:23
**defines** [1] - 36:25
**definition** [2] - 33:13, 37:13
**defrauding** [1] - 71:4
**Degree** [1] - 16:19
**degree** [2] - 26:14, 61:22
**delegated** [1] - 52:15
**deliver** [1] - 67:16
**delivered** [2] - 69:13, 70:13
**demand** [1] - 64:13
**demonstrate** [2] - 34:10, 44:13
**demonstrates** [1] - 33:2
**denied** [1] - 47:3
**denies** [3] - 6:5, 29:4, 44:24
**deny** [1] - 46:14
**Department** [14] - 2:25, 3:5, 3:9, 12:18, 47:10, 66:18, 66:24, 67:22, 69:9, 69:18, 69:19, 69:20, 69:24, 69:25
**Departure** [6] - 16:4, 45:13, 45:22, 46:11, 46:14, 47:2
**departures** [1] - 47:24
**deployed** [1] - 65:25
**deposited** [1] - 81:9
**dereliction** [1] - 62:14
**derivative** [1] - 15:19
**derived** [1] - 22:12
**derogation** [1] - 46:16
**describe** [1] - 55:23
**described** [4] - 55:13, 67:23, 75:6, 76:19
**describes** [1] - 62:20
**deserve** [1] - 54:17
**detail** [2] - 19:1, 68:17
**detain** [4] - 17:16, 18:15, 31:12, 34:12
**detained** [18] - 5:16, 11:22, 20:15, 22:19, 23:2, 23:6, 24:11, 24:16, 31:6, 31:10, 31:15, 31:18, 31:25, 33:8, 33:21, 34:6, 42:22, 74:24
**detainees** [1] - 50:17
**detention** [26] - 8:12,

14:10, 20:15, 21:18, 21:23, 21:24, 22:1, 22:3, 22:14, 22:22, 22:25, 23:10, 23:13, 23:22, 24:1, 24:5, 24:9, 24:12, 24:17, 25:24, 26:12, 31:7, 33:9, 34:8, 40:14
**deter** [1] - 79:15
**determination** [2] - 19:5, 47:22
**determine** [7] - 17:5, 31:20, 32:21, 39:1, 39:3, 47:19, 82:4
**determined** [7] - 8:20, 17:8, 18:2, 27:3, 51:4, 58:12, 58:17
**determining** [7] - 6:24, 10:11, 25:15, 26:14, 27:13, 39:11, 59:25
**deterrence** [3] - 57:19, 60:10, 79:14
**die** [2] - 29:18, 73:8
**died** [1] - 50:7
**difference** [3] - 9:25, 50:23, 55:16
**different** [3] - 17:3, 50:24, 72:20
**difficult** [3] - 13:4, 55:19, 56:9
**difficulty** [3] - 56:10, 61:1, 76:11
**direct** [3] - 34:11, 84:23
**directed** [7] - 17:15, 18:15, 23:8, 34:12, 38:7, 72:22, 74:17
**directing** [1] - 75:1
**direction** [3] - 29:15, 73:18, 77:20
**directly** [2] - 23:8, 83:5
**Director** [1] - 66:3
**disagree** [3] - 22:12, 24:7, 51:3
**disagrees** [1] - 6:12
**disbursed** [1] - 63:24
**disbursement** [1] - 81:5
**discerning** [1] - 37:2
**Discharge** [2] - 62:4, 62:6
**discharge** [1] - 62:12
**discharged** [1] - 62:8
**disclosure** [1] - 68:19
**discovered** [2] - 70:23, 71:3
**discuss** [3] - 11:2, 16:6, 48:20

**discussed** [3] - 8:20, 9:3, 34:8
**discussion** [2] - 15:16, 47:14
**dishonored** [1] - 62:20
**disloyal** [1] - 74:13
**dismissed** [3] - 2:10, 15:13, 64:7
**disobeying** [1] - 62:17
**disparities** [1] - 60:24
**disparity** [1] - 48:20
**displayed** [1] - 79:2
**disposition** [1] - 80:7
**dispute** [1] - 31:5
**disregard** [1] - 79:2
**disrespectful** [1] - 62:18
**distance** [2] - 21:8, 22:16
**distancing** [1] - 55:8
**distinguishable** [1] - 20:13
**distortion** [1] - 21:11
**District** [12] - 11:24, 20:5, 20:6, 25:11, 25:14, 68:7, 80:25, 81:5, 84:4, 84:17, 84:18
**district** [1] - 81:21
**DISTRICT** [2] - 1:1, 1:1
**divert** [1] - 70:17
**diverting** [2] - 46:18, 70:24
**Diving** [1] - 65:12
**Division** [1] - 62:2
**DNA** [1] - 82:3
**document** [10] - 15:24, 16:5, 17:25, 18:7, 22:9, 27:9, 29:8, 29:21, 43:8, 62:6
**documents** [4] - 51:12, 71:5, 71:8, 71:10
**DOJ** [2] - 1:14, 1:17
**DOJ-Crm** [1] - 1:17
**DOJ-Nsd** [1] - 1:14
**dollars** [3] - 68:5, 70:14, 78:18
**donations** [1] - 63:23
**done** [2] - 46:9, 55:14
**door** [2] - 56:2, 72:11
**doubt** [2] - 13:7, 46:19
**doubts** [2] - 14:6, 14:7
**down** [5] - 29:15, 30:14, 57:1, 64:15, 73:2
**Downward** [6] - 16:4, 45:13, 45:21, 46:11,

46:14, 47:2
**draw** [2] - 6:16, 50:1
**Drill** [2] - 69:5, 69:11
**drill** [1] - 69:8
**dropped** [1] - 64:14
**drug** [2] - 19:23, 61:19
**due** [4] - 46:10, 56:11, 81:1, 81:13
**Dunnigan** [1] - 43:21
**duration** [3] - 21:8, 21:23, 22:14
**duress** [5] - 43:25, 44:2, 45:1, 45:2, 45:7
**during** [44] - 6:4, 14:18, 17:17, 18:17, 19:14, 19:18, 20:15, 21:24, 22:19, 22:22, 23:1, 23:2, 23:8, 23:11, 23:24, 24:19, 26:2, 29:24, 38:11, 41:8, 41:18, 41:22, 41:25, 42:5, 42:25, 43:3, 43:4, 44:5, 44:11, 49:4, 52:7, 59:13, 59:17, 69:22, 70:5, 70:12, 73:20, 74:4, 76:23, 77:1, 77:4, 77:9, 80:4, 81:7
**duty** [3] - 61:25, 62:15, 62:17
**Dyncorp** [1] - 63:3
**DYNCORP** [1] - 63:3

**E**

**E-4** [1] - 62:5
**earned** [2] - 61:22, 72:1
**ears** [2] - 12:23, 73:5
**earthquake** [2] - 63:14, 63:24
**East** [1] - 61:20
**eating** [1] - 76:11
**economic** [1] - 83:2
**Economic** [2] - 3:3, 78:17
**educational** [1] - 68:15
**effect** [1] - 55:8
**effort** [1] - 65:22
**efforts** [1] - 79:4
**eight** [1] - 75:1
**either** [3] - 36:19, 69:24, 83:5
**elaborate** [2] - 42:10, 78:3
**elapsed** [3] - 5:20, 30:23, 31:3

7

**Eldorado** [2] - 69:5, 69:11
**elect** [1] - 51:21
**electrical** [1] - 28:10
**electronic** [1] - 73:11
**electronically** [1] - 71:10
**element** [9] - 8:21, 12:7, 12:9, 13:16, 23:14, 23:21, 25:19, 34:3, 36:18
**elements** [19] - 6:4, 8:4, 8:7, 8:19, 9:3, 10:3, 13:1, 13:12, 13:17, 20:25, 22:7, 33:23, 34:16, 35:13, 36:7, 36:16, 37:3, 38:4, 43:1
**Eleventh** [3] - 11:25, 25:5, 25:14
**elicited** [1] - 28:17
**Elina** [7] - 67:8, 67:15, 71:22, 72:5, 72:6, 74:2, 75:1
**Email** [1] - 3:18
**email** [1] - 67:10
**emailed** [1] - 67:15
**embarrassed** [1] - 77:16
**Emergency** [2] - 3:3, 78:17
**emigrates** [1] - 13:22
**emotional** [2] - 55:10, 55:12
**emotionally** [1] - 75:21
**empathy** [1] - 54:18
**employed** [4] - 30:1, 63:6, 66:13, 79:2
**employee** [3] - 18:13, 63:17, 72:1
**employees** [7] - 58:18, 63:21, 64:23, 68:14, 71:7, 71:12, 77:22
**employment** [3] - 62:23, 63:4, 65:15
**enabled** [1] - 25:24
**end** [9] - 5:21, 10:1, 14:21, 24:14, 26:3, 35:8, 45:22, 58:8, 74:20
**Enden** [3] - 74:3, 76:6, 76:9
**endure** [1] - 13:4
**enforcement** [4] - 21:15, 42:17, 43:13, 71:9
**engage** [2] - 70:1, 79:17
**engaged** [1] - 65:6

**engineered** [1] - 45:25
**engineering** [2] - 68:12, 68:16
**engineers** [1] - 68:20
**English** [1] - 74:17
**enhanced** [1] - 19:13
**enhancement** [26] - 5:10, 5:14, 6:5, 9:21, 10:9, 10:16, 13:8, 19:16, 20:4, 20:9, 28:4, 28:16, 28:22, 30:17, 31:1, 32:6, 32:16, 33:4, 36:12, 37:14, 38:16, 38:18, 40:25, 41:16, 42:19, 43:1
**Enhancement** [6] - 5:23, 13:10, 31:22, 43:11, 44:8, 45:10
**enlisted** [1] - 62:7
**enlistee** [1] - 62:1
**enter** [1] - 80:7
**entered** [1] - 46:21
**entire** [1] - 14:21
**entirely** [2] - 26:3, 37:10
**entirety** [1] - 61:11
**entities** [2] - 63:13, 70:10
**entitled** [3] - 18:23, 61:13, 62:9
**entrust** [1] - 52:19
**equal** [1] - 81:9
**equipment** [3] - 62:15, 63:8, 68:22
**equivalent** [3] - 39:19, 40:22, 58:2
**erased** [1] - 14:8
**erred** [1] - 25:15
**erroneous** [1] - 35:16
**error** [2] - 20:6
**ESQ** [4] - 1:11, 1:14, 1:17, 1:20
**essentially** [2] - 12:6, 64:20
**establish** [1] - 21:8
**established** [1] - 46:8
**estimated** [1] - 74:25
**Estonian** [6] - 68:14, 68:20, 71:12, 74:2, 76:3, 77:22
**Estonians** [4] - 74:5, 74:8, 74:12, 74:14
**ethnic** [1] - 46:1
**evaluation** [1] - 82:11
**event** [1] - 81:11
**eventually** [1] - 68:25
**evidence** [20] - 5:11, 5:15, 13:6, 27:3, 27:7, 27:15, 28:17,

28:19, 30:1, 31:10, 31:17, 31:24, 31:25, 33:21, 34:10, 37:21, 40:1, 43:7, 44:12
**exacerbate** [2] - 12:5, 26:7
**exact** [1] - 50:4
**exactly** [1] - 13:23
**examination** [2] - 20:22, 50:12
**examining** [1] - 49:20
**example** [1] - 75:9
**except** [1] - 53:12
**exception** [3] - 31:16, 56:7, 57:11
**exceptions** [1] - 83:13
**excess** [1] - 21:12
**excessive** [1] - 65:16
**excuse** [1] - 54:25
**execution** [2] - 42:5, 77:9
**executive** [1] - 65:19
**exhibit** [1] - 59:17
**exhibits** [1] - 70:6
**exist** [1] - 14:19
**expenses** [1] - 63:20
**expensive** [3] - 70:18, 70:20, 71:2
**experience** [4] - 55:18, 56:11, 66:11, 76:10
**experienced** [2] - 57:13, 74:22
**experiences** [1] - 76:6
**expert** [1] - 32:2
**expertise** [3] - 66:7, 68:15, 68:16
**explained** [7] - 9:12, 20:11, 61:10, 64:17, 64:21, 67:17, 69:23
**explains** [2] - 16:13, 42:14
**explanation** [1] - 25:17
**explicated** [1] - 7:15
**exploited** [1] - 26:13
**export** [2] - 69:9, 69:18
**Export** [5] - 1:15, 2:21, 3:7, 58:6, 78:16
**Exporting** [5] - 2:22, 3:3, 3:8, 44:17, 44:19
**exporting** [3] - 45:23, 46:1, 69:25
**expressed** [1] - 71:17
**expressly** [1] - 36:23
**extended** [3] - 11:12, 20:16, 25:9
**extensive** [15] - 6:19,

7:4, 15:6, 32:13, 32:19, 32:22, 33:3, 34:19, 34:23, 38:17, 38:19, 39:21, 41:3, 42:10, 78:3
**extent** [1] - 39:3
**extraordinary** [1] - 57:11
**extreme** [18] - 10:13, 10:16, 10:22, 12:24, 13:4, 13:7, 14:9, 27:24, 28:7, 28:17, 28:23, 29:1, 29:25, 30:8, 30:12, 30:15, 49:6, 74:22
**eyes** [1] - 12:23

## F

**F2d** [4] - 18:24, 21:13, 35:11, 39:9
**F3d** [10] - 18:22, 25:5, 32:20, 35:7, 35:9, 37:5, 39:6, 39:8, 43:15, 44:20
**face** [2] - 54:21, 79:19
**Facebook** [1] - 71:25
**facilitate** [1] - 39:12
**facilitated** [2] - 25:24, 40:19
**fact** [4] - 8:12, 30:10, 43:24, 74:15
**factor** [9] - 22:13, 22:17, 22:21, 22:24, 23:12, 23:25, 24:4, 24:7, 61:5
**factored** [1] - 79:10
**factors** [22] - 6:24, 9:11, 11:2, 21:21, 22:6, 22:11, 22:12, 24:25, 42:18, 47:5, 47:15, 47:18, 48:11, 48:16, 57:14, 59:24, 60:4, 60:17, 61:9, 61:10, 78:6, 80:6
**factory** [8] - 67:18, 67:20, 68:9, 68:13, 68:25, 70:14, 71:19, 72:10
**facts** [14] - 11:19, 13:5, 15:12, 20:23, 23:4, 23:10, 23:18, 26:20, 39:24, 40:24, 44:21, 45:5, 48:25, 50:19
**factual** [2] - 15:9, 62:12
**faculty** [1] - 28:1
**failed** [2] - 29:25, 66:14

**failing** [1] - 69:23
**failure** [1] - 62:16
**Failure** [1] - 67:22
**fair** [4] - 53:5, 53:8, 56:22, 59:25
**false** [9] - 42:2, 42:9, 42:16, 43:12, 72:2, 77:6, 77:13, 77:14, 78:3
**familiar** [5] - 29:7, 55:5, 57:14, 59:23, 60:1
**family** [8] - 55:7, 55:9, 55:11, 55:22, 56:4, 56:7, 56:8, 56:15
**far** [5] - 10:15, 14:10, 21:19, 23:23, 57:22
**Fargo** [3] - 67:5, 68:8, 70:6
**fashioning** [1] - 51:11
**favor** [3] - 22:7, 22:24, 24:8
**Fayetteville** [5] - 64:11, 65:8, 65:10, 65:15, 69:17
**FBI** [5] - 41:20, 41:23, 69:12, 76:25, 77:3
**fear** [1] - 79:1
**Fear** [1] - 65:11
**feared** [1] - 71:2
**Feasibility** [1] - 3:19
**feasibility** [3] - 67:13, 67:14, 67:17
**February** [5] - 41:25, 62:22, 62:25, 63:1, 77:4
**Federal** [3] - 4:17, 43:14, 81:24
**fell** [2] - 49:21, 65:5
**few** [7] - 11:9, 48:19, 53:8, 61:16, 65:1, 72:17, 83:13
**fighting** [1] - 62:14
**figure** [1] - 66:22
**file** [2] - 64:19, 83:17
**filed** [5] - 8:2, 11:7, 58:25, 83:13
**finally** [2] - 13:10, 14:2
**financial** [13] - 56:14, 67:2, 68:6, 70:5, 71:5, 72:4, 82:17, 82:18, 82:20, 82:21, 82:22, 82:25, 83:3
**findings** [2] - 9:5, 15:5
**fine** [3] - 48:4, 81:3
**fines** [1] - 67:24
**finger** [1] - 75:12
**fingers** [1] - 75:11
**firearm** [2] - 69:19, 69:21

8

**Firearm** [1] - 78:14
**firearms** [2] - 66:5, 70:21
**Firearms** [2] - 64:25, 78:14
**firing** [1] - 69:15
**Firing** [3] - 2:23, 3:16, 44:17
**first** [16] - 11:7, 12:8, 18:22, 22:13, 23:5, 25:10, 33:6, 38:22, 40:1, 55:18, 61:10, 72:17, 72:24, 74:5, 78:9, 83:6
**First** [3] - 2:24, 3:4, 3:9
**fists** [1] - 75:6
**fit** [1] - 70:17
**five** [11] - 5:25, 9:21, 12:14, 32:12, 32:18, 33:11, 34:18, 38:12, 39:19, 40:22, 52:13
**Five** [1] - 13:11
**five-participant** [1] - 38:12
**flawed** [1] - 35:16
**floor** [1] - 59:8
**folks** [1] - 58:4
**follow** [1] - 82:8
**following** [11] - 6:9, 19:18, 21:14, 25:6, 25:17, 29:10, 31:1, 55:23, 72:9, 80:7, 82:1
**follows** [12] - 2:13, 16:10, 27:19, 30:20, 32:10, 35:25, 39:25, 41:6, 41:19, 45:15, 56:18, 72:25
**FOR** [3] - 1:1, 1:10, 1:19
**force** [2] - 29:7, 30:10
**forced** [5] - 14:23, 40:6, 72:12, 72:13, 76:13
**foregoing** [6] - 4:15, 27:11, 30:16, 84:7, 84:10, 84:22
**foreign** [8] - 5:17, 31:11, 31:16, 36:13, 45:20, 46:10, 46:20, 46:23
**forfeit** [1] - 83:8
**Forfeiture** [1] - 83:9
**form** [4] - 2:12, 8:22, 9:15, 24:12
**Forma** [1] - 83:16
**forms** [1] - 75:8
**Fort** [1] - 62:2
**forth** [7] - 9:22, 27:8,

28:21, 43:8, 59:24, 61:15, 84:9
**forward** [1] - 15:11
**four** [19] - 5:22, 9:21, 21:21, 32:14, 32:16, 33:4, 34:21, 37:14, 38:10, 38:15, 38:18, 40:5, 40:11, 40:18, 40:22, 40:25, 62:8, 62:13, 72:11
**four-level** [9] - 5:22, 9:21, 32:16, 33:4, 34:21, 37:14, 38:15, 38:18, 40:25
**four-year** [1] - 62:8
**fourth** [1] - 24:4
**frankly** [1] - 49:10
**Fraud** [3] - 3:18, 3:22, 78:18
**fraud** [1] - 58:14
**fraudulent** [1] - 63:21
**free** [1] - 61:19
**friends** [1] - 55:9
**frightened** [1] - 76:8
**fucking** [1] - 54:24
**full** [2] - 61:25, 81:11
**full-time** [1] - 61:25
**fully** [2] - 46:9, 77:24
**fully-assembled** [1] - 46:9
**function** [1] - 27:25
**functional** [2] - 39:18, 40:22
**Fund** [1] - 81:10
**fundamentally** [1] - 78:19
**funded** [1] - 68:3
**funds** [5] - 46:17, 46:18, 70:17, 70:24, 81:9
**Funds** [2] - 4:4, 70:4
**Furnishing** [1] - 3:8
**Future** [1] - 63:7

**G**

**gain** [2] - 40:16, 79:19
**gaining** [1] - 8:16
**gains** [1] - 82:17
**games** [1] - 14:11
**Gas** [3] - 2:23, 3:16, 44:17
**gas** [1] - 69:15
**General** [1] - 62:3
**general** [2] - 15:17, 46:19
**generally** [1] - 27:2
**genitals** [3] - 12:22, 28:11, 73:13
**genocide** [1] - 57:12

**genuine** [1] - 65:22
**GINO** [1] - 1:20
**gist** [2] - 8:6, 8:18
**given** [3] - 7:3, 72:22, 79:22
**glass** [1] - 65:12
**Global** [1] - 69:16
**Glock** [1] - 68:11
**Glock-type** [1] - 68:11
**Goods** [2] - 3:12, 3:15
**Google** [1] - 45:25
**Goran** [5] - 38:9, 75:10, 75:12, 75:19, 75:25
**GORAN** [1] - 38:9
**Gothman** [1] - 61:17
**government** [3] - 5:17, 31:11, 31:16
**Government** [36] - 2:11, 4:21, 7:25, 8:8, 10:12, 11:6, 15:13, 17:23, 18:1, 18:6, 18:24, 19:25, 20:7, 20:24, 28:18, 28:24, 29:10, 29:22, 31:14, 32:1, 33:18, 33:24, 43:10, 43:17, 43:22, 44:25, 46:25, 52:12, 53:17, 63:8, 67:25, 70:5, 77:19, 78:11, 79:5
**GOVERNMENT** [1] - 1:10
**Government's** [2] - 24:13, 54:4
**government's** [1] - 46:20
**graduate** [1] - 61:20
**grand** [1] - 50:12
**granted** [1] - 7:16
**grasp** [1] - 78:24
**gravamen** [2] - 19:6, 19:7
**grave** [1] - 67:23
**gravel** [1] - 73:19
**gravity** [1] - 26:10
**greater** [4] - 21:19, 58:7, 60:16, 79:12
**Greece** [1] - 71:24
**groin** [2] - 29:14, 30:8
**gross** [1] - 21:10
**ground** [2] - 29:20, 75:17
**grounds** [1] - 33:5
**Group** [5] - 66:21, 80:13, 80:14, 80:16, 80:19
**group** [1] - 46:1
**guidance** [1] - 35:5
**guide** [1] - 59:24

**Guideline** [69] - 5:3, 5:5, 5:6, 5:7, 5:10, 5:14, 5:18, 5:23, 6:2, 8:9, 8:10, 9:9, 9:13, 11:11, 11:17, 11:25, 12:1, 12:8, 12:12, 16:12, 16:25, 17:9, 17:20, 18:3, 18:10, 19:9, 19:10, 19:22, 19:24, 20:7, 21:1, 21:3, 22:8, 22:25, 24:8, 25:2, 25:4, 25:12, 25:15, 26:1, 26:4, 26:10, 26:19, 26:21, 26:23, 27:6, 27:11, 27:12, 27:22, 27:24, 30:24, 31:2, 31:20, 31:22, 32:5, 32:15, 33:12, 34:20, 38:13, 41:15, 42:13, 45:9, 45:14, 48:10, 49:9
**guideline** [36] - 5:8, 8:24, 8:25, 9:16, 12:13, 12:17, 15:2, 16:11, 16:18, 16:19, 16:20, 16:21, 16:22, 16:23, 17:4, 17:5, 17:9, 17:10, 17:21, 18:2, 18:3, 18:10, 18:20, 19:5, 25:16, 27:12, 31:9, 32:23, 34:25, 47:12, 48:8, 49:10, 57:22, 60:22, 61:8
**Guidelines** [6] - 6:22, 16:5, 16:14, 50:3, 60:21, 61:5
**guidelines** [15] - 7:24, 14:5, 15:1, 15:14, 16:16, 17:3, 26:16, 27:2, 47:25, 48:1, 49:8, 50:13, 51:1, 51:5, 61:6
**guilt** [1] - 14:14
**Guilty** [34] - 2:15, 2:17, 2:20, 3:1, 3:6, 3:11, 3:14, 3:17, 3:21, 3:25, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 4:14, 17:13
**guilty** [10] - 14:13, 44:2, 44:3, 44:15, 44:21, 45:2, 45:3, 60:6, 60:25, 78:10
**Gulf** [1] - 46:3
**gun** [6] - 41:21, 44:12, 44:14, 44:23, 45:24, 77:1
**guns** [2] - 41:21, 77:1

**guys** [1] - 54:12

**H**

**Haiti** [5] - 63:14, 63:18, 63:25, 64:6, 64:8
**hand** [1] - 70:13
**hand-delivered** [1] - 70:13
**handle** [1] - 54:1
**hands** [2] - 74:21, 76:19
**handshake** [1] - 65:1
**hard** [5] - 29:15, 30:14, 49:20, 49:22, 71:10
**harm** [3] - 24:24, 46:9, 64:7
**harmful** [2] - 45:19
**hatred** [1] - 56:20
**head** [6] - 12:20, 55:17, 55:21, 72:13, 72:14, 73:6
**headquarters** [1] - 67:2
**health** [2] - 82:7, 82:13
**hear** [6] - 7:1, 30:3, 48:12, 51:22, 74:6, 74:7
**heard** [3] - 57:23, 71:13, 74:24
**hearing** [2] - 15:25, 54:13
**heavily** [1] - 9:24
**heavy** [2] - 63:8, 67:24
**heinous** [1] - 51:3
**Helbling** [9] - 32:19, 33:1, 38:15, 38:21, 39:6, 39:10, 39:14, 39:15, 39:23
**helbling** [1] - 35:7
**held** [5] - 11:12, 11:23, 20:5, 43:18, 68:7
**help** [2] - 67:9, 76:5
**helpful** [1] - 61:6
**hereby** [3] - 80:10, 81:16, 84:6
**hereinbefore** [1] - 84:9
**Heret** [3] - 74:3, 76:6, 76:9
**hide** [1] - 39:13
**high** [2] - 61:20, 64:13
**High** [1] - 61:20
**higher** [4] - 10:14, 27:14, 29:1
**highest** [1] - 62:4
**himself** [8] - 43:6,

45:6, 67:23, 68:1, 70:21, 71:4, 73:7, 76:5
**Hinkley** [5] - 11:3, 15:2, 53:24, 61:11, 83:19
**HINKLEY** [11] - 1:11, 4:22, 7:11, 11:5, 47:7, 53:25, 57:5, 57:10, 59:17, 59:22, 83:20
**hired** [3] - 67:8, 68:14, 68:20
**hiring** [2] - 68:18, 68:19
**History** [1] - 61:13
**history** [8] - 47:11, 49:19, 51:8, 57:16, 60:6, 61:18, 61:19, 62:23
**hit** [5] - 19:19, 29:15, 30:14, 73:2, 73:4
**hitting** [1] - 12:22
**home** [6] - 41:23, 55:15, 56:4, 70:19, 72:11, 77:3
**Homeland** [2] - 42:6, 77:10
**homes** [1] - 63:4
**honestly** [2] - 54:13, 54:22
**Honor** [33] - 4:22, 7:6, 7:11, 7:17, 9:7, 9:21, 10:6, 10:25, 11:6, 12:25, 14:2, 14:13, 47:8, 47:21, 48:14, 51:12, 51:19, 51:24, 53:3, 53:15, 53:19, 53:23, 53:25, 54:6, 55:1, 57:7, 57:10, 57:21, 58:8, 59:22, 83:20, 83:22
**HONORABLE** [1] - 1:8
**Honorable** [1] - 62:4
**Hookas** [1] - 65:13
**hope** [1] - 54:22
**hose** [2] - 12:23, 28:12
**hoses** [2] - 73:15, 75:7
**hospitalization** [2] - 28:2, 28:15
**host** [1] - 9:9
**hours** [4] - 53:1, 53:4, 72:25, 81:19
**housed** [1] - 72:16
**human** [2] - 54:17, 78:25
**hundreds** [1] - 70:13
**hung** [1] - 75:18
**hurdles** [1] - 67:19
**hurt** [2] - 55:22, 75:15

**I**

**identified** [7] - 6:8, 6:21, 21:21, 36:12, 38:8, 60:18, 60:20
**identifies** [1] - 29:10
**identify** [1] - 4:25
**ignored** [1] - 33:21
**ignores** [1] - 23:18
**illegal** [2] - 70:16, 78:19
**illegally** [1] - 46:16
**illicit** [1] - 61:19
**imagined** [1] - 56:25
**immediately** [1] - 81:1
**impact** [5] - 15:14, 55:10, 55:12, 56:15, 76:9
**impairment** [1] - 27:25
**impede** [3] - 41:10, 42:11, 78:5
**impeded** [2] - 41:9, 42:18
**implicated** [1] - 78:7
**implicit** [2] - 44:22, 45:5
**important** [5] - 48:19, 49:1, 50:21, 50:24, 67:13
**impose** [1] - 60:7
**imposed** [9] - 28:6, 28:8, 79:10, 79:11, 79:25, 80:16, 80:19, 81:3, 83:14
**imposition** [1] - 2:3
**imprisoned** [4] - 12:4, 25:10, 26:7, 80:12
**imprisonment** [7] - 48:1, 48:2, 48:8, 49:16, 81:7, 81:16
**impropriety** [1] - 31:21
**IN** [1] - 1:1
**inaccurately** [1] - 6:3
**inapplicable** [4] - 25:2, 31:9, 32:6, 45:11
**Inc** [2] - 63:10, 69:6
**incarcerated** [1] - 62:21
**incarceration** [1] - 67:24
**incidental** [2] - 37:18, 37:24
**include** [3] - 16:17, 43:19, 82:11
**included** [2] - 39:13, 55:2
**includes** [1] - 56:7
**including** [7] - 46:22,

47:1, 67:19, 68:16, 73:13, 75:6, 76:10
**income** [1] - 82:15
**incorrect** [1] - 36:21
**increase** [3] - 5:21, 27:4, 31:3
**increased** [1] - 75:12
**incur** [1] - 82:23
**indeed** [1] - 26:4
**independent** [3] - 22:4, 24:6, 24:10
**index** [2] - 12:14, 17:3
**India** [1] - 68:24
**indicate** [1] - 26:20
**indicated** [2] - 6:18, 31:17
**indicates** [3] - 22:17, 32:1, 40:5
**indictment** [8] - 2:6, 2:10, 11:18, 15:13, 17:14, 18:12, 44:16, 44:18
**indisputably** [1] - 46:15
**individual** [8] - 13:21, 35:13, 36:8, 37:2, 39:4, 50:10, 69:11, 71:18
**individually** [1] - 74:9
**individuals** [10] - 33:14, 36:11, 38:19, 38:24, 39:12, 39:16, 48:22, 49:4, 51:10, 67:8
**ineligibility** [1] - 48:2
**infer** [1] - 30:11
**inflict** [3] - 37:17, 37:23, 73:11
**inflicted** [3] - 13:2, 73:14, 74:10
**infliction** [1] - 37:23
**information** [6] - 6:12, 58:18, 63:5, 82:20, 82:21, 82:22
**inherent** [5] - 22:2, 23:13, 23:16, 23:23, 24:2
**inherently** [1] - 21:17
**inhumane** [4] - 12:4, 14:10, 24:11, 26:7
**injuries** [3] - 14:9, 26:11, 28:14
**injury** [15] - 5:12, 10:6, 10:10, 12:19, 13:9, 19:20, 20:2, 20:8, 24:22, 27:21, 27:23, 27:24, 28:4, 28:6, 30:17
**Inmate** [1] - 81:10
**innocence** [1] - 6:15

**input** [1] - 53:12
**inquiry** [2] - 38:20, 39:24
**inside** [1] - 55:17
**inspection** [3] - 42:1, 62:15, 77:4
**installed** [1] - 68:25
**installments** [1] - 81:14
**instances** [2] - 62:19, 77:14
**instant** [1] - 41:11
**instead** [1] - 45:3
**instilled** [1] - 79:1
**institutions** [1] - 61:23
**instructed** [2] - 13:3, 75:10
**instruction** [2] - 44:1, 45:1
**instructions** [3] - 71:22, 73:14, 75:13
**insurance** [2] - 65:18
**Intelligence** [1] - 66:3
**intend** [1] - 47:15
**intended** [3] - 37:17, 37:22, 68:11
**intense** [1] - 29:16
**intensity** [1] - 13:4
**intent** [2] - 39:2, 40:13
**interact** [1] - 83:4
**interacted** [1] - 73:23
**interest** [4] - 11:9, 45:20, 46:10, 81:6
**interfere** [1] - 46:22
**International** [7] - 3:2, 63:3, 68:5, 70:4, 70:7, 70:9, 78:17
**interpretation** [3] - 20:21, 21:5, 36:21
**interrogated** [1] - 14:12
**interrogation** [6] - 17:18, 18:17, 23:5, 73:21, 74:5, 75:3
**intervention** [1] - 28:2
**interview** [2] - 41:22, 77:2
**interviewed** [2] - 63:15, 64:17
**interwoven** [1] - 20:18
**intimidate** [1] - 74:11
**intruding** [1] - 46:22
**investigation** [11] - 6:4, 41:8, 41:11, 41:18, 42:18, 42:25, 43:3, 43:4, 44:11, 63:16, 76:23
**investigations** [2] - 44:5, 57:12
**Investigative** [2] -

47:10, 57:21
**investigators** [2] - 41:18, 76:23
**involuntarily** [1] - 74:21
**involve** [5] - 5:25, 32:18, 33:11, 34:18, 39:20
**involved** [8] - 21:18, 32:12, 38:20, 38:24, 62:24, 67:9, 68:1, 75:5
**involvement** [1] - 77:15
**Involving** [1] - 13:11
**involving** [1] - 27:24
**iPhone** [1] - 59:14
**Iraq** [21] - 3:8, 24:16, 32:3, 41:21, 42:3, 44:14, 46:2, 47:1, 66:1, 66:5, 66:9, 67:6, 69:1, 69:10, 69:14, 69:18, 71:25, 72:7, 77:1, 77:7, 78:15
**Iraqi** [1] - 32:2
**irrelevant** [1] - 44:6
**irreparable** [1] - 24:24
**irrespective** [1] - 36:5
**Islands** [3] - 18:24, 20:24, 21:5
**isolated** [2] - 22:15, 22:20
**issue** [7] - 16:7, 21:6, 25:6, 33:8, 34:7, 35:6, 35:17
**issues** [4] - 9:10, 11:9, 15:8, 65:16
**items** [6] - 69:2, 69:12, 69:17, 69:21, 69:25, 71:6
**itself** [7] - 6:16, 8:13, 9:11, 11:1, 24:12, 26:1, 48:17

**J**

**Jasperse** [4] - 7:11, 11:3, 11:5, 53:24
**JASPERSE** [2] - 1:17, 11:6
**jeopardy** [2] - 68:2
**Jim** [1] - 64:16
**job** [1] - 65:17
**jobs** [1] - 65:17
**John** [2] - 42:1, 77:4
**joined** [1] - 61:25
**journal** [1] - 71:14
**JR** [1] - 1:20
**Judge** [1] - 32:2

**10**

**Judgment** [2] - 80:10, 83:1
**judgment** [1] - 49:15
**judgments** [1] - 82:16
**judicial** [1] - 62:13
**jump** [1] - 28:9
**jurisdiction** [3] - 35:19, 36:1, 36:25
**jurisdictional** [6] - 13:13, 13:18, 19:25, 34:2, 35:24, 37:7
**jury** [27] - 2:4, 2:12, 2:15, 2:16, 2:19, 2:25, 3:5, 3:10, 3:13, 3:17, 3:20, 3:24, 4:7, 4:15, 8:17, 8:20, 8:21, 9:3, 9:14, 10:11, 12:25, 13:3, 17:13, 43:25, 44:3, 45:1, 45:3
**jury's** [1] - 44:13
**Justice** [3] - 6:2, 45:10, 76:22
**justice** [6] - 41:7, 41:10, 42:12, 43:12, 78:5

**K**

**Kadaja** [6] - 67:9, 67:15, 72:5, 72:6, 74:3, 75:1
**keep** [3] - 7:17, 10:7, 55:19
**Kennedy** [2] - 42:1, 77:5
**kept** [4] - 55:15, 55:20, 71:11, 71:14
**Kidnapping** [38] - 5:4, 5:8, 7:22, 8:10, 8:25, 9:9, 9:10, 11:10, 11:17, 11:25, 12:1, 12:7, 16:23, 17:9, 17:19, 18:3, 20:25, 21:1, 21:5, 21:9, 21:10, 21:16, 21:19, 22:8, 25:2, 25:3, 26:1, 26:4, 26:10, 26:19, 26:21, 26:22, 27:6, 27:12, 31:20, 31:22, 49:9
**kidnapping** [11] - 8:2, 8:15, 8:20, 12:7, 12:10, 12:15, 12:16, 20:22, 22:17, 25:22, 26:1
**kill** [1] - 64:6
**killed** [5] - 20:2, 26:13, 49:17, 55:22, 56:5
**Kim** [2] - 43:15, 44:7

**kind** [1] - 79:16
**Kiviking** [7] - 59:13, 71:12, 74:3, 75:25, 76:7, 76:8, 76:10
**knock** [1] - 72:11
**knocked** [3] - 29:15, 30:14, 73:2
**knowing** [4] - 11:15, 11:16, 69:22, 79:2
**knowledgeable** [1] - 73:24
**known** [2] - 45:24, 50:22
**KRISTIN** [4] - 1:24, 84:3, 84:13, 84:16
**Kurdish** [23] - 17:15, 17:16, 18:15, 18:16, 33:1, 33:12, 34:11, 34:12, 34:16, 35:15, 37:9, 38:7, 40:5, 67:16, 71:17, 72:12, 72:24, 74:4, 74:16, 74:17, 75:10, 75:24, 77:20
**Kurdistan** [15] - 41:22, 42:7, 46:24, 66:1, 66:4, 66:9, 66:17, 66:21, 67:20, 68:6, 72:19, 76:13, 77:2, 77:12, 78:15
**Kurds** [11] - 46:1, 46:2, 46:4, 46:24, 58:14, 58:19, 67:7, 68:23, 70:24, 71:3, 77:16
**Kuwait** [1] - 63:7

**L**

**lack** [2] - 24:22, 51:7
**LaCroix** [2] - 43:14, 44:6
**Lahur** [1] - 66:2
**Lahur's** [1] - 66:20
**land** [1] - 49:2
**language** [1] - 54:25
**large** [1] - 70:25
**larger** [1] - 52:25
**lash** [1] - 73:15
**lashing** [1] - 12:23
**last** [2] - 4:19, 14:2
**lasting** [2] - 14:22, 76:9
**lastly** [3] - 6:12, 45:13, 83:10
**laundering** [1] - 78:18
**Laundering** [1] - 4:2
**law** [11] - 34:13, 37:16, 37:22, 42:17, 43:13, 53:3, 57:18, 60:9,

61:4, 71:9, 78:24
**lawful** [3] - 37:19, 37:24, 40:14
**lawfully** [8] - 8:14, 31:10, 31:15, 31:25, 33:8, 33:20, 34:6, 42:21
**laws** [5] - 32:3, 46:16, 69:23, 79:3, 79:24
**lawyers** [2] - 53:1, 59:23
**lays** [1] - 12:14
**lead** [2] - 43:23, 50:11
**leader** [5] - 32:12, 33:6, 33:19, 34:4, 41:1
**leaders** [1] - 66:2
**Leadership** [1] - 13:10
**leading** [2] - 33:22, 49:9
**leads** [1] - 10:23
**leap** [1] - 9:6
**learned** [5] - 14:24, 55:24, 63:19, 63:25, 64:19
**least** [8] - 10:2, 40:3, 40:22, 41:19, 49:4, 74:9, 75:9, 76:23
**leave** [6] - 9:18, 56:3, 71:25, 72:7, 76:15, 83:15
**leaving** [1] - 62:16
**led** [4] - 17:18, 18:18, 38:5, 39:22
**left** [2] - 64:8, 64:20
**legal** [3] - 65:23, 67:19, 68:1
**legitimize** [1] - 39:12
**legs** [1] - 73:15
**length** [2] - 7:15, 26:12
**lengthy** [1] - 65:22
**less** [2] - 39:21, 81:14
**lesser** [1] - 21:11
**lesson** [1] - 76:2
**letters** [2] - 51:13, 53:22
**Level** [1] - 45:10
**level** [29] - 5:9, 5:13, 5:22, 6:1, 9:21, 10:9, 16:11, 16:13, 17:21, 18:4, 19:8, 19:9, 26:24, 27:5, 27:13, 28:4, 30:17, 30:25, 31:21, 32:16, 33:4, 34:21, 37:14, 38:15, 38:18, 40:25, 41:16, 45:18, 47:11
**levels** [6] - 5:21, 27:20, 30:21, 31:4,

32:14, 41:14
**Liability** [1] - 66:25
**Liaison** [1] - 66:1
**license** [4] - 69:24, 70:1, 79:5, 79:6
**License** [5] - 2:25, 3:5, 3:10, 69:9, 69:18
**lie** [2] - 42:20, 43:5
**lied** [5] - 41:18, 43:24, 64:4, 65:3, 76:22
**lieu** [2] - 9:17, 10:25
**life** [8] - 14:7, 48:2, 48:7, 52:22, 56:8, 56:10, 56:12, 71:3
**lifetime** [2] - 15:1, 59:6
**lifted** [1] - 29:20
**light** [2] - 7:16, 58:15
**likelihood** [1] - 28:14
**likewise** [3] - 30:13, 34:6, 35:9
**Limitations** [1] - 8:3
**Limited** [1] - 66:25
**limited** [2] - 49:10, 50:1
**lines** [1] - 82:24
**List** [1] - 2:23
**listed** [3] - 61:23, 62:13, 83:8
**listening** [1] - 52:4
**literally** [1] - 64:6
**live** [1] - 54:1
**lives** [1] - 56:13
**LLC** [2] - 66:24, 67:3
**local** [3] - 66:1, 67:3, 81:24
**located** [5] - 68:8, 68:25, 69:6, 69:16, 72:15
**location** [1] - 37:6
**locker** [1] - 62:16
**logic** [1] - 12:12
**logistical** [1] - 63:12
**loneliness** [1] - 55:13
**long-term** [1] - 65:9
**longest** [1] - 57:22
**look** [14] - 8:6, 8:18, 8:22, 9:2, 9:10, 10:16, 49:18, 50:5, 50:6, 50:15, 50:25, 51:1, 53:1
**looked** [2] - 20:10, 72:3
**lose** [1] - 75:18
**loss** [1] - 28:10
**lost** [1] - 73:8
**lottery** [1] - 82:16
**loyal** [1] - 77:25
**loyalty** [1] - 58:18

**luxury** [1] - 71:6
**lying** [5] - 6:3, 6:5, 41:7, 42:25, 44:24

**M**

**M4** [7] - 2:23, 3:16, 44:17, 45:23, 46:6, 66:11, 69:15
**M4-type** [2] - 66:7, 68:10
**machine** [2] - 1:22, 45:24
**machines** [2] - 67:11, 68:24
**main** [2] - 7:20, 7:21
**maintaining** [2] - 25:22, 62:15
**maintains** [3] - 6:14, 6:15, 18:1
**Major** [1] - 65:25
**man** [2] - 64:16, 66:4
**managed** [1] - 57:2
**manager** [1] - 66:13
**Manufacture** [1] - 78:15
**manufacture** [4] - 68:10, 68:13, 68:23, 69:8
**manufacturer** [3] - 64:12, 69:6, 79:4
**manufacturers** [1] - 69:3
**manufacturing** [11] - 66:5, 66:7, 66:8, 66:11, 67:7, 67:11, 67:15, 70:2, 70:17, 71:8, 79:18
**March** [2] - 4:19, 63:1
**MARIANI** [1] - 1:8
**Marrtin** [4] - 71:13, 74:3, 74:16, 76:7
**Marshal** [1] - 50:22
**Masters** [2] - 69:5, 69:11
**materially** [2] - 42:16, 43:12
**materials** [2] - 71:11, 71:15
**matriculated** [1] - 61:21
**matter** [6] - 2:1, 2:3, 4:18, 21:7, 25:5, 50:5
**maximum** [2] - 48:8, 59:2
**McLaren** [1] - 70:20
**mean** [2] - 8:24, 48:24
**meaning** [2] - 34:22, 56:20

**11**

**means** [4] - 13:3, 37:15, 40:2, 84:22
**measured** [1] - 68:20
**mechanical** [1] - 54:18
**mechanics** [1] - 67:19
**media** [1] - 63:13
**medical** [3] - 10:17, 10:18, 28:1
**medications** [1] - 82:13
**meet** [8] - 6:4, 8:4, 33:13, 37:13, 38:3, 43:1, 56:6, 66:15
**meets** [2] - 10:19, 41:2
**Member** [1] - 66:25
**member** [3] - 28:1, 47:1, 62:1
**members** [2] - 14:11, 50:16
**Memo** [1] - 9:18
**Memoranda** [4] - 6:20, 11:7, 11:8, 15:24
**Memorandum** [8] - 10:22, 17:24, 18:7, 27:9, 29:4, 43:8, 48:15, 52:12
**memorandum** [1] - 58:4
**Memos** [2] - 14:4, 14:8
**mens** [3] - 35:14, 36:17, 37:4
**mental** [11] - 10:12, 10:13, 11:15, 24:13, 28:1, 28:25, 37:17, 37:23, 55:13, 82:7, 82:13
**mentally** [1] - 55:18
**mention** [1] - 57:5
**mentioned** [3] - 49:14, 84:8
**mentioning** [1] - 7:13
**mere** [1] - 52:15
**merely** [1] - 24:2
**merit** [2] - 31:23, 37:11
**merits** [1] - 27:10
**message** [1] - 71:25
**met** [4] - 10:3, 10:15, 36:16, 66:19
**method** [2] - 12:10, 25:22
**methods** [1] - 82:6
**MIDDLE** [1] - 1:1
**Middle** [3] - 68:7, 84:4, 84:18
**might** [5] - 11:9, 17:2, 56:1, 58:18, 83:3
**Military** [1] - 63:8
**military** [25] - 5:17,

14:11, 17:16, 18:16, 22:18, 24:16, 30:2, 31:11, 31:16, 36:13, 40:7, 46:20, 50:16, 58:3, 61:24, 64:4, 65:3, 66:2, 72:15, 73:3, 73:19, 74:4, 75:24, 76:12, 77:20
**million** [2] - 48:4, 70:9
**millions** [2] - 68:5, 78:18
**Mills** [5] - 19:4, 19:8, 19:16, 20:12, 20:19
**mills** [2] - 18:22, 20:12
**mind** [2] - 55:25, 59:19
**minimum** [6] - 28:7, 39:19, 40:2, 40:11, 40:21, 53:16
**minutes** [3] - 52:13, 53:9
**Misconduct** [2] - 62:9, 62:10
**misreads** [1] - 35:17
**missed** [1] - 8:3
**missing** [2] - 21:1, 22:8
**mistake** [1] - 13:24
**moderate** [2] - 21:9, 21:14
**moment** [3] - 51:16, 54:14, 57:3
**mONDAY** [1] - 1:9
**monetary** [1] - 79:19
**Money** [1] - 4:2
**money** [6] - 64:10, 70:16, 71:1, 72:1, 78:18, 78:24
**monies** [1] - 82:15
**month** [3] - 63:18, 64:8, 76:14
**monthly** [1] - 81:14
**months** [14] - 47:13, 48:9, 49:3, 51:1, 57:1, 61:7, 80:12, 80:13, 80:14, 80:17, 80:19, 80:23, 81:8
**morning** [5] - 2:1, 7:19, 7:23, 54:9, 72:9
**most** [12] - 8:23, 9:15, 11:17, 11:25, 17:6, 17:10, 17:22, 25:16, 48:19, 48:23, 49:1, 55:19
**motion** [1] - 16:6
**Motion** [3] - 2:10, 15:13, 47:2
**move** [2] - 27:16, 32:9
**MR** [23] - 4:22, 7:6,

7:11, 7:17, 8:25, 9:25, 11:5, 11:6, 47:7, 47:21, 48:14, 51:15, 51:19, 53:22, 53:25, 54:6, 55:1, 57:5, 57:10, 59:17, 59:22, 83:20, 83:22
**MS** [2] - 54:9, 54:11
**multiple** [7] - 11:14, 17:17, 29:19, 49:14, 53:2, 63:20, 73:7
**Munitions** [1] - 2:22
**Murder** [3] - 16:18, 16:19, 16:20
**murdered** [1] - 49:4
**must** [36] - 13:19, 35:13, 37:3, 38:19, 38:22, 39:1, 39:3, 39:17, 39:20, 40:19, 44:1, 45:1, 60:7, 60:8, 60:9, 60:10, 60:11, 79:14, 79:15, 79:17, 81:23, 81:24, 81:25, 82:3, 82:4, 82:5, 82:7, 82:13, 82:15, 82:19, 82:23, 82:25, 83:1, 83:4, 83:10, 83:13

## N

**naked** [1] - 76:1
**name** [6] - 18:13, 38:8, 53:13, 54:9, 61:17, 64:20
**named** [4] - 64:16, 67:1, 71:18, 75:10
**National** [7] - 13:15, 13:19, 33:15, 34:1, 36:2, 36:9, 36:20
**nationality** [1] - 36:5
**Nationals** [1] - 36:13
**NATO** [1] - 47:1
**nature** [5] - 57:15, 59:11, 60:4, 65:21, 79:22
**near** [1] - 72:15
**necessarily** [3] - 44:22, 45:5, 50:4
**necessary** [10] - 6:4, 6:17, 7:3, 15:3, 39:5, 40:15, 43:1, 60:17, 78:2, 79:12
**neck** [5] - 12:21, 28:13, 29:20, 75:16, 75:18
**need** [12] - 6:23, 8:7, 9:12, 10:2, 10:5, 35:3, 56:21, 57:17, 60:20, 60:23, 66:17,

79:25
**needed** [5] - 9:16, 10:18, 58:15, 67:11, 76:1
**needs** [3] - 8:12, 10:24, 14:6
**negative** [1] - 58:19
**never** [4] - 57:12, 61:21, 75:3, 75:4
**new** [1] - 82:23
**New** [4] - 1:18, 42:1, 77:5
**next** [3] - 20:21, 30:19, 39:1
**night** [1] - 72:24
**non** [14] - 10:1, 10:5, 38:24, 39:2, 39:4, 39:11, 39:18, 40:11, 40:12, 40:15, 40:18, 40:21, 62:18, 68:19
**Non** [1] - 62:13
**non-commissioned** [1] - 62:18
**non-disclosure** [1] - 68:19
**Non-judicial** [1] - 62:13
**non-participant** [3] - 39:2, 39:4, 40:12
**non-participants** [9] - 10:1, 10:5, 38:24, 39:11, 39:18, 40:11, 40:15, 40:18, 40:21
**none** [3] - 26:15, 36:15, 40:9
**nonetheless** [1] - 70:2
**North** [7] - 62:2, 63:4, 63:11, 63:24, 64:11, 66:19, 69:17
**nose** [6] - 12:23, 28:11, 29:13, 30:8, 73:5, 73:13
**Note** [2] - 16:25, 38:23
**note** [8] - 5:18, 10:22, 16:3, 34:25, 35:1, 48:19, 60:14, 62:10
**noted** [4] - 15:25, 32:1, 67:21, 79:7
**Notes** [3] - 42:13, 42:14, 45:16
**nothing** [7] - 9:16, 14:24, 47:7, 47:22, 51:24, 53:11, 59:22
**Notice** [2] - 83:13, 83:17
**noticed** [1] - 52:6
**notify** [1] - 83:2
**noting** [1] - 59:7
**November** [3] - 3:19, 62:8, 76:12

**Nsd** [1] - 1:14
**number** [6] - 38:6, 43:18, 55:1, 58:20, 61:21, 62:24
**numbered** [1] - 84:9
**numerous** [5] - 20:14, 34:14, 62:19, 64:12, 70:21
**NW** [2] - 1:15, 1:18

## O

**oath** [8] - 6:5, 41:8, 43:2, 43:12, 43:24, 44:5, 44:9, 44:24
**objected** [4] - 30:19, 33:4, 41:5, 42:23
**objection** [16] - 7:20, 16:6, 26:22, 28:20, 28:22, 30:16, 31:8, 31:13, 32:7, 33:17, 34:15, 41:3, 42:24, 44:4, 45:11, 52:10
**objections** [19] - 4:20, 4:21, 4:24, 4:25, 6:7, 6:20, 7:1, 7:4, 7:14, 9:19, 15:10, 15:15, 15:17, 15:20, 15:23, 16:1, 16:7, 27:16, 47:8
**objectives** [1] - 79:13
**objects** [4] - 5:3, 6:8, 17:19, 28:16
**obligated** [1] - 48:21
**obligation** [2] - 78:23, 82:18
**observed** [2] - 63:21, 77:22
**observing** [1] - 15:9
**obstruct** [4] - 41:10, 42:11, 78:4, 82:6
**obstructed** [2] - 41:9, 42:17
**Obstruction** [5] - 6:2, 43:10, 44:8, 45:9, 76:22
**obstruction** [1] - 41:7
**obstructive** [1] - 41:12
**obstructs** [1] - 43:11
**Obtained** [3] - 2:24, 3:4, 3:9
**obtained** [1] - 63:12
**obtaining** [3] - 12:11, 25:22, 83:6
**obviously** [11] - 6:23, 11:1, 12:15, 14:17, 48:14, 48:17, 49:2, 51:7, 52:5, 74:11
**occasion** [2] - 75:9, 75:14

**occasions** [6] - 11:14, 34:14, 41:19, 43:19, 75:2, 76:24
**occur** [2] - 23:10, 26:2
**occurred** [13] - 13:17, 19:14, 19:16, 21:24, 22:1, 22:17, 22:22, 23:1, 23:4, 23:13, 29:5, 58:3, 58:4
**October** [2] - 71:23, 72:9
**OF** [3] - 1:1, 1:2, 1:7
**offender** [6] - 34:1, 36:2, 36:4, 36:6, 36:19, 37:6
**Offense** [2] - 2:18, 38:4
**offense** [58] - 6:14, 7:24, 15:14, 16:11, 16:13, 17:3, 17:4, 17:6, 17:21, 18:4, 18:11, 19:6, 19:7, 19:8, 19:9, 21:25, 22:2, 22:5, 22:23, 23:1, 23:11, 23:14, 23:17, 24:6, 24:11, 25:16, 26:3, 26:23, 27:5, 27:13, 27:20, 30:21, 31:21, 32:11, 35:3, 35:12, 35:18, 35:21, 36:10, 36:14, 36:20, 37:8, 41:12, 41:13, 41:14, 45:18, 45:21, 47:11, 57:16, 57:18, 59:11, 60:8, 60:21, 61:3, 65:21, 78:9, 78:22
**offenses** [5] - 60:5, 60:8, 60:9, 69:22, 83:5
**offer** [2] - 43:6, 47:4
**offered** [2] - 66:10, 66:14
**Office** [7] - 9:23, 10:19, 17:8, 81:21, 82:21, 82:22, 83:7
**office** [3] - 66:13, 67:10, 71:15
**officer** [7] - 19:20, 53:2, 62:18, 64:5, 82:9, 82:19, 82:24
**Officer** [2] - 42:21, 66:1
**officer's** [1] - 19:19
**Officers** [2] - 42:2, 77:6
**Official** [3] - 84:3, 84:14, 84:17
**official** [1] - 42:18
**oil** [1] - 63:4

**old** [1] - 61:18
**OML** [1] - 69:16
**once** [3] - 54:3, 74:9, 74:16
**one** [38] - 8:23, 9:4, 9:20, 11:4, 12:10, 12:14, 13:1, 13:16, 14:2, 14:13, 15:7, 17:4, 25:22, 35:8, 38:2, 38:9, 39:20, 39:22, 48:3, 49:25, 51:2, 51:16, 54:1, 55:3, 55:13, 56:10, 58:20, 59:2, 63:2, 63:18, 64:7, 64:22, 68:14, 75:9, 75:11, 76:14, 76:21
**One** [1] - 36:2
**ones** [1] - 60:19
**ongoing** [2] - 24:24, 70:10
**open** [3] - 54:2, 56:2, 82:23
**opened** [2] - 65:7, 65:10
**operated** [2] - 65:7, 65:11
**operates** [1] - 52:1
**operation** [1] - 71:20
**opinion** [1] - 5:15
**opportunity** [4] - 7:7, 7:8, 66:17, 71:9
**opting** [1] - 20:6
**options** [1] - 12:14
**order** [8] - 8:8, 8:10, 9:5, 33:9, 34:7, 39:20, 40:14, 55:20
**Order** [1] - 3:22
**ordered** [2] - 69:5, 82:17
**Ordered** [1] - 80:24
**ordering** [1] - 33:22
**orders** [2] - 73:5, 73:10
**organ** [1] - 28:1
**organized** [1] - 39:22
**organizer** [5] - 32:12, 33:7, 33:20, 34:5, 40:25
**Orkin** [1] - 65:19
**others'** [1] - 56:12
**otherwise** [15] - 13:1, 32:1, 32:13, 32:18, 32:22, 33:2, 34:19, 34:23, 38:17, 38:19, 39:21, 41:2, 51:12, 79:10, 83:4
**outset** [1] - 15:25
**outside** [9] - 13:17, 13:21, 30:2, 35:22,

36:24, 37:8, 38:1, 73:17, 74:6
**Outside** [1] - 4:4
**outstanding** [1] - 82:17
**overarching** [1] - 60:15
**overrule** [1] - 45:11
**overruled** [5] - 15:16, 26:24, 30:18, 32:8, 41:4
**oversee** [2] - 42:3, 77:7
**overzealous** [1] - 21:15
**own** [5] - 46:18, 52:21, 64:9, 64:20, 64:23
**ownership** [1] - 63:18

## P

**P.O** [1] - 84:18
**Page** [4] - 16:5, 18:8, 22:10, 43:9
**pages** [2] - 53:17
**Pages** [5] - 17:25, 27:9, 29:8, 29:21, 43:9
**paid** [1] - 81:11
**pain** [35] - 10:13, 10:14, 10:16, 10:22, 10:23, 11:15, 12:5, 12:24, 13:2, 13:3, 13:4, 13:8, 14:22, 24:13, 26:8, 27:25, 28:7, 28:18, 28:23, 28:25, 29:1, 29:2, 29:16, 29:25, 30:9, 30:11, 30:15, 37:18, 37:23, 37:24, 74:22, 78:25
**painful** [1] - 73:4
**paperwork** [1] - 64:20
**Parachutist** [1] - 62:11
**paragraph** [12] - 5:9, 5:22, 6:1, 6:10, 16:9, 27:17, 27:18, 30:19, 41:5, 41:17, 42:9, 61:15
**Paragraph** [15] - 5:13, 10:8, 16:9, 27:16, 30:5, 30:17, 30:19, 31:19, 31:22, 32:7, 32:9, 41:4, 41:5, 45:12
**paragraphs** [2] - 4:25, 6:9
**Paragraphs** [7] - 5:2, 6:13, 15:10, 15:18, 16:1, 41:17

**parents** [1] - 63:2
**parents'** [1] - 67:1
**Park** [1] - 65:7
**part** [12] - 11:14, 17:14, 23:19, 49:1, 52:14, 52:23, 57:7, 57:12, 58:9, 68:10, 68:19
**participant** [12] - 33:13, 34:23, 35:2, 35:6, 37:13, 38:12, 39:2, 39:4, 39:20, 39:22, 40:12, 52:21
**Participants** [1] - 13:11
**participants** [28] - 5:25, 9:21, 10:1, 10:2, 10:5, 32:13, 32:18, 33:11, 34:18, 35:8, 35:16, 36:12, 36:16, 37:10, 38:5, 38:23, 38:24, 39:11, 39:18, 39:19, 40:11, 40:15, 40:18, 40:20, 40:21, 40:23
**participate** [1] - 82:7
**participated** [3] - 23:9, 37:12, 38:2
**participation** [1] - 82:10
**particular** [9] - 6:20, 17:1, 17:4, 31:8, 60:13, 60:25, 65:18, 70:15, 76:9
**particularly** [6] - 12:2, 14:4, 26:4, 29:13, 30:7, 73:4
**parties** [1] - 4:24
**parties'** [1] - 15:5
**partner** [2] - 64:16, 64:18
**parts** [9] - 41:21, 44:12, 44:14, 44:23, 45:23, 46:1, 58:20, 69:20, 77:1
**passed** [1] - 29:18
**PATRICK** [1] - 1:17
**Patriotic** [1] - 66:4
**Patrol** [1] - 77:6
**Pattern** [1] - 62:10
**Pauperis** [1] - 83:16
**pay** [6] - 70:17, 80:24, 81:3, 82:25, 83:3, 83:15
**payable** [2] - 81:4, 81:7
**paying** [1] - 64:23
**Paying** [1] - 3:23
**payment** [1] - 81:6
**Payments** [1] - 83:1

**peculiar** [1] - 39:4
**penalties** [2] - 21:19, 79:20
**penalty** [2] - 82:25, 83:3
**pending** [1] - 13:23
**PENNSYLVANIA** [3] - 1:1, 1:9, 1:25
**Pennsylvania** [11] - 1:13, 1:15, 1:21, 41:24, 66:24, 67:1, 68:7, 69:14, 84:5, 84:18, 84:19
**people** [9] - 50:7, 52:18, 53:2, 54:16, 54:21, 56:21, 64:6, 65:3, 68:17
**per** [2] - 50:19, 64:1
**percent** [1] - 81:9
**perhaps** [1] - 7:13
**period** [11] - 7:9, 11:12, 20:16, 22:15, 23:8, 23:24, 24:20, 38:11, 48:2, 48:3, 62:8
**periods** [2] - 11:22, 25:10
**perjured** [1] - 45:6
**perjury** [2] - 42:16, 43:20
**permission** [4] - 64:22, 70:1, 76:16, 83:6
**permitted** [1] - 32:3
**perpetuated** [1] - 79:8
**Persian** [1] - 46:3
**person** [12] - 13:22, 14:22, 20:2, 35:2, 37:16, 37:19, 54:7, 55:16, 56:6, 58:11, 68:18, 81:20
**personal** [4] - 46:18, 46:21, 63:19, 70:18
**personnel** [1] - 67:19
**persons** [2] - 21:16, 40:3
**persuasive** [1] - 20:20
**Pest** [1] - 65:19
**pharmacy** [2] - 19:11, 19:16
**physical** [28] - 10:12, 10:13, 12:3, 12:5, 12:10, 12:11, 12:24, 13:2, 13:3, 13:7, 23:21, 24:13, 25:20, 25:23, 26:6, 26:7, 28:2, 28:7, 28:17, 28:25, 29:1, 37:17, 37:19, 37:20, 37:23, 37:25, 55:14, 74:10

**13**

**piece** [1] - 54:24
**Pin** [3] - 2:23, 3:16, 44:17
**pin** [1] - 69:15
**pipes** [4] - 29:16, 30:15, 65:12
**pistol** [1] - 68:11
**Pittston** [1] - 1:21
**Pizarro** [3] - 49:23, 50:6, 50:10
**place** [9] - 19:23, 36:14, 36:20, 38:1, 40:8, 62:17, 65:10, 65:24, 68:1
**Place** [1] - 4:4
**placed** [3] - 72:14, 73:6, 81:17
**places** [1] - 73:4
**placing** [2] - 12:20, 12:21
**plaintiff** [1] - 1:3
**plan** [2] - 67:17, 71:8
**planned** [2] - 68:9, 68:21
**plant** [1] - 66:9
**plastic** [9] - 28:10, 28:12, 29:16, 29:18, 30:15, 73:6, 73:15, 75:7
**play** [1] - 59:12
**played** [1] - 59:21
**playing** [1] - 14:11
**plays** [1] - 50:12
**plural** [1] - 40:2
**PNC** [4] - 67:3, 67:4, 68:8, 70:6
**point** [3] - 14:2, 63:2, 71:23
**pointed** [1] - 44:25
**points** [2] - 12:9, 43:24
**Polad** [1] - 66:20
**police** [2] - 19:18, 19:19
**policy** [3] - 45:20, 46:10, 46:23
**political** [1] - 79:19
**portion** [2] - 59:21, 61:12
**posed** [4] - 22:4, 24:6, 24:10, 45:21
**position** [7] - 6:15, 12:6, 14:14, 18:6, 22:13, 25:1, 36:18
**positive** [1] - 56:11
**possess** [1] - 81:24
**possible** [1] - 55:19
**potential** [3] - 24:21, 45:19, 66:10
**pound** [1] - 64:2

**pounds** [1] - 63:23
**power** [1] - 78:24
**Powers** [2] - 3:3, 78:17
**Pre** [17] - 4:18, 6:13, 15:10, 18:2, 18:9, 27:18, 30:25, 32:9, 32:24, 47:9, 47:16, 55:2, 57:21, 61:11, 61:13, 61:23, 64:8
**Pre-sentence** [17] - 4:18, 6:13, 15:10, 18:2, 18:9, 27:18, 30:25, 32:9, 32:24, 47:9, 47:16, 55:2, 57:21, 61:11, 61:13, 61:23, 64:8
**precise** [1] - 38:6
**prepare** [1] - 83:17
**prepared** [4] - 4:18, 7:1, 58:25, 84:11
**preparing** [1] - 59:9
**preponderance** [2] - 13:5, 27:3
**prescribed** [3] - 21:19, 62:17, 82:14
**present** [10] - 13:15, 13:20, 14:18, 33:16, 34:2, 36:4, 36:9, 38:11, 74:25, 75:4
**presented** [7] - 5:11, 5:16, 31:25, 32:4, 44:12, 45:8, 57:7
**presents** [1] - 61:1
**preserves** [1] - 14:14
**president** [1] - 65:2
**pressure** [2] - 75:11, 75:13
**pretty** [2] - 9:4, 10:4
**prevent** [2] - 21:10, 58:15
**previous** [3] - 11:20, 25:7, 66:11
**previously** [3] - 2:8, 34:9, 44:7
**primarily** [1] - 18:19
**principal** [1] - 21:15
**principally** [1] - 70:10
**prints** [2] - 68:12, 71:7
**prison** [2] - 14:7, 54:23
**Prisons** [2] - 80:11, 81:20
**Probation** [10] - 9:23, 10:19, 12:18, 17:8, 42:20, 47:10, 48:3, 81:21, 82:21, 83:6
**probation** [5] - 53:2, 64:5, 82:9, 82:19, 82:24

**Procedure** [1] - 4:17
**proceed** [8] - 7:5, 7:12, 7:16, 38:14, 47:5, 47:18, 54:5, 67:25
**proceeded** [1] - 79:5
**PROCEEDINGS** [1] - 1:7
**Proceedings** [1] - 1:22
**proceedings** [4] - 80:2, 80:4, 83:24, 84:8
**process** [4] - 14:21, 32:25, 67:12, 68:19
**produce** [3] - 46:8, 64:25, 68:21
**produced** [2] - 1:22, 63:20
**program** [3] - 82:7, 82:8, 82:10
**progress** [1] - 71:20
**prohibited** [3] - 36:1, 37:1, 82:5
**project** [15] - 18:14, 66:18, 66:19, 66:23, 67:7, 67:9, 67:15, 67:18, 67:21, 68:3, 69:2, 70:2, 70:15, 71:8, 72:4
**promise** [1] - 7:7
**promote** [3] - 57:18, 60:8, 78:23
**Promote** [1] - 4:5
**prong** [2] - 38:19, 41:3
**proof** [2] - 10:24, 27:7
**proper** [4] - 21:4, 26:3, 26:14, 27:1
**properly** [1] - 31:20
**proposed** [1] - 67:14
**proposition** [1] - 19:4
**proscribes** [1] - 17:1
**prosecuting** [1] - 57:23
**prosecution** [7] - 14:1, 41:11, 52:2, 52:9, 53:1, 58:10, 61:3
**prosecutions** [1] - 58:9
**prosecutorial** [1] - 21:12
**prostitutes** [1] - 63:22
**protect** [4] - 57:19, 60:11, 71:4, 79:25
**protecting** [1] - 79:21
**Protection** [2] - 42:2, 77:6
**protracted** [1] - 27:25
**prove** [6] - 5:12,

10:12, 12:24, 13:5, 28:17, 28:25
**proved** [1] - 5:16
**proven** [1] - 8:8
**provide** [9] - 19:2, 48:1, 48:2, 57:19, 58:18, 59:9, 60:9, 68:17, 82:19
**provided** [5] - 25:17, 26:18, 32:2, 35:5, 49:15
**provider** [1] - 82:9
**provides** [7] - 16:9, 27:18, 30:20, 32:6, 32:10, 35:24, 41:6
**providing** [3] - 42:16, 46:4, 62:19
**provision** [2] - 19:13, 20:1
**provisions** [2] - 47:16, 84:5
**PSR** [17] - 15:11, 15:18, 15:23, 16:9, 16:13, 30:5, 30:20, 41:5, 41:17, 42:9, 42:14, 48:17, 48:25, 57:7, 61:16, 62:19, 76:18
**public** [4] - 57:20, 60:11, 79:21, 79:25
**punish** [1] - 56:21
**punished** [1] - 43:5
**Punishment** [1] - 62:14
**punishment** [7] - 6:25, 26:14, 50:25, 51:1, 57:19, 60:9, 79:7
**purchase** [1] - 70:18
**purchased** [4] - 68:24, 69:3, 69:12, 69:15
**purchases** [1] - 71:6
**purchasing** [1] - 70:21
**pure** [1] - 58:22
**purpose** [1] - 74:11
**purposes** [3] - 32:22, 37:14, 40:9
**pursuant** [7] - 5:23, 6:2, 16:4, 16:14, 44:6, 80:9, 84:5
**pursue** [1] - 66:19
**pursuing** [1] - 19:19
**push** [1] - 55:20
**put** [5] - 7:7, 64:10, 64:14, 65:5, 71:1
**puts** [1] - 28:21

## Q

**questioning** [1] - 65:4
**questions** [4] - 72:21,

73:25, 74:1, 74:19
**quite** [3] - 11:19, 57:12, 57:13
**Quote** [1] - 5:21
**quote** [24] - 5:19, 13:3, 14:10, 17:12, 17:14, 21:13, 24:9, 24:14, 26:2, 26:3, 27:24, 31:2, 32:22, 35:7, 35:8, 35:13, 35:21, 38:17, 39:17, 41:2, 45:17, 45:22, 64:6, 75:22
**quoted** [1] - 39:6

## R

**Radon** [4] - 63:10, 63:15, 63:25, 64:3
**raise** [1] - 11:8
**raised** [3] - 6:21, 18:14, 19:2
**range** [6] - 21:1, 22:8, 47:12, 48:1, 49:9, 57:22
**Range** [2] - 8:9, 8:10
**rank** [1] - 62:4
**rather** [4] - 13:18, 26:19, 28:25, 63:17
**rea** [3] - 35:14, 36:17, 37:4
**read** [6] - 12:25, 51:14, 51:15, 53:16, 54:2, 55:3
**readily** [1] - 20:13
**ready** [3] - 7:16, 48:12, 51:22
**reaffirm** [1] - 47:15
**realized** [1] - 52:4
**really** [2] - 54:14, 59:18
**REALTIME** [1] - 1:24
**reason** [3] - 38:10, 57:24, 72:2
**reasonable** [3] - 13:7, 60:16, 79:12
**reasoning** [1] - 26:20
**reasons** [8] - 8:4, 21:3, 23:25, 30:16, 34:8, 47:2, 62:12
**receipt** [1] - 48:15
**receive** [1] - 10:18
**received** [11] - 4:23, 44:1, 45:1, 58:4, 58:8, 62:3, 62:10, 64:5, 65:1, 70:4, 82:15
**receiving** [2] - 46:17, 62:13
**recitation** [1] - 47:8

**14**

**recognition** [1] - 14:25

**recognize** [1] - 27:1

**recognized** [2] - 21:15, 49:24

**recognizes** [1] - 26:1

**recognizing** [1] - 50:23

**recommendation** [4] - 54:4, 58:25, 59:7

**recommendations** [1] - 56:16

**recommended** [2] - 12:18, 82:11

**record** [12] - 2:8, 6:15, 15:24, 18:7, 29:11, 30:10, 38:10, 40:1, 40:5, 47:9, 55:4, 59:14

**recorded** [1] - 1:22

**recording** [3] - 59:13, 59:21, 71:13

**records** [2] - 60:24, 72:4

**reduced** [1] - 15:6

**refer** [1] - 15:11

**reference** [3] - 30:5, 61:14, 61:16

**referenced** [1] - 17:5

**referred** [2] - 38:9, 52:7

**refers** [1] - 40:1

**reflect** [3] - 2:8, 57:17, 60:7

**reflected** [2] - 42:11, 78:4

**Reform** [1] - 80:9

**refunds** [1] - 82:16

**refutes** [1] - 43:22

**regard** [2] - 78:9, 79:21

**regarding** [8] - 11:10, 12:19, 13:10, 14:4, 31:19, 31:21, 33:19, 33:23

**regards** [2] - 47:7, 57:5

**Region** [2] - 66:1, 66:9

**region** [1] - 46:25

**regret** [2] - 80:3, 80:5

**regularly** [1] - 71:19

**regulations** [1] - 82:8

**rehabilitation** [1] - 28:3

**rehash** [1] - 53:7

**reiterate** [4] - 7:7, 7:18, 48:16, 49:1

**reiterating** [1] - 9:17

**reject** [4] - 22:23, 34:4, 34:5, 34:6

**relate** [3] - 4:25, 6:21, 15:12

**related** [7] - 14:3, 16:1, 18:4, 24:21, 41:12, 41:14, 70:10

**Related** [1] - 3:22

**relates** [1] - 20:22

**Relating** [1] - 3:18

**relation** [1] - 46:25

**relationship** [1] - 67:4

**release** [13] - 23:7, 48:3, 75:25, 76:14, 77:25, 81:12, 81:13, 81:15, 81:16, 81:17, 81:19, 81:23, 82:20

**released** [5] - 5:20, 30:22, 31:3, 76:12, 81:22

**relevant** [2] - 26:14, 41:13

**reliability** [1] - 46:19

**relies** [1] - 18:19

**rely** [1] - 19:25

**remain** [1] - 52:18

**remained** [1] - 76:13

**remaining** [1] - 15:23

**remarkably** [1] - 79:8

**remorse** [3] - 14:25, 80:3, 80:4

**render** [1] - 53:15

**renovate** [1] - 70:19

**repeat** [1] - 15:4

**repeated** [3] - 12:3, 20:18, 26:6

**repeatedly** [9] - 11:23, 12:20, 28:12, 29:12, 29:16, 30:7, 30:14, 49:14, 73:12

**Report** [17] - 3:19, 4:18, 6:14, 15:11, 18:2, 27:18, 30:25, 32:10, 32:24, 47:10, 47:16, 55:3, 57:21, 61:11, 61:13, 61:23, 64:8

**report** [7] - 4:20, 67:13, 67:14, 67:17, 67:21, 69:12, 81:20

**Report's** [1] - 18:9

**reported** [9] - 61:24, 62:1, 62:3, 62:4, 62:23, 63:6, 63:10, 63:16, 64:3

**REPORTED** [1] - 84:15

**reportedly** [4] - 64:12, 65:7, 65:8, 65:12

**REPORTER** [1] - 1:24

**Reporter** [3] - 84:3, 84:14, 84:17

**reporter** [1] - 84:23

**reports** [1] - 63:25

**representatives** [3] - 63:14, 64:3, 70:12

**reproduction** [1] - 84:22

**Republic** [1] - 47:1

**request** [5] - 7:16, 45:13, 45:15, 46:14, 83:16

**requested** [2] - 67:16, 82:20

**requests** [2] - 16:3, 66:15

**require** [3] - 8:15, 36:8, 60:4

**required** [11] - 9:5, 28:14, 28:25, 33:11, 34:19, 39:24, 67:21, 68:18, 69:17, 77:22, 79:6

**requirement** [6] - 8:15, 33:15, 60:14, 60:15, 79:7, 79:11

**requirements** [6] - 13:13, 13:18, 33:25, 40:24, 60:13, 67:18

**requires** [12] - 8:13, 20:22, 23:15, 23:20, 25:19, 29:2, 33:14, 36:19, 37:7, 39:15, 69:8, 79:9

**requiring** [2] - 10:17, 28:1

**requisite** [3] - 35:14, 36:17, 37:4

**researched** [2] - 52:6, 68:21

**researching** [1] - 67:11

**reserving** [1] - 11:1

**residence** [3] - 42:6, 67:1, 77:10

**residential** [2] - 42:4, 77:7

**respect** [26] - 5:2, 6:20, 7:1, 7:21, 10:6, 28:20, 41:10, 44:4, 46:24, 47:23, 47:25, 48:11, 50:13, 51:25, 52:24, 54:6, 55:6, 57:18, 60:8, 61:2, 61:24, 69:19, 69:20, 76:21, 78:23, 78:24

**respectfully** [4] - 8:5, 8:11, 51:4, 51:9

**respond** [2] - 7:11, 11:4

**responded** [1] - 33:18

**response** [5] - 18:1,

29:10, 33:24, 42:23, 75:13

**responses** [1] - 52:13

**responsible** [5] - 33:22, 35:2, 35:12, 37:2, 69:21

**rest** [3] - 9:7, 14:7, 51:16

**restitution** [4] - 48:4, 81:4, 81:7, 81:11

**restraint** [1] - 20:18

**Restraint** [3] - 5:4, 16:24, 17:10

**result** [5] - 16:15, 20:3, 50:7, 58:19, 77:16

**resulted** [1] - 50:6

**resulting** [1] - 30:11

**retainers** [2] - 2:24, 69:16

**Retainers** [2] - 3:16, 44:17

**returned** [1] - 72:19

**reverse** [2] - 45:25, 68:12

**reverse-engineered** [1] - 45:25

**reverse-engineering** [1] - 68:12

**reviewed** [3] - 15:4, 19:1, 61:12

**revised** [1] - 4:19

**Ribbon** [1] - 62:11

**Rifle** [1] - 44:19

**rifle** [4] - 46:6, 46:9, 64:14, 68:10

**rifle-style** [1] - 64:14

**rifles** [2] - 64:25, 66:11

**rifling** [2] - 69:5, 69:7

**Rifling** [3] - 3:3, 3:13, 3:23

**rights** [3] - 52:2, 54:17, 78:25

**rings** [1] - 69:15

**Rings** [3] - 2:23, 3:16, 44:17

**ripley** [2] - 64:17, 64:21

**Ripley** [5] - 64:16, 64:23, 64:24, 65:1, 65:5

**rise** [1] - 19:15

**risk** [3] - 24:18, 45:21

**RMR** [1] - 1:24

**RMR,CRR** [2] - 84:13, 84:16

**robbery** [1] - 21:17

**ROBERT** [1] - 1:8

**Roggio** [139] - 2:2, 2:5,

2:15, 2:17, 2:20, 3:1, 3:6, 3:11, 3:14, 3:17, 3:20, 3:25, 4:7, 6:5, 14:3, 14:6, 14:24, 17:11, 17:13, 17:15, 17:18, 18:15, 18:18, 19:3, 23:6, 23:8, 24:17, 29:4, 29:19, 30:2, 30:6, 30:13, 31:5, 33:6, 33:10, 34:11, 37:25, 38:6, 38:8, 40:4, 40:12, 40:16, 40:25, 41:18, 41:20, 41:22, 42:2, 42:6, 43:2, 43:25, 44:2, 44:3, 44:14, 45:6, 45:15, 46:15, 48:13, 48:24, 51:6, 51:20, 52:8, 56:20, 56:24, 58:13, 60:5, 61:17, 62:21, 63:16, 63:19, 64:4, 64:11, 64:18, 64:19, 65:4, 66:10, 66:11, 66:14, 66:16, 66:17, 66:19, 66:23, 67:3, 67:13, 67:23, 67:24, 68:8, 68:9, 68:16, 69:3, 69:12, 69:15, 69:22, 70:17, 70:24, 70:25, 71:17, 71:21, 71:24, 71:25, 72:3, 72:19, 72:21, 72:22, 72:24, 73:22, 74:1, 74:2, 74:8, 74:14, 74:15, 74:17, 74:18, 74:25, 75:1, 75:9, 75:14, 75:15, 75:21, 76:1, 76:3, 76:4, 76:14, 76:19, 76:22, 76:25, 77:2, 77:5, 77:10, 77:13, 77:14, 77:17, 77:21, 77:25, 78:1, 80:10

**ROGGIO** [1] - 1:5

**Roggio's** [28] - 13:24, 18:13, 18:14, 23:22, 24:1, 25:8, 29:14, 30:9, 31:17, 31:18, 37:10, 41:23, 42:9, 44:22, 53:21, 57:25, 61:2, 69:13, 70:8, 70:14, 71:6, 71:20, 73:5, 73:10, 73:14, 73:18, 75:13, 76:15

**role** [1] - 32:11

**Role** [1] - 5:23

**Rolex** [1] - 70:19

**Ronald** [3] - 65:25, 66:6, 66:20

**15**

**room** [5] - 30:3, 72:20, 73:20, 74:6, 74:9
**roommates** [1] - 72:10
**Ross** [48] - 2:2, 2:15, 2:17, 2:20, 3:1, 3:6, 3:11, 3:14, 3:17, 3:20, 3:24, 4:7, 17:13, 18:13, 37:10, 38:5, 40:4, 40:12, 41:18, 41:20, 41:23, 42:1, 42:6, 42:9, 54:12, 54:13, 61:17, 63:16, 68:7, 69:3, 70:8, 70:14, 70:24, 71:3, 71:24, 72:3, 73:5, 73:10, 73:14, 73:22, 74:1, 74:25, 76:4, 77:2, 77:10, 77:21, 80:10
**ROSS** [1] - 1:5
**rubber** [1] - 12:23
**Rubber** [1] - 65:15
**rule** [1] - 21:6
**rules** [1] - 82:8
**Rules** [1] - 4:17
**run** [8] - 59:2, 73:18, 79:10, 80:14, 80:15, 80:17, 80:21, 81:18

## S

**s/Kristin** [1] - 84:13
**Saar** [90] - 18:13, 18:15, 20:13, 20:19, 22:18, 23:2, 23:6, 23:22, 24:1, 24:3, 24:16, 28:6, 28:8, 29:5, 29:24, 29:25, 30:3, 31:5, 31:10, 31:12, 31:15, 31:24, 33:7, 33:20, 34:6, 34:12, 34:13, 37:13, 37:22, 37:24, 38:3, 38:8, 40:3, 40:10, 40:17, 40:18, 42:21, 48:5, 55:5, 55:6, 56:14, 56:17, 68:15, 70:23, 70:25, 71:2, 71:5, 71:17, 71:24, 71:25, 72:2, 72:3, 72:5, 72:7, 72:10, 72:11, 72:16, 72:20, 72:23, 72:25, 73:1, 73:4, 73:7, 73:11, 73:17, 73:21, 73:25, 74:6, 74:10, 74:20, 74:24, 75:2, 75:11, 75:14, 75:17, 75:21, 75:23, 76:1, 76:5, 76:12, 76:15, 77:15,

77:16, 77:17, 77:18, 77:22, 77:25, 81:5
**SAAR** [1] - 18:14
**Saar's** [19] - 14:9, 24:22, 28:14, 33:22, 38:11, 40:6, 40:14, 72:10, 73:6, 73:13, 73:15, 73:21, 74:2, 75:11, 75:16, 75:17, 75:24, 76:4, 77:19
**sales** [1] - 64:14
**sample** [1] - 82:3
**sanctions** [2] - 37:19, 37:24
**sat** [3] - 52:4, 57:1, 58:12
**satisfied** [1] - 38:13
**satisfy** [6] - 33:14, 34:16, 40:24, 60:17, 79:13, 81:13
**Sauer** [1] - 64:25
**Sauer's** [1] - 65:2
**save** [1] - 77:18
**savings** [1] - 64:23
**saw** [3] - 70:17, 74:15, 76:8
**scale** [1] - 79:9
**scenario** [1] - 13:24
**Schedule** [1] - 83:1
**schematics** [1] - 68:21
**scheme** [6] - 39:5, 39:20, 40:16, 50:13, 50:24, 70:11
**school** [1] - 61:20
**School** [1] - 61:21
**Science** [1] - 61:22
**scope** [1] - 78:11
**SCOTT** [1] - 1:14
**SCRANTON** [2] - 1:9, 1:25
**Scranton** [2] - 1:13, 84:19
**screamed** [1] - 72:20
**screaming** [2] - 30:4, 74:7
**se** [1] - 50:19
**search** [3] - 42:5, 45:25, 77:10
**searching** [1] - 67:9
**seat** [2] - 56:2, 72:14
**Second** [2] - 16:19, 39:8
**second** [9] - 11:8, 12:12, 15:17, 22:21, 22:23, 23:25, 33:10, 34:15, 40:12
**secondary** [2] - 41:25, 77:4
**section** [2] - 32:5, 61:15

**Section** [24] - 1:15, 5:4, 5:7, 6:24, 16:12, 19:12, 20:1, 23:20, 25:12, 25:20, 33:25, 35:19, 35:24, 36:23, 36:25, 37:15, 41:3, 45:16, 47:19, 59:24, 60:17, 80:6, 84:6
**sections** [1] - 17:6
**secure** [1] - 63:7
**security** [3] - 45:19, 46:9, 63:12
**Security** [2] - 42:6, 77:11
**see** [2] - 15:8, 52:11
**seeing** [1] - 14:22
**seem** [2] - 56:25, 73:24
**seemingly** [2] - 65:22, 72:18
**seized** [1] - 25:10
**seizure** [2] - 21:18, 25:23
**self** [1] - 62:23
**self-reported** [1] - 62:23
**semi** [1] - 68:11
**semi-automatic** [1] - 68:11
**send** [1] - 75:23
**senior** [2] - 73:20, 73:22
**sense** [1] - 9:2
**sensitive** [5] - 12:22, 29:13, 30:7, 30:11, 73:12
**sent** [1] - 78:1
**sentence** [34] - 2:3, 15:1, 15:2, 19:13, 20:4, 20:9, 25:13, 47:9, 47:19, 49:2, 49:15, 49:16, 49:21, 50:12, 51:5, 51:11, 54:4, 57:17, 57:21, 58:7, 59:2, 59:6, 59:25, 60:7, 60:16, 76:21, 78:23, 79:10, 79:11, 79:14, 79:15, 79:25, 83:11, 83:14
**Sentence** [16] - 4:18, 6:13, 15:10, 18:2, 18:9, 27:18, 27:22, 30:25, 32:9, 32:24, 47:16, 55:2, 61:11, 61:13, 61:23, 64:8
**sentences** [3] - 48:20, 58:1, 58:5
**sentencing** [15] - 11:21, 14:15, 19:15, 27:2, 31:2, 41:11,

50:24, 51:12, 51:25, 56:16, 56:19, 56:22, 58:25, 60:23, 79:13
**Sentencing** [51] - 1:8, 5:3, 5:5, 5:10, 5:14, 5:18, 5:23, 6:2, 6:20, 6:22, 9:18, 10:21, 11:7, 11:8, 12:15, 14:4, 14:8, 15:24, 16:4, 16:12, 16:14, 16:25, 17:8, 17:20, 17:24, 18:7, 18:10, 25:15, 26:23, 27:8, 27:11, 27:24, 29:4, 30:24, 32:15, 33:12, 34:20, 38:13, 38:22, 41:15, 42:13, 44:21, 45:9, 45:14, 48:10, 48:15, 50:3, 52:11, 60:20, 61:5, 80:9
**separate** [12] - 15:21, 21:25, 22:2, 22:5, 23:1, 23:11, 23:14, 23:16, 24:6, 24:11, 35:18, 38:22
**separation** [1] - 62:9
**September** [1] - 71:21
**Sergeant** [1] - 65:25
**serious** [13] - 5:12, 10:6, 10:9, 12:19, 13:8, 19:20, 21:11, 27:21, 27:23, 28:4, 28:6, 30:17, 37:17
**seriousness** [5] - 57:18, 59:11, 60:7, 78:9, 78:22
**service** [2] - 61:24, 65:4
**Service** [1] - 62:11
**Services** [2] - 3:8, 63:7
**services** [4] - 39:2, 39:4, 40:13, 40:15
**session** [1] - 23:5
**sessions** [8] - 17:18, 18:18, 23:3, 23:9, 23:24, 24:23, 29:24, 75:5
**set** [11] - 2:2, 15:23, 27:8, 43:8, 59:24, 61:15, 66:23, 67:2, 68:9, 68:13, 84:9
**setting** [2] - 67:10, 67:19
**several** [5] - 13:23, 16:15, 21:3, 68:14, 73:9
**severe** [13] - 10:12, 10:22, 11:15, 12:3, 13:2, 13:3, 24:13,

26:6, 28:25, 29:2, 37:23, 49:6, 68:1
**severest** [1] - 79:19
**severity** [1] - 29:5
**sexually** [1] - 26:13
**shall** [5] - 80:24, 81:3, 81:12, 81:20, 83:8
**share** [1] - 82:21
**shared** [1] - 71:12
**sharp** [1] - 73:18
**sheer** [1] - 59:19
**Sheet** [1] - 83:1
**ship** [1] - 44:23
**shipped** [3] - 41:21, 44:14, 77:1
**shipping** [3] - 22:20, 44:12, 72:16
**shirts** [1] - 65:12
**shit** [3] - 54:15, 54:24, 54:25
**shocks** [2] - 28:11, 73:11
**short** [3] - 7:9, 21:7, 59:12
**shorthand** [1] - 1:22
**shot** [1] - 53:8
**show** [3] - 14:20, 23:4, 74:12
**showed** [2] - 30:1, 70:6
**showing** [1] - 71:6
**shown** [3] - 80:2, 80:3, 80:4
**shows** [5] - 31:10, 37:21, 38:10, 46:15, 62:6
**shut** [1] - 64:15
**side** [1] - 56:11
**Sig** [2] - 64:24, 65:2
**sign** [1] - 68:18
**significance** [1] - 25:3
**significant** [12] - 20:2, 22:4, 24:5, 24:10, 24:18, 24:21, 24:23, 27:4, 29:2, 66:22, 70:23
**significantly** [4] - 42:17, 49:3, 49:6, 51:3
**Siim** [50] - 14:9, 14:11, 18:13, 22:18, 23:2, 23:22, 24:3, 28:6, 28:8, 29:24, 31:24, 33:22, 37:13, 37:22, 38:3, 38:8, 40:14, 42:21, 48:5, 55:4, 68:14, 70:23, 70:25, 71:5, 71:24, 72:3, 72:20, 72:23, 72:25, 73:1, 73:4, 73:6,

74:6, 74:20, 74:24, 75:11, 75:16, 75:17, 75:21, 75:23, 75:24, 76:4, 76:5, 77:15, 77:16, 77:18, 77:19, 77:22, 81:5
**SIIM** [1] - 18:13
**silent** [1] - 52:18
**similar** [13] - 11:20, 48:22, 49:18, 49:19, 49:22, 50:2, 50:4, 51:11, 52:2, 60:24, 60:25
**similarities** [2] - 50:11, 50:20
**similarly** [2] - 48:21, 51:10
**similarly-situated** [2] - 48:21, 51:10
**simple** [3] - 9:4, 10:4, 45:25
**simplest** [2] - 8:22, 9:15
**simply** [1] - 47:17
**Single** [1] - 66:25
**sit** [3] - 54:16, 54:19, 54:21
**sitting** [1] - 48:18
**situated** [2] - 48:21, 51:10
**situation** [3] - 10:23, 58:21, 73:25
**situations** [1] - 50:16
**six** [1] - 72:25
**Sixth** [2] - 18:23, 19:21
**Skate** [1] - 65:7
**sleeping** [1] - 76:11
**small** [1] - 56:7
**Smokey's** [1] - 65:10
**smuggling** [1] - 78:14
**Smuggling** [4] - 3:12, 3:13, 3:15, 3:16
**sold** [4] - 64:1, 64:12, 65:8, 65:12
**soldier** [2] - 38:2, 75:10
**soldiers** [41] - 17:15, 18:15, 28:9, 29:14, 33:1, 33:12, 34:12, 34:13, 34:16, 35:15, 36:12, 37:9, 37:12, 37:21, 38:1, 38:6, 38:7, 38:10, 40:2, 40:4, 40:6, 40:10, 62:14, 72:12, 72:17, 72:19, 72:23, 72:24, 73:1, 73:3, 73:4, 73:6, 73:10, 73:14, 73:17, 74:16, 74:17,

74:19, 75:4, 77:20
**someone** [7] - 13:21, 56:1, 56:3, 58:12, 66:14, 71:21, 83:5
**sometimes** [1] - 74:9
**somewhat** [1] - 61:3
**son** [2] - 49:3, 49:13
**soon** [1] - 72:6
**sophisticated** [1] - 46:5
**soul** [1] - 54:18
**sound** [2] - 26:18, 32:5
**sounds** [1] - 61:7
**source** [1] - 37:1
**space** [1] - 67:10
**Spartan** [1] - 72:16
**speaks** [4] - 6:16, 11:1, 48:17, 59:18
**special** [3] - 25:3, 48:5, 80:25
**specialized** [3] - 68:22, 69:6, 69:7
**specialized-type** [1] - 69:7
**specific** [8] - 4:25, 15:20, 27:20, 30:21, 39:2, 40:13, 46:24, 62:12
**Specific** [1] - 4:5
**specifically** [8] - 6:14, 35:1, 37:17, 39:7, 44:11, 50:3, 66:6, 68:16
**specify** [1] - 17:3
**specifying** [1] - 71:15
**spectator** [3] - 52:15, 52:19, 52:20
**spectrum** [1] - 79:7
**spell** [1] - 54:10
**spend** [1] - 14:7
**spending** [1] - 70:25
**spent** [3] - 52:5, 54:11, 74:5
**sponsor** [1] - 67:16
**stages** [1] - 67:18
**stand** [1] - 79:16
**standard** [5] - 10:14, 27:3, 27:14, 27:15, 81:25
**start** [2] - 67:9, 74:19
**state** [4] - 17:14, 20:10, 42:15, 45:16
**State** [9] - 2:25, 3:10, 66:19, 66:25, 67:22, 69:18, 69:19, 69:24, 81:24
**statement** [10] - 26:25, 42:17, 44:5, 48:12, 51:23, 54:2, 54:12,

55:4, 57:6, 63:11
**statements** [8] - 14:15, 42:10, 43:4, 43:12, 44:11, 44:22, 55:2, 78:3
**STATES** [2] - 1:1, 1:2
**states** [11] - 2:12, 5:19, 16:25, 30:25, 31:2, 32:24, 33:24, 41:17, 42:9, 45:15, 50:3
**States** [86] - 1:11, 2:2, 2:19, 2:22, 2:24, 3:4, 3:9, 3:13, 3:16, 4:4, 4:5, 5:3, 13:15, 13:18, 13:21, 13:22, 13:25, 16:4, 18:22, 19:12, 23:20, 25:4, 32:19, 33:15, 33:16, 33:25, 34:1, 34:2, 35:6, 35:9, 35:10, 35:22, 36:3, 36:5, 36:8, 36:9, 36:13, 36:14, 36:20, 36:21, 36:23, 36:24, 37:5, 37:8, 38:1, 38:20, 39:7, 39:9, 43:14, 43:15, 43:18, 43:21, 44:6, 44:7, 44:20, 45:20, 46:2, 46:3, 46:5, 46:10, 46:16, 46:17, 46:19, 46:23, 61:25, 62:6, 66:18, 67:21, 67:25, 69:3, 69:9, 69:10, 69:18, 69:19, 69:20, 71:2, 79:3, 79:5, 79:24, 80:25, 81:5, 82:22, 83:11, 84:4, 84:6, 84:17
**stating** [1] - 12:1
**stationed** [1] - 62:2
**Statute** [12] - 8:3, 9:10, 13:19, 21:5, 25:8, 34:17, 35:17, 35:18, 36:22, 37:7, 52:24
**statute** [2] - 17:1, 17:4
**Statute's** [1] - 33:15
**Statutes** [3] - 21:10, 21:16, 21:20
**Statutory** [3] - 36:7, 37:4, 38:4
**statutory** [5] - 12:14, 17:3, 20:21, 35:14, 36:16
**stay** [1] - 72:8
**stayed** [1] - 72:10
**stays** [1] - 56:4
**stealing** [1] - 70:24

**step** [4] - 32:21, 32:25, 38:20, 56:1
**stick** [1] - 75:20
**still** [5] - 10:5, 14:24, 40:11, 50:24, 55:15
**Stipulation** [1] - 83:9
**stomach** [2] - 73:2, 73:16
**stomped** [1] - 73:3
**stood** [2] - 73:1
**stop** [2] - 55:14, 74:20
**stopped** [3] - 71:19, 72:17, 76:16
**store** [1] - 19:23
**story** [3] - 23:19, 42:3, 77:6
**strap** [1] - 75:25
**Street** [2] - 1:20, 65:7
**strict** [1] - 58:11
**Stroudsburg** [5] - 41:24, 61:20, 67:1, 70:19, 77:3
**struck** [4] - 28:11, 29:12, 30:6, 72:13
**structured** [1] - 7:23
**Structures** [2] - 19:10, 19:22
**struggles** [1] - 56:12
**studied** [1] - 7:15
**stuff** [1] - 54:20
**style** [1] - 64:14
**subject** [2] - 13:25, 17:2
**subjected** [1] - 20:19
**submissions** [5] - 4:23, 7:4, 9:8, 9:20, 15:5
**submit** [5] - 8:5, 8:11, 49:5, 51:4, 82:4
**submitted** [10] - 6:18, 6:19, 47:10, 52:12, 53:17, 53:18, 53:23, 55:2, 57:6, 70:5
**subsection** [3] - 23:20, 25:21, 36:25
**substance** [2] - 82:4, 82:5
**substantial** [3] - 4:23, 22:15, 22:16
**substantive** [1] - 21:17
**subsumed** [1] - 24:2
**suffer** [3] - 21:19, 24:24, 54:23
**suffered** [1] - 20:2
**suffering** [5] - 13:2, 37:18, 76:18, 78:25
**sufficient** [3] - 21:8, 60:16, 79:12
**sufficiently** [1] - 76:20

**suffocate** [1] - 73:7
**suffocated** [2] - 28:9, 29:18
**suffocating** [2] - 12:20, 12:21
**suffocation** [1] - 75:7
**suggested** [3] - 31:24, 47:12, 57:22
**suggestions** [1] - 56:19
**suggestive** [1] - 19:2
**suggests** [1] - 10:19
**suicide** [1] - 55:20
**suite** [1] - 1:12
**Sulaymaniyah** [3] - 67:6, 68:25, 72:15
**sum** [2] - 39:17, 40:20
**summarize** [1] - 7:8
**summer** [1] - 71:4
**superseding** [7] - 2:6, 2:9, 15:13, 17:14, 18:12, 44:16, 44:18
**supervise** [1] - 82:10
**supervised** [5] - 48:3, 81:12, 81:13, 81:17, 81:23
**supervision** [2] - 84:11, 84:23
**Supplemental** [2] - 29:4, 48:15
**supplied** [3] - 46:5, 51:13
**supplier** [1] - 69:16
**suppliers** [1] - 68:24
**support** [10] - 18:19, 19:2, 20:24, 21:2, 25:1, 28:22, 42:23, 45:14, 63:12, 70:14
**supported** [2] - 29:11, 63:2
**supposed** [1] - 52:19
**Supreme** [2] - 43:18, 60:14
**surgery** [1] - 28:2
**surprising** [1] - 54:14
**survive** [2] - 11:16, 64:15
**suspend** [1] - 75:18
**sustained** [3] - 24:1, 27:14, 27:21
**SUV** [1] - 72:14
**Suzy** [3] - 54:7, 54:9, 67:8
**SUZY** [1] - 54:9
**sworn** [1] - 43:3

**T**

**t-shirts** [1] - 65:12
**table** [1] - 76:1

**17**

**Tactics** [4] - 63:10, 63:15, 63:25, 64:3
**Tai** [1] - 35:9
**tai** [1] - 37:5
**Talabani** [5] - 66:2, 66:4, 66:6, 66:15, 66:20
**Talabanis** [1] - 68:4
**talks** [2] - 58:2, 58:3
**tamper** [1] - 82:6
**targeting** [1] - 73:12
**tase** [1] - 74:16
**tased** [4] - 29:12, 30:7, 30:11, 73:12
**taser** [5] - 29:6, 30:9, 73:10, 73:11
**tasing** [1] - 75:7
**tasked** [1] - 10:11
**tasking** [1] - 12:21
**taught** [1] - 76:2
**tax** [1] - 82:15
**Taylor's** [2] - 49:3, 49:13
**tea** [1] - 75:15
**team** [1] - 53:2
**technical** [1] - 68:15
**telephone** [5] - 41:22, 64:5, 65:2, 72:6, 81:8
**telephonic** [1] - 77:2
**temporary** [1] - 21:18
**ten** [3] - 49:16, 52:13, 58:5
**term** [9] - 31:7, 48:8, 48:9, 65:9, 80:12, 80:13, 80:23, 81:7, 81:17
**terminated** [2] - 65:15, 67:4
**terms** [3] - 34:24, 80:16, 80:18
**territory** [1] - 10:8
**test** [1] - 32:21
**testified** [13] - 29:12, 43:25, 44:25, 70:12, 75:22, 76:1, 76:3, 76:5, 76:7, 76:9, 77:19, 77:21, 77:25
**testify** [1] - 43:19
**testimony** [8] - 31:7, 31:17, 32:2, 42:11, 46:8, 77:13, 77:14, 78:4
**testing** [3] - 82:4, 82:6, 82:7
**text** [1] - 75:1
**thankful** [1] - 56:11
**THE** [29] - 1:1, 1:1, 1:8, 1:10, 1:19, 2:1, 4:23, 7:10, 7:12,

8:24, 9:24, 11:3, 15:4, 47:14, 47:25, 51:14, 51:18, 51:22, 51:24, 53:20, 53:24, 54:5, 54:10, 57:4, 57:9, 59:16, 59:23, 83:21, 83:23
**themselves** [5] - 9:19, 22:11, 58:6, 68:23, 77:23
**theory** [1] - 22:25
**therapy** [1] - 56:14
**thereafter** [3] - 6:23, 72:6, 77:23
**therefore** [9] - 15:15, 15:20, 21:1, 23:16, 32:13, 38:5, 40:20, 41:14, 77:17
**Third** [12] - 18:23, 18:24, 21:4, 32:20, 35:5, 35:10, 35:11, 39:9, 43:15, 43:16, 83:12
**third** [4] - 15:22, 23:12, 39:3, 40:15
**thoroughly** [1] - 7:15
**thoughts** [2] - 55:20, 55:23
**thousands** [1] - 70:13
**threatened** [5] - 74:14, 75:23, 75:25, 77:23, 78:1
**three** [13] - 32:21, 32:25, 38:20, 40:3, 40:21, 41:19, 48:3, 49:4, 53:1, 55:18, 76:23, 81:8, 81:17
**three-step** [3] - 32:21, 32:25, 38:20
**threshold** [1] - 29:1
**throat** [6] - 28:11, 29:14, 30:8, 73:5, 73:13, 75:15
**throughout** [1] - 80:2
**tipped** [1] - 72:3
**tire** [1] - 65:14
**Tire** [1] - 65:14
**Title** [5] - 19:12, 23:19, 33:25, 37:15, 84:6
**title** [1] - 36:23
**today** [9] - 2:2, 10:24, 14:3, 54:2, 55:4, 57:15, 58:2, 59:9, 80:2
**TODD** [1] - 1:11
**together** [3] - 68:22, 71:7, 74:10
**took** [8] - 38:1, 40:7, 40:8, 57:1, 72:14, 72:20, 75:15, 79:3

**tool** [1] - 75:10
**tools** [4] - 41:21, 69:6, 69:21, 77:1
**Tools** [3] - 69:6, 69:11, 78:14
**torture** [50] - 8:6, 11:15, 11:20, 12:2, 12:7, 12:9, 13:1, 13:17, 20:14, 20:18, 23:2, 23:5, 23:9, 23:15, 23:23, 24:2, 24:17, 24:23, 25:19, 25:25, 26:5, 28:5, 28:8, 29:11, 29:24, 33:22, 34:13, 36:24, 37:13, 38:1, 38:3, 38:8, 40:8, 49:5, 50:9, 55:14, 58:12, 58:20, 58:21, 61:2, 73:21, 74:18, 75:8, 76:4, 77:15, 77:19, 78:13, 79:1, 79:17
**Torture** [39] - 2:14, 2:16, 7:24, 8:13, 13:13, 13:14, 13:16, 13:17, 13:19, 13:23, 17:22, 18:4, 18:5, 19:7, 23:11, 23:17, 23:19, 25:6, 25:7, 26:16, 28:24, 33:2, 33:14, 33:24, 34:3, 34:17, 35:17, 35:18, 35:23, 36:8, 36:19, 37:4, 37:7, 37:15, 38:4, 49:16, 49:25, 50:19, 78:13
**tortured** [15] - 11:14, 11:22, 14:24, 17:17, 18:17, 20:14, 25:9, 30:3, 37:21, 40:3, 40:10, 72:25, 74:25, 75:2, 77:23
**tortures** [1] - 13:21
**torturing** [2] - 55:16, 74:20
**total** [3] - 47:12, 48:6, 81:1
**totality** [1] - 11:18
**touch** [1] - 9:20
**toward** [1] - 70:16
**towards** [1] - 56:20
**toys** [1] - 71:1
**traditional** [1] - 21:6
**trafficking** [1] - 79:18
**trampled** [1] - 78:25
**transcript** [5] - 1:22, 14:19, 84:7, 84:10, 84:22
**TRANSCRIPT** [1] - 1:7
**transcription** [1] -

1:22
**Transfer** [1] - 3:24
**transferred** [1] - 68:5
**Transferring** [1] - 4:3
**Transfers** [4] - 68:6, 70:4, 70:7, 70:9
**Transmitting** [1] - 4:3
**Transporting** [1] - 4:3
**transshipped** [1] - 69:14
**traumatized** [1] - 74:15
**traveled** [1] - 67:6
**treating** [1] - 82:14
**treatment** [4] - 10:18, 24:22, 82:9, 82:12
**trembling** [1] - 76:6
**trial** [31] - 2:4, 5:11, 5:16, 6:6, 6:15, 14:14, 14:18, 14:21, 28:17, 30:1, 31:17, 31:24, 31:25, 33:21, 41:8, 42:10, 43:5, 43:7, 44:13, 44:24, 48:18, 52:10, 52:17, 53:7, 58:13, 59:13, 59:17, 70:5, 70:12, 77:13, 78:4
**tried** [3] - 55:19, 76:15, 78:10
**Triin** [7] - 59:13, 71:12, 74:3, 75:25, 76:7, 76:8, 76:10
**true** [3] - 78:7, 78:8, 84:7
**truly** [1] - 79:23
**Trust** [1] - 81:10
**trust** [1] - 56:21
**truth** [1] - 43:3
**truthful** [1] - 44:23
**trying** [3] - 9:2, 53:7, 76:4
**Turkey** [2] - 47:1, 70:10
**twitching** [1] - 74:21
**Two** [2] - 36:4, 45:10
**two** [32] - 5:9, 5:13, 5:21, 6:1, 9:1, 10:2, 10:5, 10:9, 11:7, 14:4, 14:21, 18:19, 23:5, 27:20, 28:4, 30:17, 30:21, 30:25, 31:4, 33:5, 35:18, 40:3, 41:14, 41:16, 50:21, 53:25, 62:3, 67:8, 71:12, 72:19, 73:20, 75:2
**Two-Level** [1] - 45:10
**two-level** [8] - 5:9, 5:13, 6:1, 10:9, 28:4,

30:17, 30:25, 41:16
**two-week** [1] - 14:21
**type** [7] - 29:6, 49:11, 61:3, 65:9, 68:11, 69:7, 75:5
**typed** [1] - 52:6
**types** [1] - 59:4

**U**

**U.S** [10] - 13:15, 13:19, 13:20, 32:25, 42:2, 43:21, 45:4, 50:16, 63:8, 77:5
**U.S.C** [3] - 16:11, 16:15, 25:20
**unable** [3] - 29:17, 57:2, 83:15
**unanimous** [1] - 4:15
**unanimously** [11] - 2:15, 2:16, 2:19, 3:1, 3:6, 3:10, 3:13, 3:17, 3:20, 3:24, 4:7
**uncertain** [1] - 38:6
**unconsciousness** [1] - 28:13
**unconventional** [1] - 62:23
**under** [39] - 6:5, 9:11, 9:12, 20:4, 20:8, 20:9, 25:7, 26:15, 27:3, 27:14, 29:14, 34:13, 35:19, 35:20, 37:16, 37:22, 38:15, 38:18, 38:20, 41:8, 43:2, 43:12, 43:24, 43:25, 44:2, 44:5, 44:9, 44:20, 44:24, 44:25, 45:2, 45:6, 45:14, 52:1, 61:4, 62:9, 77:20, 84:11, 84:23
**underlying** [1] - 8:18
**undertake** [1] - 67:7
**undismissed** [1] - 2:6
**unexpected** [1] - 82:17
**unfortunately** [1] - 65:23
**uniform** [1] - 72:12
**Union** [1] - 66:4
**unique** [1] - 61:3
**Unit** [1] - 66:3
**UNITED** [2] - 1:1, 1:2
**United** [86] - 1:11, 2:2, 2:19, 2:22, 2:24, 3:4, 3:9, 3:12, 3:15, 4:4, 4:5, 5:3, 13:15, 13:18, 13:21, 13:22, 13:25, 16:4, 18:22,

19:12, 23:20, 25:4, 32:19, 33:15, 33:16, 33:25, 34:1, 34:2, 35:6, 35:9, 35:10, 35:22, 36:2, 36:4, 36:8, 36:9, 36:13, 36:14, 36:20, 36:21, 36:23, 36:24, 37:5, 37:8, 38:1, 38:20, 39:7, 39:8, 43:14, 43:15, 43:18, 43:21, 44:6, 44:20, 45:20, 46:2, 46:3, 46:5, 46:10, 46:16, 46:17, 46:19, 46:23, 61:25, 62:6, 66:18, 67:21, 67:25, 69:3, 69:9, 69:10, 69:17, 69:19, 69:20, 71:2, 79:3, 79:5, 79:24, 80:25, 81:4, 82:22, 83:11, 84:4, 84:6, 84:17

**units** [1] - 64:13
**unjustified** [1] - 28:18
**unlawful** [11] - 8:13, 8:16, 20:15, 20:17, 23:10, 23:22, 24:1, 26:12, 44:10, 46:21, 79:18
**Unlawful** [4] - 4:5, 5:4, 16:24, 17:10
**unlawfully** [5] - 5:17, 8:15, 22:19, 23:2, 23:6
**Unlawfully** [2] - 44:16, 44:19
**unless** [2] - 47:4, 84:23
**unnecessarily** [1] - 7:13
**unrefuted** [1] - 31:7
**unrelated** [1] - 70:18
**unsecured** [1] - 62:16
**unsupported** [1] - 28:19
**untruthful** [1] - 43:4
**unusual** [3] - 45:20, 61:18, 70:20
**unwarranted** [1] - 60:23
**up** [12] - 52:6, 55:20, 59:5, 65:10, 66:23, 67:2, 67:10, 67:20, 68:9, 68:13, 73:1, 74:22
**upset** [1] - 72:1
**USSG** [1] - 45:16
**utter** [1] - 79:2

**V**

**vacations** [2] - 70:18, 71:1
**valid** [2] - 45:8, 45:10
**value** [1] - 20:20
**varied** [1] - 61:2
**variety** [1] - 17:2
**various** [5] - 67:11, 67:18, 68:15, 71:6, 77:14
**vehicle** [2] - 19:19
**venture** [1] - 64:17
**verdict** [11] - 2:12, 4:15, 12:25, 33:21, 34:10, 43:23, 44:13, 44:21, 44:22, 45:5, 46:15
**verified** [2] - 63:5, 63:9
**versus** [4] - 7:22, 8:25, 10:22, 11:10
**Via** [1] - 3:23
**via** [4] - 66:8, 68:5, 71:13, 71:24
**victim** [40] - 5:16, 5:20, 8:13, 8:14, 10:17, 11:12, 11:14, 11:15, 12:11, 14:22, 14:23, 17:15, 17:16, 17:17, 18:12, 21:7, 21:18, 22:4, 22:15, 22:25, 23:15, 23:22, 24:6, 24:10, 25:20, 26:12, 27:21, 29:12, 29:20, 30:22, 31:3, 31:18, 32:3, 36:5, 49:17, 54:2, 54:7, 55:4, 57:6, 83:5
**victim's** [3] - 12:20, 26:11, 29:20
**victims** [10] - 11:22, 12:4, 25:9, 25:24, 26:6, 49:17, 53:25, 55:1, 55:3, 63:25
**view** [3] - 15:20, 46:15, 73:24
**Vilist** [4] - 71:13, 74:3, 74:16, 76:7
**violate** [1] - 79:24
**violated** [1] - 69:23
**Violating** [3] - 2:21, 3:2, 3:7
**violation** [4] - 16:11, 16:15, 19:12, 79:9
**Violations** [1] - 58:6
**violations** [3] - 78:15, 78:16, 79:8
**violently** [2] - 28:9, 73:3

**Virgin** [3] - 18:24, 20:24, 21:5
**visited** [1] - 73:20
**voice** [1] - 71:13
**volatile** [1] - 46:23
**vs** [1] - 1:4

**W**

**waived** [1] - 81:6
**walked** [2] - 52:14, 53:18
**wall** [1] - 62:16
**War** [1] - 46:3
**warrant** [4] - 15:15, 15:21, 42:6, 77:10
**warranted** [1] - 45:22
**Washington** [2] - 1:12, 1:18
**WASHINGTON** [1] - 1:25
**washington** [1] - 1:16
**watch** [3] - 14:23, 58:20, 74:10
**watches** [1] - 70:19
**water** [1] - 65:12
**WATT** [10] - 7:6, 7:17, 8:25, 9:25, 47:21, 48:14, 51:15, 51:19, 53:22, 83:22
**Watt** [7] - 7:12, 11:3, 47:17, 48:12, 53:11, 53:20, 83:21
**wealthy** [1] - 79:4
**weapon** [3] - 26:11, 45:24, 81:25
**weaponery** [1] - 79:18
**weaponry** [1] - 46:4
**weapons** [13] - 18:14, 46:4, 56:3, 64:14, 66:8, 68:12, 68:21, 68:23, 69:2, 70:2, 71:19, 72:4, 72:10
**Weapons** [1] - 3:19
**wearing** [1] - 73:3
**Wednesday** [1] - 72:9
**week** [1] - 14:21
**weigh** [1] - 24:25
**weighed** [1] - 22:7
**weighs** [2] - 22:24, 24:7
**well-known** [2] - 45:24, 50:22
**Wells** [3] - 67:4, 68:8, 70:6
**whole** [2] - 9:9, 53:2
**wide** [1] - 79:9
**wife** [1] - 66:12
**willful** [2] - 42:11, 78:4
**willfully** [1] - 41:9

**William** [1] - 1:20
**willingness** [1] - 79:24
**winnings** [1] - 82:16
**wire** [1] - 78:17
**Wire** [5] - 3:18, 3:22, 3:24, 68:5, 70:7
**wish** [2] - 7:5, 53:25
**wishes** [2] - 47:4, 53:20
**wit** [1] - 2:23
**within-mentioned** [1] - 84:8
**witness** [1] - 57:6
**witnesses** [3] - 70:12, 76:3, 77:19
**word** [1] - 55:13
**workers** [1] - 63:4
**world** [2] - 45:24, 46:24
**worthwhile** [1] - 60:3
**wow** [1] - 14:15
**wrapped** [3] - 28:13, 29:19, 75:16
**write** [1] - 57:2
**writing** [3] - 7:7, 15:6, 56:25
**written** [7] - 4:23, 7:4, 9:8, 9:20, 15:5, 15:22, 71:14
**Written** [3] - 2:25, 3:5, 3:10
**wrongdoing** [1] - 14:25
**wrote** [3] - 54:12, 67:13, 67:14

**Y**

**yanked** [2] - 28:12, 75:17
**Yeager** [1] - 84:13
**YEAGER** [4] - 1:24, 84:3, 84:13, 84:16
**Year** [1] - 65:14
**year** [2] - 62:8, 71:23
**years** [13] - 46:4, 48:3, 48:10, 49:16, 55:18, 57:23, 58:5, 58:7, 59:5, 61:18, 62:3, 80:12, 81:17
**York** [4] - 1:18, 42:1, 77:5

**Z**

**Zanyari** [1] - 66:3
**Zarya** [4] - 68:4, 70:7, 70:13, 71:18
**ZARYA** [1] - 68:4
**zeal** [1] - 21:12

**zero** [2] - 14:24, 14:25