1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :
                            :
                            :
                            :
    vs                      :    3:CR-18-97
                            :
                            :
                            :
ROSS ROGGIO                 :
                            :

    BEFORE:        THE HONORABLE ROBERT D. MARIANI

    PLACE:         COURTROOM NO. 4

    PROCEEDINGS:   JURY TRIAL

    DATE:          WEDNESDAY, MAY 10, 2023

APPEARANCES:

For the United States:

TODD K. HINKLEY, ESQ.
UNITED STATES ATTORNEY'S OFFICE
WILLIAM J. NEALON FEDERAL BUILDING
SUITE 311
SCRANTON, PA 18501-2830

SCOTT ANDREW CLAFFEE, ESQ.
DOJ-NSD
COUNTERINTELLIGENCE & EXPORT CONTROL SECTION
950 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20530

PATRICK JASPERSE, ESQ.
DOJ-CRM
1301 NEW YORK AVE., NW
WASHINGTON, DC 20530

For the Defendant:

GINO A. BARTOLAI, JR., ESQ.
238 WILLIAM STREET
PITTSTON, PA 18640

2

INDEX TO WITNESSES

| FOR GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KRISTY MERRING | 3 | 39 | 45 | |
| THOMAS HALL | 47 | 59 | 67 | |
| SYUZANA ABAYEVA | 73 | 103 | 110 | |
| FRANK MONTEFORTE | 111 | 120 | 123 | |

3

THE COURT:  Good morning, everyone.  Ready to proceed?

MR. HINKLEY:  We are, Your Honor.

THE COURT:  Call your next witness.

MR. HINKLEY:  Kristy Merring, Your Honor.

KRISTY MERRING, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.    Would you make sure the microphone is close to you so that --

A.    Okay.  You can hear me good?

Q.    Ms. Merring, where do you reside?

A.    I reside in Stroudsburg, Pennsylvania.

Q.    And do you know the defendant, Ross Roggio?

A.    Yes, I was married.

Q.    And is Ross Roggio in the courtroom today?

A.    Yes, he is.

Q.    Would you describe the clothing he's wearing?

A.    I'd have to look.  He's got a blue -- looks like a sport jacket on -- and a white shirt.

MR. HINKLEY:  Your Honor, we request that the record reflect that the witness has identified the defendant Ross Roggio.

THE COURT:  The record will so reflect.

4

BY MR. HINKLEY:

Q.    How long have you known Ross Roggio?

A.    Since 1988.

Q.    And how did you meet?

A.    We had met through my mother who was an assistant bakery manager at Weis markets in East Stroudsburg, and Ross worked in the deli department right -- they were, like, right next door to each other.  So they struck up a friendship, and he and I -- we never actually dated until, like, 1989.

Q.    How old were you in that timeframe?

A.    15 and a half.

Q.    So did there come a time when you married Mr. Roggio?

A.    Yes, we married on 12/12/12.

Q.    December 12th of 2012?

A.    Correct.

Q.    Where did you live during your marriage with the defendant?

A.    We first resided at 112 Deer Run Road.  The address is Stroudsburg, but technically it's in the Tannersville area. And then we had moved to his mom and step-dad's house at 116 Turkey Hill Court, Stroudsburg, and then purchased a home at 143 Indian Spring Drive, Stroudsburg, Pennsylvania.

Q.    Is Stroudsburg very far from Scranton?

A.    I believe it's maybe 45 minutes away, not very far.

Q.    And it's in Pennsylvania?

5

A.    Yes, it is.

Q.    Are you still the defendant's wife at this point?

A.    No, I'm not.  I'm divorced.

Q.    When did your divorce occur?

A.    May 9th of 2022 I was granted.

Q.    Was the divorce from the defendant smooth or was it acrimonious?

A.    Initially it was contentious, and then it became more or less acrimonious, you know.

Q.    So how would you describe your relationship to the defendant at this point?

A.    I don't have a relationship with him.

Q.    So I would like to speak to you about events occurring April of 2016.  Do you recall being visited by special agent Thomas O'Donnell on April 29th of 2016?

A.    Yes.

Q.    Had you ever met special agent O'Donnell prior to that day?

A.    No, I had not.

Q.    And where were you when you first met special agent O'Donnell?

A.    I was outside in the yard because there was construction being done on the house.

Q.    So that would be your marital residence at that point?

A.    Yes.

Q.   Did you mention the address of that?

A.   143 Indian Spring Drive, Stroudsburg, Pennsylvania, 18630.

Q.   What type of construction was going on if you recall?

A.   A large addition, a garage to house cars, and it had three rooms upstairs, which were to be, like, a media room.  I wanted a library, you know, and just, you know, some other kind of, like, play room of some sort, you know.

Q.   And how was that addition being paid for?

A.   Ross was paying for it through -- I think it was Percell or Parcel, you know -- that they were doing the construction, but he was paying for it.

Q.   And do you know the estimated cost of the construction project?  Do you recall that?

A.   It was somewhere around 290 some thousand dollars.

Q.   Back to your meeting with special agent O'Donnell, what do you recall from that meeting?  What happened?

A.   Well, I was outside watching the people.  They were redoing downspouts and pavers.  So I was talking to them, and then I had gotten a phone call from my ex mother-in-law, and she said that --

MR. BARTOLAI:  Objection, hearsay.

THE COURT:  Sustained.

BY MR. HINKLEY:

Q.   So at some point did special agent O'Donnell show up at your house?

A.    Yes.

Q.    Go from that point.

A.    Okay.  And Tom Bachman from the Pennsylvania State Police.

Q.    So Mr. O'Donnell was accompanied by another law enforcement officer?

A.    That's correct.

Q.    Okay.  Go ahead.

A.    Yeah.  So, you know, he asked me my name, and he wanted to know information, but I couldn't provide him the information that he wanted, you know.  So I got on my cell phone, and I called Ross Roggio up, and I handed the phone over to special agent O'Donnell, and that was it, and I just conversed with Tom Bachman as --

Q.    So you didn't listen to the conversation?

A.    No.

Q.    Okay.  Now, after this occasion where you handed the phone over to special agent O'Donnell with your husband, did you have an opportunity to speak to your husband in regards to what the conversation was about regarding the F.B.I. was at your house?

A.    After the fact.  After the fact that he had spoken with agent O'Donnell, I said, you know, what's up.

        MR. BARTOLAI:  Objection, Your Honor.  May we approach?  This is marital communications, Your Honor.  We filed a paper regarding this issue.

        THE COURT:  If you would take the jury out, please.

8

I am, of course, aware of motion in limine as well as my own -- my own ruling on that which essentially laid out the law as stated by the United States Court of Appeals for the Third Circuit in United States v. Hill.  My understanding of the law is that for testimony as opposed to conduct to be elicited from this witness there would have to be a foundation showing that there was a joint involvement in some criminal activity.  I haven't heard that yet.

MR. HINKLEY:  Your Honor, I can proffer that she will testify that she mailed items on behalf of the defendant which other evidence will show were controlled items.  She did not know that it was illegal to ship those items.  However, the government's position is that the defendant certainly knew that and so, therefore, the crime fraud exception should apply to this testimony even though she was a participant but not a knowing participant to the criminal activity.

THE COURT:  Mr. Bartolai?

MR. BARTOLAI:  I think the -- we have -- this has been brought up before.  Exactly.  Nothing has changed.  This individual -- in fact, it's even -- we're at the point now we're -- they're asking him about confidential marital communications that aren't even tailored regarding these packages.  It is just a blanket question about what he she spoke about after the F.B.I. came.  So again, there's no allegation here by the government that she's an alleged

coconspirator.  There has been no evidence to suggest for a minute that she's part of this and knowing participant, she aided and abetted or did anything to that effect.  In fact, the government's proffer says it all, she didn't know what was in the packages.  She just went there.  The government said that he knew, and they haven't proven that yet I submit, Your Honor.

So I think that this testimony is clearly marital communications done in private, confidential marital communications, Your Honor.  The government hasn't shown otherwise.

THE COURT:  Well, our circuit -- and I won't read the entire opinion obviously -- but the essence of it is stated here, and I quote, where certain communications have to do with the commission of a crime in which both spouses are participants, the conversation does not fall within the marital privilege.  Now, I don't -- unless you give me more that suggests that Ms. Merring was in some way aware of the actions that Mr. Roggio is alleged to have undertaken, I don't have anything to suggest that she was a joint participant in the criminal activity.

It may very well be.  I understand she delivered from the prior submissions in this case -- I understand she delivered certain materials that were mailed to Mr. Roggio's home by a manufacturer, that she took those and went to the packaging store and she mailed those.  I think that's entirely

admissible, but to -- to get into marital communications without any more than I've heard, I'm going to sustain Mr. Bartolai's objection.

MR. HINKLEY:  May I spend a moment with the witness to make sure she doesn't get into any statements?

THE COURT:  Okay.

MR. HINKLEY:  I will not elicit a question which elicits that type of information.

THE COURT:  If you think, Mr. Bartolai, that the testimony reaches into the marital privilege communication, you can object, but --

MR. BARTOLAI:  I will, Your Honor.

THE COURT:  Okay.

MR. HINKLEY:  If I may have a moment.

THE COURT:  You may continue.

BY MR. HINKLEY:

Q.  So, Ms. Merring, I want to get back to point in your testimony you indicated that special agent O'Donnell together with the Pennsylvania State Police trooper had arrived to your home and you dialed your husband and handed the telephone to special agent O'Donnell.  Is that correct?

A.  Yes, it is.

Q.  And do you know where your husband was -- where you called him?

A.  I would assume that he would be in Sulaymaniyah, Iraq.

11

Q.    Let me ask you that -- there's a three ring binder next to you.  Would you take a look at that and find Government's Exhibit 6.1?

A.    Yes.

Q.    And are you familiar with these type of documents?  It's a multi-page document.

A.    Yeah -- no, not really.  I mean --

Q.    Let me ask you this.  What is this document?

MR. BARTOLAI:  Your Honor, I object.  She's indicated she doesn't know what the document is.

THE COURT:  That appears to be the case.

MR. HINKLEY:  Well, take a look at the document all three pages and tell me whether or not you're familiar with this type of a document.

THE WITNESS:  Okay.  It's a L. L. C., a document, incorporation for Roggio Consulting Company, L. L. C.  It was dated on September 5th of 2014.

BY MR. HINKLEY:

Q.    So does it appear to be a Pennsylvania Department of State application for an L. L. C.?

MR. BARTOLAI:  Your Honor, objection, lack of foundation.

MR. HINKLEY:  She just indicated it was, Your Honor.

MR. BARTOLAI:  Objection, hearsay.

MR. HINKLEY:  If I may, Your Honor, there's a

12

certificate, which is the first page of the document.  It's a certified public record, so it's not hearsay.  Second, I'm just trying to establish the foundation counsel is requesting.

MR. BARTOLAI:  And, Your Honor, this inquiry began with her stating that she wasn't familiar with the document.  Anyone can read the document, so it's not helpful.

MR. HINKLEY:  I'm trying to get to that point.

MR. BARTOLAI:  I object.

THE COURT:  Ms. Merring, can you state that you understand the purpose and/or the contents of this document?

THE WITNESS:  Yes, I understand incorporation paperwork.

THE COURT:  Answer the question.  Overruled.

BY MR. HINKLEY:

Q.   How do you know about these type of documents?

A.   When I was much younger, I used to work for an attorney in East Stroudsburg, and I used to do incorporation paperwork documents for L. L. C.s.

Q.   I believe you just previously indicated that this appears to be an application by the Roggio Consulting Company, L. L. C.  Is that right?

A.   That's correct.  That's what the entity name states.

MR. HINKLEY:  Your Honor the government moves for admission of Government's Exhibit 6.1.

MR. BARTOLAI:  We have an objection, Your Honor.

13

THE COURT:  6.1 is admitted over the objection.

MR. HINKLEY:  May we publish, Your Honor?

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    And who does it indicate was applying for the limited liability corporation in this document?

A.    Ross Roggio, address 116 Turkey Hill Court, Stroudsburg, Pennsylvania 18360.

Q.    Are you familiar with that address 116 Turkey Hill Court, Stroudsburg?

A.    Yes, that is his mother and stepfather's home.

Q.    Would you go to the next part down?  Does it indicate the name of the limited liability company being created by this application?

A.    Yes, it's Roggio Consulting Company, L. L. C.

Q.    And again, that's the address of the proposed corporation, correct?

A.    Yes, 116 Turkey Hill Court, Stroudsburg, Pennsylvania, 18360, Monroe County.

Q.    Does it indicate who the organizer of this particular corporation is?

A.    Yes, Ross W. Roggio.

Q.    Third page.  And it appears there's a signature on this page.  Can you recognize that signature?

A.    Yes, this would be Ross W. Roggio's signature.

Q.    What was the date of the signature affixed to this particular document?

A.    September 5th of 2014.

Q.    So getting back to again the visit with special agent O'Donnell to your home, do you recall shipping items to Iraq?

A.    Yes.

Q.    And to whom did you ship those items to?

A.    To Ross W. Roggio on his direction.

Q.    Did you ship items to Mr. Roggio on more than one occasion?

A.    Yes, I did.

Q.    The items that you shipped to Mr. Roggio in Iraq, did you purchase of any of those items?

A.    No, I did not.

Q.    Do you know who purchased those items?

A.    No.

Q.    When you shipped those items to Mr. Roggio in Iraq, how did you do that?  How did you accomplish that?

A.    He would tell me what packages.

        MR. HINKLEY:  One moment, Your Honor.

        THE WITNESS:  I apologize.

        MR. HINKLEY:  May we approach?

        (The following discussion took place at sidebar:)

        MR. HINKLEY:  So the witness has been unresponsive and keeps bringing up the husband even though I told her not to

testify in regards to him requesting that.  So I just want to give her a break.  I don't know if the Court wants -- how the -- wants me to talk to her again or.

MR. BARTOLAI:  I think she can --

MR. HINKLEY:  He told me to ship them.

MR. BARTOLAI:  That has been consistent with the testimony so far.

THE COURT:  I don't think it's inappropriate.

MR. BARTOLAI:  It could get there.  I know where you're coming from.

MR. HINKLEY:  I want the record to reflect I'm not soliciting that.

THE COURT:  As long as she's not testifying that he told me something of a nature that relates to his -- relates to the allegations against him, she can say he told her to ship this or --

MR. BARTOLAI:  Confidential marital communications.

MR. HINKLEY:  I will get into that these items that you shipped.

BY MR. HINKLEY:

Q.   These items you shipped to Mr. Roggio in Iraq, they were -- who asked you to ship them there?

A.   Ross Roggio.

Q.   So I had asked you how you got this accomplished.  How you did you ship items?  Did you go to a particular place to do

16

that?

A.    Yes, I went to East Stroudsburg to the Packaging Place because they had DHL there which they deliver internationally. So that's where I would send the packages that he requested for me to send.

Q.    There's a packaging -- the name of the business or just I -- I just went to the packaging place?

A.    No, that's the actual name of the business, the Packaging Place.

Q.    In the three ring binder I think you will find Government's Exhibit 8-4.  Do you recognize this document?

A.    Yes, I do.

Q.    What is this document?

A.    This is from the Packaging Place.  It's a, like, an item list if you would say shipping to -- yeah, shipping to and shipping from and, you know, it's --

Q.    Would this be a receipt of one of the shipments you did?

A.    Yes, that is correct, because my signature is down on the bottom of the receipt.

Q.    At the bottom does it appear to be a signature?

A.    That is my signature.

        MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 8.4.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 8.4 is admitted.

MR. HINKLEY:  If I may publish, Your Honor.

THE COURT:  Yes.

BY MR. HINKLEY:

Q.   So again, this is a Packaging Place receipt.  Is that correct?

A.   That is correct.

Q.   And would you go through the top part, what was the date of this particular shipment?

A.   It would be March 29th of 2016.

Q.   To whom was the shipment going?

A.   Ross Roggio.

Q.   And what was the address that it was being sent to?

A.   Forgive me if I pronounce incorrectly -- Baharan residential complex building, floor No. 2, office 10, Sulaymaniyah, Kurdistan region of Iraq.

Q.   And there's a phone number there.  Do you know whose phone number that is?

A.   Yes, that would have been Ross Roggio's telephone number, 570-977-8102.

Q.   And does it indicate from whom the package is being shipped?

A.   Yes, my name Kristy L. Roggio, and my address was 143 Indian Spring Drive, Stroudsburg, Pennsylvania, 18360.

Q.   And if we can go down to the bottom part, is that your signature?

A.    Yes, it is.

Q.    And the date you signed this?

A.    3/29/2016.

Q.    Do you recall what type of items that you were shipping on this occasion generally?

A.    No, I never looked in any of the boxes.  They were just being placed out for me, and Ross Roggio would direct me to, ship these over to me in Iraq, but --

Q.    So let me ask you this.  During this timeframe, were boxes delivered to your home?

A.    Yes.

Q.    Were those purchased by you?

A.    No.

Q.    Do you know who purchased those?

A.    I can only make an assumption.

Q.    I don't want assumptions.

A.    Yeah.

Q.    Are you used to having strangers have boxes delivered to your house?

A.    No, it would have been under Ross Roggio's direction.

Q.    And so when those boxes arrived, there were occasions, were there not, when you mailed those to him?

A.    Yes, that is correct.

Q.    Did you open any of those boxes?

A.    No, I did not.

Q.    Do you know anything that was in those boxes?

A.    No.

Q.    Do you have any experience in export law and what is allowed to be shipped or not shipped?

A.    No.

Q.    I would ask you to look at Government's Exhibit 9.6.

A.    Pardon me.  You said 9.6?

Q.    Yes.  Did you get that in front of you?

A.    Yes, I do.

Q.    The first page of 9.6 appears to be a certification business records.  Is that right?

A.    Yes, that's what it states.

Q.    On the second page of that document -- or that exhibit -- what's written on the top left part of the document?

A.    Fed Ex Services Solutions and Technology.

Q.    And --

          MR. BARTOLAI:  What page, I'm sorry?

          MR. HINKLEY:  Second page of Government's Exhibit 9.6.

BY MR. HINKLEY:

Q.    And there appears to be a signature on the bottom right of the second page.  Do you recognize that signature?

A.    Yes, that would have been my signature.

          MR. HINKLEY:  Your Honor, the government is moving for the admission of Government's Exhibit 9.6.

20

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 9.6 is admitted.

MR. HINKLEY:  Would you publish it, please?  Go to the second page.

BY MR. HINKLEY:

Q.    In regards to the second group, the shipper information --

A.    Okay.

Q.    -- who was is indicating is the shipper?

A.    The shipper is a Bill Matthew.

Q.    The company name?

A.    O. M. L.

Q.    The address of the shipper?

A.    6316 Yadkin Road, Fayetteville, North Carolina.

Q.    Going down to the next part the recipient, who is the recipient of this particular package?

A.    Ross Roggio.

Q.    The address?

A.    It is 143 Indian Spring Drive, Stroudsburg, Pennsylvania, 18360.

Q.    If I can recall your testimony earlier, that would have been the marital residence?

A.    That is correct.

Q.    And the shipment date at the top left, do you see that?

A.    Yes, that would be 4/25/2016.

Q.    Again, the bottom right indicating a signature?

21

A.    Yes, that would be my signature.

Q.    And to your recollection, would you have signed for this package?

A.    I must have.  My signature is on the paper, but --

Q.    Do you recall ever purchasing anything from Bill Matthew or O. M. L.?

A.    I don't even know who those people are actually.

Q.    Having received this package from O. M. L., do you recall what, if anything, you did with the package?

A.    I would just then take the package, and I would --

MR. BARTOLAI:  Objection, Your Honor.

THE COURT:  Just a moment.

MR. BARTOLAI:  I think the witness is speculating as to what she did with the package.  She hasn't said specifically what she did with the package.  We're not looking for speculation at this point, Judge.

THE COURT:  It's unclear from my reading of her testimony whether the objection should be sustained or not.  I am going to sustain it with the request that you rephrase it. Start over on that.

MR. HINKLEY:  Okay.

BY MR. HINKLEY:

Q.    Let me ask you generally then if -- or when packages arrived that you signed at your residence --

MR. BARTOLAI:  Your Honor, I object to the general

22

questioning.  I think it's even further diluted, Your Honor.
It's calling for speculation.

MR. HINKLEY:  If I may, Your Honor, I think what I'm trying to do is lay a foundation what she generally did with those.

THE COURT:  Try again.  Try again.

BY MR. HINKLEY:

Q.   You've indicated that at least on this occasion a package was delivered to your home, correct?

A.   That is correct.

Q.   Were there other times packages were delivered to your home?

A.   Yes.

Q.   What did you do with packages that were delivered to your home?

A.   I would put them in Ross' office, which was on the second floor of our home.

Q.   Did you ever look into any of these packages to see what was in the packages?

A.   No.

Q.   When this package, if you recall, arrived and you signed for it, was Mr. Roggio at home?

A.   To the best of my recollection, I do not believe that he was in -- at the house in the country.

Q.   And so was he away from home for an extended period of

time during the -- during this timeframe?

A.    Yes.

Q.    Where was he?

A.    Iraq.

Q.    Was he -- was he doing anything in Iraq or just visiting?

A.    No, he was working.

Q.    Very good.  During this timeframe of when this package arrived, which, I guess, would be the spring of 2016, did your then husband Ross Roggio -- did he have any manufacturing plants for firearms in Pennsylvania?

A.    He was working with some high school friends for Rebel Arms.

Q.    Was Rebel Arms a business that was operating at that point?

A.    It was up and coming in operation.  They had a web page, but --

Q.    Was it a factory operating during this timeframe when this package arrived?

A.    Not -- not to my knowledge.

Q.    Okay.  Is it your testimony there would be occasions where Mr. Roggio would come back to Pennsylvania during the timeframe when he's working out of Iraq?

A.    That is correct.

Q.    Where were there occasions where you believe it's possible that he may have --

MR. BARTOLAI:  Objection.  Everything is possible, Your Honor.  Speculation.

THE COURT:  I'll take it as an objection to the form of the question.  I'll sustain it.  You can rephrase.

BY MR. HINKLEY:

Q.   Was there ever an occasion where you believe that Mr. Roggio carried firearms related items on his trips to Iraq?

MR. BARTOLAI:  Your Honor, I object.  This calls for a lay opinion, a conclusionary opinion at that.  We object to it.

MR. HINKLEY:  I will proffer that she is going to describe a particular incident, Your Honor.

MR. BARTOLAI:  Your Honor, may we have a sidebar?

THE COURT:  Sure.

(The following discussion took place at sidebar:)

MR. HINKLEY:  I had to object to the hard time he's giving me, Your Honor.

MR. BARTOLAI:  Okay.  So I brought this up, Judge.  I have a 302, Judge, from her.  And, you know, there's -- I have a 302 that the government provided me in discovery in Jencks. It relates to an issue were these tools were laid out and then they weren't there anymore, Ross was on -- said he was on a ski trip in Switzerland she noticed the bag was half full.  It was speculative she came to the conclusion he might have taken those tools -- and not these gas rings from O. M. L., not these

firing pin retainers from O. M. L. but the rifle combo buttons from Drill Masters which we heard she shipped and she was of the opinion that he might have had -- they must have been in the bag.  It's entirely speculative, entirely prejudicial.

MR. HINKLEY:  So what she knows is she saw what appeared to be some type of drill, not going to be combo button.  She doesn't have any idea what a combo button is.  It appeared to drills in the home.  Mr. Roggio was taking a trip. She will say he was putting together his skis and telling her he was going to go on a skiing vacation.  So she will say he has the ski bag where he puts the skis on the inside but that it didn't appear to have the skis in it but it appeared to have something in it and that after he left those drills were gone.

THE COURT:  I think questions as to what she knows or what she saw are fair.  I mean, if you can live with -- if you can elicit answers as to what she knows, what she saw, you will be all right.  Beyond that, you should object.

MR. BARTOLAI:  The point -- one big point, Judge, and Todd, these are rifle combo buttons.  She's talking about and this Federal Express receipt that she got.  She's referring to these O. rings, gaskets and firing pin retainers.

MR. HINKLEY:  That's probably just in my inability to ask questions that we can clarify to the jury.

THE COURT:  You can clarify that.  What she knows, what she saw.

(The discussion at sidebar concluded.)

BY MR. HINKLEY:

Q.   So I'm going to try to set this up so you know what the incident that we're talking about and we can kind of zero in.

A.   Uh-huh.

Q.   Did there come a time when Mr. Roggio had indicated to you he was going on a ski trip?  Does that ring a bell about --

MR. BARTOLAI:  Your Honor, I object.  Now it's marital -- it's again these communications, Your Honor, between husband and wife.

THE COURT:  All I heard a question as designed to elicit an answer whether she knew Mr. Roggio was going on a ski trip.  Overruled.

THE WITNESS:  Yes.

BY MR. HINKLEY:

Q.   Do you recall anything about his packaging and some questions you had?

MR. BARTOLAI:  Relevance, questions she had, Your Honor, are irrelevant.

MR. HINKLEY:  I'm going to rephrase the question if I may.

THE COURT:  The question do you recall anything about his packaging would be appropriate.  The rest of it is not.

BY MR. HINKLEY:

Q.   Do you recall anything with his package -- packing for

27

that trip?  Why don't you tell the jury what happened?

A.    He -- you know, packed his -- he always packed his own bag.

Q.    Tell us -- the jury -- what happened on this particular incident.

A.    This particular incident what I noticed was the skis and the boots were left but the ski bag was gone.

Q.    And did you -- prior to Mr. Roggio packing his -- for this trip -- notice any tools around the house?

MR. BARTOLAI:  Objection, leading.

THE COURT:  Sustained.

THE WITNESS:  Tools that I'm not familiar with but items, you know, that were in his office.

BY MR. HINKLEY:

Q.    Were there items not in the office after he left for the ski trip?

A.    That is correct.

Q.    What were those items if you recall?

A.    Bars, like metal rods.

Q.    Are you familiar with what drills are?  Do you know what a drill is?

A.    Oh, yeah, yeah.

Q.    Were those bars drills?

A.    No.

Q.    Was there anything about the drills that were there that

28

were then gone?

MR. BARTOLAI:  Objection, Your Honor.  Foundation.

THE COURT:  Was there anything about the drills were there that were then gone?

MR. BARTOLAI:  It hasn't been --

THE COURT:  I am not sure I understand the question.  Sustained.  You can try it again.

MR. HINKLEY:  I'm going to move on I think.

THE COURT:  Very well.

BY MR. HINKLEY:

Q.   Did Mr. Roggio set up bank accounts for his business?

A.   Yes.

Q.   And do you know what financial institutions he used?

A.   Yes.

Q.   Which ones?

A.   The first financial institution was P.N.C. bank on North Ninth Street, Stroudsburg, Pennsylvania, and after a short term of working together they more or less told him he had to take his business elsewhere.  So --

Q.   Did he close his account then with P.N.C.?

A.   P.N.C. closed his account.

Q.   Then what happened at that point?

A.   Then he went to Wells Fargo on lower Main Street in Stroudsburg and opened a business account there.

Q.   And did you have access to those bank accounts?

A.    Only to the Wells Fargo account.

Q.    Did you ever spend money out of the Wells Fargo account?

A.    I was giving -- he would allow me to write checks for our house cleaner and, you know, if he directed me to write a check for something, I would write a check.  But he would give me, like, more or less, like, an allowance of $5,000 a month to do whatever with, you know, nails, hair, whatever.

Q.    Did you have free access to those accounts, or did you consult the defendant regarding use of the funds?

A.    Oh, yeah, I never took it upon my liberty to do so.  It, you know -- I don't work that way.

Q.    Did the defendant use funds from the Wells Fargo account for expenses or purchases himself?

A.    Yes.

Q.    What type of personal items did he spend money on?

A.    $190,000 on a BMW i8, a Cabota for his mother, a GLK Mercedes SUV for his mom and step-dad, Sea-Doos, trailer, Kawasaki Ninja motorcycle, various clothing items and watches, Rolex watches, yes.

Q.    During this timeframe did the defendant have any source of income other than his working in Iraq?

A.    No.

MR. BARTOLAI:  Your Honor, I object.  I think they have to -- the question -- a foundation needs to be established to show if she knows what his income is first.

30

THE COURT: I think Mr. Bartolai is correct. I don't want to strike that testimony without giving you an opportunity to lay a foundation for what knowledge she might have that would allow her to answer that question.

MR. HINKLEY: Certainly, Your Honor.

BY MR. HINKLEY:

Q. Did your husband at that point -- did he receive income from his work in Iraq?

A. Yes.

Q. Did he have any other source of income that you knew of during this timeframe?

A. Not that I'm aware of.

Q. In the binder there in front of you there are a number of photographs entitled government's 6.3 through 6.19. They are photographs, are they not?

A. Yes.

Q. Do you recognize what the photographs are of?

A. The first Government's Exhibit 6.3 is 143 Indian Spring Drive, the home.

Q. Generally speaking you recognize what these --

A. Absolutely.

Q. And do they accurately reflect your memory of what these photographs -- are the photographs accurate?

A. Yes.

MR. HINKLEY: Your Honor, the government is going to

31

move for admission of Government's Exhibit 6.3 through 6.19 inclusive.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 6.3 to 6.19 inclusive are admitted.

MR. HINKLEY:  And I am assuming I may publish to the jury, Your Honor?

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    Government's Exhibit 6.3, would you tell the jury what this is?

A.    That is our marital home at 143 Indian Spring Drive, Stroudsburg, Pennsylvania.

Q.    6.4?

A.    That is partial the three car garage initially from the left to the right.  That was existing.  The next house where there are technically four garage doors, that was an addition that was built.

Q.    Okay.  Now, the funds to purchase this home, do you know where they came from?

A.    I was told it was a --

MR. BARTOLAI:  Objection, Your Honor.

THE COURT:  Sounds like it's going to be a hearsay answer.

BY MR. HINKLEY:

Q.    Did you speak to Mr. Roggio in regards to where the funds came to purchase this home?

A.    Yes.

Q.    Did he tell you where the funds came from?

        MR. BARTOLAI:  Objection, marital communication.

        THE COURT:  Judy, take the jury out.  Ms. Merring, you ought as well step out as well.

        THE WITNESS:  Okay.

        THE COURT:  Counsel, it's difficult for me to determine whether this is a confidential communication such that I should sustain the objection without knowing what the answer is going to be quite frankly.  It may very well be that she's going to give an innocuous answer that will not be confidential in nature.  She may something that is.  I don't know.  You're going to have to give me a proffer.

        MR. HINKLEY:  So I believe that she will answer that the funds came from his work in Iraq, period.  That's basically what she knows what she will say.

        THE COURT:  That's it?  That's as far as you're going to go?

        MR. HINKLEY:  That's as far as I'm going to go.  There are a number of photographs.  There's the vehicles.  There are the various firearms, all of which were seized during the search warrant execution.  I'm going to have her say these were in her house, and I guess the last question will be where

-- where did the money come from to pay for these things. She's going to say Ross paid for it.

THE COURT:  So there's nothing that you expect her to say in response to your questions that's going to in any way suggest the funds were illegally obtained or --

MR. HINKLEY:  I am not going to solicit that.  I don't believe she will testify to that.  I will stay away from whether she knew -- I don't know she knew the nature of the business was --

THE COURT:  In particular that she's going to say that Mr. Roggio told her something that would suggest that the funds were not legally obtained?

MR. HINKLEY:  I am not going to solicit that.  If she tries to go there, I will stop her.

THE COURT:  I will have to strike that testimony and tell the jury to disregard it.  To the extent it's simply the funds -- the money came from his work in Iraq, I don't see that as being confidential.  All right.  Let's go.  You may continue, Mr. Hinkley.

BY MR. HINKLEY:

Q.   So this was the marital home?

A.   That's correct.

Q.   Earlier you testified there was an addition to this home that was occurring when you first spoke to special agent O'Donnell, correct?

34

A.    That is correct.

Q.    You indicated that Mr. Roggio paid for the addition?

A.    That is correct.

Q.    Did he also pay for purchase of the home?

A.    Yes.

Q.    6.5, please.  Can you identify what's in this photograph? It may be on the screen next to you, too.

A.    Oh, yeah, okay.  This is a Mercedes Benz, I believe GL 350 SUV.

Q.    Can you recognize where it's located in this photograph?

A.    Yes, it's actually in the garage that was originally attached to the house that --

Q.    That is your marital residence?

A.    Yes, that's correct.

Q.    Who paid for that vehicle?

A.    Ross Roggio.

Q.    6.6.  Do you recognize this vehicle?

A.    Yes, that's a Mercedes Benz SL 400 Roadster.

Q.    And do you recognize the location where this vehicle is stored based upon the picture?

A.    Yes, this was in the new part of the garage, the addition that was being built.  It had four garage doors, and this took one of the bays.

Q.    And who paid for this vehicle?

A.    Ross Roggio.

Q.    6.7, please.  Do you recognize the vehicles in this particular photograph?

A.    Yes, on the top of the stackable car things, it's a BMW i8, 2016, and then secondary below is a McLaren 570 S.

Q.    Do you recognize the location where these vehicles were stored based on the photograph?

A.    Yes, they were in the newer section of the garage, and that's where they were stored because so you can stack them -- so you can stack the vehicles.  You need a larger, like, a bigger door, more than a 16 foot door.  There were two lifts side by side to stack cars.

Q.    Two stackable mechanisms in the garage?

A.    That is correct.

Q.    I will show you Government's Exhibit 6.8.  Do you recognize that?

A.    Yes, that's the rear end of the McLaren 570 S.

Q.    6.9?

A.    That is a -- if you're facing that car that would be the left-hand side of the McLaren 570 S.

Q.    Behind it is there another vehicle?

A.    Yes, there's a Kawasaki Ninja motorcycle and my father's '57 Chevy Bel Air.

Q.    In regards to the motorcycle, do you know who paid for that?

A.    Ross Roggio did.

36

Q.    How about the vehicle that you indicated was your father's?

A.    Ross paid for it, but through our divorce agreement my dad was listed on a Ford F. 250 Lariat and --

Q.    Let me limit your -- did Ross Roggio pay for the Chevy?

A.    Yes, he did.

Q.    Okay.  I want you to go to Government's Exhibit 6.10.  All these would be on the screen.

A.    Okay.

Q.    Do you recognize this room?

A.    Yes.

Q.    What is this room?

A.    This is what was considered Ross' office.

Q.    Is that located in the marital home?

A.    Yes.  That was on the second floor.

Q.    And would this be the place where you took those boxes to store when they came?

A.    Yes.

Q.    What -- on the right-hand side, what is going on here? What are those things?

A.    They are firearms, long guns.  I don't know the names of them, but they are rifles.

Q.    Were these your rifles?

A.    No.

Q.    Do you know whose rifles they were?

A.    Yes, they were Ross Roggio's rifles.

Q.    Did Mr. Roggio pay for those rifles?

A.    Yes, he did.

Q.    Government's Exhibit 6.11.  And do you recognize what room this is?

A.    Yes, this is in the same room in his office on the second floor.

Q.    And what is shown in the photograph?

A.    Long guns.  What I know as A. R. 15s.

Q.    So are these rifles -- do they belong to you?

A.    No.

Q.    Who do they belong to?

A.    Ross Roggio.

Q.    And did Mr. Roggio pay for these guns?

A.    Yes, he did.

Q.    6.12, please.  Do you recognize where this would have been?

A.    Yes, this is inside because prior to purchasing the house it used to be an exercise room.  And there was a little closet, and in the closet he had, you know, various cases and parts and stuff, you know, for weapons.

Q.    So would these -- would these belong to Mr. Roggio?

A.    Yes, that is correct.

Q.    6.13.  Do you recognize where this photograph was taken?

A.    Yes, this was also in the closet in -- off his office on

the second floor.

Q.    Are these items which belong to you?

A.    No, they're not.

Q.    And do you know who they belong to?

A.    Yes, Ross Roggio.

Q.    Government's Exhibit 6.14.  Does this appear to be a different angle of the room that you were talking about?

A.    Yes, that's correct.

Q.    Government's Exhibit 6.15.  Again, this appears to be the closet area you had just testified to.  Is that correct?

A.    That is correct.

Q.    6.16.  Do you recognize this as being --

A.    This is on the left-hand side of the closet off of his office with ammunition.

Q.    And does that ammunition belong to you?

A.    No.

Q.    Who does it belong to?

A.    Ross Roggio.

Q.    Government's Exhibit 6.17.  Do you recognize this?

A.    Yes, it was another unit hanging on the wall in his office with weapons, his weapons.

Q.    Government's Exhibit 6.18.  What does this depict?

A.    This is from behind his desk in his office, more weapons with scopes and whatnot behind his chair, but they are Ross Roggio's.

Q.   So let me ask you a few questions.  Prior to Mr. Roggio working in Iraq, did he own any firearms at all?

A.   I believe he owned one pistol.

Q.   One pistol?

A.   Yes.

Q.   Prior to Mr. Roggio working in Iraq did he own any vehicles?

A.   Yes, he did.

Q.   What type of vehicle?

A.   He had a Ford F. 250 Lariat.

Q.   Were there any other vehicles he owned?

A.   No.

Q.   Government's Exhibit 6.19.  Do you recognize this location?

A.   Yes, that's his mother and step-dad John Roggio's home.

Q.   Would this be the location listed on the corporate application for Roggio Consulting Company, L. L. C.?

A.   Yes, that's correct, 116 Turkey Hill Court.

        MR. HINKLEY:  I have no further questions.  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  Cross-examine.

        MR. BARTOLAI:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. BARTOLAI:

40

Q.   Good morning.

A.   Hi.  Good morning.

Q.   So how long were you married to Mr. Roggio?

A.   Just under four years.

Q.   I want to -- I want to begin with the -- with kind of where the government left off at the end.  And we've seen some photos of your house and Mr. Roggio's firearms collection as well as his vehicles.  And these were items that were acquired by Mr. Roggio during the course of your marriage.  Is that correct?

A.   Yes.

Q.   All right.  And I believe there was a home at -- can we have that, please?  I'm sorry.  I'll do it.  Now, prior to -- prior to your marriage, what did you do for a living?

A.   I'm on Social Security disability, but prior to that, I was a medical assistant for a family practitioner.

Q.   When you got married did you continue to work?

A.   No, I was awarded Social Security disability due to my physical issues.

Q.   Okay.  And so when you were married, Mr. Roggio purchased this home as the marital home.  Is that right?

A.   Yes, but he had it put in my name.

Q.   So he -- so he bought this home.  You lived there while he was in Iraq.  Is that right?

A.   That is correct.

41

Q.    Did you live there with your son?

A.    Yes.

Q.    Okay.  That's a son from a previous --

A.    Yes, from my first husband Mitchell Merring.

Q.    How old was that young man?

A.    Gosh, he's 19 now.  So he was 13, 12 maybe.

Q.    So he was still a minor?

A.    He was a minor at the time, yes.

Q.    And you indicated that you were -- during this time you were receiving Social Security disability?

A.    That is correct.

Q.    And you also received an allowance of $5,000 a month from Mr. Roggio?

A.    Yes.

Q.    For whatever you wanted to do with it, hair, nails, anything?

A.    And pay bills like the electricity, cable, you know.

Q.    Mr. Roggio bought you -- your dad a car, '57 Chevy.  Is that right?

A.    That is correct.

Q.    That's a Bel Air.  We saw a little piece of that.  It looked like a nice car.  It was?

A.    Oh, very, yeah.

Q.    You said that at first your divorce was contentious?

A.    Yes.

42

Q.    Okay.  You were present when the F.B.I. searched this home, correct?

A.    143 Indian Spring?

Q.    Yes.

A.    Yes.

Q.    And you were present when the F.B.I. seized all of those items that we saw in the photos, correct?

A.    The gun items, yes.

Q.    The cars as well?

A.    No, I did not see that because they were located over at 116 Turkey Hill Court because he had transported them over.

Q.    But you were aware they were seized as well, correct?

A.    Yes.

Q.    Okay.  So all of those items were seized by the government for forfeiture.  Is that right?

A.    Yes.

Q.    Okay.  And this home was also seized, wasn't it?

A.    Yes, it was a technical term lis pendens.

Q.    Arrest in rem if you recall or --

A.    Lis pendens.  That's all I know.  I'm not good in Latin.

Q.    I understand.  I understand.  And but again, this was -- the home that you were living in was seized.  Is that right?

A.    That is correct.

Q.    And it was subject to forfeiture as well, correct?

A.    That is correct.

43

Q.    But a deal was made with the government?

A.    Correct.

Q.    -- where this would be taken out of forfeiture, correct, and --

A.    Yes, I believe.

Q.    -- be sold on the market.  Is that right?

A.    Yes.

Q.    And as a result of that sale, you received $250,000, correct?

A.    I did not receive 250,000.

Q.    What did you receive?

A.    I received $225,000.

Q.    I'm sorry.  And that was because now the government helped you in that regard, did they not?

A.    Absolutely.

Q.    Assistant U.S. attorney Jenny Roberts helped you in that regards?

A.    Yes, she did.

Q.    Government's Exhibit 8.4, please.  And you can see that document in front of you, correct, ma'am?

A.    Yes.

Q.    And this is a document that you signed?

A.    Yes, it is.

Q.    And did you complete the document itself?

A.    Yes, it's all in my handwriting.

44

Q.   It's all -- from the top from where it says TOSCO at the top to where it's signed Kristy Roggio 3/29/16?

A.   TOSCO, that was written by me.  But in personal items, tools and bow -- I don't know what that says.  The -- in the amount portion, that is not my handwriting.

Q.   So you're saying today that you didn't write where it says here description -- you see where I am?

A.   Yeah, I did write the description, personal items.

Q.   Did you write personal items?

A.   Yes, that's my handwriting.

Q.   And you wrote tools?

A.   That's my handwriting.

Q.   And boxes, right?

A.   I believe that's what it says, yes.

Q.   The amount -- did you write that amount?

A.   I did not.

Q.   Do you recall who wrote that amount?

A.   That would probably be the Packaging Place Frank --

Q.   Monteforte?

A.   Monteforte, yes.

Q.   So we are clear, you did write those items, okay.  Let's talk about -- so you had indicated that you shipped these packages -- this package to Mr. Roggio in Iraq.  You also indicated that you had shipped some other packages to him as well?

A.    That is correct.

Q.    Some packages that included coffee mugs, right?

A.    No, they went in his suitcase, the coffee mugs.  I sent over two board games and two bumpers for a pickup truck.  That that's the only thing I was aware of, and then I tried to -- he wanted me to send over some Zippo lighters, and Frank called me and said that he --

Q.    Pardon me.  I don't want you to answer what somebody else said.

A.    I'm sorry.

Q.    I will clarify that.  You did try to send some Zippo lighters, correct?

A.    That is correct.

Q.    But they wouldn't ship.  Is that right?

A.    Correct.

        MR. BARTOLAI:  I have nothing further.

        THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. HINKLEY:

Q.    Ms. Merring, the fact that you were able to recover money from that marital residence --

A.    Yes.

Q.    -- that was kind part of the divorce.  Is that correct?

A.    Well, originally the divorce was when Judge Sibum had me sign the deed over to Ross because he pledged that he would do

46

a --

MR. BARTOLAI:  Objection, unresponsive, Your Honor. It called for a yes or no answer to the question.

THE WITNESS:  May I please have the question again?

THE COURT:  Certainly.

MR. HINKLEY:  I am going to move on?

THE COURT:  Laura, read that question back.

(The court reporter read back the referred-to portion of the record.

THE COURT:  Can you answer that yes or no?

THE WITNESS:  No.

THE COURT:  You can't?

THE WITNESS:  It was no.

THE COURT:  That's okay.  Stop there.  Your witness.

BY MR. HINKLEY:

Q.   The fact you received these funds, has that changed your testimony whatsoever in regards to that which you've testified to today?

A.   No.

Q.   Did you tell the truth today?

A.   Yes.

MR. BARTOLAI:  Objection.  Credibility is for the jury, Your Honor.  Ultimately they decide the credibility of the witness.  I move to strike.

THE COURT:  Your motion is strike is denied.

47

Continue.

MR. HINKLEY:  No further questions, Your Honor.

THE COURT:  Anything further?

MR. BARTOLAI:  Nothing.

THE COURT:  Thank you.  You're excused.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Ready to call your next witness?

MR. CLAFFE:  We are.  Perhaps we can have a quick restroom break before we proceed.

THE COURT:  Let's take 20 minutes.

(A brief recess was taken.)

THE COURT:  Call your next witness.

MR. CLAFFE:  Your Honor, the government calls Thomas Hall.

THOMAS HALL, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CLAFFE:

Q.   Good morning, Mr. Hall.

A.   Good morning.

Q.   Please tell the jury where you work.

A.   I work at a manufacturing facility in Milford, Connecticut called Drill Masters El Dorado Tool.

Q.   How long have you worked at Drill Masters El Dorado Tool?

A.   Since 1976.

48

Q.    What's your current title?

A.    President and owner.

Q.    About how long have you been in the role of president?

A.    Since 1989.

Q.    Drill Masters El Dorado Tool can we call it DME for short?

A.    Sure, yeah.

Q.    What are your responsibilities as president of DME?

A.    Well, I look over all of the operations and financial positions of the company as well as production, output of the company.

Q.    What does DME do?

A.    We're a manufacturer of very specialized cutting tools for different industries throughout the world.  We make specialized tooling for different industries as I mentioned, firearms, automotive, aerospace, medical industry, orthopaedic industry. So we manufacture these tools for these different diversified industries.

Q.    I believe you just said the firearms industry was one of the industries you manufacture for?

A.    Yes.

Q.    What type of products does DME manufacture for the firearms industry?

A.    We manufacture deep hole gun drills.  We manufacture pull bore reamers.  We manufacture combination rifling buttons.  We manufacture hammer forging mandrels, and we manufacture air

49

groove and rifle air gauges.

Q.    Let's go through a few of those.  What is a pull bore reamer?

A.    When you are making a rifle barrel, there are three different tools they have to touch the I. D. of the barrel. One is a gun drill and then it's followed up by a pull bore reamer which finishes the I. D. of the bore of the barrel.

Q.    What does the gun drill itself do?

A.    Gun drill is a standard long extended drill with a carbide head on the end which drills the bore from a solid barrel.

Q.    For clarity, what is a bore?

A.    A bore is the I. D. of the barrel which is considered the bore of the caliber of the weapon that we're making.

Q.    What's caliber?

A.    Caliber is another word for a different size bullet.

Q.    You mentioned rifling buttons, I believe?

A.    Correct, yes.

Q.    What's a rifling button?

A.    So there's three tools, the drill and then reamer and then the rifling button puts the grooves and lands and twists inside the barrel for the accuracy of the projectile or the bullet.

Q.    So grooves and what?

A.    Lands.

Q.    What are grooves and lands?

A.    Grooves and lands are the size inside a barrel that allows

the bullet to spin at the right accuracy.

Q.    How does the spin help a bullet's accuracy?

A.    It gives accuracy by the rotation of the projectile or the bullet at a certain number of feet.

Q.    I believe you also referred to a particular type of rifling button as a combination rifling button.  What's a combination --

A.    Combination does both.  It puts the lands as well as the grooves inside the barrel.  It's a finishing tool to make a barrel.

Q.    What are rifling buttons made out of?

A.    Carbide with a type of coating that we apply to the top of it.

Q.    Are there different types of coating that be applied?

A.    Yeah, two types of coating that we use.  We use a TIN, which is a titanium coating, which is a gold color, and we also provide the rifling buttons with a TIALN, which is more a black coating that goes over the surface of the button.

Q.    What does that stand for?

A.    TIALN, titanium aluminium nitrite.

Q.    Type of metal?

A.    A type of surface coating that goes on the top of the tool.

Q.    Is there a certain life span of a rifling button?

A.    Yeah, a rifling button could go from -- we go in inches

maybe -- four to six hundred inches per rifle button.

Q.    And approximately how many rifles could you make with one button?

A.    For one button you can make anywhere between 400, maybe a thousand barrels per button.

Q.    So they wear out?

A.    Sure, they wear out.

Q.    You just replace it with a new one?

A.    Yes, non-perishable tool.

Q.    You sell a lot of rifling buttons?

A.    Yes, we do.

Q.    Are there any restrictions where you can ship a rifling button?

A.    Yes, there are.

Q.    What are the restrictions?

A.    Well, through the Homeland Security we have a list of -- since we sell throughout the world, we have a list of non-shippable rifling buttons to certain countries.

Q.    Do you know if there's a reason why certain countries aren't able to ship to?

A.    Oh, just because of through the commerce department and Homeland Security gives us this list.

Q.    I would like to show you a few exhibits now that have been previously marked as Government's Exhibits 7.4, 7.9 and 7.19. You have a binder in front of you.  If you wouldn't mind just

52

moving through and taking a quick look.  I will ask you a couple questions once you've had a chance to look at them. 7.4, 7.9 and 7.10.

A.    I have 7.4 in front of me.

Q.    Do you recognize these?

A.    Yes.

Q.    What are they generally speaking?

A.    They are sales orders, packing lists and an invoice along with the work orders for the production.

Q.    Do they all appear to relate to the same order?

A.    Yes.

Q.    Were these records made at the time of that order?

A.    Yes.

Q.    Were they created as part DME's regular business practice?

A.    Yes.

Q.    Were they maintained as part of your company's regular business activity?

A.    Yes.

        MR. CLAFFE:  Your Honor, we move to admit Government's Exhibit 7.4, 7.9 and 7.10.

        MR. BARTOLAI:  No objection.

        THE COURT:  7.4, 7.9 and 7.10 are admitted.

        MR. CLAFFE:  May we publish 7.4?

        THE COURT:  You may.

BY MR. CLAFFE:

53

Q.    Mr. Hall, I would like to direct your attention to the middle of this document.  What items are listed under the description?

A.    Under the description on line No. 1, its tells us it's a 3462 by 22 inch pull bore reamer.

Q.    What do those numbers mean, .3465.

A.    .3465 is the actual I. D. of the barrel of the bore that I mentioned -- the bore --and the 22 inches is the length of the rod that's on that tool.

Q.    What's the item below that?

A.    The item below it is the combination button -- rifling button for nine millimeter for that particular bore reamer.

Q.    What do all these numbers next to combo button mean?

A.    That's the size, diameter of the groove and its diameter of the bore, the number of grooves, which is six, the width of the grooves, which is 101 thousandths, and the twist rate of ten inches of a right hand twist.  It also mentions the rod size of a 325 by 22 inches and it's tin coated, nine millimeter.

Q.    So these are the specifications of how the grooves are to be made?

A.    Correct, right, correct.

Q.    Are these specifications provided by whoever the customer is?

A.    Sometimes, yes, and sometimes we do a design of a

54

particular rifle button.

Q.    Okay.  But the customer has to tell you what they are looking for?

A.    Right.

Q.    And how many of each of these items were purchase?

A.    15 each.

Q.    What was the total price for the reamers?

A.    $2,977.50.

Q.    And how about for the combo buttons?

A.    $3,486.

Q.    At the top left corner of this document, can you tell me what date this order was placed?

A.    December 3rd, 2015.

Q.    And who was the customer for this order?

A.    Roggio.

Q.    I'm sorry?

A.    Roggio.

Q.    I believe it's pronounced Roggio.

A.    Oh, Roggio, sorry.

Q.    That's fine.  Stepping back and looking at this document as a whole, can you tell if this order was paid for at the time?

A.    Yes.

Q.    How can you tell?

A.    Well, there is a notation on the top right that says it's

55

paid.  Normally -- yeah, paid on the top, so I assume it's paid.

Q.   Let's turn to exhibit 7.9.  It's also on the screen if that's easier.  So you said this was an invoice, I believe?

A.   Correct, yes.

Q.   Does this invoice indicate anything about how the combo buttons would be paid for?

A.   Yes, in the terms it says credit card.

Q.   Does it also indicate the shipping method for these combo buttons?

A.   Yes, being shipped United States Postal Service, UPS.

Q.   Is that -- I'm sorry.  Is that postal service or --

A.   UPS, I'm sorry.

Q.   United Parcel Service?

A.   Correct, yes.

Q.   I would like to direct your attention to the bottom of this page.  Will you please read the statement that begins with these commodities?

A.   These commodities, technology or software were exported from the United States in accordance with export administration regulations.  Diversion contrary to U.S. law is prohibited. Items are a hundred percent made in the USA.

Q.   Is this statement related to the export rules you told us about before?

A.   Yes, correct.

56

Q.    Let's look at exhibit 7.10 now.  What is this document again?

A.    This is the packing list of that -- of the invoice, one of the line items, which is the rifle buttons.

Q.    So when is this packing list created?

A.    That was created on February 25th, 2016.

Q.    Is that the same date these items were shipped?

A.    That is -- yes, ship date -- oh, no, oh, that was the original ship date.  The date it was actually shipped was February 26th, 2016.

Q.    But the packing list was created a day before the --

A.    Yes, yes, yes.

Q.    Does it indicate that they were actually shipped by UPS?

A.    Yes, that's correct.

Q.    Is there a tracking number on this?

A.    Yes, there is.

Q.    Physically speaking, how are combo buttons packed and shipped?

A.    Combo buttons are usually packaged in a clear plastic tube and then packaged into a cardboard box.

Q.    Does the cardboard box say anything on it?

A.    The cardboard box says Drill Masters El Dorado Tool on the outside of the box.  It's our company name.

Q.    I would like to also in that binder show you an exhibit that has previously marked as Government's Exhibit 7.3.  Just

let me know if you recognize that.

A.    Yes, yes.

Q.    You do recognize that exhibit?

A.    Yes, I do.

Q.    What is this exhibit generally speaking?

A.    This is a picture that I took of the actual pull bore reamer and one -- the combo rifle button.

        MR. CLAFFE:  Your Honor, we move to admit Government's Exhibit 7.3.

        MR. BARTOLAI:  No objection.

        THE COURT:  7.3 is admitted.

        MR. CLAFFE:  May we publish?

        THE COURT:  Yes.

BY MR. CLAFFE:

Q.    So this is a photograph you took?

A.    That is correct, yes.

Q.    What is the top item in this picture?

A.    Top item is a pull bore reamer mounted on that rod.

Q.    What does that mean mounted?

A.    It's assembled to the rod, so one particular piece.

Q.    Okay.  And what's the bottom item?

A.    Bottom is a rifling button assembled or mounted on a rod.

Q.    Is that the same type of rifling button as the one we have been talking about with respect to this order?

A.    Yes.

58

Q.   Mr. Hall, do you know if the combo buttons ordered by Mr. Roggio ever arrived in Pennsylvania?

A.   Yes.

Q.   How do you know?

A.   We received a call from the UPS store in Stroudsburg -- I believe it was Stroudsburg, Pennsylvania, that they had --

          MR. BARTOLAI:  Objection, hearsay.

          MR. CLAFFE:  We won't go into what was said.  You got a call?

          THE WITNESS:  Yeah

BY MR. CLAFFE:

Q.   Have you ever done business with Mr. Roggio before?

A.   Yes.

Q.   Approximately when was that?

A.   2013.

Q.   Do you recall the name of -- was Mr. Roggio the customer, or was there another name listed --

A.   There was a customer name but shipped to address to Ross Roggio.

Q.   Do you remember what was ordered?

A.   Back in 2013?

Q.   Yeah.

A.   I believe they were rifle buttons.

Q.   Do you know what type of item those rifle buttons would have been used for?

59

A.    I believe they were 5.56 or 223 caliber rifle buttons made -- 223 barrels.

Q.    What kind of firearm is made with those kind of buttons?

A.    5.56 M. 16s.

Q.    I think you said earlier that -- let me ask you again. How many gun barrels can be rifled with one button?

A.    Anywhere between 400 to a thousand again depending on the length of the barrel, so we do it by inches.

Q.    So generally speaking how many gun barrels could you rifle with 15 combo buttons?

A.    Probably between 6,000 and 15,000.

Q.    If Mr. Roggio had asked you to ship the combo buttons to Iraq, would you have done so?

A.    No.

Q.    Why not?

A.    It's restricted for us to send any rifle buttons into Iraq.  That was one of the countries we cannot ship to.

Q.    In your almost 50 years in the business have you ever shipped any combo buttons to Iraq?

A.    No, never.

        MR. CLAFFE:  Okay.  Nothing further, Your Honor.

        THE COURT:  Cross-examine.

        MR. BARTOLAI:  Thank you.

CROSS EXAMINATION

BY MR. BARTOLAI:

60

Q.   Sir, if I -- if someone contacted you, a shipper, and said that your rifle combo buttons were being shipped to Iraq, someone from your business would have said, hold on?

MR. CLAFFE:  Objection, speculation.

THE COURT:  Sustained.

BY MR. BARTOLAI:

Q.   No one from your company would allow someone to transship or to reship rifle combo buttons to Iraq knowingly, correct?

A.   No one in our facility would allow that.

Q.   Because that would be contrary to the laws -- exportation laws.  Is that correct?

A.   Yes.

Q.   I think you indicated -- so you had done business with Mr. Roggio in the past I think.  Is that your testimony?

A.   Yes.

Q.   And that time it was Rebel Arms that had bought the rifle combo buttons?

A.   Yes.

Q.   Do you have any paperwork on that today?  Did you bring any of that with you?

A.   I do have a -- I do have a file that my administrator gave me in my suitcase.

Q.   All right.  Would it have any of that information regarding Rebel Arms?

A.   Just sales order packing list.

61

Q.    Without getting into the particulars, do you know where that was shipped?

A.    Somewhere in Pennsylvania.

Q.    Somewhere in Pennsylvania, okay.  All right.  Very good.  And I want to call up the government's exhibit if I can, 7.4.  I believe you were able to pull out -- the combo buttons.  You can see -- you can see -- you can see this exhibit, right?

A.    Yes.

Q.    Thank you very much.  When you -- this is Government's Exhibit 7.4.  This is the sales order that you testified to a short time ago.  And I draw your attention to where it says combo buttons.  You can see that quantity 15 combo buttons?

A.    Uh-huh.

Q.    I believe you testified that this is for a nine millimeter.  Is that right?

A.    Correct.

Q.    And the prior shipments -- the prior combo buttons that went to Rebel Arms were for 5.56 or a .223, correct?

A.    Correct.

Q.    But this is a nine millimeter, right?

A.    Yes.

Q.    The other 5.56 and the .223 are A. R. 15 barrel links, correct?

A.    Yes.

Q.    And is a nine millimeter commonly an A. R. 15 caliber to

62

your knowledge?

A.    It's a -- it could be any kind of nine millimeter.  I can't answer what kind of nine millimeter.

Q.    But it's a nine millimeter?

A.    Correct.

Q.    I believe you indicated this is telling the various numbers behind where it says rifle combo buttons 35 -- what is 35853470 mean?

A.    That's the groove and the bore inside the barrel.

Q.    Inside the barrel, okay -- and six times -- and it has 101.  What does that mean?

A.    That's six grooves, 101 thousandths wide.

Q.    This you said was ten -- ten right hand twist?

A.    Right, one turn in ten inches.

Q.    And are you aware of the turns and twists in an A. R. 15 rifle?

A.    Off the top of my head I could guess, but I would have to look at the specs for that.

Q.    Do you have the specs?

A.    In my office I do, yes.

Q.    In your office?

A.    Yes.

Q.    Would you agree it's seven?

A.    It could -- it doesn't matter what twist.  It could be 7, 8, 9, 9 and a half, 12, there's no specification exactly what

63

twist rate somebody would want.

Q.   So they can have as many -- it could be customized?

A.   Yes, it could be, yes.

MR. BARTOLAI:  May I have a moment, Judge?

THE COURT:  Yes.

BY MR. BARTOLAI:

Q.   Could I have 7.9, please?  I just want to make things clear.  7.9 you're familiar with.  It's the invoice.  And the government had a question regarding the very bottom of this where it says -- there was a quotation.  Do you see the very bottom where it talks about -- it says -- these commodities, technology or software were exported from the United States in accordance with export administration regulations.  Diversion contrary to U.S. law is prohibited.  I don't understand. You're not saying here that these commodities were exported from the United States, are you?

A.   No, these commodities were made here in the United States and it can't be diverted to any country unless there were -- proper paperwork is made.

Q.   Okay.  Very good.  Thank you.  Thank you.  Now, you're talking about drills and such or gun drill, reamer and a button.  Why do they call it a combo button?  Where do they get the term button?

A.   That's something that goes back 60 years.  That's the terminology they came up with to put rifling inside a barrel is

64

a button.

Q.   So I understand DME is a successful corporation that is diversified and provides tools essentially, correct, to all different -- to several different industries as well?

A.   Yes.

Q.   Hospital, medical?

A.   Yes.

Q.   Aerospace?

A.   Yes.

Q.   And, of course, firearms?

A.   Yes.

Q.   And with respect to the firearms, you did testify about these three items, gun drill, the tool bar and rifling button. What's the difference between these items and getting them at Lowes or getting them at Home Depot or -- you know, the other -- Snap On is a good tool.

A.   Individually if we are talking about the gun drill, it's a very specialized drill.  You just can't buy that tool in Home Depot or anything.  That's a very specialized manufactured product that we manufacture.  It's just us and probably two other companies in the United States that makes that product. Same thing for a pull bore reamer, you cannot buy that anywhere.  It's a specialized type of tool as well as a combination rifling button.

Q.   Do you have foreign competition?

65

A.    Not really.  In drills we do but not really that much foreign competition in rifle buttons and the pull bore reamers.

Q.    Do you export a lot of rifle buttons and reamers?

A.    Yes.

Q.    To other countries as well?

A.    Yes, yes.

Q.    All legal of course.  I'm not asking about whether you do or not.  Do you have competition from China or in North Korea or India with respect to these type of -- in your industry?

A.    I know China makes rifle buttons because you can find them on Amazon but they are not specialized for a particular caliber.  They are not made out of anything that -- the quality of a level of what they're providing on Amazon is nothing like what we --

Q.    We're still the best in that respect?

A.    Best in the United States, yeah.

Q.    India, are they competing in this market as well?

A.    I don't believe.  I don't believe there's a manufacturer of the tooling that's in India.

          MR. BARTOLAI:  Okay.  All right.  May I have a moment?

          THE COURT:  Yes.

          MR. BARTOLAI:  Yes, I'm sorry.  I want to talk to you about -- I want to talk to you before I'm finished with -- Government's Exhibit 7.3 if I can have it.

66

BY MR. BARTOLAI:

Q.    You talked about these.  This is a -- did you take this picture?

A.    Yes.

Q.    And the top is a reamer?

A.    Yes, pull bore reamer.

Q.    The other is -- bottom is a rifle -- a button or combo button?

A.    Yes.

Q.    Are these -- these are nine millimeter or these 5.56?

A.    These are nine millimeter.

Q.    Nine millimeter.  Now, they would come -- are these titanium or the titanium aluminum when we talk about coating?

A.    This particular -- this particular rifle button is a TIALN.

Q.    Okay.  That's -- and the top part?

A.    Is uncoated.

Q.    So one is coated and one is not?

A.    Correct.

Q.    And these would come in a -- so this would come in a clear plastic tube?

A.    Yes, they'd be -- if they are 15, 15 may be in one plastic tube.  I'm not sure if they fit one or six in one or -- they'd be in a plastic tube.

Q.    And then they are going in a cardboard box?

A.    Correct.

Q.    That's it basically, it will have a plastic tube in a cardboard box?

A.    Yeah, with the necessary paperwork.

Q.    Can you see through the -- the cardboard box is brown and you can't see through it?

A.    Can't see through it.

MR. BARTOLAI:  Nothing further.  Thank you.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. CLAFFE:

Q.    Mr. Hall, you were asked about combo buttons for nine millimeters.  Is that right?

A.    Yes.

Q.    Could those combo buttons be used to produce a Glock nine millimeter pistol?

A.    Sure, sure.

Q.    Can we pull 7.3 up real quick?  So the bottom item in this picture, that's the combo button?

A.    Correct, yes.

Q.    Is the actual combo button the part on the right that's darker black?

A.    Yes, that's the part that's doing all of the work inside the barrel.

Q.    Is that mounted on something?

68

A.    Mounted on a type of rod that we use.

Q.    The combo buttons themselves are actually rather small?

A.    Yes, about an inch long and then an inch inserted into the rod.

Q.    You can fit a bunch of them in your pocket if you needed to?

A.    Oh, yeah.

Q.    You were asked on cross examination some questions about your competition, right.  I believe you said it was you and maybe two other companies that make these?

A.    Yeah, in the United States I believe there are two other companies other than us that manufacture rifling buttons.

Q.    China makes some that are sold on Amazon?

A.    I see that on Amazon.

Q.    Those are inferior products?

A.    We consider them interior different material than what we make ours out of.

Q.    Do you know what happened if you used an interior combo button in the --

A.    I assume you will not get any tool life they would get with ours.  Probably I would not assume them to have a good finish in the barrel like you'd get from ours.

Q.    So it's important to use a high quality button?

A.    Yeah, high quality button.

Q.    Mr. Hall, you were asked some questions about this

69

statement again.  I will ask you about that last sentence. What's diversion mean?

A.    That the actual company or person that has this -- these tools in their possession cannot divert it anywhere else outside of the United States unless they have the proper paperwork that would go with it.

Q.    Even if you shipped it to somebody in the United States, they can't ship it out of United States?

A.    Without the right paperwork, correct.

Q.    So you're putting them on notice by putting that statement there?

A.    Yes.

          MR. CLAFFE:  No further questions.

          THE COURT:  Anything further?

          MR. BARTOLAI:  No, thank you.

          THE COURT:  Thank you, sir.  You can step down.  Mr. Hinkley, how long is your next witness?

          MR. HINKLEY:  I expect direct examination to be a little bit over an hour.

          THE COURT:  All right.  Then we will break for lunch at this point.  Be back at 1:30.

          (A lunch recess was taken.)

          THE COURT:  Call your witness, please.

          MR. CLAFFE:  Suzy Abayeva.

          MR. BARTOLAI:  Can we have a sidebar, please?

(The following discussion took place at sidebar:)

MR. BARTOLAI:  So, Your Honor, this is one of the witnesses this Mrs. Abayeva is one of the witnesses who claims that Mr. Roggio raped her.  Also this is another -- this witness is also one of these witnesses who claims that as part of the, quote, loyalty test a woman by the name of Elina Kandaja, who won't be a witness for the government or the defense played a little game with her and she is suggesting to have a threesome between her and Elina and Roggio and to talk to his wife about it and she wouldn't do it, and according to that, Elina told her she passed the test.  So the point being, Judge, this is one of those things we have alerted the Court to in our motions in limine regarding, sex, rape allegation. There's a hearsay aspect as well.

THE COURT:  Why is witness being offered?

MR. HINKLEY:  Not for that for sure.  She was one of the employees in Iraq.  She will talk about working for him, going there, she will describe what the arms factory project was doing at that point, how they were preparing, what they were doing for the arms.  And in regards to the concerns, let me clarify a couple things.  As I understand it, what happened is when Mr. Roggio hired her through Istanbul on the way to Kurdistan and Iraq, while in Istanbul it was Mr. Roggio, this witness and Elina Kandaja who was there.  Mr. Roggio according to the witness raped him -- or raped her the first night she

arrived.  The next day -- the next day it was suggested that the witness have sex with the defendant together with the other woman Elina Kandaja.  She indicated, no, she didn't want -- didn't want to do that.  The next morning, she reports that Elina Kandaja came to her room, the hotel, crying and suggesting that they should call Mr. Roggio's wife.

The witness indicated that -- she said, well, let's not call the defendant's wife, let's try to figure this out, and at which point she says that Elina Kandaja starts smiling and saying, you passed the test.  They go to Roggio's room where the three discuss loyalty and discuss the circumstances of why that conversation took place.  I was not going to get into the rape allegation, nor am I going to get into the threesome suggestion.

What I was going to do -- and I talked to the witness about it -- is simply say you had conversation with Elina Kandaja, yes.  She woke you up, yes.  Did you then go to the defendant's room, yes.  Did you have a discussion with him in regards to loyalty or anything like that?  Then she can describe what he told her.

MR. BARTOLAI:  Why bring Elina Kandaja into it?  It's hearsay.

MR. HINKLEY:  It gets her back to the room.  She's not going to testify about anything Elina said, only they had conversation, then went back to the defendant's.

72

MR. BARTOLAI:  What's the relevance?  Whatever.  I will object on relevance then.

THE COURT:  Listen carefully to what you just told me the testimony regarding the defendant raping this witness who is about to testify doesn't seem to have a sufficient basis connected to your case to allow me to allow it in if I apply a 403 analysis.

MR. HINKLEY:  I am not seeking to have it entered.

THE COURT:  Where is the problem here?

MR. BARTOLAI:  I am glad the rape isn't coming in. The problem is this conversation with Elina Kandaja and the loyalty test and -- all right.  If you can take it from the threesome, I don't see the point of that.  If you talk about calling his wife, there's an inference there, an innuendo maybe there was some sort of infidelity.  The question becomes, so what if you call his wife, why not.

MR. HINKLEY:  Because she will say that the loyalty test and there was also an incident where they went to a mall and the defendant had --

MR. BARTOLAI:  I'm fine with that.  That's a real loyalty test.  That will work.  That would be cumulative then. We're talking cumulative evidence here.  She had a -- he said to her, you passed the loyalty test I mean.

MR. HINKLEY:  She hesitated to yell fuck in the mall. He said to her, if you don't do that and do exactly what I say

you're going home.  I think it all fits together.  I'm trying to exclude that which is I think prejudicial to the defendant in regards to the sex part of it.

THE COURT:  Look, I don't think anybody can seriously dispute the fact that testimony about this guy raping someone is clearly prejudicial and doesn't have a sufficient nexus to the charges against him -- even the torture charge because there's not enough for me to say the probative value is not outweighed by the prejudice.  It most certainly is.

MR. HINKLEY:  I am not trying to get into the rape.

THE COURT:  You will have to structure so you don't draw objections from him.  If you don't, we will have to take the jury out and I will deal with your arguments further.  I need to hear more of this farther before we go further.

MR. HINKLEY:  I did discuss on more than one occasion how to limit what I want her to testify to.  Will you give me a little flexibility for leading her so that we stay out of the place we don't want to go?

MR. BARTOLAI:  Where are you leading her?

MR. HINKLEY:  I will try my best.

(The discussion at sidebar concluded.)

SYUZANA ABAYEVA, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINKLEY:

74

Q.    Ms. Abayeva, there's a microphone there.  Can you move it closer or get closer to it so everybody can hear you?

A.    Better?

Q.    Yes.

A.    Okay.

Q.    How old are you?

A.    34.

Q.    Where do you reside?

A.    In New Jersey.

Q.    What's your educational background?

A.    I have a bachelor's in international business and economics from Kings.

Q.    What type of work do you do?

A.    I do logistics and operations at a car dealership in Stroudsburg.

Q.    Do you know the defendant, Ross Roggio?

A.    Yes.

Q.    And is he in the courtroom today?

A.    Yes.

Q.    Would you identify him for the record, please?

A.    Can I stand?

Q.    Yes.

A.    He's wearing a blue jacket right over there.

        MR. HINKLEY:  Your Honor, would the record please reflect this witness has identified the defendant?

THE COURT:  The record will so reflect.

BY MR. HINKLEY:

Q.    How long have you known Mr. Roggio?

A.    I would say about ten years at this point.

Q.    And how did you meet with him -- how did you first meet him?

A.    So I used to work in a jewelry store in Stroudsburg, and he and his wife came in shopping for some pieces for her.

Q.    Okay.  Did there come a time when you were offered a job by the defendant?

A.    Yes.

Q.    Would you explain to the jury how that came about?

A.    He must have found my resume on Indeed and sent an e-mail to me saying he's looking for an executive assistant.  And he contacted me, and he set up a phone interview.

Q.    Did you agree to work with Mr. Roggio?

A.    Yes.

Q.    Did he describe at that point the type of work you would be doing?

A.    No.

Q.    Once you agreed to work with Mr. Roggio, what was the next step?

A.    He said we would travel or I would have to meet him in Istanbul.

Q.    Was Istanbul the final destination of your travel as far

as you knew?

A.    No.

Q.    What was the final destination?

A.    Iraq.

Q.    Did you meet with Mr. Roggio during that travel?

A.    To --

Q.    During travel between Pennsylvania and Iraq?

A.    Yes.

Q.    And where did you meet with him?

A.    In Istanbul, Turkey.

Q.    Was he with anyone else when you met him?

A.    He came to pick me up from the airport with a driver, but there was another person that was hired as well.

Q.    Did -- at some point was there another person that --

A.    Yes.

Q.    He was with?

A.    Yes.

Q.    Who was that?

A.    Elina Kandaja I think is her last name.  I'm not sure how to say it.

Q.    Upon your arrival to Istanbul, did the defendant give you more information about the nature of the work he was hiring you to do?

A.    Yes.

Q.    What did he tell you?

77

A.    He told us that we were -- be building a weapons plant in Iraq.

Q.    And did that happen sometime in your stay in Istanbul?

A.    Yes.

Q.    How long approximately were you in Istanbul?

A.    I would say a couple days.

Q.    Did you sign any employment documents while you were there in Istanbul?

A.    Yes.

Q.    In that three ring binder in front of you, you will find Government's Exhibit 11.2.  Did you find it?

A.    Yes.

Q.    Did you recognize this document?

A.    Yes.

Q.    And what is the document?

A.    That is the employment agreement between Ross and myself.

        MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 11.2.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 11.2 is admitted.

        MR. HINKLEY:  If I may publish.

        THE COURT:  Yes.

BY MR. HINKLEY:

Q.    You indicated this was an agreement between who?

A.    Ross Roggio and myself.

Q.   Is this a document that he presented to you and asked you to sign?

A.   Yes.

Q.   Did you have any discussions with him about this document?

A.   No.

Q.   The first part of the agreement, would you review that with the jury, please, and state who it is that are the parties there?

A.   This agreement entered into this 5th day of September of 2014 between Roggio Consulting Company of Stroudsburg, Pennsylvania, the company, and Suzy Abayeva of 192 Van Auken Hill Road, Milford, P.A., the employee.

Q.   And on the last page of the document -- on the last page it appears to have a signature.  Do you recognize that signature?

A.   Yes.

Q.   Whose signature is that?

A.   That's mine.

Q.   And this non-disclosure agreement, was it something that the defendant required you to sign as part of your employment?

A.   The employment agreement or the non-disclosure?

Q.   Non-disclosure agreement.

A.   Yes, we did also have to sign that.

Q.   In the binder is Government's Exhibit 11.1.  It should be the document just prior to the one you were looking at.

A.    The non-disclosure was actually 11.2.

Q.    11.1.

A.    Point two.

Q.    So I am looking for 11.1 if you can find that.

A.    There's nothing prior.  The employment agreement is the 11.1.  That's still what you're looking for?

Q.    Yeah.  Do you recognize that document?

A.    Yes.

Q.    And what is it?

A.    This is the employment agreement.

Q.    Very good.

        MR. HINKLEY:  Your Honor, the government moves for admission of 11.1.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 11.1 is admitted and may be published.

        MR. HINKLEY:  Permission to publish.

        THE COURT:  Granted.

BY MR. HINKLEY:

Q.    At the top of the agreement would you look at that and read out loud the first sentence of that?

A.    This agreement entered on this 5 day of September of 2014 between Roggio Consulting Company of Stroudsburg, Pennsylvania, the company, and Suzy Abayeva of 191 192 Van Auken Hill Road, Milford, P.A., the employee.

80

Q.    So is this the agreement you entered into with Mr. Roggio?

A.    Yes.

Q.    If you go to the final page of the agreement, it appears to have a signature and date.  Would you let us know whether that's your signature and what the date is.

A.    That is my signature, and it's September 3rd of 2014.

Q.    So having entered into the employment agreement and the non-disclosure agreement, did the defendant then give you more information about the project?

A.    Yes.

Q.    What did he tell you?

A.    He said we were traveling to Iraq and that he was hired to build a weapons plant in Kurdistan.

Q.    You were required to sign a non-disclosure agreement.  Did Mr. Roggio talk to you about keeping the project secret?

A.    Yes.

Q.    What did he say?

A.    He said that no one is to know what we're doing and it was just to stay completely confidential and we cannot break the non-disclosure.

Q.    And did you indicate how long you were in Istanbul with the defendant, approximately how many days?

A.    Approximately -- less than a week.  I don't recall exactly how many.

Q.    Did you do any work related to the project while you were

in Istanbul prior to signing the paperwork?

A.    No.

Q.    Did the defendant speak to you about any conditions or expectations he had for you as a prerequisite of working for him?

A.    Yes.

Q.    What did he say?

A.    That a requirement was to be extremely loyal and discreet.

Q.    In regards to the loyalty, did he have -- or did he speak to anything such as loyalty tests or anything like that?

A.    Yes.

Q.    What did he mean by that?

        MR. BARTOLAI:  Objection as to what he meant, Your Honor.

        THE COURT:  Sustained.

BY MR. HINKLEY:

Q.    What did he say?

A.    Would you like --

Q.    In regards --

A.    Example of a --

Q.    Give us an example.

A.    So upon my arrival in Istanbul, we ended up going to dinner to explore the city.  We entered into a mall, sat on a bench in a huge center, and one of the things he asked me to do was to scream fuck at the top of my lungs, which I didn't want

82

to do.  I felt extremely uncomfortable.  It didn't seem like a normal thing to do.  Istanbul and Turkey being more of an Islam based country, I thought it would raise some eyebrows and I would get in trouble.  He said if I didn't do what he told me I would be on a plane home right away.

Q.    So did you, in fact, do what he asked?

A.    Yes.

Q.    Without describing the actual occurrences, were there other loyalty tests that occurred while you were in Istanbul?

A.    Yes.

Q.    Were there additional loyalty tests or discussions of loyalty once you moved on to Iraq?

A.    Yes.

Q.    When you traveled on to Iraq, where did you go, that is to say, what city?

A.    Sulaymaniyah.

Q.    And did you -- where did you stay in Sulaymaniyah?

A.    The Grand Millennium Hotel.

Q.    And once you arrived there, were you working on the project at that point?

A.    We were doing the initial set-up of the company.  We were doing the first steps of the opening the company I suppose.

Q.    Okay.  So what type of things were you involved with?

A.    Opening up e-mail addresses, looking for an office space, for a place to live, et cetera.

83

Q.    Were you part of the setting up the e-mail address electronics?

A.    Yes.

Q.    And do you recall the name of the business that you were using for the e-mail addresses?

A.    I believe it was Roggio C. C.

Q.    At that point in time were you involved in any meetings the defendant was having with his local host or people that he was working with?

A.    Yes.

Q.    Could you describe those for us?

A.    The meetings?

Q.    Yeah, the meetings.

A.    They were mostly casual either at the hotel or other various restaurants throughout the city.

Q.    And did you become familiar with the people that he was meeting with?

A.    Yes.

Q.    Did you come to a point where you knew their names?

A.    Yes.

Q.    Who was it the defendant was meeting with during this early part of the project?

A.    One would be Polad Talabani and Hiwa Ismael.

Q.    During your time in Iraq or anytime since, are you in a position or have you learned about Polad Talabani, kind of what

his background is and what his position was there in that area?

MR. BARTOLAI:  I object, Your Honor.  I don't know what the relevance is to her position as an executive assistant in 2015 or when she was there earlier in Iraq.  What she learned since then, Your Honor, unless she learned it from Mr. Roggio I would submit is irrelevant.

THE COURT:  Mr. Hinkley?

MR. HINKLEY:  I think it's relevant because it's a description of Mr. Talabani's role there while he was part of the project.

THE COURT:  Why is her knowledge of Polad Talabani relevant?

MR. HINKLEY:  As I recall, the defendant had indicated through his attorney that it was -- this project was being run by something called the Faruk Group.  So if Polad Talabani has been meeting with the defendant, which she has indicated, I think his position in the Kurdistan Iraq area is relevant to whether or not that fact is true.

MR. BARTOLAI:  Your Honor, it has been established. I think Mr. Bly testified to who he was.  I am sure there was an expert coming from -- the government has an expert who can -- who will identify all of the Talibanis including Polad. Unless it's relevant to this witness -- unless it's -- unless it relates to this witness', you know, activities in Iraq with Mr. Roggio, we will submit it's irrelevant at this point.

85

MR. HINKLEY:  Maybe I can do more precise questioning in regards to this witness that may alleviate some of the questions, Your Honor.

THE COURT:  That's fine.

BY MR. HINKLEY:

Q.    In your -- in your job in Iraq in the course of doing your job duties, did you have occasion to address, deal with or otherwise communicate with Polad Talabani?

A.    Yes.

THE COURT:  Continue.  Overruled.

BY MR. HINKLEY:

Q.    Who was Polad Talabani?

A.    A person.  What is his role?

Q.    What's his role?  What was his role?

A.    What was his role at the time?  He was in the government of Kurdistan.

Q.    And was he part of also this project Mr. Roggio was working on?

A.    Yes.

Q.    And what was his role in that?

A.    I believe that it was his idea to create this weapons plant.

Q.    So what was the typical day for you during the timeframe of this project when you were there?  What was your typical day like?

86

A.    It varied.  We would have to -- we followed a very strict schedule in the morning.  We would meet downstairs in the lobby, have breakfast and then work downstairs in the lobby most of the day, making phone calls, setting up -- as we said, setting up the e-mails.  Later on we would look at other office spaces and places to live for housing.  That was in the beginning of my stay.

Q.    Who was the one giving you or directing to you complete these tasks?

A.    Ross.

Q.    Did there come a time when you returned to the United States during these early days of the project?

A.    Yes.

Q.    When was that?

A.    I would say roughly around Thanksgiving of 2014, November, I believe.

Q.    What about Mr. Roggio, did he also return to the United States during this timeframe?

A.    Yes.

Q.    So did the defendant ever speak to you about the possibility of being questioned by authorities when traveling to or from Iraq?

A.    Yes.

Q.    What did he say about that?

A.    He said that if we were ever asked why we are in Iraq we

are to say that we're building refugee camps.

Q.   Were you building refugee camps?

A.   No.

Q.   After the holidays did you return back to Iraq?

A.   We went to Haiti first.

Q.   I'm sorry?

A.   We went to Haiti first.

Q.   And what were you doing in Haiti?

A.   From my understanding the three of us flew down to Haiti for Ross to have meetings with government officials there.

Q.   Was it related to the project?

A.   Yes.

Q.   In what way?

A.   I believe it was to communicate with people in Haiti to transport items from the U.S. through Haiti into Iraq.

Q.   Now, after Haiti did you return then back to Iraq?

A.   Yes.

Q.   Once back in Iraq what happened?

A.   We were working.  We set up our initial office.  We began to research other aspects of work, and closer to the new year I got very sick and I went home.

Q.   So before you went home -- I'll get to that in a moment. What type of research were you doing if you recall?

A.   So we had to start searching and looking for equipment and basically -- just equipment to make the weapons and then also

88

searching for engineers from countries in the area to hire.

Q.    Do you recall what type of machines you were looking for?

A.    Not specifically.

Q.    Did you have any discussions with Mr. Roggio in regards to the weapons that were going to be produced?

A.    Yes.

Q.    And were you educated on what those weapons were and how they worked?

A.    We were shown, yes.

Q.    Would you describe that for the jury?

A.    They were an automatic rifle type of weapon as well as potentially some handguns as well -- don't know the difference between them, the types of handguns.

Q.    You indicated at some point you returned home?

A.    Yes.

Q.    What were the circumstances around that?

A.    I had gotten very sick.  I would say it was after new year's.  I needed to go to a doctor, and I had a fever.  I just felt like death, and I was in tears and crying.  Ross was telling me I couldn't go.  He and Elina went to work, and they said they would return.  At that point my things were taken and I was put on a plane to get back home.  All my items were left. I was -- basically went with my bag, just -- the rest of my things stayed in Iraq.

Q.    So you did leave at that point?

89

A.    Yes.

Q.    During your time in Iraq, did you ever have any conversations with the defendant in which you discussed what would happen if you disclosed the true nature of the project you were working on?

A.    To be honest, I have blocked out most of those conversations with this man.  It took me a long time to mentally recover, but it was always an understanding that you cannot not do something that Ross said.  So --

Q.    You did you have an understanding of what would happen to you if you did --

A.    Financial destruction.  I remember he was giving me an example of a girl that he financially destroyed and said he would ruin her.  As you saw in the contract, it was for roughly a sum of 400,000.  It was just financial threats against my family and myself, which I couldn't afford to break.

Q.    In front of you I'll ask you to take a look at Government's Exhibit 11.4.  Do you recognize this exhibit?

A.    It's a photo?

Q.    Yes.

A.    Yes.

        MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 11.4.

        MR. BARTOLAI:  No objection.

        THE COURT:  11.4 is admitted.

MR. HINKLEY:  Would you publish?

BY MR. HINKLEY:

Q.   So some simple questions.  Do you recall the area in which the photograph is taken?  Was this in Iraq?

A.   Yes.

Q.   And can you identify the person on the left side of the photograph in the yellow shirt?

A.   That is Ross Roggio.

Q.   And the person on the right in sunglasses, who is that?

A.   That's me.

Q.   And do you recognize the person in the suit that's facing the defendant, Mr. Roggio?

A.   Yes, I have met him before several times.

Q.   Do you recall his name?

A.   I believe it was Akam, but I don't a hundred percent know. It was a long time ago.

Q.   Is this photograph basically taken during a meeting in regards to the firearms project?

A.   Yes.

Q.   Do you recognize the person in the white and striped shirt?

A.   Do I recognize him?

Q.   By name.

A.   No.

Q.   In your folder there will be Government's Exhibit 11.5.

And this is a photograph, right?

A.    Yes.

Q.    And is this a photograph taken in Iraq?

A.    Yes.

MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 11.5.

MR. BARTOLAI:  No objection, Your Honor.

THE COURT:  11.5 is admitted.

BY MR. HINKLEY:

Q.    So would you describe basically what this photograph is from your recollection?

A.    This is just outside of the previous photo where that building was being built.  It was just basically a work site where they were creating space.

Q.    I'll ask you to go to the next exhibit, exhibit 11.6. This is a photograph taken in Iraq, the Kurdistan region?

A.    Yes.

MR. HINKLEY:  The government moves for admission of 11.6.

MR. BARTOLAI:  Your Honor, I'm going to object to the relevance.  I don't know if this is a photo of the -- where this weapons project is being built or if these are just photos of Iraq.

MR. HINKLEY:  I can clarify, Your Honor.

THE COURT:  All right.  I'll allow Mr. Hinkley to

92

develop this further.  You can renew your objection if you feel you need to.

BY MR. HINKLEY:

Q.   So you've testified you were there during the early parts of this project, the set-up.  Is that right?

A.   Yes.

Q.   Are these photographs that we're going through, is it related to that project at all?

A.   Yes.

Q.   It how is it related?

A.   So these photos were published publically on my social media account at the time because Ross said that we had to take photos and make it appear that we are, in fact, in Suli, Kurdistan and Iraq and working.

          MR. HINKLEY:  May I then proceed, Your Honor?

          MR. BARTOLAI:  I have no objection.

          THE COURT:  11.6 is admitted.

BY MR. HINKLEY:

Q.   So this is -- I take it from your testimony -- consistent with what you just said it was?

A.   Yes.

Q.   In the binder is 11.7.  Is this another photograph that was taken and put on your social media?

A.   Yes.

          MR. HINKLEY:  The government moves for admission of

Government's Exhibit 11.7.

MR. BARTOLAI:  No objection.

THE COURT:  11.7 is admitted.  You can publish.

BY MR. HINKLEY:

Q.    And who's in this photograph if you will?

A.    Ross and myself.

Q.    And are you also in the photograph?

A.    Yes.

Q.    And to the best of your recollection -- there's seems to be a structure there.  What is that if you recall?

A.    Looks like a factory of some sort.

Q.    The next photograph.  Do you recognize this photograph?

A.    Yes.

Q.    And are you depicted in that photograph?

A.    Yes.

Q.    And was this photograph taken in the Kurdistan area of Iraq?

A.    Yes.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.8.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 11.8 is admitted.

BY MR. HINKLEY:

Q.    And who is in this photograph?

A.    Ross is driving.  You can see the arm.  I'm in the

passenger seat, and Elina is in the back seat.

Q.    What's Elina's last name if you recall?

A.    Kandaja.

Q.    So was Elina also there during the early part of this project?

A.    Yes.

Q.    And was Elina also working for the defendant?

A.    Yes.

Q.    And what position or what type of work did she do?

A.    She was to have the role of a personal assistant.

Q.    Would you take a look at Government's Exhibit 11.9?  Is this a photograph taken in the Kurdistan area of Iraq?

A.    Yes.

Q.    And would it be one of the photos you put on your social media?

A.    Yes.

        MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.9.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 11.9 is admitted.

BY MR. HINKLEY:

Q.    Who are these folks in the photograph?

A.    Me on the left, Ross on the right and the other gentleman that was in the previous pictures whose name I believe is Akam.

Q.    Would you take a look at Government's Exhibit 11.10?  Is

this another photograph taken in the Kurdistan area of Iraq which you placed on your social media?

A.    Yes.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.10.

MR. BARTOLAI:  No objection.

THE COURT:  11.10 is admitted.

BY MR. HINKLEY:

Q.    So would you describe what the jury is seeing here?

A.    Ross and one of the workers walking and talking, and this is just outside of the building that you saw.

Q.    How far is this away from the hotel you were staying if you recall?

A.    I don't.  Probably about an hour or so.

Q.    It appears to be a rural area?

A.    Yes, in the mountains.

Q.    Would you take a look at Government's Exhibit 11.11?  And is Government's Exhibit 11.11 another photograph that was taken in Kurdistan Iraq and used on your social media?

A.    Yes.

Q.    Okay.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.11.

MR. BARTOLAI:  No objection.

THE COURT:  11.11 is admitted.

96

MR. HINKLEY:  And kindly publish.

THE COURT:  Yes.

BY MR. HINKLEY:

Q.   Would you look at Government's Exhibit 11.12, please?  So I have the same question.  Is this a photograph taken in the Kurdistan Iraq area?

A.   Yes.

Q.   Was it part of the social media that you posted?

A.   Yes.

MR. HINKLEY:  And the government would move for admission of Government's Exhibit 11.12.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 11.12 is admitted.

BY MR. HINKLEY:

Q.   And is this photograph in the area of Sulaymaniyah if you recall?

A.   Yes, all in the same area.

Q.   Would you look at Government's Exhibit 11.13?  Is this another photograph that was taken in the Kurdistan Iraq region in which you used on your social media?

A.   Yes.

MR. HINKLEY:  The Government's Exhibit moves for admission of Government's Exhibit 11.13.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 11.13 is admitted.

97

BY MR. HINKLEY:

Q.    So would you describe to the jury what this would have been?

A.    More of the same type of photos of Ross and us, and that gentleman who again his name I don't remember -- I think it's Akam -- and it's -- just so everybody understands, these were photos that Ross wanted to us to take so it looks like he was working.

Q.    Was this the factory that Ross was involved building?

A.    I don't know that a hundred percent.

Q.    Is that because you left before it was completed?

A.    Yes.

Q.    Would you take a look at Government's Exhibit 11.14?  And same questions, the Kurdistan region of Iraq, is this where the photo took place?

A.    Yes.

Q.    And one of the images you put up on your social media?

A.    Yes.

        MR. HINKLEY:  The government moves for admission of 11.14.

        MR. BARTOLAI:  No objection.

        THE COURT:  11.14 is admitted.

BY MR. HINKLEY:

Q.    Take a look at the next exhibit, Government's Exhibit 11.15.  Is this a image that was taken in Kurdistan area of

98

Iraq?

A.    Yes.

Q.    And was it one of the images you used in your social media?

A.    Yes.

        MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.15.

        MR. BARTOLAI:  No objection.

        THE COURT:  11.15 is admitted.

BY MR. HINKLEY:

Q.    So I've had you describe a number of these photographs. Is it your testimony this is an area of the where the construction of the factory was going to take place as far as you know?

A.    As far as I know, yes.

Q.    The -- in this photograph, there's a gentleman on the left wearing a yellow visor type of -- a yellow vest--

A.    The Zarya Construction one, yes.

Q.    Was Zarya Construction part of this project?

A.    To my knowledge, yes.

Q.    I'm sorry?

A.    To my knowledge, yes.

Q.    So I will ask you to take a look at Government's Exhibit 11.16.  I apologize for having to go through this, but it's a way that evidence works in federal court.

99

A.    Okay.

Q.    So in Government's Exhibit 11.16, is this another photograph similar to the previous ones?

A.    Yes.

        MR. HINKLEY:  So the government will move for admission of Government's Exhibit 11.16.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 11.16 is admitted.

BY MR. HINKLEY:

Q.    Government's Exhibit 11.17 is the next one.  Take a look at that, and just go ahead and tell us whether it's another photograph in the series we're talking about.

A.    Yes.

        MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.17.

        THE COURT:  Any objection?

        MR. BARTOLAI:  None.

        THE COURT:  11.17 is admitted.

BY MR. HINKLEY:

Q.    Why don't we skip ahead to 11.28?  Some of the numbers are hard to see.

A.    It's so blurry.  Yes.

Q.    Is this another photograph that was taken in the Kurdistan area of Iraq?

A.    Yes.

100

MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.28.

MR. BARTOLAI:  No objection.

THE COURT:  11.28 is admitted.

BY MR. HINKLEY:

Q.   So earlier you testified that you had you met Polad Talabani there in Kurdistan Iraq?

A.   Yes.

Q.   I will ask you to look at Government's Exhibit 11.42.  Do you recognize this photograph?

A.   Yes.

Q.   What is this photograph?

A.   It's a picture of back of a motorcycle, the wheel cover. Are we not looking at the right one?

Q.   11.42.

A.   Oh, I apologize.  11.42 is a vehicle.

Q.   Do you know whose vehicle this is?

A.   Yes.

Q.   Whose vehicle?

A.   Polad's.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 11.42.

MR. BARTOLAI:  Your Honor, I object as to relevance.

THE COURT:  That's a fair issue.  How is this relevant?

101

MR. HINKLEY:  I will have the witness identify that the license plate is C. T. G.

MR. BARTOLAI:  Objection, Your Honor, it's not -- it's not in evidence.  It's improper to comment as to --

MR. HINKLEY:  He's asking what relevance --

MR. BARTOLAI:  Maybe we should have a sidebar, Your Honor.

THE COURT:  I think we should.

(The following discussion took place at sidebar:)

THE COURT:  Are you getting into license plates?  Is that it?

MR. HINKLEY:  C. T. G., which is Counter Terrorism Group.

THE COURT:  It would be useful if she testifies how she knows this is Polad Talabani's vehicle because she simply --

MR. BARTOLAI:  This was in London, was it not?  If you are showing a photo of a car in London, what relevance does it have to --

MR. HINKLEY:  We are claiming Polad was part of C. T. G. running it and he has a vehicle with a license plate C. T. G. 1.

THE COURT:  Fair enough.  Let's go.

(The discussion at sidebar concluded.)

BY MR. HINKLEY:

102

Q.    You've indicated that you believe this to be Polad Talabani's car.  How do you know that?

A.    How do I know it's his car?  I took the picture when he picked it up, and he picked me up in it.

            MR. HINKLEY:  I move for admission of Government's Exhibit 11.42.

            MR. BARTOLAI:  No objection.

            THE COURT:  11.42 is admitted.

BY MR. HINKLEY:

Q.    I note the vehicle has a license plate?

A.    Yes.

Q.    What's the license plate read?

A.    C. T. G. 1.

Q.    And do you know personally what C. T. G. meant on the license plate?

A.    Yes.

Q.    What?

A.    Counter Terrorist Group.

            MR. HINKLEY:  If we may have a moment, Your Honor?

            THE COURT:  Sure.

            MR. HINKLEY:  No further questions, Your Honor. Thank you.

            THE COURT:  Very well.  Cross-examine, please.

            MR. BARTOLAI:  Thank you.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    I don't want to -- I don't want to pronounce your name wrong.  Abayeva, is that --

A.    Abayeva.

Q.    Abayeva, okay?

A.    Call me Suzy.  That's fine.

Q.    Let's -- I just want to kind of -- we'll -- I want to talk about the photos and the last photo, the Lamborghini.  I think it was 11.42.

A.    Uh-huh.

Q.    Do you have that?  Can we see that?  So this is a photograph of Polad Talabani's vehicle.  Is that right?

A.    Yes.

Q.    And you took this photo?

A.    Yes.

Q.    And where was this photo when it was taken?

A.    In a car park in London.

Q.    In London, okay.  Do you recall when it was taken, the year?

A.    Not exactly, no, 2000 -- I can take a guess, but I don't recall.

Q.    Come close.  I mean try to -- I'm not asking you to guess.

A.    Trying to remember which of the times I went to London.

Q.    Were you with Polad -- I think you said he picked you up in this car?

104

A.   Yes, it was September 2017 maybe.

Q.   Okay.  So approximately?

A.   Yes.

Q.   As you recall things it was approximately September of 2017 when Polad picked you up in this car in this Lamborghini and it was in London, right?

A.   Yes.

Q.   All right.  There's a lot of photos that were just -- that were introduced.  I don't want to -- I am not going to go through all of them.  They seem to be the same.  They seem to show they were in Iraq.  They were in Kurdistan.  And they showed a factory or a partially complete building that could be some sort of factory, and there were individuals there including yourself and including Akam as well as Mr. Roggio. Do you recall that -- those series of photos?

A.   Yes, I took those photos.

Q.   I am going to ask the government if they would pull up 11.7.  Now, you've seen 11.7 before, correct?

A.   Yes.

Q.   This is -- Mr. Roggio is there as well as yourself, right?

A.   Yes.

Q.   And this is in the background is this factory it looks like or this building?

A.   Building.

Q.   It's partially -- look likes it's in construction, right?

105

A.    Correct.

Q.    Do you recall -- who you took these photos?

A.    Myself and Elina.

Q.    Okay.  And you took them at the direction of Mr. Roggio, correct?

A.    Yes.

Q.    All right.  And do you recall when that would have been?

A.    I don't.  They would be posted on my social media with the date.

Q.    Okay.  But --

A.    2014.

Q.    I don't want to confuse you at all.  These photos -- when did you leave Iraq?

A.    In January of 2015.

Q.    So January 2015.  So in other words, these photos had to be taken before January of 2015, right?

A.    Yes.

Q.    All right.  So when you went to Iraq, you were kind of on the ground floor of this project, would you agree?

A.    Yes.

Q.    In fact, I think the government has said you were their first employee.  Do you know if you were?

A.    I don't think they said that, and I don't know if I was his first employee or not.

Q.    How many other employees did you -- of Mr. Roggio did you

see when you were in Iraq?

A.    One other.

Q.    That was Elina?

A.    Yes.

Q.    Okay.  All right.  So when you got to Iraq, you began by setting up, you know, the very -- in the very beginning the building blocks of what was going to be a company.  Is that right?

A.    An office space for a company, yes.

Q.    And I believe you said that part of that -- part of what you were doing there was you had to start researching who are going to be the employees, right?

A.    Yes.

Q.    Who --

A.    Engineers.

Q.    Engineers, right.  And as well as machines -- machines were going to have to be obtained.  Is that right?

A.    Yes.

Q.    And Mr. Roggio was clear with you when he told you that when looking for these machines he wanted to look into India and China versus the United States, right?

A.    We started with China, yes.

Q.    Okay.  And he was specific that he wouldn't be buying the machines from the United States, correct?

A.    No.

107

Q.    And you say no, do you mean he wasn't going to buy them from the United States?

A.    He never said he wasn't going to.

Q.    Did he tell you to look for machines in the United States?

A.    No.

Q.    Okay.  Now, Zarya -- if you could, please, take us to Government's Exhibit 11.15.  We heard Zarya before.  We see in --

A.    Zarya, yes.

Q.    We see in 11.15 Government's Exhibit a individual with his back towards us and he has on looks like some sort of a, you know, safety vest, and it says Zarya -- but maybe it's Zarya?

A.    Zarya Construction.

Q.    This is Zarya Construction, correct?

A.    That's what it says.

Q.    All right.  You knew them to be involved in the project.  Is that right?

A.    Yes.

Q.    All right.  Getting back to this -- and again -- you know, I'm sorry.  I jumped ahead.  If we can go back to -- if we can -- 11.4, please.  And in 11.4 we see yourself and Mr. Roggio, and I believe you thought the individual in the suit right in the very forefront of the picture was Akam?

A.    I thought that was his name.  It was ten years ago.  I don't remember.

108

Q.    I understand.  And Akam was a person that was -- that Mr. Roggio dealt with a lot.  Is that right?

A.    I don't know if he dealt with him a lot.

Q.    He was somewhat of an overseer on the project, was he not?

A.    He was a point of contact I believe.

Q.    Point of contact for the --

A.    The other side.

Q.    The other side, the sources.  Is that right?

A.    Correct.

Q.    Okay.  And if we can go to 11.7, please.  Government's Exhibit 11.7.  Again, this is -- this is what I want to clear up.  This building, this uncompleted building, this is not the arms factory that Mr. Roggio was building in the Kurdistan region of Iraq, is it?

A.    I don't know.

Q.    You don't know.  You were there up until January of 2015, and there were two employees, yourself and Elina, and you were looking for engineers, and you were looking for machines and certainly if there was a site and building being constructed, you would have known it, wouldn't you?

A.    No.

Q.    You wouldn't have known, okay.  Did Ross Roggio or anyone ever tell you when you were here that day -- were you only here one day?

A.    Yes.

109

Q.   Did anyone say, well, here it is, here's the building, here's where we're going to be working, here's our project?

A.   No, it's a secret project.

Q.   Secret, I see.  It wouldn't be a secret for you?

A.   For me.  There was other people there.  I'm sure they wouldn't have their workers know what they're building.

Q.   Akam, he would have known about the project, would he have not?

        MR. HINKLEY:  Objection, speculation.

        THE COURT:  Sustained.

BY MR. BARTOLAI:

Q.   You're saying is Mr. Roggio -- you indicated that Mr. Roggio instructed you to take photos to post on Facebook to show he was working, correct?

A.   Yes.

Q.   He is working here, is he not?

A.   He's standing there.

Q.   What is he doing standing there?  What are you people doing there that day?

A.   He asked us to take these pictures and stage that we're working.

Q.   Just go up to this partially completed building and --

A.   Yes.

Q.   Take pictures?

A.   Yes.

110

Q.    That's what this --

A.    That's what he wanted us to do.  Again, because this project is so secret I think these pictures was just to show we're there, and he wanted us to specifically post them from there.

Q.    He wanted you to post secret pictures of the project on Facebook?

A.    He wanted us to post these specific pictures of this site on Facebook.

Q.    Okay.  All right.

        MR. BARTOLAI:  Nothing further.  Thank you.

        THE COURT:  Redirect?

        MR. HINKLEY:  I have one or two redirect if I may, Your Honor.

        THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. HINKLEY:

Q.    If you can pull up 11.4, please.  You indicated in cross examination that this may have been Akam who may have been related to Zarya Construction Company.  Is that right?

A.    I don't know if it was Zarya.  He was just on the other side.

Q.    Okay.  Let me ask you this.  Was that construction company -- was that the head of this project?  Was it the construction company that was interested in building a firearms factory?

A.    No.

Q.    Who was interested in building a firearms factory?

A.    To my understanding Polad.

            MR. HINKLEY:  No further questions, Your Honor. Thank you.

            MR. BARTOLAI:  Nothing.

            THE COURT:  Thank you very much.

            THE WITNESS:  Thank you.

            THE COURT:  You can step down.

            MR. HINKLEY:  May we take a 15-minute break, Your Honor?

            THE COURT:  Sure, 15 minutes.

            (A brief recess was taken.)

            THE COURT:  Call your next witness.

            MR. CLAFFE:  The government calls Frank Monteforte.

            FRANK MONTEFORTE, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CLAFFE:

Q.    Good afternoon, Mr. Monteforte.

A.    Hello.

Q.    What do you for a living?

A.    I own a packaging and shipping business in East Stroudsburg.

Q.    What's the name of that business?

112

A.    The Packaging Place.

Q.    How did you come up with that name?

A.    We are part of a franchise Packing Plus.  So instead of changing too many letters, it was just Packaging Place, easy.

Q.    How long has the Packaging Place been in business?

A.    Almost 35 years.

Q.    Have you been the owner the whole time?

A.    Yes.

Q.    And where is the Packaging Place located?

A.    In East Stroudsburg on Business Route 209.

Q.    Always been there?

A.    In the same location but within a mile.

Q.    What kind of services does the Packaging Place provide?

A.    Packaging, shipping, faxing.  We do fingerprinting now. Yeah, packaging and shipping is 90 percent of what we do.

Q.    How many people work at the Packaging Place?

A.    Me, one.

Q.    Anyone else ever help you out?

A.    My wife is there now.

Q.    How often are you yourself there?

A.    Every day.

Q.    Never missed a day?

A.    No.

Q.    Were you there this morning?

A.    Yes.

Q.    So the streak is still alive?

A.    Yes, I have been there every day for 35 years so --

Q.    What kinds of things do you typically ship for folks?

A.    Right now we have hundreds of dolls there.  We ship for an auction house, so dolls everywhere, Holly Hobbies.  In 35 years we shipped a lot of different things.

Q.    What's the most unusual thing you ever shipped?

A.    Somebody shipped a thrown that they had for themselves.

Q.    What do you mean a thrown?

A.    A big chair he kept in his living room -- and a monkey coconut lamp that freaked you out when you was a kid from the Wizard of Oz.  It was weird.

Q.    Does it matter what they bring in --

A.    Just about everything, yes.

Q.    Walk us through that process.  What do you do when someone brings in an item?

A.    Somebody brings in an object.  We have a lot of mother's day stuff this week.  Somebody brought in something for their mom that I don't think she's going to like it, but they were happy to send it.  We will just box it up, ship it out and send it on its way.

Q.    You provide all of the supplies to do the boxing?

A.    Sometimes people bring their own things packed.  Most of the time if it's anything complex, we'll do it.

Q.    What shipping companies do you work with?

A.    UPS, DHL for international and Fed Ex and the mail.

Q.    Did you say DHL for international?

A.    We use mostly them.

Q.    Why them?

A.    They seem to be the most reliable for international.

Q.    Have you ever met the defendant Ross Roggio?

A.    No, I haven't.

Q.    Do you know who he is?

A.    Now I do.

Q.    Have you ever met anyone associated with the defendant Ross Roggio?

A.    His wife.

Q.    What was her name?

A.    Kristy.

Q.    When did you first meet Kristy?

A.    When she came to the store about six years ago I would assume, yeah.

Q.    Do you know approximately what year that was?

A.    '16.  I think 2016.

Q.    Approximately how many times did Kristy come into the Packaging Place?

A.    About four or five times.

Q.    Over how many months?

A.    Four or five months.

Q.    I would like to direct your attention to March 2016.  Do

115

you recall a particular time when Kristy came into the shop in March 2016?

A.    I do now, yeah.

Q.    Well, what do you remember sitting here today about that time?

A.    She brought in these tools and a bunch of other stuff, nothing different -- a little bit different than stuff she used to bring in.  I'd just, you know -- I think she had it boxed already.  We go through it because international -- it's not like sending to Jersey.  You have to go through it unless everything is in the packaging.

Q.    Did Kristy know what the items were she was bringing?

A.    She said they were tools.

Q.    Did you know what they were looking at them?

A.    They looked like tools.  I went through each item individually to see what they were.

Q.    Describe these items like physically how they looked.

A.    They were in original packaging.  She bought them from a company, and we went through to double check -- shoe polish and some other ordinary -- we have to list everything on the customs document when it goes international.

Q.    So when Kristy brought the items, were they in a box?

A.    Yes.

Q.    Did you open the box?

A.    Yes.

116

Q.    You opened the box?

A.    Right.

Q.    You found items inside?

A.    Right.

Q.    You repackaged them after looking at them?

A.    Yeah, her box is okay sending to, you know, Florida but not to go overseas.

Q.    Where were the items going?

A.    Iraq.

Q.    I would like to show you what has been previously marked as Government's Exhibit 8.5.  You got a binder in front of you. If you don't mind -- just trying to flip to the tab that says 8.5.  I think it's probably to the right.  Take a look at that page.  You don't need to read anything about it to me.  Just generally tell me if you recognize this exhibit.

A.    This is -- when somebody brings something international you have to physically put every single item in it and it goes on a commercial invoice.  It was a gift it would be called a pro forma invoice.  This is a commercial invoice.  That's what has to be filled out.

Q.    Was this commercial invoice for the shipment that --

A.    For that box of that day.

        MR. CLAFFE:  Your Honor, the government moves exhibit 8.5.

        MR. BARTOLAI:  No objection.

117

THE COURT:  8.5 is admitted.

MR. CLAFFE:  May we publish?

THE COURT:  Yes.

BY MR. CLAFFE:

Q.   So, Mr. Monteforte, who provided the descriptions of merchandise that's listed down on the left-hand side?

A.   I did.  She had a packing list of some of these tools that she would ship.  I used that.

Q.   So looking down this list, fourth item listed, what does that say, 3465?

A.   Reamers.

Q.   Do you know what a reamer is?

A.   No.

Q.   Do you know what is below that?

A.   Drill bits part 99.18.

Q.   Do you know what that is?

A.   No, I must have copied it off the packaging.  I wouldn't know what it is.

Q.   Below that?

A.   Same thing, nine millimeter drill bits.

Q.   Do you know what that is?

A.   Drill bit for a drill.

Q.   What's the total value of the items listed there?

A.   $900.

Q.   And right below that -- so looking right below the

118

descriptions, what's listed here as the ultimate destination country?

A.    Iraq.

Q.    I'm now going to show you what has already been admitted as Government's Exhibit 8.4.

MR. CLAFFE:  Your Honor, may we publish 8.4?

THE COURT:  Yes.

BY MR. CLAFFE:

Q.    Do you recognize this document?

A.    That's the document -- if you came into my store that's what you fill out before you ship something.

Q.    So the day we have been talking about, who filled out this form?

A.    Kristy Roggio.

Q.    What is the ship to address here on this form?

A.    Iraq.

Q.    Who is the addressee here?

A.    A business TOSCO or Ross Roggio, Baharan Residential Complex Building B. Floor 1, Office 10 -- I won't pronounce it -- a region of Iraq.

Q.    What's -- if we can -- so the description of items here, who filled that out?

A.    The description, that's Kristy.

Q.    And what's below there?  Is that an e-mail address?

A.    Right.  If you want the tracking, we will e-mail you

tracking so you can see the progress of the package.

Q.    So did you ask Kristy to write an e-mail address on this?

A.    Yeah, so I can send the tracking.

Q.    Do you always ask for an e-mail address to send tracking information?

A.    People like to do it.  Instead of calling me they can track it themselves.

Q.    Did you send the tracking to this e-mail address?

A.    Yes.

Q.    How about the amount listed in the right column, who filled that out?

A.    Me.

Q.    What's that number?

A.    $2,628.22.

Q.    What was that for?

A.    Shipping.

Q.    That's the cost of shipping?

A.    Yes.

Q.    Do you know if the shipment ever made it to Iraq?

A.    I haven't heard it didn't.  You spend $2,700 I'm sure it gets there.

Q.    Fair enough.

        MR. CLAFFE:  I have no further questions.

        THE COURT:  Cross-examine.

        MR. BARTOLAI:  Thank you.  May I have a moment, Your

120

Honor?

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    Good afternoon, sir.

A.    Hello.

        MR. BARTOLAI:  Just the last one again, this -- what was this last exhibit, the 8.4?

        MR. CLAFFE:  That's right.

BY MR. BARTOLAI:

Q.    In other words, this package -- these packages that were sent to Iraq, they cost that much money to ship them, $2,628.22?

A.    Yes, that's a deal.

Q.    That's a deal.  Well, gee, they were big boxes?

A.    This is six years ago.  It's just expensive shipping overseas.

Q.    It is.  Let me ask you, so you have to do this, and you open up these -- Mrs. Roggio -- while we are on 8.4, this is -- she came in, and she filled this out, and she handed this to you.  Is that right?

A.    Yes.

Q.    And then you said, this is going overseas, so you are going to have to open it up and look at it and do these things. So, now, when you open up this box -- when you open up these boxes, you have some questions as to some of these things.  Is

121

that right?

A.    Right.

Q.    You know certain things can ship to Iraq or different places and other things can't, right?

A.    I don't know until they call the carrier.

Q.    All right.

A.    Each country is different.

Q.    Okay.  I see.  Are there certain things you would know banned right off the bat?

A.    Medicine.  Any country except Cambodia.  Every other country you can't send any medicine.

Q.    Any medicine.  Did there come a time in this particular case where you had -- you felt maybe I should call anybody regarding some of the items that were in the box?

A.    If I'm not sure I'll call -- I called the shoe polish company, too, to make sure that can go.

Q.    Do you recall calling Drill Masters Eldorado Tool in this particular shipment?

A.    Yes.

Q.    You had some concerns about how to describe these items?

A.    I gave them the part number of what was on the pack of the packet.

Q.    You told them that?

A.    Yes.

Q.    They didn't tell you, don't ship it, right?

A.    He said there's no problem.

MR. CLAFFE:  It's hearsay whatever they told him back --

THE COURT:  Sustained.

BY MR. BARTOLAI:

Q.    Regardless what they told you, you didn't ship it, right? -- I mean, you did ship it?

A.    Yes.  No, if they said I couldn't ship it, I wouldn't ship it.

Q.    So you did ship it, all right.  Let's talk about how things work.  You're familiar -- you're in the industry a long time?

A.    Yes.

Q.    And you're familiar with -- you shipped a lot of packages overseas -- I'm not talking about to Iraq in particular -- but other places?

A.    Yes.

Q.    All right.  And are you aware that there's -- are you familiar with how things leave the country?  Do they have to go through customs and such?

A.    Yes, they do.

Q.    You said you part of your job is to fill out a form regarding these things?

A.    Right.

Q.    In fact, that's what you were doing in this particular

case?

A.    Exactly.

Q.    What happens at customs?  Do people look at this form?

MR. CLAFFE:  Objection.  How does he know what happened at customs?

THE COURT:  Sustained.

BY MR. BARTOLAI:

Q.    You fill out a form so customs if they choose to check it can look to see what's on it?

A.    Exactly.

Q.    A manifest?

A.    Right.

Q.    And -- okay.  If it -- if it can't ship, what happens?

A.    It would come back to me or I get a phone call.

Q.    And did you ever try to -- Mrs. Roggio ever try to send Zippo lighters to Iraq if you remember?

A.    Yes.

Q.    Did they come back?

A.    I never shipped them because I called her and said these can't go.  I called Zippo.  They said it's not a good idea. Lighters in the plane is not a good mix.

MR. BARTOLAI:  Okay.  Good.  Good.

REDIRECT EXAMINATION

BY MR. CLAFFE:

Q.    Frank, do you have any idea how many boxes go through

customs any given day?

A.    No.

THE COURT:  Last call.

MR. BARTOLAI:  Nothing.

THE COURT:  Thank you, Mr. Monteforte.  You can step down.

MR. HINKLEY:  May we approach, Your Honor?

THE COURT:  Sure.

(The following discussion took place at sidebar:)

MR. HINKLEY:  Your Honor, Mr. Bartolai has been affective in his cross.  We have run out of witnesses for today.

THE COURT:  Is that right?

MR. HINKLEY:  I apologize.

THE COURT:  Somebody first thing tomorrow morning?

MR. HINKLEY:  We do.

THE COURT:  Okay.  Okay.  It's just about 3:30.  We will give the jury an early break.

MR. HINKLEY:  We apologize -- just scheduling with the witnesses.

THE COURT:  I understand.

(The discussion at sidebar concluded.)

THE COURT:  Members of the jury, the process of getting people here to testify sometimes doesn't work as smoothly as we would like to.  As a result the government's

125

next witness will have to be tomorrow, tomorrow morning.  So for that reason, I am going to excuse you the rest of the day and resume 9:30 tomorrow morning.  Once again as I told you, keep an open mind until you heard all of the evidence in this case and listen to my instructions.  Don't discuss the case among yourselves or with anyone else.  With that, have a good evening.  I look forward to see you tomorrow morning.  Anything else we need to discuss before we adjourn?

MR. BARTOLAI:  Todd, Your Honor, I'm just going to -- rather than come up to you tomorrow and say this and that I might as well -- I can use the time now.  Your Honor, there's a witness the government has identified through the Jencks.  I intend they are going to call him.  His name is McBride, Your Honor.  He's apparently -- this is a witness that they weren't sure if he was going to testify until the Friday the 5th of May.  I'd -- at the point at some point ask for an offer of proof regarding this fellow.

I don't know if they intend to call him tomorrow.  So if you want to take that up now, it might save us some time.

THE COURT:  We can continue to use some time today to accomplish something else.  This McBride, is this someone you intend to call?

MR. CLAFFE:  Not until next week.

THE COURT:  You require an offer of proof?

MR. BARTOLAI:  This individual wasn't over there with

126

Mr. Roggio, don't know anything about the torture, didn't work for him. I think he might have been in Iraq at one point in time, and I think the government is trying to use him to establish that some -- there was a base or -- C. T. G. base or something. They were showing him satellite photos. I don't understand the relevance. If he's an expert, I should have some sort of an opinion. I should have some sort of disclosure. And if it's a lay opinion, I don't know how it's helpful.

MR. CLAFFE: It's neither expert nor lay opinion, Your Honor. He's a fact witness. He was in Iraq in Sulaymaniyah in October, November 2015, the same time as the alleged torture. We heard testimony, and we will more testimony that this torture took place at a particular compound near the airport in Sulaymaniyah.

This witness Mr. McBride can testify as to the location of that compound and who controlled it. So it's a very relevant fact witness as to the -- corroborate the witnesses to the torture with respect to the control of that compound.

MR. BARTOLAI: I don't think he has firsthand knowledge of that.

MR. CLAFFE: He doesn't have firsthand knowledge of the torture. He has firsthand knowledge of the compound.

THE COURT: Obviously once this person is produced

127

we'll be able to determine what his firsthand knowledge consists of.  Right now there's a representation being made he has firsthand knowledge of the compound wherein it is alleged that that certain torture took place.  Beyond that I'm not ready to say he's -- he's appropriate for any other testimony. But based on representation that he has knowledge of the compound, where it is and how it's structured, I think he is certainly qualified to testify on the basis of his own personal knowledge as to that.

When we get beyond that I'll have to see because I haven't heard anything specific that would lay a foundation for his further testimony, but we'll see.  Anybody else you want to talk about?

MR. BARTOLAI:  So what happened in this case, Your Honor, is very -- I think it was Thursday of last week - and the Court is aware of this.  There was a couple government witnesses, one in particular, Mr. Mathes who had some sensitive material, and it was disclosed with me.  We asked -- the government asked for a protective order.  I agreed to it.  It was presented before the Court, and the Court signed it.  Of course, the material then was disclosed, and the nature of the material -- I'm not -- I don't ever intend -- this material consisted of reports I received.  They were heavily redacted.

I don't intend to use those reports.  However, the reports suggest that during the time relevant to this case --

in fact, covering both sides of the case beginning and the end of Mr. Roggio's conspiracy, Mr. Mathes was a confidential informant for the Department of Defense and earlier -- not including the full conspiracy.  He was a confidential informant for the FBI and that he received substantial sums of approximately 8,000 -- $7,500 from the Department of Defense and maybe $4,500 from the FBI for his role.

In those roles he came across Mr. Roggio and had discussions with him.  And again, they are pretty -- I would say they include the subject matter that forms the basis of this case, this conspiracy.  And so I intend -- and again when I do cross-examine this witness, Mr. Mathes -- and I have given the government notice pursuant to the protective order -- I intend to do so.  I will -- I would like to elicit the fact during those relevant timeframes I've mentioned he was, indeed, a confidential informant for the Department of Defense and that, you know, the time he shipped these items to Mr. Roggio and he was paid by the Department of Defense for services.

It goes towards motive and the fact he's a confidential informant.  The fact he's been being paid I think it's relevant, Your Honor.  I think it should be admissible.

THE COURT:  What's the government's position here?  Let me understand first what Mr. Mathes is being called for purposes of the government's case, and you can respond to what Mr. Bartolai indicated is the approach he wants to take on

129

cross examination.

MR. CLAFFE:  Your Honor, Mr. Mathes is being called because he sold the defendant M4 gas bolt rings and firing pin retainers and shipped them to Pennsylvania.  Like past witnesses, he's a fact witness as to one of the export charges. With respect to Mr. Bartolai's position on the information we provided last week, the government has no objection to testimony with respect to the fact that Mr. Mathes was a source for the FBI or the Department of Defense, even the fact that he was paid money.

You know, the information he provided to the government with respect to his interactions with the defendant is consistent with his testimony that we will be bringing out on direct.  So we have no objection to that.  There are some boundaries with respect to the sensitive national security information that we object to Mr. Bartolai getting into, and that would be, you know, if he started asking about who his handlers were, the Department of Defense, who else he might have given information on, not the defendant, things like that.

MR. BARTOLAI:  I won't go there.  Just as I've indicated is what I hope to elicit on cross examination.

THE COURT:  Well, I think both of you laid out your positions very well.  It doesn't appear as though there's a conflict based on what his direct testimony will be and what you intend to do on cross examination.  To the extent what you

130

do is what you just described, the government has no objection.

MR. BARTOLAI:  It's because of the protective order, Your Honor, I bring it to your attention rather than start --

THE COURT:  No, I appreciate the fact you're bringing it up now.

MR. CLAFFE:  So do we.

MR. BARTOLAI:  I think we're okay.

MR. CLAFFE:  We're good.  We're good.

THE COURT:  Anything else otherwise?

MR. CLAFFE:  One other matter, Your Honor.

THE COURT:  Of course.

MR. CLAFFE:  We might call a witness by the name of Roger Krahl tomorrow.  He's another fact witness with respect to the gas rings and retaining pin transaction.  Out of abundance of caution and pursuant to the government's discovery obligation, Roger Krahl has an older conviction for a class four felony in Kane County, Illinois.  That indictment and guilty plea was in 1997.  I don't know if Mr. Bartolai was planning on inquiring about that prior conviction for impeachment purposes, but, Your Honor, the government's position would be that Federal Rule of Evidence 609 B. says a conviction older than ten years of age are inadmissible unless the probative value outweighs the prejudicial effect.  Here the conviction is 16 years old.

It has been expunged from his record.  We think

bringing this up at this point would be much more prejudicial than probative to whether or not he has been rehabilitated and his trustworthiness is at issue here.

MR. BARTOLAI:  Your Honor, this is not a critical witness.  Mr. -- Scott is right when he says that rule 609 would preclude this remote in time -- and I don't intend to bring it up.  Indeed it has been expunged.  They brought up this Mr. Krahl.  I just want to -- this is another subject in our motion, and it's best that we might address it now.  So Mr. Krahl -- the story was according to the government when we were doing these things -- the government's briefs and such -- when Mr. Roggio tried to buy these gas -- he would have liked to buy the gas rings from Mr. Krahl, but he couldn't buy the gas rings from Mr. Krahl because of prior bad dealings they had.

And instead Mr. Mathes bought them from Mr. Krahl to forward to Mr. Roggio.  So this is one of those alleged as a bad act and subject of our limine motion.  I didn't want to get into the dispute Mr. Krahl had with Mr. Roggio.  I don't think the government is going to get into it.  But again this Mr. Krahl, he was the subject of our -- of a motion in limine regarding bad acts, regarding past bad dealings with Mr. Roggio.  It's not -- you know, it's a whole dispute.  It wasn't just, you know, Mr. Roggio feels that he was the one who actually had the bad dealings.  I don't think we need to get into that.  I think the government will agree and --

132

THE COURT:  What's the government's view on that?

MR. CLAFFE:  The government's position is that actually the prior dealings with Mr. Roggio and Mr. Krahl are actually relevant to the charge here and it explains the reason why they had to engage in sort of a triangular or transaction here.  It's not another crime, wrong or act.  It's just a course of business conduct that establishes that they had a past relationship and it's the reason for the sort of convoluted structure of the transaction.

We argue it's directly relevant to the charges and is not excludable under 404.

THE COURT:  Anything else?

MR. BARTOLAI:  Yeah, I mean, it's not -- it isn't that simple.  The papers will show that.  In other words, they're going to have receipts that show Mathes bought from Krahl and Krahl delivered to Mathes and Mathes shipped to Roggio.

THE COURT:  What is the actual factual prior bad act that's at issue here?

MR. BARTOLAI:  So what happened here Mr. Roggio -- they talked about this in the past.  Mr. Roggio was working in North Carolina or South Carolina.  He had a gun making firearms business there where he made part of the firearm.  Mr. Bly testified to that.  This individual that they're discussing Krahl had purchased some of those receivers, and Mr. Krahl had

a problem with him.  So he returned them to Mr. Roggio, and at that point in time he never paid for them.  It has to do with these lower receivers that were shipped and not paid for.  Mr. Roggio had a position that Mr. Krahl owes him $50,000 and Mr. Roggio called him about it, and Mr. Krahl said, you're not going to get paid.  It was a dispute.  It was a dispute over these lower receiver.  They wouldn't do business with each other since then.  So I mean --

THE COURT:  It sounds like a garden variety buyer seller contract dispute.

MR. BARTOLAI:  To a certain extent, yeah.

THE COURT:  I'm not seeing the prior bad act contribute here.

MR. BARTOLAI:  The prior bad act is when these fellows -- when they call him up he kind of -- it took him -- I think he became hysterical laughing about it and went off on how Mr. Roggio is a real shister.  They are my words.  I don't know to explain it.  I wouldn't want -- I don't know how that's going to come out.

THE COURT:  How would that particular episode between Mr. Krahl and Mr. Roggio have relevance here?  And I understand there was -- what you termed a triangular relationship for purposes of moving the parts because of the bad blood between Mr. Krahl and Mr. Roggio.  I don't see how that's a particularly relevant fact.  If it is I don't see how it's

134

indicative of a prior bad act.  Breaching a contract?  He manufactured parts.  This guy thought they were -- they were defective in some fashion.  There is a dispute over payment. I'm not sure that qualifies under 404 A. or B. either as something that is propensity evidence or B. something excused as being indicative of motive, lack of accident or mistake.  It doesn't seem to fit into the argument you guys are making, both sides.

MR. CLAFFE:  Our position is it lays the foundation for us to be able to ask whether Mr. Krahl would have done business with Mr. Roggio directly, and that answer then lays the foundation for testimony by who ultimately transacted with Mr. Krahl and Mr. Mathes.

THE COURT:  Why should the jury care whether Mr. Krahl would have done business with Mr. Roggio directly if upon further presentation of testimony it's revealed there was a contractual dispute them where one party thinks they were given bad parts and the other party feels they were stiffed on the price?  I'll have to wait on that to hear what you guys -- your witness actually says.

MR. CLAFFE:  To be clear, Your Honor, we're not going to dwell on that.  We just need to get to the point as to explain -- I think the jury will have questions as to why this weird transaction happened, you know, why is he sending them to Mathes in order to get to Roggio.

135

THE COURT:  It would seem to me you can agree.  There was a prior dispute that required the transaction be handled differently this time.  That's certainly relevant, but it doesn't get into the actual nature of the dispute between Roggio and Krahl.  It doesn't require -- doesn't require Mr. Bartolai to claim it's a prior bad act.

MR. CLAFFE:  I will ask that way if Gino will allow it.

MR. BARTOLAI:  I think we can get through it without -- we will try to, right?

MR. CLAFFE:  I am willing to give it a try.

THE COURT:  I will if you can't work it out.  Okay.

MR. JASPERSE:  As long as we are taking up these issues, there's one occurred to me.  One of the government's possible witnesses tomorrow is Aurelia Morales.  She's the C. V. P. officer.

THE COURT:  Who testified before me in the original suppression?

MR. JASPERSE:  Correct.  Long before I was on the case.  So she does the interview of Mr. Roggio, returns to the United States in February 2017.  The government is calling her to testify that Mr. Roggio gave a cover story similar to what you heard from some of the other witnesses which is that he was in the Kurdistan region of Iraq.

THE COURT:  He was kidnapped.

136

MR. JASPERSE: So that's the issue. The government is calling this witness to testify that the defendant said he was there to do construction, residential construction. So it corroborates other testimony regarding the cover story that people were supposed to give. The government does not intend to elicit that he also said that he was kidnapped and detained there for December 2016 until February 2017 because as -- there's been pleadings back and forth on this. We don't see how what purportedly happened to the defendant when he's trying to leave Iraq is relevant to the crimes that he's accused of committing prior to that.

So they have argued what happened is when he's trying to leave goes to duress, but that's duress that occurs, you know, well over a year after the torture and duress that occurs some months after the export violations that we've been discussing. So our position is that she's going to testify as to the cover story, and I expect the defense will try to get into the kidnapping part of the statement at J. F. K. airport. Our position is that that's irrelevant and shouldn't come in and --

THE COURT: On cross examination -- here's the difficulty. I understand your position. But on cross examination with the witness, of course, being sworn to tell the truth if, in fact, she's asked a question as to whether Mr. Roggio said that, it is hard for me to sustain an objection on

137

the grounds it's not relevant where she's giving an account of what he said on his -- on reentry where she was specifically directed to question him on certain matters before she turned him over to a subsequent official.  I think that's probably going to come in.

MR. JASPERSE:  Okay.  That's helpful to know.  We'll probably do it on direct as well then.  Thank you.

THE COURT:  Okay.  See you tomorrow.

138

REPORTER'S CERTIFICATE


     I, Laura Boyanowski, RMR, CRR, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.



                         s/ Laura Boyanowski, RMR,CRR
                         Laura Boyanowski, RMR, CRR
                         Official Court Reporter

REPORTED BY:

     LAURA BOYANOWSKI, RMR, CRR
     Official Court Reporter
     United States District Court
     Middle District of Pennsylvania
     235 N. Washington Avenue
     Scranton, PA  18503

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

**$**

**$190,000** [1] - 29:16
**$2,628.22** [2] - 119:14, 120:12
**$2,700** [1] - 119:20
**$2,977.50** [1] - 54:8
**$225,000** [1] - 43:12
**$250,000** [1] - 43:8
**$3,486** [1] - 54:10
**$4,500** [1] - 128:7
**$5,000** [2] - 29:6, 41:12
**$50,000** [1] - 133:4
**$7,500** [1] - 128:6
**$900** [1] - 117:24

**'**

**'16** [1] - 114:19
**'57** [2] - 35:22, 41:18

**1**

**1** [4] - 53:4, 101:22, 102:13, 118:19
**10** [3] - 1:11, 17:14, 118:19
**101** [3] - 53:16, 62:11, 62:12
**103** [1] - 2:6
**11.1** [6] - 78:24, 79:2, 79:4, 79:6, 79:13, 79:15
**11.10** [3] - 94:25, 95:5, 95:7
**11.11** [4] - 95:17, 95:18, 95:23, 95:25
**11.12** [3] - 96:4, 96:11, 96:13
**11.13** [3] - 96:18, 96:23, 96:25
**11.14** [3] - 97:13, 97:20, 97:22
**11.15** [5] - 97:25, 98:7, 98:9, 107:7, 107:10
**11.16** [4] - 98:24, 99:2, 99:6, 99:8
**11.17** [3] - 99:10, 99:15, 99:18
**11.2** [4] - 77:11, 77:18, 77:20, 79:1
**11.28** [3] - 99:20, 100:2, 100:4
**11.4** [6] - 89:18, 89:23, 89:25, 107:21, 110:18
**11.42** [7] - 100:9, 100:15, 100:16, 100:22, 102:6,

102:8, 103:9
**11.5** [3] - 90:25, 91:6, 91:8
**11.6** [3] - 91:15, 91:19, 92:17
**11.7** [7] - 92:22, 93:1, 93:3, 104:18, 108:10, 108:11
**11.8** [2] - 93:20, 93:22
**11.9** [3] - 94:11, 94:18, 94:20
**110** [1] - 2:6
**111** [1] - 2:7
**112** [1] - 4:18
**116** [6] - 4:20, 13:7, 13:9, 13:18, 39:18, 42:11
**12** [2] - 41:6, 62:25
**12/12/12** [1] - 4:13
**120** [1] - 2:7
**123** [1] - 2:7
**12th** [1] - 4:14
**13** [1] - 41:6
**1301** [1] - 1:21
**143** [7] - 4:22, 6:2, 17:22, 20:18, 30:18, 31:12, 42:3
**15** [10] - 4:11, 54:6, 59:10, 61:12, 61:22, 61:25, 62:15, 66:22, 111:12
**15,000** [1] - 59:11
**15-minute** [1] - 111:10
**15s** [1] - 37:9
**16** [2] - 35:10, 130:24
**16s** [1] - 59:4
**18360** [4] - 13:8, 13:19, 17:23, 20:19
**18501-2830** [1] - 1:16
**18503** [1] - 138:19
**18630** [1] - 6:2
**18640** [1] - 1:25
**19** [1] - 41:6
**191** [1] - 79:24
**192** [2] - 78:11, 79:24
**1976** [1] - 47:25
**1988** [1] - 4:3
**1989** [2] - 4:9, 48:4
**1997** [1] - 130:18
**1:30** [1] - 69:21

**2**

**2** [1] - 17:14
**20** [1] - 47:10
**2000** [1] - 103:20
**2012** [1] - 4:14
**2013** [2] - 58:15, 58:21
**2014** [7] - 11:17, 14:3, 78:10, 79:22, 80:6,

86:15, 105:11
**2015** [7] - 54:13, 84:4, 105:14, 105:15, 105:16, 108:16, 126:12
**2016** [11] - 5:14, 5:15, 17:9, 23:8, 35:4, 56:6, 56:10, 114:19, 114:25, 115:2, 136:7
**2017** [4] - 104:1, 104:5, 135:21, 136:7
**2022** [1] - 5:5
**2023** [1] - 1:11
**20530** [2] - 1:19, 1:22
**209** [1] - 112:10
**22** [3] - 53:5, 53:8, 53:18
**223** [4] - 59:1, 59:2, 61:18, 61:22
**235** [1] - 138:19
**238** [1] - 1:24
**250** [2] - 36:4, 39:10
**250,000** [1] - 43:10
**25th** [1] - 56:6
**26th** [1] - 56:10
**28** [1] - 138:5
**290** [1] - 6:14
**29th** [2] - 5:15, 17:9

**3**

**3** [1] - 2:4
**3/29/16** [1] - 44:2
**3/29/2016** [1] - 18:3
**302** [2] - 24:19, 24:20
**311** [1] - 1:16
**325** [1] - 53:18
**34** [1] - 74:7
**3462** [1] - 53:5
**3465** [3] - 53:6, 53:7, 117:10
**35** [4] - 62:7, 112:6, 113:2, 113:5
**350** [1] - 34:8
**35853470** [1] - 62:8
**39** [1] - 2:4
**3:30** [1] - 124:17
**3:CR-18-97** [1] - 1:5
**3rd** [2] - 54:13, 80:6

**4**

**4** [1] - 1:9
**4/25/2016** [1] - 20:24
**400** [3] - 34:18, 51:4, 59:7
**400,000** [1] - 89:15
**403** [1] - 72:7
**404** [2] - 132:11, 134:4
**45** [2] - 2:4, 4:24

**47** [1] - 2:5

**5**

**5** [1] - 79:22
**5.56** [5] - 59:1, 59:4, 61:18, 61:22, 66:10
**50** [1] - 59:18
**570** [3] - 35:4, 35:16, 35:19
**570-977-8102** [1] - 17:19
**59** [1] - 2:5
**5th** [4] - 11:17, 14:3, 78:9, 125:15

**6**

**6,000** [1] - 59:11
**6.1** [3] - 11:3, 12:24, 13:1
**6.10** [1] - 36:7
**6.11** [1] - 37:4
**6.12** [1] - 37:16
**6.13** [1] - 37:24
**6.14** [1] - 38:6
**6.15** [1] - 38:9
**6.16** [1] - 38:12
**6.17** [1] - 38:19
**6.18** [1] - 38:22
**6.19** [4] - 30:14, 31:1, 31:4, 39:13
**6.3** [5] - 30:14, 30:18, 31:1, 31:4, 31:10
**6.4** [1] - 31:14
**6.5** [1] - 34:6
**6.6** [1] - 34:17
**6.7** [1] - 35:1
**6.8** [1] - 35:14
**6.9** [1] - 35:17
**60** [1] - 63:24
**609** [2] - 130:21, 131:5
**6316** [1] - 20:13
**67** [1] - 2:5

**7**

**7** [1] - 62:24
**7.10** [4] - 52:3, 52:20, 52:22, 56:1
**7.19** [1] - 51:24
**7.3** [5] - 56:25, 57:9, 57:11, 65:25, 67:18
**7.4** [8] - 51:24, 52:3, 52:4, 52:20, 52:22, 52:23, 61:5, 61:10
**7.9** [7] - 51:24, 52:3, 52:20, 52:22, 55:3, 63:7, 63:8
**73** [1] - 2:6

**47** [1] - 2:5

**753** [1] - 138:6

**8**

**8** [1] - 62:25
**8,000** [1] - 128:6
**8-4** [1] - 16:11
**8.4** [7] - 16:23, 16:25, 43:19, 118:5, 118:6, 120:7, 120:18
**8.5** [4] - 116:11, 116:13, 116:24, 117:1

**9**

**9** [2] - 62:25
**9.6** [6] - 19:6, 19:7, 19:10, 19:19, 19:25, 20:2
**90** [1] - 112:15
**950** [1] - 1:19
**99.18** [1] - 117:15
**9:30** [1] - 125:3
**9th** [1] - 5:5

**A**

**Abayeva** [8] - 69:24, 70:3, 74:1, 78:11, 79:24, 103:3, 103:4, 103:5
**ABAYEVA** [2] - 2:6, 73:22
**abetted** [1] - 9:3
**able** [5] - 45:20, 51:20, 61:6, 127:1, 134:10
**above-mentioned** [1] - 138:8
**absolutely** [2] - 30:21, 43:15
**abundance** [1] - 130:15
**access** [2] - 28:25, 29:8
**accident** [1] - 134:6
**accompanied** [1] - 7:4
**accomplish** [2] - 14:18, 125:21
**accomplished** [1] - 15:24
**accordance** [2] - 55:20, 63:13
**according** [3] - 70:10, 70:24, 131:10
**account** [8] - 28:20, 28:21, 28:24, 29:1, 29:2, 29:12, 92:12, 137:1
**accounts** [3] - 28:11,

2

28:25, 29:8
**accuracy** [4] - 49:21, 50:1, 50:2, 50:3
**accurate** [1] - 30:23
**accurately** [1] - 30:22
**accused** [1] - 136:10
**acquired** [1] - 40:8
**acrimonious** [2] - 5:7, 5:9
**act** [7] - 131:17, 132:6, 132:18, 133:12, 133:14, 134:1, 135:6
**actions** [1] - 9:17
**activities** [1] - 84:24
**activity** [4] - 8:7, 8:16, 9:20, 52:17
**acts** [1] - 131:21
**actual** [8] - 16:8, 53:7, 57:6, 67:21, 69:3, 82:8, 132:18, 135:4
**addition** [6] - 6:4, 6:8, 31:17, 33:23, 34:2, 34:21
**additional** [1] - 82:11
**address** [18] - 4:18, 6:1, 13:7, 13:9, 13:16, 17:12, 17:22, 20:12, 20:17, 58:18, 83:1, 85:7, 118:15, 118:24, 119:2, 119:4, 119:8, 131:9
**addressee** [1] - 118:17
**addresses** [2] - 82:24, 83:5
**adjourn** [1] - 125:8
**administration** [2] - 55:20, 63:13
**administrator** [1] - 60:21
**admissible** [2] - 10:1, 128:21
**admission** [23] - 12:24, 16:23, 19:25, 31:1, 77:18, 79:13, 89:23, 91:6, 91:18, 92:25, 93:19, 94:17, 95:4, 95:22, 96:11, 96:23, 97:19, 98:6, 99:6, 99:14, 100:1, 100:21, 102:5
**admit** [2] - 52:19, 57:8
**admitted** [26] - 13:1, 16:25, 20:2, 31:5, 52:22, 57:11, 77:20, 79:15, 89:25, 91:8, 92:17, 93:3, 93:22, 94:20, 95:7, 95:25, 96:13, 96:25, 97:22, 98:9, 99:8, 99:18,

100:4, 102:8, 117:1, 118:4
**aerospace** [2] - 48:15, 64:8
**affective** [1] - 124:11
**affixed** [1] - 14:1
**afford** [1] - 89:16
**afternoon** [2] - 111:20, 120:4
**age** [1] - 130:22
**agent** [12] - 5:14, 5:17, 5:20, 6:15, 6:24, 7:12, 7:17, 7:21, 10:18, 10:21, 14:4, 33:24
**ago** [5] - 61:11, 90:16, 107:24, 114:16, 120:15
**agree** [5] - 62:23, 75:16, 105:19, 131:25, 135:1
**agreed** [2] - 75:21, 127:19
**agreement** [17] - 36:3, 77:16, 77:24, 78:6, 78:9, 78:19, 78:21, 78:22, 79:5, 79:10, 79:20, 79:22, 80:1, 80:3, 80:7, 80:8, 80:14
**ahead** [4] - 7:7, 99:11, 99:20, 107:20
**aided** [1] - 9:3
**air** [2] - 48:25, 49:1
**Air** [2] - 35:22, 41:21
**airport** [3] - 76:12, 126:15, 136:18
**Akam** [8] - 90:15, 94:24, 97:6, 104:14, 107:23, 108:1, 109:7, 110:19
**alerted** [1] - 70:12
**alive** [1] - 113:1
**allegation** [3] - 8:25, 70:13, 71:13
**allegations** [1] - 15:15
**alleged** [5] - 8:25, 9:18, 126:13, 127:3, 131:16
**alleviate** [1] - 85:2
**allow** [8] - 29:3, 30:4, 60:7, 60:9, 72:6, 91:25, 135:7
**allowance** [2] - 29:6, 41:12
**allowed** [1] - 19:4
**allows** [1] - 49:25
**almost** [2] - 59:18, 112:6
**aluminium** [1] - 50:20

**aluminum** [1] - 66:13
**Amazon** [4] - 65:11, 65:13, 68:13, 68:14
**AMERICA** [1] - 1:3
**ammunition** [2] - 38:14, 38:15
**amount** [5] - 44:5, 44:15, 44:17, 119:10
**analysis** [1] - 72:7
**ANDREW** [1] - 1:17
**angle** [1] - 38:7
**answer** [12] - 12:13, 26:12, 30:4, 31:24, 32:12, 32:13, 32:16, 45:8, 46:3, 46:10, 62:3, 134:11
**answers** [1] - 25:16
**anytime** [1] - 83:24
**apologize** [5] - 14:21, 98:24, 100:16, 124:14, 124:19
**Appeals** [1] - 8:3
**appear** [7] - 11:19, 16:20, 25:12, 38:6, 52:10, 92:13, 129:23
**APPEARANCES** [1] - 1:12
**appeared** [3] - 25:6, 25:8, 25:12
**application** [4] - 11:20, 12:20, 13:14, 39:17
**applied** [1] - 50:14
**apply** [4] - 8:14, 50:12, 72:6, 138:21
**applying** [1] - 13:5
**appointed** [1] - 138:5
**appreciate** [1] - 130:4
**approach** [4] - 7:23, 14:22, 124:7, 128:25
**appropriate** [2] - 26:23, 127:5
**April** [2] - 5:14, 5:15
**area** [16] - 4:19, 38:10, 84:1, 84:17, 88:1, 90:3, 93:16, 94:12, 95:1, 95:15, 96:6, 96:15, 96:17, 97:25, 98:12, 99:24
**argue** [1] - 132:10
**argued** [1] - 136:12
**argument** [1] - 134:7
**arguments** [1] - 73:13
**arm** [1] - 93:25
**arms** [3] - 70:18, 70:20, 108:13
**Arms** [5] - 23:12, 23:13, 60:16, 60:24, 61:18
**arrest** [1] - 42:19

**arrival** [2] - 76:21, 81:22
**arrived** [9] - 10:19, 18:21, 21:24, 22:21, 23:8, 23:18, 58:2, 71:1, 82:19
**aspect** [1] - 70:14
**aspects** [1] - 87:20
**assembled** [2] - 57:20, 57:22
**assistant** [6] - 4:5, 40:16, 43:16, 75:14, 84:3, 94:10
**associated** [1] - 114:10
**assume** [5] - 10:25, 55:1, 68:20, 68:21, 114:17
**assuming** [1] - 31:6
**assumption** [1] - 18:15
**assumptions** [1] - 18:16
**attached** [1] - 34:12
**attention** [5] - 53:1, 55:16, 61:11, 114:25, 130:3
**attorney** [3] - 12:16, 43:16, 84:14
**ATTORNEY'S** [1] - 1:15
**auction** [1] - 113:5
**Auken** [2] - 78:11, 79:24
**Aurelia** [1] - 135:15
**authorities** [1] - 86:21
**automatic** [1] - 88:11
**automotive** [1] - 48:15
**AVE** [1] - 1:21
**Avenue** [1] - 138:19
**AVENUE** [1] - 1:19
**awarded** [1] - 40:18
**aware** [8] - 8:1, 9:17, 30:12, 42:12, 45:5, 62:15, 122:18, 127:16

**B**

**bachelor's** [1] - 74:11
**Bachman** [2] - 7:3, 7:13
**background** [3] - 74:10, 84:1, 104:22
**bad** [12] - 131:14, 131:17, 131:21, 131:24, 132:18, 133:12, 133:14, 133:23, 134:1, 134:18, 135:6

**bag** [6] - 24:23, 25:4, 25:11, 27:3, 27:7, 88:23
**Baharan** [2] - 17:13, 118:18
**bakery** [1] - 4:5
**bank** [3] - 28:11, 28:16, 28:25
**banned** [1] - 121:9
**bar** [1] - 64:13
**barrel** [17] - 49:4, 49:5, 49:7, 49:10, 49:12, 49:21, 49:25, 50:9, 50:10, 53:7, 59:8, 61:22, 62:9, 62:10, 63:25, 67:24, 68:22
**barrels** [4] - 51:5, 59:2, 59:6, 59:9
**bars** [2] - 27:19, 27:23
**Bartolai** [8] - 8:17, 10:9, 30:1, 124:10, 128:25, 129:16, 130:18, 135:6
**BARTOLAI** [114] - 1:24, 6:21, 7:22, 8:18, 10:12, 11:9, 11:21, 11:24, 12:4, 12:8, 12:25, 15:4, 15:6, 15:9, 15:17, 16:24, 19:17, 20:1, 21:11, 21:13, 21:25, 24:1, 24:8, 24:13, 24:18, 25:18, 26:8, 26:18, 27:10, 28:2, 28:5, 29:23, 31:3, 31:22, 32:5, 39:23, 39:25, 45:16, 46:2, 46:22, 47:4, 52:21, 57:10, 58:7, 59:23, 59:25, 60:6, 63:4, 63:6, 65:20, 65:23, 66:1, 67:8, 69:15, 69:25, 70:2, 71:21, 72:1, 72:10, 72:20, 73:19, 77:19, 79:14, 81:13, 84:2, 84:19, 89:24, 91:7, 91:20, 92:16, 93:2, 93:21, 94:19, 95:6, 95:24, 96:12, 96:24, 97:21, 98:8, 99:7, 99:17, 100:3, 100:23, 101:3, 101:6, 101:17, 102:7, 102:24, 103:1, 109:11, 110:11, 111:6, 116:25, 119:25, 120:3, 120:6, 120:9, 122:5, 123:7, 123:22,

3

124:4, 125:9, 125:25, 126:21, 127:14, 129:20, 130:2, 130:7, 131:4, 132:13, 132:20, 133:11, 133:14, 135:9

**Bartolai's** [2] - 10:3, 129:6
**base** [2] - 126:4
**based** [5] - 34:20, 35:6, 82:3, 127:6, 129:24
**basis** [3] - 72:5, 127:8, 128:10
**bat** [1] - 121:9
**bays** [1] - 34:23
**became** [2] - 5:8, 133:16
**become** [1] - 83:16
**becomes** [1] - 72:15
**BEFORE** [1] - 1:8
**began** [3] - 12:4, 87:19, 106:5
**begin** [1] - 40:5
**beginning** [3] - 86:7, 106:6, 128:1
**begins** [1] - 55:17
**behalf** [1] - 8:10
**behind** [4] - 35:20, 38:23, 38:24, 62:7
**Bel** [2] - 35:22, 41:21
**bell** [1] - 26:7
**belong** [7] - 37:10, 37:12, 37:22, 38:2, 38:4, 38:15, 38:17
**below** [8] - 35:4, 53:10, 53:11, 117:14, 117:19, 117:25, 118:24
**bench** [1] - 81:24
**Benz** [2] - 34:8, 34:18
**best** [6] - 22:23, 65:15, 65:16, 73:20, 93:9, 131:9
**better** [1] - 74:3
**between** [15] - 26:9, 51:4, 59:7, 59:11, 64:14, 70:9, 76:7, 77:16, 77:24, 78:10, 79:23, 88:13, 133:20, 133:23, 135:4
**beyond** [3] - 25:17, 127:4, 127:10
**big** [3] - 25:18, 113:10, 120:14
**bigger** [1] - 35:10
**Bill** [2] - 20:9, 21:5
**bills** [1] - 41:17

**binder** [9] - 11:1, 16:10, 30:13, 51:25, 56:24, 77:10, 78:24, 92:22, 116:11
**bit** [3] - 69:19, 115:7, 117:22
**bits** [2] - 117:15, 117:20
**black** [2] - 50:17, 67:22
**blanket** [1] - 8:23
**blocked** [1] - 89:6
**blocks** [1] - 106:7
**blood** [1] - 133:23
**blue** [2] - 3:20, 74:23
**blurry** [1] - 99:22
**Bly** [2] - 84:20, 132:23
**BMW** [2] - 29:16, 35:3
**board** [1] - 45:4
**bolt** [1] - 129:3
**boots** [1] - 27:7
**bore** [19] - 48:24, 49:2, 49:6, 49:7, 49:10, 49:11, 49:12, 49:13, 53:5, 53:7, 53:8, 53:12, 53:15, 57:6, 57:18, 62:9, 64:22, 65:2, 66:6
**bottom** [12] - 16:19, 16:20, 17:24, 19:21, 20:25, 55:16, 57:21, 57:22, 63:9, 63:11, 66:7, 67:18
**bought** [6] - 40:23, 41:18, 60:16, 115:18, 131:15, 132:15
**boundaries** [1] - 129:15
**bow** [1] - 44:4
**box** [15] - 56:20, 56:21, 56:22, 56:23, 66:25, 67:3, 67:5, 113:20, 115:22, 115:24, 116:1, 116:6, 116:22, 120:24, 121:14
**boxed** [1] - 115:8
**boxes** [11] - 18:6, 18:9, 18:18, 18:21, 18:24, 19:1, 36:16, 44:13, 120:14, 120:25, 123:25
**boxing** [1] - 113:22
**Boyanowski** [3] - 138:3, 138:14, 138:14
**BOYANOWSKI** [1] - 138:17
**breaching** [1] - 134:1

**break** [7] - 15:2, 47:9, 69:20, 80:19, 89:16, 111:10, 124:18
**breakfast** [1] - 86:3
**brief** [2] - 47:11, 111:13
**briefs** [1] - 131:11
**bring** [7] - 60:19, 71:21, 113:13, 113:23, 115:8, 130:3, 131:7
**bringing** [5] - 14:25, 115:12, 129:13, 130:4, 131:1
**brings** [3] - 113:16, 113:17, 116:16
**brought** [6] - 8:19, 24:18, 113:18, 115:6, 115:22, 131:7
**brown** [1] - 67:5
**build** [1] - 80:13
**BUILDING** [1] - 1:15
**building** [20] - 17:14, 77:1, 87:1, 87:2, 91:13, 95:11, 97:9, 104:12, 104:23, 104:24, 106:7, 108:12, 108:13, 108:19, 109:1, 109:6, 109:22, 110:25, 111:2
**Building** [1] - 118:19
**built** [4] - 31:18, 34:22, 91:13, 91:22
**bullet** [4] - 49:15, 49:21, 50:1, 50:4
**bullet's** [1] - 50:2
**bumpers** [1] - 45:4
**bunch** [2] - 68:5, 115:6
**business** [25] - 16:6, 16:8, 19:11, 23:13, 28:11, 28:19, 28:24, 33:9, 52:14, 52:17, 58:12, 59:18, 60:3, 60:13, 74:11, 83:4, 111:23, 111:25, 112:5, 118:18, 132:7, 132:23, 133:7, 134:11, 134:15
**Business** [1] - 112:10
**button** [36] - 25:7, 49:18, 49:20, 50:6, 50:18, 50:24, 50:25, 51:1, 51:3, 51:4, 51:5, 51:13, 53:11, 53:12, 53:13, 54:1, 57:7, 57:22, 57:23, 59:6, 63:22, 63:23,

64:1, 64:13, 64:24, 66:7, 66:8, 66:14, 67:19, 67:21, 68:19, 68:23, 68:24
**buttons** [38] - 25:1, 25:19, 48:24, 49:16, 50:11, 50:17, 51:10, 51:18, 54:9, 55:7, 55:10, 56:4, 56:17, 56:19, 58:1, 58:23, 58:24, 59:1, 59:3, 59:10, 59:12, 59:16, 59:19, 60:2, 60:8, 60:17, 61:6, 61:12, 61:17, 62:7, 65:2, 65:3, 65:10, 67:12, 67:15, 68:2, 68:12
**buy** [6] - 64:18, 64:22, 107:1, 131:12, 131:13
**buyer** [1] - 133:9
**buying** [1] - 106:23
**BY** [72] - 3:9, 4:1, 6:23, 10:16, 11:18, 12:14, 13:4, 15:20, 17:3, 19:20, 20:5, 21:22, 22:7, 24:5, 26:2, 26:15, 26:24, 27:14, 28:10, 30:6, 31:9, 31:25, 33:20, 39:25, 45:19, 46:15, 47:18, 52:25, 57:14, 58:11, 59:25, 60:6, 63:6, 66:1, 67:11, 73:25, 75:2, 77:23, 79:19, 81:16, 85:5, 85:11, 90:2, 91:9, 92:3, 92:18, 93:4, 93:23, 94:21, 95:8, 96:3, 96:14, 97:1, 97:23, 98:10, 99:9, 99:19, 100:5, 101:25, 102:9, 103:1, 109:11, 110:17, 111:19, 117:4, 118:8, 120:3, 120:9, 122:5, 123:7, 123:24, 138:16

**C**

**C.s** [1] - 12:18
**cable** [1] - 41:17
**Cabota** [1] - 29:16
**caliber** [6] - 49:13, 49:14, 49:15, 59:1, 61:25, 65:12
**Cambodia** [1] - 121:10
**camps** [2] - 87:1, 87:2
**cannot** [5] - 59:17,

64:22, 69:4, 80:19, 89:9
**car** [12] - 31:15, 35:3, 35:18, 41:18, 41:22, 74:14, 101:18, 102:2, 102:3, 103:17, 103:25, 104:5
**carbide** [2] - 49:9, 50:12
**card** [1] - 55:8
**cardboard** [6] - 56:20, 56:21, 56:22, 66:25, 67:3, 67:5
**care** [1] - 134:14
**carefully** [1] - 72:3
**Carolina** [3] - 20:13, 132:22
**carried** [1] - 24:7
**carrier** [1] - 121:5
**cars** [3] - 6:4, 35:11, 42:9
**case** [13] - 9:22, 11:11, 72:6, 121:13, 123:1, 125:5, 127:14, 127:25, 128:1, 128:11, 128:24, 135:20
**cases** [1] - 37:20
**casual** [1] - 83:14
**caution** [1] - 130:15
**cell** [1] - 7:10
**center** [1] - 81:24
**certain** [11] - 9:13, 9:23, 50:4, 50:24, 51:18, 51:19, 121:3, 121:8, 127:4, 133:11, 137:3
**certainly** [7] - 8:13, 30:5, 46:5, 73:9, 108:19, 127:8, 135:3
**certificate** [2] - 12:1, 138:21
**CERTIFICATE** [1] - 138:1
**certification** [1] - 19:10
**certified** [1] - 12:2
**certify** [2] - 138:6, 138:10
**certifying** [1] - 138:22
**cetera** [1] - 82:25
**chair** [2] - 38:24, 113:10
**chance** [1] - 52:2
**changed** [2] - 8:19, 46:16
**changing** [1] - 112:4
**charge** [2] - 73:7, 132:4

4

**charges** [3] - 73:7, 129:5, 132:10
**check** [4] - 29:4, 29:5, 115:19, 123:8
**checks** [1] - 29:3
**Chevy** [3] - 35:22, 36:5, 41:18
**China** [4] - 65:8, 65:10, 106:21, 106:22
**china** [1] - 68:13
**choose** [1] - 123:8
**Circuit** [1] - 8:4
**circuit** [1] - 9:11
**circumstances** [2] - 71:11, 88:16
**city** [3] - 81:23, 82:15, 83:15
**CLAFFE** [41] - 47:8, 47:13, 47:18, 52:19, 52:23, 52:25, 57:8, 57:12, 57:14, 58:8, 58:11, 59:21, 60:4, 67:11, 69:13, 69:24, 111:15, 111:19, 116:23, 117:2, 117:4, 118:6, 118:8, 119:23, 120:8, 122:2, 123:4, 123:24, 125:23, 126:10, 126:23, 129:2, 130:6, 130:8, 130:10, 130:12, 132:2, 134:9, 134:21, 135:7, 135:11
**CLAFFEE** [1] - 1:17
**claim** [1] - 135:6
**claiming** [1] - 101:20
**claims** [2] - 70:3, 70:5
**clarify** [5] - 25:23, 25:24, 45:11, 70:21, 91:24
**clarity** [1] - 49:11
**class** [1] - 130:16
**cleaner** [1] - 29:4
**clear** [7] - 44:21, 56:19, 63:8, 66:20, 106:19, 108:11, 134:21
**clearly** [2] - 9:7, 73:6
**close** [3] - 3:10, 28:20, 103:22
**closed** [1] - 28:21
**closer** [3] - 74:2, 87:20
**closet** [5] - 37:19, 37:20, 37:25, 38:10, 38:13
**clothing** [2] - 3:19,

29:18
**coated** [2] - 53:18, 66:18
**coating** [7] - 50:12, 50:14, 50:15, 50:16, 50:18, 50:22, 66:13
**coconspirator** [1] - 9:1
**coconut** [1] - 113:11
**Code** [1] - 138:6
**coffee** [2] - 45:2, 45:3
**collection** [1] - 40:7
**color** [1] - 50:16
**column** [1] - 119:10
**combination** [6] - 48:24, 50:6, 50:7, 50:8, 53:11, 64:24
**combo** [31] - 25:1, 25:6, 25:7, 25:19, 53:13, 54:9, 55:6, 55:9, 56:17, 56:19, 57:7, 58:1, 59:10, 59:12, 59:19, 60:2, 60:8, 60:17, 61:6, 61:12, 61:17, 62:7, 63:22, 66:7, 67:12, 67:15, 67:19, 67:21, 68:2, 68:18
**coming** [4] - 15:10, 23:15, 72:10, 84:21
**comment** [1] - 101:4
**commerce** [1] - 51:21
**commercial** [3] - 116:18, 116:19, 116:21
**commission** [1] - 9:14
**committing** [1] - 136:11
**commodities** [5] - 55:18, 55:19, 63:11, 63:15, 63:17
**commonly** [1] - 61:25
**communicate** [2] - 85:8, 87:14
**communication** [3] - 10:10, 32:5, 32:10
**communications** [8] - 7:23, 8:22, 9:8, 9:9, 9:13, 10:1, 15:17, 26:9
**companies** [4] - 64:21, 68:10, 68:12, 113:25
**company** [17] - 13:13, 20:10, 48:9, 48:10, 56:23, 60:7, 69:3, 78:11, 79:24, 82:21, 82:22, 106:7, 106:9, 110:23, 110:25, 115:19, 121:16

**Company** [7] - 11:16, 12:20, 13:15, 39:17, 78:10, 79:23, 110:20
**company's** [1] - 52:16
**competing** [1] - 65:17
**competition** [4] - 64:25, 65:2, 65:8, 68:9
**complete** [3] - 43:24, 86:8, 104:12
**completed** [2] - 97:11, 109:22
**completely** [1] - 80:19
**complex** [2] - 17:14, 113:24
**Complex** [1] - 118:19
**compound** [6] - 126:14, 126:17, 126:20, 126:24, 127:3, 127:7
**concerns** [2] - 70:20, 121:20
**concluded** [4] - 26:1, 73:21, 101:24, 124:22
**conclusion** [1] - 24:24
**conclusionary** [1] - 24:9
**conditions** [1] - 81:3
**conduct** [2] - 8:5, 132:7
**confidential** [11] - 8:21, 9:8, 15:17, 32:10, 32:14, 33:18, 80:19, 128:2, 128:4, 128:16, 128:20
**conflict** [1] - 129:24
**confuse** [1] - 105:12
**connected** [1] - 72:6
**Connecticut** [1] - 47:22
**consider** [1] - 68:16
**considered** [2] - 36:13, 49:12
**consisted** [1] - 127:23
**consistent** [3] - 15:6, 92:19, 129:13
**consists** [1] - 127:2
**conspiracy** [3] - 128:2, 128:4, 128:11
**constructed** [1] - 108:19
**Construction** [5] - 98:18, 98:19, 107:13, 107:14, 110:20
**construction** [10] - 5:22, 6:3, 6:10, 6:12, 98:13, 104:25, 110:23, 110:24,

136:3
**consult** [1] - 29:9
**Consulting** [6] - 11:16, 12:20, 13:15, 39:17, 78:10, 79:23
**contact** [2] - 108:5, 108:6
**contacted** [2] - 60:1, 75:15
**contentious** [2] - 5:8, 41:24
**contents** [1] - 12:10
**continue** [6] - 10:15, 33:19, 40:17, 47:1, 85:10, 125:20
**contract** [3] - 89:14, 133:10, 134:1
**contractual** [1] - 134:17
**contrary** [3] - 55:21, 60:10, 63:14
**contribute** [1] - 133:13
**control** [2] - 126:19, 138:22
**CONTROL** [1] - 1:18
**controlled** [2] - 8:11, 126:17
**conversation** [7] - 7:14, 7:19, 9:15, 71:12, 71:16, 71:25, 72:11
**conversations** [2] - 89:3, 89:7
**conversed** [1] - 7:12
**conviction** [4] - 130:16, 130:19, 130:22, 130:24
**convoluted** [1] - 132:9
**copied** [1] - 117:17
**corner** [1] - 54:11
**corporate** [1] - 39:16
**corporation** [4] - 13:6, 13:16, 13:21, 64:2
**correct** [74] - 4:15, 7:6, 10:21, 12:22, 13:17, 16:18, 17:5, 17:6, 18:23, 20:22, 22:9, 22:10, 23:23, 27:17, 30:1, 33:22, 33:25, 34:1, 34:3, 34:14, 35:13, 37:23, 38:8, 38:10, 38:11, 39:18, 40:10, 40:25, 41:11, 41:20, 42:2, 42:7, 42:12, 42:23, 42:24, 42:25, 43:2, 43:3, 43:9, 43:20, 45:1, 45:12, 45:13, 45:15, 45:23, 49:17,

53:22, 55:5, 55:15, 55:25, 56:14, 57:16, 60:8, 60:11, 61:16, 61:18, 61:19, 61:23, 62:5, 64:3, 66:19, 67:1, 67:20, 69:9, 104:18, 105:1, 105:5, 106:24, 107:14, 108:9, 109:14, 135:19, 138:7
**corroborate** [1] - 126:18
**corroborates** [1] - 136:4
**cost** [3] - 6:12, 119:17, 120:11
**counsel** [2] - 12:3, 32:9
**Counter** [1] - 101:12
**counter** [1] - 102:18
**COUNTERINTELLIG ENCE** [1] - 1:18
**countries** [5] - 51:18, 51:19, 59:17, 65:5, 88:1
**country** [8] - 22:24, 63:18, 82:3, 118:2, 121:7, 121:10, 121:11, 122:19
**County** [2] - 13:19, 130:17
**couple** [4] - 52:2, 70:21, 77:6, 127:16
**course** [9] - 8:1, 40:9, 64:10, 65:7, 85:6, 127:21, 130:11, 132:7, 136:23
**Court** [17] - 4:21, 8:3, 13:7, 13:9, 13:18, 15:2, 39:18, 42:11, 70:12, 127:16, 127:20, 138:3, 138:4, 138:15, 138:17, 138:18
**COURT** [154] - 1:1, 3:1, 3:4, 3:25, 6:22, 7:25, 8:17, 9:11, 10:6, 10:9, 10:13, 10:15, 11:11, 12:9, 12:13, 13:1, 13:3, 15:8, 15:13, 16:25, 17:2, 20:2, 21:12, 21:17, 22:6, 24:3, 24:14, 25:14, 25:24, 26:11, 26:22, 27:11, 28:3, 28:6, 28:9, 30:1, 31:4, 31:8, 31:23, 32:6, 32:9, 32:19, 33:3, 33:10,

33:15, 39:22, 45:17, 46:5, 46:7, 46:10, 46:12, 46:14, 46:25, 47:3, 47:5, 47:7, 47:10, 47:12, 52:22, 52:24, 57:11, 57:13, 59:22, 60:5, 63:5, 65:22, 67:9, 69:14, 69:16, 69:20, 69:23, 70:15, 72:3, 72:9, 73:4, 73:11, 75:1, 77:20, 77:22, 79:15, 79:18, 81:15, 84:7, 84:11, 85:4, 85:10, 89:25, 91:8, 91:25, 92:17, 93:3, 93:22, 94:20, 95:7, 95:25, 96:2, 96:13, 96:25, 97:22, 98:9, 99:8, 99:16, 99:18, 100:4, 100:24, 101:8, 101:10, 101:14, 101:23, 102:8, 102:20, 102:23, 109:10, 110:12, 110:15, 111:7, 111:9, 111:12, 111:14, 117:1, 117:3, 118:7, 119:24, 122:4, 123:6, 124:3, 124:5, 124:8, 124:13, 124:15, 124:17, 124:21, 124:23, 125:20, 125:24, 126:25, 128:22, 129:22, 130:4, 130:9, 130:11, 132:1, 132:12, 132:18, 133:9, 133:12, 133:20, 134:14, 135:1, 135:12, 135:17, 135:25, 136:21, 137:8
**court** [2] - 46:8, 98:25
**courtroom** [2] - 3:17, 74:18
**COURTROOM** [1] - 1:9
**cover** [4] - 100:13, 135:22, 136:4, 136:17
**covering** [1] - 128:1
**create** [1] - 85:21
**created** [5] - 13:13, 52:14, 56:5, 56:6, 56:11
**creating** [1] - 91:14
**credibility** [2] - 46:22,

46:23
**credit** [1] - 55:8
**crime** [3] - 8:14, 9:14, 132:6
**crimes** [1] - 136:10
**criminal** [3] - 8:7, 8:16, 9:20
**critical** [1] - 131:4
**CRM** [1] - 1:21
**cross** [13] - 39:22, 59:22, 68:8, 102:23, 110:18, 119:24, 124:11, 128:12, 129:1, 129:21, 129:25, 136:21, 136:22
**CROSS** [5] - 2:3, 39:24, 59:24, 102:25, 120:2
**cross-examine** [5] - 39:22, 59:22, 102:23, 119:24, 128:12
**CRR** [3] - 138:3, 138:14, 138:17
**crying** [2] - 71:5, 88:19
**cumulative** [2] - 72:21, 72:22
**current** [1] - 48:1
**customer** [5] - 53:23, 54:2, 54:14, 58:16, 58:18
**customized** [1] - 63:2
**customs** [6] - 115:21, 122:20, 123:3, 123:5, 123:8, 124:1
**cutting** [1] - 48:12

**D**

**dad** [4] - 29:17, 36:3, 39:15, 41:18
**dad's** [1] - 4:20
**darker** [1] - 67:22
**date** [13] - 14:1, 17:7, 18:2, 20:23, 54:12, 56:7, 56:8, 56:9, 80:4, 80:5, 105:9, 138:9
**DATE** [1] - 1:11
**dated** [2] - 4:9, 11:17
**dates** [1] - 138:9
**days** [3] - 77:6, 80:22, 86:12
**DC** [2] - 1:19, 1:22
**deal** [5] - 43:1, 73:13, 85:7, 120:13, 120:14
**dealership** [1] - 74:14
**dealings** [4] - 131:14,

131:21, 131:24, 132:3
**dealt** [2] - 108:2, 108:3
**death** [1] - 88:19
**December** [3] - 4:14, 54:13, 136:7
**decide** [1] - 46:23
**deed** [1] - 45:25
**deep** [1] - 48:23
**Deer** [1] - 4:18
**defective** [1] - 134:3
**Defendant** [1] - 1:23
**defendant** [37] - 3:15, 3:23, 4:17, 5:6, 5:11, 8:10, 8:13, 29:9, 29:12, 29:20, 71:2, 72:4, 72:19, 73:2, 74:16, 74:25, 75:10, 76:21, 78:20, 80:8, 80:22, 81:3, 83:8, 83:21, 84:13, 84:16, 86:20, 89:3, 90:12, 94:7, 114:6, 114:10, 129:3, 129:12, 129:19, 136:2, 136:9
**defendant's** [4] - 5:2, 71:8, 71:18, 71:25
**defense** [2] - 70:8, 136:17
**Defense** [6] - 128:3, 128:6, 128:16, 128:18, 129:9, 129:18
**deli** [1] - 4:7
**deliver** [1] - 16:3
**delivered** [8] - 9:21, 9:23, 18:10, 18:18, 22:9, 22:11, 22:14, 132:16
**denied** [1] - 46:25
**Department** [7] - 11:19, 128:3, 128:6, 128:16, 128:18, 129:9, 129:18
**department** [2] - 4:7, 51:21
**depict** [1] - 38:22
**depicted** [1] - 93:14
**Depot** [2] - 64:15, 64:19
**describe** [14] - 3:19, 5:10, 24:12, 70:18, 71:20, 75:18, 83:11, 88:10, 91:10, 95:9, 97:2, 98:11, 115:17, 121:20
**described** [1] - 130:1
**describing** [1] - 82:8
**description** [7] - 44:7, 44:8, 53:3, 53:4,

84:9, 118:21, 118:23
**descriptions** [2] - 117:5, 118:1
**design** [1] - 53:25
**designed** [1] - 26:11
**desk** [1] - 38:23
**destination** [3] - 75:25, 76:3, 118:1
**destroyed** [1] - 89:13
**destruction** [1] - 89:12
**detained** [1] - 136:6
**determine** [2] - 32:10, 127:1
**develop** [1] - 92:1
**DHL** [3] - 16:3, 114:1, 114:2
**dialed** [1] - 10:20
**diameter** [2] - 53:14
**difference** [2] - 64:14, 88:12
**different** [15] - 38:7, 48:13, 48:14, 48:16, 49:5, 49:15, 50:14, 64:4, 68:16, 113:6, 115:7, 121:3, 121:7
**differently** [1] - 135:3
**difficult** [1] - 32:9
**difficulty** [1] - 136:22
**diluted** [1] - 22:1
**dinner** [1] - 81:23
**direct** [9] - 18:7, 53:1, 55:16, 69:18, 114:25, 129:14, 129:24, 137:7, 138:22
**DIRECT** [5] - 2:3, 3:8, 47:17, 73:24, 111:18
**directed** [2] - 29:4, 137:3
**directing** [1] - 86:8
**direction** [3] - 14:8, 18:20, 105:4
**directly** [3] - 132:10, 134:11, 134:15
**disability** [3] - 40:15, 40:18, 41:10
**disclosed** [3] - 89:4, 127:18, 127:21
**disclosure** [8] - 78:19, 78:21, 78:22, 79:1, 80:8, 80:14, 80:20, 126:8
**discovery** [2] - 24:20, 130:15
**discreet** [1] - 81:8
**discuss** [5] - 71:11, 73:15, 125:5, 125:8
**discussed** [1] - 89:3
**discussing** [2] -

132:24, 136:16
**discussion** [10] - 14:23, 24:15, 26:1, 70:1, 71:18, 73:21, 101:9, 101:24, 124:9, 124:22
**discussions** [4] - 78:4, 82:11, 88:4, 128:9
**dispute** [10] - 73:5, 131:18, 131:22, 133:6, 133:10, 134:3, 134:17, 135:2, 135:4
**disregard** [1] - 33:16
**DISTRICT** [2] - 1:1, 1:1
**District** [4] - 138:4, 138:18, 138:18
**diversified** [2] - 48:16, 64:3
**diversion** [3] - 55:21, 63:13, 69:2
**divert** [1] - 69:4
**diverted** [1] - 63:18
**divorce** [6] - 5:4, 5:6, 36:3, 41:24, 45:23, 45:24
**divorced** [1] - 5:3
**DME** [5] - 48:5, 48:7, 48:11, 48:21, 64:2
**DME's** [1] - 52:14
**doctor** [1] - 88:18
**document** [33] - 11:6, 11:8, 11:10, 11:12, 11:14, 11:15, 12:1, 12:5, 12:6, 12:10, 13:6, 14:2, 16:11, 16:13, 19:13, 19:14, 43:20, 43:22, 43:24, 53:2, 54:11, 54:20, 56:1, 77:13, 77:15, 78:1, 78:4, 78:13, 78:25, 79:7, 115:21, 118:9, 118:10
**documents** [4] - 11:5, 12:15, 12:18, 77:7
**DOJ** [2] - 1:18, 1:21
**DOJ-CRM** [1] - 1:21
**DOJ-NSD** [1] - 1:18
**dollars** [1] - 6:14
**dolls** [2] - 113:4, 113:5
**done** [7] - 5:23, 9:8, 58:12, 59:13, 60:13, 134:10, 134:15
**door** [3] - 4:7, 35:10
**doors** [2] - 31:17, 34:22
**Doos** [1] - 29:17
**Dorado** [4] - 47:23, 47:24, 48:5, 56:22

6

**double** [1] - 115:19
**down** [10] - 13:12, 16:18, 17:24, 20:14, 69:16, 87:9, 111:9, 117:6, 117:9, 124:6
**downspouts** [1] - 6:18
**downstairs** [2] - 86:2, 86:3
**draw** [2] - 61:11, 73:12
**Drill** [5] - 25:2, 47:23, 47:24, 56:22, 121:17
**drill** [16] - 25:6, 27:21, 48:5, 49:6, 49:8, 49:9, 49:19, 63:21, 64:13, 64:17, 64:18, 117:15, 117:20, 117:22
**drills** [10] - 25:8, 25:13, 27:20, 27:23, 27:25, 28:3, 48:23, 49:10, 63:21, 65:1
**Drive** [6] - 4:22, 6:2, 17:23, 20:18, 30:19, 31:12
**driver** [1] - 76:12
**driving** [1] - 93:25
**due** [1] - 40:18
**duly** [4] - 3:6, 47:15, 73:22, 111:16
**duress** [3] - 136:13, 136:14
**during** [25] - 4:16, 18:9, 23:1, 23:7, 23:17, 23:21, 29:20, 30:11, 32:23, 40:9, 41:9, 76:5, 76:7, 83:21, 83:24, 85:23, 86:12, 86:18, 89:2, 90:17, 92:4, 94:4, 127:25, 128:15
**duties** [1] - 85:7
**dwell** [1] - 134:22

**E**

**e-mail** [9] - 75:13, 82:24, 83:1, 83:5, 118:24, 118:25, 119:2, 119:4, 119:8
**e-mails** [1] - 86:5
**early** [5] - 83:22, 86:12, 92:4, 94:4, 124:18
**easier** [1] - 55:4
**East** [5] - 4:6, 12:17, 16:2, 111:23, 112:10
**easy** [1] - 112:4
**economics** [1] - 74:12
**educated** [1] - 88:7
**educational** [1] -

74:10
**effect** [2] - 9:3, 130:23
**either** [2] - 83:14, 134:4
**El** [4] - 47:23, 47:24, 48:5, 56:22
**Eldorado** [1] - 121:17
**electricity** [1] - 41:17
**electronics** [1] - 83:2
**elicit** [6] - 10:7, 25:16, 26:12, 128:14, 129:21, 136:6
**elicited** [1] - 8:5
**elicits** [1] - 10:8
**Elina** [19] - 70:6, 70:9, 70:11, 70:24, 71:3, 71:5, 71:9, 71:16, 71:21, 71:24, 72:11, 76:19, 88:20, 94:1, 94:4, 94:7, 105:3, 106:3, 108:17
**Elina's** [1] - 94:2
**elsewhere** [1] - 28:19
**employee** [4] - 78:12, 79:25, 105:22, 105:24
**employees** [4] - 70:17, 105:25, 106:12, 108:17
**employment** [7] - 77:7, 77:16, 78:20, 78:21, 79:5, 79:10, 80:7
**end** [4] - 35:16, 40:6, 49:10, 128:1
**ended** [1] - 81:22
**enforcement** [1] - 7:5
**engage** [1] - 132:5
**engineers** [4] - 88:1, 106:15, 106:16, 108:18
**entered** [6] - 72:8, 78:9, 79:22, 80:1, 80:7, 81:23
**entire** [1] - 9:12
**entirely** [3] - 9:25, 25:4
**entitled** [1] - 30:14
**entity** [1] - 12:22
**episode** [1] - 133:20
**equipment** [2] - 87:24, 87:25
**ESQ** [4] - 1:14, 1:17, 1:20, 1:24
**essence** [1] - 9:12
**essentially** [2] - 8:2, 64:3
**establish** [2] - 12:3, 126:4
**established** [2] -

29:24, 84:19
**establishes** [1] - 132:7
**estimated** [1] - 6:12
**et** [1] - 82:25
**evening** [1] - 125:7
**events** [1] - 5:13
**everywhere** [1] - 113:5
**Evidence** [1] - 130:21
**evidence** [7] - 8:11, 9:1, 72:22, 98:25, 101:4, 125:4, 134:5
**Ex** [2] - 19:15, 114:1
**ex** [1] - 6:19
**exactly** [7] - 8:19, 62:25, 72:25, 80:23, 103:20, 123:2, 123:10
**EXAMINATION** [12] - 3:8, 39:24, 45:18, 47:17, 59:24, 67:10, 73:24, 102:25, 110:16, 111:18, 120:2, 123:23
**examination** [8] - 68:8, 69:18, 110:19, 129:1, 129:21, 129:25, 136:21, 136:23
**examine** [5] - 39:22, 59:22, 102:23, 119:24, 128:12
**example** [3] - 81:20, 81:21, 89:13
**except** [1] - 121:10
**exception** [1] - 8:14
**excludable** [1] - 132:11
**exclude** [1] - 73:2
**excuse** [1] - 125:2
**excused** [2] - 47:5, 134:5
**execution** [1] - 32:24
**executive** [2] - 75:14, 84:3
**exercise** [1] - 37:19
**Exhibit** [72] - 11:3, 12:24, 16:11, 16:23, 16:25, 19:6, 19:18, 19:25, 20:2, 30:18, 31:1, 31:4, 31:10, 35:14, 36:7, 37:4, 38:6, 38:9, 38:19, 38:22, 39:13, 43:19, 52:20, 56:25, 57:9, 61:10, 65:25, 77:11, 77:18, 77:20, 78:24, 79:15, 89:18, 89:23, 90:25, 91:6, 93:1,

93:20, 93:22, 94:11, 94:18, 94:20, 94:25, 95:5, 95:17, 95:18, 95:23, 96:4, 96:11, 96:13, 96:18, 96:22, 96:23, 96:25, 97:13, 97:24, 98:7, 98:23, 99:2, 99:6, 99:8, 99:10, 99:15, 100:2, 100:9, 100:22, 102:6, 107:7, 107:10, 108:11, 116:11, 118:5
**exhibit** [15] - 19:13, 55:3, 56:1, 56:24, 57:3, 57:5, 61:5, 61:7, 89:18, 91:15, 97:24, 116:15, 116:23, 120:7
**exhibits** [1] - 51:23
**Exhibits** [1] - 51:24
**existing** [1] - 31:16
**expect** [3] - 33:3, 69:18, 136:17
**expectations** [1] - 81:4
**expenses** [1] - 29:13
**expensive** [1] - 120:15
**experience** [1] - 19:3
**expert** [4] - 84:21, 126:6, 126:10
**explain** [3] - 75:12, 133:18, 134:23
**explains** [1] - 132:4
**explore** [1] - 81:23
**export** [7] - 19:3, 55:20, 55:23, 63:13, 65:3, 129:5, 136:15
**EXPORT** [1] - 1:18
**exportation** [1] - 60:10
**exported** [3] - 55:19, 63:12, 63:15
**Express** [1] - 25:20
**expunged** [2] - 130:25, 131:7
**extended** [2] - 22:25, 49:9
**extent** [3] - 33:16, 129:25, 133:11
**extremely** [2] - 81:8, 82:1
**eyebrows** [1] - 82:3

**F**

**F.B.I** [4] - 7:19, 8:24, 42:1, 42:6
**Facebook** [3] - 109:13, 110:7, 110:9

**facility** [2] - 47:22, 60:9
**facing** [2] - 35:18, 90:11
**fact** [25] - 7:20, 8:20, 9:3, 45:20, 46:16, 73:5, 82:6, 84:18, 92:13, 105:21, 122:25, 126:11, 126:18, 128:1, 128:14, 128:19, 128:20, 129:5, 129:8, 129:9, 130:4, 130:13, 133:25, 136:24
**factory** [11] - 23:17, 70:18, 93:11, 97:9, 98:13, 104:12, 104:13, 104:22, 108:13, 110:25, 111:2
**factual** [1] - 132:18
**fair** [4] - 25:15, 100:24, 101:23, 119:22
**fall** [1] - 9:15
**familiar** [11] - 11:5, 11:13, 12:5, 13:9, 27:12, 27:20, 63:8, 83:16, 122:11, 122:14, 122:19
**family** [2] - 40:16, 89:16
**far** [9] - 4:23, 4:24, 15:7, 32:19, 32:21, 75:25, 95:12, 98:13, 98:15
**Fargo** [4] - 28:23, 29:1, 29:2, 29:12
**Faruk** [1] - 84:15
**fashion** [1] - 134:3
**father's** [2] - 35:21, 36:2
**faxing** [1] - 112:14
**Fayetteville** [1] - 20:13
**FBI** [3] - 128:5, 128:7, 129:9
**February** [4] - 56:6, 56:10, 135:21, 136:7
**Fed** [2] - 19:15, 114:1
**federal** [1] - 98:25
**Federal** [2] - 25:20, 130:21
**FEDERAL** [1] - 1:15
**feet** [1] - 50:4
**fellow** [1] - 125:17
**fellows** [1] - 133:15
**felony** [1] - 130:17
**felt** [3] - 82:1, 88:19, 121:13

7

**fever** [1] - 88:18
**few** [3] - 39:1, 49:2, 51:23
**figure** [1] - 71:8
**file** [1] - 60:21
**filed** [1] - 7:24
**fill** [3] - 118:11, 122:22, 123:8
**filled** [5] - 116:20, 118:12, 118:22, 119:11, 120:19
**final** [3] - 75:25, 76:3, 80:3
**financial** [5] - 28:13, 28:16, 48:8, 89:12, 89:15
**financially** [1] - 89:13
**fine** [4] - 54:20, 72:20, 85:4, 103:6
**fingerprinting** [1] - 112:14
**finish** [1] - 68:22
**finished** [1] - 65:24
**finishes** [1] - 49:7
**finishing** [1] - 50:9
**firearm** [2] - 59:3, 132:23
**firearms** [15] - 23:10, 24:7, 32:23, 36:21, 39:2, 40:7, 48:14, 48:18, 48:22, 64:10, 64:12, 90:18, 110:25, 111:2, 132:22
**firing** [3] - 25:1, 25:21, 129:3
**first** [22] - 4:18, 5:20, 12:1, 19:10, 28:16, 29:25, 30:18, 33:24, 41:4, 41:24, 70:25, 75:5, 78:6, 79:21, 82:22, 87:5, 87:7, 105:22, 105:24, 114:15, 124:15, 128:23
**firsthand** [5] - 126:21, 126:23, 126:24, 127:1, 127:3
**fit** [3] - 66:23, 68:5, 134:7
**fits** [1] - 73:1
**five** [2] - 114:22, 114:24
**flew** [1] - 87:9
**flexibility** [1] - 73:17
**flip** [1] - 116:12
**floor** [7] - 17:14, 22:17, 36:15, 37:7, 38:1, 105:19, 118:19
**Florida** [1] - 116:6

**folder** [1] - 90:25
**folks** [2] - 94:22, 113:3
**followed** [2] - 49:6, 86:1
**following** [5] - 14:23, 24:15, 70:1, 101:9, 124:9
**follows** [4] - 3:7, 47:16, 73:23, 111:17
**foot** [1] - 35:10
**FOR** [2] - 1:1, 2:3
**Ford** [2] - 36:4, 39:10
**forefront** [1] - 107:23
**foregoing** [3] - 138:7, 138:10, 138:21
**foreign** [2] - 64:25, 65:2
**forfeiture** [3] - 42:15, 42:24, 43:3
**forging** [1] - 48:25
**forgive** [1] - 17:13
**form** [6] - 24:3, 118:13, 118:15, 122:22, 123:3, 123:8
**forma** [1] - 116:19
**forms** [1] - 128:10
**forth** [2] - 136:8, 138:9
**forward** [2] - 125:7, 131:16
**foundation** [10] - 8:6, 11:22, 12:3, 22:4, 28:2, 29:24, 30:3, 127:11, 134:9, 134:12
**four** [7] - 31:17, 34:22, 40:4, 51:1, 114:22, 114:24, 130:17
**fourth** [1] - 117:9
**franchise** [1] - 112:3
**Frank** [3] - 44:18, 45:6, 111:15
**FRANK** [2] - 2:7, 111:16
**frank** [1] - 123:25
**frankly** [1] - 32:12
**fraud** [1] - 8:14
**freaked** [1] - 113:11
**free** [1] - 29:8
**Friday** [1] - 125:15
**friends** [1] - 23:11
**friendship** [1] - 4:8
**front** [8] - 19:8, 30:13, 43:20, 51:25, 52:4, 77:10, 89:17, 116:11
**fuck** [2] - 72:24, 81:25
**full** [2] - 24:23, 128:4
**funds** [10] - 29:9, 29:12, 31:19, 32:1, 32:4, 32:17, 33:5, 33:12, 33:17, 46:16

## G

**game** [1] - 70:8
**games** [1] - 45:4
**garage** [8] - 6:4, 31:15, 31:17, 34:11, 34:21, 34:22, 35:7, 35:12
**garden** [1] - 133:9
**gas** [6] - 24:25, 129:3, 130:14, 131:12, 131:13
**gaskets** [1] - 25:21
**gauges** [1] - 49:1
**gee** [1] - 120:14
**general** [1] - 21:25
**generally** [8] - 18:5, 21:23, 22:4, 30:20, 52:7, 57:5, 59:9, 116:15
**gentleman** [3] - 94:23, 97:5, 98:16
**gift** [1] - 116:18
**Gino** [1] - 135:7
**GINO** [1] - 1:24
**girl** [1] - 89:13
**given** [4] - 124:1, 128:12, 129:19, 134:17
**GL** [1] - 34:8
**glad** [1] - 72:10
**GLK** [1] - 29:16
**Glock** [1] - 67:15
**gold** [1] - 50:16
**gosh** [1] - 41:6
**GOVERNMENT** [1] - 2:3
**government** [53] - 8:25, 9:5, 9:9, 12:23, 16:22, 19:24, 24:20, 30:25, 40:6, 42:14, 43:1, 43:13, 47:13, 63:9, 70:7, 77:17, 79:12, 84:21, 85:15, 87:10, 89:22, 91:5, 91:18, 92:25, 93:19, 94:17, 95:4, 95:22, 96:10, 97:19, 98:6, 99:5, 99:14, 100:1, 100:21, 104:17, 105:21, 111:15, 116:23, 125:12, 126:3, 127:16, 127:19, 128:13, 129:7, 129:12, 130:1, 131:10, 131:19, 131:25, 135:21, 136:1, 136:5
**Government's** [73] - 11:2, 12:24, 16:11,

16:23, 16:25, 19:6, 19:18, 19:25, 20:2, 30:18, 31:1, 31:4, 31:10, 35:14, 36:7, 37:4, 38:6, 38:9, 38:19, 38:22, 39:13, 43:19, 51:24, 52:20, 56:25, 57:9, 61:9, 65:25, 77:11, 77:18, 77:20, 78:24, 79:15, 89:18, 89:23, 90:25, 91:6, 93:1, 93:20, 93:22, 94:11, 94:18, 94:20, 94:25, 95:5, 95:17, 95:18, 95:23, 96:4, 96:11, 96:13, 96:18, 96:22, 96:23, 96:25, 97:13, 97:24, 98:7, 98:23, 99:2, 99:6, 99:8, 99:10, 99:15, 100:2, 100:9, 100:22, 102:5, 107:7, 107:10, 108:10, 116:11, 118:5
**government's** [13] - 8:13, 9:4, 30:14, 61:5, 124:25, 128:22, 128:24, 130:15, 130:20, 131:11, 132:1, 132:2, 135:14
**Grand** [1] - 82:18
**granted** [2] - 5:5, 79:18
**groove** [3] - 49:1, 53:14, 62:9
**grooves** [9] - 49:20, 49:22, 49:24, 49:25, 50:9, 53:15, 53:16, 53:20, 62:12
**ground** [1] - 105:19
**grounds** [1] - 137:1
**Group** [3] - 84:15, 101:13, 102:18
**group** [1] - 20:6
**guess** [5] - 23:8, 32:25, 62:17, 103:20, 103:22
**guilty** [1] - 130:18
**gun** [11] - 42:8, 48:23, 49:6, 49:8, 49:9, 59:6, 59:9, 63:21, 64:13, 64:17, 132:22
**guns** [3] - 36:21, 37:9, 37:14
**guy** [2] - 73:5, 134:2
**guys** [2] - 134:7, 134:19

## H

**hair** [2] - 29:7, 41:15
**Haiti** [7] - 87:5, 87:7, 87:8, 87:9, 87:14, 87:15, 87:16
**half** [3] - 4:11, 24:23, 62:25
**Hall** [1] - 47:14
**HALL** [2] - 2:5, 47:15
**hall** [5] - 47:19, 53:1, 58:1, 67:12, 68:25
**hammer** [1] - 48:25
**hand** [6] - 35:19, 36:19, 38:13, 53:17, 62:13, 117:6
**handed** [4] - 7:11, 7:16, 10:20, 120:19
**handguns** [2] - 88:12, 88:13
**handled** [1] - 135:2
**handlers** [1] - 129:18
**handwriting** [4] - 43:25, 44:5, 44:10, 44:12
**hanging** [1] - 38:20
**happy** [1] - 113:20
**hard** [3] - 24:16, 99:21, 136:25
**head** [3] - 49:10, 62:17, 110:24
**hear** [4] - 3:12, 73:14, 74:2, 134:19
**heard** [10] - 8:8, 10:2, 25:2, 26:11, 107:7, 119:20, 125:4, 126:13, 127:11, 135:23
**hearsay** [8] - 6:21, 11:24, 12:2, 31:23, 58:7, 70:14, 71:22, 122:2
**heavily** [1] - 127:23
**hello** [2] - 111:21, 120:5
**help** [2] - 50:2, 112:18
**helped** [2] - 43:13, 43:16
**helpful** [3] - 12:6, 126:9, 137:6
**hereby** [1] - 138:6
**hereinbefore** [1] - 138:9
**hesitated** [1] - 72:24
**hi** [1] - 40:2
**high** [3] - 23:11, 68:23, 68:24
**Hill** [9] - 4:21, 8:4, 13:7, 13:9, 13:18, 39:18, 42:11, 78:12,

8

79:24

**himself** [1] - 29:13

**HINKLEY** [147] - 1:14, 3:3, 3:5, 3:9, 3:22, 4:1, 6:23, 8:9, 10:4, 10:7, 10:14, 10:16, 11:12, 11:18, 11:23, 11:25, 12:7, 12:14, 12:23, 13:2, 13:4, 14:20, 14:22, 14:24, 15:5, 15:11, 15:18, 15:20, 16:22, 17:1, 17:3, 19:18, 19:20, 19:24, 20:3, 20:5, 21:21, 21:22, 22:3, 22:7, 24:5, 24:11, 24:16, 25:5, 25:22, 26:2, 26:15, 26:20, 26:24, 27:14, 28:8, 28:10, 30:5, 30:6, 30:25, 31:6, 31:9, 31:25, 32:16, 32:21, 33:6, 33:13, 33:20, 39:19, 45:19, 46:6, 46:15, 47:2, 69:18, 70:16, 71:23, 72:8, 72:17, 72:24, 73:10, 73:15, 73:20, 73:25, 74:24, 75:2, 77:17, 77:21, 77:23, 79:12, 79:17, 79:19, 81:16, 84:8, 84:13, 85:1, 85:5, 85:11, 89:22, 90:1, 90:2, 91:5, 91:9, 91:18, 91:24, 92:3, 92:15, 92:18, 92:25, 93:4, 93:19, 93:23, 94:17, 94:21, 95:4, 95:8, 95:22, 96:1, 96:3, 96:10, 96:14, 96:22, 97:1, 97:19, 97:23, 98:6, 98:10, 99:5, 99:9, 99:14, 99:19, 100:1, 100:5, 100:21, 101:1, 101:5, 101:12, 101:20, 101:25, 102:5, 102:9, 102:19, 102:21, 109:9, 110:13, 110:17, 111:4, 111:10, 124:7, 124:10, 124:14, 124:16, 124:19

**Hinkley** [4] - 33:19, 69:17, 84:7, 91:25

**hire** [1] - 88:1

**hired** [3] - 70:22, 76:13, 80:12

**hiring** [1] - 76:22

**Hiwa** [1] - 83:23

**Hobbies** [1] - 113:5

**hold** [1] - 60:3

**hole** [1] - 48:23

**holidays** [1] - 87:4

**Holly** [1] - 113:5

**Home** [2] - 64:15, 64:18

**home** [35] - 4:21, 9:24, 10:20, 13:11, 14:5, 18:10, 22:9, 22:12, 22:15, 22:17, 22:22, 22:25, 25:8, 30:19, 31:12, 31:19, 32:2, 33:21, 33:23, 34:4, 36:14, 39:15, 40:12, 40:21, 40:23, 42:2, 42:17, 42:22, 73:1, 82:5, 87:21, 87:22, 88:14, 88:22

**Homeland** [2] - 51:16, 51:22

**honest** [1] - 89:6

**Honor** [87] - 3:3, 3:5, 3:22, 7:22, 7:23, 8:9, 9:6, 9:9, 10:12, 11:9, 11:21, 11:23, 11:25, 12:4, 12:23, 12:25, 13:2, 14:20, 16:22, 17:1, 19:24, 21:11, 21:25, 22:1, 22:3, 24:2, 24:8, 24:12, 24:13, 24:17, 26:8, 26:9, 26:19, 28:2, 29:23, 30:5, 30:25, 31:7, 31:22, 39:23, 46:2, 46:23, 47:2, 47:13, 52:19, 57:8, 59:21, 70:2, 74:24, 77:17, 79:12, 81:14, 84:2, 84:5, 84:19, 85:3, 89:22, 91:5, 91:7, 91:20, 91:24, 92:15, 100:23, 101:3, 101:7, 102:19, 102:21, 110:14, 111:4, 111:11, 116:23, 118:6, 120:1, 124:7, 124:10, 125:9, 125:11, 125:14, 126:11, 127:15, 128:21, 129:2, 130:3, 130:10, 130:20, 131:4, 134:21

**HONORABLE** [1] - 1:8

**hope** [1] - 129:21

**hospital** [1] - 64:6

**host** [1] - 83:8

**hotel** [3] - 71:5, 83:14, 95:12

**Hotel** [1] - 82:18

**hour** [2] - 69:19, 95:14

**house** [15] - 4:20, 5:23, 6:4, 6:25, 7:19, 18:19, 22:24, 27:9, 29:4, 31:16, 32:25, 34:12, 37:18, 40:7, 113:5

**housing** [1] - 86:6

**huge** [1] - 81:24

**hundred** [4] - 51:1, 55:22, 90:15, 97:10

**hundreds** [1] - 113:4

**husband** [9] - 7:17, 7:18, 10:20, 10:23, 14:25, 23:9, 26:10, 30:7, 41:4

**hysterical** [1] - 133:16

**I**

**i8** [2] - 29:16, 35:4

**idea** [4] - 25:7, 85:21, 123:20, 123:25

**identified** [3] - 3:23, 74:25, 125:12

**identify** [5] - 34:6, 74:20, 84:22, 90:6, 101:1

**illegal** [1] - 8:12

**illegally** [1] - 33:5

**Illinois** [1] - 130:17

**image** [1] - 97:25

**images** [2] - 97:17, 98:3

**impeachment** [1] - 130:20

**important** [1] - 68:23

**improper** [1] - 101:4

**IN** [1] - 1:1

**inability** [1] - 25:22

**inadmissible** [1] - 130:22

**inappropriate** [1] - 15:8

**inch** [3] - 53:5, 68:3

**inches** [7] - 50:25, 51:1, 53:8, 53:17, 53:18, 59:8, 62:14

**incident** [5] - 24:12, 26:4, 27:5, 27:6, 72:18

**include** [1] - 128:10

**included** [1] - 45:2

**including** [4] - 84:22, 104:14, 128:4

**inclusive** [2] - 31:2, 31:5

**income** [4] - 29:21, 29:25, 30:7, 30:10

**incorporation** [3] - 11:16, 12:11, 12:17

**incorrectly** [1] - 17:13

**Indeed** [1] - 75:13

**indeed** [2] - 128:15, 131:7

**INDEX** [1] - 2:1

**India** [4] - 65:9, 65:17, 65:19, 106:20

**Indian** [7] - 4:22, 6:2, 17:23, 20:18, 30:18, 31:12, 42:3

**indicate** [8] - 13:5, 13:12, 13:20, 17:20, 55:6, 55:9, 56:13, 80:21

**indicated** [24] - 10:18, 11:9, 11:23, 12:19, 22:8, 26:6, 34:2, 36:1, 41:9, 44:22, 44:24, 60:13, 62:6, 71:3, 71:7, 77:24, 84:14, 84:17, 88:14, 102:1, 109:12, 110:18, 128:25, 129:21

**indicating** [2] - 20:8, 20:25

**indicative** [2] - 134:1, 134:6

**indictment** [1] - 130:17

**individual** [5] - 8:20, 107:10, 107:22, 125:25, 132:24

**individually** [2] - 64:17, 115:16

**individuals** [1] - 104:13

**industries** [5] - 48:13, 48:14, 48:17, 48:19, 64:4

**industry** [6] - 48:15, 48:18, 48:22, 65:9, 122:11

**inference** [1] - 72:14

**inferior** [1] - 68:15

**infidelity** [1] - 72:15

**informant** [4] - 128:3, 128:4, 128:16, 128:20

**information** [12] - 7:9, 10:8, 20:6, 60:23, 76:22, 80:9, 119:5, 129:6, 129:11, 129:16, 129:19

**initial** [2] - 82:21, 87:19

**innocuous** [1] - 32:13

**innuendo** [1] - 72:14

**inquiring** [1] - 130:19

**inquiry** [1] - 12:4

**inserted** [1] - 68:3

**inside** [10] - 25:11, 37:18, 49:20, 49:25, 50:9, 62:9, 62:10, 63:25, 67:23, 116:3

**instead** [3] - 112:3, 119:6, 131:15

**institution** [1] - 28:16

**institutions** [1] - 28:13

**instructed** [1] - 109:13

**instructions** [1] - 125:5

**intend** [10] - 125:13, 125:18, 125:22, 127:22, 127:24, 128:11, 128:14, 129:25, 131:6, 136:5

**interactions** [1] - 129:12

**interested** [2] - 110:25, 111:2

**interior** [2] - 68:16, 68:18

**international** [7] - 74:11, 114:1, 114:2, 114:5, 115:9, 115:21, 116:16

**internationally** [1] - 16:3

**interview** [2] - 75:15, 135:20

**introduced** [1] - 104:9

**invoice** [9] - 52:8, 55:4, 55:6, 56:3, 63:8, 116:18, 116:19, 116:21

**involved** [4] - 82:23, 83:7, 97:9, 107:16

**involvement** [1] - 8:7

**Iraq** [79] - 10:25, 14:5, 14:12, 14:17, 15:21, 17:15, 18:8, 23:4, 23:5, 23:22, 24:7, 29:21, 30:8, 32:17, 33:17, 39:2, 39:6, 40:24, 44:23, 59:13, 59:17, 59:19, 60:2, 60:8, 70:17, 70:23, 76:4, 76:7, 77:2, 80:12, 82:12, 82:14, 83:24, 84:4, 84:17, 84:24, 85:6, 86:22, 86:25, 87:4, 87:15, 87:16, 87:18, 88:24, 89:2, 90:4, 91:3,

9

91:16, 91:23, 92:14, 93:17, 94:12, 95:1, 95:19, 96:6, 96:19, 97:14, 98:1, 99:24, 100:7, 104:11, 105:13, 105:18, 106:1, 106:5, 108:14, 116:9, 118:3, 118:16, 118:20, 119:19, 120:11, 121:3, 122:15, 123:16, 126:2, 126:11, 135:24, 136:10

**irrelevant** [4] - 26:19, 84:6, 84:25, 136:19

**Islam** [1] - 82:2

**Ismael** [1] - 83:23

**issue** [6] - 7:24, 24:21, 100:24, 131:3, 132:19, 136:1

**issues** [2] - 40:19, 135:14

**Istanbul** [14] - 70:22, 70:23, 75:24, 75:25, 76:10, 76:21, 77:3, 77:5, 77:8, 80:21, 81:1, 81:22, 82:2, 82:9

**item** [12] - 16:14, 53:10, 53:11, 57:17, 57:18, 57:21, 58:24, 67:18, 113:16, 115:15, 116:17, 117:9

**items** [48] - 8:10, 8:11, 8:12, 14:5, 14:7, 14:9, 14:12, 14:13, 14:15, 14:17, 15:18, 15:21, 15:25, 18:4, 24:7, 27:13, 27:15, 27:18, 29:15, 29:18, 38:2, 40:8, 42:7, 42:8, 42:14, 44:3, 44:8, 44:9, 44:21, 53:2, 54:5, 55:22, 56:4, 56:7, 64:13, 64:14, 87:15, 88:22, 115:12, 115:17, 115:22, 116:3, 116:8, 117:23, 118:21, 121:14, 121:20, 128:17

**itself** [2] - 43:24, 49:8

## J

**jacket** [2] - 3:21, 74:23

**January** [4] - 105:14, 105:15, 105:16,

108:16

**JASPERSE** [5] - 1:20, 135:13, 135:19, 136:1, 137:6

**Jencks** [2] - 24:20, 125:12

**Jenny** [1] - 43:16

**Jersey** [2] - 74:9, 115:10

**jewelry** [1] - 75:7

**job** [4] - 75:9, 85:6, 85:7, 122:22

**John** [1] - 39:15

**joint** [2] - 8:7, 9:19

**JR** [1] - 1:24

**Judge** [7] - 21:16, 24:18, 24:19, 25:18, 45:24, 63:4, 70:12

**Judy** [1] - 32:6

**jumped** [1] - 107:20

**JURY** [1] - 1:10

**jury** [20] - 7:25, 25:23, 27:1, 27:4, 31:7, 31:10, 32:6, 33:16, 46:23, 47:21, 73:13, 75:12, 78:7, 88:10, 95:9, 97:2, 124:18, 124:23, 134:14, 134:23

## K

**Kandaja** [10] - 70:7, 70:24, 71:3, 71:5, 71:9, 71:17, 71:21, 72:11, 76:19, 94:3

**Kane** [1] - 130:17

**Kawasaki** [2] - 29:18, 35:21

**keep** [1] - 125:4

**keeping** [1] - 80:15

**keeps** [1] - 14:25

**kept** [1] - 113:10

**kid** [1] - 113:11

**kidnapped** [2] - 135:25, 136:6

**kidnapping** [1] - 136:18

**kind** [13] - 6:6, 26:4, 40:5, 45:23, 59:3, 62:2, 62:3, 83:25, 103:7, 105:18, 112:13, 133:15

**kindly** [1] - 96:1

**kinds** [1] - 113:3

**Kings** [1] - 74:12

**knowing** [3] - 8:16, 9:2, 32:11

**knowingly** [1] - 60:8

**knowledge** [13] -

23:19, 30:3, 62:1, 84:11, 98:20, 98:22, 126:22, 126:23, 126:24, 127:1, 127:3, 127:6, 127:9

**known** [5] - 4:2, 75:3, 108:20, 108:22, 109:7

**knows** [7] - 25:5, 25:14, 25:16, 25:24, 29:25, 32:18, 101:15

**Korea** [1] - 65:8

**Krahl** [22] - 130:13, 130:16, 131:8, 131:10, 131:13, 131:14, 131:15, 131:18, 131:20, 132:3, 132:16, 132:25, 133:4, 133:5, 133:21, 133:24, 134:10, 134:13, 134:15, 135:5

**KRISTY** [2] - 2:4, 3:6

**Kristy** [12] - 3:5, 17:22, 44:2, 114:14, 114:15, 114:20, 115:1, 115:12, 115:22, 118:14, 118:23, 119:2

**Kurdistan** [20] - 17:15, 70:23, 80:13, 84:17, 85:16, 91:16, 92:14, 93:16, 94:12, 95:1, 95:19, 96:6, 96:19, 97:14, 97:25, 99:23, 100:7, 104:11, 108:13, 135:24

## L

**lack** [2] - 11:21, 134:6

**laid** [3] - 8:2, 24:21, 129:22

**Lamborghini** [2] - 103:8, 104:5

**lamp** [1] - 113:11

**lands** [5] - 49:20, 49:23, 49:24, 49:25, 50:8

**large** [1] - 6:4

**larger** [1] - 35:9

**Lariat** [2] - 36:4, 39:10

**last** [12] - 32:25, 69:1, 76:19, 78:13, 94:2, 103:8, 120:6, 120:7, 124:3, 127:15, 129:7

**Latin** [1] - 42:20

**laughing** [1] - 133:16

**Laura** [4] - 46:7,

138:3, 138:14, 138:14

**LAURA** [1] - 138:17

**law** [7] - 6:19, 7:4, 8:2, 8:4, 19:3, 55:21, 63:14

**laws** [2] - 60:10, 60:11

**lay** [6] - 22:4, 24:9, 30:3, 126:8, 126:10, 127:11

**lays** [2] - 134:9, 134:11

**leading** [3] - 27:10, 73:17, 73:19

**learned** [3] - 83:25, 84:5

**least** [1] - 22:8

**leave** [5] - 88:25, 105:13, 122:19, 136:10, 136:13

**left** [16] - 19:14, 20:23, 25:13, 27:7, 27:15, 31:16, 35:19, 38:13, 40:6, 54:11, 88:22, 90:6, 94:23, 97:11, 98:16, 117:6

**left-hand** [3] - 35:19, 38:13, 117:6

**legal** [1] - 65:7

**legally** [1] - 33:12

**length** [2] - 53:8, 59:8

**less** [4] - 5:9, 28:18, 29:6, 80:23

**letters** [1] - 112:4

**level** [1] - 65:13

**liability** [2] - 13:6, 13:13

**liberty** [1] - 29:10

**library** [1] - 6:6

**license** [6] - 101:2, 101:10, 101:21, 102:10, 102:12, 102:15

**life** [2] - 50:24, 68:20

**lifts** [1] - 35:10

**lighters** [4] - 45:6, 45:12, 123:16, 123:21

**limine** [4] - 8:1, 70:13, 131:17, 131:20

**limit** [2] - 36:5, 73:16

**limited** [2] - 13:5, 13:13

**line** [2] - 53:4, 56:4

**links** [1] - 61:22

**lis** [1] - 42:18

**Lis** [1] - 42:20

**list** [11] - 16:15, 51:16, 51:17, 51:22, 56:3, 56:5, 56:11, 60:25,

115:20, 117:7, 117:9

**listed** [9] - 36:4, 39:16, 53:2, 58:17, 117:6, 117:9, 117:23, 118:1, 119:10

**listen** [3] - 7:14, 72:3, 125:5

**lists** [1] - 52:8

**live** [5] - 4:16, 25:15, 41:1, 82:25, 86:6

**lived** [1] - 40:23

**living** [4] - 40:14, 42:22, 111:22, 113:10

**lobby** [2] - 86:3

**local** [1] - 83:8

**located** [4] - 34:10, 36:14, 42:10, 112:9

**location** [6] - 34:19, 35:5, 39:14, 39:16, 112:12, 126:17

**logistics** [1] - 74:14

**London** [6] - 101:17, 101:18, 103:17, 103:18, 103:23, 104:6

**look** [32] - 3:20, 11:2, 11:12, 19:6, 22:18, 48:8, 52:1, 52:2, 56:1, 62:18, 73:4, 79:20, 86:5, 89:17, 94:11, 94:25, 95:17, 96:4, 96:18, 97:13, 97:24, 98:23, 99:10, 100:9, 104:25, 106:20, 107:4, 116:13, 120:23, 123:3, 123:9, 125:7

**looked** [4] - 18:6, 41:22, 115:15, 115:17

**looking** [18] - 21:15, 54:3, 54:20, 75:14, 78:25, 79:4, 79:6, 82:24, 87:24, 88:2, 100:14, 106:20, 108:18, 115:14, 116:5, 117:9, 117:25

**looks** [5] - 3:20, 93:11, 97:7, 104:22, 107:11

**loud** [1] - 79:21

**lower** [3] - 28:23, 133:3, 133:7

**Lowes** [1] - 64:15

**loyal** [1] - 81:8

**loyalty** [12] - 70:6, 71:11, 71:19, 72:12, 72:17, 72:21, 72:23, 81:9, 81:10, 82:9, 82:11, 82:12

10

lunch [2] - 69:20, 69:22
lungs [1] - 81:25

## M

M4 [1] - 129:3
ma'am [1] - 43:20
machines [7] - 88:2, 106:16, 106:20, 106:24, 107:4, 108:18
mail [10] - 75:13, 82:24, 83:1, 83:5, 114:1, 118:24, 118:25, 119:2, 119:4, 119:8
mailed [4] - 8:10, 9:23, 9:25, 18:22
mails [1] - 86:5
Main [1] - 28:23
maintained [1] - 52:16
mall [3] - 72:18, 72:24, 81:23
man [2] - 41:5, 89:7
manager [1] - 4:6
mandrels [1] - 48:25
manifest [1] - 123:11
manufacture [10] - 48:16, 48:19, 48:21, 48:23, 48:24, 48:25, 64:20, 68:12
manufactured [2] - 64:19, 134:2
manufacturer [3] - 9:24, 48:12, 65:18
manufacturing [2] - 23:9, 47:22
March [3] - 17:9, 114:25, 115:2
MARIANI [1] - 1:8
marital [18] - 5:24, 7:23, 8:21, 9:7, 9:8, 9:15, 10:1, 10:10, 15:17, 20:21, 26:9, 31:12, 32:5, 33:21, 34:13, 36:14, 40:21, 45:21
marked [3] - 51:24, 56:25, 116:10
market [2] - 43:6, 65:17
markets [1] - 4:6
marriage [3] - 4:16, 40:9, 40:14
married [6] - 3:16, 4:12, 4:13, 40:3, 40:17, 40:20
Masters [6] - 25:2, 47:23, 47:24, 48:5,

56:22, 121:17
material [5] - 68:16, 127:18, 127:21, 127:22
materials [1] - 9:23
Mathes [12] - 127:17, 128:2, 128:12, 128:23, 129:2, 129:8, 131:15, 132:15, 132:16, 134:13, 134:25
matter [4] - 62:24, 113:13, 128:10, 130:10
matters [1] - 137:3
Matthew [2] - 20:9, 21:5
MAY [1] - 1:11
McBride [3] - 125:13, 125:21, 126:16
McLaren [3] - 35:4, 35:16, 35:19
mean [16] - 11:7, 25:15, 53:6, 53:13, 57:19, 62:8, 62:11, 69:2, 72:23, 81:12, 103:22, 107:1, 113:9, 122:7, 132:13, 133:8
means [1] - 138:21
meant [2] - 81:13, 102:14
mechanisms [1] - 35:12
media [11] - 6:5, 92:12, 92:23, 94:15, 95:2, 95:19, 96:8, 96:20, 97:17, 98:4, 105:8
medical [3] - 40:16, 48:15, 64:6
medicine [3] - 121:10, 121:11, 121:12
meet [8] - 4:4, 75:5, 75:23, 76:5, 76:9, 86:2, 114:15
meeting [6] - 6:15, 6:16, 83:17, 83:21, 84:16, 90:17
meetings [4] - 83:7, 83:12, 83:13, 87:10
members [1] - 124:23
memory [1] - 30:22
mentally [1] - 89:8
mention [1] - 6:1
mentioned [6] - 48:14, 49:16, 53:8, 128:15, 138:8
mentions [1] - 53:17
Mercedes [3] - 29:17,

34:8, 34:18
merchandise [1] - 117:6
MERRING [2] - 2:4, 3:6
Merring [8] - 3:5, 3:13, 9:17, 10:17, 12:9, 32:6, 41:4, 45:20
met [8] - 4:5, 5:17, 5:20, 76:11, 90:13, 100:6, 114:6, 114:10
metal [2] - 27:19, 50:21
method [1] - 55:9
microphone [2] - 3:10, 74:1
Middle [2] - 138:4, 138:18
middle [1] - 53:2
MIDDLE [1] - 1:1
might [9] - 24:24, 25:3, 30:3, 125:11, 125:19, 126:2, 129:18, 130:12, 131:9
mile [1] - 112:12
Milford [3] - 47:22, 78:12, 79:25
Millennium [1] - 82:18
millimeter [13] - 53:12, 53:19, 61:15, 61:20, 61:25, 62:2, 62:3, 62:4, 66:10, 66:11, 66:12, 67:16, 117:20
millimeters [1] - 67:13
mind [3] - 51:25, 116:12, 125:4
mine [1] - 78:18
minor [2] - 41:7, 41:8
minute [1] - 9:2
minutes [3] - 4:24, 47:10, 111:12
missed [1] - 112:22
mistake [1] - 134:6
Mitchell [1] - 41:4
mix [1] - 123:21
mom [3] - 4:20, 29:17, 113:19
moment [9] - 10:4, 10:14, 14:20, 21:12, 63:4, 65:21, 87:22, 102:19, 119:25
money [7] - 29:2, 29:15, 33:1, 33:17, 45:20, 120:11, 129:10
monkey [1] - 113:10
Monroe [1] - 13:19
Monteforte [6] - 44:19, 44:20, 111:15,

111:20, 117:5, 124:5
MONTEFORTE [2] - 2:7, 111:16
month [2] - 29:6, 41:12
months [3] - 114:23, 114:24, 136:15
Morales [1] - 135:15
morning [12] - 3:1, 40:1, 40:2, 47:19, 47:20, 71:4, 86:2, 112:24, 124:15, 125:1, 125:3, 125:7
most [6] - 73:9, 86:4, 89:6, 113:7, 113:23, 114:5
mostly [2] - 83:14, 114:3
mother [5] - 4:5, 6:19, 13:11, 29:16, 39:15
mother's [1] - 113:17
mother-in-law [1] - 6:19
motion [5] - 8:1, 46:25, 131:9, 131:17, 131:20
motions [1] - 70:13
motive [2] - 128:19, 134:6
motorcycle [4] - 29:18, 35:21, 35:23, 100:13
mountains [1] - 95:16
mounted [5] - 57:18, 57:19, 57:22, 67:25, 68:1
move [10] - 28:8, 31:1, 46:6, 46:24, 52:19, 57:8, 74:1, 96:10, 99:5, 102:5
moved [2] - 4:20, 82:12
moves [19] - 12:23, 16:22, 77:17, 79:12, 89:22, 91:5, 91:18, 92:25, 93:19, 94:17, 95:4, 95:22, 96:22, 97:19, 98:6, 99:14, 100:1, 100:21, 116:23
moving [3] - 19:24, 52:1, 133:23
MR [304] - 3:3, 3:5, 3:9, 3:22, 4:1, 6:21, 6:23, 7:22, 8:9, 8:18, 10:4, 10:7, 10:12, 10:14, 10:16, 11:9, 11:12, 11:18, 11:21, 11:23, 11:24, 11:25, 12:4, 12:7, 12:8,

12:14, 12:23, 12:25, 13:2, 13:4, 14:20, 14:22, 14:24, 15:4, 15:5, 15:6, 15:9, 15:11, 15:17, 15:18, 15:20, 16:22, 16:24, 17:1, 17:3, 19:17, 19:18, 19:20, 19:24, 20:1, 20:3, 20:5, 21:11, 21:13, 21:21, 21:22, 21:25, 22:3, 22:7, 24:1, 24:5, 24:8, 24:11, 24:13, 24:16, 24:18, 25:5, 25:18, 25:22, 26:2, 26:8, 26:15, 26:18, 26:20, 26:24, 27:10, 27:14, 28:2, 28:5, 28:8, 28:10, 29:23, 30:5, 30:6, 30:25, 31:3, 31:6, 31:9, 31:22, 31:25, 32:5, 32:16, 32:21, 33:6, 33:13, 33:20, 39:19, 39:23, 39:25, 45:16, 45:19, 46:2, 46:6, 46:15, 46:22, 47:2, 47:4, 47:8, 47:13, 47:18, 52:19, 52:21, 52:23, 52:25, 57:8, 57:10, 57:12, 57:14, 58:7, 58:8, 58:11, 59:21, 59:23, 59:25, 60:4, 60:6, 63:4, 63:6, 65:20, 65:23, 66:1, 67:8, 67:11, 69:13, 69:15, 69:18, 69:24, 69:25, 70:2, 70:16, 71:21, 71:23, 72:1, 72:8, 72:10, 72:17, 72:20, 72:24, 73:10, 73:15, 73:19, 73:20, 73:25, 74:24, 75:2, 77:17, 77:19, 77:21, 77:23, 79:12, 79:14, 79:17, 79:19, 81:13, 81:16, 84:2, 84:8, 84:13, 84:19, 85:1, 85:5, 85:11, 89:22, 89:24, 90:1, 90:2, 91:5, 91:7, 91:9, 91:18, 91:20, 91:24, 92:3, 92:15, 92:16, 92:18, 92:25, 93:2, 93:4, 93:19, 93:21, 93:23, 94:17, 94:19, 94:21, 95:4, 95:6, 95:8, 95:22, 95:24, 96:1, 96:3, 96:10, 96:12, 96:14, 96:22, 96:24, 97:1,

11

97:19, 97:21, 97:23, 98:6, 98:8, 98:10, 99:5, 99:7, 99:9, 99:14, 99:17, 99:19, 100:1, 100:3, 100:5, 100:21, 100:23, 101:1, 101:3, 101:5, 101:6, 101:12, 101:17, 101:20, 101:25, 102:5, 102:7, 102:9, 102:19, 102:21, 102:24, 103:1, 109:9, 109:11, 110:11, 110:13, 110:17, 111:4, 111:6, 111:10, 111:15, 111:19, 116:23, 116:25, 117:2, 117:4, 118:6, 118:8, 119:23, 119:25, 120:3, 120:6, 120:8, 120:9, 122:2, 122:5, 123:4, 123:7, 123:22, 123:24, 124:4, 124:7, 124:10, 124:14, 124:16, 124:19, 125:9, 125:23, 125:25, 126:10, 126:21, 126:23, 127:14, 129:2, 129:20, 130:2, 130:6, 130:7, 130:8, 130:10, 130:12, 131:4, 132:2, 132:13, 132:20, 133:11, 133:14, 134:9, 134:21, 135:7, 135:9, 135:11, 135:13, 135:19, 136:1, 137:6
**mugs** [2] - 45:2, 45:3
**multi** [1] - 11:6
**multi-page** [1] - 11:6
**must** [4] - 21:4, 25:3, 75:13, 117:17

## N

**nails** [2] - 29:7, 41:15
**name** [27] - 7:8, 12:22, 13:13, 16:6, 16:8, 17:22, 20:10, 40:22, 56:23, 58:16, 58:17, 58:18, 70:6, 76:19, 83:4, 90:14, 90:23, 94:2, 94:24, 97:5, 103:2, 107:24, 111:25, 112:2,

114:13, 125:13, 130:12
**names** [2] - 36:21, 83:19
**national** [1] - 129:15
**nature** [7] - 15:14, 32:14, 33:8, 76:22, 89:4, 127:21, 135:4
**NEALON** [1] - 1:15
**near** [1] - 126:15
**necessary** [1] - 67:4
**need** [7] - 35:9, 73:14, 92:2, 116:14, 125:8, 131:24, 134:22
**needed** [2] - 68:5, 88:18
**needs** [1] - 29:24
**never** [8] - 4:9, 18:6, 29:10, 59:20, 107:3, 112:22, 123:19, 133:2
**NEW** [1] - 1:21
**New** [1] - 74:9
**new** [4] - 34:21, 51:8, 87:20, 88:17
**newer** [1] - 35:7
**next** [22] - 3:4, 4:7, 11:1, 13:12, 20:14, 31:16, 34:7, 47:7, 47:12, 53:13, 69:17, 71:1, 71:4, 75:21, 91:15, 93:12, 97:24, 99:10, 111:14, 125:1, 125:23
**nexus** [1] - 73:6
**nice** [1] - 41:22
**night** [1] - 70:25
**nine** [14] - 53:12, 53:18, 61:14, 61:20, 61:25, 62:2, 62:3, 62:4, 66:10, 66:11, 66:12, 67:12, 67:15, 117:20
**Ninja** [2] - 29:18, 35:21
**Ninth** [1] - 28:17
**nitrite** [1] - 50:20
**NO** [1] - 1:9
**non** [9] - 51:9, 51:18, 78:19, 78:21, 78:22, 79:1, 80:8, 80:14, 80:20
**non-disclosure** [7] - 78:19, 78:21, 78:22, 79:1, 80:8, 80:14, 80:20
**non-perishable** [1] - 51:9
**non-shippable** [1] - 51:18

**none** [1] - 99:17
**normal** [1] - 82:2
**normally** [1] - 55:1
**North** [4] - 20:13, 28:16, 65:8, 132:22
**notation** [1] - 54:25
**note** [1] - 102:10
**nothing** [12] - 8:19, 33:3, 45:16, 47:4, 59:21, 65:13, 67:8, 79:5, 110:11, 111:6, 115:7, 124:4
**notice** [3] - 27:9, 69:10, 128:13
**noticed** [2] - 24:23, 27:6
**November** [2] - 86:15, 126:12
**NSD** [1] - 1:18
**number** [11] - 17:16, 17:17, 17:18, 30:13, 32:22, 50:4, 53:15, 56:15, 98:11, 119:13, 121:21
**numbered** [1] - 138:9
**numbers** [4] - 53:6, 53:13, 62:7, 99:20
**NW** [2] - 1:19, 1:21

## O

**O'Donnell** [13] - 5:15, 5:17, 5:21, 6:15, 6:24, 7:4, 7:12, 7:17, 7:21, 10:18, 10:21, 14:5, 33:25
**object** [16] - 10:11, 11:9, 12:8, 21:25, 24:8, 24:9, 24:16, 25:17, 26:8, 29:23, 72:2, 84:2, 91:20, 100:23, 113:17, 129:16
**Objection** [1] - 101:3
**objection** [52] - 6:21, 7:22, 10:3, 11:21, 11:24, 12:25, 13:1, 16:24, 20:1, 21:11, 21:18, 24:1, 24:3, 27:10, 28:2, 31:3, 31:22, 32:5, 32:11, 46:2, 46:22, 52:21, 57:10, 58:7, 60:4, 77:19, 79:14, 81:13, 89:24, 91:7, 92:1, 92:16, 93:2, 93:21, 94:19, 95:6, 95:24, 96:12, 96:24, 97:21, 98:8, 99:7, 99:16, 100:3, 102:7, 109:9,

116:25, 123:4, 129:7, 129:14, 130:1, 136:25
**objections** [1] - 73:12
**obligation** [1] - 130:16
**obtained** [3] - 33:5, 33:12, 106:17
**obviously** [2] - 9:12, 126:25
**occasion** [7] - 7:16, 14:10, 18:5, 22:8, 24:6, 73:15, 85:7
**occasions** [3] - 18:21, 23:20, 23:24
**occur** [1] - 5:4
**occurred** [2] - 82:9, 135:14
**occurrences** [1] - 82:8
**occurring** [2] - 5:13, 33:24
**occurs** [2] - 136:13, 136:14
**October** [1] - 126:12
**OF** [2] - 1:1, 1:3
**offer** [2] - 125:16, 125:24
**offered** [2] - 70:15, 75:9
**OFFICE** [1] - 1:15
**office** [16] - 17:14, 22:16, 27:13, 27:15, 36:13, 37:6, 37:25, 38:14, 38:20, 38:23, 62:20, 62:21, 82:24, 86:5, 87:19, 106:9
**Office** [1] - 118:19
**officer** [2] - 7:5, 135:16
**official** [1] - 137:4
**Official** [3] - 138:3, 138:15, 138:17
**officials** [1] - 87:10
**often** [1] - 112:20
**old** [4] - 4:10, 41:5, 74:6, 130:24
**older** [2] - 130:16, 130:22
**once** [7] - 52:2, 75:21, 82:12, 82:19, 87:18, 125:3, 126:25
**one** [58] - 14:9, 14:20, 16:17, 25:18, 34:23, 39:3, 39:4, 48:18, 49:6, 51:2, 51:4, 51:8, 56:3, 57:7, 57:20, 57:23, 59:6, 59:17, 60:7, 60:9, 62:14, 66:18, 66:22, 66:23, 70:2, 70:3, 70:5, 70:12, 70:16,

73:15, 78:25, 80:18, 81:24, 83:23, 86:8, 94:14, 95:10, 97:17, 98:3, 98:18, 99:10, 100:14, 106:2, 108:24, 110:13, 112:17, 120:6, 126:2, 127:17, 129:5, 130:10, 131:16, 131:23, 134:17, 135:14
**ones** [2] - 28:15, 99:3
**open** [7] - 18:24, 115:24, 120:18, 120:23, 120:24, 125:4
**opened** [2] - 28:24, 116:1
**opening** [2] - 82:22, 82:24
**operating** [2] - 23:13, 23:17
**operation** [1] - 23:15
**operations** [2] - 48:8, 74:14
**opinion** [7] - 9:12, 24:9, 25:3, 126:7, 126:8, 126:10
**opportunity** [2] - 7:18, 30:2
**opposed** [1] - 8:5
**order** [12] - 52:10, 52:12, 54:12, 54:14, 54:21, 57:24, 60:25, 61:10, 127:19, 128:13, 130:2, 134:25
**ordered** [2] - 58:1, 58:20
**orders** [2] - 52:8, 52:9
**ordinary** [1] - 115:20
**organizer** [1] - 13:20
**original** [3] - 56:9, 115:18, 135:17
**originally** [2] - 34:11, 45:24
**orthopaedic** [1] - 48:15
**otherwise** [3] - 9:10, 85:8, 130:9
**ought** [1] - 32:7
**output** [1] - 48:9
**outside** [6] - 5:22, 6:17, 56:23, 69:5, 91:12, 95:11
**outweighed** [1] - 73:9
**outweighs** [1] - 130:23
**overruled** [3] - 12:13, 26:13, 85:10

12

**overseas** [4] - 116:7, 120:16, 120:22, 122:15
**overseer** [1] - 108:4
**owes** [1] - 133:4
**own** [8] - 8:1, 8:2, 27:2, 39:2, 39:6, 111:23, 113:23, 127:8
**owned** [2] - 39:3, 39:11
**owner** [2] - 48:2, 112:7
**Oz** [1] - 113:12

**P**

**P.A** [2] - 78:12, 79:25
**P.N.C** [3] - 28:16, 28:20, 28:21
**PA** [3] - 1:16, 1:25, 138:19
**pack** [1] - 121:21
**package** [16] - 17:20, 20:15, 21:3, 21:8, 21:9, 21:10, 21:14, 21:15, 22:8, 22:21, 23:7, 23:18, 26:25, 44:23, 119:1, 120:10
**packaged** [2] - 56:19, 56:20
**packages** [14] - 8:23, 9:5, 14:19, 16:4, 21:23, 22:11, 22:14, 22:18, 22:19, 44:23, 44:24, 45:2, 120:10, 122:14
**packaging** [11] - 9:25, 16:6, 16:7, 26:16, 26:23, 111:23, 112:14, 112:15, 115:11, 115:18, 117:17
**Packaging** [12] - 16:2, 16:8, 16:14, 17:4, 44:18, 112:1, 112:4, 112:5, 112:9, 112:13, 112:16, 114:21
**packed** [4] - 27:2, 56:17, 113:23
**packet** [1] - 121:22
**Packing** [1] - 112:3
**packing** [8] - 26:25, 27:8, 52:8, 56:3, 56:5, 56:11, 60:25, 117:7
**page** [16] - 11:6, 12:1, 13:23, 13:24, 19:10, 19:13, 19:17, 19:18,

19:22, 20:4, 23:15, 55:17, 78:13, 80:3, 116:14
**pages** [1] - 11:13
**paid** [18] - 6:8, 33:2, 34:2, 34:15, 34:24, 35:23, 36:3, 54:21, 55:1, 55:2, 55:7, 128:18, 128:20, 129:10, 133:2, 133:3, 133:6
**paper** [2] - 7:24, 21:4
**papers** [1] - 132:14
**paperwork** [8] - 12:12, 12:17, 60:19, 63:19, 67:4, 69:6, 69:9, 81:1
**Parcel** [2] - 6:10, 55:14
**pardon** [2] - 19:7, 45:8
**park** [1] - 103:17
**part** [33] - 9:2, 13:12, 17:7, 17:24, 19:14, 20:14, 34:21, 45:23, 52:14, 52:16, 66:16, 67:21, 67:23, 70:5, 73:3, 78:6, 78:20, 83:1, 83:22, 84:9, 85:17, 94:4, 96:8, 98:19, 101:20, 106:10, 112:3, 117:15, 121:21, 122:22, 132:23, 136:18
**partial** [1] - 31:15
**partially** [3] - 104:12, 104:25, 109:22
**participant** [4] - 8:15, 8:16, 9:2, 9:19
**participants** [1] - 9:15
**particular** [25] - 13:20, 14:2, 15:25, 17:8, 20:15, 24:12, 27:4, 27:6, 33:10, 35:2, 50:5, 53:12, 54:1, 57:20, 65:11, 66:14, 115:1, 121:12, 121:18, 122:15, 122:25, 126:14, 127:17, 133:20
**particularly** [1] - 133:25
**particulars** [1] - 61:1
**parties** [1] - 78:7
**parts** [5] - 37:20, 92:4, 133:23, 134:2, 134:18
**party** [2] - 134:17, 134:18
**passed** [3] - 70:11,

71:10, 72:23
**passenger** [1] - 94:1
**past** [5] - 60:14, 129:4, 131:21, 132:8, 132:21
**PATRICK** [1] - 1:20
**pavers** [1] - 6:18
**pay** [6] - 33:1, 34:4, 36:5, 37:2, 37:14, 41:17
**paying** [2] - 6:9, 6:11
**payment** [1] - 134:3
**pendens** [2] - 42:18, 42:20
**Pennsylvania** [25] - 3:14, 4:22, 4:25, 6:2, 7:3, 10:19, 11:19, 13:8, 13:18, 17:23, 20:18, 23:10, 23:21, 28:17, 31:13, 58:2, 58:6, 61:3, 61:4, 76:7, 78:11, 79:23, 129:4, 138:5, 138:18
**PENNSYLVANIA** [2] - 1:1, 1:19
**people** [13] - 6:17, 21:7, 83:8, 83:16, 87:14, 109:5, 109:18, 112:16, 113:23, 119:6, 123:3, 124:24, 136:5
**per** [2] - 51:1, 51:5
**Percell** [1] - 6:9
**percent** [4] - 55:22, 90:15, 97:10, 112:15
**perhaps** [1] - 47:8
**period** [2] - 22:25, 32:17
**perishable** [1] - 51:9
**permission** [1] - 79:17
**person** [10] - 69:3, 76:13, 76:14, 85:13, 90:6, 90:9, 90:11, 90:20, 108:1, 126:25
**personal** [6] - 29:15, 44:3, 44:8, 44:9, 94:10, 127:8
**personally** [1] - 102:14
**phone** [9] - 6:19, 7:10, 7:11, 7:16, 17:16, 75:15, 86:4, 123:14
**photo** [8] - 89:19, 91:12, 91:21, 97:15, 101:18, 103:8, 103:14, 103:16
**photograph** [36] - 34:6, 34:10, 35:2, 35:6, 37:8, 37:24, 57:15, 90:4, 90:7,

90:17, 91:1, 91:3, 91:10, 91:16, 92:22, 93:5, 93:7, 93:12, 93:14, 93:16, 93:24, 94:12, 94:22, 95:1, 95:18, 96:5, 96:15, 96:19, 98:16, 99:3, 99:12, 99:23, 100:10, 100:12, 103:12
**photographs** [8] - 30:14, 30:15, 30:17, 30:23, 32:22, 92:7, 98:11
**photos** [17] - 40:7, 42:7, 91:22, 92:11, 92:13, 94:14, 97:4, 97:7, 103:8, 104:8, 104:15, 104:16, 105:2, 105:12, 105:15, 109:13, 126:5
**physical** [1] - 40:19
**physically** [3] - 56:17, 115:17, 116:17
**pick** [1] - 76:12
**picked** [4] - 102:4, 103:24, 104:5
**pickup** [1] - 45:4
**picture** [8] - 34:20, 57:6, 57:17, 66:3, 67:19, 100:13, 102:3, 107:23
**pictures** [6] - 94:24, 109:20, 109:24, 110:3, 110:6, 110:8
**piece** [2] - 41:21, 57:20
**pieces** [1] - 75:8
**pin** [4] - 25:1, 25:21, 129:3, 130:14
**pistol** [3] - 39:3, 39:4, 67:16
**PITTSTON** [1] - 1:25
**place** [15] - 14:23, 15:25, 16:7, 24:15, 36:16, 70:1, 71:12, 73:18, 82:25, 97:15, 98:13, 101:9, 124:9, 126:14, 127:4
**PLACE** [1] - 1:9
**Place** [12] - 16:2, 16:9, 16:14, 17:4, 44:18, 112:1, 112:4, 112:5, 112:9, 112:13, 112:16, 114:21
**placed** [3] - 18:7, 54:12, 95:2
**places** [3] - 86:6, 121:4, 122:16

**plane** [3] - 82:5, 88:22, 123:21
**planning** [1] - 130:19
**plant** [3] - 77:1, 80:13, 85:22
**plants** [1] - 23:10
**plastic** [5] - 56:19, 66:21, 66:22, 66:24, 67:2
**plate** [5] - 101:2, 101:21, 102:10, 102:12, 102:15
**plates** [1] - 101:10
**play** [1] - 6:7
**played** [1] - 70:8
**plea** [1] - 130:18
**pleadings** [1] - 136:8
**pledged** [1] - 45:25
**Plus** [1] - 112:3
**pocket** [1] - 68:5
**point** [38] - 5:2, 5:11, 5:24, 6:24, 7:2, 8:20, 10:17, 12:7, 21:16, 23:14, 25:18, 28:22, 30:7, 69:21, 70:11, 70:19, 71:9, 72:13, 75:4, 75:18, 76:14, 79:3, 82:20, 83:7, 83:19, 84:25, 88:14, 88:21, 88:25, 108:5, 108:6, 125:16, 126:2, 131:1, 133:2, 134:22
**Polad** [15] - 83:23, 83:25, 84:11, 84:15, 84:22, 85:8, 85:12, 100:6, 101:15, 101:20, 102:1, 103:12, 103:24, 104:5, 111:3
**Polad's** [1] - 100:20
**Police** [2] - 7:3, 10:19
**polish** [2] - 115:19, 121:15
**portion** [2] - 44:5, 46:8
**position** [15] - 8:13, 83:25, 84:1, 84:3, 84:17, 94:9, 128:22, 129:6, 130:21, 132:2, 133:4, 134:9, 136:16, 136:19, 136:22
**positions** [2] - 48:9, 129:23
**possession** [1] - 69:4
**possibility** [1] - 86:21
**possible** [3] - 23:24, 24:1, 135:15
**post** [4] - 109:13, 110:4, 110:6, 110:8

**Postal** [1] - 55:11
**postal** [1] - 55:12
**posted** [2] - 96:8, 105:8
**potentially** [1] - 88:12
**practice** [1] - 52:14
**practitioner** [1] - 40:16
**precise** [1] - 85:1
**preclude** [1] - 131:6
**prejudice** [1] - 73:9
**prejudicial** [5] - 25:4, 73:2, 73:6, 130:23, 131:1
**prepared** [1] - 138:11
**preparing** [1] - 70:19
**prerequisite** [1] - 81:4
**present** [2] - 42:1, 42:6
**presentation** [1] - 134:16
**presented** [2] - 78:1, 127:20
**president** [3] - 48:2, 48:3, 48:7
**pretty** [1] - 128:9
**previous** [4] - 41:3, 91:12, 94:24, 99:3
**previously** [4] - 12:19, 51:24, 56:25, 116:10
**price** [2] - 54:7, 134:19
**private** [1] - 9:8
**privilege** [2] - 9:16, 10:10
**pro** [1] - 116:19
**probative** [3] - 73:8, 130:23, 131:2
**problem** [4] - 72:9, 72:11, 122:1, 133:1
**proceed** [3] - 3:2, 47:9, 92:15
**proceedings** [1] - 138:8
**PROCEEDINGS** [1] - 1:10
**process** [2] - 113:15, 124:23
**produce** [1] - 67:15
**produced** [2] - 88:5, 126:25
**product** [2] - 64:20, 64:21
**production** [2] - 48:9, 52:9
**products** [2] - 48:21, 68:15
**proffer** [4] - 8:9, 9:4, 24:11, 32:15
**progress** [1] - 119:1

**prohibited** [2] - 55:21, 63:14
**project** [29] - 6:13, 70:18, 80:9, 80:15, 80:25, 82:20, 83:22, 84:10, 84:14, 85:17, 85:24, 86:12, 87:11, 89:4, 90:18, 91:22, 92:5, 92:8, 94:5, 98:19, 105:19, 107:16, 108:4, 109:2, 109:3, 109:7, 110:3, 110:6, 110:24
**projectile** [2] - 49:21, 50:3
**pronounce** [3] - 17:13, 103:2, 118:19
**pronounced** [1] - 54:18
**proof** [2] - 125:17, 125:24
**propensity** [1] - 134:5
**proper** [2] - 63:19, 69:5
**proposed** [1] - 13:16
**protective** [3] - 127:19, 128:13, 130:2
**proven** [1] - 9:6
**provide** [4] - 7:9, 50:17, 112:13, 113:22
**provided** [5] - 24:20, 53:23, 117:5, 129:7, 129:11
**provides** [1] - 64:3
**providing** [1] - 65:13
**provisions** [1] - 138:5
**public** [1] - 12:2
**publically** [1] - 92:11
**publish** [13] - 13:2, 17:1, 20:3, 31:6, 52:23, 57:12, 77:21, 79:17, 90:1, 93:3, 96:1, 117:2, 118:6
**published** [2] - 79:16, 92:11
**pull** [13] - 48:23, 49:2, 49:6, 53:5, 57:6, 57:18, 61:6, 64:22, 65:2, 66:6, 67:18, 104:17, 110:18
**purchase** [5] - 14:13, 31:19, 32:2, 34:4, 54:5
**purchased** [6] - 4:21, 14:15, 18:12, 18:14, 40:20, 132:25
**purchases** [1] - 29:13
**purchasing** [2] - 21:5,

37:18
**purportedly** [1] - 136:9
**purpose** [1] - 12:10
**purposes** [3] - 128:24, 130:20, 133:23
**pursuant** [3] - 128:13, 130:15, 138:5
**put** [8] - 22:16, 40:22, 63:25, 88:22, 92:23, 94:14, 97:17, 116:17
**puts** [3] - 25:11, 49:20, 50:8
**putting** [3] - 25:9, 69:10

## Q

**qualified** [1] - 127:8
**qualifies** [1] - 134:4
**quality** [3] - 65:12, 68:23, 68:24
**quantity** [1] - 61:12
**questioned** [1] - 86:21
**questioning** [2] - 22:1, 85:1
**questions** [20] - 25:14, 25:23, 26:17, 26:18, 33:4, 39:1, 39:19, 47:2, 52:2, 68:8, 68:25, 69:13, 85:3, 90:3, 97:14, 102:21, 111:4, 119:23, 120:25, 134:23
**quick** [3] - 47:8, 52:1, 67:18
**quite** [1] - 32:12
**quotation** [1] - 63:10
**quote** [2] - 9:13, 70:6

## R

**raise** [1] - 82:3
**rape** [4] - 70:13, 71:13, 72:10, 73:10
**raped** [3] - 70:4, 70:25
**raping** [2] - 72:4, 73:5
**rate** [2] - 53:16, 63:1
**rather** [3] - 68:2, 125:10, 130:3
**reaches** [1] - 10:10
**read** [8] - 9:11, 12:6, 46:7, 46:8, 55:17, 79:21, 102:12, 116:14
**reading** [1] - 21:17
**ready** [3] - 3:1, 47:7, 127:5
**real** [3] - 67:18, 72:20, 133:17

**really** [3] - 11:7, 65:1
**reamer** [12] - 49:3, 49:7, 49:19, 53:5, 53:12, 57:7, 57:18, 63:21, 64:22, 66:5, 66:6, 117:12
**reamers** [5] - 48:24, 54:7, 65:2, 65:3, 117:11
**rear** [1] - 35:16
**reason** [4] - 51:19, 125:2, 132:4, 132:8
**Rebel** [5] - 23:11, 23:13, 60:16, 60:24, 61:18
**receipt** [4] - 16:17, 16:19, 17:4, 25:20
**receipts** [1] - 132:15
**receive** [3] - 30:7, 43:10, 43:11
**received** [8] - 21:8, 41:12, 43:8, 43:12, 46:16, 58:5, 127:23, 128:5
**receiver** [1] - 133:7
**receivers** [2] - 132:25, 133:3
**receiving** [1] - 41:10
**recess** [3] - 47:11, 69:22, 111:13
**recipient** [2] - 20:14, 20:15
**recognize** [32] - 13:24, 16:11, 19:22, 30:17, 30:20, 34:10, 34:17, 34:19, 35:1, 35:5, 35:15, 36:10, 37:4, 37:16, 37:24, 38:12, 38:19, 39:13, 52:5, 57:1, 57:3, 77:13, 78:14, 79:7, 89:18, 90:11, 90:20, 90:22, 93:12, 100:10, 116:15, 118:9
**recollection** [4] - 21:2, 22:23, 91:11, 93:9
**record** [9] - 3:22, 3:25, 12:2, 15:11, 46:9, 74:20, 74:24, 75:1, 130:25
**records** [2] - 19:11, 52:12
**recover** [2] - 45:20, 89:8
**RECROSS** [1] - 2:3
**redacted** [1] - 127:23
**redirect** [4] - 45:17, 67:9, 110:12, 110:13
**REDIRECT** [5] - 2:3, 45:18, 67:10,

110:16, 123:23
**redoing** [1] - 6:18
**reentry** [1] - 137:2
**referred** [2] - 46:8, 50:5
**referred-to** [1] - 46:8
**referring** [1] - 25:20
**reflect** [6] - 3:23, 3:25, 15:11, 30:22, 74:25, 75:1
**refugee** [2] - 87:1, 87:2
**regard** [1] - 43:14
**regarding** [14] - 7:19, 7:24, 8:22, 29:9, 60:24, 63:9, 70:13, 72:4, 121:14, 122:23, 125:17, 131:21, 136:4
**regardless** [1] - 122:6
**regards** [15] - 7:18, 15:1, 20:6, 32:1, 35:23, 43:17, 46:17, 70:20, 71:19, 73:3, 81:9, 81:19, 85:2, 88:4, 90:18
**region** [7] - 17:15, 91:16, 96:19, 97:14, 108:14, 118:20, 135:24
**regular** [2] - 52:14, 52:16
**regulations** [2] - 55:21, 63:13
**rehabilitated** [1] - 131:2
**relate** [1] - 52:10
**related** [7] - 24:7, 55:23, 80:25, 87:11, 92:8, 92:10, 110:20
**relates** [4] - 15:14, 24:21, 84:24
**relationship** [4] - 5:10, 5:12, 132:8, 133:22
**relevance** [10] - 26:18, 72:1, 72:2, 84:3, 91:21, 100:23, 101:5, 101:18, 126:6, 133:21
**relevant** [15] - 84:8, 84:12, 84:18, 84:23, 100:25, 126:18, 127:25, 128:15, 128:21, 132:4, 132:10, 133:25, 135:3, 136:10, 137:1
**reliable** [1] - 114:5
**rem** [1] - 42:19
**remember** [7] - 58:20, 89:12, 97:5, 103:23,

14

107:25, 115:4, 123:16

**remote** [1] - 131:6
**renew** [1] - 92:1
**repackaged** [1] - 116:5
**rephrase** [3] - 21:19, 24:4, 26:20
**replace** [1] - 51:8
**REPORTED** [1] - 138:16
**Reporter** [3] - 138:3, 138:15, 138:17
**reporter** [2] - 46:8, 138:22
**REPORTER'S** [1] - 138:1
**reports** [4] - 71:4, 127:23, 127:24, 127:25
**representation** [2] - 127:2, 127:6
**reproduction** [1] - 138:21
**request** [2] - 3:22, 21:19
**requested** [1] - 16:4
**requesting** [2] - 12:3, 15:1
**require** [3] - 125:24, 135:5
**required** [3] - 78:20, 80:14, 135:2
**requirement** [1] - 81:8
**research** [2] - 87:20, 87:23
**researching** [1] - 106:11
**reship** [1] - 60:8
**reside** [3] - 3:13, 3:14, 74:8
**resided** [1] - 4:18
**residence** [5] - 5:24, 20:21, 21:24, 34:13, 45:21
**residential** [2] - 17:14, 136:3
**Residential** [1] - 118:18
**respect** [10] - 57:24, 64:12, 65:9, 65:15, 126:19, 129:6, 129:8, 129:12, 129:15, 130:13
**respond** [1] - 128:24
**response** [1] - 33:4
**responsibilities** [1] - 48:7
**rest** [3] - 26:23, 88:23, 125:2

**restaurants** [1] - 83:15
**restricted** [1] - 59:16
**restrictions** [2] - 51:12, 51:15
**restroom** [1] - 47:9
**result** [2] - 43:8, 124:25
**resume** [2] - 75:13, 125:3
**retainers** [3] - 25:1, 25:21, 129:4
**retaining** [1] - 130:14
**return** [4] - 86:17, 87:4, 87:16, 88:21
**returned** [3] - 86:11, 88:14, 133:1
**returns** [1] - 135:20
**revealed** [1] - 134:16
**review** [1] - 78:6
**rifle** [24] - 25:1, 25:19, 49:1, 49:4, 51:1, 54:1, 56:4, 57:7, 58:23, 58:24, 59:1, 59:9, 59:16, 60:2, 60:8, 60:16, 62:7, 62:16, 65:2, 65:3, 65:10, 66:7, 66:14, 88:11
**rifled** [1] - 59:6
**rifles** [7] - 36:22, 36:23, 36:25, 37:1, 37:2, 37:10, 51:2
**rifling** [20] - 48:24, 49:16, 49:18, 49:20, 50:6, 50:11, 50:17, 50:24, 50:25, 51:10, 51:12, 51:18, 53:11, 57:22, 57:23, 63:25, 64:13, 64:24, 68:12
**right-hand** [1] - 36:19
**ring** [4] - 11:1, 16:10, 26:7, 77:10
**rings** [6] - 24:25, 25:21, 129:3, 130:14, 131:13
**RMR** [3] - 138:3, 138:14, 138:17
**RMR,CRR** [1] - 138:14
**Road** [4] - 4:18, 20:13, 78:12, 79:24
**Roadster** [1] - 34:18
**ROBERT** [1] - 1:8
**Roberts** [1] - 43:16
**rod** [7] - 53:9, 53:17, 57:18, 57:20, 57:22, 68:1, 68:4
**rods** [1] - 27:19
**Roger** [2] - 130:13, 130:16
**Roggio** [129] - 3:15,

3:17, 3:24, 4:2, 4:12, 7:11, 9:18, 11:16, 12:20, 13:7, 13:15, 13:22, 14:8, 14:9, 14:12, 14:17, 15:21, 15:23, 17:11, 17:22, 18:7, 20:16, 22:22, 23:9, 23:21, 24:7, 25:8, 26:6, 26:12, 27:8, 28:11, 32:1, 33:11, 34:2, 34:16, 34:25, 35:25, 36:5, 37:2, 37:13, 37:14, 37:22, 38:5, 38:18, 39:1, 39:6, 39:17, 40:3, 40:9, 40:20, 41:13, 41:18, 44:2, 44:23, 54:15, 54:17, 54:18, 54:19, 58:2, 58:12, 58:16, 58:19, 59:12, 60:14, 70:4, 70:9, 70:22, 70:23, 70:24, 74:16, 75:3, 75:16, 75:21, 76:5, 77:25, 78:10, 79:23, 80:1, 80:15, 83:6, 84:6, 84:25, 85:17, 86:17, 88:4, 90:8, 90:12, 104:14, 104:20, 105:4, 105:25, 106:19, 107:21, 108:2, 108:13, 108:22, 109:12, 109:13, 114:6, 114:11, 118:14, 118:18, 120:18, 123:15, 126:1, 128:8, 128:17, 131:12, 131:16, 131:18, 131:22, 131:23, 132:3, 132:17, 132:20, 132:21, 133:1, 133:4, 133:5, 133:17, 133:21, 133:24, 134:11, 134:15, 134:25, 135:5, 135:20, 135:22, 136:25
**ROGGIO** [1] - 1:7
**Roggio's** [11] - 9:23, 13:25, 17:18, 18:20, 37:1, 38:25, 39:15, 40:7, 71:6, 71:10, 128:2
**role** [9] - 48:3, 84:9, 85:13, 85:14, 85:15, 85:20, 94:10, 128:7
**roles** [1] - 128:8
**Rolex** [1] - 29:19

**room** [13] - 6:5, 6:7, 36:10, 36:12, 37:4, 37:6, 37:19, 38:7, 71:5, 71:10, 71:18, 71:23, 113:10
**rooms** [1] - 6:5
**ROSS** [1] - 1:7
**Ross** [52] - 3:15, 3:17, 3:23, 4:2, 4:6, 6:9, 7:11, 13:7, 13:22, 13:25, 14:8, 15:23, 17:11, 17:18, 18:7, 18:20, 20:16, 23:9, 24:22, 33:2, 34:16, 34:25, 35:25, 36:3, 36:5, 37:1, 37:13, 38:5, 38:18, 38:24, 45:25, 58:18, 74:16, 77:16, 77:25, 86:10, 87:10, 88:19, 89:9, 90:8, 92:12, 93:6, 93:25, 94:23, 95:10, 97:4, 97:7, 97:9, 108:22, 114:6, 114:11, 118:18
**Ross'** [2] - 22:16, 36:13
**rotation** [1] - 50:3
**roughly** [2] - 86:15, 89:14
**Route** [1] - 112:10
**ruin** [1] - 89:14
**Rule** [1] - 130:21
**rule** [1] - 131:5
**rules** [1] - 55:23
**ruling** [1] - 8:2
**run** [2] - 84:15, 124:11
**Run** [1] - 4:18
**running** [1] - 101:21
**rural** [1] - 95:15

## S

**safety** [1] - 107:12
**sale** [1] - 43:8
**sales** [3] - 52:8, 60:25, 61:10
**sat** [1] - 81:23
**satellite** [1] - 126:5
**save** [1] - 125:19
**saw** [8] - 25:5, 25:15, 25:16, 25:25, 41:21, 42:7, 89:14, 95:11
**schedule** [1] - 86:2
**scheduling** [1] - 124:19
**school** [1] - 23:11
**scopes** [1] - 38:24
**SCOTT** [1] - 1:17
**Scott** [1] - 131:5

**Scranton** [2] - 4:23, 138:19
**SCRANTON** [1] - 1:16
**scream** [1] - 81:25
**screen** [3] - 34:7, 36:8, 55:3
**Sea** [1] - 29:17
**Sea-Doos** [1] - 29:17
**search** [1] - 32:24
**searched** [1] - 42:1
**searching** [2] - 87:24, 88:1
**seat** [2] - 94:1
**second** [10] - 12:2, 19:13, 19:18, 19:22, 20:4, 20:6, 22:16, 36:15, 37:6, 38:1
**secondary** [1] - 35:4
**secret** [6] - 80:15, 109:3, 109:4, 110:3, 110:6
**Section** [1] - 138:6
**SECTION** [1] - 1:18
**section** [1] - 35:7
**security** [1] - 129:15
**Security** [5] - 40:15, 40:18, 41:10, 51:16, 51:22
**see** [35] - 20:23, 22:18, 33:17, 42:10, 43:19, 44:7, 61:7, 61:12, 63:10, 67:5, 67:6, 67:7, 68:14, 72:13, 93:25, 99:21, 103:11, 106:1, 107:7, 107:10, 107:21, 109:4, 115:16, 119:1, 121:8, 123:9, 125:7, 127:10, 127:12, 133:24, 133:25, 136:8, 137:8
**seeing** [2] - 95:9, 133:12
**seeking** [1] - 72:8
**seem** [7] - 72:5, 82:1, 104:10, 114:5, 134:7, 135:1
**seized** [6] - 32:23, 42:6, 42:12, 42:14, 42:17, 42:22
**sell** [2] - 51:10, 51:17
**seller** [1] - 133:10
**send** [12] - 16:4, 16:5, 45:6, 45:11, 59:16, 113:20, 119:3, 119:4, 119:8, 121:11, 123:15
**sending** [3] - 115:10, 116:6, 134:24

15

**sensitive** [2] - 127:17, 129:15
**sent** [4] - 17:12, 45:3, 75:13, 120:11
**sentence** [2] - 69:1, 79:21
**September** [7] - 11:17, 14:3, 78:9, 79:22, 80:6, 104:1, 104:4
**series** [2] - 99:12, 104:15
**seriously** [1] - 73:4
**Service** [2] - 55:11, 55:14
**service** [1] - 55:12
**services** [2] - 112:13, 128:18
**Services** [1] - 19:15
**set** [7] - 26:3, 28:11, 75:15, 82:21, 87:19, 92:5, 138:9
**set-up** [2] - 82:21, 92:5
**setting** [4] - 83:1, 86:4, 86:5, 106:6
**seven** [1] - 62:23
**several** [2] - 64:4, 90:13
**sex** [3] - 70:13, 71:2, 73:3
**ship** [31] - 8:12, 14:7, 14:9, 15:5, 15:15, 15:22, 15:25, 18:8, 45:14, 51:12, 51:20, 56:8, 56:9, 59:12, 59:17, 69:8, 113:3, 113:4, 113:20, 117:8, 118:11, 118:15, 120:11, 121:3, 121:25, 122:6, 122:7, 122:8, 122:10, 123:13
**shipment** [6] - 17:8, 17:10, 20:23, 116:21, 119:19, 121:18
**shipments** [2] - 16:17, 61:17
**shippable** [1] - 51:18
**shipped** [29] - 14:12, 14:17, 15:19, 15:21, 17:21, 19:4, 25:2, 44:22, 44:24, 55:11, 56:7, 56:9, 56:13, 56:18, 58:18, 59:19, 60:2, 61:2, 69:7, 113:6, 113:7, 113:8, 122:14, 123:19, 128:17, 129:4, 132:16, 133:3

**shipper** [5] - 20:6, 20:8, 20:9, 20:12, 60:1
**shipping** [13] - 14:5, 16:15, 16:16, 18:4, 55:9, 111:23, 112:14, 112:15, 113:25, 119:16, 119:17, 120:15
**shirt** [3] - 3:21, 90:7, 90:21
**shister** [1] - 133:17
**shoe** [2] - 115:19, 121:15
**shop** [1] - 115:1
**shopping** [1] - 75:8
**short** [3] - 28:17, 48:5, 61:11
**show** [13] - 6:24, 8:11, 29:25, 35:14, 51:23, 56:24, 104:11, 109:14, 110:3, 116:10, 118:4, 132:14, 132:15
**showed** [1] - 104:12
**showing** [3] - 8:6, 101:18, 126:5
**shown** [3] - 9:9, 37:8, 88:9
**Sibum** [1] - 45:24
**sick** [2] - 87:21, 88:17
**side** [10] - 35:11, 35:19, 36:19, 38:13, 90:6, 108:7, 108:8, 110:22, 117:6
**sidebar** [12] - 14:23, 24:13, 24:15, 26:1, 69:25, 70:1, 73:21, 101:6, 101:9, 101:24, 124:9, 124:22
**sides** [2] - 128:1, 134:8
**sign** [6] - 45:25, 77:7, 78:2, 78:20, 78:23, 80:14
**signature** [20] - 13:23, 13:24, 13:25, 14:1, 16:18, 16:20, 16:21, 17:25, 19:21, 19:22, 19:23, 20:25, 21:1, 21:4, 78:14, 78:15, 78:17, 80:4, 80:5, 80:6
**signed** [7] - 18:2, 21:2, 21:24, 22:21, 43:22, 44:2, 127:20
**signing** [1] - 81:1
**similar** [2] - 99:3, 135:22

**simple** [2] - 90:3, 132:14
**simply** [3] - 33:16, 71:16, 101:15
**single** [1] - 116:17
**site** [3] - 91:13, 108:19, 110:8
**sitting** [1] - 115:4
**six** [7] - 51:1, 53:15, 62:10, 62:12, 66:23, 114:16, 120:15
**size** [4] - 49:15, 49:25, 53:14, 53:18
**ski** [6] - 24:22, 25:11, 26:7, 26:12, 27:7, 27:16
**skiing** [1] - 25:10
**skip** [1] - 99:20
**skis** [4] - 25:9, 25:11, 25:12, 27:6
**SL** [1] - 34:18
**small** [1] - 68:2
**smiling** [1] - 71:9
**smooth** [1] - 5:6
**smoothly** [1] - 124:25
**Snap** [1] - 64:16
**social** [10] - 92:11, 92:23, 94:14, 95:2, 95:19, 96:8, 96:20, 97:17, 98:3, 105:8
**Social** [3] - 40:15, 40:18, 41:10
**software** [2] - 55:19, 63:12
**sold** [3] - 43:6, 68:13, 129:3
**solicit** [2] - 33:6, 33:13
**soliciting** [1] - 15:12
**solid** [1] - 49:10
**Solutions** [1] - 19:15
**someone** [6] - 60:1, 60:3, 60:7, 73:5, 113:15, 125:21
**sometime** [1] - 77:3
**sometimes** [4] - 53:25, 113:23, 124:24
**somewhat** [1] - 108:4
**somewhere** [3] - 6:14, 61:3, 61:4
**son** [2] - 41:1, 41:3
**sorry** [12] - 19:17, 40:13, 43:13, 45:10, 54:16, 54:19, 55:12, 55:13, 65:23, 87:6, 98:21, 107:20
**sort** [9] - 6:7, 72:15, 93:11, 104:13, 107:11, 126:7, 132:5, 132:8

**sounds** [2] - 31:23, 133:9
**source** [3] - 29:20, 30:10, 129:8
**sources** [1] - 108:8
**South** [1] - 132:22
**space** [3] - 82:24, 91:14, 106:9
**spaces** [1] - 86:6
**span** [1] - 50:24
**speaking** [5] - 30:20, 52:7, 56:17, 57:5, 59:9
**special** [11] - 5:14, 5:17, 5:20, 6:15, 6:24, 7:11, 7:17, 10:18, 10:21, 14:4, 33:24
**specialized** [6] - 48:12, 48:13, 64:18, 64:19, 64:23, 65:11
**specific** [3] - 106:23, 110:8, 127:11
**specifically** [4] - 21:14, 88:3, 110:4, 137:2
**specification** [1] - 62:25
**specifications** [2] - 53:20, 53:23
**specs** [2] - 62:18, 62:19
**speculating** [1] - 21:13
**speculation** [5] - 21:16, 22:2, 24:2, 60:4, 109:9
**speculative** [2] - 24:24, 25:4
**spend** [4] - 10:4, 29:2, 29:15, 119:20
**spin** [2] - 50:1, 50:2
**spoken** [1] - 7:20
**sport** [1] - 3:20
**spouses** [1] - 9:14
**spring** [1] - 23:8
**Spring** [7] - 4:22, 6:2, 17:23, 20:18, 30:18, 31:12, 42:3
**stack** [3] - 35:8, 35:9, 35:11
**stackable** [2] - 35:3, 35:12
**stage** [1] - 109:20
**stand** [2] - 50:19, 74:21
**standard** [1] - 49:9
**standing** [2] - 109:17, 109:18
**start** [4] - 21:20,

87:24, 106:11, 130:3
**started** [2] - 106:22, 129:17
**starts** [1] - 71:9
**state** [2] - 12:9, 78:7
**State** [3] - 7:3, 10:19, 11:19
**statement** [5] - 55:17, 55:23, 69:1, 69:10, 136:18
**statements** [1] - 10:5
**STATES** [3] - 1:1, 1:3, 1:15
**states** [2] - 12:22, 19:12
**States** [24] - 1:13, 8:3, 8:4, 55:11, 55:20, 63:12, 63:16, 63:17, 64:21, 65:16, 68:11, 69:5, 69:7, 69:8, 86:12, 86:18, 106:21, 106:24, 107:2, 107:4, 135:21, 138:4, 138:6, 138:18
**stating** [1] - 12:5
**stay** [6] - 33:7, 73:17, 77:3, 80:19, 82:17, 86:7
**stayed** [1] - 88:24
**staying** [1] - 95:12
**step** [8] - 4:20, 29:17, 32:7, 39:15, 69:16, 75:22, 111:9, 124:5
**step-dad** [2] - 29:17, 39:15
**step-dad's** [1] - 4:20
**stepfather's** [1] - 13:11
**stepping** [1] - 54:20
**steps** [1] - 82:22
**stiffed** [1] - 134:18
**still** [5] - 5:2, 41:7, 65:15, 79:6, 113:1
**stop** [2] - 33:14, 46:14
**store** [6] - 9:25, 36:17, 58:5, 75:7, 114:16, 118:10
**stored** [3] - 34:20, 35:6, 35:8
**story** [4] - 131:10, 135:22, 136:4, 136:17
**strangers** [1] - 18:18
**streak** [1] - 113:1
**STREET** [1] - 1:24
**Street** [2] - 28:17, 28:23
**strict** [1] - 86:1
**strike** [4] - 30:2,

16

33:15, 46:24, 46:25
**striped** [1] - 90:20
**Stroudsburg** [25] -
3:14, 4:6, 4:19, 4:21,
4:22, 4:23, 6:2,
12:17, 13:7, 13:10,
13:18, 16:2, 17:23,
20:18, 28:17, 28:24,
31:13, 58:5, 58:6,
74:15, 75:7, 78:10,
79:23, 111:24,
112:10
**struck** [1] - 4:8
**structure** [3] - 73:11,
93:10, 132:9
**structured** [1] - 127:7
**stuff** [4] - 37:21,
113:18, 115:6, 115:7
**subject** [5] - 42:24,
128:10, 131:8,
131:17, 131:20
**submissions** [1] -
9:22
**submit** [3] - 9:6, 84:6,
84:25
**subsequent** [1] -
137:4
**substantial** [1] - 128:5
**successful** [1] - 64:2
**sufficient** [2] - 72:5,
73:6
**suggest** [5] - 9:1,
9:19, 33:5, 33:11,
127:25
**suggested** [1] - 71:1
**suggesting** [2] - 70:8,
71:6
**suggestion** [1] - 71:14
**suggests** [1] - 9:17
**suit** [2] - 90:11, 107:22
**suitcase** [2] - 45:3,
60:22
**SUITE** [1] - 1:16
**Sulaymaniyah** [7] -
10:25, 17:15, 82:16,
82:17, 96:15,
126:12, 126:15
**Suli** [1] - 92:13
**sum** [1] - 89:15
**sums** [1] - 128:5
**sunglasses** [1] - 90:9
**supervision** [2] -
138:11, 138:22
**supplies** [1] - 113:22
**suppose** [1] - 82:22
**supposed** [1] - 136:5
**suppression** [1] -
135:18
**surface** [2] - 50:18,
50:22

**sustain** [5] - 10:2,
21:19, 24:4, 32:11,
136:25
**sustained** [9] - 6:22,
21:18, 27:11, 28:7,
60:5, 81:15, 109:10,
122:4, 123:6
**SUV** [2] - 29:17, 34:9
**Suzy** [4] - 69:24,
78:11, 79:24, 103:6
**Switzerland** [1] -
24:23
**sworn** [5] - 3:7, 47:15,
73:23, 111:17,
136:23
**SYUZANA** [2] - 2:6,
73:22

### T

**tab** [1] - 116:12
**tailored** [1] - 8:22
**Talabani** [7] - 83:23,
83:25, 84:11, 84:16,
85:8, 85:12, 100:7
**Talabani's** [4] - 84:9,
101:15, 102:2,
103:12
**Talibanis** [1] - 84:22
**talks** [1] - 63:11
**Tannersville** [1] - 4:19
**tasks** [1] - 86:9
**tears** [1] - 88:19
**technical** [1] - 42:18
**technically** [2] - 4:19,
31:17
**Technology** [1] -
19:15
**technology** [2] -
55:19, 63:12
**telephone** [2] - 10:20,
17:18
**ten** [7] - 53:17, 62:13,
62:14, 75:4, 107:24,
130:22
**term** [3] - 28:17,
42:18, 63:23
**termed** [1] - 133:22
**terminology** [1] -
63:25
**terms** [1] - 55:8
**Terrorism** [1] - 101:12
**Terrorist** [1] - 102:18
**test** [7] - 70:6, 70:11,
71:10, 72:12, 72:18,
72:21, 72:23
**testified** [14] - 3:7,
33:23, 38:10, 46:17,
47:16, 61:10, 61:14,
73:23, 84:20, 92:4,

100:6, 111:17,
132:24, 135:17
**testifies** [1] - 101:14
**testify** [14] - 8:10,
15:1, 33:7, 64:12,
71:24, 72:5, 73:16,
124:24, 125:15,
126:16, 127:8,
135:22, 136:2,
136:16
**testifying** [1] - 15:13
**testimony** [27] - 8:5,
8:15, 9:7, 10:10,
10:18, 15:7, 20:20,
21:18, 23:20, 30:2,
33:15, 46:17, 60:14,
72:4, 73:5, 92:19,
98:12, 126:13,
126:14, 127:5,
127:12, 129:8,
129:13, 129:24,
134:12, 134:16,
136:4
**tests** [3] - 81:10, 82:9,
82:11
**Thanksgiving** [1] -
86:15
**THE** [169] - 1:1, 1:1,
1:8, 3:1, 3:4, 3:25,
6:22, 7:25, 8:17,
9:11, 10:6, 10:9,
10:13, 10:15, 11:11,
11:15, 12:9, 12:11,
12:13, 13:1, 13:3,
14:21, 15:8, 15:13,
16:25, 17:2, 20:2,
21:12, 21:17, 22:6,
24:3, 24:14, 25:14,
25:24, 26:11, 26:14,
26:22, 27:11, 27:12,
28:3, 28:6, 28:9,
30:1, 31:4, 31:8,
31:23, 32:6, 32:8,
32:9, 32:19, 33:3,
33:10, 33:15, 39:21,
39:22, 45:17, 46:4,
46:5, 46:7, 46:10,
46:11, 46:12, 46:13,
46:14, 46:25, 47:3,
47:5, 47:6, 47:7,
47:10, 47:12, 52:22,
52:24, 57:11, 57:13,
58:10, 59:22, 60:5,
63:5, 65:22, 67:9,
69:14, 69:16, 69:20,
69:23, 70:15, 72:3,
72:9, 73:4, 73:11,
75:1, 77:20, 77:22,
79:15, 79:18, 81:15,
84:7, 84:11, 85:4,

85:10, 89:25, 91:8,
91:25, 92:17, 93:3,
93:22, 94:20, 95:7,
95:25, 96:2, 96:13,
96:25, 97:22, 98:9,
99:8, 99:16, 99:18,
100:4, 100:24,
101:8, 101:10,
101:14, 101:23,
102:8, 102:20,
102:23, 109:10,
110:12, 110:15,
111:7, 111:8, 111:9,
111:12, 111:14,
117:1, 117:3, 118:7,
119:24, 122:4,
123:6, 124:3, 124:5,
124:8, 124:13,
124:15, 124:17,
124:21, 124:23,
125:20, 125:24,
126:25, 128:22,
129:22, 130:4,
130:9, 130:11,
132:1, 132:12,
132:18, 133:9,
133:12, 133:20,
134:14, 135:1,
135:12, 135:17,
135:25, 136:21,
137:8
**themselves** [3] - 68:2,
113:8, 119:7
**therefore** [1] - 8:14
**thinks** [1] - 134:17
**third** [1] - 13:23
**Third** [1] - 8:3
**Thomas** [2] - 5:15,
47:13
**THOMAS** [2] - 2:5,
47:15
**thousand** [3] - 6:14,
51:5, 59:7
**thousandths** [2] -
53:16, 62:12
**threats** [1] - 89:15
**three** [11] - 6:4, 11:1,
11:13, 16:10, 31:15,
49:4, 49:19, 64:13,
71:11, 77:10, 87:9
**threesome** [3] - 70:9,
71:14, 72:13
**throughout** [3] -
48:13, 51:17, 83:15
**thrown** [2] - 113:8,
113:9
**Thursday** [1] - 127:15
**TIALN** [3] - 50:17,
50:20, 66:15
**timeframe** [10] - 4:10,

18:9, 23:1, 23:7,
23:17, 23:21, 29:20,
30:11, 85:23, 86:18
**timeframes** [1] -
128:15
**tin** [1] - 53:18
**TIN** [1] - 50:15
**titanium** [4] - 50:16,
50:20, 66:13
**Title** [1] - 138:5
**title** [1] - 48:1
**TO** [1] - 2:1
**today** [9] - 3:17, 44:6,
46:18, 46:20, 60:19,
74:18, 115:4,
124:12, 125:20
**Todd** [2] - 25:19,
125:9
**TODD** [1] - 1:14
**together** [5] - 10:18,
25:9, 28:18, 71:2,
73:1
**Tom** [2] - 7:3, 7:12
**tomorrow** [10] -
124:15, 125:1,
125:3, 125:7,
125:10, 125:18,
130:13, 135:15,
137:8
**took** [22] - 9:24, 14:23,
24:15, 29:10, 34:22,
36:16, 57:6, 57:15,
70:1, 71:12, 89:7,
97:15, 101:9, 102:3,
103:14, 104:16,
105:2, 105:4, 124:9,
126:14, 127:4,
133:15
**Tool** [5] - 47:23,
47:24, 48:5, 56:22,
121:17
**tool** [9] - 50:9, 50:23,
51:9, 53:9, 64:13,
64:16, 64:18, 64:23,
68:20
**tooling** [2] - 48:14,
65:19
**tools** [16] - 24:21,
24:25, 27:9, 27:12,
44:4, 44:11, 48:12,
48:16, 49:5, 49:19,
64:3, 69:4, 115:6,
115:13, 115:15,
117:7
**top** [18] - 17:7, 19:14,
20:23, 35:3, 44:1,
44:2, 50:12, 50:22,
54:11, 54:25, 55:1,
57:17, 57:18, 62:17,
66:5, 66:16, 79:20,

17

81:25

**torture** [8] - 73:7, 126:1, 126:13, 126:14, 126:19, 126:24, 127:4, 136:14

**TOSCO** [3] - 44:1, 44:3, 118:18

**total** [2] - 54:7, 117:23

**touch** [1] - 49:5

**towards** [2] - 107:11, 128:19

**track** [1] - 119:7

**tracking** [6] - 56:15, 118:25, 119:1, 119:3, 119:4, 119:8

**trailer** [1] - 29:17

**transacted** [1] - 134:12

**transaction** [5] - 130:14, 132:5, 132:9, 134:24, 135:2

**transcript** [3] - 138:7, 138:10, 138:21

**transport** [1] - 87:15

**transported** [1] - 42:11

**transship** [1] - 60:7

**travel** [4] - 75:23, 75:25, 76:5, 76:7

**traveled** [1] - 82:14

**traveling** [2] - 80:12, 86:21

**TRIAL** [1] - 1:10

**triangular** [2] - 132:5, 133:22

**tried** [2] - 45:5, 131:12

**tries** [1] - 33:14

**trip** [7] - 24:23, 25:8, 26:7, 26:13, 27:1, 27:9, 27:16

**trips** [1] - 24:7

**trooper** [1] - 10:19

**trouble** [1] - 82:4

**truck** [1] - 45:4

**true** [3] - 84:18, 89:4, 138:7

**trustworthiness** [1] - 131:3

**truth** [2] - 46:20, 136:24

**try** [13] - 22:6, 26:3, 28:7, 45:11, 71:8, 73:20, 103:22, 123:15, 135:10, 135:11, 136:17

**trying** [10] - 12:3, 12:7, 22:4, 73:1, 73:10, 103:23, 116:12, 126:3, 136:9, 136:12

**tube** [5] - 56:19, 66:21, 66:23, 66:24, 67:2

**Turkey** [8] - 4:21, 13:7, 13:9, 13:18, 39:18, 42:11, 76:10, 82:2

**turn** [2] - 55:3, 62:14

**turned** [1] - 137:3

**turns** [1] - 62:15

**twist** [5] - 53:16, 53:17, 62:13, 62:24, 63:1

**twists** [2] - 49:20, 62:15

**two** [11] - 35:10, 35:12, 45:4, 50:15, 64:20, 68:10, 68:11, 79:3, 108:17, 110:13

**type** [28] - 6:3, 10:8, 11:5, 11:14, 12:15, 18:4, 25:6, 29:15, 39:9, 48:21, 50:5, 50:12, 50:21, 50:22, 57:23, 58:24, 64:23, 65:9, 68:1, 74:13, 75:18, 82:23, 87:23, 88:2, 88:11, 94:9, 97:4, 98:17

**types** [3] - 50:14, 50:15, 88:13

**typical** [2] - 85:23, 85:24

**typically** [1] - 113:3

---

**U**

**U.S** [4] - 43:16, 55:21, 63:14, 87:15

**ultimate** [1] - 118:1

**ultimately** [2] - 46:23, 134:12

**unclear** [1] - 21:17

**uncoated** [1] - 66:17

**uncomfortable** [1] - 82:1

**uncompleted** [1] - 108:12

**under** [8] - 18:20, 40:4, 53:2, 53:4, 132:11, 134:4, 138:11, 138:21

**undertaken** [1] - 9:18

**unit** [1] - 38:20

**UNITED** [3] - 1:1, 1:3, 1:15

**United** [25] - 1:13, 8:3, 8:4, 55:11, 55:14, 55:20, 63:12, 63:16, 63:17, 64:21, 65:16,

68:11, 69:5, 69:7, 69:8, 86:11, 86:17, 106:21, 106:24, 107:2, 107:4, 135:21, 138:4, 138:6, 138:18

**unless** [10] - 9:16, 63:18, 69:5, 84:5, 84:23, 115:10, 130:22, 138:21

**unresponsive** [2] - 14:24, 46:2

**unusual** [1] - 113:7

**up** [50] - 4:8, 6:24, 7:11, 7:21, 8:19, 14:25, 23:15, 24:18, 26:3, 28:11, 49:6, 61:5, 63:25, 67:18, 71:17, 75:15, 76:12, 81:22, 82:21, 82:24, 83:1, 86:4, 86:5, 87:19, 92:5, 97:17, 102:4, 103:24, 104:5, 104:17, 106:6, 108:12, 108:16, 109:22, 110:18, 112:2, 113:20, 120:18, 120:23, 120:24, 125:10, 125:19, 130:5, 131:1, 131:7, 133:15, 135:13

**UPS** [5] - 55:11, 55:13, 56:13, 58:5, 114:1

**upstairs** [1] - 6:5

**USA** [1] - 55:22

**useful** [1] - 101:14

---

**V**

**vacation** [1] - 25:10

**value** [3] - 73:8, 117:23, 130:23

**Van** [2] - 78:11, 79:24

**varied** [1] - 86:1

**variety** [1] - 133:9

**various** [5] - 29:18, 32:23, 37:20, 62:6, 83:15

**vehicle** [14] - 34:15, 34:17, 34:19, 34:24, 35:20, 36:1, 39:9, 100:16, 100:17, 100:19, 101:15, 101:21, 102:10, 103:12

**vehicles** [7] - 32:22, 35:1, 35:5, 35:9, 39:7, 39:11, 40:8

**versus** [1] - 106:21

**vest** [2] - 98:17, 107:12

**view** [1] - 132:1

**violations** [1] - 136:15

**visit** [1] - 14:4

**visited** [1] - 5:14

**visiting** [1] - 23:5

**visor** [1] - 98:17

**vs** [1] - 1:5

---

**W**

**wait** [1] - 134:19

**walk** [1] - 113:15

**walking** [1] - 95:10

**wall** [1] - 38:20

**wants** [3] - 15:2, 15:3, 128:25

**warrant** [1] - 32:24

**Washington** [1] - 138:19

**WASHINGTON** [2] - 1:19, 1:22

**watches** [2] - 29:18, 29:19

**watching** [1] - 6:17

**weapon** [2] - 49:13, 88:11

**weapons** [11] - 37:21, 38:21, 38:23, 77:1, 80:13, 85:21, 87:25, 88:5, 88:7, 91:22

**wear** [2] - 51:6, 51:7

**wearing** [3] - 3:19, 74:23, 98:17

**web** [1] - 23:15

**WEDNESDAY** [1] - 1:11

**week** [5] - 80:23, 113:18, 125:23, 127:15, 129:7

**weird** [2] - 113:12, 134:24

**Weis** [1] - 4:6

**Wells** [4] - 28:23, 29:1, 29:2, 29:12

**whatnot** [1] - 38:24

**whatsoever** [1] - 46:17

**wheel** [1] - 100:13

**wherein** [1] - 127:3

**white** [2] - 3:21, 90:20

**whole** [3] - 54:21, 112:7, 131:22

**wide** [1] - 62:12

**width** [1] - 53:15

**wife** [10] - 5:2, 26:10, 70:10, 71:6, 71:8, 72:14, 72:16, 75:8, 112:19, 114:12

**WILLIAM** [2] - 1:15, 1:24

**willing** [1] - 135:11

**within-mentioned** [1] - 138:8

**WITNESS** [13] - 11:15, 12:11, 14:21, 26:14, 27:12, 32:8, 39:21, 46:4, 46:11, 46:13, 47:6, 58:10, 111:8

**witness** [44] - 3:4, 3:6, 3:23, 8:6, 10:4, 14:24, 21:13, 46:14, 46:24, 47:7, 47:12, 47:15, 69:17, 69:23, 70:5, 70:7, 70:15, 70:24, 70:25, 71:2, 71:7, 71:15, 72:4, 73:22, 74:25, 84:23, 85:2, 101:1, 111:14, 111:16, 125:1, 125:12, 125:14, 126:11, 126:16, 126:18, 128:12, 129:5, 130:12, 130:13, 131:5, 134:20, 136:2, 136:23

**witness'** [1] - 84:24

**WITNESSES** [1] - 2:1

**witnesses** [10] - 70:3, 70:5, 124:11, 124:20, 126:19, 127:17, 129:5, 135:15, 135:23

**Wizard** [1] - 113:12

**woke** [1] - 71:17

**woman** [2] - 70:6, 71:3

**word** [1] - 49:15

**words** [4] - 105:15, 120:10, 132:14, 133:17

**workers** [2] - 95:10, 109:6

**works** [1] - 98:25

**world** [2] - 48:13, 51:17

**write** [9] - 29:3, 29:4, 29:5, 44:6, 44:8, 44:9, 44:15, 44:21, 119:2

**written** [2] - 19:14, 44:3

**wrote** [2] - 44:11, 44:17

---

**Y**

**Yadkin** [1] - 20:13

**yard** [1] - 5:22

18

**year** [4] - 87:20, 103:19, 114:18, 136:14

**year's** [1] - 88:18

**years** [12] - 40:4, 59:18, 63:24, 75:4, 107:24, 112:6, 113:2, 113:5, 114:16, 120:15, 130:22, 130:24

**yell** [1] - 72:24

**yellow** [3] - 90:7, 98:17

**YORK** [1] - 1:21

**young** [1] - 41:5

**younger** [1] - 12:16

**yourself** [5] - 104:14, 104:20, 107:21, 108:17, 112:20

**yourselves** [1] - 125:6

## Z

**Zarya** [11] - 98:18, 98:19, 107:6, 107:7, 107:9, 107:12, 107:13, 107:14, 110:20, 110:21

**zero** [1] - 26:4

**Zippo** [4] - 45:6, 45:11, 123:16, 123:20