1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA   :
                           :
                           :
                           :
     vs                    :     3:CR-18-97
                           :
                           :
                           :
ROSS ROGGIO                :
                           :

     BEFORE:        THE HONORABLE ROBERT D. MARIANI

     PLACE:         COURTROOM NO. 4

     PROCEEDINGS:   JURY TRIAL

     DATE:          THURSDAY, MAY 11, 2023

APPEARANCES:

For the United States:

TODD K. HINKLEY, ESQ.
UNITED STATES ATTORNEY'S OFFICE
WILLIAM J. NEALON FEDERAL BUILDING
SUITE 311
SCRANTON, PA 18501-2830

SCOTT ANDREW CLAFFEE, ESQ.
DOJ-NSD
COUNTERINTELLIGENCE & EXPORT CONTROL SECTION
950 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20530

PATRICK JASPERSE, ESQ.
DOJ-CRM
1301 NEW YORK AVE., NW
WASHINGTON, DC 20530

For the Defendant:

GINO A. BARTOLAI, JR., ESQ.
238 WILLIAM STREET
PITTSTON, PA 18640

2

INDEX TO WITNESSES

| FOR GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM MATHES | 5 | 28 | | |
| ROGER KRAHL | 58 | 69 | | |
| PATRICA FOSTER | 72 | 105 | 109 | |
| ALEX DOUVILLE | 110 | 127 | 131 | |
| AURELIA MORALES | 134 | 141 | | |
| JAMES MUNDY | 144 | 155 | | |

| FOR DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| REPLACE | | | | |

THE COURT:  Good morning.

MR. CLAFFE:  Good morning, Your Honor.

THE COURT:  Before we resume with testimony, I would like to hear further argument and conduct further discussion on one of the issues that we discussed at the end of the day yesterday.  That concerns the anticipated testimony of Aurelia Morales.  Specifically, the question came up whether Ms. Morales could be questioned either on direct or cross examination to elicit her testimony as to whether Mr. Roggio told her that on arrival at the J. F. K. airport that he told her he had been kidnapped and detailed the nature of what happened to him.

Now, I've looked at it, and I thought about it a great deal last night, and it seems to me that is something that Mr. Roggio should he testify can testify to but that at this point any question designed to elicit a statement from Ms. Morales would be objectionable as eliciting a hearsay statement because that statement is not an admission against interest under 801 D. 2 but instead is a statement that can only be admissible under 801 B. 1 and that is only in the circumstance where Mr. Roggio testifies, and even there are conditions that needs to be met.

So to the extent that I suggest that -- again, you raised the issue of relevance, Mr. Jasperse.  I continue to believe it may or may not depending what I hear at the

appropriate time.  Relevancy aside, it is hearsay.  It is self serving.  It's a self-serving statement and as such is hearsay under 801 B. 1.  So I want the parties to understand where I'm on that.

MR. BARTOLAI:  May I just offer, Your Honor, that we would submit that under rule 803 exceptions to the rule against hearsay, sub one, then existing mental, emotional or physical condition that being this individual was just kidnapped and his ordeal and his escape from Iraq, finally arriving back home -- and I -- and this mandatory interview that this would have been a statement regarding his condition, his mental condition, his physical condition, his state, his physical state upon arriving back from this difficult ordeal and that it would be admissible under 803.3.

THE COURT:  Do you want to respond to that, Mr. Jasperse?

MR. JASPERSE:  I should have argued yesterday hearsay regarding hearsay as well as relevance.  I apologize for not doing so.  We have addressed this in a number of pleadings including the issue of Amanda McComber in our motions in limine regarding self-serving hearsay.  But in response to this issue, the hearsay exception that defense counsel is referring to I think that applies to somebody making a 911 call or seeing something immediately.

By the time Mr. Roggio gets to J. F. K. airport, it's

5

been several days of travel.  I do not believe that that is a present sense impression under 803.1 or then existing state of mind under 803.3.

THE COURT:  I understand your positions on that.  I'm not going to rule on until I hear that Mr. Roggio is going to testify.  And then outside of the presence of the jury, I'll hear what he has to say and I'll rule on that.  That's how we'll leave that for now, but you understand my position on Mr. Morales.  Judy, bring the jury in, please.  Call your next witness, counsel.

MR. CLAFFE:  The government calls William Mathes.

WILLIAM MATHES, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CLAFFE:

Q.   Good morning, Mr. Mathes.

A.   Good morning, sir.

Q.   Make sure you speak into that microphone so our court reporter can hear you and the jury.

A.   Yes, sir.

Q.   Will you please tell the jury what you do for a living?

A.   I'm a defense consultant.  I work global initiative for the United States Government as well as private sector.  I'm currently working overseas right now to identify munitions and a variety of suppliers for the U.S. government to supply to the

6

Primes, to the U.S. government to aid in the Russian aggression.

Q.    Do you consult directly with the government or through defense contractors?

A.    Through defense contractors.

Q.    Where did you work before you were a consultant?

A.    21st Tactical.

Q.    What is 21st Tactical?

A.    A defense company located at Fort Bragg of Fayetteville, North Carolina.  We supply equipment, specifically tactical gear, to special operations at Fort Bragg.

Q.    And Fort Bragg, does that include selling to special forces?

A.    Yes, sir.

Q.    Did you work anywhere else other than 21st Tactical?

A.    Yes, OML, On Mission Logistics.

Q.    What does OML do?

A.    OML is a company that we set up to go after large government contracts.

Q.    So it sounds like currently you're working as a consultant for the United States Government.  Is that right?

A.    I'm considered an independent contractor, sir.

Q.    Independent contractor?

A.    Yes, sir.

Q.    And through 21st Tactical you are in essence a vendor to

the United States Government?

A.    Yes, sir.

Q.    Have you ever acted as a source for the United States Government?

A.    Yes, sir, from 2010, 2014 I worked directly for the FBI as a source, and from 2010 to 2017 I worked directly for the Department of Defense as a global source.

Q.    Were you ever paid by the FBI?

A.    I'm not sure if it was the FBI or DOD, but I was paid.

Q.    Approximately how much money?

A.    Less than $10,000.

Q.    Do you know the defendant, Ross Roggio?

A.    Yes, sir.

Q.    How do you know him?

A.    I met Mr. Roggio in 2011 in Kuwait.

Q.    Did you -- have you heard about Mr. Roggio before you met him in person?

A.    Yes, sir.  There was Roggio Arsenal in Fayetteville, North Carolina.  He was the owner of that firearms company in Fayetteville, North Carolina.

Q.    What did Roggio Arsenal do?

A.    They produced A. R. 15s.

Q.    What was Roggio Arsenal's reputation in the industry?

        MR. BARTOLAI:  Objection, relevance, Your Honor.

        MR. CLAFFE:  I am asking if he knew the reputation of

8

Roggio's company in the industry.  He's a participant in the industry.  I assume he's familiar with the suppliers and manufacturers of the weapons.

MR. BARTOLAI:  That's a big assumption, first. There's no relevance.

MR. CLAFFE:  I can establish more foundation.

THE COURT:  Please.

BY MR. CLAFFE:

Q.   Mr. Mathes, how long have you worked in the firearms industry?

A.   So I am considered a foreign weapon and domestic weapons expert.  I'm trained in multiple weapons platforms to include both foreign and domestic as well as Nato weapons platforms, and I've been working in this industry for more than 20 years.

Q.   Were you --

MR. BARTOLAI:  Your Honor, I -- this witness -- the government intends to use this witness as an expert.  I've never been provided a disclosure pursuant to the rules of evidence, Your Honor.

MR. CLAFFE:  We don't intend to offer him as an expert.  I am asking his lay opinion as a participant in the in the firearms industry of the reputation of the defendant's company.

MR. BARTOLAI:  Your Honor, he's testified he's been an expert.  So -- and I didn't know that.  I move to strike the

9

fact he's an expert.

THE COURT:  What testimony did he give indicating he's an expert?

MR. CLAFFE:  As a fact witness regarding one of the transactions.

THE COURT:  Did he use the word expert?

MR. CLAFFE:  I'm sorry?  He did.  I did not intend to elicit that information.

THE COURT:  I would grant the motion and move to strike the word expert.  Members of the jury, you are to disregard the statement regarding this witness -- witness' use of the word expert.  Continue

BY MR. CLAFFE:

Q.    Mr. Mathes, have you been a participant in the firearms industry?

A.    Yes, sir.

Q.    For approximately how long?

A.    More than 20 years, sir.

Q.    As a participant in the industry for over 20 years, are you familiar with other manufacturers of firearms?

A.    Yes, sir, very familiar.

Q.    Specifically in North Carolina?

A.    Throughout the entire United States and on a global basis.

Q.    Were you familiar with the company known as Roggio Arsenal?

A.    Yes, sir.

Q.    What was Roggio Arsenal's reputation in the industry?

A.    The reputation was they were garbage.

Q.    Can you elaborate on that?

A.    Yes, sir.  I had many friends that had their firearms and I personally have shot their lower receivers.  We have problems with mags fitting in the mag well, issues with firing pins.  We had other issues with the components as well.

Q.    When did you first meet the defendant in person?

A.    It would have been 2011 in Kuwait, sir.

Q.    Tell us about that meeting.

A.    So I had come from Pakistan, and I landed in Kuwait. Within 24 to 48 hours of me landing in Kuwait, I met Mr. Roggio in Kuwait.  It was an accident.  I was down by the waterfront. There would have been a multitude of palm trees, obviously sand.  I was working on a contract for the U.S. government for scuba diving equipment, and Mr. Roggio happened to be down there.  Ross and I started a conversation, and that's when I first met Ross.

Q.    So you had a conversation with the defendant?

A.    Yes, sir.

Q.    Could you describe that conversation, please?

A.    Yeah, we talked about what we both do, and we made introduction like you normally would.  I had learned at that time that Ross was an international businessman, that Ross

worked in a very similar field I was currently in and currently working on for the U.S. government at that time.  He seemed like a really good source and knowledgeable on ITAR, International Tariff and Restricted Items as well as DDTC, Defense Directorate Trade Control.  I hoped that by building a relationship with Mr. Roggio that I can better educate myself at that time in 2011 on international tariffs of restricted trade items.

Q.   Did the defendant mention where he was working at the time?

A.   He mentioned he owned Roggio Arsenal in Fayetteville, North Carolina.

Q.   The defendant mention any ideas he had for future business?

A.   Yes, he did.

Q.   What were those ideas?

A.   Ross had approached me about a weapons facility in Kurdistan, which was known as Iraq -- depends what side of the fence you're on.  But technically it's Iraq.  He considered putting a weapons facility in Iraq at that time or Kurdistan. We had several conversations about that.  I didn't have the money to invest in anything like that.

One of the conversations we did have with Ross based on my knowledge of the U.S. State Department, DOS, Department of State, was that a transaction of that type would require a

technology transfer license.  I asked Mr. Roggio about that, and Ross said, that's paperwork, it's easy to take care of, all we do is fill it out with the state and no problem.

Q.   Did the defendant mention whether he envisioned working with any local individuals in Iraq?

A.   Ross had mentioned he had several contacts in Kurdistan, which is technically Iraq, and he had people that potentially would invest in this operation, yes.

Q.   After you met the defendant in Kuwait, did he ever contact you again?

A.   Yes, Ross and I actually had several conversations back and forth about a variety of things.  We never officially worked on any projects together or anything, zero transactions up until the one in question today.

Q.   Did you form an impression of the defendant through your interactions?

A.   I did.

Q.   What was that impression?

        MR. BARTOLAI:  Objection, relevance.

        MR. CLAFFE:  Your Honor, I'm just asking about his course of business with the defendant and whether he had an impression of him.  The relevance is -- goes to the next series of questions as to whether or not he actually engaged in business with the defendant.

        THE COURT:  You're on the razor's edge here.  I will

let you continue.  It may be that what he has to say is relevant.  I'm not sure yet.  So, Mr. Bartolai, renew your objection if you think it's irrelevant.

BY MR. CLAFFE:

Q.    What was that impression you formed of the defendant?

A.    So in my line of work for the Department of Defense, as well as the FBI, one of the things we have to do is size people up quickly.  We can't write things down.  We have to commit everything to memory.  Ross struck me as an individual that wasn't necessarily the most trustworthy, and I will be frank with you, greasy.

        MR. BARTOLAI:  I object, move to strike.

        THE COURT:  I am going to grant the motion.  I -- I will grant the motion.  The testimony that Mr. Roggio struck the witness as untrustworthy is stricken.  You should disregard that testimony as if you've never heard it.  Go ahead.

BY MR. CLAFFE:

Q.    Have you sold anything to the defendant?

A.    Yes, sir.

Q.    Do you recall a particular transaction in 2016 with the defendant?

A.    Yes, sir.

Q.    What do you recall about that deal?

A.    Mr. Roggio had contacted me with a parts list and said he won a contract to weapons prepare for the U.S. government.  He

14

sent me a list of items to get quotes on and get pricing on of which I sold him two items on that list.  The first item was 15,000 gas rings.  The second item was 3,200 cotter pins.

Q.    Did you manufacture gas rings at the time?

A.    No, sir, we don't manufacture any firearms parts at all.

Q.    Did you have that volume of parts in stock to sell to the defendant?

A.    No, sir.

Q.    So how did -- did you go about acquiring those items for the defendant?

A.    I did not have a source or a supplier at that time.  Ross suggested I call Roger from R. Guns and get pricing from Roger.

Q.    Why didn't the defendant buy directly from R. Guns?

A.    Ross told me that Rodger and him had a --

        MR. BARTOLAI:  Objection, hearsay.

        THE COURT:  Sustained.

        MR. CLAFFE:  He said Ross told him.  That's an admission of a party opponent.

        THE COURT:  It is.  I will hear the question.  I will hear the question.  Go ahead.

BY MR. CLAFFE:

Q.    What the defendant tell you why he didn't buy the parts directly from R. Guns?

A.    That him and Rodger --

        THE COURT:  That is an appropriate question and

appropriate answer.  So the to the extent I said sustained, I was incorrect.  Go ahead.

BY MR. CLAFFE:

Q.    Do you remember the question?

A.    Yes, sir.

Q.    You may answer it.

A.    So Ross told me he could not do business directly with Roger from R. Guns because him and Rodger had a financial falling out.  Somebody owed somebody money.

Q.    What is a gas ring?

A.    A gas ring is an integral component for the a BCG, which is also known as a bolt carrier group and it's an integral part of the function of an M4 or AR-15 military rifle or civilian rifle.

Q.    What would happen if you used substandard gas rings?

A.    They would probably break and come apart and you wouldn't get proper functioning of the weapon.  It wouldn't cycle properly.

Q.    How about firing pin retainers, what are those?

A.    We have a bolt and a bolt carrier group.  You have a cam pin, and there's five major components to a bolt carrier group. The cotter pin or firing retaining pin you're referring to holds the bolt within the bolt carrier group and the cam pin.

Q.    Are there any restrictions on where you can ship M4 gas rings?

A.    Yes, sir.

Q.    What are those restrictions?

A.    The restrictions hold for both items in question the cam pin -- or excuse me -- the retaining pin and the bolt, bolt carrier group and the retaining rings.  To my understanding, any defense --

MR. BARTOLAI:  Objection, Your Honor.  This witness is not an expert in the -- in ITAR.  We suggest that any opinion by this witness would be inadmissible.

MR. CLAFFE:  Your Honor, he's already testified that he's worked in the firearm industry for over 20 years.  I'm simply asking him his understanding of whether he can ship those items overseas.

THE COURT:  I believe based upon his training and experience, knowledge in the industry, he can answer that question.  Overruled.

BY MR. CLAFFE:

Q.    You can continue.

A.    With my 20 years' experience in this industry, and currently giving what I do with ITAR and defense director trade control, it is illegal to ship any weapons components outside of the United States without an ITAR approval.

Q.    Do you know how many manufacturers of M4 gas rings there were back in 2016?

A.    In the United States I would say probably between six and

ten.

Q.   How about firing pin retainers?

A.   Same.

Q.   I would like to show you what's previously marked as Government's Exhibit 9.2.  You have a binder in front of you?

A.   Yes, sir.

Q.   If you can flip to the tab that says 9.2, please.

A.   I have located 9.2, sir.

Q.   Just read it silently to yourself and let me -- you can look up when you're ready to proceed.

A.   Okay.

Q.   Do you recognize this exhibit?

A.   Yes, sir, I do.

Q.   What is it?

A.   It is an e-mail from myself to Roger at R. Guns.

Q.   How do you know that it's an e-mail between you and Roger?

A.   Because the from, sent and to and subject line are at the top of the e-mail.

        MR. CLAFFE:  Your Honor, we move to admit Government's Exhibit 9.2.

        MR. BARTOLAI:  Your Honor, our objection is this witness is part of this conversation but R.Guns is not. Therefore, that portion is hearsay.

        THE COURT:  What do you say that to that?

        MR. CLAFFE:  We're not -- we will not be admitting

the statements of R. Guns for the truth of the matter asserted but rather to ask the witness what he did in response to those statements.

THE COURT:  For that purpose, it's admitted. Government's Exhibit 9.2 is admitted.

MR. CLAFFE:  May we publish it?

THE COURT:  Yes.

BY MR. CLAFFE:

Q.    So, Mr. Mathes, starting at the bottom, what is going on in the very first e-mail in this chain?

A.    So at the bottom I'm actually requesting to become a dealer for R.Guns.

Q.    And what are you providing in this e-mail to R. Guns?

A.    I am providing a list, which is above the very bottom.  It looks like 1,500 gas rings, and it looks like 3,200 mil speck, which is military specification, M4 standard stocks, 3,200 bird cage flash hiders with crash washer, 3,200 charging handles, 3,200 rear flip sights, 3,200 front flip sights, 3,200 mil spec buffer tubes and three thousand two hundred seven fifty low pro gas blocks.  It's a request.

Q.    Did anyone provide with you with this list of items?

A.    That list came from Ross.  That's what he asked me to quote.

Q.    Did Roger respond to your request for a quote?

A.    He did, and above this he gave me pricing on each item.

Q.    Did you send another reply to that e-mail?

A.    Yeah, I would have.  I corrected myself.  I made a typo. It was supposed to be 10,000 gas rings, and I had put in 1,500.

Q.    Did you ultimately complete a transaction with R. Guns?

A.    Yes, sir, I did.  I purchased one -- 15,000 gas rings, and I purchased 3,200 cotter pins.

Q.    Were those cotter pins and gas rings items that the defendant asked you to purchase?

A.    Yes, sir.

Q.    Did you have someone named Clark working for you?

A.    Yes.

Q.    Who was that?

A.    The individual that signed for the package from R.Guns that basically received it.

Q.    Did the defendant ever pay you for the items you ordered for him?

A.    Yes, sir.

Q.    Was that before or after you placed the order with R. Guns?

A.    So that would have been before.

Q.    Is there a reason why you would have asked him to pay before you placed order with R. Guns?

A.    Mr. Roggio had no prior history and he wasn't a U.S. government based customer.  That is standard protocol.  Anybody with a new customer we ask to prepay.

20

Q.    I would like to show you what's been previously marked as Government's Exhibit 9.5.  Flip in your binder to that exhibit. Let me know when you're ready.

A.    Yes, sir.  I have it located.

Q.    Do you recognize this exhibit?

A.    Yes, sir, I do.

Q.    Generally speaking, what is it?

A.    It's a commercial invoice.

        MR. CLAFFE:  Your Honor, we like to move to admit Government's Exhibit 9.5.

        MR. BARTOLAI:  No objection.

        THE COURT:  9.5 is admitted.

BY MR. CLAFFE:

Q.    So you said this was an invoice.  What's listed as the items ordered here?

A.    Can you repeat, sir?

Q.    What are the items ordered on this invoice?

A.    15,000 gas rings and 3,200 cotter pins.

Q.    Those gas rings, were those the same items you described earlier?

A.    Yes, sir.

Q.    And the same with the firing pin retainers?

A.    Yes, sir.  They are identified the description.  It says, M4 bolt gas ring mil, which would mean mil spec.

Q.    What is mil spec?

21

A.    Military specification.  It's a military standard.

Q.    What's the price per unit of the gas rings.

A.    15 cents each.

Q.    That's the price you charged the defendant?

A.    Yes, sir.

Q.    Was that more or less than the price you paid R. Guns?

A.    I paid R. Guns ten cents.  So it was five cents more.

Q.    How about firing pin retainers, what is the unit price for those?

A.    It looks like 60 cents.

Q.    Was that more or less than what you paid R. Guns?

A.    It was more.

Q.    So the defendant spent more money buying them from you than R. Guns?

A.    Yes, sir.

Q.    What's the total amount of this order at the bottom right-hand corner of the invoice?

A.    It is $4,487.80.

Q.    Did you send this invoice to the defendant?

A.    Yes, sir.

Q.    What happened after you sent him the invoice?

A.    Well, we would have made payment arrangements.

Q.    I would like to show you what's been previously marked as Government's Exhibit 9.4.

A.    I have it located, sir.

Q.   Take a quick look and tell me if you recognize this exhibit.

A.   Yes, sir.

Q.   What is this exhibit?

A.   This is the bank information for payment.

Q.   Generally what does the entire page depict?

A.   It's an e-mail that was sent to Mr. Roggio or to sales invoice Ross, and it was sent to R. W. Roggio and R-a-u-n-o at Roggio, Inc. -- or Roggio C. C. dot com.

         MR. CLAFFE:   We move to admit Government's Exhibit 9.4.

         MR. BARTOLAI:   May I have a moment, Your Honor?

         THE COURT:   Sure.

         MR. BARTOLAI:   No objection, Your Honor.

         THE COURT:   Government's Exhibit 9.4 is admitted.

         THE WITNESS:   Not one key piece of information on this is the originator information.

         MR. BARTOLAI:   Objection, there's no question.

         MR. CLAFFE:   Wait until I prompt you, sir.

         THE WITNESS:   Understood.

BY MR. CLAFFE:

Q.   Generally what's going on in this e-mail chain?

A.   Okay.  With this e-mail chain, it was a request for payment.  It gave our banking information, and one of the things we would have done to validate that this is a domestic

order and not an international shipment is the fact the originating information come from Roggio Consulting, 116 Turkey Hill Court, Stroudsburg, Pennsylvania. That would have been the banking information for where payment would have come from. So what we would have done is we would identify this as an American company making an American purchase shipping to an American address being paid by an American account.

Q. Is this your banking information under the beneficiary account information?

A. Yes, sir.

Q. I would like to direct your attention to your e-mail to Ross at the very top of this chain. What do you say there?

A. I say confirmed, everything is moving now.

Q. What did you mean by that?

A. What is meant by that is we received payment and the order has been placed with R. Guns and the product is now being shipped from R. Guns to us, from us to him.

Q. I would like to show you now what's been previously marked as Government's Exhibit 9.13. It will be later in the binder.

A. Yes, sir, I have it located.

Q. Do you recognize this?

A. Yes, sir, this is a bank statement.

Q. Is it your bank statement?

A. Yes, sir.

MR. CLAFFE: Your Honor, we move to admit

24

Government's Exhibit 9.13.

MR. BARTOLAI:  No objection.

THE COURT:  9.13 is admitted.

BY MR. CLAFFE:

Q.    Sir, what's the date at the top of this bank statement?

A.    4/22/2016.

Q.    Did this bank statement indicate a transaction took place on April 11th?

A.    Yes, sir.

Q.    And what transaction took place on April 11th?

A.    Wire transfer credit Roggio Consulting Company, LLC, for the dollar amount of $4,487.80, which matches the invoice amount.

Q.    So that's the same amount listed on Government's Exhibit 9.5?

A.    Yes, sir, and the incoming wire transfer is identified as 116 Turkey Hill Court, which also matches the documentation as well.

Q.    Okay.  So after you received -- what do you after you received payment from the defendant?

A.    As soon as we received product, we would have counted the product through a weigh system and shipped it immediately to Mr. Roggio.

Q.    Did you ultimately ship the items to the defendant?

A.    Yes, sir.

25

Q.    Do you know if the items arrived in Pennsylvania in Stroudsburg?

A.    Yes, sir, I do.

Q.    How do you know?

A.    Fed Ex tracker.

Q.    I would like to show you what's already been admitted into evidence as Government's Exhibit 9.6.  I would like you to look at the third page of that.

A.    Yes, sir.

Q.    What is this third page?

A.    That is a certificate of business record.

Q.    I'm sorry, the third page.

A.    I'm sorry.

Q.    You can look at the screen if you want.

A.    This is the actual shipping manifest I would have filled out.  That's my handwriting.  So that means I personally took this to a Federal Express location and put the shipping label together and dropped this off at a Fed Ex location at Fayetteville, North Carolina to ship to Ross Roggio at 143 Indian Spring Drive, Stroudsburg, Pennsylvania, 18360.

Q.    Flipping back to the second page of that exhibit, does this report indicate whether the package was delivered?

A.    Yes, sir, fourth line down it says delivery.  It identifies the date and time stamp 4/26/2016 at 9:02 in the morning to an address of 143 Indian Spring Drive, and there's

26

the courier information and the route that was used.

Q.   Does it indicate who signed for the package?

A.   It was signed by -- it looks like -- I'm not going to say that's Crystal -- I can't read it -- but something Roggio.

Q.   Does it start with a K.?

A.   Yeah, it starts with a K., sir.

Q.   If Mr. Roggio had asked you to ship the gas rings to Iraq, would you have done so?

A.   Absolutely not.

Q.   Why not?

A.   Because it's illegal.

Q.   How about firing pin retainers?

A.   Absolutely not.  It's illegal.

Q.   How many gas rings are needed for one M4 rifle?

A.   Three.

Q.   You said you shipped how many to the defendant?

A.   15,000 thousand.

Q.   So at three per rifle, approximately how many rifles could he have produced with --

A.   With no loss, that's 5,000 rifles.

Q.   You said earlier that -- I believe your testimony was about six to ten companies in 2016 manufactured gas rings and firing pin retainers.  Is that correct?

A.   Yes, sir.

Q.   In your experience, what are reasons people would buy from

different vendors as opposed to all the same vendor?

MR. BARTOLAI:  Your Honor, I object.  It's again, in his experience why a vendor would purchase from different -- why a person would purchase from different vendors, it calls for some sort of investigative expertise, and this person certainly hasn't been proven to be an expert in that regard.

MR. CLAFFE:  I will rephrase, Your Honor.

BY MR. CLAFFE:

Q.    If you were building M4 firearms, would you purchase all of the parts from one vendor or multiple vendors?

A.    Being the manager of 21st Tactical and buying hundreds of thousands of parts over 16 years, so I have a lots of experience when it comes to buying parts and accessories, I try to put as much business as I can with one vendor.  The reason we do that is, No. 1, volume reduces price which now increases our profitability.  So personally as an individual who has ran a retail shop for 16 years at Fort Bragg specializing in tactical gear and weapons, I would not do that, and nobody would.  The only reason that I would buy parts from multiple vendors and try to --

MR. BARTOLAI:  Objection, now it's calling for a hypothetical, Your Honor.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  The only reason that I would purchase multiple parts from multiple vendors is if I wanted to hide

what my true intentions were.

MR. CLAFFE:  Thank you, sir.

MR. BARTOLAI:  Your Honor, I object to the last answer.  I think it's unresponsive.  I move to strike.

THE COURT:  He's giving you based on his experience in this particular arms industry what he would do.  I think it's relevant and appropriate.  Do you have anything else?

MR. CLAFFE:  No further questions, Your Honor.

THE COURT:  Cross-examine.

MR. BARTOLAI:  Thank you.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.   Good morning, Mr. Mathes.

A.   Good morning, sir.

Q.   So I take it then from your last answer that you have experience in trying to hide these type of smuggling transactions.  Is that your testimony?

A.   No, it is not, sir.

Q.   No.  You have no experience is what you're -- purported to this jury in sending parts to different countries?  Is that right?

A.   Sir, given what I've done for the Department of Defense, which I cannot discuss here today, I have knowledge on these types of activities, but I am not at liberty to discuss them.

Q.   Let's talk -- let's talk about the Department of Defense

and some of your activities.  So you've come in here, and during your direct examination you've testified that you were a confidential informant for the FBI, right?

A.    Yes, sir.

Q.    You were a paid confidential informant for the FBI?

A.    Yes, sir.

Q.    And that during the time period of 2010 through 2017, you were also a confidential informant for the Department of Defense, correct?

A.    Yes, sir.

Q.    And you were a paid confidential informant for the Department of Defense, correct?

A.    Yes, sir.

Q.    Who is the Department of Defense?

A.    It is the United States Government.

Q.    The United States Government, very good.  And you were paid thousands of dollars in that role, correct?

A.    Yes, sir.

Q.    And it was during that time in 2011 while you were a confidential informant that you met Mr. Roggio in Kuwait in the Middle East, correct?

A.    Yes, sir.

Q.    And during that time when you were a confidential informant for both the FBI and Department of Defense you met Mr. Roggio in Kuwait and he told you specifically that he was

30

going to build an arms factory for the Kurds in Kurdistan, Iraq, correct?

A.    No, that's not correct.

Q.    Did Mr. Roggio tell you in 2011 that he was actively facilitating construction of a weapons factory in the Kurdistan area of Iraq?

A.    No, he did not.

Q.    Did Mr. Roggio tell you that he was intending to transfer technology, machinery required to manufacture assault rifles?

A.    Can you rephrase the question?

Q.    Did he tell you -- when you met Mr. Roggio in Kuwait in 2011 while you were a confidential informant for the Department of Defense -- did he tell you that he was facilitating the construction of a weapons factory and that he was transferring technology, machinery and equipment required to manufacture assault rifles?

A.    To where?

Q.    To Kurdistan, Iraq.

A.    No, sir, he did not.

Q.    Did he tell you that within with two years the Iraqi Kurds will execute an armed revolt to take back their country from Iraq?

A.    No, sir, he did not.

Q.    So if this was -- if it was said this is what you reported to the Department of Defense, that would be incorrect?  Is that

right?

A.   I don't write the reports for the Department of Defense, sir.  So I don't know what they wrote.

MR. BARTOLAI:  I think we need a sidebar.  May we come to sidebar, Your Honor?

(The following discussion took place at sidebar:)

MR. BARTOLAI:  Your Honor, you have the report, and I have a copy here and take a look at it.  I highlighted what I thought were relevant portions.  And again, I never wanted to use this report.  I just wanted him to admit this is what he told these people.  There's a report that's been disclosed that basically says so, and that's where we are, Your Honor.

I don't need -- I mean, I can put the report in front of him, and it doesn't -- of course, it wouldn't be admitted. I never intended to use the report, but I think I have to get into that.  He's adamant he never said any of these things.

MR. CLAFFE:  Your Honor, this is improper impeachment with extrinsic evidence.  It's a report the witness had never seen.  He hasn't adopted it.  What the handlers took down as to what he said is -- does not control here.  It's his recollection.  Gino is reading from a report and challenging his memory.  It's not a proper way to impeach with a prior inconsistent statement.

THE COURT:  It's not his statement.

MR. CLAFFE:  It's not his statement.  It's a

32

statement of an agent of the Department of Defense.

THE COURT:  Who spoke with this gentleman?

MR. CLAFFE:  Yes.

THE COURT:  As opposed to being the agent's account of what he said?

MR. CLAFFE:  Yes, never shown to the witness or adopted or reviewed it to see whether it was complete or accurate.

THE COURT:  Those are questions you have to ask before you use this.

MR. BARTOLAI:  I have to ask him, this witness?

THE COURT:  Did you review -- do you have any knowledge of its contents beyond the fact you spoke to this person?  If he says no, I think you're stuck.

MR. BARTOLAI:  All right.  I might have to bring -- that's something we will have to talk about.  I may have to ask for an adjournment.  I don't know if I can do that.  We will see if -- we will see if he's willing to -- I'm going to show him this report.  I'm going to ask him to review it, and I am going to -- I guess I will need to mark it as an exhibit for the record.

THE COURT:  If he says he's never seen it before such that he had an opportunity to correct it if it's wrong and he says he's never seen it for any other purpose, I don't know how you can impeach him with it.

33

MR. BARTOLAI:  Let me go down that road.  I will put a sticker on this.

(The discussion at sidebar concluded.)

MR. BARTOLAI:  Your Honor, may I have a moment?

THE COURT:  Yes.

BY MR. BARTOLAI:

Q.    Mr. Mathes, I'm going to show you what I marked as Defendant's Exhibit No. 5, and I am going to ask you to take a moment to look at that -- to look at that, please and -- please look at that.

A.    Thank you, sir.

Q.    Please review Defendant's Exhibit No. 5.  Please read the highlighted portions.

MR. CLAFFE:  Your Honor, I object to him reading aloud any portions.

MR. BARTOLAI:  Please -- just read to yourself the highlighted portions of this report, sir.

THE COURT:  Ready?

THE WITNESS:  Yes, sir.

BY MR. BARTOLAI:

Q.    Having read -- having looked over Defendant's Exhibit No. 5, do you recall the -- do you recall the matter that's contained therein?

MR. CLAFFE:  Your Honor, I object to improper attempt to refresh his recollection with this document.

34

THE COURT:  I --

MR. CLAFFE:  He didn't establish.

THE COURT:  We established at sidebar there are certain questions he would have to be asked before you could inquire further.  Among those questions is whether he's ever seen this before, whether he approved it or whether he adopted it.

BY MR. BARTOLAI:

Q.   Have you ever seen this before, this document?

A.   No, sir, I have not.

Q.   Okay.  Have you ever adopted the contents of what's in that document?

A.   I haven't read it fully.  Do you mind if I read it fully?

Q.   No, please do.

A.   Thank you.  I read it.

Q.   Does that refresh or alter the testimony you gave prior?

MR. CLAFFE:  I renew my objection.  He said he never seen this before.

THE COURT:  Sustained.  Sustained.

BY MR. BARTOLAI:

Q.   Have you ever adopted the statements that were in this report?

A.   I don't understand adopted the statements in this report.

Q.   Were these statements that would have been made by you and contained in a report?

A.    When I read those statements there, sir, they're not accurate.

Q.    Not accurate?

A.    No, sir, they're not.

Q.    Very good.  All right.  All right.  But your testimony is -- and I believe this was your testimony -- correct me if I'm wrong -- that in 2011, you met with Mr. Roggio in Kuwait and he did tell you that he was intending to build a weapons facility in Kurdistan, right?

A.    No, sir.

Q.    Did he talk about that?

A.    Yes, sir.

Q.    Okay.  He talked about it.  Is that right?  What did he tell you?

A.    That he was looking to raise funds to potentially do that type of activity.

Q.    Okay.  And what was that activity?

A.    That if he can raise the money for the capital to build a facility to build arms in Iraq that he would like to do so.

Q.    He would like to do so.  So you were -- so around this time, 2011 when you're working with the FBI and the Department of Defense as a confidential informant, you met someone in Iraq, Mr. Roggio, and he's talking about building an arms factory in Iraq, right?

A.    That is inaccurate, sir.  I did not meet him in Iraq.

Q.   No, he's in Kuwait.  He's telling you that he's considering or thinking about or contemplating building an arms factory in Iraq, right?

A.   It was a general conversation.  There was no intent.  It's like two individuals having a conversation, so, you know, I have an idea and here's what I'm thinking, what are your thoughts.

Q.   But you're a confidential informant, and you've indicated that you work for the government in this -- in a role.  And you can't write down names and numbers, but you would -- this is something you would remember, right?

A.   Yes, sir.

Q.   And, in fact, you remembered it good enough to tell people about it, right?

A.   So for the DOD?

Q.   That's a yes or no.

A.   I remember a lot of things.

Q.   Did you tell someone about the conversation with Mr. Roggio in Kuwait in 2011?

A.   Yes.

Q.   Did you tell the FBI about it?

A.   I don't recall if the FBI was present at that meeting.

Q.   No.  I didn't ask that.  Did you tell them about it after the meeting?

A.   No, we only discussed things at our meetings.

37

Q.    Did you tell the Department of Defense about your meeting with Mr. Roggio?

A.    Yes, sir.

Q.    Oh, did you, okay.  You made a report to the Department of Defense, correct?

A.    No, sir, I did not make a report.

Q.    You told them about it?

A.    I discussed it with them, yes.

Q.    You discussed it with them, very good.  That would have been in 2011, right?

A.    Yes, sir.

Q.    Now, then in later on in 2016 thereabouts you're getting a phone call from Mr. Roggio, right?  He's talking to you about buying gas rings and cotter pins, right?

A.    As well as other components, yes.

Q.    As well as other things, right.  And you're doing business with him, right?

A.    No, sir.  We did no business at that point.

Q.    In other words, you did provide him with these gas pins and these cotter pins, correct?

A.    For this particular transaction, yes, sir.

Q.    Did you contact the FBI or Department of Defense and say, hey, you remember that guy from Kuwait, he's trying to buy 15,000 gas rings enough to make 5,000 assault rifles?  Did you contact them and tell them about it?

A.    I cannot discuss that with you here in court.

MR. BARTOLAI:  I would ask the Court to instruct --

THE COURT:  Judy, take the jury out, please.  Mr. Mathes, sir, if you would be good enough to step out, sir?

THE WITNESS:  Absolutely, sir.  Should I wait in the hallway, sir?

THE COURT:  Of course.

THE WITNESS:  Thank you.

THE COURT:  Mr. Jasperse or -- any of you -- was this something that you expected from this witness?  If so, are you prepared to tell me what's going on?

MR. CLAFFE:  My understanding is that the witness' intention with that response to Mr. Bartolai's question was he's been instructed to not discuss other information he provided to either the FBI or the Department of Defense other than information relating to Mr. Roggio.  All the information he provided to the government with respect to Mr. Roggio has been produced in discovery to Mr. Bartolai.  So I believe he understood that question to be asking about other meetings with the FBI, but I don't personally -- the government is not aware of any other times he discussed Mr. Roggio with the FBI other than the one time that we have already disclosed to Mr. Bartolai.

THE COURT:  Your question to Mr. Mathes that prompted his response he couldn't discuss the matter -- his quote -- did

you contact the FBI or Department of Defense and say, hey, you remember that guy from Kuwait, he's trying to buy 15,000 gas rings enough to make 5,000 assault rifles, did you contact them and tell them about it.  Answer, I cannot discuss that with you here in court.

The question doesn't seem to extend past his conversations with Mr. Roggio.  So I'm not certain why he's saying he can't discuss this in court, and, of course, I could ask him that, and I may, but to the extent that you understand what's going on here, I would appreciate if you would enlighten me.

MR. CLAFFE:  Your Honor, that's the extent of the government's understanding.  We conducted an exhaustive search with both the FBI and the Department of Defense regarding whether there were any reports during his time as the confidential informant human source with respect to Mr. Roggio, and we turned over the sole reports at which were given back to us in response to that request.

THE COURT:  Which makes his answer somewhat cryptic because in light of your representation -- and I accept it as the truth, of course -- that there is nothing other than what has already been provided to the defendant about Mr. Roggio and that he would be free to testify about that.  Is that your understanding?

MR. CLAFFE:  That is my understanding.

THE COURT:  I don't understand his answer.  I may have to instruct the witness to answer any questions that are within his knowledge regarding Mr. Roggio's activities and whether he reported those.  Now, to the extent there's something beyond that, I would understand his reluctance to testify.  But that particular answer is troublesome because the question did not -- did not appear to seek anything other than an answer as to whether or not he told the FBI about what Mr. Roggio was in the process of doing, that is acquiring 15,000 gas rings.

MR. CLAFFE:  I think that instruction to the witness would be appropriate, Your Honor.

THE COURT:  Mr. Bartolai, what's your view?

MR. BARTOLAI:  Your Honor, I agree with the Court.  I think it's -- I think the answer is unresponsive.  He clearly can answer.  It's a yes or no question.  The question is tailored to be tight and specific, and I expect him to answer no and -- or yes, and I would just ask the Court to read back the question or have the question read back to him and have him answer it, Your Honor.

THE COURT:  Seems like a reasonable course to me.  Do you have a problem with that, counsel, from the government?

MR. CLAFFE:  No, Your Honor.  One second, Your Honor.  Your Honor, may we propose we bring Mr. Mathes in outside the presence of the jury and either allow you to provide that

instruction or to conduct a brief voir dire to see what his answer may be to the question?

THE COURT:  Mr. Bartolai?

MR. BARTOLAI:  Sure, whatever is reasonable.  I mean, I'm just trying to get an answer to the question.

THE COURT:  Understood.  Judy, if you would, please, bring Mr. Mathes back in.  Mr. Mathes?

THE WITNESS:  Yes, sir.

THE COURT:  While you were outside with the courtroom, I consulted with counsel for the government as well as counsel for the defendant in an effort to understand what might be the issue here.  Counsel for the government has represented to me that any information that the government acquired with respect to Mr. Roggio has been turned over to defense counsel in accordance with law and that accordingly questions concerning information provided by the government which in turn was turned over to Mr. Roggio is an appropriate area for cross examination.

Now, I am further advised you may -- it appears from your testimony you do have testimony about other matters that do not concern Mr. Roggio or his activities, and everyone understands those other activities that do not involve Mr. Roggio are not a proper matter for inquiry here.  So there's an understanding that's uniform as to that.  However, this particular question --  I am going to read it back -- seems to

be limited to Mr. Roggio and it would appear to be a question that you should answer.  The question was, I am quoting, did you contact the FBI or Department of Defense and say, hey, you remember that guy from Kuwait, he's trying to buy 15,000 gas rings enough to make 5,000 assault rifles, did you contact them and tell them about it.  Your answer was, I cannot discuss that with you here in court.  Based upon what I have been told and based upon what's been represented to me, that would be a proper question that you would be not only be entitled but obligated to answer.

THE WITNESS:  Yes, sir.

THE COURT:  Are we okay?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Bring the jury back.  Is there anything else before -- pardon me, Judy.  One second.  Is there anything else you want to ask before we bring the jury back in?  I don't want to take them out again for no reason.

MR. BARTOLAI:  Well, maybe we should -- so -- no, I'll just have to -- I have some more questions, but I --

THE COURT:  Mr. Jasperse, anything?

MR. JASPERSE:  No.

MR. CLAFFE:  No.

THE COURT:  What I propose to do is have my stenographer read the question back to you -- to the witness and allow him to answer it.  You can proceed from there.

43

MR. BARTOLAI:  Yes, thank you.

THE COURT:  Laura, would you read the last question back to the witness?

(The court reporter read back the referred-to portion of the record.)

THE WITNESS:  That's not how things work.  I don't contact them.  I would have reported it at my next meeting.

BY MR. BARTOLAI:

Q.   So your answer is, no, you didn't contact them?

A.   No, sir.  They would have contacted me.

Q.   All right.  Okay.  So it was no, and did you report it?

A.   Yes, sir.

Q.   Okay.  And when was that next meeting?

A.   I don't know, sir.

Q.   Okay.  Now, if I can see -- if I can see Government's Exhibit 9.5, please.  It has been entered.  Is that the entire -- there was -- or -- I'm sorry.  It's the e-mail, the e-mail thread with -- it might be 9.4.  I'm sorry.  And okay, sir.  So 9.4 -- and this was admitted into evidence, and you've testified to it.  Do you recall that testimony?

A.   Yes, sir.

Q.   And I think you indicated here, everything is moving now, correct?

A.   Confirmed everything is moving now.

Q.   You had gotten his check, et cetera, right?

44

A.    No, sir.  I got his wire transfer.

Q.    His wire transfer, I'm sorry.  And you had indicated to this jury that it was important that these -- certain things connect, for instance, that it was a -- you were checking off there was a -- an American company, an American shipping address, et cetera, correct?

A.    Correct.

Q.    Now, this -- this e-mail that you got was from a Mr. Rauno Viltrop, correct?

A.    It just says R-a-u-n-o.  I don't know who that is, sir.

Q.    Is from someone who purports to be Rauno Viltrop, correct?

A.    If they have an at symbol with the company name Roggio Inc., Roggio C. C. at the end, which would be consulting company, which is an American based firm, that would indicate they're an American based employee.

Q.    How about that number right above Roggio Consulting Company, plus 9647733743378, that's international, isn't it?

A.    Yes, it is.

Q.    And, in fact, that's Kurdistan, right?

A.    I don't know.

Q.    You don't know.  You know enough though -- you're working for in Russia now against -- for the Russian aggression?

A.    I am not working in Russia.

Q.    I didn't ask you that.  You're working for the government regarding the Russian aggression?  Was that you how you

45

started?

A.    No, sir, I'm not working for the government.

Q.    You're working regarding the Russian aggression?

A.    In a capacity, yes.

Q.    In a capacity, yes.  I mean, would it be important to know these numbers?

A.    It would be.

Q.    And would it be important to know when you're checking off that everything is from America when you see an international number like that from a, quote, Mr. Rauno Viltrop to check that off as well?

A.    Numbers are pretty universal to be frank with you.  We look for addresses, physical locations, because numbers float. They move.

Q.    So, now, did you know that Mr. Roggio was going to have these items or that it was his intention to have these items somehow shipped to Iraq?

A.    Absolutely not.

Q.    No.  Did he discuss -- was it your plan to ship items to Iraq?

A.    Was it my plan?  Absolutely not.  I would never ship to Iraq.

Q.    If you did, you would be a conspirator?

A.    If I did I would have violated ITAR regulations.

Q.    You would have been a coconspirator with Mr. Roggio,

46

correct?

A.    That I don't know.  I'm not a legal expert.

Q.    At no point in time did you talk to the Department of Defense pertaining to having these items shipped to Roggio and busting him when he got them?

A.    Can you repeat that?

Q.    In other words, at no point in time was it discussed -- did you discuss whether or not you could have a sting set up where you'd deliver these items to Mr. Roggio in Iraq?

A.    No, sir, there was no sting ever discussed.

Q.    All right. Thank you. Wait. I'm sorry. So you've testified that Mr. Roggio was -- had told you earlier that he would be -- thought about the concept the idea of building an arms factory in Iraq in Kurdistan, right?

A.    Mr. Roggio had mentioned it was something he was considering.

Q.    Right, right. And there was an issue with respect to investors. Is that right?

A.    That's my understanding, yes, he was looking for investment money.

Q.    Do you recall Mr. Roggio ever communicating with you that there were some people from Iraq, from Kurdistan that he was wooing -- are you familiar with that term wooing?

A.    I am familiar with the term, sir.

Q.    And he would like you to take them to the Shot Show?

47

A.    I don't recall that conversation.

Q.    Could you tell the jury what the Shot Show is?

A.    The Shot Show is something that I personally avoid like the plague.  It's everybody in the United States goes to present the newest manufacturers for M4s, for handguns.  It's a very poplar event in Las Vegas.

Q.    It's a poplar event.  Have you ever been there?

A.    I have been there twice.

Q.    Mr. Mathes, do you ever recall having a communication with Mr. Roggio where he had inquired about helicopters?

A.    Over the course of the duration from 2011 to 2016 that I knew Ross, we had many conversations.  I don't recall every one of them.

Q.    Your Honor, I am going to -- sir, I'm going to show you -- in a moment I'm going to show you what's been marked as Defendant's Exhibit No. 19.  Take a moment to look at that.

A.    Okay, sir.  I have read it.

Q.    Now -- again, after reading -- after reviewing number 19, does it refresh your recollection at all about the Shot Show?

        MR. CLAFFE:  Object to improper refreshment.  He did not exhaust the witness' recollection.  Actually the witness has already testified that he doesn't remember anything about Shot Show.  I'm sorry.  He didn't -- Mr. Bartolai has not established that the witness could be refreshed.  He did not ask him if anything would help refresh his recollection.

THE COURT:  Sustained.

BY MR. BARTOLAI:

Q.   All right.  In front of you is Defendant's Exhibit 19.  Do you recognize that document?

MR. CLAFFE:  Your Honor, I renew my objection.  He has to establish something that could refresh his recollection before this document is in front of him.

THE COURT:  He has to indicate he has no present memory of it that other efforts to refresh his memory would not work.  Then you can move for the document.

BY MR. BARTOLAI:

Q.   You don't -- do you recall -- you do not recall speaking with Mr. Roggio about taking individuals to the Shot Show, correct?

A.   I don't recall it.  You have this here, which I just read.

Q.   Yeah.  Okay.  So you don't recall, like I said, taking -- Mr. Roggio asking you to take individuals to the Shot Show.  Is that your testimony?

A.   It is.

Q.   All right.  After having looked at No. 19, does that refresh your recollection?

A.   It doesn't refresh my recollection because I never took people to Shot Show for Mr. Roggio.  It was another pipe dream that never worked out for him.

Q.   No, no.  But does this refresh your recollection as to

whether or not he asked you?

A.    No, it actually does not.

Q.    It does not?

A.    No, things that don't happen I try not to commit to memory.

Q.    Uh-huh, okay.  I am going to show you Defendant's Exhibit 20.  Take a look at that.  Could you tell us what that is?

A.    It looks like it's a request from Ross for two passes for Shot Show.

Q.    Who the request to?

A.    He made it to me.  He asked if I can do it.

Q.    No. 20 is him asking you, right?

A.    It is.  He said, hey, can you get two guest passes.

Q.    He did ask you?

A.    He asked me, which I did not do.

Q.    You didn't do?

A.    No, sir, I did not do it.

Q.    What did you ask him?

A.    Do these gentleman have visas, which would be the appropriate answer because --

        MR. CLAFFE:  Objection.  This exhibit is not in evidence.  He's testifying as to what this document says.

        MR. BARTOLAI:  I move --

        THE COURT:  Sustained.

BY MR. BARTOLAI:

50

Q.   Sir, can you identify Defendant's Exhibit 19?

A.   This one here, sir?

Q.   Yeah, No. 19.

A.   Yes, sir, I have got it.

Q.   Can you identify it?

A.   I'm not understanding what do you mean by identify?

Q.   Can you tell the jury what it is?

A.   It looks like an e-mail.

Q.   From who to who?

A.   Between Ross and I.

Q.   Between Ross and I?

A.   Uh-huh.

Q.   May I have it, please?

A.   Yes, sir.

MR. BARTOLAI:  Your Honor, I'll move for the exhibit of defendant's 19.

MR. CLAFFE:  We object.  Your Honor, the witness has testified he doesn't recall this interaction at all.  It's irrelevant.  It's outside the scope of direct.

MR. BARTOLAI:  It's a prior inconsistent statement.

THE COURT:  I haven't seen the document.

MR. BARTOLAI:  Your Honor, may I approach?  I have these marked and -- maybe the Court should see three of them, Your Honor.

THE COURT:  All right.  Approach, counsel.

MR. BARTOLAI:  Yes.  Government counsel as well?

(The following discussion took place at sidebar:)

THE COURT:  This document appears to be something -- well, not something -- but it appears to be an exchange of communications between Mr. Mathes and Mr. Roggio.  The question that preceded the request for introduction of the exhibit was a question as to whether this witness procured two passes to the Shot Show.

The exhibit itself indicates at the very end a message from this witness that says, quote, I have reached out to everyone I know and things are not the Shot Show that you and I know.  They have changed the rules greatly.  They even have a special foreign persons attending section.  It is only one day this year for non-booth people.  We can get you two guys in under 21st Tactical or OMI as buyers.  The cost per ticket is $35.  That appears to be inconsistent with his statement he didn't get the passes.

MR. CLAFFE:  I will disagree, Your Honor.  That communication didn't indicate whether he ended up obtaining the passes.

MR. BARTOLAI:  This is the other part of that one. It's where he's asking if these individuals have their visas.

THE COURT:  So this is November 5th.  This is also November 5th, 2014.

MR. BARTOLAI:  These are from the government -- the

52

government took these forensically from, I believe, his devices.

MR. CLAFFE:  We even had them marked for identification as exhibits.  I didn't ask him about it.  He didn't recall the interaction.

MR. BARTOLAI:  I should have used yours.  And then --

THE COURT:  This e-mail once again is an exchange between Mr. Mathes and Mr. Roggio.  It appears reading from the bottom to top here, Ross, helicopter information, and there's an e-mail from Mr. Roggio to Mr. Mathes, Bill, can you please get two passes for Shot Show for the following people, Polad Talabani and Hiwi Ismail.  They are the people who do the purchasing on the items we talked about.  They would be at Shot Show January 19-25.  I would like very much for you and Olivia to go.  If you need rooms and flights, let me know and I will book them.  I cannot go this year.  I will be here in Iraq.  If you need my credit card for the passes, please let me know.  Then -- that's an e-mail October 16th, 2016 at 4:48 a.m.  then November 5, 2014 at 9:57 a.m., which appears to be the last e-mail -- it says, Ross, do these gentlemen have visas, Bill.  That's the end of it.  So where are we going with these?  I mean, to the extent -- to the extent they're prior inconsistent statements, he didn't testify to anything but the first one.  Now --

MR. BARTOLAI:  So I would ask him -- I think I did

ask him.  He blatantly is denying he was ever asked to take these people to the Shot Show.  These are the investors.

MR. CLAFFE:  He didn't deny.  He doesn't recall.

THE COURT:  I mean, you can ask him these questions. All right.  If he says he doesn't recall, you can attempt to impeach him with these documents.  If he -- obviously, if he gives testimony that's consistent with these, then they don't come in.

MR. BARTOLAI:  Right.  Here's the last one.  No. 21. In this one, Mr. Mathes is proposing to the sale of a large number of -- he's offering to Mr. Roggio contact -- or, you know, an opportunity to get a hold of a --

THE COURT:  This one from Mr. Roggio on 6/8/2014, 12:44 p.m., to Greg -- the print at the top of it is very small.  And then it continues below that from William Mathes, May 25, 2014 at 11:14 p.m. eastern daylight time, subject looks like A. 104, Ross, is this better -- and in very large -- very large letters -- we have available in stock and ready to be shipped .  I don't see how these are not areas where you can question the witness.

MR. BARTOLAI:  Okay.

MR. CLAFFE:  May I see that?

THE COURT:  Sure.

MR. CLAFFE:  So if Mr. Bartolai seeks to admit the exhibit, we will object pending questioning to the foundation

of this because the e-mail between the witness and the defendant is embedded in a forwarded message to someone that we have no idea who that person is and whether or not the Mathes e-mail was altered in any way prior to being forwarded. If you can establish that is a true and accurate copy of the e-mail that Mathes sent with him, we will have no objection.

MR. BARTOLAI: Sure.

THE COURT: You can attempt to cross-examine this witness with what's in here. To the extent he will give you an answer you think is inconsistent with his own statements, you can introduce the exhibit.

MR. BARTOLAI: Very good. Thank you.

(The discussion at sidebar concluded.)

BY MR. BARTOLAI:

Q.    Sir, I'm going to show you again Defendant's Exhibit 20. And you've seen it before. Take another moment to look at it.

A.    Yes, sir.

Q.    All right. And this is an e-mail from Mr. Roggio to you about having individuals go to the Shot Show, right?

A.    This is an e-mail where Mr. Roggio has requested that I get two passes for individuals to go to Shot Show.

Q.    And what was your response?

A.    Do they have visas.

Q.    So you do respond to him in that you're inquiring whether or not these individuals have visas, correct?

55

A.    Yeah, with that statement what that means can they come to the United States legally.

MR. BARTOLAI:  Your Honor, I move for admission of Defendant's Exhibit 20.

MR. CLAFFE:  No objection.

THE COURT:  Defendant's Exhibit 20 is admitted.

MR. BARTOLAI:  May I publish it, please?

BY MR. BARTOLAI:

Q.    You can see Defendant's Exhibit 20, correct?

A.    Yes, sir.

Q.    And in this defendant's 20, you can see the e-mail from Ross Roggio to you October 16th, 2014, right?

A.    Yes, sir.

Q.    And he's asking you to get two passes for the Shot Show, correct?

A.    Yes, sir.

Q.    For Polad Talabani and Hiwi Ishmail, right?

A.    Yes, sir.

Q.    And he says, I cannot go this year, I will be here in Iraq, right?

A.    Yes, sir.

Q.    He said in the middle, they are people who will do the purchasing on the items we talked about.  They will be at the Shot Show January 19th and 25th, right?

A.    That's what I read there, yeah.

56

Q.    Okay.  And the subject on this e-mail has to do with a helicopter contract?

A.    I see subject H. E. L. contract for K. R. G. -- could be anything.  It doesn't say helicopter.  No, I'm not going to make that assumption.

Q.    I don't want you to.  It says Ross, the helicopter information, right?  Do you see that?

A.    Yes, I see it now.

Q.    Go just a little bit below that where it says, contract for M. I. 171.  That's a Hind, isn't it?

A.    A what?

Q.    Hind helicopter, Soviet attack helicopter, right?

A.    The Mi helicopter is.

Q.    It's a flying tank, would you agree?

A.    I would.

Q.    This is information that you're giving Mr. Roggio, right?

A.    Well, I don't see any information there, sir.  All I see is Ross, helicopter information.  Then I see contract for M. I. 171, and the rest of it looks like gibberish.  There's no images or pictures.  I don't see them.

Q.    No attempt -- knowing what you know and having met Mr. Roggio in 2011 and having a continued relationship with him until October 16th, 2014 and working as a confidential informant for the Department of Defense, it's your testimony that you never reported these contacts -- this information to

57

the Department of Defense?

A.   I never said that to you.

Q.   Did you report this information to the Department of Defense?

A.   I don't recall.

Q.   You don't recall?

A.   No, sir.

MR. BARTOLAI:  Thank you.  Nothing further.

THE COURT:  Is there redirect?

MR. CLAFFE:  Nothing further, Your Honor.

THE COURT:  Very well.  Mr. Mathes, thank you, sir.  You're excused.

THE WITNESS:  Yes, sir.

THE COURT:  Before Mr. Mathes exits, I excused him, but I was remiss in not asking both counsel whether you have any objection to his being excused?

MR. BARTOLAI:  I don't.

MR. CLAFFE:  We do not.

THE COURT:  Very well.  Thank you.  You did indicate a desire for a break, did you not?

MR. CLAFFE:  Yes, Your Honor.

THE COURT:  All right.  15 minutes.

(A brief recess was taken.)

THE COURT:  Call your next witness.

MR. CLAFFE:  Government calls Roger Krahl.

58

ROGER KRAHL, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION.

BY MR. CLAFFE:

Q.   Mr. Krahl, make sure you speak clear into the microphone for the court reporter.  Good morning, Mr. Krahl.

A.   Good morning.

Q.   Tell the your jury where you work.

A.   I work in the gun store.  That's my place of business.

Q.   What's the name of that business?

A.   The trade name is R. Guns.

Q.   Are there other names?

A.   Incorporated as Sports For Us, d/b/a R. Guns.

Q.   Where is that located?

A.   In Carpentersville, Illinois.

Q.   And what is your current title at R. Guns?

A.   I am the president.

Q.   How long have you been in that role?

A.   30 some odd years.

Q.   What did you do before you opened R. Guns?

A.   I was in the Marines.

Q.   What are your responsibilities as president of the company R. Guns?

A.   Running day-to-day operations, making sure we're in compliance with all state, federal regulations, normal

59

accounting, keeping track of employees, all that good stuff.

Q.   What does R. Guns do?

A.   We are a manufacturer.  We are an importer of firearms and accessories, and we are an O. 1 -- it's a standard dealer's license for retail, wholesale, that type of thing.

Q.   What types of products does R. Guns manufacture?

A.   We manufacture the AR-15 style rifle.

Q.   And in addition, do you also sell AR-15s?

A.   Yes.

Q.   What other products do you sell besides AR-15s?

A.   It could be surplus, old military pistols, rifles, slings, bayonets, ammunition, tools, magazines, just assorted firearm related stuff.

Q.   Do you know the defendant, Ross Roggio?

A.   I did know him, yes.

Q.   Have you ever met him?

A.   I met him in person.

Q.   How did you know him?

A.   I think he cold called me some many years ago and we were talking about business -- business related, and he was under variance making receivers for me.

Q.   Tell us about that arrangement.

          MR. BARTOLAI:  Objection, relevance, Your Honor.

          MR. CLAFFE:  Just asking about his past business relationship with the defendant.

60

MR. BARTOLAI:  I believe he said he made receivers for him.  I don't think we need to go further.

THE COURT:  Is this the receivers?

MR. CLAFFE:  Not those receivers he's talking about.

THE COURT:  So you're entering a new subject.  Is that it?

MR. CLAFFE:  Yes.

THE COURT:  Let's see what happens.  Go ahead.

BY MR. CLAFFE:

Q.   Can you explain the relationship you had with Mr. Roggio with respect to the manufacturer of receivers?

A.   Yeah, under ATF regulations you can have another company physically manufacture the serial numbered item for you with your company name on it, so you get a variance for that and you become the -- you are the manufacturer of record when it actually was made by somebody else.  Just about almost all the factories do that.

Q.   So in that particular instance, what was the company of record?

A.   I was the company of record.

Q.   Do you remember the name of Mr. Roggio's company at the time?

A.   It was Roggio Arsenal.

Q.   Without going into the details, did that relationship ultimately end?

A.   Yes.

Q.   Did the defendant ever contact you after your business relationship with him ended?

A.   I believe I've spoken to him once or twice after we discontinued business.

Q.   Would you ever have done any business with him after that initial relationship we discussed?

        MR. BARTOLAI:  Objection, relevance, Your Honor.

        THE WITNESS:  No.

        THE COURT:  I think I will allow that.  I'm not exactly sure where you're going, but I'll allow it.

BY MR. CLAFFE:

Q.   Would you like me to repeat the question?

A.   Yeah.  The answer is no, I was done doing business with Mr. Roggio.

Q.   Have you ever done business with a man by the name of William or Bill Mathes?

A.   Yes.

Q.   How do you know him?

A.   He called us up and placed an order for some parts.

Q.   Do you recall when that transaction was?

A.   Exactly, no.  2014 I think.

Q.   What, if anything, do you recall about that deal?

A.   Nothing unusual, somebody just ordered some parts.  It was gas rings and some firing pin retaining pins.  The number was a

62

little bit larger than you'd normally see, but his address was in an area that's near a lot of military bases, and there was no red flags by any means that it was out of place or anything like that.

Q.    Where was that address you're talking about?

A.    It was Fayetteville, North Carolina.

Q.    Did you ultimately sell anything to Mr. Mathes?

A.    Yes.

Q.    What did you sell?

A.    It was 15,000 gas rings and 3,200 firing pin retaining pins.

Q.    What's a gas ring?

A.    The AR-15 works on a piston system.  It's a gas ring is like a piston in your car motor.  So there's three rings that go on the bolt that give -- to allow it for some compression, and there's three rings per bolt.

Q.    How about a firing pin retainer, what is that?

A.    It looks like a little cotter pin, essentially what it is.

Q.    What its function in the gun?

A.    That's -- it goes into through the side of the bolt carrier across the firing pin through the other side, and that keeps the firing pin from falling out of the bolt assembly.

Q.    Do you know how many companies in the United States manufacture gas rings?

A.    I can think of two or three maybe.

63

Q.   I would like to show you what's been previously marked as Government's Exhibit 10.2.  You have a binder in front of you. If you can flip to the tab that says 10.2.  Do you recognize this exhibit?

A.   Yes, those are gas rings.

Q.   Did you take this photograph?

A.   I don't remember if I did or didn't.

Q.   Is this a true and accurate representation of a box of gas rings?

A.   Yes.

        MR. CLAFFE:  Your Honor, we move to admit Government's Exhibit 10.2.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 10.2 is admitted.

BY MR. CLAFFE:

Q.   So is this generally speaking what the gas rings would have looked like when you shipped them to Mr. Mathes?

A.   Yes.

Q.   I would like to show you Government's Exhibit 10.3.  Do you recognize this exhibit?

A.   Yes.

Q.   What is it?

A.   Those are firing pin retaining pins.

Q.   Is this a true and accurate representation of what a box of firing pin retainers would look like?

64

A.    Yes.

MR. CLAFFE:  We move to admit Government's Exhibit 10.3.

MR. BARTOLAI:  No objection.

THE COURT:  10.3 is admitted.

BY MR. CLAFFE:

Q.    Is this how the firing pin retainers would have looked when you shipped them to Mr. Mathes?

A.    Yes.  It was done in bulk.

Q.    Are there any restrictions on where you can ship M4 gas rings?

A.    I can only ship to the -- any U.S. address or a territory of the United States.

Q.    Do you know why that is?

A.    Under -- otherwise you would have to have permits like from the state department under the Arms Expert Control Act, essentially get permission to send the goods there and it would be okay with the government.

Q.    Do you have a permit like that?

A.    No.

Q.    What about firing pin retainers, do the same restrictions apply?

A.    Same thing.

Q.    I would like to show you what's been -- let me ask you this.  Have you ever exported any firearm parts you sell

65

overseas?

A.    No.

Q.    I would like to show you what's already been admitted as Government's Exhibit 9.2.

          MR. CLAFFE:  Your Honor, may we publish that?

          THE COURT:  Yes.

BY MR. CLAFFE:

Q.    In that binder if you -- you can look at the screen if you're more comfortable, but it's also in the binder in front of you.

A.    9.2.

Q.    Do you recognize this?

A.    Yes.

Q.    Is that your e-mail address R. Guns at voyager dot net?

A.    Yes.

Q.    Is this an e-mail you received?

A.    Yes.

Q.    Do you recognize the e-mail address that sent you this e-mail?

A.    That would have been the e-mail we responded to, yes.

Q.    Is that Bill Mathes?

A.    Yes.

Q.    What is the name of his company?

A.    21st Tactical.

Q.    How did you respond to Mr. Mathes' e-mail?

66

A.    How did I respond?

Q.    Yes.

A.    I just replied to his e-mail.

Q.    What did you say back to him?  Did you provide a quote?

A.    Yes, he asked for some pricing on a bunch of different items, parts, and we gave him a quote.

Q.    Did you ultimately complete a transaction with Mr. Mathes?

A.    Yes.

Q.    I would like to show you what's been previously marked as Government's Exhibit 10.1.  If you can flip to that in the binder, please.  10.1.  Do you recognize this exhibit?

A.    Yes.

Q.    What is it?

A.    That is an invoice from my company to 21st Tactical.

Q.    Was this invoice made at the time that Mr. Mathes placed the order?

A.    Yes.

Q.    Was it created as part of your regular practice?

A.    Yes.

Q.    And maintained in the files of your company?

A.    Yes.

        MR. CLAFFE:  Your Honor, we move to admit Government's Exhibit 10.1.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 10.1 is admitted.

67

MR. CLAFFE:  May we publish it?

THE COURT:  Yes.

BY MR. CLAFFE:

Q.   Just looking at the top of this invoice, who's listed as the customer here?

A.   21st Tactical.

Q.   What is the date of this invoice?

A.   4/20/2016.

Q.   Does that reflect that 21st Tactical was in Fayetteville like you said before?

A.   Yes.

Q.   Moving down to the middle of the invoice, what's listed as the items ordered here?

A.   15,000 M-16 gas rings and 3,200 firing pin retaining pins.

Q.   What is the price per gas ring?

A.   Ten cents each and firing retaining pins were 30 cents.

Q.   Can you tell if this order was paid for at the time?

A.   It would have been paid for before we shipped.

Q.   Is there any indication on this invoice as to the form of payment?

A.   Yes, it looks like it was -- well, it is credit card.

Q.   Does this say -- does this invoice say anything about the method you'd be shipping these items?

A.   He was in a hurry.  Shipping was next day air UPS.

Q.   I would like to show you now what has been previously

68

marked as Government's Exhibit 10.4.  Do you recognize this exhibit?

A.    Yes.

Q.    What is it?

A.    This is a tracking label that was printed out by request of somebody asking for delivery.

Q.    Is there anything else on this beside the shipping label?

A.    There's a note on there delivered on 4/22/2016 at 12:00 p.m. and who it was received by at the delivery location.

Q.    Would you maintain this note and label in the hard copy files of your company?

A.    No, this would have had to have been somebody to request to see if the box arrived.  I don't know who would have asked for it.

Q.    Did you send it to someone at their request?

A.    Yes.

        MR. CLAFFE:  We move to admit Government's Exhibit 10.4.

        MR. BARTOLAI:  No objection.

        THE COURT:  10.4 is admitted.

BY MR. CLAFFE:

Q.    What, if anything, does this exhibit show about whether the 21st Tactical order was delivered?

A.    It shows that somebody was looking for the package specifically, either didn't realize they had received it, could

69

have been calling from a different location, didn't know it was already delivered.

Q.    Did it say who it was received by?

A.    Received by Clark.

Q.    If Mr. Mathes asked you to ship these items to Iraq, would you have done so?

A.    Absolutely not.

Q.    Why not?

A.    Against the law.

        MR. CLAFFE:  No further questions, Your Honor.

        THE COURT:  Cross-examine.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    Good afternoon, Mr. Krahl.

A.    Hello.

Q.    May I see Government's Exhibit 9.2, please?  This has been admitted.  And you recall just a short while ago testifying to this, correct?

A.    Yes.

Q.    And this was from Mr. Mathes to you.  Is that right?

A.    Yes.

Q.    And he's inquiring about these gas rings and these firing pin retainers, is he not?

A.    He was inquiring about a whole bunch of parts on that.

Q.    Including the gas rings and the fire pin retainers, right?

70

A.    Yes.

Q.    Now, the other parts, excluding, of course, the gas rings and the firing pin retainers, were they purchased by Mr. Mathes from you?

A.    No, not that I'm aware of.

Q.    And, in fact, if we can go to Government's Exhibit No. 10.1.  In fact, the only thing you had delivered to Mr. Mathes was the gas rings and the fire pin retainers, correct?

A.    Yes.

Q.    If we can jump again -- I'm sorry -- to 9.2.  I should have asked you while it was on the screen.  I notice when it says -- okay.  I notice about mid page thirty two hundred 7.5 -- sorry -- thirty two hundred 7.5 steel low pro gas block, $11 each, not China shit, that was Mr. Mathes?  He sent you that, right?

A.    No, that is something I sent to Mr. Mathes.

Q.    Oh, okay.  So in other words you were telling him this isn't the crap that you get from China?

A.    Correct.

Q.    And so what happens, China makes this stuff, too?

A.    China will copy just about anything on this planet.

Q.    So they are competition nowadays?

A.    I guess you can call it that.

Q.    You're an FFL, and you have some experience building weapons, right?

71

A.    Yes.

Q.    And the AR-15 is a platform, is it not?

A.    Correct.

Q.    We hear about it all the time.  And it's a two point -- a .223 caliber, right, or 5.56?

A.    Or it could be 6.8, 300 blackout, 76239.  I can go on if you want.

Q.    That's one of the great things about the AR-15, it's a versatile platform, is it not?

A.    Correct.

Q.    The competition historically to the AR-15 is the AK-47 also known as the AKM, would you agree?

A.    I wouldn't call it competition.  It's just another type of firearm that's out there.

Q.    It's the other side of the firearm typically?

A.    What other side?

Q.    During the -- usually the bad guy has the AK-47.

A.    Talking about a military terms -- the Soviet pack -- that's a Soviet pack weapon, yes.

Q.    Is it a good weapon?

A.    The AK is an interesting gun, yes.

Q.    Is there a debate whether or not it stacks up against the AR-15 or the M-16?

A.    Like any debates you can go on photographer.

        MR. BARTOLAI:  May I have a moment, Your Honor?

72

THE COURT:  Yes.

MR. BARTOLAI:  Nothing further.  Thank you.

THE COURT:  Redirect?

MR. CLAFFE:  No, Your Honor.

THE COURT:  Thank you, sir.  You can step down.

THE WITNESS:  Thank you, Your Honor.

MR. CLAFFE:  May the witness be excused?

THE COURT:  Any objection?

MR. BARTOLAI:  No objection.

THE COURT:  He may be excused.  Do you have another witness ready?

MR. HINKLEY:  We do, Your Honor, and we're happy to call her.  I expect it will be an hour to an hour and a half direct and then --

THE COURT:  An hour to an hour and a half on your exam?

MR. HINKLEY:  Yes, yes.

THE COURT:  Good time for lunch?  Lunch it is then.  Okay.  It's about 12:10 -- so 1:10.

(A lunch recess was taken.)

THE COURT:  Call your next witness.

MR. HINKLEY:  The government calls Patricia Foster.

PATRICIA FOSTER, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

73

BY MR. HINKLEY:

Q.    Thank you.  Ms. Foster, how are you employed?

A.    I'm employed by P.N.C. bank.

Q.    And how long have you worked for P.N.C. bank?

A.    I've been with P.N.C. for 28 years.

Q.    Does P.N.C. have branches in other places?

A.    We are in 27 states.

Q.    Fairly a large institution?

A.    Yes.

Q.    What type of positions have you held with P.N.C. bank?

A.    I was in the branch setting, so I held teller position, teller lead position, branch banker, assistant manager and manager.

Q.    What is your current position?

A.    My current role is loss prevention advisor.

Q.    Could you move that microphone closer to you?  What did you say?

A.    Loss prevention advisor.

Q.    What's your educational background?

A.    I have an associate's degree in business administration.

Q.    And where did you obtain that?

A.    Churchman Business School in Easton, P.A.

Q.    In your education and experience in the banking industry, are you familiar with the process generally of international transfer of funds?

A.    Yes.

Q.    The government requested you testify today in a matter of U.S. versus Ross Roggio.  In preparing for your testimony did you review a number of --a number of records produced by P.N.C. for the government?

A.    Yes.

Q.    Were these records kept in the regular course of P.N.C.'s business?

A.    Yes.

Q.    In the three ring binder in front of you, I will ask you to take a Government's Exhibit 21.1.

A.    Okay.

Q.    And what is that document?

A.    This document is a document that whoever the record -- person who pulled the records for P.N.C. that they're attesting to the fact these are the legal documents.

Q.    So these are certification for the documents that P.N.C. turned over to the government.  Is that correct?

A.    Yes.

Q.    Take a quick look -- and there are a number of documents, 21.2 through 21.30.  Take a look at those if you would.

A.    What number to go to?

Q.    21.30.

A.    Okay.

Q.    Are these documents 21.2 through 21.30, are they some of

75

the records produced by P.N.C. bank by legal process for trial at the request of the government as per certification?

A.    Yes.

MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibits 21.1 through 21.30 inclusive.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 21.1 through 21.30 are admitted.

MR. HINKLEY:  Permission to publish as I question the witness on each document, Your Honor.

THE COURT:  You have it.

MR. HINKLEY:  Thank you, Your Honor.

THE COURT:  You're welcome.

BY MR. HINKLEY:

Q.    Turning to Government's Exhibit 21.2, which is on the screen -- or you can use the book, whatever is easier for you.

A.    The screen.

Q.    Generally speaking, what is Government's Exhibit 21.2?

A.    It's the bank statement.

Q.    Is this a P.N.C. bank statement?

A.    Yes, it is.

Q.    And is this like a monthly statement that a customer would receive who has an account with P.N.C. bank?

A.    Yes.

Q.    At the top of the first page of 21.2, does it indicate the customer's name?

A.    Yes, it does.

Q.    And what name is indicated?

A.    Roggio Consulting Company, L. L. C.

Q.    Is the customer's address indicated there?

A.    Yes, it is.

Q.    And what is the address?

A.    116 Turkey Hill Court, Stroudsburg, P.A.

Q.    And above that is there a period of which this particular monthly statement is applicable?

A.    Yes, it's for the period of 9/5/2014 to 9/30/2014.

Q.    Does the statement have the indication for deposits or additions to the account as well as checks or other deductions from the account?

A.    Yes, it does.

Q.    Does it elicit any deposits for this period?

A.    Yes, one deposit that's listed for a hundred dollars.

Q.    There's also another deposit for 100.  Is that correct?

A.    Yes.

Q.    The second page of this particular exhibit, generally speaking what is the second page?

A.    It's the activity page.

Q.    So as an activity page what does it show, more detail?

A.    Yes.

Q.    In the top -- well, top middle part, other additions?

A.    Okay.

Q.    Is there an activity shown there?

A.    Yes, there is.

Q.    What's that activity?

A.    On 9/26 there was an international wire that was deposited for $647,550.

Q.    Going down that same page there's a section entitled A. T. M. miscellaneous check card transactions.  Is there any transactions reflected there?

A.    Yes.

Q.    What is that transaction?

A.    September 30th, there was $439.79 A. T. M. withdrawal in Istanbul.

Q.    Very good.  Before we go forward all the statements you're going to testify to, you had an opportunity to review prior to coming into court?

A.    Yes, uh-huh.

Q.    Are all of the -- the monthly statements that you're testifying to, are they for Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    Same bank account, same owner throughout your testimony, right?

A.    Yes.

78

Q.    So I'll ask you to go to Government's Exhibit 21.3.  And generally speaking, what is this document?

A.    This is a transmittal of a wire.

Q.    And is this obviously a document that would be kept by P.N.C. bank?

A.    Yes.

Q.    And earlier you had indicated that you had some experience and knowledge about the international transfer of funds.  Suppose I wanted to transfer funds from somewhere outside of the United States into my bank account within the Middle District of Pennsylvania for P.N.C. bank, how does that work generally?

A.    Okay.  If you are transferring from another bank, that bank would be the initiator of the wire.  So you -- I don't know how, like, another bank -- whether you can do it over the phone or what -- but you would initially -- initialize the transaction from that bank.  You tell them who you want to send it to.  You have to give them all of the information, the bank's name, routing company, account number, the title and the reason for the wire.

Q.    And if an international transfer of funds occurs does that show up on the documents and paperwork of P.N.C.?

A.    Yes.

Q.    No. 2, do the funds go into the account requesting the funds going into it?

79

A.    Yes.

Q.    In this document did that happen as far as you can tell?

A.    Yes, uh-huh.

Q.    So let's go through this document.  In the -- in the top half of the document -- let me ask you this.  Can you tell from -- from this part of the document who the transfer of funds went to, who got those funds?

A.    These were funds that were deposited into Roggio Consulting.

Q.    That would be the monthly statement, right?  So this was just associated with that monthly statement?

A.    Right.

Q.    And on the top left does it indicate the amount of the deposit?

A.    It was $647,550.

Q.    And on the left of that document or at least that part of the document towards the bottom, does it indicate from where the funds were coming from?

A.    It's coming from Commerce Bank Nostro Reconciliation. That was the bank that sent the funds.  They would have been the one that initiated sending it to us.

Q.    Is there farther down there a reference to Kurdistan International Bank?  Do you see where I am speaking of?

A.    Yes.

Q.    So would it be your testimony the money was coming from

80

originally coming from the Kurdistan International Bank in Iraq?

A.    Yes.

Q.    Below that -- is there information in regards to what was that requested the transfer?  I will point you to that Zarya Company.

A.    Zarya Company right at the bottom towards the bottom of the --

Q.    I will go to the second page of that document 21.3 as I believe that the document continues on the second page, and then kindly highlight the top portion of the document.  Does this provide more information where the money was coming from and who the -- transfer funds?

A.    Right.  It's Zarya Company, and then it's -- Kurdistan International Bank and it's going to P. N. C.

Q.    And who is the name as the beneficiary customer of this particular transaction?

A.    Roggio Consulting Company.

Q.    Does it indicate the -- what the remittance was for?

A.    It says consulting fee.

Q.    The government's exhibit 21.4.  And what is exhibit 21.4?

A.    It's the bank statement.

Q.    For what time?

A.    October 1st, 2014 to 10/31/2014.

Q.    Second page, as I recall your testimony, would be the

81

detail page?

A.   Yes.

Q.   Are there A. T. M. transactions that occurred?

A.   Yes, there are A. T. M. transactions.

Q.   Where are those transactions occurring?

A.   In Iraq and Istanbul.

Q.   And other deductions on that same page towards the bottom, are there any wires occurring?

A.   Excuse me?

Q.   On the other deductions part of this document --

A.   Okay.  So then there are checks that are written also on the account, okay, other reductions, yes, there's international wire sent out for 8,000 on October 7th, there's a withdrawal for 5,000 on October 30th and a corporate account analysis charge of 97.65, which is -- was October 31st.

Q.   Let's go to Government's Exhibit 21.5.  Again, is this another monthly statement?

A.   Yes, it is.

Q.   By the way, does P.N.C. bank have any branches in the Stroudsburg, Pennsylvania area?

A.   Yes.

Q.   One, two, three, more or less?

A.   Right now we have one in Stroudsburg.

Q.   Okay.  Are other branches near Stroudsburg as well?

A.   Yes, there's East Stroudsburg.

82

Q.    21.5.  This is another monthly statement, is it not?

A.    Yes, it is.

Q.    On the second page of this particular exhibit, there's other additions.  I believe you indicated this is the more detailed part of these statements.  Is that correct?

A.    Yes.

Q.    And are there any international wires that occurred during this month in this account?

A.    Yes, there's four international -- actually four -- well, three international wires and a fed wire.

Q.    Go ahead and disclose a date that was posted, amount of the transaction.

A.    Okay.  November 4th, there was an international wire for $71,950.  November 14th there's another international wire for $71,950.  November 18 there's an international wire for $10,126.32.  There is -- on November 20th, there's a fed wire in for $4,960.  On November 28th an international wire for $73,477.90.

Q.    In regards to that 11/20 transaction, fed wire, would that international, or that would be domestic?

A.    That would be a domestic.

Q.    And lower down on that page there appears to be some A. T. M. or miscellaneous check card transactions?

A.    Yes.

Q.    What is reflected on the document?

A.    There are A. T. M. withdrawals in Istanbul as well as Budapest, Iraq and also in Mount Pocono, Mount Airy Casino.

Q.    The third page of the document, other deductions?  Is there activity domestic or international wires?

A.    There are fed wires going out.

Q.    Are there any international wires?

A.    Yes, international.

Q.    Moving on to Government's Exhibit 21.6.  And so again, what type of document is this?

A.    This is a transmittal of a wire.

Q.    Does it indicate on the first page top how much the wire was for?

A.    Yes, it does.

Q.    How much does it say?

A.    $71,950.

Q.    Going to the second page of the document, does it indicate the date of the transaction?

A.    It indicates November 4th, 2014.

Q.    And who is the ordering customer?

A.    Zarya Construction.

Q.    So the ordering person is the entity that requests the transfer of funds?

A.    Right.

Q.    Yes?

A.    Yes.

84

Q.    And where is the bank from which the money originated?

A.    Kurdistan International Bank.

Q.    And where is that located?

A.    It's hard to -- it's not -- I can't see the screen.  It's blurry.  Thank you.  It's coming from Iraq.

Q.    And just below that, is it going to an account in P.N.C. bank?

A.    Yes, it is.

Q.    Below that does it indicate what customer of P.N.C. bank is receiving the funds?

A.    Yes, it's Roggio Consulting Company.

Q.    Going on to 21.7.  On the first page -- well, identify it. What type of document is this?

A.    It's a wire transmittal.

Q.    And the date of the -- this particular wire?

A.    November 14th, 2014.

Q.    And the amount?

A.    $71,950.

Q.    And on the second page, I believe it's similar information.  Go ahead and tell the jury the relevant portions.

A.    Okay.  It's coming from Zarya Construction in Iraq, and it is -- the customer that that's benefitting is Roggio Consulting company in P.N.C. bank.

Q.    What bank in Iraq was it originated?

A.    It's Kurdistan International Bank.

85

Q.    Where was that bank located?

A.    In Iraq.

Q.    Government's Exhibit 21.8.  Is this another international transfer record?

A.    Yes, it is.

Q.    So the date of this particular transaction?

A.    November 18th, 2014.

Q.    And the amount of the transaction?

A.    $10,126.32.

Q.    Going to the second page, the ordering customer?

A.    Zarya Construction.

Q.    The bank from where the funds originated?

A.    Kurdistan International Bank.

Q.    Transferring into P.N.C. bank?

A.    Yes, transferring to P.N.C.

Q.    What customer?

A.    Roggio Consulting Company.

Q.    By the way, these transfer of funds, they would have been available at the local branch in which the customer had his or her account.  Is that correct?

A.    Yes.

Q.    And does the local bank have a computer that's connected to, like, the network of P.N.C.?

A.    Yes.

Q.    And would there have been electronic communications saying

that these things occurred?

A.   Yes.

Q.   Okay.  Going on to Government's Exhibit 21.9.  So starting out with -- give us a date on this particular transaction.

A.   November 20th, 2014.

Q.   I was having a hard time figuring it out.  It's actually year, slash, month, slash, day?

A.   Yes.

Q.   And how much for this particular transaction?

A.   $4,960.

Q.   Let's go onto the next one, 21.10.  Again, is this a document showing a transfer of funds?

A.   Yes.

Q.   How much was this particular transaction for?

A.   For $73,477.90.

Q.   The transaction date?

A.   November 28th, 2014.

Q.   And on the second page, who was the ordering customer or the person or entity who requested the transfer of funds?

A.   Zarya Construction.

Q.   And what bank from which the funds originated?

A.   Kurdistan International Bank.

Q.   And did it go to P.N.C.?

A.   Yes.

Q.   Who got that?

A.   Roggio Consulting Company.

Q.   21.11.  This is a monthly statement, right?

A.   Yes.

Q.   For what month is it?

A.   This is for November 29th, 2014 to December 31st, 2014.

Q.   And what customer?

A.   Roggio Consulting Company, L. L. C.

Q.   On this particular document on the fourth page, other deduction section, are there transfers that occurred during this monthly period?

A.   Yes.

Q.   What were they?

A.   There were federal wire out, international wires, also withdrawals.

Q.   Okay.  And so the fed wire out the date is 12/15.  That means December 15th?

A.   Yes.

Q.   How much was that for?

A.   $396,837.27.

Q.   And was there also an international wire out that same day?

A.   Yes.

Q.   And how much was that for?

A.   10,000.

Q.   Going on to Government's Exhibit 21.12, and what type of

88

document is this?

A.    This is a bank statement.

Q.    Same customer?

A.    Yes.

Q.    Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    On the second page, are there any international wire deposits?

A.    Yes.

Q.    Would you indicate the date and the amount?

A.    On January 16th, there was one for $59,829.  Also on January 16, one for $341,850.

Q.    Below that A. T. M. miscellaneous check card transactions, are there any transactions that occurred outside the United States?

A.    Yes.

Q.    Pick a couple if you will.

A.    Okay.  There was -- on January 5th, there was an A. T. M. withdrawal in Iraq for $875.66.  There was one for January 20th A. T. M. withdrawal in Iraq for $881.06.  There was -- on January 21st, there was a withdrawal from -- in Istanbul for $85.62, January 26, Iraq, $882.61 A. T. M. withdrawal.

Q.    The next page of this document, other deductions, are there any international wire outs, in other words, wires from this account internationally going to somewhere else?

A.    Yes.

Q.    Were there any on January 23rd?

A.    Yes.

Q.    And how much was that?

A.    $62,226.

Q.    How about on January 28th?

A.    Yes, there was one.

Q.    Moving on to Government's Exhibit 21.13, is this a document showing international transfer of funds?

A.    Yes.

Q.    For how much?

A.    $59,829.

Q.    What was the date?

A.    The date is January 16, 2015.

Q.    On the second page, more information from who it was sent and what bank?

A.    Zarya Construction.  It came from the Kurdistan International Bank in Iraq, and the beneficiary in P.N.C. was Roggio Consulting Company.

Q.    Government's Exhibit 21.14.  Is this a document showing international transfer of funds to Roggio Construction Company, L. L. C.?

A.    Yes.

Q.    And how much was the transfer for?

A.    It was for $341,850.

Q.   And what was the send date?

A.   January 16th, 2015.

Q.   Second page, is there information in regards to this specifics about this particular transfer?

A.   Yes.

Q.   Go ahead.

A.   Zarya Construction.  It's coming from Kurdistan International Bank and going into Roggio Consulting Company in P.N.C.

Q.   Government Exhibit 21.15, is this another international transfer document?

A.   Yes.

Q.   By the way, each of those transfers that occurred, money going into and out of this account?

A.   Yes.

Q.   The date of this particular transfer?

A.   January 27th, 2015.

Q.   Amount?

A.   $62,156.

Q.   Second page, it appears a little different.  So could you tell us what this document tells about this particular transaction?

A.   Okay.  So this is -- the originator is Abu Dhabi Commercial Bank.  That's where it's coming from.

Q.   Did this eventually get to P.N.C. bank?

A.    Yes.

Q.    So I'm interested in knowing a little bit -- it appears like these funds go to different institutions and work their way to your bank.  Is that how that international transfer works?

A.    Yes, for some banks it does.

Q.    Going on to Government's Exhibit 21.16, is this a monthly statement for Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    And for what date?

A.    January 31st, 2015 to February 27th, 2015.

Q.    On the second page under other additions, does it reflect any transfers in a Roggio Consulting Company, L. L. C. banking account?

A.    Yes.

Q.    What was the date and for how much?

A.    On February 3rd, there was one for $1,329,608.65, and the second one was February 25th for $84,950.

Q.    Under the A. T. M. check card transactions and without getting in a -- you know, into the reading each and every one, are there transactions that occurred internationally with A. T. M.s during this timeframe?

A.    Yes.

Q.    China?

A.    Yes.

92

Q.    Hong Kong?

A.    Yes.

Q.    Shanghai?

A.    Yes.

Q.    Beijing?

A.    Yes.

Q.    On the next page of this document other deductions -- I should say let's go to the top first.  There's additional A. T. M. check card transactions, is there not?

A.    Yes.

Q.    And it appears there were transactions that occurred in Iraq.  Is that correct?

A.    Yes.

Q.    Down then to the other deductions, are there both domestic and international wires going out of the account during this time period?

A.    Yes.

Q.    On February 6th, was there a transaction?

A.    Yes.

Q.    How much?

A.    It was for an international wire for $111,600.

Q.    Moving on to 21.17, this is the detail of an international transfer of funds.  Is that correct?

A.    Yes.

Q.    For Roggio Consulting Company, L. L. C., for the P.N.C.

93

bank account set up in the Middle District of Pennsylvania?

A.    Yes.

Q.    And how much is this particular transaction?

A.    This is for $1,329,608.65.

Q.    That was reflected in the monthly statement we just went through, right?

A.    Yes.

Q.    The second page does it indicate specifics about that transaction?

A.    It's coming from Zarya Construction, and it's coming from the Kurdistan International Bank.

Q.    And to whom was it going?

A.    Beneficiary Roggio Consulting Company.

Q.    Government's Exhibit 21.18.  Is this another document showing an international transfer of funds into Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    Tell us how much and on what date.

A.    It was for $84,950, and it was for February 25th, 2015.

Q.    On the second page does it indicate more specifics about that transaction?

A.    Yes.

Q.    What does it indicate?

A.    Zarya Construction.  It came from the Kurdistan International Bank, and it was going into Roggio Consulting

94

Company in P.N.C. account.

Q.   Going on to Government's Exhibit 21.19, what is this?

A.   This is a bank statement.

Q.   Is it a bank statement for Roggio Consulting Company?

A.   Yes.

Q.   For what date?

A.   February 28th, 2015 to March 31st, 2015.

Q.   On the second page other additions, are there any international wires noted for this date period?

A.   Yes.

Q.   Go ahead, and let us know what those are.

A.   March 17th there was one for $8,854.40 international wire. On 25th, there is one for $68,850 international wire, and March 30th there was $24,321.56.  That's a fed wire.

Q.   So that would be a domestic wire?

A.   Yes.

Q.   And the next page, in the A. T. M. miscellaneous check card transactions --

A.   Okay.

Q.   -- are there A. T. M. withdrawals reflected in this particular month or period?

A.   A. T. M.s, yes.

Q.   And on March 2nd was there a withdrawal from Scottsdale, Arizona?

A.   Yes.

95

Q.    And on March 9th appears few withdrawals from the New York area.  Is that correct?

A.    Yes.

Q.    And on the 30th of March it appears there were withdrawals from Athens?

A.    Yes.

Q.    That would be Greece.  Is that correct?

A.    Yes.

Q.    Down below other deductions.  Are there international wires going out?

A.    Yes.

Q.    That continues on the next page.  Is that correct?

A.    Yes.

Q.    Government's Exhibit 21.20.  Is this a document showing international transfer of funds?

A.    Yes.

Q.    And how much is the amount of this particular transaction?

A.    It's for $8,854.40.

Q.    And what was the date of the transaction?

A.    March 17th, 2015.

Q.    On the second page does it indicate more specifics about from whom the money came -- where it came from?

A.    Zarya Construction.  It came from the Kurdistan International Bank, and it went into Roggio Consulting Company's account.

96

Q.    Government's Exhibit 21.21.  Is this another document showing an international transfer of funds into Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    How much was the transaction for?

A.    $68,850.

Q.    Date it occurred?

A.    March 25th, 2015.

Q.    And the second page, does it have indication of the more specifics about this particular transaction?

A.    Yes.

Q.    What does it say?

A.    It says Zarya Construction.  It has it coming from the Kurdistan International Bank, and it was deposited into Roggio Consulting Company.

Q.    And in regards to the Zarya Construction, I know maybe it is difficult to pronounce, but could you give the address as it is noted in this statement?

A.    Zarya Q. R., Sulaymaniyah City, Iraq.

Q.    Thank you.  Government's Exhibit 21.22.  Is this another international transfer of funds?

A.    Yes.

Q.    Is it into Roggio Consulting Company, L. L. C. bank account at P.N.C. bank?

A.    Yes.

97

Q.    So what was the amount on this particular date?

A.    $24,321.56.

Q.    What was the date?

A.    March 30th, 2015.

Q.    And on the second page is there information in regards to where the money was coming from?

A.    Yes, this is coming from H. S. B. C. Bank Hong Kong.

Q.    Government's Exhibit 21.23.  Is this another monthly statement?

A.    Yes, it is.

Q.    What's the date range?

A.    It's period of April 1st, 2015 to April 30th, 2015.

Q.    And on the second page, are there addition -- are there any international wires noted there?

A.    Yes.

Q.    And what date and for how much?

A.    April 22nd for $88,347.

Q.    Is there also a fed wire?

A.    Yes.

Q.    And when did that occur?

A.    That was on April 14th.

Q.    How much was that for?

A.    $24,321.56.

Q.    Under the A. T. M. miscellaneous check card transactions are there A. T. M. withdrawals that occurred during this

98

timeframe?

A.    Yes.

Q.    And go through quick and announce the city or country which the A. T. M. occurred?

A.    There were some Athens, some from Iraq, Istanbul.

Q.    Next page, on the other deductions part, does this particular statement reflect any international wires going out of this account?

A.    Yes.

Q.    A number of them?

A.    Yes.

Q.    It appears there is also some domestic wire going out?

A.    Yes.

Q.    Is that correct?

A.    Uh-huh.

Q.    Let me ask you this.  Withdrawal, is that just money being taken out of the account?

A.    Yes, uh-huh.

Q.    How much was the withdrawals in this particular timeframe?

A.    Okay.  There was withdrawal for 2,500, also a withdrawal for 14,873.03.  There's another withdrawal for 40,000 and another withdrawal for 18,000 and another one for 8,000.

Q.    So I will rely on your math.  That's more than $60,000 withdrawn from the account that month?

A.    Uh-huh, yes.

99

Q.    Government's Exhibit 21.24.  Does this reflect another international transfer of funds?

A.    Yes.

Q.    How much?

A.    $24,331.56.

Q.    What date?

A.    April 14th, 2015.

Q.    Would this be funds coming into the account?  Is that right?

A.    Yes.

Q.    On the second page does it have indication where the funds were coming from?

A.    It's coming from H. S. B. C. Bank Hong Kong and Shanghai Banking Corp.

Q.    Government's Exhibit 21.25.  Is this another international transfer of funds into Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    How much was this particular transaction?

A.    88,347.

Q.    What was the date?

A.    April 22nd, 2015.

Q.    And the second page does it indicate who asked for the transfer or where it came from and where it went?

A.    Yes.

Q.    Go ahead and tell the jury.

100

A.    It's Zarya Construction.  It came from the Kurdistan International Bank, and it went into Roggio Consulting Company.

Q.    Again, the Kurdistan international bank is in Erbil, Iraq?

A.    Yes.

Q.    Government's Exhibit 21.26.  Is this a monthly statement for Roggio Consulting Company, L. L. C. bank account?

A.    Yes.

Q.    For what time period?

A.    This is for May 1st, 2015 to May 29th, 2015.

Q.    On the second page, other additions, does it indicate any international wires into this account?

A.    Yes.

Q.    And what days and how much?

A.    May 7th for 640,000 and May 14th for $344,070.

Q.    A. T. M. miscellaneous check card transactions if you look at that part, are there any A. T. M. withdrawals for this particular month?

A.    Yes.

Q.    And where are they occurring if you would?

A.    There's some in Istanbul and Athens.

Q.    And next page of the document other deductions, which is the bottom part, are there any domestic or international wires going out of the account?

A.    Yes.

Q.    On May 4th, are there any international wires going out?

A.    Yes.

Q.    What are they?  Just give us the amounts?

A.    One was for $30,701.06 and one was for $6,300.

Q.    Next page other deductions, does the list continue?

A.    Yes.

Q.    Are there international wires out?

A.    Yes.

Q.    What's the highest value amount?

A.    $15,837.

Q.    When did that occur?

A.    That occurred on May 18th.

Q.    Government's Exhibit 21.28.  What is this document?

A.    It's an international transfer.

Q.    How much was the international transfer of funds for?

A.    $344,070.

Q.    What date did this occur?

A.    May 14th, 2015.

Q.    And on the second page does it indicate more specifics about this transfer?

A.    Yes.

Q.    Who -- who transferred?

A.    Zarya Construction.

Q.    What address?

A.    Sulaymaniyah City, Iraq.

Q.    And did it come to the P.N.C. bank?

102

A.   Yes.

Q.   To what customer?

A.   To Roggio Consulting Company.

Q.   21.29.   Is this another monthly statement for Roggio Consulting Company, L. L. C. bank account?

A.   Yes.

Q.   For what time period?

A.   From May 30th, 2015 to June 30th, 2015.

Q.   On the second page, other additions, are there any international wires coming into the account?

A.   Yes.

Q.   What was the date of that?

A.   June 4th for --

Q.   How much?

A.   $89,950.

Q.   Are there any A. T. M. transactions that occurred during this timeframe?

A.   Yes.

Q.   Some local ones?

A.   Yes.

Q.   Why don't you go through on 6/8 was there an A. T. M. withdrawal?

A.   Yes.

Q.   From where?

A.   Mount Airy Casino.

103

Q.    How much?

A.    $1,003.10.

Q.    Were there any withdrawals that occurred overseas or international?

A.    Yes.

Q.    What are those?

A.    There was one in Istanbul and two in Iraq.

Q.    On the next page, are there any other deductions including any domestic or international wires going out of this account?

A.    Yes.

Q.    Are there any just cash withdrawals?

A.    Yes.

Q.    Was there a cash withdrawal June 1st?

A.    There was.

Q.    How much was that for?

A.    $65,794.54.

Q.    How about on June 4th?

A.    Yes.

Q.    How much was that?

A.    5,000.

Q.    Next page, other deductions, are there any additional cash withdrawals from this account?

A.    Yes.

Q.    Is there one on June 10th?

A.    Yes.

Q.    How much?

A.    For 105,000.

Q.    How about June 12th?

A.    Yes.

Q.    How much was that?

A.    930,000.

Q.    Government's Exhibit 21.30, which I am sure you will appreciate is the last one we're going over -- does this reflect an international transfer of funds?

A.    Yes.

Q.    How much?

A.    For $89,950.

Q.    What was the date?

A.    June 4th, 2015.

Q.    And on the next page does it give specifics about who requested the transfer?

A.    Yes.

Q.    Who did that?

A.    Zarya Construction.

Q.    What was the address of Zarya Construction?

A.    Sulaymaniyah City, Iraq.

Q.    What bank did they use?

A.    Kurdistan International Bank.

Q.    Did it come from the P.N.C. bank account?

A.    Yes.

Q.    Whose account?

A.    Roggio Consulting Company.

Q.    So you have reviewed all these documents and others in preparation for today, right?

A.    Yes.

Q.    Did there come a time when P.N.C. bank terminated its relationship with Mr. Roggio and Roggio Consulting Company, L. L. C.?

A.    Yes.

Q.    Was that his decision or the bank's decision?

A.    The bank's decision.

MR. HINKLEY:  No further questions, Your Honor. Thank you.

MR. BARTOLAI:  May I have a moment, Judge?

THE COURT:  Sure.

MR. BARTOLAI:  Good afternoon.  I just have a few questions.  I will try to be fast.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    I have a bank account, and I have seen statements -- not like that, but I have seen statements.  I want to ask you -- so okay -- you talked at the end -- here you mentioned that the bank and Mr. Roggio parted ways.  Is that right?

A.    Yes.

Q.    If I can have statement Government's Exhibit 21.29, it

indicates that there was a withdrawal of $930,000.  Is that right?  Do you recall testifying to that?

A.    Yes.

Q.    All right.  That would have been -- would that have been a cashier's check or a check?

A.    I don't know how it was handled because it doesn't indicate from the statement.

Q.    It doesn't indicate.  When you were -- when you were getting ready to testify, did you find out -- did you inquire as to how this withdrawal came out?

A.    No.

Q.    When someone closes -- if the bank were to close Mr. Roggio's account, would they give him the money that's in the account?

A.    Yes.

Q.    How would they do that typically?

A.    Usually by a cashier's check.

Q.    Do these records reflect cashier's checks?

A.    I can't honestly say.

Q.    All right.  Now, so let me -- I want to ask you a little bit about -- you know, I know if you start walking around with ten -- isn't 10,000 important in the banking industry?

A.    Yes.

Q.    That figure cash, right?

A.    Uh-huh.

Q.    At $10,000 the bank reports that to the I. R. S.?

A.    Yes.

Q.    Now, if I withdrew $930,000, would they report that to the I. R. S.

A.    Yes.

Q.    Anything over 10,000, they would report, right?

A.    Yes.

Q.    If I came in one day and withdrew 8,000 and maybe the next day withdrew three, they might even report that, too, right?

A.    Yes.

Q.    That would be structuring a transaction to avoid the reporting of 10,000, right?

A.    Yes.

Q.    So there are -- and that's laws that are enacted by in the banking industry, right?

A.    Yes.

Q.    And aren't there also other laws about suspicious transactions?

A.    Yes.

Q.    That doesn't really necessarily have a monetary figure, but it has -- it's, like, up to the teller or up to the personnel at the bank to identify transactions that could be suspicious.  Is that right?

A.    Yes.

Q.    And these the type of large transactions, would they --

and international wires especially to places like Iraq, would that draw suspicion if you know I am saying in your experience?

A.    In my experience, yes.

Q.    Okay.  All right.  What is the process of -- what is the process of if someone were to -- I'm going to say if an item was returned, how would it -- if somebody tried to send out a wire for payment of something and for whatever reason there was a return on the item or the -- or the money was returned, would it show on the records typically?  How does that work?

A.    If a wire is being sent out and rejected, yes, it does come back.

Q.    It would come back.  Do you know if any of these -- I want to draw your attention to number -- Government's Exhibit 21.24 if I can.  And I believe there's an international wire in this particular document, this exhibit.  Is that right?

A.    Yes.

Q.    And that would be for $24,321.56?

A.    Yes.

Q.    Is there a way to tell whether or not this particular item was returned, or does it indicate from looking -- your looking at this record whether or not that was returned or could have been returned?

A.    If we can make it bigger, okay.  It does say return of your fed.

Q.    So in other words, this money was returned apparently?

109

A.   Yes.

Q.   Into the bank, okay.  All right.  And again, were there -- do your records -- were you aware of that when you testified?

A.   That part, no, I did not see that.

Q.   So that's money that had gone out but had come back -- is that it -- or had come in but went back?

A.   It's saying the reason for it.  It says does not match.

Q.   Thank you.

THE COURT:  Anything further, Mr. Bartolai?

MR. HINKLEY:  Just a few follow up.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. HINKLEY:

Q.   Ms. Foster, on cross examination Mr. Bartolai asked you about suspicious transactions.  And the bank keeps track of those, right?

A.   Yes.

Q.   You indicated in this case that the bank actually terminated its relationship with this fellow.  Is that correct?

A.   Yes.

MR. HINKLEY:  No further questions.

THE COURT:  Mr. Bartolai?

MR. BARTOLAI:  Nothing.

THE COURT:  Thank you very much.  You may step down.

Any objection to this witness being excused?

110

MR. HINKLEY:  No objection, Your Honor.

MR. BARTOLAI:  No objection.  Thank you.

MR. HINKLEY:  Your Honor, may we have a 15-minute break?

THE COURT:  Sure.  15 minutes.

(A brief recess was taken.)

THE COURT:  Ready to proceed?

MR. CLAFFE:  We are, Your Honor.  The government calls Alex Douville.

ALEX DOUVILLE, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

ON QUALIFICATIONS

BY MR. CLAFFEE:

Q.   Good afternoon, Mr. Douville.

A.   Good afternoon.

Q.   Make sure you speak into the microphone.

A.   Sure.

Q.   Please tell the jury where you currently work.

A.   I work at the Director of Defense Trade Controls in the State Department, U.S. State Department.

Q.   How long have you worked at the state department?

A.   I've worked there for going on a little over 12 years.

Q.   What is your current title?

A.   I am a division chief for the space and missile and sensor

teams as well as the small arms of light weapons team.

Q.    How long have you been in the role of division chief?

A.    Full-time about two years, and I was acting for a couple years before that, so four years total.

Q.    What are your responsibilities as division chief?

A.    It's my job to ensure that the cases that we receive for exports for defense articles are adjudicated to ensure they are consistent with U.S. national security and foreign policy, and I run the day-to-day operations of my team.  I have two teams about five to eight people each of who process the cases, and I do the final adjudication of their cases.

Q.    What is a case?

A.    Oh, a case is whenever a -- I work with direct commercial sales of exports of defense articles.  And whenever an applicant or someone who is in the business of selling arms overseas gets a purchase order, they need to submit a license to export hardware and defense services or tech data.  So I supervise, and we review those cases.

Q.    What does the small arms and training do?

A.    The small arms and light weapons team --

Q.    Sorry.

A.    That's fine.  The United States munitions list is divided up into categories, 21 categories.  My team controls the small arms and light weapons categories.  Those are categories one, two and three.  We also do nine and 14.

112

Q.    How about the other division, space and missile --

A.    Yes, space and missile covers -- as you would believe, the category four is for missiles, category 15 is space.

Q.    What did you do before you became a division chief?

A.    I was a licensing officer on the space and missile team.

Q.    What does a licensing officer do?

A.    A licensing officer gets assigned cases -- export license cases that they need to review.  I review them for regulatory and administrative review to make sure that they have submitted all the correct paperwork.  Then I make sure that the application is filled out correctly and selecting the right categories.

Then I staff the case out to reviewers to review the case for national security and foreign policy concerns.  And then when those staffing positions submit their final positions, then I review those positions and do a final adjudication of the case and either issue it as an approval, approval with conditions or a R. W. A., which is return without action or a denial.

Q.    So how many of these types of reviews you have done yourself?

A.    Thousands.

Q.    In your role as division chief, you supervise others that perform reviews?

A.    Yes.

Q.    How many reviews have you supervised in that capacity?

A.    Last year and the year previously, my small arms and light weapons team did about 10,000 cases each year.

Q.    What's your educational background?

A.    I have a master's degree in American history and a bachelor's in European history.

Q.    Are you familiar with generally with how the state department controls certain items for export?

A.    Yes.

Q.    And if items are controlled for export, what are those items called?

A.    Defense articles.

Q.    Can you describe the general organization of the export regulations?

A.    Yeah, Congress passed the Arms Export Control Act, and that is the law that delegated or that authorized the presidents to control the export of and temporary import of defense articles.  Now, the law -- that's the law, but the regulations that -- the regulations that we use to implement the law is called International Traffic and Arms Regulations, the I.T.A.R.  Within the I.T.A.R. it's divided into nine chapters.  One of those chapters is the United States munitions list, a listing of all defense articles that what the U.S. government considers a defense article to be controlled, and it also talks about registration and how to submit licenses and

114

policies and procedures.

Q.    So what's a defense article?

A.    A defense article is a thing that is on the United States munitions list that is especially designed for a military purpose.

Q.    How is the United States munitions list categorized or organized?

A.    It's divided up into 21 categories.  Each one is -- has a separate commodities they are called -- so categories one would be small arms, category two is larger weapons, like, above 50 caliber machine guns, category three is ammunition, four is missiles and so on.

Q.    Does your day-to-day work involve referencing the United States munitions list?

A.    Every day.

Q.    I believe you also talked a little bit about the licensing process.  Are you familiar with the licensing process at D. D. T. C.?

A.    Yes.

Q.    How did you come to be familiar with that process?

A.    By, like, going through training and processing and being on -- and being a licensing analyst on a commodity team.

Q.    Have you testified before as an expert on defense articles United States munitions list and the state department licensing process for exports?

A.    Yes.

MR. CLAFFEE:  Your Honor, the government offers Alex Douville as an expert on defense articles, the U.S.M.L., United States Munitions List, and the state department licensing process.

MR. BARTOLAI:  He's accepted.

THE COURT:  The witness is received as you have offered him as an expert as you described him.

MR. CLAFFEE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. CLAFFEE:

Q.    Are you familiar with a firearm known as an M. 4 rifle or M. 4 carbine?

A.    Yes.

Q.    Can you describe that weapon, please?

A.    An M. 4 fully automatic firearm is a military assault rifle that is used by our armed forces.

Q.    Is an M. 4 rifle a defense article?

A.    Yes.

Q.    Was it listed on the United States Munitions List in 2016?

A.    Yes.

Q.    Under what category?

A.    Category 1 B, and 1 B. is automatic firearms up to and including 50 caliber.

Q.    I would like to show you an exhibit that has been

116

previously been admitted.  It's Government's Exhibit 9.5.  Did you read the column that says description and what item they are listed under that?

A.    Yes, the first one is M. 4 bolt gas ring.  The second is firing pin retainer, and the third is -- just says expedite shipping.

Q.    So just focusing on the first two, are you familiar with those two items?

A.    Yes.

Q.    What's an M. 4 bolt gas ring mil?

A.    A gas ring is a part and component of an M. 4 rifle.  It helps regulate the flow of gas into the bolt carrier group.

Q.    What's a firing pin retainer?

A.    Firing pin retainer is a part and component of an M. 4 that basically helps retain or helps keep the firing pin within the bolt carrier group as well.

Q.    So let's take these one by one starting with the gas rings.  Do you know if M. 4 bolt gas rings were contained on the United States Munitions List in 2016?

A.    Yes.

Q.    How do you know?

A.    Because they were found under category 1 H., which is parts and components of weapons contained under 1 B., which is a fully automatic.

Q.    How about firing pin retainers?  Were they controlled on

the United States Munitions List in 2016?

A.    Yes.

Q.    How do you know that?

A.    Because they are contained under category 1 H., which is also the same as parts and components of articles under 1 B.

Q.    Why were these two items controlled on the United States Munitions List?

A.    They are controlled because they are inherently specially designed for a defense article.  That's why they are on the United States Munitions List.

Q.    Have you formed an opinion as to whether the items in Government's Exhibit 9.5, the gas rings and the firing pin retainers, required a license to export to Iraq in 2016?

A.    Yes.

Q.    What's that opinion?

A.    That they would require a license to be exported from the country.

Q.    If an item is on the United States Munitions List, what does a person need to do in order to be able to export that item to a foreign country?

A.    First of all, a person or a company that's in the business of manufacturing and/or exporting defense articles need to be registered with the state department, with our office, department of -- director of defense trade controls.  They register.  They will come in.  There's a fee structure with

118

that.  And once they are registered, then they are eligible to be able to submit licenses to export defense articles.

Q.   Just because they are registered, are they automatically entitled to a license?

A.   No.

Q.   What would they need to show for a license?

A.   Once they are registered, then they are able to submit licenses through an online portal, D.E.C.C.S.  They will be able to submit their licenses through there.  It comes to us so we can review it.  Each license for export needs to have a purchase order, needs to have an end use statement from a foreign party, and it needs to contain all of the parties involved with the transaction, freight orders, intermediaries, sources, manufacturers, and the license itself needs to have the country of ultimate destination.  It needs to have a quantity, needs to have the commodity description, and it needs to have a value.

Q.   Those requests for licenses through the D.E.C.C.S. system come through your office?

A.   Yes.

Q.   In 2016 if you had received an application for a license to ship M. 4 bolt gas rings or firing pin retainers to Iraq, would you approve that request for license?

A.   Each case is reviewed on a case-by-case basis.  First it would need to go through regulatory and administrative to

review to make sure they had all the paperwork.  If they didn't have the paperwork, it would be sent back and they can resubmit.  If we had -- if they had all the correct paperwork and then we'd staff it out to the defense department and other staffing points for -- to review it for national security and foreign policy concerns.  For Iraq, Iraq is a 126.1 country which is section 126.1 of the International Traffic and Arms Regulations.  That chapter, 126.1, is a listing of countries where we have restrictions for what can be exported to those countries.

Q.    Is that also known as a policy of denial?

A.    It can be.

Q.    Can you explain what that means?

A.    Yeah, well, it's for -- there's different levels of countries on the 126.1 list.  126 D. 1 are countries that we have a policy of denial.  Those are for China, for Iran and Belarus and countries like that.  D. 2 countries are other countries which have -- are not as restricted but we have a -- generally a policy of denial unless they meet certain carve-outs for each country.

Q.    Does the state department maintain records of all persons or entities who have registered with D. D. T. C. to be able to be able to export defense articles?

A.    Yes.

Q.    Does the state department maintain records of all licenses

120

it has issued for exporting defense articles?

A.    Yes.

Q.    Have you checked to see if the defendant Ross Roggio has ever registered with D. D. T. C.?

A.    Yes.

Q.    Has he?

A.    No, he has not.

Q.    Did you also check a company by the name of Roggio Consulting?

A.    Yes.

Q.    And what was the result of that check?

A.    No company by that name has been registered with us.

Q.    Have you also checked to see if the defendant Ross Roggio has ever been issued an export license by D. D. T. C.?

A.    Yes.

Q.    What was the result of that check?

A.    We have no record of any export licenses for that individual.

Q.    How about for Roggio Consulting?

A.    No.

Q.    So the defendant has never registered with the state department or been issued any licenses by the state department?

A.    No.

Q.    I would like to show you what's been previously marked as Government's Exhibit 19.3.  You have a binder three-ring binder

121

I will bring you.

A.    Yes.

Q.    Flip to the tab that says 19.3.  Look at that and read it to yourself a little bit.  Look up when you're ready to proceed.  Do you recognize this document?

A.    Yes.

Q.    Generally what is it?

A.    It's a licensing registration check we received that we sent to Homeland Security.

Q.    And who is this memo from?

A.    It is from Anthony Dearth.

Q.    Do you know Anthony Dearth?

A.    Yes.

Q.    How are you familiar with Anthony Dearth?

A.    He used to be the -- well, the licensing director of D. D. T. C. of licensing, and he was also a division chief.  And I was under him when he was division chief.

Q.    Are you familiar with how Mr. Dearth would have created one of these memorandum?

A.    Yes.

Q.    And are these memos maintained in the state department's files as records of regularly conducted activity?

        MR. CLAFFEE:  Your Honor, we move to admit Government's Exhibit 19.3.

        MR. BARTOLAI:  No objection.

122

THE COURT:  Government's Exhibit 19.3 is admitted.

MR. CLAFFEE:  May we publish?

THE COURT:  Yes.

BY MR. CLAFFEE:

Q.    I will direct to direct your attention to the second paragraph of this memo.  What does this paragraph say generally?  You don't need to read the whole thing.

A.    This paragraph basically says that we did a search in our systems for a Ross William Roggio Consulting and Ross Gotham Brogan.

Q.    The next page, the first full paragraph, what does that generally say?

A.    That we also did a search for a Roggio Consulting Corporation in our systems.

Q.    Is the license and registration history check in this exhibit consistent with the checks you performed yourself?

A.    Yes.

Q.    You testified earlier that an M. 4 rifle was a defense article in 2016.  Are you also familiar with what a defense service is?

A.    Yes.

Q.    What is a defense service?

A.    A defense service is when a person or a company furnishes assistance to a foreign party in the design, development, production, manufacture, operation, use, integration of a

defense article.

Q.   In your opinion, would assisting or training a foreign person in the manufacture of an M. 4 rifle be a defense service?

A.   Yes.

Q.   What about assisting or training in the production of an M. 4 rifle?

A.   Yes.

Q.   Or assisting or training in the assembly of an M. 4 rifle?

A.   Yes.

Q.   Assisting in the testing of an M. 4?

A.   Yes.

Q.   What, if anything, is required from D. D. T. C. before a U.S. person can provide a defense service?

A.   It's similar to what -- the other licenses we receive.  We need to receive a -- it's called a technical assistance agreement.  It's a larger license which includes -- could include hardware, and it's for larger programs where we need -- where there needs to be an exchange and a back and forth of assistance and tech data and defense services in the making or distributing or sale of a defense article.

     It's different than a regular hardware license because that's just a straight up company -- country A. is buying a gun from somebody and they're just shipping it to them.  This one is when they need to have a back and forth and we need to

124

provide assistance in order to do whatever they are trying to do.

Q.    Okay.  Would your license check that you performed on the defendant have turned up any of these technical assistance agreements or written approvals from D. D. C. T. to provide defense services?

A.    Yes.

Q.    Did any of those show up?

A.    No.

Q.    So the defendant did not have any registration, license or approval from D. D. T. C. to provide any defense services either?

A.    No.

Q.    I would like to show you what's been previously marked as Government's Exhibit 19.5 if you want to just flip two more in the binder.  Do you recognize this exhibit?

A.    Yes.

Q.    Generally what is it?

A.    It's a letter to Homeland Security talking about the classification of certain articles and whether they fall on the U.S. --

Q.    Who sent this letter?

A.    This is from a Rick Koelling.

Q.    I think you said he goes by Rick?

A.    Yes.

125

Q.    Do you know Rick Koelling?

A.    Yes, I do.

Q.    Who is he?

A.    He is the deputy director for the Office of Defense Trade Controls and Policy.

Q.    Are you familiar with how Mr. Koelling would come to create a letter like this?

A.    Yes.

Q.    And are letters like these made in the regular course of business of the D. D. T. C.?

A.    Yes.

Q.    And are they maintained in D. D. T. C.'s files of regularly conducted business activity?

A.    Yes, they are.

          MR. CLAFFEE:  Your Honor, I move to admit Government's Exhibit 19.5.

          MR. BARTOLAI:  No objection.

          THE COURT:  19.5 is admitted.  You can publish.

BY MR. CLAFFEE:

Q.    Thank you.  So I would like to direct your attention to just the second page of this exhibit.  In the middle of the first there's a first full paragraph.  Read the sentence that starts for the period of.

A.    Okay.  For the period of January 1st, 2015 through March 20th, 2018, D. T. C. P. has determined that there is no doubt

the M. 4 fully automatic firearm and the furnishing of assistance including training to a foreign person in the manufacture, production, assembly, testing, operation or use of an M. 4 firearm were and are described in U.S.M.L. category 1 B. and 1 I. respectively.

Q.   You can stop there.  Then looking at the second paragraph starting with additionally, will you please read the first sentence of that paragraph.

A.   Additionally for the period of January 1st, 2015 through March 20th, 2018, D. T. C. P. has determined that there is no doubt that the M. 4 bolt gas rings M. I. L. and M. 4 firing pin retainers were described in U.S.M.L. category 1 H.

Q.   Are the conclusions contained in this letter consistent with your independent expert opinion that you offered the jury earlier?

A.   Yes.

MR. CLAFFEE:  No further questions, Your Honor.

THE COURT:  Cross-examine.

MR. BARTOLAI:  Yes, may I have a moment?

THE COURT:  Sure.

MR. BARTOLAI:  Good afternoon.

THE WITNESS:  Good afternoon.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.   Can I have Government's Exhibit 19.5, please?  I think --

127

the next page, please.  I'm pointing out for the period of January 1st, 2015.  You read this to the jury, right?

A.    Yes.

Q.    You stopped I think it was around after it said respectively about six lines down or five lines down?

A.    Yeah.

Q.    Read on.  What does that mean?

A.    What's it mean, or what does it say?

Q.    Consequently -- read that to the jury.

A.    Sure.  Consequently, a commodity jurisdiction determination as described in I.T.A.R. 120.4 is not required.

Q.    What's not required?

A.    A commodity or jurisdiction determination.

Q.    What is that?

A.    That's when there is doubt as to if a manufacturer or an he exporter has doubt as to something as on the U.S.M.L., United States Munitions List, and they can submit a commodity jurisdiction request to our commodity jurisdiction team.

Q.    So, okay.  I understand.  If it's doubtful they can submit that request.  Is that what that's about?

A.    Yeah.

Q.    If there's dual purposes, is that a reason to be doubtful for an item, dual purposes?

A.    No.

Q.    No.  Like, for instance, the difference between a firing

128

pin retainer and cotter pin, is that just semantics?

A.    And a what?

Q.    Cotter pin.

A.    I don't know what a cotter pin is.

Q.    Okay.  All right.  How about can I have -- there's a photo of some -- let me get that.

MR. BARTOLAI:  May I have a moment, Your Honor?

THE COURT:  Yes, of course.

MR. BARTOLAI:  Can I have 10.3, please?  So do you know what these are when you look at Government's Exhibit 10.3?

THE WITNESS:  Yes.

BY MR. BARTOLAI:

Q.    What are they?

A.    Those look like firing pin retainers.

Q.    Do you know if they are mil spec from looking at them?

A.    They are on the United States Munitions List.

Q.    How about was there a difference between mil spec and what's on the United States Munitions List?

A.    There could be, yes.

Q.    There could be, okay.  What does mil spec mean?

A.    Mil spec means it's something that was designed or it's -- what it means if something is designed and it's up to certain specifications that the military requires.

Q.    In other words, it could look like this and it can be made out of some sort of base metal that wouldn't cut it for

129

military purposes, right?

A.    I guess, yes.

Q.    Okay.  Good.  How about Government's Exhibit 10.2?  Can you tell us what they are?

A.    Yeah, those are the gas bolt rings.

Q.    Do you know whether or not they are mil spec?

A.    No.

Q.    And I think -- and I know you -- can I have 19.3 for a moment, please?  Government's Exhibit 19.3.  And I think this is a multi-page document.  Would you go to the next page?  Stop right there.  Thank you.  And we have -- you recall testifying to that, correct?

A.    Yes.

Q.    It says history check -- a license and registration history check for Roggio Consulting Company, right --

A.    Yes.

Q.    And also the next one would be Roggio Arsenal, right?

A.    Yes.

Q.    And the next paragraph, Kristy Lynn Roggio, correct?

A.    Yes.

Q.    That would be the next paragraph, second line.

A.    Yes.

Q.    And the next paragraph, Amanda Mecomber?

A.    Yes.

Q.    The very first one was Ross Roggio, correct?

130

A.    Yes.

Q.    And the government asked you -- or the case agents in this case submitted those names and asked you to run the check on those names?

A.    Yes.

Q.    Is that how that works?  All right.  You said -- you talked a little bit about the munitions list.  What are defense articles was the question, and I believe it was your answer, things that are on the munitions list, right.  And I think you -- you went a little bit farther.  Things that are specifically designed for military purposes?

A.    Yes.

Q.    So an AR-15 versus an M. 4, is that a defense article?

A.    What kind of AR-15?

Q.    Colt AR-15, like, a Colt type -- I guess -- well, I have to get specific I guess, right.  Like a Colt A. 4, AR-15?

A.    A fully automatic one, no.  A semiautomatic Colt firearm or a Colt AR-15 is not.

Q.    Is not.  In other words, so it has to be fully automatic to be on the munitions list?

A.    Currently, yeah.

Q.    Now, these parts you, know, these firing pin retainers, they are interchangeable with AR-15s, right?

A.    They could be, yes.

Q.    As well as the gas ring containers, they can be

131

interchangeable with AR-15s?

A.    Yes, they could be.

Q.    It's the same platform, correct?

A.    Same platform?  It's different platforms, same part.

Q.    Thank you.

        MR. BARTOLAI:  Nothing further.

        THE COURT:  Redirect?

        MR. CLAFFEE:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. CLAFFEE:

Q.    I believe in response to one of counsel's last questions he asked you if a semiautomatic AR-15 was on the United States Munitions List, and I believe you said currently not.  Is that right?

A.    Yes.

Q.    What about in 2016?

A.    It was on the -- it was considered a defense article in 2015.

Q.    And 2016?

A.    2016 as well.

        MR. CLAFFEE:  Thank you.  No further questions.

        MR. BARTOLAI:  Your Honor, I'm sorry.  I had another question that I forgot to ask, and I think it's --

        MR. CLAFFEE:  Is it within the scope of direct?

        MR. BARTOLAI:  It is.

RECROSS EXAMINATION

BY MR. BARTOLAI:

Q.   When you talk about things on the munitions list and the regulations, would you agree with me that aside from a license, other approval can be done on a case-by-case basis?

A.   Sometimes, yes.

Q.   For instance, non-lethal military equipment, correct?

A.   To who?

Q.   To Iraq or these countries on the D. 2 list.

A.   If it's -- are you saying they wouldn't require a license?

Q.   No, they can other approval though.

A.   I'm sorry.  I am confused by your --

Q.   In other words, if there's a policy against shipping items to Iraq, there can be a license or other approval can be issued on a case-by-case basis for that type of services and those type of items, defense articles?

A.   For Iraq -- the carve-outs for exports to Iraq are for -- we'd only accept licenses for non-lethal stuff or stuff that was approved by the national government of Iraq.

Q.   Or lethal military equipment required by the government of Iraq or coalition forces, correct?

A.   Yes.

Q.   So that would be an exception?

A.   No.  You would still require a license, but we'd be able to approve it if it was for those end use purposes.

133

Q.    For the government of Iraq or for the coalition forces?

A.    Yes.

MR. BARTOLAI:  Nothing further.  Thank you.

MR. CLAFFEE:  Quick clarifying question, Your Honor.

REDIRECT EXAMINATION

BY MR. CLAFFEE:

Q.    Even if one were to seek a license through this other approval exceptions that counsel just referred to, would one still have to be registered with D. D. T. C.?

A.    Yes.

MR. CLAFFEE:  That's it.

RECROSS EXAMINATION

BY MR. BARTOLAI:

Q.    Are there any circumstances where the other approval wouldn't be in your indices of who has a license and who does not?

A.    No.

Q.    No.  Very good.  Thank you.

THE COURT:  Thank you, sir.  You can step down.

MR. CLAFFEE:  May the witness be excused?

THE COURT:  Any objection to him being excused?

MR. BARTOLAI:  No objection.

THE COURT:  The witness is excused.  Call your next witness.

MR. JASPERSE:  Government calls Aurelia Morales.

134

AURELIA MORALES, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JASPERSE:

Q.   Good afternoon, Ms. Morales.  Tell the jury where you went to college.

A.   I went to college in New York, John Jay Criminal Justice College.

Q.   Did you get your bachelor's degree?

A.   Yes.

Q.   What was your degree in?

A.   In international criminal justice.

Q.   About a year was that?

A.   2007.

Q.   How are you employed?

A.   Working as a supervisory officer with the United States Customs and Boarder Protection.

Q.   How long have you worked for the United States Customs and Boarder Protection?

A.   I work for 15 years.

Q.   Where are you currently stationed?

A.   I'm currently stationed in Montreal Pre-clearance in Canada.

Q.   What clearance?

A.   Montreal.

135

Q.    Okay.  How long have you been stationed in Montreal?

A.    I've been in Montreal four years.

Q.    Why does U.S. Customs and Boarder Protection have employees in Montreal?

A.    United States Customs and Boarder Protection pre-clears passengers destined to the United States ahead of time.  When they get to the United States, they don't have to see U.S. customs.

Q.    Formally travelers entering the United States from abroad are screened by C. B. P. upon arrival at the U. S. airport but there are certain airports where travelers get screened in the foreign airport first.  Is that right?

A.    Yes.

Q.    And there are airports like that besides Montreal?  Are there other airports in Canada and other countries where that occurs?

A.    Yes, 15 locations worldwide, so there's one in Abu Dhabi, two in Ireland, Dublin and Shannon.  There's one in Bahamas, one in Arbua.  The rest of them are all in Canada, Vancouver, Toronto, Ottawa, Edmonton, Halifax, Montreal and a few more.

Q.    Where were you stationed in February 2017?

A.    I was stationed at J. F. K. International Airport in New York City.

Q.    What was your position at that time?

A.    I was an officer with the U.S. Customs and Boarder

Protection.

Q.    When a person who is flying into the United States from an international airport and not one like Montreal where the screening takes place at the departure airport, what is their first encounter with C. B. P. going to be?

A.    So after they get off the plane, they go to a primary officer and present their passports.  And the primary officer processes them, clears them, and after they go to baggage to collect baggage.  Then they just leave the area.

Q.    Are some passengers referred for a secondary inspection?

A.    Yes.

Q.    What typically happens during a secondary inspection?

A.    So during the secondary inspection, the primary officer usually brings the passenger into a secondary area for a further review of the documents and their belongings and the stuff they brought from abroad.

Q.    Do you have experience conducting secondary inspections?

A.    Yes.

Q.    How many have you done in your career?

A.    Thousands.

Q.    What is the purpose of a secondary inspection?

A.    The secondary inspection provides more in depth look at the passenger that traveled to the United States in terms of their passport validity, admissibility issues or the belongings, their goods they are bringing in to determine if

137

they going to be a threat to the national security or if there's suspected criminality.

Q.    When you conduct a secondary inspection, do you write a report?

A.    Yes.

Q.    Is that standard procedure?

A.    Yes.

Q.    Do you try to write accurate reports?

A.    Yes.

Q.    How soon after the secondary interview do you write the report?

A.    Same day or the next day.

Q.    Did you conduct a secondary inspection of Ross Roggio when he returned from Iraq to J. F. K. airport February 27, 2017?

A.    Yes.

Q.    Did you write a report that documents your interview of Mr. Roggio on that date?

A.    Yes.

Q.    Did you review your report in preparation for your testimony today?

A.    Yes.

Q.    That interview was six years ago.  You conducted thousands of secondary inspections during that time.  Would you remember this particular interview without the benefit of your report?

A.    Not in detail.

Q.   During that secondary inspection, did Mr. Roggio say how long he had been working in Iraq?

A.   Yes.

Q.   Do you recall what he said?

A.   I believe three or four years.

Q.   Do you recall him saying where in Iraq he had been working?

A.   Yes, in the Sulaymaniyah area of Kurdistan.

Q.   Did he say what he had been doing there?

A.   He said that he has a construction company, Roggio Consulting, and he was overseeing a project of high rise buildings in Sulaymaniyah.

Q.   Constructing high rise buildings?

A.   Yes.

Q.   Did he say how much his money -- did he say how much money his company had been paid for that project?

A.   Yes, $9 million.

Q.   At the end of your interview with Ross Roggio did the agent of homeland security investigations James Mundy take possession of Mr. Roggio's phones, laptop and other electronics?

A.   Yes.

Q.   Did you have any involvement in that?

A.   I don't recall unless I put it on my report.

Q.   Okay.  Would it refresh your memory to look at your

report?

A.    Yes.

Q.    There should be a three ring binder.  12.1?

A.    Yes, I got it.

Q.    If you just want to take a moment to glance at that to see if it refreshes your memory and whether you had any involvement in the taking possession of Mr. Roggio's electronic devices.

A.    Yes, yes.

Q.    Having had a chance to refresh your memory, what is your answer?  Did you have any involvement in the taking possession of Mr. Roggio's electronic devices?

A.    Yes.

Q.    After your interview and after the devices were taken, was Mr. Roggio allowed to proceed and enter the United States?

A.    Yes.

        MR. JASPERSE:  No further questions, Your Honor.

        MR. BARTOLAI:  Your Honor, may we approach?

        THE COURT:  Sure.

        (The following discussion took place at sidebar:)

        MR. BARTOLAI:  So I have the report of -- that she's referring to in front of me, Your Honor.  And she was questioned about how much money -- the money that was given by Roggio, and she answered it was $9 million.  That's what he said.  In fact, when we looked at this report, it says that he was given -- they claimed they had given him $12 million and

that as a result that he was being kidnapped and somewhat extorted by that. We submit, Your Honor -- I know the Court ruled earlier. But I believe the government by virtue of their getting into his employment and the amount of money that was brought up opened the door or created misleading testimony or should permit me to inquire to the circumstances regarding his money and the kidnapping and subsequently torture.

MR. JASPERSE: Your Honor, actually the report does say that he was paid -- he said he was paid $9 million for the project, which is exactly what she testified to.

THE COURT: Where is the other reference you're making, Mr. Bartolai?

MR. BARTOLAI: It's kind of tight here. The words are --

THE COURT: Can you help me out here? Thank you.

MR. BARTOLAI: It's more than midway. It says, subject stated Zarya claimed they paid him $12 million instead of nine. So there's, you know, an issue with respect to the amount of money, Your Honor.

THE COURT: I don't think her statement is incorrect based upon what's here. I understand that there's additional information offered by Mr. Roggio, but it ties into what I believe to be the very hearsay I discussed earlier today. And as a result absent Mr. Roggio testifying about this himself, I don't think I can allow it in because again, under rule 801 D.

141

1 that's the only exception to the hearsay rule other than admission against a party opponent. This is clear this particularly thing would not be an admission. To the contrary it would be something you want to use to defend him and is hearsay absent his testimony. So that's my ruling.

(The discussion at sidebar concluded.)

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Do you have your report with you?

A.   Yes.

Q.   Take a quick look at it. We want to be straight with the date. Was it February 27th or February 26th that he actually came into the country?

A.   February 26th.

Q.   February 26th, okay. And so you met him as a result of a secondary inspection. Is that right?

A.   Yes, so he was referred from primary.

Q.   And you spoke with him. Now, did you -- when you -- people come through customs, you look at their paperwork, their documents. Is that what you said?

A.   Yes.

Q.   In fact, you looked at his documents in this case?

A.   Yes.

142

Q.   And do you recall him having a temporary passport?

A.   Yes.

Q.   Okay.  And can you recall why he had a temporary passport?

A.   I believe that it's in my report.

Q.   If it would help you, please take a look.

A.   Yes.

Q.   Do you remember?

A.   I don't remember unless I read.

Q.   Would you see if you can find out?  Look at your report, please.  I'm sorry.

A.   Subject stated that the --

          MR. JASPERSE:  Your Honor, unless counsel can establish that the witness knows the reason why he had a temporary passport independent of what the defendant told her, it's subject to the same ruling the Court just made.

          THE COURT:  That's correct.

          MR. BARTOLAI:  All right.

BY MR. BARTOLAI:

Q.   So I'm going to ask you some -- try to be tight with my questions, all right.  Mr. Roggio did show up for secondary inspection with a temporary passport, right?

A.   Yes.

Q.   And did he also have with him a copy of his original passport?

A.   Yes.

Q.    Okay.  And but that was a copy of it, right?

A.    Yes.

Q.    And is it common for temporary passports to be issued if a traveler loses or their passport is stolen?

A.    Yes.

Q.    That's what you had here, right?

A.    Yes.

Q.    And was that suspicion to you at the time?

A.    Yes.

Q.    All right.  And the fact that -- okay.  And did you -- without -- without saying what Mr. Roggio said, did you -- did you inquire with him about that?

A.    Yes.

Q.    All right.  And did he give you an answer?

A.    Yes.

Q.    All right.  Okay.  All right.

        MR. BARTOLAI:  Thank you.

        THE COURT:  Redirect?

        MR. JASPERSE:  Your Honor, no further questions.  We will ask for the witness to be excused.

        THE COURT:  Thank you, ma'am.  You can step down.  Any objection to Ms. Morales being excused?

        MR. BARTOLAI:  No, Your Honor.

        THE COURT:  The witness is excused.

        MR. JASPERSE:  Would it be possible to have another

break, Your Honor, or --

THE COURT:  Sure.  It's now quarter to four.  Let's keep it to 4:00 if you can.  Call your next witness.

MR. HINKLEY:  The government calls James Mundy.

JAMES MUNDY, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.   Mr. Mundy, how are you employed?

A.   I'm employed as a special agent with the Department of Homeland Security Homeland Security Investigations.

Q.   How long have you been employed with that agency?

A.   This is coming August will be 16 years.

Q.   And prior to your employment as a special agent with H. S. I., were you in law enforcement, or were you in some other field?

A.   No, I was.  I was a police officer in N. Y. P. D. and New York Police Department.

Q.   What type of educational background do you have?

A.   I have a bachelor's degree in criminal justice.

Q.   Where did you receive that from?

A.   Down the road, Kings College.

Q.   Down in Wilkes-Barre?

A.   That's right.

Q.   Have you received any specialized training or education as

145

a law enforcement officer?

A.    I have for my current position I spent six months at the federal law enforcement training center in Glenco, Georgia where I learned -- I went to the criminal investigator training program as long as -- in addition to some training specific to my agency.

Q.    And in your career as a special agent with Homeland Security Investigations, what type of crimes have you investigated?

A.    The bulk of the crimes I've investigated have been smuggling of narcotics, money violations, any sort of cross boarder investigation.

Q.    And during your career with Homeland Security Investigations, where have you been, what locations?

A.    I worked in Newark, New Jersey for seven years.  And then as of March 2014 I was assigned to the J. F. K. field office at J. F. K. airport, and I'm currently assigned as an investigate liaison with Customs and Boarder Protection with their aviation division.

Q.    And as -- in your position as special agent, what's your day-to-day things?  Basically what do you do day to day?

A.    Currently or when I was at J. F. K?

Q.    Start out currently.

A.    Currently I am assigned to the C. V. P. air unit as a liaison agent between the investigators and the pilots.  I

146

coordinate missions on behalf of the agents and handle evidence, fly on missions we support and a couple other tasks.

Q.    When you fly on a mission, what's that like, what are you doing?

A.    I'm operating the sensor equipment on the aircraft.  We have two helicopters, and they have some camera equipment on board, and we assist the agents on the ground with their surveillance.

Q.    So you're in support of agents on the ground?

A.    That's correct.

Q.    What kind of support would you offer them?

A.    Aerial support visually from -- eye in the sky.

Q.    You indicated earlier that you were assigned to J. F. K. at some point in your career?

A.    That's correct.

Q.    What was the timeframe again?

A.    March of 2014 until about September 2020.

Q.    And during that timeframe, what type of duties did you have?

A.    I was assigned predominantly to a group that was involved with the narcotics couriers that come in through Kennedy and the furtherance of investigations once they arrived and they were intercepted by Customs and Boarder Protection.

Q.    And so I think J. F. K. means something?

A.    J. F. K. what?

147

Q.    J. F. K. means something in a particular location?

A.    John F. Kennedy airport, yes.

Q.    And what city is that located?

A.    It's in Jamaica, Queens, New York.

Q.    So we have asked you to come here to testify in this case United States of America versus Ross Roggio.  And did you take any part in this investigation if you recall?

A.    I did.

Q.    Generally speaking what part?  We will get into more specifics in a moment.

A.    If you are assigned to the J. F. K. office no matter what sort of group you are involved in, narcotics or financial group or a general group, you're ultimately going to be the duty agent for the whole office.  That's a 24-hour period that comes up about every two months, and your job is essentially do any task that things that come from outside offices you are the liaison -- you are there to complete their request, as you know, Kennedy has -- J. F. K. has about 1,200 flights per day. There's a lot of activity, and the J. F. K. gets a lot of request for assistance.

Q.    What type of requests are typical?

A.    Typical are sometimes there are arrest warrants that are outstanding, federal arrest warrants and someone -- an agent from another region will give us a call and say they'll have a target coming in and if we can coordinate the arrest of that

148

person.  Boarder searches are another aspect of what we do.

Q.   Is it unusual to a get a request from other agent?

A.   Quite common.

Q.   You indicated boarder search?

A.   That's right.

Q.   What does that mean?

A.   Well, when you land -- when you cross an international boarder, whether it be a physical boundary, let's say the southern boarder or functional equivalent, port of entry such as J. F. K. International Airport, you have no reasonable expectation of privacy on your persons or your devices until you're admitted into the country.  You're subject to search.

Q.   On February 26th of 2017 or thereabouts, around that date did you receive a request by the name of special agent Jeff Burke in regards to an investigation he was conducting?

A.   I did.

Q.   And would that be related to an individual by the name of Ross Roggio?

A.   It was.

Q.   Do you recall what the request was?

A.   It was -- the request was similar to all of our boarder search requests, which were that Mr. Burke had a target arriving on an international flight who was subject of an investigation and he was arriving into Kennedy, and he asked that the Customs and Boarder Protection officers perform an

149

inspection of that person and that their devices are detained, transferred to myself and I would in turn transfer them to agent Burke.

Q.    So I notice you used the word detained.  Is that different from seizure?

A.    It is.

Q.    Explain that for us.

A.    Well, the detention is, you know, temporary in the sense that it allows the agents the ability to examine in this instance the electronic device and ascertain or determine if it is to seizure.

Q.    Seizure, is something that would happen, say, for a federal search warrant?

A.    It would.

Q.    I take it from your testimony that's not what you did in this particular instance?

A.    That's correct.

Q.    You were there to detain electronics if Mr. Ross Roggio had any on him when he entered the country?

A.    That's correct.

Q.    And did you do so?

A.    Yes.

Q.    Do you prepare paperwork in connection to property that's detained in your job?

A.    Yes, for something like this we would -- we would complete

150

a standard form C. V. P. 6051, which is a chain of custody form where I would list the items that were being detained and, you know, illustrate the date and time that they were detained and the transfer of that custody, in this instance Mr. Burke.

Q.   There's a three ring binder I up there near you.

A.   Yeah.

Q.   Would you look at Government's Exhibit 13.1 and let me know when you get to that?

A.   I got it here.

Q.   Do you recognize this document?

A.   I do.

Q.   What is this document?

A.   That is that D. H. S. form 6051 I just spoke of.

        MR. HINKLEY:  The government moves for admission of Government's Exhibit 13.1.

        THE COURT:  Mr. Bartolai?

        MR. BARTOLAI:  No objection.

        THE COURT:  13.1 is admitted.

        MR. HINKLEY:  Permission to publish?

        THE COURT:  Granted.

BY MR. HINKLEY:

Q.   What is this form?

A.   It's called a 6051.  It is a detention notice illustrating -- receipt we give to the individual we're detaining the devices from.

151

Q.    Beginning from the top left, would you just go through the form and explain to the jury -- let me ask you this.  Did you prepare this form?

A.    I did.

Q.    Why don't you just talk to the jury the information you entered into this form beginning on the top left?

A.    On the top left, so held for another agent was no, held for the same agency, the case number, which is a Philadelphia case number.

Q.    Would you have received that case number from special agent Burke?

A.    Yes.  J. F. K. port code is 4701, date it was detained 2/26/2017 at approximate time of 8 p.m. from Mr. Roggio.  And in the remarks column I put the password Mr. Roggio provided for his devices, and I put Mr. -- agent Burke's contact information in block 15 so that he could arrange for the return of these items from Mr. -- from agent Burke once the search was complete.

Q.    I take it a copy of this was given to whoever the person is that you're taking items from?

A.    Yes, that's the standard practice, yes.

Q.    And the reason for the detention of the property?

A.    Boarder search.  Below that in section 19, these were the devices that were found to -- to be in the possession of Mr. Roggio.

Q.    Which are?

A.    Which are Mac Book Pro iPad, two iPhones, and as you can see in box D. quantity is two and a San Disk flash drive.

Q.    Is there a signature below that?

A.    The signature is mine.

Q.    Was it dated?

A.    It was February 26, 2017.

Q.    Below that there's another section.  Is that correct?

A.    There's another -- I'm sorry.  Say again.

Q.    Below the next section down, what's that?

A.    This is agent Burke illustrating that he received those line items one through five, which are listed above.  He listed description as above, which he's just implying that he received was as above what I listed, his name, his signature and the date.

Q.    So that's basically him receiving the items that you indicated were detained from --

A.    That's correct.

Q.    -- from Mr. Roggio, correct?

A.    Yes, it looks like Mr. Burke in box three filled in that case number.

Q.    Oh, okay.  It looks like his handwriting?

A.    That's correct.

Q.    So there's a second page to this document.  Why don't we go through the second page if we could?  Starting at the top

third of the page.

A.    Okay.  This is the same detention notice 6051 held for the same agency, same case number, port code being the same, date and time being the same, the individual who we detained the items was Christina Sidiropoulou.

Q.    Do you recall why it is that an item or items may have been detained from that individual?

A.    I believe she was a travel partner of Mr. Roggio.

Q.    Very good.  Go ahead.

A.    The items below listed iPhone, I believe that's a five, seven and eight, one of each, my signature, date being February 26th, 2017 and below that agent Burke illustrating he received those items on February 28th, 2017.

Q.    Third page of the document just generally speaking -- I don't need to have you go through the whole --

A.    This is just a glossary of sorts explaining what each block means for the form we just went over.

Q.    So is it common practice for Homeland Security Investigations or C. P. B. to detain items that are coming into the country from travelers?

A.    Yes.

Q.    Does it happen very often?

A.    It does.

Q.    And if I am understanding your testimony after these items have been inspected by the authorities they are then returned

154

to the traveler?

A.    That's my understanding.

Q.    Okay.  I will ask you to look at Government's Exhibit 13.2.

A.    I have 13.2 here.

Q.    Do you recognize this document?

A.    I do.

Q.    And is it another detention notice and custody receipt for detained property?

A.    It is.  It is the same detention receipt that we just went over for Ms. Sidiropoulou just illustrating the acceptance or chain of custody by additional members of law enforcement and/or -- I'm not certain who the final --

          MR. HINKLEY:  We move for admittance of Government's Exhibit 13.2.

          MR. BARTOLAI:  No objection.

          THE COURT:  13.2 is admitted.

BY MR. HINKLEY:

Q.    It appears there's additional signatures.

A.    Yes.

Q.    From your experience do these type of chain of custody go along with the property that's been detained so that any law enforcement officer who comes into possession of those things would sign this type of document?

A.    That's correct.

Q.    So I notice that the items were detained on February 26th. Is that correct?

A.    Yes, it is.

Q.    And that if I am reading these documents correctly that they were turned over to special agent Burke on February 28th. Is that an unusual occurrence?

A.    No, it's standard practice would be to Fed Ex the items to the requesting agent in this case, agent Burke.

Q.    It may take time for the agent to arrive and pick those things up?

A.    Right.

Q.    Would these items be secured in a secure area?

A.    Yes.

        MR. HINKLEY:  No further questions, Your Honor.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    Good afternoon.  Mr. Hinkley talked about detained versus seized.  Do you recall?

A.    I do.

Q.    Yeah.  I think these were detained.  Is that right?

A.    That's correct.

Q.    On this night with Mr. Roggio came into J. F. K. from abroad with his traveling companion and went through customs and secondary inspection.  Ultimately it wound up that his electronic devices, his phones, the phones, their phones and

156

iPad other things were detained.  Is that right?

A.    That's correct.

Q.    And so he didn't -- he walked out of the airport.  He didn't have those with him, did he?

A.    Correct.

Q.    Is it -- what happens, is it -- is there a system where, like, if someone had theater tickets on the phone or tickets to the ball game, what would they do and the phone is detained?  Is there a copy of the phone they can make for these people so they can go to the game or things like that, or are they just --

A.    You know, they'd have to make their own arrangements to get those items.

Q.    Do you know if they make -- isn't there a procedure where you can make a copy of the memory device and let them leave with their device?

A.    I'm not aware of that.

        MR. BARTOLAI:  All right.  Nothing further.

        THE COURT:  Any redirect?

        MR. HINKLEY:  No, Your Honor.  Thank you.

        THE COURT:  Thank you, sir.  You can step down.

        THE WITNESS:  Thank you.

        MR. HINKLEY:  May the witness be released, Your Honor?

        THE COURT:  Any objection to --

157

MR. BARTOLAI:  No.

THE COURT:  Very well.  Witness is released.  Do you have another witness?

MR. HINKLEY:  We do, Your Honor.  However, they are coming from out of the area and they just won't be here in the morning and available to testify.

THE COURT:  It's about 4:30, members of the jury. You're going to get an early quit today for that reason.  We will see you tomorrow morning and resume testimony in this case.  Once again I will remind you, keep an open mind until you heard all of the evidence and not discuss the case among yourselves or with anyone else nor read about anything about this case should there be any -- this article or media coverage or reference.  With that, once again thank you very much for your attention.  Anything before we adjourn?

MR. HINKLEY:  No.

MR. BARTOLAI:  Your Honor, I will bring it up if we are using the Court's time efficiently and things.  I know there's McBride -- I don't know if he's going to be called tomorrow as a witness or --

MR. CLAFFE:  Not tomorrow.

MR. BARTOLAI:  Okay.  Very good, Your Honor.  Thank you.

THE COURT:  See you tomorrow morning.

158

REPORTER'S CERTIFICATE


     I, Laura Boyanowski, RMR, CRR, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.



                              s/ Laura Boyanowski, RMR,CRR
                              Laura Boyanowski, RMR, CRR
                              Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    235 N. Washington Avenue
    Scranton, PA  18503

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

## $

**$1,003.10** [1] - 103:2
**$1,329,608.65** [2] - 91:17, 93:4
**$10,000** [2] - 7:11, 107:1
**$10,126.32** [2] - 82:16, 85:9
**$11** [1] - 70:13
**$111,600** [1] - 92:21
**$12** [2] - 139:25, 140:17
**$15,837** [1] - 101:9
**$24,321.56** [4] - 94:14, 97:2, 97:23, 108:17
**$24,331.56** [1] - 99:5
**$30,701.06** [1] - 101:3
**$341,850** [2] - 88:12, 89:25
**$344,070** [2] - 100:14, 101:15
**$35** [1] - 51:16
**$396,837.27** [1] - 87:19
**$4,487.80** [2] - 21:18, 24:12
**$4,960** [2] - 82:17, 86:10
**$439.79** [1] - 77:13
**$59,829** [2] - 88:11, 89:12
**$6,300** [1] - 101:3
**$60,000** [1] - 98:23
**$62,156** [1] - 90:19
**$62,226** [1] - 89:5
**$647,550** [2] - 77:7, 79:15
**$65,794.54** [1] - 103:16
**$68,850** [2] - 94:13, 96:6
**$71,950** [4] - 82:14, 82:15, 83:15, 84:18
**$73,477.90** [2] - 82:18, 86:15
**$8,854.40** [2] - 94:12, 95:18
**$84,950** [2] - 91:18, 93:19
**$85.62** [1] - 88:22
**$875.66** [1] - 88:19
**$88,347** [1] - 97:17
**$881.06** [1] - 88:20
**$882.61** [1] - 88:22
**$89,950** [2] - 102:15, 104:12
**$930,000** [2] - 106:1, 107:3

## 1

**1** [15] - 3:20, 4:3, 27:15, 59:4, 115:23, 116:22, 116:23, 117:4, 117:5, 119:15, 126:4, 126:5, 126:12, 141:1
**1,200** [1] - 147:18
**1,500** [2] - 18:15, 19:3
**10,000** [6] - 19:3, 87:24, 106:22, 107:6, 107:12, 113:3
**10.1** [5] - 66:10, 66:11, 66:23, 66:25, 70:7
**10.2** [5] - 63:2, 63:3, 63:12, 63:14, 129:3
**10.3** [5] - 63:19, 64:3, 64:5, 128:9, 128:10
**10.4** [3] - 68:1, 68:18, 68:20
**10/31/2014** [1] - 80:24
**100** [1] - 76:19
**104** [1] - 53:17
**105** [1] - 2:6
**105,000** [1] - 104:2
**109** [1] - 2:6
**10th** [1] - 103:24
**11** [1] - 1:11
**11/20** [1] - 82:19
**110** [1] - 2:7
**116** [3] - 23:2, 24:17, 76:9
**11:14** [1] - 53:16
**11th** [2] - 24:8, 24:10
**12** [1] - 110:23
**12.1** [1] - 139:3
**12/15** [1] - 87:15
**120.4** [1] - 127:11
**126** [1] - 119:15
**126.1** [4] - 119:6, 119:7, 119:8, 119:15
**127** [1] - 2:7
**12:00** [1] - 68:8
**12:10** [1] - 72:19
**12:44** [1] - 53:14
**12th** [1] - 104:3
**13.1** [3] - 150:7, 150:15, 150:18
**13.2** [4] - 154:4, 154:5, 154:15, 154:17
**1301** [1] - 1:21
**131** [1] - 2:7
**134** [1] - 2:8
**14** [1] - 111:25
**14,873.03** [1] - 98:21
**141** [1] - 2:8
**143** [2] - 25:19, 25:25
**144** [1] - 2:9

**14th** [6] - 82:14, 84:16, 97:21, 99:7, 100:14, 101:17
**15** [7] - 21:3, 57:22, 110:5, 112:3, 134:20, 135:17, 151:16
**15,000** [10] - 14:3, 19:5, 20:18, 26:17, 37:24, 39:2, 40:9, 42:4, 62:10, 67:14
**15-minute** [1] - 110:3
**155** [1] - 2:9
**15s** [1] - 7:22
**15th** [1] - 87:16
**16** [5] - 27:12, 27:17, 88:12, 89:14, 144:13
**16th** [5] - 52:18, 55:12, 56:23, 88:11, 90:2
**171** [2] - 56:10, 56:19
**17th** [2] - 94:12, 95:20
**18** [1] - 82:15
**18,000** [1] - 98:22
**18360** [1] - 25:20
**18501-2830** [1] - 1:16
**18503** [1] - 158:19
**18640** [1] - 1:25
**18th** [2] - 85:7, 101:11
**19** [8] - 47:16, 47:18, 48:3, 48:20, 50:1, 50:3, 50:16, 151:23
**19-25** [1] - 52:14
**19.3** [6] - 120:25, 121:3, 121:24, 122:1, 129:8, 129:9
**19.5** [4] - 124:15, 125:16, 125:18, 126:25
**19th** [1] - 55:24
**1:10** [1] - 72:19
**1st** [7] - 80:24, 97:12, 100:9, 103:13, 125:24, 126:9, 127:2

## 2

**2** [4] - 3:19, 78:24, 119:17, 132:9
**2,500** [1] - 98:20
**2/26/2017** [1] - 151:13
**20** [12] - 8:14, 9:18, 9:19, 16:11, 16:19, 49:7, 49:12, 54:15, 55:4, 55:6, 55:9, 55:11
**2007** [1] - 134:14
**2010** [3] - 7:5, 7:6, 29:7
**2011** [12] - 7:15, 10:10, 11:7, 29:19, 30:4,

30:12, 35:7, 35:21, 36:19, 37:10, 47:11, 56:22
**2014** [17] - 7:5, 51:24, 52:19, 53:16, 55:12, 56:23, 61:22, 80:24, 83:18, 84:16, 85:7, 86:5, 86:17, 87:5, 145:16, 146:17
**2015** [25] - 89:14, 90:2, 90:17, 91:11, 93:19, 94:7, 95:20, 96:8, 97:4, 97:12, 99:7, 99:21, 100:9, 101:17, 102:8, 104:14, 125:24, 126:9, 127:2, 131:18
**2016** [15] - 13:20, 16:24, 26:22, 37:12, 47:11, 52:18, 115:20, 116:19, 117:1, 117:13, 118:21, 122:19, 131:16, 131:19, 131:20
**2017** [8] - 7:6, 29:7, 135:21, 137:14, 148:13, 152:7, 153:12, 153:13
**2018** [2] - 125:25, 126:10
**2020** [1] - 146:17
**2023** [1] - 1:11
**20530** [2] - 1:19, 1:22
**20th** [5] - 82:16, 86:5, 88:19, 125:25, 126:10
**21** [3] - 53:9, 111:23, 114:8
**21.1** [3] - 74:11, 75:5, 75:8
**21.10** [1] - 86:11
**21.11** [1] - 87:2
**21.12** [1] - 87:25
**21.13** [1] - 89:8
**21.14** [1] - 89:20
**21.15** [1] - 90:10
**21.16** [1] - 91:7
**21.17** [1] - 92:22
**21.18** [1] - 93:14
**21.19** [1] - 94:2
**21.2** [5] - 74:21, 74:25, 75:16, 75:19, 76:1
**21.20** [1] - 95:14
**21.21** [1] - 96:1
**21.22** [1] - 96:20
**21.23** [1] - 97:8
**21.24** [2] - 99:1, 108:13
**21.25** [1] - 99:15

**21.26** [1] - 100:5
**21.28** [1] - 101:12
**21.29** [2] - 102:4, 105:25
**21.3** [2] - 78:1, 80:9
**21.30** [6] - 74:21, 74:23, 74:25, 75:5, 75:8, 104:7
**21.4** [2] - 80:21
**21.5** [2] - 81:16, 82:1
**21.6** [1] - 83:8
**21.7** [1] - 84:12
**21.8** [1] - 85:3
**21.9** [1] - 86:3
**21st** [12] - 6:7, 6:8, 6:15, 6:25, 27:11, 51:15, 65:24, 66:14, 67:6, 67:9, 68:23, 88:21
**223** [1] - 71:5
**22nd** [2] - 97:17, 99:21
**235** [1] - 158:19
**238** [1] - 1:24
**23rd** [1] - 89:2
**24** [1] - 10:13
**24-hour** [1] - 147:14
**25** [1] - 53:16
**25th** [5] - 55:24, 91:18, 93:19, 94:13, 96:8
**26** [2] - 88:22, 152:7
**26th** [6] - 141:14, 141:16, 141:17, 148:13, 153:12, 155:1
**27** [2] - 73:7, 137:14
**27th** [3] - 90:17, 91:11, 141:14
**28** [3] - 2:4, 73:5, 158:5
**28th** [6] - 82:17, 86:17, 89:6, 94:7, 153:13, 155:5
**29th** [2] - 87:5, 100:9
**2nd** [1] - 94:23

## 3

**3,200** [11] - 14:3, 18:15, 18:16, 18:17, 18:18, 19:6, 20:18, 62:10, 67:14
**30** [2] - 58:19, 67:16
**300** [1] - 71:6
**30th** [8] - 77:13, 81:14, 94:14, 95:4, 97:4, 97:12, 102:8
**311** [1] - 1:16
**31st** [4] - 81:15, 87:5, 91:11, 94:7
**3:CR-18-97** [1] - 1:5

2

**3rd** [1] - 91:17

## 4

**4** [22] - 1:9, 115:12, 115:13, 115:16, 115:18, 116:4, 116:10, 116:11, 116:14, 116:18, 118:22, 122:18, 123:3, 123:7, 123:9, 123:11, 126:1, 126:4, 126:11, 130:13, 130:16
**4/20/2016** [1] - 67:8
**4/22/2016** [2] - 24:6, 68:8
**4/26/2016** [1] - 25:24
**40,000** [1] - 98:21
**4701** [1] - 151:12
**48** [1] - 10:13
**4:00** [1] - 144:3
**4:30** [1] - 157:7
**4:48** [1] - 52:18
**4th** [6] - 82:13, 83:18, 100:25, 102:13, 103:17, 104:14

## 5

**5** [5] - 2:4, 33:8, 33:12, 33:22, 52:19
**5,000** [6] - 26:20, 37:24, 39:3, 42:5, 81:14, 103:20
**5.56** [1] - 71:5
**50** [2] - 114:10, 115:24
**58** [1] - 2:5
**5th** [3] - 51:23, 51:24, 88:18

## 6

**6.8** [1] - 71:6
**6/8** [1] - 102:21
**6/8/2014** [1] - 53:13
**60** [1] - 21:10
**6051** [4] - 150:1, 150:13, 150:23, 153:2
**640,000** [1] - 100:14
**69** [1] - 2:5
**6th** [1] - 92:18

## 7

**7.5** [2] - 70:12, 70:13
**72** [1] - 2:6
**753** [1] - 158:6
**76239** [1] - 71:6

**7th** [2] - 81:13, 100:14

## 8

**8** [1] - 151:13
**8,000** [3] - 81:13, 98:22, 107:8
**801** [4] - 3:19, 3:20, 4:3, 140:25
**803** [1] - 4:6
**803.1** [1] - 5:2
**803.3** [2] - 4:14, 5:3
**88,347** [1] - 99:19

## 9

**9** [3] - 138:17, 139:23, 140:9
**9.13** [3] - 23:19, 24:1, 24:3
**9.2** [9] - 17:5, 17:7, 17:8, 17:20, 18:5, 65:4, 65:11, 69:16, 70:10
**9.4** [5] - 21:24, 22:11, 22:15, 43:18, 43:19
**9.5** [7] - 20:2, 20:10, 20:12, 24:15, 43:16, 116:1, 117:12
**9.6** [1] - 25:7
**9/26** [1] - 77:6
**9/30/2014** [1] - 76:12
**9/5/2014** [1] - 76:12
**911** [1] - 4:23
**930,000** [1] - 104:6
**950** [1] - 1:19
**9647733743378** [1] - 44:17
**97.65** [1] - 81:15
**9:02** [1] - 25:24
**9:57** [1] - 52:19
**9th** [1] - 95:1

## A

**a.m** [2] - 52:18, 52:19
**ability** [1] - 149:9
**able** [7] - 117:19, 118:2, 118:7, 118:9, 119:22, 119:23, 132:24
**above-mentioned** [1] - 158:8
**abroad** [3] - 135:9, 136:16, 155:23
**absent** [2] - 140:24, 141:5
**absolutely** [6] - 26:9, 26:13, 38:5, 45:18, 45:21, 69:7

**Abu** [2] - 90:23, 135:17
**accept** [2] - 39:20, 132:18
**acceptance** [1] - 154:11
**accepted** [1] - 115:6
**accessories** [2] - 27:13, 59:4
**accident** [1] - 10:14
**accordance** [1] - 41:15
**accordingly** [1] - 41:15
**account** [39] - 23:7, 23:9, 32:4, 75:24, 76:14, 76:15, 77:23, 78:10, 78:19, 78:24, 81:12, 81:14, 82:8, 84:6, 85:20, 88:25, 90:14, 91:14, 92:15, 93:1, 94:1, 95:25, 96:24, 98:8, 98:17, 98:24, 99:8, 100:6, 100:11, 100:23, 102:5, 102:10, 103:9, 103:22, 104:24, 105:1, 105:20, 106:13, 106:14
**accounting** [1] - 59:1
**accurate** [7] - 32:8, 35:2, 35:3, 54:5, 63:8, 63:24, 137:8
**acquired** [1] - 41:14
**acquiring** [2] - 14:9, 40:9
**Act** [2] - 64:16, 113:15
**acted** [1] - 7:3
**acting** [1] - 111:3
**action** [1] - 112:18
**actively** [1] - 30:4
**activities** [5] - 28:24, 29:1, 40:3, 41:21, 41:22
**activity** [10] - 35:16, 35:17, 76:23, 76:24, 77:3, 77:5, 83:4, 121:22, 125:13, 147:19
**actual** [1] - 25:15
**adamant** [1] - 31:16
**addition** [3] - 59:8, 97:13, 145:5
**additional** [5] - 92:8, 103:21, 140:21, 154:12, 154:19
**additionally** [2] - 126:7, 126:9
**additions** [7] - 76:14,

77:1, 82:4, 91:12, 94:8, 100:10, 102:9
**address** [13] - 23:7, 25:25, 44:6, 62:1, 62:5, 64:12, 65:14, 65:18, 76:6, 76:8, 96:17, 101:23, 104:20
**addressed** [1] - 4:19
**addresses** [1] - 45:13
**adjourn** [1] - 157:15
**adjournment** [1] - 32:17
**adjudicated** [1] - 111:7
**adjudication** [2] - 111:11, 112:16
**administration** [1] - 73:20
**administrative** [2] - 112:9, 118:25
**admissibility** [1] - 136:24
**admissible** [2] - 3:20, 4:13
**admission** [7] - 3:18, 14:18, 55:3, 75:5, 141:2, 141:3, 150:14
**admit** [12] - 17:19, 20:9, 22:10, 23:25, 31:10, 53:24, 63:11, 64:2, 66:22, 68:17, 121:23, 125:15
**admittance** [1] - 154:14
**admitted** [22] - 18:4, 18:5, 20:12, 22:15, 24:3, 25:6, 31:14, 43:19, 55:6, 63:14, 64:5, 65:3, 66:25, 68:20, 69:17, 75:9, 116:1, 122:1, 125:18, 148:12, 150:18, 154:17
**admitting** [1] - 17:25
**adopted** [6] - 31:19, 32:7, 34:6, 34:11, 34:21, 34:23
**advised** [1] - 41:19
**advisor** [2] - 73:15, 73:18
**aerial** [1] - 146:12
**afternoon** [10] - 69:14, 105:16, 110:15, 110:16, 126:21, 126:22, 134:5, 141:9, 141:10, 155:17
**agency** [4] - 144:12, 145:6, 151:8, 153:3

**agent** [22] - 32:1, 138:19, 144:10, 144:14, 145:7, 145:20, 145:25, 147:14, 147:23, 148:2, 148:14, 149:3, 151:7, 151:11, 151:15, 151:17, 152:11, 153:12, 155:5, 155:8, 155:9
**agent's** [1] - 32:4
**agents** [5] - 130:2, 146:1, 146:7, 146:9, 149:9
**aggression** [4] - 6:2, 44:22, 44:25, 45:3
**ago** [3] - 59:19, 69:17, 137:22
**agree** [4] - 40:14, 56:14, 71:12, 132:4
**agreement** [1] - 123:17
**agreements** [1] - 124:5
**ahead** [12] - 13:16, 14:20, 15:2, 27:23, 60:8, 82:11, 84:20, 90:6, 94:11, 99:25, 135:6, 153:9
**aid** [1] - 6:1
**air** [2] - 67:24, 145:24
**aircraft** [1] - 146:5
**airport** [10] - 3:10, 4:25, 135:10, 135:12, 136:3, 136:4, 137:14, 145:17, 147:2, 156:3
**Airport** [2] - 135:22, 148:10
**airports** [3] - 135:11, 135:14, 135:15
**Airy** [2] - 83:2, 102:25
**AK** [1] - 71:21
**AK-47** [2] - 71:11, 71:17
**AKM** [1] - 71:12
**Alex** [2] - 110:9, 115:2
**ALEX** [2] - 2:7, 110:10
**allow** [6] - 40:25, 42:25, 61:10, 61:11, 62:15, 140:25
**allowed** [1] - 139:14
**allows** [1] - 149:9
**almost** [1] - 60:16
**aloud** [1] - 33:15
**alter** [1] - 34:16
**altered** [1] - 54:4
**Amanda** [2] - 4:20, 129:23

3

**AMERICA** [1] - 1:3
**America** [2] - 45:9, 147:6
**American** [9] - 23:6, 23:7, 44:5, 44:14, 44:15, 113:5
**ammunition** [2] - 59:12, 114:11
**amount** [15] - 21:16, 24:12, 24:13, 24:14, 79:13, 82:11, 84:17, 85:8, 88:10, 90:18, 95:17, 97:1, 101:8, 140:4, 140:19
**amounts** [1] - 101:2
**analysis** [1] - 81:14
**analyst** [1] - 114:22
**ANDREW** [1] - 1:17
**announce** [1] - 98:3
**answer** [28] - 15:1, 15:6, 16:15, 28:4, 28:15, 39:4, 39:19, 40:1, 40:2, 40:6, 40:8, 40:15, 40:16, 40:17, 40:20, 41:2, 41:5, 42:2, 42:6, 42:10, 42:25, 43:9, 49:20, 54:10, 61:14, 130:8, 139:10, 143:14
**answered** [1] - 139:23
**Anthony** [3] - 121:11, 121:12, 121:14
**anticipated** [1] - 3:6
**apart** [1] - 15:16
**apologize** [1] - 4:18
**appear** [2] - 40:7, 42:1
**APPEARANCES** [1] - 1:12
**applicable** [1] - 76:11
**applicant** [1] - 111:15
**application** [2] - 112:11, 118:21
**applies** [1] - 4:23
**apply** [2] - 64:22, 158:21
**appointed** [1] - 158:5
**appreciate** [2] - 39:10, 104:8
**approach** [3] - 50:22, 50:25, 139:17
**approached** [1] - 11:17
**appropriate** [7] - 4:1, 14:25, 15:1, 28:7, 40:12, 41:17, 49:20
**approval** [9] - 16:22, 112:17, 124:11, 132:5, 132:11, 132:14, 133:8,

133:14
**approvals** [1] - 124:5
**approve** [2] - 118:23, 132:25
**approved** [2] - 34:6, 132:19
**approximate** [1] - 151:13
**April** [8] - 24:8, 24:10, 97:12, 97:17, 97:21, 99:7, 99:21
**AR-15** [13] - 15:13, 59:7, 62:13, 71:2, 71:8, 71:11, 71:23, 130:13, 130:14, 130:15, 130:16, 130:18, 131:12
**AR-15s** [4] - 59:8, 59:10, 130:23, 131:1
**Arbua** [1] - 135:19
**area** [10] - 30:6, 41:18, 62:2, 81:20, 95:2, 136:9, 136:14, 138:8, 155:12, 157:5
**areas** [1] - 53:19
**argued** [1] - 4:17
**argument** [1] - 3:4
**Arizona** [1] - 94:24
**armed** [2] - 30:21, 115:17
**Arms** [4] - 64:16, 113:15, 113:20, 119:7
**arms** [13] - 28:6, 30:1, 35:19, 35:23, 36:2, 46:14, 111:1, 111:15, 111:19, 111:20, 111:24, 113:2, 114:10
**arrange** [1] - 151:16
**arrangement** [1] - 59:22
**arrangements** [2] - 21:22, 156:12
**arrest** [3] - 147:22, 147:23, 147:25
**arrival** [2] - 3:10, 135:10
**arrive** [1] - 155:9
**arrived** [3] - 25:1, 68:13, 146:22
**arriving** [4] - 4:9, 4:12, 148:23, 148:24
**Arsenal** [6] - 7:18, 7:21, 9:25, 11:11, 60:23, 129:17
**Arsenal's** [2] - 7:23, 10:2
**article** [11] - 113:24, 114:2, 114:3,

115:18, 117:9, 122:19, 123:1, 123:21, 130:13, 131:17, 157:13
**articles** [15] - 111:7, 111:14, 113:12, 113:18, 113:23, 114:23, 115:3, 117:5, 117:22, 118:2, 119:23, 120:1, 124:20, 130:8, 132:16
**ascertain** [1] - 149:10
**aside** [2] - 4:1, 132:4
**aspect** [1] - 148:1
**assault** [6] - 30:9, 30:16, 37:24, 39:3, 42:5, 115:16
**assembly** [3] - 62:22, 123:9, 126:3
**asserted** [1] - 18:1
**assigned** [7] - 112:7, 145:16, 145:17, 145:24, 146:13, 146:20, 147:11
**assist** [1] - 146:7
**assistance** [7] - 122:24, 123:16, 123:20, 124:1, 124:4, 126:2, 147:20
**assistant** [1] - 73:12
**assisting** [4] - 123:2, 123:6, 123:9, 123:11
**associate's** [1] - 73:20
**associated** [1] - 79:11
**assorted** [1] - 59:12
**assume** [1] - 8:2
**assumption** [2] - 8:4, 56:5
**ATF** [1] - 60:12
**Athens** [3] - 95:5, 98:5, 100:20
**attack** [1] - 56:12
**attempt** [4] - 33:24, 53:5, 54:8, 56:21
**attending** [1] - 51:13
**attention** [5] - 23:11, 108:13, 122:5, 125:20, 157:15
**attesting** [1] - 74:15
**ATTORNEY'S** [1] - 1:15
**August** [1] - 144:13
**AURELIA** [2] - 2:8, 134:1
**Aurelia** [2] - 3:6, 133:25
**authorities** [1] - 153:25
**authorized** [1] -

113:16
**automatic** [6] - 115:16, 115:23, 116:24, 126:1, 130:17, 130:19
**automatically** [1] - 118:3
**available** [3] - 53:18, 85:19, 157:6
**AVE** [1] - 1:21
**AVENUE** [1] - 1:19
**Avenue** [1] - 158:19
**aviation** [1] - 145:18
**avoid** [2] - 47:3, 107:11
**aware** [4] - 38:20, 70:5, 109:3, 156:17

**B**

**bachelor's** [3] - 113:6, 134:9, 144:20
**background** [3] - 73:19, 113:4, 144:19
**bad** [1] - 71:17
**baggage** [2] - 136:8, 136:9
**Bahamas** [1] - 135:18
**ball** [1] - 156:8
**Bank** [19] - 79:19, 79:23, 80:1, 80:15, 84:2, 84:25, 85:13, 86:22, 89:18, 90:8, 90:24, 93:11, 93:25, 95:24, 96:14, 97:7, 99:13, 100:2, 104:23
**bank** [57] - 22:5, 23:22, 23:23, 24:5, 24:7, 73:3, 73:4, 73:10, 75:1, 75:20, 75:21, 75:24, 77:23, 78:5, 78:10, 78:11, 78:13, 78:14, 78:15, 78:17, 79:20, 80:22, 81:19, 84:1, 84:7, 84:9, 84:23, 84:24, 85:1, 85:12, 85:14, 85:22, 86:21, 88:2, 89:16, 90:25, 91:4, 93:1, 94:3, 94:4, 96:23, 96:24, 100:3, 100:6, 101:25, 102:5, 104:22, 104:24, 105:6, 105:20, 105:23, 106:12, 107:1, 107:22, 109:2, 109:15, 109:18
**bank's** [3] - 78:19, 105:10, 105:11

**banker** [1] - 73:12
**banking** [7] - 22:24, 23:4, 23:8, 73:23, 91:13, 106:22, 107:15
**Banking** [1] - 99:14
**banks** [1] - 91:6
**Barre** [1] - 144:23
**Bartolai** [12] - 13:2, 38:18, 38:23, 40:13, 41:3, 47:23, 53:24, 109:9, 109:14, 109:22, 140:12, 150:16
**BARTOLAI** [109] - 1:24, 4:5, 7:24, 8:4, 8:16, 8:24, 12:19, 13:12, 14:15, 16:7, 17:21, 20:11, 22:12, 22:14, 22:18, 24:2, 27:2, 27:21, 28:3, 28:10, 28:12, 31:4, 31:7, 32:11, 32:15, 33:1, 33:4, 33:6, 33:16, 33:20, 34:8, 34:20, 38:2, 40:14, 41:4, 42:18, 43:1, 43:8, 48:2, 48:11, 49:23, 49:25, 50:15, 50:20, 50:22, 51:1, 51:21, 51:25, 52:6, 52:25, 53:9, 53:21, 54:7, 54:12, 54:14, 55:3, 55:7, 55:8, 57:8, 57:17, 59:23, 60:1, 61:8, 63:13, 64:4, 66:24, 68:19, 69:13, 71:25, 72:2, 72:9, 75:7, 105:14, 105:16, 105:19, 109:23, 110:2, 115:6, 121:25, 125:17, 126:19, 126:21, 126:24, 128:7, 128:9, 128:12, 131:6, 131:22, 131:25, 132:2, 133:3, 133:13, 133:22, 139:17, 139:20, 140:13, 140:16, 141:8, 142:17, 142:18, 143:17, 143:23, 150:17, 154:16, 155:16, 156:18, 157:1, 157:17, 157:22
**Bartolai's** [1] - 38:13
**base** [1] - 128:25
**based** [9] - 11:23,

4

16:14, 19:24, 28:5, 42:7, 42:8, 44:14, 44:15, 140:21
**bases** [1] - 62:2
**basis** [4] - 9:23, 118:24, 132:5, 132:15
**bayonets** [1] - 59:12
**BCG** [1] - 15:11
**became** [1] - 112:4
**become** [2] - 18:11, 60:15
**BEFORE** [1] - 1:8
**beginning** [2] - 151:1, 151:6
**behalf** [1] - 146:1
**Beijing** [1] - 92:5
**Belarus** [1] - 119:17
**belongings** [2] - 136:15, 136:25
**below** [13] - 53:15, 56:9, 80:4, 84:6, 84:9, 88:13, 95:9, 151:23, 152:4, 152:8, 152:10, 153:10, 153:12
**beneficiary** [4] - 23:8, 80:16, 89:18, 93:13
**benefit** [1] - 137:24
**benefitting** [1] - 84:22
**beside** [1] - 68:7
**better** [2] - 11:6, 53:17
**between** [10] - 16:25, 17:16, 50:10, 50:11, 51:5, 52:8, 54:1, 127:25, 128:17, 145:25
**beyond** [2] - 32:13, 40:5
**big** [1] - 8:4
**bigger** [1] - 108:23
**Bill** [4] - 52:10, 52:20, 61:17, 65:21
**binder** [13] - 17:5, 20:2, 23:19, 63:2, 65:8, 65:9, 66:11, 74:10, 120:25, 124:16, 139:3, 150:5
**bird** [1] - 18:16
**bit** [8] - 56:9, 62:1, 91:2, 106:21, 114:16, 121:4, 130:7, 130:10
**blackout** [1] - 71:6
**blatantly** [1] - 53:1
**block** [3] - 70:13, 151:16, 153:17
**blocks** [1] - 18:20
**blurry** [1] - 84:5
**board** [1] - 146:7

**Boarder** [8] - 134:17, 134:19, 135:3, 135:5, 135:25, 145:18, 146:23, 148:25
**boarder** [7] - 145:12, 148:1, 148:4, 148:8, 148:9, 148:21, 151:23
**bolt** [21] - 15:12, 15:20, 15:21, 15:23, 16:4, 20:24, 62:15, 62:16, 62:20, 62:22, 116:4, 116:10, 116:12, 116:16, 116:18, 118:22, 126:11, 129:5
**Book** [1] - 152:2
**book** [2] - 52:16, 75:17
**booth** [1] - 51:14
**bottom** [10] - 18:9, 18:11, 18:14, 21:16, 52:9, 79:17, 80:7, 81:7, 100:22
**boundary** [1] - 148:8
**box** [5] - 63:8, 63:24, 68:13, 152:3, 152:20
**Boyanowski** [3] - 158:3, 158:14, 158:14
**BOYANOWSKI** [1] - 158:17
**Bragg** [4] - 6:9, 6:11, 6:12, 27:17
**branch** [3] - 73:11, 73:12, 85:19
**branches** [3] - 73:6, 81:19, 81:24
**break** [4] - 15:16, 57:20, 110:4, 144:1
**brief** [3] - 41:1, 57:23, 110:6
**briefly** [1] - 131:8
**bring** [8] - 5:9, 32:15, 40:24, 41:7, 42:14, 42:16, 121:1, 157:17
**bringing** [1] - 136:25
**brings** [1] - 136:14
**Brogan** [1] - 122:10
**brought** [2] - 136:16, 140:5
**Budapest** [1] - 83:2
**buffer** [1] - 18:19
**build** [4] - 30:1, 35:8, 35:18, 35:19
**BUILDING** [1] - 1:15
**building** [6] - 11:5, 27:9, 35:23, 36:2, 46:13, 70:24

**buildings** [2] - 138:12, 138:13
**bulk** [2] - 64:9, 145:10
**bunch** [2] - 66:5, 69:24
**Burke** [11] - 148:15, 148:22, 149:3, 150:4, 151:11, 151:17, 152:11, 152:20, 153:12, 155:5, 155:8
**Burke's** [1] - 151:15
**business** [24] - 11:14, 12:21, 12:24, 15:7, 25:11, 27:14, 37:16, 37:18, 58:9, 58:10, 59:20, 59:24, 61:2, 61:5, 61:6, 61:14, 61:16, 73:20, 74:8, 111:15, 117:21, 125:10, 125:13
**Business** [1] - 73:22
**businessman** [1] - 10:25
**busting** [1] - 46:5
**buy** [7] - 14:13, 14:22, 26:25, 27:19, 37:23, 39:2, 42:4
**buyers** [1] - 51:15
**buying** [5] - 21:13, 27:11, 27:13, 37:14, 123:23
**BY** [55] - 5:15, 8:8, 9:13, 13:4, 13:17, 14:21, 15:3, 16:17, 18:8, 20:13, 22:21, 24:4, 27:8, 28:12, 33:6, 33:20, 34:8, 34:20, 43:8, 48:2, 48:11, 49:25, 54:14, 55:8, 58:4, 60:9, 61:12, 63:15, 64:6, 65:7, 67:3, 68:21, 69:13, 73:1, 75:15, 105:19, 109:13, 110:14, 115:11, 122:4, 125:19, 126:24, 128:12, 131:10, 132:2, 133:6, 133:13, 134:4, 141:8, 142:18, 144:8, 150:21, 154:18, 155:16, 158:16

**C**

**C.'s** [1] - 125:12
**cage** [1] - 18:17
**caliber** [3] - 71:5,

114:11, 115:24
**cam** [3] - 15:20, 15:23, 16:3
**camera** [1] - 146:6
**Canada** [3] - 134:23, 135:15, 135:19
**cannot** [6] - 28:23, 38:1, 39:4, 42:6, 52:16, 55:19
**capacity** [3] - 45:4, 45:5, 113:1
**capital** [1] - 35:18
**car** [1] - 62:14
**carbine** [1] - 115:13
**card** [10] - 52:17, 67:21, 77:9, 82:23, 88:13, 91:19, 92:9, 94:18, 97:24, 100:15
**care** [1] - 12:2
**career** [4] - 136:19, 145:7, 145:13, 146:14
**Carolina** [7] - 6:10, 7:19, 7:20, 9:22, 11:12, 25:19, 62:6
**Carpentersville** [1] - 58:15
**carrier** [8] - 15:12, 15:20, 15:21, 15:23, 16:5, 62:21, 116:12, 116:16
**carve** [2] - 119:20, 132:17
**carve-outs** [2] - 119:20, 132:17
**case** [26] - 109:18, 111:12, 111:13, 112:13, 112:17, 118:24, 130:2, 130:3, 132:5, 132:15, 141:24, 147:5, 151:8, 151:9, 151:10, 152:21, 153:3, 155:8, 157:10, 157:11, 157:13
**case-by-case** [3] - 118:24, 132:5, 132:15
**cases** [7] - 111:6, 111:10, 111:11, 111:18, 112:7, 112:8, 113:3
**cash** [4] - 103:11, 103:13, 103:21, 106:24
**cashier's** [3] - 106:5, 106:17, 106:18
**Casino** [2] - 83:2, 102:25

**categories** [7] - 111:23, 111:24, 112:12, 114:8, 114:9
**categorized** [1] - 114:6
**category** [10] - 112:3, 114:10, 114:11, 115:22, 115:23, 116:22, 117:4, 126:4, 126:12
**center** [1] - 145:3
**cents** [6] - 21:3, 21:7, 21:10, 67:16
**certain** [9] - 34:4, 39:7, 44:3, 113:8, 119:19, 124:20, 128:22, 135:11, 154:13
**certainly** [1] - 27:6
**CERTIFICATE** [1] - 158:1
**certificate** [2] - 25:11, 158:21
**certification** [2] - 74:17, 75:2
**certify** [2] - 158:6, 158:10
**certifying** [1] - 158:22
**cetera** [2] - 43:25, 44:6
**chain** [7] - 18:10, 22:22, 22:23, 23:12, 150:1, 154:12, 154:21
**challenging** [1] - 31:21
**chance** [1] - 139:9
**changed** [1] - 51:12
**chapter** [1] - 119:8
**chapters** [2] - 113:22
**charge** [1] - 81:15
**charged** [1] - 21:4
**charging** [1] - 18:17
**check** [22] - 43:25, 45:10, 77:9, 82:23, 88:13, 91:19, 92:9, 94:17, 97:24, 100:15, 106:5, 106:17, 120:8, 120:11, 120:16, 121:8, 122:15, 124:3, 129:14, 129:15, 130:3
**checked** [2] - 120:3, 120:13
**checking** [2] - 44:4, 45:8
**checks** [4] - 76:14, 81:11, 106:18, 122:16
**chief** [7] - 110:25,

5

111:2, 111:5, 112:4, 112:23, 121:16, 121:17

**China** [6] - 70:14, 70:18, 70:20, 70:21, 91:24, 119:16

**Christina** [1] - 153:5

**churchman** [1] - 73:22

**circumstance** [1] - 3:20

**circumstances** [2] - 133:14, 140:6

**City** [4] - 96:19, 101:24, 104:21, 135:23

**city** [2] - 98:3, 147:3

**civilian** [1] - 15:13

**CLAFFE** [83] - 3:2, 5:11, 5:15, 7:25, 8:6, 8:8, 8:20, 9:4, 9:7, 9:13, 12:20, 13:4, 13:17, 14:17, 14:21, 15:3, 16:10, 16:17, 17:19, 17:25, 18:6, 18:8, 20:9, 20:13, 22:10, 22:19, 22:21, 23:25, 24:4, 27:7, 27:8, 28:2, 28:8, 31:17, 31:25, 32:3, 32:6, 33:14, 33:24, 34:2, 34:17, 38:12, 39:12, 39:25, 40:11, 40:23, 42:22, 47:20, 48:5, 49:21, 50:17, 51:18, 52:3, 53:3, 53:22, 53:24, 55:5, 57:10, 57:18, 57:21, 57:25, 58:4, 59:24, 60:4, 60:7, 60:9, 61:12, 63:11, 63:15, 64:2, 64:6, 65:5, 65:7, 66:22, 67:1, 67:3, 68:17, 68:21, 69:10, 72:4, 72:7, 110:8, 157:21

**CLAFFEE** [19] - 1:17, 110:14, 115:2, 115:9, 115:11, 121:23, 122:2, 122:4, 125:15, 125:19, 126:17, 131:8, 131:10, 131:21, 131:24, 133:4, 133:6, 133:11, 133:20

**claimed** [2] - 139:25, 140:17

**clarifying** [1] - 133:4

**Clark** [2] - 19:10, 69:4

**classification** [1] -

124:20

**clear** [2] - 58:5, 141:2

**clearance** [2] - 134:22, 134:24

**clearly** [1] - 40:15

**clears** [2] - 135:5, 136:8

**close** [1] - 106:12

**closer** [1] - 73:16

**closes** [1] - 106:12

**coalition** [2] - 132:21, 133:1

**coconspirator** [1] - 45:25

**Code** [1] - 158:6

**code** [2] - 151:12, 153:3

**cold** [1] - 59:19

**collect** [1] - 136:9

**college** [2] - 134:6, 134:7

**College** [2] - 134:8, 144:22

**Colt** [5] - 130:15, 130:16, 130:17, 130:18

**column** [2] - 116:2, 151:14

**com** [1] - 22:9

**comfortable** [1] - 65:9

**coming** [23] - 77:17, 79:18, 79:19, 79:25, 80:1, 80:12, 84:5, 84:21, 90:7, 90:24, 93:10, 96:13, 97:6, 97:7, 99:8, 99:12, 99:13, 102:10, 144:13, 147:25, 153:19, 157:5

**Commerce** [1] - 79:19

**commercial** [2] - 20:8, 111:13

**Commercial** [1] - 90:24

**commit** [2] - 13:8, 49:4

**commodities** [1] - 114:9

**commodity** [6] - 114:22, 118:16, 127:10, 127:13, 127:17, 127:18

**common** [3] - 143:3, 148:3, 153:18

**communicating** [1] - 46:21

**communication** [2] - 47:9, 51:19

**communications** [2] - 51:5, 85:25

**companies** [2] - 26:22, 62:23

**companion** [1] - 155:23

**Company** [34] - 24:11, 44:17, 76:5, 77:20, 80:6, 80:7, 80:14, 80:18, 84:11, 85:17, 87:1, 87:7, 88:5, 89:19, 89:21, 90:8, 91:8, 91:13, 92:25, 93:13, 93:16, 94:1, 94:4, 96:3, 96:15, 96:23, 99:16, 100:2, 100:6, 102:3, 102:5, 105:2, 105:7, 129:15

**company** [29] - 6:9, 6:18, 7:19, 8:1, 8:23, 9:24, 23:6, 44:5, 44:12, 44:14, 58:22, 60:12, 60:14, 60:18, 60:20, 60:21, 65:23, 66:14, 66:20, 68:11, 78:19, 84:23, 117:21, 120:8, 120:12, 122:23, 123:23, 138:10, 138:16

**Company's** [1] - 95:25

**competition** [3] - 70:22, 71:11, 71:13

**complete** [6] - 19:4, 32:7, 66:7, 147:17, 149:25, 151:18

**compliance** [1] - 58:25

**component** [3] - 15:11, 116:11, 116:14

**components** [6] - 10:8, 15:21, 16:21, 37:15, 116:23, 117:5

**compression** [1] - 62:15

**computer** [1] - 85:22

**concept** [1] - 46:13

**concern** [1] - 41:21

**concerning** [1] - 41:16

**concerns** [3] - 3:6, 112:14, 119:6

**concluded** [3] - 33:3, 54:13, 141:6

**conclusions** [1] - 126:13

**condition** [4] - 4:8, 4:11, 4:12

**conditions** [2] - 3:21, 112:18

**conduct** [4] - 3:4, 41:1, 137:3, 137:13

**conducted** [4] - 39:13, 121:22, 125:13, 137:22

**conducting** [2] - 136:17, 148:15

**confidential** [11] - 29:3, 29:5, 29:8, 29:11, 29:20, 29:23, 30:12, 35:22, 36:8, 39:16, 56:23

**confirmed** [2] - 23:13, 43:24

**confused** [1] - 132:12

**Congress** [1] - 113:15

**connect** [1] - 44:4

**connected** [1] - 85:22

**connection** [1] - 149:23

**consequently** [2] - 127:9, 127:10

**considered** [4] - 6:22, 8:11, 11:19, 131:17

**considering** [2] - 36:2, 46:16

**considers** [1] - 113:24

**consistent** [4] - 53:7, 111:8, 122:16, 126:13

**conspirator** [1] - 45:23

**constructing** [1] - 138:13

**Construction** [16] - 83:20, 84:21, 85:11, 86:20, 89:17, 89:21, 90:7, 93:10, 93:24, 95:23, 96:13, 96:16, 100:1, 101:22, 104:19, 104:20

**construction** [3] - 30:5, 30:14, 138:10

**consult** [1] - 6:3

**consultant** [3] - 5:22, 6:6, 6:20

**consulted** [1] - 41:10

**Consulting** [39] - 23:2, 24:11, 44:16, 76:5, 77:20, 79:9, 80:18, 84:11, 84:22, 85:17, 87:1, 87:7, 88:5, 89:19, 90:8, 91:8, 91:13, 92:25, 93:13, 93:16, 93:25, 94:4, 95:24, 96:3, 96:15, 96:23, 99:16, 100:2, 100:6, 102:3, 102:5, 105:2, 105:7, 120:9, 120:19, 122:9, 122:13, 129:15, 138:11

**consulting** [2] - 44:13, 80:20

**contact** [12] - 12:9, 37:22, 37:25, 39:1, 39:3, 42:3, 42:5, 43:7, 43:9, 53:11, 61:2, 151:15

**contacted** [2] - 13:24, 43:10

**contacts** [2] - 12:6, 56:25

**contain** [1] - 118:12

**contained** [6] - 33:23, 34:25, 116:18, 116:23, 117:4, 126:13

**containers** [1] - 130:25

**contemplating** [1] - 36:2

**contents** [2] - 32:13, 34:11

**continue** [5] - 3:24, 9:12, 13:1, 16:18, 101:4

**continued** [1] - 56:22

**continues** [3] - 53:15, 80:10, 95:12

**contract** [6] - 10:16, 13:25, 56:2, 56:3, 56:9, 56:18

**contractor** [2] - 6:22, 6:23

**contractors** [2] - 6:4, 6:5

**contracts** [1] - 6:19

**contrary** [1] - 141:3

**Control** [3] - 11:5, 64:16, 113:15

**control** [4] - 16:21, 31:20, 113:17, 158:22

**CONTROL** [1] - 1:18

**controlled** [5] - 113:10, 113:24, 116:25, 117:6, 117:8

**Controls** [2] - 110:20, 125:5

**controls** [3] - 111:23, 113:8, 117:24

**conversation** [8] - 10:18, 10:20, 10:22, 17:22, 36:4, 36:5, 36:18, 47:1

**conversations** [5] - 11:21, 11:23, 12:11, 39:7, 47:12

**coordinate** [2] - 146:1, 147:25

**copy** [9] - 31:8, 54:5,

68:10, 70:21, 142:23, 143:1, 151:19, 156:9, 156:15
**corner** [1] - 21:17
**Corp** [1] - 99:14
**corporate** [1] - 81:14
**Corporation** [1] - 122:14
**correct** [60] - 26:23, 29:9, 29:12, 29:17, 29:21, 30:2, 30:3, 32:23, 35:6, 37:5, 37:20, 43:23, 44:6, 44:7, 44:9, 44:11, 46:1, 48:14, 54:25, 55:9, 55:15, 69:18, 70:8, 70:19, 71:3, 71:10, 74:18, 76:19, 82:5, 85:20, 92:12, 92:23, 95:2, 95:7, 95:12, 98:14, 109:19, 112:10, 119:3, 129:12, 129:19, 129:25, 131:3, 132:7, 132:21, 142:16, 146:10, 146:15, 149:17, 149:20, 152:8, 152:18, 152:19, 152:23, 154:25, 155:2, 155:21, 156:2, 156:5, 158:7
**corrected** [1] - 19:2
**correctly** [2] - 112:11, 155:4
**cost** [1] - 51:15
**cotter** [11] - 14:3, 15:22, 19:6, 19:7, 20:18, 37:14, 37:20, 62:18, 128:1, 128:3, 128:4
**counsel** [12] - 4:22, 5:10, 40:22, 41:10, 41:11, 41:12, 41:15, 50:25, 51:1, 57:15, 133:8, 142:12
**counsel's** [1] - 131:11
**counted** [1] - 24:21
**COUNTERINTELLIG ENCE** [1] - 1:18
**countries** [10] - 28:20, 119:8, 119:10, 119:15, 119:17, 119:18, 132:9, 135:15
**country** [12] - 30:21, 98:3, 117:17, 117:20, 118:15,

119:6, 119:20, 123:23, 141:15, 148:12, 149:19, 153:20
**couple** [3] - 88:17, 111:3, 146:2
**courier** [1] - 26:1
**couriers** [1] - 146:21
**course** [11] - 12:21, 31:14, 38:7, 39:8, 39:21, 40:21, 47:11, 70:2, 74:7, 125:9, 128:8
**court** [8] - 5:18, 38:1, 39:5, 39:8, 42:7, 43:4, 58:6, 77:17
**Court** [14] - 23:3, 24:17, 38:2, 40:14, 40:18, 50:23, 76:9, 140:2, 142:15, 158:3, 158:4, 158:15, 158:17, 158:18
**COURT** [130] - 1:1, 3:1, 3:3, 4:15, 5:4, 8:7, 9:2, 9:6, 9:9, 12:25, 13:13, 14:16, 14:19, 14:25, 16:14, 17:24, 18:4, 18:7, 20:12, 22:13, 22:15, 24:3, 27:23, 28:5, 28:9, 31:24, 32:2, 32:4, 32:9, 32:12, 32:22, 33:5, 33:18, 34:1, 34:3, 34:19, 38:3, 38:7, 38:9, 38:24, 39:19, 40:1, 40:13, 40:21, 41:3, 41:6, 41:9, 42:12, 42:14, 42:20, 42:23, 43:2, 48:1, 48:8, 49:24, 50:21, 50:25, 51:3, 51:23, 52:7, 53:4, 53:13, 53:23, 54:8, 55:6, 57:9, 57:11, 57:14, 57:19, 57:22, 57:24, 60:3, 60:5, 60:8, 61:10, 63:14, 64:5, 65:6, 66:25, 67:2, 68:20, 69:11, 72:1, 72:3, 72:5, 72:8, 72:10, 72:15, 72:18, 72:21, 75:8, 75:12, 75:14, 105:15, 109:9, 109:11, 109:22, 109:24, 110:5, 110:7, 115:7, 122:1, 122:3, 125:18, 126:18, 126:20,

128:8, 131:7, 133:19, 133:21, 133:23, 139:18, 140:11, 140:15, 140:20, 142:16, 143:18, 143:21, 143:24, 144:2, 150:16, 150:18, 150:20, 154:17, 156:19, 156:21, 156:25, 157:2, 157:7, 157:24
**Court's** [1] - 157:18
**courtroom** [1] - 41:10
**COURTROOM** [1] - 1:9
**coverage** [1] - 157:13
**covers** [1] - 112:2
**crap** [1] - 70:18
**crash** [1] - 18:17
**create** [1] - 125:7
**created** [3] - 66:18, 121:18, 140:5
**credit** [3] - 24:11, 52:17, 67:21
**crimes** [2] - 145:8, 145:10
**Criminal** [1] - 134:7
**criminal** [3] - 134:12, 144:20, 145:4
**criminality** [1] - 137:2
**CRM** [1] - 1:21
**cross** [9] - 3:8, 28:9, 41:18, 54:8, 69:11, 109:14, 126:18, 145:11, 148:7
**CROSS** [8] - 2:3, 2:12, 28:11, 69:12, 105:18, 126:23, 141:7, 155:15
**cross-examine** [4] - 28:9, 54:8, 69:11, 126:18
**CRR** [3] - 158:3, 158:14, 158:17
**cryptic** [1] - 39:19
**Crystal** [1] - 26:4
**current** [5] - 58:16, 73:14, 73:15, 110:24, 145:2
**custody** [5] - 150:1, 150:4, 154:8, 154:12, 154:21
**customer** [15] - 19:24, 19:25, 67:5, 75:23, 80:16, 83:19, 84:9, 84:22, 85:10, 85:16, 85:19, 86:18, 87:6, 88:3, 102:2
**customer's** [2] - 76:2,

76:6
**Customs** [8] - 134:17, 134:18, 135:3, 135:5, 135:25, 145:18, 146:23, 148:25
**customs** [3] - 135:8, 141:21, 155:23
**cut** [1] - 128:25
**cycle** [1] - 15:17

# D

**D.E.C.C.S** [2] - 118:8, 118:18
**d/b/a** [1] - 58:13
**data** [2] - 111:17, 123:20
**DATE** [1] - 1:11
**date** [40] - 24:5, 25:24, 67:7, 82:11, 83:17, 84:15, 85:6, 86:4, 86:16, 87:15, 88:10, 89:13, 89:14, 90:1, 90:16, 91:10, 91:16, 93:18, 94:6, 94:9, 95:19, 96:7, 97:1, 97:3, 97:11, 97:16, 99:6, 99:20, 101:16, 102:12, 104:13, 137:17, 141:14, 148:13, 150:3, 151:12, 152:15, 153:3, 153:11, 158:9
**dated** [1] - 152:6
**dates** [1] - 158:9
**day-to-day** [4] - 58:24, 111:9, 114:13, 145:21
**daylight** [1] - 53:16
**days** [2] - 5:1, 100:13
**DC** [2] - 1:19, 1:22
**DDTC** [1] - 11:4
**deal** [3] - 3:14, 13:23, 61:23
**dealer** [1] - 18:12
**dealer's** [1] - 59:4
**Dearth** [4] - 121:11, 121:12, 121:14, 121:18
**debate** [1] - 71:22
**debates** [1] - 71:24
**December** [2] - 87:5, 87:16
**decision** [3] - 105:10, 105:11
**deduction** [1] - 87:9
**deductions** [13] - 76:14, 81:7, 81:10, 83:3, 88:23, 92:7,

92:14, 95:9, 98:6, 100:21, 101:4, 103:8, 103:21
**defend** [1] - 141:4
**defendant** [37] - 7:12, 10:9, 10:20, 11:9, 11:13, 12:4, 12:9, 12:15, 12:21, 12:24, 13:5, 13:18, 13:21, 14:7, 14:10, 14:13, 14:22, 19:8, 19:15, 21:4, 21:13, 21:19, 24:20, 24:24, 26:16, 39:22, 41:11, 54:2, 59:14, 59:25, 61:2, 120:3, 120:13, 120:21, 124:4, 124:10, 142:14
**Defendant** [1] - 1:23
**DEFENDANT** [1] - 2:12
**Defendant's** [11] - 33:8, 33:12, 33:21, 47:16, 48:3, 49:6, 50:1, 54:15, 55:4, 55:6, 55:9
**defendant's** [3] - 8:22, 50:16, 55:11
**Defense** [27] - 7:7, 11:5, 13:6, 28:22, 28:25, 29:9, 29:12, 29:14, 29:24, 30:13, 30:25, 31:2, 32:1, 35:22, 37:1, 37:5, 37:22, 38:15, 39:1, 39:14, 42:3, 46:4, 56:24, 57:1, 57:4, 110:20, 125:4
**defense** [42] - 4:22, 5:22, 6:4, 6:5, 6:9, 16:6, 16:20, 41:15, 111:7, 111:14, 111:17, 113:12, 113:18, 113:23, 113:24, 114:2, 114:3, 114:23, 115:3, 115:18, 117:9, 117:22, 117:24, 118:2, 119:4, 119:23, 120:1, 122:18, 122:19, 122:22, 122:23, 123:1, 123:3, 123:14, 123:20, 123:21, 124:6, 124:11, 130:7, 130:13, 131:17, 132:16
**degree** [5] - 73:20, 113:5, 134:9,

7

134:11, 144:20
**delegated** [1] - 113:16
**deliver** [1] - 46:9
**delivered** [5] - 25:22, 68:8, 68:23, 69:2, 70:7
**delivery** [3] - 25:23, 68:6, 68:9
**denial** [4] - 112:19, 119:11, 119:16, 119:19
**deny** [1] - 53:3
**denying** [1] - 53:1
**department** [12] - 64:16, 110:22, 113:8, 114:24, 115:4, 117:23, 117:24, 119:4, 119:21, 119:25, 120:22
**Department** [30] - 7:7, 11:24, 13:6, 28:22, 28:25, 29:8, 29:12, 29:14, 29:24, 30:12, 30:25, 31:2, 32:1, 35:21, 37:1, 37:4, 37:22, 38:15, 39:1, 39:14, 42:3, 46:3, 56:24, 57:1, 57:3, 110:21, 144:10, 144:18
**department's** [1] - 121:21
**departure** [1] - 136:4
**depict** [1] - 22:6
**deposit** [3] - 76:18, 76:19, 79:14
**deposited** [3] - 77:6, 79:8, 96:14
**deposits** [3] - 76:13, 76:17, 88:8
**depth** [1] - 136:22
**deputy** [1] - 125:4
**describe** [3] - 10:22, 113:13, 115:15
**described** [5] - 20:19, 115:8, 126:4, 126:12, 127:11
**description** [4] - 20:23, 116:2, 118:16, 152:13
**design** [1] - 122:24
**designed** [6] - 3:16, 114:4, 117:9, 128:21, 128:22, 130:11
**desire** [1] - 57:20
**destination** [1] - 118:15
**destined** [1] - 135:6

**detail** [4] - 76:24, 81:1, 92:22, 137:25
**detailed** [2] - 3:11, 82:5
**details** [1] - 60:24
**detain** [2] - 149:18, 153:19
**detained** [16] - 149:1, 149:4, 149:24, 150:2, 150:3, 151:12, 152:17, 153:4, 153:7, 154:9, 154:22, 155:1, 155:17, 155:20, 156:1, 156:8
**detaining** [1] - 150:24
**detention** [6] - 149:8, 150:23, 151:22, 153:2, 154:8, 154:10
**determination** [2] - 127:11, 127:13
**determine** [2] - 136:25, 149:10
**determined** [2] - 125:25, 126:10
**development** [1] - 122:24
**device** [3] - 149:10, 156:15, 156:16
**devices** [10] - 52:2, 139:7, 139:11, 139:13, 148:11, 149:1, 150:25, 151:15, 151:24, 155:25
**Dhabi** [2] - 90:23, 135:17
**difference** [2] - 127:25, 128:17
**different** [12] - 27:1, 27:3, 27:4, 28:20, 66:5, 69:1, 90:20, 91:3, 119:14, 123:22, 131:4, 149:4
**difficult** [2] - 4:13, 96:17
**dire** [1] - 41:1
**DIRECT** [9] - 2:3, 2:12, 5:14, 58:3, 72:25, 110:12, 115:10, 134:3, 144:7
**direct** [11] - 3:8, 23:11, 29:2, 50:19, 72:14, 111:13, 122:5, 125:20, 131:24, 158:22
**directly** [6] - 6:3, 7:5, 7:6, 14:13, 14:23, 15:7
**Director** [1] - 110:20

**director** [4] - 16:20, 117:24, 121:15, 125:4
**Directorate** [1] - 11:5
**disagree** [1] - 51:18
**disclose** [1] - 82:11
**disclosed** [2] - 31:11, 38:22
**disclosure** [1] - 8:18
**discontinued** [1] - 61:5
**discovery** [1] - 38:18
**discuss** [11] - 28:23, 28:24, 38:1, 38:14, 38:25, 39:4, 39:8, 42:6, 45:19, 46:8, 157:11
**discussed** [9] - 3:5, 36:25, 37:8, 37:9, 38:21, 46:7, 46:10, 61:7, 140:23
**discussion** [7] - 3:4, 31:6, 33:3, 51:2, 54:13, 139:19, 141:6
**Disk** [1] - 152:3
**disregard** [2] - 9:11, 13:15
**distributing** [1] - 123:21
**DISTRICT** [2] - 1:1, 1:1
**District** [6] - 78:11, 93:1, 158:4, 158:18, 158:18
**divided** [3] - 111:22, 113:21, 114:8
**diving** [1] - 10:17
**division** [9] - 110:25, 111:2, 111:5, 112:1, 112:4, 112:23, 121:16, 121:17, 145:19
**document** [53] - 33:25, 34:9, 34:12, 48:4, 48:7, 48:10, 49:22, 50:21, 51:3, 74:13, 74:14, 75:11, 78:2, 78:4, 79:2, 79:4, 79:5, 79:6, 79:16, 79:17, 80:9, 80:10, 80:11, 81:10, 82:25, 83:3, 83:9, 83:16, 84:13, 86:12, 87:8, 88:1, 88:23, 89:9, 89:20, 90:11, 90:21, 92:7, 93:14, 95:14, 96:1, 100:21, 101:12, 108:15, 121:5, 129:10, 150:10, 150:12, 152:24, 153:14,

154:6, 154:24
**documentation** [1] - 24:17
**documents** [12] - 53:6, 74:16, 74:17, 74:20, 74:25, 78:22, 105:3, 136:15, 137:16, 141:22, 141:24, 155:4
**DOD** [2] - 7:9, 36:15
**DOJ** [2] - 1:18, 1:21
**DOJ-CRM** [1] - 1:21
**DOJ-NSD** [1] - 1:18
**dollar** [1] - 24:12
**dollars** [2] - 29:17, 76:18
**domestic** [11] - 8:11, 8:13, 22:25, 82:20, 82:21, 83:4, 92:14, 94:15, 98:12, 100:22, 103:9
**done** [12] - 22:25, 23:5, 26:8, 28:22, 61:6, 61:14, 61:16, 64:9, 69:6, 112:20, 132:5, 136:19
**door** [1] - 140:5
**DOS** [1] - 11:24
**dot** [2] - 22:9, 65:14
**doubt** [4] - 125:25, 126:11, 127:15, 127:16
**doubtful** [2] - 127:19, 127:22
**DOUVILLE** [2] - 2:7, 110:10
**Douville** [3] - 110:9, 110:15, 115:3
**down** [23] - 10:14, 10:17, 13:8, 25:23, 31:19, 33:1, 36:10, 67:12, 72:5, 77:8, 79:22, 82:22, 92:14, 95:9, 109:24, 127:5, 133:19, 143:21, 144:22, 144:23, 152:10, 156:21
**draw** [2] - 108:2, 108:13
**dream** [1] - 48:23
**drive** [1] - 152:3
**Drive** [2] - 25:20, 25:25
**dropped** [1] - 25:18
**dual** [2] - 127:22, 127:23
**Dublin** [1] - 135:18
**duly** [6] - 5:12, 58:1, 72:23, 110:10, 134:1, 144:5

**duration** [1] - 47:11
**during** [18] - 29:2, 29:7, 29:19, 29:23, 39:15, 71:17, 82:7, 87:9, 91:22, 92:15, 97:25, 102:16, 136:12, 136:13, 137:23, 138:1, 145:13, 146:18
**duties** [1] - 146:18
**duty** [1] - 147:13

## E

**e-mail** [32] - 17:15, 17:16, 17:18, 18:10, 18:13, 19:1, 22:7, 22:22, 22:23, 23:11, 43:17, 44:8, 50:8, 52:7, 52:10, 52:18, 52:20, 54:1, 54:4, 54:5, 54:18, 54:20, 55:11, 56:1, 65:14, 65:16, 65:18, 65:19, 65:20, 65:25, 66:3
**early** [1] - 157:8
**easier** [1] - 75:17
**East** [2] - 29:21, 81:25
**eastern** [1] - 53:16
**Easton** [1] - 73:22
**easy** [1] - 12:2
**edge** [1] - 12:25
**Edmonton** [1] - 135:20
**educate** [1] - 11:6
**education** [2] - 73:23, 144:25
**educational** [3] - 73:19, 113:4, 144:19
**efficiently** [1] - 157:18
**effort** [1] - 41:11
**efforts** [1] - 48:9
**eight** [2] - 111:10, 153:11
**either** [6] - 3:8, 38:15, 40:25, 68:25, 112:17, 124:12
**elaborate** [1] - 10:4
**electronic** [5] - 85:25, 139:7, 139:11, 149:10, 155:25
**electronics** [2] - 138:21, 149:18
**elicit** [4] - 3:9, 3:16, 9:8, 76:17
**eliciting** [1] - 3:17
**eligible** [1] - 118:1
**embedded** [1] - 54:2
**emotional** [1] - 4:7
**employed** [6] - 73:2,

8

73:3, 134:15, 144:9, 144:10, 144:12
**employee** [1] - 44:15
**employees** [2] - 59:1, 135:4
**employment** [2] - 140:4, 144:14
**enacted** [1] - 107:14
**encounter** [1] - 136:5
**end** [9] - 3:5, 44:13, 51:9, 52:21, 60:25, 105:22, 118:11, 132:25, 138:18
**ended** [2] - 51:19, 61:3
**enforcement** [5] - 144:15, 145:1, 145:3, 154:12, 154:23
**engaged** [1] - 12:23
**enlighten** [1] - 39:10
**ensure** [2] - 111:6, 111:7
**enter** [1] - 139:14
**entered** [3] - 43:16, 149:19, 151:6
**entering** [2] - 60:5, 135:9
**entire** [3] - 9:23, 22:6, 43:16
**entities** [1] - 119:22
**entitled** [3] - 42:9, 77:8, 118:4
**entity** [2] - 83:21, 86:19
**entry** [1] - 148:9
**envisioned** [1] - 12:4
**equipment** [7] - 6:10, 10:17, 30:15, 132:7, 132:20, 146:5, 146:6
**equivalent** [1] - 148:9
**Erbil** [1] - 100:3
**escape** [1] - 4:9
**especially** [2] - 108:1, 114:4
**ESQ** [4] - 1:14, 1:17, 1:20, 1:24
**essence** [1] - 6:25
**essentially** [3] - 62:18, 64:17, 147:15
**establish** [5] - 8:6, 34:2, 48:6, 54:5, 142:13
**established** [2] - 34:3, 47:24
**et** [2] - 43:25, 44:6
**European** [1] - 113:6
**event** [2] - 47:6, 47:7
**eventually** [1] - 90:25
**evidence** [7] - 8:19,

25:7, 31:18, 43:19, 49:22, 146:2, 157:11
**Ex** [3] - 25:5, 25:18, 155:7
**exactly** [3] - 61:11, 61:22, 140:10
**exam** [1] - 72:16
**examination** [4] - 3:9, 29:2, 41:18, 109:14
**EXAMINATION** [18] - 5:14, 28:11, 58:3, 69:12, 72:25, 105:18, 109:12, 110:12, 115:10, 126:23, 131:9, 132:1, 133:5, 133:12, 134:3, 141:7, 144:7, 155:15
**examine** [5] - 28:9, 54:8, 69:11, 126:18, 149:9
**exception** [3] - 4:22, 132:23, 141:1
**exceptions** [2] - 4:6, 133:8
**exchange** [3] - 51:4, 52:7, 123:19
**excluding** [1] - 70:2
**excuse** [2] - 16:4, 81:9
**excused** [12] - 57:12, 57:14, 57:16, 72:7, 72:10, 109:25, 133:20, 133:21, 133:23, 143:20, 143:22, 143:24
**execute** [1] - 30:21
**exhaust** [1] - 47:21
**exhaustive** [1] - 39:13
**Exhibit** [79] - 17:5, 17:20, 18:5, 20:2, 20:10, 21:24, 22:10, 22:15, 23:19, 24:1, 24:14, 25:7, 33:8, 33:12, 33:21, 43:16, 47:16, 48:3, 49:6, 50:1, 54:15, 55:4, 55:6, 55:9, 63:2, 63:12, 63:14, 63:19, 64:2, 65:4, 66:10, 66:23, 66:25, 68:1, 68:17, 69:16, 70:6, 74:11, 75:8, 75:16, 75:19, 78:1, 81:16, 83:8, 85:3, 86:3, 87:25, 89:8, 89:20, 90:10, 91:7, 93:14, 94:2, 95:14, 96:1, 96:20, 97:8, 99:1, 99:15, 100:5, 101:12, 104:7,

105:25, 108:13, 116:1, 117:12, 120:25, 121:24, 122:1, 124:15, 125:16, 126:25, 128:10, 129:3, 129:9, 150:7, 150:15, 154:3, 154:15
**exhibit** [27] - 17:12, 20:2, 20:5, 22:2, 22:4, 25:21, 32:20, 49:21, 50:15, 51:6, 51:9, 53:25, 54:11, 63:4, 63:20, 66:11, 68:2, 68:22, 76:21, 80:21, 82:3, 108:15, 115:25, 122:16, 124:16, 125:21
**Exhibits** [1] - 75:5
**exhibits** [1] - 52:4
**existing** [2] - 4:7, 5:2
**exits** [1] - 57:14
**expect** [2] - 40:17, 72:13
**expectation** [1] - 148:11
**expected** [1] - 38:10
**expedite** [1] - 116:5
**experience** [15] - 16:15, 16:19, 26:25, 27:3, 27:13, 28:5, 28:16, 28:19, 70:24, 73:23, 78:7, 108:2, 108:3, 136:17, 154:21
**expert** [16] - 8:12, 8:17, 8:21, 8:25, 9:1, 9:3, 9:6, 9:10, 9:12, 16:8, 27:6, 46:2, 114:23, 115:3, 115:8, 126:14
**Expert** [1] - 64:16
**expertise** [1] - 27:5
**explain** [4] - 60:10, 119:13, 149:7, 151:2
**explaining** [1] - 153:16
**export** [13] - 111:17, 112:7, 113:8, 113:10, 113:13, 113:17, 117:13, 117:19, 118:2, 118:10, 119:23, 120:14, 120:17
**EXPORT** [1] - 1:18
**Export** [1] - 113:15
**exported** [3] - 64:25, 117:16, 119:9
**exporter** [1] - 127:16

**exporting** [2] - 117:22, 120:1
**exports** [4] - 111:7, 111:14, 114:25, 132:17
**Express** [1] - 25:17
**extend** [1] - 39:6
**extent** [8] - 3:23, 15:1, 39:9, 39:12, 40:4, 52:22, 54:9
**extorted** [1] - 140:2
**extrinsic** [1] - 31:18
**eye** [1] - 146:12

**F**

**facilitating** [2] - 30:5, 30:13
**facility** [4] - 11:17, 11:20, 35:8, 35:19
**fact** [12] - 9:1, 9:4, 23:1, 32:13, 36:13, 44:19, 70:6, 70:7, 74:16, 139:24, 141:24, 143:10
**factories** [1] - 60:17
**factory** [6] - 30:1, 30:5, 30:14, 35:24, 36:3, 46:14
**fairly** [1] - 73:8
**fall** [1] - 124:20
**falling** [2] - 15:9, 62:22
**familiar** [16] - 8:2, 9:20, 9:21, 9:24, 46:23, 46:24, 73:24, 113:7, 114:17, 114:20, 115:12, 116:7, 121:14, 121:18, 122:19, 125:6
**far** [1] - 79:2
**fast** [1] - 105:17
**Fayetteville** [7] - 6:9, 7:18, 7:20, 11:11, 25:19, 62:6, 67:9
**FBI** [18] - 7:5, 7:8, 7:9, 13:7, 29:3, 29:5, 29:24, 35:21, 36:21, 36:22, 37:22, 38:15, 38:20, 38:21, 39:1, 39:14, 40:8, 42:3
**February** [18] - 91:11, 91:17, 91:18, 92:18, 93:19, 94:7, 135:21, 137:14, 141:14, 141:16, 141:17, 148:13, 152:7, 153:11, 153:13, 155:1, 155:5

**fed** [8] - 82:10, 82:16, 82:19, 83:5, 87:15, 94:14, 97:18, 108:24
**Fed** [3] - 25:5, 25:18, 155:7
**FEDERAL** [1] - 1:15
**federal** [5] - 58:25, 87:13, 145:3, 147:23, 149:13
**Federal** [1] - 25:17
**fee** [2] - 80:20, 117:25
**fellow** [1] - 109:19
**fence** [1] - 11:19
**few** [4] - 95:1, 105:16, 109:10, 135:20
**FFL** [1] - 70:24
**field** [3] - 11:1, 144:16, 145:16
**fifty** [1] - 18:19
**figure** [2] - 106:24, 107:20
**figuring** [1] - 86:6
**files** [4] - 66:20, 68:11, 121:22, 125:12
**fill** [1] - 12:3
**filled** [3] - 25:15, 112:11, 152:20
**final** [4] - 111:11, 112:15, 112:16, 154:13
**finally** [1] - 4:9
**financial** [2] - 15:8, 147:12
**fine** [1] - 111:22
**fire** [2] - 69:25, 70:8
**firearm** [10] - 16:11, 59:12, 64:25, 71:14, 71:15, 115:12, 115:16, 126:1, 126:4, 130:17
**firearms** [10] - 7:19, 8:9, 8:22, 9:14, 9:20, 10:5, 14:5, 27:9, 59:3, 115:23
**firing** [32] - 10:7, 15:19, 15:22, 17:2, 20:22, 21:8, 26:12, 26:23, 61:25, 62:10, 62:17, 62:21, 62:22, 63:23, 63:25, 64:7, 64:21, 67:14, 67:16, 69:22, 70:3, 116:5, 116:13, 116:14, 116:15, 116:25, 117:12, 118:22, 126:11, 127:25, 128:14, 130:22
**firm** [1] - 44:14
**first** [21] - 8:4, 10:9, 10:19, 14:2, 18:10,

9

52:23, 76:1, 83:11, 84:12, 92:8, 116:4, 116:7, 117:21, 118:24, 122:11, 125:22, 126:7, 129:25, 135:12, 136:5
**fitting** [1] - 10:7
**five** [6] - 15:21, 21:7, 111:10, 127:5, 152:12, 153:10
**flags** [1] - 62:3
**flash** [2] - 18:17, 152:3
**flight** [1] - 148:23
**flights** [2] - 52:15, 147:18
**flip** [8] - 17:7, 18:18, 20:2, 63:3, 66:10, 121:3, 124:15
**flipping** [1] - 25:21
**float** [1] - 45:13
**flow** [1] - 116:12
**fly** [2] - 146:2, 146:3
**flying** [2] - 56:14, 136:2
**focusing** [1] - 116:7
**follow** [1] - 109:10
**following** [4] - 31:6, 51:2, 52:11, 139:19
**follows** [6] - 5:13, 58:2, 72:24, 110:11, 134:2, 144:6
**FOR** [3] - 1:1, 2:3, 2:12
**forces** [4] - 6:13, 115:17, 132:21, 133:1
**foregoing** [3] - 158:7, 158:10, 158:21
**foreign** [12] - 8:11, 8:13, 51:13, 111:8, 112:14, 117:20, 118:12, 119:6, 122:24, 123:2, 126:2, 135:12
**forensically** [1] - 52:1
**forgot** [1] - 131:23
**form** [10] - 12:15, 67:19, 150:1, 150:13, 150:22, 151:2, 151:3, 151:6, 153:17
**formally** [1] - 135:9
**formed** [2] - 13:5, 117:11
**Fort** [4] - 6:9, 6:11, 6:12, 27:17
**forth** [4] - 12:12, 123:19, 123:25, 158:9

**forward** [1] - 77:15
**forwarded** [2] - 54:2, 54:4
**Foster** [3] - 72:22, 73:2, 109:14
**FOSTER** [2] - 2:6, 72:23
**foundation** [2] - 8:6, 53:25
**four** [8] - 82:9, 111:4, 112:3, 114:11, 135:2, 138:5, 144:2
**fourth** [2] - 25:23, 87:8
**frank** [2] - 13:10, 45:12
**free** [1] - 39:23
**freight** [1] - 118:13
**friends** [1] - 10:5
**front** [9] - 17:5, 18:18, 31:13, 48:3, 48:7, 63:2, 65:9, 74:10, 139:21
**full** [3] - 111:3, 122:11, 125:22
**full-time** [1] - 111:3
**fully** [7] - 34:13, 115:16, 116:24, 126:1, 130:17, 130:19
**function** [2] - 15:13, 62:19
**functional** [1] - 148:9
**functioning** [1] - 15:17
**funds** [34] - 35:15, 73:25, 78:8, 78:9, 78:21, 78:24, 78:25, 79:6, 79:7, 79:8, 79:18, 79:20, 80:13, 83:22, 84:10, 85:12, 85:18, 86:12, 86:19, 86:21, 89:9, 89:21, 91:3, 92:23, 93:15, 95:15, 96:2, 96:21, 99:2, 99:8, 99:11, 99:16, 101:14, 104:9
**furnishes** [1] - 122:23
**furnishing** [1] - 126:1
**furtherance** [1] - 146:22
**future** [1] - 11:13

## G

**game** [2] - 156:8, 156:10
**garbage** [1] - 10:3
**gas** [52] - 14:3, 14:4, 15:10, 15:11, 15:15, 15:24, 16:23, 18:15,

18:20, 19:3, 19:5, 19:7, 20:18, 20:19, 20:24, 21:2, 26:7, 26:14, 26:22, 37:14, 37:19, 37:24, 39:2, 40:10, 42:4, 61:25, 62:10, 62:12, 62:13, 62:24, 63:5, 63:8, 63:16, 64:10, 67:14, 67:15, 69:22, 69:25, 70:2, 70:8, 70:13, 116:4, 116:10, 116:11, 116:12, 116:17, 116:18, 117:12, 118:22, 126:11, 129:5, 130:25
**gear** [2] - 6:11, 27:18
**general** [3] - 36:4, 113:13, 147:13
**generally** [17] - 20:7, 22:6, 22:22, 63:16, 73:24, 75:19, 76:21, 78:2, 78:12, 113:7, 119:19, 121:7, 122:7, 122:12, 124:18, 147:9, 153:14
**gentleman** [2] - 32:2, 49:19
**gentlemen** [1] - 52:20
**Georgia** [1] - 145:3
**gibberish** [1] - 56:19
**GINO** [1] - 1:24
**Gino** [1] - 31:21
**given** [6] - 28:22, 39:17, 139:22, 139:25, 151:19
**glance** [1] - 139:5
**Glenco** [1] - 145:3
**global** [3] - 5:22, 7:7, 9:23
**glossary** [1] - 153:16
**goods** [2] - 64:17, 136:25
**Gotham** [1] - 122:9
**government** [42] - 5:11, 5:25, 6:1, 6:3, 6:19, 8:17, 10:16, 11:2, 13:25, 19:24, 36:9, 38:17, 38:20, 40:22, 41:10, 41:12, 41:13, 41:16, 44:24, 45:2, 51:1, 51:25, 52:1, 57:25, 64:18, 72:22, 74:2, 74:5, 74:18, 75:2, 75:4, 110:8, 113:24, 115:2, 130:2, 132:19, 132:20,

133:1, 133:25, 140:3, 144:4, 150:14
**Government** [7] - 5:23, 6:21, 7:1, 7:4, 29:15, 29:16, 90:10
**GOVERNMENT** [1] - 2:3
**Government's** [68] - 17:5, 17:20, 18:5, 20:2, 20:10, 21:24, 22:10, 22:15, 23:19, 24:1, 24:14, 25:7, 43:15, 63:2, 63:12, 63:14, 63:19, 64:2, 65:4, 66:10, 66:23, 66:25, 68:1, 68:17, 69:16, 70:6, 74:11, 75:5, 75:8, 75:16, 75:19, 78:1, 81:16, 83:8, 85:3, 86:3, 87:25, 89:8, 89:20, 91:7, 93:14, 94:2, 95:14, 96:1, 96:20, 97:8, 99:1, 99:15, 100:5, 101:12, 104:7, 105:25, 108:13, 116:1, 117:12, 120:25, 121:24, 122:1, 124:15, 125:16, 126:25, 128:10, 129:3, 129:9, 150:7, 150:15, 154:3, 154:14
**government's** [2] - 39:13, 80:21
**grant** [3] - 9:9, 13:13, 13:14
**granted** [1] - 150:20
**greasy** [1] - 13:11
**great** [2] - 3:14, 71:8
**greatly** [1] - 51:12
**Greece** [1] - 95:7
**Greg** [1] - 53:14
**ground** [2] - 146:7, 146:9
**group** [11] - 15:12, 15:20, 15:21, 15:23, 16:5, 116:12, 116:16, 146:20, 147:12, 147:13
**guess** [5] - 32:20, 70:23, 129:2, 130:15, 130:16
**guest** [1] - 49:13
**gun** [4] - 58:9, 62:19, 71:21, 123:23
**guns** [1] - 114:11
**Guns** [24] - 14:12, 14:13, 14:23, 15:8,

17:15, 18:1, 18:13, 19:4, 19:19, 19:22, 21:6, 21:7, 21:11, 21:14, 23:16, 23:17, 58:11, 58:13, 58:16, 58:20, 58:23, 59:2, 59:6, 65:14
**guy** [4] - 37:23, 39:2, 42:4, 71:17
**guys** [1] - 51:15

## H

**half** [3] - 72:13, 72:15, 79:5
**Halifax** [1] - 135:20
**hallway** [1] - 38:6
**hand** [1] - 21:17
**handguns** [1] - 47:5
**handle** [1] - 146:1
**handled** [1] - 106:6
**handlers** [1] - 31:19
**handles** [1] - 18:17
**handwriting** [2] - 25:16, 152:22
**happy** [1] - 72:12
**hard** [3] - 68:10, 84:4, 86:6
**hardware** [3] - 111:17, 123:18, 123:22
**hear** [8] - 3:4, 3:25, 5:5, 5:7, 5:19, 14:19, 14:20, 71:4
**heard** [3] - 7:16, 13:16, 157:11
**hearsay** [13] - 3:17, 4:1, 4:2, 4:7, 4:17, 4:18, 4:21, 4:22, 14:15, 17:23, 140:23, 141:1, 141:5
**held** [5] - 73:10, 73:11, 151:7, 153:2
**helicopter** [8] - 52:9, 56:2, 56:4, 56:6, 56:12, 56:13, 56:18
**helicopters** [2] - 47:10, 146:6
**hello** [1] - 69:15
**help** [3] - 47:25, 140:15, 142:5
**helps** [3] - 116:12, 116:15
**hereby** [1] - 158:6
**hereinbefore** [1] - 158:9
**hide** [2] - 27:25, 28:16
**hiders** [1] - 18:17
**high** [2] - 138:11, 138:13
**highest** [1] - 101:8

**highlight** [1] - 80:11
**highlighted** [3] - 31:8, 33:13, 33:17
**Hill** [3] - 23:3, 24:17, 76:9
**himself** [1] - 140:24
**Hind** [2] - 56:10, 56:12
**Hinkley** [1] - 155:17
**HINKLEY** [27] - 1:14, 72:12, 72:17, 72:22, 73:1, 75:4, 75:10, 75:13, 75:15, 105:12, 109:10, 109:13, 109:21, 110:1, 110:3, 144:4, 144:8, 150:14, 150:19, 150:21, 154:14, 154:18, 155:14, 156:20, 156:23, 157:4, 157:16
**historically** [1] - 71:11
**history** [6] - 19:23, 113:5, 113:6, 122:15, 129:14, 129:15
**Hiwi** [2] - 52:12, 55:17
**hold** [2] - 16:3, 53:12
**holds** [1] - 15:23
**home** [1] - 4:9
**homeland** [1] - 138:19
**Homeland** [7] - 121:9, 124:19, 144:11, 145:7, 145:13, 153:18
**honestly** [1] - 106:19
**Hong** [3] - 92:1, 97:7, 99:13
**Honor** [86] - 3:2, 4:5, 7:24, 8:16, 8:19, 8:24, 12:20, 16:7, 16:10, 17:19, 17:21, 20:9, 22:12, 22:14, 23:25, 27:2, 27:7, 27:22, 28:3, 28:8, 31:5, 31:7, 31:12, 31:17, 33:4, 33:14, 33:24, 39:12, 40:12, 40:14, 40:20, 40:23, 40:24, 47:14, 48:5, 50:15, 50:17, 50:22, 50:24, 51:18, 55:3, 57:10, 57:21, 59:23, 61:8, 63:11, 65:5, 66:22, 69:10, 71:25, 72:4, 72:6, 72:12, 75:4, 75:11, 75:13, 105:12, 110:1, 110:3, 110:8, 115:2, 115:9, 121:23,

125:15, 126:17, 128:7, 131:8, 131:22, 133:4, 139:16, 139:17, 139:21, 140:2, 140:8, 140:19, 142:12, 143:19, 143:23, 144:1, 155:14, 156:20, 156:24, 157:4, 157:17, 157:22
**HONORABLE** [1] - 1:8
**hoped** [1] - 11:5
**hour** [4] - 72:13, 72:15
**hours** [1] - 10:13
**human** [1] - 39:16
**hundred** [4] - 18:19, 70:12, 70:13, 76:18
**hundreds** [1] - 27:11
**hurry** [1] - 67:24
**hypothetical** [1] - 27:22

## I

**I.T.A.R** [3] - 113:21, 127:11
**idea** [3] - 36:6, 46:13, 54:3
**ideas** [2] - 11:13, 11:16
**identification** [1] - 52:4
**identified** [2] - 20:23, 24:16
**identifies** [1] - 25:24
**identify** [7] - 5:24, 23:5, 50:1, 50:5, 50:6, 84:12, 107:22
**illegal** [3] - 16:21, 26:11, 26:13
**Illinois** [1] - 58:15
**illustrate** [1] - 150:3
**illustrating** [4] - 150:23, 152:11, 153:12, 154:11
**images** [1] - 56:20
**immediately** [2] - 4:24, 24:22
**impeach** [3] - 31:22, 32:25, 53:6
**impeachment** [1] - 31:17
**implement** [1] - 113:19
**implying** [1] - 152:13
**import** [1] - 113:17
**important** [4] - 44:3, 45:5, 45:8, 106:22
**importer** [1] - 59:3

**impression** [5] - 5:2, 12:15, 12:18, 12:22, 13:5
**improper** [3] - 31:17, 33:24, 47:20
**IN** [1] - 1:1
**inaccurate** [1] - 35:25
**inadmissible** [1] - 16:9
**Inc** [2] - 22:9, 44:13
**include** [3] - 6:12, 8:12, 123:18
**includes** [1] - 123:17
**including** [5] - 4:20, 69:25, 103:8, 115:24, 126:2
**inclusive** [1] - 75:6
**incoming** [1] - 24:16
**inconsistent** [5] - 31:23, 50:20, 51:16, 52:22, 54:10
**incorporated** [1] - 58:13
**incorrect** [3] - 15:2, 30:25, 140:20
**increases** [1] - 27:15
**independent** [4] - 6:22, 6:23, 126:14, 142:14
**INDEX** [1] - 2:1
**Indian** [2] - 25:20, 25:25
**indicate** [25] - 24:7, 25:22, 26:2, 44:14, 48:8, 51:19, 57:19, 76:1, 79:13, 79:17, 80:19, 83:11, 83:16, 84:9, 88:10, 93:8, 93:20, 93:23, 95:21, 99:22, 100:10, 101:18, 106:7, 106:8, 108:20
**indicated** [11] - 36:8, 43:22, 44:2, 76:4, 76:6, 78:7, 82:4, 109:18, 146:13, 148:4, 152:17
**indicates** [3] - 51:9, 83:18, 106:1
**indicating** [1] - 9:2
**indication** [4] - 67:19, 76:13, 96:9, 99:11
**indices** [1] - 133:15
**individual** [9] - 4:8, 13:9, 19:13, 27:16, 120:18, 148:17, 150:24, 153:4, 153:7
**individuals** [8] - 12:5, 36:5, 48:13, 48:17, 51:22, 54:19, 54:21,

54:25
**industry** [16] - 7:23, 8:1, 8:2, 8:10, 8:14, 8:22, 9:15, 9:19, 10:2, 16:11, 16:15, 16:19, 28:6, 73:23, 106:22, 107:15
**informant** [11] - 29:3, 29:5, 29:8, 29:11, 29:20, 29:24, 30:12, 35:22, 36:8, 39:16, 56:24
**information** [32] - 9:8, 22:5, 22:16, 22:17, 22:24, 23:2, 23:4, 23:8, 23:9, 26:1, 38:14, 38:16, 41:13, 41:16, 52:9, 56:7, 56:16, 56:17, 56:18, 56:25, 57:3, 78:18, 80:4, 80:12, 84:20, 89:15, 90:3, 97:5, 140:22, 151:5, 151:16
**inherently** [1] - 117:8
**initial** [1] - 61:7
**initialize** [1] - 78:16
**initiated** [1] - 79:21
**initiative** [1] - 5:22
**initiator** [1] - 78:14
**inquire** [4] - 34:5, 106:9, 140:6, 143:12
**inquired** [1] - 47:10
**inquiring** [3] - 54:24, 69:22, 69:24
**inquiry** [1] - 41:23
**inspected** [1] - 153:25
**inspection** [12] - 136:10, 136:12, 136:13, 136:21, 136:22, 137:3, 137:13, 138:1, 141:18, 142:21, 149:1, 155:24
**inspections** [2] - 136:17, 137:23
**instance** [7] - 44:4, 60:18, 127:25, 132:7, 149:10, 149:16, 150:4
**instead** [2] - 3:19, 140:17
**institution** [1] - 73:8
**institutions** [1] - 91:3
**instruct** [2] - 38:2, 40:2
**instructed** [1] - 38:14
**instruction** [2] - 40:11, 41:1
**integral** [2] - 15:11,

15:12
**integration** [1] - 122:25
**intend** [2] - 8:20, 9:7
**intended** [1] - 31:15
**intending** [2] - 30:8, 35:8
**intends** [1] - 8:17
**intent** [1] - 36:4
**intention** [2] - 38:13, 45:16
**intentions** [1] - 28:1
**interaction** [2] - 50:18, 52:5
**interactions** [1] - 12:16
**intercepted** [1] - 146:23
**interchangeable** [2] - 130:23, 131:1
**interest** [1] - 3:18
**interested** [1] - 91:2
**interesting** [1] - 71:21
**intermediaries** [1] - 118:13
**international** [62] - 10:25, 11:7, 23:1, 44:17, 45:9, 73:24, 77:6, 78:8, 78:21, 81:12, 82:7, 82:9, 82:10, 82:13, 82:14, 82:15, 82:17, 82:20, 83:4, 83:6, 83:7, 85:3, 87:13, 87:20, 88:7, 88:24, 89:9, 89:21, 90:10, 91:4, 92:15, 92:21, 92:22, 93:15, 94:9, 94:12, 94:13, 95:9, 95:15, 96:2, 96:21, 97:14, 98:7, 99:2, 99:15, 100:3, 100:11, 100:22, 100:25, 101:6, 101:13, 101:14, 102:10, 103:4, 103:9, 104:9, 108:1, 108:14, 134:12, 136:3, 148:7, 148:23
**International** [20] - 11:4, 79:23, 80:1, 80:15, 84:2, 84:25, 85:13, 86:22, 89:18, 90:8, 93:11, 93:25, 95:24, 96:14, 100:2, 104:23, 113:20, 119:7, 135:22, 148:10
**internationally** [2] - 88:25, 91:21

11

**interview** [7] - 4:10, 137:10, 137:16, 137:22, 137:24, 138:18, 139:13
**introduce** [1] - 54:11
**introduction** [2] - 10:24, 51:6
**invest** [2] - 11:22, 12:8
**investigate** [1] - 145:17
**investigated** [2] - 145:9, 145:10
**investigation** [4] - 145:12, 147:7, 148:15, 148:24
**investigations** [2] - 138:19, 146:22
**Investigations** [4] - 144:11, 145:8, 145:14, 153:19
**investigative** [1] - 27:5
**investigator** [1] - 145:4
**investigators** [1] - 145:25
**investment** [1] - 46:20
**investors** [2] - 46:18, 53:2
**invoice** [15] - 20:8, 20:14, 20:17, 21:17, 21:19, 21:21, 22:8, 24:12, 66:14, 66:15, 67:4, 67:7, 67:12, 67:19, 67:22
**involve** [2] - 41:22, 114:13
**involved** [3] - 118:13, 146:20, 147:12
**involvement** [3] - 138:23, 139:6, 139:10
**iPad** [2] - 152:2, 156:1
**iPhone** [1] - 153:10
**iPhones** [1] - 152:2
**Iran** [1] - 119:16
**Iraq** [58] - 4:9, 11:18, 11:19, 11:20, 12:5, 12:7, 26:7, 30:2, 30:6, 30:18, 30:22, 35:19, 35:23, 35:24, 35:25, 36:3, 45:17, 45:20, 45:22, 46:9, 46:14, 46:22, 52:16, 55:20, 69:5, 80:2, 81:6, 83:2, 84:5, 84:21, 84:24, 85:2, 88:19, 88:20, 88:22, 89:18, 92:12, 96:19, 98:5, 100:3, 101:24,

103:7, 104:21, 108:1, 117:13, 118:22, 119:6, 132:9, 132:14, 132:17, 132:19, 132:21, 133:1, 137:14, 138:2, 138:6
**Iraqi** [1] - 30:20
**Ireland** [1] - 135:18
**irrelevant** [2] - 13:3, 50:19
**Ishmail** [1] - 55:17
**Ismail** [1] - 52:12
**issue** [7] - 3:24, 4:20, 4:21, 41:12, 46:17, 112:17, 140:18
**issued** [5] - 120:1, 120:14, 120:22, 132:14, 143:3
**issues** [4] - 3:5, 10:7, 10:8, 136:24
**Istanbul** [7] - 77:14, 81:6, 83:1, 88:21, 98:5, 100:20, 103:7
**ITAR** [5] - 11:3, 16:8, 16:20, 16:22, 45:24
**item** [12] - 14:2, 14:3, 18:25, 60:13, 108:5, 108:8, 108:19, 116:2, 117:18, 117:20, 127:23, 153:6
**items** [48] - 11:8, 14:1, 14:2, 14:9, 16:3, 16:13, 18:21, 19:7, 19:15, 20:15, 20:17, 20:19, 24:24, 25:1, 45:16, 45:19, 46:4, 46:9, 52:13, 55:23, 66:6, 67:13, 67:23, 69:5, 113:8, 113:10, 113:11, 116:8, 117:6, 117:11, 132:13, 132:16, 150:2, 151:17, 151:20, 152:12, 152:16, 153:5, 153:6, 153:10, 153:13, 153:19, 153:24, 155:1, 155:7, 155:12, 156:13
**Items** [1] - 11:4
**itself** [2] - 51:9, 118:14

**J**

**Jamaica** [1] - 147:4
**JAMES** [2] - 2:9, 144:5
**James** [2] - 138:19,

144:4
**January** [17] - 52:14, 55:24, 88:11, 88:12, 88:18, 88:19, 88:21, 88:22, 89:2, 89:6, 89:14, 90:2, 90:17, 91:11, 125:24, 126:9, 127:2
**Jasperse** [4] - 3:24, 4:16, 38:9, 42:20
**JASPERSE** [10] - 1:20, 4:17, 42:21, 133:25, 134:4, 139:16, 140:8, 142:12, 143:19, 143:25
**Jay** [1] - 134:7
**Jeff** [1] - 148:14
**Jersey** [1] - 145:15
**job** [3] - 111:6, 147:15, 149:24
**John** [1] - 134:7
**john** [1] - 147:2
**JR** [1] - 1:24
**Judge** [1] - 105:14
**Judy** [4] - 5:9, 38:3, 41:6, 42:15
**jump** [1] - 70:10
**June** [7] - 102:8, 102:13, 103:13, 103:17, 103:24, 104:3, 104:14
**jurisdiction** [4] - 127:10, 127:13, 127:18
**JURY** [1] - 1:10
**jury** [24] - 5:6, 5:9, 5:19, 5:21, 9:10, 28:20, 38:3, 40:25, 42:14, 42:16, 44:3, 47:2, 50:7, 58:8, 84:20, 99:25, 110:19, 126:14, 127:2, 127:9, 134:5, 151:2, 151:5, 157:7
**Justice** [1] - 134:7
**justice** [2] - 134:12, 144:20

**K**

**keep** [3] - 116:15, 144:3, 157:10
**keeping** [1] - 59:1
**keeps** [2] - 62:22, 109:15
**Kennedy** [4] - 146:21, 147:2, 147:18, 148:24
**kept** [2] - 74:7, 78:4

**key** [1] - 22:16
**kidnapped** [3] - 3:11, 4:8, 140:1
**kidnapping** [1] - 140:7
**kind** [3] - 130:14, 140:13, 146:11
**kindly** [1] - 80:11
**Kings** [1] - 144:22
**knowing** [2] - 56:21, 91:2
**knowledge** [6] - 11:24, 16:15, 28:23, 32:13, 40:3, 78:8
**knowledgeable** [1] - 11:3
**known** [6] - 9:24, 11:18, 15:12, 71:12, 115:12, 119:11
**knows** [1] - 142:13
**Koelling** [3] - 124:23, 125:1, 125:6
**Kong** [3] - 92:1, 97:7, 99:13
**Krahl** [4] - 57:25, 58:5, 58:6, 69:14
**KRAHL** [2] - 2:5, 58:1
**Kristy** [1] - 129:19
**Kurdistan** [27] - 11:18, 11:20, 12:6, 30:1, 30:5, 30:18, 35:9, 44:19, 46:14, 46:22, 79:22, 80:1, 80:14, 84:2, 84:25, 85:13, 86:22, 89:17, 90:7, 93:11, 93:24, 95:23, 96:14, 100:1, 100:3, 104:23, 138:8
**Kurds** [2] - 30:1, 30:20
**Kuwait** [15] - 7:15, 10:10, 10:12, 10:13, 10:14, 12:9, 29:20, 29:25, 30:11, 35:7, 36:1, 36:19, 37:23, 39:2, 42:4

**L**

**label** [4] - 25:17, 68:5, 68:7, 68:10
**land** [1] - 148:7
**landed** [1] - 10:12
**landing** [1] - 10:13
**laptop** [1] - 138:20
**large** [6] - 6:18, 53:10, 53:17, 53:18, 73:8, 107:25
**larger** [4] - 62:1, 114:10, 123:17, 123:18
**Las** [1] - 47:6

**last** [9] - 3:14, 28:3, 28:15, 43:2, 52:19, 53:9, 104:8, 113:2, 131:11
**Laura** [4] - 43:2, 158:3, 158:14, 158:14
**LAURA** [1] - 158:17
**law** [11] - 41:15, 69:9, 113:16, 113:18, 113:20, 144:15, 145:1, 145:3, 154:12, 154:22
**laws** [2] - 107:14, 107:17
**lay** [1] - 8:21
**lead** [1] - 73:12
**learned** [2] - 10:24, 145:4
**least** [1] - 79:16
**leave** [3] - 5:8, 136:9, 156:15
**left** [5] - 79:13, 79:16, 151:1, 151:6, 151:7
**legal** [3] - 46:2, 74:16, 75:1
**legally** [1] - 55:2
**less** [4] - 7:11, 21:6, 21:11, 81:22
**lethal** [3] - 132:7, 132:18, 132:20
**letter** [4] - 124:19, 124:22, 125:7, 126:13
**letters** [2] - 53:18, 125:9
**levels** [1] - 119:14
**liaison** [3] - 145:18, 145:25, 147:17
**liberty** [1] - 28:24
**license** [25] - 12:1, 59:5, 111:16, 112:7, 117:13, 117:16, 118:4, 118:6, 118:10, 118:14, 118:21, 118:23, 120:14, 122:15, 123:17, 123:22, 124:3, 124:10, 129:14, 132:4, 132:10, 132:14, 132:24, 133:7, 133:15
**licenses** [10] - 113:25, 118:2, 118:8, 118:9, 118:18, 119:25, 120:17, 120:22, 123:15, 132:18
**licensing** [11] - 112:5, 112:6, 112:7,

12

114:16, 114:17, 114:22, 114:24, 115:4, 121:8, 121:15, 121:16

**light** [5] - 39:20, 111:1, 111:20, 111:24, 113:2

**limine** [1] - 4:20

**limited** [1] - 42:1

**line** [5] - 13:6, 17:17, 25:23, 129:21, 152:12

**lines** [2] - 127:5

**list** [20] - 13:24, 14:1, 14:2, 18:14, 18:21, 18:22, 101:4, 111:22, 113:23, 114:4, 114:6, 114:14, 114:24, 119:15, 130:7, 130:9, 130:20, 132:3, 132:9, 150:2

**List** [11] - 115:4, 115:20, 116:19, 117:1, 117:7, 117:10, 117:18, 127:17, 128:16, 128:18, 131:13

**listed** [11] - 20:14, 24:14, 67:4, 67:12, 76:18, 115:20, 116:3, 152:12, 152:14, 153:10

**listing** [2] - 113:23, 119:8

**living** [1] - 5:21

**LLC** [1] - 24:11

**local** [4] - 12:5, 85:19, 85:22, 102:19

**located** [9] - 6:9, 17:8, 20:4, 21:25, 23:20, 58:14, 84:3, 85:1, 147:3

**location** [5] - 25:17, 25:18, 68:9, 69:1, 147:1

**locations** [3] - 45:13, 135:17, 145:14

**Logistics** [1] - 6:16

**look** [30] - 17:10, 22:1, 25:7, 25:14, 31:8, 33:9, 33:10, 45:13, 47:16, 49:7, 54:16, 63:25, 65:8, 74:20, 74:21, 100:15, 121:3, 121:4, 128:10, 128:14, 128:24, 136:22, 138:25, 141:13, 141:21, 142:5,

142:9, 150:7, 154:3

**looked** [7] - 3:13, 33:21, 48:20, 63:17, 64:7, 139:24, 141:24

**looking** [8] - 35:15, 46:19, 67:4, 68:24, 108:20, 126:6, 128:15

**looks** [12] - 18:15, 21:10, 26:3, 49:8, 50:8, 53:16, 56:19, 62:18, 67:21, 152:20, 152:22

**loses** [1] - 143:4

**loss** [3] - 26:20, 73:15, 73:18

**low** [2] - 18:19, 70:13

**lower** [2] - 10:6, 82:22

**lunch** [3] - 72:18, 72:20

**Lynn** [1] - 129:19

## M

**M-16** [2] - 67:14, 71:23

**M.s** [2] - 91:22, 94:22

**M4** [8] - 15:13, 15:24, 16:23, 18:16, 20:24, 26:14, 27:9, 64:10

**M4s** [1] - 47:5

**ma'am** [1] - 143:21

**Mac** [1] - 152:2

**machine** [1] - 114:11

**machinery** [2] - 30:9, 30:15

**mag** [1] - 10:7

**magazines** [1] - 59:12

**mags** [1] - 10:7

**mail** [32] - 17:15, 17:16, 17:18, 18:10, 18:13, 19:1, 22:7, 22:22, 22:23, 23:11, 43:17, 44:8, 50:8, 52:7, 52:10, 52:18, 52:20, 54:1, 54:4, 54:5, 54:18, 54:20, 55:11, 56:1, 65:14, 65:16, 65:18, 65:19, 65:20, 65:25, 66:3

**maintain** [3] - 68:10, 119:21, 119:25

**maintained** [3] - 66:20, 121:21, 125:12

**major** [1] - 15:21

**man** [1] - 61:16

**manager** [3] - 27:11, 73:12, 73:13

**mandatory** [1] - 4:10

**manifest** [1] - 25:15

**manufacture** [11] - 14:4, 14:5, 30:9, 30:15, 59:6, 59:7, 60:13, 62:24, 122:25, 123:3, 126:3

**manufactured** [1] - 26:22

**manufacturer** [4] - 59:3, 60:11, 60:15, 127:15

**manufacturers** [5] - 8:3, 9:20, 16:23, 47:5, 118:14

**manufacturing** [1] - 117:22

**March** [13] - 94:7, 94:12, 94:13, 94:23, 95:1, 95:4, 95:20, 96:8, 97:4, 125:24, 126:10, 145:16, 146:17

**MARIANI** [1] - 1:8

**Marines** [1] - 58:21

**mark** [1] - 32:20

**marked** [13] - 17:4, 20:1, 21:23, 23:18, 33:7, 47:15, 50:23, 52:3, 63:1, 66:9, 68:1, 120:24, 124:14

**master's** [1] - 113:5

**match** [1] - 109:7

**matches** [2] - 24:12, 24:17

**math** [1] - 98:23

**Mathes** [35] - 5:11, 5:16, 8:9, 9:14, 18:9, 28:13, 33:7, 38:4, 38:24, 40:24, 41:7, 47:9, 51:5, 52:8, 52:10, 53:10, 53:15, 54:3, 54:6, 57:11, 57:14, 61:17, 62:7, 63:17, 64:8, 65:21, 66:7, 66:15, 69:5, 69:20, 70:3, 70:7, 70:14, 70:16

**MATHES** [2] - 2:4, 5:12

**Mathes'** [1] - 65:25

**matter** [6] - 18:1, 33:22, 38:25, 41:23, 74:2, 147:11

**matters** [1] - 41:20

**MAY** [1] - 1:11

**McBride** [1] - 157:19

**McComber** [1] - 4:20

**mean** [12] - 20:24, 23:14, 31:13, 41:4, 45:5, 50:6, 52:22, 53:4, 127:7, 127:8,

128:20, 148:6

**means** [11] - 25:16, 55:1, 62:3, 87:16, 119:13, 128:21, 128:22, 146:24, 147:1, 153:17, 158:21

**meant** [1] - 23:15

**Mecomber** [1] - 129:23

**media** [1] - 157:13

**meet** [3] - 10:9, 35:25, 119:19

**meeting** [6] - 10:11, 36:22, 36:24, 37:1, 43:7, 43:13

**meetings** [2] - 36:25, 38:19

**members** [3] - 9:10, 154:12, 157:7

**memo** [2] - 121:10, 122:6

**memorandum** [1] - 121:19

**memory** [9] - 13:9, 31:22, 48:9, 49:5, 138:25, 139:6, 139:9, 156:15

**memos** [1] - 121:21

**mental** [2] - 4:7, 4:11

**mention** [3] - 11:9, 11:13, 12:4

**mentioned** [6] - 11:11, 12:6, 46:15, 105:22, 158:8

**message** [2] - 51:10, 54:2

**met** [15] - 3:22, 7:15, 7:16, 10:13, 10:19, 12:9, 29:20, 29:24, 30:11, 35:7, 35:22, 56:21, 59:16, 59:17, 141:17

**metal** [1] - 128:25

**method** [1] - 67:23

**Mi** [1] - 56:13

**microphone** [4] - 5:18, 58:5, 73:16, 110:17

**mid** [1] - 70:12

**MIDDLE** [1] - 1:1

**Middle** [5] - 29:21, 78:10, 93:1, 158:4, 158:18

**middle** [4] - 55:22, 67:12, 77:1, 125:21

**midway** [1] - 140:16

**might** [4] - 32:15, 41:12, 43:18, 107:9

**mil** [11] - 18:15, 18:18,

20:24, 20:25, 116:10, 128:15, 128:17, 128:20, 128:21, 129:6

**military** [14] - 15:13, 18:16, 21:1, 59:11, 62:2, 71:18, 114:4, 115:16, 128:23, 129:1, 130:11, 132:7, 132:20

**million** [5] - 138:17, 139:23, 139:25, 140:9, 140:17

**mind** [3] - 5:3, 34:13, 157:10

**mine** [1] - 152:5

**minutes** [2] - 57:22, 110:5

**miscellaneous** [6] - 77:9, 82:23, 88:13, 94:17, 97:24, 100:15

**misleading** [1] - 140:5

**missile** [4] - 110:25, 112:1, 112:2, 112:5

**missiles** [2] - 112:3, 114:12

**mission** [1] - 146:3

**Mission** [1] - 6:16

**missions** [2] - 146:1, 146:2

**moment** [13] - 22:12, 33:4, 33:9, 47:15, 47:16, 54:16, 71:25, 105:14, 126:19, 128:7, 129:9, 139:5, 147:10

**monetary** [1] - 107:20

**money** [25] - 7:10, 11:22, 15:9, 21:13, 35:18, 46:20, 79:25, 80:12, 84:1, 90:13, 95:22, 97:6, 98:16, 106:13, 108:8, 108:25, 109:5, 138:15, 139:22, 140:4, 140:7, 140:19, 145:11

**month** [6] - 82:8, 86:7, 87:4, 94:21, 98:24, 100:17

**monthly** [14] - 75:23, 76:11, 77:19, 79:10, 79:11, 81:17, 82:1, 87:2, 87:10, 91:7, 93:5, 97:8, 100:5, 102:4

**months** [2] - 145:2, 147:15

**Montreal** [8] - 134:22, 134:25, 135:1,

13

135:2, 135:4, 135:14, 135:20, 136:3

**Morales** [7] - 3:7, 3:8, 3:17, 5:9, 133:25, 134:5, 143:22

**MORALES** [2] - 2:8, 134:1

**morning** [12] - 3:1, 3:2, 5:16, 5:17, 25:25, 28:13, 28:14, 58:6, 58:7, 157:6, 157:9, 157:24

**most** [1] - 13:10

**motion** [3] - 9:9, 13:13, 13:14

**motions** [1] - 4:20

**motor** [1] - 62:14

**Mount** [2] - 83:2

**mount** [1] - 102:25

**move** [21] - 8:25, 9:9, 13:12, 17:19, 20:9, 22:10, 23:25, 28:4, 45:14, 48:10, 49:23, 50:15, 55:3, 63:11, 64:2, 66:22, 68:17, 73:16, 121:23, 125:15, 154:14

**moves** [2] - 75:4, 150:14

**moving** [7] - 23:13, 43:22, 43:24, 67:12, 83:8, 89:8, 92:22

**MR** [244] - 3:2, 4:5, 4:17, 5:11, 5:15, 7:24, 7:25, 8:4, 8:6, 8:8, 8:16, 8:20, 8:24, 9:4, 9:7, 9:13, 12:19, 12:20, 13:4, 13:12, 13:17, 14:15, 14:17, 14:21, 15:3, 16:7, 16:10, 16:17, 17:19, 17:21, 17:25, 18:6, 18:8, 20:9, 20:11, 20:13, 22:10, 22:12, 22:14, 22:18, 22:19, 22:21, 23:25, 24:2, 24:4, 27:2, 27:7, 27:8, 27:21, 28:2, 28:3, 28:8, 28:10, 28:12, 31:4, 31:7, 31:17, 31:25, 32:3, 32:6, 32:11, 32:15, 33:1, 33:4, 33:6, 33:14, 33:16, 33:20, 33:24, 34:2, 34:8, 34:17, 34:20, 38:2, 38:12, 39:12, 39:25, 40:11, 40:14, 40:23, 41:4, 42:18, 42:21,

42:22, 43:1, 43:8, 47:20, 48:2, 48:5, 48:11, 49:21, 49:23, 49:25, 50:15, 50:17, 50:20, 50:22, 51:1, 51:18, 51:21, 51:25, 52:3, 52:6, 52:25, 53:3, 53:9, 53:21, 53:22, 53:24, 54:7, 54:12, 54:14, 55:3, 55:5, 55:7, 55:8, 57:8, 57:10, 57:17, 57:18, 57:21, 57:25, 58:4, 59:23, 59:24, 60:1, 60:4, 60:7, 60:9, 61:8, 61:12, 63:11, 63:13, 63:15, 64:2, 64:4, 64:6, 65:5, 65:7, 66:22, 66:24, 67:1, 67:3, 68:17, 68:19, 68:21, 69:10, 69:13, 71:25, 72:2, 72:4, 72:7, 72:9, 72:12, 72:17, 72:22, 73:1, 75:4, 75:7, 75:10, 75:13, 75:15, 105:12, 105:14, 105:16, 105:19, 109:10, 109:13, 109:21, 109:23, 110:1, 110:2, 110:3, 110:8, 110:14, 115:2, 115:6, 115:9, 115:11, 121:23, 121:25, 122:2, 122:4, 125:15, 125:17, 125:19, 126:17, 126:19, 126:21, 126:24, 128:7, 128:9, 128:12, 131:6, 131:8, 131:10, 131:21, 131:22, 131:24, 131:25, 132:2, 133:3, 133:4, 133:6, 133:11, 133:13, 133:20, 133:22, 133:25, 134:4, 139:16, 139:17, 139:20, 140:8, 140:13, 140:16, 141:8, 142:12, 142:17, 142:18, 143:17, 143:19, 143:23, 143:25, 144:4, 144:8, 150:14, 150:17, 150:19, 150:21, 154:14, 154:16, 154:18,

155:14, 155:16, 156:18, 156:20, 156:23, 157:1, 157:4, 157:16, 157:17, 157:21, 157:22

**multi** [1] - 129:10

**multi-page** [1] - 129:10

**multiple** [5] - 8:12, 27:10, 27:19, 27:25

**multitude** [1] - 10:15

**MUNDY** [2] - 2:9, 144:5

**Mundy** [3] - 138:19, 144:4, 144:9

**Munitions** [11] - 115:4, 115:20, 116:19, 117:1, 117:7, 117:10, 117:18, 127:17, 128:16, 128:18, 131:13

**munitions** [11] - 5:24, 111:22, 113:22, 114:4, 114:6, 114:14, 114:24, 130:7, 130:9, 130:20, 132:3

## N

**name** [16] - 44:12, 58:10, 58:11, 60:14, 60:21, 61:16, 65:23, 76:2, 76:4, 78:19, 80:16, 120:8, 120:12, 148:14, 148:17, 152:14

**named** [1] - 19:10

**names** [4] - 36:10, 58:12, 130:3, 130:4

**narcotics** [3] - 145:11, 146:21, 147:12

**national** [5] - 111:8, 112:14, 119:5, 132:19, 137:1

**Nato** [1] - 8:13

**nature** [1] - 3:11

**NEALON** [1] - 1:15

**near** [3] - 62:2, 81:24, 150:5

**necessarily** [2] - 13:10, 107:20

**need** [18] - 31:4, 31:13, 32:20, 52:15, 52:17, 60:2, 111:16, 112:8, 117:19, 117:22, 118:6, 118:25, 122:7, 123:16, 123:18,

123:25, 153:15

**needed** [1] - 26:14

**needs** [9] - 3:22, 118:10, 118:11, 118:12, 118:14, 118:15, 118:16, 123:19

**net** [1] - 65:14

**network** [1] - 85:23

**never** [17] - 8:18, 12:12, 13:16, 31:9, 31:15, 31:16, 31:18, 32:6, 32:22, 32:24, 34:17, 45:21, 48:22, 48:24, 56:25, 57:2, 120:21

**new** [2] - 19:25, 60:5

**NEW** [1] - 1:21

**New** [6] - 95:1, 134:7, 135:22, 144:17, 145:15, 147:4

**Newark** [1] - 145:15

**newest** [1] - 47:5

**next** [30] - 5:9, 12:22, 43:7, 43:13, 57:24, 67:24, 72:21, 86:11, 88:23, 92:7, 94:17, 95:12, 98:6, 100:21, 101:4, 103:8, 103:21, 104:15, 107:8, 122:11, 127:1, 129:10, 129:17, 129:19, 129:21, 129:23, 133:23, 137:12, 144:3, 152:10

**night** [2] - 3:14, 155:22

**nine** [3] - 111:25, 113:21, 140:18

**NO** [1] - 1:9

**nobody** [1] - 27:18

**non** [3] - 51:14, 132:7, 132:18

**non-booth** [1] - 51:14

**non-lethal** [2] - 132:7, 132:18

**normal** [1] - 58:25

**normally** [2] - 10:24, 62:1

**North** [7] - 6:10, 7:18, 7:20, 9:22, 11:12, 25:19, 62:6

**Nostro** [1] - 79:19

**note** [2] - 68:8, 68:10

**noted** [3] - 94:9, 96:18, 97:14

**nothing** [9] - 39:21, 57:8, 57:10, 61:24, 72:2, 109:23, 131:6,

133:3, 156:18

**notice** [7] - 70:11, 70:12, 149:4, 150:23, 153:2, 154:8, 155:1

**November** [14] - 51:23, 51:24, 52:19, 82:13, 82:14, 82:15, 82:16, 82:17, 83:18, 84:16, 85:7, 86:5, 86:17, 87:5

**nowadays** [1] - 70:22

**NSD** [1] - 1:18

**number** [18] - 4:19, 44:16, 45:10, 47:18, 53:11, 61:25, 74:4, 74:20, 74:22, 78:19, 98:10, 108:13, 151:8, 151:9, 151:10, 152:21, 153:3

**numbered** [2] - 60:13, 158:9

**numbers** [4] - 36:10, 45:6, 45:12, 45:13

**NW** [2] - 1:19, 1:21

## O

**object** [8] - 13:12, 27:2, 28:3, 33:14, 33:24, 47:20, 50:17, 53:25

**objection** [37] - 7:24, 12:19, 13:3, 14:15, 16:7, 17:21, 20:11, 22:14, 22:18, 24:2, 27:21, 34:17, 48:5, 49:21, 54:6, 55:5, 57:16, 59:23, 61:8, 63:13, 64:4, 66:24, 68:19, 72:8, 72:9, 75:7, 109:25, 110:1, 110:2, 121:25, 125:17, 133:21, 133:22, 143:22, 150:17, 154:16, 156:25

**objectionable** [1] - 3:17

**obligated** [1] - 42:10

**obtain** [1] - 73:21

**obtaining** [1] - 51:19

**obviously** [3] - 10:15, 53:6, 78:4

**occur** [3] - 97:20, 101:10, 101:16

**occurred** [14] - 81:3, 82:7, 86:1, 87:9, 88:14, 90:13, 91:21,

14

92:11, 96:7, 97:25, 98:4, 101:11, 102:16, 103:3
**occurrence** [1] - 155:6
**occurring** [3] - 81:5, 81:8, 100:19
**occurs** [2] - 78:21, 135:16
**October** [7] - 52:18, 55:12, 56:23, 80:24, 81:13, 81:14, 81:15
**odd** [1] - 58:19
**OF** [2] - 1:1, 1:3
**offer** [3] - 4:5, 8:20, 146:11
**offered** [3] - 115:8, 126:14, 140:22
**offering** [1] - 53:11
**offers** [1] - 115:2
**OFFICE** [1] - 1:15
**office** [5] - 117:23, 118:19, 145:16, 147:11, 147:14
**Office** [1] - 125:4
**officer** [11] - 112:5, 112:6, 112:7, 134:16, 135:25, 136:7, 136:13, 144:17, 145:1, 154:23
**officers** [1] - 148:25
**offices** [1] - 147:16
**Official** [3] - 158:3, 158:15, 158:17
**officially** [1] - 12:12
**often** [1] - 153:22
**old** [1] - 59:11
**Olivia** [1] - 52:14
**OMI** [1] - 51:15
**OML** [3] - 6:16, 6:17, 6:18
**ON** [1] - 110:13
**once** [8] - 52:7, 61:4, 118:1, 118:7, 146:22, 151:17, 157:10, 157:14
**one** [66] - 3:5, 4:7, 9:4, 11:23, 12:14, 13:7, 19:5, 22:16, 22:24, 26:14, 27:10, 27:14, 38:22, 40:23, 42:15, 47:12, 50:2, 51:14, 51:21, 52:23, 53:9, 53:10, 53:13, 71:8, 76:18, 79:21, 81:22, 81:23, 86:11, 88:11, 88:12, 88:19, 89:7, 91:17, 91:18, 91:20, 94:12, 94:13, 98:22, 101:3, 103:7,

103:24, 104:8, 107:8, 111:24, 113:22, 114:8, 114:9, 116:4, 116:17, 121:19, 123:24, 129:17, 129:25, 130:17, 131:11, 133:7, 133:8, 135:17, 135:18, 135:19, 136:3, 152:12, 153:11
**ones** [1] - 102:19
**online** [1] - 118:8
**open** [1] - 157:10
**opened** [2] - 58:20, 140:5
**operating** [1] - 146:5
**operation** [3] - 12:8, 122:25, 126:3
**operations** [3] - 6:11, 58:24, 111:9
**opinion** [6] - 8:21, 16:9, 117:11, 117:15, 123:2, 126:14
**opponent** [2] - 14:18, 141:2
**opportunity** [3] - 32:23, 53:12, 77:16
**opposed** [2] - 27:1, 32:4
**ordeal** [2] - 4:9, 4:13
**order** [13] - 19:18, 19:22, 21:16, 23:1, 23:15, 61:20, 66:16, 67:17, 68:23, 111:16, 117:19, 118:11, 124:1
**ordered** [5] - 19:15, 20:15, 20:17, 61:24, 67:13
**ordering** [4] - 83:19, 83:21, 85:10, 86:18
**orders** [1] - 118:13
**organization** [1] - 113:13
**organized** [1] - 114:7
**original** [1] - 142:23
**originally** [1] - 80:1
**originated** [4] - 84:1, 84:24, 85:12, 86:21
**originating** [1] - 23:2
**originator** [2] - 22:17, 90:23
**otherwise** [1] - 64:15
**Ottawa** [1] - 135:20
**outs** [3] - 88:24, 119:20, 132:17
**outside** [8] - 5:6,

16:21, 40:24, 41:9, 50:19, 78:9, 88:14, 147:16
**outstanding** [1] - 147:23
**overruled** [2] - 16:16, 27:23
**overseas** [5] - 5:24, 16:13, 65:1, 103:3, 111:16
**overseeing** [1] - 138:11
**owed** [1] - 15:9
**own** [2] - 54:10, 156:12
**owned** [1] - 11:11
**owner** [2] - 7:19, 77:23

# P

**P.A** [2] - 73:22, 76:9
**p.m** [4] - 53:14, 53:16, 68:9, 151:13
**P.N.C** [31] - 73:3, 73:4, 73:5, 73:6, 73:10, 74:4, 74:15, 74:17, 75:1, 75:21, 75:24, 78:5, 78:11, 78:22, 81:19, 84:6, 84:9, 84:23, 85:14, 85:15, 85:23, 86:23, 89:18, 90:9, 90:25, 92:25, 94:1, 96:24, 101:25, 104:24, 105:6
**P.N.C.'s** [1] - 74:7
**PA** [3] - 1:16, 1:25, 158:19
**pack** [2] - 71:18, 71:19
**package** [4] - 19:13, 25:22, 26:2, 68:24
**page** [63] - 22:6, 25:8, 25:10, 25:12, 25:21, 70:12, 76:1, 76:21, 76:22, 76:23, 76:24, 77:8, 80:9, 80:10, 80:25, 81:1, 81:7, 82:3, 82:22, 83:3, 83:11, 83:16, 84:12, 84:19, 85:10, 86:18, 87:8, 88:7, 88:23, 89:15, 90:3, 90:20, 91:12, 92:7, 93:8, 93:20, 94:8, 94:17, 95:12, 95:21, 96:9, 97:5, 97:13, 98:6, 99:11, 99:22, 100:10, 100:21, 101:4, 101:18, 102:9, 103:8,

103:21, 104:15, 122:11, 125:21, 127:1, 129:10, 152:24, 152:25, 153:1, 153:14
**paid** [15] - 7:8, 7:9, 21:6, 21:7, 21:11, 23:7, 29:5, 29:11, 29:17, 67:17, 67:18, 138:16, 140:9, 140:17
**Pakistan** [1] - 10:12
**palm** [1] - 10:15
**paperwork** [8] - 12:2, 78:22, 112:10, 119:1, 119:2, 119:3, 141:21, 149:23
**paragraph** [10] - 122:6, 122:8, 122:11, 125:22, 126:6, 126:8, 129:19, 129:21, 129:23
**pardon** [1] - 42:15
**part** [18] - 15:12, 17:22, 51:21, 66:18, 77:1, 79:6, 79:16, 81:10, 82:5, 98:6, 100:16, 100:22, 109:4, 116:11, 116:14, 131:4, 147:7, 147:9
**parted** [1] - 105:23
**participant** [4] - 8:1, 8:21, 9:14, 9:19
**particular** [33] - 13:20, 28:6, 37:21, 40:6, 41:25, 60:18, 76:10, 76:21, 80:17, 82:3, 84:15, 85:6, 86:4, 86:9, 86:14, 87:8, 90:4, 90:16, 90:21, 93:3, 94:21, 95:17, 96:10, 97:1, 98:7, 98:19, 99:18, 100:17, 108:15, 108:19, 137:24, 147:1, 149:16
**particularly** [1] - 141:3
**parties** [2] - 4:3, 118:12
**partner** [1] - 153:8
**parts** [19] - 13:24, 14:5, 14:6, 14:22, 27:10, 27:12, 27:13, 27:19, 27:25, 28:20, 61:20, 61:24, 64:25, 66:6, 69:24, 70:2, 116:23, 117:5, 130:22

**party** [4] - 14:18, 118:12, 122:24, 141:2
**passed** [1] - 113:15
**passenger** [2] - 136:14, 136:23
**passengers** [2] - 135:6, 136:10
**passes** [9] - 49:8, 49:13, 51:7, 51:17, 51:20, 52:11, 52:17, 54:21, 55:14
**passport** [7] - 136:24, 142:1, 142:3, 142:14, 142:21, 142:24, 143:4
**passports** [2] - 136:7, 143:3
**password** [1] - 151:14
**past** [2] - 39:6, 59:24
**PATRICA** [1] - 2:6
**Patricia** [1] - 72:22
**PATRICIA** [1] - 72:23
**PATRICK** [1] - 1:20
**pay** [2] - 19:15, 19:21
**payment** [8] - 21:22, 22:5, 22:24, 23:4, 23:15, 24:20, 67:20, 108:7
**pending** [1] - 53:25
**PENNSYLVANIA** [2] - 1:1, 1:19
**Pennsylvania** [8] - 23:3, 25:1, 25:20, 78:11, 81:20, 93:1, 158:5, 158:18
**people** [15] - 12:7, 13:7, 26:25, 31:11, 36:13, 46:22, 48:23, 51:14, 52:11, 52:12, 53:2, 55:22, 111:10, 141:21, 156:9
**per** [7] - 21:2, 26:18, 51:15, 62:16, 67:15, 75:2, 147:18
**perform** [2] - 112:24, 148:25
**performed** [2] - 122:16, 124:3
**period** [16] - 29:7, 76:10, 76:12, 76:17, 87:10, 92:16, 94:9, 94:21, 97:12, 100:8, 102:7, 125:23, 125:24, 126:9, 127:1, 147:14
**permission** [3] - 64:17, 75:10, 150:19
**permit** [2] - 64:19, 140:6

15

**permits** [1] - 64:15
**person** [20] - 7:17, 10:9, 27:4, 27:5, 32:14, 54:3, 59:17, 74:15, 83:21, 86:19, 117:19, 117:21, 122:23, 123:3, 123:14, 126:2, 136:2, 148:1, 149:1, 151:19
**personally** [5] - 10:6, 25:16, 27:16, 38:20, 47:3
**personnel** [1] - 107:22
**persons** [3] - 51:13, 119:21, 148:11
**pertaining** [1] - 46:4
**Philadelphia** [1] - 151:8
**phone** [5] - 37:13, 78:16, 156:7, 156:8, 156:9
**phones** [4] - 138:20, 155:25
**photo** [1] - 128:5
**photograph** [1] - 63:6
**photographer** [1] - 71:24
**physical** [5] - 4:7, 4:12, 45:13, 148:8
**physically** [1] - 60:13
**pick** [2] - 88:17, 155:9
**pictures** [1] - 56:20
**piece** [1] - 22:16
**pilots** [1] - 145:25
**pin** [41] - 15:19, 15:21, 15:22, 15:23, 16:4, 17:2, 20:22, 21:8, 26:12, 26:23, 61:25, 62:10, 62:17, 62:18, 62:21, 62:22, 63:23, 63:25, 64:7, 64:21, 67:14, 69:23, 69:25, 70:3, 70:8, 116:5, 116:13, 116:14, 116:15, 116:25, 117:12, 118:22, 126:11, 128:1, 128:3, 128:4, 128:14, 130:22
**pins** [13] - 10:7, 14:3, 19:6, 19:7, 20:18, 37:14, 37:19, 37:20, 61:25, 62:11, 63:23, 67:14, 67:16
**pipe** [1] - 48:23
**pistols** [1] - 59:11
**piston** [2] - 62:13, 62:14
**PITTSTON** [1] - 1:25

**PLACE** [1] - 1:9
**place** [8] - 24:7, 24:10, 31:6, 51:2, 58:9, 62:3, 136:4, 139:19
**placed** [5] - 19:18, 19:22, 23:16, 61:20, 66:15
**places** [2] - 73:6, 108:1
**plague** [1] - 47:4
**plan** [2] - 45:19, 45:21
**plane** [1] - 136:6
**planet** [1] - 70:21
**platform** [4] - 71:2, 71:9, 131:3, 131:4
**platforms** [3] - 8:12, 8:13, 131:4
**pleadings** [1] - 4:19
**plus** [1] - 44:17
**Pocono** [1] - 83:2
**point** [7] - 3:16, 37:18, 46:3, 46:7, 71:4, 80:5, 146:14
**pointing** [1] - 127:1
**points** [1] - 119:5
**Polad** [2] - 52:11, 55:17
**police** [1] - 144:17
**Police** [1] - 144:18
**policies** [1] - 114:1
**policy** [7] - 111:8, 112:14, 119:6, 119:11, 119:16, 119:19, 132:13
**Policy** [1] - 125:5
**poplar** [2] - 47:6, 47:7
**port** [3] - 148:9, 151:12, 153:3
**portal** [1] - 118:8
**portion** [3] - 17:23, 43:4, 80:11
**portions** [5] - 31:9, 33:13, 33:15, 33:17, 84:20
**position** [7] - 5:8, 73:11, 73:12, 73:14, 135:24, 145:2, 145:20
**positions** [5] - 5:4, 73:10, 112:15, 112:16
**possession** [5] - 138:20, 139:7, 139:10, 151:24, 154:23
**possible** [1] - 143:25
**posted** [1] - 82:11
**potentially** [2] - 12:7, 35:15
**practice** [4] - 66:18,

151:21, 153:18, 155:7
**Pre** [1] - 134:22
**pre** [1] - 135:5
**Pre-clearance** [1] - 134:22
**pre-clears** [1] - 135:5
**preceded** [1] - 51:6
**predominantly** [1] - 146:20
**preparation** [2] - 105:4, 137:19
**prepare** [3] - 13:25, 149:23, 151:3
**prepared** [2] - 38:11, 158:11
**preparing** [1] - 74:3
**prepay** [1] - 19:25
**presence** [2] - 5:6, 40:25
**present** [5] - 5:2, 36:22, 47:5, 48:8, 136:7
**president** [2] - 58:17, 58:22
**presidents** [1] - 113:17
**pretty** [1] - 45:12
**prevention** [2] - 73:15, 73:18
**previously** [11] - 17:4, 20:1, 21:23, 23:18, 63:1, 66:9, 67:25, 113:2, 116:1, 120:24, 124:14
**price** [6] - 21:2, 21:4, 21:6, 21:8, 27:15, 67:15
**pricing** [4] - 14:1, 14:12, 18:25, 66:5
**primary** [4] - 136:6, 136:7, 136:13, 141:19
**Primes** [1] - 6:1
**print** [1] - 53:14
**printed** [1] - 68:5
**privacy** [1] - 148:11
**private** [1] - 5:23
**Pro** [1] - 152:2
**pro** [2] - 18:19, 70:13
**problem** [2] - 12:3, 40:22
**problems** [1] - 10:6
**procedure** [2] - 137:6, 156:14
**procedures** [1] - 114:1
**proceed** [5] - 17:10, 42:25, 110:7, 121:5, 139:14
**PROCEEDINGS** [1] -

1:10
**proceedings** [1] - 158:8
**process** [11] - 40:9, 73:24, 75:1, 108:4, 108:5, 111:10, 114:17, 114:20, 114:25, 115:5
**processes** [1] - 136:8
**processing** [1] - 114:21
**procured** [1] - 51:7
**produced** [5] - 7:22, 26:19, 38:18, 74:4, 75:1
**product** [3] - 23:16, 24:21, 24:22
**production** [3] - 122:25, 123:6, 126:3
**products** [2] - 59:6, 59:10
**profitability** [1] - 27:16
**program** [1] - 145:5
**programs** [1] - 123:18
**project** [3] - 138:11, 138:16, 140:10
**projects** [1] - 12:13
**prompt** [1] - 22:19
**prompted** [1] - 38:24
**pronounce** [1] - 96:17
**proper** [4] - 15:17, 31:22, 41:23, 42:9
**properly** [1] - 15:18
**property** [4] - 149:23, 151:22, 154:9, 154:22
**propose** [2] - 40:24, 42:23
**proposing** [1] - 53:10
**Protection** [8] - 134:17, 134:19, 135:3, 135:5, 136:1, 145:18, 146:23, 148:25
**protocol** [1] - 19:24
**proven** [1] - 27:6
**provide** [9] - 18:21, 37:19, 40:25, 66:4, 80:12, 123:14, 124:1, 124:5, 124:11
**provided** [6] - 8:18, 38:15, 38:17, 39:22, 41:16, 151:14
**provides** [1] - 136:22
**providing** [2] - 18:13, 18:14
**provisions** [1] - 158:5
**publish** [8] - 18:6, 55:7, 65:5, 67:1,

75:10, 122:2, 125:18, 150:19
**pulled** [1] - 74:15
**purchase** [8] - 19:8, 23:6, 27:3, 27:4, 27:9, 27:24, 111:16, 118:11
**purchased** [3] - 19:5, 19:6, 70:3
**purchasing** [2] - 52:13, 55:23
**purported** [1] - 28:19
**purports** [1] - 44:11
**purpose** [4] - 18:4, 32:24, 114:5, 136:21
**purposes** [5] - 127:22, 127:23, 129:1, 130:11, 132:25
**pursuant** [2] - 8:18, 158:5
**put** [8] - 19:3, 25:17, 27:14, 31:13, 33:1, 138:24, 151:14, 151:15
**putting** [1] - 11:20

## Q

**QUALIFICATIONS** [1] - 110:13
**quantity** [2] - 118:16, 152:3
**quarter** [1] - 144:2
**Queens** [1] - 147:4
**questioned** [2] - 3:8, 139:22
**questioning** [1] - 53:25
**questions** [20] - 12:23, 28:8, 32:9, 34:4, 34:5, 40:2, 41:16, 42:19, 53:4, 69:10, 105:12, 105:17, 109:21, 126:17, 131:11, 131:21, 139:16, 142:20, 143:19, 155:14
**quick** [5] - 22:1, 74:20, 98:3, 133:4, 141:13
**quickly** [1] - 13:8
**quit** [1] - 157:8
**quite** [1] - 148:3
**quote** [7] - 18:23, 18:24, 38:25, 45:10, 51:10, 66:4, 66:6
**quotes** [1] - 14:1
**quoting** [1] - 42:2

16

## R

**R-a-u-n-o** [1] - 44:10
**R.Guns** [3] - 17:22, 18:12, 19:13
**raise** [2] - 35:15, 35:18
**raised** [1] - 3:24
**ran** [1] - 27:16
**range** [1] - 97:11
**rather** [1] - 18:2
**RAUNO** [1] - 22:8
**Rauno** [3] - 44:8, 44:11, 45:10
**razor's** [1] - 12:25
**reached** [1] - 51:10
**read** [28] - 17:9, 26:4, 33:12, 33:16, 33:21, 34:13, 34:15, 35:1, 40:18, 40:19, 41:25, 42:24, 43:2, 43:4, 47:17, 48:15, 55:25, 116:2, 121:3, 122:7, 125:22, 126:7, 127:2, 127:7, 127:9, 142:8, 157:12
**reading** [6] - 31:21, 33:14, 47:18, 52:8, 91:20, 155:4
**ready** [8] - 17:10, 20:3, 33:18, 53:18, 72:11, 106:9, 110:7, 121:4
**realize** [1] - 68:25
**really** [2] - 11:3, 107:20
**rear** [1] - 18:18
**reason** [12] - 19:21, 27:14, 27:19, 27:24, 42:17, 78:20, 108:7, 109:7, 127:22, 142:13, 151:22, 157:8
**reasonable** [3] - 40:21, 41:4, 148:10
**reasons** [1] - 26:25
**receipt** [3] - 150:24, 154:8, 154:10
**receive** [6] - 75:24, 111:6, 123:15, 123:16, 144:21, 148:14
**received** [18] - 19:14, 23:15, 24:19, 24:20, 24:21, 65:16, 68:9, 68:25, 69:3, 69:4, 115:7, 118:21, 121:8, 144:25, 151:10, 152:11, 152:13, 153:12
**receivers** [6] - 10:6, 59:21, 60:1, 60:3,

60:4, 60:11
**receiving** [2] - 84:10, 152:16
**recess** [3] - 57:23, 72:20, 110:6
**recognize** [15] - 17:12, 20:5, 22:1, 23:21, 48:4, 63:3, 63:20, 65:12, 65:18, 66:11, 68:1, 121:5, 124:16, 150:10, 154:6
**recollection** [9] - 31:21, 33:25, 47:19, 47:21, 47:25, 48:6, 48:21, 48:22, 48:25
**Reconciliation** [1] - 79:19
**record** [10] - 25:11, 32:21, 43:5, 60:15, 60:19, 60:20, 74:14, 85:4, 108:21, 120:17
**records** [10] - 74:4, 74:7, 74:15, 75:1, 106:18, 108:9, 109:3, 119:21, 119:25, 121:22
**RECROSS** [4] - 2:3, 2:12, 132:1, 133:12
**red** [1] - 62:3
**redirect** [6] - 57:9, 72:3, 109:11, 131:7, 143:18, 156:19
**REDIRECT** [5] - 2:3, 2:12, 109:12, 131:9, 133:5
**reduces** [1] - 27:15
**reductions** [1] - 81:12
**reference** [3] - 79:22, 140:11, 157:14
**referencing** [1] - 114:13
**referred** [4] - 43:4, 133:8, 136:10, 141:19
**referred-to** [1] - 43:4
**referring** [3] - 4:22, 15:22, 139:21
**reflect** [6] - 67:9, 91:12, 98:7, 99:1, 104:9, 106:18
**reflected** [4] - 77:10, 82:25, 93:5, 94:20
**reluctance** [1] - 40:5
**refresh** [11] - 33:25, 34:16, 47:19, 47:25, 48:6, 48:9, 48:21, 48:22, 48:25, 138:25, 139:9
**refreshed** [1] - 47:24
**refreshes** [1] - 139:6
**refreshment** [1] -

47:20
**regard** [1] - 27:6
**regarding** [10] - 4:11, 4:18, 4:21, 9:4, 9:11, 39:14, 40:3, 44:25, 45:3, 140:6
**regards** [6] - 80:4, 82:19, 90:3, 96:16, 97:5, 148:15
**region** [1] - 147:24
**register** [1] - 117:25
**registered** [9] - 117:23, 118:1, 118:3, 118:7, 119:22, 120:4, 120:12, 120:21, 133:9
**registration** [5] - 113:25, 121:8, 122:15, 124:10, 129:14
**regular** [4] - 66:18, 74:7, 123:22, 125:9
**regularly** [2] - 121:22, 125:13
**regulate** [1] - 116:12
**regulations** [7] - 45:24, 58:25, 60:12, 113:14, 113:19, 132:4
**Regulations** [2] - 113:20, 119:8
**regulatory** [2] - 112:8, 118:25
**rejected** [1] - 108:10
**related** [3] - 59:13, 59:20, 148:17
**relating** [1] - 38:16
**relationship** [9] - 11:6, 56:22, 59:25, 60:10, 60:24, 61:3, 61:7, 105:7, 109:19
**released** [2] - 156:23, 157:2
**relevance** [8] - 3:24, 4:18, 7:24, 8:5, 12:19, 12:22, 59:23, 61:8
**relevancy** [1] - 4:1
**relevant** [4] - 13:2, 28:7, 31:9, 84:20
**reluctance** [1] - 40:5
**rely** [1] - 98:23
**remarks** [1] - 151:14
**remember** [12] - 15:4, 36:11, 36:17, 37:23, 39:2, 42:4, 47:22, 60:21, 63:7, 137:23, 142:7, 142:8
**remembered** [1] -

36:13
**remind** [1] - 157:10
**remiss** [1] - 57:15
**remittance** [1] - 80:19
**renew** [3] - 13:2, 34:17, 48:5
**repeat** [3] - 20:16, 46:6, 61:13
**rephrase** [2] - 27:7, 30:10
**REPLACE** [1] - 2:13
**replied** [1] - 66:3
**reply** [1] - 19:1
**report** [33] - 25:22, 31:7, 31:10, 31:11, 31:13, 31:15, 31:18, 31:21, 32:19, 33:17, 34:22, 34:23, 34:25, 37:4, 37:6, 43:11, 57:3, 107:3, 107:6, 107:9, 137:4, 137:11, 137:16, 137:19, 137:24, 138:24, 139:1, 139:20, 139:24, 140:8, 141:11, 142:4, 142:9
**reported** [4] - 30:24, 40:4, 43:7, 56:25
**REPORTED** [1] - 158:16
**reporter** [4] - 5:19, 43:4, 58:6, 158:22
**Reporter** [3] - 158:3, 158:15, 158:17
**REPORTER'S** [1] - 158:1
**reporting** [1] - 107:12
**reports** [5] - 31:2, 39:15, 39:17, 107:1, 137:8
**representation** [3] - 39:20, 63:8, 63:24
**represented** [2] - 41:13, 42:8
**reproduction** [1] - 158:21
**reputation** [5] - 7:23, 7:25, 8:22, 10:2, 10:3
**request** [20] - 18:20, 18:24, 22:23, 39:18, 49:8, 49:10, 51:6, 68:5, 68:12, 68:15, 75:2, 118:23, 127:18, 127:20, 147:17, 147:20, 148:2, 148:14, 148:20, 148:21
**requested** [5] - 54:20,

74:2, 80:5, 86:19, 104:16
**requesting** [3] - 18:11, 78:24, 155:8
**requests** [4] - 83:21, 118:18, 147:21, 148:22
**require** [4] - 11:25, 117:16, 132:10, 132:24
**required** [7] - 30:9, 30:15, 117:13, 123:13, 127:11, 127:12, 132:20
**requires** [1] - 128:23
**respect** [6] - 38:17, 39:16, 41:14, 46:17, 60:11, 140:18
**respectively** [2] - 126:5, 127:5
**respond** [5] - 4:15, 18:24, 54:24, 65:25, 66:1
**responded** [1] - 65:20
**response** [7] - 4:21, 18:2, 38:13, 38:25, 39:18, 54:22, 131:11
**responsibilities** [2] - 58:22, 111:5
**rest** [2] - 56:19, 135:19
**restricted** [2] - 11:7, 119:18
**Restricted** [1] - 11:4
**restrictions** [6] - 15:24, 16:2, 16:3, 64:10, 64:21, 119:9
**resubmit** [1] - 119:3
**result** [5] - 120:11, 120:16, 140:1, 140:24, 141:17
**resume** [2] - 3:3, 157:9
**retail** [2] - 27:17, 59:5
**retain** [1] - 116:15
**retainer** [5] - 62:17, 116:5, 116:13, 116:14, 128:1
**retainers** [19] - 15:19, 17:2, 20:22, 21:8, 26:12, 26:23, 63:25, 64:7, 64:21, 69:23, 69:25, 70:3, 70:8, 116:25, 117:13, 118:22, 126:12, 128:14, 130:22
**retaining** [8] - 15:22, 16:4, 16:5, 61:25, 62:10, 63:23, 67:14, 67:16
**return** [4] - 108:8,

108:23, 112:18, 151:16
**returned** [8] - 108:6, 108:8, 108:20, 108:21, 108:22, 108:25, 137:14, 153:25
**review** [16] - 32:12, 32:19, 33:12, 74:4, 77:16, 111:18, 112:8, 112:9, 112:13, 112:16, 118:10, 119:1, 119:5, 136:15, 137:19
**reviewed** [3] - 32:7, 105:3, 118:24
**reviewers** [1] - 112:13
**reviewing** [1] - 47:18
**reviews** [3] - 112:20, 112:24, 113:1
**revolt** [1] - 30:21
**Rick** [3] - 124:23, 124:24, 125:1
**rifle** [13] - 15:13, 15:14, 26:14, 26:18, 59:7, 115:12, 115:17, 115:18, 116:11, 122:18, 123:3, 123:7, 123:9
**rifles** [8] - 26:18, 26:20, 30:9, 30:16, 37:24, 39:3, 42:5, 59:11
**right-hand** [1] - 21:17
**ring** [14] - 15:10, 15:11, 20:24, 62:12, 62:13, 67:15, 74:10, 116:4, 116:10, 116:11, 120:25, 130:25, 139:3, 150:5
**rings** [41] - 14:3, 14:4, 15:15, 15:25, 16:5, 16:23, 18:15, 19:3, 19:5, 19:7, 20:18, 20:19, 21:2, 26:7, 26:14, 26:22, 37:14, 37:24, 39:3, 40:10, 42:5, 61:25, 62:10, 62:14, 62:16, 62:24, 63:5, 63:9, 63:16, 64:11, 67:14, 69:22, 69:25, 70:2, 70:8, 116:18, 117:12, 118:22, 126:11, 129:5
**rise** [2] - 138:11, 138:13
**RMR** [3] - 158:3, 158:14, 158:17

**RMR,CRR** [1] - 158:14
**road** [2] - 33:1, 144:22
**ROBERT** [1] - 1:8
**Rodger** [3] - 14:14, 14:24, 15:8
**ROGER** [2] - 2:5, 58:1
**Roger** [7] - 14:12, 15:8, 17:15, 17:16, 18:24, 57:25
**Roggio** [144] - 3:9, 3:15, 3:21, 4:25, 5:5, 7:12, 7:15, 7:16, 7:18, 7:21, 7:23, 9:24, 10:2, 10:13, 10:17, 11:6, 11:11, 12:1, 13:14, 13:24, 19:23, 22:7, 22:8, 22:9, 23:2, 24:11, 24:23, 25:19, 26:4, 26:7, 29:20, 29:25, 30:4, 30:8, 30:11, 35:7, 35:23, 36:19, 37:2, 37:13, 38:16, 38:17, 38:21, 39:7, 39:16, 39:22, 40:9, 41:14, 41:17, 41:21, 41:23, 42:1, 44:12, 44:13, 44:16, 45:15, 45:25, 46:4, 46:9, 46:12, 46:15, 46:21, 47:10, 48:13, 48:17, 48:23, 51:5, 52:8, 52:10, 53:11, 53:13, 54:18, 54:20, 55:12, 56:16, 56:22, 59:14, 60:10, 60:23, 61:15, 74:3, 76:5, 77:20, 79:8, 80:18, 84:11, 84:22, 85:17, 87:1, 87:7, 88:5, 89:19, 89:21, 90:8, 91:8, 91:13, 92:25, 93:13, 93:15, 93:25, 94:4, 95:24, 96:2, 96:14, 96:23, 99:16, 100:2, 100:6, 102:3, 102:4, 105:2, 105:7, 105:23, 120:3, 120:8, 120:13, 120:19, 122:9, 122:13, 129:15, 129:17, 129:19, 129:25, 137:13, 137:17, 138:1, 138:10, 138:18, 139:14, 139:23, 140:22, 140:24, 142:20, 143:11, 147:6, 148:18, 149:18, 151:13,

151:25, 152:19, 153:8, 155:22
**roggio** [1] - 151:14
**ROGGIO** [1] - 1:7
**Roggio's** [7] - 8:1, 40:3, 60:21, 106:13, 138:20, 139:7, 139:11
**role** [6] - 29:17, 36:9, 58:18, 73:15, 111:2, 112:23
**rooms** [1] - 52:15
**Ross** [41] - 7:12, 10:18, 10:19, 10:25, 11:17, 11:23, 12:2, 12:6, 12:11, 13:9, 14:11, 14:14, 14:17, 15:7, 18:22, 22:8, 23:12, 25:19, 47:12, 49:8, 50:10, 50:11, 52:9, 52:20, 53:17, 55:12, 56:6, 56:18, 59:14, 74:3, 120:3, 120:13, 122:9, 129:25, 137:13, 138:18, 147:6, 148:18, 149:18
**ROSS** [1] - 1:7
**route** [1] - 26:1
**routing** [1] - 78:19
**rule** [6] - 4:6, 5:5, 5:7, 140:25, 141:1
**ruled** [1] - 140:3
**rules** [2] - 8:18, 51:12
**ruling** [2] - 141:5, 142:15
**run** [2] - 111:9, 130:3
**running** [1] - 58:24
**Russia** [2] - 44:22, 44:23
**Russian** [4] - 6:1, 44:22, 44:25, 45:3

## S

**sale** [2] - 53:10, 123:21
**sales** [2] - 22:7, 111:14
**San** [1] - 152:3
**sand** [1] - 10:16
**School** [1] - 73:22
**scope** [2] - 50:19, 131:24
**SCOTT** [1] - 1:17
**Scottsdale** [1] - 94:23
**SCRANTON** [1] - 1:16
**Scranton** [1] - 158:19
**screen** [6] - 25:14, 65:8, 70:11, 75:17,

75:18, 84:4
**screened** [2] - 135:10, 135:11
**screening** [1] - 136:4
**scuba** [1] - 10:17
**search** [9] - 39:13, 122:8, 122:13, 148:4, 148:12, 148:22, 149:13, 151:17, 151:23
**searches** [1] - 148:1
**second** [39] - 14:3, 25:21, 40:23, 42:15, 76:21, 76:22, 80:9, 80:10, 80:25, 82:3, 83:16, 84:19, 85:10, 86:18, 88:7, 89:15, 90:3, 90:20, 91:12, 91:18, 93:8, 93:20, 94:8, 95:21, 96:9, 97:5, 97:13, 99:11, 99:22, 100:10, 101:18, 102:9, 116:4, 122:5, 125:21, 126:6, 129:21, 152:24, 152:25
**secondary** [15] - 136:10, 136:12, 136:13, 136:14, 136:17, 136:21, 136:22, 137:3, 137:10, 137:13, 137:23, 138:1, 141:18, 142:20, 155:24
**SECTION** [1] - 1:18
**section** [7] - 51:13, 77:8, 87:9, 119:7, 151:23, 152:8, 152:10
**Section** [1] - 158:6
**sector** [1] - 5:23
**secure** [1] - 155:12
**secured** [1] - 155:12
**Security** [7] - 121:9, 124:19, 144:11, 145:8, 145:13, 153:18
**security** [5] - 111:8, 112:14, 119:5, 137:1, 138:19
**see** [34] - 32:7, 32:18, 41:1, 43:15, 45:9, 50:23, 53:19, 53:22, 55:9, 55:11, 56:3, 56:7, 56:8, 56:17, 56:18, 56:20, 60:8, 62:1, 68:13, 69:16, 79:23, 84:4, 109:4,

120:3, 120:13, 135:7, 139:5, 142:9, 152:3, 157:9, 157:24
**seeing** [1] - 4:23
**seek** [2] - 40:7, 133:7
**seeks** [1] - 53:24
**seem** [1] - 39:6
**seized** [1] - 155:18
**seizure** [3] - 149:5, 149:11, 149:12
**selecting** [1] - 112:11
**self** [3] - 4:1, 4:2, 4:21
**self-serving** [2] - 4:2, 4:21
**sell** [6] - 14:6, 59:8, 59:10, 62:7, 62:9, 64:25
**selling** [2] - 6:12, 111:15
**semantics** [1] - 128:1
**semiautomatic** [2] - 130:17, 131:12
**send** [7] - 19:1, 21:19, 64:17, 68:15, 78:17, 90:1, 108:6
**sending** [2] - 28:20, 79:21
**sense** [2] - 5:2, 149:8
**sensor** [2] - 110:25, 146:5
**sent** [16] - 14:1, 17:17, 21:21, 22:7, 22:8, 54:6, 65:18, 70:14, 70:16, 79:20, 81:13, 89:15, 108:10, 119:2, 121:9, 124:22
**sentence** [2] - 125:22, 126:8
**separate** [1] - 114:9
**September** [2] - 77:13, 146:17
**serial** [1] - 60:13
**series** [1] - 12:22
**service** [5] - 122:20, 122:22, 122:23, 123:4, 123:14
**services** [5] - 111:17, 123:20, 124:6, 124:11, 132:15
**serving** [3] - 4:2, 4:21
**set** [4] - 6:18, 46:8, 93:1, 158:9
**setting** [1] - 73:11
**seven** [3] - 18:19, 145:15, 153:11
**several** [4] - 5:1, 11:21, 12:6, 12:11
**Shanghai** [2] - 92:3, 99:13
**Shannon** [1] - 135:18

**ship** [12] - 15:24, 16:12, 16:21, 24:24, 25:19, 26:7, 45:19, 45:21, 64:10, 64:12, 69:5, 118:22
**shipment** [1] - 23:1
**shipped** [9] - 23:17, 24:22, 26:16, 45:17, 46:4, 53:19, 63:17, 64:8, 67:18
**shipping** [10] - 23:6, 25:15, 25:17, 44:5, 67:23, 67:24, 68:7, 116:6, 123:24, 132:13
**shit** [1] - 70:14
**shop** [1] - 27:17
**short** [1] - 69:17
**Shot** [18] - 46:25, 47:2, 47:3, 47:19, 47:23, 48:13, 48:17, 48:23, 49:9, 51:8, 51:11, 52:11, 52:13, 53:2, 54:19, 54:21, 55:14, 55:24
**shot** [1] - 10:6
**show** [27] - 17:4, 20:1, 21:23, 23:18, 25:6, 32:18, 33:7, 47:14, 47:15, 49:6, 54:15, 63:1, 63:19, 64:24, 65:3, 66:9, 67:25, 68:22, 76:24, 78:22, 108:9, 115:25, 118:6, 120:24, 124:8, 124:14, 142:20
**Show** [18] - 46:25, 47:2, 47:3, 47:19, 47:23, 48:13, 48:17, 48:23, 49:9, 51:8, 51:11, 52:11, 52:14, 53:2, 54:19, 54:21, 55:14, 55:24
**showing** [6] - 86:12, 89:9, 89:20, 93:15, 95:14, 96:2
**shown** [2] - 32:6, 77:3
**shows** [1] - 68:24
**side** [5] - 11:18, 62:20, 62:21, 71:15, 71:16
**sidebar** [9] - 31:4, 31:5, 31:6, 33:3, 34:3, 51:2, 54:13, 139:19, 141:6
**Sidiropoulou** [2] - 153:5, 154:11
**sights** [2] - 18:18
**sign** [1] - 154:24
**signature** [4] - 152:4,

152:5, 152:14, 153:11
**signatures** [1] - 154:19
**signed** [3] - 19:13, 26:2, 26:3
**silently** [1] - 17:9
**similar** [4] - 11:1, 84:19, 123:15, 148:21
**simply** [1] - 16:12
**six** [5] - 16:25, 26:22, 127:5, 137:22, 145:2
**size** [1] - 13:7
**sky** [1] - 146:12
**slash** [2] - 86:7
**slings** [1] - 59:11
**small** [7] - 53:15, 111:1, 111:19, 111:20, 111:23, 113:2, 114:10
**smuggling** [2] - 28:16, 145:11
**sold** [2] - 13:18, 14:2
**sole** [1] - 39:17
**someone** [11] - 19:10, 35:22, 36:18, 44:11, 54:2, 68:15, 106:12, 108:5, 111:15, 147:23, 156:7
**sometimes** [2] - 132:6, 147:22
**somewhat** [2] - 39:19, 140:1
**somewhere** [2] - 78:9, 88:25
**soon** [2] - 24:21, 137:10
**sorry** [15] - 9:7, 25:12, 25:13, 43:17, 43:18, 44:2, 46:11, 47:23, 70:10, 70:13, 111:21, 131:22, 132:12, 142:10, 152:9
**sort** [4] - 27:5, 128:25, 145:11, 147:12
**sorts** [1] - 153:16
**sounds** [1] - 6:20
**source** [6] - 7:3, 7:6, 7:7, 11:3, 14:11, 39:16
**sources** [1] - 118:14
**southern** [1] - 148:9
**Soviet** [3] - 56:12, 71:18, 71:19
**space** [5] - 110:25, 112:1, 112:2, 112:3, 112:5
**speaking** [9] - 20:7,

48:12, 63:16, 75:19, 76:22, 78:2, 79:23, 147:9, 153:14
**spec** [8] - 18:18, 20:24, 20:25, 128:15, 128:17, 128:20, 128:21, 129:6
**special** [10] - 6:11, 6:12, 51:13, 144:10, 144:14, 145:7, 145:20, 148:14, 151:10, 155:5
**specialized** [1] - 144:25
**specializing** [1] - 27:17
**specially** [1] - 117:8
**specific** [3] - 40:17, 130:16, 145:5
**specifically** [6] - 3:7, 6:10, 9:22, 29:25, 68:25, 130:10
**specification** [2] - 18:16, 21:1
**specifications** [1] - 128:23
**specifics** [8] - 90:4, 93:8, 93:20, 95:21, 96:10, 101:18, 104:15, 147:10
**speck** [1] - 18:15
**spent** [2] - 21:13, 145:2
**spoken** [1] - 61:4
**Sports** [1] - 58:13
**Spring** [2] - 25:20, 25:25
**stacks** [1] - 71:22
**staff** [2] - 112:13, 119:4
**staffing** [2] - 112:15, 119:5
**stamp** [1] - 25:24
**standard** [8] - 18:16, 19:24, 21:1, 59:4, 137:6, 150:1, 151:21, 155:7
**start** [3] - 26:5, 106:21, 145:23
**started** [2] - 10:18, 45:1
**starting** [5] - 18:9, 86:3, 116:17, 126:7, 152:25
**starts** [2] - 26:6, 125:23
**state** [16] - 4:12, 5:2, 12:3, 58:25, 64:16, 110:22, 113:7,

114:24, 115:4, 117:23, 119:21, 119:25, 120:21, 120:22, 121:21
**State** [4] - 11:24, 11:25, 110:21
**statement** [43] - 3:16, 3:17, 3:18, 3:19, 4:2, 4:11, 9:11, 23:22, 23:23, 24:5, 24:7, 31:23, 31:24, 31:25, 32:1, 50:20, 51:17, 55:1, 75:20, 75:21, 75:23, 76:11, 76:13, 79:10, 79:11, 80:22, 81:17, 82:1, 87:2, 88:2, 91:8, 93:5, 94:3, 94:4, 96:18, 97:9, 98:7, 100:5, 102:4, 105:25, 106:7, 118:11, 140:20
**statements** [13] - 18:1, 18:3, 34:21, 34:23, 34:24, 35:1, 52:23, 54:10, 77:15, 77:19, 82:5, 105:20, 105:21
**states** [1] - 73:7
**STATES** [3] - 1:1, 1:3, 1:15
**States** [46] - 1:13, 5:23, 6:21, 7:1, 7:3, 9:23, 16:22, 16:25, 29:15, 29:16, 47:4, 55:2, 62:23, 64:13, 78:10, 88:15, 111:22, 113:22, 114:3, 114:6, 114:14, 114:24, 115:4, 115:20, 116:19, 117:1, 117:6, 117:10, 117:18, 127:17, 128:16, 128:18, 131:12, 134:16, 134:18, 135:5, 135:6, 135:7, 135:9, 136:2, 136:23, 139:14, 147:6, 158:4, 158:6, 158:18
**stationed** [5] - 134:21, 134:22, 135:1, 135:21, 135:22
**steel** [1] - 70:13
**stenographer** [1] - 42:24
**step** [6] - 38:4, 72:5, 109:24, 133:19, 143:21, 156:21
**sticker** [1] - 33:2

**still** [2] - 132:24, 133:9
**sting** [2] - 46:8, 46:10
**stock** [2] - 14:6, 53:18
**stocks** [1] - 18:16
**stolen** [1] - 143:4
**stop** [2] - 126:6, 129:10
**stopped** [1] - 127:4
**store** [1] - 58:9
**straight** [2] - 123:23, 141:13
**STREET** [1] - 1:24
**stricken** [1] - 13:15
**strike** [4] - 8:25, 9:10, 13:12, 28:4
**Stroudsburg** [8] - 23:3, 25:2, 25:20, 76:9, 81:20, 81:23, 81:24, 81:25
**struck** [2] - 13:9, 13:14
**structure** [1] - 117:25
**structuring** [1] - 107:11
**stuck** [1] - 32:14
**stuff** [6] - 59:1, 59:13, 70:20, 132:18, 136:16
**style** [1] - 59:7
**sub** [1] - 4:7
**subject** [10] - 17:17, 53:16, 56:1, 56:3, 60:5, 140:17, 142:11, 142:15, 148:12, 148:23
**submit** [10] - 4:6, 111:16, 112:15, 113:25, 118:2, 118:7, 118:9, 127:17, 127:19, 140:2
**submitted** [2] - 112:9, 130:3
**subsequently** [1] - 140:7
**substandard** [1] - 15:15
**suggest** [2] - 3:23, 16:8
**suggested** [1] - 14:12
**SUITE** [1] - 1:16
**Sulaymaniyah** [5] - 96:19, 101:24, 104:21, 138:8, 138:12
**supervise** [2] - 111:18, 112:23
**supervised** [1] - 113:1
**supervision** [2] - 158:11, 158:22

19

**supervisory** [1] - 134:16
**supplier** [1] - 14:11
**suppliers** [2] - 5:25, 8:2
**supply** [2] - 5:25, 6:10
**support** [4] - 146:2, 146:9, 146:11, 146:12
**suppose** [1] - 78:9
**supposed** [1] - 19:3
**surplus** [1] - 59:11
**surveillance** [1] - 146:8
**suspected** [1] - 137:2
**suspicion** [2] - 108:2, 143:8
**suspicious** [3] - 107:17, 107:23, 109:15
**sustained** [6] - 14:16, 15:1, 34:19, 48:1, 49:24
**sworn** [6] - 5:13, 58:1, 72:24, 110:10, 134:2, 144:5
**symbol** [1] - 44:12
**system** [4] - 24:22, 62:13, 118:18, 156:6
**systems** [2] - 122:9, 122:14

**T**

**tab** [3] - 17:7, 63:3, 121:3
**Tactical** [11] - 6:7, 6:8, 6:15, 6:25, 27:11, 51:15, 65:24, 66:14, 67:6, 67:9, 68:23
**tactical** [2] - 6:10, 27:18
**tailored** [1] - 40:17
**Talabani** [2] - 52:12, 55:17
**talks** [1] - 113:25
**tank** [1] - 56:14
**target** [2] - 147:25, 148:22
**Tariff** [1] - 11:4
**tariffs** [1] - 11:7
**task** [1] - 147:16
**tasks** [1] - 146:2
**team** [8] - 111:1, 111:9, 111:20, 111:23, 112:5, 113:3, 114:22, 127:18
**teams** [2] - 111:1, 111:9

**tech** [2] - 111:17, 123:20
**technical** [2] - 123:16, 124:4
**technically** [2] - 11:19, 12:7
**technology** [3] - 12:1, 30:9, 30:15
**teller** [3] - 73:11, 73:12, 107:21
**temporary** [7] - 113:17, 142:1, 142:3, 142:14, 142:21, 143:3, 149:8
**ten** [5] - 17:1, 21:7, 26:22, 67:16, 106:22
**term** [2] - 46:23, 46:24
**terminated** [2] - 105:6, 109:19
**terms** [2] - 71:18, 136:23
**territory** [1] - 64:12
**testified** [17] - 5:13, 8:24, 16:10, 29:2, 43:20, 46:12, 47:22, 50:18, 58:2, 72:24, 109:3, 110:11, 114:23, 122:18, 134:2, 140:10, 144:6
**testifies** [1] - 3:21
**testify** [11] - 3:15, 5:6, 39:23, 40:6, 52:23, 74:2, 77:16, 106:9, 147:5, 157:6
**testifying** [6] - 49:22, 69:17, 77:20, 106:2, 129:11, 140:24
**testimony** [27] - 3:3, 3:6, 3:9, 9:2, 13:14, 13:16, 26:21, 28:17, 34:16, 35:5, 35:6, 41:20, 43:20, 48:18, 53:7, 56:24, 74:3, 77:23, 79:25, 80:25, 137:20, 140:5, 141:5, 149:15, 153:24, 157:9
**testing** [2] - 123:11, 126:3
**THE** [148] - 1:1, 1:1, 1:8, 3:1, 3:3, 4:15, 5:4, 8:7, 9:2, 9:6, 9:9, 12:25, 13:13, 14:16, 14:19, 14:25, 16:14, 17:24, 18:4, 18:7, 20:12, 22:13, 22:15, 22:16, 22:20, 24:3, 27:23, 27:24, 28:5, 28:9, 31:24, 32:2, 32:4, 32:9,

32:12, 32:22, 33:5, 33:18, 33:19, 34:1, 34:3, 34:19, 38:3, 38:5, 38:7, 38:8, 38:9, 38:24, 39:19, 40:1, 40:13, 40:21, 41:3, 41:6, 41:8, 41:9, 42:11, 42:12, 42:13, 42:14, 42:20, 42:23, 43:2, 43:6, 48:1, 48:8, 49:24, 50:21, 50:25, 51:3, 51:23, 52:7, 53:4, 53:13, 53:23, 54:8, 55:6, 57:9, 57:11, 57:13, 57:14, 57:19, 57:22, 57:24, 60:3, 60:5, 60:8, 61:9, 61:10, 63:14, 64:5, 65:6, 66:25, 67:2, 68:20, 69:11, 72:1, 72:3, 72:5, 72:6, 72:8, 72:10, 72:15, 72:18, 72:21, 75:8, 75:12, 75:14, 105:15, 109:9, 109:11, 109:22, 109:24, 110:5, 110:7, 115:7, 122:1, 122:3, 125:18, 126:18, 126:20, 126:22, 128:8, 128:11, 131:7, 133:19, 133:21, 133:23, 139:18, 140:11, 140:15, 140:20, 142:16, 143:18, 143:21, 143:24, 144:2, 150:16, 150:18, 150:20, 154:17, 156:19, 156:21, 156:22, 156:25, 157:2, 157:7, 157:24
**theater** [1] - 156:7
**thereabouts** [2] - 37:12, 148:13
**therefore** [1] - 17:23
**therein** [1] - 33:23
**thinking** [2] - 36:2, 36:6
**third** [7] - 25:8, 25:10, 25:12, 83:3, 116:5, 153:1, 153:14
**thirty** [2] - 70:12, 70:13
**thoughts** [1] - 36:7
**thousand** [2] - 18:19, 26:17
**thousands** [5] - 27:12,

29:17, 112:22, 136:20, 137:22
**thread** [1] - 43:18
**threat** [1] - 137:1
**three** [18] - 18:19, 26:15, 26:18, 50:23, 62:14, 62:16, 62:25, 74:10, 81:22, 82:10, 107:9, 111:25, 114:11, 120:25, 138:5, 139:3, 150:5, 152:20
**three-ring** [1] - 120:25
**throughout** [2] - 9:23, 77:23
**THURSDAY** [1] - 1:11
**ticket** [1] - 51:16
**tickets** [2] - 156:7
**ties** [1] - 140:22
**tight** [3] - 40:17, 140:13, 142:19
**timeframe** [6] - 91:22, 98:1, 98:19, 102:17, 146:16, 146:18
**title** [3] - 58:16, 78:19, 110:24
**Title** [1] - 158:5
**TO** [1] - 2:1
**today** [7] - 12:14, 28:23, 74:2, 105:4, 137:20, 140:23, 157:8
**TODD** [1] - 1:14
**together** [2] - 12:13, 25:18
**tomorrow** [4] - 157:9, 157:20, 157:21, 157:24
**took** [9] - 24:7, 24:10, 25:16, 31:6, 31:19, 48:22, 51:2, 52:1, 139:19
**tools** [1] - 59:12
**top** [18] - 17:18, 23:12, 24:5, 52:9, 53:14, 67:4, 76:1, 77:1, 79:4, 79:13, 80:11, 83:11, 92:8, 151:1, 151:6, 151:7, 152:25
**Toronto** [1] - 135:20
**torture** [1] - 140:7
**total** [2] - 21:16, 111:4
**towards** [3] - 79:17, 80:7, 81:7
**track** [2] - 59:1, 109:15
**tracker** [1] - 25:5
**tracking** [1] - 68:5
**trade** [4] - 11:8, 16:20, 58:11, 117:24
**Trade** [3] - 11:5,

110:20, 125:4
**Traffic** [2] - 113:20, 119:7
**trained** [1] - 8:12
**training** [11] - 16:14, 111:19, 114:21, 123:2, 123:6, 123:9, 126:2, 144:25, 145:3, 145:4, 145:5
**transaction** [32] - 11:25, 13:20, 19:4, 24:7, 24:10, 37:21, 61:21, 66:7, 77:12, 78:17, 80:17, 82:12, 82:19, 83:17, 85:6, 85:8, 86:4, 86:9, 86:14, 86:16, 90:22, 92:18, 93:3, 93:9, 93:21, 95:17, 95:19, 96:5, 96:10, 99:18, 107:11, 118:13
**transactions** [23] - 9:5, 12:13, 28:17, 77:9, 77:10, 81:3, 81:4, 81:5, 82:23, 88:13, 88:14, 91:19, 91:21, 92:9, 92:11, 94:18, 97:24, 100:15, 102:16, 107:18, 107:22, 107:25, 109:15
**transcript** [3] - 158:7, 158:10, 158:21
**transfer** [40] - 12:1, 24:11, 24:16, 30:8, 44:1, 44:2, 73:25, 78:8, 78:9, 78:21, 79:6, 80:5, 80:13, 83:22, 85:4, 85:18, 86:12, 86:19, 89:9, 89:21, 89:24, 90:4, 90:11, 90:16, 91:4, 92:23, 93:15, 95:15, 96:2, 96:21, 99:2, 99:16, 99:23, 101:13, 101:14, 101:19, 104:9, 104:16, 149:2, 150:4
**transferred** [2] - 101:21, 149:2
**transferring** [4] - 30:14, 78:13, 85:14, 85:15
**transfers** [3] - 87:9, 90:13, 91:13
**transmittal** [3] - 78:3, 83:10, 84:14
**travel** [2] - 5:1, 153:8
**traveled** [1] - 136:23
**traveler** [2] - 143:4,

154:1
**travelers** [3] - 135:9, 135:11, 153:20
**traveling** [1] - 155:23
**trees** [1] - 10:15
**TRIAL** [1] - 1:10
**trial** [1] - 75:1
**tried** [1] - 108:6
**troublesome** [1] - 40:6
**true** [5] - 28:1, 54:5, 63:8, 63:24, 158:7
**trustworthy** [1] - 13:10
**truth** [2] - 18:1, 39:21
**try** [6] - 27:13, 27:20, 49:4, 105:17, 137:8, 142:19
**trying** [6] - 28:16, 37:23, 39:2, 41:5, 42:4, 124:1
**tubes** [1] - 18:19
**Turkey** [3] - 23:2, 24:17, 76:9
**turn** [2] - 41:17, 149:2
**turned** [6] - 39:17, 41:14, 41:17, 74:18, 124:4, 155:5
**turning** [1] - 75:16
**twice** [2] - 47:8, 61:4
**two** [30] - 14:2, 18:19, 30:20, 36:5, 49:8, 49:13, 51:7, 51:14, 52:11, 54:21, 55:14, 62:25, 70:12, 70:13, 71:4, 81:22, 103:7, 111:3, 111:9, 111:25, 114:10, 116:7, 116:8, 117:6, 124:15, 135:18, 146:6, 147:15, 152:2, 152:3
**type** [19] - 11:25, 28:16, 35:16, 59:5, 71:13, 73:10, 83:9, 84:13, 87:25, 107:25, 130:15, 132:15, 132:16, 144:19, 145:8, 146:18, 147:21, 154:21, 154:24
**types** [3] - 28:24, 59:6, 112:20
**typical** [2] - 147:21, 147:22
**typically** [4] - 71:15, 106:16, 108:9, 136:12
**typo** [1] - 19:2

**U**

**U.S** [17] - 5:25, 6:1, 10:16, 11:2, 11:24, 13:25, 19:23, 64:12, 74:3, 110:21, 111:8, 113:23, 123:14, 124:21, 135:3, 135:7, 135:25
**U.S.M.L** [4] - 115:3, 126:4, 126:12, 127:16
**ultimate** [1] - 118:15
**ultimately** [7] - 19:4, 24:24, 60:25, 62:7, 66:7, 147:13, 155:24
**under** [26] - 3:19, 3:20, 4:3, 4:6, 4:14, 5:2, 5:3, 23:8, 51:15, 59:20, 60:12, 64:15, 64:16, 91:12, 91:19, 97:24, 115:22, 116:3, 116:22, 116:23, 117:4, 117:5, 121:17, 140:25, 158:11, 158:21
**understood** [3] - 22:20, 38:19, 41:6
**uniform** [1] - 41:24
**unit** [3] - 21:2, 21:8, 145:24
**UNITED** [3] - 1:1, 1:3, 1:15
**United** [46] - 1:13, 5:23, 6:21, 7:1, 7:3, 9:23, 16:22, 16:25, 29:15, 29:16, 47:4, 55:2, 62:23, 64:13, 78:10, 88:14, 111:22, 113:22, 114:3, 114:6, 114:13, 114:24, 115:3, 115:20, 116:19, 117:1, 117:6, 117:10, 117:18, 127:17, 128:16, 128:18, 131:12, 134:16, 134:18, 135:5, 135:6, 135:7, 135:9, 136:2, 136:23, 139:14, 147:6, 158:4, 158:6, 158:18
**universal** [1] - 45:12
**unless** [5] - 119:19, 138:24, 142:8, 142:12, 158:21
**unresponsive** [2] - 28:4, 40:15

**untrustworthy** [1] - 13:15
**unusual** [3] - 61:24, 148:2, 155:6
**up** [29] - 3:7, 6:18, 12:14, 13:8, 17:10, 46:8, 51:19, 61:20, 71:22, 78:22, 93:1, 107:21, 109:10, 111:23, 114:8, 115:23, 121:4, 123:23, 124:4, 124:8, 128:22, 140:5, 142:20, 147:15, 150:5, 155:10, 155:24, 157:17
**UPS** [1] - 67:24

**V**

**validate** [1] - 22:25
**validity** [1] - 136:24
**value** [2] - 101:8, 118:17
**Vancouver** [1] - 135:19
**variance** [2] - 59:21, 60:14
**variety** [2] - 5:25, 12:12
**Vegas** [1] - 47:6
**vendor** [5] - 6:25, 27:1, 27:3, 27:10, 27:14
**vendors** [5] - 27:1, 27:4, 27:10, 27:20, 27:25
**versatile** [1] - 71:9
**versus** [4] - 74:3, 130:13, 147:6, 155:17
**view** [1] - 40:13
**Viltrop** [3] - 44:9, 44:11, 45:10
**violated** [1] - 45:24
**violations** [1] - 145:11
**virtue** [1] - 140:3
**visas** [5] - 49:19, 51:22, 52:20, 54:23, 54:25
**visually** [1] - 146:12
**voir** [1] - 41:1
**volume** [2] - 14:6, 27:15
**voyager** [1] - 65:14
**vs** [1] - 1:5

**W**

**wait** [3] - 22:19, 38:5, 46:11
**walked** [1] - 156:3
**walking** [1] - 106:21
**warrant** [1] - 149:13
**warrants** [2] - 147:22, 147:23
**washer** [1] - 18:17
**WASHINGTON** [2] - 1:19, 1:22
**Washington** [1] - 158:19
**waterfront** [1] - 10:14
**ways** [1] - 105:23
**weapon** [5] - 8:11, 15:17, 71:19, 71:20, 115:15
**weapons** [19] - 8:3, 8:11, 8:12, 8:13, 11:17, 11:20, 13:25, 16:21, 27:18, 30:5, 30:14, 35:8, 70:25, 111:1, 111:20, 111:24, 113:3, 114:10, 116:23
**weigh** [1] - 24:22
**welcome** [1] - 75:14
**whole** [4] - 69:24, 122:7, 147:14, 153:15
**wholesale** [1] - 59:5
**Wilkes** [1] - 144:23
**Wilkes-Barre** [1] - 144:23
**William** [4] - 5:11, 53:15, 61:17, 122:9
**WILLIAM** [4] - 1:15, 1:24, 2:4, 5:12
**willing** [1] - 32:18
**wire** [35] - 24:11, 24:16, 44:1, 44:2, 77:6, 78:3, 78:14, 78:20, 81:13, 82:10, 82:13, 82:14, 82:15, 82:16, 82:17, 82:19, 83:10, 83:11, 84:14, 84:15, 87:13, 87:15, 87:20, 88:7, 88:24, 92:21, 94:12, 94:13, 94:14, 94:15, 97:18, 98:12, 108:7, 108:10, 108:14
**wires** [20] - 81:8, 82:7, 82:10, 83:4, 83:5, 83:6, 87:13, 88:24, 92:15, 94:9, 95:10, 97:14, 98:7, 100:11, 100:22, 100:25,

101:6, 102:10, 103:9, 108:1
**withdrawal** [16] - 77:13, 81:13, 88:19, 88:20, 88:21, 88:22, 94:23, 98:16, 98:20, 98:21, 98:22, 102:22, 103:13, 106:1, 106:10
**withdrawals** [11] - 83:1, 87:14, 94:20, 95:1, 95:4, 97:25, 98:19, 100:16, 103:3, 103:11, 103:22
**withdrawn** [1] - 98:24
**withdrew** [3] - 107:3, 107:8, 107:9
**within-mentioned** [1] - 158:8
**WITNESS** [16] - 22:16, 22:20, 27:24, 33:19, 38:5, 38:8, 41:8, 42:11, 42:13, 43:6, 57:13, 61:9, 72:6, 126:22, 128:11, 156:22
**witness** [50] - 5:10, 5:12, 8:16, 8:17, 9:4, 9:11, 13:15, 16:7, 16:9, 17:22, 18:2, 31:18, 32:6, 32:11, 38:10, 40:2, 40:11, 42:24, 43:3, 47:21, 47:24, 50:17, 51:7, 51:10, 53:20, 54:1, 54:9, 57:24, 58:1, 72:7, 72:11, 72:21, 72:23, 75:11, 109:25, 110:10, 115:7, 133:20, 133:23, 133:24, 134:1, 142:13, 143:20, 143:24, 144:3, 144:5, 156:23, 157:2, 157:3, 157:20
**witness'** [3] - 9:11, 38:12, 47:21
**WITNESSES** [1] - 2:1
**won** [1] - 13:25
**wooing** [2] - 46:23
**word** [4] - 9:6, 9:10, 9:12, 149:4
**words** [9] - 37:19, 46:7, 70:17, 88:24, 108:25, 128:24, 130:19, 132:13, 140:13
**works** [3] - 62:13,

21

91:5, 130:6
**worldwide** [1] - 135:17
**wound** [1] - 155:24
**write** [7] - 13:8, 31:2, 36:10, 137:3, 137:8, 137:10, 137:16
**written** [2] - 81:11, 124:5
**wrote** [1] - 31:3

## Y

**year** [8] - 51:14, 52:16, 55:19, 86:7, 113:2, 113:3, 134:13
**years** [20] - 8:14, 9:18, 9:19, 16:11, 27:12, 27:17, 30:20, 58:19, 59:19, 73:5, 110:23, 111:3, 111:4, 134:20, 135:2, 137:22, 138:5, 144:13, 145:15
**years'** [1] - 16:19
**yesterday** [2] - 3:6, 4:17
**York** [5] - 95:1, 134:7, 135:23, 144:18, 147:4
**YORK** [1] - 1:21
**yourself** [5] - 17:9, 33:16, 112:21, 121:4, 122:16
**yourselves** [1] - 157:12

## Z

**Zarya** [20] - 80:5, 80:7, 80:14, 83:20, 84:21, 85:11, 86:20, 89:17, 90:7, 93:10, 93:24, 95:23, 96:13, 96:16, 96:19, 100:1, 101:22, 104:19, 104:20, 140:17
**zero** [1] - 12:13