1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA     :
                             :
                             :
                             :
     vs                      :     3:CR-18-97
                             :
                             :
                             :
ROSS ROGGIO                  :
                             :

     BEFORE:          THE HONORABLE ROBERT D. MARIANI

     PLACE:           COURTROOM NO. 4

     PROCEEDINGS:     JURY TRIAL

     DATE:            FRIDAY, MAY 12, 2023

APPEARANCES:

For the United States:

TODD K. HINKLEY, ESQ.
UNITED STATES ATTORNEY'S OFFICE
WILLIAM J. NEALON FEDERAL BUILDING
SUITE 311
SCRANTON, PA 18501-2830

SCOTT ANDREW CLAFFEE, ESQ.
DOJ-NSD
COUNTERINTELLIGENCE & EXPORT CONTROL SECTION
950 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20530

PATRICK JASPERSE, ESQ.
DOJ-CRM
1301 NEW YORK AVE., NW
WASHINGTON, DC 20530

For the Defendant:

GINO A. BARTOLAI, JR., ESQ.
238 WILLIAM STREET
PITTSTON, PA 18640

2

INDEX TO WITNESSES

FOR GOVERNMENT:    DIRECT   CROSS   REDIRECT   RECROSS

STEVEN CLAGETT        5        18

KATHERINE SALAZAR     20

DOUGLAS GREEN         40

THOMAS SMITH          66
                    (Q)63

JEFFREY BURKE         76       142

3

THE COURT:  Good morning, everyone.

MR. HINKLEY:  Good morning.

THE COURT:  I understand there's something you want to discuss?

MR. HINKLEY:  If may.  As the Court is aware, this case has been going in fairly rapidly and very well in regards to timing.  The government is looking at our witness list and as you know, we have folks coming from Estonia as well as Iraq who won't be here this week.  So as I'm looking at the witnesses we have remaining who are here and available to call, I think what it amounts to is we have approximately a day and a half of testimony but two days to fill.

So when we are thinking about it, we thought we'd make a recommendation to the Court that we call witnesses who we think will fill up the morning and maybe a little bit through after lunch depending on how quickly those witnesses go and then start fresh Monday, which would then -- would give the jury an opportunity to have the afternoon off on a beautiful spring day.

If the Court decides to do that, we still anticipate that based on the paces of witnesses we have left it's likely we will -- we will be resting -- the government's case will be resting either Wednesday afternoon or Thursday midmorning, you know, depending how quickly those last witnesses go.  So it will be still be fairly quick.  We anticipate two to three

4

weeks, but, again, the testimony has been going in fairly smoothly.  So we want to alert the Court of that fact.

THE COURT:  Thank you.  Mr. Bartolai, your thoughts?

MR. BARTOLAI:  No, no, I have no thoughts.  I mean, it is a -- I wouldn't want to have the last witness at ten to five today to cross-examine, but, you know, that's always a problem, you know, but whatever.  I mean, we will deal with what the day gives us, right.  As far as -- I have a -- I have a witness or two that -- at least one witness we have been discussing and perhaps that -- if it does happen maybe a video.  We talked about the possibility of a video conference call, and so I'm just bringing that to the Court's attention.  I don't know what more I can tell you at this point, Judge.

THE COURT:  All right.  Well, you think you have enough to fill the day today and possibly you won't be reach all of the witnesses who are presently available?

MR. HINKLEY:  So we would have -- we think a day and a half worth of testimony, two days to fill.  So the guess the Court's decision is whether we take the afternoon off today giving the jury an opportunity to go home early or Monday we will be short or if we do half day today then Monday we will be a full day and go right into the week and hopefully be done, as I said, Wednesday evening or Thursday morning.

THE COURT:  Let's proceed.  Let's see how far we get. Perhaps around lunchtime I'll have Judy inquire of the jury how

they want to approach this.  I suspect without knowing they would welcome an early quit on Friday.  Unless there's some opposition from the jury, then that's how we will proceed.

MR. HINKLEY:  Thank you so much, Your Honor.

THE COURT:  Okay.  Bring them in, Judy.  You may call your next witness.

MR. CLAFFEE:  The government calls Steven Clagett.

STEVEN CLAGETT, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

ON QUALIFICATIONS

BY MR. CLAFFEE:

Q.   Good morning, Mr. Clagett.  Would you please tell the jury where you work currently?

A.   I am the director of the nuclear missile technology division at the U.S. Department of Commerce Bureau of Industry Security in Washington, D. C.

Q.   How long have you worked at the Commerce Department?

A.   I worked at the Commerce Department since 1989.

Q.   How long have you been in the role of director of the nuclear and missile technology division?

A.   Since the year 2000.

Q.   What does the nuclear and missile technology division do?

A.   We oversee the export and policy related to the export of items that are considered dual use for the nuclear suppliers

group, the missile technology control regime and now also commercial firearms and ammunition.

Q.    What are your responsibilities as director?

A.    As director I basically oversee the licensing, you know, and commodity classification use and licensing determinations. That is when a person wants to export an item that is controlled by the Department of Commerce, they'd come to us to get the license and refer to other agencies, review the transaction and then make a determination.  Also if people have questions as to whether or not it was controlled or not, they would come to us.  We make a technical rendering telling them where if would fall on our list.  From that they can determine to where a license would be required as well as a policy related to these exports.

Q.    Did you have any other roles at commerce before you became a director?

A.    Prior to director, I served as an engineer.  I did actually the actual processes of licensing, making commodity classifications, licensing determinations, again, representing the United States at various international negotiations regarding the export of these type items.

Q.    Have you worked anywhere other than the Department of Commerce?

A.    Yes, I was an engineer with the Department of Navy at a naval station Indian Head.

Q.    Were you a civilian?

A.    Yes, I was a civilian.

Q.    What is your educational background?

A.    I have a bachelor's of science in mechanical engineering from West Virginia University and a master in engineering administration from George Washington University.

Q.    I believe you touched on this earlier.  Are you generally familiar with how the Commerce Department controls certain items for export?

A.    Yes.

Q.    Are you familiar with something called the commerce control list?

A.    Yes, I am.

Q.    Can we call that the C. C. L.?

A.    Yes, it's commonly referred to as a C. C. L.

Q.    What is the C. C. L.?

A.    The C. C. L. is a list of commodities and technologies that are controlled by the Department of Commerce, and from that you can determine where they fall on the list, and also from that you can determine to what countries you would need to apply for a license for.

Q.    How is the C. C. L. organized?

A.    The C. C. L. is organized in ten categories zero through nine.  Within each category there are individual E. C. C. N.s, export control classification numbers.  They are a five

character number.  From that you determine from what regime the item comes, whether it's material, software, technology.  And also for that E. C. C. N. you can look at the country chart and determine to what country we need to get a license for.

Q.    You said E. C. C. N.s consist of five characters?

A.    Yes.

Q.    How are they generally organized?

A.    Generally you have the first character would be what category it is, zero through nine.  You know, one is -- one is materials, two is machinery, three is electronics.  Then there's a letter A., B., C., D., E., A. being equipment, B. being production equipment, C. being materials, D. software, E. technology, et. cetera, and a three digit code.  Then there's some foreign policy controls that have other numbers at the end.

Q.    One of the things you mentioned you oversee is -- I believe you called it a licensing determination?

A.    Yes.

Q.    Can you explain more about the process of licensing?

A.    License determination is also somewhat like a commodity classification.  A licensing determination is when a law enforcement agency would come and say, we have an item, where does it fall on your list and also they may say a country where they needed a license at that time.  So basically it's a technical rendering, you know, of seeing what the item is,

where it falls on the list.  If they give a country from that, you would also determine as to whether or not a license is required to export it to a particular country.

Q.    So you mentioned a license determination comes from law enforcement.  What if you're not law enforcement and you want to know if an item is controlled by commerce?

A.    It's called a commodity classification.  The Commerce Department C. C. L. is written in a way that most people familiar -- remotely familiar within the industry should be able to determine where their item falls on the list.  If they can't determine it, we also say you can go to the original manufacturer who may be able to provide an E. C. C. N., or you can apply for a commodity classification request.  They're free.  There's a simple procedure to do it.  Basically you would send in specifications or a brochure.  We look at the item and then send you back an official sheet of paper which says, this is the E. C. C. N., these are the reasons for control.  And then again you can look at your country chart. It's like a big matrix.  There's an X. in the box you can apply for a license.  We provide those thousands a year.

Q.    So it's written in a way that people in the industry should be able to tell, but if they have any questions they can just ask commerce?

A.    Yes.

Q.    Have you ever done any licensing determinations yourself?

A.    I've performed -- I prepared thousands of them, and I have reviewed and counter-signed, which is the official final determination -- thousands of them.

Q.    Do you oversee people who perform licensing determinations now?

A.    As a director I oversee the people who perform them.  As an engineer I actually did them.  Basically an engineer who works for me will do a license determination, I will review it and sign it off as correct and final.

Q.    Have you testified before on how commerce controls items for export in the process for issuing licenses?

A.    Yes.

MR. CLAFFEE:  Your Honor, the government offers Steven Clagett as an expert on Commerce Department licensing process and how commerce controls items for export in certain countries.

MR. BARTOLAI:  He's accepted, Your Honor.

THE COURT:  The witness is accepted as an expert in the field as described by counsel.

MR. CLAFFEE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. CLAFFEE:

Q.    I would like to show you an exhibit that's already been admitted as Government's Exhibit 7.10.  It will pop up on that screen in a moment.

11

A.    Okay.

Q.    So directing your attention there to the middle of this page, can you read the item that's listed on this packing list?

A.    Combo button 3585/3470, 6X.101 10 inch -- R.H. is probably right hand -- .325 x 22, 17-4 P. H. Rod Futura Nano titanium coated, 9 millimeter.  It's a description of a 9 millimeter rifling button.

Q.    Are you familiar with a rifling button?

A.    Yes.  It's a tool which is either pulled or pushed through a gun barrel to impose the rifling action.  It cuts the grooves and slightly resizes the barrel in the process.

Q.    You mentioned that this item appears to be 9 millimeter in size.  What types of guns could this type of rifling button --

A.    9 millimeter is a traditionally a traditional handgun, semiautomatic handgun round, various submachine guns, some semiautomatic carbines, not a very common size round.

Q.    But you can't tell by looking at this item what type of firearm they'll end up rifling?

A.    No, not exactly, no.

Q.    Does it matter in terms of controls what type of firearm they are going to --

A.    No, it would still be controlled.

Q.    Do you know if this item was contained on the C. C. L. in 2016?

A.    Yes.

12

Q.    How do you know?

A.    By looking at the C. C. L. at the time it would be E. C. C. N. 2 B. 018.

Q.    What types of items does 2 B. 018 control?

A.    It tends to control items that are used in the production of munitions and firearms.  It has, you know, rifling equipment, turning -- armor drilling equipment.  It's items that are for the production of arms and armory.

Q.    I'm sorry?

A.    There's numerous items listed in that E. C. C. N.

Q.    Does that category of items you just described match your -- or include your understanding of the item listed in Government's Exhibit 7.10?

A.    Yes, it would fall under E. C. C. N. 20 B. 018.

Q.    You mentioned that you look to a country chart to determine whether items are controlled for a particular country.  Are there different reasons for control to countries?

A.    Yeah, items could be controlled for a number of reasons. This particular type item would be controlled for national security, regional stability and United Nations Arms Embargo. It's a U. N. reason.

Q.    What does that mean, U. N.?

A.    That had to do -- it was tied to an U. T. arms embargo. So it was -- in this particular entry, so if the country was subject to an arms embargo, that control would apply.

13

Q.    Have you formed an opinion as to whether the item in Government's Exhibit 7.10 required a license to export to Iraq in 2016?

A.    Yes, it would.  There would be an X. in the box for national security, regional stability and for U.N.

Q.    Of the X. in the box on the --

A.    On the country chart, yes.

Q.    Under the Country of Iraq?

A.    On the Country of Iraq the X.s in the boxes means a license is required.

Q.    The whole Country of Iraq?

A.    Yes.

Q.    Now, I would like to show you a document that has been marked for identification as Government's Exhibit 18.3.  You have a binder right there on the ledge.  If you want to just flip to 18.3 silently and look at it yourself and then let me know when you're ready.

A.    Okay.

Q.    Do you recognize this exhibit?

A.    Yes.

Q.    Generally speaking what is it?

A.    This is a print-out of a licensing determination.  It's what we do for -- usually a law enforcement request, and it's what we -- it's what we produce and the print-out from it.

Q.    Is that as a result of the same process you talked about

14

earlier?

A.   Yes, we'd look at the specification of the item, look at the C. C. L., look at the country.  From that we'd say where it falls in the E. C. C. N., whether or not a license is required. Sometimes we will put extra verbiage about licensing policy, et cetera.

MR. CLAFFEE:  Your Honor, the government moves for admission of Exhibit 18.3.

MR. BARTOLAI:  No objection.

THE COURT:  18.3 is admitted.

BY MR. CLAFFEE:

Q.   Let's actually start with second page and all the way up at the top.  Did you personally certify this document?

A.   Yes.

Q.   Is it -- is that part of your job as director to certify records like this?

A.   Yes.

Q.   Okay.  Going back to the first page about half way down there's a section that begins with policy text.  Will you please read the sentence that starts under policy text beginning with based on?

A.   Based on information provided with this request, the Bureau of Industry and Security has determined that the rifling combo button 385.3470 6 X. 101 10 Inch R. H. .325 x 22 17-4PH Futura Nano Titanium Nitrate Coated 9 millimeter is classified

under export control classification 2 B. 018.  Items classified under E.C.C.N.  2 B. 018 are controlled on the commerce control list, the C.C.L., 15 C.F.R. Part 774 Supplement No. 1 for national security and regional stability and United Nations embargo, reasons to Iraq.

Q.    Is that consistent with the opinion that you just gave the jury a few moments ago?

A.    Yes.

Q.    And just read the next sentence from January 1.

A.    From January 1, 2016 to May 19th, 2016 a B. I. S. license was required under part 742.4 and part 742.6 of the export administration regulations E.A.R. 15 C.F.R. part 730 for the export or re-export to Iraq of items classified under E. C. C. N. 2 B. 018.

Q.    So this license determination is consistent with your opinion that a license was required to send this particular type of rifling combo button to Iraq in 2016?

A.    Yes.

Q.    Does the Commerce Department maintain records of all licenses it has issued for exporting items to certain countries?

A.    Yes.

Q.    So would commerce have a record of licenses for all items controlled under 2 B. 018 sent to Iraq?

A.    Yes.

Q.    Explain why it's organized like that.  Why would you maintain a record of all licensing --

A.    We control records -- we control records of all export license applications no matter how they are adjudicated.  We have them -- you can search by the names of the parties, countries of destination or E. C. C. N.s, that being 2 B. 018, and it's helpful in case there's ever a question about a license.  It's also helpful for determining past licensing practices and past licensing history.  So we keep a record of all of it.

Q.    Have you personally checked to see whether any licenses have ever been issued to send items under 2 B. 018 to Iraq?

A.    I searched and did not see any license applications for 2 B. 018.

Q.    Were there any?

A.    There were none.

Q.    Have you also checked to see if the defendant Ross Roggio was ever issued a license?

A.    I found no record of him in the system.

Q.    To any country?

A.    To any country.

Q.    For any item?

A.    For any item.

Q.    What about Roggio Consulting, did you check that name?

A.    Yes.

Q.   What were the results of that search?

A.   The same.

Q.   So the defendant has never been issued any licenses by the Commerce Department at all?

A.   No.

Q.   I would like to show you document marked for identification as Government's Exhibit 18.2.  So it should be in the binder there one tab earlier.  Do you recognize this?

A.   Yes.

Q.   What is it?

A.   It's a certified licensing history which is done by our export management and compliance division who oversees in some ways the database, and they have gone through and looked for these individuals, these addresses, these companies and state that no licensing history was found.

Q.   Do you know the person -- the director who prepared this memorandum?

A.   Yes.

Q.   Are you familiar with how that director goes about producing a memo like this?

A.   Yes.

          MR. CLAFFEE:  Your Honor, the government moves to admit Government's Exhibit 18.2.

          MR. BARTOLAI:  No objection.

          THE COURT:  Exhibit 18.2 is admitted.

18

BY MR. CLAFFEE:

Q.    So directing your attention to the text in bold at the bottom of the page -- bottom half of the page, generally speaking what does that say?

A.    It says that these individuals, these addresses, these companies, the databases were searched and there's no licensing history found for them.  They don't appear on any license request or applications or anything.

Q.    So down there at the bottom following the asterisks, what does that say?

A.    The Commerce Department export license management record systems checks are completed back to October 2012, which are the oldest records available electronically.

Q.    Above that?

A.    No license history found.

Q.    Is that consistent with your own checks that you just described?

A.    Yes.

        MR. CLAFFEE:  No further questions, Your Honor.

        THE COURT:  Cross-examine.

        MR. BARTOLAI:  May I have a moment?

        THE COURT:  Of course.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.    Sir, good morning.  Can we see Government's Exhibit 19.2 I

believe it is -- or 18.2 again?  The asterisks at the very bottom no license history found, and there's an asterisk.  It says -- I will read it.  Commerce Department export license management record system checks are completed back to October 2012 which are the oldest records available electronically.  What do you do in a situation like that before 2012?

A.    There are -- could be some possible paper records or something else, but traditionally that's what the default is.

Q.    So in other words, you have to go back to the paper method at that point?

A.    Paper method or data which may not be generally searchable on the normal system.

Q.    Was it checked back to before 2012?

A.    I do not know.

Q.    Pardon me?

A.    Sir, I would not know.  I just said the check goes to 2012.  Whether or not they searched before I'm not --

            MR. BARTOLAI:  Nothing further.

            THE COURT:  Anything further?

            MR. CLAFFEE:  Nothing further.

            THE COURT:  Thank you very much, sir.  You may step down.

            MR. CLAFFEE:  May we release the witness, Your Honor?

            MR. BARTOLAI:  No objection.

            THE COURT:  Witness is released.  Next witness.

20

MR. HINKLEY:  The government calls Kate Salazar.

KATHERINE SALAZAR, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMIANTION

BY MR. HINKLEY:

Q.    Ms. Salazar, how are you employed?

A.    I work for Wells Fargo bank.  I've been there 18 years.

Q.    And what type of position do you hold at Wells Fargo?

A.    I'm an operational list consultant is the best terminology.  I work for the litigation department, and I represent the bank in court explaining different terms, explaining the story of the bank, the side of the bank, and I pull the research for litigation.

Q.    Have you held this position for the full-time that you were there, or have you held other positions with the bank?

A.    I was in the branch at first with Wachovia bank before it turned to Wells Fargo.  And then I was in corporate, but I've been in the litigation and risk area for nine years.

Q.    What's your educational background?

A.    I went to the University of Arkansas and got a degree in political science and communications.  I attended a short term of law school, and I'm a certified fraud examiner with the bank.

Q.    So you were smart enough not to complete your law degree. Have you received education in regards to your employment with

a financial institution?  Have you any training through the bank in other words?

A.    Oh, absolutely.  I am a certified fraud examiner, which is kind of like the C. P. A. of fraud training with classes for over a year, very difficult eight-hour exam.

Q.    In your education and experience in the banking industry, are you familiar with the process generally of international transfer of funds?

A.    Absolutely.

Q.    The government has requested that you testify today in the matter of United States versus Ross Roggio.  In preparing for your testimony, did you review a number of records produced by Wells Fargo bank for the government?

A.    Yes.

Q.    Were these records kept in the regular course of Wells Fargo's business?

A.    Yes.

Q.    In the three ring binder before you, you will find Government's Exhibit 22.1.  Would you take a moment to look at that document?

A.    Okay.

Q.    And what is Government's Exhibit 22.1?

A.    This is our business records declaration.  The government asked us to produce this information.  This is a list of what we are -- what they've asked and what we produced by paper

22

count and total copies.

Q.   And likewise, would you look at Government's Exhibit 22.2?

A.   Okay.

Q.   What is this document?

A.   The same thing.  This is -- they're asking for our records for our wires.  So they've requested wire information, and we have given them paper count and total copies.

Q.   Do these business records declarations indicate that the information documents that were prepared and turned over to the government were kept in the ordinary course of business of Wells Fargo bank?

A.   Yes, this is exactly what verifies it.

Q.   I'm going to ask you now to look at Government's Exhibits 22.3 through 23.9, which are the next several documents there.

A.   Okay.

Q.   And are these the records that were produced by Wells Fargo?

A.   Yes.

        MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 22.1 through 22.9 inclusive.

        MR. BARTOLAI:  No objection.

        THE COURT:  22.1 through 22.9 are admitted.

BY MR. HINKLEY:

Q.   Would you take a look at Government's Exhibit 22.10, please?

23

A.    Okay.

Q.    Is that, likewise, a record produced?

A.    Yes.

        MR. HINKLEY:  And the government does move for admission of Government's Exhibit 22.10.

        MR. BARTOLAI:  May I have a moment, Your Honor?

        THE COURT:  Sure.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 22.10 is admitted.

        MR. HINKLEY:  May I approach the witness, Your Honor?

        THE COURT:  Yes.

BY MR. HINKLEY:

Q.    Rather than have you look through that huge other binder, I will just provide you a copy what's been marked as Government's Exhibit 14.9 for identification purposes.  Is this another record that was produced by Wells Fargo bank?

A.    Oh, yes, it is.

        MR. HINKLEY:  The government moves for admission of Government's Exhibit 14.9.

        MR. BARTOLAI:  Your Honor, may I have a moment?

        THE COURT:  Yes.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government 14.9 is admitted.

        MR. HINKLEY:  Permission to publish the document, Your Honor?

24

THE COURT:  Granted.

BY MR. HINKLEY:

Q.    Let's start out with Government's Exhibit 22.3.  Would you expand the top half?  Generally speaking what is this document, Government's Exhibit 22.3?

A.    This is Wells Fargo business choice checking statement.

Q.    Would this be a monthly statement?

A.    Yes, for August -- whole month of August.

Q.    What year?

A.    Of 2015.

Q.    So on the screen next to you I think there will be an expanded -- the exhibit expanded so it's a little bit larger. Do you see that?

A.    Yes.

Q.    So does the customer's name who owns this account appear there?

A.    Yes.

Q.    And what is that?

A.    Roggio Consulting Company, L. L. C.

Q.    And what address was the --

A.    116 Turkey Hill Court, Stroudsburg, P.A., 18360-6869.

Q.    Going to the second page, action history at the top part, generally speaking what does this section of the monthly statement show?

A.    Very similar to any checking account, it is all of the

deposits and all the withdrawals and your ending daily balance for that month and the exact date they were posted to the bank.

Q.    And in this particular month of August of 2015, were there any international transfer of funds coming into this particular account?

A.    Yes, the first one on August 6th is a wire from Kurdistan Intern deposited into the account for $137,868.06.

Q.    Would that be a transfer of funds from outside the United States into the United States?

A.    Yes, Kurdistan internal is an out of U.S. bank.

Q.    Are there any other international wires coming into this account during this month?

A.    Again, on August 21st, again Kurdistan Intern, a wire for $108,988, so big numbers.

Q.    So you -- the bank also turned over to the government the paperwork that shows those particular transactions in more detail.  Is that correct?

A.    Correct.

Q.    We will get to that in a moment.  What I would like to do is go through the monthly statements first, and then we will turn to that document.  By the way, in preparing for today, did you determine what local branch of Wells Fargo this particular account was associated with?

A.    Yes, the account 28089401166 was opened in the Stroudsburg branch on Main Street, and that's what was used throughout.

Q.   And one -- when -- let me ask you this way.  Is your bank as a whole is it interconnected with computers so that branch offices are -- know what's going on in the accounts from the system?

A.   Yes, this account is housed in Stroudsburg, Pennsylvania. Everything that goes through it goes to that branch.  I can look at it in Philadelphia, or I can look at it if I'm in Minneapolis.  But this is housed and opened and everything associated with it, the cost, anything associated with that account comes out of the cost center for Stroudsburg, Pennsylvania.

Q.   Let me ask you this, and -- when you say one of these international transactions take place where funds are being put into that account --

A.   Yes.

Q.   -- is there an electronic communication with a computer located at the local branch that that signal is sent there to update the computer saying this has happened?

A.   We're all updated, but it's owned by Stroudsburg, Pennsylvania.

Q.   Okay.

A.   If that makes sense.  It's updated at the same time across the United States and internationally, but it is housed and lives --

Q.   It's housed and owned by the Stroudsburg branch?

27

A.    Yes, it lives there if that makes sense.

Q.    But there's a communication going over the computers and electronic lines to a computer located there when that --

A.    Absolutely, yes, yes.  Especially the wire piece would go directly to -- that communication would go to that branch.

Q.    Okay.  Let's turn to Government's Exhibit 22.4.  On the first page does this appear to be a statement for the same account?

A.    Yes, sir, September of 2015.

Q.    Roggio Consulting Company, L. L. C.?

A.    Same account, yes, same everything.

Q.    And on the second page of this document?

A.    Again, the deposits and withdrawals from this account.

Q.    And the date of this particular statement?

A.    September 1st through September 30th of 2015.

Q.    I notice in the transaction history that there appears to be a September 23rd transaction of $440.14.

A.    September what?

Q.    23rd in the amount of $440.14?

A.    Yes.

Q.    Do you see that?

A.    Yes.

Q.    Are you able to determine what type of transaction this is?

A.    That is a withdrawal from an A. T. M., and T. B. I. Iraq

is Visa debit card.

Q.    So would that signify to you that the transaction A. T. M. transaction occurred in Iraq?

A.    Yes, sir, an A. T. M. in Iraq.

Q.    Government's Exhibit 22.5.  This appears to be the same bank account?

A.    The whole month of October of 2015, the first through the 31st same account, Roggio Consulting Company, L. L. C.

Q.    On the second page?

A.    Yes.

Q.    Transaction history?

A.    Yes, saying deposits and withdrawals.

Q.    Does there appear to be any international transfers of funds into this account?

A.    Into, so deposit, a wire?

Q.    Yes.

A.    So a wire came in from again Kurdistan Intern for $730,575.

Q.    What was the date of that?

A.    October 7th.

Q.    And can you tell from this record from where the money was originated?

A.    Again, a wire from Kurdistan -- internal -- international bank.

Q.    It appears there is some additional information there?

A.    So on October 27th another wire from Kurdistan international came in for $189,377 on October 27th, a wire. Then an additional wire came in on the 28th, the next day, from Mega International, and that was for $21,717.

Q.    In regards to the two transactions from Iraq, it appears the language as or equals Zarya Company for construction. Do you know what that means in this record?

A.    Where are you?

Q.    Look at the 10/7 transaction.

A.    That's going to be a notation that the person sending the money would put in there, kind of a memo like you have on your checking account -- your check book. It's a memo on the wire.

Q.    What's the memo say?

A.    Zarya Company for construction.

Q.    Government's Exhibit 22.6.

A.    Okay.

Q.    What's the date, and is it the same customer?

A.    November 1st through the 30th of 2015 for Roggio Consulting Company, L. L. C, deposits and withdrawals.

Q.    So if we can go to the second page --

A.    Yes.

Q.    -- does it appear there are any international wires of funds coming into this account?

A.    Yes, so on November 3rd international wire from Kurdistan International came in for $163,471, and November 13th again

30

Kurdistan International wire came in for $127,192, and on November 27th another wire from Kurdistan International for $22,182.87 with the same memo as Zarya Company for construction.

Q.    Turning to Government's Exhibit 22.7 --

A.    Okay.

Q.    -- is this the same account?

A.    Same account, different month, December 1st through the 31st of December 2015.

Q.    Second page, detail transaction history, are there any international wires coming into this account?

A.    We have one on December 16th a wire coming from Kurdistan International, Zarya Company for construction memo for $602,197.

Q.    That was December 16th?

A.    Yes.

Q.    Does it appear to be the same person or organization that was sending funds to Mr. Roggio's account?

A.    Yes.

Q.    I noticed there's another A. T. M. transaction or at least appears to be one December 15, a couple slots above that.  Do you see what I'm speaking of?

A.    Yes.

Q.    For $464.10?

A.    Yes.

Q.    And can you tell us from the record where the A. T. M. transaction took place?

A.    So it's a non-Wells Fargo A. T. M. withdrawal at Alpha Bank in Athens, Greece for using his debit card for $464.10.

Q.    Are there two such transactions on that day?  Is that correct?

A.    There's a $5 for doing that, and then we have another Alpha Bank in Athens, Greece withdrawal at the A. T. M. for another $464.10 and the non-Wells Fargo A. T. M. transaction fee of $5.

Q.    Moving on to Government's Exhibit 22.8.

A.    In January, the whole month for the same account.

Q.    Of what year?

A.    2016, Roggio Consulting Company, L. L. C., no credits, no deposits.

Q.    I notice there are some withdrawals during the 7th day of January.

A.    Yes.

Q.    It appears of $6,670 and $15,000?

A.    Correct, on the 7th in a branch -- actual branch they -- he withdrew $6,670 and $15,000.

Q.    And is there an additional withdrawal on the eighth?

A.    Well, also -- I'm so sorry.  There is a cash withdrawal also at the branch in Stroudsburg for $2,272.20 and then on the 8th, the next day, in a branch withdrawal of $5,000.

32

Q.    Are those cash type withdrawals?  Are you able to tell that from this document?

A.    Well, the one on the 2,273.20, that is actual cash at the teller line and used debit card to -- the E. withdrawal means that he swiped his debit card to show his identity.  I can't tell on the other two for 6,670 and 15,000.  It could have been a cashier's check or cash -- most likely not cash -- but some other form of moving that money.

Q.    And did there appear to be a number of A. T. M. withdrawals from Greece during this timeframe?

A.    Starting on the 11th of January through the 14th is A. T. M. withdrawals all from Alpha Bank in Greece, and then an A. T. M. in Iraq starts on January 15th through the 19th of January, so 1/15 through 1/19 withdrawals at an A. T. M. in Iraq.  On the next page would be an A. T. M. withdrawal from Iraq on an Iraq A. T. M. on January 19th.

Q.    Moving on to Government's Exhibit 22.10.

A.    Okay.

Q.    Is this the document earlier you testified to that gives details in regards to the international transfer of funds?

A.    Yes, this is the wire detail from our computer systems -- a little difficult to read -- but, yes.

Q.    Yes, it is a little --

A.    This is computer jargon.

Q.    Well, let's see if we can parse through this.

A.   Okay.

Q.   On the first page it appears there's information in regards to a transfer and then a line that says, end of transaction information, and then it appears there's -- below that the beginning of a different transaction.  Is that kind of how this works on this document?

A.   Okay.  The first section is the -- is going to tell where you they debited the value -- the date where they debited the money from and it was credited $108,988 to the account of Roggio Consulting Company in Stroudsburg.  So then that tells you about that wire.

Q.   So I guess that's the point, right.  Each one of these that is separated by the end of transaction language would align.  Is that right?

A.   Okay, yes.  Then we start to go to the next wire, yes.  So end of transaction will then start the other wire.  So all of this is only wire information, yeah.

Q.   And so let's go through these, and we'll do it fairly quickly as best we can.

A.   Okay.

Q.   So the first transaction, how much is the transaction for?

A.   108,988.

Q.   What was the date of the transaction?

A.   8/21/2015.

Q.   That date is up on the right side of that?

34

A.    Correct.

Q.    And can you tell from what country of origin the money came?

A.    The ordering bank of this is Kurdistan International bank.

Q.    What is the address of the Kurdistan International bank as listed here?

A.    70 Abdul Salam Barzani.

Q.    Is there a city listed?

A.    Erbil, Iraq.  I'm sorry if I am mispronouncing it.

Q.    Does it note who requested the transfer?

A.    Zarya Company for construction, Goizha, Q. R., Sulaymaniyah City, Iraq is their address.

Q.    Does it indicate to whom the money was being transferred to?

A.    To the right side would be Roggio Consulting Company, L. L. C.

Q.    So having just done that, why don't we go through each transaction?  You kind of see where that stuff is, okay.  Next transaction, how much was the transaction for?

A.    137,868.06.

Q.    The date it was sent?

A.    8/16 -- I'm sorry -- August 6, 2015.

Q.    Next page of the document.

A.    Coming into Roggio Consulting Company in Stroudsburg. It's coming from Kurdistan International Bank, same address in

Iraq and again saying Zarya Company for construction, Goizha in Iraq.

Q.    To whose account did it go?

A.    Roggio Consulting in Turkey Hill Court, Stroudsburg, and it has his account number on there.

Q.    And again, this money was actually going -- because the local branch owns the account it's going to the Stroudsburg branch.  Is that right?

A.    Correct.

Q.    The next transaction.

A.    A wire coming into Roggio Consulting in Stroudsburg, P.A. for the amount of $21,717.  It is coming from Mega International Commercial Bank, and that address looks to be in Taiwan, I believe, yes.

Q.    What was the date of that transaction?

A.    October 28th, 2015.

Q.    Moving on to the next transaction.

A.    Depositing into the same account number at Roggio Consulting Company in Stroudsburg on October 27th of 2015, $189,377 coming from Kurdistan International Bank in Iraq from Zarya Company for construction.

Q.    On the next page is the next transaction.

A.    Coming into Roggio Consulting Company in Stroudsburg, P.A., $730,575 -- 730,575 on October 7th, 2015.  It's coming from Kurdistan International Bank in Iraq from Zarya Company

for construction to Roggio Consulting Company in Stroudsburg.

Q.    So the next transaction occurs on November 27th of 2015?

A.    Yes.

Q.    And how much is that particular amount for?

A.    $22,182.87.

Q.    And is it coming from the Kurdistan International Bank?

A.    Yes, it is.

Q.    From Zarya Company for construction?

A.    Correct.

Q.    Sulaymaniyah City?

A.    Say that again.

Q.    Sulaymaniyah City.

A.    That's how you say it, Sulaymaniyah City.

Q.    Whose account is that going into?

A.    Roggio Consulting Company in Stroudsburg.

Q.    And the next transaction, what date did it occur?

A.    November 13th of 2015 coming into Roggio Consulting Company in Stroudsburg, the amount $127,192, Kurdistan International Bank.

Q.    Who was ordering this particular international transfer of funds?

A.    Zarya Company for construction.

Q.    The next transaction occurred November 3rd, 2015?

A.    Yes, to Roggio Consulting Company in Stroudsburg for $163,471 coming from Kurdistan International Bank, Zarya

Company for construction.

Q.    And the next transaction, which was on the next page, occurring on December 16th, 2015?

A.    December 16th, Roggio Consulting Company in Stroudsburg for $602,197, Kurdistan International Bank in Iraq from Zarya Company for construction.

Q.    The next transaction appears to have occurred on February 17th of 2016.  Is that correct?

A.    Yes.

Q.    How much was that particular transaction?

A.    $194,198.

Q.    And on the next page is there detail information in regards to this particular transaction?

A.    That one is on the same page there Turkey, Istanbul.

Q.    So where was the money coming from?

A.    Istanbul, Turkey, okay.  So Turkey Bankasi -- so a different bank here.  This is in Istanbul, Turkey.

Q.    Did it go to the Roggio Consulting Company --

A.    Yes, it did, for $194,198.

Q.    In regards to the next transaction, which appears to have occurred on February 17th of 2016, would you give the particulars about that particular transaction?

A.    So that was the February 17th.  The next one underneath that is March 17th of 2016.

Q.    I'm sorry.  You're right.

38

A.    That was for $541,078 going to Roggio Consulting Company in Stroudsburg from Istanbul Turkey, same bank.

Q.    And moving on to the next transaction.  We will get you there.

A.    March 15th, 2016, $131,642 to Roggio Consulting Company in Stroudsburg from Istanbul, Turkey, the same bank.

Q.    Okay.  Moving on to the next -- in fact, rather than me direct you, why don't you go ahead and go through each of these?

A.    March 7th of 2016, $162,254 to Roggio Consulting in Stroudsburg, P.A. from the Turkey bank in Istanbul.  The next one is March 3rd of 2016 for $208,454 to Roggio Consulting in Stroudsburg from the Turkey -- Turkish Bank in Istanbul, Turkey.  The next one is the same date of March 3rd, 2016, $174,706 to Roggio Consulting in Stroudsburg, P.A. from Istanbul, Turkey, same bank.  The next one is April 27th of 2016, amount is $799,920 to Roggio Consulting Company in Stroudsburg from the same bank in Istanbul, Turkey.  The next one is April 21st of 2016 the amount of $428,158 going into the Roggio Consulting Company in Stroudsburg, P.A. from the Turkey bank in Istanbul, Turkey.

The next one is April 11th, 2016, the amount of $399,908 going into Roggio Consulting Company in Stroudsburg, P.A. from the Istanbul bank I mentioned previously in Istanbul, Turkey.  The next one is April 6, 2016 in the amount of $506,857 going

to Roggio Consulting Company in Stroudsburg from the Turkish bank in Istanbul, Turkey.  The next one is June 13th, 2016 in the amount of $27,970 to Roggio Consulting Company in Stroudsburg, P.A.  Mumbai, India is the country of residence coming from Zohal Engineering Solutions.  It looks like a possible name versus -- I don't know if that's a company's name, but Zohal Engineering Solutions is the person -- the group sending this money from Mumbai, India.

The next one is July 25th, 2016 in the amount of $379,908 going into Roggio Consulting Company in Stroudsburg, P.A. from the Turkish bank in Istanbul, Turkey.  That is it.

Q.    That was exhibit 14.9.

A.    So that was 22.  So we are going to what?

Q.    On the screen.

A.    I'm sorry, okay.

Q.    Is this another monthly statement?

A.    Yes, this is for same Roggio Consulting Company, L. L. C. in Stroudsburg, Pennsylvania.

Q.    And what's the date range for this particular monthly statement for Mr. Roggio's account?

A.    March 1st of 2016 through March 31st.

Q.    On the debit section of this particular transaction is there on March 1st a payment to Discover?

A.    Yes, March 1st there's a $35,926.90 electronic pay to -- I'm sorry -- to Chase, and then the next one on the same day of

40

March 1st, $3,508.16 to Discover electronic payment.

Q.    And is there any notification in there -- read that whole Discover.

A.    Discover E. payment 1603010417, which would most likely be the last four digits of the account or credit card number, Roggio, John.

Q.    You indicated the transactions that actually takes place from the Stroudsburg branch where the defendant held the account.  Is that correct?

A.    That is correct.

Q.    So this money would have been electronically transferred from that place?

A.    That -- yes.

Q.    There would have been an electronic communication coming in or going out from the Stroudsburg branch like this occurred?

A.    That is correct.

MR. HINKLEY:  No further questions, Your Honor. Thank you.

MR. BARTOLAI:  May I have a moment?

THE COURT:  Yes.

MR. BARTOLAI:  No questions.

THE COURT:  Thank you very much.  You can step down.

MR. CLAFFE:  May the witness be released?

THE COURT:  Any objection?

MR. BARTOLAI:  No objection.

41

MR. HINKLEY:  The government calls Douglas Green, Your Honor.

DOUGLAS GREEN, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

ON QUALIFICATIONS

BY MR. HINKLEY:

Q.   Good morning, Mr. Green.

A.   Good morning, sir.

Q.   Can I ask you how are you employed?

A.   I'm currently an assistant professor of instruction at Temple University.

Q.   How long have you been an assistant professor of instruction at that institution?

A.   Almost four years now.

Q.   What type of courses do you teach at Temple?

A.   I teach in the criminal justice department, so I teach a range of classes including research methods in criminal justice, introduction to law enforcement, terrorism transnational crime and global security as well as a course in cyber investigations digital forensics in the law.  That's my course load for the coming semester.

Q.   I am looking at the court reporter to make sure she can keep up.

A.   I will do my best.  Please let me know if I'm going too

42

fast.

Q.   Have you taught at any other schools?

A.   I have.

Q.   Where would that be?

A.   I taught as an adjunct professor at Rutgers University in the Camden campus, Saint Joseph 's University in their master's program in criminal justice and at Delaware Valley University as well.

Q.   Have you ever consulted in the private sector with areas of your expertise?

A.   I have.

Q.   Where, and what did you do?

A.   For about 15 years I've worked in a consulting capacity in digital forensics and other issues around computer crime, again consulting both private clients mainly for civil matters as well as to some companies that provide forensics in E. discovery services.

Q.   Have you ever worked in law enforcement?

A.   I did.

Q.   What agency or agencies have you worked for?

A.   I retired after 28 years as an agent with Homeland Security investigations back in 2019.  I originally started working in law enforcement in 1991 as a special agent with the Immigration and Naturalization Service, which over time evolved with the formation of the Department of Homeland Security

43

became H. S. I. part of Homeland Security investigations.

Q.    Does Homeland Security Investigations investigate violations of federal law?

A.    It does.

Q.    Does the agency investigate violations of export control?

A.    It does.

Q.    How about crimes related to export control such as money laundering?

A.    Yes, it does.

Q.    Wire fraud?

A.    Investigates that offense as well.

Q.    How about torture or other violent crimes?

A.    It does.

Q.    During your career as a law enforcement -- you were a special agent, correct?

A.    Yes, sir.

Q.    Did you put your expertise in computer or digital forensics to use?

A.    I did for about 22 of my years serving as an agent. I served as a computer forensics examiner or a digital forensics examiner, a job assignment known within H. S. I. as C. F. A., computer forensics agent.

Q.    What were your duties as an computer forensics agent?

A.    As a computer forensics agent, I was responsible for helping in other investigations when agents would encounter or

44

seize digital devices such as computers, phones, tablets and other types of digital media and digital devices.  I would help them in identifying and recovering potential evidence from those devices for their later review and possible use in any proceedings in court or elsewhere.

Q.    Approximately how many forensic examinations have you done in your career?

A.    Somewhere in the range of 1 to 2,000.

Q.    Have you ever been designated an expert in the field of digital forensics by any court?

A.    I have.

Q.    Have you testified as an expert?

A.    Yes, I have.

Q.    What is your educational background?

A.    I hold a bachelor's degree in psychology from the University of Rochester, a master's degrees in forensic psychology and criminal justice from John Jay College of Criminal Justice in New York and a doctoral degree in criminal justice with a forensics psychology specialization from the graduate center of the city of -- City University of New York.

Q.    Did you receive any special training for the position of computer forensics agent?

A.    I did.

Q.    What type?

A.    I originally -- I was trained in a program that was known

as seized computer evidence recovery specialist, and over the course of the 22 years that I worked in forensics I took a number of different courses in trainings that involved digital forensics in a number of different forms.

MR. HINKLEY:  Since I am not sure which binder, it's in, if I may I approach, Your Honor.

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    I will show you what's been marked Government's Exhibit 16.1 for identification purposes.  Do you recognize that?

A.    Yes.

Q.    What's that?

A.    My C. V., curriculum vitae.

MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 16.1.

MR. BARTOLAI:  Your Honor, we are prepared to accept Mr. Green as an expert.  I don't believe the C. V. needs to be admitted.  So I would object on that basis.

MR. HINKLEY:  It's part of his testimony and gives an idea of his background, his education, training as well as things that he's taught in, so his work history.

THE COURT:  I'll allow 16.1 to be admitted.

MR. HINKLEY:  At this time, Your Honor, the government moves the Court to recognize Kenneth Green as an expert in the field of investigation of crime involving

46

computers generally and computer and digital forensics specifically.

MR. BARTOLAI:  Accepted.

THE COURT:  The witness --

MR. HINKLEY:  I have the wrong Mr. Green, Your Honor, in my notes.

THE COURT:  The witness is qualified as an expert in the fields described by Mr. Hinkley without objection.

MR. HINKLEY:  I apologize to you, Mr. Green.

THE WITNESS:  No problem at all, sir.

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.    Were you involved in an investigation related to Ross Roggio and Roggio Consulting Company, L. L. C.?

A.    I was.

Q.    Was Homeland Security Investigations one of the agencies involved in the investigation?

A.    It was.

Q.    Do you know what other agencies were involved?

A.    If I'm not mistaken, the Department of Commerce and the Federal Bureau of Investigations as well.

Q.    What was your personal role in the investigation?  What did you do?

A.    I served as a digital forensics examiner, and I was involved in the extraction of information from devices that

were from -- I'm not mistaken -- detained at Kennedy airport and extracted that information for further review by the case agents.

Q.    In one of the binders you will find Government's Exhibit 20.6.  What is Government's Exhibit 20.6?

A.    An application for a federal search warrant.

Q.    Was that for the electronics you ultimately worked on?

A.    Yes, sir.

MR. HINKLEY:  The government moves for the admission of Government's Exhibit 20.6.

MR. BARTOLAI:  We object.  It's an application for search warrant.  It contains a lot of data that would be inappropriate for the jury.

MR. HINKLEY:  We will note that we have redacted the entirety of the probable cause section of the search warrant application.

MR. BARTOLAI:  May I have a moment, Your Honor?

THE COURT:  Sure.

MR. HINKLEY:  Your Honor, if it pleases the Court, there's no need to publish it.  I will just have the witness testify from the document.

MR. BARTOLAI:  We maintain our objection on it.  We submit in this form it's irrelevant, Your Honor.

THE COURT:  Let's discuss this.  Judy, take the jury out, please.  Mr. Green, if you would step out, please.

48

THE WITNESS:  Certainly.

THE COURT:  Thank you.  Please be seated.  Thank you. From my brief examination of the document, it would appear to me that since this witness has already indicated what his role was in connection with the particular items that were detained at J. F. K. airport in the matter of Mr. Roggio's reentry into the United States, it would seem to me that there is really no need for the search warrant itself nor the statement of the law that follows.

On the other hand, attachment A. indicates the property would be searched as well as attachment B., particular things to be seized.  That I think would be useful to the witness in connection with his testimony.  So that would be the approach I would take here.  I will hear objections for me to decide.

MR. HINKLEY:  That's fine, Your Honor.  What I will do is just direct his attention to those documents and have him summarize them for the jury and just move on.  I will then get right into what his work was on those things that were seized.

MR. BARTOLAI:  Again, Judge, we're not contesting the validity of the search.  That has been determined by the Court.

THE COURT:  That's right.

MR. BARTOLAI:  And there are other search warrant applications.  So it will be the same objection to those as well.  I didn't notice that they were redacted.  But the

redaction even vicarates it except for the law the Court pointed out.  Again, that's misleading because ultimately the Court will instruct the jury as to what the law is.  So we submit they're irrelevant.  If the government wants to ask if a search warrant was issued, certainly no objection and go through the list as the Court mentioned describing the items.  That's fine as well.  To put the document in, Your Honor, we submit is irrelevant.  Thank you.

THE COURT:  I just want to be clear on this, and if you have an objection I understand, you can so state.  But I'm allowing Mr. Hinkley to as necessary to develop testimony here.  Use attachment A., attachment B.

MR. HINKLEY:  I probably just would also ask the affiant because -- I believe the affiant is the one that provided him with the devices.  Or maybe I need not even go that far.  I'm -- I'll just ask him A. and B. -- what generally is A. and B. attachment to a search warrant, was there one here, what were the items seized, what were you looking for and as a result did you do your forensics.

THE COURT:  Yeah, I don't see a problem.

MR. BARTOLAI:  You're not moving it in.  Is that it?

MR. HINKLEY:  I moved it in.

MR. BARTOLAI:  Are you withdrawing that, or do you still want to move it in?

MR. HINKLEY:  It's up to the Court.  If you think

50

it's a problematic document, I will certainly withdraw my motion.

THE COURT:  I don't think the jury needs to see the application for a search warrant.  The submissions that were made to the Court in support of the probable cause, I don't think that's really something --

MR. HINKLEY:  The government does withdraw understanding that we -- we will the document -- usually we would have to refresh the guy's recollection to go -- kind of use it for that purpose so he can tell the jury what was seized on the attachment A. what he's looking for.

THE COURT:  I'm not barring you from making reference to the fact there was a search warrant, that the application was approved and that as a consequence this individual conducted a search of certain digital devices and he's going to testify about what he found.

MR. HINKLEY:  Yeah.

THE COURT:  Right.

MR. HINKLEY:  Yes.

THE COURT:  Okay.

MR. BARTOLAI:  Can we have a break?

THE COURT:  Let's do that.

(A brief recess was taken.)

BY MR. HINKLEY:

Q.   We were speaking in regards to the number of items that

were subject of a search warrant.  And let me ask you, through your career have you been the affiant on any federal search warrants?

A.    I have.

Q.    And are you generally familiar with how the application for search warrant works?

A.    I am.

Q.    How generally familiar with what is known as attachment A. to a search warrant?

A.    Yes, sir, I am.

Q.    How about attachment B.?

A.    Yes, sir, I am.

Q.    Do you still have the search warrant in front of you that we were speaking of?

A.    I do.

Q.    Would you go to attachment A. for that search warrant?  I think it's page 46.

A.    I do have it here.

Q.    And what is an attachment A.?  What's that designed to do?

A.    List specifically the items to be searched.

Q.    Are those items listed?

A.    They are.

Q.    And are the same items that were detained from Mr. Roggio and Christina Sidiropoulou as they flew into J. F. K.?

A.    They are.

52

Q.    Are you familiar what attachment B. is in a search warrant?

A.    I am.

Q.    What is attachment B.?

A.    Attachment B. will list the material to which -- which you're searching for, the items which you are searching for the type of information.

Q.    Is there an attachment B. attached to the search warrant?

A.    Yes.

Q.    Would you take a moment to read that through if you would?

A.    Yes, sir.

Q.    Generally speaking, what was the things to be searched, what were you looking for?

A.    Well, it lists specific offenses that are being investigated, and it specifically indicates that we're searching digital devices for different types of information that normally would be found on electronic media.

Q.    So you look for evidence inside the electronic media?

A.    Yes, sir.

Q.    So these items, did they eventually come to your possession so you can work on them?

A.    They did.

Q.    And did the search warrant there grant you permission to search his cellular telephones seized on that occasion?

A.    It did.

Q.    How about the computer equipment?

A.    It did.

Q.    And any other electronic devices or storage units?

A.    Yes, sir.

Q.    Why don't you explain to the jury what you did and how you did it relating to the items provided to you?

A.    Certainly.  Typically in the case of the computer, the goal is to essentially capture every bit that's stored on the hard drive or other storage media.  In this case if memory serves, it was an Apple Mac Book.  It's possible to boot up Apple Mac Books so they think they're in external hard drive so they can just be accessed.  If memory serves in this case, that is what I did and connected that computer to a ripe locker, which is just a little piece of hardware that prevents any changes being made by the person doing the forensic examination.

The forensic software is run, and every bit on that hard drive storage area is then copied over to a government hard drive so you capture every piece of information on the computer hard drive.  That government hard drive is wiped ahead of time of all previous information just do ensure that all of the information that you're capturing belongs to this investigation and there's no cross examination with any other information.  That's how the forensic image of the hard drive was formed.

In the case of the cellular telephones and the tablet as

54

well, the devices are turned on inside what is known as a radio frequency test enclosure. It's just a metal box that has actually metal mesh gloves that reach into it and a window and a light. The point of that just to prevent any cell phone or any other wireless signal from the device -- being connecting or any -- the device connecting to any signal. The one thing you try to avoid is any intentional changes or inadvertent changes that you can avoid being made to things like a cell phone that's seized.

So these things are put in that device, turned and removed from network connectivity by placing them in airport mode and turn off any connection to Wi-Fi. Now, you got that device powered on and unable to connect to any network. It's removed from that radio frequency test enclosure connected to a computer, and forensic software in this case -- if I'm not mistaken it was made by a company known as Cellebrite -- is run, and that software extracts as much information as it's able to from the powered on cell phone for later examination.

That cell phone extraction can then be parsed into the different types of information that we can typically see in our cell phones so the case agents are able actually to look for information that they think might be relevant to their investigation. That's the process I followed with the devices in this case.

Q.    And in the binder you will find Government's Exhibit 16.2,

55

.3,.4,.5 and .6.

A.    Looks like -- looks like I am starting --

Q.    One of the other binders next to you on the --

A.    Oh, I'm sorry.  Yes, sir.

Q.    Do you recognize those documents?

A.    I do.

Q.    What are they?

A.    They are the extraction report portion generated by Cellebrite of the actual analysis report for the cell phones, and those were generated by me upon extracting information from the mobile phones in question.

        MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibits 16.2, .3, .4, .5, .6.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibits 16.2 through and including 16.6 are admitted.

        MR. HINKLEY:  If I may approach the witness, Your Honor.

        THE COURT:  Yes, of course.

BY MR. HINKLEY:

Q.    Mr. Green, I'm showing you what's been marked as exhibit 2.1.  Do you recognize this item?

A.    I do.

Q.    What is this item?

A.    This is an optical disc which I reviewed yesterday which

56

contains the extractions from the mobile devices we're discussing.

Q.   Does that contain your signature on top of the disc?

A.   It does.

Q.   As well as the date?

A.   Yes, sir.

MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 16.2.  Let me start that over again.  Government moves for admission of Government's Exhibit 2.1.

MR. BARTOLAI:  So, Your Honor, my understanding is 2.1 is the -- is this the hard drive of the contents of his phone?

MR. HINKLEY:  It's the Cellebrite extractions from the cell phones.

MR. BARTOLAI:  Your Honor, I object.  May we approach?

THE COURT:  Yes.

(The following discussion took place at sidebar:)

MR. BARTOLAI:  So, Your Honor, my understanding is there were personal photos of a -- I don't know how to explain it -- elicit nature -- am I using the right word -- between Mr. Roggio and some of -- his girlfriend that are kind of irrelevant to this proceeding.  Certainly we wouldn't want to give -- we -- if we can minimize that type of private

information, we would have to do so, you know.

MR. HINKLEY:  So, yeah.  I haven't seen those.  It's only being introduced for foundation, right.  We have a limited number of actual exhibits that we're going to use from this as well from the hard drive, which Gino has already seen.  This is just a way of putting it in a foundation.

I don't think everyone is going to see -- open that dis and see all of the information on there.  We're -- it's like the universe from which we're taking the documents we marked as exhibits.  We just want to get it as foundation into the record.

THE COURT:  Was there some way that if this -- what is 2.1?  Do you have it?

MR. HINKLEY:  I do.  It's a disc.  It includes all of the extractions from each of the cell phones that were seized from J. F. K.

THE COURT:  Would the jury be able to access that and look everything that's in it?

MR. HINKLEY:  I don't think they would be able to because we will make sure it's not included on the JERS, that only those documents that we have other witnesses testify to are included in that.

THE COURT:  All right.  Then we're okay.

MR. HINKLEY:  Same with the hard disc, which I am going to do next.

MR. BARTOLAI:  That's the only thing because this is -- this is a long standing thing -- I think he might have said this before.  We don't need to -- I don't know -- that stuff come into the public domain so to speak by virtue of having an exhibit admitted at trial.

MR. HINKLEY:  Okay.

MR. BARTOLAI:  Very good.

(The discussion at sidebar concluded.)

MR. HINKLEY:  The government moves for admission of Government's Exhibit 2.1 subject to the limitations we discussed at sidebar.

MR. BARTOLAI:  Agreed.

THE COURT:  2.1 is admitted as limited.

BY MR. HINKLEY:

Q.   I show you what's been premarked as Government's Exhibit 2.2 for identification purposes.  Do you recognize this device?

A.   I do.

Q.   What is this device?

A.   That's the hard drive that contains the forensic images and extractions from the computer digital media and cell phones data we are discussing.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 2.2 subject to limitations discussed at sidebar.

MR. BARTOLAI:  No objection.  Agreed.

THE COURT:  2.2 is admitted.

BY MR. HINKLEY:

Q.    So what's you're done with your forensics of bringing all of the information down, what happens at that point?

A.    In this case I forwarded the information toward the investigative team so they can conduct a review, and most investigations that don't involve certain types that are very obvious, in this type of investigation, I don't know what the investigator is looking for, so I don't actually cull through the information looking to see what might be valuable as evidence.

So I forward that information in this case in the form of reports of the contents of the telephones as well as extracted information of likely documents that need to be reviewed to the case agent so they're able to actually begin reviewing the material.

Q.    And how would a case agent review the information that you have downloaded?

A.    The cell phone reports are easy.  They are very large P. D. F. documents.  The documents I exported out that appeared to be of interest, those can simply be reviewed in a number of different forensic tools to just allow the review to go more quickly and to allow for the search of certain key words or certain types of information.  And in the case of the forensic images of the hard drive, that can also be loaded into a number

of different forensic tools that just kind of parse things out to make it understandable and allow case agents to look for certain types of documents, certain types of key words.  But they can explore the entire contents of the hard drive to look for things that may be of evidentiary value.

Q.    Are there steps taken to protect the integrity of the data?

A.    Absolutely.  Typically one of the standards used in digital forensics is something called a hash value, and I teach my classes about it.  I sort of refer to it as a digital fingerprint.  What ends up happening is the information has a very complex math formula run across it that results in a unique number that can be reproduced and is often reproduced automatically by the forensic tools that load the different data sources just to make sure that no bits have changed.  It's hard to change something intentionally.  Even an accidental change would result in different information being examined.

So typically this information is validated repeatedly across the process to ensure that the materials that an agent is reviewing are no different than the materials that were seized and extracted by me when we first encounter them.

Q.    Mr. Green, a question occurred to me when standing here. During your course of your career as well as your -- in your training and experience and expertise, do you know or have you heard of the term metadata?

A.    I have.

Q.    What is metadata generally?

A.    The simplified definition is data about data.  It's -- a number of different forms exist for it.  But it's any information about a computer file typically.  So there could be file system metadata, which is if you use computers with any degree of regularity, you see all the time the creation dates and modification dates tat you will see in Windows operating system or Mac operating system.

That's just saved in file system so the computer and the users understands information about the file.  There's also something known as application metadata which actually kind of lives inside the data file.  You experience this all the time when you take a picture sometimes photo software will show you the date it was actually taken as opposed to when the file was saved or sometimes even the location it was saved in.

That's known as application metadata because the file system the computer maintained, the hard drive doesn't make those changes, but rather the program creating or editing the data file does and stores it in the data file.  Typically when people talk about metadata in these contexts, they talk about file system metadata, creation dates of files, modification of dates of files, things like that.

Q.    Is there a -- can there be metadata that is related to, say, a photograph that's taken by a cell phone?

A.    There can.

Q.    What type of metadata generally speaking would be there?

A.    Well, that's a kind of application metadata referred to as exif metadata typically.  It varies based on the device that took the picture as well as tools that may have been used to edit that file or make changes potentially to that file.  Those will usually save a record of changes that were made as well. Typically if we are just taking a picture, you will see when and where the picture was taken, the photographic settings, camera settings like aperture and F. stops and things like that and often again G. P. S. coordinates if the device is capable of storing and capturing it.  That way you can see when and where the picture was taken as well.

Q.    Likewise, if a video is taken by a cell phone or some other electronic device, similar type of information like where the video took place could be in the metadata?

A.    Certainly.  It's very dependent on the device and the software that being run in the device, but it's absolutely possible.

        MR. HINKLEY:  No further questions, Your Honor. Thank you, sir.

        THE WITNESS:  Yes, sir.

        THE COURT:  Cross-examine.

        MR. BARTOLAI:  We have nothing.  Thank you.

        THE COURT:  Thank you, sir.

63

THE WITNESS:  Thank you, Your Honor.

MR. CLAFFE:  Your Honor, may this witness be released?

MR. BARTOLAI:  No objection.

THE COURT:  He may.

THE WITNESS:  Thank you.

MR. HINKLEY:  May I have a moment to confer with counsel?

THE COURT:  Sure.

MR. HINKLEY:  Thank you, Your Honor.  Your Honor, the government calls Thomas Smith.

THOMAS SMITH, called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

ON QUALIFICATIONS

BY MR. HINKLEY:

Q.    Mr. Smith, how are you employed, sir?

A.    I'm employed as a special agent with the U.S. Department of Commerce Office of Export Enforcement.

Q.    How long have you been employed with the department of commerce -- bureau -- I'm sorry, what was --

A.    Bureau of Industry and Security Export Enforcement, yes, approximately 12 and a half years.

Q.    Prior to joining the Department of Commerce, what type of work did you do?

64

A.    I was a federal air marshal, and then prior to that I was a police officer with the United States Department of -- United States Capitol Police in Washington, D. C.

Q.    What is your current title with the Department of Commerce?

A.    I'm a special agent, and I am a computer forensics examiner within that department as well.

Q.    Generally speaking what does -- what do you do for -- as forensic examiner?

A.    I am responsible for the New York field office and any outside offices that are in our area of responsibility assisting with search warrants, loading electronic search warrants, assisting agents with review of those search warrants, generating evidentiary reports, providing testimony, providing guidance about different electronics and the best way to seize them and what electronic evidence we may find off them to include servers, laptops, phones.

Q.    And approximately how many forensic examinations have you done in your career?

A.    I do approximately -- it's easier by the month because I really don't remember.  I do about four to six forensic exams a month.

Q.    How long have you been at it?

A.    Since -- 11 and a half years now I've been doing computer forensics for the Department of Commerce.

65

Q.    I will let the jury do the math.

A.    Almost my whole Department of Commerce career I've been doing that.

Q.    Have you ever been designated as an expert in the field of digital forensics by any court?

A.    I have not.

Q.    What's your educational background?

A.    So I have a bunch of college.  I never actually finished a degree.  I have a certificate in electronic computer repair, but I have many different tracks of many different years of college.

Q.    You're on the 30 year plan?

A.    Yes, I am.  Maybe when I retire I will graduate.

Q.    Did you receive any special training for your current position?

A.    Yes.  So my basic agent training was at the Law Enforcement Training Center in Glenco, Georgia where I attended C. I. T. P. or the special agent training.  I also attended basic digital forensic collection training there, the analysis portion of the digital forensics where the class teaches you to analyze the -- the evidence for any evidentiary items that may be in it.  I took a mobile device class at FLETC, and I took a network class, a network acquisition class and analysis class at FLETC.  I've taken a number of vendor specific for the tools we use -- classes.  I usually take an update every couple years

66

just to stay current except during COVID which messed up my plan.

I took vendor specific training for cell phone and Cellebrite, which is the tool we use to acquire cell phones. So I have taken a bunch of training as often as I can to keep my skills up.

Q.   I take it from earlier testimony that's much of what your job is at this point?

A.   Yes, I do -- I support 10 to 12 agents in our field office, and I'm also called around the country because there's only a few forensics agents within the Department of Commerce -- so just, for instance, on Monday I was in Tampa dealing with digital forensics for one of our field offices down in that area.

MR. HINKLEY:  Your Honor, the government moves for the Court to recognize special agent Thomas Smith as an expert if the field of investigation of crime involving computers generally and digital forensics specifically.

MR. BARTOLAI:  We accept.

THE COURT:  The witness is qualified as offered by the government without objection.

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.   Special agent Smith, were you involved in an investigation related to Ross Roggio and Roggio Consulting Company, L. L. C?

A.    Yes, I was.

Q.    Was the Department of Commerce one of the agencies involved in the investigation?

A.    Yes.

Q.    Do you know what other agencies were involved?

A.    Homeland Security Investigations and the FBI.

Q.    What was your personal role in the investigation?  What did you do?

A.    So in the beginning I assisted the special agent who retired with the e-mail search warrants, which was generally what you get first in one of these cases.  I assisted him in downloading it, loading it into our evidence computer, assisting him with some review.  But basically at the beginning parts of these cases the case agent is trying to develop information and determine if there was crimes that occurred.

So a lot of times the case agent is doing the review themselves, and I don't get bogged down in the early stages of these cases unless they really need or they can't find something they are looking for or they need help opening a specific type of file that's maybe difficult or troublesome.

Q.    So in this case, it is true, is it not, that the case agent sought a federal search warrant for certain Yahoo e-mail accounts?

A.    Yes.

Q.    Including the e-mail account Ross Roggio at Yahoo.com?

A.    Yes.

Q.    And including the Yahoo e-mail Roggio at Yahoo.com?

A.    Yes, I think it was R. W. Roggio, yes.

Q.    And is it your testimony then that the case agent would have brought the results of those search warrants to you for your forensic assistance?

A.    So I helped him download it.  So at the time you would go on the Yahoo cite -- actually we get a disc from Yahoo, and I assist him in putting those discs in the forensics tool to make sure that they are done correctly and that because the format they come in is not exactly easy.  Sometimes to put them into the tool -- so I assist the case agent in getting them in the tool.  I run some tests against it just to make sure the evidence is actually working correctly.  And then since I don't know much about the case in the beginning usually I leave the case agent to start searching for what they believe may be the evidence for their case.

Q.    And are there steps taken by your agency to ensure the integrity of the information received as a result of the search warrants?

A.    So we take the original that comes from Yahoo.  We will make a copy on my evidence server.  It goes into a piece of software that is read only so that we can't make changes to any data on it.  That's how we make sure that the integrity of that data stays true.

Q.    Once the case agent has access to the data, you indicated there's a way for them to look around to see if there's anything that's germane to the investigation?

A.    Yes.  So they can run key words, which is generally how you start.  So you may, you know, run, like, rainy day or whatever your key words that relate to your case are, and then it will pop up results, and then you can look at the results. Sometimes these e-mails have thousand of e-mails or thousands of even objects.  You can have an e-mail.  Plus you can have an attachment, and sometimes the software splits those things out. You can have a hundred thousand objects that come back in a search warrant.

It's hard to look through every one where it's easier to start with a key word, you know, what it is about your case and you narrow that down.  Our software allows you to put two different people.  You can put Tom and Joe and see how many times they communicated.  There's a number of ways you can filter this to try to reduce the number that you have to have to go through at one time.

Q.    So in addition to the search warrants for the two Yahoo accounts you testified to, were there any other federal search warrants that were granted in which you participated in this investigation?

A.    Yes, I participated in the physical search warrant at Mr. Roggio's parents' home and his residence.

Q.    Would those both be the Stroudsburg area?

A.    Yes, yes.

Q.    And what was your participation in those particular services of search warrants?

A.    So I was originally there just to assist with searching, and I don't remember exactly why I was the only forensics person on the case there.  I ended up taking over the forensics and imaging devices while I was there.  So I switched from searcher to a digital forensics person at that point, and I was imaging phones, laptops, computers that were in the house and previewing -- we did look at some other older devices that we couldn't get the power up like cell phones.  And, you know, we didn't -- weren't able to take them because we couldn't get any information off them.  There were thumb drives, S. D. cards.

Q.    So as part of the investigation would you have kept track of the actual items that you imaged or looked through during your forensic --

A.    Yes.

Q.    In one of the binders -- it should be 14.4.  There are three binders.

A.    I got to get my glasses.  14.4.

Q.    Do you recognize that document?

A.    So this is the search warrant from the residence and the parents' house.

Q.    Does it appear to be the items that were either seized or

searched as a result of the search warrants that were executed?

A.    It does appears to be the items searched and seized from those locations, yes.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 14.4.

MR. BARTOLAI:  No objection.

THE COURT:  14.4 is admitted.

BY MR. HINKLEY:

Q.    You said that you imaged the various electronics at the residence.  What did you do?  What was the next step?  What did you do next?

A.    So in the imaging process you hook it up to a laptop or device that makes a forensic copy of it so it's an encapsulated evidence file.  It's a file you can't modify.  It has a numerical value they call a hash number.  So if you look at the number from 2017 and you call that same disc up today that hash number would not have changed.  It shows you nothing has changed on that disc.  That's how you guarantee the image I made in 2017 is still integrated -- it's still good and has not been modified.  So I can go into my forensic program, rehash the drive today or rehash the drive a week from today and that number will stay the same.

Q.    And were the electronics, the information, documents images, videos, things that you downloaded or images from those devices, were they provided to the case agents?

72

A.    Yes.  So from the relevant data -- and we had gone through a number of devices, some of which had no relevant data on it for the case.  So there was no report to give to the case agents.  There was a few devices that had relevant information, but both I and the case agent did review the electronics.  So I loaded them.  I would do a -- some searches.  The case agent would go and do some searches.  I go and assist because that program when you do an entire computer it's a little more intensive to do it.

So I did a lot of work as it related to drawing pieces of evidence and putting it into the report.

Q.    Doing the searches on this information data, does that change the original data at all?

A.    No, it does not.  I am saying you can go into the software today and rehash it and that encapsulated evidence file would not have been modified.

Q.    So the searches the case agents do is based on their investigation what they are looking for?

A.    Yes.

Q.    Ultimately?

A.    Yeah.

Q.    Now, prior to testifying, did you have an opportunity to stop at the U. S. Attorney's Office and to look at a piece of evidence?

A.    Yes, I did.

MR. HINKLEY:  If I may approach, Your Honor.

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    I show you what's marked as Government's Exhibit 1.1 for evidence purposes.  Is this the device you looked at?

A.    Yes, it is.

Q.    And what is this device, and what does it contain?

A.    This is an internal hard drive that contains all of the images that we created from that day on the search warrant including -- and including the e-mails for R. W. Roggio and Roggio@Yahoo including the reports that I generated for any device with relevant information.  So if there was not a report there was no relevant information on it.  But if there was a report, relevant information was on this disc.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 1.1 subject to limitations as equivalent to the 2.1 and 2.2.

MR. BARTOLAI:  Your Honor, to the extent there's reports on there, we will object.  They can be hearsay.  I don't know -- what reports they are -- but it seems to me that this is not just a mirror image of Mr. Roggio's hard drive.  It seems it's a combination of that hard drive as well as the e-mails from Mr. Roggio from Yahoo and reports, and I don't know what those reports are.  And I object to them, Your Honor, because they may be -- most likely are hearsay.

74

THE COURT:  Mr. Hinkley?

MR. HINKLEY:  Let me inquire as to the witness what he means by reports, and noting the limitation I proffered for the admission would be that the government would only use those documents and exhibits which have been premarked and provided to the defense.  We are laying a foundation for those particular things, and we would not be presenting any reports that would be objectionable to the jury.

MR. BARTOLAI:  Your Honor, with that understanding -- I can raise the hearsay objection later if the government brings in that report.  I understand that, and for purposes of foundation, I have no objection with that limiting instruction.

THE COURT:  All right.  Thank you, gentlemen.

MR. HINKLEY:  Thank you.

THE COURT:  You can proceed.

MR. HINKLEY:  With that I have no further questions, Your Honor.

MR. BARTOLAI:  I have no questions.  Thank you.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  You can step down.

MR. HINKLEY:  May he be released, Your Honor?

THE COURT:  Any objection to him being released?

MR. BARTOLAI:  No, Your Honor.

THE COURT:  He's released.

75

THE WITNESS:  Thank you.

(The following discussion occurred at sidebar:)

MR. HINKLEY:  Well, I estimated would be done between 12 and 1.  That's a good estimate.  If the Court wants to inquire of the jury at this point, we will hold that next witness.  If they want to go forward, we will do that.  If they want to break for the week, we are prepared and able to do that.

THE COURT:  What do you have left you can present?

MR. HINKLEY:  Case agent.  It will be very lengthy.

THE COURT:  All right.  All right.  He would be next?

MR. HINKLEY:  Yes.  I will ask Judy to inquire of the jury.  See what the jury wants to do here.

THE COURT:  Break for lunch.

MR. HINKLEY:  They want the witness for this afternoon, Your Honor?

THE COURT:  Yeah.

(The discussion at sidebar concluded.)

THE COURT:  My watch indicates 12:15.  We will take our lunch break now, and we will return at 1:15, and we will continue to the extent there's sufficient witnesses to be presented to you today.

(A lunch recess was taken.)

THE COURT:  Call your next witness.

MR. HINKLEY:  Government calls Jeffrey Burke.

JEFFREY BURKE, called as a witness, being duly sworn, testified as follows:

MR. HINKLEY:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. HINKLEY:

Q.   Mr. Burke, how are you employed?

A.   I am currently employed as a special agent with Homeland Security Investigations.

Q.   How long -- well, can we call Homeland Security Investigations H. S. I.?

A.   We can.

Q.   How long have you worked for H. S. I.?

A.   I've been employed with H. S. I. since 2008.

Q.   And you indicated you are a special agent with them?

A.   Yes.

Q.   And have you been a special agent from day one?

A.   I have.

Q.   What are your duties as a special agent for Homeland Security Investigations?

A.   The overall catch phrase is we're -- we investigate transnational organized crime meaning anything that crosses the boarder in an illicit manner.  We have jurisdiction to investigate.

Q.   Do you investigate other federal crimes?

A.    Yes, we do, Title 18 authority, which is general investigative responsibilities for fraud, money laundering, you know, anything that could be investigated federally.  We investigate customs law, drug law.  It's a very broad spectrum.

Q.    So you have a fairly broad, say, area of responsibility?

A.    Yes.

Q.    How about wire fraud, is that one of the crimes you investigate?

A.    Yes.

Q.    Would money laundering be a crime that falls under your investigative duties?

A.    Yes.

Q.    How about crimes such as torture or conspiracy?

A.    Yes.

Q.    What's your educational background?

A.    I have undergraduate degrees, bachelor of science in business administration focusing on accounting, bachelor of science in criminal justice and a master's of science in criminal justice with focus on organized crime and international terrorism.

Q.    Where did you receive the these?

A.    Undergraduate degrees from Shippensburg University and a master's degree at St. Joe's University in Philadelphia.

Q.    Where are you working from?

A.    I work out of the H. S. I. office special agent in charge

Philadelphia, and I'm assigned to the counter proliferation investigations group.

Q.    What does the counter proliferations group do?  What do they investigate?

A.    We investigate -- as it was mentioned prior there's U.S. munitions list.  We're looking to investigate cases where foreign adversaries are attempting to get our technology and controlled items either controlled by the Department of Commerce or Department of state.  It could be anything from weapons to the F. 35 fighter jet satellite technology.  The list -- it's very large.

Q.    As a special agent for H. S. I., have you received any special or particular training in the field of investigation you're dealing with?

A.    Yes, I've -- prior to the H. S. I. I was employed with ten years with the state Attorney General's Office of Pennsylvania where I investigated organized crime, and I have been training in law enforcement since 1998 through various academies, through various additional technical training environments. The training is constantly part of the process.

Q.    Are you involved in the investigation of the crimes alleged of Mr. Roggio?

A.    Yes.

Q.    Are you familiar with the charging document the superseding indictment in this case?

79

A.    I am.

Q.    What other agencies are directly involved in the investigation?

A.    It is a joint investigation with the FBI and Department of Commerce.

Q.    Is it unusual in these type of investigations to have joint agencies involved in the investigation?

A.    No, due to the nature of these types of crimes, it's actually common for all three typically be a part of one of these investigations.

Q.    Were you involved in this investigation from the beginning?

A.    No.

Q.    How did it come -- how did you come part of the investigation?

A.    There or around December of 2016 I had been up in the Middle District of P.A. here in Scranton on another case, and I spoke with A.U.S.A. Hinkley, and they asked if I would be interested in joining the investigation.

Q.    So I asked you on this investigation?

A.    Yes.

Q.    Would you provide the jury with an overview of how the investigation developed including investigative techniques utilized by the investigative team?

          MR. BARTOLAI:  Objection, Your Honor, calls for a

narrative.

THE COURT:  I think it's permissible at this early stage of his testimony.  To the extent you get into specifics, I will ask you to engage in traditional question and answer approach.

THE WITNESS:  The investigation began in March of 2016.  The investigative approaches used was originated from a tip line call into the FBI.  To further the investigation we use telephonic interviews, in person interviews.  We do open source research on the internet looking for evidence to support the tip.  We used search warrants, Court authorized search warrants.  As we're developing the investigation we identify certain things, e-mail accounts, residences, things that we believe may contain further evidence of the investigation, and we're required to author a document called an affidavit for application for a search warrant.

Once those warrants are approved, they are served on various entities who will provide us the information that we're asking for.  That information could be documents.  It could be electronic media.  That electronic media could be in various formats, something we can view immediately.  It could be something we need to submit to a forensics unit to take that image of data and extract a report that's easier for the investigator to go through and analyze.

I am sure there's other methods we have employed as

the investigation is needed.

Q.    So in process of familiarizing yourself with the case when you first came on, did you speak to the other case agents who are involved in the investigation?

A.    Absolutely.

Q.    Did you read the reports that have been generated?

A.    Yes.

Q.    Did you look at evidence gathered during the investigation?

A.    Yes.

Q.    Was there a point to familiarize yourself with what had gone on to you prior to joining the investigation?

A.    Absolutely, yes.

Q.    You mentioned search warrants.  Were there search warrants that were obtained during this investigation?

A.    Yes, there were.

Q.    And were they federal search warrants?

A.    Yes, they were.

Q.    Have you been granted search warrants during your career as your federal law enforcement officer?

A.    Absolutely.

Q.    What's the process one goes through to obtain a federal search warrant?

A.    As we are collecting evidence and information throughout the case, I -- we create a document.  It's almost like writing

a book of the facts that we've obtained throughout the investigation. Those -- those facts are then organized into an affidavit to specifically request a piece of information, say, an e-mail address. If we want to obtain the information that a provider would have within their records to show communications between a target and other people and other people back to the target, we craft an affidavit stating why we believe that there is evidence to be found within that specific item. We detail why we believe it is, and we work in conjunction with our assigned U.S. attorney, A.U.S.A., to complete an application for a search warrant, which is then submitted to a federal magistrate to approve.

Once that's approved, we have to detail both the facts behind what -- why we believe what we believe and also detail what we're searching for specifically. Once that document is approved, we submit it to the provider or whoever, you know, the target of what we're looking for is, and we collect the evidence, and we review it. Essentially we execute that search warrant on whatever we're asking for.

Q. That would be related to -- if you were searching for e-mail accounts -- and if I can understand your testimony, you have to get the approval of the Court. A judge has to review and approve what you submitted in order for you to obtain the search warrant to be able to do that?

A. Yes.

Q.    Is the process similar when the investigative team or the case agent wishes to search someone's home?

A.    Yeah, it's even more in depth.  We have to again -- we have to be able to show that we have probable cause that we believe evidence of a crime that we're investigating can be found in whatever premises we are looking to search, be it an e-mail, be it a residence, be it a vehicle or a phone.

Q.    Is it fair to say that search warrants are an integral part of searching and seizing evidence of crime?

A.    Yes.

Q.    The search warrants that were obtained in this investigation, as part of the investigation, do you have a pretty good grasp of those search warrants?

A.    Yes.

Q.    Do you recall generally what the search warrants were granted in this investigation?

A.    The first two search warrants were requested in November of 2016, and they were for two e-mail addresses Roggio at Yahoo.com and R.W. Roggio at Yahoo.com.

Q.    Based upon that investigation, were there later search warrants that were sought and granted?

A.    Yes.

Q.    What were those?

A.    The second set of search warrants that we requested and obtained were March of 2017, and they were for electronic items

that had been seized -- or I should say -- I'm sorry -- detained from Mr. Roggio and his travel partner Christina Sidiropoulou as they reentered the United States at the end of February of 2017.

Q.    Where did they enter the United States?

A.    J. F. K. International Airport.

Q.    Were there any additional search warrants that were granted to the investigative team?

A.    Yes, several months later, May of 2017, we requested search warrants for Mr. Roggio's marital residence, 143 Indian Spring Drive in Stroudsburg, Pennsylvania, and the residence he was currently staying at his parents' residence, 116 Turkey Hill Court in Stroudsburg, Pennsylvania.

Q.    Were all those search warrants you just described -- were they all served or executed?

A.    Yes, they were.

Q.    And did the investigative team gather evidence based on all those search warrants?

A.    Yes, we did.

Q.    Were you part of the team that executed the search warrants on two residences you had testified about?

A.    I was on the team that executed the search warrant at 116 Turkey Hill Court where Mr. Roggio was staying.

Q.    Are you familiar, and do you know that the search warrant on the other residence was also executed?

A.    Yes.

Q.    By other members of your team?

A.    Yes, they were executed simultaneously for the safety of everyone involved.

Q.    Up until that point after the execution of those search warrants, if I'm understanding your testimony you had the information that would have been provided by Yahoo on two e-mail accounts you sought?

A.    Yes.

Q.    And you had the electronic devices that were detained at J. F. K. airport?

A.    Correct, that included a laptop computer, I believe, a Mac Book Pro.  There were four mobile phones, which were in possession of Mr. Roggio, two in possession of Ms. Sidiropoulou, and an iPad tablet, which belonged to Mr. Roggio as well as a few other items, yes.

Q.    Were there additional electronics seized from one or both of the residences?

A.    Yes.

Q.    And you were in the courtroom and heard the testimony of two forensic experts that were called by the government.  Is that correct?

A.    I was not in the courtroom for their testimony.

Q.    That's right.  You were not there.  Nonetheless, that evidence was seized.  Did you have access to that evidence as

part of the investigation?

A.   Yes.

Q.   What does that mean generally?

A.   Generally that means in the sake of the electronic data from the airport that was taken in February of 2017 upon their arrival they underwent a secondary exam.  Part of that secondary exam was to detain their electronic devices.  Special agent Mundy accomplished that and shipped them down to me in Philadelphia.  Upon my receipt of those, we then -- I then turned those over -- I make a forensic request for -- to have the devices analyzed.  The devises were turned over to special agent Doug Green, and Mr. Green goes through his process of taking an image of each device.  I am sure he did a much better job explaining than I can.

     Essentially that image is a snapshot of what is on that particular device, ones and zeros, that needs to then put into a forensic examination tool so an agent like me who is conducting the investigation has a much more user friendly approach to searching through this vast amount of data as opposed to sitting there and trying to thumb through the phone and examine it that way.  Those forensic reports are placed on to a system in which I am granted access to sit and evaluate what was on that particular device.

Q.   And was a similar process done for the electronics that were located at the two residences during that search warrant?

87

A.    Yes.

Q.    Did you have access -- do you have access to that or documents and electronic records, whatever was there?

A.    Yes.

Q.    As part of your investigation have you looked at stuff using forensic tools?

A.    Yes, I have.

Q.    During the execution of the defendant's marital home as well as his parents' home, were there other physical items that were seized by the government?

A.    Yes, I'm sure there were -- there were firearms seized from both locations, vehicles in which we had search and seizure warrants for that we had identified through the investigation that were present at the both houses, various miscellaneous documents that would have been found throughout the residence.  There were Rolex watches that had been identified and seized.  We also had search and seizure warrants for bank accounts related to the investigation.

Q.    And without getting into the specifics about the bank accounts, were they -- do you know what name the bank accounts were entitled?

A.    P.N.C. was one bank account.  Wells Fargo was another bank account.

Q.    And would that have been the Roggio Consulting Company, L. L. C. bank accounts?

A.    Yes.

Q.    Earlier you testified you were familiar with the superseding indictment that was filed in this case.  Is the defendant Mr. Roggio charged with conspiracy to commit an offense against the United States in that document?

A.    Yes, he is.

Q.    Are members of the conspiracy alleged to have committed what's known as overt acts in furtherance of the conspiracy in the superseding indictment?

A.    Yes.

Q.    Do you recall how many overt acts are alleged?

A.    I believe we have five or six.

Q.    I would like to go through each alleged overt act with you and see some of the evidence you discovered during the investigation about each.

        MR. BARTOLAI:  Your Honor, I object.  The indictment is not evidence, and I don't know if the Court -- the jury hasn't seen the indictment.  I don't believe it will be submitted to the jury, and I would object to it being read or being read in part by this witness.  If the government wishes to go through each act without referencing the indictment, that's a different manner, Your Honor.

        MR. HINKLEY:  It's just a way to organize his thoughts because we're going to present any evidence in regards to each of those overt acts.  And the overt act, as the Court

knows, is just a specific thing that's alleged to have happened. It's just a way that really organizes the testimony in the trial.

THE COURT: Members of the jury, you already heard me in the days previous of this trial beginning with jury selection tell you that the indictment is not evidence of anything, and I tell you that again. Nonetheless, Mr. Hinkley may make reference to the charge that would be found in the indictment as a -- as a basis for asking a question. Understanding that the fact that he is making a reference to something in the indictment does not mean there's any evidence of that, does not mean it's true. It's simply his way of questioning the witness. You can go ahead with that limitation. Let's not hear count one charges this, this and this. You can do it a different way.

MR. HINKLEY: Thank you, Your Honor. I'm just going to restrict just those overt acts so we can kind of go through those.

BY MR. HINKLEY:

Q. Do you recall the first overt act alleged in the superseding indictment?

A. I believe it's an e-mail regarding a weapons and feasibility report.

Q. I'll show you what's marked as Government's Exhibit -- let me ask you to look in the binders for Government's Exhibit

90

20.13.

MR. BARTOLAI:  Todd, what number?

MR. HINKLEY:  20.13.  Do you recognize Government's Exhibit 20.13?

THE WITNESS:  Yes, I do.

BY MR. HINKLEY:

Q.    What is it?

A.    This is an e-mail dated November 14th, 2015.  It is an e-mail sent from Elina Kandaja to Ross Roggio where the body of the e-mail -- I'm sorry -- it's from Ross Roggio to Elina Kandaja where Ross is instructing her, please print out and get to Bayan, thanks, Ross.

MR. HINKLEY:  Your Honor, the Government moves for admission of Government's Exhibit 20.13.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 20.13 is admitted.

MR. HINKLEY:  May we publish, Your Honor?

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    You already testified from and to.  What was the date on this particular e-mail?

A.    November 14th, 2015.

Q.    And what is -- it indicates there's an attachment.  What does the attachment read?

A.    The attachment reads as weapons and ammunition feasibility

91

report No. 1.

Q.    And which e-mail account was Mr. Roggio using on this particular document?

A.    This e-mail account was R. W. Roggio at Yahoo.com.

Q.    Is that one of the e-mail accounts that a search warrant was utilized to get?

A.    Yes, it was.

Q.    All right.  To your recollection, was there a weapons and ammunition feasibility report attached to this e-mail based on your forensic reviews?

A.    Yes, there was.

Q.    Did you review that report as part of the investigation?

A.    Yes, I did.

Q.    What is page two of the exhibit?

A.    Page two is a face sheet that lists weapons and ammunition feasibility report with Roggio Consulting Company up top, and the document name is identified in the lower right corner as weapons and ammunition feasibility report No. 1.

Q.    Have you reviewed the document as part of the investigation?

A.    Yes, I have.

Q.    Generally speaking tell the jury what it is.

A.    This appears to be a proposal to build a weapons manufacturing facility to include equipment that would be needed, personnel that would be needed, costs associated with

92

such an endeavor and additional information that would be required to complete this endeavor.

Q.    Going forward to the next page underneath the -- looks like a box diagram.  Would you read that part for the jury?

A.    The detailed feasibility study is the first step of designing a program to address the numerous challenges with this venture.  This study or report provides an overview of the project and should address all significant issues before opening of the facility.  This report will cover technical feasibility, legal feasibility, operational feasibility, economic feasibility.

Q.    Going forth to the next page of the report, this would be entitled the technical feasibility section.  Is that correct?

A.    Yes.

Q.    And without reading this whole thing, kind of summarize what it is that this page is talking about.

A.    There's an overview of the M4 weapons platform.  There is an overview of the 556 Nato ammunition round, list of technical difficulties which read, trained personnel experienced in the M4 weapons platform, trained engineers to oversee development and production, trained personnel to operate highly specialized equipment for production, procuring generalized manufacturing equipment, procuring specialized manufacturing equipment, procurement of specialized and job specific tooling.

Q.    So I'm going to ask that you just publish page by page and

maybe spend three or four seconds so the jury can look at it briefly.

A.    Is there a specific section?

Q.    When we get to page six I will have additional questions for you.

A.    Okay, very good.

Q.    I note there's a recommendation section of this particular page.  Would you read that to the jury, please?

A.    Recommendations.  One, one selected personnel with gun drill experience preferred.  Two, two selected personnel with C. N. C. Swiss experience, three, two selected personnel with M. I. M., metal injection molding experience, four, one selected personnel with plastic injection molding experience, five, one selected personnel with anodizing type three experience.  Conclusions, in a cursory inquiry of available personnel, these positions should be relatively easy to fill.  Skilled workers of this type can be hired from an extensive pool of potential candidates.

Q.    So from the recommendations contained on page six it would appear, would it not, that part of the project was to drill their own gun barrels?

A.    Yes.

Q.    Moving on to page 7, on page 7 are there recommendations in regards to types of machines that should be used in the project?

A.    Recommendations, No. 1, six C. N. C. milling centers, two, two C. N. C. Swiss machine, three, four C. N. C. lathes, four, three injection molding machines, five, two D. E. burring machines, six, two heat treat ovens, seven, one stamping machine.

Q.    At the bottom of page 7, could you read through the procuring specialized manufacturing equipment paragraph?

A.    Procuring specialized manufacturing equipment, this list of equipment shall be considered mission critical.  Without the following machines the ability to make the weapon system will be impossible.  The ability to procure these machines and the difficulties will be outlined in the legal feasibility section of --

Q.    Next page, please.

A.    -- this report.  The availability of these machines is quite common.  However, trade restrictions must be met -- meet before shipping.  The following recommendations are based on a 400 per day completed units production.

Q.    And are there any recommendations listed below that?

A.    Recommendations, No. 1, three high tolerance counter rotating stock gun drills, two, one debind vacuum oven, three, one Sintering oven, four, one broaching machine, 100 ton.

Q.    There's a paragraph procurement of job specialized and job specific tooling.  Would you read that to the jury, please?

A.    Procurement of specialized and job specific tooling.  This

list is entirely compromised of tools that will require both import and export permits.  More detail will be provided in the legal feasibility portion of this report.  The tooling will almost entirely come from the U.S.A. as the U.S.A. has the only open market on these tools.  The specific tools are proprietary especially concerning the tooling required to manufacture the weapons barrels.  It would not be devisable to attempt to reverse engineer the barrel or attempt to derive the dimensions of these tools.

Q.    And below that are there recommendations?

A.    Recommendations.  One, self centering high speed precision drills, two, self centering high speed precision reamers.

Q.    And the next page does the list continue?

A.    No. 3, rifle buttons to forge rifling, No. 4, magazine well broach, No. 5, barrel extension broach.

Q.    We have heard a great deal of testimony from experts in regards to controlled items.  Is No. 3 a controlled item in your experience as an enforcer as this part of the law?

A.    Yes, as part of this investigation it was determined through searches with the Department of Commerce that rifle buttons are a restricted item that needs a license and permissions to be exported from the U.S. specifically to Iraq.

Q.    At the bottom of page 9, there's another section.  Is that right?  What's that?

A.    Legal feasibility.

Q.    Moving on to page 10, and if you would read -- go ahead and read page 10.

A.    The legality of the plant will have to be established by the Iraq government.  Even considering that the Kurdish regional government is a semi-autonomous government, it cannot issue the necessary permits to import many items that are required to complete the plant.  The largest pool of skilled gun manufacturers will come from the U.S.A.  In order for these selected personnel to work on the project, they must be compliant to the International Traffic in Arms Regulations, ITAR.  They will require the approval of the United States department -- United States State Department.  Failure to get proper approvals, places, the selected personnel in grave danger of incarceration and heavy fines.  Most of the European union are members of ITAR and will bind their citizens as well.

Specialized equipment will require an end user certificate E. U. C. issued by the Iraq government.  Specialized tools will require an end user certificate, E. U. C., issued by the Iraq government.  Recommendations.  One, gain Iraq government's approval to build plant, two, apply and receive end user certificates for critical machines and tools, three, establish a serial numbering system to ensure manufactured weapons can be tracked.  Conclusions, the very nature of ITAR does not allow manufacturing plants of this nature to exist without the host countries central government approving it.  No attempt should

be made without all proper approvals -- I'm sorry -- no attempt should be made without all the proper approvals are received.

Q.    Agent Burke, part of what you just read indicates most of the European union are members of ITAR and will bind their citizens as well.  During the investigation, did you have the opportunity to travel to Estonia?

A.    Yes.

Q.    Is Estonia a part of the European union?

A.    It is.

Q.    I would like to go back to the first page of this document.  That would be the e-mail.  Again, what date was this e-mail sent?

A.    November 14th, 2015.

Q.    As part of your investigation did you determine whether Ross Roggio was present in the United States on the date that this e-mail was sent?

A.    Yes, based on a review of D. H. S. indices which include passenger travel in and out of the United States crossing the U.S. boarder, I recall that Mr. Roggio had returned from a flight into J. F. K. from Istanbul, Turkey on October 26th of 2015 several weeks prior to this e-mail.  Two days following this e-mail, November 16th, I believe, showed an outbound leg of travel for Mr. Roggio in which he left from J. F. K. to Italy.

Q.    Very good.  Going back to the superseding indictment, do

98

you recall overt act B., the second overt act alleged in the conspiracy?

A.    If I can refresh my recollection with the document.

Q.    Would reviewing -- looking at the -- a copy of the superseding indictment assist you in refreshing your recollection?

A.    Yes.

        MR. HINKLEY:  Permission to approach the witness, Your Honor.

        THE COURT:  Granted.

BY MR. HINKLEY:

Q.    It is your memory refreshed?

A.    Yes.

Q.    Can you answer?

A.    It was another e-mail with an attachment of a budget increase attached to the e-mail.

Q.    In your review of the evidence did you find the budget increase spreadsheet in the materials or evidence gathered during the investigation?

A.    Yes, we did.

Q.    Would you find exhibit 20.14?

        MR. BARTOLAI:  What is it, Todd?

        MR. HINKLEY:  20.14.

        THE WITNESS:  Okay.

BY MR. HINKLEY:

Q.    Is this the material that you were just testifying to?

A.    Yes, this is it.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 20.14.

MR. BARTOLAI:  No objection.

THE COURT:  20.14 is admitted.

MR. HINKLEY:  Permission to publish.

THE COURT:  Granted.

BY MR. HINKLEY:

Q.    So describe what this document is based upon what you see on the screen?

A.    This is a Roggio Consulting Company budget increase document.  It appears to be showing anticipated dollar amounts needed to complete the project.

Q.    Is the document dated?

A.    Yes, it is dated March 9th, 2016.

Q.    Is it entitled -- what company it is?

A.    Roggio Consulting Company, 116 Turkey Hill Court, Stroudsburg, Pennsylvania, 18360.

Q.    Have you as part of the investigation or preparation for today looked through this document at the various items that are listed?

A.    Yes.

Q.    And do any of the items in this document line up with information from the feasibility report that you just went

100

over?

A.    Yes, I see various references to C. N. C. related items, M.I.M., metal injection molding items, plastic injection molding items, tooling, yes, there are various items that appear to have been previously mentioned.

Q.    I want to move on to the third overt act.  Do you have an independent recollection of what is -- that is?

A.    I believe that is in relation to OML Global invoice.

Q.    Okay.  I would like to show you what has already been entered into evidence as Government's Exhibit 9.5.  It should come up on the screen.

A.    Yes, I see it.

Q.    What is this?

A.    This is an invoice dated March 28th, 2016 for OML Global in Fayetteville, North Carolina shipping items to Ross Roggio, and specifically the items are 15,000 gas rings, M4 bolt gas ring mil for a total of $2,250, 3,200 cotter pin firing pin retainer for a total of $1,920 and a shipping charge to expedite shipping $317.80.

Q.    Does the invoice indicate to who the items were sold?

A.    Yes, to Ross Roggio.

Q.    And from your investigation as well as -- probably heard the testimony in court -- is it your understanding these items are controlled for export?

A.    Yes, they are.

101

Q.    Is it your understanding OML had the parts to sell to Mr. Roggio, or did OML source the supplies from another company?

A.    Through our investigation we learned that the product -- these items were sourced through Roger Krahl at R. Guns in Illinois through William Mathes at OML Global who procured them and then shipped them to Ross Roggio.

Q.    And I would like to you what's been previously marked and entered as Government's Exhibit 10.1.

A.    I am familiar with that document.

Q.    What is that document?

A.    This is a receipt of sale from Sports Were Us, Incorporated doing business as R. Guns to 21st Tactical on April 20th, of 2016 in Fayetteville for 15,000 M16 gas rings for $1,500 and 3,200 firing pin retaining pins for $960.

Q.    Do you recall the testimony of Roger Krahl whether or not he indicated he had records of his shipment to OML of these parts?

A.    Yes, and he did have those documents.

Q.    Let me show you what's been marked as Government's Exhibit 10.4.   Is this a document received from Mr. Krahl?

A.    Yes, it is.

Q.    And does this exhibit have a tracking number for UPS for that shipment?

A.    Yes, it does.

Q.    Did you do anything with this tracking number as part of

your investigation?

A.   Yes, when I received these documents from Mr. Krahl, I input the tracking number from this document into the UPS website to see what their automated records would show.

            MR. HINKLEY:  If I may approach the witness, Your Honor.

            THE COURT:  Yes.

BY MR. HINKLEY:

Q.   I am showing you Government's Exhibit 10.5.  Do you recognize this document?

A.   Yes.

Q.   What is that document?

A.   This would be a screen print representing their automated information from their website regarding that tracking number.

Q.   Thank you.

            MR. HINKLEY:  The government moves for admission of Government's Exhibit 10.5.

            MR. BARTOLAI:  Your Honor, may I have a moment?

            THE COURT:  Sure.

            MR. BARTOLAI:  No objection.

            THE COURT:  Very well.  10.5 is admitted.

            MR. HINKLEY:  May we publish?

            THE COURT:  Yes.

BY MR. HINKLEY:

Q.   What information were you able to gather from this

investigative technique?

A.    This just verified that the package identified with that tracking number had been delivered, signature was required, it was received by and signed for by Clark, and the manner in which it was served -- sent -- UPS next day air.  It was delivered to Fayetteville, North Carolina, and it was delivered on April 22nd, 2016 at 12 p.m.

Q.    Going now to what has already been introduced as Government's Exhibit 9.4, are you familiar with this document?

A.    Yes.

Q.    Would you generally describe what it is?

A.    This is an e-mail from William Mathes to Ross Roggio, and the subject is listed as sales invoice Ross.

Q.    And is there anything -- information that was exchanged during these communications?

A.    Yes, there is.

Q.    And where is that located?

A.    In the body of the e-mail that is located within the embedded e-mail from Rauno Viltrop to Ross Roggio, and that banking information is embedded within the e-mail regarding a bank transfer.

Q.    During your investigation were you able to determine who Rauno Viltrop is?

A.    Yes.

Q.    Who is he?

A.    Rauno Viltrop is one of Mr. Roggio's employees from Estonia.

Q.    Where was Mr. Viltrop working?

A.    He was working for Roggio Consulting Company in Sulaymaniyah, Iraq and the surrounding area.

Q.    Turning to Government's Exhibit 9.13, which has already been introduced as evidence, what does this particular document show?

A.    This is F. S. N. B. bank statement or part of a statement dated April 22nd, 2016 for William Mathes, and this is showing checking account activity.

Q.    Is there a wire transfer on the 11th of April to Roggio Consulting Company, L. L. C.?

A.    Yes.  April 11th, wire transfer credit to Roggio Consulting Company, L. L. C. in the amount of $4,487.80.

Q.    Were those payment for those items we just described?

A.    Yes, based on the documents it appears so.

Q.    How many gas rings were purchased?

A.    15,000 gas rings and 3,200 firing pin retaining pins.

Q.    In the three ring binder before you, you will see Government's Exhibit 24.4.

A.    Yes, I have it.

Q.    And do you recognize Government's Exhibit 24.4?

A.    Yes.

Q.    Without getting into the specifics what it is, generally

105

what is it?

A.   This is a balance sheet which appears -- I should say first this is an e-mail titled balance sheet 28 April from Rauno Viltrop to Ross Roggio dated May 1st, 2016 with an attachment that's listed as balance sheet April 28th, 2016 which appears -- which is in an Excel S. X. spreadsheet format.

Q.   Would the investigator have received that prior to the search warrant or search on the computer?

A.   Yes.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 24.4.

MR. BARTOLAI:  Your Honor, I object.  This is hearsay and -- includes hearsay.  Mr. Viltrop hasn't testified.  Also there's an e-mail here -- message from another individual, who I don't expect to testify, so we will object on the basis of hearsay.

THE COURT:  Are you objecting to the e-mail or the documents attached?

MR. BARTOLAI:  To the e-mail and the documents attached.  I don't know who created that document, Your Honor.

THE COURT:  Mr. Hinkley?

MR. HINKLEY:  Two things, Your Honor.  Mr. Viltrop as this witness identified worked for Mr. Roggio in Roggio Consulting Company, L. L. C., and, therefore, any statement he may have made would be as an agent of the defendant.  This is

106

also a business record for the Roggio Consulting Company, L. L. C. and, therefore, would be a -- not hearsay but business record of the defendant.

THE COURT:  Mr. Bartolai, I haven't heard any evidence that Mr. Viltrop's e-mail was not within the scope of his authority as an employee of Mr. Roggio.  At this point I'll overrule the objection on that basis.  We will deal with those other documents.  I am assuming Mr. Hinkley will lay a foundation for these documents as being business records.

BY MR. HINKLEY:

Q.    In regards to the document that's attached, the balance sheet document, have you reviewed that document?

A.    Yes, I have.

Q.    Does it appear to be a business record for Roggio Consulting Company, L. L. C.?

A.    It appears to be a complete business record of Roggio, L. L. C. and the project, the weapons manufacturing facility.

THE COURT:  I'll allow the documents to be admitted.

MR. HINKLEY:  May we publish, Your Honor?

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    Would you indicate to the jury on the bottom half of this document it appears to be an e-mail from Rauno Viltrop.  Is that correct?

A.    Yes.

107

Q.    Could you indicate to the jury what Mr. Viltrop says in that part of the e-mail?

A.    In the screen I have there appears to be two separate e-mails.  The first occurs on April 28th, 2016.  Rauno Viltrop is sending an e-mail to Akam.  And it says, Dear Akam, balance sheet and attachments, also includes some invoices that aren't submitted yet, best regards, Mr. Rauno Viltrop.  There is a reply listed above it dated May 1st, 2016 to Rauno Viltrop, Dear Rauno, this balance sheet is not include some of those latest invoices.  I already paid for it, please update, regards.

Q.    So let's go to the balance sheet.  Before we enter the discussion in regards to this exhibit, you were discussing the purchase of the gas rings and the firing pin retainers, correct?

A.    Yes.

Q.    As part of the investigation, did you review the contents of the balance sheet?

A.    Yes, I did.

Q.    Generally speaking, what is a balance sheet?  What is this balance sheet?

A.    The balance sheet is a -- I would call it a living document that is adjusted throughout a company's existence to show assets, liabilities and keep track of expenditures that a company is undergoing -- is involved with.

108

Q.    That is what -- this document is in regards to Roggio Consulting?

A.    Yes.

Q.    I am going to ask you to go to page 10 of the exhibit. Are you able to read line 111?

A.    Yes, I am.

Q.    And why don't you go from left to right?

A.    Okay.  It's designated as line 111, listed supplies, factory supply, 10242, a date of April 10th, 2016, firing pin retainer, $2, 3,200 pieces, $6,400.

Q.    Are you able to read the next line down 112?

A.    Yes.

Q.    Your eyes are better than mine.  Read that for the jury.

A.    Line 112, supplies, factory supply, 10242, a date of April 10th, 2016, gas ring, .15, 15,000 pieces, P. C. S., $2,250.

Q.    Do the number of gas rings listed as well as firing pins match the number of firing pin retainers and gas rings which were listed in the OML sale to Mr. Roggio?

A.    Yes, they do.

Q.    By the way, do you recall where the gas rings and firing pin retainers that were sold to Mr. Roggio -- where they went, where they were shipped?

A.    Yes, they were shipped from Mr. Mathes to Roggio's marital residence of 143 Indian Spring Drive in Stroudsburg, Pennsylvania.

109

Q.    Is that one of the addresses that were searched as part of the search warrants in this case?

A.    Yes, it is.

Q.    Were gas rings found at the place that was searched?

A.    No, there were no bulk items of gas rings or firing pin retaining pins found within the residence or -- at either residence.

Q.    Throughout the investigation were you able to find any manufacturing plant in Pennsylvania or elsewhere in the United States which Mr. Roggio would have used these parts?

A.    No.

Q.    Did you come across any communication from all of the evidence you reviewed where Mr. Roggio offered to sell these items to any person?

A.    No.

Q.    Did you come across any financial transaction where he sold the gas rings to anyone?

A.    No.

Q.    Did you come across any financial transaction where he sold firing pins to anyone?

A.    No.

Q.    Let's go over firing combo buttons.  I show you what's been marked entered into evidence as Government's Exhibit 7.4. Do you recognize this document?

A.    Yes, I do.

110

Q.    What is it generally?

A.    This is a sales order indicating that a sale had been made from Drill Masters El Dorado Tool.

Q.    I ask you to go to Government's Exhibit 7.9, which was previously marked and entered into evidence.

A.    I see it.

Q.    And is this also related to the Drill Masters El Dorado Tool sale of combo buttons?

A.    Yes, I see it's an invoice Drill Masters El Dorado shipped to Roggio, 116 Turkey Hill Road, Stroudsburg, P.A. with a tracking number and a description of combo buttons listed under the items.

Q.    And how much was the cost of the combo buttons?

A.    $3,486.

Q.    And remind the jury, a combo button -- is that a controlled item?

A.    Yes, it is.

Q.    And what were the terms of the sale?  How was it paid for?

A.    Terms of the sale he used a credit card.

Q.    What was the total invoice price on that on the bottom right?

A.    Invoice total is $3,508.16.

Q.    In the binder are you able to find Government's Exhibit 14.14?  If not quickly, I can bring the document to you.

A.    Yes, I have it.

111

Q.    And what type of document is this?

A.    This is a monthly account statement for a Discover Card -- credit card in the name of John W. Roggio, 116 Turkey Hill Court, Stroudsburg, Pennsylvania.

MR. HINKLEY:  The government moves for admission of Government's Exhibit 14.14.

MR. BARTOLAI:  Your Honor, may I have a moment?

THE COURT:  Of course.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 14.14 is admitted. You can publish.

BY MR. HINKLEY:

Q.    On the first page bottom, whose credit card -- Discovery card does this appear to be?

A.    This is in the name of John W. Roggio, 116 Turkey Hill Court, Stroudsburg, Pennsylvania.  Through the investigation we've come to know that as Mr. Roggio's father -- stepfather I should say.

Q.    And during your investigation did you determine whether or not Mr. Roggio here, the defendant, used this credit card related to the Kurdistan firearms project?

A.    Yes.

Q.    Did he?

A.    Yes.

Q.    Please go to the second page.  And was there a transaction

112

that occurred on February 26th?

A.    Yes, there is.

Q.    And please identify what the statement says about that transaction.

A.    This is a transaction listed on the statement dated February 26th.  It says Drill Masters El Dorado T., Connecticut.  I believe that number next to it is a phone number, and then the total cost -- total amount charged $3,508.16.

Q.    That is the same amount as listed on the combo buttons bill, is it not?

A.    Yes.

Q.    In this document towards the top is there also a payment noted for the same amount $3,508.16?

A.    Yes, there is.

Q.    And when does it indicate that payment was made?

A.    The payment is listed as March 1st as an internet payment.

Q.    Please go to what has been admitted as Government's Exhibit 14.9.

A.    I see it.

Q.    On the first page of this document towards the bottom, is there a credit card -- well let me ask you this first.  Whose checking account is this?

A.    This is a checking account statement for Wells Fargo Bank in the name of Roggio Consulting Company, L. L. C., 116 Turkey

Hill Court, Stroudsburg, Pennsylvania.

Q.    And is this checking account opened by Mr. Roggio, the defendant?

A.    Based on your investigation, yes, that's what we determined.

Q.    And based upon your investigation was this account receiving funds from Kurdistan and Iraq in regards or related to the firearms project?

A.    Yes.

Q.    On the bottom part debits, is there a payment on March 3rd of $3,508.16?

A.    Yes, March 1st, $3,508.16.  The transaction is described Discover E. payment, 1603010417 Roggio John.

Q.    Going back to Government's Exhibit 24.4, that's the spreadsheet, have you been able to identify any entry for these combo buttons in this spreadsheet?

A.    Entry specific to listing a combo button, no.

Q.    Are there any other entries which not directly matches the description or close thereto?

A.    There are general entries indicating tools.

Q.    Based on your investigation is there evidence that Mr. Roggio drilled barrel was imparted rifling that would required combo buttons to accomplish?

A.    It appears he did, yes.

Q.    What makes you say it appears he did?

114

A.    There is evidence that we have obtained throughout the investigation that he was successful in completing a rifle.  We have seen photos of multiple rifles and I would -- it is my understanding based upon equipment that had been purchased, equipment that we have seen used, video that we have obtained during the investigation that he was able to --

MR. BARTOLAI:  Your Honor, I object.  It calls for a lay opinion.  There's no foundation.

THE COURT:  You really haven't laid a foundation for this particular testimony.

MR. HINKLEY:  Very good.  I will -- I will do so.  I will get a specific items of evidence found in the investigation.

BY MR. HINKLEY:

Q.    Would you kindly look in the three ring binders for Government's Exhibit 20.17?

A.    I don't believe that I have that in the binder.

Q.    Mr. Burke, do you recognize this document?

A.    Yes.

Q.    Generally speaking and got getting into specifics what the document is, would you describe it?

A.    This is an e-mail that was recovered as part of our forensic review of the items we seized via search warrant.

Q.    For what e-mail account?

A.    The e-mail account is R. W. Roggio at Yahoo.com.

115

MR. HINKLEY:  The government moves for the admission of Government's Exhibit 20.17.

MR. BARTOLAI:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. BARTOLAI:  No objection.

THE COURT:  Government's Exhibit 20.17 is admitted. You can publish.

BY MR. HINKLEY:

Q.    From whom is the e-mail from?

A.    The e-mail is from Ross Roggio.  It is dated September 26th, 2016.  It was sent to Polad Talabani and Faruk Zarya.

Q.    Is there an attachment to this e-mail?

A.    Yes, the attachment was a movie clip.

Q.    And have you during your investigation looking into forensics and whatnot, have you watched that video?

A.    Yes.

Q.    Were you in court when Rob Bly was testifying?

A.    Yes.

Q.    There was a video played during his testimony, was there not?

A.    Yes.

Q.    Is that the same video?

A.    Yes, I believe it is.

Q.    Okay.  Going on to the e-mail contents -- starting with please review -- would you read the first two lines?

116

A.    Please review the following test videos.  Upper receiver assemble contains parts manufactured here.

Q.    Stop there for a moment.  Do you know -- are you familiar with A. R. type of firearms?

A.    Yes, I have been assigned an M4 rifle as part of my duties with Homeland Security Investigations since 2009.

Q.    Are you familiar with what an upper is?

A.    Yes.

Q.    Generally speaking what is it?

A.    An upper receiver is part of the rifle.  It houses the barrel, the bolt assembly group and the stock -- or I'm sorry, the -- not the stock -- the bolt assembly group, the barrel and the upper portion of the weapon.

Q.    Are there any controlled items of particular interest to this investigation which would be part of the upper?

A.    Based on this investigation every part contained within the rifle is a controlled item.

Q.    Does the e-mail note that the barrels were created locally in the project?

A.    Yes, barrel, barrel extension and barrel nut are all listed in that list as being manufactured locally.

Q.    In your experience and based upon what you know as a result of the investigation, would rifling combo buttons be required in order for the defendant, Mr. Roggio, to create the barrels of the test weapons?

117

A.    To create barrels that worked and fired accurately, yes, they would.

Q.    If we can watch the video, which has been previously marked and introduced as Government's Exhibit 3.3 -- I misspoke, 3.9.  Thank you.  As part of your investigation did you forensically look at metadata embedded in Government's Exhibit 3.9?

A.    Yes.

Q.    What is that?

A.    Metadata is as the photo is taken metadata is imparted to the file that will include the type of device used, the time, date, location depending on the settings of the device which can show where the photo was taken or the video was taken.

Q.    Is it possible to determine the geolocation of this video based on your review of that data?

A.    Yes, it was.

Q.    What was the geolocation?

A.    The geolocation was an area to the northeast of Sulaymaniyah, Iraq in a mountainous region -- I'm butchering it -- Qaiwan.

Q.    Back to Government's Exhibit 20.17.  You had testified that the e-mail indicates there were upper receiver assembly contained parts manufactured here including a barrel, right?

A.    Yes.

Q.    Does the communication indicate that there are parts that

118

were not manufactured locally?

A.    Yes, it does.

Q.    Why don't you read that part of the e-mail?

A.    Lower receiver --

Q.    We want --

A.    Yeah, parts in upper receiver assemble not manufactured here.  Dust cover, forward assist, bolt carrier assembly, flash suppressor.

Q.    In regards to the bolt carrier assembly, are you familiar what that part is?

A.    Yes.

Q.    What is it?

A.    That is the part of the rifle that houses the bolt and the firing pin.  It essentially is piston driven by gasses in the rifle to cycle which causes the rifle to eject and then reload.

Q.    And does the bolt carrier assembly contain any parts of interest to this investigation?

A.    Yes, specifically that is the area of the rifle that contains the gas rings and the firing pin retaining pins we saw earlier.

Q.    Is the actual e-mailing as demonstrated by Government's Exhibit 20.17 one of the overt acts laid out in the superseding indictment?

A.    Yes.

Q.    And which act if you recall?

A.    I would need to be refreshed.

Q.    Just -- we will just go with that.

A.    Okay.

Q.    Do you recall what the fourth overt act is or overt act --

A.    I would need to take a look.

Q.    Would there be anything that would help refresh your recollection?

A.    Yes.

Q.    What would that be?

A.    The superseding indictment.

        MR. HINKLEY:  May I approach, Your Honor?

        THE COURT:  Yes.

        THE WITNESS:  Okay.

        MR. HINKLEY:  Thank you.

BY MR. HINKLEY:

Q.    If you recall, agent, can you answer the question?

A.    Yes, it was another e-mail in regard to metal injection molding parts between Mr. Roggio and Dr. Ravi Ballina.

        MR. BARTOLAI:  What number?

        MR. HINKLEY:  That was overt act --

        MR. BARTOLAI:  Oh, I'm sorry.

BY MR. HINKLEY:

Q.    In the three ring binder I believe there will be an exhibit marked 20.12.

A.    Mine skips from 20.16 to 21.

120

MR. HINKLEY:  If I may have a moment, Your Honor?

THE COURT:  Of course.

BY MR. HINKLEY:

Q.    Would you look for Government's Exhibit 20.9?

A.    I have it.

Q.    Are you familiar with this particular document?

A.    Yes, this is an extraction report from one of our forensics specific to a laptop computer taken from Mr. Roggio.

Q.    Did you review it during your investigation?

A.    Yes, sir.

MR. HINKLEY:  The government moves for the admittance of Government's Exhibit 20.9.

MR. BARTOLAI:  Your Honor, may I have a moment?

THE COURT:  Yes.

MR. BARTOLAI:  Your Honor, we object.  This is a 3 is page extraction report containing hearsay, specifically an individual by the -- multiple e-mails here from an individual by the name of Dr. Ravi Ballina, and I believe he's certainly not on the witness list provided by the government, Your Honor. So we will object on the basis of hearsay and the confrontation clause.

THE COURT:  Mr. Hinkley?

MR. HINKLEY:  Perhaps it's a little bit too wide -- I would -- I will create a new document that has only the specific e-mail between Mr. Roggio that's referenced in the

121

overt act and we will that rather than the full report if that is satisfactory to defense counsel.

THE COURT:  Is that something you can do now?

MR. HINKLEY:  I'm sorry?

THE COURT:  Is that something you can do now?

MR. HINKLEY:  Yes, I believe so.

THE COURT:  Do you need a break for that?

MR. HINKLEY:  No, I have it.

THE COURT:  All right.

MR. BARTOLAI:  Your Honor, it's the same objection. They narrowed it down to one piece of paper now.  Again, this is Mr. Ballina.  He's a doctor, and it's an e-mail.  It's hearsay and there's a confrontation --

THE COURT:  Who is the e-mail between?

MR. HINKLEY:  Between Mr. Roggio and a gentleman named Ravi --

MR. BARTOLAI:  There's a big copy list C. C. on it as well.

MR. HINKLEY:  The communications between the defendant and Mr. Ravi.

THE COURT:  Spell that.

MR. HINKLEY:  R-a-v-i.

THE COURT:  Communications between Mr. Ravi and defendant I will allow because the defendant's statements are admissions under 801 D. 2, and obviously in order to understand

122

Mr. Roggio's statements you need context, and that context would be provided by Mr. Ravi's response or his statement eliciting Mr. Roggio's response.  Overruled.  Go ahead.

MR. HINKLEY:  So I am clear so I am in bounds of the order what I will do is rather than having the exhibit itself entered, I'm going to have the witness testify in regards just to those communications so that will be part of the record.

THE COURT:  Okay.

MR. BARTOLAI:  What's your new document?

MR. HINKLEY:  20.9, just the information put on the record by the witness.

BY MR. HINKLEY:

Q.    Since I gave you the only copy -- I'm blind here -- what is the date of the first communication if you can tell from that sheet?

A.    The date of the first communication is Wednesday, March 16th, 2016.

Q.    And would you read that communication, please?

A.    Yes.  This is from Mr. Ballina to Elina Kandaja.  This is an embedded e-mail within the top e-mail.  Dear, Elina. Greetings and --

MR. BARTOLAI:  Excuse me, Your Honor, it is hearsay.

MR. HINKLEY:  It is.  I thought it was only between the defendant and -- let me check that again.

THE WITNESS:  There is above -- so the first

123

communication is an embedded e-mail which is between Mr. Roggio -- I'm sorry -- Ravi Ballina and Elina.  The subsequent communications above that which occur on April 6th are between Mr. Roggio and Ravi Ballina.

Q.    Those are the e-mails I am asking you to focus on.

A.    So on April 6th, 2016.  Dear Ross, this is the e-mail I have written -- and I apologize for the -- it's -- it's tiny but I'm trying -- I'm reading through it.  Dear Ross, this is the e-mail I have written to address the time, pressure -- we -- if -- can I use a magnifying glass?  It's very tiny.

Q.    Will my glasses help?

A.    I don't know.  Can I use a magnifying app on an iPhone?

MR. HINKLEY:  I have no objection.

MR. BARTOLAI:  I have no objection.

THE COURT:  Let's do that, please.

THE WITNESS:  This is the e-mail I have written to address the time pressure we are all under in this situation. I will send you an e-mail with all the parts so you can authorize me to make the 3,200, regards, Ravi.  On April 6th, 2016, a reply from Mr. Roggio to Ravi Ballina Dear, Ravi, let's move on this, thanks.  And a reply to that e-mail on April 6th, 2016, thanks, Ross, also I would request your chief engineer to authorize me to speak to the injection machine guys, centering furnace guys, et cetera.  A reply above that, Dear Ravi, you are so authorized.  I will send them an e-mail.  Thanks, Ross.

124

Q.   Thank you.  I'm sorry you had to go through that process.

A.   Getting old.

MR. HINKLEY:  Your Honor, is it a good time for a break?  I'm starting to --

THE COURT:  Would you like a break?  We will have a break.  We will take 20 minutes.

(A brief recess was taken.)

BY MR. HINKLEY:

Q.   Moving on the last overt act alleged in the conspiracy, do you recall what that overt act was?

A.   Yes, that's a wire transfer into Mr. Roggio's P.N.C. account.

Q.   I show you was been previously marked as Government's Exhibit 21.16 entered into evidence.

A.   Yes, I see it.

Q.   This is a P.N.C. record, correct?

A.   Yes, appears to be a banking statement for Roggio Consulting Company, L. L. C., 116 Turkey Hill Court, Stroudsburg, P.A. from P.N.C. bank.

Q.   The second page of this document under other additions is there a transaction which occurred -- or date posted of February 3rd?

A.   Yes, I see a February 3rd transaction in the amount of $1,329,608.65 described as an international wire coming in with the number 016524 and a reference number of W. 0165240203.

125

Q.    I will show you what's marked and entered into evidence as Government's Exhibit 21.17.  Do you recognize this document?

A.    Yes, this is a wire transfer document.

Q.    From P.N.C. bank?

A.    From P.N.C. bank, yes.

Q.    What was the date of this particular transaction?

A.    The send date is listed as February 3rd, 2015.

Q.    That's the same date from the other document, right?

A.    Yes.

Q.    And the amount of the transaction?

A.    The amount in U.S. dollars is $1,329,608.65.

Q.    And does it indicate from where the international transfer came on the left-hand side?

A.    Yes, looking through all -- it looks it originated Kurdistan International Bank, Erbil, Iraq.

Q.    From whom?

A.    Zarya Construction.

Q.    Does this go into Mr. Roggio's account at P.N.C. bank?

A.    Yes, sent to Roggio Consulting Company, L. L. C.

Q.    In the binder before you you have Government's Exhibit 20.10 or 20-10.

A.    Yes, I have it.

Q.    And do you recognize this document?

A.    Yes, this is a document that we recovered in the forensic review from Mr. Roggio's digital items.

MR. HINKLEY:  Your Honor, government moves for admission of Government's Exhibit 20.10?

MR. BARTOLAI:  No objection.

THE COURT:  20.10 is admitted.

BY MR. HINKLEY:

Q.    If you can go to page 33 of this document, the top box?

A.    Yes.

Q.    What is it describing?

A.    Legal authorities for defense trade controls, and it's specifically referencing AECA, Arms Export Control Act and ITAR, International Traffic in Arms Regulations.

Q.    Is this a document that was found on the defendant's computer?

A.    Yes.

Q.    The second box down?

A.    This is a slide, country policies and embargoes, specifically section 126.1 of the ITAR prohibited exports, imports and sales to or from certain countries.

Q.    Is Iraq listed in the countries that are listed?

A.    Yes, it is.

Q.    Where is that listed?

A.    Bottom of the second column.

Q.    Prior to coming to testify as part of your investigation, did you review any video recordings located in the electronic file seized from the defendant which shows the floor of the

127

firearms factory in Kurdistan?

A.    Yes, I did.

Q.    Have you reviewed -- looked and watched Government's Exhibits 25.5 and 25.10?

A.    Yes, I have.

Q.    And are those?

A.    Yes.

        MR. HINKLEY:  The government moves for admission of Government's Exhibits 24.5 and 25.10.

        MR. BARTOLAI:  May I have a moment, Judge?

        THE COURT:  Yes.

        MR. BARTOLAI:  No objection.

        THE COURT:  Government's Exhibit 24.5 and 25.10 are admitted without objection.

        MR. HINKLEY:  Permission to publish to the jury, Your Honor.

        THE COURT:  Yes.

BY MR. HINKLEY:

Q.    Please show 24.5.  Kindly show Government's Exhibit 25.10. Turning back now to the investigation, did there come a time when the focus of the investigation turned to Estonia?

A.    Yes.

Q.    Would you explain how that progressed?

A.    As the investigation progressed, I received information through D. H. S. indices that an individual we had identified

as Elina Kandaja had traveled to the United States, and I began attempting to contact her in an effort to interview her.

Q.   Without getting into anything that she may have said to you, as a result of your -- well, did you speak to her?

A.   Yes, we did.

Q.   Again, without getting into the contents of what that conversation was, did it prompt you to do anything further in the investigation?

A.   Yes, it made us travel to Tallinn, Estonia.  Prior to traveling we entered what is called a mutual legal assistance treaty request to our foreign partners, the central authority of the Estonian government requesting to interview a number of their citizens who we identified as working within Roggio Consulting Company in Iraq at the weapons factory.

Q.   And was that mutually legal assistance treaty request granted to you?

A.   Yes.

Q.   Did you meet with Estonia authorities and with the witnesses?

A.   Yes, we did, multiple times.

Q.   What witnesses did you meet with if you recall?

A.   The -- in our initial trip in August of 2021, we met with and interviewed Elina Kandaja, Siim Saar, and I believe Rauno Viltrop as well among others.

Q.   Would that be Siim Sebastian Saar?

129

A.    Yes.

Q.    Look at what has been marked as Government's Exhibit 26.8 if you can find that.

A.    I have it.

Q.    Is this a document you received pursuant to the multi legal assistance treaty request with the Estonian authorities?

A.    Yes, it is.

Q.    Is this a document which was connected to their interviews with Siim Sebastian Saar?

A.    Yes.

Q.    Did you do anything separate from that interview to advance your investigation?

A.    Yes.

        MR. HINKLEY:  Your Honor, the government moves for the admission of Government's Exhibit 26.8.

        MR. BARTOLAI:  Your Honor, it's a -- it's hearsay.

        THE COURT:  It very well may be.  I don't think you asked this witness to authenticate the document to lay a foundation as to the authorship.  I'm really not able to go further until I hear more about it.

        MR. HINKLEY:  Certainly, Your Honor.

BY MR. HINKLEY:

Q.    Who is the author of this document?

A.    On April 26th of 2022 I had traveled along with my partner to Estonia.  During that trip we were physically present and

130

assisting in the interview of Siim Sebastian Saar.  At the conclusion of his verbal interview, he indicated to us that he --

MR. BARTOLAI:  Objection, hearsay.

THE COURT:  Sustained.

THE WITNESS:  At the conclusion of that interview with me present over his -- watching him, Siim Sebastian Saar created this document from his memory depicting --

MR.  HINKLEY:  Well, we can stop right there.  That would be the origin and authenticity of the document.  The government is not offering it for the truth of the matter but rather offering it to explain the investigatory steps special agent Burke took as a result of receiving this document from Siim Saar.

We note that Siim Saar will be testifying later in this trial and will identify and testify about this document, and we also request that the document be conditionally admitted pending that further testimony.

MR. BARTOLAI:  Your Honor, so clearly it's hearsay, and more importantly there's a confrontational clause matter here.  This isn't a witness from down the street.  This is a witness from Estonia who may or may not show up.  And so there is that matter.  Now, if the government wants to use this or ask this witness what steps he took based upon this document, he's free to do so.  They don't need to introduce the document

131

at this point to ask that question.  So we will maintain our objection.

MR. HINKLEY:  That's fine, Your Honor.  I will ask him about what investigative steps he took.  And if later on we determine we think that we would like to have that admitted through this witness, I will address it.

THE COURT:  All right.  So you can proceed as you both described meaning that there will be no reference to this document.

BY MR. HINKLEY:

Q.    Having received this document without getting into the specifics, what is it basically?  Is it --

A.    This was his --

Q.    I don't want a location.  I just want to know what it is.

A.    A depiction of the military compound where he was held.

Q.    Okay.  Having received that did you do anything with that depiction that you had received?

A.    Yes, using this document I began searching an area through the investigation we had identified as the potential location of this compound.

Q.    And what area were you searching?

A.    An area outside of Sulaymaniyah to the northwest.

Q.    And what tool did you use to search?

A.    I was using Google Earth Pro.

Q.    And does that particular tool allow you to search images

132

in Google maps for date ranges?

A.   Yes, it does.  It has an option to include historical views of the same aerial mapping through the past.

Q.   And as part of your investigation, did you have an idea of the timeframe which would be relevant for the search?

A.   Yes, we were looking specifically for the last quarter of 2015.

Q.   And did -- did you say Google professional?

A.   Google Earth Pro.

Q.   Did Google Earth Pro allow you to use that date range in your manipulation?

A.   Yeah, I do a search initially of the area.  I focus on the area I'm interested in, and then in the toolbar above you select an option to include historical data.  That brings up a secondary graph which allows you to go backward from -- and show images from the present, their most recent image, flyover image and whatever historical images of the exact same area that they would have.

Q.   So having testified, is that a basis of what you did?

A.   Yes.

Q.   Were you successful in finding anything that resembles the document that you received?

A.   Yes, I did.

Q.   I'm going to ask you to go through exhibits 25.1 through 25.8.

A.    Okay.

MR. HINKLEY:  If I may have one moment, Your Honor?

THE COURT:  Yes.

BY MR. HINKLEY:

Q.    Government's Exhibit 21 -- 25.1 through 25.8.

A.    These are a sequence of aerial maps the first showing -- 25.1 showing an overall aerial view of the Sulaymaniyah, Iraq region and then 25.2 focusing in more so on the area around the Sulaymaniyah International Airport and then using the airport to focus in more on a closer close-up of the region and just each photo is focusing closer and closer onto a specific location to show what we have identified as a military compound.

Q.    I note that each document has a box attached to the top corner?

A.    Yes.

Q.    Is that something that is integral to Google or something that you added to that?

A.    This is something that I added to the document.

MR. HINKLEY:  Your Honor, the government moves for admission of Government's Exhibit 25.5 through 25.8?

MR. BARTOLAI:  Your Honor, we object.  May we approach?

THE COURT:  All right.

(The following discussion took place at sidebar:)

134

MR. BARTOLAI:  So we have an objection, Your Honor. And what we are concerned with, No. 1, maps are like photos. When a photo is annotated like what -- the various markings and such, it becomes a statement.  So there's an hearsay aspect. More importantly, Your Honor, there's an authentication aspect as well.

I have a case -- and I apologize -- I just got this case this morning but it's U.S. versus Lizarraga-Tirado, 789 F.3rd 1107, a Ninth Circuit case, 2015.  And what it talks about, Judge -- I will hand it up to the Court to look at.  But there's authentication that's required.  Some of the things, for instance, proponent must show that the machine he was using is reliable and correctly calibrated and that the data put in the machine is accurate.

It also -- process or system needs to be shown that produces an accurate result.  And it goes on to talk about this, Your Honor.  They can do this through calling a Google technician, earth programmer or a witness who frequently works with and relies upon these program to produce accurate images. So we submit, Your Honor, that there's a hearsay aspect and there is an authentication aspect.

I believe what we have is Mr. -- agent Burke, you know, playing around with Google Earth or whatever program it was and putting together a bunch of pictures that they're going to use as a collage ultimately.  So we object, Your Honor.

135

THE COURT: All right. Well, Mr. Hinkley, what's your view?

MR. HINKLEY: Well, this case says it's not hearsay, and it's indicating that if anything there's an authenticity question, and so we will let the Court know where we're going with this. This witness is the one that created this document. We have the Estonian witnesses who will be testifying about the documents indicating that from their -- from their memory that this is the area and it accurately reflects what the area looked like and this is the compound they were taken to.

THE COURT: What about this objection concerning the legend? This box entitled legend?

MR. BARTOLAI: And including, Your Honor, the -- I believe the routes and the streets and the cities are -- you know, there are statements on the map. I don't know the towns and -- maybe that's what they are. A map is different than a photo is our submission.

THE COURT: These names were added?

MR. BARTOLAI: I don't suggest that. But there was a map maker. It's more than just a photo. A map is an assertion and, you know, we don't know -- Google apparently is the -- you know, the Court can take judicial notice that perhaps those names or those -- it's an accurate map, but we're beyond that as far as the process that's used to make this -- to arrive at these conclusions.

136

MR. HINKLEY:  This is an illustrative exhibit which to aid the witnesses when they testify to explain and make clear for the jury what it is they are testifying to.  So --

THE COURT:  Certainly if those persons were here now, I would take that into consideration, but instead I have Mr. Burke who --

MR. HINKLEY:  This is a fight that I don't know that I really care because we are going to have those witnesses here.  I just want to have the testimony of how they were created.  If you want to reserve your decision based upon when we call the other witnesses, I'm fine with that.  I withdraw the motion to admit it.

MR. BARTOLAI:  That's fair.

MR. HINKLEY:  Conditionally subject to the Estonian witnesses.

THE COURT:  You know, what's that case?

MR. BARTOLAI:  Here, Judge.  I will give it to you. Let's take ten minutes.

(The discussion at sidebar concluded.)

THE COURT:  Ladies and gentlemen, we are going to take ten minutes so I can look over some documents.

(A brief recess was taken.)

THE COURT:  Mr. Burke, would you kindly step out for a moment?

THE WITNESS:  Yes.

137

THE COURT:  From my quick reading of this decision in United States versus Lizarraga-Tirado, 789 F.3rd 1107 I think there are certain principals that be identified.  All of it however begins with the Court's observation that -- the word they use is tacks, t-a-c-k-s -- that tacks can be placed on a Google Earth map photograph either by the actual G. P. S. system of Google itself or it can be placed by a user.

I quote, a user can type G. P. S. coordinates into Google Earth which automatically produces a digital tack at the appropriate spot on the map labeled with coordinates.  A user can also manually add marker by clicking any spot on the map which results in a tack that can be labeled by the user.  The Court goes on to say in the circumstance where the tacks are the product of Google system itself, that is not hearsay.

Again, I quote, a photograph merely depicts a scene as it existed at a particular time.  The same is true of a Google Earth satellite image.  Such images are produced by high resolution imaging satellites, and though the cameras are more powerful the result is the same, a snapshot of the world as it existed when the satellite passed overhead because a satellite image like a photograph makes no assertion, it isn't hearsay.  That, of course, doesn't end the inquiry.  They go on to say, on the other hand, quote, if the tack is placed manually and then labeled, paren, with a name or G. P. S. coordinates, closed paren, it's classic hearsay akin to where we held --

citing a prior case of their circuit -- that hand held -- beg your pardon -- hand drawn additions to a map, their topography lines are hearsay. So that takes us further on, and essentially there's a question here that will have to define either now or later as to the tacks on these photographs whether they were automatically generated by Google or whether they were generated by the witness. In that case, they're hearsay.

In addition to that, there's an authentication issue that the Court discusses, and certainly one of the ways that authentication could be proven is to bring a -- as they put it -- someone in to show the machines are reliable, correctly calibrated and that the data put into the machine, here the G. P. S. coordinates, is accurate. They go on to say that an additional way is testimony from a Google Earth programmer or a witness who frequently works with and relies on the program quoting Charles Alan Wright and Victor James Gold, Federal Practice and Procedure Section 7114. Finally, they say, quote, it can also be met through judicial notice of the program's reliability as the advisory committee notes specifically contemplate, end quote.

So I guess the principle issue here to the extent you want to move forward with these photographs today is we will bring Mr. Burke back in. He will have to tell us how those tacks were placed on these photographs. If he says he did it,

then the objection will be sustained.  If he says they weren't, they were automatically part of the Google program, then that objection will be denied.  As far as the reliability for authentication purposes, I am quite willing to take judicial notice of the G. P. S. program's reliability as the advisory committee notes allow.

But this basic issue of where the tacks came from is something that we can't avoid, and I would suggest we bring Mr. Burke back in here and find that out.

MR. BARTOLAI:  Your Honor, if I may add to my objection -- and again, we're submitting under rule 701 opinion testimony by a lay witness this -- what he's testifying is based upon scientific, technical and specialized knowledge, and therefore, Your Honor, he should be an expert, and he's not clearly.  So --

THE COURT:  I'm got going to reach that, Mr. Bartolai.  We haven't gotten that far.  Let's talk about and address what is, in fact, the specific problem at hand, which is the very admission of these photographs before we ever get to what he can say or not say.

MR. BARTOLAI:  Thank you.

THE COURT:  Bring Mr. Burke back in.  If you want to do the questioning you can do it, or I can do it, but we need to find out about these maps.

MR. HINKLEY:  May I, Your Honor?

140

BY MR. HINKLEY:

Q.    Mr. Burke, there's a question that goes to whether or not portions of these exhibits which you created are hearsay.

A.    Okay.

Q.    The question is -- and if you want to look at, for example, 25.3.

A.    Okay.

Q.    This is true for a number of these maps.  On the right-hand is a box that's titled legend, and there's something which I think are commonly called tacks.

A.    Yes.

Q.    Is the question is, did you create the tacks that resulted in that legend and those statements there, or was that automatically done by Google?

A.    I did not create any of those tacks.  They were already in existence.

         THE COURT:  So to be clear, Mr. Burke, if I may, looking at exhibit 25.3, there are various locations identified.  Do you see these?

         THE WITNESS:  Yes, I do.

         THE COURT:  For example, in the lower right-hand corner, there is a location -- do you see that?

         THE WITNESS:  Yes, I do.

         THE COURT:  I consider that to be a tack unless somebody tells me otherwise.  Did you put that in there?

THE WITNESS:  No, I did not, Your Honor.

THE COURT:  Is there any identification of any location on any of these exhibits that you put in?

THE WITNESS:  No, Your Honor.

THE COURT:  Well, in that case -- and this legend in the upper right-hand corner, so I'm clear is that something you inserted?

THE WITNESS:  No, it is not, Your Honor.

THE COURT:  That came through the G. P. S. program itself such that what was delivered to you as a result of your use of the program was the photograph as it is, what these legends in the upper right-hand corner?

THE WITNESS:  Yes, I made no -- I did not create any of these plot points.

THE COURT:  If you would again, please step out.  I'm sorry, Mr. Bartolai, I beg your pardon.  You should have had the right to cross-examine him on that.  Do you want me to bring him back in so you can question him?

MR. BARTOLAI:  Thank you.

THE COURT:  I overlooked.  Mr. Hinkley, do you have any questions before I turn the witness over for cross examination?

MR. HINKLEY:  No, Your Honor.

THE COURT:  Cross-examine.

CROSS EXAMINATION

BY MR. BARTOLAI:

Q.   Agent Burke, so I'm discussing these exhibits 25.1 through 25.8.  And I have in front of me -- I notice each of one of these -- let's look at 25.5 for a moment.  Do you have that in front of you?

A.   25.5, yes, sir.

Q.   On the upper left-hand side where it says main road entrance three view, is that your handwriting -- did you create that?

A.   Yes, that's a label that I created.

Q.   So you did create that label.  Each one of these has a label, does it not?

A.   Yes, they do.  Although I believe one or two may have been whited out.

Q.   Yeah, okay.  So they all do.  They're all on the left.  This one I'm looking at now is 25.7, and that has -- that says main road entrance five view.  That has a label, too.  Where are you getting main road and entrance five?

A.   That was my labeling as I was getting closer and closer so I could keep track of which photo was which photo.

Q.   As you were interpreting the map.  In the very last one, I think it's a 25.8.  25.8 is a document that was offered.  This says C. T. G. base.  Is that your -- you wrote that C. T. G. base?

A.   Yes, I did.

MR. HINKLEY:  That has been redacted from the document in use.

MR. BARTOLAI:  Is it?  That document doesn't have that?

MR. HINKLEY:  That's correct.

MR. BARTOLAI:  I didn't know that, okay.  Very good.

BY MR. BARTOLAI:

Q.  All these photos were taken -- all these -- this was your -- this was you using what program was it?

A.  Google Earth Pro.

Q.  Google Earth Pro.  And you say -- now, when did you do this?  When did you take the photos?

A.  I don't remember right now, like -- it was within the past couple weeks.

Q.  Uh-huh, okay.  And so you took them, and it would be 2023 you put this together?

A.  Oh, yes.

Q.  All right.  And you're saying that these here -- how were you able to say that this accurately depicts what this area looked like in 2015?

MR. HINKLEY:  I will object to the question, Your Honor.  It goes well beyond Your Honor's questions, and you've already indicated that you are willing to judicially notice that the maps are accurate and in general use.

THE COURT:  The difficulty here is that as we all

144

know from the basic authentication and foundation question for any photograph is whether it's a fair and accurate representation of a particular object or other matter, and for our purposes it would seem to me it would have to be a fair and accurate representation of what this particular area looked like at the relevant time period, which is not 2023.

MR. HINKLEY:  I believe the witness testified that he used the Google Pro option and had it for the time period which was relevant for the investigation not for --

THE COURT:  I didn't hear him say that.  Go ahead.

BY MR. BARTOLAI:

Q.   Yes, so the -- I think you understand the question.  How do we know this is a fair and accurate depiction of what these areas looked like specifically, October, November, 2015?

A.   Specifically with this image, as this image is on the screen I'm looking at 25.8, there is an option on the program within Google Earth Pro to select the use of historical images. That brings up a slide bar in the top left.  It is not depicted on this photo.

It is a tool that you can then fast forward or -- it starts with the most recent view, and then you click back and any image of this area that Google has within its files -- there could be maybe -- maybe there's five photos within 2023. Maybe there's no photos in '22.  Maybe there are two photos. As the satellite passes over Google has categorized the various

145

aerial views of, you know, the world, and you can now access these historical photos.

I have used it to look at my house and how it has changed over the years, and it has proven to be accurate and --

Q.   How many photos were there for -- you just said there may be five photos for 2023 and no photos for 2022.  How many photos were there for 2015?

A.   In 2015 I believe there was one photo in June of 2015, and then fast forwarding the next photo overlay was January of 2016.  This is January of 2016.

Q.   So this -- so, okay.  This is -- I see.  So this is not October or November of 2015?

A.   Yes, unfortunately there was no specific photo in the historical archives for that month and year.

Q.   So we are clear on that then the photos we're looking at then would have been January 2016.  Do you have a representative image from that?  Do you have a -- do you have that image -- and not in the form you made it -- but in the form that it appeared when you were making the program?

A.   I'm not following that question.

Q.   In other words, this -- you took this photo.  Again, we're just looking at -- I'm going to use --

A.   These are like -- so as the image appears on Google, I'm not taking a photo.  As it appears on the screen through the Google Pro program, I am clicking print and creating a P. D. F,

which is what these images are.

Q.    Let's go -- do 25.3.  When you see 25.3, what we're looking at here -- what we're looking at is an image of this area as it looked according to that program on January 2016, right?

A.    I can't be a hundred percent sure on that.

Q.    Why?

A.    Because the image that I wanted to focus on as I'm -- I don't believe the overall area is changing significantly.  The airport will be where the airport is going to be.  That's not going to change.  The location that I'm trying to get to is going to be the same throughout from a higher up.  When I get close and we have the detail that's depicted in that final photo, that's the image I want to see throughout the years and try to pick the closest to the timeframe that we're concerned about.

Q.    So all of these -- so this is -- there's more than one photo that we're seeing here.  This isn't one master photo that you zoomed in on.  You've taken several different photos, is that it?  Where they all from January 2016?

A.    I'm not using the slide bar on each photo.  I'm coming in from -- I don't know --

Q.    I understand.  Let me ask you.  You can answer the question.  You're not using the slide bar for each photo?

A.    Correct.

Q.    So each photo isn't January of 2016?

A.    I can't tell you specifically that it is.

Q.    And that --

A.    If I --

THE COURT:  Let him finish.

THE WITNESS:  On the initial photo, the overlay of Sulaymaniyah the farthest out, I may have set it to back -- you know, to an area, you know, in 2015 or 2016.  But as I'm closing in, I'm not changing that representation.  I'm just showing the overall progression of where the final compound is in relation to the overall projection of Sulaymaniyah to show, okay, here's -- here's the city, here's the region using the airport to focus in more and more and more, and I can't tell you if that date remains the same.

What I can tell you is that once I am focused on that specific compound the area that I'm, you know, ultimately trying to get to, I want to see what that specific -- that smaller portion how that looks over the years.  And I can tell you that as you're looking at that label, the C. T. G. base that I have labeled, that slide bar I can tell you had images from 2000 -- I'm sorry, June of 2015, January of 2016.

If you were to blow it up, that major overlay may have, you know, a ton more photographs, but it's not going to show you any detail change in the base from what we're looking at it at 25.3.

BY MR. BARTOLAI:

Q.    Did you document your process, how you did it?

A.    The photos, the screen prints that I took were sequentially made all in the same sitting as I was scrolling and focusing in.

Q.    The overlay you just referred to, do you have that?  Do you have a copy of the overlay?

A.    I took them directly from the computer and saved them to a file, and we print from that file.

        MR. BARTOLAI:  I have had enough of that, Your Honor.

        THE COURT:  So, counsel, what is -- is there any further argument before I ask any further question or before I rule on these photographs?

        MR. BARTOLAI:  Judge, so I mean as we inquire we find out that the closest we can get is January 2016 a few months later from October.  But then when we discuss about how these documents were created it seems to be that all -- he can't say with certainty -- with reliability that that image of January 2016 was used to create all these documents as --

        THE COURT:  That is a good question.

        MR. BARTOLAI:  Yeah.  So --

        THE COURT:  I think we need to -- Mr. Burke, help us out here if you can.  If I ask you to take each photograph and indicate whether it is a photograph of the area depicted as of either January of 2016 or June of 2015.  Can you do that?

THE WITNESS:  No, not at this time.

THE COURT:  When you say not at this time, are you suggesting there's a way you can do it?

THE WITNESS:  I can recreate it, and as I'm going in, specifically as I said, I -- in creating this, I'm not looking for detailed changes from 30,000 feet in the air.  The change of the compound I don't believe -- you know, from the original photo that's high up to the one that's close -- the closest image I can get of that compound were -- was the only photo I was concerned about manipulating with the -- their time and date historical --

THE COURT:  Is there any photograph here that you can tell us under oath it is a photograph that depicts the area as of either January of 2016 or June of 2015?

THE WITNESS:  Yes, I can specifically state that 25.8 is of January 2016 based upon the application Google Earth Pro as it stores its historical data.

MR. HINKLEY:  Your Honor, the government does have a suggestion that may resolve the issue.

THE COURT:  Let's hear it.

MR. HINKLEY:  I would recommend to the Court that perhaps we break for the weekend, I'll have Mr. Burke make new exhibits using the date range that's applicable to the case and not putting any box on the top left which would include any type of statement.

150

THE COURT:  I was about to tell counsel that the box on the top left has to go.

MR. HINKLEY:  That's what we --

THE COURT:  Has to be deleted.

MR. HINKLEY:  I will have him create a new series of documents with the correct date range.

THE COURT:  Is that acceptable to you, Mr. Bartolai?

MR. BARTOLAI:  Yeah, I guess -- well, no, Your Honor, I'm sorry it's not.  The problem is again, it goes to authentication.  It goes to offering a lay opinion.  He's actually creating a document that's his opinion, his opinion of what -- where this is, his interpretation of scientific and technical data about this --

THE COURT:  I am not so sure he's interpreting anything, and that isn't -- the alternative is going to be either this individual goes back and produces an entirely new set, or I'm going to admit 25.8 with the proviso that the upper left-hand corner statement main road entrance 3 D. view be deleted.  It's either that comes in, or you can agree to other photographs by Mr. Burke that can be introduced and we can do this again.  If you want to do it again, I'll do it again.

MR. BARTOLAI:  That's all right.  We will take a -- under that condition, 25.8 will have to be acceptable, you know.  I mean, he said January '16.  So I see -- I see where that's coming from.  Now, regarding the other exhibits though,

151

again, you know, this is --

THE COURT:  I'm not allowing the other exhibits in because he's not able to tell us what time period this depicts.

MR. BARTOLAI:  Yes, Judge, that's acceptable.

THE COURT:  Mr. Hinkley, do you want to proceed?  For the record, 26.8 is admitted -- 25.8.  I beg your pardon.

MR. HINKLEY:  I apologize.  Your Honor, the next exhibit we were going to address is actually Mr. Burke doing what he did with the low resolution way back photo getting closer, closer, but he does it while recording himself in video type of format.  So I suspect we're going to have the same issue.  Maybe we can address that now before we bring the jury back in.

MR. BARTOLAI:  Your Honor, and again this is -- what number --

THE COURT:  I'm not sure I understand what it is you're proposing.

MR. JASPERSE:  25.9.

MR. BARTOLAI:  25.9 is a collage of the exhibits you just found would be inadmissible for lack of --

MR. HINKLEY:  We don't know that.  Let's play the video and ask the witness how he did that.

THE COURT:  Do I have that, or is that a video?

MR. HINKLEY:  It's a video.

THE COURT:  Let's have the witness present his

152

testimony with respect to 25.9.

BY MR. HINKLEY:

Q.   Could you describe for the judge how it is that you created this?

A.   Again, using Google Earth Pro, this is an option within that program that you can create its movie maker, and I'm scrolled out.  And if I am remembering my procedure correctly, the date was set close-up first for January of 2016.  I then scroll out to the overall hype image the video started with, I hit record and then do the close-up, you know, this gradual using a mouse on a computer scrolling in, adjusting the screen, scrolling in further, adjusting the screen.

Q.   Is it your testimony then this is for date range you had said that would be from way back up and then just down to where your focusing in on that particular location?

A.   Correct, and I am looking just quickly at various vehicle placements in the compound that appear on the 25.8 such as here, here and here, here.  It is -- yeah, what I would say is the view that 25.8 shows would have been my starting point.  I would then back out and then create the recording coming back in to create a video progression of getting closer and closer to the compound that we wanted to identify.

Q.   So I don't mean to interrupt you, but it was all from January of 2016?

A.   Yes.

Q.    That's what this is?

A.    Yes.

Q.    Okay.

MR. HINKLEY:  Your Honor, that being the case I think what I'm going to do is I will withdraw my motion in regards to still images and I will address this with the jury with him for this document.  This will be the only document or video that we ask to be admitted.  And by the way, I am not going to play this for the jury now.  This is going to be for use for the Estonians when they testify.

THE COURT:  Any objection?

MR. BARTOLAI:  Same objection.

THE COURT:  Overruled.  It's now five to five.  What -- you want the jury back in to hear testimony?

MR. HINKLEY:  Can we break for the day and reconvene Monday?

THE COURT:  Any objection to that, Mr. Bartolai?

MR. BARTOLAI:  No.

THE COURT:  Bring the jury back in.  Members of the jury, since the time I asked my courtroom deputy to take you out of the courtroom I have conducted extensive discussions with counsel for the parties regarding certain matters as to issues that have arisen which would bear on what testimony you hear.  As a result, it's now 5:00, and counsel's view as well as my view that rather than trying to continue this evening, we

154

should adjourn now.  So I apologize for that delay, but it was necessary.  With that, I'll excuse you until Monday morning at 9:30.  And at the risk of repeating myself, which I know I'm doing, you need to remember you haven't heard all the evidence yet and keep an open mind until you hear all the evidence and my instructions.  Do not discuss the case with yourselves or anyone else.  See you Monday.

155

REPORTER'S CERTIFICATE


I, Laura Boyanowski, RMR, CRR, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.


                              s/ Laura Boyanowski, RMR,CRR
                              Laura Boyanowski, RMR, CRR
                              Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    235 N. Washington Avenue
    Scranton, PA  18503

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

## $

**$1,329,608.65** [2] - 124:24, 125:11
**$1,500** [1] - 101:14
**$1,920** [1] - 100:18
**$108,988** [2] - 25:14, 33:9
**$127,192** [2] - 30:1, 36:18
**$131,642** [1] - 38:5
**$137,868.06** [1] - 25:7
**$15,000** [2] - 31:19, 31:21
**$162,254** [1] - 38:10
**$163,471** [2] - 29:25, 36:25
**$174,706** [1] - 38:15
**$189,377** [2] - 29:2, 35:20
**$194,198** [2] - 37:11, 37:19
**$2,250** [2] - 100:17, 108:15
**$2,272.20** [1] - 31:24
**$208,454** [1] - 38:12
**$21,717** [2] - 29:4, 35:12
**$22,182.87** [2] - 30:3, 36:5
**$27,970** [1] - 39:3
**$3,486** [1] - 110:14
**$3,508.16** [6] - 40:1, 110:22, 112:9, 112:14, 113:11, 113:12
**$317.80** [1] - 100:19
**$35,926.90** [1] - 39:24
**$379,908** [1] - 39:9
**$399,908** [1] - 38:22
**$4,487.80** [1] - 104:15
**$428,158** [1] - 38:19
**$440.14** [2] - 27:17, 27:19
**$464.10** [3] - 30:24, 31:4, 31:9
**$5** [1] - 31:10
**$5,000** [1] - 31:25
**$506,857** [1] - 38:25
**$541,078** [1] - 38:1
**$6,400** [1] - 108:10
**$6,670** [2] - 31:19, 31:21
**$602,197** [2] - 30:14, 37:5
**$730,575** [2] - 28:18, 35:24
**$799,920** [1] - 38:17
**$960** [1] - 101:14

## '

**'16** [1] - 150:24
**'22** [1] - 144:24

## 0

**016524** [1] - 124:25
**0165240203** [1] - 124:25
**018** [10] - 12:3, 12:4, 12:14, 15:1, 15:2, 15:14, 15:24, 16:6, 16:12, 16:14

## 1

**1** [10] - 15:3, 15:9, 15:10, 44:8, 75:4, 91:1, 91:18, 94:1, 94:20, 134:2
**1.1** [2] - 73:4, 73:16
**1/15** [1] - 32:14
**1/19** [1] - 32:14
**10** [6] - 11:4, 14:24, 66:9, 96:1, 96:2, 108:4
**10.1** [1] - 101:8
**10.4** [1] - 101:20
**10.5** [3] - 102:9, 102:17, 102:21
**10/7** [1] - 29:9
**100** [1] - 94:22
**101** [1] - 14:24
**10242** [2] - 108:9, 108:14
**108,988** [1] - 33:22
**10th** [2] - 108:9, 108:15
**11** [1] - 64:24
**1107** [2] - 134:9, 137:2
**111** [2] - 108:5, 108:8
**112** [2] - 108:11, 108:14
**116** [9] - 24:21, 84:12, 84:22, 99:18, 110:10, 111:3, 111:15, 112:25, 124:18
**11th** [4] - 32:11, 38:22, 104:12, 104:14
**12** [5] - 1:11, 63:23, 66:9, 75:4, 103:7
**126.1** [1] - 126:17
**12:15** [1] - 75:19
**1301** [1] - 1:21
**137,868.06** [1] - 34:20
**13th** [3] - 29:25, 36:17, 39:2
**14.14** [3] - 110:24,

111:6, 111:10
**14.4** [4] - 70:19, 70:21, 71:5, 71:7
**14.9** [5] - 23:15, 23:19, 23:23, 39:12, 112:19
**142** [1] - 2:8
**143** [2] - 84:10, 108:24
**14th** [4] - 32:11, 90:8, 90:22, 97:13
**15** [5] - 15:3, 15:12, 30:21, 42:13, 108:15
**15,000** [5] - 32:6, 100:16, 101:13, 104:19, 108:15
**15th** [2] - 32:13, 38:5
**16.1** [3] - 45:10, 45:15, 45:22
**16.2** [4] - 54:25, 55:13, 55:15, 56:8
**16.6** [1] - 55:16
**1603010417** [2] - 40:4, 113:13
**16th** [6] - 30:12, 30:15, 37:3, 37:4, 97:22, 122:17
**17-4** [1] - 11:5
**17-4PH** [1] - 14:24
**17th** [4] - 37:8, 37:21, 37:23, 37:24
**18** [3] - 2:4, 20:7, 77:1
**18.2** [4] - 17:7, 17:23, 17:25, 19:1
**18.3** [4] - 13:14, 13:16, 14:8, 14:10
**18360** [1] - 99:19
**18360-6869** [1] - 24:21
**18501-2830** [1] - 1:16
**18503** [1] - 155:19
**18640** [1] - 1:25
**19.2** [1] - 18:25
**1989** [1] - 5:19
**1991** [1] - 42:23
**1998** [1] - 78:18
**19th** [3] - 15:10, 32:13, 32:16
**1:15** [1] - 75:20
**1st** [11] - 27:15, 29:18, 30:8, 39:21, 39:23, 39:24, 40:1, 105:4, 107:8, 112:17, 113:12

## 2

**2** [11] - 12:3, 12:4, 15:1, 15:2, 15:14, 15:24, 16:6, 16:12, 16:13, 108:10, 121:25
**2,000** [1] - 44:8

**2,273.20** [1] - 32:3
**2.1** [7] - 55:22, 56:10, 56:12, 57:13, 58:10, 58:13, 73:17
**2.2** [4] - 58:16, 58:23, 59:1, 73:17
**20** [3] - 2:5, 12:14, 124:6
**20-10** [1] - 125:21
**20.10** [3] - 125:21, 126:2, 126:4
**20.12** [1] - 119:24
**20.13** [5] - 90:1, 90:3, 90:4, 90:14, 90:16
**20.14** [4] - 98:21, 98:23, 99:4, 99:6
**20.16** [1] - 119:25
**20.17** [5] - 114:16, 115:2, 115:6, 117:21, 118:22
**20.6** [3] - 47:5, 47:10
**20.9** [3] - 120:4, 120:12, 122:10
**2000** [2] - 5:22, 147:21
**2008** [1] - 76:14
**2009** [1] - 116:6
**2012** [5] - 18:12, 19:5, 19:6, 19:13, 19:17
**2015** [32] - 24:10, 25:3, 27:9, 27:15, 28:7, 29:18, 30:9, 34:22, 35:16, 35:19, 35:24, 36:2, 36:17, 36:23, 37:3, 90:8, 90:22, 97:13, 97:21, 125:7, 132:7, 134:9, 143:20, 144:14, 145:7, 145:8, 145:12, 147:8, 147:21, 148:25, 149:14
**2016** [54] - 11:24, 13:3, 15:10, 15:17, 31:14, 37:8, 37:21, 37:24, 38:5, 38:10, 38:12, 38:14, 38:17, 38:19, 38:22, 38:25, 39:2, 39:9, 39:21, 79:16, 80:7, 83:18, 99:16, 100:14, 101:13, 103:7, 104:10, 105:4, 105:5, 107:4, 107:8, 108:9, 108:15, 115:11, 122:17, 123:6, 123:20, 123:22, 145:10, 145:16, 146:4, 146:20, 147:1, 147:8, 147:21, 148:15,

148:19, 148:25, 149:14, 149:16, 152:8, 152:24
**2017** [6] - 71:16, 71:19, 83:25, 84:4, 84:9, 86:5
**2019** [1] - 42:22
**2021** [1] - 128:22
**2022** [2] - 129:24, 145:6
**2023** [5] - 1:11, 143:15, 144:6, 144:23, 145:6
**20530** [2] - 1:19, 1:22
**20th** [1] - 101:13
**21** [2] - 119:25, 133:5
**21.16** [1] - 124:14
**21.17** [1] - 125:2
**21st** [3] - 25:13, 38:19, 101:12
**22** [5] - 11:5, 14:24, 39:13, 43:19, 45:2
**22.1** [4] - 21:19, 21:22, 22:20, 22:22
**22.10** [4] - 22:24, 23:5, 23:9, 32:17
**22.2** [1] - 22:2
**22.3** [3] - 22:14, 24:3, 24:5
**22.4** [1] - 27:6
**22.5** [1] - 28:5
**22.6** [1] - 29:15
**22.7** [1] - 30:5
**22.8** [1] - 31:11
**22.9** [2] - 22:20, 22:22
**22nd** [2] - 103:7, 104:10
**23.9** [1] - 22:14
**235** [1] - 155:19
**238** [1] - 1:24
**23rd** [2] - 27:17, 27:19
**24.4** [4] - 104:21, 104:23, 105:11, 113:14
**24.5** [3] - 127:9, 127:13, 127:19
**25.1** [4] - 132:24, 133:5, 133:7, 142:2
**25.10** [4] - 127:4, 127:9, 127:13, 127:19
**25.2** [1] - 133:8
**25.3** [5] - 140:6, 140:18, 146:2, 147:25
**25.5** [4] - 127:4, 133:21, 142:4, 142:6
**25.7** [1] - 142:16
**25.8** [13] - 132:25, 133:5, 133:21,

2

142:3, 142:22, 144:16, 149:15, 150:17, 150:23, 151:6, 152:17, 152:19
**25.9** [3] - 151:18, 151:19, 152:1
**25th** [1] - 39:9
**26.8** [3] - 129:2, 129:15, 151:6
**26th** [5] - 97:20, 112:1, 112:6, 115:11, 129:24
**27th** [6] - 29:1, 29:2, 30:2, 35:19, 36:2, 38:16
**28** [3] - 42:21, 105:3, 155:5
**28089401166** [1] - 25:24
**28th** [5] - 29:3, 35:16, 100:14, 105:5, 107:4

## 3

**3** [5] - 55:13, 95:14, 95:17, 120:15, 150:18
**3,.4,.5** [1] - 55:1
**3,200** [5] - 100:17, 101:14, 104:19, 108:10, 123:19
**3.3** [1] - 117:4
**3.9** [2] - 117:5, 117:7
**30** [1] - 65:12
**30,000** [1] - 149:6
**30th** [2] - 27:15, 29:18
**311** [1] - 1:16
**31st** [3] - 28:8, 30:9, 39:21
**325** [2] - 11:5, 14:24
**33** [1] - 126:6
**35** [1] - 78:10
**3585/3470** [1] - 11:4
**385.3470** [1] - 14:24
**3:CR-18-97** [1] - 1:5
**3rd** [8] - 29:24, 36:23, 38:12, 38:14, 113:10, 124:22, 124:23, 125:7

## 4

**4** [3] - 1:9, 55:13, 95:14
**40** [1] - 2:6
**400** [1] - 94:18
**46** [1] - 51:17

## 5

**5** [4] - 2:4, 31:7, 55:13, 95:15
**556** [1] - 92:18
**5:00** [1] - 153:24

## 6

**6** [5] - 14:24, 34:22, 38:25, 55:1, 55:13
**6,670** [1] - 32:6
**66** [1] - 2:7
**6th** [5] - 25:6, 123:3, 123:6, 123:19, 123:21
**6X.101** [1] - 11:4

## 7

**7** [3] - 93:23, 94:6
**7.10** [3] - 10:24, 12:13, 13:2
**7.4** [1] - 109:23
**7.9** [1] - 110:4
**70** [1] - 34:7
**701** [1] - 139:11
**7114** [1] - 138:18
**730** [1] - 15:12
**730,575** [1] - 35:24
**742.4** [1] - 15:11
**742.6** [1] - 15:11
**753** [1] - 155:6
**76** [1] - 2:8
**774** [1] - 15:3
**789** [2] - 134:8, 137:2
**7th** [5] - 28:20, 31:16, 31:20, 35:24, 38:10

## 8

**8/16** [1] - 34:22
**8/21/2015** [1] - 33:24
**801** [1] - 121:25
**8th** [1] - 31:25

## 9

**9** [6] - 11:6, 11:12, 11:14, 14:25, 95:23
**9.13** [1] - 104:6
**9.4** [1] - 103:9
**9.5** [1] - 100:10
**950** [1] - 1:19
**9:30** [1] - 154:3
**9th** [1] - 99:16

## A

**A.U.S.A** [2] - 79:18,

82:10
**Abdul** [1] - 34:7
**ability** [2] - 94:10, 94:11
**able** [25] - 9:10, 9:12, 9:22, 27:23, 32:1, 54:18, 54:21, 57:17, 57:19, 59:15, 70:13, 75:7, 82:24, 83:4, 102:25, 103:22, 108:5, 108:11, 109:8, 110:23, 113:15, 114:6, 129:19, 143:19, 151:3
**above-mentioned** [1] - 155:8
**absolutely** [8] - 21:3, 21:9, 27:4, 60:8, 62:18, 81:5, 81:13, 81:21
**academies** [1] - 78:18
**accept** [2] - 45:16, 66:19
**acceptable** [3] - 150:7, 150:23, 151:4
**accepted** [3] - 10:17, 10:18, 46:3
**access** [7] - 57:17, 69:1, 85:25, 86:22, 87:2, 145:1
**accessed** [1] - 53:12
**accidental** [1] - 60:16
**accomplish** [1] - 113:23
**accomplished** [1] - 86:8
**according** [1] - 146:4
**account** [47] - 24:15, 24:25, 25:5, 25:7, 25:12, 25:23, 25:24, 26:5, 26:10, 26:14, 27:8, 27:11, 27:13, 28:6, 28:8, 28:14, 29:12, 29:23, 30:7, 30:8, 30:11, 30:18, 31:12, 33:9, 35:3, 35:5, 35:7, 35:18, 36:14, 39:20, 40:5, 40:9, 67:25, 87:22, 87:23, 91:2, 91:4, 104:11, 111:2, 112:23, 112:24, 113:2, 113:6, 114:24, 114:25, 124:12, 125:18
**accounting** [1] - 77:17
**accounts** [11] - 26:3, 67:23, 69:21, 80:13, 82:21, 85:8, 87:18,

87:20, 87:25, 91:5
**accurate** [10] - 134:14, 134:16, 134:19, 135:23, 138:14, 143:24, 144:2, 144:5, 144:13, 145:4
**accurately** [3] - 117:1, 135:9, 143:19
**acquire** [1] - 66:4
**acquisition** [1] - 65:23
**Act** [1] - 126:10
**act** [14] - 88:13, 88:21, 88:25, 89:20, 98:1, 100:6, 118:25, 119:4, 119:20, 121:1, 124:9, 124:10
**action** [2] - 11:10, 24:22
**activity** [1] - 104:11
**acts** [5] - 88:8, 88:11, 88:25, 89:17, 118:22
**actual** [8] - 6:18, 31:20, 32:3, 55:9, 57:4, 70:16, 118:21, 137:6
**add** [2] - 137:11, 139:10
**added** [3] - 133:18, 133:19, 135:18
**addition** [2] - 69:20, 138:9
**additional** [9] - 28:25, 29:3, 31:22, 78:19, 84:7, 85:17, 92:1, 93:4, 138:15
**additions** [2] - 124:20, 138:2
**address** [15] - 24:20, 34:5, 34:12, 34:25, 35:13, 82:4, 92:6, 92:8, 123:9, 123:17, 131:6, 139:18, 151:8, 151:12, 153:6
**addresses** [4] - 17:14, 18:5, 83:18, 109:1
**adjourn** [1] - 154:1
**adjudicated** [1] - 16:4
**adjunct** [1] - 42:5
**adjusted** [1] - 107:23
**adjusting** [2] - 152:11, 152:12
**administration** [3] - 7:6, 15:12, 77:17
**admission** [25] - 14:8, 22:20, 23:5, 23:18, 45:15, 47:9, 55:13, 56:8, 56:9, 58:9, 58:22, 71:4, 73:15, 74:4, 90:14, 99:3, 102:16, 105:10,

111:5, 115:1, 126:2, 127:8, 129:15, 133:21, 139:19
**admissions** [1] - 121:25
**admit** [3] - 17:23, 136:12, 150:17
**admittance** [1] - 120:11
**admitted** [26] - 10:24, 14:10, 17:25, 22:22, 23:9, 23:23, 45:18, 45:22, 55:16, 58:5, 58:13, 59:1, 71:7, 90:16, 99:6, 102:21, 106:18, 111:10, 112:18, 115:6, 126:4, 127:14, 130:17, 131:5, 151:6, 153:8
**advance** [1] - 129:12
**adversaries** [1] - 78:7
**advisory** [2] - 138:20, 139:5
**AECA** [1] - 126:10
**aerial** [4] - 132:3, 133:6, 133:7, 145:1
**affiant** [3] - 49:14, 51:2
**affidavit** [3] - 80:15, 82:3, 82:7
**afternoon** [4] - 3:18, 3:23, 4:19, 75:16
**agencies** [8] - 6:8, 42:20, 46:16, 46:19, 67:2, 67:5, 79:2, 79:7
**agency** [4] - 8:22, 42:20, 43:5, 68:18
**agent** [44] - 42:21, 42:23, 43:15, 43:19, 43:22, 43:23, 43:24, 44:22, 59:15, 59:17, 60:19, 63:18, 64:6, 65:16, 65:18, 66:16, 66:24, 67:9, 67:14, 67:16, 67:22, 68:4, 68:12, 68:16, 69:1, 72:5, 72:6, 75:10, 76:8, 76:15, 76:17, 76:19, 77:25, 78:12, 83:2, 86:8, 86:12, 86:17, 97:3, 105:25, 119:16, 130:13, 134:22, 142:2
**agents** [11] - 43:25, 47:3, 54:21, 60:2, 64:13, 66:9, 66:11, 71:25, 72:4, 72:17, 81:3

3

**ago** [1] - 15:7
**agree** [1] - 150:19
**agreed** [2] - 58:12, 58:25
**ahead** [6] - 38:8, 53:20, 89:13, 96:1, 122:3, 144:10
**aid** [1] - 136:2
**air** [3] - 64:1, 103:5, 149:6
**airport** [9] - 47:1, 48:6, 54:11, 85:11, 86:5, 133:9, 146:10, 147:13
**Airport** [2] - 84:6, 133:9
**Akam** [2] - 107:5
**akin** [1] - 137:25
**Alan** [1] - 138:17
**alert** [1] - 4:2
**align** [1] - 33:14
**alleged** [8] - 78:22, 88:7, 88:11, 88:13, 89:1, 89:20, 98:1, 124:9
**allow** [10] - 45:22, 59:22, 59:23, 60:2, 96:23, 106:18, 121:24, 131:25, 132:10, 139:6
**allowing** [2] - 49:11, 151:2
**allows** [2] - 69:15, 132:15
**almost** [4] - 41:15, 65:2, 81:25, 95:4
**Alpha** [3] - 31:3, 31:8, 32:12
**alternative** [1] - 150:15
**AMERICA** [1] - 1:3
**ammunition** [6] - 6:2, 90:25, 91:9, 91:15, 91:18, 92:18
**amount** [18] - 27:19, 35:12, 36:4, 36:18, 38:17, 38:19, 38:22, 38:25, 39:3, 39:9, 86:19, 104:15, 112:8, 112:10, 112:14, 124:23, 125:10, 125:11
**amounts** [2] - 3:11, 99:13
**analysis** [3] - 55:9, 65:19, 65:23
**analyze** [2] - 65:21, 80:24
**analyzed** [1] - 86:11
**ANDREW** [1] - 1:17

**annotated** [1] - 134:3
**anodizing** [1] - 93:14
**answer** [4] - 80:4, 98:14, 119:16, 146:23
**anticipate** [2] - 3:20, 3:25
**anticipated** [1] - 99:13
**aperture** [1] - 62:10
**apologize** [5] - 46:9, 123:7, 134:7, 151:7, 154:1
**app** [1] - 123:12
**appear** [14] - 18:7, 24:15, 27:7, 28:13, 29:22, 30:17, 32:9, 48:3, 70:25, 93:20, 100:5, 106:14, 111:14, 152:17
**APPEARANCES** [1] - 1:12
**appeared** [2] - 59:20, 145:19
**Apple** [2] - 53:10, 53:11
**applicable** [1] - 149:23
**application** [12] - 47:6, 47:11, 47:16, 50:4, 50:13, 51:5, 61:12, 61:17, 62:3, 80:16, 82:10, 149:16
**applications** [4] - 16:4, 16:13, 18:8, 48:24
**apply** [6] - 7:21, 9:13, 9:19, 12:25, 96:20, 155:21
**appointed** [1] - 155:5
**approach** [13] - 5:1, 23:10, 45:6, 48:14, 55:17, 56:17, 73:1, 80:5, 86:19, 98:8, 102:5, 119:11, 133:23
**approaches** [1] - 80:7
**appropriate** [1] - 137:10
**approval** [3] - 82:22, 96:11, 96:20
**approvals** [3] - 96:13, 97:1, 97:2
**approve** [2] - 82:12, 82:23
**approved** [4] - 50:14, 80:17, 82:13, 82:16
**approving** [1] - 96:25
**April** [19] - 38:16, 38:19, 38:22, 38:25, 101:13, 103:7,

104:10, 104:12, 104:14, 105:3, 105:5, 107:4, 108:9, 108:14, 123:3, 123:6, 123:19, 123:21, 129:24
**archives** [1] - 145:14
**area** [27] - 20:18, 53:18, 64:11, 66:14, 70:1, 77:5, 104:5, 117:18, 118:18, 131:18, 131:21, 131:22, 132:12, 132:13, 132:17, 133:8, 135:9, 143:19, 144:5, 144:22, 146:4, 146:9, 147:8, 147:16, 148:24, 149:13
**areas** [2] - 42:9, 144:14
**argument** [1] - 148:12
**arisen** [1] - 153:23
**Arkansas** [1] - 20:20
**armor** [1] - 12:7
**armory** [1] - 12:8
**arms** [3] - 12:8, 12:23, 12:25
**Arms** [4] - 12:20, 96:10, 126:10, 126:11
**arrival** [1] - 86:6
**arrive** [1] - 135:24
**aspect** [4] - 134:4, 134:5, 134:20, 134:21
**assemble** [2] - 116:2, 118:6
**assembly** [6] - 116:11, 116:12, 117:22, 118:7, 118:9, 118:16
**assertion** [2] - 135:20, 137:21
**assets** [1] - 107:24
**assigned** [3] - 78:1, 82:10, 116:5
**assignment** [1] - 43:21
**approval** [3] - 82:22, 96:11, 96:20
**assist** [6] - 68:9, 68:12, 70:5, 72:7, 98:5, 118:7
**assistance** [4] - 68:6, 128:10, 128:15, 129:6
**assistant** [2] - 41:11, 41:13
**assisted** [2] - 67:9, 67:11
**assisting** [4] - 64:12,

64:13, 67:13, 130:1
**associated** [4] - 25:23, 26:9, 91:25
**assuming** [1] - 106:8
**asterisk** [1] - 19:2
**asterisks** [2] - 18:9, 19:1
**Athens** [2] - 31:4, 31:8
**attached** [7] - 52:8, 91:9, 98:16, 105:18, 105:20, 106:11, 133:14
**attachment** [22] - 48:10, 48:11, 49:12, 49:17, 50:11, 51:8, 51:11, 51:16, 51:19, 52:1, 52:4, 52:5, 52:8, 69:10, 90:23, 90:24, 90:25, 98:15, 105:5, 115:12, 115:13
**attachments** [1] - 107:6
**attempt** [4] - 95:7, 95:8, 96:25, 97:1
**attempting** [2] - 78:7, 128:2
**attended** [3] - 20:21, 65:17, 65:18
**attention** [4] - 4:12, 11:2, 18:2, 48:17
**attorney** [1] - 82:10
**Attorney** [1] - 78:16
**ATTORNEY'S** [1] - 1:15
**Attorney's** [1] - 72:23
**August** [7] - 24:8, 25:3, 25:6, 25:13, 34:22, 128:22
**authenticate** [1] - 129:18
**authentication** [8] - 134:5, 134:11, 134:21, 138:9, 138:11, 139:4, 144:1, 150:10
**authenticity** [2] - 130:10, 135:4
**author** [2] - 80:15, 129:23
**authorities** [3] - 126:9, 128:18, 129:6
**authority** [3] - 77:1, 106:6, 128:11
**authorize** [2] - 123:19, 123:23
**authorized** [2] - 80:11, 123:25
**authorship** [1] - 129:19

**automated** [2] - 102:4, 102:13
**automatically** [5] - 60:14, 137:9, 138:6, 139:2, 140:14
**autonomous** [1] - 96:5
**availability** [1] - 94:15
**available** [5] - 3:10, 4:16, 18:13, 19:5, 93:15
**AVE** [1] - 1:21
**Avenue** [1] - 155:19
**AVENUE** [1] - 1:19
**avoid** [3] - 54:7, 54:8, 139:8
**aware** [1] - 3:5

## B

**bachelor** [2] - 77:16, 77:17
**bachelor's** [2] - 7:4, 44:15
**background** [6] - 7:3, 20:19, 44:14, 45:20, 65:7, 77:15
**backward** [1] - 132:15
**balance** [12] - 25:1, 105:2, 105:3, 105:5, 106:11, 107:5, 107:9, 107:12, 107:18, 107:20, 107:21, 107:22
**Ballina** [7] - 119:18, 120:18, 121:12, 122:19, 123:2, 123:4, 123:20
**Bank** [14] - 31:4, 31:8, 32:12, 34:25, 35:13, 35:20, 35:25, 36:6, 36:19, 36:25, 37:5, 38:13, 112:24, 125:15
**bank** [42] - 20:7, 20:11, 20:12, 20:15, 20:16, 20:23, 21:2, 21:13, 22:11, 23:16, 25:2, 25:10, 25:15, 26:1, 28:6, 28:24, 34:4, 34:5, 37:17, 38:2, 38:6, 38:11, 38:16, 38:18, 38:21, 38:24, 39:2, 39:11, 87:18, 87:19, 87:20, 87:22, 87:25, 103:21, 104:9, 124:19, 125:4, 125:5, 125:18
**Bankasi** [1] - 37:16

4

**banking** [3] - 21:6, 103:20, 124:17
**bar** [4] - 144:18, 146:21, 146:24, 147:20
**barrel** [11] - 11:10, 11:11, 95:8, 95:15, 113:22, 116:11, 116:12, 116:20, 117:23
**barrels** [5] - 93:21, 95:7, 116:18, 116:25, 117:1
**barring** [1] - 50:12
**Bartolai** [6] - 4:3, 106:4, 139:17, 141:16, 150:7, 153:17
**BARTOLAI** [98] - 1:24, 4:4, 10:17, 14:9, 17:24, 18:21, 18:24, 19:18, 19:24, 22:21, 23:6, 23:8, 23:20, 23:22, 40:19, 40:21, 40:25, 45:16, 46:3, 47:11, 47:17, 47:22, 48:20, 48:23, 49:21, 49:23, 50:21, 55:14, 56:11, 56:16, 56:20, 58:1, 58:7, 58:12, 58:25, 62:24, 63:4, 66:19, 71:6, 73:18, 74:9, 74:18, 74:24, 79:25, 88:16, 90:2, 90:15, 98:22, 99:5, 102:18, 102:20, 105:12, 105:19, 111:7, 111:9, 114:7, 115:3, 115:5, 119:19, 119:21, 120:13, 120:15, 121:10, 121:17, 122:9, 122:22, 123:14, 126:3, 127:10, 127:12, 129:16, 130:4, 130:19, 133:22, 134:1, 135:13, 135:19, 136:13, 136:17, 139:10, 139:21, 141:19, 142:1, 143:3, 143:6, 143:7, 144:11, 148:1, 148:10, 148:14, 148:21, 150:8, 150:22, 151:4, 151:14, 151:19, 153:12, 153:18
**Barzani** [1] - 34:7

**base** [4] - 142:23, 142:24, 147:19, 147:24
**based** [23] - 3:21, 14:21, 14:22, 62:4, 72:17, 83:20, 84:17, 91:9, 94:17, 97:17, 99:10, 104:17, 113:4, 113:6, 113:21, 114:4, 116:16, 116:22, 117:15, 130:24, 136:10, 139:13, 149:16
**basic** [4] - 65:16, 65:19, 139:7, 144:1
**basis** [6] - 45:18, 89:9, 105:15, 106:7, 120:20, 132:19
**Bayan** [1] - 90:12
**bear** [1] - 153:23
**beautiful** [1] - 3:18
**became** [2] - 6:15, 43:1
**becomes** [1] - 134:4
**BEFORE** [1] - 1:8
**beg** [3] - 138:1, 141:16, 151:6
**began** [3] - 80:6, 128:1, 131:18
**begin** [1] - 59:15
**beginning** [7] - 14:21, 33:5, 67:9, 67:13, 68:15, 79:12, 89:5
**begins** [2] - 14:19, 137:4
**behind** [1] - 82:14
**belonged** [1] - 85:15
**belongs** [1] - 53:22
**below** [3] - 33:4, 94:19, 95:10
**best** [5] - 20:9, 33:19, 41:25, 64:15, 107:7
**better** [2] - 86:13, 108:13
**between** [12] - 56:22, 75:3, 82:6, 119:18, 120:25, 121:14, 121:15, 121:19, 121:23, 122:23, 123:1, 123:3
**beyond** [2] - 135:23, 143:22
**big** [3] - 9:19, 25:14, 121:17
**bill** [1] - 112:11
**bind** [2] - 96:15, 97:4
**binder** [11] - 13:15, 17:8, 21:18, 23:13, 45:5, 54:25, 104:20,

110:23, 114:17, 119:23, 125:20
**binders** [6] - 47:4, 55:3, 70:19, 70:20, 89:25, 114:15
**bit** [5] - 3:15, 24:12, 53:8, 53:17, 120:23
**bits** [1] - 60:15
**blind** [1] - 122:13
**blow** [1] - 147:22
**Bly** [1] - 115:17
**boarder** [2] - 76:23, 97:19
**body** [2] - 90:9, 103:18
**bogged** [1] - 67:17
**bold** [1] - 18:2
**bolt** [7] - 100:16, 116:11, 116:12, 118:7, 118:9, 118:13, 118:16
**book** [2] - 29:12, 82:1
**Book** [2] - 53:10, 85:13
**Books** [1] - 53:11
**boot** [1] - 53:10
**bottom** [12] - 18:3, 18:9, 19:2, 94:6, 95:23, 106:22, 110:20, 111:13, 112:21, 113:10, 126:22
**bounds** [1] - 122:4
**box** [12] - 9:19, 13:4, 13:6, 54:2, 92:4, 126:6, 126:15, 133:14, 135:12, 140:9, 149:24, 150:1
**boxes** [1] - 13:9
**Boyanowski** [3] - 155:3, 155:14, 155:14
**BOYANOWSKI** [1] - 155:17
**branch** [16] - 20:16, 25:22, 25:25, 26:2, 26:6, 26:17, 26:25, 27:5, 31:20, 31:24, 31:25, 35:7, 35:8, 40:8, 40:15
**break** [10] - 50:21, 75:7, 75:14, 75:20, 121:7, 124:4, 124:5, 124:6, 149:22, 153:15
**brief** [4] - 48:3, 50:23, 124:7, 136:22
**briefly** [1] - 93:2
**bring** [9] - 5:5, 110:24, 138:11, 138:24, 139:8, 139:22,

141:18, 151:12, 153:19
**bringing** [2] - 4:12, 59:3
**brings** [3] - 74:11, 132:14, 144:18
**broach** [2] - 95:15
**broaching** [1] - 94:22
**broad** [2] - 77:4, 77:5
**brochure** [1] - 9:15
**brought** [1] - 68:5
**budget** [3] - 98:15, 98:17, 99:12
**build** [2] - 91:23, 96:20
**BUILDING** [1] - 1:15
**bulk** [1] - 109:5
**bunch** [3] - 65:8, 66:5, 134:24
**bureau** [2] - 63:21, 63:22
**Bureau** [3] - 5:16, 14:23, 46:21
**Burke** [18] - 75:25, 76:7, 97:3, 114:18, 130:13, 134:22, 136:6, 136:23, 138:24, 139:9, 139:22, 140:2, 140:17, 142:2, 148:22, 149:22, 150:20, 151:8
**BURKE** [2] - 2:8, 76:1
**burring** [1] - 94:3
**business** [12] - 21:16, 21:23, 22:8, 22:10, 24:6, 77:17, 101:12, 106:1, 106:2, 106:9, 106:14, 106:16
**butchering** [1] - 117:19
**button** [8] - 11:4, 11:7, 11:8, 11:13, 14:24, 15:17, 110:15, 113:17
**buttons** [10] - 95:14, 95:21, 109:22, 110:8, 110:11, 110:13, 112:10, 113:16, 113:23, 116:23
**BY** [51] - 5:12, 10:22, 14:11, 18:1, 18:24, 20:5, 22:23, 23:12, 24:2, 41:7, 45:8, 46:12, 50:24, 55:20, 58:14, 59:2, 63:16, 66:23, 71:8, 73:3, 76:6, 89:19, 90:6, 90:19, 98:11, 98:25,

99:9, 102:8, 102:24, 106:10, 106:21, 111:12, 114:14, 115:8, 119:15, 119:22, 120:3, 122:12, 124:8, 126:5, 127:18, 129:22, 131:10, 133:4, 140:1, 142:1, 143:7, 144:11, 148:1, 152:2, 155:16

## C

**C.C.L** [1] - 15:3
**C.F.R** [2] - 15:3, 15:12
**calibrated** [2] - 134:13, 138:13
**Camden** [1] - 42:6
**camera** [1] - 62:10
**cameras** [1] - 137:18
**campus** [1] - 42:6
**candidates** [1] - 93:18
**cannot** [1] - 96:5
**capable** [1] - 62:11
**capacity** [1] - 42:13
**Capitol** [1] - 64:3
**capture** [2] - 53:8, 53:19
**capturing** [2] - 53:22, 62:12
**carbines** [1] - 11:16
**card** [11] - 28:1, 31:4, 32:4, 32:5, 40:5, 110:19, 111:3, 111:13, 111:14, 111:20, 112:22
**Card** [1] - 111:2
**cards** [1] - 70:14
**care** [1] - 136:8
**career** [7] - 43:14, 44:7, 51:2, 60:23, 64:19, 65:2, 81:19
**Carolina** [2] - 100:15, 103:6
**carrier** [3] - 118:7, 118:9, 118:16
**case** [56] - 3:6, 3:22, 16:7, 47:2, 53:7, 53:9, 53:12, 53:25, 54:15, 54:21, 54:24, 59:5, 59:12, 59:15, 59:17, 59:24, 60:2, 67:14, 67:16, 67:21, 68:4, 68:12, 68:15, 68:16, 68:17, 69:1, 69:6, 69:14, 70:7, 71:25, 72:3, 72:5, 72:6, 72:17, 75:10, 78:25, 79:17, 81:2,

5

81:3, 81:25, 83:2, 88:3, 109:2, 134:7, 134:8, 134:9, 135:3, 136:16, 138:1, 138:7, 141:5, 149:23, 153:4, 154:6

**cases** [4] - 67:11, 67:14, 67:18, 78:6

**cash** [5] - 31:23, 32:1, 32:3, 32:7

**cashier's** [1] - 32:7

**catch** [1] - 76:21

**categories** [1] - 7:23

**categorized** [1] - 144:25

**category** [3] - 7:24, 8:9, 12:11

**causes** [1] - 118:15

**cell** [15] - 54:4, 54:8, 54:18, 54:19, 54:21, 55:9, 56:15, 57:15, 58:20, 59:19, 61:25, 62:14, 66:3, 66:4, 70:12

**Cellebrite** [4] - 54:16, 55:9, 56:14, 66:4

**cellular** [2] - 52:24, 53:25

**center** [2] - 26:10, 44:20

**Center** [1] - 65:17

**centering** [3] - 95:11, 95:12, 123:23

**centers** [1] - 94:1

**central** [2] - 96:25, 128:11

**certain** [14] - 7:8, 10:15, 15:20, 50:15, 59:7, 59:23, 59:24, 60:3, 67:22, 80:13, 126:18, 137:3, 153:22

**certainly** [10] - 48:1, 49:5, 50:1, 53:7, 56:24, 62:17, 120:18, 129:21, 136:4, 138:10

**certainty** [1] - 148:18

**certificate** [4] - 65:9, 96:16, 96:18, 155:21

**CERTIFICATE** [1] - 155:1

**certificates** [1] - 96:21

**certified** [3] - 17:11, 20:22, 21:3

**certify** [4] - 14:13, 14:15, 155:6, 155:10

**certifying** [1] - 155:22

**cetera** [3] - 8:13, 14:6, 123:24

**challenges** [1] - 92:6

**change** [6] - 60:16, 60:17, 72:13, 146:11, 147:24, 149:6

**changed** [4] - 60:15, 71:17, 71:18, 145:3

**changes** [8] - 53:15, 54:7, 54:8, 61:19, 62:6, 62:7, 68:23, 149:6

**changing** [2] - 146:9, 147:9

**character** [2] - 8:1, 8:8

**characters** [1] - 8:5

**charge** [3] - 77:25, 89:8, 100:18

**charged** [2] - 88:4, 112:8

**charges** [1] - 89:14

**charging** [1] - 78:24

**Charles** [1] - 138:17

**chart** [4] - 8:3, 9:18, 12:15, 13:7

**Chase** [1] - 39:25

**check** [5] - 16:24, 19:16, 29:12, 32:7, 122:24

**checked** [3] - 16:11, 16:17, 19:13

**checking** [7] - 24:6, 24:25, 29:12, 104:11, 112:23, 112:24, 113:2

**checks** [3] - 18:12, 18:16, 19:4

**chief** [1] - 123:22

**choice** [1] - 24:6

**Christina** [2] - 51:24, 84:2

**Circuit** [1] - 134:9

**circuit** [1] - 138:1

**circumstance** [1] - 137:13

**cite** [1] - 68:8

**cities** [1] - 135:14

**citing** [1] - 138:1

**citizens** [3] - 96:15, 97:5, 128:13

**city** [3] - 34:8, 44:20, 147:12

**City** [5] - 34:12, 36:10, 36:12, 36:13, 44:20

**civil** [1] - 42:15

**civilian** [2] - 7:1, 7:2

**CLAFFE** [2] - 40:23, 63:2

**CLAFFEE** [13] - 1:17, 5:7, 5:12, 10:13, 10:20, 10:22, 14:7,

14:11, 17:22, 18:1, 18:19, 19:20, 19:23

**Clagett** [3] - 5:7, 5:13, 10:14

**CLAGETT** [2] - 2:4, 5:8

**Clark** [1] - 103:4

**class** [5] - 65:20, 65:22, 65:23

**classes** [4] - 21:4, 41:18, 60:10, 65:25

**classic** [1] - 137:25

**classification** [6] - 6:5, 7:25, 8:21, 9:7, 9:13, 15:1

**classifications** [1] - 6:19

**classified** [3] - 14:25, 15:1, 15:13

**clause** [2] - 120:21, 130:20

**clear** [6] - 49:9, 122:4, 136:3, 140:17, 141:6, 145:15

**clearly** [2] - 130:19, 139:15

**click** [1] - 144:21

**clicking** [2] - 137:11, 145:25

**clients** [1] - 42:15

**clip** [1] - 115:13

**close** [6] - 113:19, 133:10, 146:13, 149:8, 152:8, 152:10

**close-up** [3] - 133:10, 152:8, 152:10

**closed** [1] - 137:25

**closer** [9] - 133:10, 133:11, 142:19, 151:10, 152:21

**closest** [3] - 146:15, 148:15, 149:8

**closing** [1] - 147:9

**Coated** [1] - 14:25

**coated** [1] - 11:6

**code** [1] - 8:13

**Code** [1] - 155:6

**collage** [2] - 134:25, 151:19

**collect** [1] - 82:17

**collecting** [1] - 81:24

**collection** [1] - 65:19

**College** [1] - 44:17

**college** [2] - 65:8, 65:11

**column** [1] - 126:22

**combination** [1] - 73:22

**combo** [13] - 11:4, 14:24, 15:17,

109:22, 110:8, 110:11, 110:13, 110:15, 112:10, 113:16, 113:17, 113:23, 116:23

**coming** [25] - 3:8, 25:4, 25:11, 29:23, 30:11, 30:12, 34:24, 34:25, 35:11, 35:12, 35:20, 35:23, 35:24, 36:6, 36:17, 36:25, 37:15, 39:5, 40:14, 41:22, 124:24, 126:23, 146:21, 150:25, 152:20

**commerce** [9] - 6:15, 7:11, 9:6, 9:23, 10:10, 10:15, 15:2, 15:23, 63:21

**Commerce** [24] - 5:16, 5:18, 5:19, 6:7, 6:23, 7:8, 7:18, 9:7, 10:14, 15:19, 17:4, 18:11, 19:3, 46:20, 63:19, 63:24, 64:5, 64:25, 65:2, 66:11, 67:2, 78:9, 79:5, 95:20

**Commercial** [1] - 35:13

**commercial** [1] - 6:2

**commit** [1] - 88:4

**committed** [1] - 88:7

**committee** [2] - 138:20, 139:6

**commodities** [1] - 7:17

**commodity** [5] - 6:5, 6:18, 8:20, 9:7, 9:13

**common** [3] - 11:16, 79:9, 94:16

**commonly** [2] - 7:15, 140:10

**communicated** [1] - 69:17

**communication** [10] - 26:16, 27:2, 27:5, 40:14, 109:12, 117:25, 122:14, 122:16, 122:18, 123:1

**communications** [7] - 20:21, 82:5, 103:15, 121:19, 121:23, 122:7, 123:3

**companies** [3] - 17:14, 18:6, 42:16

**Company** [53] - 24:19, 27:10, 28:8, 29:6, 29:14, 29:19, 30:3, 30:13, 31:14, 33:10,

34:11, 34:15, 34:24, 35:1, 35:19, 35:21, 35:23, 35:25, 36:1, 36:8, 36:15, 36:18, 36:22, 36:24, 37:1, 37:4, 37:6, 37:18, 38:1, 38:5, 38:17, 38:20, 38:23, 39:1, 39:3, 39:10, 39:17, 46:14, 66:25, 87:24, 91:16, 99:12, 99:18, 104:4, 104:13, 104:15, 105:24, 106:1, 106:15, 112:25, 124:18, 125:19, 128:14

**company** [4] - 54:16, 99:17, 101:2, 107:25

**company's** [2] - 39:6, 107:23

**complete** [6] - 20:24, 82:10, 92:2, 96:7, 99:14, 106:16

**completed** [3] - 18:12, 19:4, 94:18

**completing** [1] - 114:2

**complex** [1] - 60:12

**compliance** [1] - 17:12

**compliant** [1] - 96:10

**compound** [10] - 131:15, 131:20, 133:13, 135:10, 147:10, 147:16, 149:7, 149:9, 152:17, 152:22

**compromised** [1] - 95:1

**computer** [34] - 26:16, 26:18, 27:3, 32:21, 32:24, 42:14, 43:17, 43:20, 43:22, 43:23, 43:24, 44:22, 45:1, 46:1, 53:1, 53:7, 53:13, 53:19, 54:15, 58:20, 61:5, 61:10, 61:18, 64:6, 64:24, 65:9, 67:12, 72:8, 85:12, 105:8, 120:8, 126:13, 148:8, 152:11

**computers** [7] - 26:2, 27:2, 44:1, 46:1, 61:6, 66:17, 70:10

**concerned** [3] - 134:2, 146:15, 149:10

**concerning** [2] - 95:6, 135:11

**concluded** [3] - 58:8, 75:18, 136:19

6

**conclusion** [2] - 130:2, 130:6
**conclusions** [3] - 93:15, 96:23, 135:25
**condition** [1] - 150:23
**conditionally** [2] - 130:17, 136:14
**conduct** [1] - 59:6
**conducted** [2] - 50:15, 153:21
**conducting** [1] - 86:18
**confer** [1] - 63:7
**conference** [1] - 4:11
**confrontation** [2] - 120:20, 121:13
**confrontational** [1] - 130:20
**conjunction** [1] - 82:9
**connect** [1] - 54:13
**connected** [3] - 53:13, 54:14, 129:8
**Connecticut** [1] - 112:7
**connecting** [2] - 54:5, 54:6
**connection** [3] - 48:5, 48:13, 54:12
**connectivity** [1] - 54:11
**consequence** [1] - 50:14
**consider** [1] - 140:24
**consideration** [1] - 136:5
**considered** [2] - 5:25, 94:9
**considering** [1] - 96:4
**consist** [1] - 8:5
**consistent** [3] - 15:6, 15:15, 18:16
**conspiracy** [6] - 77:13, 88:4, 88:7, 88:8, 98:2, 124:9
**constantly** [1] - 78:20
**construction** [12] - 29:6, 29:14, 30:4, 30:13, 34:11, 35:1, 35:21, 36:1, 36:8, 36:22, 37:1, 37:6
**Construction** [1] - 125:17
**consultant** [1] - 20:9
**consulted** [1] - 42:9
**Consulting** [48] - 16:24, 24:19, 27:10, 28:8, 29:19, 31:14, 33:10, 34:15, 34:24, 35:4, 35:11, 35:19, 35:23, 36:1, 36:15, 36:17, 36:24, 37:4,

37:18, 38:1, 38:5, 38:10, 38:12, 38:15, 38:17, 38:20, 38:23, 39:1, 39:3, 39:10, 39:17, 46:14, 66:25, 87:24, 91:16, 99:12, 99:18, 104:4, 104:13, 104:15, 105:24, 106:1, 106:15, 108:2, 112:25, 124:18, 125:19, 128:14
**consulting** [2] - 42:13, 42:15
**contact** [1] - 128:2
**contain** [4] - 56:3, 73:7, 80:14, 118:16
**contained** [4] - 11:23, 93:19, 116:16, 117:23
**containing** [1] - 120:16
**contains** [6] - 47:12, 56:1, 58:19, 73:8, 116:2, 118:19
**contemplate** [1] - 138:21
**contents** [6] - 56:12, 59:13, 60:4, 107:17, 115:24, 128:6
**contesting** [1] - 48:20
**context** [2] - 122:1
**contexts** [1] - 61:21
**continue** [3] - 75:21, 95:13, 153:25
**control** [15] - 6:1, 7:12, 7:25, 9:18, 12:4, 12:5, 12:17, 12:25, 15:1, 15:2, 16:3, 43:5, 43:7, 155:22
**CONTROL** [1] - 1:18
**Control** [1] - 126:10
**controlled** [18] - 6:7, 6:10, 7:18, 9:6, 11:22, 12:16, 12:18, 12:19, 15:2, 15:24, 78:8, 95:17, 100:24, 110:16, 116:14, 116:17
**controls** [6] - 7:8, 8:14, 10:10, 10:15, 11:20, 126:9
**conversation** [1] - 128:7
**coordinates** [5] - 62:11, 137:8, 137:10, 137:24, 138:14
**copied** [1] - 53:18

**copies** [2] - 22:1, 22:7
**copy** [7] - 23:14, 68:22, 71:13, 98:4, 121:17, 122:13, 148:7
**corner** [6] - 91:17, 133:15, 140:22, 141:6, 141:12, 150:18
**corporate** [1] - 20:17
**correct** [24] - 10:9, 25:17, 25:18, 31:6, 31:20, 34:1, 35:9, 36:9, 37:8, 40:9, 40:10, 40:16, 43:15, 85:12, 85:22, 92:13, 106:24, 107:15, 124:16, 143:5, 146:25, 150:6, 152:16, 155:7
**correctly** [5] - 68:10, 68:14, 134:13, 138:12, 152:7
**cost** [4] - 26:9, 26:10, 110:13, 112:8
**costs** [1] - 91:25
**cotter** [1] - 100:17
**counsel** [6] - 10:19, 63:8, 121:2, 148:11, 150:1, 153:22
**counsel's** [1] - 153:24
**count** [3] - 22:1, 22:7, 89:14
**counter** [4] - 10:2, 78:1, 78:3, 94:20
**counter-signed** [1] - 10:2
**COUNTERINTELLIG ENCE** [1] - 1:18
**countries** [8] - 7:20, 10:16, 12:17, 15:21, 16:6, 96:25, 126:18, 126:19
**Country** [3] - 13:8, 13:9, 13:11
**country** [17] - 8:3, 8:4, 8:23, 9:1, 9:3, 9:18, 12:15, 12:17, 12:24, 13:7, 14:3, 16:20, 16:21, 34:2, 39:4, 66:10, 126:16
**couple** [3] - 30:21, 65:25, 143:14
**course** [11] - 18:22, 21:15, 22:10, 41:20, 41:22, 45:2, 55:19, 60:23, 111:8, 120:2, 137:22
**courses** [2] - 41:16, 45:3

**COURT** [154] - 1:1, 3:1, 3:3, 4:3, 4:14, 4:24, 5:5, 10:18, 14:10, 17:25, 18:20, 18:22, 19:19, 19:21, 19:25, 22:22, 23:7, 23:9, 23:11, 23:21, 23:23, 24:1, 40:20, 40:22, 40:24, 45:7, 45:22, 46:4, 46:7, 47:18, 47:24, 48:2, 48:22, 49:9, 49:20, 50:3, 50:12, 50:18, 50:20, 50:22, 55:15, 55:19, 56:18, 57:12, 57:17, 57:23, 58:13, 59:1, 62:23, 62:25, 63:5, 63:9, 66:20, 71:7, 73:2, 74:1, 74:13, 74:15, 74:19, 74:21, 74:23, 74:25, 75:9, 75:11, 75:14, 75:17, 75:19, 75:24, 76:4, 80:2, 89:4, 90:16, 90:18, 98:10, 99:6, 99:8, 102:7, 102:19, 102:21, 102:23, 105:17, 105:21, 106:4, 106:18, 106:20, 111:8, 111:10, 114:9, 115:4, 115:6, 119:12, 120:2, 120:14, 120:22, 121:3, 121:5, 121:7, 121:9, 121:14, 121:21, 121:23, 122:8, 123:15, 124:5, 126:4, 127:11, 127:13, 127:17, 129:17, 130:5, 131:7, 133:3, 133:24, 135:1, 135:11, 135:18, 136:4, 136:16, 136:20, 136:23, 137:1, 139:16, 139:22, 140:17, 140:21, 140:24, 141:2, 141:5, 141:9, 141:15, 141:20, 141:24, 143:25, 144:10, 147:5, 148:11, 148:20, 148:22, 149:2, 149:12, 149:20, 150:1, 150:4, 150:7, 150:14, 151:2, 151:5, 151:16, 151:23, 151:25, 153:11, 153:13,

153:17, 153:19
**court** [7] - 20:11, 41:23, 44:5, 44:10, 65:5, 100:23, 115:17
**Court** [38] - 3:5, 3:14, 3:20, 4:2, 24:21, 35:4, 45:24, 47:19, 48:21, 49:1, 49:3, 49:6, 49:25, 50:5, 66:16, 75:4, 80:11, 82:22, 84:13, 84:23, 88:17, 88:25, 99:18, 111:4, 111:16, 113:1, 124:18, 134:10, 135:5, 135:22, 137:13, 138:10, 149:21, 155:3, 155:4, 155:15, 155:17, 155:18
**Court's** [3] - 4:12, 4:19, 137:4
**COURTROOM** [1] - 1:9
**courtroom** [4] - 85:20, 85:23, 153:20, 153:21
**cover** [2] - 92:9, 118:7
**COVID** [1] - 66:1
**craft** [1] - 82:7
**create** [14] - 81:25, 116:24, 117:1, 120:24, 140:12, 140:15, 141:13, 142:8, 142:11, 148:19, 150:5, 152:6, 152:20, 152:21
**created** [10] - 73:9, 105:20, 116:18, 130:8, 135:6, 136:10, 140:3, 142:10, 148:17, 152:4
**creating** [4] - 61:19, 145:25, 149:5, 150:11
**creation** [2] - 61:7, 61:22
**credit** [7] - 40:5, 104:14, 110:19, 111:3, 111:13, 111:20, 112:22
**credited** [1] - 33:9
**credits** [1] - 31:14
**crime** [10] - 41:20, 42:14, 45:25, 66:17, 76:22, 77:10, 77:19, 78:17, 83:5, 83:9
**crimes** [8] - 43:7,

7

43:12, 67:15, 76:25, 77:7, 77:13, 78:21, 79:8
**Criminal** [1] - 44:18
**criminal** [7] - 41:17, 41:18, 42:7, 44:17, 44:18, 77:18, 77:19
**critical** [2] - 94:9, 96:21
**CRM** [1] - 1:21
**cross** [7] - 4:6, 18:20, 53:23, 62:23, 141:17, 141:21, 141:24
**CROSS** [3] - 2:3, 18:23, 141:25
**cross-examine** [5] - 4:6, 18:20, 62:23, 141:17, 141:24
**crosses** [1] - 76:22
**crossing** [1] - 97:18
**CRR** [3] - 155:3, 155:14, 155:17
**cull** [1] - 59:9
**current** [3] - 64:4, 65:14, 66:1
**curriculum** [1] - 45:13
**cursory** [1] - 93:15
**customer** [1] - 29:17
**customer's** [1] - 24:15
**customs** [1] - 77:4
**cuts** [1] - 11:10
**cyber** [1] - 41:21
**cycle** [1] - 118:15

**D**

**daily** [1] - 25:1
**danger** [1] - 96:14
**data** [26] - 19:11, 47:12, 58:21, 60:7, 60:15, 61:3, 61:13, 61:20, 68:24, 68:25, 69:1, 72:1, 72:2, 72:12, 72:13, 80:23, 86:4, 86:19, 117:15, 132:14, 134:13, 138:13, 149:17, 150:13
**database** [1] - 17:13
**databases** [1] - 18:6
**date** [35] - 25:2, 27:14, 28:19, 29:17, 33:8, 33:23, 33:25, 34:21, 35:15, 36:16, 38:14, 39:19, 56:5, 61:15, 90:20, 97:11, 97:15, 108:9, 108:14, 117:12, 122:14, 122:16, 124:21,

125:6, 125:7, 125:8, 132:1, 132:10, 147:14, 149:11, 149:23, 150:6, 152:8, 152:13, 155:9
**DATE** [1] - 1:11
**dated** [9] - 90:8, 99:15, 99:16, 100:14, 104:10, 105:4, 107:8, 112:5, 115:10
**dates** [5] - 61:7, 61:8, 61:22, 61:23, 155:9
**days** [4] - 3:12, 4:18, 89:5, 97:21
**DC** [2] - 1:19, 1:22
**deal** [3] - 4:7, 95:16, 106:7
**dealing** [2] - 66:12, 78:14
**dear** [2] - 123:6, 123:8
**Dear** [5] - 107:5, 107:9, 122:20, 123:20, 123:24
**debind** [1] - 94:21
**debit** [5] - 28:1, 31:4, 32:4, 32:5, 39:22
**debited** [2] - 33:8
**debits** [1] - 113:10
**December** [8] - 30:8, 30:9, 30:12, 30:15, 30:21, 37:3, 37:4, 79:16
**decide** [1] - 48:15
**decides** [1] - 3:20
**decision** [3] - 4:19, 136:10, 137:1
**declaration** [1] - 21:23
**declarations** [1] - 22:8
**default** [1] - 19:8
**defendant** [13] - 16:17, 17:3, 40:8, 88:4, 105:25, 106:3, 111:20, 113:3, 116:24, 121:20, 121:24, 122:24, 126:25
**Defendant** [1] - 1:23
**defendant's** [3] - 87:8, 121:24, 126:12
**defense** [3] - 74:6, 121:2, 126:9
**define** [1] - 138:4
**definition** [1] - 61:3
**degree** [7] - 20:20, 20:24, 44:15, 44:18, 61:7, 65:9, 77:23
**degrees** [3] - 44:16, 77:16, 77:22
**Delaware** [1] - 42:7

**delay** [1] - 154:1
**deleted** [2] - 150:4, 150:19
**delivered** [4] - 103:3, 103:6, 141:10
**demonstrated** [1] - 118:21
**denied** [1] - 139:3
**Department** [29] - 5:16, 5:18, 5:19, 6:7, 6:22, 6:24, 7:8, 7:18, 9:8, 10:14, 15:19, 17:4, 18:11, 19:3, 42:25, 46:20, 63:18, 63:24, 64:2, 64:4, 64:25, 65:2, 66:11, 67:2, 78:8, 78:9, 79:4, 95:20, 96:12
**department** [5] - 20:10, 41:17, 63:20, 64:7, 96:12
**dependent** [1] - 62:17
**depicted** [3] - 144:18, 146:13, 148:24
**depicting** [1] - 130:8
**depiction** [3] - 131:15, 131:17, 144:13
**depicts** [4] - 137:15, 143:19, 149:13, 151:3
**deposit** [1] - 28:15
**deposited** [1] - 25:7
**depositing** [1] - 35:18
**deposits** [5] - 25:1, 27:13, 28:12, 29:19, 31:15
**depth** [1] - 83:3
**deputy** [1] - 153:20
**derive** [1] - 95:8
**describe** [4] - 99:10, 103:11, 114:21, 152:3
**described** [9] - 10:19, 12:11, 18:17, 46:8, 84:14, 104:16, 113:12, 124:24, 131:8
**describing** [2] - 49:6, 126:8
**description** [3] - 11:6, 110:11, 113:19
**designated** [3] - 44:9, 65:4, 108:8
**designed** [1] - 51:19
**designing** [1] - 92:6
**destination** [1] - 16:6
**detail** [10] - 25:17, 30:10, 32:21, 37:12, 82:8, 82:13, 82:14, 95:2, 146:13, 147:24

**detailed** [2] - 92:5, 149:6
**details** [1] - 32:20
**detain** [1] - 86:7
**detained** [5] - 47:1, 48:5, 51:23, 84:2, 85:10
**determination** [9] - 6:9, 8:17, 8:20, 8:21, 9:4, 10:3, 10:8, 13:22, 15:15
**determinations** [4] - 6:5, 6:19, 9:25, 10:4
**determine** [17] - 6:12, 7:19, 7:20, 8:1, 8:4, 9:2, 9:10, 9:11, 12:16, 25:22, 27:23, 67:15, 97:14, 103:22, 111:19, 117:14, 131:5
**determined** [4] - 14:23, 48:21, 95:19, 113:5
**determining** [1] - 16:8
**develop** [2] - 49:11, 67:14
**developed** [1] - 79:23
**developing** [1] - 80:12
**development** [1] - 92:20
**device** [21] - 54:5, 54:6, 54:10, 54:12, 58:16, 58:18, 62:4, 62:11, 62:15, 62:17, 62:18, 65:22, 71:13, 73:5, 73:7, 73:12, 86:13, 86:16, 86:23, 117:11, 117:12
**devices** [19] - 44:1, 44:2, 44:4, 46:25, 49:15, 50:15, 52:16, 53:3, 54:1, 54:23, 56:1, 70:8, 70:11, 71:25, 72:2, 72:4, 85:10, 86:7, 86:11
**devisable** [1] - 95:7
**devises** [1] - 86:11
**diagram** [1] - 92:4
**different** [23] - 12:17, 20:11, 30:8, 33:5, 37:17, 45:3, 45:4, 52:16, 54:20, 59:22, 60:1, 60:14, 60:17, 60:20, 61:4, 64:15, 65:10, 69:16, 88:22, 89:15, 135:16, 146:19
**difficult** [3] - 21:5, 32:22, 67:20
**difficulties** [2] - 92:19,

94:12
**difficulty** [1] - 143:25
**digit** [1] - 8:13
**digital** [24] - 41:21, 42:14, 43:17, 43:20, 44:1, 44:2, 44:10, 45:3, 46:1, 46:24, 50:15, 52:16, 58:20, 60:9, 60:10, 65:5, 65:19, 65:20, 66:13, 66:18, 70:9, 125:25, 137:9
**digits** [1] - 40:5
**dimensions** [1] - 95:8
**DIRECT** [9] - 2:3, 5:10, 10:21, 20:4, 41:5, 46:11, 63:14, 66:22, 76:5
**direct** [3] - 38:8, 48:17, 155:22
**directing** [2] - 11:2, 18:2
**directly** [4] - 27:5, 79:2, 113:18, 148:8
**director** [10] - 5:15, 5:20, 6:3, 6:4, 6:16, 6:17, 10:6, 14:15, 17:16, 17:19
**dis** [1] - 57:8
**disc** [8] - 55:25, 56:3, 57:14, 57:24, 68:8, 71:16, 71:18, 73:14
**Discover** [5] - 39:23, 40:1, 40:3, 111:2, 113:13
**discover** [1] - 40:4
**discovered** [1] - 88:14
**Discovery** [1] - 111:13
**discovery** [1] - 42:17
**discs** [1] - 68:9
**discuss** [4] - 3:4, 47:24, 148:16, 154:6
**discussed** [2] - 58:11, 58:23
**discusses** [1] - 138:10
**discussing** [5] - 4:10, 56:2, 58:21, 107:13, 142:2
**discussion** [7] - 56:19, 58:8, 75:2, 75:18, 107:13, 133:25, 136:19
**discussions** [1] - 153:21
**DISTRICT** [2] - 1:1, 1:1
**District** [5] - 79:17, 155:4, 155:18, 155:18
**division** [4] - 5:16, 5:21, 5:23, 17:12

8

**doctor** [1] - 121:12
**doctoral** [1] - 44:18
**document** [92] - 13:13, 14:13, 17:6, 21:20, 22:4, 23:24, 24:4, 25:21, 27:12, 32:2, 32:19, 33:6, 34:23, 47:21, 48:3, 49:7, 50:1, 50:8, 70:22, 78:24, 80:15, 81:25, 82:15, 88:5, 91:3, 91:17, 91:19, 97:11, 98:3, 99:10, 99:13, 99:15, 99:21, 99:24, 101:9, 101:10, 101:20, 102:3, 102:10, 102:12, 103:9, 104:7, 105:20, 106:11, 106:12, 106:23, 107:23, 108:1, 109:24, 110:24, 111:1, 112:13, 112:21, 114:18, 114:21, 120:6, 120:24, 122:9, 124:20, 125:2, 125:3, 125:8, 125:23, 125:24, 126:6, 126:12, 129:5, 129:8, 129:18, 129:23, 130:8, 130:10, 130:13, 130:16, 130:17, 130:24, 130:25, 131:9, 131:11, 131:18, 132:22, 133:14, 133:19, 135:6, 142:22, 143:2, 143:3, 148:2, 150:11, 153:7
**documents** [28] - 22:9, 22:14, 48:17, 55:5, 57:9, 57:21, 59:14, 59:20, 60:3, 71:23, 74:5, 80:19, 87:3, 87:15, 101:18, 102:2, 104:17, 105:18, 105:19, 106:8, 106:9, 106:18, 135:8, 136:21, 148:17, 148:19, 150:6
**DOJ** [2] - 1:18, 1:21
**DOJ-CRM** [1] - 1:21
**DOJ-NSD** [1] - 1:18
**dollar** [1] - 99:13
**dollars** [1] - 125:11
**domain** [1] - 58:4

**done** [11] - 4:22, 9:25, 17:11, 34:17, 44:6, 59:3, 64:19, 68:10, 75:3, 86:24, 140:14
**Dorado** [4] - 110:3, 110:7, 110:9, 112:6
**Doug** [1] - 86:12
**DOUGLAS** [2] - 2:6, 41:3
**Douglas** [1] - 41:1
**down** [15] - 14:18, 18:9, 19:22, 40:22, 59:4, 66:13, 67:17, 69:15, 74:21, 86:8, 108:11, 121:11, 126:15, 130:21, 152:14
**download** [1] - 68:7
**downloaded** [2] - 59:18, 71:24
**downloading** [1] - 67:12
**Dr** [2] - 119:18, 120:18
**drawing** [1] - 72:10
**drawn** [1] - 138:2
**Drill** [4] - 110:3, 110:7, 110:9, 112:6
**drill** [2] - 93:10, 93:20
**drilled** [1] - 113:22
**drilling** [1] - 12:7
**drills** [2] - 94:21, 95:12
**drive** [18] - 53:9, 53:11, 53:18, 53:19, 53:20, 53:24, 56:12, 57:5, 58:19, 59:25, 60:4, 61:18, 71:21, 73:8, 73:21, 73:22
**Drive** [2] - 84:11, 108:24
**driven** [1] - 118:14
**drives** [1] - 70:14
**drug** [1] - 77:4
**dual** [1] - 5:25
**due** [1] - 79:8
**duly** [5] - 5:8, 20:2, 41:3, 63:12, 76:1
**during** [23] - 25:12, 31:16, 32:10, 43:14, 60:23, 66:1, 70:16, 81:8, 81:15, 81:19, 86:25, 87:8, 88:14, 97:5, 98:19, 103:15, 103:22, 111:19, 114:6, 115:14, 115:19, 120:9, 129:25
**dust** [1] - 118:7
**duties** [4] - 43:23, 76:19, 77:11, 116:5

## E

**e-mail** [62] - 67:10, 67:22, 67:25, 68:2, 69:9, 80:13, 82:4, 82:21, 83:7, 83:18, 85:8, 89:22, 90:8, 90:9, 90:10, 90:21, 91:2, 91:4, 91:5, 91:9, 97:11, 97:12, 97:16, 97:21, 97:22, 98:15, 98:16, 103:12, 103:18, 103:19, 103:20, 105:3, 105:14, 105:17, 105:19, 106:5, 106:23, 107:2, 107:5, 114:22, 114:24, 114:25, 115:9, 115:10, 115:12, 115:24, 116:18, 117:22, 118:3, 119:17, 120:25, 121:12, 121:14, 122:20, 123:1, 123:6, 123:9, 123:16, 123:18, 123:21, 123:25
**e-mailing** [1] - 118:21
**e-mails** [7] - 69:8, 73:10, 73:23, 107:4, 120:17, 123:5
**E.A.R** [1] - 15:12
**E.C.C.N** [1] - 15:2
**early** [4] - 4:20, 5:2, 67:17, 80:2
**Earth** [13] - 131:24, 132:9, 132:10, 134:23, 137:6, 137:9, 137:17, 138:15, 143:10, 143:11, 144:17, 149:16, 152:5
**earth** [1] - 134:18
**easier** [3] - 64:20, 69:13, 80:23
**easy** [3] - 59:19, 68:11, 93:16
**economic** [1] - 92:11
**edit** [1] - 62:6
**editing** [1] - 61:19
**education** [3] - 20:25, 21:6, 45:20
**educational** [5] - 7:3, 20:19, 44:14, 65:7, 77:15
**effort** [1] - 128:2
**eight** [1] - 21:5
**eight-hour** [1] - 21:5

**eighth** [1] - 31:22
**either** [11] - 3:23, 11:9, 70:25, 78:8, 109:6, 137:6, 138:5, 148:25, 149:14, 150:16, 150:19
**eject** [1] - 118:15
**El** [4] - 110:3, 110:7, 110:9, 112:6
**electronic** [20] - 26:16, 27:3, 39:24, 40:1, 40:14, 52:17, 52:18, 53:3, 62:15, 64:12, 64:16, 65:9, 80:20, 83:25, 85:10, 86:4, 86:7, 87:3, 126:24
**electronically** [3] - 18:13, 19:5, 40:11
**electronics** [8] - 8:10, 47:7, 64:15, 71:9, 71:23, 72:5, 85:17, 86:24
**elicit** [1] - 56:22
**eliciting** [1] - 122:3
**Elina** [7] - 90:9, 90:10, 122:19, 122:20, 123:2, 128:1, 128:23
**elsewhere** [2] - 44:5, 109:9
**Embargo** [1] - 12:20
**embargo** [3] - 12:23, 12:25, 15:5
**embargoes** [1] - 126:16
**embedded** [5] - 103:19, 103:20, 117:6, 122:20, 123:1
**employed** [10] - 20:6, 41:10, 63:17, 63:18, 63:20, 76:7, 76:8, 76:14, 78:15, 80:25
**employee** [1] - 106:6
**employees** [1] - 104:1
**employment** [1] - 20:25
**encapsulated** [2] - 71:13, 72:15
**enclosure** [2] - 54:2, 54:14
**encounter** [2] - 43:25, 60:21
**end** [11] - 8:15, 11:18, 33:3, 33:13, 33:16, 84:3, 96:16, 96:18, 96:20, 137:22, 138:21
**endeavor** [2] - 92:1, 92:2
**ended** [1] - 70:7
**ending** [1] - 25:1

**ends** [1] - 60:11
**enforcement** [10] - 8:22, 9:5, 13:23, 41:19, 42:18, 42:23, 43:14, 78:18, 81:20
**Enforcement** [3] - 63:19, 63:22, 65:17
**enforcer** [1] - 95:18
**engage** [1] - 80:4
**engineer** [6] - 6:17, 6:24, 10:7, 95:8, 123:22
**Engineering** [2] - 39:5, 39:7
**engineering** [2] - 7:4, 7:5
**engineers** [1] - 92:20
**ensure** [4] - 53:21, 60:19, 68:18, 96:22
**enter** [2] - 84:5, 107:12
**entered** [8] - 100:10, 101:8, 109:23, 110:5, 122:6, 124:14, 125:1, 128:10
**entire** [2] - 60:4, 72:8
**entirely** [3] - 95:1, 95:4, 150:16
**entirety** [1] - 47:15
**entities** [1] - 80:18
**entitled** [4] - 87:21, 92:13, 99:17, 135:12
**entrance** [4] - 142:8, 142:17, 142:18, 150:18
**entries** [2] - 113:18, 113:20
**entry** [3] - 12:24, 113:15, 113:17
**environments** [1] - 78:19
**equals** [1] - 29:6
**equipment** [15] - 8:11, 8:12, 12:7, 53:1, 91:24, 92:22, 92:23, 94:7, 94:8, 94:9, 96:16, 114:4, 114:5
**equivalent** [1] - 73:16
**erbil** [1] - 34:9
**Erbil** [1] - 125:15
**especially** [2] - 27:4, 95:6
**ESQ** [4] - 1:14, 1:17, 1:20, 1:24
**essentially** [5] - 53:8, 82:18, 86:15, 118:14, 138:4
**establish** [1] - 96:21
**established** [1] - 96:3

**estimate** [1] - 75:4
**estimated** [1] - 75:3
**Estonia** [9] - 3:8, 97:6, 97:8, 104:2, 127:21, 128:9, 128:18, 129:25, 130:22
**Estonian** [4] - 128:12, 129:6, 135:7, 136:14
**Estonians** [1] - 153:10
**et** [3] - 8:13, 14:5, 123:24
**European** [3] - 96:14, 97:4, 97:8
**evaluate** [1] - 86:22
**evening** [2] - 4:23, 153:25
**eventually** [1] - 52:20
**evidence** [46] - 44:3, 45:1, 52:18, 59:11, 64:16, 65:21, 67:12, 68:14, 68:17, 68:22, 71:14, 72:11, 72:15, 72:24, 73:5, 80:10, 80:14, 81:8, 81:24, 82:8, 82:18, 83:5, 83:9, 84:17, 85:25, 88:14, 88:17, 88:24, 89:6, 89:11, 98:17, 98:18, 100:10, 104:7, 106:5, 109:13, 109:23, 110:5, 113:21, 114:1, 114:12, 124:14, 125:1, 154:4, 154:5
**evidentiary** [3] - 60:5, 64:14, 65:21
**evolved** [1] - 42:24
**exact** [2] - 25:2, 132:17
**exactly** [4] - 11:19, 22:12, 68:11, 70:6
**exam** [3] - 21:5, 86:6, 86:7
**EXAMIANTION** [1] - 20:4
**EXAMINATION** [9] - 5:10, 10:21, 18:23, 41:5, 46:11, 63:14, 66:22, 76:5, 141:25
**examination** [6] - 48:3, 53:16, 53:23, 54:18, 86:17, 141:22
**examinations** [2] - 44:6, 64:18
**examine** [6] - 4:6, 18:20, 62:23, 86:21, 141:17, 141:24
**examined** [1] - 60:17
**examiner** [7] - 20:22,

21:3, 43:20, 43:21, 46:24, 64:7, 64:9
**example** [2] - 140:6, 140:21
**exams** [1] - 64:21
**Excel** [1] - 105:6
**except** [2] - 49:1, 66:1
**exchanged** [1] - 103:14
**excuse** [2] - 122:22, 154:2
**execute** [1] - 82:18
**executed** [6] - 71:1, 84:15, 84:20, 84:22, 84:25, 85:3
**execution** [2] - 85:5, 87:8
**exhibit** [17] - 10:23, 13:19, 17:25, 24:12, 39:12, 55:21, 58:5, 91:14, 98:21, 101:22, 107:13, 108:4, 119:24, 122:5, 136:1, 140:18, 151:8
**Exhibit** [81] - 10:24, 12:13, 13:2, 13:14, 14:8, 17:7, 17:23, 18:25, 21:19, 21:22, 22:2, 22:20, 22:24, 23:5, 23:9, 23:15, 23:19, 24:3, 24:5, 27:6, 28:5, 29:15, 30:5, 31:11, 32:17, 45:9, 45:15, 47:4, 47:5, 47:10, 54:25, 56:8, 56:9, 58:10, 58:15, 58:23, 71:5, 73:4, 73:16, 89:24, 89:25, 90:4, 90:14, 90:16, 99:4, 100:10, 101:8, 101:19, 102:9, 102:17, 103:9, 104:6, 104:21, 104:23, 105:11, 109:23, 110:4, 110:23, 111:6, 111:10, 112:19, 113:14, 114:16, 115:2, 115:6, 117:4, 117:7, 117:21, 118:22, 120:4, 120:12, 124:14, 125:2, 125:20, 126:2, 127:13, 127:19, 129:2, 129:15, 133:5, 133:21
**Exhibits** [5] - 22:13, 55:13, 55:15, 127:4,

127:9
**exhibits** [11] - 57:4, 57:10, 74:5, 132:24, 140:3, 141:3, 142:2, 149:23, 150:25, 151:2, 151:19
**exif** [1] - 62:4
**exist** [2] - 61:4, 96:24
**existed** [2] - 137:16, 137:20
**existence** [2] - 107:23, 140:16
**expand** [1] - 24:4
**expanded** [2] - 24:12
**expect** [1] - 105:15
**expedite** [1] - 100:19
**expenditures** [1] - 107:24
**experience** [10] - 21:6, 60:24, 61:13, 93:10, 93:11, 93:12, 93:13, 93:15, 95:18, 116:22
**experienced** [1] - 92:19
**expert** [10] - 10:14, 10:18, 44:9, 44:12, 45:17, 45:25, 46:7, 65:4, 66:16, 139:14
**expertise** [3] - 42:10, 43:17, 60:24
**experts** [2] - 85:21, 95:16
**explain** [7] - 8:19, 16:1, 53:5, 56:21, 127:23, 130:12, 136:2
**explaining** [3] - 20:11, 20:12, 86:14
**explore** [1] - 60:4
**EXPORT** [1] - 1:18
**Export** [3] - 63:19, 63:22, 126:10
**export** [22] - 5:24, 6:6, 6:21, 7:9, 7:25, 9:3, 10:11, 10:15, 13:2, 15:1, 15:11, 15:13, 16:3, 17:12, 18:11, 19:3, 43:5, 43:7, 95:2, 100:24
**exported** [2] - 59:20, 95:22
**exporting** [1] - 15:20
**exports** [2] - 6:14, 126:17
**extension** [2] - 95:15, 116:20
**extensive** [2] - 93:17, 153:21
**extent** [4] - 73:18, 75:21, 80:3, 138:22

**external** [1] - 53:11
**extra** [1] - 14:5
**extract** [1] - 80:23
**extracted** [3] - 47:2, 59:13, 60:21
**extracting** [1] - 55:10
**extraction** [5] - 46:25, 54:19, 55:8, 120:7, 120:16
**extractions** [4] - 56:1, 56:14, 57:15, 58:20
**extracts** [1] - 54:17
**eyes** [1] - 108:13

**F**

**F.3rd** [2] - 134:9, 137:2
**face** [1] - 91:15
**facility** [3] - 91:24, 92:9, 106:17
**fact** [5] - 4:2, 38:7, 50:13, 89:10, 139:18
**factory** [4] - 108:9, 108:14, 127:1, 128:14
**facts** [3] - 82:1, 82:2, 82:13
**failure** [1] - 96:12
**fair** [5] - 83:8, 136:13, 144:2, 144:4, 144:13
**fairly** [5] - 3:6, 3:25, 4:1, 33:18, 77:5
**fall** [4] - 6:12, 7:19, 8:23, 12:14
**falls** [4] - 9:1, 9:10, 14:4, 77:10
**familiar** [19] - 7:8, 7:11, 9:9, 11:8, 17:19, 21:7, 51:5, 51:8, 52:1, 78:24, 84:24, 88:2, 101:9, 103:9, 116:3, 116:7, 118:9, 120:6
**familiarize** [1] - 81:11
**familiarizing** [1] - 81:2
**far** [6] - 4:8, 4:24, 49:16, 135:24, 139:3, 139:17
**Fargo** [13] - 20:7, 20:8, 20:17, 21:13, 22:11, 22:17, 23:16, 24:6, 25:22, 31:3, 31:9, 87:22, 112:24
**Fargo's** [1] - 21:16
**farthest** [1] - 147:7
**Faruk** [1] - 115:11
**fast** [3] - 42:1, 144:20, 145:9
**father** [1] - 111:17

**Fayetteville** [3] - 100:15, 101:13, 103:6
**FBI** [3] - 67:6, 79:4, 80:8
**feasibility** [15] - 89:23, 90:25, 91:9, 91:16, 91:18, 92:5, 92:10, 92:11, 92:13, 94:12, 95:3, 95:25, 99:25
**February** [10] - 37:7, 37:21, 37:23, 84:4, 86:5, 112:1, 112:6, 124:22, 124:23, 125:7
**Federal** [2] - 46:21, 138:17
**FEDERAL** [1] - 1:15
**federal** [11] - 43:3, 47:6, 51:2, 64:1, 67:22, 69:21, 76:25, 81:17, 81:20, 81:22, 82:11
**federally** [1] - 77:3
**fee** [1] - 31:10
**feet** [1] - 149:6
**few** [5] - 15:7, 66:11, 72:4, 85:16, 148:15
**Fi** [1] - 54:12
**field** [9] - 10:19, 44:9, 45:25, 64:10, 65:4, 66:9, 66:13, 66:17, 78:13
**fields** [1] - 46:8
**fight** [1] - 136:7
**fighter** [1] - 78:10
**file** [20] - 61:5, 61:6, 61:10, 61:11, 61:13, 61:15, 61:17, 61:20, 61:22, 62:6, 67:20, 71:14, 72:15, 117:11, 126:25, 148:9
**filed** [1] - 88:3
**files** [3] - 61:22, 61:23, 144:22
**fill** [5] - 3:12, 3:15, 4:15, 4:18, 93:16
**filter** [1] - 69:18
**final** [4] - 10:2, 10:9, 146:13, 147:10
**finally** [1] - 138:18
**financial** [3] - 21:1, 109:16, 109:19
**fine** [4] - 48:16, 49:7, 131:3, 136:11
**fines** [1] - 96:14
**fingerprint** [1] - 60:11
**finish** [1] - 147:5
**finished** [1] - 65:8

10

**firearm** [2] - 11:18, 11:20
**firearms** [7] - 6:2, 12:6, 87:11, 111:21, 113:8, 116:4, 127:1
**fired** [1] - 117:1
**firing** [13] - 100:17, 101:14, 104:19, 107:14, 108:9, 108:16, 108:17, 108:20, 109:5, 109:20, 109:22, 118:14, 118:19
**first** [28] - 8:8, 14:18, 20:16, 25:6, 25:20, 27:7, 28:7, 33:2, 33:7, 33:21, 60:21, 67:11, 81:3, 83:17, 89:20, 92:5, 97:10, 105:3, 107:4, 111:13, 112:21, 112:22, 115:25, 122:14, 122:16, 122:25, 133:6, 152:8
**five** [12] - 4:6, 7:25, 8:5, 88:12, 93:14, 94:3, 142:17, 142:18, 144:23, 145:6, 153:13
**flash** [1] - 118:7
**FLETC** [2] - 65:22, 65:24
**flew** [1] - 51:24
**flight** [1] - 97:20
**flip** [1] - 13:16
**floor** [1] - 126:25
**flyover** [1] - 132:16
**focus** [7] - 77:19, 123:5, 127:21, 132:12, 133:10, 146:8, 147:13
**focused** [1] - 147:15
**focusing** [5] - 77:17, 133:8, 133:11, 148:5, 152:15
**folks** [1] - 3:8
**followed** [1] - 54:23
**following** [9] - 18:9, 56:19, 75:2, 94:10, 94:17, 97:21, 116:1, 133:25, 145:20
**follows** [6] - 5:9, 20:3, 41:4, 48:9, 63:13, 76:2
**FOR** [2] - 1:1, 2:3
**foregoing** [3] - 155:7, 155:10, 155:21
**foreign** [3] - 8:14, 78:7, 128:11
**forensic** [27] - 44:6,

44:16, 53:15, 53:17, 53:24, 54:15, 58:19, 59:22, 59:24, 60:1, 60:14, 64:9, 64:18, 64:21, 65:19, 68:6, 70:17, 71:13, 71:20, 85:21, 86:10, 86:17, 86:21, 87:6, 91:10, 114:23, 125:24
**forensically** [1] - 117:6
**forensics** [33] - 41:21, 42:14, 42:16, 43:18, 43:20, 43:22, 43:23, 43:24, 44:10, 44:19, 44:22, 45:2, 45:4, 46:1, 46:24, 49:19, 59:3, 60:9, 64:6, 64:25, 65:5, 65:20, 66:11, 66:13, 66:18, 68:9, 70:6, 70:7, 70:9, 80:22, 115:15, 120:8
**forge** [1] - 95:14
**form** [5] - 32:8, 47:23, 59:12, 145:18, 145:19
**format** [3] - 68:10, 105:6, 151:11
**formation** [1] - 42:25
**formats** [1] - 80:21
**formed** [2] - 13:1, 53:24
**forms** [2] - 45:4, 61:4
**formula** [1] - 60:12
**forth** [2] - 92:12, 155:9
**forward** [6] - 59:12, 75:6, 92:3, 118:7, 138:23, 144:20
**forwarded** [1] - 59:5
**forwarding** [1] - 145:9
**foundation** [10] - 57:3, 57:6, 57:10, 74:6, 74:12, 106:9, 114:8, 114:9, 129:19, 144:1
**four** [9] - 40:5, 41:15, 64:21, 85:13, 93:1, 93:12, 94:2, 94:22
**fourth** [1] - 119:4
**fraud** [6] - 20:22, 21:3, 21:4, 43:10, 77:2, 77:7
**free** [2] - 9:14, 130:25
**frequency** [2] - 54:2, 54:14
**frequently** [2] - 134:18, 138:16
**fresh** [1] - 3:17
**FRIDAY** [1] - 1:11
**Friday** [1] - 5:2

**friendly** [1] - 86:18
**front** [3] - 51:13, 142:3, 142:5
**full** [3] - 4:22, 20:14, 121:1
**full-time** [1] - 20:14
**funds** [10] - 21:8, 25:4, 25:8, 26:13, 28:14, 29:23, 30:18, 32:20, 36:21, 113:7
**furnace** [1] - 123:24
**furtherance** [1] - 88:8
**Futura** [2] - 11:5, 14:25

## G

**gain** [1] - 96:19
**gas** [14] - 100:16, 101:13, 104:18, 104:19, 107:14, 108:15, 108:16, 108:17, 108:20, 109:4, 109:5, 109:17, 118:19
**gasses** [1] - 118:14
**gather** [2] - 84:17, 102:25
**gathered** [2] - 81:8, 98:18
**general** [3] - 77:1, 113:20, 143:24
**General's** [1] - 78:16
**generalized** [1] - 92:22
**generally** [30] - 7:7, 8:7, 8:8, 13:21, 18:3, 19:11, 21:7, 24:4, 24:23, 46:1, 49:16, 51:5, 51:8, 52:12, 61:2, 62:2, 64:8, 66:18, 67:10, 69:4, 83:15, 86:3, 86:4, 91:22, 103:11, 104:25, 107:20, 110:1, 114:20, 116:9
**generated** [6] - 55:8, 55:10, 73:11, 81:6, 138:6, 138:7
**generating** [1] - 64:14
**gentleman** [1] - 121:15
**gentlemen** [2] - 74:13, 136:20
**geolocation** [3] - 117:14, 117:17, 117:18
**George** [1] - 7:6
**Georgia** [1] - 65:17
**germane** [1] - 69:3

**Gino** [1] - 57:5
**GINO** [1] - 1:24
**girlfriend** [1] - 56:23
**given** [1] - 22:7
**glass** [1] - 123:10
**glasses** [2] - 70:21, 123:11
**Glenco** [1] - 65:17
**Global** [3] - 100:8, 100:14, 101:5
**global** [1] - 41:20
**gloves** [1] - 54:3
**goal** [1] - 53:8
**Goizha** [2] - 34:11, 35:1
**Gold** [1] - 138:17
**Google** [28] - 131:24, 132:1, 132:8, 132:9, 132:10, 133:17, 134:17, 134:23, 135:21, 137:6, 137:7, 137:9, 137:14, 137:17, 138:6, 138:15, 139:2, 140:14, 143:10, 143:11, 144:8, 144:17, 144:22, 144:25, 145:23, 145:25, 149:16, 152:5
**GOVERNMENT** [1] - 2:3
**Government** [1] - 90:13
**government** [60] - 3:7, 5:7, 10:13, 14:7, 17:22, 20:1, 21:10, 21:13, 21:23, 22:10, 22:19, 23:4, 23:18, 23:23, 25:15, 41:1, 45:14, 45:24, 47:9, 49:4, 50:7, 53:18, 53:20, 55:12, 56:7, 56:9, 58:9, 58:22, 63:11, 66:15, 66:21, 71:4, 73:15, 74:4, 74:10, 75:25, 85:21, 87:10, 88:20, 96:4, 96:5, 96:17, 96:19, 96:25, 99:3, 102:16, 105:10, 111:5, 115:1, 120:11, 120:19, 126:1, 127:8, 128:12, 129:14, 130:11, 130:23, 133:20, 149:18
**government's** [2] - 3:22, 96:19
**Government's** [85] -

10:24, 12:13, 13:2, 13:14, 17:7, 17:23, 18:25, 21:19, 21:22, 22:2, 22:13, 22:20, 22:24, 23:5, 23:9, 23:15, 23:19, 24:3, 24:5, 27:6, 28:5, 29:15, 30:5, 31:11, 32:17, 45:9, 45:15, 47:4, 47:5, 47:10, 54:25, 55:13, 55:15, 56:8, 56:9, 58:10, 58:15, 58:23, 71:5, 73:4, 73:16, 89:24, 89:25, 90:3, 90:14, 90:16, 99:4, 100:10, 101:8, 101:19, 102:9, 102:17, 103:9, 104:6, 104:21, 104:23, 105:11, 109:23, 110:4, 110:23, 111:6, 111:10, 112:18, 113:14, 114:16, 115:2, 115:6, 117:4, 117:6, 117:21, 118:21, 120:4, 120:12, 124:13, 125:2, 125:20, 126:2, 127:3, 127:9, 127:13, 127:19, 129:2, 129:15, 133:5, 133:21
**gradual** [1] - 152:10
**graduate** [2] - 44:20, 65:13
**grant** [1] - 52:23
**granted** [10] - 24:1, 69:22, 81:19, 83:16, 83:21, 84:8, 86:22, 98:10, 99:8, 128:16
**graph** [1] - 132:15
**grasp** [1] - 83:13
**grave** [1] - 96:13
**great** [1] - 95:16
**Greece** [4] - 31:4, 31:8, 32:10, 32:12
**GREEN** [2] - 2:6, 41:3
**Green** [4] - 41:1, 45:24, 86:12
**green** [7] - 41:8, 45:17, 46:5, 46:9, 47:25, 55:21, 60:22
**greetings** [1] - 122:21
**grooves** [1] - 11:10
**group** [6] - 6:1, 39:8, 78:2, 78:3, 116:11, 116:12
**guarantee** [1] - 71:18

11

**guess** [4] - 4:18, 33:12, 138:22, 150:8
**guidance** [1] - 64:15
**gun** [5] - 11:10, 93:9, 93:21, 94:21, 96:8
**Guns** [2] - 101:4, 101:12
**guns** [2] - 11:13, 11:15
**guys** [2] - 123:23, 123:24

## H

**half** [9] - 3:12, 4:18, 4:21, 14:18, 18:3, 24:4, 63:23, 64:24, 106:22
**hand** [14] - 11:5, 48:10, 125:13, 134:10, 137:23, 138:1, 138:2, 139:18, 140:9, 140:21, 141:6, 141:12, 142:7, 150:18
**handgun** [2] - 11:14, 11:15
**handwriting** [1] - 142:8
**hard** [19] - 53:9, 53:11, 53:17, 53:18, 53:20, 53:24, 56:12, 57:5, 57:24, 58:19, 59:25, 60:4, 60:16, 61:18, 69:13, 73:8, 73:21, 73:22
**hardware** [1] - 53:14
**hash** [3] - 60:9, 71:15, 71:16
**Head** [1] - 6:25
**hear** [8] - 48:14, 89:14, 129:20, 144:10, 149:20, 153:14, 153:24, 154:5
**heard** [7] - 60:25, 85:20, 89:4, 95:16, 100:22, 106:4, 154:4
**hearsay** [23] - 73:19, 73:25, 74:10, 105:12, 105:13, 105:16, 106:2, 120:16, 120:20, 121:13, 122:22, 129:16, 130:4, 130:19, 134:4, 134:20, 135:3, 137:14, 137:21, 137:25, 138:3,

138:8, 140:3
**heat** [1] - 94:4
**heavy** [1] - 96:14
**held** [6] - 20:14, 20:15, 40:8, 131:15, 137:25, 138:1
**help** [5] - 44:2, 67:19, 119:6, 123:11, 148:22
**helped** [1] - 68:7
**helpful** [2] - 16:7, 16:8
**helping** [1] - 43:25
**hereby** [1] - 155:6
**hereinbefore** [1] - 155:9
**high** [5] - 94:20, 95:11, 95:12, 137:17, 149:8
**higher** [1] - 146:12
**highly** [1] - 92:21
**Hill** [10] - 24:21, 35:4, 84:13, 84:23, 99:18, 110:10, 111:3, 111:15, 113:1, 124:18
**himself** [1] - 151:10
**Hinkley** [11] - 46:8, 49:11, 74:1, 79:18, 89:7, 105:21, 106:8, 120:22, 135:1, 141:20, 151:5
**HINKLEY** [161] - 1:14, 3:2, 3:5, 4:17, 5:4, 20:1, 20:5, 22:19, 22:23, 23:4, 23:10, 23:12, 23:18, 23:24, 24:2, 40:17, 41:1, 41:7, 45:5, 45:8, 45:14, 45:19, 45:23, 46:5, 46:9, 46:12, 47:9, 47:14, 47:19, 48:16, 49:13, 49:22, 49:25, 50:7, 50:17, 50:19, 50:24, 55:12, 55:17, 55:20, 56:7, 56:14, 57:2, 57:14, 57:19, 57:24, 58:6, 58:9, 58:14, 58:22, 59:2, 62:20, 63:7, 63:10, 63:16, 66:15, 66:23, 71:4, 71:8, 73:1, 73:3, 73:15, 74:2, 74:14, 74:16, 74:22, 75:3, 75:10, 75:12, 75:15, 75:25, 76:3, 76:6, 88:23, 89:16, 89:19, 90:3, 90:6, 90:13, 90:17, 90:19, 98:8, 98:11, 98:23, 98:25, 99:3,

99:7, 99:9, 102:5, 102:8, 102:16, 102:22, 102:24, 105:10, 105:22, 106:10, 106:19, 106:21, 111:5, 111:12, 114:11, 114:14, 115:1, 115:8, 119:11, 119:14, 119:15, 119:20, 119:22, 120:1, 120:3, 120:11, 120:23, 121:4, 121:6, 121:8, 121:15, 121:19, 121:22, 122:4, 122:10, 122:12, 122:23, 123:13, 124:3, 124:8, 126:1, 126:5, 127:8, 127:15, 127:18, 129:14, 129:21, 129:22, 130:9, 131:3, 131:10, 133:2, 133:4, 133:20, 135:3, 136:1, 136:7, 136:14, 139:25, 140:1, 141:23, 143:1, 143:5, 143:21, 144:7, 149:18, 149:21, 150:3, 150:5, 151:7, 151:21, 151:24, 152:2, 153:4, 153:15
**hired** [1] - 93:17
**historical** [8] - 132:2, 132:14, 132:17, 144:17, 145:2, 145:14, 149:11, 149:17
**history** [11] - 16:9, 17:11, 17:15, 18:7, 18:15, 19:2, 24:22, 27:16, 28:11, 30:10, 45:21
**hit** [1] - 152:10
**hold** [3] - 20:8, 44:15, 75:5
**home** [5] - 4:20, 69:25, 83:2, 87:8, 87:9
**Homeland** [10] - 42:21, 42:25, 43:1, 43:2, 46:16, 67:6, 76:8, 76:10, 76:19, 116:6
**Honor** [100] - 5:4, 10:13, 10:17, 10:20, 14:7, 17:22, 18:19,

19:23, 22:19, 23:6, 23:10, 23:20, 23:25, 40:17, 41:2, 45:6, 45:14, 45:16, 45:23, 46:5, 47:17, 47:19, 47:23, 48:16, 49:7, 55:12, 55:18, 56:7, 56:11, 56:16, 56:20, 62:20, 63:1, 63:2, 63:10, 66:15, 73:1, 73:18, 73:24, 74:9, 74:17, 74:22, 74:24, 75:16, 76:3, 79:25, 88:16, 88:22, 89:16, 90:13, 90:17, 98:9, 102:6, 102:18, 105:12, 105:20, 105:22, 106:19, 111:7, 114:7, 115:3, 119:11, 120:1, 120:13, 120:15, 120:19, 121:10, 122:22, 124:3, 126:1, 127:16, 129:14, 129:16, 129:21, 130:19, 131:3, 133:2, 133:20, 133:22, 134:1, 134:5, 134:17, 134:20, 134:25, 135:13, 139:10, 139:14, 139:25, 141:1, 141:4, 141:8, 141:23, 143:22, 148:10, 149:18, 150:8, 151:7, 151:14, 153:4
**Honor's** [1] - 143:22
**HONORABLE** [1] - 1:8
**hook** [1] - 71:12
**hopefully** [1] - 4:22
**host** [1] - 96:24
**hour** [1] - 21:5
**house** [3] - 70:10, 70:24, 145:3
**housed** [4] - 26:5, 26:8, 26:23, 26:25
**houses** [3] - 87:14, 116:10, 118:13
**huge** [1] - 23:13
**hundred** [2] - 69:11, 146:6
**hype** [1] - 152:9

## I

**idea** [2] - 45:20, 132:4
**identification** [6] - 13:14, 17:7, 23:15,

45:10, 58:16, 141:2
**identified** [11] - 87:13, 87:17, 91:17, 103:2, 105:23, 127:25, 128:13, 131:19, 133:12, 137:3, 140:19
**identify** [5] - 80:12, 112:3, 113:15, 130:16, 152:22
**identifying** [1] - 44:3
**identity** [1] - 32:5
**illicit** [1] - 76:23
**Illinois** [1] - 101:5
**illustrative** [1] - 136:1
**image** [22] - 53:24, 71:18, 73:21, 80:23, 86:13, 86:15, 132:16, 132:17, 137:17, 137:21, 144:15, 144:22, 145:17, 145:18, 145:23, 146:3, 146:8, 146:14, 148:18, 149:9, 152:9
**imaged** [2] - 70:16, 71:9
**images** [14] - 58:19, 59:25, 71:24, 73:9, 131:25, 132:16, 132:17, 134:19, 137:17, 144:17, 146:1, 147:20, 153:6
**imaging** [4] - 70:8, 70:10, 71:12, 137:18
**immediately** [1] - 80:21
**Immigration** [1] - 42:24
**imparted** [2] - 113:22, 117:10
**import** [2] - 95:2, 96:6
**importantly** [2] - 130:20, 134:5
**imports** [1] - 126:18
**impose** [1] - 11:10
**impossible** [1] - 94:11
**IN** [1] - 1:1
**inadmissible** [1] - 151:20
**inadvertent** [1] - 54:7
**inappropriate** [1] - 47:13
**incarceration** [1] - 96:14
**Inch** [1] - 14:24
**inch** [1] - 11:4
**include** [9] - 12:12, 64:17, 91:24, 97:17, 107:9, 117:11,

12

132:2, 132:14, 149:24

**included** [3] - 57:20, 57:22, 85:12

**includes** [3] - 57:14, 105:13, 107:6

**including** [10] - 41:18, 55:16, 67:25, 68:2, 73:10, 73:11, 79:23, 117:23, 135:13

**inclusive** [1] - 22:20

**Incorporated** [1] - 101:12

**increase** [3] - 98:16, 98:18, 99:12

**independent** [1] - 100:7

**INDEX** [1] - 2:1

**India** [2] - 39:4, 39:8

**Indian** [3] - 6:25, 84:10, 108:24

**indicate** [9] - 22:8, 34:13, 100:20, 106:22, 107:1, 112:16, 117:25, 125:12, 148:24

**indicated** [7] - 40:7, 48:4, 69:1, 76:15, 101:16, 130:2, 143:23

**indicates** [6] - 48:10, 52:15, 75:19, 90:23, 97:3, 117:22

**indicating** [4] - 110:2, 113:20, 135:4, 135:8

**indices** [2] - 97:17, 127:25

**indictment** [14] - 78:25, 88:3, 88:9, 88:16, 88:18, 88:21, 89:6, 89:9, 89:11, 89:21, 97:25, 98:5, 118:23, 119:10

**individual** [7] - 7:24, 50:14, 105:14, 120:17, 127:25, 150:16

**individuals** [2] - 17:14, 18:5

**industry** [3] - 9:9, 9:21, 21:6

**Industry** [3] - 5:16, 14:23, 63:22

**information** [59] - 14:22, 21:24, 22:6, 22:9, 28:25, 33:2, 33:4, 33:17, 37:12, 46:25, 47:2, 52:7, 52:16, 53:19, 53:21, 53:22, 53:23, 54:17,

54:20, 54:22, 55:10, 57:1, 57:8, 59:4, 59:5, 59:10, 59:12, 59:14, 59:17, 59:24, 60:11, 60:17, 60:18, 61:5, 61:11, 62:15, 67:15, 68:19, 70:14, 71:23, 72:4, 72:12, 73:12, 73:13, 73:14, 80:18, 80:19, 81:24, 82:3, 82:4, 85:7, 92:1, 99:25, 102:14, 102:25, 103:14, 103:20, 122:10, 127:24

**initial** [2] - 128:22, 147:6

**injection** [7] - 93:12, 93:13, 94:3, 100:3, 119:17, 123:23

**input** [1] - 102:3

**inquire** [5] - 4:25, 74:2, 75:5, 75:12, 148:14

**inquiry** [2] - 93:15, 137:22

**inserted** [1] - 141:7

**inside** [3] - 52:18, 54:1, 61:13

**instance** [2] - 66:12, 134:12

**instead** [1] - 136:5

**institution** [2] - 21:1, 41:14

**instruct** [1] - 49:3

**instructing** [1] - 90:11

**instruction** [3] - 41:11, 41:14, 74:12

**instructions** [1] - 154:6

**integral** [2] - 83:8, 133:17

**integrated** [1] - 71:19

**integrity** [3] - 60:6, 68:19, 68:24

**intensive** [1] - 72:9

**intentional** [1] - 54:7

**intentionally** [1] - 60:16

**interconnected** [1] - 26:2

**interest** [3] - 59:21, 116:14, 118:17

**interested** [2] - 79:19, 132:13

**Intern** [3] - 25:7, 25:13, 28:17

**internal** [3] - 25:10, 28:23, 73:8

**International** [20] -

29:4, 29:25, 30:1, 30:2, 30:13, 34:4, 34:5, 34:25, 35:13, 35:20, 35:25, 36:6, 36:19, 36:25, 37:5, 84:6, 96:10, 125:15, 126:11, 133:9

**international** [16] - 6:20, 21:7, 25:4, 25:11, 26:13, 28:13, 28:23, 29:2, 29:22, 29:24, 30:11, 32:20, 36:20, 77:20, 124:24, 125:12

**internationally** [1] - 26:23

**internet** [2] - 80:10, 112:17

**interpretation** [1] - 150:12

**interpreting** [2] - 142:21, 150:14

**interrupt** [1] - 152:23

**interview** [6] - 128:2, 128:12, 129:11, 130:1, 130:2, 130:6

**interviewed** [1] - 128:23

**interviews** [3] - 80:9, 129:8

**introduce** [1] - 130:25

**introduced** [5] - 57:3, 103:8, 104:7, 117:4, 150:20

**introduction** [1] - 41:19

**investigate** [10] - 43:2, 43:5, 76:21, 76:24, 76:25, 77:4, 77:8, 78:4, 78:5, 78:6

**investigated** [3] - 52:15, 77:3, 78:17

**investigates** [1] - 43:11

**investigating** [1] - 83:5

**investigation** [82] - 45:25, 46:13, 46:17, 46:22, 53:22, 54:23, 59:8, 66:17, 66:24, 67:3, 67:7, 69:3, 69:23, 70:15, 72:18, 78:13, 78:21, 79:3, 79:4, 79:7, 79:11, 79:15, 79:19, 79:20, 79:23, 80:6, 80:8, 80:12, 80:14, 81:1, 81:4, 81:9, 81:12, 81:15, 82:2, 83:12, 83:16, 83:20, 86:1,

86:18, 87:5, 87:14, 87:18, 88:15, 91:12, 91:20, 95:19, 97:5, 97:14, 98:19, 99:20, 100:22, 101:3, 102:1, 103:22, 107:17, 109:8, 111:16, 111:19, 113:4, 113:6, 113:21, 114:2, 114:6, 114:13, 115:14, 116:15, 116:16, 116:23, 117:5, 118:17, 120:9, 126:23, 127:20, 127:21, 127:24, 128:8, 129:12, 131:19, 132:4, 144:9

**investigations** [8] - 41:21, 42:22, 43:1, 43:25, 59:7, 78:2, 79:6, 79:10

**Investigations** [8] - 43:2, 46:16, 46:21, 67:6, 76:9, 76:11, 76:20, 116:6

**investigative** [11] - 59:6, 77:2, 77:11, 79:23, 79:24, 80:7, 83:1, 84:8, 84:17, 103:1, 131:4

**investigator** [3] - 59:9, 80:24, 105:7

**investigatory** [1] - 130:12

**invoice** [7] - 100:8, 100:14, 100:20, 103:13, 110:9, 110:20, 110:22

**invoices** [2] - 107:6, 107:10

**involve** [1] - 59:7

**involved** [15] - 45:3, 46:13, 46:17, 46:19, 46:25, 66:24, 67:3, 67:5, 78:21, 79:2, 79:7, 79:11, 81:4, 85:4, 107:25

**involving** [2] - 45:25, 66:17

**iPad** [1] - 85:15

**iPhone** [1] - 123:12

**Iraq** [37] - 3:8, 13:2, 13:8, 13:9, 13:11, 15:5, 15:13, 15:17, 15:24, 16:12, 27:25, 28:3, 28:4, 29:5, 32:13, 32:14, 32:15, 32:16, 34:9, 34:12,

35:1, 35:2, 35:20, 35:25, 37:5, 95:22, 96:4, 96:17, 96:18, 96:19, 104:5, 113:7, 117:19, 125:15, 126:19, 128:14, 133:7

**irrelevant** [4] - 47:23, 49:4, 49:8, 56:24

**issue** [6] - 96:6, 138:9, 138:22, 139:7, 149:19, 151:12

**issued** [7] - 15:20, 16:12, 16:18, 17:3, 49:5, 96:17, 96:18

**issues** [3] - 42:14, 92:8, 153:23

**issuing** [1] - 10:11

**Istanbul** [15] - 37:14, 37:16, 37:17, 38:2, 38:6, 38:11, 38:13, 38:16, 38:18, 38:21, 38:24, 39:2, 39:11, 97:20

**Italy** [1] - 97:24

**ITAR** [6] - 96:11, 96:15, 96:23, 97:4, 126:11, 126:17

**item** [24] - 6:6, 8:2, 8:22, 8:25, 9:6, 9:10, 9:16, 11:3, 11:12, 11:17, 11:23, 12:12, 12:19, 13:1, 14:2, 16:22, 16:23, 55:22, 55:24, 82:8, 95:17, 95:21, 110:16, 116:17

**items** [56] - 5:25, 6:21, 7:9, 10:10, 10:15, 12:4, 12:5, 12:7, 12:10, 12:11, 12:16, 12:18, 15:1, 15:13, 15:20, 15:23, 16:12, 48:5, 49:6, 49:18, 50:25, 51:20, 51:21, 51:23, 52:6, 52:20, 53:6, 65:21, 70:16, 70:25, 71:2, 78:8, 83:25, 85:16, 87:9, 95:17, 96:6, 99:21, 99:24, 100:2, 100:3, 100:4, 100:15, 100:16, 100:20, 100:23, 101:4, 104:16, 109:5, 109:14, 110:12, 114:12, 114:23, 116:14, 125:25

**itself** [5] - 48:8, 122:5, 137:7, 137:14,

13

141:10

## J

**James** [1] - 138:17
**January** [23] - 15:9, 15:10, 31:12, 31:17, 32:11, 32:13, 32:16, 145:9, 145:10, 145:16, 146:4, 146:20, 147:1, 147:21, 148:15, 148:18, 148:25, 149:14, 149:16, 150:24, 152:8, 152:24
**jargon** [1] - 32:24
**JASPERSE** [2] - 1:20, 151:18
**Jay** [1] - 44:17
**JEFFREY** [2] - 2:8, 76:1
**Jeffrey** [1] - 75:25
**JERS** [1] - 57:20
**jet** [1] - 78:10
**job** [8] - 14:15, 43:21, 66:8, 86:14, 92:24, 94:23, 94:25
**Joe** [1] - 69:16
**Joe's** [1] - 77:23
**John** [5] - 40:6, 44:17, 111:3, 111:15, 113:13
**joining** [3] - 63:24, 79:19, 81:12
**joint** [2] - 79:4, 79:7
**Joseph** [1] - 42:6
**JR** [1] - 1:24
**Judge** [6] - 4:13, 48:20, 127:10, 134:10, 136:17, 151:4
**judge** [3] - 82:22, 148:14, 152:3
**judicial** [3] - 135:22, 138:19, 139:4
**judicially** [1] - 143:23
**Judy** [4] - 4:25, 5:5, 47:24, 75:12
**July** [1] - 39:9
**June** [5] - 39:2, 145:8, 147:21, 148:25, 149:14
**jurisdiction** [1] - 76:23
**JURY** [1] - 1:10
**jury** [41] - 3:18, 4:20, 4:25, 5:3, 5:13, 15:7, 47:13, 47:24, 48:18, 49:3, 50:3, 50:10, 53:5, 57:17, 65:1,

74:8, 75:5, 75:13, 79:22, 88:17, 88:19, 89:4, 89:5, 91:22, 92:4, 93:1, 93:8, 94:24, 106:22, 107:1, 108:13, 110:15, 127:15, 136:3, 151:12, 153:6, 153:9, 153:14, 153:19, 153:20
**Justice** [1] - 44:18
**justice** [7] - 41:17, 41:19, 42:7, 44:17, 44:19, 77:18, 77:19

## K

**Kandaja** [5] - 90:9, 90:11, 122:19, 128:1, 128:23
**Kate** [1] - 20:1
**KATHERINE** [2] - 2:5, 20:2
**keep** [6] - 16:9, 41:24, 66:5, 107:24, 142:20, 154:5
**Kennedy** [1] - 47:1
**Kenneth** [1] - 45:24
**kept** [3] - 21:15, 22:10, 70:15
**key** [5] - 59:23, 60:3, 69:4, 69:6, 69:14
**kind** [11] - 21:4, 29:11, 33:5, 34:18, 50:9, 56:23, 60:1, 61:12, 62:3, 89:17, 92:15
**kindly** [3] - 114:15, 127:19, 136:23
**knowing** [1] - 5:1
**knowledge** [1] - 139:13
**known** [8] - 43:21, 44:25, 51:8, 54:1, 54:16, 61:12, 61:17, 88:8
**knows** [1] - 89:1
**Krahl** [4] - 101:4, 101:15, 101:20, 102:2
**Kurdish** [1] - 96:4
**Kurdistan** [23] - 25:6, 25:10, 25:13, 28:17, 28:23, 29:1, 29:24, 30:1, 30:2, 30:12, 34:4, 34:5, 34:25, 35:20, 35:25, 36:6, 36:18, 36:25, 37:5, 111:21, 113:7, 125:15, 127:1

## L

**label** [5] - 142:10, 142:11, 142:12, 142:17, 147:19
**labeled** [4] - 137:10, 137:12, 137:24, 147:20
**labeling** [1] - 142:19
**lack** [1] - 151:20
**ladies** [1] - 136:20
**laid** [2] - 114:9, 118:22
**language** [2] - 29:6, 33:13
**laptop** [3] - 71:12, 85:12, 120:8
**laptops** [2] - 64:17, 70:10
**large** [2] - 59:19, 78:11
**larger** [1] - 24:12
**largest** [1] - 96:7
**last** [6] - 3:24, 4:5, 40:5, 124:9, 132:6, 142:21
**latest** [1] - 107:10
**lathes** [1] - 94:2
**laundering** [3] - 43:8, 77:2, 77:10
**Laura** [3] - 155:3, 155:14, 155:14
**LAURA** [1] - 155:17
**law** [20] - 8:21, 9:4, 9:5, 13:23, 20:22, 20:24, 41:19, 41:21, 42:18, 42:23, 43:3, 43:14, 48:8, 49:1, 49:3, 77:4, 78:18, 81:20, 95:18
**Law** [1] - 65:16
**lay** [5] - 106:8, 114:8, 129:18, 139:12, 150:10
**laying** [1] - 74:6
**learned** [1] - 101:3
**least** [2] - 4:9, 30:20
**leave** [1] - 68:15
**ledge** [1] - 13:15
**left** [11] - 3:21, 75:9, 97:23, 108:7, 125:13, 142:7, 142:15, 144:18, 149:24, 150:2, 150:18
**left-hand** [3] - 125:13, 142:7, 150:18
**leg** [1] - 97:22
**legal** [8] - 92:10, 94:12, 95:3, 95:25, 126:9, 128:10,

128:15, 129:6
**legality** [1] - 96:3
**legend** [5] - 135:12, 140:9, 140:13, 141:5
**legends** [1] - 141:12
**lengthy** [1] - 75:10
**letter** [1] - 8:11
**liabilities** [1] - 107:24
**license** [26] - 6:8, 6:13, 7:21, 8:4, 8:20, 8:24, 9:2, 9:4, 9:20, 10:8, 13:2, 13:10, 14:4, 15:10, 15:15, 15:16, 16:4, 16:8, 16:13, 16:18, 18:7, 18:11, 18:15, 19:2, 19:3, 95:21
**licenses** [5] - 10:11, 15:20, 15:23, 16:11, 17:3
**licensing** [18] - 6:4, 6:5, 6:18, 6:19, 8:17, 8:19, 8:21, 9:25, 10:4, 10:14, 13:22, 14:5, 16:2, 16:8, 16:9, 17:11, 17:15, 18:6
**light** [1] - 54:4
**likely** [5] - 3:21, 32:7, 40:4, 59:14, 73:25
**likewise** [3] - 22:2, 23:2, 62:14
**limitation** [2] - 74:3, 89:14
**limitations** [3] - 58:10, 58:23, 73:16
**limited** [2] - 57:3, 58:13
**limiting** [1] - 74:12
**line** [8] - 32:4, 33:3, 80:8, 99:24, 108:5, 108:8, 108:11, 108:14
**lines** [3] - 27:3, 115:25, 138:3
**list** [24] - 3:7, 6:12, 7:12, 7:17, 7:19, 8:23, 9:1, 9:10, 11:3, 15:3, 20:9, 21:24, 49:6, 51:20, 52:5, 78:6, 78:11, 92:18, 94:8, 95:1, 95:13, 116:21, 120:19, 121:17
**listed** [23] - 11:3, 12:10, 12:12, 34:6, 34:8, 51:21, 94:19, 99:22, 103:13, 105:5, 107:8, 108:8, 108:16, 108:18,

110:11, 112:5, 112:10, 112:17, 116:21, 125:7, 126:19, 126:21
**listing** [1] - 113:17
**lists** [2] - 52:14, 91:15
**litigation** [3] - 20:10, 20:13, 20:18
**lives** [3] - 26:24, 27:1, 61:13
**living** [1] - 107:22
**Lizarraga** [2] - 134:8, 137:2
**Lizarraga-Tirado** [2] - 134:8, 137:2
**load** [2] - 41:22, 60:14
**loaded** [2] - 59:25, 72:6
**loading** [2] - 64:12, 67:12
**local** [3] - 25:22, 26:17, 35:7
**locally** [3] - 116:18, 116:21, 118:1
**located** [6] - 26:17, 27:3, 86:25, 103:17, 103:18, 126:24
**location** [9] - 61:16, 117:12, 131:14, 131:19, 133:12, 140:22, 141:3, 146:11, 152:15
**locations** [3] - 71:3, 87:12, 140:18
**locker** [1] - 53:13
**look** [40] - 8:3, 9:15, 9:18, 12:15, 13:16, 14:2, 14:3, 21:19, 22:2, 22:13, 22:24, 23:13, 26:7, 29:9, 52:18, 54:21, 57:18, 60:2, 60:4, 69:2, 69:7, 69:13, 70:11, 71:15, 72:23, 81:8, 89:25, 93:1, 114:15, 117:6, 119:5, 120:4, 129:2, 134:10, 136:21, 140:5, 142:4, 145:3
**looked** [11] - 17:13, 70:16, 73:5, 87:5, 99:21, 127:3, 135:10, 143:20, 144:5, 144:14, 146:4
**looking** [31] - 3:7, 3:9, 11:17, 12:2, 41:23, 49:18, 50:11, 52:13, 59:9, 59:10, 67:19, 72:18, 78:6, 80:10, 82:17, 83:6, 98:4,

115:14, 125:14, 132:6, 140:18, 142:16, 144:16, 145:15, 145:22, 146:3, 147:19, 147:24, 149:5, 152:16
**looks** [7] - 35:13, 39:5, 55:2, 92:3, 125:14, 147:18
**low** [1] - 151:9
**lower** [3] - 91:17, 118:4, 140:21
**lunch** [4] - 3:16, 75:14, 75:20, 75:23
**lunchtime** [1] - 4:25

**M**

**M.I.M** [1] - 100:3
**M16** [1] - 101:13
**M4** [4] - 92:17, 92:20, 100:16, 116:5
**Mac** [4] - 53:10, 53:11, 61:9, 85:12
**machine** [7] - 94:2, 94:5, 94:22, 123:23, 134:12, 134:14, 138:13
**machinery** [1] - 8:10
**machines** [8] - 93:24, 94:3, 94:4, 94:10, 94:11, 94:15, 96:21, 138:12
**magazine** [1] - 95:14
**magistrate** [1] - 82:12
**magnifying** [2] - 123:10, 123:12
**mail** [62] - 67:10, 67:22, 67:25, 68:2, 69:9, 80:13, 82:4, 82:21, 83:7, 83:18, 85:8, 89:22, 90:8, 90:9, 90:10, 90:21, 91:2, 91:4, 91:5, 91:9, 97:11, 97:12, 97:16, 97:21, 97:22, 98:15, 98:16, 103:12, 103:18, 103:19, 103:20, 105:3, 105:14, 105:17, 105:19, 106:5, 106:23, 107:2, 107:5, 114:22, 114:24, 114:25, 115:9, 115:10, 115:12, 115:24, 116:18, 117:22, 118:3, 119:17, 120:25,

121:12, 121:14, 122:20, 123:1, 123:6, 123:9, 123:16, 123:18, 123:21, 123:25
**mailing** [1] - 118:21
**mails** [7] - 69:8, 73:10, 73:23, 107:4, 120:17, 123:5
**Main** [1] - 25:25
**main** [4] - 142:7, 142:17, 142:18, 150:18
**maintain** [4] - 15:19, 16:2, 47:22, 131:1
**maintained** [1] - 61:18
**major** [1] - 147:22
**maker** [2] - 135:20, 152:6
**management** [3] - 17:12, 18:11, 19:4
**manipulating** [1] - 149:10
**manipulation** [1] - 132:11
**manner** [3] - 76:23, 88:22, 103:4
**manually** [2] - 137:11, 137:23
**manufacture** [1] - 95:6
**manufactured** [6] - 96:22, 116:2, 116:21, 117:23, 118:1, 118:6
**manufacturer** [1] - 9:12
**manufacturers** [1] - 96:8
**manufacturing** [8] - 91:24, 92:22, 92:23, 94:7, 94:8, 96:24, 106:17, 109:9
**map** [10] - 135:15, 135:16, 135:20, 135:23, 137:6, 137:10, 137:11, 138:2, 142:21
**mapping** [1] - 132:3
**maps** [6] - 132:1, 133:6, 134:2, 139:24, 140:8, 143:24
**March** [18] - 37:24, 38:5, 38:10, 38:12, 38:14, 39:21, 39:23, 39:24, 40:1, 80:6, 83:25, 99:16, 100:14, 112:17, 113:10, 113:12, 122:16

**MARIANI** [1] - 1:8
**marital** [3] - 84:10, 87:8, 108:23
**marked** [17] - 13:14, 17:6, 23:14, 45:9, 55:21, 57:10, 73:4, 89:24, 101:7, 101:19, 109:23, 110:5, 117:4, 119:24, 124:13, 125:1, 129:2
**marker** [1] - 137:11
**market** [1] - 95:5
**markings** [1] - 134:3
**marshal** [1] - 64:1
**master** [2] - 7:5, 146:18
**master's** [4] - 42:6, 44:16, 77:18, 77:23
**Masters** [4] - 110:3, 110:7, 110:9, 112:6
**match** [2] - 12:11, 108:17
**matches** [1] - 113:18
**material** [4] - 8:2, 52:5, 59:16, 99:1
**materials** [5] - 8:10, 8:12, 60:19, 60:20, 98:18
**math** [2] - 60:12, 65:1
**Mathes** [4] - 101:5, 103:12, 104:10, 108:23
**matrix** [1] - 9:19
**matter** [8] - 11:20, 16:4, 21:11, 48:6, 130:11, 130:20, 130:23, 144:3
**matters** [2] - 42:15, 153:22
**MAY** [1] - 1:11
**mean** [9] - 4:4, 4:7, 12:22, 86:3, 89:11, 89:12, 148:14, 150:24, 152:23
**meaning** [2] - 76:22, 131:8
**means** [6] - 13:9, 29:7, 32:4, 74:3, 86:4, 155:21
**mechanical** [1] - 7:4
**media** [7] - 44:2, 52:17, 52:18, 53:9, 58:20, 80:20
**meet** [3] - 94:16, 128:18, 128:21
**Mega** [2] - 29:4, 35:12
**members** [6] - 85:2, 88:7, 89:4, 96:15, 97:4, 153:19

**memo** [6] - 17:20, 29:11, 29:12, 29:13, 30:3, 30:13
**memorandum** [1] - 17:17
**memory** [5] - 53:9, 53:12, 98:12, 130:8, 135:8
**mentioned** [11] - 8:16, 9:4, 11:12, 12:15, 38:24, 49:6, 78:5, 81:14, 100:5, 155:8
**merely** [1] - 137:15
**mesh** [1] - 54:3
**message** [1] - 105:14
**messed** [1] - 66:1
**met** [3] - 94:16, 128:22, 138:19
**metadata** [15] - 60:25, 61:2, 61:6, 61:12, 61:17, 61:21, 61:22, 61:24, 62:2, 62:3, 62:4, 62:16, 117:6, 117:10
**metal** [5] - 54:2, 54:3, 93:12, 100:3, 119:17
**method** [2] - 19:9, 19:11
**methods** [2] - 41:18, 80:25
**MIDDLE** [1] - 1:1
**Middle** [3] - 79:17, 155:4, 155:18
**middle** [1] - 11:2
**midmorning** [1] - 3:23
**might** [3] - 54:22, 58:2, 59:10
**mil** [1] - 100:17
**military** [2] - 131:15, 133:12
**millimeter** [5] - 11:6, 11:12, 11:14, 14:25
**milling** [1] - 94:1
**mind** [1] - 154:5
**mine** [2] - 108:13, 119:25
**minimize** [1] - 56:25
**Minneapolis** [1] - 26:8
**minutes** [3] - 124:6, 136:18, 136:21
**mirror** [1] - 73:21
**miscellaneous** [1] - 87:15
**misleading** [1] - 49:2
**mispronouncing** [1] - 34:9
**missile** [4] - 5:15, 5:21, 5:23, 6:1
**mission** [1] - 94:9
**misspoke** [1] - 117:5

**mistaken** [3] - 46:20, 47:1, 54:16
**mobile** [4] - 55:11, 56:1, 65:22, 85:13
**mode** [1] - 54:11
**modification** [2] - 61:8, 61:22
**modified** [2] - 71:20, 72:16
**modify** [1] - 71:14
**molding** [6] - 93:12, 93:13, 94:3, 100:3, 100:4, 119:18
**moment** [20] - 10:25, 18:21, 21:19, 23:6, 23:20, 25:19, 40:19, 47:17, 52:10, 63:7, 102:18, 111:7, 115:3, 116:3, 120:1, 120:13, 127:10, 133:2, 136:24, 142:4
**moments** [1] - 15:7
**Monday** [7] - 3:17, 4:20, 4:21, 66:12, 153:16, 154:2, 154:7
**money** [13] - 28:21, 29:11, 32:8, 33:9, 34:2, 34:13, 35:6, 37:15, 39:8, 40:11, 43:7, 77:2, 77:10
**month** [10] - 24:8, 25:2, 25:3, 25:12, 28:7, 30:8, 31:12, 64:20, 64:22, 145:14
**monthly** [6] - 24:7, 24:23, 25:20, 39:16, 39:19, 111:2
**months** [2] - 84:9, 148:15
**morning** [10] - 3:1, 3:2, 3:15, 4:23, 5:13, 18:25, 41:8, 41:9, 134:8, 154:2
**most** [9] - 9:8, 32:7, 40:4, 59:6, 73:25, 96:14, 97:3, 132:16, 144:21
**motion** [3] - 50:2, 136:12, 153:5
**mountainous** [1] - 117:19
**mouse** [1] - 152:11
**move** [6] - 23:4, 48:18, 49:24, 100:6, 123:21, 138:23
**moved** [1] - 49:22
**moves** [26] - 14:7, 17:22, 22:19, 23:18, 45:14, 45:24, 47:9, 55:12, 56:7, 56:9,

15

58:9, 58:22, 66:15, 71:4, 73:15, 90:13, 99:3, 102:16, 105:10, 111:5, 115:1, 120:11, 126:1, 127:8, 129:14, 133:20
**movie** [2] - 115:13, 152:6
**moving** [10] - 31:11, 32:8, 32:17, 35:17, 38:3, 38:7, 49:21, 93:23, 96:1, 124:9
**MR** [272] - 3:2, 3:5, 4:4, 4:17, 5:4, 5:7, 5:12, 10:13, 10:17, 10:20, 10:22, 14:7, 14:9, 14:11, 17:22, 17:24, 18:1, 18:19, 18:21, 18:24, 19:18, 19:20, 19:23, 19:24, 20:1, 20:5, 22:19, 22:21, 22:23, 23:4, 23:6, 23:8, 23:10, 23:12, 23:18, 23:20, 23:22, 23:24, 24:2, 40:17, 40:19, 40:21, 40:23, 40:25, 41:1, 41:7, 45:5, 45:8, 45:14, 45:16, 45:19, 45:23, 46:3, 46:5, 46:9, 46:12, 47:9, 47:11, 47:14, 47:17, 47:19, 47:22, 48:16, 48:20, 48:23, 49:13, 49:21, 49:22, 49:23, 49:25, 50:7, 50:17, 50:19, 50:21, 50:24, 55:12, 55:14, 55:17, 55:20, 56:7, 56:11, 56:14, 56:16, 56:20, 57:2, 57:14, 57:19, 57:24, 58:1, 58:6, 58:7, 58:9, 58:12, 58:14, 58:22, 58:25, 59:2, 62:20, 62:24, 63:2, 63:4, 63:7, 63:10, 63:16, 66:15, 66:19, 66:23, 71:4, 71:6, 71:8, 73:1, 73:3, 73:15, 73:18, 74:2, 74:9, 74:14, 74:16, 74:18, 74:22, 74:24, 75:3, 75:10, 75:12, 75:15, 75:25, 76:3, 76:6, 79:25, 88:16, 88:23, 89:16, 89:19, 90:2, 90:3, 90:6, 90:13, 90:15, 90:17, 90:19, 98:8, 98:11, 98:22, 98:23,

98:25, 99:3, 99:5, 99:7, 99:9, 102:5, 102:8, 102:16, 102:18, 102:20, 102:22, 102:24, 105:10, 105:12, 105:19, 105:22, 106:10, 106:19, 106:21, 111:5, 111:7, 111:9, 111:12, 114:7, 114:11, 114:14, 115:1, 115:3, 115:5, 115:8, 119:11, 119:14, 119:15, 119:19, 119:20, 119:21, 119:22, 120:1, 120:3, 120:11, 120:13, 120:15, 120:23, 121:4, 121:6, 121:8, 121:10, 121:15, 121:17, 121:19, 121:22, 122:4, 122:9, 122:10, 122:12, 122:22, 122:23, 123:13, 123:14, 124:3, 124:8, 126:1, 126:3, 126:5, 127:8, 127:10, 127:12, 127:15, 127:18, 129:14, 129:16, 129:21, 129:22, 130:4, 130:9, 130:19, 131:3, 131:10, 133:2, 133:4, 133:20, 133:22, 134:1, 135:3, 135:13, 135:19, 136:1, 136:7, 136:13, 136:14, 136:17, 139:10, 139:21, 139:25, 140:1, 141:19, 141:23, 142:1, 143:1, 143:3, 143:5, 143:6, 143:7, 143:21, 144:7, 144:11, 148:1, 148:10, 148:14, 148:21, 149:18, 149:21, 150:3, 150:5, 150:8, 150:22, 151:4, 151:7, 151:14, 151:18, 151:19, 151:21, 151:24, 152:2, 153:4, 153:12, 153:15, 153:18

**multi** [1] - 129:5
**multiple** [3] - 114:3, 120:17, 128:20
**Mumbai** [2] - 39:4, 39:8
**Mundy** [1] - 86:8
**munitions** [2] - 12:6, 78:6
**must** [3] - 94:16, 96:9, 134:12
**mutual** [1] - 128:10
**mutually** [1] - 128:15

## N

**N.s** [3] - 7:24, 8:5, 16:6
**name** [11] - 16:24, 24:15, 39:6, 39:7, 87:20, 91:17, 111:3, 111:15, 112:25, 120:18, 137:24
**named** [1] - 121:16
**names** [3] - 16:5, 135:18, 135:23
**Nano** [2] - 11:5, 14:25
**narrative** [1] - 80:1
**narrow** [1] - 69:15
**narrowed** [1] - 121:11
**national** [3] - 12:19, 13:5, 15:4
**Nations** [2] - 12:20, 15:4
**Nato** [1] - 92:18
**Naturalization** [1] - 42:24
**nature** [4] - 56:22, 79:8, 96:23, 96:24
**naval** [1] - 6:25
**Navy** [1] - 6:24
**NEALON** [1] - 1:15
**necessary** [3] - 49:11, 96:6, 154:2
**need** [18] - 7:20, 8:4, 47:20, 48:8, 49:15, 58:3, 59:14, 67:18, 67:19, 80:22, 119:1, 119:5, 121:7, 122:1, 130:25, 139:23, 148:22, 154:4
**needed** [5] - 8:24, 81:1, 91:25, 99:14
**needs** [5] - 45:17, 50:3, 86:16, 95:21, 134:15
**negotiations** [1] - 6:20
**network** [4] - 54:11, 54:13, 65:23
**never** [2] - 17:3, 65:8
**NEW** [1] - 1:21

**New** [3] - 44:18, 44:20, 64:10
**new** [5] - 120:24, 122:9, 149:22, 150:5, 150:16
**next** [51] - 5:6, 15:9, 19:25, 22:14, 24:11, 29:3, 31:25, 32:15, 33:15, 34:18, 34:23, 35:10, 35:17, 35:22, 36:2, 36:16, 36:23, 37:2, 37:7, 37:12, 37:20, 37:23, 38:3, 38:7, 38:11, 38:14, 38:16, 38:18, 38:22, 38:25, 39:2, 39:9, 39:25, 55:3, 57:25, 71:10, 71:11, 75:5, 75:11, 75:24, 92:3, 92:12, 94:14, 95:13, 103:5, 108:11, 112:7, 145:9, 151:7
**nine** [3] - 7:24, 8:9, 20:18
**Ninth** [1] - 134:9
**Nitrate** [1] - 14:25
**NO** [1] - 1:9
**non** [2] - 31:3, 31:9
**non-Wells** [2] - 31:3, 31:9
**none** [1] - 16:16
**nonetheless** [2] - 85:24, 89:7
**normal** [1] - 19:12
**normally** [1] - 52:17
**North** [2] - 100:15, 103:6
**northeast** [1] - 117:18
**northwest** [1] - 131:22
**notation** [1] - 29:10
**note** [6] - 34:10, 47:14, 93:7, 116:18, 130:15, 133:14
**noted** [1] - 112:14
**notes** [3] - 46:6, 138:20, 139:6
**nothing** [4] - 19:18, 19:20, 62:24, 71:17
**notice** [8] - 27:16, 31:16, 48:25, 135:22, 138:19, 139:5, 142:3, 143:23
**noticed** [1] - 30:20
**notification** [1] - 40:2
**noting** [1] - 74:3
**November** [14] - 29:18, 29:24, 29:25, 30:2, 36:2, 36:17, 36:23, 83:17, 90:8, 90:22, 97:13, 97:22,

144:14, 145:12
**NSD** [1] - 1:18
**nuclear** [4] - 5:15, 5:21, 5:23, 5:25
**number** [40] - 8:1, 12:18, 21:12, 32:9, 35:5, 35:18, 40:5, 45:3, 45:4, 50:25, 57:4, 59:21, 59:25, 60:13, 61:4, 65:24, 69:17, 69:18, 71:15, 71:16, 71:17, 71:22, 72:2, 90:2, 101:22, 101:25, 102:3, 102:14, 103:3, 108:16, 108:17, 110:11, 112:7, 112:8, 119:19, 124:25, 128:12, 140:8, 151:15
**numbered** [1] - 155:9
**numbering** [1] - 96:22
**numbers** [3] - 7:25, 8:14, 25:14
**numerical** [1] - 71:15
**numerous** [2] - 12:10, 92:6
**nut** [1] - 116:20
**NW** [2] - 1:19, 1:21

## O

**oath** [1] - 149:13
**object** [16] - 45:18, 47:11, 56:16, 73:19, 73:24, 88:16, 88:19, 105:12, 105:15, 114:7, 120:15, 120:20, 133:22, 134:25, 143:21, 144:3
**objecting** [1] - 105:17
**objection** [44] - 14:9, 17:24, 19:24, 22:21, 23:8, 23:22, 40:24, 40:25, 46:8, 47:22, 48:24, 49:5, 49:10, 55:14, 58:25, 63:4, 66:21, 71:6, 74:10, 74:12, 74:23, 79:25, 90:15, 99:5, 102:20, 106:7, 111:9, 115:5, 121:10, 123:13, 123:14, 126:3, 127:12, 127:14, 130:4, 131:2, 134:1, 135:11, 139:1, 139:3, 139:11, 153:11, 153:12, 153:17

**objectionable** [1] - 74:8
**objections** [1] - 48:14
**objects** [2] - 69:9, 69:11
**observation** [1] - 137:4
**obtain** [3] - 81:22, 82:4, 82:23
**obtained** [6] - 81:15, 82:1, 83:11, 83:25, 114:1, 114:5
**obvious** [1] - 59:8
**obviously** [1] - 121:25
**occasion** [1] - 52:24
**occur** [2] - 36:16, 123:3
**occurred** [10] - 28:3, 36:23, 37:7, 37:21, 40:15, 60:22, 67:15, 75:2, 112:1, 124:21
**occurring** [1] - 37:3
**occurs** [2] - 36:2, 107:4
**October** [13] - 18:12, 19:4, 28:7, 28:20, 29:1, 29:2, 35:16, 35:19, 35:24, 97:20, 144:14, 145:12, 148:16
**OF** [2] - 1:1, 1:3
**offense** [2] - 43:11, 88:5
**offenses** [1] - 52:14
**offered** [3] - 66:20, 109:13, 142:22
**offering** [3] - 130:11, 130:12, 150:10
**offers** [1] - 10:13
**Office** [3] - 63:19, 72:23, 78:16
**OFFICE** [1] - 1:15
**office** [3] - 64:10, 66:10, 77:25
**officer** [2] - 64:2, 81:20
**offices** [3] - 26:3, 64:11, 66:13
**Official** [3] - 155:3, 155:15, 155:17
**official** [2] - 9:16, 10:2
**often** [3] - 60:13, 62:11, 66:5
**old** [1] - 124:2
**older** [1] - 70:11
**oldest** [2] - 18:13, 19:5
**OML** [7] - 100:8, 100:14, 101:1, 101:2, 101:5,

101:16, 108:18
**ON** [3] - 5:11, 41:6, 63:15
**once** [5] - 69:1, 80:17, 82:13, 82:15, 147:15
**one** [71] - 4:9, 8:9, 8:16, 17:8, 25:6, 26:1, 26:12, 30:12, 30:21, 32:3, 33:12, 37:14, 37:23, 38:12, 38:14, 38:16, 38:19, 38:22, 38:25, 39:2, 39:9, 39:25, 46:16, 47:4, 49:14, 49:17, 54:6, 55:3, 60:8, 66:13, 67:2, 67:11, 69:13, 69:19, 70:19, 76:17, 77:7, 79:9, 81:22, 85:17, 87:22, 89:14, 91:5, 93:9, 93:12, 93:14, 94:4, 94:21, 94:22, 95:11, 96:19, 104:1, 109:1, 118:22, 120:7, 121:11, 133:2, 135:6, 138:10, 142:3, 142:11, 142:13, 142:16, 142:21, 145:8, 146:17, 146:18, 149:8
**ones** [1] - 86:16
**open** [4] - 57:7, 80:9, 95:5, 154:5
**opened** [3] - 25:24, 26:8, 113:2
**opening** [2] - 67:19, 92:9
**operate** [1] - 92:21
**operating** [2] - 61:8, 61:9
**operational** [2] - 20:9, 92:10
**opinion** [8] - 13:1, 15:6, 15:16, 114:8, 139:11, 150:10, 150:11
**opportunity** [4] - 3:18, 4:20, 72:22, 97:6
**opposed** [2] - 61:15, 86:20
**opposition** [1] - 5:3
**optical** [1] - 55:25
**option** [5] - 132:2, 132:14, 144:8, 144:16, 152:5
**order** [6] - 82:23, 96:8, 110:2, 116:24, 121:25, 122:5
**ordering** [2] - 34:4,

36:20
**ordinary** [1] - 22:10
**organization** [1] - 30:17
**organize** [1] - 88:23
**organized** [8] - 7:22, 7:23, 8:7, 16:1, 76:22, 77:19, 78:17, 82:2
**organizes** [1] - 89:2
**origin** [2] - 34:2, 130:10
**original** [4] - 9:11, 68:21, 72:13, 149:7
**originally** [3] - 42:22, 44:25, 70:5
**originated** [3] - 28:22, 80:7, 125:14
**otherwise** [1] - 140:25
**outbound** [1] - 97:22
**outlined** [1] - 94:12
**outside** [3] - 25:8, 64:11, 131:22
**oven** [2] - 94:21, 94:22
**ovens** [1] - 94:4
**overall** [6] - 76:21, 133:7, 146:9, 147:10, 147:11, 152:9
**overhead** [1] - 137:20
**overlay** [5] - 145:9, 147:6, 147:22, 148:6, 148:7
**overlooked** [1] - 141:20
**overrule** [1] - 106:7
**overruled** [2] - 122:3, 153:13
**oversee** [6] - 5:24, 6:4, 8:16, 10:4, 10:6, 92:20
**oversees** [1] - 17:12
**overt** [17] - 88:8, 88:11, 88:13, 88:25, 89:17, 89:20, 98:1, 100:6, 118:22, 119:4, 119:20, 121:1, 124:9, 124:10
**overview** [4] - 79:22, 92:7, 92:17, 92:18
**own** [2] - 18:16, 93:21
**owned** [2] - 26:19, 26:25
**owns** [2] - 24:15, 35:7

**P**

**P.A** [12] - 24:21, 35:11, 35:24, 38:11, 38:15, 38:20, 38:23, 39:4,

39:10, 79:17, 110:10, 124:19
**p.m** [1] - 103:7
**P.N.C** [7] - 87:22, 124:11, 124:16, 124:19, 125:4, 125:5, 125:18
**PA** [3] - 1:16, 1:25, 155:19
**paces** [1] - 3:21
**package** [1] - 103:2
**packing** [1] - 11:3
**page** [45] - 11:3, 14:12, 14:18, 18:3, 24:22, 27:7, 27:12, 28:9, 29:20, 30:10, 32:15, 33:2, 34:23, 35:22, 37:2, 37:12, 37:14, 51:17, 91:14, 91:15, 92:3, 92:12, 92:16, 92:25, 93:4, 93:8, 93:19, 93:23, 94:6, 94:14, 95:13, 95:23, 96:1, 96:2, 97:10, 108:4, 111:13, 111:25, 112:21, 120:16, 124:20, 126:6
**paid** [2] - 107:10, 110:18
**paper** [7] - 9:16, 19:7, 19:9, 19:11, 21:25, 22:7, 121:11
**paperwork** [1] - 25:16
**paragraph** [2] - 94:7, 94:23
**pardon** [4] - 19:15, 138:2, 141:16, 151:6
**paren** [2] - 137:24, 137:25
**parents'** [4] - 69:25, 70:24, 84:12, 87:9
**parse** [2] - 32:25, 60:1
**parsed** [1] - 54:19
**part** [47] - 14:15, 15:11, 15:12, 24:22, 43:1, 45:19, 70:15, 78:20, 79:9, 79:14, 83:9, 83:12, 84:20, 86:1, 86:6, 87:5, 88:20, 91:12, 91:19, 92:4, 93:20, 95:18, 95:19, 97:3, 97:8, 97:14, 99:20, 101:25, 104:9, 107:2, 107:17, 109:1, 113:10, 114:22, 116:5, 116:10, 116:15, 116:16, 117:5,

118:3, 118:10, 118:13, 122:7, 126:23, 132:4, 139:2
**Part** [1] - 15:3
**participated** [2] - 69:22, 69:24
**participation** [1] - 70:3
**particular** [37] - 9:3, 12:16, 12:19, 12:24, 15:16, 25:3, 25:4, 25:16, 25:22, 27:14, 36:4, 36:20, 37:10, 37:13, 37:22, 39:19, 39:22, 48:5, 48:11, 70:3, 74:7, 78:13, 86:16, 86:23, 90:21, 91:3, 93:7, 104:7, 114:10, 116:14, 120:6, 125:6, 131:25, 137:16, 144:3, 144:5, 152:15
**particulars** [1] - 37:22
**parties** [2] - 16:5, 153:22
**partner** [2] - 84:2, 129:24
**partners** [1] - 128:11
**parts** [11] - 67:14, 101:1, 101:17, 109:10, 116:2, 117:23, 117:25, 118:6, 118:16, 119:18, 123:18
**passed** [1] - 137:20
**passenger** [1] - 97:18
**passes** [1] - 144:25
**past** [4] - 16:8, 16:9, 132:3, 143:13
**PATRICK** [1] - 1:20
**pay** [1] - 39:24
**payment** [10] - 39:23, 40:1, 40:4, 104:16, 112:13, 112:16, 112:17, 113:10, 113:13
**pending** [1] - 130:18
**Pennsylvania** [15] - 26:5, 26:11, 26:20, 39:18, 78:16, 84:11, 84:13, 99:19, 108:25, 109:9, 111:4, 111:16, 113:1, 155:5, 155:18
**PENNSYLVANIA** [2] - 1:1, 1:19
**people** [9] - 6:9, 9:8, 9:21, 10:4, 10:6, 61:21, 69:16, 82:6
**per** [1] - 94:18

17

**percent** [1] - 146:6
**perform** [2] - 10:4, 10:6
**performed** [1] - 10:1
**perhaps** [5] - 4:10, 4:25, 120:23, 135:22, 149:22
**period** [3] - 144:6, 144:8, 151:3
**permissible** [1] - 80:2
**permission** [5] - 23:24, 52:23, 98:8, 99:7, 127:15
**permissions** [1] - 95:22
**permits** [2] - 95:2, 96:6
**person** [10] - 6:6, 17:16, 29:10, 30:17, 39:7, 53:15, 70:7, 70:9, 80:9, 109:14
**personal** [3] - 46:22, 56:21, 67:7
**personally** [2] - 14:13, 16:11
**personnel** [11] - 91:25, 92:19, 92:21, 93:9, 93:10, 93:11, 93:13, 93:14, 93:16, 96:9, 96:13
**persons** [1] - 136:4
**Philadelphia** [4] - 26:7, 77:23, 78:1, 86:9
**phone** [12] - 54:4, 54:9, 54:18, 54:19, 56:13, 59:19, 61:25, 62:14, 66:3, 83:7, 86:20, 112:7
**phones** [12] - 44:1, 54:21, 55:9, 55:11, 56:15, 57:15, 58:20, 64:17, 66:4, 70:10, 70:12, 85:13
**photo** [25] - 61:14, 117:10, 117:13, 133:11, 134:3, 135:17, 135:20, 142:20, 144:19, 145:8, 145:9, 145:13, 145:21, 145:24, 146:14, 146:18, 146:21, 146:24, 147:1, 147:6, 149:8, 149:9, 151:9
**photograph** [10] - 61:25, 137:6, 137:15, 137:21, 141:11, 144:2,

148:23, 148:24, 149:12, 149:13
**photographic** [1] - 62:9
**photographs** [7] - 138:5, 138:23, 138:25, 139:19, 147:23, 148:13, 150:20
**photos** [16] - 56:21, 114:3, 134:2, 143:8, 143:12, 144:23, 144:24, 145:2, 145:5, 145:6, 145:7, 145:15, 146:19, 148:3
**phrase** [1] - 76:21
**physical** [2] - 69:24, 87:9
**physically** [1] - 129:25
**pick** [1] - 146:15
**picture** [5] - 61:14, 62:5, 62:8, 62:9, 62:13
**pictures** [1] - 134:24
**piece** [7] - 27:4, 53:14, 53:19, 68:22, 72:23, 82:3, 121:11
**pieces** [3] - 72:10, 108:10, 108:15
**pin** [11] - 100:17, 101:14, 104:19, 107:14, 108:9, 108:17, 108:21, 109:5, 118:14, 118:19
**pins** [6] - 101:14, 104:19, 108:16, 109:6, 109:20, 118:19
**piston** [1] - 118:14
**PITTSTON** [1] - 1:25
**PLACE** [1] - 1:9
**place** [8] - 26:13, 31:2, 40:7, 40:12, 56:19, 62:16, 109:4, 133:25
**placed** [5] - 86:21, 137:5, 137:7, 137:23, 138:25
**placements** [1] - 152:17
**places** [1] - 96:13
**placing** [1] - 54:11
**plan** [2] - 65:12, 66:2
**plant** [4] - 96:3, 96:7, 96:20, 109:9
**plants** [1] - 96:24
**plastic** [2] - 93:13, 100:3
**platform** [2] - 92:17,

92:20
**play** [2] - 151:21, 153:8
**played** [1] - 115:19
**playing** [1] - 134:23
**pleases** [1] - 47:19
**plot** [1] - 141:14
**plus** [1] - 69:9
**point** [13] - 4:13, 19:10, 33:12, 54:4, 59:4, 66:8, 70:9, 75:5, 81:11, 85:5, 106:6, 131:1, 152:19
**pointed** [1] - 49:2
**points** [1] - 141:14
**Polad** [1] - 115:11
**police** [1] - 64:2
**Police** [1] - 64:3
**policies** [1] - 126:16
**policy** [6] - 5:24, 6:13, 8:14, 14:5, 14:19, 14:20
**political** [1] - 20:21
**pool** [2] - 93:18, 96:7
**pop** [2] - 10:24, 69:7
**portion** [5] - 55:8, 65:20, 95:3, 116:13, 147:18
**portions** [1] - 140:3
**position** [4] - 20:8, 20:14, 44:21, 65:15
**positions** [2] - 20:15, 93:16
**possession** [3] - 52:21, 85:14
**possibility** [1] - 4:11
**possible** [6] - 19:7, 39:6, 44:4, 53:10, 62:19, 117:14
**possibly** [1] - 4:15
**posted** [2] - 25:2, 124:21
**potential** [3] - 44:3, 93:18, 131:19
**potentially** [1] - 62:6
**power** [1] - 70:12
**powered** [2] - 54:13, 54:18
**powerful** [1] - 137:19
**Practice** [1] - 138:18
**practices** [1] - 16:9
**precision** [2] - 95:11, 95:12
**preferred** [1] - 93:10
**premarked** [2] - 58:15, 74:5
**premises** [1] - 83:6
**preparation** [1] - 99:20
**prepared** [6] - 10:1,

17:16, 22:9, 45:16, 75:7, 155:11
**preparing** [2] - 21:11, 25:21
**present** [8] - 75:9, 87:14, 88:24, 97:15, 129:25, 130:7, 132:16, 151:25
**presented** [1] - 75:22
**presenting** [1] - 74:7
**presently** [1] - 4:16
**pressure** [2] - 123:9, 123:17
**pretty** [1] - 83:13
**prevent** [1] - 54:4
**prevents** [1] - 53:14
**previewing** [1] - 70:11
**previous** [2] - 53:21, 89:5
**previously** [6] - 38:24, 100:5, 101:7, 110:5, 117:3, 124:13
**price** [1] - 110:20
**principals** [1] - 137:3
**principle** [1] - 138:22
**print** [6] - 13:22, 13:24, 90:11, 102:13, 145:25, 148:9
**print-out** [2] - 13:22, 13:24
**prints** [1] - 148:3
**private** [3] - 42:9, 42:15, 56:25
**Pro** [11] - 85:13, 131:24, 132:9, 132:10, 143:10, 143:11, 144:8, 144:17, 145:25, 149:16, 152:5
**probable** [3] - 47:15, 50:5, 83:4
**problem** [5] - 4:7, 46:10, 49:20, 139:18, 150:9
**problematic** [1] - 50:1
**Procedure** [1] - 138:18
**procedure** [2] - 9:14, 152:7
**proceed** [6] - 4:24, 5:3, 74:15, 76:3, 131:7, 151:5
**proceeding** [1] - 56:24
**proceedings** [2] - 44:5, 155:8
**PROCEEDINGS** [1] - 1:10
**process** [19] - 8:19, 10:11, 10:15, 11:11,

13:25, 21:7, 54:23, 60:19, 71:12, 78:20, 81:2, 81:22, 83:1, 86:12, 86:24, 124:1, 134:15, 135:24, 148:2
**processes** [1] - 6:18
**procure** [1] - 94:11
**procured** [1] - 101:5
**procurement** [3] - 92:24, 94:23, 94:25
**procuring** [4] - 92:22, 92:23, 94:7, 94:8
**produce** [3] - 13:24, 21:24, 134:19
**produced** [6] - 21:12, 21:25, 22:16, 23:2, 23:16, 137:17
**produces** [3] - 134:16, 137:9, 150:16
**producing** [1] - 17:20
**product** [2] - 101:3, 137:14
**production** [6] - 8:12, 12:5, 12:8, 92:21, 92:22, 94:18
**professional** [1] - 132:8
**professor** [3] - 41:11, 41:13, 42:5
**proffered** [1] - 74:3
**program** [18] - 42:7, 44:25, 61:19, 71:20, 72:8, 92:6, 134:19, 134:23, 138:16, 139:2, 141:9, 141:11, 143:9, 144:16, 145:19, 145:25, 146:4, 152:6
**program's** [2] - 138:19, 139:5
**programmer** [2] - 134:18, 138:15
**progressed** [2] - 127:23, 127:24
**progression** [2] - 147:10, 152:21
**prohibited** [1] - 126:17
**project** [9] - 92:8, 93:20, 93:25, 96:9, 99:14, 106:17, 111:21, 113:8, 116:19
**projection** [1] - 147:11
**proliferation** [1] - 78:1
**proliferations** [1] - 78:3
**prompt** [1] - 128:7
**proper** [3] - 96:13,

18

97:1, 97:2
**property** [1] - 48:11
**proponent** [1] - 134:12
**proposal** [1] - 91:23
**proposing** [1] - 151:17
**proprietary** [1] - 95:5
**protect** [1] - 60:6
**proven** [2] - 138:11, 145:4
**provide** [6] - 9:12, 9:20, 23:14, 42:16, 79:22, 80:18
**provided** [9] - 14:22, 49:15, 53:6, 71:25, 74:5, 85:7, 95:2, 120:19, 122:2
**provider** [2] - 82:5, 82:16
**provides** [1] - 92:7
**providing** [2] - 64:14, 64:15
**provisions** [1] - 155:5
**proviso** [1] - 150:17
**psychology** [3] - 44:15, 44:17, 44:19
**public** [1] - 58:4
**publish** [10] - 23:24, 47:20, 90:17, 92:25, 99:7, 102:22, 106:19, 111:11, 115:7, 127:15
**pull** [1] - 20:13
**pulled** [1] - 11:9
**purchase** [1] - 107:14
**purchased** [2] - 104:18, 114:4
**purpose** [1] - 50:10
**purposes** [7] - 23:15, 45:10, 58:16, 73:5, 74:11, 139:4, 144:4
**pursuant** [2] - 129:5, 155:5
**pushed** [1] - 11:9
**put** [17] - 14:5, 26:13, 29:11, 43:17, 49:7, 54:10, 68:11, 69:15, 69:16, 86:16, 122:10, 134:13, 138:11, 138:13, 140:25, 141:3, 143:16
**putting** [5] - 57:6, 68:9, 72:11, 134:24, 149:24

## Q

**Q)63** [1] - 2:7

**Qaiwan** [1] - 117:20
**QUALIFICATIONS** [3] - 5:11, 41:6, 63:15
**qualified** [2] - 46:7, 66:20
**quarter** [1] - 132:6
**questioning** [2] - 89:13, 139:23
**questions** [11] - 6:10, 9:22, 18:19, 40:17, 40:21, 62:20, 74:16, 74:18, 93:4, 141:21, 143:22
**quick** [2] - 3:25, 137:1
**quickly** [6] - 3:16, 3:24, 33:19, 59:23, 110:24, 152:16
**quit** [1] - 5:2
**quite** [2] - 94:16, 139:4
**quote** [5] - 137:8, 137:15, 137:23, 138:18, 138:21
**quoting** [1] - 138:17

## R

**R-a-v-i** [1] - 121:22
**R.H** [1] - 11:4
**R.W** [1] - 83:19
**radio** [2] - 54:1, 54:14
**rainy** [1] - 69:5
**raise** [1] - 74:10
**range** [7] - 39:19, 41:18, 44:8, 132:10, 149:23, 150:6, 152:13
**ranges** [1] - 132:1
**rapidly** [1] - 3:6
**rather** [7] - 23:13, 38:7, 61:19, 121:1, 122:5, 130:12, 153:25
**Rauno** [10] - 103:19, 103:23, 104:1, 105:4, 106:23, 107:4, 107:7, 107:8, 107:9, 128:23
**Ravi** [11] - 119:18, 120:18, 121:16, 121:20, 121:23, 123:2, 123:4, 123:19, 123:20, 123:24
**Ravi's** [1] - 122:2
**re** [1] - 15:13
**re-export** [1] - 15:13
**reach** [3] - 4:15, 54:3, 139:16
**read** [26] - 11:3, 14:20,

15:9, 19:3, 32:22, 40:2, 52:10, 68:23, 81:6, 88:19, 88:20, 90:24, 92:4, 92:19, 93:8, 94:6, 94:24, 96:1, 96:2, 97:3, 108:5, 108:11, 108:13, 115:25, 118:3, 122:18
**reading** [3] - 92:15, 123:8, 137:1
**reads** [1] - 90:25
**ready** [1] - 13:17
**really** [8] - 48:7, 50:6, 64:21, 67:18, 89:2, 114:9, 129:19, 136:8
**reamers** [1] - 95:12
**reason** [1] - 12:21
**reasons** [4] - 9:17, 12:17, 12:18, 15:5
**receipt** [2] - 86:9, 101:11
**receive** [4] - 44:21, 65:14, 77:21, 96:20
**received** [14] - 20:25, 68:19, 78:12, 97:2, 101:20, 102:2, 103:4, 105:7, 127:24, 129:5, 131:11, 131:16, 131:17, 132:22
**receiver** [5] - 116:1, 116:10, 117:22, 118:4, 118:6
**receiving** [2] - 113:7, 130:13
**recent** [2] - 132:16, 144:21
**recess** [4] - 50:23, 75:23, 124:7, 136:22
**recognize** [16] - 13:19, 17:8, 45:10, 45:24, 55:5, 55:22, 58:16, 66:16, 70:22, 90:3, 102:10, 104:23, 109:24, 114:18, 125:2, 125:23
**recollection** [6] - 50:9, 91:8, 98:3, 98:6, 100:7, 119:7
**recommend** [1] - 149:21
**recommendation** [2] - 3:14, 93:7
**recommendations** [10] - 93:9, 93:19, 93:23, 94:1, 94:17, 94:19, 94:20, 95:10, 95:11, 96:19
**reconvene** [1] -

153:15
**record** [22] - 15:23, 16:2, 16:9, 16:19, 18:11, 19:4, 23:2, 23:16, 28:21, 29:7, 31:1, 57:11, 62:7, 106:1, 106:3, 106:14, 106:16, 122:7, 122:11, 124:16, 151:6, 152:10
**recording** [2] - 151:10, 152:20
**recordings** [1] - 126:24
**records** [18] - 14:16, 15:19, 16:3, 18:13, 19:5, 19:7, 21:12, 21:15, 21:23, 22:5, 22:8, 22:16, 82:5, 87:3, 101:16, 102:4, 106:9
**recovered** [2] - 114:22, 125:24
**recovering** [1] - 44:3
**recovery** [1] - 45:1
**recreate** [1] - 149:4
**RECROSS** [1] - 2:3
**redacted** [3] - 47:14, 48:25, 143:1
**redaction** [1] - 49:1
**REDIRECT** [1] - 2:3
**reduce** [1] - 69:18
**reentered** [1] - 84:3
**reentry** [1] - 48:6
**refer** [2] - 6:8, 60:10
**reference** [5] - 50:12, 89:8, 89:10, 124:25, 131:8
**referenced** [1] - 120:25
**references** [1] - 100:2
**referencing** [2] - 88:21, 126:10
**referred** [3] - 7:15, 62:3, 148:6
**reflects** [1] - 135:9
**refresh** [3] - 50:9, 98:3, 119:6
**refreshed** [2] - 98:12, 119:1
**refreshing** [1] - 98:5
**regard** [1] - 119:17
**regarding** [6] - 6:21, 89:22, 102:14, 103:20, 150:25, 153:22
**regards** [21] - 3:6, 20:25, 29:5, 32:20, 33:3, 37:13, 37:20,

50:25, 88:24, 93:24, 95:17, 106:11, 107:7, 107:11, 107:13, 108:1, 113:7, 118:9, 122:6, 123:19, 153:5
**regime** [2] - 6:1, 8:1
**region** [4] - 117:19, 133:8, 133:10, 147:12
**regional** [4] - 12:20, 13:5, 15:4, 96:5
**regular** [1] - 21:15
**regularity** [1] - 61:7
**regulations** [1] - 15:12
**Regulations** [2] - 96:10, 126:11
**rehash** [3] - 71:20, 71:21, 72:15
**relate** [1] - 69:6
**related** [13] - 5:24, 6:14, 43:7, 46:13, 61:24, 66:25, 72:10, 82:20, 87:18, 100:2, 110:7, 111:21, 113:7
**relating** [1] - 53:6
**relation** [2] - 100:8, 147:11
**relatively** [1] - 93:16
**release** [1] - 19:23
**released** [6] - 19:25, 40:23, 63:3, 74:22, 74:23, 74:25
**relevant** [10] - 54:22, 72:1, 72:2, 72:4, 73:12, 73:13, 73:14, 132:5, 144:6, 144:9
**reliability** [4] - 138:20, 139:3, 139:5, 148:18
**reliable** [2] - 134:13, 138:12
**relies** [2] - 134:19, 138:16
**reload** [1] - 118:15
**remaining** [1] - 3:10
**remains** [1] - 147:14
**remember** [4] - 64:21, 70:6, 143:13, 154:4
**remembering** [1] - 152:7
**remind** [1] - 110:15
**remotely** [1] - 9:9
**removed** [2] - 54:10, 54:13
**rendering** [2] - 6:11, 8:25
**repair** [1] - 65:9
**repeatedly** [1] - 60:18
**repeating** [1] - 154:3
**reply** [4] - 107:8,

19

123:20, 123:21, 123:24
**report** [23] - 55:8, 55:9, 72:3, 72:11, 73:12, 73:14, 74:11, 80:23, 89:23, 91:1, 91:9, 91:12, 91:16, 91:18, 92:7, 92:9, 92:12, 94:15, 95:3, 99:25, 120:7, 120:16, 121:1
**REPORTED** [1] - 155:16
**reporter** [2] - 41:23, 155:22
**Reporter** [3] - 155:3, 155:15, 155:17
**REPORTER'S** [1] - 155:1
**reports** [12] - 59:13, 59:19, 64:14, 73:11, 73:19, 73:20, 73:23, 73:24, 74:3, 74:7, 81:6, 86:21
**represent** [1] - 20:11
**representation** [3] - 144:3, 144:5, 147:9
**representative** [1] - 145:17
**representing** [2] - 6:19, 102:13
**reproduced** [2] - 60:13
**reproduction** [1] - 155:21
**request** [11] - 9:13, 13:23, 14:22, 18:8, 82:3, 86:10, 123:22, 128:11, 128:15, 129:6, 130:17
**requested** [6] - 21:10, 22:6, 34:10, 83:17, 83:24, 84:9
**requesting** [1] - 128:12
**require** [4] - 95:1, 96:11, 96:16, 96:18
**required** [15] - 6:13, 9:3, 13:2, 13:10, 14:4, 15:11, 15:16, 80:15, 92:2, 95:6, 96:7, 103:3, 113:22, 116:24, 134:11
**research** [3] - 20:13, 41:18, 80:10
**resembles** [1] - 132:21
**reserve** [1] - 136:10
**residence** [13] - 39:4, 69:25, 70:23, 71:10,

83:7, 84:10, 84:11, 84:12, 84:25, 87:16, 108:24, 109:6, 109:7
**residences** [4] - 80:13, 84:21, 85:18, 86:25
**resizes** [1] - 11:11
**resolution** [2] - 137:18, 151:9
**resolve** [1] - 149:19
**respect** [1] - 152:1
**response** [2] - 122:2, 122:3
**responsibilities** [2] - 6:3, 77:2
**responsibility** [2] - 64:11, 77:5
**responsible** [2] - 43:24, 64:10
**resting** [2] - 3:22, 3:23
**restrict** [1] - 89:17
**restricted** [1] - 95:21
**restrictions** [1] - 94:16
**result** [12] - 13:25, 49:19, 60:17, 68:19, 71:1, 116:23, 128:4, 130:13, 134:16, 137:19, 141:10, 153:24
**resulted** [1] - 140:12
**results** [6] - 17:1, 60:12, 68:5, 69:7, 137:12
**retainer** [2] - 100:18, 108:10
**retainers** [3] - 107:14, 108:17, 108:21
**retaining** [4] - 101:14, 104:19, 109:6, 118:19
**retire** [1] - 65:13
**retired** [2] - 42:21, 67:10
**return** [1] - 75:20
**returned** [1] - 97:19
**reverse** [1] - 95:8
**review** [25] - 6:8, 10:8, 21:12, 44:4, 47:2, 59:6, 59:17, 59:22, 64:13, 67:13, 67:16, 72:5, 82:18, 82:22, 91:12, 97:17, 98:17, 107:17, 114:23, 115:25, 116:1, 117:15, 120:9, 125:25, 126:24
**reviewed** [8] - 10:2, 55:25, 59:14, 59:21, 91:19, 106:12, 109:13, 127:3

**reviewing** [3] - 59:15, 60:20, 98:4
**reviews** [1] - 91:10
**rifle** [10] - 95:14, 95:20, 114:2, 116:5, 116:10, 116:17, 118:13, 118:15, 118:18
**rifles** [1] - 114:3
**rifling** [11] - 11:7, 11:8, 11:10, 11:13, 11:18, 12:6, 14:23, 15:17, 95:14, 113:22, 116:23
**right-hand** [4] - 140:9, 140:21, 141:6, 141:12
**ring** [6] - 21:18, 100:17, 104:20, 108:15, 114:15, 119:23
**rings** [12] - 100:16, 101:13, 104:18, 104:19, 107:14, 108:16, 108:17, 108:20, 109:4, 109:5, 109:17, 118:19
**ripe** [1] - 53:13
**risk** [2] - 20:18, 154:3
**RMR** [3] - 155:3, 155:14, 155:17
**RMR,CRR** [1] - 155:14
**Road** [1] - 110:10
**road** [4] - 142:7, 142:17, 142:18, 150:18
**Rob** [1] - 115:17
**ROBERT** [1] - 1:8
**Rochester** [1] - 44:16
**Rod** [1] - 11:5
**Roger** [2] - 101:4, 101:15
**ROGGIO** [1] - 1:7
**Roggio** [106] - 16:17, 16:24, 21:11, 24:19, 27:10, 28:8, 29:18, 31:14, 33:10, 34:15, 34:24, 35:4, 35:11, 35:18, 35:23, 36:1, 36:15, 36:17, 36:24, 37:4, 37:18, 38:1, 38:5, 38:10, 38:12, 38:15, 38:17, 38:20, 38:23, 39:1, 39:3, 39:10, 39:17, 40:6, 46:14, 51:23, 56:23, 66:25, 67:25, 68:2, 68:3, 73:10, 73:23, 78:22, 83:18, 83:19,

84:2, 84:23, 85:14, 85:15, 87:24, 88:4, 90:9, 90:10, 91:2, 91:4, 91:16, 97:15, 97:19, 97:23, 99:12, 99:18, 100:15, 100:21, 101:2, 101:6, 103:12, 103:19, 104:4, 104:12, 104:14, 105:4, 105:23, 106:1, 106:6, 106:14, 106:16, 108:1, 108:18, 108:21, 109:10, 109:13, 110:10, 111:3, 111:15, 111:20, 112:25, 113:2, 113:13, 113:22, 114:25, 115:10, 116:24, 119:18, 120:8, 120:25, 121:15, 123:1, 123:4, 123:20, 124:17, 125:19, 128:13
**Roggio's** [14] - 30:18, 39:20, 48:6, 69:25, 73:21, 84:10, 104:1, 108:23, 111:17, 122:1, 122:3, 124:11, 125:18, 125:25
**Roggio@Yahoo** [1] - 73:11
**role** [4] - 5:20, 46:22, 48:4, 67:7
**roles** [1] - 6:15
**Rolex** [1] - 87:16
**ROSS** [1] - 1:7
**Ross** [22] - 16:17, 21:11, 46:13, 66:25, 67:25, 90:9, 90:10, 90:11, 90:12, 97:15, 100:15, 100:21, 101:6, 103:12, 103:13, 103:19, 105:4, 115:10, 123:6, 123:8, 123:22, 123:25
**rotating** [1] - 94:21
**round** [3] - 11:15, 11:16, 92:18
**routes** [1] - 135:14
**rule** [2] - 139:11, 148:13
**run** [7] - 53:17, 54:17, 60:12, 62:18, 68:13, 69:4, 69:5
**Rutgers** [1] - 42:5

**S**

**Saar** [7] - 128:23, 128:25, 129:9, 130:1, 130:7, 130:14, 130:15
**safety** [1] - 85:3
**Saint** [1] - 42:6
**sake** [1] - 86:4
**Salam** [1] - 34:7
**Salazar** [2] - 20:1, 20:6
**SALAZAR** [2] - 2:5, 20:2
**sale** [6] - 101:11, 108:18, 110:2, 110:8, 110:18, 110:19
**sales** [3] - 103:13, 110:2, 126:18
**satellite** [5] - 78:10, 137:17, 137:20, 144:25
**satellites** [1] - 137:18
**satisfactory** [1] - 121:2
**save** [1] - 62:7
**saved** [4] - 61:10, 61:16, 148:8
**saw** [1] - 118:19
**scene** [1] - 137:15
**school** [1] - 20:22
**schools** [1] - 42:2
**science** [5] - 7:4, 20:21, 77:16, 77:18
**scientific** [2] - 139:13, 150:12
**scope** [1] - 106:5
**SCOTT** [1] - 1:17
**Scranton** [2] - 79:17, 155:19
**SCRANTON** [1] - 1:16
**screen** [12] - 10:25, 24:11, 39:14, 99:11, 100:11, 102:13, 107:3, 144:16, 145:24, 148:3, 152:11, 152:12
**scroll** [1] - 152:9
**scrolled** [1] - 152:7
**scrolling** [3] - 148:4, 152:11, 152:12
**search** [79] - 16:5, 17:1, 47:6, 47:12, 47:15, 48:8, 48:21, 48:23, 49:5, 49:17, 50:4, 50:13, 50:15, 51:1, 51:2, 51:6, 51:9, 51:13, 51:16, 52:1, 52:8, 52:23,

20

52:24, 59:23, 64:12, 64:13, 67:10, 67:22, 68:5, 68:19, 69:12, 69:20, 69:21, 69:24, 70:4, 70:23, 71:1, 73:9, 80:11, 80:16, 81:14, 81:17, 81:19, 81:23, 82:11, 82:18, 82:24, 83:2, 83:6, 83:8, 83:11, 83:13, 83:15, 83:17, 83:20, 83:24, 84:7, 84:10, 84:14, 84:18, 84:20, 84:22, 84:24, 85:5, 86:25, 87:12, 87:17, 91:5, 105:8, 109:2, 114:23, 131:23, 131:25, 132:5, 132:12

**searchable** [1] - 19:11
**searched** [10] - 16:13, 18:6, 19:17, 48:11, 51:20, 52:12, 71:1, 71:2, 109:1, 109:4
**searcher** [1] - 70:9
**searches** [5] - 72:6, 72:7, 72:12, 72:17, 95:20
**searching** [11] - 52:6, 52:16, 68:16, 70:5, 82:15, 82:20, 83:9, 86:19, 131:18, 131:21
**seated** [1] - 48:2
**Sebastian** [4] - 128:25, 129:9, 130:1, 130:7
**second** [12] - 14:12, 24:22, 27:12, 28:9, 29:20, 30:10, 83:24, 98:1, 111:25, 124:20, 126:15, 126:22
**secondary** [3] - 86:6, 86:7, 132:15
**seconds** [1] - 93:1
**section** [11] - 14:19, 24:23, 33:7, 39:22, 47:15, 92:13, 93:3, 93:7, 94:12, 95:23, 126:17
**Section** [2] - 138:18, 155:6
**SECTION** [1] - 1:18
**sector** [1] - 42:9
**security** [4] - 12:20, 13:5, 15:4, 41:20
**Security** [13] - 5:17, 14:23, 42:22, 42:25, 43:1, 43:2, 46:16,

63:22, 67:6, 76:9, 76:10, 76:20, 116:6
**see** [43] - 4:24, 16:11, 16:13, 16:17, 18:25, 24:13, 27:21, 30:22, 32:25, 34:18, 49:20, 50:3, 54:20, 57:7, 57:8, 59:10, 61:7, 61:8, 62:8, 62:12, 69:2, 69:16, 75:13, 88:14, 99:10, 100:2, 100:12, 102:4, 104:20, 110:6, 110:9, 112:20, 124:15, 124:23, 140:19, 140:22, 145:11, 146:2, 146:14, 147:17, 150:24, 154:7
**seeing** [2] - 8:25, 146:18
**seem** [2] - 48:7, 144:4
**seize** [2] - 44:1, 64:16
**seized** [19] - 45:1, 48:12, 48:19, 49:18, 50:10, 52:24, 54:9, 57:15, 60:21, 70:25, 71:2, 84:1, 85:17, 85:25, 87:10, 87:11, 87:17, 114:23, 126:25
**seizing** [1] - 83:9
**seizure** [2] - 87:13, 87:17
**select** [2] - 132:14, 144:17
**selected** [7] - 93:9, 93:10, 93:11, 93:13, 93:14, 96:9, 96:13
**selection** [1] - 89:6
**self** [2] - 95:11, 95:12
**sell** [2] - 101:1, 109:13
**semester** [1] - 41:22
**semi** [1] - 96:5
**semi-autonomous** [1] - 96:5
**semiautomatic** [2] - 11:15, 11:16
**send** [7] - 9:15, 9:16, 15:16, 16:12, 123:18, 123:25, 125:7
**sending** [4] - 29:10, 30:18, 39:8, 107:5
**sense** [2] - 26:22, 27:1
**sent** [9] - 15:24, 26:17, 34:21, 90:9, 97:12, 97:16, 103:5, 115:11, 125:19
**sentence** [2] - 14:20,

15:9
**separate** [2] - 107:3, 129:11
**separated** [1] - 33:13
**September** [6] - 27:9, 27:15, 27:17, 27:18, 115:10
**sequence** [1] - 133:6
**sequentially** [1] - 148:4
**serial** [1] - 96:22
**series** [1] - 150:5
**served** [6] - 6:17, 43:20, 46:24, 80:17, 84:15, 103:5
**server** [1] - 68:22
**servers** [1] - 64:17
**serves** [2] - 53:10, 53:12
**Service** [1] - 42:24
**services** [2] - 42:17, 70:4
**serving** [1] - 43:19
**set** [5] - 83:24, 147:7, 150:17, 152:8, 155:9
**settings** [3] - 62:9, 62:10, 117:12
**seven** [1] - 94:4
**several** [4] - 22:14, 84:9, 97:21, 146:19
**shall** [1] - 94:9
**sheet** [14] - 9:16, 91:15, 105:2, 105:3, 105:5, 106:12, 107:6, 107:9, 107:12, 107:18, 107:20, 107:21, 107:22, 122:15
**shipment** [2] - 101:16, 101:23
**shipped** [5] - 86:8, 101:6, 108:22, 108:23, 110:9
**Shippensburg** [1] - 77:22
**shipping** [4] - 94:17, 100:15, 100:18, 100:19
**short** [2] - 4:21, 20:21
**show** [30] - 10:23, 13:13, 17:6, 24:24, 32:5, 45:9, 58:15, 61:14, 73:4, 82:5, 83:4, 89:24, 100:9, 101:19, 102:4, 104:8, 107:24, 109:22, 117:13, 124:13, 125:1, 127:19, 130:22, 132:16, 133:12,

134:12, 138:12, 147:11, 147:24
**showed** [1] - 97:22
**showing** [7] - 55:21, 99:13, 102:9, 104:10, 133:6, 133:7, 147:10
**shown** [1] - 134:15
**shows** [4] - 25:16, 71:17, 126:25, 152:19
**side** [5] - 20:12, 33:25, 34:15, 125:13, 142:7
**sidebar** [8] - 56:19, 58:8, 58:11, 58:24, 75:2, 75:18, 133:25, 136:19
**Sidiropoulou** [3] - 51:24, 84:3, 85:15
**sign** [1] - 10:9
**signal** [3] - 26:17, 54:5, 54:6
**signature** [2] - 56:3, 103:3
**signed** [2] - 10:2, 103:4
**significant** [1] - 92:8
**significantly** [1] - 146:9
**signify** [1] - 28:2
**Siim** [7] - 128:23, 128:25, 129:9, 130:1, 130:7, 130:14, 130:15
**silently** [1] - 13:16
**similar** [4] - 24:25, 62:15, 83:1, 86:24
**simple** [1] - 9:14
**simplified** [1] - 61:3
**simply** [2] - 59:21, 89:12
**simultaneously** [1] - 85:3
**Sintering** [1] - 94:22
**sit** [1] - 86:22
**sitting** [2] - 86:20, 148:4
**situation** [2] - 19:6, 123:17
**six** [6] - 64:21, 88:12, 93:4, 93:19, 94:1, 94:4
**size** [2] - 11:13, 11:16
**skilled** [2] - 93:17, 96:7
**skills** [1] - 66:6
**skips** [1] - 119:25
**slide** [5] - 126:16, 144:18, 146:21, 146:24, 147:20

**slightly** [1] - 11:11
**slots** [1] - 30:21
**smaller** [1] - 147:18
**smart** [1] - 20:24
**SMITH** [2] - 2:7, 63:12
**Smith** [4] - 63:11, 63:17, 66:16, 66:24
**smoothly** [1] - 4:2
**snapshot** [2] - 86:15, 137:19
**software** [11] - 8:2, 8:12, 53:17, 54:15, 54:17, 61:14, 62:18, 68:23, 69:10, 69:15, 72:14
**sold** [4] - 100:20, 108:21, 109:17, 109:20
**Solutions** [2] - 39:5, 39:7
**someone** [1] - 138:12
**sometimes** [6] - 14:5, 61:14, 61:16, 68:11, 69:8, 69:10
**somewhat** [1] - 8:20
**somewhere** [1] - 44:8
**sorry** [20] - 12:9, 31:23, 34:9, 34:22, 37:25, 39:15, 39:25, 55:4, 63:21, 84:1, 90:10, 97:1, 116:11, 119:21, 121:4, 123:2, 124:1, 141:16, 147:21, 150:9
**sort** [1] - 60:10
**sought** [3] - 67:22, 83:21, 85:8
**source** [2] - 80:10, 101:2
**sourced** [1] - 101:4
**sources** [1] - 60:15
**speaking** [14] - 13:21, 18:4, 24:4, 24:23, 30:22, 50:25, 51:14, 52:12, 62:2, 64:8, 91:22, 107:20, 114:20, 116:9
**special** [20] - 42:23, 43:15, 44:21, 63:18, 64:6, 65:14, 65:18, 66:16, 66:24, 67:9, 76:8, 76:15, 76:17, 76:19, 77:25, 78:12, 78:13, 86:7, 86:11, 130:12
**specialist** [1] - 45:1
**specialization** [1] - 44:19
**specialized** [10] -

21

92:21, 92:23, 92:24, 94:7, 94:8, 94:23, 94:25, 96:16, 96:17, 139:13
**specific** [20] - 52:14, 65:24, 66:3, 67:20, 82:8, 89:1, 92:24, 93:3, 94:24, 94:25, 95:5, 113:17, 114:12, 120:8, 120:25, 133:11, 139:18, 145:13, 147:16, 147:17
**specifically** [19] - 46:2, 51:20, 52:15, 66:18, 82:3, 82:15, 95:22, 100:16, 118:18, 120:16, 126:10, 126:17, 132:6, 138:20, 144:14, 144:15, 147:2, 149:5, 149:15
**specification** [1] - 14:2
**specifications** [1] - 9:15
**specifics** [5] - 80:3, 87:19, 104:25, 114:20, 131:12
**spectrum** [1] - 77:4
**speed** [2] - 95:11, 95:12
**spell** [1] - 121:21
**spend** [1] - 93:1
**splits** [1] - 69:10
**Sports** [1] - 101:11
**spot** [2] - 137:10, 137:11
**spreadsheet** [4] - 98:18, 105:6, 113:15, 113:16
**spring** [1] - 3:19
**Spring** [2] - 84:11, 108:24
**St** [1] - 77:23
**stability** [3] - 12:20, 13:5, 15:4
**stage** [1] - 80:3
**stages** [1] - 67:17
**stamping** [1] - 94:4
**standards** [1] - 60:8
**standing** [2] - 58:2, 60:22
**start** [9] - 3:17, 14:12, 24:3, 33:15, 33:16, 56:8, 68:16, 69:5, 69:14
**started** [2] - 42:22, 152:9
**starting** [5] - 32:11,

55:2, 115:24, 124:4, 152:19
**starts** [3] - 14:20, 32:13, 144:21
**State** [1] - 96:12
**state** [5] - 17:14, 49:10, 78:9, 78:16, 149:15
**statement** [20] - 24:6, 24:7, 24:24, 27:7, 27:14, 39:16, 39:20, 48:8, 104:9, 105:24, 111:2, 112:3, 112:5, 112:24, 122:2, 124:17, 134:4, 149:25, 150:18
**statements** [5] - 25:20, 121:24, 122:1, 135:15, 140:13
**STATES** [3] - 1:1, 1:3, 1:15
**States** [22] - 1:13, 6:20, 21:11, 25:9, 26:23, 48:7, 64:2, 64:3, 84:3, 84:5, 88:5, 96:11, 96:12, 97:15, 97:18, 109:10, 128:1, 137:2, 155:4, 155:6, 155:18
**stating** [1] - 82:7
**station** [1] - 6:25
**stay** [2] - 66:1, 71:22
**staying** [2] - 84:12, 84:23
**stays** [1] - 68:25
**step** [8] - 19:21, 40:22, 47:25, 71:10, 74:21, 92:5, 136:23, 141:15
**stepfather** [1] - 111:17
**steps** [5] - 60:6, 68:18, 130:12, 130:24, 131:4
**Steven** [2] - 5:7, 10:14
**STEVEN** [2] - 2:4, 5:8
**still** [8] - 3:20, 3:25, 11:22, 49:24, 51:13, 71:19, 153:6
**stock** [3] - 94:21, 116:11, 116:12
**stop** [3] - 72:23, 116:3, 130:9
**stops** [1] - 62:10
**storage** [3] - 53:3, 53:9, 53:18
**stored** [1] - 53:8
**stores** [2] - 61:20, 149:17
**storing** [1] - 62:12

**story** [1] - 20:12
**Street** [1] - 25:25
**STREET** [1] - 1:24
**street** [1] - 130:21
**streets** [1] - 135:14
**Stroudsburg** [43] - 24:21, 25:24, 26:5, 26:10, 26:19, 26:25, 31:24, 33:10, 34:24, 35:4, 35:7, 35:11, 35:19, 35:23, 36:1, 36:15, 36:18, 36:24, 37:4, 38:2, 38:6, 38:11, 38:13, 38:15, 38:18, 38:20, 38:23, 39:1, 39:4, 39:10, 39:18, 40:8, 40:15, 70:1, 84:11, 84:13, 99:19, 108:24, 110:10, 111:4, 111:16, 113:1, 124:19
**study** [2] - 92:5, 92:7
**stuff** [3] - 34:18, 58:3, 87:5
**subject** [7] - 12:25, 51:1, 58:10, 58:23, 73:16, 103:13, 136:14
**submachine** [1] - 11:15
**submission** [1] - 135:17
**submissions** [1] - 50:4
**submit** [6] - 47:23, 49:4, 49:8, 80:22, 82:16, 134:20
**submitted** [4] - 82:11, 82:23, 88:19, 107:7
**submitting** [1] - 139:11
**subsequent** [1] - 123:2
**successful** [2] - 114:2, 132:21
**sufficient** [1] - 75:21
**suggest** [2] - 135:19, 139:8
**suggesting** [1] - 149:3
**suggestion** [1] - 149:19
**SUITE** [1] - 1:16
**Sulaymaniyah** [11] - 34:12, 36:10, 36:12, 36:13, 104:5, 117:19, 131:22, 133:7, 133:9, 147:7, 147:11
**summarize** [2] -

48:18, 92:15
**superseding** [8] - 78:25, 88:3, 88:9, 89:21, 97:25, 98:5, 118:22, 119:10
**supervision** [2] - 155:11, 155:22
**Supplement** [1] - 15:3
**suppliers** [1] - 5:25
**supplies** [3] - 101:2, 108:8, 108:14
**supply** [2] - 108:9, 108:14
**support** [3] - 50:5, 66:9, 80:10
**suppressor** [1] - 118:8
**surrounding** [1] - 104:5
**suspect** [2] - 5:1, 151:11
**sustained** [2] - 130:5, 139:1
**swiped** [1] - 32:5
**Swiss** [2] - 93:11, 94:2
**switched** [1] - 70:8
**sworn** [5] - 5:9, 20:3, 41:3, 63:12, 76:1
**system** [16] - 16:19, 19:4, 19:12, 26:4, 61:6, 61:9, 61:10, 61:18, 61:22, 86:22, 94:10, 96:22, 134:15, 137:7, 137:14
**systems** [2] - 18:12, 32:21

## T

**tab** [1] - 17:8
**tablet** [2] - 53:25, 85:15
**tablets** [1] - 44:1
**tack** [4] - 137:9, 137:12, 137:23, 140:24
**tacks** [9] - 137:5, 137:13, 138:5, 138:25, 139:7, 140:10, 140:12, 140:15
**TACKS** [1] - 137:5
**Tactical** [1] - 101:12
**Taiwan** [1] - 35:14
**Talabani** [1] - 115:11
**talks** [1] - 134:9
**Tallinn** [1] - 128:9
**Tampa** [1] - 66:12
**target** [3] - 82:6, 82:7, 82:17

**tat** [1] - 61:8
**taught** [3] - 42:2, 42:5, 45:21
**teach** [4] - 41:16, 41:17, 60:9
**teaches** [1] - 65:20
**team** [8] - 59:6, 79:24, 83:1, 84:8, 84:17, 84:20, 84:22, 85:2
**technical** [8] - 6:11, 8:25, 78:19, 92:9, 92:13, 92:18, 139:13, 150:13
**technician** [1] - 134:18
**technique** [1] - 103:1
**techniques** [1] - 79:23
**technologies** [1] - 7:17
**technology** [8] - 5:15, 5:21, 5:23, 6:1, 8:2, 8:13, 78:7, 78:10
**telephones** [3] - 52:24, 53:25, 59:13
**telephonic** [1] - 80:9
**teller** [1] - 32:4
**Temple** [2] - 41:12, 41:16
**ten** [5] - 4:5, 7:23, 78:15, 136:18, 136:21
**tends** [1] - 12:5
**term** [2] - 20:21, 60:25
**terminology** [1] - 20:10
**terms** [4] - 11:20, 20:11, 110:18, 110:19
**terrorism** [2] - 41:19, 77:20
**test** [4] - 54:2, 54:14, 116:1, 116:25
**testified** [16] - 5:9, 10:10, 20:3, 32:19, 41:4, 44:12, 63:13, 69:21, 76:2, 84:21, 88:2, 90:20, 105:13, 117:21, 132:19, 144:7
**testify** [10] - 21:10, 47:21, 50:16, 57:21, 105:15, 122:6, 126:23, 130:16, 136:2, 153:10
**testifying** [7] - 72:22, 99:1, 115:17, 130:15, 135:7, 136:3, 139:12
**testimony** [29] - 3:12, 4:1, 4:18, 21:12,

22

45:19, 48:13, 49:11, 64:14, 66:7, 68:4, 80:3, 82:21, 85:6, 85:20, 85:23, 89:2, 95:16, 100:23, 101:15, 114:10, 115:19, 130:18, 136:9, 138:15, 139:12, 152:1, 152:13, 153:14, 153:23
**tests** [1] - 68:13
**text** [3] - 14:19, 14:20, 18:2
**THE** [181] - 1:1, 1:1, 1:8, 3:1, 3:3, 4:3, 4:14, 4:24, 5:5, 10:18, 14:10, 17:25, 18:20, 18:22, 19:19, 19:21, 19:25, 22:22, 23:7, 23:9, 23:11, 23:21, 23:23, 24:1, 40:20, 40:22, 40:24, 45:7, 45:22, 46:4, 46:7, 46:10, 47:18, 47:24, 48:1, 48:2, 48:22, 49:9, 49:20, 50:3, 50:12, 50:18, 50:20, 50:22, 55:15, 55:19, 56:18, 57:12, 57:17, 57:23, 58:13, 59:1, 62:22, 62:23, 62:25, 63:1, 63:5, 63:6, 63:9, 66:20, 71:7, 73:2, 74:1, 74:13, 74:15, 74:19, 74:20, 74:21, 74:23, 74:25, 75:1, 75:9, 75:11, 75:14, 75:17, 75:19, 75:24, 76:4, 80:2, 80:6, 89:4, 90:5, 90:16, 90:18, 98:10, 98:24, 99:6, 99:8, 102:7, 102:19, 102:21, 102:23, 105:17, 105:21, 106:4, 106:18, 106:20, 111:8, 111:10, 114:9, 115:4, 115:6, 119:12, 119:13, 120:2, 120:14, 120:22, 121:3, 121:5, 121:7, 121:9, 121:14, 121:21, 121:23, 122:8, 122:25, 123:15, 123:16, 124:5, 126:4, 127:11, 127:13, 127:17, 129:17, 130:5,

130:6, 131:7, 133:3, 133:24, 135:1, 135:11, 135:18, 136:4, 136:16, 136:20, 136:23, 136:25, 137:1, 139:16, 139:22, 140:17, 140:20, 140:21, 140:23, 140:24, 141:1, 141:2, 141:4, 141:5, 141:8, 141:9, 141:13, 141:15, 141:20, 141:24, 143:25, 144:10, 147:5, 147:6, 148:11, 148:20, 148:22, 149:1, 149:2, 149:4, 149:12, 149:15, 149:20, 150:1, 150:4, 150:7, 150:14, 151:2, 151:5, 151:16, 151:23, 151:25, 153:11, 153:13, 153:17, 153:19
**themselves** [1] - 67:17
**therefore** [3] - 105:24, 106:2, 139:14
**thereto** [1] - 113:19
**they've** [2] - 21:25, 22:6
**thinking** [1] - 3:13
**third** [1] - 100:6
**Thomas** [2] - 63:11, 66:16
**THOMAS** [2] - 2:7, 63:12
**thoughts** [3] - 4:3, 4:4, 88:24
**thousand** [2] - 69:8, 69:11
**thousands** [4] - 9:20, 10:1, 10:3, 69:8
**three** [18] - 3:25, 8:10, 8:13, 21:18, 70:20, 79:9, 93:1, 93:11, 93:14, 94:2, 94:3, 94:20, 94:21, 96:21, 104:20, 114:15, 119:23, 142:8
**throughout** [9] - 25:25, 81:24, 82:1, 87:15, 107:23, 109:8, 114:1, 146:12, 146:14
**thumb** [2] - 70:14, 86:20
**Thursday** [2] - 3:23,

4:23
**tied** [1] - 12:23
**timeframe** [3] - 32:10, 132:5, 146:15
**timing** [1] - 3:7
**tiny** [2] - 123:7, 123:10
**tip** [2] - 80:8, 80:11
**Tirado** [2] - 134:8, 137:2
**titanium** [1] - 11:5
**Titanium** [1] - 14:25
**Title** [2] - 77:1, 155:5
**title** [1] - 64:4
**titled** [2] - 105:3, 140:9
**TO** [1] - 2:1
**today** [13] - 4:6, 4:15, 4:19, 4:21, 21:10, 25:21, 71:16, 71:21, 72:15, 75:22, 99:21, 138:23
**TODD** [1] - 1:14
**Todd** [2] - 90:2, 98:22
**together** [2] - 134:24, 143:16
**tolerance** [1] - 94:20
**Tom** [1] - 69:16
**ton** [2] - 94:22, 147:23
**took** [16] - 31:2, 45:2, 56:19, 62:5, 62:16, 65:22, 66:3, 130:13, 130:24, 131:4, 133:25, 143:15, 145:21, 148:3, 148:8
**tool** [9] - 11:9, 66:4, 68:9, 68:12, 68:13, 86:17, 131:23, 131:25, 144:20
**Tool** [2] - 110:3, 110:8
**toolbar** [1] - 132:13
**tooling** [6] - 92:24, 94:24, 94:25, 95:3, 95:6, 100:4
**tools** [13] - 59:22, 60:1, 60:14, 62:5, 65:24, 87:6, 95:1, 95:5, 95:9, 96:17, 96:21, 113:20
**top** [12] - 14:13, 24:4, 24:22, 56:3, 91:16, 112:13, 122:20, 126:6, 133:14, 144:18, 149:24, 150:2
**topography** [1] - 138:2
**torture** [2] - 43:12, 77:13
**total** [8] - 22:1, 22:7, 100:17, 100:18,

110:20, 110:22, 112:8
**touched** [1] - 7:7
**toward** [1] - 59:5
**towards** [2] - 112:13, 112:21
**towns** [1] - 135:15
**track** [3] - 70:15, 107:24, 142:20
**tracked** [1] - 96:23
**tracking** [6] - 101:22, 101:25, 102:3, 102:14, 103:3, 110:11
**tracks** [1] - 65:10
**trade** [2] - 94:16, 126:9
**traditional** [2] - 11:14, 80:4
**traditionally** [2] - 11:14, 19:8
**Traffic** [2] - 96:10, 126:11
**trained** [4] - 44:25, 92:19, 92:20, 92:21
**Training** [1] - 65:17
**training** [15] - 21:1, 21:4, 44:21, 45:20, 60:24, 65:14, 65:16, 65:18, 65:19, 66:3, 66:5, 78:13, 78:17, 78:19, 78:20
**trainings** [1] - 45:3
**transaction** [47] - 6:9, 27:16, 27:17, 27:23, 28:2, 28:3, 28:11, 29:9, 30:10, 30:20, 31:2, 31:9, 33:4, 33:5, 33:13, 33:16, 33:21, 33:23, 34:18, 34:19, 35:10, 35:15, 35:17, 35:22, 36:2, 36:16, 36:23, 37:2, 37:7, 37:10, 37:13, 37:20, 37:22, 38:3, 39:22, 109:16, 109:19, 111:25, 112:4, 112:5, 113:12, 124:21, 124:23, 125:6, 125:10
**transactions** [5] - 25:16, 26:13, 29:5, 31:5, 40:7
**transcript** [3] - 155:7, 155:10, 155:21
**transfer** [13] - 21:8, 25:4, 25:8, 32:20, 33:3, 34:10, 36:20, 103:21, 104:12,

104:14, 124:11, 125:3, 125:12
**transferred** [2] - 34:13, 40:11
**transfers** [1] - 28:13
**transnational** [2] - 41:20, 76:22
**travel** [5] - 84:2, 97:6, 97:18, 97:23, 128:9
**traveled** [2] - 128:1, 129:24
**traveling** [1] - 128:10
**treat** [1] - 94:4
**treaty** [3] - 128:11, 128:15, 129:6
**trial** [4] - 58:5, 89:3, 89:5, 130:16
**TRIAL** [1] - 1:10
**trip** [2] - 128:22, 129:25
**troublesome** [1] - 67:20
**true** [6] - 67:21, 68:25, 89:12, 137:16, 140:8, 155:7
**truth** [1] - 130:11
**try** [3] - 54:7, 69:18, 146:15
**trying** [6] - 67:14, 86:20, 123:8, 146:11, 147:17, 153:25
**Turkey** [27] - 24:21, 35:4, 37:14, 37:16, 37:17, 38:2, 38:6, 38:11, 38:13, 38:14, 38:16, 38:18, 38:20, 38:21, 38:24, 39:2, 39:11, 84:12, 84:23, 97:20, 99:18, 110:10, 111:3, 111:15, 112:25, 124:18
**Turkish** [3] - 38:13, 39:1, 39:11
**turn** [4] - 25:21, 27:6, 54:12, 141:21
**turned** [8] - 20:17, 22:9, 25:15, 54:1, 54:10, 86:10, 86:11, 127:21
**turning** [4] - 12:7, 30:5, 104:6, 127:20
**two** [35] - 3:12, 3:25, 4:9, 4:18, 8:10, 29:5, 31:5, 32:6, 69:15, 69:20, 83:17, 83:18, 84:21, 85:7, 85:14, 85:21, 86:25, 91:14, 91:15, 93:10, 93:11,

23

94:1, 94:2, 94:3, 94:4, 94:21, 95:12, 96:20, 97:21, 105:22, 107:3, 115:25, 142:13, 144:24

**type** [27] - 6:21, 11:13, 11:17, 11:20, 12:19, 15:17, 20:8, 27:23, 32:1, 41:16, 44:24, 52:7, 56:25, 59:8, 62:2, 62:15, 63:24, 67:20, 79:6, 93:14, 93:17, 111:1, 116:4, 117:11, 137:8, 149:25, 151:11

**types** [11] - 11:13, 12:4, 44:2, 52:16, 54:20, 59:7, 59:24, 60:3, 79:8, 93:24

**typically** [9] - 53:7, 54:20, 60:8, 60:18, 61:5, 61:20, 62:4, 62:8, 79:9

## U

**U.N** [1] - 13:5

**U.S** [9] - 5:16, 25:10, 63:18, 78:5, 82:10, 95:22, 97:19, 125:11, 134:8

**U.S.A** [3] - 95:4, 96:8

**ultimately** [5] - 47:7, 49:2, 72:20, 134:25, 147:16

**unable** [1] - 54:13

**under** [19] - 12:14, 13:8, 14:20, 15:1, 15:2, 15:11, 15:13, 15:24, 16:12, 77:10, 110:11, 121:25, 123:17, 124:20, 139:11, 149:13, 150:23, 155:11, 155:21

**undergoing** [1] - 107:25

**undergraduate** [2] - 77:16, 77:22

**underneath** [2] - 37:23, 92:3

**understandable** [1] - 60:2

**underwent** [1] - 86:6

**unfortunately** [1] - 145:13

**union** [3] - 96:15, 97:4, 97:8

**unique** [1] - 60:13

**unit** [1] - 80:22

**UNITED** [3] - 1:1, 1:3, 1:15

**United** [24] - 1:13, 6:20, 12:20, 15:4, 21:11, 25:8, 25:9, 26:23, 48:7, 64:2, 84:3, 84:5, 88:5, 96:11, 96:12, 97:15, 97:18, 109:9, 128:1, 137:2, 155:4, 155:6, 155:18

**units** [2] - 53:3, 94:18

**universe** [1] - 57:9

**University** [11] - 7:5, 7:6, 20:20, 41:12, 42:5, 42:6, 42:7, 44:16, 44:20, 77:22, 77:23

**unless** [4] - 5:2, 67:18, 140:24, 155:21

**unusual** [1] - 79:6

**up** [32] - 3:15, 10:24, 11:18, 14:12, 33:25, 41:24, 49:25, 53:10, 60:11, 66:1, 66:6, 69:7, 70:7, 70:12, 71:12, 71:16, 79:16, 85:5, 91:16, 99:24, 100:11, 130:22, 132:14, 133:10, 134:10, 144:18, 146:12, 147:22, 149:8, 152:8, 152:10, 152:14

**update** [3] - 26:18, 65:25, 107:10

**updated** [2] - 26:19, 26:22

**upper** [11] - 116:1, 116:7, 116:10, 116:13, 116:15, 117:22, 118:6, 141:6, 141:12, 142:7, 150:17

**UPS** [3] - 101:22, 102:3, 103:5

**useful** [1] - 48:12

**user** [8] - 86:18, 96:16, 96:18, 96:20, 137:7, 137:8, 137:10, 137:12

**users** [1] - 61:11

**utilized** [2] - 79:24, 91:6

## V

**vacuum** [1] - 94:21

**validated** [1] - 60:18

**validity** [1] - 48:21

**Valley** [1] - 42:7

**valuable** [1] - 59:10

**value** [4] - 33:8, 60:5, 60:9, 71:15

**varies** [1] - 62:4

**various** [15] - 6:20, 11:15, 71:9, 78:18, 78:19, 80:18, 80:20, 87:14, 99:21, 100:2, 100:4, 134:3, 140:18, 144:25, 152:16

**vast** [1] - 86:19

**vehicle** [2] - 83:7, 152:16

**vehicles** [1] - 87:12

**vendor** [2] - 65:24, 66:3

**venture** [1] - 92:7

**verbal** [1] - 130:2

**verbiage** [1] - 14:5

**verified** [1] - 103:2

**verifies** [1] - 22:12

**versus** [4] - 21:11, 39:6, 134:8, 137:2

**via** [1] - 114:23

**vicarates** [1] - 49:1

**Victor** [1] - 138:17

**video** [19] - 4:10, 4:11, 62:14, 62:16, 114:5, 115:15, 115:19, 115:22, 117:3, 117:13, 117:14, 126:24, 151:10, 151:22, 151:23, 151:24, 152:9, 152:21, 153:7

**videos** [2] - 71:24, 116:1

**view** [10] - 80:21, 133:7, 135:2, 142:8, 142:17, 144:21, 150:18, 152:19, 153:24, 153:25

**views** [2] - 132:3, 145:1

**Viltrop** [13] - 103:19, 103:23, 104:1, 104:3, 105:4, 105:13, 105:22, 106:23, 107:1, 107:4, 107:7, 107:8, 128:24

**Viltrop's** [1] - 106:5

**violations** [2] - 43:3, 43:5

**violent** [1] - 43:12

**Virginia** [1] - 7:5

**virtue** [1] - 58:4

**Visa** [1] - 28:1

**vitae** [1] - 45:13

**vs** [1] - 1:5

## W

**Wachovia** [1] - 20:16

**wants** [5] - 6:6, 49:4, 75:4, 75:13, 130:23

**warrant** [33] - 47:6, 47:12, 47:15, 48:8, 48:23, 49:5, 49:17, 50:4, 50:13, 51:1, 51:6, 51:9, 51:13, 51:16, 52:2, 52:8, 52:23, 67:22, 69:12, 69:24, 70:23, 73:9, 80:16, 81:23, 82:11, 82:19, 82:24, 84:22, 84:24, 86:25, 91:5, 105:8, 114:23

**warrants** [34] - 51:3, 64:12, 64:13, 64:14, 67:10, 68:5, 68:20, 69:20, 69:22, 70:4, 71:1, 80:11, 80:12, 80:17, 81:14, 81:17, 81:19, 83:8, 83:11, 83:13, 83:15, 83:17, 83:21, 83:24, 84:7, 84:10, 84:14, 84:18, 84:21, 85:6, 87:13, 87:17, 109:2

**WASHINGTON** [2] - 1:19, 1:22

**Washington** [4] - 5:17, 7:6, 64:3, 155:19

**watch** [2] - 75:19, 117:3

**watched** [2] - 115:15, 127:3

**watches** [1] - 87:16

**watching** [1] - 130:7

**ways** [3] - 17:13, 69:17, 138:10

**weapon** [2] - 94:10, 116:13

**weapons** [14] - 78:10, 89:22, 90:25, 91:8, 91:15, 91:18, 91:23, 92:17, 92:20, 95:7, 96:22, 106:17, 116:25, 128:14

**website** [2] - 102:4, 102:14

**Wednesday** [3] - 3:23, 4:23, 122:16

**week** [4] - 3:9, 4:22, 71:21, 75:7

**weekend** [1] - 149:22

**weeks** [3] - 4:1, 97:21, 143:14

**welcome** [1] - 5:2

**Wells** [14] - 20:7, 20:8, 20:17, 21:13, 21:15, 22:11, 22:16, 23:16, 24:6, 25:22, 31:3, 31:9, 87:22, 112:24

**West** [1] - 7:5

**whatnot** [1] - 115:15

**whited** [1] - 142:14

**whole** [8] - 13:11, 24:8, 26:2, 28:7, 31:12, 40:2, 65:2, 92:15

**Wi** [1] - 54:12

**Wi-Fi** [1] - 54:12

**wide** [1] - 120:23

**William** [3] - 101:5, 103:12, 104:10

**WILLIAM** [2] - 1:15, 1:24

**willing** [2] - 139:4, 143:23

**window** [1] - 54:3

**Windows** [1] - 61:8

**wiped** [1] - 53:20

**wire** [28] - 22:6, 25:6, 25:13, 27:4, 28:15, 28:17, 28:23, 29:1, 29:2, 29:3, 29:12, 29:24, 30:1, 30:2, 30:12, 32:21, 33:11, 33:15, 33:16, 33:17, 35:11, 43:10, 77:7, 104:12, 104:14, 124:11, 124:24, 125:3

**wireless** [1] - 54:5

**wires** [4] - 22:6, 25:11, 29:22, 30:11

**wishes** [2] - 83:2, 88:20

**withdraw** [4] - 50:1, 50:7, 136:11, 153:5

**withdrawal** [8] - 27:25, 31:3, 31:8, 31:22, 31:23, 31:25, 32:4, 32:15

**withdrawals** [9] - 25:1, 27:13, 28:12, 29:19, 31:16, 32:1, 32:10, 32:12, 32:14

**withdrawing** [1] - 49:23

**withdrew** [1] - 31:21

**within-mentioned** [1] - 155:8

**witness** [50] - 3:7, 4:5,

4:9, 5:6, 5:8, 10:18, 19:23, 19:25, 20:2, 23:10, 40:23, 41:3, 46:4, 46:7, 47:20, 48:4, 48:13, 55:17, 63:2, 63:12, 66:20, 74:2, 75:6, 75:15, 75:24, 76:1, 88:20, 89:13, 98:8, 102:5, 105:23, 120:19, 122:6, 122:11, 129:18, 130:21, 130:22, 130:24, 131:6, 134:18, 135:6, 138:7, 138:16, 139:12, 141:21, 144:7, 151:22, 151:25

**WITNESS** [25] - 46:10, 48:1, 62:22, 63:1, 63:6, 74:20, 75:1, 80:6, 90:5, 98:24, 119:13, 122:25, 123:16, 130:6, 136:25, 140:20, 140:23, 141:1, 141:4, 141:8, 141:13, 147:6, 149:1, 149:4, 149:15

**WITNESSES** [1] - 2:1

**witnesses** [15] - 3:10, 3:14, 3:16, 3:21, 3:24, 4:16, 57:21, 75:21, 128:19, 128:21, 135:7, 136:2, 136:8, 136:11, 136:15

**word** [3] - 56:22, 69:14, 137:4

**words** [7] - 19:9, 21:2, 59:23, 60:3, 69:4, 69:6, 145:21

**workers** [1] - 93:17

**works** [5] - 10:8, 33:6, 51:6, 134:18, 138:16

**world** [2] - 137:19, 145:1

**worth** [1] - 4:18

**Wright** [1] - 138:17

**writing** [1] - 81:25

**written** [5] - 9:8, 9:21, 123:7, 123:9, 123:16

**wrote** [1] - 142:23

## X

**X.s** [1] - 13:9

## Y

**Yahoo** [8] - 67:22, 68:2, 68:8, 68:21, 69:20, 73:23, 85:7

**Yahoo.com** [6] - 67:25, 68:2, 83:19, 91:4, 114:25

**year** [7] - 5:22, 9:20, 21:5, 24:9, 31:13, 65:12, 145:14

**years** [15] - 20:7, 20:18, 41:15, 42:13, 42:21, 43:19, 45:2, 63:23, 64:24, 65:10, 65:25, 78:16, 145:4, 146:14, 147:18

**yesterday** [1] - 55:25

**York** [3] - 44:18, 44:20, 64:10

**YORK** [1] - 1:21

**yourself** [4] - 9:25, 13:16, 81:2, 81:11

**yourselves** [1] - 154:6

## Z

**Zarya** [14] - 29:6, 29:14, 30:3, 30:13, 34:11, 35:1, 35:21, 35:25, 36:8, 36:22, 36:25, 37:5, 115:11, 125:17

**zero** [2] - 7:23, 8:9

**zeros** [1] - 86:16

**Zohal** [2] - 39:5, 39:7

**zoomed** [1] - 146:19